ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL S. DORSI, State Bar No. 281865
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0299
  Fax:  (510) 622-2270
  E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON** | Case No. 25-cv-_____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | Administrative Procedure Act Case |
| **UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States, | |
| Defendants. | |

**INTRODUCTION**

1. When Congress directed the United States Environmental Protection Agency (EPA) to regulate harmful emissions from new motor vehicles, 42 U.S.C. § 7521(a), it also preempted States from setting such standards, *id.* § 7543(a). But, recognizing that California had already developed deep expertise in vehicle emissions control and that the State suffers from severe air pollution challenges, Congress directed EPA to "waive" this preemption for California, unless record evidence supports one of three limited bases for declining to do so. *Id.* § 7543(b)(1).

2. Congress's choice to allow California "to continue and expand its pioneering efforts" (pursuant to preemption waivers granted by EPA) has meant that the State "act[s] as a kind of laboratory for innovation" for vehicular emission controls, thereby advancing a core value of federalism while encouraging technological innovation for the protection of public health and welfare. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 386-87 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

3. This Clean Air Act waiver provision was enacted in 1967, and EPA has granted California more than seventy-five preemption waivers for updates to the State's new motor vehicle emissions control program. As Congress intended, these waivers have allowed California to "improve on 'its already excellent program,'" to foster technological advancements, and to protect Californians from harmful pollution. *See MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

4. Between April 2023 and January 2025, EPA granted California's requests for three Clean Air Act preemption waivers, authorizing enforcement of the State's latest additions to its regulatory program, including the Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx ("Omnibus") regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Pursuant to Section 177 of the Clean

1

1  Air Act, 42 U.S.C. § 7507, other States—including Plaintiffs here—have adopted these California

2  standards as their own.

3      5.    On May 22, 2025, the Senate joined the House in adopting three Resolutions,

4  purporting to "disapprove[]" these waivers.  H.J. Res. 87, 88, 89 (119th Congress).

5  ("Resolutions").  The President signed the Resolutions on June 12, 2025.  In so doing, the Federal

6  Government "singled out" these waivers—and the underlying California regulations—for an

7  unprecedented attack, *South Carolina v. Baker*, 485 U.S. 505, 513 (1988), employing a statute—

8  the Congressional Review Act (CRA)—deemed inapplicable by every nonpartisan arbiter and

9  expert who analyzed the question.  The Plaintiff States—California, Colorado, Delaware,

10  Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and

11  Washington—challenge these unlawful Resolutions, which purport to prevent these States from

12  enforcing laws they have chosen to adopt within their jurisdictions.

13      6.    The CRA was enacted to facilitate congressional review of certain *federal agency*

14  *rules*.  5 U.S.C. § 801(a)(1)(A); *id.* § 804(3) (defining "rule").  Where it applies, it creates a

15  narrow exception to the filibuster that enables the Senate to adopt a resolution disapproving of a

16  federal agency's rule with a simple majority vote.  *Id.* § 802(d)(1).  The CRA also limits Senate

17  debate over a given resolution to a maximum of five hours per side.  *Id.* § 802(d)(2).  If a CRA

18  resolution disapproving of a federal agency's rule is enacted, the targeted rule ceases to have legal

19  effect.  *Id.* § 801(b)(1).  And "a new rule that is substantially the same … may not be issued,"

20  absent further, specific congressional authorization.  *Id.* § 801(b)(2).

21      7.    While all fifty States consented—through their Senators—to these expedited

22  procedures for congressional disapproval of *federal rules*, no State consented to the CRA as a

23  means for Congress to negate *state rules*.  Nor would any State have done so.  States do not so

24  easily surrender "the dignity … of sovereignty" they retain in our system of government.  *Alden*

25  *v. Maine*, 527 U.S. 706, 715 (1999).

26      8.    Cabining the CRA to *federal rules* is also consistent with the principle that the

27  Federal Government does not "impose its will on the States … lightly"—*e.g.*, through a process

28  with severely constrained debate.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  To the

contrary, the Framers intentionally designed the Federal Government to "partake sufficiently of the spirit [of the States]" such that it would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985) (quoting The Federalist No. 46, p. 332).

9.      The Federal Government ran roughshod over federalism and separation of powers principles in applying the CRA to these three preemption waiver decisions.  It did so despite EPA's decades-old, consistent position—reiterated in each of the three actions at issue—that preemption waiver decisions are not "rules" and, accordingly, "the Congressional Review Act … does not apply." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023).  The Federal Government also blithely disregarded the legal conclusions of every nonpartisan arbiter upon whom Congress otherwise relies for determining the CRA's applicability—all of whom concluded that use of the CRA here would be unlawful.

10.      In fact, the CRA has never before been used in any context that resembles this one.  It has certainly never been used, as it was here, to negate particular state laws.

11.      The President, his EPA Administrator, and Congressional leadership took these unprecedented steps because they saw the CRA as a quick and easy way to "take … down" California's regulations.  Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[1]  They appear to have agreed with the argument that the CRA should be used—despite its obvious inapplicability—because "[w]aivers take years to roll back through the administrative process" and "ordinary legislation … would have to overcome the 60-vote filibuster in the Senate."  Boyden Gray PLLC, *Buschbacher, Conde Discuss How to Overturn CA's EV Mandate in the Wall Street Journal* (Jan. 9, 2025).[2]

12.      With every step, the "workings of the National Government" failed to follow the law and likewise failed to honor the "special restraints on federal power over the States."  *Garcia*, 469 U.S. at 552.  The "extraordinary defects" in the "national political process" that produced these

---

[1] Available at https://perma.cc/8GQV-LQEN, last visited May 15, 2025.
[2] Available at https://perma.cc/D59T-Q7JB, last visited May 17, 2025.

1   Resolutions renders them unlawful and "invalid under the Tenth Amendment" and principles of

2   structural federalism. *South Carolina*, 485 U.S. at 512. That Congress violated separation of

3   powers principles along the way only underscores the unconstitutionality of the Resolutions.

4       13.    This Court should declare that the Resolutions have no effect on the status or

5   enforceability of state emissions control programs. This Court should also require EPA to

6   implement the Clean Air Act, including Section 209(b)(3), 42 U.S.C. § 7543(b)(3), in a manner

7   consistent with the three waivers as granted.

8                                **PARTIES**

9       14.    Plaintiff State of California is a sovereign state in the United States of America.

10  California is represented by and through Attorney General Rob Bonta, the chief law enforcement

11  officer of California; Governor Gavin Newsom, the chief executive officer of the State; and the

12  California Air Resources Board (CARB), the state agency that developed and promulgated the

13  state regulations at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and

14  Omnibus regulations. *See, e.g.*, Cal. Code Regs., tit. 13, §§ 1961.4, 1962.4; *id.* § 1963 et seq.; *id.*

15  §§ 1956.8, 1961.2.

16      15.    Plaintiff State of Colorado is a sovereign state in the United States of America.

17  Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney

18  General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat.

19  § 24-31-101 to pursue this action. Colorado has adopted the Advanced Clean Cars II (for model

20  years 2027-2032), Advanced Clean Trucks, and Omnibus regulations. *See* 5 Colo. Code Regs.

21  § 1001-24.

22      16.    Plaintiff State of Delaware, represented by and through its Attorney General,

23  Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is

24  Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29

25  Del. C. § 2504. Delaware has adopted the Advanced Clean Cars II regulation. *See* 7 Del. Admin.

26  C. § 1140.

27      17.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States

28  of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the

                                         4

chief law enforcement officer of Massachusetts.  The Commonwealth of Massachusetts has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 310 C.M.R. §§ 7.40(1)(c) Tbls. 1 & 2, 7.40(1)(d)(3)-(5).

18.    Plaintiff State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.  New Jersey has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.J.A.C. 7:27-29A.7; N.J.A.C. 7:27-31.4; N.J.A.C. 7:27-28A.11.

19.    Plaintiff State of New Mexico is a sovereign state in the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.  New Mexico has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 20.2.91.102 (C) New Mexico Administrative Code.

20.    Plaintiff State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York.  Attorney General Letitia James is the chief law enforcement officer for New York.  New York has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* N.Y. Comp. Codes R. & Regs., tit. 6, Part 218 and Section 200.9.

21.    Plaintiff State of Oregon is a sovereign state of the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is Oregon's chief legal officer and is authorized to represent the State in this Court.  Oregon has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Or. Admin. R. 340-257-0020 to -0095; 340-257-0200 to -0230; 340-261-0010 to -0090.

22.    Plaintiff State of Rhode Island is a sovereign state in the United States of America.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.  Rhode Island has adopted the Advanced Clean Cars II,

5

Advanced Clean Trucks, and Omnibus regulations.  *See* 250-RICR-120-05-37; 250-RICR-120-05-37.4(B)(1) Tbls. 1 & 2.

23.    Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159. Vermont has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Vt. Code R. § 12.030-040.

24.    Plaintiff State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown.  The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.  *See* Chapter 43.10 RCW.  Washington has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Wash. Admin. Code § 173-423-030.

25.    Defendant United States is the Federal Government of the United States of America.

26.    Defendant EPA is a federal agency.

27.    Defendant Lee Zeldin is the EPA Administrator.  He is sued in his official capacity.

28.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

29.    This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the Constitution or laws of the United States).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.

30.    5 U.S.C. § 805 does not strip this Court of its jurisdiction because (a) Plaintiffs challenge actions and/or determinations that fall outside the scope of that provision; (b) Plaintiffs raise constitutional issues to which that provision does not apply; and/or (c) it would be unconstitutional to apply that provision to Plaintiffs' claims.  Indeed, this case presents precisely

6

the kinds of "questions of intricacy and nicety" about federalism that the courts alone can resolve. *New York v. United States*, 505 U.S. 144, 155 (1992) (quoting The Federalist No. 82, p. 491 (C. Rossiter ed. 1961)).

31.   Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial district in which the State of California resides for purposes of that provision.

32.   Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for assignment of this action to any particular location or division of this Court.

## **FACTUAL BACKGROUND**

**I.    Congress Enacted the Clean Air Act Waiver Provision to Allow California's Regulatory Program to Continue with Minimal Federal Oversight**

33.   From the inception of efforts to limit vehicular air pollution, California led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *MEMA I*, 627 F.2d at 1109 n.26, and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091.  By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

34.   When Congress took up the mantle of federal vehicle emission regulation, it recognized both California's extraordinary air pollution challenges and the value of state-level experimentation.  Congress therefore opted to allow the State to continue and "improve on 'its already excellent program.'" *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).  Accordingly, while it preempted other States from regulating emissions from new motor vehicles, Congress required EPA to waive that preemption for California except in narrow circumstances.  Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967).[3]  Under this waiver provision, California promulgates its own standards through a state rulemaking proceeding, determines that its state program is at least as protective as EPA's, and requests a

---

[3] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare.  In 1970, Congress transferred this authority to the Administrator of the newly created EPA.  Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713 (1970).

7

1    waiver of preemption from EPA.  42 U.S.C. § 7543(b)(1); *see also* 42 U.S.C. § 7543(b)(1)(A)-(C)

2    (identifying exclusive findings that can support EPA's denial of California's request for waiver).

3        35.    Consistent with the principle that Congress does not "impose its will on the States …

4    lightly," *Gregory*, 501 U.S. at 460, the questions about whether and how to preempt state

5    regulation of new motor vehicle emissions were heavily debated.  The precise text of the waiver

6    provision was the subject of particularly rigorous discussion, with competing versions offered by

7    the House and Senate.  The Senate version provided that the waiver "shall" be granted (absent

8    certain limited findings), while the House version made waivers discretionary through the use of

9    the word "may."  *See* 113 Cong. Rec. 30,956-57 (1967); *see also id.* at 30,950, 30,952.

10       36.    The Senate's use of "shall" was described as a "guarantee[]" that California could

11   regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not

12   be allowed to [do so]," H.R. Rep. No. 90-728, at 96 (1967).  By contrast, the House's use of

13   "may" was characterized as placing California "at the mercy of" the Federal government, forcing

14   the State "to come with hat in hand to Washington."  113 Cong. Rec. at 30,941, 30,955; *see also*

15   H.R. Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run

16   her own program, that big government should do it instead?").

17       37.    Congress opted for "shall," 42 U.S.C. § 7543(b)(1), "consciously choos[ing] to permit

18   California to blaze its own trail with a minimum of federal oversight," *Ford Motor Co. v. EPA*,

19   606 F.2d 1293, 1297 (D.C. Cir. 1979).[4]

20       38.    The decision to allow California to continue and expand its state-level program

21   reflected a careful congressional compromise, balancing the benefits—for the State and "the

22   entire country"—of preserving "a kind of laboratory for innovation," *Engine Mfrs. Ass'n v. EPA*,

23   88 F.3d 1075, 1080 (D.C. Cir. 1996), against automakers' fears of "having to meet fifty-one

24   separate sets of emissions control requirements," *MEMA I*, 627 F.2d at 1109-10.  This

25   compromise ensured that California's "government will represent and remain accountable to its

26   own citizens," *Printz v. United States*, 521 U.S. 898, 920 (1997), while also ensuring

27

28       [4] In the 1970 CAA amendments, the waiver provision (originally Section 208(b)) was
     recodified as Section 209(b), 42 U.S.C. § 7543(b).  Pub. L. No. 91-604, § 8(a), 84 Stat. at 1694.

manufacturers must meet no more than two different sets of emission standards—California's state standards and EPA's federal ones.  And, as intended, this compromise has allowed California to continue addressing the "harsh reality" of the State's pollution problems using its expertise in regulating vehicular emissions.  *See* H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967).

39.    As part of the 1977 Clean Air Act Amendments, Congress noted with approval that EPA had been readily granting waivers to California, consistent with Congress's intent.  H.R. Rep. No. 94-1175 at 247 (1976); *see also MEMA I*, 627 F.2d at 1110 n.32.  Congress nonetheless sought to "ratify and strengthen" the waiver provision in order "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."  H.R. Rep. No. 95-294, at 301-02 (1977).  Specifically, Congress amended the waiver provision's text, removing the original requirement that each California standard be more stringent than its federal counterpart and allowing the protectiveness of the state's program to be measured by viewing all the "state standards, in the aggregate."  42 U.S.C. § 7543(b)(1).

40.    Congress also opted to permit other States to choose to adopt "standards … identical to the California standards for which a waiver has been granted" under certain conditions, 42 U.S.C. § 7507, thereby respecting state authority to protect residents and natural resources while maintaining the commitment that manufacturers would be subject to no more than two sets of standards.

41.    EPA has granted California more than seventy-five Clean Air Act preemption waivers as the State has expanded and strengthened its requirements that manufacturers reduce emissions from the vehicles they sell in the State.  *See* EPA, *Vehicle Emissions California Waivers and Authorizations*.[5]  EPA has granted such waivers under Democratic and Republican Presidents alike.  *See id.*  And these waivers are—and have been—subject to judicial review in the appropriate Court of Appeals.  42 U.S.C. § 7607(b)(1).

42.    Among these previously granted waivers are those for California's zero-emission-vehicle (ZEV) requirements for passenger cars and light trucks.  58 Fed. Reg. 4166 (Jan. 13,

_____

[5] Available at https://perma.cc/9F5K-QC79, last visited May 14, 2025.

1    1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2112 (Jan. 9, 2013).[6]  The State first

2    adopted such requirements in 1990, Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991), and has made

3    them increasingly more stringent over time.

4        43.    One of the three waivers at issue here authorized the Advanced Clean Cars II

5    regulation which extended and gradually strengthened California's ZEV requirements for

6    passenger cars and light trucks such that, by model year 2035, at least 80% of such vehicles sold

7    in California would be zero-emission, while the other 20% could be plug-in hybrids.  Cal. Code

8    Regs., tit. 13, § 1962.4(c), (e)(1)(C).  That regulation also strengthened several emission

9    standards for vehicles with internal combustion engines, requiring reduced emissions of fine

10   particulate matter and smog-forming oxides of nitrogen.  *Id.* § 1961.4.

11       44.    Another of the waivers at issue here authorized, *inter alia*, the Advanced Clean

12   Trucks regulation—designed to build on the success of the California ZEV requirements

13   described above by requiring gradual increases in sales of medium- and heavy-duty ZEVs

14   beginning with model year 2024.  Cal. Code Regs., tit. 13, § 1963.1(b).  This regulation was

15   adopted in 2021, and manufacturers began earning early credits for ZEV sales that year.  CARB,

16   *Advanced Clean Trucks Credits Summary as of March 31, 2022.*[7]  Indeed, manufacturers

17   "generated enough credits to meet the estimated 2024 model year compliance obligations" before

18   that model year even commenced.  CARB, *Advanced Clean Trucks Credit Summary through the*

19   *2023 Model Year* (May 22, 2024).[8]

20       45.    The third of the waivers at issue here authorized California's "Omnibus" regulation

21   which requires manufacturers of heavy-duty (mostly diesel-fueled) trucks to reduce smog-

22   forming emissions beginning with model year 2024 and then further reduce those emissions in

23   model year 2027 and beyond.  Cal. Code Regs., tit. 13, § 1956.8.

24       46.    Despite decades of progress, tens of millions of Californians live, study, work, or play

25   in regions that continue to experience some of the worst air quality in the Nation.  American Lung

26

27   [6] A zero-emission vehicle is one that—like an electric or hydrogen vehicle—has zero
     tailpipe emissions of any pollutant.
28   [7] Available at https://perma.cc/2DHP-FUR9, last visited May 24, 2025.
     [8] Available at https://perma.cc/7B5E-2RBG, last visited May 24, 2025.

Association, *State of the Air 2025 Report* 15-16, 18-19.[9]  The State faces particularly severe

challenges to meet public health standards for ozone (or smog) and fine particulate matter.  *Id.*

The regulations covered by the waivers at issue are crucial parts of comprehensive plans to meet

those public health standards and improve the air Californians breathe.  California Air Resources

Board, *2022 State Strategy for the State Implementation Plan* 55, 65 (Sept. 22, 2022).[10]

47.    All of these regulations apply only in California and other States that have chosen to

adopt one or more of the regulations, pursuant to the option provided by Congress in the Clean

Air Act.  *See* 42. U.S.C. § 7507.

**II.    Congress Enacted the Congressional Review Act to Enhance Its Oversight of
Generally Applicable *Federal Rules* and, Prior to these Resolutions, Has Only
Used It for that Purpose**

48.    When Republicans took control of both chambers of Congress after the 1994 midterm

elections, they credited their election victory to the "Contract with America," which contained a

promise to push for federal regulatory reform, including shrinking the size of the federal

government.  *See* S. Rep. 104-15, at 3 (Mar. 16, 1995) (describing 1994 elections as sending "a

clear message to Washington that [Americans] want a smaller, more efficient, and more effective

government").

49.    Once in office, the Republican majority in the House attempted to impose a

moratorium on all new federal regulations "to ensure economy and efficiency of Federal

Government Operations."  H.R. Rep. No. 104-39, at 1 (Feb. 16, 1995).  That effort failed.

50.    The push for federal regulatory reform then evolved into what became known as the

Small Business Regulatory Enforcement Fairness Act and the CRA, both of which were

incorporated into a broader, bipartisan bill:  the Contract with America Advancement Act of

1996.  Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996).  That Act also contained an increase to the

Nation's debt limit and an increase to the limit on income Social Security recipients may earn

without losing benefits.  110 Stat. at 847, 875.  That broader bill passed the House by a bipartisan

---

[9] Available at https://perma.cc/G2RK-V9BM, last visited May 24, 2025.
[10] Available at https://perma.cc/X2Y9-LQ4N, last visited May 24, 2025.

vote of 328 to 91.  The House bill then passed, without amendment, by unanimous consent in the Senate.  142 Cong. Rec. S3114 (Mar. 28, 1996).

51.    The CRA requires a "Federal agency" that has promulgated a "rule" to submit the rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[b]efore a rule can take effect."  5 U.S.C. § 801(a)(1)(A) (emphasis added).

52.    Underscoring that it applies only to federal rules, the CRA defines the federal agency actions to which it applies by way of the federal Administrative Procedure Act's (APA) definition of "rule."  5 U.S.C. § 804(3) (cross-referencing 5 U.S.C. § 551).  The CRA then narrows the APA definition by, among other things, excluding "any rule of particular applicability."  *Id.*

53.    Congress has 60 session days from the agency's submission to adopt a resolution to disapprove a particular rule.  5 U.S.C. § 802(a).  The text of such resolutions is prescribed by the statute as follows:  "That Congress disapproves the rule submitted by the __ relating to __, and such rule shall have no force or effect."  *Id.*  The first blank is filled in with the agency's name and the second is typically filled in with the title of the Federal Register notice announcing the final rule.  *E.g.,* H.J. Res. 35 (approved Mar. 14, 2025).  After a joint resolution of disapproval, "a new rule that is substantially the same … may not be issued, unless [it] is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."  5 U.S.C. § 801(b)(2).

54.    If an agency fails to submit an action that one or more members of Congress believe is a "rule" subject to the CRA, those members may ask the GAO for a determination.  Congressional Research Service, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 23 (updated Oct. 22, 2024).[11]  In that case, if the GAO concludes the agency action is or is not subject to the CRA, Congress treats that conclusion as dispositive.  *Id.* ("Thus, the question of whether Congress may use the CRA's fast-track parliamentary

---

[11] Available at The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress | Congress.gov | Library of Congress, last visited May 21, 2025.

disapproval mechanism generally hinges upon the determination reached in GAO's opinion in such cases.").

55.    In the Senate, the consideration of CRA resolutions is highly expedited.  The CRA creates an exception to the filibuster, so that resolutions of disapproval require only a simple majority to pass.  5 U.S.C. § 802(d)(1).  And motions, amendments, and even debate are all severely limited.  *Id.* §§ 802(d)(1), 802(d)(2).  Specifically, debate about the resolution and any "debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution."  *Id.* § 802(d)(2).  Although other motions are not "in order" and thus not permitted, "[a] motion further to limit debate"—to less than 10 hours—"is in order and not debatable."  *Id.*

56.    The CRA also provides that "no determination, finding, action, or omission under [it] shall be subject to judicial review."  5 U.S.C. § 805.

57.    Nothing in the CRA—or the broader Contract with America Advancement Act of 1996—indicates Congress was contemplating the use of the CRA to negate *state rules* or to otherwise alter federal limits on state authority.  To the contrary, the text of the CRA is exclusively concerned with federal rules promulgated by federal agencies.  *E.g.*, 5 U.S.C. § 801(a)(1)(B) (referring to "the Federal agency promulgating the rule").  So, too, were other parts of the broader bill that contained the CRA.  *E.g.*, Pub. L. 104-121, 110 Stat. at 857 ("fundamental changes … are needed in the regulatory and enforcement culture of Federal agencies").

58.    The absence of any mention of state rules or state authority is particularly telling because Congress does not lightly exercise its power to "impose its will on the States."  *Gregory*, 501 U.S. at 460.  Many features of the CRA—including its constraints on debate and its barriers to judicial review—are entirely inconsistent with that principle.

59.    Moreover, the Framers intended "[t]he difficulty of legislating at the federal level … to preserve room for lawmaking by governments" like States, which are "more local and more accountable than a distant federal authority."  *West Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring).  As the 1967 debate over the Clean Air Act's preemption and waiver

13

provisions indicate, had Congress contemplated that the CRA could be used to hamstring state authority, that would have been the topic of fierce debate.

60.    Until these Resolutions, Congress had never applied the CRA to an agency action outside the statute's intended and explicit scope.

61.    Specifically, no previous use of the CRA disapproved of a federal agency action that waived preemption or otherwise authorized States to proceed with their own regulatory programs. Congress has never, for example, even considered using the CRA to disapprove EPA's actions to authorize States to implement permitting programs under the Clean Water Act—even when EPA has "rush[ed] to transfer this permitting authority to [a State] in the final days" of a presidential administration.  *See Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 11 (D.D.C.), *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024) (appeal pending).  Congress has likewise never even considered using the CRA to disapprove of waivers that allow individual States "to test new or existing ways to deliver and pay for health care services in Medicaid and the Children's Health Insurance Program (CHIP)."  *See* Centers for Medicare & Medicaid Services, State Waivers List.[12]

62.    Likewise, Congress has never considered using the CRA to disapprove federal agency orders that, like these preemption waivers, permit conduct that would otherwise be prohibited. For example, Congress has never considered using the CRA to disapprove of a radio spectrum license, mining permit, or oil lease.

**III.    For Half a Century, and Regardless of Which Party Occupied the White House, Clean Air Act Preemption Waivers Have Been Understood to Be Adjudicatory *Orders*, Not *Rules***

63.    The text of the Clean Air Act demonstrates that Congress has always understood the difference between federal vehicle emission standards (which are federal rules) and decisions to waive preemption for state vehicle emission standards (which are not).  Where Congress delegated rulemaking power over vehicle emissions to EPA, it directed the agency to "prescribe … standards," 42 U.S.C. § 7521(a)(1), consistent with the APA's definition of rules as

---

[12] Available at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list, last visited May 8, 2025.

"prescrib[ing] law," 5 U.S.C. § 551(4).  By contrast, Congress "sharply restricted [EPA's] role in a waiver proceeding."  *MEMA I*, 627 F.2d at 1121.  Far from delegating rulemaking authority to EPA, the waiver provision anticipates that *California* will prescribe "State standards" and determine whether its standards "will be, in the aggregate, at least as protective" as EPA's.  42 U.S.C. § 7543(b)(1).  Thus, the waiver provision only empowers EPA to "waive application" of the preemption provision to California, not to make rules.  *Id.*

64.    Congress confirmed as much when it omitted waiver decisions from the list of EPA Clean Air Act actions to which the Act's "[r]ulemaking" requirements apply.  42 U.S.C. § 7607(d)(1).

65.    Until its post-hoc actions challenged here, EPA had likewise consistently maintained that its waiver decisions are not rules and therefore are not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. § 601(2)), and the CRA.  This had been EPA's position through Administrations of both parties, regardless of whether EPA granted a waiver request or denied it.  Thus, EPA's waiver decisions have consistently specified "this action is not a rule."  75 Fed. Reg. 70,237, 70,241 (Nov. 17, 2010); *see also, e.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The CRA does not apply … because this action is not a rule."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule…").  EPA maintained this position when the first Trump Administration purported to withdraw parts of a waiver EPA had granted six years earlier. 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests….").[13]

66.    The GAO—the entity on which Congress relies for CRA applicability determinations—has agreed.  When asked by members of Congress whether a 2022 waiver action was a "rule" subject to the CRA, the GAO concluded that the action "meets the statutory definition of an order," rather than a rule.  GAO Decision B-334309, *Environmental Protection*

---

[13] This Federal Register notice was submitted to the Office of Management and Budget under Executive Order 12866, and to Congress and the GAO for CRA consideration, because it contained a separate action by the National Highway Traffic Safety Administration that was a "rule."  84 Fed. Reg. at 51,352, 51,353.  By contrast, EPA repeatedly reaffirmed its position that the waiver portion of the notice was not a rule.  *Id.* at 51,352, 51,353, 51,360.

*Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* 5 (Nov. 30, 2023) (Exh. A).  Specifically, the GAO determined that a waiver decision "mak[es] a 'final disposition' granting California a 'form of permission' which meets the definition of order under APA."  *Id.* (quoting 5 U.S.C. § 551(6), (8), (9)).

67.     Members of both the Senate and the House also indicated—as recently as last year—that they understood that EPA's preemption waiver decisions are not rules.  When he introduced a bill to repeal the Clean Air Act's waiver provision, in September 2024, Senator Mike Lee expressly acknowledged that Clean Air Act preemption waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA."  Mike Lee, *Stop CARB Act One Pager* (118th Congress) (emphasis omitted).[14]  That bill—S.5038, 118th Cong. (2024)—had five co-sponsors in the Senate.[15]  Representative Troy Nehls likewise acknowledged that "none of [California's waivers] are subject to congressional review" when he introduced the companion bill in the House.  Rep. Troy Nehls Introduces the Stop CARB Act (Sept. 12, 2024).[16]  That bill—H.R. 9574, 118th Cong. (2024)—had nine co-sponsors in the House.[17]

68.     Consistent with those understandings (including its own longstanding view), EPA did not follow rulemaking procedures when considering these California waiver requests.  It did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment.  Instead, EPA followed its traditional practice, providing notice to the public that it had received a waiver request from California and would provide "opportunity for public hearing and comment" on the three findings the waiver provision empowers EPA to make.  *E.g.*, 88 Fed. Reg. 88,908, 88,909 (Dec. 26, 2023).

69.     When it finalized the waiver decisions at issue here, EPA reiterated its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et seq., … does not apply because this

---

[14] Available at https://perma.cc/LNG5-45AW, last visited May 4, 2025.
[15] *See* https://www.congress.gov/bill/118th-congress/senate-bill/5038/cosponsors.
[16] Available at https://perma.cc/55TB-737M, last visited May 4, 2025.
[17] *See* https://www.congress.gov/bill/118th-congress/house-bill/9574/cosponsors.

action is not a rule, for purposes of 5 U.S.C. 804(3)." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023).

70.    EPA did not submit these waivers to Congress when they were published in the Federal Register—one in April 2023 and two in January 2025.  Any member of Congress could have asked the GAO to determine whether these unsubmitted actions were rules subject to the CRA.  No member of Congress did so.

**IV.    The Trump Administration Implements a CRA Playbook, Without Providing Any Legal Rationale and Without Any Administrative Process**

71.    President Trump took aim at parts of California's vehicle emission program, from the very beginning of his second term.  He signed a day-one Executive Order that declared "state emissions waivers that function to limit sales of gasoline-powered automobiles" should be "terminat[ed]."[18]

72.    That Executive Order directed federal agencies (including EPA) to "identify … agency actions … inconsistent with" the Order and to "develop and begin implementing action plans to suspend, revise, or rescind all [such] agency actions."  *Id.*  Thus, at the outset, it appeared that the Trump Administration intended to take administrative action to rescind certain waivers (or parts thereof), as the first Trump Administration had done.  *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019) ("EPA announces its decision to withdraw the waiver" for certain California emission standards).

73.    The Administration changed course on February 14, 2025, when President Trump and EPA Administrator Zeldin "announced in the Oval Office … that the EPA [would] transmit[] to Congress," for CRA consideration, the three waiver decisions at issue.[19]  In so doing, the President and EPA Administrator appeared to be following a playbook as to "how the incoming Trump administration" could use the CRA to "stop" the State's efforts to reduce vehicular pollution, without following "the administrative process" which could "take years" and without

---

[18] *Unleashing American Energy* Executive Order (Jan. 20, 2025), available at https://perma.cc/33NL-LQKE, last visited May 5, 2025.
[19] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirement* (Feb. 14, 2025), available at https://perma.cc/GDF5-HVM2, last visited May 5, 2025.

employing "ordinary legislation [which] would have to overcome the 60-vote filibuster in the Senate."  *See supra* n.2.

74.    The Administration's announcement provided no explanation for EPA's about-face from its longstanding prior position that waiver decisions are not rules, much less rules of general applicability subject to the CRA.  *See supra* n.19.  Indeed, the announcement did not even acknowledge that EPA had always treated waiver decisions as adjudicatory orders, including in the very actions at issue.  *See id.*  Nor did EPA provide any public process leading up to the announcement of the purported reclassification of these waivers from orders to rules.

75.    The Administration's announcement likewise did not explain how the submission of these waiver decisions was consistent with the CRA, given that all of the waivers had already "take[n] effect" and one of the waivers had been published in the Federal Register almost two years earlier.  *See* 5 U.S.C. § 801(a)(1)(A).

76.    Nonetheless, some members of Congress indicated they, too, were prepared to follow the CRA playbook (again without establishing the statute's applicability), responding to the Administration's announcement by asserting that "the Trump EPA's" submission of "these waivers, [would give] Congress the opportunity to reject California's effort to impose its EV mandate on all Americans."[20]  The only "rules" referenced were California's *state rules*, not federal ones, and these statements failed to acknowledge that California's regulations only apply in California (and other States that so choose), much less to accurately describe California's regulations, including the many provisions that require reduced emissions from gasoline- or diesel-fueled vehicles.

77.    EPA then submitted the three waivers at issue to the GAO and Congress on February 19, 2025.  *See* GAO Letter B-337179, *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 1 & n.1 (March 6, 2025) (Exh. B).  Neither EPA nor the

---

[20] @EPWGOP, X, https://perma.cc/5WMM-DQVJ (Feb. 14, 2025), last visited May 11, 2025.

President made that submission public, although Administrator Zeldin claimed EPA was taking this action to "transparently correct[]" prior errors.  *See supra* n.19.

## V.    The GAO Determines (Again) that Waiver Decisions Are Not Subject to the CRA

78.    Upon receipt of EPA's submission, the GAO observed that the waiver "notices themselves stated that CRA did not apply" and that EPA had not explained "why the agency was submitting the notices under the CRA."  Exh. B at 2, 6.  In fact, EPA's February 19 submission described the waiver decisions as "actions" and "Notice[s] of Decisions," rather than rules.  The GAO thus "reached out to EPA on February 20, 2025, for clarification."  *Id.* at 2.

79.    On February 21, 2025, three Senators—including both Senators from California—requested that the GAO provide its legal opinion about whether these three waivers were rules subject to the CRA.  *See id.* at 1.

80.    On February, 25, 2025, the GAO followed up on its initial outreach to EPA, sending "a formal letter … seeking factual information and the agency's legal views on this matter."  *Id.* at 2.  EPA "resubmitted the Notices of Decision to GAO on February 27, 2025" but "still did not address the statements in the notices regarding the inapplicability of the CRA."  *Id.*

81.    Some members of Congress welcomed EPA's submission but, like EPA, failed to articulate a legal basis for treating waiver decisions as rules.  Rather, they asserted that the agency's submission—by itself—could transform into *rules* these actions that had been considered and finalized by EPA as *orders*:  "Once they submitted it to us, it's a rule. … [And] we can take it down."  Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[21]

82.    On March 5, 2025, EPA submitted a revised version of its report to Congress.  In this version, EPA altered the labels it applied to the waiver decisions, referring to them as "final rules," instead of "actions" or "Notice[s] of Decision" as in the initial February 19 report.  EPA still provided no explanation for the change.

---

[21] Available at https://perma.cc/9VHE-RTB4, last visited May 11, 2025.

83.    On March 6, 2025, the GAO issued its legal analysis, concluding (as before) that waiver actions are not subject to the CRA.  Exh. B at 9.  Again, the GAO concluded that these three waiver decisions meet "the APA definition of an order," not of a rule, because they make preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order."  *Id.* at 6 (quoting 5 U.S.C. § 551(6)).

84.    The GAO also reiterated its prior conclusion that, even if waiver decisions were rules, they would still not be subject to the CRA because they are not rules of general applicability.  Instead, the GAO concluded, waiver decisions "concern[] a specific entity—California—and address[] a statutory waiver specific to California's [program]."  *Id.*

**VI.    Congressional Leadership Considers Moving Forward with the Resolutions, Despite GAO's Determination that the CRA Was Inapplicable**

85.    About a month later, and despite the GAO's reaffirmation that the CRA does not apply to Clean Air Act preemption waivers, members of the House introduced the Resolutions— each targeting one of the three preemption waivers at issue.  H.J. Res. 87, 88, 89 (introduced April 2, 2025).

86.    Some Senate leaders also signaled an interest in disregarding the GAO's determination.  For example, Senator Capito—Chairman of the Senate Committee on Environment and Public Works—responded to the GAO's determination by stating "that these waivers are rules, and subject to a resolution of disapproval under the Congressional Review Act."  Alex Nieves, *There's hope for the waivers still* (Mar. 20, 2025).[22]

87.    No legal justification for using the CRA was provided, however.  No public statements identified any errors in the GAO's reasoning or otherwise articulated a legal rationale for concluding that these waivers fit the statutory definition of a rule (or were generally applicable).

88.    Meanwhile, industry advocates—including those who first publicized the CRA playbook—maintained that the GAO's determination and, indeed, the statutory definition of "rule," were all irrelevant.  Buschbacher & Conde, *Congress Has the Authority to Review EPA*

---

[22] Available at https://www.politico.com/newsletters/california-climate/2025/03/20/theres-hope-for-the-waivers-still-00242123, last visited May 11, 2025.

*"Waivers" of Clean Air Act Preemption*, Yale J. Reg. (Mar. 5, 2025) (arguing "that the CRA's text … do[es] not bind").[23]  Under that view, the only thing that mattered was EPA's submission of the waiver decisions to Congress because "the CRA gives Congress unchallengeable power to invalidate any action that an agency submits for review."  *Id.*

**VII.  The Senate Parliamentarian Also Concludes that these Waiver Decisions Are Not Properly Subject to the CRA**

89.    The question of the CRA's applicability was then presented to the Senate Parliamentarian, "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber.  Congressional Research Service, *The Congressional Review Act (CRA):  Frequently Asked Questions*, 18 (Updated Nov. 12, 2021);[24] *see also* Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters of the rules governing Congress.").

90.    After hearing arguments on both sides, the Senate Parliamentarian agreed with the GAO that waiver decisions are not subject to the CRA.  Although her decision was not made public, it was widely reported as occurring on April 4, 2025.  Lisa Friedman, *Republican Plan to Kill California's E.V. Policies Hits Senate Snag* (April 4, 2025).[25]

91.    That should have been the end of it because "in the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—are as good as binding."  *Law Within Congress* at 1958.  Senate Majority Leader John Thune had agreed as recently as January 2025, responding to questions about possibly overriding the Senate Parliamentarian with "[w]e can't go there."  Russell Payne, *The Senate parliamentarian could block some of Trump's agenda — and be a scapegoat for Republicans* (January 9, 2025).[26]

92.    But some members of Congress remained intent on using the CRA to invalidate these three waivers.  Indeed, some immediately started "weighing whether to defy the parliamentarian [in order to] to reject California's plans…."  Kelsey Brugger, *Senators weigh next moves on*

---

[23] Available at https://perma.cc/C8V5-9KFY, last visited May 11, 2025.
[24] Available at https://www.congress.gov/crs-product/R43992, last visited May 21, 2025.
[25] Available at https://www.nytimes.com/2025/04/04/climate/california-ev-waiver-senate.html, last visited May 22, 2025; *see also* https://perma.cc/A47L-KQEJ, last visited May 21, 2025.
[26] Available at https://perma.cc/B8K5-CLCZ, last visited May 10, 2025.

21

*California clean car rules* (April 10, 2025).[27]  The attack continued to focus on the parts of California's program that allegedly "ban gas-powered cars and trucks," again failing to acknowledge that other parts of the state program were authorized by these waivers.  *See supra* n.26.

## VIII. Congress Adopts the Resolutions, Flouting the GAO and Parliamentarian's Rulings

93.    Despite the GAO and Senate Parliamentarian determinations, House members proceeded to introduce the Resolutions targeting the three California waivers at issue.  Kelsey Brugger, *House plows ahead with assault on California EPA waivers* (Apr. 4, 2025).[28]  The public statements around this action again failed to address the fact that state emission regulations only apply in States that have chosen to adopt them.  *Id.* ("The American people should choose what vehicle is right for them, not California bureaucrats.").  These statements likewise failed to reconcile claims about the impacts of these waivers with EPA's position—in the very reports it submitted to Congress—that these were not "major rules," meaning EPA did not expect these waiver decisions to cause "major increase[s] in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions" or "significant adverse effects on competition, employment, investment, productivity, [or] innovation."  *See* 5 U.S.C. § 804(2).

94.    The only explanation provided by House members for departing from the practice that "the GAO … has historically decided what can be considered a rule under the CRA" was the fact that EPA submitted the waivers to Congress.  *Id.* ("'By submitting the three California waivers to Congress, Administrator Zeldin is ensuring that Congress has oversight of these major rules that impact every American,' [Energy and Commerce Chair] Guthrie said."); *see also Chairman Guthrie, Vice Chairman Joyce, and Energy and Commerce Republicans Introduce Legislation to Stop California EV Mandates*.[29]

---

[27] Available at https://perma.cc/SX9T-AAQK, last visited May 11, 2025.
[28] Available at https://perma.cc/AD9Z-P7W7, last visited May 11, 2025.
[29] Available at https://perma.cc/3UAM-QWWL, last visited May 21, 2025.

95.    The House later voted to adopt all three Resolutions, targeting the Advanced Clean Trucks and Omnibus waivers on April 30, 2025, and the Advanced Clean Cars II waiver on May 1, 2025. Camila Domonoske, *The House Strikes a Blow Against California in the Fight over EVs* (May 1, 2025).[30]

96.    No member or committee of the House provided any legal rationale for concluding that waiver decisions are federal agency rules of general applicability that could be subject to the CRA. Nor did any members of the House who had previously expressed the opposite view explain their change of position. Instead, after the House votes, the sponsors of the Resolutions continued to attribute Congress's ability to use the CRA here solely to the actions of the Executive Branch. *E.g.*, Congressmen Brett Guthrie, John Joyce, John James, and Jay Obernolte, *How Congress Is Fighting Biden's Disastrous EV Mandate* (May 2, 2025).[31]

97.    At least one press outlet described the House's decision to "hold[] the votes anyway"—despite the GAO and Senate Parliamentarian determinations—as "demonstrating that they are willing to carry out their agenda regardless of whether the nonpartisan arbiter deems them legal." Rachel Frazin, *House votes to overturn California gas car ban — again defying internal watchdog*.[32]

98.    Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and overriding the Senate Parliamentarian's determination that the CRA was inapplicable. E&E News, *Senate GOP Plots Demise of California Clean Car Rules* (May 20, 2025).[33] Yet again, the announcements provided no basis for any disagreement with the GAO and Parliamentarian's legal conclusions.

99.    In justifying the decision to "defy the chamber's parliamentarian," Senate Majority Leader Thune asserted that "'widespread effects'" make preemption waivers rules, without reference to the definition of a rule, without acknowledging that any "widespread effects" result from choices by *state governments*, and without explaining how waiver decisions do anything

---

[30] Available at https://perma.cc/63NY-2KR9, last visited May 21, 2025.
[31] Available at https://perma.cc/DUL5-3VQS, last visited May 21, 2025.
[32] Available at https://perma.cc/W7UY-CLGA, last visited May 11, 2025.
[33] Available at https://perma.cc/PKF2-4386, last visited May 22, 2025.

1   other than dispose of a request from California.  *Id.*  Senate Majority Whip John Barrasso

2   likewise focused on alleged nationwide effects (and ignored the conventional vehicle provisions

3   of these state regulations), claiming California's laws would somehow "force-feed electric

4   vehicles to every man and woman who drives in this country."  *Id.*

5       100.   When Senate Majority Leader Thune announced that he would override the

6   Parliamentarian's decision and proceed with the Resolutions, he did not explain how the Senate

7   would do so, underscoring the unprecedented nature of this step.  *See id.* ("It's a little early to

8   sketch and lay that out.  But we have a process.  We're moving forward.").

9       101.   The process to end-run the Parliamentarian became clear two days later when—on an

10  unrelated CRA resolution concerning a Department of Transportation (DOT) safety rule—Senate

11  Majority Leader Thune introduced a point of order for the Senate to determine "that points of

12  order are in order under the Congressional Review Act given sections 802(d)(1), 802(d)(2), and

13  802(d)(4) are in conflict with one another."[34]  That point of order was agreed to by a vote of 51 to

14  46.

15      102.   Notably, section 802(d)(1) provides that "all points of order against the joint

16  resolution (and against consideration of the joint resolution) are waived," meaning no such points

17  of order are permitted as to CRA resolutions.  5 U.S.C. § 802(d)(1).  The passage of Senator

18  Thune's point of order purported to change that and make any point of order permissible.

19      103.   That change was necessary only to allow Senate Majority Leader Thune to introduce

20  a second point of order—one that would presumably have been impermissible without approval

21  of the first.  This second point of order sought to establish that "Joint Resolutions that meet all the

22  requirements of Section 802 of the Congressional Review Act [are] entitled to expedited

23  procedures under the Congressional Review Act."  *See supra* n.34 ("Recent Floor Activity").

24

---

25      [34] *See* Recent Floor Activity, May 21, 2025, *available at* https://perma.cc/4RK3-L4ZU,
    last visited May 23, 2025.  "Points of order" are the mechanism by which "Senators may enforce
26  the Senate's legislative rules and precedents."  Congressional Research Service, *Points of Order,
    Rulings, and Appeals in the Senate* 1 (updated Nov. 15, 2018), available at Points of Order,
    Rulings, and Appeals in the Senate | Congress.gov | Library of Congress, last visited June 8,
27  2025.  When a member "believe[s] that one of those rules or precedents is, or is about to be,
    violated," they introduce a point of order to obtain a decision whether or not the action of another
28  member would violate or have violated the Senate's internal rules.  *Id.*

Under this second point of order, the Senate could proceed to consider and vote on joint resolutions so long as a federal agency had submitted a report to Congress declaring that its action was a "rule," regardless of whether the GAO and Senate Parliamentarian had concluded otherwise.  In other words, the purpose of Majority Leader Thune's second point of order was to change the trigger for the Senate's CRA procedures so that agency submission alone sufficed, effectively rendering the statutory definition of "rule"—and any Senate Parliamentarian determinations concerning applicability of that definition—irrelevant.

104.   As Senator Whitehouse, the Ranking Member of the Senate Environment and Public Works Committee, noted "[t]he purpose" of these points of order was to "allow[] a bypass of the Parliamentarian's decision" that it was unlawful to apply the CRA to Clean Air Act preemption waivers because they are not rules subject to the CRA.  117 Cong. Rec. S3025 (May 21, 2025) (Exh. C).

105.   Indeed, these points of order had no other purpose—and seemingly no other effect— other than to evade the CRA's express limitations that make it applicable only to certain federal rules.  Neither point of order was necessary for the proceeding into which the points of order were introduced—the proceeding concerning the DOT CRA resolution.  In other words, the Senate Majority Leader introduced impermissible and entirely unnecessary points of order into the Senate's consideration of the DOT CRA resolution solely to enable the Senate to later vote on the EPA waiver Resolutions without having to directly address the Parliamentarian's contrary determination.

106.   The Presiding Officer—Senator Capito—confirmed the point when the Senate proceeded to consider the Resolutions concerning the preemption waivers.  She explicitly stated that the Senate could only do so "[p]ursuant to the precedent just established by the Senate"—i.e., the second point of order just approved during proceedings concerning the DOT resolution.  117 Cong. Rec. S3052 (May 21, 2025) (Exh. C).

107.   Those in favor of the Resolutions continued to mischaracterize California's regulations and the waivers that authorized them.  For example, Senate Majority Whip Barrasso asserted that "the Biden administration gave California—the liberal State of California—

25

permission to export its far-left electric vehicle mandate to the entire country." 117 Cong. Rec. S3017 (May 21, 2025) (Exh.C); *see also, e.g., id.* at S3086-87 (Senator Capito inaccurately describing Advanced Clean Cars II as an "EV mandate"). All of these statements made clear that the regulatory requirements disfavored by the speakers were those designed and promulgated *by California*. No regulatory requirement designed or promulgated by any federal agency was ever identified.

108. Those in favor of the Resolutions also made clear they were relying on the "submission by the Trump EPA" as the sole basis for application of the CRA's expedited procedures. 117 Cong. Rec. S3087 (May 21, 2025) (Senator Capito describing agency submission as sufficient to "trigger[] my right as a Senator to introduce this resolution to block California's EV mandate") (Exh. C); *see also id.* at S3088 (repeatedly using the phrase "Agency-submitted rules" rather than simply "rules"). Indeed, Senate leadership exclusively credited "President Trump and EPA Administrator Lee Zeldin … submitting the approved California waiver[s]" for the opportunity to use the CRA and to enact the Resolutions. *Id.* at S3807.

109. As noted, that was the full purpose and effect of Senate Majority Leader Thune's second point of order: to allow the Senate to proceed on the Resolutions simply because EPA submitted CRA reports concerning the waiver decisions, without regard to EPA's express, prior conclusions in the Federal Register notices or the independent determinations of the GAO and Senate Parliamentarian that these waiver decisions are not rules, and without any congressional finding that these EPA actions are rules actually subject to the CRA. *See also* 117 Cong. Rec. S3106 (May 22, 2025) (Exh. D) ("Before dinner yesterday, these bills to gut California's Clean Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes to move forward, open to full debate and amendments, but somehow, after dinnertime yesterday, once Senate Republicans were done with overruling the Parliamentarian, these bills were now not subject to the filibuster.").

110. Nonetheless, throughout the Senate proceedings, advocates for the Resolutions continued to acknowledge that, by its plain terms, the CRA "applies only to allow for disapproval of Federal Agency rules and only during a prescribed time defined by the statute." 117 Cong.

Rec. S3088 (May 21, 2025) (Exh. C).  They also described the expedited Senate procedures as

established "by law," *id.* at S3087, although they had purported to alter the trigger for those

procedures by a mere point of order.

111.   The next day, May 22, 2025, the Senate voted on each of the Resolutions and passed

all three with votes of 51-45 (H.J. Res. 87, Advanced Clean Trucks), 51-44 (H.J. Res. 88,

Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus).

112.   EPA "hail[ed]" the Resolutions with a press release indicating that President Trump

would sign them and again mischaracterizing the California regulations as an "EV Mandate."

EPA, *EPA Hails Congressional Disapproval of Biden EPA's California EV Mandate Rule* (May

22, 2025).[35]  EPA described the Resolutions as "maintaining a consistent national approach to

vehicle standards"—an approach the Clean Air Act explicitly rejects—and as preventing a "single

state" from imposing "its radical agenda."  *Id.*

113.   The President signed the Resolutions on June 12, 2025.

## CLAIMS FOR RELIEF

### COUNT I
### *Ultra Vires* – Conduct in Excess of Statutory Authority
### (Against All Defendants)

114.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged

herein.

115.   No statute empowers any of the Defendants to intentionally utilize a statute that is

inapplicable to these waiver decisions—as declared on the face of the actions—simply because it

provides a faster or easier, but unlawful, means to a desired end.

116.   Certainly, no statute empowers Defendants to reclassify agency actions from

adjudicatory orders into rules after the actions are final and the agency proceedings are complete.

Nor does any statute empower any of the Defendants to take such actions without any public

process and without providing any explanation or justification for the reclassification.

---

[35] Available at https://perma.cc/WW4C-Z4P7, last visited May 23, 2025.

117. Yet, that is precisely what President Trump and Administrator Zeldin purported to do by fiat in their February 14, 2025 Oval Office announcement and press release. Their post-hoc reclassification of these three waiver decisions from adjudicatory orders to rules was ultra vires.

118. That reclassification was the sole basis for the submission of these waivers to Congress as "rules" subject to the CRA. The submission was also ultra vires because it had no lawful premise and because no statute empowers Defendants to recharacterize, much less mischaracterize, agency actions to Congress. Nor does any statute empower Defendants to do so after the agency action has gone into effect.

119. Defendants took these ultra vires actions to provide a pretextual basis for the use of the CRA to disapprove adjudicatory orders granting the three waivers at issue, and the Resolutions would not have been enacted without that pretextual basis. The Resolutions thus "stand[] or fall[] on the validity of the" actions taken by the President, EPA, and its Administrator. *See INS v. Chadha*, 462 U.S. 919, 938 (1983).

120. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants reclassification and submission actions were *ultra vires* and the resulting Resolutions are unlawful, void, and of no effect.

121. Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect and from taking similar actions as to other Clean Air Act adjudicatory orders.

**COUNT II**
**Violation of the Administrative Procedure Act**
**(Against the United States, EPA and Its Administrator)**

122. Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

123. Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (internal quotation marks and citation omitted).

28

124.   EPA is an "agency" as defined in 5 U.S.C. § 551(1).  Both the agency and its Administrator must follow the APA when it applies.

125.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

126.   In carrying out the purported reclassification of these adjudicatory orders into rules (and the follow-on submission to Congress), EPA and its Administrator ("EPA Defendants") failed to observe the procedures required by law and took arbitrary and capricious actions that contravened core principles of reasoned decision-making.

127.   Indeed, they followed no procedure at all.  Administrator Zeldin simply referred to the waiver decisions as "rules" in a press release.  That does not suffice to reclassify an action after it was finalized pursuant to the opposite view.  *See supra* n.19.  Agencies cannot supplant earlier conclusions with "impermissible post hoc rationalization," *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (internal quotation marks and citation omitted), much less can they do so by way of unsupported references in a press release, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  That the challenged agency actions—the reclassification and submission—were taken without *any* process and without acknowledgment, let alone explanation, for the change in position renders them unlawful—particularly given States' reliance on these waivers to protect public health and welfare.  *Id.*

128.   All of the EPA Defendants' actions were predicated on a new (albeit implicit) interpretation of the APA term "rule," but that interpretation is contrary to the statute's text.  EPA's waiver decisions do not "implement, interpret, or prescribe law or policy" as rules do.  5 U.S.C. § 551(4).

129.   That is clear from the nature of waiver proceedings which, pursuant to the Clean Air Act's text, do not begin with notices of proposed rulemaking.  Rather, by congressional design, a waiver proceeding commences with a request from California that includes a finding that the

State's new motor vehicle emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards. 42 U.S.C. § 7543(b)(1). EPA must then grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial. *Id.* § 7543(b)(1)(A)-(C).

130. In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted." *MEMA I*, 627 F.2d at 1121. EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards increase in stringency. California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA. For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result. *Id.*

131. Put another way, it is California's actions here (not EPA's) that are "designed to prescribe law"—namely, the emission standards and other requirements vehicle manufacturers must meet in the State. 5 U.S.C. § 551(4) (defining "rule"). EPA issues an "order" as "a final disposition" of California's request; and that order—like a licensing decision—either grants or denies California permission to engage in a course of conduct (i.e., enforcement of its regulatory program). *Id.* §§ 551(6) (defining "order" and including "licensing"), 551(8) (defining "license").

132. The EPA Defendants' APA violations provided a pretextual basis for the use of the CRA by the United States to disapprove these waivers, and the Resolutions would not have been enacted without that pretextual basis. The Resolutions thus "stand[] or fall[] on the validity of the" actions taken by the EPA Defendants. *See Chadha*, 462 U.S. at 938.

133. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the reclassification and submission actions, and the resulting Resolutions, are unlawful, void, and of no effect.

134. Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of EPA Defendants' reclassification and submission actions.

135. Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

1

2

**COUNT III**
**Violation of the Congressional Review Act**
**(Against All Defendants)**

3      136.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged

4    herein.

5      137.   By its own plain terms, the CRA does not apply to these waiver decisions because

6    EPA's waiver actions are orders, not rules, as defined by the APA (and incorporated in the CRA).

7    And, even if waiver decisions were rules, they would still not be rules of general applicability that

8    would be subject to the CRA.  Until its post-hoc change of position here, EPA consistently

9    maintained that waiver decisions are adjudicatory orders that dispose of California's requests. It

10   reiterated that position in each of the three final orders here.

11      138.   Based on EPA's longstanding position (affirmed by the GAO) that these waiver

12   decisions are adjudicatory orders, not rules, EPA did not submit these waiver decisions to

13   Congress when it issued the orders.  Notably, no member of Congress sought a determination

14   from the GAO that these decisions were rules, rather than adjudicatory orders.  In other words, no

15   member of Congress sought to apply the CRA to these waiver decisions when the decisions

16   issued, although these decisions took effect upon issuance and the CRA is expressly intended to

17   apply before a rule takes effect.

18      139.    When Defendants later changed positions and declared these decisions were rules

19   subject to the CRA, they never explained why.  Most notably, Defendants identified no errors in

20   the legal analysis provided in the GAO's 2023 determination that an earlier waiver decision was

21   not a rule subject to the CRA, although Congress had relied on that determination at the time by

22   declining to take up resolutions of disapproval.

23      140.   The GAO and the Senate Parliamentarian—the nonpartisan arbiters that advise

24   Congress on the CRA's applicability—concurred with the position EPA announced in these

25   waiver decisions:  they are not rules and are, therefore, outside the scope of the CRA.

26      141.   The CRA's plain terms—the terms to which all fifty States consented—cabin its use;

27   and that purported use was unlawful here.  Indeed, there was no "reasonable relation between the

28

1    mode or method of proceeding"—i.e., the CRA—"and the result which [the Federal Government]

2    sought" here—i.e., rendering particular *state* rules unenforceable.  *United States v. Ballin*, 144

3    U.S. 1, 5 (1892).

4        142.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

5    Resolutions are unlawful, void, and of no effect.

6        143.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

7    enjoining EPA and its Administrator from giving the Resolutions any legal effect.

8                                      **COUNT IV**
                              **Violation of the Take Care Clause**
9                  **(Against President Trump, EPA, and Its Administrator)**

10       144.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged

11   herein.

12       145.  Article II, Section 3 of the Constitution provides that the President—and pursuant to

13   his direction, the Executive Branch—"shall take care that the laws be faithfully executed."  U.S.

14   Const. art. II, § 3.

15       146.  All Executive Branch Defendants were aware that the three waiver decisions at issue

16   are not rules, much less rules of general applicability, subject to the CRA.  That had been EPA's

17   consistent position since the enactment of the CRA, under Presidents of both parties.  And EPA

18   reiterated that position in these very decisions.  These Defendants were also aware that the

19   GAO—the non-partisan body that aids Congress in implementing the CRA—had concluded, in

20   2023, that Clean Air Act preemption waiver decisions are not rules and not subject to that statute.

21       147.  The Executive Branch Defendants nonetheless declared, by press release, that these

22   actions were suddenly rules of general applicability subject to the CRA.  They then submitted

23   these waiver decisions to Congress and the GAO for CRA action, claiming (without support) this

24   was "in accordance with statutory requirements."  *See supra* n.19.  Notably, EPA had to submit

25   these waiver decisions to Congress *twice* because in the first submission, EPA correctly described

26   the decisions not as "rules," but as "actions" and "Notice[s] of Decision."

27

28

                                         32

148.   The Executive Branch Defendants purported to replace the statutory definition of "rule" with their own, unidentified one.  These Defendants did so purely for purposes of using a statute they knew to be inapplicable—and one they hoped would preclude judicial review.

149.   The Executive Branch Defendants neither exercised care nor even attempted to faithfully execute the Nation's laws, including the Clean Air Act, the APA, the CRA, and the Constitution.

150.   The Executive Branch Defendants' failure to honor their constitutional duties were deliberate efforts to use—and enable Congress's use—of the CRA to disapprove of these waivers. These actions were unconstitutional, and so, too, are the Resolutions that depend on them.

151.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

152.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

## COUNT V
### Violation of Separation of Powers
### (Against All Defendants)

153.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

154.   The "checks and balances" established in the Constitution "were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). "The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people." *Id.*  "The Framers also provided for a Judicial Branch equally independent with "'[t]he judicial Power ... extend[ing] to all Cases, in Law and Equity, arising under this Constitution, and the Laws of the United States,'" *id.* (quoting U.S. Const. Art. III, § 2), and expressly to those cases in which the United States or one of the several States is a party, U.S. Const. Art. III, §§ 1, 2.

33

155.   The Federal Government was "deliberately so structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power." *Bowsher*, 478 U.S. at 722.

156.   Using its lawmaking powers, Congress expressly cabined the CRA so it applies only to certain rules promulgated by federal agencies. *E.g.*, 5 U.S.C. § 801(a)(1)(A); id. § 804(3) (defining "rule[s]" to which CRA applies). Congress could, of course, use those same lawmaking powers to amend the CRA—for example, by changing the trigger for its application or by changing the definition of "rule." It did not do so here, however.

157.   Instead, Congress opted to proceed as though the term "rule" had a different definition than the one in 5 U.S.C. § 804(3) or was entirely irrelevant to the statutory scheme. Specifically, Congress relied exclusively on the submission of a report from EPA characterizing the waiver decisions as rules as a sufficient trigger for application of the CRA. The Senate did so explicitly in its second point of order. *See supra* ¶¶ 103-106. The House did so as well by proceeding to vote on the Resolutions, although CRA resolutions are only proper as to certain federal rules (as defined in the statute), and although no one offered any credible basis for disagreeing with EPA's stated position in these Federal Register notices (affirmed by the GAO and Senate Parliamentarian) that these waiver decisions do not fit that definition.

158.   Each chamber improperly delegated its constitutional authority "to determine the Rules of its Proceedings," U.S. Const., art. I, § 5, cl. 2, to the Executive Branch. Both chambers purported to employ their rules for CRA resolutions based exclusively on mere statements by the Executive Branch—no matter how spurious—that these orders were rules of the sort subject to the CRA.

159.   Maintaining separation of powers for congressional procedural rules is no less important than maintaining that separation for more substantive powers. "The Constitution … is concerned with means as well as ends." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015). "To leave this aspect of the constitutional structure alone undefended would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of

authority that was constitutionally reserved for the people's representatives in order to protect their liberties." *Gundy v. United States*, 588 U.S. 128, 169 (2019) (Gorsuch, J., dissenting).

160.  And, as James Madison reiterated, quoting "the famous warning of Montesquieu," "'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates.'" *Bowsher*, 478 U.S. at 721–22 (quoting The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).

161.  The rules Congress adopts for its own proceedings cannot "ignore constitutional restraints," and *Congress* is responsible, in the first instance, for ensuring there is "a reasonable relation between the mode or method of [its] proceeding … and the result which is sought to be attained." *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (quoting *United States v. Ballin,* 144 U.S. 1, 5 (1892)).

162.  It matters not that Congress's abdication of its internal rulemaking powers reflected the preferences (in favor of the use of the CRA) of majorities in Congress.  Separation of powers problems are not erased simply because "the encroached-upon branch approves the encroachment." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) (quoting *New York v. United States,* 505 U.S. 144, 182 (1992)).

163.  Congress's decision to allow the Executive Branch to be the sole arbiter of what the definition of "rule" means under the APA and CRA also unconstitutionally intruded on the judiciary's Article III power "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); U.S. Const. art. III, § 2.

164.  So, too, did Congress's direction that preexisting federal law preempts particular state laws, where Congress failed to legislatively change the legal standard for that preemption.  Put another way, Congress may not enact "a statute [that] would create no new substantive law" but "instead direct the court how pre-existing law applies to particular circumstances." *Bank Markazi v. Peterson*, 578 U.S. 212, 226 n.17 (2016).

165.  In these waiver decisions, EPA exercised "the type of nonpolicymaking adjudicatory power[] typically exercised by a court in the agency-review context," *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 154 (1991), by pronouncing that particular laws

35

1   are not preempted by the Clean Air Act.  EPA's adjudicatory orders were the subject of pending

2   litigation at the time the Resolutions were introduced and voted on.

3        166.  The Resolutions "fail[] to supply any new legal standard effectuating the lawmakers'

4   [new] policy judgment," *Bank Markazi*, 578 U.S. at 231, that the relevant state laws should be

5   preempted by federal law.  Indeed, by applying the CRA—a statute designed to allow for

6   rescission of new *federal law* made by the Executive Branch—beyond its bounds, Congress did

7   not make law.  Rather, it disapproved the Executive Branch's application of existing law to a

8   particular factual record, ignoring both that the Executive Branch had acted within its powers in

9   carrying out existing law and that the Judiciary might well agree with EPA's decisions and is

10  entitled to say so.

11       167.   "The hydraulic pressure inherent within each of the separate Branches to exceed the

12  outer limits of its power, even to accomplish desirable objectives, must be resisted."  *Chadha*, 462

13  U.S. at 951.  The Federal Government may not violate separation of powers principles, as it did

14  here, even when doing so makes achieving desired objectives easier.

15       168.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

16  Resolutions are unlawful, void, and of no effect.

17       169.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

18  enjoining EPA and its Administrator from giving the Resolutions any legal effect.

19                                   **COUNT VI**
20  **Violation of the Tenth Amendment and Structural Principles of Federalism**
    **(Against All Defendants)**

21       170.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged

22  herein.

23       171.  A "fundamental limitation that the constitutional scheme imposes on the Commerce

24  Clause to protect the 'States as States' is one of process."  *Garcia*, 469 U.S. at 554.  Thus, courts

25  may—and indeed must—intervene "to compensate for possible failings in the national political

26  process" that infringe on the States as States.  *Id.*  And that is not the only "affirmative limit[] *the*

27  *constitutional structure* might impose on federal action affecting the States under the Commerce

28

                                      36

Clause." *South Carolina*, 485 U.S. 505, 528 (1988) (Scalia, J, concurring in part) (quoting *Garcia*, 469 U.S. at 556).

172.   These Resolutions were enacted only because both the Executive and Legislative Branches opted to flout settled procedures and the plain text of the CRA (to which all States consented).  The Executive Branch began this unprecedented maneuver when, without any process or explanation, it issued a blatantly unlawful post-hoc declaration that the three adjudicatory orders at issue were suddenly rules.  With the President's imprimatur, Congress then compounded the errors, opting to disregard and overrule the reasoned decisions of both the GAO and the Senate Parliamentarian, although those decisions are ordinarily treated as dispositive.

173.   By purporting to use the CRA (despite its clear inapplicability), the Federal Government blasted gaping holes in longstanding state regulatory programs without any of the procedural mechanisms—such as rigorous debate and state official testimony—that serve to inform members of Congress about the consequences of their actions.  In the push to end the alleged "electric vehicle fantasy," for example, state regulations that require crucial emission reductions from gasoline- and diesel-fueled vehicles got swept in for termination too.

174.   In so doing, the Federal Government also effectively changed the substantive criteria applicable to a California waiver request retroactively—years after California submitted its requests (and in one instance years after EPA acted on that request).  The Federal Government also created uncertainty about how it will apply the waiver provision's statutory criteria to future waiver requests.

175.   Put simply, the Federal Government carried out an illegal playbook designed to evade lawful procedures that might prevent the "take down" of disfavored California laws.  The Federal Government cast aside expert legal opinions and the plain text of the CRA in order to extend that statute's expedited procedures beyond the bounds to which all States agreed.  Defendants provided no opportunity for California, or the public, to participate in crucial parts in this scheme. And Defendants and congressional leadership chose to use the CRA here precisely because, when that statute applies, it severely limits debate, avoids the filibuster, and contains a barrier to judicial review.  Those features further prevented Plaintiff States from defending their own state

37

laws in the political process; and the Federal Government seeks to prevent Plaintiff States from obtaining relief in the courts.

176.   The Framers designed a Federal Government that would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, at 332 (B. Wright ed. 1961)).  These Resolutions required an end-run around that design.  The numerous "extraordinary defects in the national political process" reflected in that end-run render the Resolutions "invalid under the Tenth Amendment" and the principles of federalism embedded in the Constitution's structure. *South Carolina*, 485 U.S. at 512.

177.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

178.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect.

## COUNT VII
**Nonstatutory Review: Violations of Federal Law by Federal Officials**
**(Against All Defendants)**

179.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

180.   Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), among them violations that themselves contravene the structural principles of the Constitution, *see Free Enter. Fund*, 561 U.S. at 491–92 n.2, or actions premised on legislation that does.

181.   The President, EPA, and its Administrator have stated definitely that the state regulations at issue here, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, became preempted and unenforceable upon enactment of the respective Resolutions and are now preempted and unenforceable.

182.   Each of the Resolutions is unlawful and unconstitutional.

38

183.   Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for California's addition of the state regulations at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, to the State's regulatory program are valid and in effect.

184.   Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit the rejection of certifications of vehicle or engine manufacturer compliance with the state regulations at issue—including the Advanced Clean Cars II, Advanced Clean Trucks, and/or Omnibus regulations—as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3).

185.   Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit their taking other actions to implement or give legal effect to the Resolutions.

186.   Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit interference with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law.

187.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

188.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that any action by Defendants premised on validity of the unconstitutional Resolutions is itself unlawful, void, and of no effect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs State of California, et al. respectfully request that this Court

1.     Declare the Resolutions unconstitutional, unlawful, void, and of no effect;

2.     Declare that the three preemption waivers at issue are valid and in effect;

3.     Declare that any action by Defendants premised on validity of the Resolutions is unlawful, void, and of no effect;

39

4.    Enjoin EPA and its Administrator from taking any action to implement or give legal effect to the Resolutions;

5.    Enjoin EPA and its Administrator from rejecting certifications of vehicle or engine manufacturer compliance with the state regulations for which EPA waived Clean Air Act preemption in the decisions at issue, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3);

6.    Enjoin EPA and its Administrator from interfering with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law;

7.    Declare the reclassification and submission of the three preemption waiver decisions as federal agency rules *ultra vires*, unconstitutional, and unlawful;

8.    Vacate EPA's reclassification of the three preemption waiver decisions as federal rules and the submission of those decisions as rules to Congress;

9.    Declare that the CRA does not apply to EPA waiver decisions under 42 U.S.C. § 7543(b)(1);

10.    Enjoin EPA and its Administrator from transmitting these or other Clean Air Act waiver decisions under 42 U.S.C. § 7543(b)(1) to Congress for consideration under the CRA;

11.    Grant such other relief as the Court deems just and proper.


Dated:  June 12, 2025                              Respectfully submitted,

                                                   ROB BONTA
                                                   Attorney General of California
                                                   MYUNG J. PARK
                                                   Supervising Deputy Attorney General


                                                   */s/ M. Elaine Meckenstock*
                                                   M. ELAINE MECKENSTOCK
                                                   Deputy Attorney General
                                                   *Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

*/s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

41

1   **DAN RAYFIELD**                          **CHARITY R. CLARK**
2   *Attorney General for the State of Oregon*   *Attorney General for the State of Vermont*

3   */s/ Paul Garrahan*                        */s/ Hannah Yindra*
    PAUL GARRAHAN*                             HANNAH YINDRA*
4   Sr. Assistant Attorney General            Assistant Attorney General
    Oregon Department of Justice              Office of the Attorney General
5   1162 Court Street NE                      109 State Street
    Salem, Oregon 97301-4096                  Montpelier, VT 05609
6   (503) 947-4540                            (802) 828-3186
7   Paul.Garrahan@doj.oregon.gov              Hannah.Yindra@vermont.gov

8

9   **PETER F. NERONHA**                       **NICHOLAS W. BROWN**
    *Attorney General for the State of Rhode*   *Attorney General for the State of*
10  *Island*                                    *Washington*

11  */s/ Nicholas M. Vaz*                       */s/ Alexandria Doolittle*
12  NICHOLAS M. VAZ*                           ALEXANDRIA K. DOOLITTLE*
    Special Assistant Attorney General        Assistant Attorney General
13  Office of the Attorney General            Office of the Attorney General
    Chief, Environmental and Energy Unit      P.O. Box 40117
14  150 South Main Street                     Olympia, Washington 98504-0117
15  Providence, Rhode Island 02903            (360) 586-6769
    (401) 274-4400 ext. 2297                  Alex.Doolittle@atg.wa.gov
16  nvaz@riag.ri.gov

17

18
    *Application for admission pro hac vice forthcoming*
19

20

21
    Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.
22
    */s/ M. Elaine Meckenstock*
23  M. Elaine Meckenstock
    Counsel for Plaintiff State of California
24

25

26

27

28