# EXHIBIT C




United States *of* America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE *119th* CONGRESS, FIRST SESSION

*Vol. 171* WASHINGTON, WEDNESDAY, MAY 21, 2025 *No. 86*

# *Senate*

The Senate met at 10 a.m. and was called to order by the President pro tempore (Mr. GRASSLEY).

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Heavenly Father, You are our fortress and shield. Your laws guide us, and Your teachings protect us. Your way is perfect, and Your word is truth. Bless all who follow Your guidance, giving them the power to serve others with wisdom, patience, and kindness.

As our lawmakers seek to serve, empower them to minister in Your Name to the suffering, the friendless, and the needy. Lord, give our legislators wisdom and strength for this day, that they may dispose of their responsibilities in ways that honor You. Help them in all their relationships to be constructive and edifying, speaking words that will bring life and peace.

We pray in Your matchless Name. Amen.

## PLEDGE OF ALLEGIANCE

The President pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## RESERVATION OF LEADER TIME

The PRESIDING OFFICER (Mr. MULLIN). Under the previous order, the leadership time is reserved.

## CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. Morning business is closed.

## LEGISLATIVE SESSION

## GUIDING AND ESTABLISHING NATIONAL INNOVATION FOR U.S. STABLECOINS ACT—Motion to Proceed—Resumed

The PRESIDING OFFICER. Under the previous order, the Senate will resume consideration of the motion to proceed to S. 1582, which the clerk will report.

The senior assistant legislative clerk read as follows:

Motion to proceed to Calendar No. 66, S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes.

The PRESIDING OFFICER. The Senator from Iowa.

### MAKE AMERICA HEALTHY AGAIN COMMISSION

Mr. GRASSLEY. Mr. President, I come to the floor today to express concerns that I have heard from many stakeholders regarding the Make America Healthy Again Commission. For short, this is called the MAHA Commission. Their report will be coming out tomorrow.

The concerns that I have heard from food and agriculture stakeholders center around the difficulty that they have had getting meetings with the Department of Health and Human Services. HHS Secretary Kennedy is the Chair of the MAHA Commission.

Many people fear that the contents of this report will not be based on sound science, that it will be based on opinions and fears instead of scientific consensus.

When I met with Secretary Kennedy before his confirmation—and that is a traditional thing to do—we discussed things like pesticides, genetically modified crops and other important components that come together to ensure the United States has the largest and safest food supply on the globe, and how all those things center on making the life of the farmer producing food as easy as possible. Now, Secretary Kennedy agreed that these tools farmers use are necessary for that food supply.

The MAHA report should be based upon sound science. I believe that Department of Agriculture Secretary Rollins and EPA Administrator Zeldin have had robust input on this report and that they would advocate for the 2 percent of Americans that feed the other 98 percent and the tools that are used to produce the food supply that feeds America.

We want to remember that we have the reputation of producing food so that the expendable income of—the average family in the United States spends roughly 10 or 11 percent of their discretionary money on food—the cheapest of any consumers in the world.

So I want everybody to know that I am watching this report closely that is coming out tomorrow, and I hope it reflects what Secretary Kennedy told me when I met with him in my office and he stands by his word.

I hope there is nothing in the MAHA report that jeopardizes our food supply or the livelihood of farmers or jeopardizes the food supply—to emphasize—for the 98 percent of Americans that buy and depend on the food that the 2 percent of Americans that are farmers produce.

I yield the floor.

The PRESIDING OFFICER. The Republican whip.

### S.J. RES. 55

Mr. BARRASSO. Mr. President, as you know, in its final days in office, the Biden administration gave California—the liberal State of California—permission to export its far-left electric vehicle mandate to the entire country. This week, this Senate will end California's mandate madness.

Now, I listened to some of the Democrats' arguments on the floor yesterday. There was a lot of huffing and puffing going on about the sanctity of the Government Accountability Office and about the filibuster, which, let me

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Printed on recycled paper.



remind you, every single Democrat has promised to eliminate. There were wild accusations that the sky was falling on the U.S. Senate.

What nobody who tuned in heard is what these California rules would actually do to our country. Why not, Mr. President? Isn't that why Democrats are really so panicked? Isn't that why Democrats and Joe Biden waited until after the election—after they lost the election in the House, the Senate, and the White House—to spring this whole thing on the American people? They were losers going out the door, and they said: We are coming after you, the American people, with our leftist dreams.

Isn't that why they spent months coordinating this release with their allies at the GAO—so they could avoid or at least try to avoid Senate scrutiny under the Congressional Review Act? Isn't that what they were really up to? Well, it is what they were up to.

So why are the Democrats so darn desperate to talk about anything and everything except what these punishing rules will actually do to America, American workers, and the American economy? Let me tell you why.

California EV mandates ban—ban, ban—the sale of gas-powered cars and trucks. No more in America—gas-powered trucks. Can you imagine that in Oklahoma or in my home State of Wyoming? They threaten—the Democrats want to threaten the freedom of every American to choose what they drive. That is what this is about.

EVs currently make up 7 percent—7 percent—of the U.S. market. Even in California, they account for only 20 percent of vehicle sales. And do you know what else? The sales are stalling. They are stalling out. People don't want these. Even with the big government subsidies, people don't want to buy these things. Yet California's radical mandates require that by next year—it is coming; we are already into May of this year. By next year, by January, all vehicle sales in the State of California—35 percent of them have to be electric. That is 6 months from now, 7 months from now. By 2035, it would be 100 percent of vehicle sales in California have to be electric, with big penalties if it doesn't meet that.

For the people that are making the cars that people don't want to buy, this is a whole new meaning in California of fantasyland. That is what we are dealing with here.

America can't meet these impossible standards—not next year, not in 10 years—and the American people don't want to meet those standards.

For carmakers, the consequences are severe. If you don't sell enough electric vehicles—California is saying to them and to the other States that sign on to this—even when Americans don't want to buy them, too bad. In California, these people will pay a fine of $20,000 per vehicle—$20,000 per vehicle because people don't want to buy what the government says they have to buy.

There are ways to avoid this fine, and one way is limiting the sales of gas-powered vehicles. Well, that is rationing. That is what we are seeing. The Democrats want to ration the sales of gas-powered vehicles to live in their fantasyland of everybody driving an electric vehicle.

The harms of this mandate extend way beyond just carmakers. The Democrat mandates would cost the economy about $100 billion a year—$100 billion. The impact would be about 330,000 jobs lost.

The Democrat mandate would punish hard-working families. Prices would be higher. They are trying to buy these regular, gas-powered vehicles, but there would be fewer for sale. They would bury small businesses under crushing compliance costs.

In my home State of Wyoming and in rural States like ours, farmers and ranchers would suffer, both from EV's limited reliability and, clearly, from the limited range. People drive long distances in Wyoming to school, to the grocery store, to work.

Every American citizen would lose options, whether you live in California or not.

So you have the California EV mandates. The Democrats don't want to talk about that part of it. They are expensive, they are expansive, and they are economically destructive. They would hurt our economy, hurt our workers, and hurt the pocketbooks and purses of Mr. and Mrs. America.

This isn't just a California problem. It is a nationwide assault on gas-powered cars in America. The California mandates cover over 40 percent of all new cars in the country. They span 11 States, including big-population States—New York, New Jersey, here in the District of Columbia. All of them signed onto California's radical attempt to set a new national standard. So it is not just a California standard. Everyone is impacted.

The California Senators—the Members of this body—they actually brag about this overreach of this mandate on EVs. The junior Senator from California says he is ''very proud'' that his State's liberal agenda can control the country.

How many Members of this Senate—certainly on this side of the aisle—want to share the pride of California's liberal agenda controlling the country? The American public on election day rejected the liberal agenda of California—whether it comes to electric vehicles, whether it comes to open borders, whether it comes to sanctuary cities and sanctuary States, or their efforts to defund police. People have rejected, all across the country, the liberal agenda controlling our country.

So Democrats have this delusional dream. They want to eliminate gas-powered vehicles. The rest of us, we live in the real world. And that is what we are doing here today, because in the real world, gas-powered vehicles keep our farms running, keep our ranches growing, keep our businesses thriving, and keep our economy moving.

The Congressional Review Act provides the Senate a swift and permanent solution. With a simple majority here in the Senate, Congress can kill these rules and ban similar ones forever—not just the Senate, the House as well.

And the fight goes beyond party lines because it is not just about Republicans and Democrats. It is about common sense. It is about control. The House of Representatives voted on this. They wanted to end these punishing mandates.

How did the vote go? Well, every Republican voted to kill the mandate. Thirty-five House Democrats voted to kill this mandate, including Democrats from the State of California who realized just how impractical and expensive and impossible it would be to comply with what the Biden administration tried to force-feed the American people after they lost the election, lost the Presidency, lost the House, and lost the Senate.

A New York Democrat who voted with the Republicans and with these 35 other Democrats said: ''Out of touch with reality'' is what these California mandates are—''out of touch with reality.''

Even the junior Senator from Michigan, a Democrat, campaigned and won an election in 2024 against EV mandates. Well, we will see how she votes today on the floor of the Senate, after she campaigned last year in Michigan against the EV mandate.

Will she be against them today when we vote on this? Time will tell. She actually told voters: ''Drive what you want.'' We will see today if she really believes that, or if she says: Drive what you want, but you can only buy what I am demanding that you buy—an electric vehicle.

We will see it in the vote today.

Senate Democrats now want to force-feed electric vehicles to everyone in America. So Democrats are claiming the Congressional Review Act doesn't apply. They don't want to talk about the policy. They want to say: Well, the Congressional Review Act shouldn't apply.

These last-minute objections by Democrats are very flawed. What they are citing is a nonbinding observation—an observation—by the Government Accountability Office—an observation that said, for the first time in history, an Agency-submitted rule wasn't a rule. That is what they are saying. The argument collapses under scrutiny.

The Environmental Protection Agency submitted these rules as rules to Congress this year, after being released by the Biden administration in his final days in office. That is a fact. No one disputes it. The Democrats don't dispute it. They know what happened. They know they are trying to sneak one through. They know it.

Under the Congressional Review Act, that makes these rules subject to review—period, end of story. They are subject to review.

The GAO has no veto power over this body, the U.S. Senate—not a veto from the Congressional Review Act, not a veto under the Senate rules, not a veto under Senate precedent. They have no standing.

More troubling, the GAO's actions suggest bias because leftwing bureaucrats in the GAO rushed a response in only 13 days to prop up the mandates. How do we know that? Because we know they colluded with Senate Democrats to do so.

When Republicans challenged the GAO's observations, Senate Democrats turned to scare tactics now about the filibuster. It is ironic since every single Senate Democrat has either voted for or campaigned for eliminating the filibuster.

This Senate vote on the California EV mandates is not about Senate rules. It is about the Democrats' delusional dream to eliminate gas-powered vehicles forever. That is what they want. What their complaints are is a smokescreen to save a pillar of their Green New Deal.

You know, years ago, Congress created a fast-track procedure. It was actually in 1996. That is when the Congress passed the Congressional Review Act.

This week, the Senate must decide: Do we uphold our rights under the Congressional Review Act, or do we give the GAO a veto over Congressional Review Act now and forever?

Our decision is going to shape the future of the Congressional Review Act. Americans have spoken. They have rejected EV mandates in November at the ballot box. The House has acted in a bipartisan way, with 35 Democrats joining all the Republicans. And it is now up to the Senate to stop these EV mandates from taking hold on our Nation.

I want to thank my colleagues who led the effort: Chairman SHELLEY MOORE CAPITO of West Virginia, Senator DEB FISCHER of Nebraska, and Senator MARKWAYNE MULLIN of Oklahoma.

Together, we are going to reject this far-left cheerleading for more regulations, and we are going the protect consumers. We are going to protect affordability, and we are going to protect the authority of this institution.

It is time to end this California mandate madness.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. THUNE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

RECOGNITION OF THE MAJORITY LEADER

The majority leader is recognized.

BUDGET RECONCILIATION

Mr. THUNE. Mr. President, Republicans are continuing our work on a reconciliation bill that delivers for the American people. And if I had to summarize this bill in one phrase, I would say it is about building a stronger America.

A stronger America is a safer America.

Last week, I discussed the importance of strengthening our border security, something we are addressing in our reconciliation bill. Today, I would like to discuss another aspect of that bill: strengthening our military to meet today's and tomorrow's threats.

The world has grown increasingly unstable in recent years. America's interests, our allies, and, worst of all, American servicemembers have come under attack. Russia, China, North Korea, and Iran and its terrorist proxies have all grown more brazen.

Meanwhile, the previous administration regularly telegraphed weakness on the world stage and put investing in our military on the back burner.

There is never a time when we can afford to let our military readiness slide. But above all, at this time of increased instability, it is vital that we ensure that our military has the resources it needs to deter our enemies and defend our country.

ADM Samuel Paparo, the commander of the U.S. Indo-Pacific Command, last year called deterrence ''our highest duty.''

He said:

> Deterrence is effective when it is credible: The adversary believes the defending side will act on its threats when it is capable. A robust military with the ability to project power globally and inflict significant damage on the aggressor is essential.

Let me just repeat that:

> A robust military with the ability to project power globally and inflict significant damage on the aggressor is essential.

That is the kind of military we need to secure with this bill.

Our aim is to reverse the trend of underinvestment in our military, to rebuild our military capabilities, and to ensure that our adversaries will think long and hard before attacking us—in other words, peace through strength.

One area where that is especially critical is in our strategic competition with China. Leaders of the intelligence community testified this year that China represents the most comprehensive, robust military threat to U.S. national security. Its designs on Taiwan are obvious, and its brazen actions, from cybertheft and espionage to its aggressive territorial claims and its harassment of American pilots are alarming.

But we have allowed China to outpace us in building new military capabilities. China produces two submarines per year for every 1.4 submarines built in the United States. China can build naval surface warships three times faster than we can. And in the defining technologies of tomorrow's wars—space, AI, hypersonics, and cyber—China is gaining quickly or already has an edge.

Republicans' reconciliation bill is about reestablishing the U.S. advantage in all those areas. We are going to invest in shipbuilding to expand and enhance our fleet. We will restock our munitions stockpiles and expand weapons production. We will modernize our nuclear deterrence and build a Golden Dome for missile defense here at home.

Our bill will expedite the delivery of innovative weapons to servicemembers on the frontlines. It will enhance the readiness of our military units and modernize infrastructure at depots and shipyards. And it will make improvements to servicemembers' quality of life.

To be clear, the investment we are making here in this bill, while critically important, is no substitute for robust annual defense funding levels. But it will help us catch up after years of the Biden administration's deprioritizing defense investments.

We can't afford to let our military readiness slide any further. We need to reverse the current trend and put our national security on a better trajectory for the future, and that is what our reconciliation bill will do.

A stronger America is a safer America, and that, Mr. President, is what Republicans intend to deliver.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

RECOGNITION OF THE MINORITY LEADER

The Democratic leader is recognized.

S.J. RES. 55

Mr. SCHUMER. Mr. President, so 100 days into Donald Trump's Presidency, America is plagued with deep problems. Donald Trump's trade war is sending prices up and up. Republicans are on the brink of taking away people's Medicaid. Trust in American leadership is in decline on the world stage. But what are Senate Republicans focusing on today? Today, Republicans are going nuclear to appease the fossil fuel industry and, at the same time, erode away the institution they profess to care about.

First, the facts: This week, Senate Republicans want to use a measure known as the Congressional Review Act—CRA for short—to repeal three vehicle emission waivers from California. These waivers have been used for decades and are vital for helping keep our air cleaner, our kids healthier, and to lessen our reliance on Big Oil.

Republicans have tried to get rid of California's emission waivers for a very long time. The fossil fuel industry—which knows it is in decline, which knows that clean energy is not only the cleaner wave of the future but the less costly wave of the future—but the fossil fuel industry hates them, hates

that industry. So Donald Trump's EPA tried to rescind the last iteration of one of these waivers during his first administration, but that effort fell short in the courts. The courts rejected it. Now Republicans want to try again. This time by using the CRA to repeal these emissions waiver at a simple majority threshold.

But what was made crystal clear today on the Senate floor through parliamentary inquiries I made to the Parliamentarian that the Senate Parliamentarian has advised both sides, Democrats and Republicans, that legislation to overturn these waivers does not—does not—qualify for expedited consideration under the Congressional Review Act. That means any legislation to repeal these waivers should be subject to a 60-vote threshold in the Senate.

The Senate Parliamentarian, as we know, plays a vital role in keeping this institution whole. It is thankless work. Parliamentarians' advice and judgment on rules and procedures of this institution is indispensable to both parties. So Republicans face a choice: Do they adhere to Senate precedent, as they have long claimed to do, and find another way to pass their repeal or are they going to plow ahead, overrule the Parliamentarian, do the bidding of Big Oil, and further eat away at the Senate in the process?

Well, today we have our answer: Senate Republicans are going nuclear. Let's be very clear, to override the Parliamentarian and to use the CRA in the ways the Republicans propose is going nuclear—no ifs, ands, or buts.

And don't take my word for it. Let me read a quote from Leader THUNE from just a few months ago when he was asked if he would advise his party against moving to override the Parliamentarian, Leader THUNE said this:

> Yeah, and that's totally akin to killing the filibuster. We can't go there. People need to understand that.

Again, Leader THUNE himself said: Overruling the Parliamentarian is akin to killing the filibuster, and that is just what the Republicans are proposing to do today.

Just yesterday, Leader THUNE admitted that this step could ''create precedent for the future'' and what an awful precedent.

And in his first address as Republican leader, Leader THUNE stood right here in the Chamber—I sat and listened—and promised that ''one of my priorities as leader will be to ensure that the Senate stays the Senate.''

Well, what happened to all of that? What happened to all the preaching we hear from the other side about norms and rules and precedent? Apparently, when the rules suit them, Republicans will preach about protecting precedent. But now that the rules are inconvenient, when they stand in the way of their ideological goals, Republicans say: Away with them.

Shameful. Shameful.

Republicans don't need to take the Senate down this road. They have other alternatives at their disposal. If they want to repeal these waivers, bring legislation to the floor. Have a debate. There is nothing that prohibits that. That is what should be done in the kind of regular order our Senate Republicans professed they were going to restore when they got here, when they got the majority here in January.

Make no mistake, this is not a narrow assertion of congressional authority, as Leader THUNE claimed it was. Today, Republicans set a new precedent that cannot likely be reversed. Moving forward, Congressional Review Acts will be weaponized like never before. Today it is all about California emission waivers; tomorrow, the CRA could now be used to erase any policy from an Agency that the Trump administration doesn't like at a simple majority threshold. They could go after permits for oil and gas drilling; some on the other side wouldn't like that. They could eliminate healthcare innovation waivers that States use to get care to people through Medicaid and the ACA.

They could even use the CRAs to make it even harder to form a union. They could go after Agency actions that protect access to reproductive care, like making it harder to access the medication mifepristone. They could go after rules that protect access to reproductive care.

All of this and more could now be done at a simple majority threshold with an expanded CRA. And all that would need to happen is for Donald Trump to choose an Agency action or policy he doesn't like, stamp it with a label ''CRA,'' send it over to the Congress, and Republicans will bow in obeisance and repeal it at a simple majority threshold.

This, in other words, is a backdoor strategy from Republicans to make Project 2025 a reality. And mark my words, many of our Republican colleagues are going to not like having to vote on CRAs that Trump wants, and we will be able to get votes on them because of what the Republicans are attempting to do today.

It is the legislative branch ceding authority over to the executive if we go forward with this, and Republicans should tread carefully. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and highjack the CRA in a way that it has never been used before, they will not like it the next time they are in the minority. That is for sure.

So this is a sad, shameful, disappointing day for the U.S. Senate. Republicans will come to regret the ill-considered step they take today, mark my words. And our country, the health of our children, the health of our communities—the whole country—will be worse off because of what Republicans have done.

BUDGET RECONCILIATION

Mr. President, now, on reconciliation, it is no secret how awful the Republican tax bill is. For weeks, we have said their bill shows that billionaires win; American families lose. Last night, the nonpartisan CBO proved that to be quite accurate.

The CBO's nonpartisan analysis shows that this bill would decrease household resources by 4 percent for the bottom 10 percent of Americans while increasing household resources by 2 percent for the top 10 percent of the country. To be clear, this bill would hurt the most vulnerable Americans, and the most benefits would only reach the top wealthiest—trickle-down economics, if there ever was one.

This bill hurts American families. They are the losers of this bill. American families will lose healthcare. They will lose food benefits. They will lose jobs. They will lose money. Bottom line: American families lose; billionaires win.

SALT

Mr. President, and finally on the SALT deal, yesterday Donald Trump came to the Capitol to deliver a message to New York House Republicans:

> Back down on SALT or else.

That is what he reportedly said, his words.

Less than 24 hours later, we are learning that New York Republicans have all bowed to the king and caved in obeisance to Trump. New York Republicans are showing, once again, that their loyalty does not lie with the volunteer firefighter in Bay Shore or with the teacher in Riverhead or even with the small business owner in Suffern. No. Their blind loyalty lies with Donald Trump.

The so-called SALT deal is a humiliating failure for New York Republicans. New York Republicans settled for barely half of what they wanted on SALT and barely a fraction of what Trump ripped away from them in the first term, and they are doing it because they are scared of the President and no relief for the marriage penalty. So if there is a firefighter and a teacher married to one another, nope. Being married hurts them in the SALT deal the Republicans made.

New York Republicans settled for SALT caps forever and a double tax on middle-class New Yorkers: our cops and firefighters, our teachers, our small businesses, our construction workers in the Hudson Valley, on Long Island, and across the State. I mean, even if New York Republicans did nothing, New York would be better off at the end of this year when the SALT cap would have expired.

This SALT deal leaves in place a penalty for married couples. A couple who are paying both taxes face the same limit as a single individual, even if they are paying double the taxes. This is one of the biggest issues facing middle-class families, and New York Republicans are leaving it in place. It is barely 20 percent of the New York Republicans' own SALT bill that they wrote.

One Republican Congressman— MIKE LAWLER—said last year:

Eliminating the marriage penalty within SALT isn't just important—it's absolutely essential.

Well, clearly it must not have been that essential.

New York Republicans have said for months that they had one job they were sent to Washington for: to get rid of the SALT cap. With this SALT deal, so-called SALT deal, they have failed everyone back home.

New York Republicans' capitulation to Trump on SALT is a slap in the face to Long Island, the Hudson Valley, New York City, and the hard-working, middle-class families across New York and across the United States.

I yield the floor.

The PRESIDING OFFICER. The Senator from South Carolina.

UKRAINE

Mr. GRAHAM. Mr. President, I will be making a quick presentation here and then Senator ERNST will follow, and I just want to compliment her for all the effort she has made to stand by Ukraine and make sure that this war ends in a way that is honorable and just. And we can stop the killing but do it in a way that we don't have future wars because we made a mistake here.

So there are so many things going on in the world right now that are very dangerous. You have Iran close to a nuclear breakout. You have the war in Russia and Ukraine. It is killing 5,000 people a day. Only God knows how many people are actually being killed or wounded, hard to track, but it is just massive. It is a major land war in Europe, and we thought those days were behind us.

We have threats from China. We have got all kinds of things going on in the world. So my advice is, when you have a hard decision to make, make sure you look at it through a moral clarity lens. Make it simple. Russia is the problem, not Ukraine. Ukraine didn't invade Russia; Russia invaded Ukraine.

We need moral clarity on all these issues. Iran is not trying to have civilian nuclear power; they are trying to build a bomb. We need to take them at their word as to what they intended to do over time. They intended to destroy the State of Israel, purify Islam, and come after us. That is what they say. They write on their missiles ''Death to Israel,'' and they call us the ''Great Satan.'' They have 600 pounds of highly enriched uranium—60 percent. That is enough for six or seven or maybe more bombs. They went from 60-percent to 90-percent enrichment in less than a month.

They have one civilian nuclear reactor. How much uranium has been used to run that reactor enriched by Iran itself? Not one gram. Think of all the fuel needed to run the civilian reactor from Russia. So they are trying to stockpile weapons-grade uranium to make a bomb; and they lie, cheat, and steal, and we catch them all the time.

So some moral clarity here. Iran with a nuclear weapon is not only unacceptable, it is the biggest threat to the planet, as I see it. The Arab nations want a nuclear weapon of their own.

And Israel—one Holocaust is sufficient. This is the 80th anniversary of the end of World War II. It happened a few days ago. During that war, there was an effort to annihilate the Jews. Founding the State of Israel in 1948 was a significant world event. And there is a saying in Israel, ''Never again.'' They actually mean it.

(Mr. SHEEHY assumed the Chair.)

How about moral clarity from the United States here? We are with Israel. If Israel has to use military force to destroy or degrade the nuclear capability of Iran, we should be with them. I am glad we are trying to find a peaceful solution to the uranium problem. If you can get Iran to dismantle their nuclear program, then that gets us to where I want to go. But they have to dismantle.

Right now, there are discussions between Russia, Ukraine, and the United States and Europe about how to end this war. Putin, in my view, is playing us all. President Trump called for a 30-day cease-fire. Ukraine said yes; Russia said no. President Trump urged Zelenskyy and Putin to go to Istanbul—I was over there—and meet to have direct talks. Zelenskyy went; Putin didn't.

So there was a call a couple of days ago between President Trump and Putin. The Russians now are supposed to submit a terms sheet about what it takes to get a cease-fire. That is supposed to happen in a few days. They are talking about going to the Vatican and having direct negotiations. I am for all of that, but I don't know about how. I think most people feel like I do. We have given Russia plenty of opportunity to find an honorable and just end to this war. They are not interested, and they are not going to change until we up the ante.

So we need moral clarity here. Putin is dragging this out. He believes he is winning on the battlefield. I don't believe he is. He is defying every effort that has been earnest by President Trump to find a solution to this war. President Trump says he wants to stop the slaughtering and the killing. He is right to do so. But this is a time of decision-making. This has gone on too long with too many games being played.

I will tell you in just a minute what the Senate can do. But what we need when it comes to Russia-Ukraine is moral clarity. When President Trump focuses on an issue and takes a firm stand, it always works. He is standing up to China and the world who has been ripping us off on trade. He has a policy now that whatever you charge us on tariffs, we are going to charge you. It is called reciprocal trade. He has imposed tariffs on China.

Everybody in this body goes home and talks about how China rips us off. Trump is actually doing something about it. China steals our intellectual property, they manipulate the currency to get them a trade advantage, and that needs to come to an end.

When President Trump focuses on fixing a problem—righting a wrong—he gets good results because the world now is calling Washington wanting deals. I think you are going to see a lot of good trade deals to right the wrong of trade abuse because President Trump stood up and insisted we get a better outcome.

The border. When he got in office, one of his top priorities was to fix a broken border. Look at what has happened. The lowest daily number of border encounters fell to less than 200, the lowest in history. He turned it all off because he was firm and resolved with Mexico and others. His border policies have worked. He has shut down a broken border, literally, in months because he had the desire and the will to do it, and people responded. And we are getting a great result at the border because of his determination and his will to do so. We went from 7,200 in March down to 200—that drop is amazing—because of his policies.

China, I just talked about. He is taking China on, and I am hoping we can reach a deal with China that will level out the trade playing field. China is talking to us; we are talking to China. The world is responding to President Trump's tariffs. We are going to get a bunch of good trade deals. And I very much appreciate that.

What did he say about Iran?

You know, it's not complicated formula. Iran cannot have a nuclear weapon. That's all there is.

That is moral clarity. You can understand that, no matter where you are at on the planet:

You know, it's not complicated formula. Iran cannot have a nuclear weapon. That's all there is.

We are in talks with Iran. Whether or not they achieve a result, I don't know. I don't mind trying. I do know this: Time is not on our side. President Trump said we are going to end the nuclear program one way or the other. When he said it, I think the Iranians believed it; and when he says it, I believe it. And the best chance to stop the Iran nuclear program is with President Trump's leadership.

Moral clarity, again, regarding Russia and Ukraine. Russia is the aggressor. Russia must end this bloodbath now. He has talked about ending the bloodbath. I am saying, from my point of view, Russia is the aggressor. Ukraine, like every other Nation, is not perfect. But they have fought like tigers.

In 1994, 1998—I can't remember—they gave up 1,700 nuclear weapons, the Budapest Memorandum. In return, Russia, the United States, Great Britain promised territorial integrity. They gave up 1,700 nuclear weapons with a promise from these countries they would be safe territorially.

Russia has violated that promise numerous times. They are constantly

harassing their neighbors. This is the second invasion of Ukraine by Russia. They have a view Ukraine belongs to them. No, it doesn't. It belongs to the people of Ukraine, a sovereign nation. If you have a dispute with a country, there are ways to arbitrate land disputes.

Putin is trying to rewrite the map of Europe by force of arms. If he gets away with it, if he is seen to having been rewarded for, you will get more of this. There goes Taiwan. Russia is the aggressor. Russia must end this bloodbath. That is my view of this situation.

Let's look at history and see what happens when you have moral clarity and see what happens when you lose it. September 27, 1938. Here is what Chamberlain said:

How horrible, fantastic, incredible it is that we should be digging trenches and trying on gas-masks here because of a quarrel in a faraway country between people of whom we know nothing.

That was his view of what Hitler was doing. Why do we care? We don't know these people. We don't speak their language. That is not exactly moral clarity in the face of Nazi oppression:

However much we may sympathize with a small nation confronted by a big and powerful neighbour, we cannot, in all circumstances, undertake to involve the whole British Empire in war simply on her account.

We know what that small country was. It led to the slaughter of 50 million people. It enticed Hitler to keep going, and Hitler told you what he was going to do. He wrote a book. Chamberlain, obviously, didn't read the book, and he didn't have the moral clarity to confront the Nazi regime. And a lot of people died.

September 30, 1938:

I believe it is peace for our time.

A paper signed by Adolf Hitler that he waved to the world. Less than a year later, the world is on fire. This is what happens when you don't realize what is going on. You misread evil. You think Hitler is something he is not. This is an example of not having moral clarity. It leads to a worldwide war.

Russia, the Soviet Union—this is an example of moral literacy, President John F. Kennedy:

Let every nation know, whether it wishes us well or ill, that we shall pay any price, bear any burden, meet any hardship, support any friend, oppose any foe to assure the survival and the success of liberty . . . When all are free, then we can look forward to that day when this city will be joined as one and this country and this great continent of Europe in a peaceful and hopeful globe.

He was talking about Berlin—moral clarity to the Soviet Union. He stood up for freedom, stood against the Soviet Empire.

And along comes my favorite, Ronald Reagan:

Mr. Gorbachev, tear down this wall!

How clear could you be? On the other side of this wall is an evil empire that moral clarity, over time, brought the Soviet Union down to its knees.

Russia today, Putin's Russia, is an evil country oppressing his own people, harassing his neighbor, wanting to take things that are not theirs, wanting to recreate the Soviet Union, the Russian Empire. And they are using every terrible tactic in the military book—bombing civilians, killing people by tens of thousands.

So when it comes to Putin, we need to have moral clarity, as Reagan and Kennedy had with the Soviet Union. It is not enough to give speeches. These were great speeches. But what we did against the Soviet Union is we built up our military. Ronald Reagan went to ''Star Wars'' and they couldn't keep up. We not only opposed the Soviet Union rhetoric, we opposed it in capability.

What do we do now with Putin? How do we end this war? I am not out to humiliate Russia or Putin, but I am out to end this war soon—not later but soon—in a way not to start another war.

When we left Afghanistan dishonorably and disgracefully, it set in motion a belief that the United States will not stand by its allies and we are apparently weak. I believe that. And the Presiding Officer of the Senate understands what happens when politicians get it wrong. People like him, in his old job, pay a heavy price. They go all over the world fighting these guys because when we pulled out of Afghanistan, every jihadist was on steroids. Putin licked his chops and went into Ukraine and Iran, kept enriching, and sort of the rest is history. That was a horrible decision, and we are paying the price for it today.

To my colleagues, Republican and Democrat, if we don't get Ukraine-Russia right, it will be worse than Afghanistan. If it is seen, when this is all over, that Putin was rewarded for his aggression—I am not trying to humiliate Russia, but I am trying to make sure they are not rewarded in a way that China will be enticed to take Taiwan or Iran will believe we are all talk in the West when it comes to their nuclear capability, isolating Israel even further.

Speeches are important. Moral clarity is the right lens from which to look through regarding aggression and evil. But we have to do more than talk.

I appreciate President Trump's earnest effort to bring the parties together, to find a solution we can all live with, to keep an independent, sovereign Ukraine and end this war sooner rather than later. It is clear to me after all these months, the earnest efforts by President Trump are not being equally met. I think Zelenskyy is ready to make concessions to end this war. Putin seems to be more talking and less acting.

What can we do to up the ante? What can we do in the U.S. Senate to change the equation? What can we do to persuade Russia to get to the peace table?

We can impose bone-crushing sanctions on Putin's Russia. And he has earned that. I hate it for the Russian people, but it is now time to increase the cost of this war on Putin.

The sanctions packet that we have put together has 80 cosponsors. Do you know how hard it is to get 80 Senators to agree on anything? Eighty of us—and the number is climbing—are ready to impose sanctions on Russia if he does not come to the table and earnestly seek peace—Putin.

And these sanctions are geared toward China. There are tariffs in these sanctions on any nation that buys Russian oil and gas from the shadow fleet. Putin's war machine is propped up by China and India buying Russian oil at a massive discount to keep the war machine and Putin running.

So what have we decided to do here? Focus on those causing the problem, not just Putin; focus on his customers.

Most of Europe has weaned themselves off of Russian oil and gas. That is a major advancement. But it is now time to let the Chinese know: If you want to be a normal country, act normal. If you want to have a better relationship with the United States and Europe, help us. Don't fuel the flames of a bloodbath. Don't buy cheap oil from a despot because you can with impunity. Those days of buying cheap oil from Putin with impunity are coming to a close.

We are going to act. And how we act and when we act will be a political exercise among the body, talking to the White House, and talking to our allies.

To China: I would like a better relationship. We have a lot of opportunity to grow our economies together. But if you keep supporting Putin and fueling his war machine, you will never have a normal relationship with the U.S. Senate.

To our friends in India: Watch what you are doing.

To my colleagues: Seldom do we have a chance to speak with one voice at such an important time. The entire world is watching the U.S. Senate.

I just got back from T rkiye with Secretary Rubio, who invited me to go. He allowed me to speak to every Foreign Minister of our NATO allies, talking about the Senate bill, telling them that the Senate is an independent body and that we are moving down the road to holding Putin accountable.

The world is watching the Senate in a way I haven't seen since I have been here. We have a chance, my colleagues, to help end this war. We have a chance to push Putin to the table. And if we fail as a world, not only does this war continue, but we are going to start new wars.

I have never been more proud of this body than I am right now. We have come together in a bipartisan fashion. There are a group of House Members who will take the Senate bill and sign a discharge petition. What does that mean? It is coming to the floor of the House no matter what.

So we stand ready. I am going to talk to the majority leader, talk to all of

my colleagues who have a say in how this bill moves forward, and I am going to urge them to get ready to act.

We have sat on the sidelines too long. We have watched too many people get slaughtered by Putin. We have put sanctions on, but they haven't worked the way they should.

What we are doing in the Senate is a game-changer. It will affect China, which provides the most fuel to Putin's war machine in a dramatic fashion.

To China: I don't want to do that. I will, if I have to. I want you to help us in this war. I am not looking to punish or destroy your economy or hurt our economy. I am looking to get a result here.

But I will end where I started: If we have to, we will.

President Kennedy said: ''We shall pay any price and bear any burden.'' He was right.

President Reagan said: ''Tear down this wall''; end this evil empire.

Sometimes, freedom comes at a heavy price. The Ukrainians are paying that price, and I am so proud of them. They are fighting like tigers, and they are dying by the thousands. And they are not going to quit no matter what we do—nor should they.

This is a moment of reckoning. This is a moment that matters. All of us got to the Senate, and it is not an easy path to take to get elected to this body. But now you are here, and you have a chance, my colleagues, to make a real difference, to make this world safer and more peaceful.

Let's not shirk the responsibility history has put upon us. This is a historical moment. Let's rise to the occasion like those before us. Let's have moral clarity when it comes to Putin. Let's do more than talk. Let's act.

I will yield to Senator ERNST, who has been a champion for getting a good outcome for Ukraine and the world.

I very much appreciate all you have done in this cause.

The PRESIDING OFFICER. The Senator from Iowa.

Ms. ERNST. Mr. President, I want to thank my colleague and great friend, as we work on this together.

I really appreciate your leadership. Thank you for allowing me to join you on the floor today as we show our support for your bill, Sanctioning Russia Act of 2025. Thank you, Senator GRAHAM.

Folks, last week, President Trump showed the world that American leadership is back. He brought home the last living American hostage, delivering Edan Alexander from Iran-backed Hamas and reuniting him to his family after nearly 600 days. He stood with our partners in the Middle East to strength the historic Abraham Accords. And he delivered a strong message to Vladimir Putin: End the war.

Today, I stand in support of a sovereign Ukraine and echo the President's call to Putin to stop this bloodbath that never should have happened.

This is an issue that not only affects a close partner under siege but also the strength of the United States of America and the security of the free world.

Let's be clear here, folks: China is watching; so are Iran and North Korea. And, of course, Vladimir Putin is watching too. They call it the ''new axis of evil'' for a reason.

I personally witnessed and experienced the growth of the U.S.-Ukrainian relationship when I visited Ukraine, in its waning days of Soviet control, as part of an agricultural student exchange program. This was in 1989.

I had the privilege of living with a Ukrainian family on a very small collective farm. As we got together, there were a number of us Iowa students on that exchange. Again, it was an agricultural exchange. We came together, each of us with our families, in a group setting, one of the very first nights that we were on that collective. Again, with the premise of an agricultural exchange—we were farming tomatoes, working with the cattle and the hogs—a very small, small collective. We came together, and the Ukrainians wanted to ask us questions. So all of us American students, all of us from Iowa, we sat down with our Ukrainian families. We expected to talk about agriculture—Iowan agriculture versus Ukrainian agriculture. Much to my surprise, the first question that came from our Ukrainian counterparts was not about how we raise corn or soybeans in Iowa. It was not about the types of machinery that we use on our farm. But the first question the Ukrainians asked us was, What is it like to be free? What is it like to be an American? Because in 1989, those Ukrainians were living under Soviet socialist rule. They could not travel without having the permission of their government.

My family did not have a telephone, and if they wanted to use the collective manager's telephone, they would have somebody listening in on the conversation. They would have to know the purpose of the telephone call, whom they were calling, why they needed to make a telephone call.

This was 1989, and I learned a lot from that exchange. I saw a Ukrainian people who were desperate to break free of socialist economic structures and authoritarian restrictions on freedom of movement, the ability to have your own employment, and on freedom of speech.

Two years later, Ukraine declared its independence from the Soviet Union and broke free.

Later—many years later—in 2003, the United States is involved in the war in Iraq. I was a soldier in 2003 during Iraqi Freedom. I was a transportation company commander, permanently stationed in Kuwait.

My transporters ran convoys from the ports in Kuwait up to Iraq, delivering goods for our warfighters. So I got a little subcamp in Kuwait, outside of Camp Arifjan. Half of that subcamp, called Camden Yards, was occupied by American forces. My soldiers and I lived on that subcamp. The other half of the camp was occupied by other forces. Those other forces were Ukrainian soldiers.

Ukraine is not part of NATO. They were not required to support the United States of America in Iraq. But Ukraine, of its own volition, sent their soldiers—and not just as support elements. They were there as combat forces.

Again, I was a transporter. We ran convoys in Iraq. The other half of that camp that I lived on, they were Ukrainian engineer forces. They did road clearing.

I think back: How many American lives did those engineers save from their road-clearing efforts, clearing bombs so they wouldn't be detonated by my drivers—Ukrainian forces, combat forces?

Today, Ukraine is fighting its own war. And I will remind everyone, the United States does not have forces involved in the Russia-Ukraine war—none, zero, none.

Today, Ukraine fights not only for its own survival but for the very principles the United States was founded on. When America leads, the world is safer. When we disengage and when we retreat, like we saw for the last 4 years under the Biden administration, chaos fills the void.

Russia's aggression has already cost too many innocent lives, about 5,000 lives every single week. Those are too many innocent lives, folks, which is why I support President Trump's efforts to get a peace deal done now. Vladimir Putin cannot keep tapping the United States of America along.

I vow to keep working with my colleagues to equip the President with all the tools necessary to hold Russia accountable, including sanctioning Russia and its supporters if they continue to drag out these peace talks and carry on with the needless bloodshed so this war that never should have started can come to an end.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. Mr. President, I ask unanimous consent to complete my remarks before the vote starts.

The PRESIDING OFFICER. Without objection, it is so ordered.

BUDGET RECONCILIATION

Ms. CANTWELL. Mr. President, I come to the floor to talk about the action that we are seeing in the House of Representatives today that will lead to action here in the Senate and asking our colleagues to reverse course on this reconciliation bill that I think is going to have unbelievable economic consequences to our economy.

Trillions in red ink that are alarming credit agencies and bond markets, spiking billions in energy project costs, and driving up prices and burdening States with billions of dollars of new healthcare that they can't afford.

Instead, they should be focusing on protecting healthcare coverage, lowering costs for American families, and

giving working families the breathing room they need to prosper.

Even now, 5 years later out of COVID, we can still see the effects of the pandemic. That time changed the way we live and took a toll on our economy. The U.S. economy lost 23 million jobs at the start of the pandemic, leading to a recession in early 2020, and thanks in no small part to well-designed, bipartisan fiscal policies by both Congress and the Biden administration, the recession that started was the shortest in history, lasting only 2 months.

Coming out of it though, the combined effects and impacts on our supply chains and durable goods caused inflation to spike to 9 percent by June of 2022. Again, well-designed fiscal policies by the Fed helped get that inflation back down in just 1 year to 3 percent by June of '23 and continue to lower and hover just above 2 percent.

We need, though, to continue to make progress on inflation and costs—costs that impact everything from clothes, cars, food, computers, you name it, and costs may be getting even more expensive because of the impacts of the tariffs, and they are making their way onto our shelves.

The last thing American families need is to be saddled with even more financial restraint, particularly as it relates to Medicaid and the policies in the reconciliation bill. More than 72 million Americans are enrolled in Medicaid, making it the single largest insurer in the United States.

It is critical that it remain a critical part of our healthcare system. Depending on the State, the Federal Government covers somewhere between 50 and 70 percent of the cost of insuring people with Medicaid. While Medicaid is administered jointly by the Federal Government and, in most States, about two-thirds of the funding for the State Medicaid program is Federal support. So make no mistake about it, cutting Medicaid at the Federal level is going to have a dramatic economic impact on States. It is the largest source of Federal funding for States.

It is the largest component expenditure across all States—more than K–12, more than higher education, more than transportation—and somehow, in an economy with great inflation, you think the idea is to make it more expensive for Americans to get health insurance and cover their costs and impact the economy?

The bill that is now being cobbled together is a serious attack on Medicaid. As an assault, they will continue to have ripple impacts on the economy. It undermines the Medicaid program, shifting the burdens to the State, and it makes the entire healthcare system more expensive for everyone.

Medicaid provides financial support to the healthcare sector, stimulates local economies—spending that does have a multiplier effect. Every dollar spent generates more than $1 worth of economic activity. Medicaid drives employment in the healthcare sector, it generates State and local revenue, and it saves money for the enrollees to spend on more items—not healthcare.

But reductions in the Medicaid funding, especially as large as $715 billion, will take a toll on States, on jobs, on revenue, and it will increase the financial burden on individuals and families.

So it is important to remember that direct recipients of Medicaid are not just individuals with coverage. They are a payment system. They are the benefits of a healthcare system, hospitals, doctors' offices, pharmacies, nursing homes. And so when you cut that funding, you are cutting those businesses and those opportunities. The impact on the State economy would be greater than the loss of Federal Medicaid funding because of the ripple effects of the costs across the State.

The Commonwealth Fund estimated that, collectively, States' gross domestic product could be cut $95 billion smaller than the total economic output lost, and that could be even deeper.

So imagine every State now having $2 billion more costs because of Medicaid. The additional loss in individual income would mean that State and local revenues would decline by $7 billion. This would make it harder for States and localities to balance the burden of Medicaid.

And our constituents would also see more far reaching impacts as they struggle to provide healthcare. Today, 49 States, plus the District of Columbia, are all part of the system and counting on these providers and the funds. But this bill even eliminates the ability for States to adjust the revenue in any way that would be helpful for them to deal with this crisis. So this is an extreme approach to cutting American citizens off of the healthcare.

But think a bit about it for a second on the work requirement—also almost like a surveillance of U.S. citizens, trying to make them prove that they are eligible. Let's be honest; the provisions are not designed to cut down on waste. Rather, their primary objective is to prevent people from signing up for Medicaid coverage. In Arkansas, the casework requirement led to disenrollment of 18,000 people in just 4 months. And in New Hampshire, the complexity and administrative burden of the work requirement caused 17,000 beneficiaries to receive coverage termination in just 1 month.

Today, Georgia is the only State that has a work requirement for Medicaid. And instead of expanding Medicaid through the Affordable Care Act, it allows individuals and households that have income up to 100 percent of the Federal work poverty to get coverage if they work for 80 hours a month. The results are not good. A report found that Georgia's model cost taxpayers—taxpayers, not these individuals—cost the taxpayers $87 million and enrolled only 6,000 people, about 75 percent fewer than had been projected. So I ask again, what policy is this that saves money?

It makes healthcare more expensive for the rest of us. Nobody defers their healthcare costs. They are just going to show up at the emergency room. Just because we are cutting spending, it doesn't mean that the need magically disappears. States will have to find their way to make up for these shortfalls. A Kaiser analysis found that the House reconciliation bill—if it is enacted, the State of Washington would need to spend 30 percent more per Medicaid enrollee to make up the difference.

We don't have those resources. The same will be true of every State. For example, Louisiana would have to spend 50 percent more per Medicaid enrollee to make up the difference, translating into an 11 percent increase in the State taxes if they had to do that. Now is not the time to force our States to jump off of a cliff just because we won't live up to our Medicaid obligation.

I know the President used the f word, but what is real here on the Senate floor—I am not going to say it—but you are making a mess out of Medicaid, and we should stop them.

I yield the floor.

VOTE ON MOTION

The PRESIDING OFFICER. Under the previous order, all time is expired.

The question is on agreeing to the motion to proceed.

Mr. BOOZMAN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

The result was announced—yeas 69, nays 31, as follows:

[Rollcall Vote No. 263 Leg.]

YEAS—69

| | | |
|---|---|---|
| Alsobrooks | Gallego | Moreno |
| Banks | Gillibrand | Mullin |
| Barrasso | Graham | Murkowski |
| Blackburn | Grassley | Ossoff |
| Blunt Rochester | Hagerty | Padilla |
| Booker | Hassan | Ricketts |
| Boozman | Heinrich | Risch |
| Britt | Hoeven | Rosen |
| Budd | Husted | Rounds |
| Capito | Hyde-Smith | Schiff |
| Cassidy | Johnson | Schmitt |
| Collins | Justice | Scott (FL) |
| Cornyn | Kelly | Scott (SC) |
| Cortez Masto | Kennedy | Sheehy |
| Cotton | Lankford | Slotkin |
| Cramer | Lee | Sullivan |
| Crapo | Luján | Thune |
| Cruz | Lummis | Tillis |
| Curtis | Marshall | Tuberville |
| Daines | McConnell | Warner |
| Ernst | McCormick | Warnock |
| Fetterman | Moody | Wicker |
| Fischer | Moran | Young |

NAYS—31

| | | |
|---|---|---|
| Baldwin | Hirono | Paul |
| Bennet | Kaine | Peters |
| Blumenthal | Kim | Reed |
| Cantwell | King | Sanders |
| Coons | Klobuchar | Schatz |
| Duckworth | Markey | Schumer |
| Durbin | Merkley | Shaheen |
| Hawley | Murphy | |
| Hickenlooper | Murray | |

| | | |
|---|---|---|
| Smith | Warren | Whitehouse |
| Van Hollen | Welch | Wyden |

The motion was agreed to.

## GUIDING AND ESTABLISHING NATIONAL INNOVATION FOR U.S. STABLECOINS ACT

The PRESIDING OFFICER (Mr. RICKETTS). The clerk will report.

The senior assistant legislative clerk read as follows:

A bill (S. 1582) to provide for the regulation of payment stablecoins, and for other purposes.

The PRESIDING OFFICER. The majority leader.

AMENDMENT NO. 2228

Mr. THUNE. Mr. President, I call up my amendment No. 2228 and ask that it be reported by number.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from North Dakota [Mr. THUNE], for Mr. RICKETTS, proposes an amendment numbered 2228.

The amendment is as follows:

(Purpose: To provide for expedited certification of existing regulatory regimes)

In section 4(c), add at the end the following:

(8) EXPEDITED CERTIFICATIONS OF EXISTING REGULATORY REGIMES.—The Stablecoin Certification Review Committee shall take all necessary steps to endeavor that, with respect to a State that, within 180 days of the date of enactment of this Act, has in effect a prudential regulatory regime (including regulations and guidance) for the supervision of digital assets or payment stablecoins, the certification process under this paragraph with respect to that regime occurs on an expedited timeline after the effective date of this Act.

## PROVIDING FOR CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION RELATING TO ''FEDERAL MOTOR VEHICLE SAFETY STANDARDS; FUEL SYSTEM INTEGRITY OF HYDROGEN VEHICLES; COMPRESSED HYDROGEN STORAGE SYSTEM INTEGRITY; INCORPORATION BY REFERENCE''—Motion to Proceed

Mr. THUNE. Mr. President, I move to proceed to Calendar No. 85, S.J. Res. 55.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion to proceed.

Mrs. GILLIBRAND. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Virginia (Mr. WARNER) is necessarily absent.

The result was announced—yeas 53, nays 46, as follows:

[Rollcall Vote No. 264 Leg.]

YEAS—53

| | | |
|---|---|---|
| Banks | Graham | Moreno |
| Barrasso | Grassley | Mullin |
| Blackburn | Hagerty | Murkowski |
| Boozman | Hawley | Paul |
| Britt | Hoeven | Ricketts |
| Budd | Husted | Risch |
| Capito | Hyde-Smith | Rounds |
| Cassidy | Johnson | Schmitt |
| Collins | Justice | Scott (FL) |
| Cornyn | Kennedy | Scott (SC) |
| Cotton | Lankford | Sheehy |
| Cramer | Lee | Sullivan |
| Crapo | Lummis | Thune |
| Cruz | Marshall | Tillis |
| Curtis | McConnell | Tuberville |
| Daines | McCormick | Wicker |
| Ernst | Moody | Young |
| Fischer | Moran | |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hickenlooper | Rosen |
| Baldwin | Hirono | Sanders |
| Bennet | Kaine | Schatz |
| Blumenthal | Kelly | Schiff |
| Blunt Rochester | Kim | Schumer |
| Booker | King | Shaheen |
| Cantwell | Klobuchar | Slotkin |
| Coons | Luján | Smith |
| Cortez Masto | Markey | Van Hollen |
| Duckworth | Merkley | Warnock |
| Durbin | Murphy | Warren |
| Fetterman | Murray | Welch |
| Gallego | Ossoff | Whitehouse |
| Gillibrand | Padilla | Wyden |
| Hassan | Peters | |
| Heinrich | Reed | |

NOT VOTING—1

Warner

The motion was agreed to.

## PROVIDING FOR CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION RELATING TO ''FEDERAL MOTOR VEHICLE SAFETY STANDARDS; FUEL SYSTEM INTEGRITY OF HYDROGEN VEHICLES; COMPRESSED HYDROGEN STORAGE SYSTEM INTEGRITY; INCORPORATION BY REFERENCE''

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

The senior assistant legislative clerk read as follows:

A joint resolution (S.J. Res. 55) providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the National Highway Traffic Safety Administration relating to ''Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference''.

The PRESIDING OFFICER. The Senator from Rhode Island.

CLIMATE CHANGE

Mr. WHITEHOUSE. Mr. President, let me describe what I think is going on here on the Senate floor. Today is an unusual and interesting day.

What we understood the plan was, was that the majority was going to move to the Congressional Review Act regarding the California clean air rule in an effort to overrule the Clean Air Act rule for the fossil fuel industry, which the majority so diligently serves.

The problem with that is that the Parliamentarian has ruled that the Congressional Review Act does not apply to the waiver that California gets, allowing it to do its own clean air standard. So they had a problem. The problem was that Democrats were going to make a point of order saying: Hey, you can't do that. We have argued this matter. We both went before the Parliamentarian. We made our case. We filed our pleadings. We got a decision. In our view, it was not even a close call of a decision. But that is in our view. And what you are really doing here is, for the fossil fuel industry, going nuclear, overruling the Senate Parliamentarian to accomplish a legislative task—to amend, basically, the Congressional Review Act—and then open the door for that to undo a 30-year tradition of California and other States like Rhode Island being able to operate under better clean air standards and the vehicle emissions standards than the Federal Government may be willing to accomplish.

So that is where we thought we were. Now, what is happening is that we have gone to a different CRA, this one having to do with hydrogen vehicles. The minority has 5 hours. There is a total of 10 hours, evenly divided. I suspect the majority is not going to use much of that time. But the minority has 5 hours to talk about what is going on.

We are now in the 5-hour debate period on the hydrogen vehicle CRA, as the majority moves toward making its play on the California clean air standard.

This is a slight bump in the road for them, but our understanding is that there is a new plan. The new plan is, at the conclusion of our 5 hours, to make a new point of order that allows them to do the California CRA effort and create a new way to get around the terms of the Congressional Review Act.

The predicament for them is that the Congressional Review Act, as a law—passed by the Senate, passed by the House, signed into law by the President—says: In the Senate, which is where we are, when a committee is discharged from further consideration of a joint resolution, which is where we are, all points of order against the joint resolution are waived.

They intend to create a Senate exception to that. We expect the Parliamentarian will say, when they offer this point of order, based on the statute, based on the law, well, that is not in order. Then they will go nuclear on this. They will bring everybody back to, by a simple majority vote of 51, overrule the Parliamentarian as to that new point of order.

The purpose is to create a point of order that allows a bypass of the Parliamentarian's decision—a very sound one, a clear one, in my view, based on precedent, law, history, tradition, all of it—that the CRA effort to undermine California's clean air standard does not work under Senate rules.

In a sense, this is like a double nuclear option. They are going to overrule the Parliamentarian to create a new point of order under the CRA that will amend, in effect, the CRA. It will make the law regarding this no longer effective because they will come in and overrule the Parliamentarian.

And, then, even though the Parliamentarian's ruling is that you can't use the CRA to go after the California waiver, they don't have to overrule that directly because they will have, by overruling the Parliamentarian, created this little end-around.

So I guess this is a demonstration of how many hoops the Senate majority is willing to jump through for their fossil fuel supports.

And it ends at the same point, which is the purpose of the exercise. It ends with the Parliamentarian being overruled, and it ends with an attack on California and other sovereign States' ability to require cleaner air and lower vehicle emissions in their States.

Now, why does that matter? Well, obviously, if you are the fossil fuel industry, one of the things you sell is gasoline, and one of the things that the California clean air and emissions standards do is to require the auto industry to make automobiles more efficient—maybe even make them hybrid, maybe even make them electric. And whether they are more efficient or hybrid or electric, it all ends in the same place for the fossil fuel industry, which is: We can't sell as much polluting gasoline, and we want to sell more gasoline, and we don't like clean air standards that get in the way of us selling as much gasoline as we want to.

So we are here through this complex parliamentary rigmarole to overrule the Parliamentarian to get around her ruling that the Congressional Review Act only covers rulemakings, not the California waiver and other things. One of the problems with that is that—you know, if you give a mouse a cookie—it doesn't stop here; it opens the Congressional Review Act, which was very specifically designed to address rulemakings within a period of time after the conclusion of the rulemaking. And this would allow essentially anything you could put into the Federal Register to be submitted to Congress for Congressional Review Act review, no matter when it was done. All you have to do is re-up it with a submission and send it in to Congress, the California waiver being an example of that in the sense that it has been around for about 30 years now.

So one of the Congressional Review Act's limitations was it had a brief time window in which you were allowed to come to Congress to disapprove a rule, and that time period is now blown to smithereens if they go through with this parliamentary scheme.

The second thing is, it had to be a rulemaking; that it added a process at the end of the Administrative Procedure Act rulemaking, when the rule was finally enacted into law as an Agency rule. You always had the ability to go to court and sue and say that the Administrative Procedure Act was violated, it is arbitrary and capricious, was a violation of the law or whatever. This gave it political extra opportunity, which was to jump straight to Congress and just ask us to disapprove it. You don't have to prove, then, that there is anything wrong with the rule; just, politically, we don't like it so we are going to jam it.

And so, when you expand beyond just APA rulemaking to essentially any Executive decision that can be dumped into the Federal Register to create a submission that can then be brought here, you have opened a massive, massive array of Executive actions to Congressional Review Act disapproval.

As my colleagues have said, it could be as simple as a lease, as simple as a permit, as simple as a license. Essentially, any Executive decision since the passage of the Congressional Review Act can now be brought here on a purely political basis and—boom—blown up.

If my colleagues on the other side don't think that we will use this if they do this, they have taken leave of their senses. Of course we will. They are about to create a new Senate in which the CRA can be used for an immense array of purposes, well beyond what the actual law says.

(Mr. SHEEHY assumed the Chair.)

They don't have to be doing this. Let's be clear. They do not have to be doing this. There are other ways to serve their fossil fuel industry friends in the industry's desire to attack the vehicle emissions standards, the clean air standards. There are a whole bunch of them. One, they could do it administratively.

In fact, in 2019, the Trump administration withdrew a previously granted Clean Air Act waiver. And to do that, it made findings per a Clean Air Act process—administrative findings per a Clean Air Act process—as to the three criteria established under the Clean Air Act that determine whether a waiver application gets granted or denied.

So they already tried that once. They know that that is an avenue. Why did they not want to do that? Well, for starters, it is amenable to challenge if it is done unlawfully, if it is done arbitrarily and capriciously—the magic words of administrative mischief. And you end up in a forum like a court where you have to defend your facts, unlike here where all you have to do is have a majority and ram it through. So they didn't want to do it administratively, but they could have, and they already tried in the last Trump administration.

What else could they have done? Well, this is California's Clean Air Act standard. They could have gone and negotiated with the sovereign State of California and the other sovereign States that have attached themselves to the cleaner standard of California, which includes Rhode Island. This could be done through a regular process of negotiation.

We just had the Administrator of the EPA in the committee this morning for a lively exchange, and he repeatedly talked about how interested EPA was in cooperative federalism; that the Federal Government has to be a real partner with sovereign States; that we shouldn't be lording it over the sovereign States; they have expertise and interests of their own and cooperative federalism means that the Federal Government and the State governments should work as partners to accomplish goals.

Well, that was pretty rich, while EPA is trying to roll a sovereign State that is the fourth biggest economy on the planet without any hint of negotiation or cooperative federalism or effort—because when you are negotiating, the other side gets a vote, too, and you have to come to an agreement. And it is much easier to come here and have your friends in the Senate do your bidding in the Senate without any standard other than: Do we have the votes?

But they could have done it that way. There is a totally clear path to negotiate with California—say: Hey, circumstances have changed in this way or that. We have new policy issues that we want to argue to you, and let's try to figure out if we can work this out.

Nope. Didn't even try.

The other way to do this would be to go back and actually change the Congressional Review Act, right? It is a statute so we can amend it. And we could go through the process of amendment and say: OK, we don't want the Congressional Review Act to be limited to rulemakings any longer. We want to open it up to more stuff. And we could have a conversation about what should and should not be included in an expanded gateway to the Congressional Review Act. The House would have its say. You would end up doing what we call around here regular order. And in the Senate the minority—because you would have to get through cloture, the minority would have a chance to make our points. And you could do an amendment using regular order. Again, they would have to listen to us, and they would have to pay attention to facts.

Now, all they have to pay attention to are interests—and the fossil fuel interest is their dominant interest—and votes, do they have the votes. And those make it easy to choose this way, to go nuclear in the Senate rather than do the work either of amending the Congressional Review Act by law or negotiating with a sovereign State in ordinary Federal-State cooperative federalism or pursue that Clean Air Act administrative process that they had begun back in Trump 1.

Again, the reason not to do all those three is you can't just roll everybody and do what the fossil fuel industry wants. So here we are. This is because

this is the shortcut. This is the thing that does what the fossil fuel industry wants.

And the price is going to be very, very high because, in my recollection, there has never been a legislative outcome in this body determined by overruling the Parliamentarian. We have gone back and forth on nominations, but on a legislative outcome which changes the Congressional Review Act and which allows an attack on a statutory waiver in the Clean Air Act for the State of California—those are legislative in their effect. And so, to me, that is not the right way that we should be going about this.

So there are a bunch of problems with what is going on here, but to understand the floor machinations we are about to go through—the overruling of the Parliamentarian to create an end-around so we don't have to overrule but can only violate the order of the Parliamentarian on the CRA—you really have to understand the baseline story here. And the baseline story here is that this is the fossil fuel industry in action. It may look like it is a majority and a minority in the Senate having an argument. No. It is the fossil fuel industry in action, trying to create a shortcut for itself so it can sell more gasoline and pollute more and ignore all the States that have joined with California to demand cleaner air for their constituents.

The fossil fuel industry essentially runs the Republican Party right now. The fossil fuel industry hates this clean air standard because it sells less gasoline in the States where the clean air standard is there. And it sells less gasoline in other States because it is hard to market both a clean vehicle and a dirty vehicle side by side. So to get to the enormous number of States that are with California on this and to sell into their markets, they have to make more efficient vehicles everywhere so that everybody enjoys the benefit of spending less on gasoline, getting better vehicle mileage, and having cleaner air.

So it actually works out pretty well for everybody except—except—the fossil fuel industry, which, of course, wants to sell more gasoline, period and end of story. And what they have is a willing Senate majority that will basically do whatever it is that they want, and they have an executive branch that has been infiltrated by fossil fuel interests and is now essentially run by fossil fuel interests.

In my previous ''Time to Wake Up'' speeches, I have described—I am probably not going to get this perfectly right because I am going from memory here, but there is a kind of wasp that injects its larvae into another bug; and as the larval wasp begins to grow, it takes over the neural system, it takes over the command and control system of the other bug. So the other bug is still alive. It still looks like the other bug's shape and size and all of that. It doesn't look any different than a regular other bug, but it is being driven from inside by the larval wasp, which tells it to go do things that then create a place where the larval wasp can grow, can nest, can feed, whatever it needs to do.

It takes over the bug from the inside and takes over command and control, and steers it around. That, to me, is a pretty good analogy for what the fossil fuel industry is doing with the U.S. Government right now.

All of their front groups, all the machinery they created over the years to propagate the fraud of climate denial and to exert wild political influence all over the country, all of that just slots right into positions in government that are taken over by people who say, you know, that the concern about climate change is crud, climate change is a religion and not science.

They speak utter nonsense. It is like the worship of Baal back in Biblical times, bowing down to fossil fuel and doing whatever it is the great god Baal wants.

Well, things didn't work out too well for the priests of Baal, if you followed that analogy, but that is where we are. And what all of this overlooks is the coming storm.

When the President pretends that climate change is a hoax, he disables government's ability to prepare for a coming storm. When the executive branch sensors the use of the terms ''climate change,'' demands that they be struck from government documents, that prevents the executive branch from preparing for the coming storm.

When the executive branch—as we heard just today in the Environment and Public Works Committee—goes around and terminates grants based on a heresy hunt, where they are looking through the grants for language they don't like—like ''equity,'' there is a bad word; ''inclusion,'' can't have that; ''climate,'' definitely worth terminating a grant over that—they are destroying the programs that would help communities prepare for the coming storm because they have the word ''climate'' in them.

They even went so far in the executive branch as to have an Executive order on energy that refused to include either solar energy or wind energy in the definition of ''energy.'' Like, you can say what you want about whether you like solar or whether you like wind, but all you have to do is go to a solar facility or go to a wind facility, and you can see the electrons coming off of it.

The idea that that is not energy, that is not just a violation of law and common sense, that violates the dictionary. But that is how far the fossil fuel industry wasp will drive the Trump administration bug to ignore the coming storm.

What does the coming storm look like? Well, let me start.

Mr. President, I ask unanimous consent to use a larger than usual graphic in order to show an old page from the New York Times.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WHITEHOUSE. Mr. President, now this is always good to remember because it wasn't always this way with President Trump. Here in 2009, there was a full-page ad in the New York Times. President Obama was getting ready to send a crew to Copenhagen for the COP, the climate change conference, and business leaders spoke up about that, saying, as business leaders, here is what we have to say:

> [One,] if we fail to act now, it is scientifically irrefutable that there will be catastrophic and irreversible consequences for humanity and our planet.

Well, that is kind of the point here, and I will get into, in a moment, what some of those catastrophic and irreversible consequences look like.

And it goes on to demand that the Obama administration show leadership on climate change:

> Please allow us, the United States of America, to serve in modeling the change necessary to protect humanity and our planet.

Signed by Donald J. Trump, chairman and President; Donald J. Trump, Jr., EVP; Eric F. Trump, EVP; Ivanka M. Trump, EVP; and the Trump organization.

So there have been times when the Trump family understood what climate change was all about, understood the catastrophic and irreversible consequences that were looming, and were willing to say so.

But in between came exposure to politics, exposure to the power of fossil fuel on the Republican side and the understanding that if you really want to make it in Republican politics, you have got to do whatever the fossil fuel industry wants, whenever the fossil fuel industry wants it. That means we are ignoring some pretty serious warnings.

One of the earliest warnings came from Freddie Mac. Freddie Mac is not a green organization. Freddie Mac is a huge mortgage company, a federally chartered giant mortgage company. And as a giant mortgage company, it has a very distinct interest in the mortgage market.

And what did the chief economist for Freddie Mac warn? He warned that climate change was making coastal properties uninsurable. Climate change was making coastal properties uninsurable, either because sea levels were rising and they would flood or because storms were worse and there would be more damage by hurricanes and massive rains or because, who knows, they would lose access to the fresh water in their wells because of the infiltration of salt water underground. There are all sorts of ways in which climate risk hits coastal properties.

So the chief economist said: Here is how that works. The climate risk disrupts the insurance industry as to certain properties—meaning, those properties also can't get a mortgage any longer.

Freddie Mac is a mortgage giant. It knows what is needed for a mortgage. What is needed for a mortgage is an insurance policy. No insurance policy, no mortgage.

So now you have got properties along the coast that are at risk, that can't get insurance and can't get a mortgage. What happens to the value of those properties? Well, it goes down, he predicted. He predicted a coastal property values crash as a result of that cascade from climate risk to uninsurability to no mortgages.

And the coastal properties values crash he predicted was going to be so severe that it would look like 2008—that mortgage meltdown—all over again, and he stands by that testimony. In fact, he came when I was chairman of the Budget Committee to reiterate it.

Something else has changed in the meantime, though. It is not just coastal property risk. Ask any of our Western colleagues about wildfire risk and about what is going on in areas that have wildfire risk that the insurance company can't figure out, can't predict; and, therefore, it backs away from.

We are seeing that all across the country. The coastal property values crash warning now has an evil sibling: the wildfire adjacent property values crash warning. And either one of them, or both, could create that cascade from uninsurability to unmortgageability to crash in property values to nationwide recession.

He is not alone. A little over a month ago, the Chairman of the Federal Reserve Chairman Powell came and testified in the Banking Committee. What did Chairman Powell have to say? He said that in 10 to 15 years, it will be impossible to get insurance or a mortgage in entire regions of the United States; exactly that cascade—climate risk, uninsurability, can't get a mortgage, property values crash.

Here is the Chairman of the Federal Reserve, also not green, just a guy who is interested in dealing with risk to the financial system, and he is saying: Here it comes, buckle up. We are going to see that in 10 to 15 years.

Well, if we are going to see that in 10 to 15 years, who is looking at that now? Investors are; insurance companies are. You can't wait 10 to 15 years for the effects of entire regions of the country that can't get mortgages to start to be felt. That is going to start to happen now, and, in fact, it is. Look at the high-risk areas in the country.

Here, we see things like—from our Budget Committee work—these are nonrenewal rates around the country. And you can see in high-risk areas—Florida or coastal, California for both coastal and wildfire, that nonrenewals are spiking up in areas of climate risk.

What is nonrenewal? A nonrenewal is when your insurance company says to you: You know, thanks for all the premium you paid all these years, but your piece of property has now become uninsurable. We can't manage that risk any longer. Therefore, you are fired. Go find another insurance company.

Well, that is a big mess.

Then we go onto First Street, which took some of this data and others and started predicting forward. This is where home values are headed because of climate change.

You can see in these darker red areas, you are looking at actual reductions in home value, right? Not your home is your castle and it is always going to be valuable but, actually, the value of it goes down.

Some of the marks go as much as 100-percent loss of value. Eighty percent is this color. Sixty percent is this color. And you can see it speckled throughout the country. Places where, in the time of a 30-year mortgage—in the time of a 30-year mortgage, you are going to see property values actually go down—the property values crash that was predicted by Freddie Mac and the loss of mortgage availability that was predicted by Chairman Powell.

Here is another one: Where do insurance premiums go in the next 30 years? Well, in a lot of places, like down in Florida, we have already seen double, triple, and quadruple. An average home insurance payment in Miami Dade County is $17,000 a year. You look down here at Miami, and it is in the dark zone where it is supposed to go up 300 percent. That is a quadrupling, just so you know.

So if you are at $17,000 now and you are going to quadruple in 30 years, that means you are going to end up—do the math. I am not doing it right now in my head, but let's say it is $70,000 a year, right? Quadrupling $17,000—$68,000 a year.

If you have a property that has a carrying cost for the buyer of $68,000 a year, how valuable is that property? What is the present value of that liability that comes with the property? It is a huge liability, and it knocks down the value of the property.

So that is why the home value evidence that First Street collected here relates to the insurance premium expense. You don't just lose the value of your house when your property isn't mortgageable any longer and you can't find anybody to buy it other than a cash buyer; you also lose the value of your house when the carrying cost of your home insurance becomes so great that nobody wants to buy into that annual $68,000 liability.

How much would you pay to have to write a $68,000 check every year? Not much. It would have to be a pretty darn nice house to cover that. And for a lot of people, that just erases the value of the home, which is why we get there.

So, First Street, their estimate was that climate change could erase $1.4 trillion in U.S. residential real estate value by 2055 due to these concerns that they put on the chart. And they are not alone. It is not just Freddie Mac; it is not just First Street Foundation; it is not just Fed Chair Powell.

Here is the Mortgage Bankers Association. You think that is a green group? Fat chance. But they do care about mortgages, and what they say in their report is:

> Chronic physical risk associated with climate change—i.e. the insurance risk—may exceed the capacity of insurance and government assistance to sustain some areas.

That kind of tracks with Jay Powell saying there are going to be whole regions of the country where you can't get a mortgage any longer—even with government help, even with insurance, it just doesn't work any longer.

So when an advocacy group like that for the mortgage bankers is giving this warning, it might be worth paying attention to. It might be worth not just dismissing it: Oh, climate change is a hoax. None of us need to worry about that.

The Economist Magazine, also about as ungreen as it can be. And the Economist Magazine—this is a cover story. If you can't read it, it says: "The next housing disaster," and it is a house on a piece of land that is being eroded by seas.

> If the size of the risk suddenly sinks in and borrowers and lenders alike realize the collateral underpinning so many transactions—

Like those mortgages—

> is not worth as much as they thought—

Because those prices have fallen as insurance rates climbed—

> a wave of repricing will reverberate through financial markets.

Here is the punch line:

> Climate change, in short, could prompt the next global property crash.

Another way they say it in the article is this:

> At present, the risks of climate change are not properly reflected in house prices. A study in Nature, a journal, finds that if the expected losses from increased flooding alone—

That is that coastal value crash risk; not the wildfire one, just flooding—

> were taken into account, the value of American homes would fall by from $121 billion to $237 billion.

Again aligning with what First Street predicted—changes in Americans' home values because of climate risk uninsurability and unmortgageability.

Mr. President, $121 billion to $237 billion is a pretty big hit on those homeowners whose properties have lost that value.

Globally, what they say is that we are looking at a $25 trillion hit to global real estate markets. The largest asset class on the planet is real estate, and it is looking at a $25 trillion hit. Yeah, let's ignore that and believe the fossil fuel-funded White House that says it is a hoax. That makes a lot of sense.

Obviously, if there is going to be a property values crash and if mortgages are going to be in the center of it, that is not great for the banking industry. Why? First of all, the banking industry makes a lot of money off of mortgages.

If a whole bunch of properties won't sustain a mortgage any longer, that shrinks the market, so there is less revenue to be had for the banking industry.

Also, if you have a mortgage on your books as a bank, the liability—what the owner owes you on the mortgage—gets offset in your solvency determination by the value of the collateral that you hold against that liability. The collateral is the value of the home.

What happens to a bank in a region where the value of the home has fallen by half? What happens when the homeowner owes more money than the property is now worth? That hits the bank's loan-to-value ratio. That is a determinant of bank solvency.

So, guess what, this is not just me saying this; the International Financial Stability Board just did this report in January giving a warning to the global banking system: Look out. Buckle up. Climate risk is coming. Uninsurability is coming. Unmortgageability is coming. You need to plan to stay solvent through and survive that crisis.

So I will tell you, this is a very technical report done by very technical people. The Financial Stability Board is, again, not a green organization, but they do have an obligation to look forward and predict risk, and they are predicting this risk to the global banking system.

The Commodity Futures Trading Commission, during Trump 1, by the way, issued this report—''Managing Climate Risk in the U.S. Financial System''—saying that climate change poses systemic risk to the U.S. economy across multiple sectors ''simultaneously and within a short timeframe''—this is coming at us—undermining the U.S. financial system's ability to sustain the economy.

Let me read the opening sentence from the report, from the executive summary:

> Climate change poses a major risk to the stability of the U.S. financial system and to its ability to sustain the American economy.

Precisely as the other experts argued.

Risk to insurance, to mortgage, to property values crash, to economic collapse.

On the next page, they say among findings of the report:

> A central finding of this report is that climate change could pose systemic risks to the U.S. financial system.

Let me say a word on systemic risks because it sounds like a pretty dull term. It is not like apocalyptic risk, catastrophic risk; it just says systemic risk. What does that mean? That means that the whole system takes a hit. That means that the damage is not contained to the sector where the damage is happening.

That is like 2008 all over again. We had that set of bad mortgages, but when that set of bad mortgages—when it became apparent that that was fake and phony and that there was not real value there, it didn't just harm the mortgage holders, it took down entire investment firms, and that crash cascaded out through the entire economy.

Those of us who were here in 2008—I can remember the financial agony of Rhode Islanders when that recession hit so hard and so suddenly. I can remember the people who were at the Treasury and at the Fed who were supposed to prop up our economy in a state of absolute, sweating panic about how this crash was going to wipe out the U.S. financial system. That is what systemic risk is. It means the whole thing goes down, the whole system.

So it sounds like a pretty mild term, but if you are familiar with economics, you know that is one of the scariest words in the economic lexicon.

What else have we here? We have Deloitte—not very green, either—a big consulting powerhouse. Here is what they say about continuing to fiddle around on climate change, pretend it is a hoax, censor the term, and act like idiots about a true coming risk with abundant warnings about the risk. They say that we have a range of outcomes. By 2070—that was their target period—they said that if we can start getting climate right, if we can start addressing this problem before these systemic harms happen, then what is going to happen is the global GDP will increase by around $40 trillion; i.e., the world will be better off financially by $40 trillion by our making the right decisions to get climate change right. That is one outcome.

The other option is that we continue goofing off. We continue fiddling around and lying about climate change or believing the lies about climate change. We continue ignoring the evidence. We continue ignoring what we are seeing with our own eyes in the insurance industry in regions of the United States right now, already.

Go around Florida and talk about property insurance and tell me what you hear, because I am pretty sure I know because I have been there and heard it.

The other is a $180 trillion hit to global GDP, which means there is a $220 trillion swing that will come to pass in the lives of children now. The world can be $220 trillion poorer or $220 trillion richer depending on whether we continue to screw up responding to climate change, ignore it, and listen to the worst people in the world to listen to—the fossil fuel industry, which is wreathed in conflicts of interest on the subject, crawling with conflicts of interest, infested with conflicts of interest, and eager to shove those conflicts of interest into our politics with lies and dark money, secret influence. It is one of the fouler things that have been done, what has been done in our Congress by the fossil fuel industry.

If Deloitte is right, that $220 trillion swing is a hell of an outcome for people who will be alive then—all because we won't make good decisions now.

Potsdam Institute says that climate change losses by 2049 could hit $38 trillion and then get bigger after that.

So, again, we are dealing with a sooner window than 2070, but we are dealing with very, very, very big numbers—$25 trillion hit to the global real estate sector; $38 trillion hit from lost agricultural yields, labor productivity, and infrastructure; $220 trillion globally, depending on whether we get this right or continue to be fooled by those with the worst conflicts of interest.

Recently, Allianz, which, by the way, is the biggest insurance company in the world, a trillion-dollar company—two things about the insurance industry and Allianz in particular. The insurance industry needs to predict accurately in order to price its insurance correctly. So, first of all, they are making like trillion-dollar bets on what the future is going to look like. They are not just lying to make up stuff so that they can sell more gasoline next year in California and Rhode Island and other States; they have to look out.

When they do look out, not only do they have that huge bet that they are placing on what the world is going to look like, what risk they are insuring, they are actually under a fiduciary obligation. They can be sued by their shareholders and by their members if they are not doing proper due diligence and getting it right.

So when the insurance industry is doing signals like this, it is worth paying attention. The insurance industry is under a fiduciary obligation to get it right, the fossil fuel industry has a massive conflict of interest to tell us stuff that is wrong, and we are believing the fossil fuel industry? It is madness or it is politics or worse.

Well, here is what the Allianz board member wrote:

> We are fast approaching temperature levels—1.5 degrees [centigrade], 2 degrees [centigrade], 3 degrees [centigrade]—where insurers will no longer be able to offer coverage. . . . Entire regions are becoming uninsurable.

Sound familiar? Fed Chair Powell used almost the exact same language. They are seeing the same thing.

This is a systemic risk. Remember what I said about systemic risk? Here is a board member of the largest insurance company on the planet, with a trillion dollars at stake, saying that this is a systemic risk that threatens ''the very foundation of the financial sector''—just like the Commodity Futures Trading Commission report threatened, just like the International Financial Stability Board warned.

This is a systemic risk that threatens ''the very foundation of the financial sector.'' How? He continues. If insurance is no longer available, ''other financial services become unavailable'' too. A house that cannot be insured cannot be mortgaged.

This is the same deal that the chief economist of Freddie Mac was predicting. No bank will issue loans for uninsurable property.

Credit markets freeze. This is a climate-induced credit crunch.

He also points out in his article something that I hadn't paid attention to. I was looking at the ''insurance to mortgage to property values'' crash. But what he points out is that, if you go to the financial sector, big wheeler-dealers in the financial world do big deals and transactions, and very often those transactions depend on an insurance component to make the deal work. And in areas where the risk involved in that transaction is uninsurable, then the transaction can't happen any longer.

So it is not just mortgages and the mortgage market that are imperiled by this insurance risk. It is the whole swath of other financial transactions, which is why the title was ''An End to Capitalism.'' That is what we are dealing with.

There is a lot more that I could go through. Here is my current binder on the economic risks of climate change, which includes these articles and more. I have circulated it to Finance Committee members. I have circulated it to Budget Committee members. I have circulated it to Environment and Public Works Committee members. I don't think anybody really wants to read it because, in this place, the fossil fuel industry gets what it wants, whatever it wants, whenever it wants. And the fossil fuel industry does not want the Senate or the House paying any attention to these looming risks, to these storm warnings that are coming.

I have been through small insurance collapses in Rhode Island—two of them. One was a banking insurance—State-backed banking insurer—that failed just as I was coming in as a new Governor's legal counsel. And as we saw this beginning to fail, he asked me to handle the issue. So it was a handful of an issue, I will tell you, because we knew that the insurer was going to fail, and we knew that all of the insured banks would no longer be able to honor their accounts. And we knew that about a third of Rhode Islanders had money in those various banking institutions and that they would lose access to their funds until we sorted this out. And it happened the day that the new Governor was sworn in.

I can remember preparing the needed papers to take over the closed institution in an all-nighter in a law firm and, in the morning, running the papers up to the Governor's office through the cold weather of a Rhode Island January as the guns were firing, signaling the start of the new administration—the ceremonial guns of probably the Newport Artillery Company.

And on day one, we had to close all of these banking institutions, and I spent the next many months of my life trying to figure out how to get them back, get depositors repaid, and clean up the insurance system.

So I know that when Ernest Hemingway was asked, ''How did you go broke?'' he said, ''Gradually, and then all at once.'' That is how these insurance crises happen.

The Rhode Island Share and Deposit Indemnity Corporation went broke gradually and then all at once. It was just a matter of days from steady state status to complete calamity, and we had to dig our way back out of it.

The next one was workers' compensation insurance—that too, gradually and then all at once.

Like the California FAIR Plan, we had a backstop insurance entity that, if you couldn't get insurance in the regular market, you would go to the State entity, and then your risk would be farmed out to all of the other companies—which is fine if it is 2 or 3 or 4 percent of the market. But when that company starts to have a huge share of the market and huge losses, the insurance companies look around and say: Wow, we are going to own our share of those losses. I don't want to do business here any longer.

They came in, and in a matter of a day or two, every single workers' comp insurer in Rhode Island had said: We are out of here. We are done. We are closing.

And we had until the end of their policy to stand up a whole new workers' compensation system that paid for itself and was fair to workers.

Between those two things, I don't think I have ever worked so hard in my life. But we solved both of those problems.

Now, you may say: Well, that is just a little problem in a little State. Yes.

Many years ago, my father set up Special Operations and Low Intensity Conflict in the Defense Department. He was the first SOLOC, as they called it. And one of the things that people in Special Operations really didn't like was being told that what they were doing was low intensity.

Mr. Whitehouse, when it is you that is being shot at, it is not low intensity. We have got to get rid of that name.

So small fights can be brutally intense fights, and these were small but brutally intense situations in Rhode Island. And the lesson to me is really clear: These things happen gradually and then all at once. And we are well into the gradual part of what climate change is doing to insurance markets, and the cascade from that into mortgage markets and into property values and into economic recession is now entirely predictable—indeed, predicted by essentially anyone who is, A, paying attention to this, and, B, not on the payroll of the fossil fuel industry.

So when we are messing around with Senate parliamentary procedures, when we are actually threatening—maybe cooler heads will prevail—threatening to go nuclear, threatening to overrule a ruling of the Parliamentarian just to run a political errand for the fossil fuel industry to help it sell more gasoline, we are doing two really evil things at once: We are doing real damage to this institution that will be very hard to walk back from; and, two, we are indulging an industry with a massive special interest and a massive conflict of interest that is simply out to sell more gasoline and that wants us to ignore the risk that its emissions are creating in the world.

And we are now, in this building, so overwhelmed by that fossil fuel political influence infrastructure—all its dark money running through super PACs, all its lies being spouted out by phony front groups, all of the fake scientists making up stuff that isn't science but sounds good because it was cooked up on Madison Avenue to sound good. And now they have actually infiltrated the office of government, and they are running the U.S. Government from the inside with a view to making sure that nobody pays attention to the climate harm.

And I will close with a different point, which is that I have spent my time so far on the floor talking about how a corrupting industry has used its influence in Congress to steer us away from paying attention to a massive economic risk that numerous expert voices have warned us is in peril—and not just expert voices but many who are under a fiduciary obligation to their shareholders.

We had in the Budget Committee the CEO of Aon, which is one of the biggest insurance companies in the world. He is their U.S. CEO. He came in to testify and give that same warning. Over and over and over again, we are getting that warning about the economic peril that is looming, where we are now in it gradually, and we are waiting for ''all at once'' to happen.

And I talk about that as an economic matter because this is the ''House of Mammon,'' where the worship of the fossil fuel god Baal and money is the No. 1 thing that we do. So I am speaking in the terms that the Senate and the House most pay attention to, which is money—money.

But know that behind the economic peril is real natural disaster, is real tumult in the natural systems of the Earth that have allowed our species to develop for 20,000 years in a relatively safe harbor of limited atmospheric carbon, a healthy climate range, moderate storm activity, and a robust ecosystem around us where that security and that safety have allowed the ecosystem to flourish.

And it happens in a million small ways. One of my favorites was the red knot. There is a bird; it is called the red knot. It lands in Delaware every year, and lots of them land in Delaware every year, and they come to Delaware every year because the horseshoe crabs in Delaware Bay come ashore to lay their eggs. So it is like social hour for horseshoe crabs, but it is also feeding frenzy for birds that like to eat the horseshoe crab eggs.

But here is the deal about the red knot. I bet you don't know where they come from to get to Delaware Bay for that moment when the horseshoe crabs are laying their eggs. They come from

Brazil. They have come from all the way down in Patagonia. They have flown up to Brazil, and then they go from Brazil over the water to Delaware Bay.

Imagine how long it takes to fly from Brazil to the east coast, to Delaware, in a jet plane. These little birds, they do it on their own. They are not big. They are about that big. And they fly all that way on their own.

It is such an arduous journey that their bodies actually metamorphose a bit during the journey to make it possible. It is one of the miracles of creation that this little bird can make that astonishing journey and have the physical changes to its body that take place during that trip make it possible for that little bird to make that journey.

And the reason that species makes it and survives is because, in God's great ecosystem, they have figured out that if they land at this time in this bay, the food will be there for them. And if we screw that up with fossil fuel emissions so that the schedule of the horseshoe crabs' egg laying goes off and those red knots come all the way from Brazil and there are no eggs there for them—they are too late; they are too early—that is how populations crash.

That is just one tiny example. That is one thread of this beautiful interlocking natural planet that we have, and there are a million more such threads that put the world together that we take for granted.

Behind the looming economic risk is a disruption of the Earth's natural systems that goes well beyond just economic harm.

It means that the creek where your grandfather taught you to fish and where you want to teach your granddaughter to fish isn't going to have the fish in it any longer. Can you put a price on that? No. It means that the water flowing out of the Himalayas—fought over between Pakistan and India forever—becomes less because there is dramatically less glacier in the Himalayas to provide the glacial flow down into those rivers.

And now you have a conflict between those countries over that most elemental need of humans—water. Can you put a price on that risk? Coastal homes all over the world are being lost to sea level rise.

After Superstorm Sandy, I walked the beaches near Matunuck, RI, and there was a man standing on the shore near his house. His house was tipped over because the storm had eroded the foundations of it, and he was looking at his house. They spent time going into it. It was tipping over. It was dangerous to go in, but they were getting out as much stuff as they could.

I asked him: Tell me the story of this house. It was a nice old house, been there a long time. He said: Well, I remember being here as a baby. It was my grandparents' house. They came here in the summers. It was beautiful. We had all this beach in front of us. We even had a lawn in front of us. The thing I want most in my life is to be able to pass this home on to my grandchildren; to have that family tradition, generation after generation after generation, to be able to come to this beautiful place and enjoy this beautiful shore and continue this glorious family tradition.

How do you put a price on that when that is taken away because we are too damned lazy and indolent to clean up the fossil fuel industry's mess when they won't do it?

My point is that as I focus on the economics of this—because that is what people care about in this place—there is a whole other set of costs to mankind and to our Earth that we will be forcing future generations to bear that have nothing to do with the almighty dollar but actually may be worse in terms of humankind and the human spirit.

I yield the floor.

The PRESIDING OFFICER (Mr. BANKS). The Democratic whip.

Mr. DURBIN. Mr. President, let me first thank my colleague from Rhode Island. I don't know how many years he has been delivering this message on the floor, but he has become the spokesperson for a cause that we all should share and try to make certain we address the deterioration of this planet that we live on; that our kids, our grandkids, and their children have a fighting chance against elements that they can't personally control. It is up to our generation. And Senator WHITEHOUSE comes to the floor and reminds us on a regular basis about our moral and economic and environmental responsibility.

I thank him for his statement today. I want to join him in that respect.

S.J. RES. 55

Mr. President, last month, the Senate Parliamentarian analyzed the GAO's opinion ruling that Senate Republicans cannot use the Congressional Review Act to overturn a waiver granted to California by the U.S. EPA to regulate its own vehicle emissions.

I remember a time in the House and, again, in the Senate when we had a hardy debate here over miles per gallon and what was reasonable. I remember the automobile industry saying that we shouldn't impose a standard that they could never live up to, never produce cars that meet that standard of the higher miles per gallon.

I remember that California stepped out ahead of the rest of the Nation and said: Let us prove we can do it. Our economy is so big, you can't miss it if we succeed or if we fail. And they succeeded. They proved that if you create the right incentives, technology will move in that direction, and it has, successfully, when it comes to miles per gallon.

Now Republicans have decided, with the new President, to attempt to block a California law requiring all new cars sold in the State by 2035 to be zero-emission vehicles. It is an ambitious goal. It is as ambitious as some of the MPG goals they set in earlier times.

That is right. Despite the claims of being the party of States' rights, Republicans want to end the State-level regulation in the State of California. And get this, Elon Musk—the unelected adviser to the President—previously wrote to the EPA in favor of California's waiver. Now he has joined the Republican majority to try to gut the rule.

The Parliamentarian's decision was not one of party loyalty. It followed decades of precedent showing California's Clean Air Act waivers are not subject to the Congressional Review Act.

Despite the Parliamentarian's decision, my Senate Republican colleagues want to override the GAO and Senate Parliamentarian to advance the fossil fuel agenda. It is ''burn, baby, burn; drill, baby, drill.''

Now, I understand using the CRA might be faster than Agency rulemaking or even considering legislation. Think about this. There was a time when we actually legislated on the floor of the U.S. Senate. I can vaguely remember, it was so long ago. Rather than deal with legislation, hearings, and public review, we are all about these shortcut methods, which in some cases are disastrous. In fact, President Trump, in his first term, took administrative action to rescind California's Clean Air Act waivers and can take that path again.

But what Republicans are pursuing today is a procedural nuclear option, a dramatic break from Senate precedent with profound consequences. Let me repeat. Should my Senate Republican colleagues overrule the Senate Parliamentarian, it will have a major long-term impact for the Senate and the legislative filibuster.

This move is unprecedented. The Senate has never overruled the Parliamentarian regarding the CRA or allowing a bill to pass by majority vote. Before, when the tables were turned and the Senate Democrats were in the majority, my Republican colleagues were singing a very different tune about never breaking from the Parliamentarian. Leader THUNE, himself, acknowledged in January of this year that overruling the Parliamentarian is ''totally akin to killing the filibuster. We can't go there,'' Leader THUNE said, ''People need to understand that.''

If Senate Republicans disregard the Parliamentarian's decision, they would set a new precedent in the Senate, eliminating longstanding guardrails and paving the way for future Senate majorities to overrule the Parliamentarian to achieve its partisan goals. I caution my Senate Republican colleagues from toeing this line and setting the wrong precedent.

As I said, time and time again, there cannot be one set of rules for the Republicans in the Senate and another set of rules for the Democrats. I hope my Republican colleagues will heed my

warning and make the right choice—the only choice: accept the GAO and Senate Parliamentarian's decision.

I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. PADILLA. Mr. President, colleagues, today, on the Senate floor, we are expecting to see some outrageous attacks on my home State of California and important provisions of the historic Clean Air Act.

While it is not too late to turn back at this moment, I think it is important for all of my colleagues to know that I will be back here again and again and again throughout this process to make sure that everyone knows what these votes mean, not just for the precedent and procedures of the U.S. Senate but for the health of my constituents in California and about the real threat to human life that comes when California is denied the ability to control toxic air and greenhouse gas emissions.

But before I do, I want Senators and the American people to fully understand what we are about to witness on the Senate floor. Put aside all the procedural back-and-forth—I will get back to that in a few minutes—but overall it is actually pretty simple. Senate Republicans are preparing to vote to overrule the Parliamentarian—the nonpartisan umpire, referee for the Senate—who lets us know what is in order, what is not in order. Senate Republicans are preparing to vote to overrule the Parliamentarian. They will argue that they are not, but that is indeed what is happening here. They want to do that in order to bypass the filibuster in order to gut the Clean Air Act.

As I stand here right now, those joint resolutions that are going to be before us are subject to rule XXII of the Senate and, therefore, subject to the 60-vote filibuster threshold. They are subject to debate. They are subject to amendments. That has already been determined.

In this moment, they are in regular legislation and are subject, as a result, to the legislative filibuster. But if we see what we expect to see happen today, the status of these same bills—maybe later this evening—will be very, very different. If Senate Republicans behave the way that we expect them to, all of a sudden these same measures that are subject to the legislative filibuster and debate and amendments will all of a sudden be expedited procedurally—no amendments allowed, very limited debate.

Colleagues, as I said here yesterday, it is not just the ''why'' Republicans are willing to endanger the health of Californians, it is also the ''how'' they are doing it that is threatening.

A bit of history. In 1967, the Clean Air Act passed this body under regular order by a vote of 88 to 12. In 1990, the landmark Clean Air Act amendment passed the Senate 89 to 11—overwhelming bipartisan support. But today, Republicans are trying to pass these bills to gut California's Clean Air Act authority under a simple 50-vote threshold. They are plotting to overturn the Senate Parliamentarian's determination, plain and simple.

Why is that significant? Well, the majority leader said it himself at the very start of this Congress that when it comes to overriding the Parliamentarian, ''that is totally akin to killing the filibuster. We can't go there. People need to understand that.'' But fast forward to this week, and we have heard all sorts of excuses and explanations and mental gymnastics as to why all of a sudden overturning the Parliamentarian is not akin to killing the filibuster. It is a complete 180-degree shift.

But in one way, I guess, they might be right. No, this isn't the same as killing the legislative filibuster. This actually goes way, way beyond that because, first, they are doing more than going nuclear on the Parliamentarian; they are going nuclear on the Congressional Review Act itself. It is true that the Parliamentarian does not make law. Under the Constitution, the House and the Senate set their own procedures, limited by the requirements set in the Constitution.

For the good of the order and actual functioning democracy, we have all come to rely on the Parliamentarian to call balls and strikes and set the rules of the road. But the Congressional Review Act is a law, and it says that all points of order are waived during a CRA resolution. And that is what we are debating right now, an actual CRA resolution relating to hydrogen fuel.

I oppose this particular resolution, but at least it is following the law and Senate procedure. But what is about to happen is going to be against the law and against Senate procedure.

As I understand it, Senate Republicans are preparing to have this Senate go nuclear not just once but twice. First, we will go nuclear and overturn the rule on points of order during a CRA, which is in the law. Then Republicans plan to go nuclear a second time: to throw out the rulebook and use the CRA against any Agency action that any Agency submits, no questions asked. Like I said, this goes way beyond just the legislative filibuster. So let's play it out a little bit so we are clear as to what this would lead to.

Under this logic, the Trump administration can send an endless stream of nonrule actions to Congress going back to 1996, including vaccine approvals. After all, we have an HHS Secretary with a spotty history as it pertains to the health and safety of vaccines. The administration could send broadcast licenses because you know this is an administration that is not shy about attacking anybody in the community who disagrees with their agenda. We can see the administration send merger approvals—again, not just those that are pending but go back to 1996—and any number of government decisions that apply to President Trump's long list of enemies.

All it would take is a minimum of 30 Senators to introduce related bills, and the Senate would be bogged down voting on Agency actions, large and small, all day long. Is that how we want to spend our days here in the Senate, voting on every vaccine approval because Secretary Kennedy decides to send them to Congress?

And what about the next Democratic administration? All bets would be off. Consider mining permits. Consider fossil fuel project approvals; consider LNG export licenses or offshore leases, IRS tax policies, foreign policies, and every Project 2025 or DOGE disruption or overreach. Every Agency action the Democrats don't like—whether it is a rule or not and no matter how much time has passed—would be fair game if Republicans go through with this and establish this precedent.

So let's take a step back. Republicans are admitting that they don't have the votes to pass these California resolutions under the Senate rules that the Parliamentarian says apply in this case, so they will overrule the Parliamentarian—why not throw out the rulebook altogether?

By voting to go nuclear on the CRA, they are ignoring the law, not just Senate rules but the text of the law itself. By voting to overrule the Parliamentarian, they are saying that the rules are whatever the Republicans say they are, not what the Parliamentarian has determined. The majority here can tell themselves whatever they want, and they can twist themselves into pretzels and knots to try and justify these reckless actions, but despite their smoke-and-mirrors approach to confuse the general public, we are all going to see it today with our own eyes if they go forward.

The majority wants to go nuclear to bypass the filibuster and pass a bill for the first time in Senate history. It has happened for nominations before. It has happened on a few procedural questions before, but never on a bill or three bills—never. And if this happens under a Republican majority, it would actually be pretty ironic that the party who claims to be the staunch defender of the filibuster threw the rules aside as soon as it was convenient.

I have been honest on my views of the filibuster. I do think it needs to be changed overall going forward, but it was my colleagues on the other side of the aisle who fought hard to keep it.

Well, there is about to be a new precedent on the record, unless we step back at the last minute. And it will stand as a guidepost going forward. Democrats are in the minority today. Democrats will be in the majority again some day—maybe later, maybe sooner—but we will certainly not forget what happened here today. History will not forget. California will not forget what is at stake today either.

I yield for now, but I will be back.

The PRESIDING OFFICER. The Senator from California.

Mr. SCHIFF. Mr. President, I thank my colleague Senator PADILLA for his eloquent speech on this subject.

Today, I want to talk about what is taking place in this Chamber, and I want to talk about it in two respects. I want to talk about what it will mean for the American people in terms of the air that we breathe and the water that we drink—that is the most important thing—but then I want to also talk about what it will mean for this institution, for the Senate; what it will mean for the filibuster; what it will mean for whether things can get passed on a simple majority vote at the behest of the oil industry or any other special interest or whether things in the future will continue to require 60 votes to get through this body.

Let's start with the first and most important thing: What does the repeal of California's clean air waiver—that is, its right to set its own standards for the air that we breathe—what does this mean for the people of California? What does this mean for the people of the United States?

This is downtown Los Angeles in 1955. Now, I don't remember 1955—I didn't come around until 1960—but I do remember air that looked a lot like this when I moved to Los Angeles. I remember days when there were smog alerts. We still have some of those. I remember when it was unhealthy air to breathe, and people were advised not to go outside if they didn't need to, and kids couldn't go out on recess because the air quality was so bad.

But this is what places in California, like Los Angeles and many places in the San Joaquin Valley, looked like just a few years ago—the San Joaquin Valley, where so much of the food in the Nation is grown. These areas have experienced the rapid rise of personal automobiles and expansion of our population—America's West, its suburbs and its cities.

On days like this, you just couldn't walk outside sometimes without hacking. If you had asthma or breathing problems, it was even more severe. And California families, through no fault of their own, were on the frontlines of a health risk unseen since the worst days of the Industrial Revolution pollution. The smog was so bad that in one instance, mass panic broke out in California because there was a belief that there was some kind of chemical weapons attack.

This was, in part, due to these amazing increases of population, but it was also our unique topography. The San Gabriel Mountains in Los Angeles, the Sierra Nevadas for the Central Valley, they trap fossil fuel emissions and keep smog clouds hanging over our cities where they may not hang over other parts of the Nation. So the San Gabriel Mountains, for those of us in L.A., but the Verdugos and other mountain ranges and the Sierra Nevadas have an impact on the Central Valley.

All that means is that 10 million Californians are living in areas that are under distinct and elevated threats from air pollution. And what that has meant historically is higher rates of respiratory issues like asthma and chronic lung disease. It has meant increased risk of heart disease, chronic headaches, immune system issues, and, most significantly, increased cancer risks.

That is multiplied by us living now on the frontlines of the climate crisis. We have devastating and year-round fire dangers that put millions of other pollutants into our air. So we need, deserve, and reserve the right, as Californians, to do something about our air.

In fact, this is why California became the first State in the Nation to regulate the emissions of automobiles back in 1966 because we understood then, as we do now, the risks that Californians face if we don't take action. Over the past 60 years, since our skies looked like this, California has led on this issue, and now, we are being targeted for it.

What will the cost of that be? By revoking California's right to protect its citizens from dirty air, we face not just dirtier air, but we also face a sicker society. The American Lung Association projected that our Nation moving to zero-emission vehicles in the next decade would generate more than $1 trillion in public health benefits and save more than 100,000 people from premature death.

So this is really the heart of the question for this body, and that is, What is more valuable to us? Is it the unfettered right to pollute the skies and make them look like this? Or do we want to save about $1 trillion in money we would have to spend otherwise on treating asthma and treating lung cancer and treating heart disease that is caused by air like this?

That electric vehicle requirement can save more than 100,000 people from premature death. So I guess we have to ask ourselves, How much is life worth? What would it be worth to us to be able to live a few years longer?

I suppose the answer to that question depends on, well, what kind of life is that? What kind of health are we in? But I would say a few more years is worth a lot. It is worth a lot. It is certainly worth more than contributions from the oil industry to be able to live a little longer, to be able to live a little healthier.

By targeting California—as this effort is doing—which comprises 11 percent of the Nation, and our goal of decarbonizing our transportation sector, we are selling poison seeds for the future—seeds that will grow to be more asthma and more sickness and more hospitalizations and more death. That is the bleak but blatant reality of what we are debating here today.

If the Republicans go nuclear to repeal California's clean air rules, that is what this will mean. It will mean shorter lives, poorer quality of life because of what we are breathing in the air, and ultimately, when they strike down clean water rules, what we are drinking in our water is going to be dirtier, and the American people are going to be more plagued by a whole variety of cancers.

Now, I mentioned the term ''going nuclear.'' What does that mean? This gets to the second point I want to make today, which is how the Republican majority intends to go about repealing California's ability to set the standards for its own air; that is, how does the Republican majority intend to foist its will on millions of people in other States? How are they determined to overturn States' rights? How are they determined that the Federal Government should tell a State: No, you can't protect your people from air pollution, not to that degree you can't, because we answer to a higher authority and that higher authority is called the oil industry? So how are they going to do it because in this body, for better or worse, it generally takes 60 votes to get things done. That is the filibuster. It requires 60 votes.

To repeal California's law, if you were to take that step, it would require 60 votes. Don't just take my word for it. We asked the Parliamentarian, who is the expert: Does this require 60 votes? Is this subject to the filibuster?

The answer is, yes, it does.

Well, you would think that would be the end of the story, but you can overrule the Parliamentarian, say the Parliamentarian is wrong, and then reduce the threshold to 50 votes.

Now, you might ask: How is that possible? Is the filibuster really that fragile that whenever it is ruled that you need 60 votes, you can simply overrule the Parliamentarian?

The answer is, yes, the rule is that fragile, which means that if Republicans move to go nuclear, to overturn the Parliamentarian, to do away with the filibuster, to do away with California's clean air, they will be setting a precedent that at any time and for any reason, for any State, for any rule, for any nonrule, for any waiver, for any license, for any grant—for any anything—a new majority can simply say: Well, we would like to vote on this with 50 votes. And if the Parliamentarian says it takes 60, you just vote to overturn the Parliamentarian.

So that is the import of what we are doing today, which is we are setting a precedent that the filibuster is essentially now meaningless, because if you can do away with the filibuster to do away with one State's clean air, well, you can pretty much do away with the filibuster for anything and everything.

So that is the momentous nature of what is happening today. The majority here may force Californians to breathe air like that again, and the majority here may decide they are getting rid of the filibuster.

Now, getting back to the underlying merits here, the American Lung Association found that our transition to cleaner air and zero-emission vehicles would result in 13 million fewer lost

workdays in the next 10 years. So what does that mean, 13 million? It means 13 million fewer times that you are so sick, you can't go to work. You get 13 million more days of health with these clean air rules. Think about that—13 million more healthy days for you, the American people, if we achieve our emissions goals.

Now, since my swearing-in 6 months ago to the Senate, I have had the privilege of visiting communities all over California, talking to Californians who are on the frontlines of this. Yes, some are environmental activists, and, yes, some work on science and climate issues, but there are others, too. They are the people who put food in your grocery stores. They are the people who spend so much of their days outside, breathing the only air available to them. They are the people who will be sicker—some of the people who will be sicker, work less, maybe die earlier, if we let the fossil fuel industry win this week; the people who spend hundreds of hours each month on their hands and knees, making sure that all the rest of us can have fresh berries and greens and other crops that California puts on your plate. I am, of course, talking about farmworkers. I invite any of my colleagues to consider what millions more pounds of smog in our air over the next decade will do to them.

Of course, it is not just farmworkers; it is all of us—all of us who spend time outdoors, all of us who can't help but be outdoors. All of us are going to be breathing in dirtier air, all of us are going to be suffering more sick days, and all of us are going to be plagued by more cancers if we repeal the rules that each State gets to set that has a waiver or wants to join California's healthier air rules. That will be the repercussion.

It used to be there was a bipartisan consensus in favor of cleaner air. It wasn't just Democrats. Richard Nixon, who founded the EPA, Pete Wilson, Ronald Reagan—they all understood the importance of the environment and clean air and clean water. They helped California take the environmental movement and make it mainstream. We got pollutants out of our air and out of our water and out of our communities.

Where is that party now? Where is the party that helped write the Clean Air Act? Where is the party that says Congress should not meddle in what one State is doing to govern itself?

What will happen when you lose the majority and Democrats have the opportunity to follow this precedent? What will happen to your State? We decide we don't like your State's rule on mifepristone or we don't like the fact that your State got a license to export liquid natural gas or we don't like a grant that your State got in transportation or we don't like some rule that benefits your State. Will you argue to us that ''oh, no, you can't overturn the Parliamentarian''? Will that be your argument? Because that fight will be over.

So I will remember where I am today. I will remember what we are doing today. I think we all would and will. I hope it is not the day that we made it easier to pollute California's skies. I hope it is not the date we made it easier to make water filled with more forever chemicals like PFAS. I hope it is not the day we decided that we could eliminate a State's right to control the quality of the air that their citizens breathe or the water they drink. And I hope it is not the day we decided that it was worth getting rid of the filibuster to satisfy the fossil fuel industry.

With that, I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. SCHIFF. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SANDERS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Vermont.

UNANIMOUS CONSENT REQUEST—S. 1818

Mr. SANDERS. Mr. President, I know that my Republican colleagues like to do what the President asks them to do. They agree with him on virtually everything, so today I am going to make life easy for my Republican colleagues. I am going to ask them to support legislation—extremely important legislation—that, in fact, does what President Trump claims that he wants to do.

On May 20, just a few days ago, President Trump said the following:

> Not only that, remember, I am cutting drug prices by 85 percent.

This is what President Trump said a few days ago: I am cutting drug prices by 85 percent. Right now, I am saving—I am saving the whole thing because I did something nobody was willing to do. Other countries pay a tiny fraction of what we do, and I instituted favored nations. We are now going to pay the lowest in the world. We will be the equivalent of the lowest country in the world. People go to London, they go to Canada, they go to other countries, many other countries, because they want to pay their pharmaceutical products—their drugs—at a fraction of the cost. We are going to have the lowest cost of anywhere in the world. No one else could do that but me.

That is President Trump a few days ago.

Well, I don't usually agree with President Trump on anything, but, in fact, on this issue, he makes a very strong point.

In the United States today, we have a healthcare system that is broken; it is dysfunctional; and it is cruel. It is a system which spends twice as much per capita on healthcare as any other major country while 85 million Americans are uninsured or underinsured. And one out of four Americans today cannot afford the cost of the drugs their doctors prescribe, and it is a system where over 60,000 people a year die because they don't get to a doctor on time.

While the current system makes huge profits for the large drug companies, huge profits for the insurance companies, it is obviously failing the needs of ordinary Americans.

So what is the U.S. Congress doing to address this crisis? Well, right now, sadly and tragically, the Republicans are trying to ram through a so-called reconciliation bill, which would deny coverage—take away coverage—for up to 13.7 million Americans, according to the Congressional Budget Office.

In other words, in the midst of a terrible healthcare crisis, this legislation makes a very bad situation much worse. We cannot allow that to happen.

So what should we do? Well, in my view, healthcare is a human right. We should do what every other major country on Earth does and guarantee healthcare for all people.

But, today, I want to get back to what President Trump said a few days ago, and what he said is that the American people are sick and tired of paying by far the highest prices in the world for prescription drugs. And he is right.

Whether you are a Democrat or a Republican or an Independent, or progressive or conservative, you understand that there is something wrong when Americans can't afford the high cost of prescription drugs, and the drug companies make over $100 billion a year in profits.

Let me give you just a few examples of the current situation regarding prescription drug costs in America. While it costs just $5 to manufacture Ozempic—that is a widely used drug right now—Novo Nordisk, the manufacturer of Ozempic, makes obscene profits by selling this drug for more than a $1,000 in the United States. That drug costs $76 in France, $85 in Germany, and $170 in Canada.

But it is not just Ozempic. Prescription drug after prescription drug costs far more in this country to purchase than in other countries—in some cases, 10 times more.

So what are we going to do about it? Well, I think it might be a good idea for my Republican friends to listen to what the President of the United States said. And, today, we are going to offer my Republican friends the opportunity to achieve the goals that President Trump has talked about.

The problem with President Trump's initiative is that he is mostly just talking. The Executive order that he has introduced and signed does not do what he says he wants to do.

Just don't take my word for it. An expert at Harvard University was recently quoted as saying:

> The executive order reads more like an aspirational statement than a serious attempt to initiate a policy change.

The Wall Street Journal—no great friend of mine—their analysts said the order was ''more bark than bite.''

Since issuing the Executive order, President Trump has gone on FOX News, and while talking about differences in American prices and international prices, he said ''he ended it.''

Good news. It is all over. He ended it. We no longer pay the highest prices in the world for prescription drugs, according to President Trump.

During that same interview, he said that ''drug companies were great.'' The drug companies, apparently, even told him: ''Look, it's time.''

Just yesterday, at a press conference with Speaker Johnson, he claimed he ''is cutting [drug prices] by 80 to 85 percent'' because ''he stopped the scam.''

Well, there you go. Good news, America. The President said it. It must be true because he would not lie. Drug prices are down by 80 to 85 percent.

Does anyone really believe that? Nobody does.

If we want to, on the other hand, do more than just talk, we have got to do something, and the way we do it is with some serious legislation. And that is the legislation that I have introduced today.

If we want to actually lower the outrageously high cost of prescription drugs in America, we need to take on the pharmaceutical industry in a way that President Trump has never even thought about doing. In other words, we need less talk; we need more action.

And that is why I introduced legislation to make sure that Americans pay no more than people in other countries for the exact same prescription drug. Unlike President Trump's Executive order, my bill doesn't just ask drug companies nicely, please, to lower prices. My legislation makes it clear that drug companies must lower prices for Americans to those they charge people in other countries. In other words, what we are finally saying is, if you are charging the people in the UK $100 for this prescription drug, that is what you are going to charge the people in the United States—not 10 times more.

And the difference between my legislation and Trump's so-called Executive order is that, if the pharmaceutical industry refuses to do the right thing and substantially lower drugs, my bill will allow other companies to sell the same prescription drugs at a far lower cost. In other words, generics can come on to the market and sell the drug for a fraction of the price.

So President Trump says he supports making sure Americans pay no more than people in other countries for prescription drugs. President Trump says:

> Campaign contributions can do wonders, but not with me, and not with the Republican Party. We are going to do the right thing, something that the Democrats have fought for many years.

Well, I am just ever so delighted that campaign contributions have no impact on the Republican Party. It could have shocked me, but there we go. President Trump said it. It must be right.

So the bottom line here is President Trump says he wants to lower the cost of prescription drugs in America by 80 to 85 percent. I agree.

President Trump has issued an Executive order which he says will do that. It will not do that.

The legislation that I have introduced has real teeth, and it will do that. So, today, I call upon all of my colleagues, especially my Republican colleagues, to support this legislation, because I know President Trump has said that the huge amount of money that the pharmaceutical industry gives in campaign contributions to Democrats and Republicans doesn't have any impact on the Republicans. They are prepared to stand up to the drug companies. So that is great news. I am delighted to hear that.

So, Mr. President, as if in legislative session, I ask unanimous consent that the Committee on Health, Education, Labor, and Pensions be discharged from further consideration of S. 1818, and the Senate proceed to its immediate consideration; further, that the bill be considered read a third time and passed, and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there an objection?

Mr. CASSIDY. Reserving the right to object.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. CASSIDY. I appreciate the ranking member's interest in addressing drug prices, and you absolutely have to lower the cost of prescription drugs. And we absolutely have to acknowledge that there is a tension. If we do not incentivize the development of new types of drugs, we condemn ourselves to continue to die from diseases for which there are currently no cures.

And I say this as a guy who has practiced medicine—or graduated from med school in 1983. Let me put it that way.

When I graduated from medical school, one of the most common surgeries was taking out a portion of somebody's stomach. I don't mean your belly. I mean your stomach, where the food goes down after you swallow it. This is how I talk to medical students—because of peptic ulcer disease.

And there came along a medicine called cimetidine. It just changed the landscape. And we went from a surgery being most common to one which was rarely performed in 6 months. Cimetidine, which is now called Tagamet, which is now sold over the counter—just a measure of innovation, which if we had not had that innovation then, a most common surgery would still be removing a portion of somebody's stomach because of bleeding ulcers.

More tragically—it is pretty tragic when you lose part of your stomach—when I was a resident in Los Angeles is when the HIV epidemic came out. And all of these men—they were all men—20 to 30, came in with something that we didn't even know what the disease was. We didn't have a way to diagnose it. So we called it the Acquired Immunodeficiency Syndrome. And they all died. They all died.

And I remember saying to one of the older physicians: Why do we even bother treating them, because they all die?

But because there was an incentive for companies to come up with cures, they did it. And they stopped dying, and they began living.

That doesn't happen accidentally. It happens because there is incentive to bring a drug through expensive studies to the market. By the way, I recently had a doc tell me, who treats HIV positives, that if a patient takes their medicine, they die when they are 88 of Alzheimer's or a stroke or something else, but they should not die from an AIDS-related cancer. That is the power of innovation, and that is the power of incentivizing innovation.

I could go down a list of other drugs. Melanoma. When I was in med school, if you got diagnosed with melanoma, they said go fill out the will. Now I have friends who have been living for 8 years, 10 years longer taking immunotherapy for melanoma. That doesn't just happen. That happens because you incentivize innovation.

So what are our diseases now for which we have no cure? Alzheimer's. I lost two parents to it. Wouldn't it be great if we had a cure for Alzheimer's?

Pancreatic cancer, esophageal cancer—I could just go down the list of things for which there is no cure. But, I can tell you, with the appropriate incentive, with the research taking place, in 10 years, we will speak of those diseases as diseases of the past, as we now speak of bleeding peptic ulcer disease causing a portion of your stomach to be resected as something in the distant past.

Now, by the way, I applaud my colleague. I applaud President Trump for saying that other countries are not carrying their fair share of the load for paying for this innovation. They should do it too. This is not the way to get there. But it is absolutely essential that they do. And my staff is bringing something, which I will invite my colleague from Vermont to join us on that, because it is absolutely essential that we have the innovation, that we be able to afford it. And the only way we balance those two is if other countries pay their fair share.

But let's return to the measure at hand. The measure at hand sounds simple. It is simple. It won't succeed. Well, it will succeed in lowering prices temporarily, but, in the long term, it will defeat the ability to incentivize innovation. And then all drugs will be cheap because all drugs will be old. But we need new drugs, and we need the incentive, and this kills that incentive.

So for that, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Vermont.

Mr. SANDERS. I want to thank my colleague from Louisiana, the chairman of the Committee on Health, Education, Labor, and Pensions, on which I serve, for his remarks. And I think nobody will disagree with him that we have seen in recent years incredible innovation, and there are drugs now on the market that are saving lives that 20, 30 years ago, 10 years ago, were not the case. And we want to continue that innovation—no debate about that.

But all that I am asking my colleague from Louisiana to focus on is what President Trump said, not last year, not 5 years ago. It is what he said yesterday. And what he said yesterday, and I quote, Senator CASSIDY—this is President Trump:

> I'm cutting drug prices by 85 percent. Right now, I'm saving—I'm saving the whole thing because I did something that nobody was willing to do. Other countries pay a tiny fraction of what we do. And I instituted favored nations. We're now going to pay the lowest in the world. We will be the equivalent of the lowest country in the world. People go to London. They go to Canada. They go to other countries—many other countries.

But we are going to do it here in the United States. That is what he said.

So all that I am doing, Chairman CASSIDY, is putting into legislative, effective language what the President of the United States said.

And by the way, he said, again, that the pharmaceutical industry and all of their campaign contributions have no impact on Republicans, only on Democrats. Well, maybe that is the case, but I doubt that very much.

So all that I am asking my colleague and friend the chairman of the committee to do is to put in place what President Trump said he was doing.

And what my legislation would do is exactly what Trump talked about. It would lower the cost of prescription drugs to what other countries are paying. That is what it does; it does what Trump says he wants to do. I would urge my friend from Louisiana to reconsider.

I yield the floor.

The PRESIDING OFFICER. The Senator from Hawaii.

BUDGET RECONCILIATION

Mr. SCHATZ. Mr. President, there is a sort of general rule in politics, which is that if you start your meeting at 1 a.m., you are probably not proud of what you are doing. Now, there are some instances in which you start the meeting at 7 p.m. and it goes long and then you have to vote at whatever hour you finish. But to convene at 1 a.m. is an intentional thing. It is to say: I would very much like if nobody saw what we were up to. And that is exactly what happened at 1 a.m. today, Wednesday morning.

Republicans in the House know that the bill that they are considering is super unpopular, but they have been ordered to pass it anyway. That is what is happening on the other side of the Capitol right now. House Republicans have convened the Rules Committee at 1 a.m. to advance their tax bill, and it is because they know this bill stinks.

For starters, it is the largest wealth transfer in American history. Think about that. There have been a lot of wealth transfers in American history, but this is the biggest one in terms of the Tax Code. It is not like they were redistributing wealth among the wealthy. They are literally taking from the poor—people who don't have enough money—and shoveling it straight into the pockets of people who already have more than enough.

This bill is about making the richest people ever to walk the Earth even richer. How do they plan to do that? By kicking 14 million Americans off of health insurance and denying food assistance to millions more. People will be turned away at hospitals and go to bed hungry, all so that billionaires have a bit more.

You do not need fancy polling to tell you that this is super unpopular. And so Republicans have decided to fix that problem by convening the hearing in the middle of the night, hoping that people will not notice.

The plain facts of the bill are so egregious. And as I started to write these remarks, I had a problem, which is, How do you describe this thing accurately and not sound like you are frothing at the mouth like a partisan and sort of overstating the case? Because this really is kicking 14 million people off of Medicaid, kicking millions more off of food assistance, and then that is the savings that is generated in order to fund these tax cuts for billionaire corporations and the wealthiest people in the United States.

And what happens if something is both true and sounds like a partisan accusation? But that is where we are at. This is actually what they are trying to do.

Here is the thing, even the biggest cuts to Medicaid in history are still not enough to cover the cost of these enormous giveaways. So the Republicans have turned to one of their favorite punching bags: solving the climate crisis.

Never mind that hundreds of billions of dollars are being invested in clean energy across the country, mostly in Republican States and districts; never mind that those investments are creating hundreds of thousands of good-paying jobs; never mind that even if you don't care about any of that, there is a basic principle in running a smart economy and running an investable economy—and that is that when the private sector makes an investment on the basis of the Tax Code and they are in the middle of that investment, you can't pull the rug out from under them.

The reason is very simple. Besides fairness and besides the fact that we are undermining progress towards actually addressing an existential crisis for the planet, it also makes the United States very hard to invest in because if you were a business and you are looking at the Federal Tax Code and you are saying: I am going to make a 5-, maybe 10-year investment—capital investment—in chips, manufacturing, climate, agriculture, hospitality, real estate, transportation, infrastructure, whatever it may be—you are doing it on the basis of what the Federal Tax Code says.

And then your investment committee, board of directors, whomever it may be, will say: How do we know these things are going to stay on the books?

The normal answer is: Come on, the Federal Government is not going to pull out a tax incentive structure in the middle of your investment and construction cycle.

And the truth is, yes, they are.

So this doesn't have just climate implications or economic implications in terms of the specific projects. It actually has to do with how stable of an investment climate we establish in the United States of America. We are no longer doing ''all of the above.'' The argument that we used to have between the political parties was Democrats would say we have to transition to clean energy; Republicans would say, no, let's do clean energy, but let's also do these other things.

But now the Republican position is picking winners and losers and, basically, riding the losers into the ground.

Here is the very tough truth: Coal is on the way out, whether you like it or not. But Trump and Republicans would rather revive it for a few more years just to squeeze a couple more years of profitability out of it because, after all, their capital investments are fully amortized. So a couple more years of profitability means no more investment, but a couple more years of revenue.

So that is what they are doing. This is going to raise costs for Americans. Let's be clear. This is going to raise costs for Americans.

There was a time—and I was part of these debates in the State of Hawaii—there was a time when there was a tradeoff between how much consumers had to pay and our climate objectives. But those trends have changed. Now wind is the cheapest form of energy. Nuclear is among the cheapest forms of energy. Solar is among the cheapest forms of energy. For me, in the State of Hawaii, to bring in low sulfur fuel oil on a fuel tanker and then light it on fire for electron is the dumbest thing to do, even if you don't care about climate.

It is simply cheaper. It is simply cheaper for consumers and businesses and for the climate crisis and, therefore, our ability to fiscally manage the climate crisis as we see increasing disasters, both in their severity and how often they happen. And then every—what?—year, year and a half we do $150 million emergency supplemental because there are now wildfires where there have never been wildfires, floods where there have never been floods, tornadoes where there have never been

tornadoes? This is not made up. Nobody gets to deny this anymore.

So there is a reason they convened at 1 a.m., and it is not because that is prime time in Hawaii. They didn't convene at 1 a.m. because they like to see each other past midnight. They convened at 1 a.m. because they are about to pass one of the most unpopular pieces of legislation that has ever been passed out of the U.S. House of Representatives.

I just wonder why—if I am a House Member and I am being told ''We are going to make all these changes. All these things that you are voting for are going to be excised from the Senate version. Don't worry,'' well, my view would be ''If you are going to fix all that stuff, why are you making me vote on it now? Why are you making me vote on it now?''

The answer is very simple: Donald Trump showed up in the caucus and used a couple of expletives. They implied that voting no is a betrayal, that standing up for your constituents is a betrayal, and I think they are all going to fall in line.

So it is up to the U.S. Senate to fix this bill or kill this bill. That is the task in front of us.

I am hoping that cooler heads prevail. I know there are a number of Republicans who hate these Medicaid cuts. I know there are a number of Republicans who have a ton of clean energy investment in their States.

There is plenty of political room to criticize the Biden administration or say ''I am against the Green New Deal'' and still be for wind and solar and nuclear and geothermal and agriculture that is done in a more climate-friendly way. All of that is available to us. We don't have to do things in the maximally unpopular way, but the Speaker apparently wants to do it that way.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Democratic leader.

UNANIMOUS CONSENT REQUEST—S. 1593

Mr. SCHUMER. Mr. President, I am a sponsor, along with Senator MARKEY, our lead sponsor, and Senator HIRONO, for the Small Business Liberation Act. In a few minutes, Senator MARKEY will come to the floor and ask unanimous consent to pass it, but I wanted to say a few words in advance of his coming.

Senate Democrats today will try to pass the Small Business Liberation Act to exempt small businesses from Trump's destructive trade war. I am very proud to cosponsor and support this legislation that Senator MARKEY has sponsored.

Two months since Donald Trump's so-called ''Liberation Day,'' his tariffs have been economic arson on Main Street, and small businesses are getting scorched.

I have visited small businesses from one end of New York to the other, and these tariffs are sowing chaos. They are raising costs, smashing supply chains, forcing businesses to hike prices, lay off people, and even close their doors for good. Already, employment of the smallest of small businesses has declined by 3 percent, and last month alone, 65,000 small business jobs were wiped out.

Trump's 90-day pause does nothing to bring relief or certainty to small business but only continues the uncertainty and chaos. How can a small business possibly plan for the future when the future only shows chaos? One day Donald Trump says this, the next day he says that, and nobody knows what tomorrow brings.

These small businesses can't do anything about their pain. They don't have the ear of the President like the mega corporation CEOs do. The administration is utterly clueless about the pain they are creating for small business.

Our legislation will help small businesses get back on track by exempting them from Trump's destructive tariffs. There are almost 35 million small businesses in the United States that employ roughly half of the private sector jobs in the country. Providing these businesses with tariff relief shouldn't be partisan. It is a national priority.

If Republicans clearly care and truly care about protecting small business, they should not stand in the way of our legislation passing today.

Will they side with the American people and small business and help pass our legislation or will Republicans block this bill and side with Donald Trump as his trade war decimates small businesses from one end of the country to the other?

I yield the floor.

The PRESIDING OFFICER. The Senator from Hawaii.

Ms. HIRONO. Mr. President, we are witnessing one of the most anti-small business administrations in our Nation's history.

Since day one, Donald Trump and his administration have sown chaos in our country and our economy, disregarding the impacts of their mayhem on the American people, including the nearly 35 million small business owners in our country.

From freezing Federal funds to enacting tariffs that harm small businesses and consumers, Donald Trump is taking a wrecking ball to the American economy and the small businesses that fuel it. Now the Trump administration has taken to gaslighting business owners and the American people about the impacts of their recklessness.

Just today, Small Business Administrator Kelly Loeffler—a billionaire herself—testified before the Small Business Committee on which I sit. To call her remarks Orwellian would be an understatement. In her testimony before the committee, Administrator Loeffler claimed that thanks to the President's economic agenda, ''demand for American goods is rising and small manufacturers are stepping up to meet it.''

On the contrary, President Trump's tariffs are harming U.S. businesses—especially small businesses—and increasing their costs. As a result, business confidence is plummeting.

According to the National Small Business Association, only 59 percent of small business owners are confident in the financial future of their businesses. This is a new low in this organization's survey. It is a new low in the 16-year history of this survey.

According to another organization, Small Business for America's Future, 80 percent of business owners feel concerned or pessimistic about their economic outlook, 79 percent of businesses are concerned about a recession in the next 12 months, and 86 percent are concerned about navigating current economic conditions.

Normally, the SBA would be there for small businesses in moments of pain and uncertainty like this, but this anti-business administration has wasted no time in basically gutting the SBA. To date, nearly 800 SBA employees have been fired or resigned, and the Administrator has a goal to shed another 1,900 employees in the months ahead. The SBA is the smallest entity in our Federal bureaucracy, and they are shedding all these employees. When I asked the Administrator about these employees, the majority of whom are gone, she had a hard time giving me a straight answer.

Already, we have heard from small businesses that have noticed a significant decline in customer service since January when the SBA began shedding all these employees. If the SBA goes ahead with this disastrous plan to shed more employees, nearly half—nearly half—of the Agency's workforce will have been eliminated, leaving small businesses across the country basically to fend for themselves, not to mention all of the programs that the SBA supports on behalf of small businesses.

Gutting the SBA is hardly what I would call, to quote Ms. Loeffler in her testimony today, ''meeting the moment.'' Despite the Administrator's bluster, the numbers are clear: Our small businesses are suffering; they are not prospering. They are suffering under the weight of Trump's actions, especially his tariffs.

That is why I was proud to join Senator MARKEY in introducing legislation which he will talk about soon to exempt small businesses from Trump's tariffs, tariffs that may well force many of these businesses to shut down altogether. While the massive corporations controlled by President Trump's billionaire buddies may be able to weather this economic storm, our small businesses don't have the same luxury.

Republicans think our Tax Code makes our economy great; that if they

keep giving massive tax breaks to their billionaire buddies, some of these tax breaks, this money that is concentrated at the top, will eventually trickle down to working people. We already know that is not so. Democrats know that small businesses, entrepreneurs, and their hard-working employees are the powerhouses of the American economy. We should be making it easier for hard-working people to start and run businesses—not harder—so that they can unleash a wave of innovation and prosperity rather than waiting and hoping for a trickle that may never come. And in fact, it hasn't. It doesn't. But the Republicans keep hoping that we are going to continue to buy this argument.

So, for these reasons, if Republicans are serious about supporting small businesses, they will join us in passing our commonsense bill. On behalf of the nearly 35 million small businesses across our country, I urge my colleagues to join us in passing the Markey bill.

I yield the floor.

The PRESIDING OFFICER (Mr. SCHMITT). The Senator from Massachusetts.

S.J. RES. 55

Mr. MARKEY. Mr. President, while we are waiting for the next opportunity to move on the legislation to liberate small businesses from the tariffs of the Trump administration, I would just like to speak for a few minutes about the attempts by the Republican leadership to truncate the process by which California is able to have a waiver to increase the efficiency of the vehicles which are driven in California, but the same thing would be true across the rest of the Nation.

All I want to say is that, right now, China is investing $1 trillion this year in clean energy, low-carbon technologies—$1 trillion in 1 year. Japan has just announced they are investing $1 trillion in clean energy, low-carbon technologies.

So what we are debating here is going to absolutely allow for these other countries to catch up to us, and we will ultimately fall further and further behind, especially in the efficiency of the vehicles which we drive in this country. We might as well put a bow on an entire industry over the long term and just hand it over to countries around the world that are focusing on these technologies.

That is why this is a big mistake. We should not be allowing for a procedural trick to be played here that is unprecedented in the history of the Senate, to then have the underlying issue be really not debated the way it should in terms of the consequences for our Nation and for the planet in terms of the greenhouse gases, additionally, that are going to go up that will endanger our planet.

So I just wanted to make that comment. I will come back later in order to speak on it.

At this point, Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Minnesota.

TARIFFS

Ms. KLOBUCHAR. Mr. President, I am here in support of Senator MARKEY's very important bill that looks at these tariff taxes which, as we all know, apply to consumers—$3,000 for every family in America will be the tariff tax from President Trump's tariffs.

But the focus of Senator MARKEY's bill—which is so smart—it is on what is happening with small businesses. They are literally roadkill here. They do not have the margins of the big businesses who can go in and have the number of the White House and get a special meeting and get an exemption, which is exactly what has happened.

Or they are not invited to the special secret meeting at JPMorgan with the Treasury Secretary with major investors to find out what is going to happen next with tariffs. They are completely in the dark. Yet they are the backbone of our economy.

I use the example of Beth Benike who is from Minnesota, an Army veteran from southern Minnesota, CEO and founder of a little company called Busy Baby, Minnesota Small Business Person of the Year, just honored at the Small Business Administration about a week ago or 2. And she was celebrating getting her products into major, major retailers. And then these tariffs struck.

Beth's story is the American dream. She came up with an idea based on her own experiences with little kids to help with highchairs. And now she is worried about losing her business and even her house because of these across-the-board tariffs.

We are seeing this over and over again. That is why I am honored to join Senator MARKEY in his bill to say: If we are not going to help the rest of the world, at least we must exempt small businesses in America from these tariff taxes.

I would prefer for everyone to look at only doing targeted tariffs like we have successfully done in the past under both Democratic and Republican Presidents, instead of this across-the-board business that is basically driving China into the arms of Russia, that is dissing our own allies, like South Korea and Japan and Europe, Canada and Mexico. And the time is here to do something.

Mr. President, at the very least, let us exempt those small businesses who are going to be the first to fold under the weight of these tariff taxes. I thank Mr. MARKEY for his leadership.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

TRIBUTE TO JESSICA STEVENS

Mr. MERKLEY. Mr. President, the motto of the State of Oregon is ''She flies with her own wings.''

I can't think of a better description for my State director Jessica Stevens. After more than 12 years with Team Merkley, I have come to the Senate floor today to bid her a grateful farewell.

Jessica has spent her career serving the people of our State of Oregon. She fought for working families as the executive director of the Oregon State Council of the Service Employees International Union, SEIU, before joining Team Merkley as director of our field team.

I hold a townhall in each of Oregon's 36 counties every year, so leading the field team is a very demanding challenge.

For 3 years, she traveled with me across the length and breadth of our State, from big cities to rural communities, from the Oregon coast to the Owyhee Canyonlands, from the Columbia River to Crater Lake.

So in 2015, when it was time to hire a new State director, there was no question that Jessica was the right person to lead our State team.

For the last decade, she has coordinated between two teams on two coasts, managing six field offices with nearly 20 staff working across Oregon's more than 98,000 square miles.

She has overseen more than 400 townhalls with the people of Oregon. She has built close working relationships with 3 Governors, 11 Members of the House of Representatives, countless State legislators, county commissioners, community leaders, stakeholders, advocates, and constituents, not to mention Senator WYDEN's team.

And she leads by example.

As one of our team members said:

> Jessica works harder than anyone else. And what we see is only the tip of the iceberg.

Others describe her ''constantly working behind the scenes,'' that she ''squashes trouble,'' ''puts out fires,'' and ''fixes problems nobody [has even yet seen].''

A former Team Merkley member said she ''was so impressed with how Jessica handled [difficult situations, bringing] immense calmness and clarity [with] considerable empathy and support.''

Another former team member said:

> Regardless of roadblocks or the crisis du jour, Jessica has always remained dogged and determined to make sure that the people and causes who needed help [get] it.

Jessica has also taken countless members of Team Merkley under her wing. She has encouraging words for our interns, podcast recommendations on tricky local issues.

She sets a ''calm but strong'' example for the entire team, including her ''skill for listening and really seeing all the diverse groups and constituencies'' my office serves.

One longtime member of our team said:

> When I first met Jessica, I was pretty intimidated by her as an intern and just recognized immediately [that] she was a badass woman.

Another shared the story of the first time she had to do an airport pickup, saying:

> Jessica could tell I was really nervous and offered to come with me . . . so I would feel

more comfortable and [that] everything would go smoothly.

Another member of Jessica's team said:

She takes care of family, she takes care of friends, she takes care of her neighbors. She is just honestly incredibly selfless and giving.

Someone said:

[She's] always sending a personal note to celebrate people's good news and glad tidings. [And] it [really] means a lot and builds the kind of camaraderie that makes Team Merkley special.

And one member of my team summed it up by simply saying:

When you have Jessica in your corner, you feel [very] supported and safe.

In addition, she led one of the most consequential and sensitive processes: the nominations of Federal judgeships in Oregon. She supported judicial selection committees of legal and community leaders and worked with the White House to advance these nominations.

Thanks to her tireless efforts, Oregon has made history with its recent appointments, including Judge Adrienne Nelson, who is the first African-American woman to serve on the Federal bench from the District of Oregon, and Judge Mustafa Kasubhai, who is the first Muslim to serve as a Federal judge in the United States.

Her quiet efforts behind the scenes have helped to make our courts and our country more equitable and more just.

The motto of the State of Oregon is ''She flies with her own wings.''

Through workers' strikes and wildfires, through pandemics and post office closings, through the first Trump administration and now the second, she has kept Team Merkley flying for 12½ years.

It is with deep gratitude that Team Merkley and I thank Jessica Stevens for her service to the people of Oregon. We wish her all the best in her new chapter.

The PRESIDING OFFICER. The Senator from Massachusetts.

UNANIMOUS CONSENT REQUEST—S. 1593

Mr. MARKEY. Mr. President, today, I rise to advocate to my colleagues in the Senate for my Small Business Liberation Act, and I do so with Leader SCHUMER and Senator HIRONO, who have each already spoken on this very important issue.

Here is what the bill would do: The bill would give relief from President Trump's disastrous, destructive, small business-killing tariffs that have been turning Main Street into ''Pain Street'' all over our country for the last 7 weeks.

I would also provide with my bill certainty to the constant whiplash and chaos that is President Trump's tariff policies by exempting small businesses from the baseline 10-percent tariffs and the tariffs that have been on a 90-day pause since April 9.

So let me just explain what I am talking about. On April 2, President Trump imposed a 10-percent tariff on pretty much the whole world. In other words, a 10-percent tax on anything coming into the country—10 percent.

He also imposed an additional—called reciprocal tariff—on April 2 as well. And those tariffs, for example, were an additional 20 percent on the EU or an additional—we will just say—32 percent on Fiji, for whatever reason.

So that was an incredible additional tax on top of the 10-percent tax, which he imposed on the same day.

So on April 9, the President said: Well, we will wait—we will wait 90 days on those additional tariffs; on the EU for 20 percent; the 32 percent for Fiji; the 24 percent additional for Japan—we will put that aside, but we are going to keep the 10 percent on.

Now, for a big company, maybe they can figure that out. They can ride that out, the 10 percent. However, if you are a small business in our country, and all of a sudden, there is a new 10-percent tax you have to pay on all of those goods which you are bringing into our country, and then there is a sword of Damocles sitting out there, as well, that there could be, in July—which is only 6 weeks away—an additional 20 percent if those products come in from Europe. You are going to have a chilling effect that is placed on your business decisions, without question.

They don't have the leeway to be able to make the kind of riskier decisions that, perhaps, a bigger business could to just ride through all of these tariffs. So all across every Main Street in our country, these small businesses are getting paralyzed by the Trump actions.

Again, we are going to start with this: There is a 10-percent tariff—tax—already in place right now, since April 2, on every good coming into our country. So this is a very dangerous place to put the small businesses of our country.

Even as the vast majority of small businesses are seeing massive tariff-induced cost hikes, this administration is offering exemptions—exemptions—for billion-dollar corporations.

If you can get a dinner invitation to Mar-a-Lago, like the heads of Apple and Google, you can secure an exemption for your industry.

Now, in almost every instance, that is preceded by a big, big multimillion-dollar contribution to some entity that the Trump administration would like you to give that money to.

And then Apple is out; Google is out. They are not any longer affected by the tariffs. But no one on Main Street can afford to go to Mar-a-Lago to give the President $1 million. That probably exceeds the total worth of their business.

So that is the problem with where we are. And, by the way, it is also why the national chamber of commerce says that small businesses should get an exemption. It is not me. It is the national chamber of commerce that says that they should get an exemption.

And 97 percent of all companies that do business on an international basis are small businesses, and they constitute 30 percent of all trade. The national chamber of commerce is saying they should all be exempted. That is what my bill does. It says: Exempt those 97 percent of all businesses that constitute 30 percent of the trade from these tariffs—from the 10-percent tariff; from the upcoming, 6 weeks from now, upward of 20 percent, 30 percent, 40 percent more tariffs that are being imposed on countries around the world, while we are waiting for the President to negotiate bilateral agreements with each one of these entities.

Well, so far, after a month and a half, he is up to one agreement with the United Kingdom. That is it. He has got dozens and dozens to go and no time on the clock, and that is what small businesses are looking at. They are looking up at the clock. They are saying: How long can I last? I survive week to week. I survive month to month. I can't afford to be paying these tariffs or wondering if there is a new tariff which is coming in.

And all across our country, these numbers are unbelievable. In Massachusetts, we have 7 million people. We have 700,000 small businesses. Well, the same thing is true for the country. There are about 330 million Americans, and there are 33 million small businesses. There is a small business in America for every 10 people, and that person right now is looking up with fear that their future has a cloud over it.

And those small businesses, they account for two out of every three jobs added to our economy in the last 25 years. They are our engine of growth.

So I have heard from small businesses all across Massachusetts, all across our country, about how they are forcing those businesses to lay off employees, scale back benefits, or even shut their doors in some cases.

I spoke with Brandale Randolph, founder of the 1854 Cycling Company, an electric bike manufacturer based in Massachusetts, and here is what Brandale told me. He shared the story that his company finally—finally—after years of work, recovered from the $45 million which they lost during COVID, only to now be forced to decide whether or not they can weather this new tariff disaster hanging over their head.

So they moved from COVID to tariffs—none of this having been in any way instigated by the small businesses of our country. They don't have anything to do with it. It just keeps coming into their lives. And the messages from 1854 and other small businesses across the country are clear: These tariffs are going to threaten to put them out of business.

Small businesses are not Democrat. They are not Republican. This should not be a partisan issue, and I am disappointed that President Trump continues to ignore the outrage and the opposition to his irrational and ill-advised tariff policy.

It is time for the Senate to stand up and exempt small businesses in our country. There is a trade war going on. We should allow small businesses not to be drafted into this war because they are the ones that will be the casualty.

So, Mr. President, I ask unanimous consent that the Committee on Finance be discharged from further consideration of S. 1593, and the Senate proceed to its immediate consideration; that the bill be considered read a third time and passed; and that the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Is there an objection?

The Senator from Ohio.

Mr. MORENO. Reserving the right to object, and if my Democratic colleague could just yield for a very brief question for clarification, I think, for those listening: How do you define a small business?

Mr. MARKEY. Well, a small business is defined in the Small Business Administration definitions, and those would be the ones which we would exempt. And it can be different, depending upon the industry or its status, but, in general, what we are using is the definition used by the Small Business Administration.

Mr. MORENO. And just for clarification of my colleague, that is actually 500 employees or less. So I think when we are talking about small businesses, I just want to clarify that we are talking about 500-employee businesses.

So, first of all, I also want to actually thank my colleague for caring about small businesses. Certainly, as a small business owner up until 4 months ago, I think we should have much more passion here in this Chamber around small businesses. So I truly commend you for that.

I also commend you in a very big and meaningful way for the vote you took 25 years ago when you voted against giving China normalization status with the United States. I think that was a courageous vote. You were on the right side of history.

That disastrous situation has led China to grow its GDP from $1.2 trillion back then, when you voted, to $25 trillion today. So the fact that you went against some of your colleagues and took that vote shows that you are somebody who is independently minded and understands what businesses go through.

I truly, truly commend you for that because there is no worse bill in American history than that act. That act destroyed companies, not just all over America but, specifically, in the Presiding Officer's State and in my State. We see it every day, don't we, when we go on the campaign trail, when we are driving around Missouri or driving around Ohio. We see the remnants of companies that once existed.

Well, let's talk about how we can liberate small businesses, and maybe we can agree on these plans. No. 1, in the 2017 tax reform, the 2017 Tax Cuts and Jobs Act, what is interesting to me, as a small business owner, is that very large companies had their taxes made permanent, but it was for small businesses that those tax rates expire. In fact, they expire this year.

And the bill that we are looking to advance here in the Senate is a bill that would make those tax rates permanent. Let me just repeat that. We are not looking to cut taxes, because that is what you hear from my colleagues quite a bit. We are looking to make the 2017 tax reform permanent—not for big companies, not for the massive companies that are headquartered in Massachusetts but for the small businesses in Ohio and Missouri and in other places around the country that are going to see a massive increase in their taxes if we don't take action.

To put it in numbers, it is a $4 trillion tax increase for businesses. So if we are going to liberate small businesses, join me in calling for the 2017 tax reform to be made permanent.

Let's reform onerous regulations, especially in the banking sector. If you were a small business over the last 4 years, it was really hard to get access to banking because banks were basically shutting out small businesses from lending. The big banks kept getting bigger. Community banks, which is what small businesses rely on, were getting absolutely tortured.

We need better energy policies. What that means is certainly not banning coal, which is important in my State; natural gas, of which we have a thousand years of reserves. And I have offered to my colleague that we will build a big, beautiful pipeline right to Massachusetts. You will never need energy again from Canada or any other place. You can get it right from Ohio.

Better workforce policies, ending the incredible amount of onerous overlitigation—those types of policies will liberate small businesses. How do I know it? Because I have been a small business owner my entire life.

So let's talk about the subject at hand, tariffs. Tariffs are exactly intended to help these kinds of companies. When a Mexican company came in and bought Republic Steel in Canton, OH, the first thing they did was take all the equipment that was valuable, shipped it to Mexico, massively laid off the employees, sucked all of the cash out of the business, and left a 258-acre environmental disaster in the heart of Canton, OH. Now, that same steel is made in Mexico, and they want to ship that steel into the United States completely tariff free.

What was the impact on small businesses around that steel mill—restaurants, the hairdressers, the grocery stores, the doctors, the dentists—that relied on those employees? Devastation. Devastation rate.

In Lordstown, OH, we once had a General Motors facility that employed 10,000 people, 6 million square feet.

They made the highest quality products of any facility in America. The production was shipped to Mexico. Now the facility remains basically idle. What was the effect on the small businesses of Lordstown, OH? Total and complete devastation.

So while I appreciate my colleague's desire—I really, really do. I have had a chance to meet you in your office. I think you are a good man. I say that with total earnestness on my part.

Let's actually liberate small businesses. Let's give them certainty on taxes. Let's keep their tax rates permanent, just like the big guys got.

Why did the big guys get permanency? And the little guys, who don't have access to the Halls of Congress, why do they get the tax rates that go up?

Let's give them better energy policies that allow them to have energy costs go down. Let's give them better workforce policy. Let's end the reign of terror of litigation that hits small businesses and drives up insurance costs. And let's give them good workforce policies. And let's support—let's unite as a country, as President Trump tries to undo, Senator, what you tried to do 25 years ago. And 25 years ago, you wanted this country to stand up to China and say: No, we will not give you normalization because if we do, you will destroy our economy.

And they have.

Let's rally around President Trump. It has been just over 100 and some-odd days. He is trying to reverse 25 years of bad behavior. We should be in this Chamber saying: Look, go out and do that. Negotiate. We have your back. Fight for America. Fight for American workers. Fight for American small businesses.

That is the message other countries need to hear. They shouldn't be hearing from this Chamber that we are not united as Americans in making the best deal for American workers.

And with that and therefore, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Massachusetts.

Mr. MARKEY. First of all, I want to say that I appreciate the comments of the Senator from Ohio.

But here is the bottom line: This isn't just about China. The President hasn't targeted just China. He hasn't explained his ''just China'' strategy. He has imposed these tariffs all across the world—all across the world, every country.

And yes, the legislation that we have, it doesn't touch the steel tariffs that are imposed. We don't touch those. They can stay in place. We don't touch them.

But here is the bottom line: You can't make silk for U.S. ties in the United States. You can't grow coffee in the United States. I could go on and on and on and on, about product after product that is sold in Main Street in America. Putting a 20-percent tariff on and, on top of that, an additional 20

percent, 30 percent, 40 percent, it is not going to do anything for the person on Main Street with the small business. It is just going to make it almost impossible for them to import those goods that they need to sell in their stores on every Main Street in America. That is what they are saying to us. And this 10-percent tariff is still going to stay on.

We are only 6 weeks from having the sword of Damocles of 20 percent more for the EU and countries from all around the world—Japan, Israel, you name it, India—it is just dozens and dozens of countries that aren't China. But there is no plan. The President is making it up as he goes along, and the people who are going to suffer are going to be the small business people.

If you import toys, and there are maybe 20 different countries from which you import your toys to put on the shelves of your stores on Main Street everywhere, and parents can go in to buy the presents for their child—I just think it is unrealistic. The President is saying: Well, maybe the kids can get by with 3 dolls instead of 30.

Well, that is not how it is going to work. The store is going out of business. The store has a certain predictable business model in terms of how much revenue they are going to have per year, based upon what they can import.

If the President had a plan, I would like to hear it. But I don't. I don't want to hear him talk about how he is ultimately going to get a deal with dozens of countries in 6 weeks. There is no likelihood of that happening. But a small business person can't take that risk.

So that is why, again, this short-term pain that the President keeps talking about for long-term gains, well, honestly, in the short run, these businesses are going—they are going under, the small businesses. And there may be some posthumous indication of the President's theory about these tariffs, 2 years, 3 years, 5 years from now. That won't really do these small businesses any good.

So let the big businesses fight it out, and don't allow the Googles and the Apples to buy their way out of it.

You know, in the Civil War, there was an old saying: It was ''a rich man's war but a poor man's fight''—meaning the rich man could buy his way out of the draft. Rich man's war; poor man's fight.

So big business war, but it is going to be fought by small businesses on Main Street, who are going to be the victims. Those are always the casualties. And they have been drafted into this battle of big businesses.

So, again, I appreciate the comments of the gentleman from Ohio. I think he is wrong. I think we should exempt small businesses and let them know that they are not going to be driven out of business by this still-unplanned guided missile heading right toward every Main Street in our country that is going to be destructive of the hard-earned success those small businesses have had.

I yield the floor.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. MORENO. Just real quickly. Again, I truly respect my colleague and his point of view. I want to remind him that there is a great Massachusetts family, the Hassenfelds. Do you know what they used to do—what they still do? The brothers created a company called Hasbro. Those toys used to be made in the United States of America. They were employing lots of American citizens. They shipped all that production to China and elsewhere, and communities suffered as a result.

As I said—if you notice, my colleague did not address any of the points that I made. If you talk to any small business owner, they will tell you the No. 1 priority right now is for us to make their tax rates permanent. It is not tax cuts. No matter how many times my colleagues will say it is tax cuts for billionaires, it is objectively not true. This is permanency of the current rates.

Only in Washington, DC, by the way, would keeping things the same be considered a tax cut. It is ludicrous, and it makes no sense.

Since you asked for the plan, here is the plan: We are going to make America the best place to do business. We are going to give American companies and American citizens the best tax rates so they can grow and thrive here. We are going to give them a regulatory environment that is not overbearing, that doesn't kneecap companies. We are going to make certain we protect critical industries like steel, which I appreciate that.

I think we should put, by the way, a full tariff on all major steel products—like, for example, appliances. This country was once the epicenter of appliance manufacturing, and now there is only one company—Whirlpool. I am proud they make their appliances primarily in Ohio. Yet they have to compete with cheap appliances coming in from China.

We have a plan. The plan is very simple. We are going to have fair and reciprocal trade. And you are right; it is not just China. It is Japan, which charges us tariffs and nontariff barriers, and we allow them to bring their products here.

South Korea—not only is that the case, but we also pay to defend them.

Australia. Great ally. Great people. They tariff our meat. Their meat can come in tariff-free.

Canada and Mexico are great allies and large trading partners, but they have allowed their borders to be open. They have allowed hundreds of thousands of Americans to die of fentanyl. I am ecstatic that we have a President of the United States that says: No, we will not allow that to continue. And if you want to have a relationship with the United States of America, you are going to secure your borders, and you are going to make it darn well necessary to secure your borders to protect Americans.

So that is the plan. The plan is to usher in a golden age for this country where working-class Americans have the ability to live a good life, have a good job where a mom or a dad can provide for their kids, afford a home, afford a car, go on vacation every once in a while, and retire with dignity. That was once the dream of the Democratic Party. This is what we should unite around and rally around and make certain that all of our policies are pointed straight in that direction.

So, again, I appreciate the comments from my colleague. Hopefully, I think we can work together on some initiatives, as I laid out—good tax policy, good regulatory policy, good workforce policies that allow small businesses to thrive—because as somebody who did that 5 months ago for my whole entire life, I am happy to hear that conversation happening here in the U.S. Senate.

I yield the floor.

The PRESIDING OFFICER. The minority leader.

UNANIMOUS CONSENT REQUEST—S. 1804

Mr. SCHUMER. Mr. President, earlier today, the Defense Department announced that the United States has formally accepted a luxury 747 jetliner as a gift from Qatar to be used as Air Force One. It is the largest foreign gift to an American President in modern history—one Donald Trump says will go to his Presidential library after his term.

This gift is outrageous. Donald Trump will berate companies to ''eat his tariffs'' and tell parents to pay yet more for groceries but is accepting a luxury plane he can use as Air Force One.

This gift screams ''national security risk.'' It is bribery in broad daylight. Donald Trump is thumbing his nose at Republicans and practically daring them to stop him.

Well, today, the Senate can. In a few moments, I will move for swift passage of the Presidential Airlift Security Act, prohibiting the use of any foreign plane to be utilized as Air Force One.

Specifically, my legislation would prohibit even a single taxpayer dollar from being used by the Department of Defense to procure, modify, retrofit, or maintain any foreign aircraft for the purposes of transporting a U.S. President. This is about ensuring our national security and about not wasting taxpayer dollars on an utterly senseless deal.

It should not take an act of Congress to stop the President of the United States from accepting the largest foreign bribe in modern history, but apparently Donald Trump is perfectly willing to sell out the American people and the Presidency to fill his own pockets.

Senate Republicans who say they are troubled by the idea of using a foreign plane as Air Force One should join me in supporting this very commonsense

bill. Donald Trump accepting this gift reeks of corruption and naked self-enrichment, and Republicans should stand up and support my bill, defend national security, and protect Americans.

So I ask unanimous consent that the Committee on Armed Services be discharged from further consideration of S. 1804 and the Senate proceed to its immediate consideration; that the bill be considered read a third time and passed and the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Is there an objection?

The Senator from Kansas.

Mr. MARSHALL. I object.

The PRESIDING OFFICER. The objection is heard.

Mr. SCHUMER. I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. BLUMENTHAL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. BANKS). Without objection, it is so ordered.

UNANIMOUS CONSENT REQUESTS—S. RES. 242, S. RES. 243, S. RES. 244, AND S. RES. 245

Mr. BLUMENTHAL. Mr. President, I ask unanimous consent that at a time to be determined by the majority leader in consultation with the Democratic leader, the Senate proceed to the consideration of the following Senate resolutions in the order listed: S. Res. 242, S. Res. 243, S. Res. 244, and S. Res. 245; that there be up to 2 hours for debate on each resolution, individually; and that upon the use or yielding back of that time, the Senate vote on adoption of the resolutions, individually; and that if any of the resolutions are adopted, the preambles be agreed to and the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there objection?

The Senator from Wyoming.

Mr. BARRASSO. I object.

The PRESIDING OFFICER. Objection is heard.

The Senator from Connecticut.

Mr. BLUMENTHAL. Mr. President, the purpose and effect of these resolutions, very simply, is to provide votes. That is what we do in the U.S. Senate—we vote. And on these votes, the Constitution is involved. The provision of the Constitution commonly known as the emoluments clause enables officials of the Federal Government—from a sergeant in the Air Force or some other military branch to the President of the United States—to accept payments or benefits from a foreign power or other foreign entity or individual but only if there is approval by the U.S. Senate and Congress.

We need to take those votes if the President of the United States is to accept any benefits or payments. And that is what is happening in plain sight, openly, for all to see.

Literally, tomorrow night, in the White House, individuals who have invested to the President's benefit in his meme coin and World Liberty Financial will have dinner with him in the White House. He has literally put a ''For Sale'' sign on the White House. But money in his pocket will come from some anonymous donors, some foreign investors, and others in violation of the emoluments clause, unless there is approval from the U.S. Congress. That is tomorrow night in the White House.

And today, the Trump administration formally accepted a $200 million Boeing 747–8 jumbo jet as a gift from the Government of Qatar. Now, that plane may be used as Air Force One while he is in office before it is transferred to the Trump Presidential Library Foundation before the end of his term.

The Department of Defense has confirmed that the Secretary of Defense, Pete Hegseth, has ordered the Air Force to plan rapid modifications to upgrade the plane for use as Air Force One. They are no small modifications. The plane has to be stripped down virtually to its shell to ensure the installation of multiple top-secret systems. The work will take, potentially, years to complete. And the estimate to taxpayers—all of us American taxpayers—is about $1 billion.

That plane probably won't even be ready before the end of President Trump's term when the foundation—his foundation—takes ownership of it. It is a gift, in effect, to him from Qatar.

The Air Force is a passthrough entity. That is the arrogance of this step—corruption—but also a violation of the emoluments clause, unless there is approval from the U.S. Congress.

Majority leader Thune has said:

> If and when the plane is no longer a hypothetical, I can assure you there will be plenty of scrutiny of whatever that arrangement might look like.

Well, it is no longer a hypothetical. Selling out American interests began the first days and hours of this administration in President Trump's second term. How did he celebrate his inauguration? Well, he launched a cryptocurrency scheme, a meme coin. The only purpose of it was to enrich the President. Unsurprisingly, by design, foreign governments, unscrupulous foreign individuals, and anonymous foreign nationals are competing with themselves—literally, there is a leaderboard—to line his pockets and make known how they are lining his pockets.

There is no reason for them to write him a letter or file with some government Agency. Face-to-face, he will be with them in the White House tomorrow evening. They are competing—and I mean literally competing—with each other for access, and he has put his office and the White House on the auction block.

Tomorrow evening, he will be hosting that dinner—personally hosting it for 220 holders of that meme coin. Wherever the dinner occurs, whether it is in the White House or someplace else, the effect is the same: to be selling access.

And after the dinner competition was announced—alongside a ''Special VIP White House Tour'' for the top 25 holders—President Trump cashed in. The price of that meme coin rose more than 50 percent after the announcement of that dinner. In total, President Trump and his sons and his business partners have now earned $350 million in sales and related fees from that scheme.

Come tomorrow evening, he will have pumped up the price. And sometimes the price goes down. He may have dumped part of his holding—pump-and-dump—raise the price and then dump the stock. It is a classic Wall Street corrupt move that would normally go to the SEC. But, of course, there is no regulation.

Bidders aren't hiding the pay-for-play scheme either. The winner of Trump's contest—the grand winner—is Justin Sun, who faces a civil fraud case from the SEC over allegations of market manipulation and unregistered asset sales.

Since the election, Justin Sun has poured nearly $100 million into Trump's crypto ventures. And guess what. Trump's SEC—poof—it is not a legal term, by the way—poof—the SEC paused the litigation and now is in negotiations to settle that case. It is out in the open.

One shipping firm with operations in Mexico announced it has raised $20 million to purchase the Trump coins for the express purpose of influencing tariff policy in the United States of America.

When Donald Trump negotiates tariffs, is he protecting American consumers and small businesses? No, not so much. More likely, he is cutting deals for his crypto friends. That is the essence of selling public office, and it is corruption.

But put aside the criminal violations of law that may be involved because the U.S. Supreme Court has given him immunity for what he is doing in the White House, the emoluments clause forbids him from taking those payments—benefits—without coming to the U.S. Congress and seeking our consent and approval.

Foreign governments are paying President Trump through another one of his cryptocurrency ventures, in addition to the FIGHT, FIGHT, FIGHT meme coin. World Liberty Financial, on May 1—literally, this month—World Liberty Financial announced an investment fund backed by the United Arab Emirates. The government of that country, using Trump's digital coins, is completing a $2 billion transaction that, once again, puts money in his pocket. From this deal, Donald Trump and his family stand to gain hundreds

of millions of dollars—apart from the $350 million I mentioned earlier—hundreds of millions more from this foreign government.

His sons are traveling around the world getting VIP treatment in Pakistan and elsewhere, using the President and the White House to strike deals for World Liberty Financial. We simply cannot accept this kind of practice as normal or legal. We can't abdicate our responsibility. We cannot seem to endorse or encourage this kind of corruption. That is the reason we have the emoluments clause. That is the reason the Founders wanted Congress to be involved whenever there is any benefit or payment to a member of the executive branch. Again, it applies not only to the President of the United States but all of the Federal officials, down to the rank and file.

Right now, the Senate is considering legislation to promote the growth of cryptocurrencies. This legislation has no ethical rules or conflict of interest provisions that would stop the President or his family from using the White House to enrich himself—none applying to the President. It fails to provide many basic consumer protections and national security rules. It invites Big Tech into our financial system.

We are considering this legislation at the very same time as Trump's crypto dinner will be happening literally within about 24 hours. Is there any wonder that the public's esteem for the U.S. Congress has sunk to the kinds of lows we are seeing right now? We are adding to the perception that Congress somehow is legitimizing or overlooking his behavior—in fact, looking the other way. That is not the message we ought to be sending at this moment in our history, and it is not legally right under the Constitution.

We ought to be voting on his emoluments, every one of these benefits. That is the reason I have separate resolutions—simply to preserve our own authority and power and our integrity and send a signal about the independence of this branch, the legislative branch.

Foreign governments have figured out a lot of ways to line Donald Trump's pockets. The Trump Organization—he is still the owner. It may be in trust. He maybe figured out some technical legal way to seem to insulate or isolate himself from it. But that organization is doing business deals with Saudi Arabia, with Qatar, and with Oman and Serbia.

LIV Golf, backed by the Saudi Arabian Government, hosted a tournament at Trump National Doral in April—April—of this year. The Trump Organization has signed $5.5 billion in real estate deals with a Qatari Government-owned firm, and it is going to build a new development on government-owned land in Serbia and Oman. The Trump Organization has already received $5 million from Oman. These are violations of the emoluments clause plainly, simply, in plain sight.

We have no excuse for failing to vote. We have no excuse for remaining silent. We have no excuse for ducking or dodging.

The foreign emoluments clause states:

> [N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of Congress, accept of any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State.

Foreign states are clearly involved in these transactions.

The purpose of this clause is basic and unassailable, indisputable. It is to prevent undue foreign influence and foreign corruption.

The Founders knew about the dangers of a foreign government trying to influence our President or anyone under him. They knew about those powerful Kings in France and England. We had just liberated ourselves from England. We were a small, struggling country, and they were afraid that our executives would be influenced by those more powerful countries.

It was to ensure our government officials work for the American people and the Nation rather than their own financial self-interests or on behalf of any foreign government that the emoluments clause was adopted. But President Trump seemingly doesn't care about working for the American people; he cares about his own pocketbook. Not once has he come to Congress for consent on any of these deals. He hasn't even hinted at it. And he will continue pursuing these corrupt foreign deals until we, as Congress, have the gumption to act.

Today, I am introducing resolutions that condemn President Trump's violation of the foreign emoluments clause and demand the transfer to the U.S. Government of any gifts, benefits, or payments recovered or received from foreign governments or others through his illegal dealings.

I have asked for unanimous consent to schedule floor votes—I want floor votes—on each of these resolutions. I think the American people deserve to know where we stand, who is going to allow him to go forward with these deals, who is going to sacrifice the integrity and independence of this branch of government, and where every Senator stands on Donald Trump's self-enrichment schemes. We need to know whether the Senate is willing to stand up and show up against this corrupt self-dealing.

I yield the floor.

The PRESIDING OFFICER. The Democratic whip.

Mr. DURBIN. Mr. President, it was my good fortune as a young man to work for a Senator from Illinois named Paul Douglas. He was known as Mr. Ethics in the U.S. Senate. He believed—and he shared that belief with me and all who worked with and for him—that the first obligation of a public official is to not betray the trust of the voters when it comes to self-dealing or making money out of public office.

He started me down the path in my early years in politics of making a complete disclosure—both my income tax return and net worth in detail, specific amounts—every year. I have done that for over 40 years. I believe he was right.

I remember Paul Simon, my predecessor in the U.S. Senate, used to say: People may not agree with my vote, but they know I didn't cast it to make a buck.

It is just that simple.

So what has happened at the highest level of the Government, the Office of President? Throughout our history, there have been examples of corruption which have been well documented. The Teapot Dome scandal comes to mind, and certainly the departures of previous Vice Presidents for wrongdoing have been well documented.

What we have going on in the White House now with the Trump administration is unprecedented not just in the amount of money involved going to the President and his family but also in the very real fact that the bottom line is that he is bold and states clearly: I have done it, and I defy you to do anything about it.

It is one of the reasons I am opposing the pending legislation on the floor on cryptocurrency. The President, as has been documented by my colleague from Connecticut, is making millions of dollars exploiting cryptocurrency, and he is inviting those who buy into his scheme—his profit-making scheme—to official gatherings and occasions at the White House. It is the most bald-faced demonstration of corruption we have ever seen in the Office of the Presidency. And this plane now—this $400 million airplane—says it all.

Mr. President, so that you understand, Pam Bondi is the Attorney General of the United States, duly appointed, and she has supposedly released a memo justifying the transfer of this airplane to the U.S. Government and then to Donald Trump personally as being acceptable—no objection. I am still looking for a copy of that public opinion. It should be public, if it hasn't been yet.

There has been reference made to the Constitution on this issue. In the Constitution, article I, section 9 is explicit:

> [N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title of any kind whatever, from any King, Prince, or foreign State.

How clear can you be? This President has no authority to accept this gift. And the notion that he would accept it, use it for the remainder of his Presidency, and then take personal title to the airplane is outrageous.

The fact of the matter is—those of us who have taken the time to check—it will cost the American taxpayers a fortune to take this gift from Qatar and to make it safe for any President to travel in it.

As one of my colleagues has said, if the Qataris said ''As a favor to the people of the United States, we are going to redesign and pay for the redesign of the Oval Office, the Situation Room, and the President's residence. We will do it on our dime,'' the American people would never fall for it. Why would we ever let them get that close to the decision making at the highest level in America? That is exactly what we are doing here if we accept this airplane. We have taken all those three functions of the President, added wings to the equation, and said the Constitution doesn't count.

Republicans have claimed for years that Joe Biden, during his administration and his time as Vice President, engaged in wrongdoing due to his family's business dealings. I am sure we remember congressional Republicans' endless investigations into President Biden's son and his past business dealings as a private citizen. But despite multiple investigations and a failed impeachment inquiry against President Biden, Republicans are largely silent and willing to disregard the overwhelming corruption of President Trump and his family as they pocket millions of dollars personally at the expense of the American people.

In the latest of a long line of shady dealings, President Trump is receiving a private jet as a gift from the royal family of Qatar and is claiming that it is simply a gift to the Defense Department.

This aircraft that we are talking about is sitting in San Antonio, TX. It would be retrofitted to act as Air Force One for the remainder of Trump's term in office before ownership is transferred to the Trump Presidential Library Foundation.

The President claimed it would be ''stupid [to] say 'No, we don't want a free, very expensive airplane.' '' However, what he doesn't say is that it will cost American taxpayers millions more to retrofit the plane to meet the President's security, communication, and intelligence needs.

Mr. President, what is stupid is retrofitting a very expensive plane from a foreign government, which constitutes a major counterintelligence risk, on the American taxpayers' dime when an American company is already manufacturing the next Air Force One.

The Constitution, as I have read, explicitly gives Congress the power to control whether any officer of the United States, including the President, may accept a gift from ''any King, Prince, or foreign State.'' This unprecedented gift clearly violates the Constitution and laws enacted by Congress to govern such gifts. Yet Attorney General Bondi reportedly concluded it would be ''legally permissible'' for President Trump to accept this gift. I am calling on the Attorney General today to release this opinion and report in its entirety to the U.S. Congress.

I am not surprised by it. This administration continues to abuse its power at the cost of the American people time and again, while Republicans in Congress stand by and allow it.

Mr. President, do you hear it? The silence? The silence of the President's party? The silence of the lambs?

Make no mistake, this is more than just a gift that benefits the President and not the American people. The President, we understand, it has been reported, has actively solicited this gift from Qatar. The question remains: In exchange for what?

President Trump's acceptance of such a substantial gift from a foreign government could disproportionately influence the foreign policies of this country—exactly why the Founding Fathers gave Congress the power to control these gifts under the Constitution. It is clear to our foreign partners and enemies that, under President Trump, America's policymaking is open to the highest bidder.

We also see President Trump and his family profiting off the promise of influenced domestic policy. Right before his second inauguration, President Trump launched a valueless cryptocurrency token marked not as an investment but as monetary support for Trump. First Lady Melania Trump also promoted her own meme coin shortly thereafter. This scheme allowed the President to pocket millions of dollars in direct payments with little or no public disclosure or oversight. He has never denied it. He has since fired the heads of the Agencies that investigate these crypto schemes.

Donald Trump, Jr., has founded a new private membership club in DC called Executive Branch with a $500,000 membership fee. The launch party, featuring several Cabinet and other administration officials, underscored Trump Junior's efforts to sell access.

That is what this administration does. It sees a barrier to cutting corners or any check on its corruption and gets rid of it. These actions were entirely predictable because Trump and his family also blatantly used the Presidency to enrich themselves by selling access and the chance to influence policy under his first administration.

I am saddened that our colleagues on the Republican side of the aisle apparently believe that silence is the best response to these outrages. It is the ''Silence of the Lambs.''

When will they stand up for the American people and say ''enough is enough,'' or do they believe American policy should be sold to whatever country is willing to place the highest bid?

If we are talking about a swamp in DC, sadly, this is a major part of it.

I yield the floor.

The PRESIDING OFFICER (Mr. MORENO). The Senator from Vermont.

Mr. WELCH. Mr. President, I want to align myself with the comments made by the Senator from Connecticut and the Senator from Illinois.

The Constitution is pretty straightforward on this. It is pretty basic:

> [N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.

This $200 million plane that is going to—$400 million plane—the estimates go up and down, but it is an expensive plane—is a gift, and it is going to the personal use of the President of the United States. The Constitution says it is the job of Congress to say yes or no to a gift. It is our job. And if this Congress wants to vote to accept this $400 million plane, that is our job to do it. If this Congress is silent and doesn't demand that we enforce article I responsibility about this extraordinary gift from the Government of Qatar, that is on us. That is on us.

And what we are seeing time and again is the relinquishment of authority and power under article I, and it can't be shipped out of here fast enough to the Executive down at 1600 Pennsylvania Avenue to satisfy anyone.

That is so profoundly threatening to the well-being of our democracy. The whole point of having three branches of government is the recognition that you cannot allow one person, or even one branch of government, to consolidate all power. There has to be checks and balances. It was based upon what was true then and is true now: Absolute power can corrupt absolutely. And the foundational principle that has served us well is that with the checks and balances, the ambition of one branch can compete with the ambition of the other branch. We have given away the authority that Congress has and the responsibility it has to have those checks and balances and defend democracy.

And by the way, why in the world would we want some other government to be providing transportation for our Chief Executive? It is embarrassing. We don't need no stinking Qatar plane. We need our own planes. We need our own planes. This is about us having respect for the men and women who work here. It is about us having respect for our own responsibility to take care of our own national security needs. We can't outsource this to another government. We shouldn't do it, just as a matter of pride.

But we also shouldn't do it because it does stink—it does stink—of corruption. And all the evidence here is that, for whatever reason, Donald Trump thought this would be a pretty cool plane to fly in. He started putting the pressure on, directly and indirectly, to get this offer of a gift, and now it is a $200 million, $400 million gift. That is what we have. And that is, by the way, without any of us having any opportunity to ask the hard questions: What is it going to cost to so-call retrofit? Can it be retrofitted? How much will taxpayers be asked to pay? Is this gift going to be something that actually costs us a lot more money?

So the Appropriations Committee has no capacity to look into this, to kick the tires, to assess what this

means for the taxpayers of this country. So I find it astonishing that we would even be considering and that the President of the United States would be considering having the national security transportation, Air Force One, be a gift of a foreign government. I find it astonishing that we in Congress wouldn't, on a unanimous basis, demand that the emoluments clause be enforced by the Congress voting yes or no on acceptance of this gift.

The implications are pretty clear: Corruption is alive and well in the administration. The implications are pretty clear: Passivity is alive and well in the Congress of the United States, that we turn our back on exercising the profound responsibility that we have, an obligation we have to the people we represent.

Mr. President, I urge the passage of this resolution, and I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. BLUMENTHAL. Mr. President, I want to thank my colleagues Senator DURBIN and Senator WELCH for being here today. I know my resolutions reflect unanimity on our side, and I believe sincerely the reservations and doubts on the other side as well. And I regret the objection to these resolutions because I think that my colleagues deserve a vote. We deserve a vote on both sides of the aisle.

This violation of the Constitution benefits nobody. Many of the votes we take here, there are differing interests, there are contrasting and sometimes conflicting points of view on the merits, on who benefits and who may be hurt. Here, there is only one beneficiary: Donald Trump and his family—maybe some of the foreign investors, maybe some of the others who have donated or contributed to his campaign and have invested in the meme coins or in World Liberty Financial stablecoin.

This plane should be built by an American company. It should be built so that President Trump can use it—or any other President—on time, on schedule. It is now already delayed. Boeing should be held accountable. And if it can't deliver it when the President needs it, somebody else ought to be required to build it.

So I am deeply disappointed we are not going to have these votes, at least right now. I am going to be coming back to the floor and asking for these votes on the emoluments clause because it is part of our job, it is part of our constitutional responsibility, and Donald Trump is violating the Constitution by accepting gifts in the plane, investments, and money in his pocket from his cryptocurrency ventures and other schemes that he is enabling in plain sight. This corruption should not be allowed to continue.

I yield the floor.

The PRESIDING OFFICER. The Senator from Massachusetts.

CLEAN AIR ACT

Mr. MARKEY. Mr. President, today, I am here to defend clean air regulations that tackle the climate crisis, protect public health, and save drivers money at the pump.

For more than 50 years, California has had the legal authority under the Clean Air Act to adopt stricter emissions standards than the Federal baseline. For 50 years, both Democrat and Republican administrations have granted these Clean Air Act waivers that are essential for reducing toxic air pollution, protecting public health, and cutting greenhouse gas emissions that dangerously warm our planet. No Congress has ever dared to revoke these waivers—until now.

My Republican colleagues say this is about protecting consumer choice. Well, let me ask: Who is really choosing this? Not the parents. Not the residents near busy highways. Not the doctors and nurses. Not even the drivers.

It is the polluters. This dependence on fossil fuels allows Big Oil CEOs to turn drivers upside down at the pump and shake money out of their pockets.

The Republicans say ‘‘all of the above.’’ No. No. It is ‘‘oil above all.’’ We put 70 percent of the oil we consume into gasoline tanks. And with cleaner, smarter, more efficient technologies, we can reduce and reduce and reduce the amount of oil that we put into the vehicles which we drive. This terrifies the oil industry.

America is a technological giant. We have a capacity to invent new technologies. By the way, the Chinese are just on the HOV lane of new technologies for the vehicles which they are driving. They have invented a technology that allows for the charging of a battery in 5 minutes in a vehicle that people are driving.

That should be us. We should be the ones leading.

That is not what the Republicans are doing. Donald Trump is saying he wants to repeal the tax breaks for electric vehicles in our Nation, just take those tax breaks off the books. He wants to repeal the laws which incentivize the development of even better batteries in our country—batteries that, with one charge, will go further and further and further. Maybe we could compete with the Chinese. But Trump wants to take them off the books, and the Republicans are going along with that.

Maybe we could put more charging stations across the country to make it easier for people to drive all-electric vehicles. No. Trump is saying we want to take away all those tax breaks too. Let's just make it easy for the Chinese to take over the electric vehicle industry of the 21st century. Let's just hand it over to them on a silver platter.

We are only 5 percent of the world's population. The other 95 percent is going electric.

The other 95 percent is moving to the future. That is not going to be the United States. The Republicans are working here tonight in order to absolutely short-circuit this future that was ours.

You know, honestly, gas-guzzling cars aren't just bad for drivers, they are bad for every one of us. According to the American Lung Association, more than 131 million people live in counties with unhealthy levels of ozone and particulate pollution.

And what is the largest source of that pollution? It is vehicles. It is the cars and the trucks which we drive in our country. That is what sends up the pollution. That is what gets into the lungs of Americans.

And now my Republican colleagues are trying to rip away the safeguards that help to protect public health and to save our country money. By triggering the Congressional Review Act to repeal California's waivers, it would allow for 1.6 billion metric tons of carbon emissions; more than 1.5 million metric tons of nitrogen oxide, all going up into the air; 17,000 metric tons of fine particulate matter, the type of pollution that penetrates deep into your lungs, the lungs of your children, the lungs of your loved ones, and enters the bloodstream to wreak havoc on the body in the form of asthma, respiratory problems, cardiovascular diseases, and more—much, much, more—all spewed into the air.

And that is what they want. That is what they want.

After the Surgeon General in 1964 issued a warning about smoking, America went from 50 percent of the country smoking down to 18 percent. People started to wise up. They said: We don't want that stuff in our lungs, and we are going to tell our kids not to smoke because it is dangerous.

Your lungs—your lungs—are vulnerable if there is an inhalation of dangerous substances.

So what does it look like in real life? Well, it means more kids are going to suffer from asthma. It means grandma and grandpa dying earlier. It means more death and destruction from extreme weather events, such as the Los Angeles wildfires and Hurricanes Helene and Milton. By the way, those three events caused $500 billion worth of damage—those three events, all related to climate change, all related to the warming of the atmosphere.

Just assume that the ceiling here on the Senate floor is capturing all of the heat all day long, and there is no air-conditioning down below. That is the greenhouse effect. It just gets warmer and warmer and warmer, which is why, by the way, the Senate used to adjourn in the beginning of May because it just got too hot in rooms like this before air-conditioning.

Well, there is no air-conditioning for the planet. You have to engage in a preventive strategy, lower the temperature right from the beginning, lower the thermostat right from the beginning.

Ultimately, it is just going to raise costs on everyday families. By blocking the California waivers, consumers would spend more than $89 billion in additional fuel costs through the year

2040. It is much less expensive to be charging a battery than to be putting that pump into the side of your car and watching that dollar sign just skyrocket as you are watching your hard-earned money go to Big Oil all across our Nation.

That is more money at Big Oil's gas pump and less money at your kitchen table. This comes at a time when Trump is waging war on clean cars, repeals to clean vehicle tax credits, attempts to flip a U-turn on fuel economy and EPA vehicle emissions standards.

In 2007, I worked on a bipartisan basis as the chairman of the committee over in the House to enact a provision in the energy law that increased our Nation's fuel economy standards for the first time in 32 years. We were actually going backward by 2007, and the rest of the world was zooming right past us.

It is one of the laws I passed which I am most proud of, and that is what led to the rulemaking that promulgated the higher fuel economy standards for our Nation. I am very proud of that law and the work I played over in the House authoring it.

And the industry, they were able to do it. They were still stuck at 27 miles a gallon. That was the law from 1975. It was 2007, 32 years later. They still couldn't figure out how to improve the efficiency of the vehicles which we drive.

Meanwhile, the Chinese and others, they were getting on the speedway. They were getting ready to catch up to us. And starting in 2009, the Obama administration's Environmental Protection Agency and Department of Transportation built upon that law to negotiate a historic agreement with the State regulators, with the automakers, with labor unions, and the environmental community.

But now—now—Trump, Republicans, at the behest of the oil industry, are trying to do a U-turn on these standards and the benefits that they give to our consumers, to our families, to our planet.

It is not enough for Republicans to promote chaos and conflict in our economy for the sake of billionaires. They now want to create chaos and conflict as well.

By intentionally modifying the Senate rules that protect this institution at a moment when Donald Trump is actively undermining the checks and balances enshrined in our Constitution, that is a serious threat, not just to the Senate but to our country. It is a threat to the rule of law. It is a threat to our health, to our communities, and access to clean air. It is a threat to our planet.

With this action, my Republican colleagues are opening the door for future votes on the countless unlawful and unethical actions waiting to be carried out by the Trump administration. There will be no putting the genie back into the bottle.

It is going to unleash the President who says he is a stable genius to continue to perpetrate more of his unconscionable actions on the people of our country.

So let's not trigger this nuclear option. Let's not unleash a mushroom cloud of pollution on our communities. Let's not allow polluters to rewrite Senate precedent. Let's not steal the right of States to set high standards that result in children breathing cleaner air, not having their vulnerable lungs be sucking in these particulates, sucking in this unhealthy air that vehicles emit.

We have another direction in which we can head. We have a better vision for us. By the way, this is not rocket science. We are not asking anyone to go to Mars. We are just asking people to improve automotive technology. This is car mechanics. It is not a mission to the Moon.

So while I hear Trump bragging about his buddy Elon and a mission to Mars and all these satellites out in outer space and how he wants to have a Golden Dome over our Nation that is going to protect us from incoming Soviet missiles at 2 a.m. in the morning, and here is vision of a Golden Dome that is going to protect us.

Then, when you turn to him and say: Hey, can we improve the efficiency of the cars which we drive, Trump and his oil buddies said: What are you crazy? That is auto mechanics. That is too difficult for us to figure out.

Well, it is not too difficult for the Chinese. They are coming. They are coming. And country by country, it is going to say: ''Made in China.'' ''Made in China.''

Unfortunately, for too many of our domestic auto companies, they are using this as the excuse to just walk away. And maybe for the short run, it will be OK, but in the long run, that is not a business plan.

Maybe it makes it to their retirement as executives of the companies, maybe they make it a few more years, but the country—the country—is going to suffer.

You know, when you look at Fortune magazine or Forbes magazine and there is a picture of one or another businessperson on the cover, that is great. That is great for that individual. But when you look at the international magazines, you know what is on the cover, just a picture of China.

It is a country with a plan. It is a country with a vision. It is a country that is just speeding past us in terms of their capacity to deploy new technologies. That is what we are confronted with right now—a plan from our arch rival economically that we are going to ignore on behalf of the oil industry in our Nation.

They will reap the short-term profits for sure, but our country and the children in our country will reap whirlwinds economically as each year goes by because we are going to be left in China's technological dust.

So that is what we are voting on, and they are going to use a perversion of Senate rules to attempt to accomplish it at the behest of the oil industry, but the price—the price—not only for this institution and its rules but also the well-being of our economy, the health of our planet is going to be way too high to pay.

You can't preach temperance from a barstool. You can't tell the rest of the world they have to reduce greenhouse gases if the Senate continues to pass laws which allow for all of this dangerous pollution to go up in historically high quantities.

That is absolutely the wrong path for the next several generations of American children. You are endangering their lungs right now, and you are going to endanger their ability to have a job in the future.

We are going to wind up with China dominating the auto industry and the planet. That is what we are voting on tonight: Who is going to win in the long term?

By the way, the Republicans have a comprehensive plan to hand this entire industry over to the Chinese. They are going to do away with all the tax breaks for electric vehicles, do away with all the tax breaks for chargers. They are going to do away with all the tax breaks for battery storage technologies to be developed.

This is systematic. This is a plan that our country has to pull us out of the competition with the largest industry in the world, this automotive industry, tied to the oil industry—just an absolutely reckless, historic mistake.

And by the way, they are doing the same thing over in biotech. They want to cut NIH funding by 40 percent. That is finding the cure for Alzheimer's and cancer and diabetes and Parkinson's and every other disease.

You are saying to all the young, brilliant people in the country who are going to dedicate their lives to finding the cures for those diseases: Don't go there. There is no guarantee you are going to have a job next year or the year after or the year after. Again, another industry we are going to put a bow on it and hand it over to Beijing: Hope you enjoy this great present we are handing you—the technological leadership of the United States in biotech, in automotive technology, in battery technology, just handing it over.

So this is a pretty sad day in the history of the Senate, that there will be a compromise of our procedures—our rules—that have been sacred on behalf of the oil industry in our Nation. It is not the first. There is an ongoing systematic plot that Donald Trump came up to the Hill to say: Get my ''big, beautiful bill'' passed.

Well, he might see it as a ''big, beautiful bill,'' but this thing is one big economic disaster for our Nation.

And I will say it again. It is all to get the tax breaks for the billionaires, all of the tax breaks for the wealthiest people in our society.

So, please, Senate, please say no. Please allow us to retain our procedural prerogatives. And please, on this

larger issue of the planet and the leadership which the United States should be playing, please say no to these industries.

They are going to look back at this moment—children alive today—and they are going to just wonder, What were they thinking that every car is coming in from China into every country in the world, and eventually our barriers will come down, too, because we won't be able to compete.

It is just a sad commentary on the Senate today that they will acquiesce to such a pathetic concession made to the oil industry in our Nation. But it is the perfect example of the outsized influence that is now playing in our society.

When Trump promised them last April if they gave him a billion dollars, he would do away with all the clean energy technologies in our country, he is paying them off right now. There is no transition plan. There is no promise that maybe we will help the oil industry so they catch up to the Chinese Government.

Mr. President, no. They are going to cede the field, and ultimately it will be the next generations that pay the price.

I yield the floor.

Mr. SCHATZ. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Democratic leader.

S.J. RES. 55

Mr. SCHUMER. Mr. President, I want to be very clear about what is about to happen tonight, here on the floor of the Senate.

Tonight, in order to do the bidding of the fossil fuel industry, Republicans will erode away at the Senate and undermine this institution they claim to care about.

By weaponizing the CRA, Republicans tonight cross a point of no return for the Senate, expanding what this Chamber can do at a majority threshold—this from the very party that professes to care about the rules and norms and precedents of this institution.

To override the Parliamentarian and to use the CRA in the way that Republicans propose is going nuclear—no ifs, no ands, no buts. It is going nuclear.

Don't take my word for it. This comes from Leader THUNE himself. He was asked a few months ago about this very scenario of overriding the Parliamentarian, and he said this:

> Yeah, and that's totally akin to killing the filibuster. We can't go there. People need to understand that.

But, unfortunately, we are going there, it seems. And, just yesterday, he admitted that this step could "create precedent for the future."

So, apparently, when the rules suit the Republicans, they will preach about protecting them. But now that the rules are inconvenient, when they stand in the way of their ideological goals, Republicans will say: Away with them.

Make no mistake, this is not a narrow assertion of congressional authority, as the other side claims. This is an aggressive, new precedent. Moving forward, Congressional Review Acts will likely be weaponized to bold new levels.

Today, it is all about California emission waivers, but tomorrow the CRA could now be used to erase any policy from an Agency that the Trump administration doesn't like, at a simple majority threshold. They could eliminate healthcare innovation waivers that assist patients on Medicaid and the ACA, at a simple majority threshold. They could use CRAs to make it harder to form a union, at a simple majority threshold. They could go after Agency actions that protect access to reproductive care, like making it harder to access the medication mifepristone. All of this and more can now be done, at a simple majority threshold, with an expanded CRA.

This, in other words, is a backdoor strategy for Republicans to make Project 2025 a reality. It is the legislative branch ceding its authority over to the Executive, which will now slap the "CRA" label on a whole host of policies and get Congress to rubberstamp their appeals.

Republicans should tread very carefully today. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and hijack the CRA in a way it has never been used before, they will not like it during this session of Congress and, certainly, next time, when they are in the minority.

So this is a sad, shameful, disappointing day for the U.S. Senate. Republicans, I am certain, will come to regret the ill-considered step they take tonight.

PARLIAMENTARY INQUIRY

Now, I have a parliamentary inquiry.

The PRESIDING OFFICER (Mrs. CAPITO). The Senator will state his inquiry.

Mr. SCHUMER. Is the Chair familiar with section 802(d)(1) of the Congressional Review Act, which states that "all points of order against the joint resolution (and against consideration of the joint resolution) are waived"?

The PRESIDING OFFICER. Yes.

Mr. SCHUMER. Thank you, Madame Chair, you made the case that this is nuclear.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. THUNE. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

S.J. RES. 55

Mr. THUNE. Madam President, we are facing a novel situation here in the Senate. For the sake of my Democrat colleagues, who seem more than a little confused as to what is going on here, let me just review the situation.

We have received from the House joint resolutions of disapproval that meet all the statutory requirements under chapter 8, title 5, of the U.S. Code, the Congressional Review Act.

In the past, the Senate has treated any such joint resolution as being eligible for expedited floor consideration procedures prescribed under the Congressional Review Act. But here is the twist: Senate Democrats claim that we can't consider these resolutions under these Congressional Review Act procedures because the rules addressed in the resolutions in question are not, in fact, rules.

Now, the rules in question, the California waiver rules, were submitted to Congress's rules, which has always been all the Senate needed to consider something as eligible for consideration under the Congressional Review Act, and they are clearly rules in substance given their nationwide impact and scope. But, in an unprecedented move, the Government Accountability Office has inserted itself into this situation and declared that these rules submitted to Congress by the EPA as rules are not, in fact, rules.

Now, for years, the Senate has turned to the Government Accountability Office, the GAO, to determine if something not submitted by an Agency is actually a rule that should have been submitted to Congress as such. That is not part of the Congressional Review Act statute, but the Senate has relied on GAO for this to prevent Agencies from flouting the law and ignoring Congress's statutory right to review Agency rulemaking. In other words, GAO has acted as a failsafe to ensure Congress's rights are protected from encroachment by the executive branch.

That is not the situation we find ourselves in today. In fact, it is the inverse. The situation we are facing today is an Agency submitting to the Senate actions that the Agency says are rules and GAO, for the first time in history, inserting itself into the situation and offering its own opinion that the rules in question are not, in fact, rules.

Well, so what do we do about this? I believe that when the Senate is facing a novel situation like this one with disagreement among its Members, it is appropriate for the Senate to speak as a body to the question—something the Senate does when questions over application of the rules arise.

For example, just last year, a Republican Member of the Senate brought a resolution to the floor under a fast-track procedure, the War Powers Act, and a Democrat Member of the Senate argued that it was not entitled to those

procedures. He then made a point of order to that effect, and the Chair submitted the question to the Senate, and the Senate voted on what qualifies for that fast-track procedure. That is what we are doing today.

Nobody at the time cried nuclear. Nobody said the Democrat Member was blowing up the Senate. In fact, most Members probably don't even remember the situation because it was just the Senate doing what the Senate is supposed to do, and that is voting on how to apply the rules when faced with a new situation.

I think at this point it should be abundantly clear that what we are doing has nothing to do with the legislative filibuster. But while I would love to think that reality will prevail, I fully expect Democrats to continue to misrepresent the situation, and I think there are probably multiple reasons for that.

One is that I think a lot of Democrats support an electric vehicle mandate and are perfectly happy to allow California to set an EV mandate for the whole country. In fact, I think they are somewhat frantic at the prospect of losing this ''Green New Deal'' policy.

Two, I suspect Democrats are trying to use the situation as cover to justify abolishing the filibuster next time they are in charge. I think they think that they can make dismantling the Senate filibuster a lot more palatable by claiming—however mendaciously—that Republicans attacked it first.

I would love to believe—I would love to believe—the Democrats have suddenly come to the realization of the importance of the legislative filibuster no matter how misplaced their concerns would be in this particular instance. I think there is perhaps no Senate rule today that does more to preserve the character of the Senate as developed by our Founders, and there is nothing I would like more than to see Democrats recognize this.

But despite the rank hypocrisy the Democrats have displayed by embracing the use of the filibuster this Congress repeatedly after campaigning to overturn it mere months ago, I suspect that their newfound enthusiasm for the filibuster is situational only—something to be used when it helps them and to be destroyed when it doesn't.

As I said, I strongly suspect they are attempting to use the situation as cover for destroying the filibuster the next time they are in power; hence the misrepresentations and hysteria.

I can't control what Democrats do the next time they take the majority here in the Senate, although if they attempt to abolish the legislative filibuster and destroy the institution of the Senate, I can safely promise to fight them on it tooth and nail. But I can say this: While Republicans are in charge, the legislative filibuster will remain in place, and you can take that to the bank.

The PRESIDING OFFICER. The Democrat leader.

PARLIAMENTARY INQUIRY

Mr. SCHUMER. Madam President, is it true—parliamentary inquiry, Madam President.

The PRESIDING OFFICER. The Senator will state his inquiry.

Mr. SCHUMER. Yes. I just want to—I hope our leader will listen because it is exactly clear, and I want to repeat what we had said yesterday.

Is it true what you said yesterday: that the Parliamentarian advised leadership offices that the joint resolution of disapproval regarding the California waivers at issue do not qualify—do not qualify—for expedited consideration under the Congressional Review Act?

The PRESIDING OFFICER. The Parliamentarian has advised me that such advice was given.

Mr. SCHUMER. Thank you. It shows we are going nuclear, no matter what the leader says.

I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island.

S.J. RES. 55

Mr. WHITEHOUSE. Madam President, notwithstanding the distinguished majority leader's accusations of mendacity and hypocrisy and misrepresentation, the facts at heart here are quite simple: The waiver at issue is not a rule and was never a rule. Thirty years of precedent and practice at EPA and in this body prove that. So what the GAO did here was not unprecedented.

What was unprecedented was for the House to send over a document claiming falsely, according to the Parliamentarian, that the waiver is, in fact, a rule under the CRA. And to blame the GAO or the Parliamentarian for that is to mistake the referee for the player who committed the foul. The foul here is pretending that a waiver is a rule, and both the GAO and the Parliamentarian independently blew the whistle on that foul. Those are the facts.

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. I yield back all time.

The PRESIDING OFFICER. All time is yielded back.

POINT OF ORDER

Mr. THUNE. Madam President, I make a point of order. The points of order are in order under the Congressional Review Act, given sections 802(d)(1), 802(d)(2), and 802(d)(4) are in conflict with each other.

The PRESIDING OFFICER. In the opinion of the Chair, the Senate has not previously considered this question; therefore, the Chair, under the provisions of rule XX, submits the question to the Senate for its decision: Shall points of order be in order under the Congressional Review Act?

The Democrat leader.

VOTE ON MOTION TO TABLE

Mr. SCHUMER. Madam President, I move to table the question submitted by the Chair, and I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senator is necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN).

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 52, as follows:

[Rollcall Vote No. 265 Leg.]

YEAS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper
Hirono
Kaine
Kelly
Kim
King
Klobuchar
Luján
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen
Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

NAYS—52

Banks
Barrasso
Boozman
Britt
Budd
Capito
Cassidy
Collins
Cornyn
Cotton
Cramer
Crapo
Cruz
Curtis
Daines
Ernst
Fischer
Graham
Grassley
Hagerty
Hawley
Hoeven
Husted
Hyde-Smith
Johnson
Justice
Kennedy
Lankford
Lee
Lummis
Marshall
McConnell
McCormick
Moody
Moran
Moreno
Mullin
Murkowski
Paul
Ricketts
Risch
Rounds
Schmitt
Scott (FL)
Scott (SC)
Sheehy
Sullivan
Thune
Tillis
Tuberville
Wicker
Young

NOT VOTING—2

Blackburn
Heinrich

The motion was rejected.

The PRESIDING OFFICER. For the benefit of the Senate, I would like to remind you that the question is, Shall points of order be in order under the Congressional Review Act?

The Democratic leader.

POINT OF ORDER

Mr. SCHUMER. Madam President, I raise a point of order that points of order are not in order under section 802 (d)(1) of the Congressional Review Act.

The PRESIDING OFFICER. A point of order is currently pending before the Senate. It is not in order to have multiple points of order pending at the same time; therefore, the point of order is out of order.

Mr. SCHUMER. I appeal the ruling of the Chair.

The PRESIDING OFFICER. The Republican leader.

MOTION TO TABLE

Mr. THUNE. Madam President, I move to table the appeal, and I ask for the yeas and nays.

VOTE ON MOTION TO TABLE APPEAL

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from Kentucky (Mr. PAUL).

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 266 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Graham | Moran |
| Barrasso | Grassley | Moreno |
| Boozman | Hagerty | Mullin |
| Britt | Hawley | Murkowski |
| Budd | Hoeven | Ricketts |
| Capito | Husted | Risch |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Johnson | Schmitt |
| Cornyn | Justice | Scott (FL) |
| Cotton | Kennedy | Scott (SC) |
| Cramer | Lankford | Sheehy |
| Crapo | Lee | Sullivan |
| Cruz | Lummis | Thune |
| Curtis | Marshall | Tillis |
| Daines | McConnell | Tuberville |
| Ernst | McCormick | Wicker |
| Fischer | Moody | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Heinrich | Paul |

The motion was agreed to.

(Mr. JUSTICE assumed the Chair.)

The PRESIDING OFFICER (Mr. HUSTED). The Senate sustains the decision of the Chair. The point of order by the Democratic leader is not in order.

The Chair recognizes the Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 90 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 267 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. Mr. President, for the information of Senators, for the balance of the evening, we are going to confine votes to 15 minutes in duration.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 60 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay''.

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) and the Senator from Colorado (Mr. HICKENLOOPER) are necessarily absent.

The result was announced—yeas 45, nays 51, as follows:

[Rollcall Vote No. 268 Leg.]

YEAS—45

| | | |
|---|---|---|
| Alsobrooks | Bennet | Blunt Rochester |
| Baldwin | Blumenthal | Booker |
| Cantwell | King | Schatz |
| Coons | Klobuchar | Schiff |
| Cortez Masto | Luján | Schumer |
| Duckworth | Markey | Shaheen |
| Durbin | Merkley | Slotkin |
| Fetterman | Murphy | Smith |
| Gallego | Murray | Van Hollen |
| Gillibrand | Ossoff | Warner |
| Hassan | Padilla | Warnock |
| Hirono | Peters | Warren |
| Kaine | Reed | Welch |
| Kelly | Rosen | Whitehouse |
| Kim | Sanders | Wyden |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—4

| | |
|---|---|
| Blackburn | Heinrich |
| Budd | Hickenlooper |

The motion was rejected.

The PRESIDING OFFICER (Mr. RICKETTS). The Democrat leader.

MOTION TO RECESS

Mr. SCHUMER. I move to recess for 30 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay.''

Mr. DURBIN. I announce that the Senator from new Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 269 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Cassidy | Crapo |
| Barrasso | Collins | Cruz |
| Boozman | Cornyn | Curtis |
| Britt | Cotton | Daines |
| Capito | Cramer | Ernst |

| | | |
|---|---|---|
| Fischer | Lee | Risch |
| Graham | Lummis | Rounds |
| Grassley | Marshall | Schmitt |
| Hagerty | McConnell | Scott (FL) |
| Hawley | McCormick | Scott (SC) |
| Hoeven | Moody | Sheehy |
| Husted | Moran | Sullivan |
| Hyde-Smith | Moreno | Thune |
| Johnson | Mullin | Tillis |
| Justice | Murkowski | Tuberville |
| Kennedy | Paul | Wicker |
| Lankford | Ricketts | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 15 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 270 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER. The Democratic leader.

MOTION TO RECESS

Mr. SCHUMER. Mr. President, I move to recess for 10 minutes, and I ask for the yeas and nays.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 45, nays 52, as follows:

[Rollcall Vote No. 271 Leg.]

YEAS—45

| | | |
|---|---|---|
| Alsobrooks | Hirono | Rosen |
| Baldwin | Kaine | Sanders |
| Bennet | Kelly | Schatz |
| Blumenthal | Kim | Schiff |
| Blunt Rochester | King | Schumer |
| Booker | Klobuchar | Shaheen |
| Cantwell | Luján | Slotkin |
| Coons | Markey | Smith |
| Cortez Masto | Merkley | Van Hollen |
| Duckworth | Murphy | Warner |
| Durbin | Murray | Warnock |
| Gallego | Ossoff | Warren |
| Gillibrand | Padilla | Welch |
| Hassan | Peters | Whitehouse |
| Hickenlooper | Reed | Wyden |

NAYS—52

| | | |
|---|---|---|
| Banks | Grassley | Mullin |
| Barrasso | Hagerty | Murkowski |
| Boozman | Hawley | Paul |
| Britt | Hoeven | Ricketts |
| Capito | Husted | Risch |
| Cassidy | Hyde-Smith | Rounds |
| Collins | Johnson | Schmitt |
| Cornyn | Justice | Scott (FL) |
| Cotton | Kennedy | Scott (SC) |
| Cramer | Lankford | Sheehy |
| Crapo | Lee | Sullivan |
| Cruz | Lummis | Thune |
| Curtis | Marshall | Tillis |
| Daines | McConnell | Tuberville |
| Ernst | McCormick | Wicker |
| Fetterman | Moody | Young |
| Fischer | Moran | |
| Graham | Moreno | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

The PRESIDING OFFICER (Mr. HUSTED). The Democratic leader.

MOTION TO ADJOURN

Mr. SCHUMER. Mr. President, I move that the Senate adjourn, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

VOTE ON MOTION

The question is on agreeing to the motion to adjourn.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennesee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''nay.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 46, nays 51, as follows:

[Rollcall Vote No. 272 Leg.]

YEAS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NAYS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was rejected.

VOTE ON POINT OF ORDER

The PRESIDING OFFICER (Mrs. CAPITO). For the body to remember, the question is, shall points of order be in order under the Congressional Review Act?

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''yea.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 273 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Cornyn | Ernst |
| Barrasso | Cotton | Fischer |
| Boozman | Cramer | Graham |
| Britt | Crapo | Grassley |
| Capito | Cruz | Hagerty |
| Cassidy | Curtis | Hawley |
| Collins | Daines | Hoeven |

Husted
Hyde-Smith
Johnson
Justice
Kennedy
Lankford
Lee
Lummis
Marshall
McConnell
McCormick
Moody
Moran
Moreno
Mullin
Murkowski
Paul
Ricketts
Risch
Rounds
Schmitt
Scott (FL)
Scott (SC)
Sheehy
Sullivan
Thune
Tillis
Tuberville
Wicker
Young

NAYS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper
Hirono
Kaine
Kelly
Kim
King
Klobuchar
Luján
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen
Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

NOT VOTING—3

Blackburn
Budd
Heinrich

The PRESIDING OFFICER. On this vote, the yeas are 51, the nays are 46.

The point of order is sustained.

The PRESIDING OFFICER. The majority leader.

POINT OF ORDER

Mr. THUNE. Madam President, I make a point of order that joint resolutions that meet all the requirements of section 802 of the Congressional Review Act or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures under the Congressional Review Act.

The PRESIDING OFFICER. In the opinion of the Chair, the Senate has not previously considered this question. Therefore, the Chair, under the provisions of rule XX, submits the question to the Senate for its decision.

Shall joint resolutions that meet all of the requirements of section 802 of the Congressional Review Act or are disapproving of Agency actions which have been determined to be rules subject to the Congressional Review Act by a legal decision from the Government Accountability Office be entitled to expedited procedures under the Congressional Review Act?

The Democrat leader.

Mr. SCHUMER. Madam President, on this vote, the Republicans will be breaking their commitment and will be going nuclear. And however they try to disguise their actions, this is nuclear—no ands, ifs, or buts.

Tonight, Senate Republicans expose themselves as fair weather institutionalists by overriding the Parliamentarian, which the Chair explicitly noted that the Parliamentarian has been overridden. And in order to do the bidding of the fossil fuel industry, Republicans have eroded away at the Senate foundation and undermined this institution they claim to care about.

Make no mistake, Republicans have set a new precedent that will come back to haunt them and haunt this Chamber. What goes around comes around.

If Republicans are willing to overrule the Parliamentarian and highjack the CRA in a way that has never been used before, they will not like it next time they are in the minority.

I yield the floor.

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 274 Leg.]

YEAS—51

Banks
Barrasso
Boozman
Britt
Capito
Cassidy
Collins
Cornyn
Cotton
Cramer
Crapo
Cruz
Curtis
Daines
Ernst
Fischer
Graham
Grassley
Hagerty
Hawley
Hoeven
Husted
Hyde-Smith
Johnson
Justice
Kennedy
Lankford
Lee
Lummis
Marshall
McConnell
McCormick
Moody
Moran
Moreno
Mullin
Murkowski
Paul
Ricketts
Risch
Rounds
Schmitt
Scott (FL)
Scott (SC)
Sheehy
Sullivan
Thune
Tillis
Tuberville
Wicker
Young

NAYS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper
Hirono
Kaine
Kelly
Kim
King
Klobuchar
Luján
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen
Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

NOT VOTING—3

Blackburn
Budd
Heinrich

The PRESIDING OFFICER. On this vote, the yeas are 51, the nays are 46.

The point of order is sustained.

The clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to be engrossed for a third reading and was read the third time.

VOTE ON S.J. RES. 55

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Mr. BARRASSO. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 275 Leg.]

YEAS—51

Banks
Barrasso
Boozman
Britt
Capito
Cassidy
Collins
Cornyn
Cotton
Cramer
Crapo
Cruz
Curtis
Daines
Ernst
Fischer
Graham
Grassley
Hagerty
Hawley
Hoeven
Husted
Hyde-Smith
Johnson
Justice
Kennedy
Lankford
Lee
Lummis
Marshall
McConnell
McCormick
Moody
Moran
Moreno
Mullin
Murkowski
Paul
Ricketts
Risch
Rounds
Schmitt
Scott (FL)
Scott (SC)
Sheehy
Sullivan
Thune
Tillis
Tuberville
Wicker
Young

NAYS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper
Hirono
Kaine
Kelly
Kim
King
Klobuchar
Luján
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen
Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

NOT VOTING—3

Blackburn
Budd
Heinrich

The joint resolution (S.J. Res. 55) was passed, as follows:

S.J. RES. 55

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That Congress disapproves the rule submitted by the National Highway Traffic Safety Administration relating to "Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference" (90 Fed. Reg. 6218 (January 17, 2025)), and such rule shall have no force or effect.

The PRESIDING OFFICER. The majority leader.

## PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO ''CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION''—Motion to Proceed

Mr. THUNE. Madam President, I understand the Senate has received H.J. Res. 88 from the House.

The PRESIDING OFFICER. The leader is correct.

Mr. THUNE. I move to proceed to H.J. Res. 88.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

Motion to proceed to H.J. Res. 88, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision''.

VOTE ON MOTION

The PRESIDING OFFICER. Pursuant to the precedent just established by the Senate, the question occurs on the motion to proceed.

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted ''yea.''

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 276 Leg.]

YEAS—51

Banks
Barrasso
Boozman
Britt
Capito
Cassidy
Collins
Cornyn
Cotton
Cramer
Crapo
Cruz
Curtis
Daines
Ernst
Fischer
Graham
Grassley
Hagerty
Hawley
Hoeven
Husted
Hyde-Smith
Johnson
Justice
Kennedy
Lankford
Lee
Lummis
Marshall
McConnell
McCormick
Moody
Moran
Moreno
Mullin
Murkowski
Paul
Ricketts
Risch
Rounds
Schmitt
Scott (FL)
Scott (SC)
Sheehy
Sullivan
Thune
Tillis
Tuberville
Wicker
Young

NAYS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper
Hirono
Kaine
Kelly
Kim
King
Klobuchar
Luján
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen
Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

NOT VOTING—3

Blackburn
Budd
Heinrich

The motion was agreed to.

(Mr. CASSIDY assumed the Chair.)

---

## PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO ''CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION''

The PRESIDING OFFICER (Mr. ROUNDS). The clerk will report the joint resolution by title.

The legislative clerk read as follows:

A joint resolution (H.J. Res. 88) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision''.

---

## APPOINTMENT

The PRESIDING OFFICER. The Chair, on behalf of the Vice President, pursuant to 22 U.S.C. 276d–276g, as amended, appoints the following Senator as Chairman of the Senate Delegation to the Canada-U.S. Interparliamentary Group conference during the 119th Congress: The Honorable KEVIN CRAMER of North Dakota.

---

## MORNING BUSINESS

---

## THE GRAVITY OF MEMORIAL DAY MUST NOT BE FORGOTTEN

Mr. GRASSLEY. Mr. President, after the bloodiest war in U.S. history, an enlisted soldier in the Union Army was assigned to recover war dead from Southern battlefields. Brevet Lt.-Col. Edmund B. Whitman mapped out an intricate system of ''cemeterial districts'' that formed the framework for our system of National Cemeteries. They provide a final resting place for fallen heroes and sacred space for mourners and citizenry to honor those who gave their last full measure of devotion to preserve freedom and liberty for generations to come.

''That Nation which respects and honors its dead, shall ever be respected and honored itself.''—Brevet Lt.-Col. Edmund B. Whitman, 1868

After the Civil War, it became popular to place flowers near gravesites to honor the fallen. So-called ''decoration days'' in springtime came to be called Memorial Day. A Union General issued General Orders No. 11 urging the Nation not to forget the human toll of war.

''Let no vandalism of avarice or neglect, no ravages of time, testify to the present or to the coming generations that we have forgotten as a people the cost of a free and undivided republic.''—General John A. Logan, May 5, 1868

A century later, President Lyndon B. Johnson signed into law the Uniform Monday Holiday Act, designating Memorial Day a Federal holiday on the last Monday in May.

In 1973, President Richard M. Nixon signed the National Cemeteries Act to update and modernize the administration of gravesites, particularly for aging World War II and Korean war veterans, as well as future servicemembers. It transferred 82 National Cemeteries from the Department of the Army to the Veterans Administration, expanding its network to 103 National Cemeteries. Today, the National Cemetery Administration oversees 156 National Cemeteries, 35 soldiers' lots, and has 122 grant-funded State veterans cemeteries, including the Iowa Veterans Cemetery at Van Meter. One of the oldest in the country is located in southeast Iowa. Keokuk National Cemetery was established during the Civil War for veterans who died in local military hospitals. Cast-iron tablets inscribed with a verse from an elegiac poem ''Bivouac of the Dead'' written by Theodore O'Hara are found throughout our National Cemeteries, including in Keokuk. The original tablets were fabricated at Rock Island Arsenal in the late 19th century to replace painted signs first placed on battlefields turned into burial grounds. The most frequently quoted passage follows:

On Fame's eternal camping-ground
Their silent tents are spread,
And Glory guards, with solemn round,
The bivouac of the dead.

On Memorial Day, the annual wreath-laying at Arlington National Cemetery is a somber moment to honor the sons and daughters lost on the battlefields of history. Since 1948, the 3rd Infantry Regiment, known as the Old Guard, places U.S. flags at more than 260,000 headstones and more than 7,000 columbarium niches containing the remains of the deceased. Iowa-born President Herbert Hoover led the first national Memorial Day ceremony at the Tomb of the Unknown Soldier on May 30, 1929, calling on Americans to honor the ''unselfish souls who gave life in service to their ideals'' and that their sacrifice must evoke ''the most solemn mood of consecration'' to ''manifest our gratitude'' in memoriam of their valor for perpetuity.

Since the Civil War, when Iowa sent the most soldiers per capita to the Union Army, Iowans have continued a legacy of strong military service, including the ultimate sacrifice. One of

the first three American soldiers killed in World War I was an Iowa farm boy from Glidden. Pvt. Merle David Hay was killed while serving sentry duty in the trenches in France. On May 25, 1930, thousands of people gathered at West Lawn Cemetery to dedicate an 8-foot granite monument in his honor. Travelers can see the monument while driving through Glidden on the historic Lincoln Highway.

Put the Sullivan Brothers Iowa Veterans Museum in Waterloo on your family calendar. You will learn about Iowans who answered the call to serve in the Armed Forces, including all five Sullivan brothers who were tragically killed aboard the USS *Juneau* on November 13, 1942.

Fifty years ago, one of the last servicemembers killed in Vietnam was a 19-year-old from Marshalltown. Lance Cpl. Darwin Lee Judge died 1 day before the fall of Saigon in 1975. As Saigon fell, Judge rescued a 3-year-old girl, putting her on his back ''piggy-back style'' and ran her out to the plane. His bravery saved her life and cost him his own in a mortar attack on Tan Son Nhut Air Base.

Every Memorial Day, communities across Iowa reverently celebrate hometown heroes who made the ultimate sacrifice. From grave decorations to patriotic observances, neighbors, loved ones, and family members gather to pay tribute to these fallen heroes from one generation to the next, honoring their memories, bravery, and service. The sacrifice of these fallen servicemembers is a profound reminder to every American articulated by President Ronald Reagan, ''Ours is the land of the free because it is the home of the brave.''

As Americans, it is our solemn duty to honor fallen servicemembers who have given their lives to defend our cherished blessings of freedom. In his acceptance speech for the Vice Presidential nomination in 1920, Calvin Coolidge imparted wisdom from history that rings truer than ever in the 21st century, ''The nation which forgets its defenders will be itself forgotten.''

I encourage Iowa families to remember the defenders from our home State and hometowns who are deeply missed around supper tables and family celebrations. Be intentional on Memorial Day to attend community celebrations. Plan a road trip to visit nearby Freedom Rocks honoring veterans in each of Iowa's 99 counties. Find out the history of road names, parks, and post offices named for local heroes who died in service to our country. They put their precious lives on the line to preserve our way of life for generations yet to come. For that, Americans owe them an eternal debt of gratitude.

---

## FISCAL YEAR 2025 ENFORCEMENT FILING

Mr. GRAHAM. Mr. President, H. Con. Res. 14, the fiscal year 2025 congressional budget resolution, included an instruction to the chairman of the Senate Committee on the Budget to file enforceable levels in the Senate in the event the budget was agreed to without the need to appoint a committee of conference on the measure. On April 5, 2025, the Senate amended and adopted H. Con. Res. 14, and on April 10, the House agreed to the amended resolution without changes. As such, I am submitting the required filing.

Specifically, section 4002 of the fiscal year 2025 congressional budget resolution requires the chairman to file an allocation for fiscal year 2025 for the Committee on Appropriations and an allocation for fiscal years 2025, 2025–2029, and 2025–2034 for committees other than the Committee on Appropriations.

The figures in the filing are consistent with the spending limits set forth in the Fiscal Responsibility Act of 2023 and the levels included in H. Con. Res. 14, as adjusted for the budgetary effects of recent legislation, pursuant to section 4006 of the resolution.

Adjustments were included for the budgetary effects of the following enacted legislation: Full-Year Continuing Appropriations and Extensions Act of 2025, H.R. 1968, and Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Internal Revenue Service relating to ''Gross Proceeds Reporting by Brokers That Regularly Provide Services Effectuating Digital Asset Sales,'' H.J. Res. 25.

Section 2002 of the fiscal year 2025 budget resolution included reconciliation instructions to six Senate committees to increase the deficit by not more than a given amount. Pursuant to section 3001 of the resolution, I am holding the corresponding amounts in reserve until the consideration of reconciliation legislation.

For purposes of enforcing the Senate's pay-as-you-go rule found in section 4106 of the fiscal year 2018 congressional budget resolution, I am resetting the Senate's scorecard to zero for all fiscal years.

The 2025 congressional budget resolution's budgetary levels and the budget baseline used to enforce it reflect current tax policy and assume provisions of the 2017 Tax Cuts and Jobs Act are permanently extended. I am also including in this filing the Joint Committee on Taxation's estimate of the budgetary effects of these current tax policy adjustments relative to the Congressional Budget Office's unmodified baseline.

The Congressional Budget Office and Joint Committee on Taxation will provide cost estimates of legislation using both the budget resolution baseline and CBO's unmodified baseline.

I ask unanimous consent that the accompanying tables be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

ALLOCATION OF SPENDING AUTHORITY TO SENATE COMMITTEE ON APPROPRIATIONS FOR FISCAL YEAR 2025

[$ Billions]

| | Budget Authority | Outlays |
|---|---|---|
| Appropriations: | | |
| Revised Security Category Discretionary Budget Authority [1] | 906.987 | N.A. |
| Revised Nonsecurity Category Discretionary Budget Authority [1] | 856.623 | N.A. |
| General Purpose Outlays [1] | N.A. | 1,872.320 |
| Memo: | | |
| Subtotal | 1,763.610 | 1,872.320 |
| on-budget | 1,757.332 | 1,866.013 |
| off-budget | 6.278 | 6.307 |
| Mandatory | 1,688.081 | 1,667.103 |

[1] The allocation includes adjustments to the discretionary spending limits outlined in section 251(b) of the Balanced Budget and Emergency Deficit Control Act of 1985(BBEDCA), as estimated by the Congressional Budget Office during the consideration of the legislation containing the eligible adjustments.

**Note:** This allocation is consistent with the statutory limits imposed by the Fiscal Responsibility Act of 2023, Regular appropriations assumed in this allocation total $895.212billion in revised security category discretionary budget authority and $710.688 billion in revised nonsecurity category discretionary budget authority, This allocation alsoincludes the cap adjustments pursuant to section 251 of BBEDCA and sections 302 and 314 of the Congressional Budget Act of 1974.

ALLOCATION OF SPENDING AUTHORITY TO SENATE COMMITTEES OTHER THAN APPROPRIATIONS

[$ Billions]

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Agriculture, Nutrition, and Forestry | | | |
| Budget Authority | 185.761 | 967.912 | 1,987.937 |
| Outlays | 177.349 | 926.669 | 1,876.969 |
| Armed Services | | | |
| Budget Authority | 289.771 | 1,117.079 | 2,102.064 |
| Outlays | 287.699 | 1,113.882 | 2,104.071 |
| Banking, Housing and Urban Affairs | | | |
| Budget Authority | 26.245 | 87.321 | 277.233 |
| Outlays | −12.404 | −128.025 | −165.530 |
| Commerce, Science, and Transportation | | | |
| Budget Authority | 28.674 | 112.433 | 208.612 |
| Outlays | 19.151 | 103.520 | 188.736 |
| Energy and Natural Resources | | | |
| Budget Authority | 11.317 | 46.797 | 94.470 |
| Outlays | 14.111 | 73.125 | 129.454 |
| Environment and Public Works | | | |
| Budget Authority | 65.948 | 333.253 | 657.947 |
| Outlays | 26.197 | 70.513 | 92.512 |
| Finance | | | |
| Budget Authority | 4,098.211 | 22,927.227 | 53,373.809 |
| Outlays | 4,086.136 | 22,904.608 | 53,305.155 |
| Foreign Relations | | | |
| Budget Authority | 60.169 | 256.871 | 501.910 |
| Outlays | 51.381 | 249.031 | 494.062 |
| Homeland Security and Government Affairs | | | |
| Budget Authority | 183.814 | 962.501 | 2,038.641 |
| Outlays | 186.248 | 954.058 | 2,009.642 |
| Judiciary | | | |
| Budget Authority | 25.392 | 121.706 | 241.572 |
| Outlays | 23.858 | 120.549 | 237.629 |
| Health. Education, Labor, and Pensions | | | |
| Budget Authority | 58.247 | 281.354 | 537.451 |
| Outlays | 73.149 | 274.662 | 513.809 |
| Rules and Administration | | | |
| Budget Authority | 0.054 | 0.282 | 0.596 |
| Outlays | 0.029 | 0.217 | 0.471 |
| Intelligence | | | |
| Budget Authority | 0.514 | 2.570 | 3.598 |
| Outlays | 0.514 | 2.570 | 3.598 |
| Veterans' Affairs | | | |
| Budget Authority | 231.668 | 1,334.594 | 3,081.121 |
| Outlays | 230.783 | 1,325.218 | 3,085.866 |
| Indian Affairs | | | |
| Budget Authority | 2.222 | 11.283 | 22.896 |
| Outlays | 2.480 | 11.963 | 23.259 |
| Small Business | | | |
| Budget Authority | 0.000 | 0.000 | 0.000 |
| Outlays | 0.013 | 0.014 | 0.014 |
| Unassigned to Committee | | | |
| Budget Authority | −2,484.527 | −12,554.107 | −27,799.842 |
| Outlays | −2,483.659 | −12,501.545 | −27,679.319 |
| TOTAL | | | |
| Budget Authority | 2,783.480 | 16,009.076 | 37,330.015 |
| Outlays | 2,683.035 | 15,501.026 | 36,220.398 |

Includes entitlements funded in annual appropriations acts. Certain budgetary changes related to reconciliation legislation pursuant to section 3001 of H.Can. Res. 14 will be held in reserve until consideration of such legislation.

BUDGET AGGREGATES

($ billions)

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Figures Found in H. Con. Res. 14 | | | |
| Spending: | | | |
| Budget Authority | 4,663.769 | N.A. | N.A. |
| Outlays | 4,636.008 | N.A. | N.A. |
| Revenue | 3,699.743 | 19,737.037 | 43,789.852 |
| Social Security Levels: | | | |
| Outlays | 1,413.704 | 7,968.716 | 18,518.095 |
| Revenue | 1,303.924 | 7,088.122 | 15,681.437 |
| Adjustments Pursuant to Sections 3001 and 4006 of H. Con. Res. 14 | | | |
| Spending: | | | |
| Budget Authority | −51.709 | N.A. | N.A. |
| Outlays | −51.806 | N.A. | N.A. |
| Revenue | 149.921 | 748.663 | 1,496.094 |
| Social Security Levels: | | | |
| Outlays | 0.000 | 0.000 | 0.000 |
| Revenue | 0.000 | 0.000 | 0.000 |
| Adjusted H. Con. Res. 14 Figures | | | |
| Spending: | | | |
| Budget Authority | 4,612.060 | N.A. | N.A. |
| Outlays | 4,584.202 | N.A. | N.A. |
| Revenue | 3,849.664 | 20,485.700 | 45,285.946 |
| Social Security Levels: | | | |
| Outlays | 1,413.704 | 7,968.716 | 18,518.095 |
| Revenue | 1,303.924 | 7,088.122 | 15,681.437 |

Note: Aggregate figures displayed at levels assumed in H. Con. Res. 14, with adjustments for enacted legislation and certain budgetary changes for reconciliation legislation held in reserve. Total figures here reflect levels different from those that will be enforced immediately due to the inclusion of spending exempt from enforcement.

PAY-AS-YOU-GO SCORECARD FOR THE SENATE

($ billions)

| | Balances |
|---|---|
| Fiscal Year 2025 | 0 |
| Fiscal Years 2025–2029 | 0 |
| Fiscal Years 2025–2034 | 0 |

BASELINE ADJUSTMENTS FOR CURRENT TAX POLICIES

($ billions)

| | 2025 | 2025–2029 | 2025–2034 |
|---|---|---|---|
| Individual rates and standard deduction changes | 0.000 | −535.717 | −1,440.061 |
| Child tax credit provisions | 0.000 | −282.939 | −692.806 |
| Pass-through business income changes | −6.970 | −283.369 | −712.800 |
| Deductions, exclusions and other individual tax provisions | 0.000 | 397.038 | 1,087.217 |
| Estate tax changes | −0.050 | −66.520 | −201.316 |
| Alternative minimum tax modifications | 0.000 | −506.121 | −1,374.973 |
| Business tax provisions | −0.098 | −227.343 | −425.018 |
| Net Total | −7.118 | −1,504.971 | −3,759.757 |

Source: Joint Committee on Taxation.
Note: Includes effects on both revenues and outlays, including off-budget effects.

## REMEMBERING RICHARD ARMITAGE

Mr. REED. Mr. President, I rise today to pay tribute to Richard Armitage, one of the finest statesmen of his, or any, generation of American national security leaders.

Few American leaders have served their Nation more thoroughly—from combat overseas as a young officer, to the heights of diplomacy on the world stage. Richard Armitage will hold an important place in our country's history.

Richard dedicated his life to service. He attended the Naval Academy and, following graduation, volunteered to serve three combat tours in Vietnam. He was known to his comrades to be fearless and unwavering, even risking his life embedding with Vietnamese riverine warfighters and, over the objections of others, personally led a flotilla of 30,000 Vietnamese refugees to safe harbor during the fall of Saigon.

Richard would go on to serve in a number of critical roles in the Senate, Pentagon, and State Department across a number of administrations, including as Assistant Secretary of Defense for International Security Affairs and as Deputy Secretary of State. He served as one of America's lead diplomats during the Gulf War, in Eastern Europe after the fall of the Soviet Union, and in the early years of the Global War on Terror.

Throughout his distinguished career, Richard was an inspirational force to the men and women he commanded and the leaders he advised. Indeed, like his reputation as a linebacker at the Naval Academy, his tenacity was legendary among the national security and foreign policy leaders he worked with.

I was privileged to work often with Richard, both in and out of his time in government. His leadership in so many demanding jobs leaves me with great admiration and gratitude.

Richard's love for his country was surpassed only by his love of family—his wonderful wife Laura, their eight children, and their beautiful grandchildren. I offer the Armitage family my deepest condolences and thank them for sharing Richard with us for so many years.

Richard Armitage was a powerful, inspiring person. He dedicated his life's work to serving others, and his was a life well-lived. He will be missed by all who had the privilege to know him and serve with him.

I am proud to honor the legacy of Richard Armitage, and I know the Members of the Senate will join me in recognizing the incredible contributions he made for our Nation.

---

## TRIBUTE TO RETIRING LEADERSHIP OFFICIALS AT THE IDAHO CLEANUP PROJECT

Mr. CRAPO. Mr. President, with my colleagues Senator JIM RISCH and Representative SIMPSON, I recognize the careers and service of Mark Brown, Maria Mitchell-Williams, Michael Goriup, Jennifer Cate, Doug Pruitt, and Mark Jones, instrumental leaders for the Idaho Cleanup Project, ICP. With more than 140 combined years of experience, these individuals have been integral contributors to the U.S. Department of Energy, DOE, and the ICP.

With more than 40 years of experience in nuclear operations and environmental restoration, Mark C. Brown has made a lasting impact on the Nation's environmental cleanup mission. Since joining DOE in 1995, he has held several senior leadership positions, most recently serving as manager of the ICP, where he led critical efforts to safely treat, store, and dispose of radioactive and hazardous waste, remove legacy buried waste and oversee the removal of spent nuclear fuel and high-level waste from Idaho. His career reflects a deep commitment to safety, operational excellence, and environmental stewardship, demonstrated through his roles at both the Idaho Site and Office of River Protection. Prior to his civilian service, Mr. Brown served with distinction as a nuclear submarine officer in the U.S. Navy.

Maria Mitchell-Williams provided outstanding leadership throughout her career, most recently as deputy manager for the ICP, where she oversaw the complex cleanup work at the Idaho National Laboratory, INL, Site. Previously, she served as assistant manager for business and acquisition management, applying more than 20 years of experience in contract oversight, budget management, and workforce planning, including administration of the $6.4 billion ICP End State contract. Her work encompassed leading high-impact efforts in contract management, project controls, budget, and workforce oversight, while also driving strategic coordination between the Office of Environmental Management and the Office of Nuclear Energy to ensure mission alignment and operational success. With a strong foundation in business, human resources, and level III certifications in acquisition and financial assistance, Ms. Mitchell-Williams' service has significantly advanced DOE's cleanup mission.

With more than 34 years of dedicated service to the DOE and nearly 40-plus years of experience in the nuclear field, Michael Goriup has been a vital leader in advancing the mission of the ICP. Since joining DOE Idaho in 1990, he has held key roles including program manager for the Idaho Nuclear Technology

and Engineering Center, INTEC, construction project manager, facility engineer at the Advanced Test Reactor Complex, and as a facility representative qualified across all INL facilities. In 2012, he was promoted to supervisor of the facility representatives team, where he led a group of facility representatives providing critical oversight of ICP operations, safety, and support activities. Under his leadership members of his staff were awarded four DOE Complex Facility Representative of the Year Awards. His Federal service was preceded by 9 years in the U.S. Navy, where he served in a nuclear submarine fleet as an electronics technician. Mr. Goriup's commitment to safety, technical excellence, and mission success has left a meaningful legacy at DOE Idaho.

Doug Pruitt, assistant manager for environment and waste programs at the ICP, has provided 20 years of environmental restoration and waste management, starting as a college intern, Mr. Pruitt completed his career as a senior manager with ICP. Mr. Pruitt has overseen critical cleanup efforts at the INL site, including the exhumation and disposal of transuranic waste, soil and groundwater remediation, and facility demolition. He has also played a key role in waste disposal systems, such as the Comprehensive Environmental Response, Compensation, and Liability Act, CERCLA, waste disposal cell and the evapotranspiration cap over waste disposal areas. Mr. Pruitt has been instrumental in leading procurement efforts for the past two ICP contracts and served as transition manager for the ICP end state contract.

Jennifer K. Cate, who concluded her notable Federal service as the acting assistant manager for business and acquisition management at the ICP, played a key role in overseeing the project cost and analysis and contract management teams, which provided essential services including budget formulation, financial management, and contracting for the $6.4 billion ICP end state indefinite delivery indefinite quantity, IDIQ, contract. With more than 30 years of contract management experience, she developed innovative business strategies and cost-effective solutions to support the successful execution of the ICP mission. Holding level III certifications in acquisition and financial assistance, her leadership and expertise were critical to the success of the project and the broader DOE mission.

Mark Jones served with dedication as the chief of staff for the ICP, bringing a strong background in project controls to the DOE. With 17 years of Federal civilian service and more than 20 years in the U.S. Air Force, retiring as a major in the Air Force Reserve, he has provided consistent leadership, coordination, and support across a wide range of mission-critical functions. Mr. Jones played a key role in integrating project baseline planning and performance metrics that supported the safe and timely execution of environmental cleanup activities under the ICP end state contract. Mr. Jones' professionalism and commitment to the ICP mission have made him a valued leader and colleague throughout his career.

The careers of Mark Brown, Maria Mitchell-Williams, Mike Goriup, Doug Pruitt, Jennifer Cate, and Mark Jones reflect an unwavering dedication to public service, technical excellence, and mission success to the American people. Throughout their distinguished service, these individuals provided oversight and leadership on some of the most significant accomplishments at the ICP, including the completion of exhumation and retrieval of buried waste at the radioactive waste management complex, the startup of the integrated waste treatment unit, the successful transfer of spent nuclear fuel from wet to dry storage, and the awarding of multiple major contracts for managing the cleanup mission. Collectively, they were responsible for the management and disposition of high-level waste, transuranic waste, and spent nuclear fuel at the INL Site. They provided executive oversight of a $470 million annual budget, 52 Federal employees, and more than 1,900 contractor personnel. As they enter retirement, we honor their lasting contributions and thank them for their tireless efforts to advance the DOE's environmental cleanup mission and serve the people of Idaho and the Nation.

It is our great honor to congratulate these individuals on their accomplishments and thank them for the many years of service. We wish them the best of luck following their retirement from DOE and the Idaho Cleanup Project.

---

## TRIBUTE TO LIEUTENANT COLONEL LAUREN A. HARRISON

Mr. KELLY. Mr. President, I rise today to honor a great American and an exceptional member of the U.S. Air Force, Lt. Col. Lauren Harrison.

As an Air Force Senate legislative liaison officer from April 2023 to May 2024, Lauren performed her duties well and without reservation supporting the 118th U.S. Congress. Hailing from Puyallup, WA, and a graduate of the U.S. Air Force Academy, Lauren has served in the Air Force for over 15 years. Throughout her career, she has demonstrated exceptional and unrivaled officership. She is a senior pilot with over 2,700 hours of flight time—1,200 of which are in combat. Lieutenant Colonel Harrison was formerly an E–3 formal training unit instructor pilot, where she developed highly-skilled and mission-ready aviators prepared to meet global challenges.

Lieutenant Colonel Harrison distinguished herself through her professional character and dedication by serving this Nation in uniform as a Department of the Air Force legislative liaison to the Senate. In this role she advised the Department's senior leaders and helped develop strategic engagement opportunities to advance U.S. Air Force and U.S. Space Force priorities. Her leadership facilitated seamless collaboration on behalf of the Department of the Air Force across 62 congressional offices, serving as the principal Air Force liaison to 20 Senators and their respective staffs. She supported numerous engagements and delegations for 150 Senators, Congressmen, and staffers, including my own staff, to showcase Department equities in the United States and abroad. Most notably, Lauren spearheaded efforts across eight organizations, leading a 28-person team to successfully plan and execute critical briefings for key lawmakers. These briefings, including the Secretary of the Air Force Imperatives Briefings for Members of Congress and the China Threat briefing for new Senate Armed Services Committee Members, effectively communicated the Department's modernization and resource requirements to address pacing challenges abroad. Her efforts helped ensured the Department of the Air Force's support of the National Defense Strategy in our return to Great Power Competition.

A skilled relationship builder, Lauren expertly conveyed Department of the Air Force positions on the Air Force Future Design. Responding to Senate staff feedback regarding the clarity of Air Force program messaging, Lauren drove a proactive collaborative effort to enhance communication with Congress. Working across six divisions, she organized a series of five targeted briefings for Armed Services Committee staff, fostering greater transparency and bolstering congressional support for the Department of the Air Force's modernization strategy and priorities.

Finally, Lauren cultivated strong relationships with Members of Congress through insightful and consistent engagement. She organized 9 trips showcasing 26 defense installations to 3 Senators and 46 staffers, demonstrating transparency and building understanding of Department of the Air Force operations. Lauren's significant efforts led to 79 successful engagements between this governing body and senior Department of Defense officials, including the Secretary of the Air Force. All of these engagements helped U.S. Senators and their staffs understand defense equities and their impact on national security. Due to her direct involvement and stewardship, Members of Congress were able to make informed decisions and ensured the Department of the Air Force was properly resourced and funded.

After serving in this crucial role and becoming a fixture on Capitol Hill, Lt. Col. Lauren Harrison will move on to attend the School of Advanced Air and Space Studies this summer, where she will learn to develop strategy and policy for the Air Force and the Nation. Lauren and her husband William, who is also a command pilot in the U.S. Air

Force, have together flown over 2,500 combat hours as Air Force aviators and have instilled a legacy of service for their children Lillian, Corrie, and Claire. They have sacrificed much as a family in service to our Nation. I am thankful for Lauren's service and her work with my office and the Senate over the past year on issues of vital importance to the defense of the United States. I salute this American patriot whose selfless service has kept our country safe and strong.

## ADDITIONAL STATEMENTS

### TRIBUTE TO COLONEL RON BARNES

• Mr. WHITEHOUSE. Mr. President, I rise today to congratulate Colonel Ron Barnes on his retirement after serving 20 years as commanding officer of the Pawtuxet Rangers. The Pawtuxet Rangers are among the oldest existing chartered commands in the United States and the most active of Rhode Island's historic militia groups.

The Rangers were chartered in 1774 by the Colony of Rhode Island to protect what was then the thriving seaport of Pawtuxet in the wake of the Gaspee Affair. The Colonists' first strike against England took place in 1772 on Narragansett Bay with the burning of the Royal Navy's loathed revenue cutter, the HMS *Gaspee*. Each year, the spirited Gaspee Days Parade takes place in Pawtuxet Village to commemorate this important historic event and Rhode Island's great contribution to the American Revolution. And Colonel Barnes has become a beloved feature of the celebration.

Colonel Barnes marched in his first Gaspee Days Parade as a student at Cranston East High School. In 1987, he formally enlisted with the Pawtucket Rangers. He started as a drummer and went on to hold positions of artillery officer and executive officer before serving as commander. Colonel Barnes was bestowed the high honor of serving as the grand marshal of the 250th Gaspee Days Parade, the first event of the Nation's semiquincentennial celebrations.

Some years ago, Colonel Barnes gave me a challenge coin which I have always made sure to carry with me on any occasion on which I might see him. I thank him for keeping this very special part of Rhode Island's history alive and thriving for future generations. He has done a wonderful job leading the Rangers and I wish him, his wife Sandra—known affectionately as ''The General''—and his sons Joshua, Zachary, and Alexander all the best. Godspeed, my friend.•

## MESSAGES FROM THE HOUSE

At 10:10 a.m., a message from the House of Representatives, delivered by Mrs. Alli, one of its reading clerks, announced that the House has passed the following joint resolution, without amendment:

S.J. Res. 13. Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Office of the Comptroller of the Currency of the Department of the Treasury relating to the review of applications under the Bank Merger Act.

The message also announced that the House has passed the following bill, in which it requests the concurrence of the Senate:

H.R. 1223. An act to require a plan to improve the cybersecurity and telecommunications of the U.S. Academic Research Fleet, and for other purposes.

At 7:47 p.m., a message from the House of Representatives, delivered by Mrs. Cole, one of its reading clerks, announced that the House has passed the following joint resolution, in which it requests the concurrence of the Senate:

H.J. Res. 88. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision''.

At 10:54 p.m., a message from the House of Representatives, delivered by Mrs. Cole, of its reading clerks, announced that the House has passed the following joint resolutions, in which it requests the concurrence of the Senate:

H.J. Res. 87. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision''.

H.J. Res. 89. Joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to ''California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low NOX Regulation; Waiver of Preemption; Notice of Decision''.

## MEASURES REFERRED

The following bill was read the first and the second times by unanimous consent, and referred as indicated:

H.R. 1223. An act to require a plan to improve the cybersecurity and telecommunications of the U.S. Academic Research Fleet, and for other purposes; to the Committee on Commerce, Science, and Transportation.

## MEASURES DISCHARGED PETITION

We, the undersigned Senators, in accordance with chapter 8 of title 5, United States Code, hereby direct that the Senate Committee on Commerce, Science, and Transportation be discharged from further consideration of S.J. Res. 55, a joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the National Highway Traffic Safety Administration relating to ''Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference'' and, further, that the joint resolution be immediately placed upon the Legislative Calendar under General Orders.

Shelly Moore Capito, John Thune, Lindsey Graham, Cynthia M. Lummis, Tommy Tuberville, Ashley Moody, Cindy Hyde-Smith, Tim Scott, Lisa Murkowski, Katie Boyd Britt, James Lankford, Todd Young, James E. Risch, Steve Daines, Dan Sullivan, John Hoeven, Kevin Cramer, Roger F. Wicker, Tom Cotton, John Boozman, Deb Fischer, John Cornyn, Ted Budd, Thom Tillis, John Kennedy, Mike Rounds, Tim Sheehy, Marsha Blackburn, Roger Marshall, Bernie Moreno.

## MEASURES DISCHARGED

The following joint resolution was discharged from the Committee Commerce, Science, and Transportation by petition, pursuant to 5 U.S.C. 802(c), and placed on the calendar:

S.J. Res. 55. Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the National Highway Traffic Safety Administration relating to ''Federal Motor Vehicle Safety Standards; Fuel System Integrity of Hydrogen Vehicles; Compressed Hydrogen Storage System Integrity; Incorporation by Reference''.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. CRUZ, from the Committee on Commerce, Science, and Transportation, without amendment:

S. 283. A bill to require the Under Secretary of Commerce for Standards and Technology and the Administrator of National Oceanic and Atmospheric Administration to develop a standard methodology for identifying the country of origin of seafood to support enforcement against illegal, unreported, and unregulated fishing, and for other purposes (Rept. No. 119–24).

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of nominations were submitted:

By Mr. BOOZMAN for the Committee on Agriculture, Nutrition, and Forestry.

*Luke Lindberg, of South Dakota, to be Under Secretary of Agriculture for Trade and Foreign Agricultural Affairs.

*Devon Westhill, of Florida, to be an Assistant Secretary of Agriculture.

By Mr. CRUZ for the Committee on Commerce, Science, and Transportation.

*David Fink, of New Hampshire, to be Administrator of the Federal Railroad Administration.

*Pierre Gentin, of New York, to be General Counsel of the Department of Commerce.

*David Fogel, of Connecticut, to be Assistant Secretary of Commerce and Director General of the United States and Foreign Commercial Service.

*Robert Gleason, of Pennsylvania, to be Director of the Amtrak Board of Directors for a term of five years.

Mr. CRUZ. Mr. President, for the Committee on Commerce, Science, and

Transportation I report favorably the following nomination lists which were printed in the RECORDS on the dates indicated, and ask unanimous consent, to save the expense of reprinting on the Executive Calendar that these nominations lie at the Secretary's desk for the information of Senators.

The PRESIDING OFFICER. Without objection, it is so ordered.

*Coast Guard nominations beginning with Joshua S. Alleman and ending with Matthew G. Zavalij, which nominations were received by the Senate and appeared in the Congressional Record on April 28, 2025. (minus 3 nominees: Bradford D. Long; Trent D. Moon; Tevin A. White)

*Coast Guard nominations beginning with Jason B. Veara and ending with Tara E. Larkin, which nominations were received by the Senate and appeared in the Congressional Record on April 28, 2025.

By Mr. LEE for the Committee on Energy and Natural Resources.

*Conner Prochaska, of Texas, to be Director of the Advanced Research Projects Agency-Energy, Department of Energy.

*Ned Mamula, of Pennsylvania, to be Director of the United States Geological Survey.

*Tina Pierce, of Idaho, to be Chief Financial Officer, Department of Energy.

*Jonathan Brightbill, of Virginia, to be General Counsel of the Department of Energy.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. SCOTT of Florida:

S. 1824. A bill to improve defense cooperation between the United States and Taiwan, and for other purposes; to the Committee on Foreign Relations.

By Ms. HIRONO (for herself and Mr. MORAN):

S. 1825. A bill to amend the Research Facilities Act to address deferred maintenance at agricultural research facilities, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Ms. ERNST (for herself and Ms. KLOBUCHAR):

S. 1826. A bill to amend the Food, Conservation, and Energy Act of 2008 to clarify propane storage as an eligible use for funds provided under the storage facility loan program, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mrs. MOODY (for herself and Mr. SCHMITT):

S. 1827. A bill to authorize the expedited removal of aliens who are criminal gang members, members of foreign terrorist organizations, or have been convicted of certain specified crimes; to the Committee on the Judiciary.

By Mr. CRAMER (for himself and Mr. MARKEY):

S. 1828. A bill to amend title 23, United States Code, to require States to designate a coordinator of the safe routes to school program in the State, and for other purposes; to the Committee on Environment and Public Works.

By Mr. HAWLEY (for himself, Mr. DURBIN, Ms. KLOBUCHAR, Mr. GRASSLEY, and Mr. KELLY):

S. 1829. A bill to combat the sexual exploitation of children by supporting victims and promoting accountability and transparency by the tech industry; to the Committee on the Judiciary.

By Mr. JOHNSON:

S. 1830. A bill to clarify that agencies of the Department of Health and Human Services do not have the authority to regulate the practice of medicine; to the Committee on Health, Education, Labor, and Pensions.

By Mr. KAINE (for himself and Mr. CASSIDY):

S. 1831. A bill to amend the Internal Revenue Code of 1986 and the Employee Retirement Income Security Act of 1974 to allow for periodic automatic reenrollment under qualified automatic contribution arrangements, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. SANDERS (for himself, Mr. BLUMENTHAL, Mr. PADILLA, Mr. MURPHY, Mr. WELCH, Ms. WARREN, Mr. MARKEY, Mr. VAN HOLLEN, Mr. MERKLEY, and Mr. BOOKER):

S. 1832. A bill to amend the Higher Education Act of 1965 to ensure College for All; to the Committee on Finance.

By Mrs. BLACKBURN (for herself and Mr. WELCH):

S. 1833. A bill to require the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office to establish and carry out a pilot program to expedite the examination of applications for certain patents, and for other purposes; to the Committee on the Judiciary.

By Mrs. HYDE–SMITH (for herself, Mr. KAINE, Mr. HAWLEY, and Mrs. GILLIBRAND):

S. 1834. A bill to prevent cost-sharing requirements for prenatal, childbirth, neonatal, perinatal, or postpartum health care; to the Committee on Health, Education, Labor, and Pensions.

By Mrs. FISCHER (for herself and Mr. RICKETTS):

S. 1835. A bill to amend title 38, United States Code, to make permanent the pilot program authorized by the Communities Helping Invest through Property and Improvements Needed for Veterans Act of 2016, and for other purposes; to the Committee on Veterans' Affairs.

By Ms. KLOBUCHAR (for herself, Mr. WELCH, Ms. SMITH, Mr. KING, Ms. CANTWELL, Mr. REED, Mr. WHITEHOUSE, Ms. DUCKWORTH, Ms. WARREN, Mrs. GILLIBRAND, Mr. MERKLEY, Mrs. MURRAY, Mr. BLUMENTHAL, Mrs. SHAHEEN, Ms. CORTEZ MASTO, Ms. BALDWIN, Mr. BOOKER, Mr. VAN HOLLEN, Mr. DURBIN, Mr. MURPHY, Mr. FETTERMAN, Mr. MARKEY, Mr. LUJAN, Ms. HASSAN, Mr. HEINRICH, Ms. SLOTKIN, and Mr. BENNET):

S. 1836. A bill to amend title XVIII of the Social Security Act to strengthen the drug pricing reforms in the Inflation Reduction Act; to the Committee on Finance.

By Mr. DURBIN (for himself, Mr. GRAHAM, Ms. KLOBUCHAR, Mr. KING, Mr. LEE, Mr. HEINRICH, Mr. WELCH, Mr. SCHUMER, and Mr. HAWLEY):

S. 1837. A bill to improve rights to relief for individuals affected by non-consensual activities involving intimate digital forgeries, and for other purposes; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself, Mr. MORAN, Mr. BOOKER, and Mr. MULLIN):

S. 1838. A bill to amend the Public Health Service Act to authorize the Secretary of Health and Human Services to carry out a program of research, training, and investigation related to Down syndrome, and for other purposes; to the Committee on Health, Education, Labor, and Pensions .

By Mr. CORNYN:

S. 1839. A bill to amend the Internal Revenue Code of 1986 to allow individuals to defer recognition of reinvested capital gains distributions from regulated investment companies; to the Committee on Finance.

By Ms. HASSAN (for herself and Mr. BUDD):

S. 1840. A bill to amend the Internal Revenue Code of 1986 to provide for a micro-employer pension plan startup credit; to the Committee on Finance.

By Mr. PAUL:

S. 1841. A bill to provide regulatory relief to alternative fuel producers and consumers, and for other purposes; to the Committee on Environment and Public Works.

By Mr. WHITEHOUSE (for himself and Mr. SCHIFF):

S. 1842. A bill to amend the Internal Revenue Code of 1986 to create a credit for carbon removal and storage for forest residues from wildfire management; to the Committee on Finance.

By Mrs. CAPITO (for herself, Mr. BOOKER, Mr. CORNYN, Mr. DURBIN, Mr. TILLIS, Mr. WHITEHOUSE, Mr. CRAMER, Mr. WELCH, Mrs. BRITT, Ms. KLOBUCHAR, Mr. JUSTICE, Mr. COONS, and Ms. ALSOBROOKS):

S. 1843. A bill to reauthorize the Second Chance Act of 2007; to the Committee on the Judiciary.

By Ms. HIRONO (for herself, Mr. PADILLA, Ms. KLOBUCHAR, Mr. BOOKER, Mr. GALLEGO, and Ms. ROSEN):

S. 1844. A bill to authorize the Secretary of Education to award grants to eligible entities to carry out educational programs that include the history of peoples of Asian, Native Hawaiian, and Pacific Islander descent in the settling and founding of America, the social, economic, and political environments that led to the development of discriminatory laws targeting Asians, Native Hawaiians, and Pacific Islanders and their relation to current events, and the impact and contributions of Asian Americans, Native Hawaiians, and Pacific Islanders to the development and enhancement of American life, United States history, literature, the economy, politics, body of laws, and culture, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. BANKS (for himself and Mr. TUBERVILLE):

S. 1845. A bill to amend the public service loan forgiveness program under the Higher Education Act of 1965 to ensure qualifying public service excludes employment with organizations that engage in activities that have a substantial illegal purpose; to the Committee on Health, Education, Labor, and Pensions.

By Mr. BANKS (for himself and Mr. HICKENLOOPER):

S. 1846. A bill to amend title 38, United States Code, to provide for certain requirements relating to the use of the design-build construction method for Department of Veterans Affairs construction projects, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. PAUL (for himself and Mr. WICKER):

S. 1847. A bill to amend the Employee Retirement Income Security Act of 1974 to clarify the treatment of certain association health plans as employers, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. LEE (for himself, Mr. BOOKER, Ms. WARREN, and Mr. PAUL):

S. 1848. A bill to prohibit certain practices relating to certain commodity promotion programs, to require greater transparency by those programs, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. BENNET:

S. 1849. A bill to amend the Federal Election Campaign Act of 1971 to require each authorized committee or leadership PAC of a former candidate for election for Federal office to disburse all of the remaining funds of the committee or PAC after the election, and for other purposes; to the Committee on Rules and Administration.

By Mr. BENNET:

S. 1850. A bill to provide greater controls and restrictions on revolving door lobbying; to the Committee on Homeland Security and Governmental Affairs.

By Ms. ROSEN (for herself and Mr. YOUNG):

S. 1851. A bill to enhance the cybersecurity of the Healthcare and Public Health Sector; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CRUZ (for himself and Mr. LUJAN):

S. 1852. A bill to amend the International Bridge Act of 1972 to streamline the Presidential permitting process for international bridges and land ports of entry, and for other purposes; to the Committee on Environment and Public Works.

By Ms. HIRONO (for herself and Mr. SCHATZ):

S. 1853. A bill to amend title 38, United States Code, to improve the provision of direct housing loans and medical care from the Department of Veterans Affairs for Native Hawaiians; to the Committee on Veterans' Affairs.

By Mrs. SHAHEEN (for herself, Mr. SCOTT of Florida, Mr. KAINE, Mr. CURTIS, and Mr. COONS):

S. 1854. A bill to require the imposition of sanctions with respect to political and economic elites in Haiti, and for other purposes; to the Committee on Foreign Relations.

## SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. CRAMER (for himself, Mr. KING, Mr. CRAPO, Mrs. BLACKBURN, Ms. KLOBUCHAR, Ms. MURKOWSKI, Ms. HASSAN, Ms. COLLINS, Mr. ROUNDS, and Mr. WELCH):

S. Res. 239. A resolution reaffirming the deep and steadfast partnership between the United States and Canada and the ties that bind the 2 countries in support of economic and national security; to the Committee on Foreign Relations.

By Ms. HIRONO (for herself, Mr. BOOKER, Mr. COONS, Ms. DUCKWORTH, Mr. PADILLA, Mr. SCHIFF, Mr. WHITEHOUSE, Ms. KLOBUCHAR, Mr. WELCH, Mr. BLUMENTHAL, and Ms. SMITH):

S. Res. 240. A resolution affirming that diversity, equity, inclusion , and accessibility are fundamental values of the United States and emphasizing the ongoing need to address discrimination and inequality in the workplace, pre-K through 12th grade and higher education systems, government programs, the military, and our society; to the Committee on the Judiciary.

By Mr. RICKETTS (for himself, Mr. MARSHALL, Mrs. FISCHER, and Mr. CORNYN):

S. Res. 241. A resolution expressing support for the designation of May 2025 as ''National Beef Month'' to recognize the important role cattle play in the United States, and to consumers; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. BLUMENTHAL:

S. Res. 242. A resolution condemning the private business agreements of President Donald J. Trump with foreign governments for posing unacceptable conflicts of interest, affirming such agreements violate the Foreign Emoluments Clause of the Constitution of the United States, and demanding the transfer of any proceeds from such agreements to the United States Government; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 243. A resolution condemning the financial entanglements of World Liberty Financial, Inc. with President Donald J. Trump, the Trump family, and the Trump Administration; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 244. A resolution affirming that the underlying purpose of the Foreign Emoluments Clause renders the acceptance and transfer of a plane from the government of Qatar, without the explicit consent of Congress, an illegal emolument, withholding the consent of the Senate to the acceptance and transfer of plane from the government of Qatar, and demanding the transfer of any plane received by President Donald J. Trump or entities under his control from the government of Qatar to the permanent control of the United States Government; to the Committee on Homeland Security and Governmental Affairs.

By Mr. BLUMENTHAL:

S. Res. 245. A resolution condemning the financial entanglements of Presidnet Donald J. Trump with the $TRUMP meme coin; to the Committee on Homeland Security and Governmental Affairs.

## ADDITIONAL COSPONSORS

S. 224

At the request of Mr. LANKFORD, the names of the Senator from North Dakota (Mr. HOEVEN) and the Senator from Ohio (Mr. HUSTED) were added as cosponsors of S. 224, a bill to amend the Internal Revenue Code of 1986 to allow intangible drilling and development costs to be taken into account when computing adjusted financial statement income.

S. 463

At the request of Mrs. GILLIBRAND, the names of the Senator from Maryland (Ms. ALSOBROOKS) and the Senator from New York (Mr. SCHUMER) were added as cosponsors of S. 463, a bill to facilitate the implementation of security measures undertaken by the United States Postal Service, and for other purposes.

S. 719

At the request of Ms. MURKOWSKI, the name of the Senator from Alaska (Mr. SULLIVAN) was added as a cosponsor of S. 719, a bill to amend the Tribal Forest Protection Act of 2004 to improve that Act, and for other purposes.

S. 756

At the request of Ms. KLOBUCHAR, the name of the Senator from Kansas (Mr. MORAN) was added as a cosponsor of S. 756, a bill to amend the Internal Revenue Code of 1986 to treat certain postsecondary credentialing expenses as qualified higher education expenses for purposes of 529 accounts.

S. 817

At the request of Mr. CRUZ, the name of the Senator from South Dakota (Mr. ROUNDS) was added as a cosponsor of S. 817, a bill to provide for the imposition of sanctions with respect to forced organ harvesting within the People's Republic of China, and for other purposes.

S. 844

At the request of Mr. HAWLEY, the name of the Senator from Arizona (Mr. GALLEGO) was added as a cosponsor of S. 844, a bill to accelerate workplace time-to-contract under the National Labor Relations Act.

S. 995

At the request of Mr. CRAPO, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 995, a bill to repeal a rule of the Environmental Protection Agency with respect to multi-pollutant emissions standards, to amend the Clean Air Act to ensure that tailpipe regulations do not limit the availability of new motor vehicles, and for other purposes.

S. 1072

At the request of Mr. LEE, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 1072, a bill to amend the Clean Air Act to eliminate a waiver under that Act, to eliminate an authorization for States to use new motor vehicle emission and new motor vehicle engine emissions standards identical to standards adopted in California, and for other purposes.

S. 1241

At the request of Mr. GRAHAM, the name of the Senator from Delaware (Ms. BLUNT ROCHESTER) was added as a cosponsor of S. 1241, a bill to impose sanctions and other measures with respect to the Russian Federation if the Government of the Russian Federation refuses to negotiate a peace agreement with Ukraine, violates any such agreement, or initiates another military invasion of Ukraine, and for other purposes.

S. 1298

At the request of Mr. KAINE, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. 1298, a bill to authorize the continuation of lawful nonimmigrant status for certain religious workers affected by the backlog for religious worker immigrant visas.

S. 1318

At the request of Mr. MORAN, the name of the Senator from Maine (Ms. COLLINS) was added as a cosponsor of S. 1318, a bill to direct the American Battle Monuments Commission to establish a program to identify American-Jewish servicemembers buried in United States military cemeteries

overseas under markers that incorrectly represent their religion and heritage, and for other purposes.

S. 1467

At the request of Mr. REED, the name of the Senator from Alaska (Mr. SULLIVAN) was added as a cosponsor of S. 1467, a bill to amend the Fair Credit Reporting Act to prevent consumer reporting agencies from furnishing consumer reports under certain circumstances, and for other purposes.

S. 1563

At the request of Ms. KLOBUCHAR, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. 1563, a bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to establish a grant program to help law enforcement agencies with civilian law enforcement tasks, and for other purposes.

S. 1668

At the request of Mr. MERKLEY, the name of the Senator from Arizona (Mr. GALLEGO) was added as a cosponsor of S. 1668, a bill to amend chapter 131 of title 5, United States Code, to prohibit the President, Vice President, Members of Congress, and individuals appointed to Senate-confirmed positions from issuing, sponsoring, or endorsing certain financial instruments, and for other purposes.

S. 1804

At the request of Mr. SCHUMER, the names of the Senator from Rhode Island (Mr. REED) and the Senator from Maryland (Ms. ALSOBROOKS) were added as cosponsors of S. 1804, a bill to prohibit the use of funds to procure or modify foreign aircraft for presidential airlift.

S. RES. 212

At the request of Mr. GRAHAM, the name of the Senator from North Carolina (Mr. TILLIS) was added as a cosponsor of S. Res. 212, a resolution affirming the acceptable outcome of any nuclear deal between the United States and the Islamic Republic of Iran, and for other purposes.

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. DURBIN (for himself, Mr. GRAHAM, Ms. KLOBUCHAR, Mr. KING, Mr. LEE, Mr. HEINRICH, Mr. WELCH, Mr. SCHUMER, and Mr. HAWLEY):

S. 1837. A bill to improve rights to relief for individuals affected by non-consensual activities involving intimate digital forgeries, and for other purposes; to the Committee on the Judiciary.

Mr. DURBIN. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 1837

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''Disrupt Explicit Forged Images and Non-Consensual Edits Act of 2025'' or the ''DEFIANCE Act of 2025''.

**SEC. 2. FINDINGS.**

Congress finds the following:

(1) Digital forgeries, often called deepfakes, are synthetic images and videos that look realistic. The technology to create digital forgeries is now ubiquitous and easy to use. Hundreds of apps are available that can quickly generate digital forgeries without the need for any technical expertise.

(2) Digital forgeries can be wholly fictitious but can also manipulate images of real people to depict sexually intimate conduct that did not occur. For example, some digital forgeries will paste the face of an individual onto the body of a real or fictitious individual who is nude or who is engaging in sexual activity. Another example is a photograph of an individual that is manipulated to digitally remove the clothing of the individual so that the person appears to be nude.

(3) The individuals depicted in such digital forgeries are profoundly harmed when the content is produced with intent to disclose, disclosed, or obtained without the consent of those individuals. These harms are not mitigated through labels or other information that indicates that the depiction is fake.

(4) It can be destabilizing to victims whenever those victims are depicted in intimate digital forgeries against their will, as the privacy of those victims is violated and the victims lose control over their likeness and identity.

(5) Victims can feel helpless because the victims—

(A) may not be able to determine who has created the content; and

(B) do not know how to prevent further disclosure of the intimate digital forgery or how to prevent more forgeries from being made.

(6) Victims may be fearful of being in public out of concern that individuals the victims encounter have seen the digital forgeries. This leads to social rupture through the loss of the ability to trust, stigmatization, and isolation.

(7) Victims of non-consensual, sexually intimate digital forgeries may experience depression, anxiety, and suicidal ideation. These victims may also experience the ''silencing effect'' in which the victims withdraw from online spaces and public discourse to avoid further abuse.

(8) Digital forgeries are often used to—

(A) harass victims, interfering with their employment, education, reputation, or sense of safety; or

(B) commit extortion, sexual assault, domestic violence, and other crimes.

(9) Because of the harms caused by non-consensual, sexually intimate digital forgeries, such digital forgeries are considered to be a form of image-based sexual abuse.

**SEC. 3. CIVIL ACTION RELATING TO DISCLOSURE OF INTIMATE IMAGES.**

(a) DEFINITIONS.—Section 1309 of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851) is amended—

(1) in the section heading, by inserting ''**OR NONCONSENSUAL ACTIVITY INVOLVING DIGITAL FORGERIES**'' after ''**INTIMATE IMAGES**''; and

(2) in subsection (a)—

(A) in paragraph (2), by inserting ''competent,'' after ''conscious,'';

(B) by striking paragraph (3);

(C) by redesignating paragraph (4) as paragraph (3);

(D) by redesignating paragraphs (5) and (6) as paragraphs (6) and (7), respectively;

(E) by inserting after paragraph (3) the following:

''(4) IDENTIFIABLE INDIVIDUAL.—The term 'identifiable individual' means an individual whose body appears in whole or in part in an intimate visual depiction or intimate digital forgery and who is identifiable by virtue of the individual's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature, or from information displayed in connection with the intimate visual depiction or intimate digital forgery.

''(5) INTIMATE DIGITAL FORGERY.—

''(A) IN GENERAL.—The term 'intimate digital forgery' means any intimate visual depiction of an identifiable individual that—

''(i) falsely represents, in whole or in part—

''(I) the identifiable individual; or

''(II) the conduct or content that makes the visual depiction intimate;

''(ii) is created through the use of software, machine learning, artificial intelligence, or any other computer-generated or technological means, including by adapting, modifying, manipulating, or altering an authentic visual depiction; and

''(iii) is indistinguishable from an authentic visual depiction of the identifiable individual when viewed as a whole by a reasonable person.

''(B) LABELS, DISCLOSURE, AND CONTEXT.—Any visual depiction described in subparagraph (A) constitutes an intimate digital forgery for purposes of this paragraph regardless of whether a label, information disclosed with the visual depiction, or the context or setting in which the visual depiction is disclosed states or implies that the visual depiction is not authentic.''; and

(F) in paragraph (6)(A), as so redesignated—

(i) in clause (i), by striking ''or'' at the end;

(ii) in clause (ii)—

(I) in subclause (I), by striking ''individual;'' and inserting ''individual; or''; and

(II) by striking subclause (III); and

(iii) by adding at the end the following:

''(iii) an identifiable individual engaging in sexually explicit conduct; and''.

(b) CIVIL ACTION.—Section 1309(b) of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851(b)) is amended—

(1) in paragraph (1)—

(A) by striking subparagraph (A) and inserting the following:

''(A) IN GENERAL.—Except as provided in paragraph (5)—

''(i) an identifiable individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the identifiable individual, where such disclosure was made by a person who knows or recklessly disregards that the identifiable individual has not consented to such disclosure, may bring a civil action against that person in an appropriate district court of the United States for relief as set forth in paragraph (3);

''(ii) an identifiable individual who is the subject of an intimate digital forgery may bring a civil action in an appropriate district court of the United States for relief as set forth in paragraph (3) against any person that knowingly produced or possessed the intimate digital forgery with intent to disclose it, knowingly disclosed the intimate digital forgery, or knowingly solicited and received the intimate digital forgery, if—

''(I) the identifiable individual did not consent to such production or possession with intent to disclose, disclosure, or solicitation and receipt;

''(II) the person knew or recklessly disregarded that the identifiable individual did not consent to such production or possession

with intent to disclose, disclosure, or solicitation and receipt; and

''(III) such production or possession with intent to disclose, disclosure, or solicitation and receipt, is in or affects interstate or foreign commerce or uses any means or facility of interstate or foreign commerce; and

''(iii) an identifiable individual who is the subject of an intimate digital forgery may bring a civil action in an appropriate district court of the United States for relief as set forth in paragraph (3) against any person that knowingly produced the intimate digital forgery if—

''(I) the identifiable individual did not consent to such production;

''(II) the person knew or recklessly disregarded that the identifiable individual—

''(aa) did not consent to such production; and

''(bb) was harmed, or was reasonably likely to be harmed, by the production; and

''(III) such production is in or affects interstate or foreign commerce or uses any means or facility of interstate or foreign commerce.''; and

(B) in subparagraph (B)—

(i) in the subparagraph heading, by inserting ''IDENTIFIABLE'' before ''INDIVIDUALS''; and

(ii) by striking ''an individual who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the individual'' and inserting ''an identifiable individual who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the identifiable individual'';

(2) in paragraph (2)—

(A) in subparagraph (A)—

(i) by inserting ''identifiable'' before ''individual'';

(ii) by striking ''depiction'' and inserting ''intimate visual depiction or intimate digital forgery''; and

(iii) by striking ''distribution'' and inserting ''disclosure, solicitation, or possession''; and

(B) in subparagraph (B)—

(i) by inserting ''identifiable'' before ''individual'';

(ii) by inserting ''or intimate digital forgery'' after ''depiction'' each place it appears; and

(iii) by inserting '', solicitation, or possession'' after ''disclosure'';

(3) by redesignating paragraph (4) as paragraph (5);

(4) by striking paragraph (3) and inserting the following:

''(3) RELIEF.—

''(A) IN GENERAL.—In a civil action filed under this section, an identifiable individual may recover—

''(i) damages as provided under subparagraph (C); and

''(ii) the cost of the action, including reasonable attorney fees and other litigation costs reasonably incurred.

''(B) PUNITIVE DAMAGES AND OTHER RELIEF.—The court may, in addition to any other relief available at law, award punitive damages or order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to delete, destroy, or cease to display or disclose the intimate visual depiction or intimate digital forgery.

''(C) DAMAGES.—For purposes of subparagraph (A)(i), the identifiable individual may recover—

''(i) liquidated damages in the amount of—

''(I) $150,000; or

''(II) $250,000 if the conduct at issue in the claim was—

''(aa) committed in relation to actual or attempted sexual assault, stalking, or harassment of the identifiable individual by the defendant; or

''(bb) the direct and proximate cause of actual or attempted sexual assault, stalking, or harassment of the identifiable individual by any person; or

''(ii) actual damages sustained by the individual, which shall include any profits of the defendant that are attributable to the conduct at issue in the claim that are not otherwise taken into account in computing the actual damages.

''(D) CALCULATION OF DEFENDANT'S PROFIT.—For purposes of subparagraph (C)(ii), to establish the defendant's profits, the identifiable individual shall be required to present proof only of the gross revenue of the defendant, and the defendant shall be required to prove the deductible expenses of the defendant and the elements of profit attributable to factors other than the conduct at issue in the claim.

''(4) PRESERVATION OF PRIVACY.—In a civil action filed under this section, the court may issue an order to protect the privacy of a plaintiff, including by—

''(A) permitting the plaintiff to use a pseudonym;

''(B) requiring the parties to redact the personal identifying information of the plaintiff from any public filing, or to file such documents under seal; and

''(C) issuing a protective order for purposes of discovery, which may include an order indicating that any intimate visual depiction or intimate digital forgery shall remain in the care, custody, and control of the court.'';

(5) in paragraph (5)(A), as so redesignated—

(A) by striking ''image'' and inserting ''visual depiction or intimate digital forgery''; and

(B) by striking ''depicted'' and inserting ''identifiable''; and

(6) by adding at the end the following:

''(6) STATUTE OF LIMITATIONS.—Any action commenced under this section shall be barred unless the complaint is filed not later than 10 years from the later of—

''(A) the date on which the identifiable individual reasonably discovers the violation that forms the basis for the claim; or

''(B) the date on which the identifiable individual reaches 18 years of age.

''(7) DUPLICATIVE RECOVERY BARRED.—No relief may be ordered under paragraph (3) against a person who is subject to a judgment under section 2255 of title 18, United States Code, for the same conduct involving the same identifiable individual and the same intimate visual depiction or intimate digital forgery.''.

(c) CONTINUED APPLICABILITY OF FEDERAL, STATE, AND TRIBAL LAW.—

(1) IN GENERAL.—This Act shall not be construed to impair, supersede, or limit a provision of Federal, State, or Tribal law.

(2) NO PREEMPTION.—Nothing in this Act shall prohibit a State or Tribal government from adopting and enforcing a provision of law governing disclosure of intimate images or nonconsensual activity involving an intimate digital forgery, as defined in section 1309(a) of the Consolidated Appropriations Act, 2022 (15 U.S.C. 6851(a)), as amended by this Act, that is at least as protective of the rights of a victim as this Act.

**SEC. 4. SEVERABILITY; RULE OF CONSTRUCTION.**

(a) SEVERABILITY.—If any provision of this Act, an amendment made by this Act, or the application of such a provision or amendment to any person or circumstance, is held to be unconstitutional, the remaining provisions of and amendments made by this Act, and the application of the provision or amendment held to be unconstitutional to any other person or circumstance, shall not be affected thereby.

(b) RULE OF CONSTRUCTION.—Nothing in this Act, or an amendment made by this Act, shall be construed to limit or expand any law pertaining to intellectual property.

## SUBMITTED RESOLUTIONS

### SENATE RESOLUTION 239—REAFFIRMING THE DEEP AND STEADFAST PARTNERSHIP BETWEEN THE UNITED STATES AND CANADA AND THE TIES THAT BIND THE 2 COUNTRIES IN SUPPORT OF ECONOMIC AND NATIONAL SECURITY

Mr. CRAMER (for himself, Mr. KING, Mr. CRAPO, Mrs. BLACKBURN, Ms. KLOBUCHAR, Ms. MURKOWSKI, Ms. HASSAN, Ms. COLLINS, Mr. ROUNDS, and Mr. WELCH) submitted the following resolution; which was referred to the Committee on Foreign Relations:

S. RES. 239

Whereas strengthening and deepening United States alliances is critically important, and the Senate is called upon not only to protect, but to advance, United States partnerships;

Whereas the United States enjoys the great fortune of having one of its closest allies next door at a time when countries around the world are facing existential threats from their neighbors;

Whereas, in June 2023, the bipartisan and bicameral American-Canadian Economy and Security Caucus was established in the Senate and the House of Representatives, which presents an opportunity to fortify and advance the indispensable economic and security partnership between the United States and Canada;

Whereas the United States and Canada can together reinforce their shared interest in 4 critical areas, which are—

(1) economic security;

(2) energy and critical minerals security;

(3) national security; and

(4) global security;

Whereas the prosperity of the citizens of the United States and Canada are supported by their mutually beneficial economic relationship and resilient and integrated supply chains;

Whereas the Agreement between the United States of America, the United Mexican States, and Canada, done at Mexico City on December 10, 2019 (commonly known as the ''USMCA''), forms the foundation of the economic competitiveness of the 3 countries;

Whereas the United States and Canada—

(1) share one of the largest trading relationships in the world, with nearly $1,000,000,000,000 in bilateral trade in goods and services in 2023, supporting nearly 8,000,000 jobs in the United States and more than 2,400,000 jobs in Canada; and

(2) understand the importance of secure and resilient supply chains, and have established formal mechanisms to further strengthen economic integration and minimize the dependency of the United States on foreign adversaries;

Whereas Canada is the largest single export market for the United States, and Canada was the number one customer for 36 of the 50 States in 2023;

Whereas, in 2023, more than 330 congressional districts each exported more than $250,000,000 in goods to Canada, and more than congressional 100 districts each exported more than $1,000,000,000 in goods to Canada;

Whereas bilateral trade in agriculture between Canada and the United States reached

$72,500,000,000 in 2023 and Canada is the number one agricultural export market for 27 States;

Whereas trade between Canada and the United States is built on long-standing binational supply chains, whereby roughly 70 percent of Canadian goods exported to the United States are used by manufacturers in the United States to produce higher value goods;

Whereas Canada purchases more than $22,000,000,000 worth of automotive parts and approximately $33,600,000,000 worth of vehicles from the United States each year;

Whereas, in 2024, the United States imported $53,000,000,000 worth of motor vehicles and parts from Canada, while United States exports of motor vehicles and parts to Canada totaled $55,000,000,000, including $18,000,000,000 worth of automotive parts;

Whereas the United States lumber industry produces approximately 70 percent of the lumber needed every year in the United States and Canadian lumber makes up most of the shortfall, helping to meet the needs of United States consumers;

Whereas the United States and Canada—

(1) are global leaders in science, technology, and innovation, and can secure the future of North America as the most competitive region in the world; and

(2) are working together to deepen cooperation in developing and protecting emerging technologies, including artificial intelligence and quantum technologies;

Whereas Canada—

(1) is the world's fourth-largest petroleum producer and is the largest foreign supplier of energy, including oil, uranium, natural gas, and electricity, to the United States;

(2) supports United States energy dominance by providing safe and reliable natural gas, electricity, crude oil, and uranium for nuclear power;

(3) bolsters the position of the United States as the world's number one exporter of liquified natural gas by supplying border States with Canadian natural gas;

(4) enables the growth of United States artificial intelligence technology by supplying the critical fuels required by the United States power industry; and

(5) is a reliable source of energy and resources for the United States, producing more than 60 minerals and metals, and is a leading global producer of critical minerals on the critical minerals list the United States Geological Survey;

Whereas Canada is—

(1) committed to ensuring North American competitiveness and the success of workers and communities in Canada and the United States; and

(2) taking steps to address nonmarket practices of the People's Republic of China, notably by screening inbound investment into Canada and applying a surtax on products imported from the People's Republic of China, such as electric vehicles, steel, and aluminum;

Whereas the United States and Canada—

(1) have a deeply interconnected electricity sector, with more than 35 active electricity transmission connections between the 2 countries, many of which enable bidirectional flows of electricity, helping to ensure the security and reliability of the North American grid;

(2) have committed to work together to protect biodiverse areas that span their shared border, including in collaboration with Indigenous and Tribal partners, benefitting shared species like migratory birds; and

(3) have jointly collaborated for more than 100 years under the Treaty relating to the Boundary Waters and Questions arising along the Boundary between the United States and Canada, signed at Washington January 11, 1909 (36 Stat. 2448; 12 Bevans 319) (commonly known as the ''Boundary Waters Treaty'') to manage and conserve their shared waters for the benefit of both countries, including almost 50 years under the Agreement on Great Lakes Water Quality, 1978, with Annexes and Terms of Reference, signed at Ottawa November 22, 1978 (commonly known as the ''Great Lakes Water Quality Agreement'');

Whereas the United States and Canada—

(1) share 3 oceans and the world's longest border, and safely oversee the movement of about 400,000 people and more than $2,500,000,000 worth of goods and services across that border each day;

(2) cooperate to keep the border open to legitimate trade and travel but closed to illegal migration, terrorists, criminals, and threats to the health and safety of citizens;

(3) are committed to jointly protecting the security of their citizens, including though Canada's recent actions and significant investments to strengthen border security by—

(A) fighting sources of illegal migration at the border, and keeping deadly drugs like fentanyl and its precursors from entering;

(B) securing border crossings by maintaining 24/7 eyes on the border using new surveillance technology and increased personnel;

(C) combating fentanyl trafficking through the appointment of a fentanyl czar, listing cartels as terrorist entities, and launching a Canada-United States Joint Strike Force detecting and disrupting the fentanyl trade with more technology, tools, and intelligence;

(D) reinforcing a ''one border, one team'' approach through more cross-border information and intelligence sharing; and

(E) keeping people safe through joint emergency readiness and creating a joint emergency management partnership similar to the North American Aerospace Defense Command (commonly referred to as ''NORAD'');

(4) are united in fighting a fentanyl crisis that is indiscriminately affecting citizens on both sides of the border and is fueled by the actions of malign actors abroad;

(5) work together to secure the border between the United States and Canada through the Cross Border Crime Forum, the Integrated Border Enforcement Teams, the Beyond the Border Initiative, the United States-Canada NEXUS Trusted Traveler Program, the Border Enforcement Security Task Forces, the Integrated Cross-Border Maritime Law Enforcement Operations (commonly known as the ''Shiprider''), and the United States preclearance operations conducted at airports in Canada, all of which enhance joint security efforts;

(6) have an Integrated Border Enforcement Charter that allows border enforcement agencies to jointly identify national security threats, disrupt organized criminal activities, seize drugs and weapons, and intercept criminal networks trying to smuggle people across the border; and

(7) both understand that a threat to the security of one country is a threat to the security of both countries;

Whereas the United States and Canada—

(1) are Pacific, Atlantic, and Arctic countries;

(2) are unequivocally committed to playing a leadership role in protecting global security and promoting democracy around the world;

(3) recognize that collective security is a shared responsibility, and are committed to expanding cooperation on continental defense and in the Arctic, including by increasing investments in continental defense and modernizing NORAD, the world's only binational military command;

(4) share the desire for a peaceful, stable, and predictable Arctic region, including for the benefit of Arctic and Northern peoples and communities;

(5) work together to advance democratic principles, human rights, and free trade policies through the Group of 7, the Group of 20, the United Nations, the Organization for Security and Co-operation in Europe, the Organisation for Economic Co-operation and Development, the World Trade Organization, and at the Organization of American States;

(6) cooperate extensively through a ''Tri-Command Framework'' comprised of the United States Northern Command, the Canadian Joint Operations Command, and NORAD;

(7) work together as the only North American members of the North Atlantic Treaty Organization (commonly referred to as ''NATO'') to ensure peace and security in the transatlantic region;

(8) support NATO's deterrence and defense efforts, and allies in Europe, through their roles as the Framework Nations for the NATO brigades in Latvia and Poland; and

(9) share a long and storied history of civil space partnership between the National Aeronautics and Space Administration (commonly referred to as ''NASA'') and the Canadian Space Agency, and a Canadian will fly on the historic Artemis II mission around the Moon with NASA;

Whereas Canada has been a committed ally in upholding the rules-based international order by promoting peace, resilience, and security in the Indo-Pacific region through an augmented and diversified military presence;

Whereas Canada has been a reliable and engaged partner of the United States in the Indo-Pacific region by collaborating extensively with the United States Indo-Pacific Command, including through bilateral and multilateral exercises, regional security cooperation and defense engagements, involvement in regional defense forums, and ultimately, through unwavering support of free, open, and inclusive Indo-Pacific region;

Whereas Canada is in consultation with the United States, Australia, and the United Kingdom to identify collaborative projects on advanced capabilities under Pillar II of the enhanced trilateral security partnership between Australia, the United Kingdom, and the United States; and

Whereas history, geography, commerce, security, and shared democratic values underpin a close relationship between the United States and Canada: Now, therefore, be it

*Resolved*, That the Senate—

(1) recognizes that the relationship between the United States and Canada is—

(A) an essential strategic asset to the United States and the people of the United States; and

(B) critical to promoting peace, expanding global economic opportunity, and being prepared to respond to unforeseen events;

(2) reaffirms its full commitment to maintain and grow the critical partnership between the United States and Canada;

(3) recognizes that the security of either the United States or Canada is dependent on the security of the other, and welcomes greater collaboration in the areas of defense, cyber and technology security, and Arctic security;

(4) reaffirms its commitment to the bilateral and international alliance between the 2 countries, which allows both countries to face common threats together and uphold common values, including democracy, human rights, and the rule of law;

(5) recognizes the strategic importance of one of the most secure borders in the world, the co-management of which facilitates trade and serves as a trusted corridor for the supply chains of both countries;

(6) recognizes that bolstering the supply chains of both countries will make both countries more competitive and more resilient in the face of economic aggression from hostile countries;

(7) supports an increased focus on energy security through greater cross-border energy infrastructure, including infrastructure for oil, natural gas, nuclear, renewable energy, and resilient electricity transmission, and through diversifying supply chains for critical minerals; and

(8) is fully committed to the creation of more well-paying United States jobs through continued trade and investment with Canada.

---

## SENATE RESOLUTION 240—AFFIRMING THAT DIVERSITY, EQUITY, INCLUSION , AND ACCESSIBILITY ARE FUNDAMENTAL VALUES OF THE UNITED STATES AND EMPHASIZING THE ONGOING NEED TO ADDRESS DISCRIMINATION AND INEQUALITY IN THE WORKPLACE, PRE-K THROUGH 12TH GRADE AND HIGHER EDUCATION SYSTEMS, GOVERNMENT PROGRAMS, THE MILITARY, AND OUR SOCIETY

Ms. HIRONO (for herself, Mr. BOOKER, Mr. COONS, Ms. DUCKWORTH, Mr. PADILLA, Mr. SCHIFF, Mr. WHITEHOUSE, Ms. KLOBUCHAR, Mr. WELCH, Mr. BLUMENTHAL, and Ms. SMITH) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 240

Whereas everyone should have the opportunity to achieve the American Dream, and it is too often out of reach for hardworking and talented individuals due to discriminatory barriers to opportunity;

Whereas diversity, equity, inclusion, and accessibility initiatives address discriminatory barriers to opportunity and ongoing discrimination;

Whereas diversity, equity, inclusion, and accessibility initiatives allow everyone to access equal opportunity and are not unlawful quotas;

Whereas, for 6 decades, Presidents of both major political parties have supported diversity, equity, inclusion, and accessibility initiatives to strengthen the workforce, expand opportunity, and ensure everyone has a fair shot at achieving the American Dream;

Whereas diversity, equity, and inclusion initiatives are broadly popular;

Whereas polling shows that over 70 percent of people in the United States, including majorities of White, Black, Latino, and Asian American populations, support diversity, equity, inclusion, and accessibility initiatives;

Whereas data from the Department of Labor, the Bureau of the Census, the Board of Governors of the Federal Reserve System, the Survey of Consumer Finances, the Bureau of Labor Statistics, the Equal Employment Opportunity Commission, the Department of Housing and Urban Development, the Bipartisan Policy Center, the Urban Institute, the Brookings Institution, the Pew Research Center, Citi Group, the KFF Survey on Racism, Discrimination, and Health, the GLSEN National School Climate Survey, McKinsey & Company, and numerous other sources show that Black, Latino, Asian American, and Indigenous people, women, LGBTQ+ people, and people with disabilities experience persistent segregation, exclusion, and discrimination in education, employment, healthcare, access to capital and financial services, housing, and other sectors, which demonstrates the necessity for diversity, equity, inclusion, and accessibility practices, policies, and programs;

Whereas disability-based discrimination constitutes more than half (53.26 percent) of all housing discrimination complaints filed with fair housing organizations and government agencies;

Whereas, for the past several years, disability has continued to be the top basis of discrimination reported under the Fair Housing Act (42 U.S.C. 3601 et seq.), representing 5,128 complaints filed with the Department of Housing and Urban Development and its Fair Housing Assistance Program partners in fiscal year 2023;

Whereas less than 5 percent of housing nationwide is accessible to individuals with moderate mobility difficulties, and less than 1 percent of housing is accessible for those who use wheelchairs;

Whereas approximately 32 percent of adults with disabilities have reported unfair treatment in healthcare settings due to their disabilities or other personal characteristics;

Whereas, in 2023, only 22.5 percent of people with disabilities were employed, compared to 65.8 percent of those without disabilities;

Whereas students with disabilities frequently receive insufficient support, resulting in lower graduation rates and limited career opportunities;

Whereas Black and Latino homebuyers—

(1) have been steered toward or away from certain neighborhoods, which impacts their ability to buy homes in their preferred areas;

(2) face appraisal discrimination, which diminishes their wealth by undervaluing their property; and

(3) are more likely than White homebuyers to receive costly subprime mortgages, even when their financial situations are comparably qualified;

Whereas these disparities highlight systemic issues in the housing market that disproportionately disadvantage Black and Latino communities, emphasizing the need for ongoing efforts to address and rectify discriminatory lending and appraisal practices;

Whereas the racial wealth gap has widened in recent decades, with Black and Latino households experiencing significantly lower average net wealth than White households;

Whereas, while White households hold 86.8 percent of the overall wealth of the United States, they only account for 68.1 percent of the total households in the United States, and in comparison, Black and Hispanic households hold 2.9 percent and 2.8 percent of the overall wealth of the United States, respectively, while accounting for 15.6 percent and 10.9 percent of the United States population, respectively;

Whereas nearly 30 percent of LGBTQ+ people have encountered discrimination, including being denied or discouraged from buying or renting a home, being denied loans, being physically and verbally harassed, and having landlords refuse to provide maintenance;

Whereas people of color have faced significant discrimination in healthcare, impacting access to care, treatment quality, health outcomes, and trust in medical institutions;

Whereas this discrimination has led to disparities in treatment, access, health outcomes, and social determinants of health;

Whereas racial biases result in inadequate pain management, misdiagnoses, and higher maternal and infant mortality rates, particularly among Black and Indigenous women;

Whereas historical injustices contribute to deep mistrust in the medical system, affecting participation in clinical trials and preventive care;

Whereas environmental racism, lack of culturally competent mental health services, and unequal access to quality healthcare further worsen health disparities;

Whereas healthcare discrimination negatively impacts the lives of LGBTQ+ people;

Whereas 1 out of 5 transgender people have been turned away from healthcare, and more than 60 percent of LGBTQ+ adults have had a negative interaction with a healthcare provider, such as being blamed for their health challenges, being ignored, and being denied pain medications;

Whereas, for LGBTQ+ people, these experiences cut across racial lines;

Whereas Black, Indigenous, and Latino students continue to experience discrimination in the pre-k through 12th grade and higher education systems that create barriers to accessing and completing a quality education;

Whereas Black students and Indigenous students are disproportionately disciplined in schools and excluded from classrooms, feeding a pipeline to prison and disengagement from school, particularly for Black girls, who are 4 times more likely to be suspended, 4 times more likely to be expelled, and 3 times more likely to have the police called on them in school, compared to White girls;

Whereas 1 in 5 Black students and 1 in 4 Latino students experience discrimination on college and university campuses;

Whereas most students who are parents while attending higher education identify as Black, Indigenous, and Latino, and they face a variety of barriers to graduation while learning in schools that do not consider their parenting responsibilities;

Whereas LGBTQ+ students face hostility and discrimination in educational settings, which negatively impacts their success in schools;

Whereas more than ⅔ of LGBTQ+ students feel unsafe at school due to their sexual orientation or gender identity, and more than ⅓ of LGBTQ+ students have missed school as a result;

Whereas occupational segregation of Black workers into lower-paid jobs and less lucrative industries persists despite an increase in the number of Black people with college degrees over the previous 20 years;

Whereas Black, Latino, Asian American, and Indigenous workers are over represented in dangerous jobs with worse pay and fewer benefits due to ongoing occupational segregation;

Whereas, in 2023, the wage gap widened for the first time in 20 years, with women working full-time, year-round jobs receiving 83 cents for every dollar paid to men while that number was 84 cents in 2022, and Black women experienced a more severe backslide;

Whereas, in 2023, Black women working full-time, year-round jobs were paid 66 cents for every dollar paid to White, non-Hispanic men, compared to 69 cents in 2022;

Whereas Asian American and Native Hawaiian and Pacific Islander women were paid 97 cents, Latinas were paid 58 cents, and Native women were paid 58 cents for every dollar paid to White, non-Hispanic men;

Whereas women at all education levels experience a wage gap compared to their male counterparts;

Whereas a Latina with a professional degree stands to lose over $2,900,000 over her lifetime due to the wage gap;

Whereas Native women working a full-time, year-round job must get a bachelor's degree (typical pay of $58,113) to be paid more than White, non-Hispanic men working a full-time, year-round job with a high school diploma (typical pay of $50,976);

Whereas disabled women also face a pay gap;

Whereas a disabled woman working a full-time, year-round job is paid 68 cents for every dollar paid to a non-disabled man;

Whereas studies reveal wage disparities for LGBTQ+ individuals, particularly for transgender and bisexual people;

Whereas data shows LGBTQ+ workers earn about 90 cents, transgender men earn 70 cents, and transgender women earn 60 cents for every dollar that all full-time workers are paid;

Whereas approximately 40 percent of Black workers, 25 percent of Asian workers, and 20 percent of Latino workers report experiencing discrimination or being treated unfairly by an employer in hiring, pay, or promotions because of their race or ethnicity;

Whereas women continue to face discrimination in the workplace, and many women of color experience the dual burden of race and sex discrimination at work;

Whereas 1 recent study found that 40 percent of working women experience sexual harassment on the job;

Whereas some studies indicate that as many as 60 percent of women have experienced workplace sexual harassment, and in some industries, that number is as high as 90 percent;

Whereas women also continue to face occupational segregation, limiting their access to higher paying careers across the spectrum;

Whereas, in the skilled trades, women make up just 3.9 percent of the workforce;

Whereas, in private law firms, just 18 percent of associates are women of color, only 28 percent of partners are women, and just over 5 percent of partners are women of color;

Whereas, in corporate management generally, women still make up just 29 percent of C-suite positions;

Whereas, despite legal protections guaranteed by Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.) and the Supreme Court's ruling in Bostock v. Clayton County, 590 U.S. 644 (2020), many LGBTQ+ individuals still encounter workplace discrimination, including being fired, denied promotions, or harassed due to their sexual orientation or gender identity;

Whereas ½ of LGBTQ+ adults and 70 percent of transgender workers reported experiencing some form of workplace discrimination or harassment;

Whereas LGBTQ+ workers of color and LGBTQ+ workers with disabilities report experiencing workplace discrimination at higher rates than LGBTQ+ workers who do not identify as people of color or people with disabilities;

Whereas discriminatory lending practices, barriers to funding, and limited access to capital make it difficult for Black, Latino, and Asian American entrepreneurs to start or expand businesses;

Whereas venture capital firms reject Black-owned businesses at 3 times the rate of their white counterparts;

Whereas Black women receive less than 0.35 percent of all venture capital funding despite Black people making up 14.2 percent of the United States population;

Whereas Latino small business owners experience similar barriers to access to funding;

Whereas racial disparities exist in government contract awards;

Whereas firms owned by people of color receive a smaller share of contracting dollars than their representation among available firms;

Whereas, in fiscal year 2023, Black-owned businesses secured approximately $9,990,000,000 in Federal contracts, representing less than 1.3 percent of the total amount awarded by the Federal Government;

Whereas, in fiscal year 2023, Latino-owned small companies received roughly $10,900,000,000 in Federal contracts, and Asian American-owned businesses were awarded $9,000,000,000 in Federal contracts out of $774,000,000,000 in Federal contracts;

Whereas the persistence of discrimination in the United States limits our innovation and productivity, weakens our economy, and undermines our democracy;

Whereas the failure to effectively address growing inequality has decreased economic mobility rates in the United States and made the American Dream more elusive regardless of talent or hard work;

Whereas the Federal Government is responsible for addressing discriminatory barriers to opportunity in the United States by increasing and enhancing initiatives that support diversity, equity, inclusion, and accessibility, and enforcing anti-discrimination laws;

Whereas, according to an analysis by Citi Group, disparities for Black people across the economic system of the United States from 2004 to 2024 have cost the United States economy $16,000,000,000,000;

Whereas studies show that companies with workforces that are diverse on multiple levels, including by race, are more innovative, productive, and profitable;

Whereas diversity, equity, inclusion, and accessibility initiatives can address disparities and reduce labor shortages in high-demand industries like technology, healthcare, and finance, ensuring that the United States can compete in the global marketplace;

Whereas the United States is best served when the Federal workforce reflects the talent and contributions of people from all backgrounds;

Whereas career pathway programs, investment in Historically Black Colleges and Universities, Tribal Colleges and Universities, and other minority-serving institutions, access to financial aid, expanding access to apprenticeship and job skills training programs, offering mentorship opportunities, and other solutions help talented individuals overcome barriers to opportunity;

Whereas diversity, equity, inclusion, and accessibility initiatives are crucial in ensuring fair and comprehensive access to core services for all communities, whether in education, healthcare, employment, or government programs;

Whereas diversity, equity, inclusion, and accessibility initiatives ensure that core services are designed to meet the diverse needs of all populations, especially historically underserved or marginalized communities;

Whereas, without an equity lens, systemic barriers, such as cost, transportation, and a lack of culturally competent services, may prevent some groups from accessing essential resources;

Whereas government agencies and organizations that integrate diversity, equity, inclusion, and accessibility principles develop policies that intentionally reduce disparities in service accessibility;

Whereas diversity, equity, inclusion, and accessibility-focused transportation policies could ensure rural communities and individuals with disabilities have equal access to public transit;

Whereas a diverse workforce in service-oriented fields, such as education, healthcare, and social services, leads to better understanding and responsiveness to community needs;

Whereas inclusion training can reduce biases that might otherwise result in service denial or discrimination;

Whereas qualified students and workers who benefit from scholarships, internships, training programs, and mentorships supported by diversity, equity, inclusion, and accessibility initiatives could lose these opportunities, potentially widening existing disparities;

Whereas diversity, equity, inclusion, and accessibility initiatives in schools, colleges, and universities help foster inclusive environments and support underrepresented students;

Whereas eliminating these initiatives may reduce retention and graduation rates among underrepresented groups;

Whereas companies and organizations may struggle to recruit and retain skilled, diverse workforces, which could potentially affect innovation, productivity, and competitiveness;

Whereas diversity, equity, inclusion, and accessibility initiatives bring down costs in several ways through reduced turnover and hiring costs and better decision making;

Whereas diversity, equity, inclusion, and accessibility initiatives help mitigate the risk of discrimination lawsuits by helping to ensure equal opportunity and workplace cultures of respect;

Whereas diversity, equity, inclusion, and accessibility initiatives often support small minority- and women-owned businesses through procurement goals and funding, and their elimination could hinder such businesses' growth and success;

Whereas diversity, equity, inclusion, and accessibility efforts and policies in healthcare ensure culturally competent and bias-free care and address social determinants of health, such as housing and food security;

Whereas diversity, equity, inclusion, and accessibility efforts and policies in healthcare promote culturally competent providers who understand and respond to diverse patient needs;

Whereas language access services, including qualified medical interpreters and translated materials, ensure that patients can receive quality care in their primary language;

Whereas expanding Medicaid, subsidies under the Patient Protection and Affordable Care Act (Public Law 111–148; 124 Stat. 119), and community-based healthcare programs assists uninsured and underinsured populations in obtaining necessary medical services;

Whereas implicit bias in healthcare results in racial and socioeconomic disparities in treatment, as evidenced by Black women facing higher maternal mortality rates than the general population;

Whereas diversity, equity, inclusion, and accessibility-informed training equips medical professionals to recognize and mitigate biases, ensuring equal treatment and fostering patient trust;

Whereas diversity, equity, inclusion, and accessibility initiatives in healthcare often address disparities in access and outcomes for marginalized communities and assist individuals benefitting from community programs focused on equity in housing, nutrition, and mental health;

Whereas these and other initiatives that advance diversity, equity, inclusion, and accessibility promote equal access to opportunities and resources, foster an environment of respect and belonging, ensure that every individual, regardless of background, can fully participate in all aspects of society, and are essential to creating a culture where all individuals are valued and included;

Whereas President Donald Trump's Executive orders on diversity, equity, inclusion, and accessibility represent a regressive step, undermining decades of progress toward equal opportunity in the United States, and misconstrue the fundamental purpose of diversity, equity, inclusion, and accessibility efforts;

Whereas the idea that diversity, equity, inclusion, and accessibility initiatives do not consider merit is a false and harmful narrative that misunderstands both concepts;

Whereas, rather than lowering standards, diversity, equity, inclusion, and accessibility initiatives ensure that merit is measured in ways that are more accurate, inclusive, and aligned with real-world potential, benefitting schools, workplaces, and society at large;

Whereas, contrary to the Trump administration's claims, diversity, equity, inclusion, and accessibility initiatives are not about preferential treatment or quotas but leveling the playing field;

Whereas dismantling these programs disregards the persistent inequalities that necessitate their existence and signals a troubling departure from the commitment of the United States to civil rights and equal opportunity for all; and

Whereas attacks on initiatives that advance diversity, equity, inclusion, and accessibility make the United States less prosperous, fair, and safe: Now, therefore, be it

*Resolved*, That the Senate—

(1) affirms its commitment to—

(A) diversity, equity, inclusion, and accessibility as essential foundations for achieving the American Dream; and

(B) fostering environments where all individuals have the freedom to be healthy, prosperous, and safe, the opportunity to realize their full potential, and the right to be equal members of our multiracial democracy; and

(2) encourages local, State, and Federal policymakers, educational institutions, workplaces, and other organizations to adopt, uphold, and promote inclusivity, expand diversity and accessibility, remove barriers, and provide equitable opportunities for all individuals to pursue their dreams, which, in turn, benefits all people.

## SENATE RESOLUTION 241—EXPRESSING SUPPORT FOR THE DESIGNATION OF MAY 2025 AS "NATIONAL BEEF MONTH" TO RECOGNIZE THE IMPORTANT ROLE CATTLE PLAY IN THE UNITED STATES, AND TO CONSUMERS

Mr. RICKETTS (for himself, Mr. MARSHALL, Mrs. FISCHER, and Mr. CORNYN) submitted the following resolution; which was referred to the Committee on Agriculture, Nutrition, and Forestry:

S. RES. 241

Whereas cattle production accounts for largest share of cash receipts for agricultural commodities in the United States at $88,400,000,000;

Whereas the United States produces the most beef in the world, accounting for 19 percent of global production;

Whereas the United States raises more than 92,000,000 head of cattle accounting for 6 percent of global production;

Whereas the United States has the largest inventory of fed cattle in the world;

Whereas beef provides 25 grams of high-quality protein per 3-ounce serving; and

Whereas beef contains essential nutrients which help the body convert food into energy and support immune health and brain function, including—

(1) iron, which helps with oxygen absorption;

(2) choline, which supports nervous system development;

(3) vitamins B6 and B12, which maintains brain function;

(4) phosphorous, which builds bones and teeth;

(5) zinc, which maintains immune system function;

(6) niacin, which supports energy production and metabolism;

(7) riboflavin, which converts food into energy; and

(8) selenium, which promotes cell health: Now, therefore, be it

*Resolved*, That the Senate—

(1) supports the designation of May 2025 as "National Beef Month"; and

(2) recognizes that—

(A) historically, cattle production has contributed about 17 percent of the $520,000,000,000 in total cash receipts for agricultural commodities;

(B) the United States is also the largest consumer of beef in the world, primarily high-value, grain-fed beef; and

(C) beef is an excellent source of nutritious protein.

## SENATE RESOLUTION 242—CONDEMNING THE PRIVATE BUSINESS AGREEMENTS OF PRESIDENT DONALD J. TRUMP WITH FOREIGN GOVERNMENTS FOR POSING UNACCEPTABLE CONFLICTS OF INTEREST, AFFIRMING SUCH AGREEMENTS VIOLATE THE FOREIGN EMOLUMENTS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES, AND DEMANDING THE TRANSFER OF ANY PROCEEDS FROM SUCH AGREEMENTS TO THE UNITED STATES GOVERNMENT

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 242

Whereas President Donald J. Trump has pursued numerous new business deals with foreign states that will generate millions of dollars of revenue for President Trump and the Trump family;

Whereas LIV Golf, which is backed by the government of Saudi Arabia, hosted a tournament at Trump National Doral Resort in April 2025;

Whereas the Trump Organization is designing a Trump-branded hotel, golf course, and golf club on government-owned land in Oman and with a Saudi Arabian real estate firm that has close ties to the government of Saudi Arabia;

Whereas the Trump Organization has already received not less than $5,000,000 from the Trump-branded hotel deal in Oman;

Whereas the Trump Organization plans to build a $500,000,000 luxury residential and commercial complex and Trump International Hotel on government-owned land in Serbia;

Whereas the Trump Organization has signed a $5,500,000,000 deal with a Qatari government-owned firm and a Saudi Arabian company with close ties to the government of Saudi Arabia to build a luxury golf resort in Qatar, including Trump-branded beachside villas and an 18-hole golf course;

Whereas President Trump recently completed a 4-day tour of Saudi Arabia, Qatar, and the United Arab Emirates;

Whereas, prior to the 4-day tour, the sons of President Trump had traveled through the Middle East to pursue and announce a flurry of new deals for the Trump Organization, including a residential tower in Saudi Arabia and a hotel in Dubai;

Whereas President Trump has refused to divest from his financial interests and remains an owner of the Trump Organization;

Whereas engaging in private business transactions with a foreign government, and the acceptance of substantial payments and benefits from a foreign government, could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause has long been understood to be "'directed against every kind of influence by foreign governments upon officers of the United States,' in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved*, That the Senate—

(1) condemns the private business agreements of President Donald J. Trump with foreign governments for posing unacceptable conflicts of interest;

(2) affirms that any such agreements are violations of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress for any such agreements; and

(3) demands the transfer of any proceeds from any such agreements nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

## SENATE RESOLUTION 243—CONDEMNING THE FINANCIAL ENTANGLEMENTS OF WORLD LIBERTY FINANCIAL, INC. WITH PRESIDENT DONALD J. TRUMP, THE TRUMP FAMILY, AND THE TRUMP ADMINISTRATION

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 243

Whereas World Liberty Financial, Inc. (referred to in this preamble as "WLFI"), which is owned in part by President Donald J. Trump and members of the Trump family, launched in September 2024 with the promise of "driving the mass adoption of stablecoins and decentralized finance";

Whereas the Trump family took greater control over WLFI during the period immediately preceding the inauguration of the President, asserting a claim of more than 75 percent of net revenues from token sales and 60 percent from the operations of the firm;

Whereas WLFI started attracting new attention from investors after the 2024 election, raising $550,000,000 from the governance

token issued by WLFI, with half of those investors spending more than $1,000,000 each;

Whereas the financial ties of President Trump to WLFI allow and invite anyone in the world, including foreign governments and unscrupulous individuals, to directly enrich the President and the Trump family, while hiding potential payoffs in the pseudonymity of the blockchain;

Whereas Justin Sun, who was facing a civil fraud case beginning in 2023 from the Securities and Exchange Commission over allegations of market manipulation and unregistered asset sales, has invested $75,000,000 in WLFI and announced that his blockchain project, TRON, would be a partner on the WLFI stablecoin named USD1;

Whereas the Securities and Exchange Commission under President Trump has paused the litigation against Justin Sun, and Justin Sun is now seeking to favorably settle;

Whereas reporting indicates that the blockchain project TRON of Justin Sun has become a preferred payment platform for Hamas and Hezbollah to evade United States sanctions;

Whereas WLFI has reportedly used the Trump name to solicit substantial investments from cryptocurrency startups, asking for between $10,000,000 and $30,000,000 in investment in the governance token issued by WLFI, while WLFI would buy a smaller amount of the digital coins of the startup in return and pocket the difference for WLFI;

Whereas DWF Labs, a Dubai-based cryptocurrency firm suspected of engaging in market manipulation, has invested $25,000,000 in the governance token issued by WLFI, making it one of the largest holders of the governance token;

Whereas, on May 1, 2025, MGX Fund Management Limited, an investment firm established and backed by the government of the United Arab Emirates, announced an agreement to use the WLFI stablecoin to complete a $2,000,000,000 deal with Binance Holdings, Ltd.;

Whereas, as a result of the deal between MGX Fund Management Limited and Binance Holdings, Ltd., President Trump and the Trump family could stand to receive hundreds of millions of dollars from a foreign state;

Whereas representatives of the Trump family have reportedly held talks with Binance Holdings, Ltd. about investing in the United States arm of Binance Holdings, Ltd.;

Whereas Binance Holdings, Ltd. pleaded guilty to violating anti-money-laundering laws in 2023, and the founder of Binance Holdings, Ltd., Changpeng Zhao, has served 4 months in prison after pleading guilty to related charges;

Whereas the Securities and Exchange Commission under President Trump has paused a civil lawsuit against Binance Holdings, Ltd.;

Whereas Binance Holdings, Ltd. executives have reportedly met with officials of the Department of the Treasury to discuss loosening United States Government oversight on the company;

Whereas Binance Holdings, Ltd. founder Changpeng Zhao is reportedly seeking a formal pardon from the Trump Administration;

Whereas President Trump has used the Federal Government to enrich cryptocurrency firms through the creation of a Strategic Bitcoin Reserve and United States Digital Asset Stockpile and used the White House to promote cryptocurrencies;

Whereas WLFI business partners and other cryptocurrency interests donated millions of dollars to the inauguration fund of President Trump;

Whereas the financial entanglements of WLFI with the President, the Trump family, and the Trump Administration present unprecedented conflicts of interest, national security risks, and constitutional violations;

Whereas the acceptance of a substantial payment from a foreign government could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause of the Constitution of the United States has long been understood to be ''directed against every kind of influence by foreign governments upon officers of the United States, in the absence of consent by Congress'';

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved*, That the Senate—

(1) condemns the financial entanglements of World Liberty Financial, Inc. with President Donald J. Trump, the Trump family, and the Trump Administration for—

(A) potentially enabling the violation of Government ethics requirements;

(B) facilitating investments from foreign governments and financial transactions with foreign nationals under Federal prosecution; and

(C) posing unacceptable conflicts of interest;

(2) affirms that the agreement between MGX Fund Management Limited and World Liberty Financial, Inc. is a violation of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress for such agreement; and

(3) demands the transfer of any proceeds from any such agreement nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

## SENATE RESOLUTION 244—AFFIRMING THAT THE UNDERLYING PURPOSE OF THE FOREIGN EMOLUMENTS CLAUSE RENDERS THE ACCEPTANCE AND TRANSFER OF A PLANE FROM THE GOVERNMENT OF QATAR, WITHOUT THE EXPLICIT CONSENT OF CONGRESS, AN ILLEGAL EMOLUMENT, WITHHOLDING THE CONSENT OF THE SENATE TO THE ACCEPTANCE AND TRANSFER OF PLANE FROM THE GOVERNMENT OF QATAR, AND DEMANDING THE TRANSFER OF ANY PLANE RECEIVED BY PRESIDENT DONALD J. TRUMP OR ENTITIES UNDER HIS CONTROL FROM THE GOVERNMENT OF QATAR TO THE PERMANENT CONTROL OF THE UNITED STATES GOVERNMENT

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 244

Whereas President Donald J. Trump reportedly plans to—

(1) accept a Boeing 747-8 jumbo jet from the government of Qatar for United States Government use as Air Force One during the Trump Administration; and

(2) transfer that plane nominally to the Donald J. Trump Presidential Library shortly before the expiration of the term of office of President Trump but continue personal use of the plane after the Presidency of President Trump;

Whereas the estimated value of the plane is $400,000,000, making the plane one of the biggest gifts to the United States from a foreign government, if accepted;

Whereas Air Force One is equipped with advanced, specialized communications technologies, so that Air Force One may transmit highly classified national security information and serve as a mobile command center in the event of an attack on the United States;

Whereas accepting a plane from a foreign government poses counterintelligence and other national security concerns, such as the insertion of listening devices on the plane;

Whereas ensuring the plane is free from all security risks, including listening devices, could require stripping the plane down to its parts;

Whereas retrofitting the Qatari plane to serve as Air Force One also requires the installation of multiple top-secret systems that enable secure Government communications, midair refueling, and missile defense and that protect against electronic jamming and electromagnetic pulse attacks;

Whereas such a process could cost taxpayers more than $1,000,000,000 and take years to complete;

Whereas the only means of speeding up such work requires relaxing current Air Force One security rules;

Whereas, even if such work is sped up, the Qatari plane may only be ready near the end of the term of office of President Trump, at which time the plane will be turned over to the Donald J. Trump Presidential Library;

Whereas all fees related to the transfer of the plane to the Donald J. Trump Presidential Library reportedly will be paid by the United States Air Force, rather than by President Trump himself;

Whereas the acceptance of a substantial gift from a foreign government could unduly influence the foreign policies of the United States;

Whereas the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause has long been understood to be "'directed against every kind of influence by foreign governments upon officers of the United States,' in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved*, That the Senate—

(1) affirms that the underlying purpose of the Foreign Emoluments Clause of the Constitution of the United States renders the acceptance and transfer of a plane from the government of Qatar, without the explicit consent of Congress, an illegal emolument, regardless of the legal technicalities of ownership;

(2) withholds the consent of the Senate to the acceptance and transfer of any plane from the government of Qatar, as such acceptance and transfer poses unacceptable potential costs to taxpayers in the United States as well as grave risks to national security and of foreign corruption; and

(3) demands the transfer of any plane received by President Donald J. Trump or entities under the control of President Trump from the government of Qatar, in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States, to the permanent control of the United States Government.

## SENATE RESOLUTION 245—CONDEMNING THE FINANCIAL ENTANGLEMENTS OF PRESIDNET DONALD J. TRUMP WITH THE $TRUMP MEME COIN

Mr. BLUMENTHAL submitted the following resolution; which was referred to the Committee on Homeland Security and Governmental Affairs:

S. RES. 245

Whereas, on January 17, 2025, Fight Fight Fight LLC launched the "OFFICIAL TRUMP" cryptocurrency (referred to in this preamble as "$TRUMP"), which is a meme coin;

Whereas a meme coin is a type of asset purchased "for entertainment, social interaction, and cultural purposes", with the value of the asset "driven primarily by market demand and speculation";

Whereas the $TRUMP website states in the disclaimers of the website that the product is "not intended to be . . . an investment opportunity", but rather to function as "an expression of support for, and engagement with, the ideals and beliefs embodied by the symbol '$TRUMP' ";

Whereas President Trump himself promoted the venture at the time of launch, and on multiple occasions since the launch has encouraged investors to "join [his] very special Trump Community";

Whereas, within 2 days of launch, the price for $TRUMP skyrocketed over 10 times to $74.27 before steeply declining to settle at $7.50 by April 2025;

Whereas, in the face of dwindling value and steep losses for hundreds of thousands of investors, on April 23, 2025, Fight Fight Fight LLC announced a "Dinner with Trump" competition that promised an evening with the President to discuss cryptocurrency policy at Trump National Club in Washington, D.C., for the top 220 holders of $TRUMP;

Whereas, in addition to the dinner, the promotion offered a "Special VIP White House Tour" for the top 25 holders before removing the reference to the White House;

Whereas the price of $TRUMP rose more than 50 percent with a significant surge in trading volume following the announcement of the promotional dinner;

Whereas $TRUMP allows and invites anyone in the world, potentially even foreign governments and unscrupulous individuals, to directly enrich the President, while hiding potential payoffs in the pseudonymity of the blockchain;

Whereas the top holders of $TRUMP are reported to be foreign nationals and entities, which may include individuals or entities tied to foreign governments;

Whereas a Chinese-linked firm, GD Culture Group, which nominally produces content for TikTok, has raised up to $300,000,000 from an unidentified investor to purchase $TRUMP and Bitcoin, despite having no revenue;

Whereas a shipping firm with operations in Mexico raised $20,000,000 to purchase $TRUMP for the express purpose of influencing the tariff policy of the United States;

Whereas Justin Sun, who was facing a civil fraud case from the Securities and Exchange Commission over allegations of market manipulation and unregistered asset sales, is believed to be the top holder of $TRUMP;

Whereas the Securities and Exchange Commission under President Trump paused the litigation against Justin Sun, and Sun is now seeking to favorably settle;

Whereas President Trump financially benefits from the market value and activity of the $TRUMP, as Fight Fight Fight LLC and CIC Digital LLC, an affiliate of the Trump Organization, collectively own 80 percent of the 1,000,000,000 issued $TRUMP coins, which are currently worth $10,500,000,000 in market value;

Whereas both Fight Fight Fight LLC and CIC Digital LLC, as well as the affiliated "Celebration Cards LLC", receive transaction fees derived from trading activities, making surges in trading from the promotion of the $TRUMP coin by President Trump and competition particularly lucrative;

Whereas the $TRUMP coin has generated $350,000,000 in fees for Fight Fight Fight LLC and partners of Fight Fight Fight LLC, including over $1,000,000 since the "Dinner with Trump" announcement;

Whereas the financial entanglements of President Trump with the $TRUMP coin, as well as the attempted use of the White House to host competitions to prop up the value of $TRUMP, represent an unprecedented, pay-to-play scheme to provide access to the Presidency to the highest bidder;

Whereas the purchase by a foreign government of $TRUMP would violate the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States, which provides that no present, emolument, office, or title, of any kind, may be accepted by the President of the United States from a king, prince, or foreign state without the consent of Congress;

Whereas the Founders included the Foreign Emoluments Clause in the Constitution of the United States, by unanimous agreement of the State delegations, to ensure the President would remain loyal to the Nation and the public interest;

Whereas the Foreign Emoluments Clause of the Constitution of the United States has long been understood to be "directed against every kind of influence by foreign governments upon officers of the United States, in the absence of consent by Congress";

Whereas the President of the United States has a constitutional and statutory obligation to uphold the public trust; and

Whereas the violation of the Foreign Emoluments Clause of the Constitution of the United States undermines public trust and the integrity of public office in the United States: Now, therefore, be it

*Resolved*, That the Senate—

(1) condemns the financial entanglements of President Donald J. Trump with the $TRUMP meme coin for—

(A) permitting and facilitating covert payments to the President and the Trump family, including potential investments from foreign governments and foreign nationals under Federal prosecution; and

(B) auctioning access to the Presidency in return for the purchase of the cryptocurrency of President Trump;

(2) affirms that any purchase of $TRUMP by a foreign government is a violation of the Foreign Emoluments Clause of the Constitution of the United States because President Donald J. Trump did not seek the consent of Congress before accepting such payments; and

(3) demands the transfer of any proceeds from any foreign government purchase of $TRUMP nevertheless received by President Donald J. Trump in violation of the Foreign Emoluments Clause contained in clause 8 of section 9 of article I of the Constitution of the United States to the United States Government.

## AMENDMENTS SUBMITTED AND PROPOSED

SA 2236. Mr. TUBERVILLE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table.

SA 2237. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2238. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2239. Mr. HAWLEY (for himself and Mr. SANDERS) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2240. Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2241. Mr. HAGERTY (for himself, Mrs. GILLIBRAND, Mr. SCOTT of South Carolina, and Ms. LUMMIS) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2242. Mr. WHITEHOUSE submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2243. Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2244. Mr. DURBIN (for himself and Mr. WARNOCK) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2245. Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2246. Mr. DURBIN (for himself, Mr. BLUMENTHAL, Mr. REED, and Ms. WARREN) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2247. Mr. LEE submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2248. Mr. TUBERVILLE submitted an amendment intended to be proposed to amendment SA 2228 proposed by Mr. THUNE (for Mr. RICKETTS (for himself and Ms. LUMMIS)) to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2249. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2250. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2251. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2252. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2253. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2254. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2255. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2256. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2257. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2258. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2259. Mr. MURPHY submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2260. Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2261. Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2262. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2263. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2264. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2265. Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 2236.** Mr. TUBERVILLE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 18(a), add at the end the following:

(5) The foreign payment stablecoin issuer is not owned, in whole or in part, by—

(A) the People's Republic of China, including the Hong Kong Special Administrative Region and the Macao Special Administrative Region;

(B) the Republic of Cuba;

(C) the Islamic Republic of Iran;

(D) the Democratic People's Republic of Korea;

(E) the Russian Federation; or

(F) the Bolivarian Republic of Venezuela under the regime of Nicolás Maduro Moros.

**SA 2237.** Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

**TITLE II—STOP CSAM ACT**

**SEC. 201. SHORT TITLE.**

This title may be cited as the ''Strengthening Transparency and Obligations to Protect Children Suffering from Abuse and Mistreatment Act of 2025'' or the ''STOP CSAM Act of 2025''.

**SEC. 202. PROTECTING CHILD VICTIMS AND WITNESSES IN FEDERAL COURT.**

(a) IN GENERAL.—Section 3509 of title 18, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (2)(A), by striking ''or exploitation'' and inserting ''exploitation, or kidnapping, including international parental kidnapping'';

(B) in paragraph (3), by striking ''physical or mental injury'' and inserting ''physical injury, psychological abuse'';

(C) by striking paragraphs (5), (6), and (7) and inserting the following:

''(5) the term 'psychological abuse' includes—

''(A) a pattern of acts, threats of acts, or coercive tactics intended to degrade, humiliate, intimidate, or terrorize a child; and

''(B) the infliction of trauma on a child through—

''(i) isolation;

''(ii) the withholding of food or other necessities in order to control behavior;

''(iii) physical restraint; or

''(iv) the confinement of the child without the child's consent and in degrading conditions;

''(6) the term 'exploitation' means—

''(A) child pornography;

''(B) child sex trafficking; or

''(C) an obscene visual depiction of a child;

''(7) the term 'multidisciplinary child abuse team' means a professional unit of individuals working together to investigate child abuse and provide assistance and support to a victim of child abuse, composed of representatives from—

''(A) health, social service, and legal service agencies that represent the child;

''(B) law enforcement agencies and prosecutorial offices; and

''(C) children's advocacy centers;'';

(D) in paragraph (9)(D)—

(i) by striking ''genitals'' and inserting ''anus, genitals,''; and

(ii) by striking ''or animal'';

(E) in paragraph (11), by striking ''and'' at the end;

(F) in paragraph (12)—

(i) by striking ''the term 'child abuse' does not'' and inserting ''the terms 'physical injury' and 'psychological abuse' do not''; and

(ii) by striking the period and inserting a semicolon; and

(G) by adding at the end the following:

''(13) the term 'covered person' means a person of any age who—

''(A) is or is alleged to be—

''(i) a victim of a crime of physical abuse, sexual abuse, exploitation, or kidnapping, including international parental kidnapping; or

''(ii) a witness to a crime committed against another person; and

''(B) was under the age of 18 when the crime described in subparagraph (A) was committed;

''(14) the term 'protected information', with respect to a covered person, includes—

''(A) personally identifiable information of the covered person, including—

''(i) the name of the covered person;

''(ii) an address;

''(iii) a phone number;

''(iv) a user name or identifying information for an online, social media, or email account; and

''(v) any information that can be used to distinguish or trace the identity of the covered person, either alone or when combined with other information that is linked or linkable to the covered person;

''(B) medical, dental, behavioral, psychiatric, or psychological information of the covered person;

''(C) educational or juvenile justice records of the covered person; and

''(D) any other information concerning the covered person that is deemed 'protected information' by order of the court under subsection (d)(5);

''(15) the term 'child pornography' has the meaning given the term in section 2256(8); and

''(16) the term 'obscene visual depiction of a child' means any visual depiction prohibited by section 1466A involving an identifiable minor, as that term is defined in section 2256(9).'';

(2) in subsection (b)—

(A) in paragraph (1)(C), by striking ''minor'' and inserting ''child''; and

(B) in paragraph (2)—

(i) in the heading, by striking ''VIDEOTAPED'' and inserting ''RECORDED'';

(ii) in subparagraph (A), by striking ''that the deposition be recorded and preserved on videotape'' and inserting ''that a video recording of the deposition be made and preserved'';

(iii) in subparagraph (B)—

(I) in clause (ii), by striking ''that the child's deposition be taken and preserved by videotape'' and inserting ''that a video recording of the child's deposition be made and preserved'';

(II) in clause (iii)—

(aa) in the matter preceding subclause (I), by striking ''videotape'' and inserting ''recorded''; and

(bb) in subclause (IV), by striking ''videotape'' and inserting ''recording''; and

(III) in clause (v)—

(aa) in the heading, by striking ''VIDEOTAPE'' and inserting ''VIDEO RECORDING'';

(bb) in the first sentence, by striking ''made and preserved on video tape'' and inserting ''recorded and preserved''; and

(cc) in the second sentence, by striking ''videotape'' and inserting ''video recording'';

(iv) in subparagraph (C), by striking ''child's videotaped'' and inserting ''video recording of the child's'';

(v) in subparagraph (D)—

(I) by striking ''videotaping'' and inserting ''deposition''; and

(II) by striking ''videotaped'' and inserting ''recorded'';

(vi) in subparagraph (E), by striking ''videotaped'' and inserting ''recorded''; and

(vii) in subparagraph (F), by striking ''videotape'' each place the term appears and inserting ''video recording'';

(3) in subsection (d)—

(A) in paragraph (1)(A)—

(i) in clause (i), by striking ''the name of or any other information concerning a child'' and inserting ''a covered person's protected information''; and

(ii) in clause (ii)—

(I) by striking ''documents described in clause (i) or the information in them that concerns a child'' and inserting ''a covered person's protected information''; and

(II) by striking '', have reason to know such information'' and inserting ''(including witnesses or potential witnesses), have reason to know each item of protected information to be disclosed'';

(B) in paragraph (2)—

(i) by striking ''the name of or any other information concerning a child'' each place the term appears and inserting ''a covered person's protected information'';

(ii) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively, and adjusting the margins accordingly;

(iii) by striking ''All papers'' and inserting the following:

''(A) IN GENERAL.—All papers''; and

(iv) by adding at the end the following:

''(B) ENFORCEMENT OF VIOLATIONS.—The court may address a violation of subparagraph (A) in the same manner as disobedience or resistance to a lawful court order under section 401(3).'';

(C) in paragraph (3)—

(i) in subparagraph (A)—

(I) by striking ''a child from public disclosure of the name of or any other information concerning the child'' and inserting ''a covered person's protected information from public disclosure''; and

(II) by striking '', if the court determines that there is a significant possibility that such disclosure would be detrimental to the child'';

(ii) in subparagraph (B)—

(I) in clause (i)—

(aa) by striking ''a child witness, and the testimony of any other witness'' and inserting ''any witness''; and

(bb) by striking ''the name of or any other information concerning a child'' and inserting ''a covered person's protected information''; and

(II) in clause (ii), by striking ''child'' and inserting ''covered person''; and

(iii) by adding at the end the following:

''(C)(i) For purposes of this paragraph, there shall be a presumption that public disclosure of a covered person's protected information would be detrimental to the covered person.

''(ii) The court shall deny a motion for a protective order under subparagraph (A) only if the court finds that the party opposing the motion has rebutted the presumption under clause (i) of this subparagraph.'';

(D) in paragraph (4)—

(i) by striking ''This subsection'' and inserting the following:

''(A) DISCLOSURE TO CERTAIN PARTIES.—This subsection'';

(ii) in subparagraph (A), as so designated—

(I) by striking ''the name of or other information concerning a child'' and inserting ''a covered person's protected information''; and

(II) by striking ''or an adult attendant, or to'' and inserting ''an adult attendant, a law enforcement agency for any intelligence or investigative purpose, or''; and

(iii) by adding at the end the following:

''(B) REQUEST FOR PUBLIC DISCLOSURE.—If any party requests public disclosure of a covered person's protected information to further a public interest, the court shall deny the request unless the court finds that—

''(i) the party seeking disclosure has established that there is a compelling public interest in publicly disclosing the covered person's protected information;

''(ii) there is a substantial probability that the public interest would be harmed if the covered person's protected information is not disclosed;

''(iii) the substantial probability of harm to the public interest outweighs the harm to the covered person from public disclosure of the covered person's protected information; and

''(iv) there is no alternative to public disclosure of the covered person's protected information that would adequately protect the public interest.''; and

(E) by adding at the end the following:

''(5) OTHER PROTECTED INFORMATION.—The court may order that information shall be considered to be 'protected information' for purposes of this subsection if the court finds that the information is sufficiently personal, sensitive, or identifying that it should be subject to the protections and presumptions under this subsection.'';

(4) by striking subsection (f) and inserting the following:

''(f) VICTIM IMPACT STATEMENT.—

''(1) PROBATION OFFICER.—In preparing the presentence report pursuant to rule 32(c) of the Federal Rules of Criminal Procedure, the probation officer shall request information from the multidisciplinary child abuse team, if applicable, or other appropriate sources to determine the impact of the offense on a child victim and any other children who may have been affected by the offense.

''(2) GUARDIAN AD LITEM.—A guardian ad litem appointed under subsection (h) shall—

''(A) make every effort to obtain and report information that accurately expresses the views of a child victim, and the views of family members as appropriate, concerning the impact of the offense; and

''(B) use forms that permit a child victim to express the child's views concerning the personal consequences of the offense, at a level and in a form of communication commensurate with the child's age and ability.'';

(5) in subsection (h), by adding at the end the following:

''(4) AUTHORIZATION OF APPROPRIATIONS.—

''(A) IN GENERAL.—There is authorized to be appropriated to the United States courts to carry out this subsection $25,000,000 for each fiscal year.

''(B) SUPERVISION OF PAYMENTS.—Payments from appropriations authorized under subparagraph (A) shall be made under the supervision of the Director of the Administrative Office of the United States Courts.'';

(6) in subsection (i)—

(A) by striking ''A child testifying at or attending a judicial proceeding'' and inserting the following:

''(1) IN GENERAL.—A child testifying at a judicial proceeding, including in a manner described in subsection (b),'';

(B) in paragraph (1), as so designated—

(i) in the third sentence, by striking ''proceeding'' and inserting ''testimony''; and

(ii) by striking the fifth sentence; and

(C) by adding at the end the following:

''(2) RECORDING.—If the adult attendant is in close physical proximity to or in contact with the child while the child testifies—

''(A) at a judicial proceeding, a video recording of the adult attendant shall be made and shall become part of the court record; or

''(B) in a manner described in subsection (b), the adult attendant shall be visible on the closed-circuit television or in the recorded deposition.

''(3) COVERED PERSONS ATTENDING PROCEEDING.—A covered person shall have the right to be accompanied by an adult attendant when attending any judicial proceeding.'';

(7) in subsection (j)—

(A) by striking ''child'' each place the term appears and inserting ''covered person''; and

(B) in the fourth sentence—

(i) by striking ''and the potential'' and inserting '', the potential'';

(ii) by striking ''child's'' and inserting ''covered person's''; and

(iii) by inserting before the period at the end the following: '', and the necessity of the continuance to protect the defendant's rights'';

(8) in subsection (k), by striking ''child'' each place the term appears and inserting ''covered person'';

(9) in subsection (l), by striking ''child'' each place the term appears and inserting ''covered person''; and

(10) in subsection (m)—

(A) by striking ''(as defined by section 2256 of this title)'' each place it appears;

(B) by inserting ''or an obscene visual depiction of a child'' after ''child pornography'' each place it appears except the second instance in paragraph (3);

(C) in paragraph (1), by inserting ''and any civil action brought under section 2255 or 2255A'' after ''any criminal proceeding'';

(D) in paragraph (2), by adding at the end the following:

''(C)(i) Notwithstanding rule 26 of the Federal Rules of Civil Procedure, a court shall deny, in any civil action brought under section 2255 or 2255A, any request by any party to copy, photograph, duplicate, or otherwise reproduce any property or material that constitutes child pornography or an obscene visual depiction of a child.

''(ii) In a civil action brought under section 2255 or 2255A, for purposes of paragraph (1), the court may—

''(I) order the plaintiff or defendant to provide to the court or the Government, as applicable, any equipment necessary to maintain care, custody, and control of such property or material; and

''(II) take reasonable measures, and may order the Government (if such property or material is in the care, custody, and control of the Government) to take reasonable measures, to provide each party to the action, the attorney of each party, and any individual a party may seek to qualify as an expert, with ample opportunity to inspect, view, and examine such property or material at the court or a Government facility, as applicable.''; and

(E) in paragraph (3)—

(i) by inserting ''and during the 1-year period following the date on which the criminal proceeding becomes final or is terminated'' after ''any criminal proceeding'';

(ii) by striking '', as defined under section 2256(8),''; and

(iii) by inserting ''or obscene visual depiction of a child'' after ''such child pornography''.

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to conduct that occurs before, on, or after the date of enactment of this Act.

**SEC. 203. FACILITATING PAYMENT OF RESTITUTION; TECHNICAL AMENDMENTS TO RESTITUTION STATUTES.**

Title 18, United States Code, is amended—

(1) in section 1593(c)—

(A) by inserting ''(1)'' after ''(c)'';

(B) by striking ''chapter, including, in'' and inserting the following: ''chapter.

''(2) In''; and

(C) in paragraph (2), as so designated, by inserting ''may assume the rights of the victim under this section'' after ''suitable by the court'';

(2) in section 2248(c)—

(A) by striking ''For purposes'' and inserting the following:

''(1) IN GENERAL.—For purposes'';

(B) by striking ''chapter, including, in'' and inserting the following: ''chapter.

''(2) ASSUMPTION OF CRIME VICTIM'S RIGHTS.—In''; and

(C) in paragraph (2), as so designated, by inserting ''may assume the rights of the victim under this section'' after ''suitable by the court'';

(3) in section 2259—

(A) by striking subsection (a) and inserting the following:

''(a) IN GENERAL.—Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under—

''(1) section 1466A, to the extent the conduct involves a visual depiction of an identifiable minor; or

''(2) this chapter.'';

(B) in subsection (b)—

(i) in paragraph (1), by striking ''DIRECTIONS.—Except as provided in paragraph (2), the'' and inserting ''RESTITUTION FOR CHILD PORNOGRAPHY PRODUCTION.—If the defendant was convicted of child pornography production, the''; and

(ii) in paragraph (2)(B), by striking ''$3,000.'' and inserting the following: ''—

''(i) $3,000; or

''(ii) 10 percent of the full amount of the victim's losses, if the full amount of the victim's losses is less than $3,000.''; and

(C) in subsection (c)—

(i) by striking paragraph (1) and inserting the following:

''(1) CHILD PORNOGRAPHY PRODUCTION.—For purposes of this section and section 2259A, the term 'child pornography production' means—

''(A) a violation of, attempted violation of, or conspiracy to violate section 1466A(a) to the extent the conduct involves production of a visual depiction of an identifiable minor;

''(B) a violation of, attempted violation of, or conspiracy to violate section 1466A(a) involving possession with intent to distribute, or section 1466A(b), to the extent the conduct involves a visual depiction of an identifiable minor—

''(i) produced by the defendant; or

''(ii) that the defendant attempted or conspired to produce;

''(C) a violation of subsection (a), (b), or (c) of section 2251, or an attempt or conspiracy to violate any of those subsections under subsection (e) of that section;

''(D) a violation of section 2251A;

''(E) a violation of section 2252(a)(4) or 2252A(a)(5), or an attempt or conspiracy to violate either of those sections under section 2252(b)(2) or 2252A(b)(2), to the extent such conduct involves child pornography—

''(i) produced by the defendant; or

''(ii) that the defendant attempted or conspired to produce;

''(F) a violation of subsection (a)(7) of section 2252A, or an attempt or conspiracy to violate that subsection under subsection (b)(3) of that section, to the extent the conduct involves production with intent to distribute;

''(G) a violation of section 2252A(g) if the series of felony violations involves not fewer than 1 violation—

''(i) described in subparagraph (A), (B), (E), or (F) of this paragraph;

''(ii) of section 1591; or

''(iii) of section 1201, chapter 109A, or chapter 117, if the victim is a minor;

''(H) a violation of subsection (a) of section 2260, or an attempt or conspiracy to violate that subsection under subsection (c)(1) of that section;

''(I) a violation of section 2260B(a)(2) for promoting or facilitating an offense—

''(i) described in subparagraph (A), (B), (D), or (E) of this paragraph; or

''(ii) under section 2422(b); and

''(J) a violation of chapter 109A or chapter 117, if the offense involves the production or attempted production of, or conspiracy to produce, child pornography.'';

(ii) by striking paragraph (3) and inserting the following:

''(3) TRAFFICKING IN CHILD PORNOGRAPHY.—For purposes of this section and section 2259A, the term 'trafficking in child pornography' means—

''(A) a violation of, attempted violation of, or conspiracy to violate section 1466A(a) to the extent the conduct involves distribution or receipt of a visual depiction of an identifiable minor;

''(B) a violation of, attempted violation of, or conspiracy to violate section 1466A(a) involving possession with intent to distribute, or section 1466A(b), to the extent the conduct involves a visual depiction of an identifiable minor—

''(i) not produced by the defendant; or

''(ii) that the defendant did not attempt or conspire to produce;

''(C) a violation of subsection (d) of section 2251 or an attempt or conspiracy to violate that subsection under subsection (e) of that section;

''(D) a violation of paragraph (1), (2), or (3) of subsection (a) of section 2252, or an attempt or conspiracy to violate any of those paragraphs under subsection (b)(1) of that section;

''(E) a violation of section 2252(a)(4) or 2252A(a)(5), or an attempt or conspiracy to violate either of those sections under section 2252(b)(2) or 2252A(b)(2), to the extent such conduct involves child pornography—

''(i) not produced by the defendant; or

''(ii) that the defendant did not attempt or conspire to produce;

''(F) a violation of paragraph (1), (2), (3), (4), or (6) of subsection (a) of section 2252A, or an attempt or conspiracy to violate any of those paragraphs under subsection (b)(1) of that section;

''(G) a violation of subsection (a)(7) of section 2252A, or an attempt or conspiracy to violate that subsection under subsection (b)(3) of that section, to the extent the conduct involves distribution;

''(H) a violation of section 2252A(g) if the series of felony violations exclusively involves violations described in this paragraph (except subparagraphs (A) and (B));

''(I) a violation of subsection (b) of section 2260, or an attempt or conspiracy to violate that subsection under subsection (c)(2) of that section; and

''(J) a violation of subsection (a)(1) of section 2260B, or a violation of subsection (a)(2) of that section for promoting or facilitating an offense described in this paragraph (except subparagraphs (A) and (B)).''; and

(iii) in paragraph (4), in the first sentence, by inserting ''or an identifiable minor harmed as a result of the commission of a crime under section 1466A'' after ''under this chapter'';

(4) in section 2259A(a)—

(A) in paragraph (1), by striking ''under section 2252(a)(4) or 2252A(a)(5)'' and inserting ''described in subparagraph (B) or (E) of section 2259(c)(3)''; and

(B) in paragraph (2), by striking ''any other offense for trafficking in child pornography'' and inserting ''any offense for trafficking in child pornography other than an offense described in subparagraph (B) or (E) of section 2259(c)(3)'';

(5) in section 2429—

(A) in subsection (b)(3), by striking ''2259(b)(3)'' and inserting ''2259(c)(2)''; and

(B) in subsection (d)—

(i) by inserting ''(1)'' after ''(d)'';

(ii) by striking ''chapter, including, in'' and inserting the following: ''chapter.

''(2) In''; and

(iii) in paragraph (2), as so designated, by inserting ''may assume the rights of the victim under this section'' after ''suitable by the court''; and

(6) in section 3664, by adding at the end the following:

''(q) TRUSTEE OR OTHER FIDUCIARY.—

''(1) IN GENERAL.—

''(A) APPOINTMENT OF TRUSTEE OR OTHER FIDUCIARY.—When the court issues an order of restitution under section 1593, 2248, 2259, 2429, or 3663, or subparagraphs (A)(i) and (B) of section 3663A(c)(1), for a victim described in subparagraph (B) of this paragraph, the court, at its own discretion or upon motion by the Government, may appoint a trustee or other fiduciary to hold any amount paid for restitution in a trust or other official account for the benefit of the victim.

''(B) COVERED VICTIMS.—A victim referred to in subparagraph (A) is a victim who is—

''(i) under the age of 18 at the time of the proceeding;

''(ii) incompetent or incapacitated; or

''(iii) subject to paragraph (3), a foreign citizen or stateless person residing outside the United States.

''(2) ORDER.—When the court appoints a trustee or other fiduciary under paragraph (1), the court shall issue an order specifying—

''(A) the duties of the trustee or other fiduciary, which shall require—

''(i) the administration of the trust or maintaining an official account in the best interests of the victim; and

''(ii) disbursing payments from the trust or account—

''(I) to the victim; or

''(II) to any individual or entity on behalf of the victim;

''(B) that the trustee or other fiduciary—

''(i) shall avoid any conflict of interest;

''(ii) may not profit from the administration of the trust or maintaining an official account for the benefit of the victim other than as specified in the order; and

''(iii) may not delegate administration of the trust or maintaining the official account to any other person;

''(C) if and when the trust or the duties of the other fiduciary will expire; and

''(D) the fees payable to the trustee or other fiduciary to cover expenses of administering the trust or maintaining the official account for the benefit of the victim, and the schedule for payment of those fees.

''(3) FACT-FINDING REGARDING FOREIGN CITIZENS AND STATELESS PERSON.—In the case of a victim who is a foreign citizen or stateless person residing outside the United States and is not under the age of 18 at the time of the proceeding or incompetent or incapacitated, the court may appoint a trustee or other fiduciary under paragraph (1) only if the court finds it necessary to—

''(A) protect the safety or security of the victim; or

''(B) provide a reliable means for the victim to access or benefit from the restitution payments.

''(4) PAYMENT OF FEES.—

''(A) IN GENERAL.—The court may, with respect to the fees of the trustee or other fiduciary—

''(i) pay the fees in whole or in part; or

''(ii) order the defendant to pay the fees in whole or in part.

''(B) APPLICABILITY OF OTHER PROVISIONS.—With respect to a court order under subparagraph (A)(ii) requiring a defendant to pay fees—

''(i) subsection (f)(3) shall apply to the court order in the same manner as that subsection applies to a restitution order;

''(ii) subchapter C of chapter 227 (other than section 3571) shall apply to the court order in the same manner as that subchapter applies to a sentence of a fine; and

''(iii) subchapter B of chapter 229 shall apply to the court order in the same manner as that subchapter applies to the implementation of a sentence of a fine.

''(C) EFFECT ON OTHER PENALTIES.—Imposition of payment under subparagraph (A)(ii) shall not relieve a defendant of, or entitle a defendant to a reduction in the amount of, any special assessment, restitution, other fines, penalties, or costs, or other payments required under the defendant's sentence.

''(D) SCHEDULE.—Notwithstanding any other provision of law, if the court orders the defendant to make any payment under subparagraph (A)(ii), the court may provide a payment schedule that is concurrent with the payment of any other financial obligation described in subparagraph (C).

''(5) AUTHORIZATION OF APPROPRIATIONS.—

''(A) IN GENERAL.—There is authorized to be appropriated to the United States courts to carry out this subsection $15,000,000 for each fiscal year.

''(B) SUPERVISION OF PAYMENTS.—Payments from appropriations authorized under subparagraph (A) shall be made under the supervision of the Director of the Administrative Office of the United States Courts.''.

**SEC. 204. CYBERTIPLINE IMPROVEMENTS, AND ACCOUNTABILITY AND TRANSPARENCY BY THE TECH INDUSTRY.**

(a) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended—

(1) in section 2258A—

(A) by striking subsections (a), (b), and (c) and inserting the following:

''(a) DUTY TO REPORT.—

''(1) DUTY.—In order to reduce the proliferation of online child sexual exploitation and to prevent the online sexual exploitation of children, as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances described in paragraph (2) or any apparent child pornography on the provider's service, and in any event not later than 60 days after obtaining such knowledge, a provider shall submit to the CyberTipline of NCMEC, or any successor to the CyberTipline operated by NCMEC, a report that—

''(A) shall contain—

''(i) the mailing address, telephone number, facsimile number, electronic mailing address of, and individual point of contact for, such provider; and

''(ii) information or material described in subsection (b)(1)(A) concerning such facts or circumstances or apparent child pornography; and

''(B) may contain information described in subsection (b)(2), including any available information to identify or locate any involved minor.

''(2) FACTS OR CIRCUMSTANCES.—The facts or circumstances described in this paragraph are any facts or circumstances indicating an apparent, planned, or imminent violation of section 1591 (if the violation involves a minor), 2251, 2251A, 2252, 2252A, 2252B, 2260, or 2422(b).

''(3) COMPLAINANT INFORMATION.—For a report premised on a complaint or notification submitted to a provider by a user of the provider's product or service, or a parent, guardian, or representative of such user, the provider shall take reasonable measures to determine what information or material in the user's account shall be included in the report as provided in subsection (b)(1)(A)(vi).

''(b) CONTENTS OF REPORT.—

''(1) IN GENERAL.—In an effort to prevent the future sexual victimization of children, and to the extent the information is within the custody or control of a provider, each report provided under subsection (a)(1)—

''(A) shall include, to the extent that it is applicable and reasonably available—

''(i) the name, address, electronic mail address, user or account identification, Internet Protocol address, port number, and uniform resource locator of any individual who is a subject of the report;

''(ii) the terms of service in effect at the time of—

''(I) the apparent violation; or

''(II) the detection of apparent child pornography or a planned or imminent violation;

''(iii) a copy of any apparent child pornography that is the subject of the report, or all accessible chats, messages, or text exchanges that are related to the report, that were identified in a publicly available location;

''(iv) for each item of apparent child pornography included in the report under clause (iii) or paragraph (2)(E), information indicating whether—

''(I) the apparent child pornography was publicly available; or

''(II) the provider, in its sole discretion, viewed the apparent child pornography, or any copy thereof, at any point concurrent with or prior to the submission of the report;

''(v) for each item of apparent child pornography that is the subject of the report, an indication as to whether the apparent child pornography—

''(I) is created in whole or in part through the use of software, machine learning, artificial intelligence, or any other computer-generated or technological means, including by adapting, modifying, manipulating, or altering an authentic visual depiction;

''(II) has previously been the subject of a report under subsection (a)(1); or

''(III) is the subject of multiple contemporaneous reports due to rapid and widespread distribution; and

''(vi) any and all information or material (including apparent child pornography, chats, messages, or text exchanges) relating to the subject of the report in the account of a user of the provider's product or service, if the user, or the parent, guardian, or representative of such user—

''(I) provided the information or material in a notification or complaint to the provider;

''(II) indicates that such information or material should be included in the report; or

''(III) consents to the inclusion of such information or material in the report; and

''(B) may, at the sole discretion of the provider, include the information described in paragraph (2) of this subsection.

''(2) OTHER INFORMATION.—The information referred to in paragraph (1)(B) is the following:

''(A) INFORMATION ABOUT ANY INVOLVED INDIVIDUAL.—Any information relating to the identity or location of any individual who is a subject of the report, including payment or financial information (excluding personally identifiable information) and self-reported identifying or locating information.

''(B) INFORMATION ABOUT ANY INVOLVED MINOR.—Information relating to the identity or location of any involved minor, which may include an address, electronic mail address, Internet Protocol address, port number, uniform resource locator, payment or financial information (excluding personally identifiable information), or any other information that may identify or locate any involved minor, including self-reported identifying or locating information.

''(C) HISTORICAL REFERENCE.—Information relating to when and how a customer or subscriber of a provider uploaded, transmitted, or received content relating to the report or when and how content relating to the report was reported to, or discovered by the provider, including a date and time stamp and time zone.

''(D) GEOGRAPHIC LOCATION INFORMATION.—Information relating to the geographic location of the involved individual or website, which may include the Internet Protocol address, port number, or verified address, or, if not reasonably available, at least one form of geographic identifying information, including area code or zip code, provided by the customer or subscriber, or stored or obtained by the provider.

''(E) APPARENT CHILD PORNOGRAPHY.—Any apparent child pornography not described in paragraph (1)(A)(iii), or other content related to the subject of the report.

''(F) COMPLETE COMMUNICATION.—The complete communication containing any apparent child pornography or other content, including—

''(i) any data or information regarding the transmission of the communication; and

''(ii) any visual depictions, data, or other digital files contained in, or attached to, the communication.

''(G) TECHNICAL IDENTIFIER.—An industry-standard hash value or other similar industry-standard technical identifier for any reported visual depiction as it existed on the provider's service.

''(H) DESCRIPTION.—For any item of apparent child pornography that is the subject of the report, an indication of whether—

''(i) the depicted sexually explicit conduct involves—

''(I) genital, oral, or anal sexual intercourse;

''(II) bestiality;

''(III) masturbation;

''(IV) sadistic or masochistic abuse; or

''(V) lascivious exhibition of the anus, genitals, or pubic area of any person; and

''(ii) the depicted minor is—

''(I) an infant or toddler;

''(II) prepubescent;

''(III) pubescent;

''(IV) post-pubescent; or

''(V) of an indeterminate age or developmental stage.

''(I) CHATS, MESSAGES, OR TEXT EXCHANGES.—Chats, messages, or text exchanges that fully provide the context for the report.

''(3) FORMATTING OF REPORTS.—When a provider includes any information described in paragraph (1) or, at its sole discretion, any information described in paragraph (2) in a report to the CyberTipline of NCMEC, or any successor to the CyberTipline operated by NCMEC, the provider shall use best efforts to ensure that the report conforms with the structure of the CyberTipline or the successor, as applicable.

''(c) FORWARDING OF REPORT AND OTHER INFORMATION TO LAW ENFORCEMENT.—

''(1) IN GENERAL.—Pursuant to its clearinghouse role as a private, nonprofit organization, and at the conclusion of its review in furtherance of its nonprofit mission, NCMEC shall make available each report submitted

under subsection (a)(1) to one or more of the following law enforcement agencies:

''(A) Any Federal law enforcement agency that is involved in the investigation of child sexual exploitation, kidnapping, or enticement crimes.

''(B) Any State or local law enforcement agency that is involved in the investigation of child sexual exploitation.

''(C) A foreign law enforcement agency designated by the Attorney General under subsection (d)(3) or a foreign law enforcement agency that has an established relationship with the Federal Bureau of Investigation, Immigration and Customs Enforcement, or INTERPOL, and is involved in the investigation of child sexual exploitation, kidnapping, or enticement crimes.

''(2) TECHNICAL IDENTIFIERS.—If a report submitted under subsection (a)(1) contains an industry-standard hash value or other similar industry-standard technical identifier—

''(A) NCMEC may compare that hash value or identifier with any database or repository of visual depictions owned or operated by NCMEC; and

''(B) if the comparison under subparagraph (A) results in a match, NCMEC may include the matching visual depiction from its database or repository when forwarding the report to an agency described in subparagraph (A) or (B) of paragraph (1).'';

(B) in subsection (d)—

(i) in paragraph (2), by striking ''subsection (c)(1)'' and inserting ''subsection (c)(1)(A)'';

(ii) in paragraph (3)—

(I) in subparagraph (A), by striking ''subsection (c)(3)'' and inserting ''subsection (c)(1)(C)''; and

(II) in subparagraph (C), by striking ''subsection (c)(3)'' and inserting ''subsection (c)(1)(C)''; and

(iii) in paragraph (5)(B)—

(I) in clause (i), by striking ''forwarded'' and inserting ''made available''; and

(II) in clause (ii), by striking ''forwarded'' and inserting ''made available'';

(C) by striking subsection (e) and inserting the following:

''(e) FAILURE TO COMPLY WITH REQUIREMENTS.—

''(1) CRIMINAL PENALTY.—

''(A) OFFENSE.—It shall be unlawful for a provider to knowingly—

''(i) fail to submit a report under subsection (a)(1) within the time period required by that subsection; or

''(ii) fail to preserve material as required under subsection (h).

''(B) PENALTY.—

''(i) IN GENERAL.—A provider that violates subparagraph (A) shall be fined—

''(I) in the case of an initial violation, not more than—

''(aa) $850,000 if the provider has not fewer than 100,000,000 monthly active users; or

''(bb) $600,000 if the provider has fewer than 100,000,000 monthly active users; and

''(II) in the case of any second or subsequent violation, not more than—

''(aa) $1,000,000 if the provider has not fewer than 100,000,000 monthly active users; or

''(bb) $850,000 if the provider has fewer than 100,000,000 monthly active users.

''(ii) HARM TO INDIVIDUALS.—The maximum fine under clause (i) shall be doubled if an individual is harmed as a direct and proximate result of the applicable violation.

''(2) CIVIL PENALTY.—

''(A) VIOLATIONS RELATING TO CYBERTIPLINE REPORTS AND MATERIAL PRESERVATION.—A provider shall be liable to the United States Government for a civil penalty in an amount of not less than $50,000 and not more than $250,000 if the provider knowingly—

''(i) fails to submit a report under subsection (a)(1) within the time period required by that subsection;

''(ii) fails to preserve material as required under subsection (h); or

''(iii) submits a report under subsection (a)(1) that—

''(I) contains materially false or fraudulent information; or

''(II) omits information described in subsection (b)(1)(A) that is reasonably available.

''(B) ANNUAL REPORT VIOLATIONS.—A provider shall be liable to the United States Government for a civil penalty in an amount of not less than $100,000 and not more than $1,000,000 if the provider knowingly—

''(i) fails to submit an annual report as required under subsection (i); or

''(ii) submits an annual report under subsection (i) that—

''(I) contains a materially false, fraudulent, or misleading statement; or

''(II) omits information described in subsection (i)(1) that is reasonably available.

''(C) HARM TO INDIVIDUALS.—The amount of a civil penalty under subparagraph (A) or (B) shall be tripled if an individual is harmed as a direct and proximate result of the applicable violation.

''(D) COSTS OF CIVIL ACTIONS.—A provider that commits a violation described in subparagraph (A) or (B) shall be liable to the United States Government for the costs of a civil action brought to recover a civil penalty under that subparagraph.

''(E) ENFORCEMENT.—This paragraph shall be enforced in accordance with sections 3731, 3732, and 3733 of title 31, except that a civil action to recover a civil penalty under subparagraph (A) or (B) of this paragraph may only be brought by the United States Government.

''(3) DEPOSIT OF FINES AND PENALTIES.—Notwithstanding any other provision of law, any criminal fine or civil penalty collected under this subsection shall be deposited into the Child Pornography Victims Reserve as provided in section 2259B.'';

(D) in subsection (f), by striking paragraph (3) and inserting the following:

''(3) affirmatively search, screen, or scan for—

''(A) facts or circumstances described in subsection (a)(2);

''(B) information described in subsection (b)(2); or

''(C) any apparent child pornography.'';

(E) in subsection (g)—

(i) in paragraph (2)(A)—

(I) in clause (iii), by inserting ''or personnel at a children's advocacy center'' after ''State)''; and

(II) in clause (iv), by striking ''State or subdivision of a State'' and inserting ''State, subdivision of a State, or children's advocacy center''; and

(ii) in paragraph (3), in the matter preceding subparagraph (A), by striking ''subsection (a)'' and inserting ''subsection (a)(1)'';

(F) in subsection (h), by striking paragraph (5) and inserting the following:

''(5) RELATION TO REPORTING REQUIREMENT.—Submission of a report as described in subsection (a)(1) does not satisfy the obligations under this subsection.''; and

(G) by adding at the end the following:

''(i) ANNUAL REPORT.—

''(1) IN GENERAL.—Not later than March 31 of the second year beginning after the date of enactment of the STOP CSAM Act of 2025, and of each year thereafter, a provider that had more than 1,000,000 unique monthly visitors or users during each month of the preceding year and accrued revenue of more than $50,000,000 during the preceding year shall submit to the Attorney General and the Chair of the Federal Trade Commission a report, disaggregated by subsidiary, that provides the following information for the preceding year to the extent such information is applicable and reasonably available:

''(A) CYBERTIPLINE DATA.—

''(i) The total number of reports that the provider submitted under subsection (a)(1).

''(ii) Which items of information described in subsection (b)(2) are routinely included in the reports submitted by the provider under subsection (a)(1).

''(B) OTHER REPORTING TO THE PROVIDER.—

''(i) The measures the provider has in place to receive other reports concerning child sexual exploitation and abuse using the provider's product or on the provider's service.

''(ii) The average time for responding to reports described in clause (i).

''(iii) The number of reports described in clause (i) that the provider received.

''(iv) A summary description of the actions taken upon receipt of the reports described in clause (i).

''(C) POLICIES.—

''(i) A description of the policies of the provider with respect to the commission of child sexual exploitation and abuse using the provider's product or on the provider's service, including how child sexual exploitation and abuse is defined.

''(ii) A description of possible user consequences for violations of the policies described in clause (i).

''(iii) The methods of informing users of the policies described in clause (i).

''(iv) The process for adjudicating potential violations of the policies described in clause (i).

''(D) CULTURE OF SAFETY.—

''(i) The measures, tools, and technologies that the provider deploys to—

''(I) protect children from sexual exploitation and abuse using the provider's product or service;

''(II) prevent or interdict activity by children related to sexual exploitation and abuse, including the posting or sharing of intimate visual depictions; and

''(III) accurately identify adult and minor users.

''(ii) The measures, tools, and technologies that the provider deploys to empower parents and guardians to protect their children from sexual exploitation and abuse using the provider's product or service.

''(iii) The measures, tools, and technologies that the provider deploys to prevent the use of the provider's product or service by individuals seeking to commit child sexual exploitation and abuse.

''(iv) With respect to the measures, tools, and technologies described in clauses (i), (ii), and (iii)—

''(I) an assessment of their efficacy, including any relevant quantitative information indicating when and how often they are used; and

''(II) information on any factors that limit their efficacy or create gaps in their protection and efforts by the provider to address those loopholes or gaps.

''(v) A description of factors that interfere with the provider's ability to detect or evaluate instances of child sexual exploitation and abuse and an analysis of the impact of those factors.

''(vi) Information shared by the provider with users about the risks to children on the provider's product or service concerning sexual exploitation and abuse and an assessment of the impact of the information on users, including any relevant quantitative information indicating how often the information is reviewed.

''(E) SAFETY BY DESIGN.—The measures that the provider takes before launching a new product or service—

''(i) to assess—

''(I) the safety risks for children with respect to sexual exploitation and abuse; and

''(II) whether and how individuals could use the new product or service to commit child sexual exploitation and abuse; and

''(ii) to determine—

''(I) the appropriate age for users of the new product or service; and

''(II) whether the new product or service will be adopted to commit child sexual exploitation and abuse.

''(F) PREVALENCE, TRENDS, AND PATTERNS.—Any information concerning—

''(i) the prevalence of child sexual exploitation and abuse on the provider's product or service, including the volume of child pornography that is available and that is being accessed, distributed, or received; and

''(ii) emerging trends, risks, and changing patterns with respect to the commission of online child sexual exploitation and abuse.

''(G) OTHER INFORMATION.—Any other information relevant to child sexual exploitation and abuse on the provider's product or service.

''(2) AVOIDING DUPLICATION.—Notwithstanding the requirement under the matter preceding paragraph (1) that information be submitted annually, in the case of any report submitted under that paragraph after the initial report, a provider shall submit information described in subparagraphs (C) through (F) of that paragraph not less frequently than once every 3 years or when new information is available, whichever is more frequent.

''(3) LIMITATION.—Nothing in paragraph (1) shall require the disclosure of trade secrets or other proprietary information.

''(4) PUBLICATION.—

''(A) IN GENERAL.—Subject to subparagraph (B), the Attorney General and the Chair of the Federal Trade Commission shall publish the reports received under this subsection.

''(B) REDACTION.—

''(i) IN GENERAL.—Whether or not such redaction is requested by the provider, the Attorney General and Chair of the Federal Trade Commission shall redact from a report published under subparagraph (A) any information as necessary to avoid—

''(I) undermining the efficacy of a safety measure described in the report; or

''(II) revealing how a product or service of a provider may be used to commit online child sexual exploitation and abuse.

''(ii) ADDITIONAL REDACTION.—

''(I) REQUEST.—In addition to information redacted under clause (i), a provider may request the redaction, from a report published under subparagraph (A), of any information that is law enforcement sensitive or otherwise not suitable for public distribution.

''(II) AGENCY DISCRETION.—The Attorney General and Chair of the Federal Trade Commission—

''(aa) shall consider a request made under subclause (I); and

''(bb) may, in their discretion, redact from a report published under subparagraph (A) any information pursuant to the request.'';

(2) in section 2258B—

(A) by striking subsection (a) and inserting the following:

''(a) IN GENERAL.—

''(1) LIMITED LIABILITY.—Except as provided in subsection (b), a civil claim or criminal charge described in paragraph (2) may not be brought in any Federal or State court.

''(2) COVERED CLAIMS AND CHARGES.—A civil claim or criminal charge referred to in paragraph (1) is a civil claim or criminal charge against a provider or domain name registrar, including any director, officer, employee, or agent of such provider or domain name registrar, that is directly attributable to—

''(A) the performance of the reporting or preservation responsibilities of such provider or domain name registrar under this section, section 2258A, or section 2258C;

''(B) transmitting, distributing, or mailing child pornography to any Federal, State, or local law enforcement agency, or giving such agency access to child pornography, in response to a search warrant, court order, or other legal process issued or obtained by such agency; or

''(C) the use by the provider or domain name registrar of any material being preserved under section 2258A(h) by such provider or registrar for research and the development and training of tools, undertaken voluntarily and in good faith for the sole and exclusive purpose of—

''(i) improving or facilitating reporting under this section, section 2258A, or section 2258C; or

''(ii) stopping the online sexual exploitation of children.''; and

(B) in subsection (b)—

(i) in paragraph (1), by striking ''; or'' and inserting ''or knowingly failed to comply with a requirement under section 2258A;'';

(ii) in paragraph (2)(C)—

(I) by striking ''sections'' and inserting ''this section or section''; and

(II) by striking the period and inserting ''; or''; and

(iii) by adding at the end the following:

''(3) for purposes of subsection (a)(2)(C), knowingly distributed or transmitted the material, or made the material available, except as required by law, to—

''(A) any other entity;

''(B) any person not employed by the provider or domain name registrar; or

''(C) any person employed by the provider or domain name registrar who is not conducting any research described in that subsection.'';

(3) in section 2258C—

(A) in the section heading, by striking ''**the CyberTipline**'' and inserting ''**NCMEC**'';

(B) in subsection (a)—

(i) in the subsection heading, by striking ''ELEMENTS'' and inserting ''INFORMATION SHARING WITH PROVIDERS AND ENTITIES FOR THE PURPOSES OF PREVENTING AND CURTAILING THE ONLINE SEXUAL EXPLOITATION OF CHILDREN'';

(ii) in paragraph (1)—

(I) by striking ''to a provider'' and inserting the following: ''or submission to the Child Victim Identification Program to—

''(A) a provider'';

(II) in subparagraph (A), as so designated—

(aa) by inserting ''use of the provider's products or services to commit'' after ''stop the''; and

(bb) by striking the period at the end and inserting ''; or''; and

(III) by adding at the end the following:

''(B) an entity for the sole and exclusive purpose of preventing and curtailing the online sexual exploitation of children.''; and

(iii) in paragraph (2)—

(I) in the heading, by striking ''INCLUSIONS'' and inserting ''ELEMENTS'';

(II) by striking ''unique identifiers'' and inserting ''similar technical identifiers'';

(III) by inserting ''or content, elements, or reported materials,'' after'' visual depiction,'';

(IV) by inserting a comma after ''location'';

(V) by striking ''and any other elements''; and

(VI) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report'';

(C) in subsection (b)—

(i) in the heading, by inserting ''OR ENTITIES'' after ''PROVIDERS'';

(ii) by striking ''Any provider'' and inserting the following:

''(1) IN GENERAL.—Any provider or entity'';

(iii) in paragraph (1), as so designated—

(I) by striking ''receives'' and inserting ''obtains''; and

(II) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report''; and

(iv) by adding at the end the following:

''(2) LIMITATION ON SHARING WITH OTHER ENTITIES.—A provider or entity that obtains elements under subsection (a)(1) may not distribute those elements, or make those elements available, to any other entity, except for the sole and exclusive purpose of curtailing, preventing, or stopping the online sexual exploitation of children.'';

(D) in subsection (c)—

(i) by striking ''subsections'' and inserting ''subsection'';

(ii) by striking ''providers receiving'' and inserting ''a provider or entity to obtain'';

(iii) by inserting ''or submission to the Child Victim Identification Program'' after ''CyberTipline report''; and

(iv) by striking ''to use the elements to stop the online sexual exploitation of children''; and

(E) in subsection (d), by inserting ''or to the Child Victim Identification Program'' after ''CyberTipline'';

(4) in section 2258E—

(A) in paragraph (6), by striking ''electronic communication service provider'' and inserting ''electronic communication service'';

(B) in paragraph (7), by striking ''and'' at the end;

(C) in paragraph (8), by striking the period at the end and inserting a semicolon; and

(D) by adding at the end the following:

''(9) the term 'publicly available', with respect to a visual depiction on a provider's service, means the visual depiction can be viewed by or is accessible to all users of the service, regardless of the steps, if any, a user must take to create an account or to gain access to the service in order to access or view the visual depiction; and

''(10) the term 'Child Victim Identification Program' means the program described in section 404(b)(1)(K)(ii) of the Juvenile Justice and Delinquency Prevention Act of 1974 (34 U.S.C. 11293(b)(1)(K)(ii)).'';

(5) in section 2259B(a), by inserting '', any fine or penalty collected under section 2258A(e),'' after ''2259A''; and

(6) by adding at the end the following:

**''§ 2260B. Liability for certain child sexual exploitation offenses**

''(a) OFFENSE.—It shall be unlawful for a provider of an interactive computer service, as that term is defined in section 230 of the Communications Act of 1934 (47 U.S.C. 230), that operates through the use of any facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, through such service to—

''(1) intentionally host or store child pornography or make child pornography available to any person; or

''(2) knowingly promote or facilitate a violation of section 2251, 2251A, 2252, 2252A, or 2422(b).

''(b) PENALTY.—A provider of an interactive computer service that violates subsection (a)—

''(1) subject to paragraph (2), shall be fined not more than $1,000,000; and

''(2) if the offense involves a conscious or reckless risk of serious personal injury or an individual is harmed as a direct and proximate result of the violation, shall be fined not more than $5,000,000.

''(c) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to apply to

any good faith action by a provider of an interactive computer service that is necessary to comply with a valid court order, subpoena, search warrant, statutory obligation, or preservation request from law enforcement.''.

(b) CLERICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by adding at the end the following:

''2260B. Liability for certain child sexual exploitation offenses.''.

(c) EFFECTIVE DATE FOR AMENDMENTS TO REPORTING REQUIREMENTS OF PROVIDERS.—The amendments made by subsection (a)(1) of this section shall take effect on the date that is 120 days after the date of enactment of this Act.

**SEC. 205. EXPANDING CIVIL REMEDIES FOR VICTIMS OF ONLINE CHILD SEXUAL EXPLOITATION.**

(a) STATEMENT OF INTENT.—Nothing in this section shall be construed to abrogate or narrow any case law concerning section 2255 of title 18, United States Code.

(b) CIVIL REMEDY FOR PERSONAL INJURIES.—Section 2255(a) of title 18, United States Code, is amended—

(1) by striking ''IN GENERAL.—Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue'' and inserting the following: ''PRIVATE RIGHT OF ACTION.—

''(1) IN GENERAL.—Any person described in subparagraph (A), (B), or (C) of paragraph (2) who suffers personal injury as a result of a violation described in that subparagraph, regardless of whether the injury occurred while such person was a minor, may bring a civil action''; and

(2) by adding at the end the following:

''(2) ELIGIBLE PERSONS.—Paragraph (1) shall apply to any person—

''(A) who, while a minor, was a victim of—

''(i) a violation of section 1589, 1590, 1591, 2241, 2242, 2243, 2251, 2251A, 2260(a), 2421, 2422, or 2423;

''(ii) an attempt to violate section 1589, 1590, or 1591 under section 1594(a);

''(iii) a conspiracy to violate section 1589 or 1590 under section 1594(b); or

''(iv) a conspiracy to violate section 1591 under section 1594(c);

''(B) who—

''(i) is depicted as a minor in child pornography; and

''(ii) is a victim of a violation of 2252, 2252A, or 2260(b) (regardless of when the violation occurs); or

''(C) who—

''(i) is depicted as an identifiable minor in a visual depiction described in section 1466A; and

''(ii) is a victim of a violation of that section (regardless of when the violation occurs).''.

(c) CIVIL REMEDY AGAINST ONLINE PLATFORMS AND APP STORES.—

(1) IN GENERAL.—Chapter 110 of title 18, United States Code, is amended by inserting after section 2255 the following:

**''§ 2255A. Additional remedy for certain victims of child pornography or child sexual exploitation**

''(a) IN GENERAL.—

''(1) PROMOTION OR AIDING AND ABETTING OF CERTAIN VIOLATIONS.—Any person who is a victim of the intentional, knowing, or reckless promotion, or aiding and abetting, of a violation of section 1591 or 1594(c) (involving a minor), or section 2251, 2251A, 2252, 2252A, or 2422(b), where such promotion, or aiding and abetting, is by a provider of an interactive computer service or an app store, and who suffers personal injury as a result of such promotion or aiding and abetting, regardless of when the injury occurred, may bring a civil action in any appropriate United States District Court for relief set forth in subsection (b).

''(2) ACTIVITIES INVOLVING CHILD PORNOGRAPHY.—Any person who is a victim of the intentional, knowing, or reckless hosting or storing of child pornography or making child pornography available to any person by a provider of an interactive computer service, and who suffers personal injury as a result of such hosting, storing, or making available, regardless of when the injury occurred, may bring a civil action in any appropriate United States District Court for relief set forth in subsection (b).

''(b) RELIEF.—In a civil action brought by a person under subsection (a)—

''(1) the person shall recover the actual damages the person sustains or liquidated damages in the amount of $300,000, and the cost of the action, including reasonable attorney fees and other litigation costs reasonably incurred; and

''(2) the court may, in addition to any other relief available at law, award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering the defendant to cease the offending conduct.

''(c) STATUTE OF LIMITATIONS.—There shall be no time limit for the filing of a complaint commencing an action under subsection (a).

''(d) VENUE; SERVICE OF PROCESS.—

''(1) VENUE.—Any action brought under subsection (a) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28.

''(2) SERVICE OF PROCESS.—In an action brought under subsection (a), process may be served in any district in which the defendant—

''(A) is an inhabitant; or

''(B) may be found.

''(e) RELATION TO SECTION 230 OF THE COMMUNICATIONS ACT OF 1934.—Nothing in section 230 of the Communications Act of 1934 (47 U.S.C. 230) shall be construed to impair or limit any claim brought under subsection (a).

''(f) RULES OF CONSTRUCTION.—

''(1) APPLICABILITY TO LEGAL PROCESS OR OBLIGATION.—Nothing in this section shall be construed to apply to any good faith action that is necessary to comply with a valid court order, subpoena, search warrant, statutory obligation, or preservation request from law enforcement.

''(2) APPLICATION OF SECTION 2258B.—A civil action brought under subsection (a) shall be subject to section 2258B.

''(g) ENCRYPTION TECHNOLOGIES.—

''(1) IN GENERAL.—None of the following actions or circumstances shall serve as an independent basis for liability under subsection (a):

''(A) Utilizing full end-to-end encrypted messaging services, device encryption, or other encryption services.

''(B) Not possessing the information necessary to decrypt a communication.

''(C) Failing to take an action that would otherwise undermine the ability to offer full end-to-end encrypted messaging services, device encryption, or other encryption services.

''(2) CONSIDERATION OF EVIDENCE.—Evidence of actions or circumstances described in paragraph (1) shall be admissible in a civil action brought under subsection (a) if—

''(A) the actions or circumstances are relevant under rules 401 and 402 of the Federal Rules of Evidence to—

''(i) prove motive, intent, preparation, plan, absence of mistake, or lack of accident; or

''(ii) rebut any evidence or factual or legal claim; and

''(B) the actions or circumstances—

''(i) are otherwise admissible under the Federal Rules of Evidence; and

''(ii) are not subject to exclusion under rule 403 or any other rule of the Federal Rules of Evidence.

''(3) NO EFFECT ON DISCOVERY.—Nothing in paragraph (1) or (2) shall be construed to create a defense to a discovery request or otherwise limit or affect discovery in any civil action brought under subsection (a).

''(h) DEFENSE.—In a civil action under subsection (a)(2) involving knowing or reckless conduct, it shall be a defense at trial, which the provider of an interactive computer service must establish by a preponderance of the evidence as determined by the finder of fact, that—

''(1) the provider disabled access to or removed the child pornography within a reasonable timeframe, and in any event not later than 48 hours after obtaining knowledge that the child pornography was being hosted, stored, or made available by the provider (or, in the case of a provider that, for the most recent calendar year, averaged fewer than 10,000,000 active users on a monthly basis in the United States, within a reasonable timeframe, and in any event not later than 2 business days after obtaining such knowledge);

''(2) the provider exercised a reasonable, good faith effort to disable access to or remove the child pornography but was unable to do so for reasons outside the provider's control; or

''(3) it is technologically impossible for the provider to disable access to or remove the child pornography without compromising encryption technologies.

''(i) SANCTIONS FOR REPEATED BAD FAITH CIVIL ACTIONS OR DEFENSES.—

''(1) DEFINITIONS.—In this subsection:

''(A) BAD FAITH CIVIL ACTION.—The term 'bad faith civil action' means a civil action brought under subsection (a) in bad faith where the finder of fact determines that at the time the civil action was filed, the party, attorney, or law firm described in paragraph (2) had actual knowledge that—

''(i) the alleged conduct did not involve any minor; or

''(ii) the alleged child pornography did not depict—

''(I) any minor; or

''(II) sexually explicit conduct, sexual suggestiveness, full or partial nudity, or implied sexual activity.

''(B) BAD FAITH DEFENSE.—The term 'bad faith defense' means a defense in a civil action brought under subsection (a) raised in bad faith where the finder of fact determines that at the time the defense was raised, the party, attorney, or law firm described in paragraph (3) had actual knowledge that the defense—

''(i) was made solely for purpose of delaying the civil action or increasing the costs of the civil action; or

''(ii) was objectively baseless in light of the applicable law or facts at issue.

''(2) BAD FAITH CIVIL ACTION.—In the case of a civil action brought under subsection (a), the court may impose sanctions on—

''(A) the party bringing the civil action if the court finds that the party has brought 2 or more bad faith civil actions (which may include the instant civil action); or

''(B) an attorney or law firm representing the party bringing the civil action if the

court finds that the attorney or law firm has represented—

''(i) a party who has brought 2 or more bad faith civil actions (which may include the instant civil action); or

''(ii) 2 or more parties who have each brought a bad faith civil action (which may include the instant civil action).

''(3) BAD FAITH DEFENSE.—In the case of a civil action brought under subsection (a), the court may impose sanctions on—

''(A) the party defending the civil action if the court finds that the party has raised 2 or more bad faith defenses (which may include 1 or more defenses raised in the instant civil action); or

''(B) an attorney or law firm representing the party defending the civil action if the court finds that the attorney or law firm has represented—

''(i) a party who has raised 2 or more bad faith defenses (which may include 1 or more defenses raised in the instant civil action); or

''(ii) 2 or more parties who have each raised a bad faith defense (which may include a defense raised in the instant civil action).

''(4) IMPLEMENTATION.—Rule 11(c) of the Federal Rules of Civil Procedure shall apply to sanctions imposed under this subsection in the same manner as that rule applies to sanctions imposed for a violation of rule 11(b) of those Rules.

''(5) RULES OF CONSTRUCTION.—

''(A) RULE 11.—This subsection shall not be construed to limit or expand the application of rule 11 of the Federal Rules of Civil Procedure.

''(B) DEFINITION CHANGE.—Paragraph (1)(A)(ii) shall not be construed to apply to a civil action affected by a contemporaneous change in the law with respect to the definition of 'child pornography'.

''(j) DEFINITIONS.—In this section:

''(1) APP.—The term 'app' means a software application or electronic service that may be run or directed by a user on a computer, a mobile device, or any other general purpose computing device.

''(2) APP STORE.—The term 'app store' means a publicly available website, software application, or other electronic service that—

''(A) distributes apps from third-party developers to users of a computer, a mobile device, or any other general purpose computing device; and

''(B) operates—

''(i) through the use of any means or facility of interstate or foreign commerce; or

''(ii) in or affecting interstate or foreign commerce.

''(3) INTERACTIVE COMPUTER SERVICE.—The term 'interactive computer service' means an interactive computer service, as defined in section 230(f) of the Communications Act of 1934 (47 U.S.C. 230(f)), that operates—

''(A) through the use of any means or facility of interstate or foreign commerce; or

''(B) in or affecting interstate or foreign commerce.

''(k) SAVINGS CLAUSE.—Nothing in this section, including the defenses under this section, shall be construed to apply to any civil action brought under any other Federal law, rule, or regulation, including any civil action brought against a provider of an interactive computer service or an app store under section 1595 or 2255.''.

(2) CLERICAL AMENDMENT.—The table of sections for chapter 110 of title 18, United States Code, is amended by inserting after the item relating to section 2255 the following:

''2255A. Additional remedy for certain victims of child pornography or child sexual exploitation.''.

**SEC. 206. SEVERABILITY.**

If any provision of this title, an amendment made by this title, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this title and the amendments made by this title, and the application of the provision or amendment to any other person or circumstance, shall not be affected.

**SEC. 207. CONTINUED APPLICABILITY OF FEDERAL, STATE, AND TRIBAL LAW.**

(a) FEDERAL LAW.—Nothing in this title or the amendments made by this title, nor any rule or regulation issued pursuant to this title or the amendments made by this title, shall affect or diminish any right or remedy for a victim of child pornography or child sexual exploitation under any other Federal law, rule, or regulation, including any claim under section 2255 of title 18, United States Code, with respect to any individual or entity.

(b) STATE OR TRIBAL LAW.—Nothing in this title or the amendments made by this title, nor any rule or regulation issued pursuant to this title or the amendments made by this title, shall—

(1) preempt, diminish, or supplant any right or remedy for a victim of child pornography or child sexual exploitation under any State or Tribal common or statutory law; or

(2) prohibit the enforcement of a law governing child pornography or child sexual exploitation that is at least as protective of the rights of a victim as this title and the amendments made by this title.

---

**SA 2238.** Mr. HAWLEY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 2, redesignate paragraphs (27) through (32) as paragraphs (32) through (37), paragraphs (22) through (26) as paragraphs (26) through (30), and paragraphs (10) through (21) as paragraphs (11) through (22).

In section 2, after paragraph (9), insert the following:

(10) EXCLUDED LARGE ONLINE PLATFORM.—The term ''excluded large online platform''—

(A) means a social media platform, an online search engine, an online marketplace, or an online communication platform that—

(i) averages more than 1,000,000 unique users on a monthly basis; or

(ii) has more than 1,000,000 user accounts;

(B) includes all parents, subsidiaries, and affiliates of the excluded large online platform; and

(C) does not include a platform that only permits users to interact via a predetermined set of phrases, emoticons, or nonlinguistic symbols.

In section 2, after paragraph (22), as so redesignated, insert the following:

(23) ONLINE COMMUNICATION PLATFORM.—The term ''online communication platform'' means a service that allows users to communicate, connect, or collaborate via the internet and includes instant messaging, online video conferencing, online discussion forum, and online collaboration services.

(24) ONLINE MARKETPLACE.—The term ''online marketplace'' has the meaning given that term in section 2(f) of the Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act (15 U.S.C. 45f(f)).

(25) ONLINE SEARCH ENGINE.—The term ''online search engine'' means an internet intermediary service that allows users to input queries to perform searches of the World Wide Web and, in response, returns information related to the requested content.

In section 2(27)(A)(iii), as so redesignated, strike ''and''.

In section 2(27)(B), as so redesignated, strike the period at the end and insert ''; and''.

In section 2(27), as so redesignated, add at the end the following:

(C) is not an excluded large online platform.

In section 2, after paragraph (30), as so redesignated, insert the following:

(31) SOCIAL MEDIA PLATFORM.—The term ''social media platform'' has the meaning given that term in section 124(a) of the Trafficking Victims Prevention and Protection Reauthorization Act of 2022 (42 U.S.C. 1862w(a)).

---

**SA 2239.** Mr. HAWLEY (for himself and Mr. SANDERS) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. CAP ON CREDIT CARD INTEREST RATES.**

(a) IN GENERAL.—Section 107 of the Truth in Lending Act (15 U.S.C. 1606) is amended by adding at the end the following:

''(f)(1) The annual percentage rate applicable to an extension of credit obtained by use of a credit card may not exceed 10 percentage points, inclusive of all finance charges.

''(2) Any fees that are not considered finance charges under section 106(a) may not be used to evade the limitations of paragraph (1), and the total sum of such fees may not exceed the total amount of finance charges assessed.

''(3) The taking, receiving, reserving, or charging of a credit card annual percentage rate or fee greater than that permitted under this subsection, when knowingly done, shall be deemed a violation of this title, and a forfeiture of the entire interest which the note, bill, or other evidence of the obligation carries with it, or which has been agreed to be paid thereon.

''(4) If a credit card annual percentage rate or fee greater than that permitted under this subsection has been paid, the person by whom it has been paid, or the legal representative thereof, may, by bringing an action not later than 2 years after the date on which the usurious collection was last made, recover back from the lender in an action in the nature of an action of debt, the entire amount of interest, finance charges, or fees paid.

''(5) Any creditor who violates this subsection shall be subject to the provisions of section 130.

''(g) Nothing in this section may be construed to preempt any provision of State law that provides greater protection to consumers than is provided under this section.''.

(b) TECHNICAL AND CONFORMING AMENDMENT.—Section 130(a) of the Truth in Lending Act (15 U.S.C. 1640(a)) is amended, in the matter preceding paragraph (1), by inserting ''section 107(f),'' before ''this chapter''.

(c) SUNSET.—

(1) IN GENERAL.—The Truth in Lending Act (15 U.S.C. 1601 et seq.) is amended—

(A) in section 107 (15 U.S.C. 1606), by striking subsections (f) and (g); and

(B) in section 130(a) (15 U.S.C. 1640(a)), in the matter preceding paragraph (1), by striking ''section 107(f),''.

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall take effect on January 1, 2031.

---

**SA 2240.** Mr. HAWLEY submitted an amendment intended to be proposed by

him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ____. COMMUNICATIONS ACT AMENDMENT.**

Section 230(c) of the Communications Act of 1934 (47 U.S.C. 230(c)) is amended by adding at the end the following:

''(3) EXCEPTION FOR ISSUERS OF PAYMENT STABLECOIN.—The protections under this subsection shall not apply to any person that issues a payment stablecoin, as defined in section 2 of the GENIUS Act.''.

**SA 2241.** Mr. HAGERTY (for himself, Mrs. GILLIBRAND, Mr. SCOTT of South Carolina, and Ms. LUMMIS) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

On page 3, line 25, strike ''node''.

On page 9, line 23, insert ''is'' after ''that''.

On page 9, strike line 24 and all that follows through page 10, line 9, and insert the following:

(A) a subsidiary of an insured depository institution that has been approved to issue payment stablecoins under section 5;

(B) a Federal qualified payment stablecoin issuer; or

(C) a State qualified payment stablecoin issuer.

On page 13, line 18, strike ''any'' and insert ''a''.

On page 13, line 24, strike ''person'' and insert ''digital asset service provider''.

On page 14, line 5, strike ''or'' and insert ''and any''.

On page 14, line 18, strike ''If the Secretary'' and all that follows through line 21, and insert the following:

(A) IN GENERAL.—If the Secretary of the Treasury determines that unusual and exigent circumstances exist, the Secretary may provide limited safe harbors from subsection (a).

(B) JUSTIFICATION.—Prior to issuing a limited safe harbor under this paragraph, the Secretary of the Treasury shall submit to the chairs and ranking members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a justification for the determination of the unusual and exigent circumstances, which may be contained in a classified annex, as applicable.

On page 14, line 22, strike ''The'' and insert ''Consistent with section 13, the''.

On page 14, line 23, strike ''may'' and insert ''shall''/

On page 14, line 25, strike ''statutory''.

On page 15, line 19, insert ''as'' before ''a cash equivalent''.

On page 15, line 21, insert ''as'' before ''a cash equivalent''.

On page 16, line 5, strike ''RULE'' and insert ''RULES''.

On page 16, strike lines 7 through 18 and insert the following:

(1) EXEMPT TRANSACTIONS.—This section shall not apply to—

(A) the direct transfer of digital assets between 2 individuals acting on their own behalf and for their own lawful purposes, without the involvement of an intermediary;

(B) to any transaction involving the receipt of digital assets by an individual between an account owned by the individual in the United States and an account owned by the individual abroad that are offered by the same parent company; or

(C) to any transaction by means of a software or hardware wallet that facilitates an individual's own custody of digital assets.

(2) TREASURY AUTHORITY.—Nothing in this Act shall alter the existing authority of the Secretary of the Treasury to block, restrict, or limit transactions involving payment stablecoins that reference or are denominated in United States dollars that are subject to the jurisdiction of the United States.

On page 28, lines 17 and 18, strike '', as applicable''.

On page 28, lines 20 and 21, strike ''and economic sanctions compliance''.

On page 28, lines 22 and 23, strike '', verification of sanctions lists,''.

On page 28, line 24, strike ''programs'' and insert ''program''.

On page 29, line 4, strike ''policies'' and insert ''technical capabilities, policies,''.

On page 29, line 7, strike ''and''.

On page 29, line 13, strike the period and insert ''; and''.

On page 29, between lines 13 and 14, insert the following:

(vi) maintenance of an effective economic sanctions compliance program, including verification of sanctions lists, consistent with Federal law.

On page 29, lines 14 and 15, strike ''Financial Crimes Enforcement Network'' and insert ''Secretary of the Treasury''.

On page 32, lines 21 and 22, strike ''and the amendments made by that section''.

On page 32, strike lines 10 through 16 and insert the following:

(B) RULE OF CONSTRUCTION.—Nothing in subparagraph (A) shall limit a permitted payment stablecoin issuer from engaging in payment stablecoin activities or digital asset service provider activities specified by this Act, and activities incidental thereto, that are authorized by the primary Federal payment stablecoin regulator or the State payment stablecoin regulator, as applicable, consistent with all other

On page 33, line 15, strike ''A permitted'' and all that follows through page 34, line 3, and insert the following:

(A) IN GENERAL.—A permitted payment stablecoin issuer may not—

(i) use any combination of terms relating to the United States Government, including ''United States'', ''United States Government'', and ''USG'', in the name of a payment stablecoin; or

(ii) market a payment stablecoin in such a way that a reasonable person would perceive the payment stablecoin to be—

(I) legal tender, as described in section 5103 of title 31, United States Code;

(II) issued by the United States; or

(III) guaranteed or approved by the Government of the United States.

(B) PEGGED STABLECOINS.—Abbreviations directly relating to the currency to which a payment stablecoin is pegged, such as ''USD'', are not subject to the prohibitions in subparagraph (A).

On page 36, strike lines 7 through 12 and insert the following:

(11) PROHIBITION ON INTEREST.—No permitted payment stablecoin issuer or foreign payment stablecoin issuer shall pay the holder of any payment stablecoin any form of interest or yield (whether in cash, tokens, or other consideration) solely in connection with the holding, use, or retention of such payment stablecoin.

On page 36, between lines 12 and 13, insert the following:

(12) NON-FINANCIAL SERVICES PUBLIC COMPANIES.—

(A) DEFINITIONS.—In this paragraph:

(i) FINANCIAL ACTIVITIES.—The term ''financial activities''—

(I) has the meaning given that term in section 4(k) of the Bank Holding Company Act of 1956 (12 U.S.C. 1843(k)); and

(II) for the avoidance of doubt, includes those activities described in subparagraphs (A) and (B) of section 2(7) and section 4(a)(7)(A) of this Act.

(ii) PUBLIC COMPANY.—The term ''public company'' means an issuer that is required to file reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)).

(B) PROHIBITION.—

(i) IN GENERAL.—A public company that is not predominantly engaged in 1 or more financial activities, and its wholly or majority owned subsidiaries or affiliates, may not issue a payment stablecoin unless the public company obtains a unanimous vote of the Stablecoin Certification Review Committee finding that—

(I) it will not pose a material risk to the safety and soundness of the United States banking system, the financial stability of the United States, or the Deposit Insurance Fund;

(II) the public company will comply with data use limitations providing that, unless the public company receives consent from the consumer, nonpublic personal information obtained from stablecoin transaction data may not be—

(aa) used to target, personalize, or rank advertising or other content;

(bb) sold to any third party; or

(cc) shared with non-affiliates; and

(III) the public company and the affiliates of the public company will comply with the tying prohibitions under paragraph (8).

(ii) EXCEPTION.—The prohibition under clause (i) against the sharing of consumer information shall not apply to sharing of such information—

(I) to comply with Federal, State, or local laws, rules, and other applicable legal requirements;

(II) to comply with a properly authorized civil, criminal, or regulatory investigation, subpoena, or summons by a Federal, State, or local authority; or

(III) to respond to judicial process or a government regulatory authority having jurisdiction over the public company.

(C) EXTENSION OF PROHIBITION.—

(i) IN GENERAL.—Any company not domiciled in the United States or its Territories that is not predominantly engaged in 1 or more financial activities, may not issue a payment stablecoin unless the public company obtains a unanimous vote of the Stablecoin Certification Review Committee finding that—

(I) it will not pose a material risk to the safety and soundness of the United States banking system, the financial stability of the United States, or the Deposit Insurance Fund;

(II) the public company will comply with data use limitations providing that, unless the public company receives consent from the consumer, nonpublic personal information obtained from stablecoin transaction data may not be—

(aa) used to target, personalize, or rank advertising or other content;

(bb) sold to any third party; or

(cc) shared with non-affiliates; except

(III) the public company and the affiliates of the public company will comply with the tying prohibitions under paragraph (8).

(ii) EXCEPTION.—The prohibition under clause (i) against the sharing of consumer information shall not apply to sharing of such information—

(I) to comply with Federal, State, or local laws, rules, and other applicable legal requirements;

(II) to comply with a properly authorized civil, criminal, or regulatory investigation, subpoena, or summons by a Federal, State, or local authority; or

(III) to respond to judicial process or a government regulatory authority having jurisdiction over the public company.

(D) RULEMAKING.—Not later than 1 year after the date of enactment of this Act, the Stablecoin Certification Review Committee shall issue an interpretive rule clarifying the application of this paragraph.

(13) ELIGIBILITY.—Nothing in this Act shall be construed as expanding or contracting legal eligibility to receive services available from a Federal Reserve bank or to make deposits with a Federal Reserve bank, in each case pursuant to the Federal Reserve Act.

On page 36, line 13, strike ''(12)'' and insert ''(14)''.

On page 38, lines 2 and 3, strike ''that subsection'' and insert ''this Act''.

On page 40, line 13, insert ''any'' after ''to''.

On page 43, line 1, insert ''(or the Vice Chair for Supervision, as delegated by the Chair of the Board)'' after ''Board''.

On page 46, line 16, strike ''a''.

On page 46, line 17, strike ''stablecoin'' and insert ''stablecoins''.

On page 47, line 18, strike '', provided that'' and all that follows through line 25.

On page 49, line 6, strike ''may'' and insert ''shall''.

On page 51, lines 14 and 15, strike ''House of Representatives and the Senate'' and insert ''Senate and the House of Representatives''.

On page 51, lines 19 and 20, strike ''House of Representatives and the Senate'' and insert ''Senate and the House of Representatives''.

On page 51, line 22, strike ''product''.

On page 51, line 23, insert ''For the purposes of this paragraph, an employee described in section 202 of title 18, United States Code, shall be deemed an executive branch employee for purposes of complying with section 208 of that title.'' after ''public service.''.

On page 60, line 21, insert ''Nothing in this subsection shall preempt or supersede the authority of a State to charter, license, supervise, or regulate an insured depository institution or credit union chartered in such State or to supervise a subsidiary of such insured depository institution or credit union that is approved under this section to be a permitted payment stablecoin issuer.'' after ''stablecoin issuer.''.

On page 61, line 9, strike ''including,''.

On page 63, lines 22 and 23, strike ''to be'' and insert ''and''.

On page 64, line 9, strike ''with'' and insert ''within''.

On page 66, line 5, insert ''or recklessly'' after ''willfully'' each place it appears.

On page 73, strike lines 3 through 8 and insert the following:

(c) RULE OF CONSTRUCTION.—Nothing in this Act may be construed to modify or otherwise affect any right or remedy under any Federal consumer financial law, including 12 U.S.C. 5515 and 15 U.S.C. 41 et seq.

On page 81, lines 5 and 6, strike ''Unless otherwise provided in this Act'' and insert ''Notwithstanding any other provision of law''.

On page 82, lines 8 and 9, strike ''as specified in this subsection'' and insert ''for State laws relating to the chartering, licensure, or other authorization to do business as a permitted payment stablecoin issuer''.

On page 82, line 13, strike ''STABLECOIN'' and insert ''STABLECOINS''.

On page 82, line 15, strike ''Payment'' and insert ''A payment''.

On page 82, line 18, insert ''by a digital asset service provider'' after ''United States''.

On page 83, lines 6 and 7, strike ''that is''.

On page 83, line 25, insert ''except as provided in subsection (c)'' after ''(a),''.

On page 83, line 25, strike ''may'' and insert ''shall''.

On page 85, between lines 4 and 5, insert the following:

(C) PUBLICATION.—Upon a determination under subparagraph (A), the Secretary of the Treasury shall publish the determination in the Federal Register, including a statement detailing how the foreign payment stablecoin issuer has met the criteria described in subparagraph (B).

On page 86, line 9, insert ''Notwithstanding the foregoing, the Secretary of Treasury may determine that multiple acts of noncompliance constitute separate violations if such acts were the result of gross negligence, a reckless disregard for, or a pattern of indifference to, money laundering, financing of terrorism, or sanctions evasion requirements.'' after ''cause.''.

On page 88, line 15, insert ''(2), or (3),'' after ''(1),''.

On page 88, lines 15 and 16, strike ''a report''.

On page 88, line 19, insert ''a report, which may include a classified annex, if applicable,'' after ''House of Representatives,''.

On page 88, between lines 22 and 23, insert the following:

(d) RULE OF CONSTRUCTION.—Nothing in this Act shall be construed as altering the existing authority of the Secretary of the Treasury to block, restrict, or limit transactions involving payment stablecoins that reference or are denominated in United States dollars that are subject to the jurisdiction of the United States.

On page 91, line 22, strike ''Best practices'' and insert ''Standards''.

On page 92, line 2, strike ''and'' and insert ''or''.

On page 92, line 3, strike ''Best practices'' and insert ''Standards''.

On page 92, between lines 9 and 10, insert the following:

(4) Tailored risk management standards for financial institutions interacting with decentralized finance protocols.

On page 92, line 11, strike ''Not later than'' and all that follows through page 93, line 7, and insert the following:

(1) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the Secretary of the Treasury shall submit to the chairs and ranking members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report on—

(A) legislative and regulatory proposals to allow regulated financial institutions to develop and implement novel and innovative methods, techniques, or strategies to detect illicit activity, such as money laundering and sanctions evasion, involving digital assets;

(B) the results of the research and risk assessments conducted pursuant to this section;

(C) efforts to support the ability of financial institutions to implement novel and innovative methods, techniques, or strategies to detect illicit activity, such as money laundering and sanctions evasion, involving digital assets;

(D) the extent to which transactions on distributed ledgers, digital asset mixing services, tumblers, or other similar services that mix payment stablecoins in such a way as to make such transaction or the identity of the transaction parties less identifiable may facilitate illicit activity; and

(E) legislative recommendations relating to the scope of the term ''digital asset service provider'' and the application of that term to decentralized finance.

(2) CLASSIFIED ANNEX.—A report under this section may include a classified annex, if applicable.

On page 95, strike line 1 through 25 and insert the following:

(b) CUSTOMER PROPERTY REQUIREMENT.—A person described in subsection (a) shall, with respect to other property described in that subsection—

(1) treat and deal with the payment stablecoins, private keys, cash, and other property of a person for whom or on whose behalf the person described in that subsection receives, acquires, or holds payment stablecoins, private keys, cash, and other property (hereinafter referred to in this section as the ''customer'') as belonging to such customer and not as the property of such person; and

(2) take such steps as are appropriate to protect the payment stablecoins, private keys, cash, and other property of a customer from the claims of creditors of the person.

On page 98, line 8, insert ''provided such treatment is consistent with Federal law'' after ''deposit''.

On page 99, strike lines 6 through 18 and insert the following:

(a) IN GENERAL.—Subject to section 507(e) of title 11, United States Code, as added by subsection (d), in any insolvency proceeding of a permitted payment stablecoin issuer under Federal or State law, including any proceeding under that title and any insolvency proceeding administered by a State payment stablecoin regulator with respect to a permitted payment stablecoin issuer—

(1) the claim of a person holding payment stablecoins issued by the permitted payment stablecoin issuer shall have priority over the claims of the permitted payment stablecoin issuer and any other creditor of the permitted payment stablecoin issuer, with respect to required payment stablecoin reserves;

(2) notwithstanding any other provision of law, including the definition of ''claim'' under section 101(5) of title 11, United States Code, any person holding a payment stablecoin issued by the permitted payment stablecoin issuer shall be deemed to hold a claim; and

(3) the priority under paragraph (1) shall not apply to claims other than those arising directly from the holding of payment stablecoins or required payment stablecoin reserves maintained by the permitted payment stablecoin issuer.

On page 101, lines 16 and 17, strike ''of a person holding payment stablecoin'' and insert ''arising from a person's holding of a payment stablecoin''.

On page 103, between lines 7 and 8, insert the following:

(h) STUDY BY PRIMARY FEDERAL PAYMENT STABLECOIN REGULATORS.—

(1) STUDY REQUIRED.—The primary Federal payment stablecoin regulators shall perform a study of the potential insolvency proceedings of permitted payment stablecoin issuers, including an examination of—

(A) existing gaps in the bankruptcy laws and rules for permitted payment stablecoin issuers;

(B) the ability of payment stablecoin holders to be paid out in full in the event a permitted payment stablecoin issuer is insolvent; and

(C) the utility of orderly insolvency administration regimes and whether any additional authorities are needed to implement such regimes.

(2) REPORT.—Not later than 3 years after the date of enactment of this Act, the primary Federal payment stablecoin regulators shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that contains all findings of the study under paragraph (1), including any legislative recommendations.

On page 110, line 13, strike ''8'' and insert ''10''.

On page 113, line 8, insert a period at the end.

On page 114, between lines 11 and 12, insert the following:

(4) The foreign country in which the foreign payment stablecoin issuer is domiciled and regulated is not subject to comprehensive economic sanctions by the United States or in a jurisdiction that the Secretary of the Treasury has determined to be a jurisdiction of primary money laundering concern.

On page 114, line 19, insert ''Prior to such determination taking effect, the Secretary of the Treasury shall publish in the Federal Register a justification for such determination, including how the foreign country's regulatory and supervisory regime is comparable to the requirements established under this Act, including the requirements under section 4(a). The Stablecoin Certification Review Committee shall have not less than 7 days' notice of a determination under this paragraph to reject such determination prior to publication in the Federal Register. Such rejection shall be published in the Federal Register.'' after ''section 4(a).''.

On page 115, line 13, insert ''Prior to such rescission taking effect, the Secretary of the Treasury shall publish in the Federal Register a justification for the rescission.'' after ''under this Act.''.

On page 118, line 22, insert ''Prior to such rescission taking effect, the Comptroller shall publish in the Federal Register a justification for the rescission.'' after ''financial stability risk.''.

On page 119, strike lines 9 through 19 and insert the following:

(1) IN GENERAL.—The Secretary of the Treasury may create and implement reciprocal arrangements or other bilateral agreements between the United States and jurisdictions with payment stablecoin regulatory regimes that are comparable to the requirements established under this Act. The Secretary of the Treasury shall consider whether the jurisdiction's requirements for payment stablecoin issuers include—

(A) similar requirements to those under section 4(a);

(B) adequate anti-money laundering and counter-financing of terrorism program and sanction compliance standards; and

(C) adequate supervisory and enforcement capacity to facilitate international transactions and interoperability with United States dollar-denominated payment stablecoins issued overseas.

On page 119, between lines 19 and 20, insert the following:

(2) PUBLICATION.—Not later than 90 days prior to the entry into force of any arrangement or agreement under paragraph (1), the Secretary of the Treasury shall publish the arrangement or agreement in the Federal Register.

On page 119, in line 20, strike ''(2)'' and insert ''(3)''.

---

**SA 2242.** Mr. WHITEHOUSE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

**SEC. 20. EMISSIONS FROM POWER CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.**

(a) AMENDMENT.—Part A of title I of the Clean Air Act (42 U.S.C. 7401 et seq.) is amended by adding at the end the following:

**''SEC. 139. EMISSIONS FROM POWER CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.**

''(a) DEFINITIONS.—In this section:

''(1) COVERED FACILITY.—The term 'covered facility' means a data center or cryptomining facility that has more than 100 kilowatts of installed information technology nameplate power.

''(2) CRYPTOMINING FACILITY.—The term 'cryptomining facility' means a facility used to mine or create cryptocurrencies or other blockchain based digital assets, which may be—

''(A) a freestanding structure; or

''(B) a facility within a larger structure that uses environmental control equipment to maintain the proper conditions for the operation of electronic equipment.

''(3) DATA CENTER.—The term 'data center' has the meaning given the term in section 453(a) of the Energy Independence and Security Act of 2007 (42 U.S.C. 17112(a)).

''(4) ELECTRIC UTILITY.—The term 'electric utility' has the meaning given the term in section 3 of the Federal Power Act (16 U.S.C. 796).

''(5) REGION.—The term 'region' means a geographic region described in the National Transmission Needs Study of the Department of Energy, dated October 30, 2023.

''(b) ANNUAL DATA COLLECTION OF ENERGY CONSUMPTION OF DATA CENTERS AND CRYPTOMINING FACILITIES.—

''(1) IN GENERAL.—The Administrator, in conjunction with the Administrator of the Energy Information Administration, shall annually collect—

''(A) the information described in paragraph (2) from the owners of covered facilities, including federally owned data centers located within the United States and territories of the United States; and

''(B) the information described in paragraph (3) from the electric utilities that serve covered facilities.

''(2) INFORMATION DESCRIBED FOR COVERED FACILITIES.—The information referred to in paragraph (1)(A), with respect to a covered facility, is—

''(A) the location of the covered facility, including in which balancing authority area the covered facility is located;

''(B) whether the covered facility is a data center or a cryptomining facility;

''(C) the owner of the covered facility;

''(D) the electric utility, if any, that provides power to the covered facility;

''(E) the total annual electricity consumption of the covered facility;

''(F) the total annual electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility;

''(G) subject to paragraph (5), the percentage of electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of the covered facility that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source;

''(H) the terms of any power purchase agreements or other contractual mechanisms for procuring power from an electricity generator that the covered facility is party to; and

''(I) any other relevant information, as reasonably determined by the Administrator and the Administrator of the Energy Information Administration.

''(3) INFORMATION DESCRIBED FOR ELECTRIC UTILITIES.—The information referred to in paragraph (1)(B), with respect to each covered facility served by an electric utility, is—

''(A) the total annual electricity consumed by the covered facility from the electric grid;

''(B) subject to paragraph (4), the percentage of electricity consumed annually by the covered facility from the electric grid that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source;

''(C) the rates charged by the electric utility for each class of electric consumer for the current year and each of the 3 prior years; and

''(D) any other relevant information, as reasonably determined by the Administrator and the Administrator of the Energy Information Administration.

''(4) ELECTRICITY CONSUMED FROM THE ELECTRIC GRID.—For purposes of collecting the information described in paragraph (3)(B) with respect to a covered facility—

''(A) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the average resource mix of the electric utilities that serve the covered facility to be the resource mix for the portion of electricity consumed annually from the electric grid by a covered facility that is not described in subparagraph (B); and

''(B) if the covered facility or the owner of the covered facility is party to a power purchase agreement or other contractual mechanism for procuring power from an electricity generation asset (such as the voluntary higher rate described in subsection (c)(4)(C)(iii)(I)(aa)), or purchases and retires energy attribute certificates, the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the electricity generation represented by those instruments as part of the electricity consumed annually by the covered facility from the electric grid only if the owner of the covered facility can demonstrate that—

''(i)(I) the electricity generation asset began commercial operations not more than 36 months before the date on which operations began at the covered facility;

''(II) the electricity generation asset would otherwise be retired and the retirement could not be prevented by the use of existing public funding programs;

''(III) the electricity provided by the electricity generation asset would otherwise be curtailed;

''(IV) the power that the electricity generation asset provides to the covered facility resulted from an uprate that occurred not more than 36 months before the date on which operations began at the covered facility;

''(V) the power purchase agreement or other contractual mechanism was finalized before the date of enactment of this section; or

''(VI)(aa) the electricity generation asset has undergone or will undergo a retrofit that reduces the greenhouse emissions intensity of the electricity generation asset, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, by not less than 75 percent, as compared to before the retrofit; and

''(bb) the retrofit otherwise would not have occurred, even after the use of existing public funding programs, without the power purchase agreement or other contractual mechanism;

''(ii) the electricity is generated—

''(I) in the same calendar year as the electricity is consumed by the covered facility, in the case of electricity that is generated before January 1, 2028; and

''(II) in the same hour as the electricity is consumed by the covered facility or an energy storage asset that serves the covered facility, in the case of electricity that is generated after December 31, 2027;

''(iii)(I) the electricity generation asset that produced the electricity is electrically interconnected to a balancing authority located in the same region as the covered facility; or

''(II) the owner of the electricity generation asset can demonstrate that the power produced by the electricity generation asset is physically delivered to the covered facility, as determined by the Administrator, in coordination with the Secretary of Energy; and

''(iv) the electricity generation represented by the power purchase agreement or other contractual mechanism for procuring power from an electricity generation asset are claimed exclusively by the covered facility through the retirement of an equivalent quantity of energy attribute certificates.

''(5) ELECTRICITY CONSUMED FROM ASSETS BEHIND THE METER.—For purposes of collecting the information described in paragraph (2)(G) with respect to a covered facility—

''(A) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the average resource mix of the electric utilities that serve the covered facility to be the resource mix for the portion of electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of a covered facility that is not described in subparagraph (B); and

''(B) the Administrator, in conjunction with the Administrator of the Energy Information Administration, shall consider the electricity generated by electricity generation assets located behind the power meter of the covered facility as part of the electricity consumed annually by the covered facility from electricity generation assets located behind the power meter of the covered facility only if—

''(i) the owner of the covered facility can demonstrate that—

''(I) the electricity generation asset began operations not more than 36 months before the date on which operations began at the covered facility; or

''(II) the electricity generation asset would otherwise be retired and the retirement could not be prevented by the use of existing public funding programs; or

''(ii) the Administrator determines that the greenhouse gas emissions intensity, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, of the electricity generation asset is higher than the greenhouse gas emissions intensity of the electric utilities that serve the covered facility, based on the average resource mix of those electric utilities.

''(6) GREENHOUSE GAS EMISSIONS INTENSITY.—Based on the information collected under paragraph (1), for each covered facility, the Administrator shall determine the greenhouse gas emission intensity, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, of—

''(A) the total annual electricity consumed by the covered facility from the electric grid; and

''(B) the total annual electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility.

''(7) PUBLICLY AVAILABLE.—The Administrator shall make publicly available on an annual basis—

''(A) for each covered facility—

''(i) the information described in each of subparagraphs (A), (B), (C), and (D) of paragraph (2);

''(ii) the percent of electricity consumed annually by the covered facility that is generated from wind, solar, hydropower, nuclear, coal, gas, and any other power source; and

''(iii) the greenhouse gas emissions intensity of the total annual electricity consumed by the covered facility, as determined under paragraph (6); and

''(B) for each owner of a covered facility, the aggregate annual electricity consumption of all covered facilities owned by that owner.

''(8) CONFIDENTIAL BUSINESS INFORMATION.—

''(A) IN GENERAL.—Except as provided in subparagraph (B), of the information collected under paragraph (1), the Administrator and the Administrator of the Energy Information Administration shall treat the information described in each of subparagraphs (E) and (F) of paragraph (2) and subparagraph (A) of paragraph (3) as confidential business information.

''(B) EXCEPTION.—Subparagraph (A) does not apply to information that is required to be made publicly available pursuant to paragraph (7)(C).

''(c) EMISSIONS PERFORMANCE STANDARD.—

''(1) DEFINITIONS.—In this subsection:

''(A) BASELINE.—The term 'baseline', with respect to a covered facility in a calendar year, means the baseline of the region the covered facility is located in for that calendar year as determined under paragraph (2).

''(B) GREENHOUSE GAS.—

''(i) IN GENERAL.—The term 'greenhouse gas' means the air pollutants carbon dioxide, any hydrofluorocarbon, methane, nitrous oxide, any perfluorocarbon, and sulfur hexafluoride.

''(ii) GLOBAL WARMING POTENTIAL.—For purposes of the term 'methane' in clause (i), the Administrator shall use the 20-year global warming potential of methane, as determined in accordance with the Sixth Assessment Report of the Intergovernmental Panel on Climate Change.

''(2) DETERMINATION OF BASELINE.—

''(A) PUBLICATION OF BASELINE.—Not later than December 31, 2025, the Administrator shall determine and publish in the Federal Register the greenhouse gas emissions intensities of the electric grid of each region, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour.

''(B) INITIAL BASELINE.—For purposes of calendar year 2026, the baseline of each region shall be the baseline of that region published under subparagraph (A).

''(C) BASELINES THROUGH 2034.—For each of calendar years 2027 through 2034, the baseline of each region for that calendar year shall be determined by reducing the baseline from the previous calendar year by 11 percent of the baseline of that region for calendar year 2026.

''(D) BASELINE IN 2035 AND THEREAFTER.—For calendar year 2035 and each calendar year thereafter, the baseline for each region shall be 0 metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour.

''(3) ASSESSMENT OF FEES.—

''(A) FEE ON UTILITIES.—

''(i) IMPOSITION OF FEE ON UTILITIES.—Beginning on January 1, 2026, the Administrator shall, in accordance with this subparagraph and using the information collected under subsection (b) but subject to subparagraphs (C) and (D), assess on the owner of any electric utility providing power to a covered facility a fee with respect to the greenhouse gas emissions of the electricity consumed by the covered facility from the electric grid above the baseline of the region the covered facility is located in for that calendar year.

''(ii) AMOUNT OF FEE.—The amount of a fee assessed under clause (i) with respect to an electric utility for a calendar year shall be the sum obtained by adding, for each covered facility served by the electric utility, the product (rounded to the nearest dollar) obtained by multiplying—

''(I) the total electricity consumed by the covered facility from the electric grid during the calendar year, as expressed in kilowatt-hours;

''(II) subject to clause (iii), $20; and

''(III) the amount, if any, that the greenhouse gas emissions intensity of the electricity consumed by the covered facility from the electric grid, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, exceeds the baseline of the region the covered facility is located in for the calendar year.

''(iii) FEE ADJUSTMENT.—Beginning in calendar year 2027, the Administrator shall annually increase the amount described in clause (ii)(II) by the sum obtained by adding—

''(I) the product obtained by multiplying—

''(aa) the applicable amount under clause (ii)(II) during the previous calendar year; and

''(bb) the rate of inflation, as determined by the Administrator using the changes for the 12-month period ending the preceding November 30 in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor; and

''(II) $10.

''(iv) NOTIFICATION OF FEE AMOUNT.—Not later than January 31, 2027, and not later than January 31 of each calendar year thereafter, the Administrator shall notify—

''(I) the owner of each electric utility subject to a fee under clause (i) of the amount of the fee that is assessed with respect to the electric utility for the previous calendar year under clause (i); and

''(II) the owner of each covered facility of the total amount of any fee assessed for the previous calendar year under clause (i) that is attributable, pursuant to clause (ii), to the electricity consumed by the covered facility.

''(v) REMITTANCE OF FEE AMOUNT.—A fee assessed under clause (i) for a calendar year shall be due and payable to the Administrator not later than March 31 of the calendar year after the calendar year for which the fee is assessed.

''(vi) PASS-THROUGH LIMITATION.—

''(I) IN GENERAL.—Any electric utility assessed a fee under clause (i) may not recoup the cost of the fee by raising rates or assessing fees on any customer that is not a covered facility.

''(II) MONITORING COMPLIANCE.—The Administrator, in conjunction with the Administrator of the Energy Information Administration, shall use the best available data, including the information collected pursuant to subsection (b)(1)(B) and described in subsection (b)(3)(C), to monitor the compliance of electric utilities with subclause (I).

''(III) PENALTY.—If the Administrator, in conjunction with the Administrator of the Energy Information Administration, determines that an electric utility has violated subclause (I), the Administrator shall assess a fine on the electric utility in an amount equal to 2 times the amount recouped by the electric utility, as described in subclause (I), from customers that are not covered facilities.

''(B) FEE ON COVERED FACILITIES.—

''(i) IMPOSITION OF FEE ON COVERED FACILITIES.—Beginning on January 1, 2026, the Administrator shall, in accordance with this subparagraph and using the information collected under subsection (b) but subject to subparagraphs (C) and (D), assess on the owner of any covered facility a fee with respect to the greenhouse gas emissions of the electricity consumed by the covered facility from electricity generation assets located

behind the power meter of the covered facility above the baseline of the region the covered facility is located in for that calendar year.

"(ii) AMOUNT OF FEE.—The amount of a fee assessed under clause (i) with respect to a covered facility for a calendar year shall be the product (rounded to the nearest dollar) obtained by multiplying—

"(I) the total electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility during the calendar year, as expressed in kilowatt-hours;

"(II) subject to clause (iii), $20; and

"(III) the amount, if any, that the greenhouse gas emissions intensity of the electricity consumed by the covered facility from electricity generation assets located behind the power meter of the covered facility, expressed in terms of metric tons of carbon dioxide-equivalent of greenhouse gases per kilowatt-hour, exceeds the baseline of the region the covered facility is located in for the calendar year.

"(iii) FEE ADJUSTMENT.—Beginning in calendar year 2027, the Administrator shall annually increase the amount described in clause (ii)(II) by the sum obtained by adding—

"(I) the product obtained by multiplying—

"(aa) the applicable amount under clause (ii)(II) during the previous calendar year; and

"(bb) the rate of inflation, as determined by the Administrator using the changes for the 12-month period ending the preceding November 30 in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor; and

"(II) $10.

"(iv) NOTIFICATION OF FEE AMOUNT.—Not later than January 31, 2027, and not later than January 31 of each calendar year thereafter, the Administrator shall notify the owner of each covered facility the amount of the fee that is assessed with respect to the covered facility for the previous calendar year under clause (i).

"(v) REMITTANCE OF FEE AMOUNT.—A fee assessed under clause (i) for a calendar year shall be due and payable to the Administrator not later than March 31 of the calendar year after the calendar year for which the fee is assessed.

"(C) APPLICABILITY TO ZERO-CARBON ELECTRICITY GENERATION ASSETS.—This paragraph shall not apply to a covered facility if the Administrator, in conjunction with the Administrator of the Energy Information Administration, determines, pursuant to the information collected under subsection (b), that the covered facility is powered entirely by zero-carbon electricity generation assets during all hours of the operation of the covered facility.

"(D) ALTERNATIVE BASELINE.—If the Administrator determines at any point that the greenhouse gas emissions intensity of the electric grid of any region falls below the baseline of that region, during the period beginning on the date of that determination and ending on the date on which the Administrator determines that the determination is no longer applicable, subparagraphs (A) and (B) shall be applied to covered facilities located in that region by substituting 'greenhouse gas emissions intensity of the electric grid' for 'baseline'.

"(4) USE OF FUNDS.—

"(A) ADMINISTRATION.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 3 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during the previous calendar year to support the administration of the reporting program under subsection (b) and the assessment of the fees and penalties under this subsection.

"(B) CONSUMER ENERGY COSTS.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 25 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during the previous calendar year to award grants to States, Indian Tribes, municipalities, and electric utilities to support programs that lower residential electricity consumer energy costs, such as through energy use savings or direct rebates, to offset cost increases resulting from increased data center electricity consumption.

"(C) CLEAN FIRM GRANTS.—

"(i) IN GENERAL.—For fiscal year 2028 and each fiscal year thereafter, there are appropriated, out of any funds in the Treasury not otherwise appropriated, to the Administrator an amount equal to 70 percent of the amounts collected pursuant to fees and penalties assessed under paragraph (3) during the previous calendar year to award to eligible entities, as determined by the Administrator, grants, rebates, advanced market commitments, or low-interest loans, as determined appropriate by the Administrator, for the research, development, demonstration, and deployment of—

"(I) zero-carbon electricity generation assets that are capable of generating electricity throughout the year, with the exception of planned outages for maintenance, refueling, or retrofits, at capacity factors greater than 70 percent; or

"(II) long-duration energy storage assets that are capable of continuously discharging energy at their rated power output for at least 10 hours.

"(ii) APPLICATION.—An eligible entity seeking an award under clause (i) shall submit to the Administrator an application at such time, in such manner, and containing such information as the Administrator may require.

"(iii) CERTIFICATION AND CLAWBACK.—

"(I) CERTIFICATION.—An eligible entity that receives an award under clause (i) for the purpose of financing the construction or operation of an electricity generation asset or energy storage asset shall certify that any electric utility selling or contracted to sell electricity generated or stored by the asset shall—

"(aa) not later than 2 years after the date on which the eligible entity receives the award, allow the customers of the electric utility to voluntarily pay a higher rate for the purchase of electricity service that is sourced from zero-carbon electricity generation, including long-duration energy storage assets charged by zero-carbon electricity, in all hours of the year; and

"(bb) exclusively use the additional amounts collected pursuant to those higher rates to support the financing, development, or acquisition of—

"(AA) zero-carbon electricity generation assets that are capable of generating electricity throughout the year, with the exception of planned outages for maintenance, refueling, or retrofits, at capacity factors greater than 70 percent; or

"(BB) long-duration energy storage assets that are capable of continuously discharging energy at their rated power output for at least 10 hours.

"(II) CLAWBACK.—If the Administrator determines that a recipient of an award described in subclause (I) has violated the certification required under that subclause, the Administrator shall seek reimbursement of the full amount of the award from the recipient.

"(d) APPLICABILITY TO LEASED FACILITIES.—For purposes of this section—

"(1) if a covered facility is leased to a tenant, the tenant shall be considered the owner of the facility; and

"(2) if a portion of a covered facility is leased to a tenant and the leased space also meets the requirements described in subsection (a)(1)—

"(A) the leased space shall be considered to be a separate covered facility from the rest of the larger facility; and

"(B) the tenant shall be considered the owner of the covered facility that comprises the leased space.".

(b) SEVERABILITY.—If any provision of this section, an amendment made by this section, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this section and the amendments made by this section, and the application of the provision or amendment to any other person or circumstance, shall not be affected by the holding.

(c) EFFECTIVE DATE.—Notwithstanding section 19, this section and the amendments made by this section shall take effect on the date of enactment of this Act.

---

**SA 2243.** Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. TREATMENT OF PERMITTED PAYMENT STABLECOIN ISSUERS AS DEPOSITORY INSTITUTIONS.**

A permitted payment stablecoin issuer shall be deemed to be an insured depository institution for the purpose of any requirement applicable to an insured depository institution to file a charter, submit suspicious activity reports, report large transactions under the Bank Secrecy Act, meet regulatory capital standards, and undergo audits.

---

**SA 2244.** Mr. DURBIN (for himself and Mr. WARNOCK) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. FEDERAL CONSUMER FINANCIAL LAW SAVINGS CLAUSE.**

No authority granted or conferred to a primary Federal payment stablecoin regulator or State payment stablecoin regulator under this Act, or pursuant to any rule or order issued thereunder, or pursuant to any other provision in this Act, shall be construed, either directly or in conjunction with any other provision of law, including the Consumer Financial Protection Act of 2010 (Public Law 110–203; 124 Stat. 1955) and the Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.), to limit or otherwise abridge the authority of the Director of the Consumer Financial Protection Bureau to enforce Federal consumer financial laws with respect to any person. For the avoidance of doubt, the Consumer Financial Protection Bureau has jurisdiction over permitted payment stablecoin issuers to enforce the consumer financial laws under the purview of the Consumer Financial Protection Bureau, and all enumerated consumer protection provisions under the Consumer Financial Protection

Act of 2010 (12 U.S.C. 5481 et seq.) are applicable to payment stablecoins.

**SA 2245.** Mr. DURBIN submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(1)(B)(i), strike ''; and'' and insert a semicolon.

In section 4(a)(1)(B), add at the end the following:

''(iii) provide for fee limitations associated with purchasing or redeeming the payment stablecoins; and''.

**SA 2246.** Mr. DURBIN (for himself, Mr. BLUMENTHAL, Mr. REED, and Ms. WARREN) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ____. CRYPTO ATM FRAUD PREVENTION.**

(a) REGISTRATION WITH THE SECRETARY OF THE TREASURY.—Section 5330 of title 31, United States Code, is amended—

(1) in subsection (d)—

(A) in paragraph (1)(A), by inserting '', any person who owns, operates, or manages a virtual currency kiosk in the United States or its territories,'' after ''similar instruments''; and

(B) by adding at the end the following:

''(3) VIRTUAL CURRENCY; VIRTUAL CURRENCY ADDRESS; VIRTUAL CURRENCY KIOSK; VIRTUAL CURRENCY KIOSK OPERATOR.—The terms 'virtual currency', 'virtual currency address', 'virtual currency kiosk', and 'virtual currency kiosk operator' have the meanings given those terms, respectively, in section 5337.''; and

(2) by adding at the end the following:

''(f) REGISTRATION OF VIRTUAL CURRENCY KIOSK LOCATIONS.—

''(1) IN GENERAL.—Not later than 90 days after the effective date of this subsection, and not less than once every 90 days thereafter, the Secretary of the Treasury shall require virtual currency kiosk operators to submit an updated list containing the physical address of each virtual currency kiosk owned or operated by the virtual currency kiosk operator.

''(2) FORM AND MANNER OF REGISTRATION.—Each submission by a virtual currency kiosk operator pursuant to paragraph (1) shall include—

''(A) the legal name of the virtual currency kiosk operator;

''(B) any fictitious or trade name of the virtual currency kiosk operator;

''(C) the physical address of each virtual currency kiosk owned, operated, or managed by the virtual currency kiosk operator that is located in the United States or the territories of the United States;

''(D) the start date of operation of each virtual currency kiosk;

''(E) the end date of operation of each virtual currency kiosk, if applicable; and

''(F) each virtual currency address used by the virtual currency kiosk operator.

''(3) FALSE AND INCOMPLETE INFORMATION.—The filing of false or materially incomplete information in a submission required under paragraph (1) shall be deemed a failure to comply with the requirements of this subsection.''.

(b) PREVENTING FRAUDULENT TRANSACTIONS AT VIRTUAL CURRENCY KIOSKS.—

(1) IN GENERAL.—Subchapter II of Chapter 53 of Title 31, United States Code, is amended by adding at the end the following:

**''§ 5337. Virtual currency kiosk fraud prevention**

''(a) DEFINITIONS.—In this section:

''(1) BLOCKCHAIN ANALYTICS.—The term 'blockchain analytics' means the analysis of data from blockchains or public distributed ledgers, and associated transaction information, to provide risk-specific information about virtual currency transactions and virtual currency addresses.

''(2) CUSTOMER.—The term 'customer' means any person that purchases or sells virtual currency through a virtual currency kiosk.

''(3) EXISTING CUSTOMER.—The term 'existing customer' means a customer other than a new customer.

''(4) FINCEN.—The term 'FinCEN' means the Financial Crimes Enforcement Network of the Department of the Treasury.

''(5) NEW CUSTOMER.—The term 'new customer', with respect to a virtual currency kiosk operator, means a customer during the 14-day period beginning on the date of the first virtual currency kiosk transaction of the customer with the virtual currency kiosk operator.

''(6) TRANSACTION HASH.—The term 'transaction hash' means a unique identifier made up of a string of characters that act as a record of and provide proof that a transaction was verified and added to the blockchain.

''(7) VIRTUAL CURRENCY.—The term 'virtual currency' means any digital representation of value that is recorded on a cryptographically secured distributed ledger or any similar technology or another implementation, which was designed and built as part of a system to leverage or replace blockchain, distributed ledger technology, or their derivatives.

''(8) VIRTUAL CURRENCY ADDRESS.—The term 'virtual currency address' means an alphanumeric identifier associated with a virtual currency wallet identifying the location to which virtual currency purchased through a virtual currency kiosk can be sent or from which virtual currency sold through a virtual currency kiosk can be accessed.

''(9) VIRTUAL CURRENCY KIOSK.—The term 'virtual currency kiosk' means a stand-alone machine that is capable of accepting or dispensing legal tender in exchange for virtual currency.

''(10) VIRTUAL CURRENCY KIOSK OPERATOR.—The term 'virtual currency kiosk operator' means a person who owns, operates, or manages a virtual currency kiosk located in the United States or its territories.

''(11) VIRTUAL CURRENCY KIOSK TRANSACTION.—The term 'virtual currency kiosk transaction' means the purchase or sale of virtual currency via a virtual currency kiosk.

''(12) VIRTUAL CURRENCY WALLET.—The term 'virtual currency wallet' means a software application or other mechanism providing a means for holding, storing, and transferring virtual currency.

''(b) DISCLOSURES.—Before entering into a virtual currency transaction with a customer, a virtual currency kiosk operator shall disclose in a clear, conspicuous, and easily readable manner—

''(1) all relevant terms and conditions of the virtual currency kiosk transaction, including—

''(A) the amount of the virtual currency kiosk transaction;

''(B) the type and nature of the virtual currency kiosk transaction;

''(C) a warning that the virtual currency kiosk transaction is final, is not refundable, and may not be reversed; and

''(D) the type and amount of any fees or other expenses paid by the customer;

''(2) a warning relating to consumer fraud including—

''(A) a warning that consumer fraud often starts with contact from a stranger, and that the customer should never send money to someone they do not know;

''(B) a warning about the most common types of fraudulent schemes involving virtual currency kiosks, such as—

''(i) impersonation of a government official or a bank representative;

''(ii) threats of jail time or financial penalties;

''(iii) offers of a job or reward in exchange for payment, or offers of deals that seem too good to be true;

''(iv) claims of a frozen bank account or credit card; or

''(v) requests for donations to charity or disaster relief; and

''(C) a statement that the customer should contact the virtual currency kiosk operator's customer service helpline or State or local law enforcement if they suspect fraudulent activity.

''(c) ACKNOWLEDGMENT OF DISCLOSURES.—Each time a customer uses a virtual currency kiosk, the virtual currency kiosk operator shall ensure acknowledgment of all disclosures required under subsection (b) via confirmation of consent of the customer at the virtual currency kiosk.

''(d) RECEIPTS.—Upon completion of each virtual currency kiosk transaction, the virtual currency kiosk operator shall provide the customer with a receipt, which shall include the following information:

''(1) The name and contact information of the virtual currency kiosk operator, including a telephone number for a customer service helpline.

''(2) The name of the customer.

''(3) The type, value, date, and precise time of the virtual currency kiosk transaction, transaction hash, and each applicable virtual currency address.

''(4) The amount of the virtual currency kiosk transaction expressed in United States dollars.

''(5) All fees charged.

''(6) A statement that the customer may be entitled by law to a refund if the customer reports fraudulent activity in conjunction with the virtual currency kiosk transaction not later than 30 days after the date of the virtual currency kiosk transaction.

''(7) The refund policy of the virtual currency kiosk operator or a Uniform Resource Locator where the refund policy of the virtual currency kiosk operator can be found.

''(8) A statement that the customer should contact law enforcement if they suspect fraudulent activity, such as scams, including contact information for a relevant law enforcement or government agency.

''(9) Any additional information the virtual currency kiosk operator determines appropriate.

''(e) PHYSICAL RECEIPTS REQUIRED.—Not later than 1 year after the effective date of this section, each receipt required under subsection (d) shall be issued to the customer as a physical receipt at the virtual currency kiosk at the time of the virtual currency kiosk transaction, but such receipt may also be provided in additional forms or communications.

''(f) ANTI-FRAUD POLICY.—

''(1) IN GENERAL.—Each virtual currency kiosk operator shall take reasonable steps to detect and prevent fraud, including establishing and maintaining a written anti-fraud policy that includes—

''(A) the identification and assessment of fraud-related risk areas;

''(B) procedures and controls to protect against risks identified under subparagraph (A);

''(C) allocation of responsibility for monitoring the risks identified under subparagraph (A); and

''(D) procedures for the periodic evaluation and revision of the anti-fraud procedures, controls, and monitoring mechanisms under subparagraphs (B) and (C).

''(2) SUBMISSION OF ANTI-FRAUD POLICY TO FINCEN.—Each virtual currency kiosk operator shall submit to FinCEN the anti-fraud policy required under paragraph (1) not later than 90 days after the later of—

''(A) the effective date of this section; or

''(B) the date on which the virtual currency kiosk operator begins operating.

''(g) APPOINTMENT OF COMPLIANCE OFFICER.—Each virtual currency kiosk operator shall designate and employ a compliance officer who—

''(1) is qualified to coordinate and monitor compliance with this section and all other applicable Federal and State laws, rules, and regulations;

''(2) is employed full-time by the virtual currency kiosk operator;

''(3) is not the chief executive officer of the virtual currency kiosk operator; and

''(4) does not own or control more than 20 percent of any interest in the virtual currency kiosk operator.

''(h) USE OF BLOCKCHAIN ANALYTICS.—

''(1) IN GENERAL.—Each virtual currency kiosk operator shall use blockchain analytics to prevent sending virtual currency to a virtual currency wallet known to be affiliated with fraudulent activity at the time of a virtual currency kiosk transaction and to detect transaction patterns indicative of fraud or other illicit activities.

''(2) COMPLIANCE.—The Director of FinCEN may request evidence from any virtual currency kiosk operator to confirm compliance with this subsection.

''(i) VERBAL CONFIRMATION REQUIRED BEFORE NEW CUSTOMER TRANSACTIONS.—

''(1) IN GENERAL.—Before entering into a virtual currency kiosk transaction valued at 500 dollars or more with a new customer, a virtual currency kiosk operator shall obtain verbal confirmation from the new customer that—

''(A) the new customer wishes to proceed with the virtual currency kiosk transaction;

''(B) the new customer understands the nature of the virtual currency kiosk transaction; and

''(C) the new customer is not being fraudulently induced to engage in the transaction.

''(2) REASONABLE EFFORT.—A virtual currency kiosk operator shall make a reasonable effort to determine whether the customer is being fraudulently induced to engage in the virtual currency kiosk transaction.

''(3) METHOD OF CONFIRMATION.—Each verbal confirmation required under paragraph (1) shall be given by way of a live telephone or video call to a person employed by, or on behalf of, the virtual currency kiosk operator.

''(j) REFUNDS.—

''(1) IN GENERAL.—

''(A) NEW CUSTOMERS.—Not later than 30 days after receiving an application under paragraph (2), a virtual currency kiosk operator shall issue a refund to a customer for the full amount of each virtual currency kiosk transaction, including the dollar value of virtual currency exchanged and all transaction fees, made during the period in which the customer was a new customer and for which the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

''(B) EXISTING CUSTOMERS.—Not later than 30 days after receiving an application under paragraph (2), a virtual currency kiosk operator shall issue a refund to a customer for the full amount of all transaction fees associated with each virtual currency kiosk transaction made during the period in which the customer was an existing customer and for which the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

''(2) APPLICATION.—A customer seeking a refund under paragraph (1) shall, not later than 30 days after the date of the virtual currency kiosk transaction, submit an application to the virtual currency kiosk operator that includes the following:

''(A) The name, address, and phone number of the customer.

''(B) The transaction hash of the virtual currency kiosk transaction or information sufficient to determine the type, value, date, and time of the virtual currency kiosk transaction.

''(C) A copy of a report to a State or local law enforcement or government agency, made not later than 30 days after the virtual currency kiosk transaction, that includes a sworn affidavit attesting that the customer was fraudulently induced to engage in the virtual currency kiosk transaction.

''(3) ENHANCED DAMAGES.—Any person who willfully denies a refund to a customer in violation of paragraph (1) shall be liable to the customer for 3 times the amount of the refund owed under that paragraph or $10,000, whichever is greater. A penalty under this paragraph shall be in addition to any penalty under subsection (n).

''(k) TRANSACTION LIMITS WITH RESPECT TO NEW CUSTOMERS.—

''(1) IN A 24-HOUR PERIOD.—A virtual currency kiosk operator shall not accept more than $2,000, or the equivalent amount in virtual currency, from any new customer during any 24-hour period.

''(2) TOTAL.—A virtual currency kiosk operator shall not accept a total of more than $10,000, or the equivalent amount in virtual currency, from any new customer.

''(l) CUSTOMER SERVICE HELPLINE.—Each virtual currency kiosk operator shall provide live customer service during all hours that the virtual currency kiosk operator accepts virtual currency kiosk transactions, the phone number for which is regularly monitored and displayed in a clear, conspicuous, and easily readable manner upon each virtual currency kiosk.

''(m) COMMUNICATIONS WITH LAW ENFORCEMENT.—

''(1) IN GENERAL.—Each virtual currency kiosk operator shall provide a dedicated and frequently monitored phone number and email address for relevant law enforcement and government agencies to facilitate communication with the virtual currency kiosk operator in the event of reported or suspected fraudulent activity.

''(2) SUBMISSION.—Not later than 90 days after the effective date of this section, each virtual currency kiosk operator shall submit the phone number and email address described in paragraph (1) to FinCEN and all other relevant law enforcement and government agencies.

''(n) CIVIL PENALTIES.—

''(1) IN GENERAL.—Any person who fails to comply with any requirement of this section, or any regulation prescribed under this section, shall be liable to the United States for a civil monetary penalty of $10,000 for each such violation.

''(2) CONTINUING VIOLATION.—Each day that a violation described in paragraph (1) continues shall constitute a separate violation for purposes of such paragraph.

''(3) ASSESSMENTS.—Any penalty imposed under this section shall be assessed and collected by the Secretary of the Treasury as provided in section 5321 and any such assessment shall be subject to the provisions of that section.

''(o) RELATIONSHIP TO STATE LAWS.—The provisions of this section shall preempt any State law, rule, or regulation only to the extent that such State law, rule, or regulation conflicts with a provision of this section. Nothing in this section shall be construed to prohibit a State from enacting a law, rule, or regulation that provides greater protection to customers than the protection provided by the provisions of this section.''.

(2) CLERICAL AMENDMENT.—The table of sections for chapter 53 of title 31, United States Code, is amended by inserting after the item relating to section 5336 the following:

''5337. Virtual currency kiosk fraud prevention.''.

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect 90 days after the date of enactment of this Act.

---

**SA 2247.** Mr. LEE submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. BANK SECRECY ACT REFORMS.**

(a) RIGHT TO FINANCIAL PRIVACY ACT OF 1978.—The Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.) is amended—

(1) by amending section 1102 (12 U.S.C. 3402) to read as follows:

**''SEC. 1102. CONFIDENTIALITY OF RECORDS—GOVERNMENT AUTHORITIES.**

''Except as provided by subsection (c) or (d) of section 1103 or section 1113, no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and such financial records are disclosed in response to a search warrant which meets the requirements of section 1106.'';

(2) by striking sections 1104 (12 U.S.C. 3404), 1105 (12 U.S.C. 3405), 1107 (12 U.S.C. 3407), and 1108 (12 U.S.C. 3408); and

(3) in section 1109(a) (12 U.S.C. 3409(a)), by striking ''section 1104(c), 1105(2), 1106(c), 1107(2), 1108(4),'' and inserting ''section 1106(c)''.

(b) TITLE 31.—Chapter 53 of title 31, United States Code, is amended—

(1) by amending section 5311 to read as follows:

**''§ 5311. Declaration of purpose**

''It is the purpose of this subchapter to require financial institutions to retain transaction records that include information identified with or identifiable as being derived from the financial records of particular customers.'';

(2) in section 5312(a)—

(A) in paragraph (2), by repealing subparagraphs (O), (Q), (S), (T), (V), (Y), and (Z); and

(B) by amending paragraph (4) to read as follows:

''(4) 'nonfinancial trade or business' means any entity engaged in trade or business other than a financial institution.'';

(3) by striking sections 5313, 5314, 5315, 5316, 5317, 5318A, 5324, 5326, 5331, 5332, and 5336;

(4) in section 5318—

(A) in subsection (a)—

(i) in the matter preceding paragraph (1), by striking ''(except under section 5315 of this title and regulations prescribed under section 5315)'';

(ii) by striking paragraph (2); and

(iii) by redesignating paragraphs (3) through (7) as paragraphs (2) through (6), respectively; and

(B) in subsection (k)—

(i) in paragraph (1)(C), by striking ''has the same meaning as in section 5318A(e)(1)(B)'' and inserting ''means an account established to receive deposits from, make payments on behalf of a foreign financial institution, or handle other financial transactions related to such institution''; and

(ii) in paragraph (3)(A)(i)—

(I) in subclause (II), by adding ''or'' at the end;

(II) in subclause (III), by striking ''; or'' and inserting a period; and

(III) by striking subclause (IV);

(5) in section 5321—

(A) in subsection (a)—

(i) in paragraph (1), by striking ''(except sections 5314, 5315, and 5336 of this title or a regulation prescribed under sections 5314, 5315, and 5336)'';

(ii) by striking paragraphs (2), (3), (4), and (5);

(iii) in paragraph (6), by striking ''(except section 5336)'' each place that term appears;

(iv) in paragraph (7), by striking ''or any special measures imposed under section 5318A''; and

(v) by redesignating paragraphs (6) and (7) as paragraphs (2) and (3), respectively;

(B) by striking subsection (c); and

(C) by redesignating subsections (d) through (g) as subsection (c) through (f), respectively;

(6) in section 5322—

(A) by striking ''(except section 5315, 5324, or 5336 of this title or a regulation prescribed under section 5315, 5324, or 5336)'' each place that term appears; and

(B) in subsection (d)—

(i) by striking '', or any special measures imposed under section 5318A,''; and

(ii) by striking ''or section 5318A'';

(7) in section 5325(a), in the matter preceding paragraph (1), by inserting after ''$3,000'' the following: ''(as such amount is annually adjusted by the Secretary to reflect the percentage change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor)'';

(8) in section 5330(d)(1)—

(A) in subparagraph (A), by adding ''and'' at the end;

(B) by striking subparagraph (B); and

(C) by redesignating subparagraph (C) as subparagraph (B);

(9) in section 5335—

(A) by striking subsection (c); and

(B) by redesignating subsections (d) and (e) as subsections (c) and (d), respectively;

(10) by striking subchapter III; and

(11) in the table of contents for chapter 53, by striking the items relating to—

(A) sections 5313, 5314, 5315, 5316, 5317, 5318A, 5324, 5326, 5331, 5332, and 5336; and

(B) subchapter III.

**SEC. _____. WARRANT REQUIREMENTS AND EXCEPTIONS.**

The Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.) is amended—

(1) in section 1108 (12 U.S.C. 3408)—

(A) by striking paragraph (2); and

(B) by redesignating paragraphs (3) and (4) as paragraphs (2) and (3), respectively; and

(2) in section 1113 (12 U.S.C. 3413)—

(A) by repealing subsections (a), (d), (e), (f), (g), (i), (l), (m), (n), (p), (q), and (r); and

(B) by adding at the end the following:

''(s) ACCESS OF RECORDS.—

''(1) IN GENERAL.—Notwithstanding any other provision of this title, the Federal Government may not access the financial records or information of an individual in a manner that is prohibited by the Fourth Amendment to the Constitution of the United States with respect to the records or information in question.

''(2) AID IN STATUTORY CONSTRUCTION.—It is the sense of Congress that, through the enactment of this title, Congress has established a statutory right that ensures that the expectation of privacy that the people of the United States have with respect to financial records is protected.''.

**SA 2248.** Mr. TUBERVILLE submitted an amendment intended to be proposed to amendment SA 2228 proposed by Mr. THUNE (for Mr. RICKETTS (for himself and Ms. LUMMIS)) to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

(d) PROHIBITION ON FOREIGN ADVERSARY OWNERSHIP.—A foreign payment stablecoin issuer may not be owned, in whole or in part, by—

(1) the People's Republic of China, including the Hong Kong Special Administrative Region and the Macao Special Administrative Region;

(2) the Republic of Cuba;

(3) the Islamic Republic of Iran;

(4) the Democratic People's Republic of Korea;

(5) the Russian Federation; or

(6) the Bolivarian Republic of Venezuela under the regime of Nicolás Maduro Moros.

**SA 2249.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(10)(A)(i), strike ''$50,000,000,000'' and insert ''$10,000,000,000''.

**SA 2250.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(a)(1), strike subparagraph (A) and insert the following:

(A) maintain reserves backing the issuer's payment stablecoins outstanding on an at least 1 to 1 basis, with reserves comprising—

(i) United States coins and currency (including Federal reserve notes);

(ii) funds held as insured demand deposits (or other deposits that may be withdrawn upon request at any time) at insured depository institutions or insured shares at insured depository institutions, subject to limitations established by the Corporation and the National Credit Union Administration, respectively, to address safety and soundness risks of such insured depository institutions; or

(iii) Treasury bills—

(I)(aa) with a remaining maturity of 93 days or less; or

(bb) issued with a maturity of 93 days or less; and

(II) with a weighted average maturity of not more than 30 days;

**SA 2251.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the end the following:

**SEC. _____. ACQUISITION AND DISPOSITION OF DIGITAL ASSETS.**

(a) IN GENERAL.—No funds shall be used to acquire additional digital assets, other than in connection with criminal or civil asset forfeiture proceedings or in satisfaction of any civil money penalty imposed by any agency.

(b) DISPOSITION.—The Secretary of the Treasury and the Attorney General shall dispose of any digital assets in the Department of the Treasury Forfeiture Fund and the Department of Justice Assets Forfeiture Fund, respectively, in a reliable and predictable manner over time in order to—

(1) be returned to identifiable and verifiable victims of crime;

(2) be used for law enforcement operations;

(3) be equitably shared with State and local law enforcement partners; or

(4) for any other purpose described in section 9705 of title 31, United States Code, section 524(c) of title 28, United States Code, section 981 of title 18, United States Code, or section 511 of the Controlled Substances Act (21 U.S.C. 881).

(c) REPORTS.—The reports to Congress described in 9705 of title 31, United States Code, and section 524(c) of title 28, United States Code, shall include a report on the time horizons over which the Secretary and the Attorney General anticipate disposing of digital assets in the Funds.

**SA 2252.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Add at the end the following:

**SEC. _____. STANDARD OF REVIEW.**

If this Act is silent or ambiguous as to the proper construction of a particular term or provision or set of terms or provisions, and a primary Federal payment stablecoin regulator has followed the applicable procedures in sections 551 through 559 of title 5, United States Code, has otherwise lawfully adjudicated a matter, or has followed the corresponding procedural provisions of this Act, as applicable, a reviewing court shall defer to the reasonable or permissible interpretation of that statute by an agency, regardless of the significance of the related agency action or a possible future agency action.

**SA 2253.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(a)(10) and insert the following:

(10) AUDITING AND INTERNAL CONTROLS.—

(A) MANAGEMENT RESPONSIBILITY FOR FINANCIAL STATEMENTS AND INTERNAL CONTROLS.—Each payment stablecoin issuer shall prepare—

(i) annual financial statements in accordance with generally accepted accounting principles and such other disclosure requirements as the primary Federal payment stablecoin regulators and State payment stablecoin regulators may prescribe; and

(ii) a report signed by the chief executive officer and the chief accounting or financial officer of the institution which contains—

(I) a statement of the management's responsibilities for—

(aa) preparing financial statements;

(bb) establishing and maintaining an adequate internal control structure and procedures for financial reporting; and

(cc) complying with the laws and regulations relating to safety and soundness which

are designated by the primary Federal payment stablecoin regulators and State payment stablecoin regulators; and

(II) an assessment, as of the end of the institution's most recent fiscal year, of—

(aa) the effectiveness of such internal control structure and procedures; and

(bb) the institution's compliance with the laws and regulations relating to safety and soundness which are designated by the primary Federal payment stablecoin regulators and State payment stablecoin regulators.

(B) INTERNAL CONTROL EVALUATION AND REPORTING REQUIREMENTS FOR INDEPENDENT PUBLIC ACCOUNTANTS.—

(i) IN GENERAL.—With respect to any internal control report of any institution, the institution's independent public accountant shall attest to, and report separately on, the assertions of the institution's management contained in such report.

(ii) ATTESTATION REQUIREMENTS.—Any attestation pursuant to clause (i) shall be made in accordance with generally accepted standards for attestation engagements.

(C) ANNUAL INDEPENDENT AUDITS OF FINANCIAL STATEMENTS.—

(i) AUDITS REQUIRED.—The primary Federal payment stablecoin regulators and State payment stablecoin regulators shall prescribe regulations requiring that each payment stablecoin issuer shall have an annual independent audit made of the institution's financial statements by an independent public accountant in accordance with generally accepted auditing standards.

(ii) SCOPE OF AUDIT.—In connection with any audit under this subparagraph, the independent public accountant shall determine and report whether the financial statements of the issuer—

(I) are presented fairly in accordance with generally accepted accounting principles; and

(II) comply with such other disclosure requirements as the primary Federal payment stablecoin regulators and State payment stablecoin regulators may prescribe.

(D) FORM AND CONTENT OF REPORTS AND AUDITING STANDARD.—The scope of each report by an independent public accountant pursuant to this paragraph, and the procedures followed in preparing such report, shall meet or exceed the scope and procedures required by generally accepted auditing standards and other applicable standards recognized by the primary Federal payment stablecoin regulators and State payment stablecoin regulators.

**SA 2254.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ____. SANCTIONS ENFORCEMENT.**

(a) EXTRATERRITORIAL JURISDICTION.—For purposes of any provision of law authorizing sanctions or sanctions enforcement actions, a payment stablecoin denominated in United States dollars, wherever located, shall be considered property subject to the jurisdiction of the United States.

(b) AUTHORITIES OVER DIGITAL ASSET PLATFORMS.—Section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702) is amended by adding at the end the following:

''(d) DIGITAL ASSET PLATFORMS.—

''(1) IN GENERAL.—For the purposes of this section, any digital asset platform, wherever located, shall be considered subject to the jurisdiction of the United States if the Secretary of the Treasury determines the platform is engaged in the business of performing any of the functions of a digital asset platform in interstate commerce.

''(2) DEFINITION.—For purposes of paragraph (1), the term 'digital asset platform' means any person that the Secretary determines—

''(A) facilitates the exchange, purchase, sale, custody, transfer, issuance, or lending of digital assets (as defined in section 2 of the Guiding and Establishing National Innovation for U.S. Stablecoins Act);

''(B) makes available any service in connection with digital asset transactions; or

''(C) controls any person engaged in an activity described in subparagraph (A) or (B).''.

**SA 2255.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ____. USE OF SANCTIONS AUTHORITIES UNDER INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT WITH RESPECT TO BLOCKCHAIN-ENABLED SMART CONTRACTS.**

Section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702) is amended—

(1) in subsection (a), by adding at the end the following:

''(4) The President may exercise the authorities granted by this subsection with respect to blockchain-enabled smart contracts, or other similar technology, without regard to whether such contracts operate autonomously, can be modified, or are owned.''; and

(2) by adding at the end the following:

''(d) In this section:

''(1) The term 'interest' includes any interest of any nature whatsoever, direct or indirect, present, future, or contingent, and legal, equitable, or beneficial, or otherwise, without regard to whether such interest is legally cognizable.

''(2) The terms 'person' and 'national' include—

''(A) any individual;

''(B) any entity, association, group, or other organization; and

''(C) any body of persons joined by common purpose or interest.

''(3) The term 'property' includes—

''(A) property of any nature whatsoever, real, personal, or mixed, tangible or intangible, even if such property is abandoned or ownerless;

''(B) services of any nature whatsoever; and

''(C) contracts of any nature whatsoever.''.

**SA 2256.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4(a), insert the following:

(____) ADDITIONAL STANDARDS AUTHORIZED.—The primary Federal payment stablecoin regulators and State payment stablecoin regulators may establish additional prudential standards, including enhanced public disclosures, for payment stablecoin issuers that such regulators determine are appropriate, in their discretion.

**SA 2257.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. PROHIBITIONS OR CONDITIONS ON CERTAIN TRANSMITTALS OF FUNDS.**

Section 5318A of title 31, United States Code, is amended—

(1) in subsection (a)(2)(C), by striking ''subsection (b)(5)'' and inserting ''paragraphs (5) and (6) of subsection (b)''; and

(2) in subsection (b)—

(A) in paragraph (5), by striking ''for or on behalf of a foreign banking institution''; and

(B) by adding at the end the following:

''(6) PROHIBITIONS OR CONDITIONS ON CERTAIN TRANSMITTALS OF FUNDS.—If the Secretary finds a jurisdiction outside the United States, 1 or more financial institutions operating outside the United States, 1 or more types of accounts within, or involving, a jurisdiction outside the United States, or 1 or more classes of transactions within, or involving, a jurisdiction outside the United States to be of primary money laundering concern, the Secretary, in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System, may prohibit, or impose conditions upon, certain transmittals of funds (to be determined by the Secretary) to or from any domestic financial institution or domestic financial agency if that transmittal of funds involves any such jurisdiction, institution, class of transaction, or type of account.''.

**SA 2258.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4(a)(8), insert the following:

(____) MANAGEMENT OFFICIALS.—

(i) IN GENERAL.—A management official of a permitted payment stablecoin issuer may not serve as a management official of any other permitted payment stablecoin issuer that is not an institution-affiliated party.

(ii) ENFORCEMENT.—In the enforcement of any violation of clause (i), the Attorney General shall have all of the functions and powers afforded the Attorney General under the Clayton Act (15 U.S.C. 12 et seq.) without respect to any jurisdictional limitations under that Act, including the power to bring an enforcement action in the same manner as if the violation of this subsection had been a violation of that Act. All of the functions and powers of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice are available to the Attorney General or to such Assistant Attorney General to investigate a possible violation of clause (i) in the same manner as if such possible violation was a possible violation of that Act.

**SA 2259.** Mr. MURPHY submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. MEME ACT.**

(a) SHORT TITLE.—This section may be cited as the ''Modern Emoluments and Malfeasance Enforcement Act'' or the ''MEME Act''.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) federally elected officials must not utilize those positions, granted by the trust of the public, for private financial gain;

(2) the issuance, sponsorship, or promotion of financial instruments by public office holders deprives the public of the honest services of the public office holders, facilitates bribery by investors or purchasers, and results in public exploitation and corrupt foreign influence; and

(3) Members of Congress and the executive branch must not seek to use public office to benefit financially, but rather those positions should be held in trust for the benefit of the public in the United States.

(c) PROHIBITED FINANCIAL TRANSACTIONS.—

(1) FINANCIAL EXPLOITATION BY PUBLIC OFFICE HOLDERS.—

(A) IN GENERAL.—Chapter 131 of title 5, United States Code, is amended by adding at the end the following:

**"Subchapter IV—Financial Exploitation by Public Office Holders**

**"§ 13151. Definitions**

''In this subchapter:

''(1) ADJACENT INDIVIDUAL.—The term 'adjacent individual' means—

''(A) each officer or employee in the executive branch holding a Senior Executive Service position (as defined in section 3132(a)(2));

''(B) each member of a uniformed service whose pay grade is at or in excess of O–7 under section 201 of title 37;

''(C) each officer or employee in any other position in the executive branch determined by the Office of the Special Counsel, in consultation with the Director of the Office of Government Ethics, to be of equal classification to a position described in subparagraph (A) or (B); or

''(D) the spouse or dependent child of any individual described in subparagraph (A), (B), or (C).

''(2) COVERED ASSET.—The term 'covered asset' means—

''(A) a security (as defined in section 3(a) of Securities Exchange Act of 1934 (15 U.S.C. 78c(a)));

''(B) a security future (as defined in section 3(a) of Securities Exchange Act of 1934 (15 U.S.C. 78c(a)));

''(C) a commodity (as defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a));

''(D) a digital asset that can be sold for remuneration, including a cryptocurrency, a meme coin, a token, or a non-fungible token; or

''(E) any derivative, option, warrant, mutual fund, or exchange-traded fund of an asset described in subparagraphs (A) through (D).

''(3) COVERED INDIVIDUAL.—The term 'covered individual' means—

''(A) the President;

''(B) the Vice President;

''(C) a public official (as defined in section 201(a) of title 18); or

''(D) the spouse or dependent child of any individual described in subparagraph (A), (B), or (C).

''(4) DEPENDENT CHILD.—The term 'dependent child' has the meaning given the term in section 13101.

''(5) PROHIBITED FINANCIAL TRANSACTION.—The term 'prohibited financial transaction' means the issuance, sponsorship, or promotion of a covered asset for pecuniary gain.

**"§ 13152. Prohibition on certain transactions**

''(a) PROHIBITION.—Except as provided in subsection (b), a covered individual or an adjacent individual may not engage in or benefit from a prohibited financial transaction—

''(1) during the term of service of the covered individual or adjacent individual;

''(2) during the 180-day period ending on the date on which the service of the covered individual or adjacent individual commences; or

''(3) during the 180-day period beginning on the date on which the service of the covered individual or adjacent individual is terminated.

''(b) ADJACENT INDIVIDUALS.—With respect to adjacent individuals, nothing in this section shall be construed to limit the application of section 208 of title 18.

''(c) LIABILITY AND IMMUNITY.—For purposes of any immunities to civil liability, any conduct comprising or relating to a prohibited financial transaction under this section shall be deemed an unofficial act and beyond the scope of the official duties of the relevant covered individual or adjacent individual.

**"§ 13153. Civil penalties**

''(a) CIVIL ACTION.—The Attorney General may bring a civil action in any appropriate district court of the United States against any covered individual or adjacent individual who violates section 13152(a).

''(b) CIVIL PENALTY.—Any covered individual or adjacent individual who knowingly violates section 13152(a) shall be subject to a civil monetary penalty of not more than $250,000.

''(c) DISGORGEMENT.—A covered individual or an adjacent individual who is found to have violated section 13152(a) in a civil action under subsection (a) of this section shall disgorge to the Treasury of the United States any profit from the unlawful activity that is the subject of that civil action.''.

(B) CLERICAL AMENDMENT.—The table of sections for chapter 131 of title 5, United States Code, is amended by adding at the end the following:

''SUBCHAPTER IV—FINANCIAL EXPLOITATION BY PUBLIC OFFICE HOLDERS

''13151. Definitions.
''13152. Prohibition on certain transactions.
''13153. Civil penalties.''.

(2) CRIMINAL PENALTIES.—

(A) PROHIBITED FINANCIAL TRANSACTIONS.—Chapter 11 of title 18, United States is amended by inserting after section 220 the following:

**"§ 221. Prohibited financial transactions**

''(a) DEFINITIONS.—In this section:

''(1) ADJACENT INDIVIDUAL.—The term 'adjacent individual' means—

''(A) each officer or employee in the executive branch holding a Senior Executive Service position (as defined in section 3132(a)(2) of title 5);

''(B) each member of a uniformed service whose pay grade is at or in excess of O–7 under section 201 of title 37;

''(C) each officer or employee in any other position in the executive branch determined by the Office of the Special Counsel, in consultation with the Director of the Office of Government Ethics, to be of equal classification to a position described in subparagraph (A) or (B); or

''(D) the spouse or dependent child of any individual described in subparagraph (A), (B), or (C).

''(2) COVERED ASSET.—The term 'covered asset' means—

''(A) a security (as defined in section 3(a) of Securities Exchange Act of 1934 (15 U.S.C. 78c(a)));

''(B) a security future (as defined in section 3(a) of Securities Exchange Act of 1934 (15 U.S.C. 78c(a)));

''(C) a commodity (as defined in section 1a of the Commodity Exchange Act (7 U.S.C. 1a));

''(D) a digital asset that can be sold for remuneration, including a cryptocurrency, a meme coin, a token, or a non-fungible token; or

''(E) any derivative, option, warrant, mutual fund, or exchange-traded fund of an asset described in subparagraphs (A) through (D).

''(3) COVERED INDIVIDUAL.—The term 'covered individual' means—

''(A) the President;

''(B) the Vice President;

''(C) a public official (as defined in section 201(a)); or

''(D) the spouse or dependent child of any individual described in subparagraph (A), (B), or (C).

''(4) DEPENDENT CHILD.—The term 'dependent child' has the meaning given the term in section 13101 of title 5.

''(5) PROHIBITED FINANCIAL TRANSACTION.—The term 'prohibited financial transaction' means the issuance, sponsorship, or promotion of a covered asset for pecuniary gain.

''(b) BENEFIT FROM PROHIBITED FINANCIAL TRANSACTION.—Any covered individual or adjacent individual who—

''(1) knowingly violates any provision of section 13152(a) of title 5; and

''(2) through such violation—

''(A) causes an aggregate loss of not less than $1,000,000 to 1 or more persons in the United States; or

''(B) benefits financially, through profit, gain, or advantage, directly or indirectly through any family member or business associate of the covered individual or adjacent individual, from the sale, purchase, or distribution of the covered asset issued in violation of section 13152(a) of title 5,

shall be fined under this title or imprisoned for not more than 5 years, or both.

''(c) BRIBERY.—Any covered individual or adjacent individual who—

''(1) knowingly violates any provision of section 13152(a) of title 5; and

''(2) directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept any thing of value personally or for any other person or entity, in return for—

''(A) being influenced in the performance of any official act;

''(B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

''(C) being induced to do or omit to do any act in violation of the official duty of such official or person,

shall be fined under this title or not more than 3 times the amount of financial gain, if any, that the individual benefitted from relating to the prohibited conduct, whichever is greater, or imprisoned for not more than 15 years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

''(d) INSIDER TRADING.—Any covered individual or adjacent individual who knowingly violates section 13152(a) of title 5 and, in committing such violation, knowingly violates section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)), shall be fined under this title or not more than 3 times the amount of financial gain, if any, that the individual benefitted from relating to the prohibited conduct, whichever is greater, or imprisoned for not more than 15 years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

''(e) LIABILITY AND IMMUNITY.—For purposes of any immunities to civil and criminal liability, any conduct comprising or relating to a prohibited financial transaction under this section shall be deemed an unofficial act and beyond the scope of the official duties of the relevant covered individual or adjacent individual.''.

(B) CLERICAL AMENDMENT.—The table of sections for chapter 11 of title 18, United

States Code, is amended by inserting after the item relating to section 220 the following:

''221. Prohibited financial transactions.''.

**SA 2260.** Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4, insert the following:

(____) DISCLOSURE RELATING TO PAYMENT STABLECOINS.—Section 13104 of title 5, United States Code, is amended—

(1) in subsection (a)—

(A) in paragraph (5)—

(i) in subparagraph (B), by inserting ''payment stablecoins (as defined in section 2 of the GENIUS ACT),'' after ''commodities futures,''; and

(ii) in the flush matter following subparagraph (B), by adding at the end the following: ''Reporting is not required under subparagraph (B) of any exchange of payment stablecoins (as defined in section 2 of the GENIUS Act) for goods and services.''; and

(B) by adding at the end the following:

''(9) PAYMENT STABLECOINS.—The identity and category of value of any payment stablecoin (as defined in section 2 of the GENIUS Act) that has a fair market value that exceeds $1,000 as of the close of the preceding calendar year held by the reporting individual during the preceding calendar year.'';

(2) in subsection (b)(1)(B), by striking ''(3) and (4)'' and inserting ''(3), (4), and (9)''; and

(3) in subsection (d)(1)—

(A) in the paragraph heading, by striking ''(3), (4), (5), AND (8)'' and inserting ''(3), (4), (5), (8), AND (9)''; and

(B) in the matter preceding subparagraph (A), by striking ''(3), (4), (5), and (8)'' and inserting ''(3), (4), (5), (8), and (9)''.

**SA 2261.** Mr. SCHIFF submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in section 4, insert the following:

(____) DISCLOSURE RELATING TO PAYMENT STABLECOINS.—Section 13104(a) of title 5, United States Code, is amended—

(1) in paragraph (3)—

(A) in the paragraph heading, by inserting ''AND PAYMENT STABLECOINS'' after ''PROPERTY''; and

(B) in the first sentence, by inserting ''or payment stablecoins (as defined in section 2 of the GENIUS Act)'' after ''any interest in property''; and

(2) in paragraph (5)—

(A) in subparagraph (B), by inserting ''payment stablecoins (as defined in section 2 of the GENIUS ACT),'' after ''commodities futures,''; and

(B) in the flush matter following subparagraph (B), by adding at the end the following: ''Reporting is not required under subparagraph (B) of any exchange of payment stablecoins (as defined in section 2 of the GENIUS Act) for goods and services.''.

**SA 2262.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 6(b), strike ''attempted'' each place that term appears and insert ''potential''.

In section 6(b)(1)(A), strike ''or has willfully recklessly violated'' and insert '', has willfully or recklessly violated, or is about to willfully or recklessly violate''.

In section 6(b)(2), in the matter preceding subparagraph (A), strike ''attempting'' and insert ''about''.

In section 6(b)(2), in the matter preceding subparagraph (A), strike ''application or other request'' and insert ''application, notice, or other request by the permitted payment stablecoin issuer or institution-affiliated party or any written agreement entered into with the regulator''.

**SA 2263.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 2(13), insert '', or agent for,'' after ''controlling stockholder of''.

In section 6(b)(3), in the matter preceding subparagraph (A), strike ''all such permitted payment stablecoin issuers'' and insert ''all such permitted payment stablecoin issuers, any insured depository institution, any savings association, any Farm Credit System institution chartered under, and subject to the provisions of, the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.), any appropriate Federal banking agency (as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the Federal Housing Finance Agency, any Federal Home Loan Bank, or the Bureau of Consumer Financial Protection''.

In section 6(b)(3)(A), strike ''; or'' and insert a semicolon.

In section 6(b)(3)(B), strike the period and insert a semicolon.

In section 6(b)(3), add at the end the following:

(C) the institution-affiliated party has participated in any unsafe or unsound practice; or

(D) the institution-affiliated party has breached any fiduciary duty.

**SA 2264.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 4(f), in the subsection heading, strike ''OR DIRECTORS'' and insert ''DIRECTORS, OR PRINCIPAL SHAREHOLDERS''.

In section 4(f)(1)(A), strike ''; or'' and insert a semicolon.

In section 4(f)(1)(B), strike the period and insert ''; or''.

In section 4(f)(1), add at the end the following:

(C) a principal shareholder of a payment stablecoin issuer.

In section 4(f), add at the end the following:

(3) PRINCIPAL SHAREHOLDER.—For purposes of paragraph (1)(C), a person is a principal shareholder of a payment stablecoin issuer if that person controls more than 5 percent of a class of equity securities of a payment stablecoin issuer.

In section 5(c)(2), insert ''any crime involving dishonesty or breach of trust or'' after ''convicted of''.

**SA 2265.** Mr. REED submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the end of section 4(a), add the following:

(____) EXECUTIVE COMPENSATION STANDARDS.—Each primary Federal payment stablecoin regulator and State payment stablecoin regulator shall prescribe, with respect to each permitted payment stablecoin issuer within the jurisdiction of the regulator—

(A) standards prohibiting, as an unsafe and unsound practice, any employment contract, compensation or benefit agreement, fee arrangement, perquisite, stock option plan, post-employment benefit, or other compensatory arrangement that—

(i) would provide any executive officer, employee, director, or principal shareholder of the issuer with excessive compensation, fees, or benefits; or

(ii) could lead to material financial loss to the issuer;

(B) standards specifying when compensation, fees, or benefits described in subparagraph (A) are excessive, which shall require the regulator to determine whether the amounts are unreasonable or disproportionate to the services actually performed by the applicable individual, taking into consideration—

(i) the combined value of all cash and noncash benefits provided to the individual;

(ii) the compensation history of the individual and other individuals with comparable expertise at the issuer;

(iii) the financial condition of the issuer;

(iv) comparable compensation practices at comparable issuers, which shall be based on such factors as asset size, geographic location, and the complexity of the asset portfolio;

(v) with respect to post-employment benefits, the projected total cost and benefit to the issuer;

(vi) any connection between the individual and any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with respect to the issuer; and

(vii) other factors that the regulator determines to be relevant; and

(C) such other standards relating to compensation, fees, and benefits as the regulator determines to be appropriate.

## NOTICE OF INTENT TO OBJECT TO PROCEEDING

I, Senator RICHARD J. DURBIN, intend to object to proceeding to the nomination of Jason Reding Quinones, of Florida, to be United States Attorney for the Southern District of Florida, dated May 21, 2025.

## AUTHORITY FOR COMMITTEES TO MEET

Mr. CASSIDY. Mr. President, I have 14 requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

### COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

The Committee on Agriculture, Nutrition, and Forestry is authorized to meet during the session of the Senate

on Wednesday, May 21, 2025, at 10:30 a.m., to conduct a hearing on nominations.

COMMITTEE ON AGRICULTURE, NUTRITION, AND FORESTRY

The Committee on Agriculture, Nutrition, and Forestry is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, to conduct a business meeting.

COMMITTEE ON ARMED SERVICES

The Committee on Armed Services is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 9:30 a.m., to conduct a closed briefing.

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

The Committee on Commerce, Science, and Transportation is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct an executive session.

COMMITTEE ON ENERGY AND NATURAL RESOURCES

The Committee on Energy and Natural Resources is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 9:30 a.m., to conduct a business meeting.

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

The Committee on Environment and Public Works is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

The Committee on Health, Education, Labor, and Pensions is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10:15 a.m., to conduct a hearing on nominations.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to conduct a hearing.

COMMITTEE ON SMALL BUSINESS AND ENTREPRENEURSHIP

The Committee on Small Business and Entrepreneurship is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON VETERANS' AFFAIRS

The Committee on Veterans' Affairs is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 4 p.m., to conduct a hearing.

SELECT COMMITTEE ON INTELLIGENCE

The Select Committee on Intelligence is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to conduct a closed briefing.

SUBCOMMITTEE ON CYBERSECURITY

The Subcommittee on Cybersecurity of the Committee on Armed Services is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2:30 p.m., to receive testimony in open and closed sessions.

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

The Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs is authorized to meet during the session of the Senate on Wednesday, May 21, 2025, at 2 p.m., to conduct a hearing.

---

## ORDERS FOR THURSDAY, MAY 22, 2025

Mr. THUNE. Mr. President, I ask unanimous consent that when the Senate completes its business today, it stand adjourned until 10 a.m. on Thursday, May 22; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, morning business be closed, and following leader remarks, the Senate resume consideration of H.J. Res. 88, the joint resolution be read a third time, and the Senate vote on passage of the joint resolution; finally, if passed, the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## ORDER FOR ADJOURNMENT

Mr. THUNE. Mr. President, if there is no further business to come before the Senate, I ask that it stand adjourned under the previous order, following the remarks of my colleagues.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from West Virginia.

---

## H.J. RES. 88

Mrs. CAPITO. Mr. President, as chairman of the Environment and Public Works Committee, I rise in support of my resolution to block the Biden EPA's rule approving California's Clean Air Act waiver for its Advanced Clean Cars II regulation.

I want to explain to my colleagues why they should join me in disapproving of this job-killing electric vehicle mandate and why the use of the Congressional Review Act is appropriate and correct in this instance.

First, I would like to offer a little bit of background about how we got here. Typically, the Clean Air Act stops State laws that regulate emissions for motor vehicles in favor of a national standard by the Environmental Protection Agency. This allows automakers to build the same vehicles for use by drivers all across the country.

Since 1966, the Clean Air Act has given California, and only California, the ability to seek a waiver of Federal mobile source emissions standards. Other States can choose to adopt California's standard or follow the Federal standard, but they cannot seek their own waiver.

Congress provided California this special ability because of its need to address unique locally high levels of pollution—like smog—in Los Angeles and in the San Joaquin Valley. But over the past two decades, California has used its waiver authority to push its extreme climate policies on the rest of the country, which was never the intent of the Clean Air Act's decision to grant the waiver. As EPA recognized in 2008, the rationale for California's ability to seek waivers does not extend to greenhouse gases, as these levels are not unique to California but are global in nature. But now, in addition to establishing an EV mandate, California is also seeking to use its waiver authority to eliminate diesel trucks. The Advanced Clean Trucks and Low $NO_X$ truck rules set unattainable standards that will harm our ability to ship goods across this country.

While my remarks today will focus on the resolution of disapproval that I have offered on the Advanced Clean Cars II EV mandate, I strongly support the resolutions that will follow that are offered by Senator FISCHER and Senator MULLIN to block these rules.

California's Advanced Clean Cars II program requires all—and I did say "all"—vehicles sold in that State, Washington, DC, and 11 other States that have adopted California's standard—all cars—to be zero-emissions vehicles by the year 2035; meaning, in one decade, these States, totaling 30 percent of the new car market, will have a full ban on the sale of gasoline-powered vehicles—and not just those but also on traditional hybrids as well.

The regulation begins in 2026—next year—by requiring affected States to sell 35 percent electric vehicles. These cars will hit showroom floors within the next few months. So to avoid the devastating impacts of these waivers, we need to act now.

These unattainable standards, backed by a fine of $26,000 per vehicle—I said $26,000 per vehicle—for noncompliance attempt to reshape auto manufacturing and take away consumer choice all across the country.

I want to be clear, I have no problem with electric vehicles. Consumers should be able to purchase the vehicle of their choice. But I do have a big problem with electric vehicle mandates that replace the will of the consumer and the will of the government.

Only 2.3 percent of new vehicle registrations in West Virginia last year were electric vehicles. Nationwide, EVs accounted for only 10.2 percent of new vehicle registrations. The plain truth is, electric vehicles are not popular. Even in New York, one of the States that has adopted the California standard, only 10.1 percent of 2024 new vehicle registrations were EVs. Perhaps that is why six New York House Democrats voted against this rule.

As States and manufacturers ramp up to meet this EV mandate, the impacts and costs will be massive. As the National Automobile Dealers Association wrote, the economic impact of California's regulation will affect all States. Soon, automakers will be forced to either sell more EVs or limit the number of gas cars for sale in the other affected States. Affordable new gas and hybrid vehicles, which cost between $30,000 and $40,000, are expected to be among the first vehicles that would be rationed out. This will leave consumers with far fewer choices and force everyone to pay more for new and used cars to reflect consumer demand and offset automaker losses.

To make matters worse, hundreds of thousands of jobs will be eliminated. The Specialty Equipment Market Association wrote that a ban on internal combustion engines ''would represent over $100 billion annual economic impact to the U.S. economy and impact roughly 330,000 jobs.''

And those job losses will not be confined to California, but they will be spread all across the Nation. Workers in auto manufacturing, oil and gas production, and the agriculture sectors across this country would lose jobs because of California's EV mandate.

And the elected officials who represent Michigan autoworkers, Nebraska corn farmers, or West Virginia gas workers had no say in California and EPA's decision to impose this mandate nationwide.

The responsibility of approving or disapproving California's waiver application rests solely with the EPA.

California applied to EPA for a waiver to implement ACC2 in May of 2023, and the Biden administration sat on that application until December of 2024. Well, there is no practical reason that the Biden EPA couldn't have acted on California's waiver in 2023 or even during the first 11 months of 2024, but we know why the previous administration decided to wait: President Biden and his team knew that electric vehicle mandates were unpopular with most American voters, especially swing State voters that would decide the Presidential and congressional elections. Mr. President, 2024 polling from WPA intelligence showed that 70 percent of likely voters opposed a ban on gas-powered cars, with only 18 percent in support.

Both the text of the Clean Air Act and public sentiment should have led the Biden EPA to reject California's application. Instead, the Biden administration approved California's waiver in December 2024, after Democrats lost the election.

EPA's approval was published in the Federal Register on January 6, 2025, the same day Congress certified President Trump's victory. The decision to limit consumer choice, increase car prices, and cost hundreds of thousands of jobs was made by California and approved by a Federal administration that had already been rejected by the American voters.

I strongly oppose these California EV mandates and strongly oppose a process that allows such a major national policy decision to be made against the will of the American people, without input from their Members of Congress.

In 1996, the Congressional Review Act was enacted through regular order to create an expedited process for Congress to consider resolutions that overturn rules finalized by Federal Agencies, like the Biden EPA's decision to approve California's EV mandate. The CRA's rationale—as explained by sponsors Don Nickles, Harry Reid, and Ted Stevens—was to allow Congress to efficiently stop rules it finds ''too burdensome, excessive, inappropriate, or duplicative.'' Every one of these terms applies to the situation we find ourselves in today.

The CRA works by requiring Federal Agencies to submit their final rules to the Senate and to the House of Representatives. When a rule is submitted to Congress and published in the Federal Register, a 60-day period is opened for any Member to introduce a resolution of disapproval that, if passed by both Chambers and signed by the President, prevents the rule from taking effect. These resolutions, by law, are subject to limited debate, allowing them to be enacted by the Senate by a simple majority vote.

Senators can bring resolutions of disapproval to the Senate floor either by reporting them through committee or by submitting a petition that has been signed by at least 30 Senators. Either way, the process allows the Senators to vote on whether the rule should go into effect, providing a method for elected Representatives to have oversight over unelected bureaucracies.

I decided to use the CRA process and introduce this resolution against EPA's approval of the California electric vehicle mandate for two reasons.

First, enactment of the resolution would vacate EPA's rule approving of the California waiver, stopping the EV mandate and protecting consumers and workers across the country.

Second, because a vote here in the Senate and in the House would allow the elected representatives of Americans of all 50 States, not just California, to decide whether a nationally significant policy should be implemented.

As I discussed earlier, the Biden administration delayed its action on approving the California waiver for 18 months to get past the 2024 election. But that wasn't the end of the previous administration's effort to shield this unpopular EV mandate from the will of the people. The Biden EPA did not submit its approval of the California EV mandate for review under the CRA and claimed its action was not a rule. That was a clear effort to avoid accountability from Congress.

Fortunately, President Trump and EPA Administrator Lee Zeldin decided to give the American people a say by submitting the approved California waiver to Congress as a rule. Under the CRA, that submission by the Trump EPA triggered my right as a Senator to introduce this resolution to block California's EV mandate. But that submission kicked off another effort by Democrats to stop the Senate from voting on this issue.

On March of this year, at the request of three Senate Democrats, the Government Accountability Office wrote an unprecedented letter stating its ''observation'' that the Biden EPA action approving California's EV waiver is not a rule subject to the CRA. Similar to the Biden administration's efforts, this GAO letter was obtained in an attempt to stop the Senate from exercising its authority provided by the CRA, keeping the California EV mandate in place without a vote in this Chamber.

Nothing in the Congressional Review Act, Senate rules, or Senate precedents gives unelected staff at the GAO the authority to prevent elected Senators from considering a resolution of disapproval against a rule. In fact, Comptroller General Gene Dodaro, who is head of the GAO, recently testified in a Senate hearing and said:

> Our decisions are not dispositive on the Congress—they're advisory.

But Democrats now want to give the GAO staff a veto over the Senate's use of the CRA to disapprove rules submitted by Federal Agencies.

The Senate has given GAO the authority in the CRA process in the past to protect the legislative branch's ability to conduct oversight over administrative rules.

My predecessor West Virginia Senator Jay Rockefeller was a leader in 2008 efforts to give GAO the ability to trigger the Congressional Review Act procedures for Agency actions not submitted to Congress as required by the statute.

The issue in 2008 was an action by the Centers for Medicare and Medicaid Services directing States on how they were to administer the Children's Health Insurance Program. CMS did not submit its action to Congress, calling it guidance rather than a rule. Senator Rockefeller asked GAO to determine that the CMS guidance was a rule. When GAO agreed with him, he introduced a resolution to block the rule—the first time such a resolution was introduced pursuant to a GAO decision rather than an Agency submission.

Ten years later, Congress passed and President Trump signed a resolution introduced by my colleague Senator MORAN from Kansas against guidance from the Consumer Financial Protection Bureau that was similarly not submitted. Senator Toomey went to GAO for a legal opinion that the CFPB guidance was a rule for the purposes of the CRA, and GAO determined that Congress could consider it as such.

I have personally gone to the GAO myself on several occasions when I believed that an Agency action not submitted to Congress under the CRA

should, in fact, be considered a rule, like I did in 2022, when GAO agreed with me that guidance from the Federal Highway Administration instructing State departments of transportation to prioritize bike and pedestrian projects over new highway capacity projects should be a rule. And I did so a year later, when GAO disagreed with my argument that a separate California waiver should have been submitted as a rule.

In all of these cases, Federal Agencies had not submitted their actions to Congress, but in this case, EPA did submit its rule approving the California EV mandate to Congress.

A GAO opinion has never been used to cut off the Senate's ability to consider a CRA resolution of disapproval when the Federal Agency actually submitted the rule to Congress. In fact, GAO has repeatedly recognized that its legal opinions are unnecessary when Agencies submit a rule to Congress.

In 2018, GAO wrote:

> [The] Congressional Review Act gives agencies the primary responsibility for determining which agency actions meet the statute's definition of a rule.''

And:

> Submission . . . to Congress pursuant to the Congressional Review Act obviates the need for a GAO opinion.''

Two years later, GAO concluded:

> When an agency submits a document to our office under CRA, we consider that to be the agency's determination that the document is a rule under CRA. When a rule is submitted to Congress, Congress has an opportunity to review the rule and pass a joint resolution of disapproval to void the rule.

Protecting our legislative branch oversight is the basis upon which this Senate has involved GAO in the CRA process since 2008, but it does not follow that GAO should be able to halt congressional privileges when the executive branch does submit a rule. Once an Agency has submitted a rule to Congress, as EPA has done here, elected representatives should be able to decide whether to approve or disapprove of the rule. That is how the Congressional Review Act has functioned since its beginning in 1996.

I want to quickly talk about the filibuster and the Parliamentarian because this has been raised.

My Democrat colleagues argue that there will be ''profound institutional consequences'' by the Senate not allowing GAO a veto over the use of the CRA against Agency-submitted rules. I, on the other hand, disagree. Such a GAO veto has never existed before, and we must remember that the CRA is all about protecting the authority of elected representatives over unelected Agencies. Delegating to the unelected GAO staff the authority to determine if Members of Congress can use the CRA against Agency-submitted rules turns the statute completely on its head.

My Democrat colleagues say that our action today undermines the legislative filibuster, and that is simply not true. I support the legislative filibuster. I have supported the legislative filibuster as a Senator in the majority and as a Senator in the minority.

The Congressional Review Act, which was passed with the legislative filibuster in place, has stood since 1996, providing a narrow exception to the Senate's normal practice of extended debate. It applies only to allow for disapproval of Federal Agency rules and only during a prescribed time defined by the statute.

In deciding to retain the 30-year-old practice of allowing the use of CRA procedures against Agency-submitted rules, we are not expanding any authority to enact laws by a simple majority. We are not expanding the scope of the CRA itself but, rather, simply refusing to narrow the CRA by subjecting its use to GAO approval.

Like my colleagues in the Senate, I hold our Parliamentarians in very high regard. They perform and she performs a vital role in this institution, and her wise counsel is critical to making this Senate function.

I want to make two things crystal clear: The procedural action we have taken today is not about the filibuster and not about the Parliamentarian. Instead, the procedural issue before the Senate was simply whether GAO staff should be able to block resolutions of disapproval against Agency-submitted rules.

I have explained why my answer to that is no. I have spent significant time talking about the CRA itself and about procedure. I think that is important because I respect the Senate as an institution, and I care about how we do things.

We shouldn't lose sight of the substance of what we are doing today. We are deciding whether California, DC, and 11 other States can impose an electric vehicle mandate that will take away consumer choice, drive up prices, and eliminate jobs across the country.

West Virginians don't want California's climate policy. West Virginians don't want California's EV mandate. And I am confident that most Americans don't want these things either. That is why the House of Representatives passed this resolution of disapproval with a strong bipartisan vote that included every Republican and 35 Democrats, some from the State of California.

Today, despite the best efforts of the Biden administration and congressional Democrats to shield this EV mandate from the will of the American people, the Senate will have its say.

I urge my colleagues to vote tomorrow for the resolution of disapproval.

I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. President, today, the Senate has done something unprecedented. Our actions and the ones that will follow from the procedural steps taken here today, over the next day or so, will change the Clean Air Act, will change the Congressional Review Act, will change the rules of the Senate, and will do so by overruling the Parliamentarian and breaking the filibuster.

In effect, going nuclear. The Republicans can say what they like about this, but the fact of the matter is that the Parliamentarian ruled that the Congressional Review Act does not permit what we are doing.

And she did so on the basis of advice from the Government Accountability Office, which was given that role by the Senate, given that role in a bipartisan agreement years ago.

So we are de facto legislating here, amending the operation of the Clean Air Act to remove a statutory waiver for the State of California, amending the Congressional Review Act, so it is no longer the narrow provision only about rules with a short timeframe that the Senator from West Virginia described.

That may have been what the Congressional Review Act was like until today, but after today, none of that is true any longer because of this action.

It did not have to come to this. It did not have to come to this. There were many ways around the procedural shortcut of going nuclear, where a majority of the Senate shoves its view on the minority, without consideration, without cloture, without 60 votes, without negotiation, just rolling the minority in order to get what they want done. That ought to be a last recourse for a desperate majority, but instead it was the first recourse because this is the easy way to do what the fossil fuel industry wants.

Now, one way to do this would have been to go and amend the Clean Air Act and amend the Congressional Review Act through regular order, the way the laws were created, through bicameralism, with both Houses passing the bill and the President signing it. They have been amended over and over again. We know how to amend those laws. That is what we call in the Senate regular order. But regular order would have required compromise, would have required effort, would have required working with Democrats, and the fossil fuel industry didn't want to put up with any of that. They wanted the Republican Party to jam this through, and that is what happened.

So regular legislative order—not interested, not going to do it. That was one way. The second way would have been to go to EPA and have them follow an administrative process, which they had already started in the first Trump administration, to review the three predicates for the waiver administratively.

Now, the problem is that would have taken a certain amount of administrative effort out of EPA, and it also would have required EPA to meet the basic standards for Agency action, that the Agency action be rationally based and not arbitrary and capricious.

If they made a decision that had no rational basis and was arbitrary and

capricious, then it could be challenged in court and knocked down. So rather than allow the Agency to go through that administrative process, subject to those very standard requirements of not being arbitrary and capricious and having a rational basis, they came here where it can be as arbitrary and capricious as you please, where it can have no rational basis as long as you have got the votes and are willing to roll the minority.

So that is the second avenue that Republicans could have followed here, that the fossil fuel industry could have followed here, but simply didn't want to.

The third avenue that they could have undertaken was to go talk to California. This is California's waiver. Last I heard, California had a Governor. Last I heard, the United States has a President. They could talk. They could invite the fossil fuel industry into the room. They could invite the auto industry into the room. They could invite environmental groups and health groups into the room.

They could say: Look, we want to have some consideration here. Let's negotiate. But they didn't want to do that because they had this quick and dirty, sneaky maneuver that they could pull off so they didn't have to negotiate, they didn't have to legislate, and they didn't have to use regulatory process. All those rules were available, and yet this was the shortcut that was chosen.

Now, we have repeatedly heard it said—in fact, it was recently said just now on the floor—that President Biden claimed that what was being done with the California waiver was not a rule, claimed that it was not a rule. Do you know why the Biden administration claimed it was not a rule? For the simple reason that it was not a rule.

It did not go through the APA rulemaking process, and it had a history. And I have got a summary of that history right here.

The EPA started granting waivers to California under this Clean Air Act process in 1968. The first waiver was granted on July 11, 1968. And this summary of the waivers that have either been granted or amended or modified over the years, 131 times. The score on whether the California clean air rule is treated by EPA as a waiver or a rule, it is 131 to 0.

It is nearly 50 years of constant practice undisputed. Under President Nixon, 15 times a Republican EPA granted the waivers. Under President Reagan, 33 times a Republican EPA granted the waivers. Under President George H. W. Bush, nine times a Republican EPA granted the waivers. Under George W. Bush, 15 times a Republican President granted the waivers. A waiver for half a century has never once been treated as a rule.

So it really ought to come as no surprise to anybody that the Biden administration did not treat it as a rule. The Reagan administration didn't treat it as a rule. Neither Bush administrations treated it as a rule. No Republican administration since the passage of the Clean Air Act has treated these California waivers as a rule. It just isn't so.

So it is pretty clear that with this history of waivers, there was a real problem. And that is why when EPA pretended for the first time that this was a rule, the Government Accountability Office, which didn't inject itself into this, which didn't butt in to try to interfere with us, which was tasked with giving advice on this by the Senate—we gave them this job, and now we are accusing them of butting in and interfering with our process? We gave them this job so they did it.

It has been said that what GAO did was unprecedented in making this decision that it is actually a waiver and not a rule. Yes, it is unprecedented. It is unprecedented in the same way that a referee blowing a whistle on an unprecedented foul is doing something unprecedented. But it is not the fault of the referee that their whistleblowing is unprecedented, it is the fault of the player committing the foul that has never been committed before, and the foul is to treat the waiver as a rule.

So it was easy for GAO to say: This ain't a rule. This is a waiver. It is not allowed under the Congressional Review Act. Not allowed. But the GAO is just advisory; they don't make any decisions for us.

The rules of the Senate are actually the Parliamentarian, and that is where the going nuclear happened because we went in with the California delegation staff and the EPW staff and the Republicans, and we argued in front of the Parliamentarian. GAO wasn't even in the room. We filed our pleadings. We made our arguments. The arguments went back and forth. The Parliamentarian asked questions.

At the end, there was a decision, and, in my view, it was a slam-dunk decision because the score going in was 131 to 0. Mr. President, 131 times these waivers have been granted. Never once was it even argued that they were a rule, let alone decided that they were a rule.

It was only when GAO and the Parliamentarian made the obvious decision that what the EPA did in this case was wrong that then the fossil fuel industry decided that Republicans had to go nuclear, and that is why we are where we are.

There is statutory text in the Clean Air Act that gives California its waiver. We had testimony from Administrator Reilly earlier today. He was the EPA Administrator at the time this happened. And he understands full well how valuable it was to have a second set of eyes on this process.

The California process is so popular that a dozen other States follow it, and it is in the law. The way we should work around here is if there is something in the law you don't like, you amend the law. You don't run it falsely through the Congressional Review Act, treat it as a rule when it is not, overrule the Parliamentarian when she says it is not, and pretend you haven't broken the rules around here. We have broken the rules around here.

The other rule we broke was the Congressional Review Act itself, which says—I am reading from the text of the law:

> In the Senate—

Which is where we are—

> when a committee is discharged from further consideration of a joint resolution—

Which means it has come to the floor, it is out of the committee, which is procedurally where we are—

> all points of order against the joint resolution are waived.

That is part of expediting the process; part of the deal with it being a very narrow process for only regulations and only in a short time window.

We just heard the person sitting in that chair before this Presiding Officer say that under the rule just created we are now going forward. We just created a new rule through this parliamentary process, and it is that rule that violates this law because now we have a point of order, even though the law says that all points of order are waived.

Why did we go through this? As has been said, the Congressional Review Act is kind of an odd thing. Usually, an Agency goes through a rulemaking process under the Administrative Procedures Act. And if they got it wrong, an aggrieved party can go to court and say that was a bad regulation; it was arbitrary and capricious; it is not a rational basis; you didn't follow the APA properly; your findings are demonstrably false; there isn't support for the rule; the way you have written it violates the actual law involved.

There are a whole array of challenges that you can make in court, but we wanted something more than that. We wanted to have a political intervention narrowed just to rules, just to that short time period window that the Congressional Review Act provides. That was the idea. And the two concerns were what we described in our argument to the Parliamentarian as oversubmission and undersubmission.

I will read from our presentation.

> There are two ways in which the Executive branch could try to defeat congressional intent with respect to the scope of the Congressional Review Act. The first would pose an undersubmission problem. In this scenario, an Agency might purposely refrain from submitting an action to Congress, even when the withheld action meets the definition of a rule under the CRA.

Right? So there is a rule. It is actually amenable to Congressional Review Act under the CRA, but they don't submit. They just don't because they don't want to subject it to that process. They thought they could sneak around it would be the notion.

> To protect against this type of abuse, it became congressional practice to ask the GAO for an opinion as to whether the withheld action is, nonetheless, a rule and to treat a

positive GAO determination as a trigger for the CRA process.

So if an executive Agency tries to cheat on exposing itself to the CRA process by not submitting the rule, a Member of Congress can go to the GAO and say: Hey, what is up with this? Isn't this a rule?

And if GAO says it is a rule, then it is deemed submitted, and the CRA process begins. That solves the under submission process.

We continued in the argument: The second way an Agency could work to defeat Congressional intent in crafting the CRA would be this situation, the incident situation, where an Agency submits actions, which clearly do not meet the definition of a rule under the CRA. This would pose an over submission problem.

The three CRA submissions at stake here illustrate well the slippery slope that could ensue. Not only would treating them as rules override two GAO analyses and broaden the scope of CRA coverage in an unprecedented way, but the waivers are already in effect, and one was issued so long ago as to violate any reasonable reading of the time bounds in the CRA. To accept these three submissions as rules would be to reject the principle that the privileged procedure in the CRA should be closely examined and strictly limited.

Agencies could submit any final action, going back to the enactment of the CRA in 1996—including adjudications, leasing contracts, grant awards, and licensing decisions—and magically convert those actions into timely rules that could be disapproved under the CRA's privileged procedures. This would nullify the reasonable bounds that Congress itself set in the text of the CRA, in the statutory law.

Without strict limits—truly absent any meaningful limits—the statute would be fully weaponized, threatening to destabilize decades of Agency action and highjack the Senate floor for the foreseeable future, which is precisely the can of worms that the majority has just opened with this overruling of the Parliamentarian, this establishment of a new rule.

Now, the other problem with this is that it provides a way to evade court review. Court review is usually how you check the action of the executive branch when they are up to no good. But very often, they are doing perfectly reasonable things, but a special interest doesn't like it. So they have the right to go to court too.

But when they go to court, first of all, there is a record of the proceeding, and the court is bound to that record. Second of all, there is law involved. There is both the Administrative Procedure Act, and there is the substantive law that is the subject of the regulation. Then you have to deal with evidence. The court reviews evidence. Then there has to be a rational decision by the court. And the court is, what we know of, as a neutral and disinterested magistrate.

Those are pretty essential due process determinations. For the Congressional Review Act, none of that. The only thing is the politics and the votes. You have got the politics behind you, and you got the votes. Anything is fair game.

And that is the danger of what was done today. What we have just done is open up the Congressional Review Act from that little 6-month period—60-day period; I am sorry—all the way back to when the CRA was passed, 30 years. Licenses, leases, Executive actions that have had a decade or more of reliance could simply be brought forward, dumped into the Federal Register, sent over here as a submission, magically become a new rule because of this loophole we just built, and then the majority of the Senate, with a compliant House, can just shove it right out the door without following regular order, without ever going to court, without following bicameralism, and present with the constitutional requirements.

I will conclude with two things. First, please don't call this unprecedented when you are talking about GAO saying that this was not a rule. Please don't call it unprecedented when the Parliamentarian said: This was not a rule. This actually is illegal for you to do.

The only thing unprecedented about what GAO said and what the Parliamentarian said was the fact that this rule breaking by EPA, that is what was unprecedented.

Again, 131 waiver determinations over half a century always, always, always treated as waivers—always—a score of 131 to 0.

But the Trump administration, flacking for fossil fuel, decides that all of that is wrong, that this actually is a waiver, even though there was no APA rulemaking, even though none of the steps that lead to a regulation under the Congressional Review Act were undertaken. They just filed it in the Federal Register and sent it over as a submission.

You could do anything that way. File it in the Federal Register, send it over as a submission, and—boom—it is over here to be kicked around as a political football, without due process, without bicameralism, without regular order—none of it.

That is what was unprecedented. And the only reason that the GAO's decision was unprecedented was because nobody had the nerve or the foolishness to do something so stupid before. So they called them out for it for the first time because nobody had ever done such a thing before.

But because of the politics, that just got shoved through here. Because of the power of the fossil fuel industry, that just got shoved through here.

This is part of a campaign of the Trump administration to pretend that climate change isn't real, to ignore the immediate threats that are looming over us of climate change—looming over us—and to serve the interest of the fossil fuel industry.

You remember the President saying, ''Give me a billion dollars, and I will give you everything you want,'' to the fossil fuel executives? Well, he didn't get the full billion dollars, but he got a lot of money. He got north of a 100 million, and now, sure enough, he has given them everything he wants.

And this is one of the payments—this breaking of the Senate rules, this overruling of the Parliamentarian, this going nuclear, this pretending that something that was never a rule, and is clearly not a rule by any reasonable reading of what APA rulemaking is, is suddenly now magically a rule. All of that is being done as just a political errand for the fossil fuel industry, and it is wrong.

I see that the two Senators from California are here. The hour is getting later and later. So I will not review at this moment my presentation earlier today, where I went through the multiple warnings of the systemic economic collapse that is coming at us, based on a fairly simple proposition, which is that climate risk is making weather and risk unpredictable. And when you can't predict weather risk, you can't predict the insurability of a piece of property. The original concern was about coastal risk—flooding, hurricanes, rainstorms, damage to coastal properties. Now wildfire is just as dangerous. And when you can't predict it, you can't insure it.

And we are right now, in the United States, in the middle of an insurance crisis. Go ask around Florida how property insurance is going. It is a full-blown meltdown.

And when you can't get insurance any longer, you can't get a mortgage on a property any longer. And when property doesn't carry a mortgage any longer, when you can't get a mortgage on that piece of real estate, then your buyer pool collapses. You are left with only cash buyers. And what happens then is that the property value crashes.

And that is the prediction: climate risk to insurance collapse, to mortgage unavailability, to property value crash, to economic collapse—recession. And it is coming from all over—all over. And we won't listen to those warnings whether they come from insurance CEOs, from Freddie Mac, from international banking safety reviews, from international economic magazines, from the chief risk officer of Goldman Sachs, from the head of the Bank of England. I mean, you can just go on and on. The warnings are piling, piling, piling up.

And as Ernest Hemingway said about going broke, ''it happens gradually, and then all at once.'' And we are deep into ''gradually'' on this climate risk mess, and pretty soon we are going to get hit with ''all at once.''

And then all this foolishness done on this floor in the service of the fossil fuel industry, which has the world's biggest conflict of interest and a history of lying and of dark-money political influence, is going to look pretty damned bad.

I yield the floor.

The PRESIDING OFFICER. The senior Senator from California.

Mr. PADILLA. Mr. President, I, first of all, thank my colleague from the State of Rhode Island and echo his sentiment and his message that Senate Republicans have crossed the line this evening. They have chosen to overrule the Parliamentarian, thrown out some rules, rewritten some rules, established new precedents for how this body operates, despite claiming that that was something they were not going to do, despite the majority leader warning earlier this year that this would be akin to killing the filibuster.

But now we have seen it. It is on the record. They have overruled the Parliamentarian not just once but twice. And the Parliamentarian's determination as to whether or not the action taken this evening was in conformance with the rules that we have or not were buttressed by—again, as my colleague from Rhode Island has explained—the analysis and the findings of the GAO, which we charge with this input.

And so I want to take a moment to just read some excerpts from the GAO, as written to the Senate. And I will submit the entire letter for the RECORD, but the key excerpts are important to highlight.

From the GAO:

> As background to these issues, we issued a legal decision concluding that a Clean Air Act preemption waiver was not a rule subject to CRA but was instead an adjudicatory order.

It couldn't be more clear than that.

> Furthermore, we explained that even if the waiver were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability and, therefore, would still not be subject to CRA's submission requirement because of CRA's exclusions.

Just two other elements that, again, I think are in need of being highlighted here because of the significance of the action taken this evening—quoting still from the letter:

> EPA stated that the Notices of Decision were not rules under CRA, and, in the underlying decision documents for two of those notices, cited to our 2023 decision in support of that statement. However, EPA submitted them as rules to GAO and Congress without any explanation of this discrepancy.

Pretty clear.

And, finally, later in their letter:

> The agency still did not address the statements in the notices regarding the inapplicability of the CRA, and, to date, EPA has not further responded to our letter.

GAO is charged with establishing this review and making a finding. They heard from the parties involved. They did not get responses from the EPA. Why? They must have something to hide. What are they afraid of? And the GAO shared their conclusions which informed the Parliamentarian in their determination: This was inconsistent with the rules.

Not only have Senate Republicans overruled the Parliamentarian this evening, they have also broken the Congressional Review Act, as has been respected for years, all to bypass the filibuster in order to undermine California's efforts to pursue cleaner air for our constituents. And while today the California waivers may be the target, we don't know what comes next.

In previous statements on this issue earlier today and in previous days, I have given examples of, now that the CRA has been applied in this fashion, there is a whole host of adjudicatory decisions by a wide variety of Agencies across the Federal Government that are now fair game.

But for now, let me continue to focus on the waivers in question that Republicans are seeking to overturn. See, I rise not only in opposition to this power play tonight, I rise in the interest of protecting the health of my constituents, the nearly 40 million Californians that I am honored to represent.

Because, colleagues, leaders in California didn't just wake up one day to find some special privileges to establish our own climate policy and impose it upon the rest of the country. And we certainly didn't cheat the system to jam States represented by Republicans in the Senate or in their Governors' mansions. No. California was explicitly granted waivers because of the unique air quality challenges that we face, different than anywhere else in the country.

California was granted these waivers because California, as a whole, and Los Angeles, in particular—the southern California area, the Los Angeles Basin—is uniquely situated to produce some of the most dangerous air pollution in the Nation. So it means that we had to work harder than other States and other regions to protect the health of our residents.

This is not some new liberal agenda. It actually goes back nearly a century with broad bipartisan support. Way back in the summer of 1943, Angelenos actually started to notice a brown haze descending upon the city. People's eyes and throats began to sting from this smoke, and they could no longer see more than a handful of blocks ahead of them, let alone the beautiful skyline or the views of the city around them.

It was actually in the middle of a World War when Americans feared that breakouts of chemical warfare were imminent and many started to wear gas masks as a result. While it didn't take long to learn that there was no chemical attack targeting Los Angeles, it would take researchers years to learn that the true source of the haze was different. Eventually, they learned it wasn't just factories that were pumping black smoke into the sky; it was in large part due to the cars that were being driven.

Now, unfortunately for us, Los Angeles does create the ideal conditions for smog to thrive. Southern California's sunshine along with a booming population of people reliant on car travel and all the exhaust that comes with it combines to make a photochemical reaction that we call smog. But in addition to that, given the beautiful mountains—and you have all seen the scenes—the mountains that surround the Los Angeles area act as a perfect sort of cradle to hold all those pollutants in, encasing the city in a thick haze of pollution.

For all the beauty of our city—most of you have visited, and you have certainly seen images on television and in the movies—generations of Angelenos know what it is like to feel engulfed by the smog around us.

As I began to share earlier today, that includes me. As many of you know by now, I grew up in the community of Pacoima in the San Fernando Valley, the northern part of the city of Los Angeles. And growing up in the 1970s and 1980s—40 years after the gas masks that I spoke about a minute ago—smog was still ever-present in our sky and part of our daily life.

I still remember what it was like being sent home early from school as a kid because the air was too unhealthy for us just to play on the playground—the stinging in our eyes, the tightness in your chest. Yes, when I was growing up, we were more often waking up to air quality forecasts of unhealthy or hazardous than clean. Imagine just the sheer simplicity of trying to take a deep breath, but not being able to because halfway through taking in a deep breath, your chest would tighten up. You literally choke because of the pollution in the air. While we have come a long way, for too many Californians today, that is still a reality. It doesn't have to be that way.

But that is why, decades ago, Congress recognized both California's unique air quality challenges but also its ingenuity, its creativity, the innovation that is in our DNA and granted California the special authority to do something about those unique air quality challenges.

Thanks to the Clean Air Act, which, again, was adopted in an overwhelming bipartisan basis over 50 years ago, California obtained the legal authority to set its own emissions standards because Congress wisely recognized back then that West Virginia and Wyoming are different than California; and their air quality is different; there are significantly fewer cars on the road in Salt Lake City than there are in Los Angeles; and because California was and still is seen as the innovation center of the United States.

So we earned the right to set California standards for California. We are not setting California standards for national standards. I am sure my colleagues in State government wish we had that kind of power and authority, but that is not the case. And it is certainly not California's agenda to impose our standards on States across the country. We are simply seeking to protect Californians.

And, quite frankly, if Members of this body representing the other 49 States in the Nation are worried about some Federal mandate taking effect

because of California's actions, then you should support California's right to set our own State standards. We know that the EPA and the Federal Government has not effectively done its part to rein in pollution.

So from a government standpoint, let me explain why I get so worked up on this. State and local jurisdictions in California have done all they can to push ambitious but implementable regulatory agendas in the country—some of the most ambitious in the country. But we are out of options when it comes to controlling the pollution sources that State and local governments are allowed to regulate.

What is left—the biggest nut to crack—are the mobile sources of pollution—the cars, the heavy-duty trucks, the locomotives, the ships, and the planes that are the key sources of the bad air quality in regions of California. These are industries that only the Federal Government can regulate.

So California has had no option, but we have embraced the challenge to innovate, to advance creative and indirect source rules or rules that, for example, require ships to plug in when docked in our ports to cut down on pollution.

That is why these waivers are so important. They let us get at these mobile sources of pollution that we need to clean up because unless or until the Federal Government gets more ambitious about setting national standards that meet the moment of this climate crisis, at least let California protect Californians.

I am realistic with the times that we are living in. Under this administration, I doubt we will get the assist from the Federal Government over the course of the next 3½ years.

I want to acknowledge that it was former President Ronald Reagan, when he was Governor of California, who first created the California Air Resources Board. And 3 years later, it was Republican President Nixon who signed amendments to the Clean Air Act into law, fulfilling a promise that he made at that year's State of the Union, that clean air should be the birthright of every American. What a far, far cry from Republican leadership then to the Republican agenda today.

But the bottom line is, colleagues, by supporting this measure, Republicans are simply making it harder for California to improve air quality in California.

As I did yesterday, I also just have to acknowledge what it means for families throughout the State. You see, as the parents of three growing boys—they are not little kids anymore; they are growing—through the course of their upbringing, we have been able to control certain things, like how we feed our kids. We go to the grocery store, and you are shopping for what you are going to prepare for dinner. You have readily accessible information—nutritional information—not just calorie information, protein information, but ingredients of what is in the product you are about to buy. There are certain things that we cannot control, like the ingredients in the air we breathe.

If you are fortunate enough to live in a part of the State of California, in the part of the country with a great air quality index, good for you. But for those who aren't as fortunate and with the assistance of the Union of Concerned Scientists, let me read off a couple of the ingredients that are in the air that we breathe—not just us, our children too.

Particulate matter, defined as follows:

One type of particulate matter is the soot seen in vehicle exhaust. Fine particles—less than one-tenth the diameter of a human hair—[it] pose[s] a serious threat to human health, as it can penetrate deep into the lungs. [Particulate matter] can be a primary pollutant or a secondary pollutant from hydrocarbons, nitrogen oxides, and sulfur dioxides. Diesel exhaust is major contributor to [particulate matter] pollution.

How is this for another ingredient: volatile organic compounds, known as VOCs, referred to as VOCs:

These pollutants react with nitrogen oxides in the presence of sunlight to form ground-level ozone, a main ingredient in smog.

Though beneficial in the upper atmosphere, at the ground level, this gas irritates the respiratory system, causing coughing, choking, and reduced lung capacity.

Now, I know I have felt those things as a kid. It is in the science.

VOCs emitted from cars, trucks and buses—which include the toxic air pollutants benzene, acetaldehyde, and butadiene—are linked to different types of cancer.

Just a couple more:

Nitrogen oxides.

Which we refer to as $NO_X$.

These pollutants form ground level ozone and particulate matter. . . . Also harmful as a primary pollutant, $NO_X$ can cause lung irritation and weaken the body's defenses against respiratory infections such as pneumonia and influenza.

I can go on and on—carbon monoxide, sulfur dioxide, greenhouse gases—but in the interest of time and given the late hour, let me say this: All of these ingredients are in the air that we breathe, as I just described, but as you heard me say earlier, it is not just our lungs that are at risk; these toxins can permeate into the bloodstream and spread to other parts of the body. That is what is at stake, again, not just for us but for our children.

But for all the dangers that I see around us, I also see opportunity. Thanks to the allowances afforded to California under the Clean Air Act, we have actually made tremendous progress.

As evidence of that, in 2015, USC—the University of Southern California—published a study that said that the reduction of air pollution was paying off; kids were breathing healthier.

Let me read just briefly from their findings, summarized in a National Geographic article from March of 2015 that said:

In the study published in the New England Journal of Medicine, researchers followed 2,000 kids from five southern California cities with some of the worst air, including Long Beach, Riverside, San Dimas, Upland, and Mira Loma. They focused on kids ages 11 to 15, whose lungs are growing the most.

While other studies have compared kids from polluted neighborhoods to those living with cleaner air, the USC team tracked children from the same communities over 20 years and correlated their findings with pollution data from local air monitors. That allowed them to more clearly weed out other potential factors.

Regardless of race, exposure to cigarette smoke, or factors like education and pets, kids tested between 2007 and 2011 had healthier lungs than kids the same ages tested between 1994 and 1998.

I will skip some of the additional scientific details and jump to more of the conclusions because during those decades differential in the study, ''California officials set groundbreaking standards that phased out many inefficient car and truck engines and some of the dirtiest fuels for everything from jet skis and lawnmowers to school buses and heavy-duty trucks. Local smog-fighters in the Los Angeles basin forced cleanup of oil refineries, manufacturing plants, and consumer products such as paints and solvents. Other local and state programs offered incentives for replacing old trucks and buses.''

The result: Some of the most problematic pollutants—smog-forming nitrogen dioxide and fine particles created by diesel-engine exhaust and other fossil fuels—declined in the worst neighborhoods by up to 50 percent in 20 years. Maritime pollution, particularly in neighborhoods near the massive ports of Los Angeles and Long Beach, also has dropped substantially.

As a side note, by the way, the two ports referenced in this, the ports of Long Beach and Los Angeles—sister ports in the San Pedro Sports Complex—account for 40 percent of our Nation's imports, those two ports alone. So you can imagine the intensity of the pollution in that specific region, let alone the air quality and health impacts for Californians.

So I go back to, if the Federal Government, through the EPA, isn't willing to step up to meet the challenge of air quality in California, let California take care of Californians. As these studies and reports lay out, California's leadership is working. Kids are breathing cleaner air.

But we still have a lot more work to do. We have a track record of successfully developing and implementing innovative tools to improve lives, but because of what is transpiring here now in the Senate, our progress is now at risk. It is important, it is urgent, it is significant because we still have so much more work to do.

California plans on continuing to exercise our legal authority under the Clean Air Act to protect kids, to set ambitious but achievable goals, to reduce pollution and, yes, Heaven forbid, set an example, set a model, set a path for other States to follow if they wish because no one is forcing California

standards on States that don't voluntarily choose to follow that simple path.

But what I see transpiring here with the overruling of the Parliamentarian and the overturning of these waivers as if they were rules is the Senators from other States, Republican Senators from other States, imposing their will on California. So much for States' rights, I guess.

And I hope you sleep well at night with the consequences of your decisions in the years ahead.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. GOVERNMENT ACCOUNTABILITY OFFICE,
MARCH 6, 2025.

Congressional Requesters

Subject: Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act

This letter responds to your request for a legal decision as to whether the Environmental Protection Agency's (EPA) Clean Air Act preemption waivers and Notices of Decision that EPA submitted as rules to Congress and GAO in late February 2025 are rules subject to the Congressional Review Act (CRA). Our regular practice is to issue decisions on actions that agencies have not submitted to Congress as rules under CRA in order to further the purposes of CRA by protecting Congress's CRA review and oversight authorities. In this case, we are presented with a different situation because the actions were submitted as rules under the CRA, and it is not one in which we normally issue a legal decision. However, we do have prior caselaw that addressed the applicability of CRA to Clean Air Act preemption waivers, B–334309, Nov. 30, 2023, and EPA's recent submission is inconsistent with this caselaw. Therefore, we are providing you with our views and analysis of preemption waivers under the Clean Air Act that may be helpful as Congress considers how to treat these Notices of Decision and the application of CRA procedures.

As background to these issues, we issued a legal decision concluding that a Clean Air Act preemption waiver was not a rule subject to CRA but was instead an adjudicatory order. See B–334309, Nov. 30, 2023. Furthermore, we explained that even if the waiver were to satisfy the APA definition of a rule, it would be considered a rule of particular applicability and, therefore, would still not be subject to CRA's submission requirement because of CRA's exclusions. Id.

For the three Notices of Decision announcing the waivers at issue here, EPA stated that the Notices of Decision were not rules under CRA, and, in the underlying decision documents for two of those notices, cited to our 2023 decision in support of that statement. However, EPA submitted them as rules to GAO and Congress without any explanation of this discrepancy.

We reached out to EPA on February 20, 2025, for clarification on the submission of the Notices of Decision at issue here because the notices themselves stated that CRA did not apply. After receiving your request, we followed our regular procedure and sent a formal letter to EPA on February 25, 2025, seeking factual information and the agency's legal views on this matter. Although EPA resubmitted the Notices of Decision to GAO on February 27, 2025, with additional information in the corresponding CRA reports, the agency still did not address the statements in the notices regarding the inapplicability of the CRA, and, to date, EPA has not further responded to our letter.

As explained more fully below, our view is that the analysis and conclusions in our 2023 Clean Air Act preemption waiver decision would also apply to the Notices of Decision recently submitted as rules to Congress by EPA.

BACKGROUND

Clean Air Act

The Clean Air Act generally preempts states from adopting or enforcing emission control standards for new motor vehicles or new motor vehicle engines. See 42 U.S.C. §7543(a); B–334309, Nov. 30, 2023. However, the Clean Air Act requires the EPA Administrator to grant a waiver of preemption for a state that adopted a standard prior to March 30, 1966, if the state determined its standard will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards. 42 U.S.C. §7543(b); B–334309, Nov. 30, 2023. Only California can qualify for preemption waivers under this section because it is the only state that adopted a standard prior to March 30, 1966. B–334309, Nov. 30, 2023.

The EPA Administrator must approve the waiver unless the Administrator makes any one of three findings set forth in the statute: (1) the determination of the state is arbitrary and capricious; (2) the state does not need state standards to meet compelling and extraordinary conditions; or (3) the state standards and accompanying enforcement procedures are not consistent with 42 U.S.C. §7521(a) (EPA standards for emissions from new motor vehicles or new motor vehicle engines). 42 U.S.C. §7543(b)(1)(A)–(C); B–334309, Nov. 30, 2023.

When the EPA Administrator receives a waiver request, they must provide notice of a public hearing and comment period. 42 U.S.C. §7543(b); B–334309, Nov. 30, 2023; EPA, Vehicle Emissions California Waivers and Authorizations, available at https://www.epa.qov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations (last visited Mar. 5, 2025) (California Waivers and Authorizations Website). The Administrator makes a decision on the waiver and publishes a notice of their decision and reasons in the Federal Register. B–334309, Nov. 30, 2023.

The Clean Air Act provides similar procedures for the EPA Administrator to authorize California to adopt and enforce emission control standards for certain nonroad engines or vehicles. 42 U.S.C. §7543(e)(2)(A). The Administrator must authorize California to adopt and enforce such standards if California determined that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards, unless the Administrator makes any one of three findings set forth in the statute: (1) California's determination is arbitrary and capricious; (2) California does not need its own standards to meet compelling and extraordinary conditions; or (3) the California standards and accompanying enforcement procedures are not consistent with section 7543. Id. Like the waiver process under section 7543(b), the authorization process under section 7543(e)(2)(A) involves providing notice of a public hearing and comment period and publishing notice of the decision. See id.; California Waivers and Authorizations Website.

EPA Notices of Decision

At issue here are the following EPA Clean Air Act preemption waiver Notices of Decision:

*California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle, Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision*, 88 Fed. Reg. 20688 (Apr. 6, 2023) (Advanced Clean Trucks Waiver Notice);

California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The ''Omnibus'' Low $NO_X$ Regulation; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 643 (Jan. 6, 2025) (Low $NO_X$ Waiver Notice); and

California State Motor Vehicle Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision, 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II Waiver Notice).

In the Advanced Clean Trucks Waiver Notice, the EPA Administrator granted two separate requests for preemption waivers regarding four California regulations for heavy-duty on-road vehicles and engines. 88 Fed. Reg. at 20688. The Low $NO_X$ Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2024 and subsequent model year California on-road heavy-duty vehicles and engines and authorizing regulations regarding off-road diesel engines. 90 Fed. Reg. at 643–44. The Advanced Clean Cars II Waiver Notice announced the EPA Administrator's December 17, 2024, decision granting California a preemption waiver for regulations applicable to new 2026 and subsequent model year California on-road light- and medium-duty vehicles. 90 Fed. Reg. at 642.

Congressional Review Act (CRA)

CRA, enacted in 1996 to strengthen congressional oversight of agency rulemaking, requires federal agencies to submit a report on each new rule to both houses of Congress and the Comptroller General for review before the rule can take effect. 5 U.S.C. §801(a)(1)(A). The report must contain a copy of the rule, ''a concise general statement relating to the rule,'' and the rule's proposed effective date. Id. CRA allows Congress to review and disapprove rules issued by federal agencies for a period of 60 days using special procedures. See 5 U.S.C. §802. If a resolution of disapproval is enacted, then the new rule has no force or effect. 5 U.S.C. §801(b)(1).

CRA adopts the definition of ''rule'' under the Administrative Procedure Act (APA), which states that a rule is ''the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.'' 5 U.S.C. §§551(4); 804(3). However, CRA excludes three categories of APA rules from coverage: (1) rules of particular applicability; (2) rules relating to agency management or personnel; and (3) rules of agency organization, procedure, or practice that do not substantially affect the rights or obligations of nonagency parties. 5 U.S.C. §804(3).

EPA did not submit CRA reports to Congress or GAO for any of the Notices of Decision when they were initially issued on April 6, 2023, and January 6, 2025, and each notice states that CRA does not apply because the relevant action is not a rule for purposes of the Act. Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20726; Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 645; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 643. In addition, the underlying decision documents referenced in the Low $NO_X$ Waiver Notice and Advanced Clean Cars II Waiver Notice include similar statements about the inapplicability of CRA and cite our 2023 decision determining that a Clean Air Act preemption waiver notice of decision was not a rule

under CRA. See EPA, California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The ''Omnibus'' Low $NO_X$ Regulation; Waiver of Preemption; Decision Document (Dec. 17, 2024) (Low $NO_X$ Waiver Decision), at 95 & n.281; EPA, California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Decision Document (Dec. 17, 2024) (Advanced Clean Cars II Waiver Decision), at 189 & n.504 (both citing B–334309, Nov. 30, 2023).

EPA subsequently submitted a CRA report for the three Notices of Decision to Congress and GAO on February 19, 2025. The House of Representatives and GAO received the report on February 19, 2025, and the Senate received the report on February 20, 2025. EPA resubmitted the CRA report to GAO on February 27, 2025. The resubmitted report included additional information for each notice, including the date of the document, the nature of the action submitted, and proposed effective date. EPA did not explain in either submission why the agency was submitting the notices under CRA given its statement in each notice that CRA did not apply.

DISCUSSION

*GAO's 2023 Decision on a Clean Air Act Preemption Waiver Notice of Decision*

In B–334309, we examined an EPA Notice of Decision titled California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision (Advanced Clean Car Program Waiver Notice). 87 Fed. Reg. 14332 (Mar. 14, 2022). This Notice of Decision rescinded EPA's 2019 withdrawal of a 2013 preemption waiver for California's greenhouse gas emissions standards and zero emission vehicle sale mandate, thereby reinstating the waiver. Id. at 14332; B–334309, Nov. 30, 2023.

We determined that the Advanced Clean Car Program Waiver Notice was not a rule under CRA because it did not meet the APA definition of a rule. We concluded that the notice was, instead, an ''order'' under APA. APA defines an order as ''the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'' 5 U.S.C. §551(6). APA further defines ''licensing'' to include an agency granting or revoking a license, and ''license'' to include an agency approval, statutory exemption, or other form of permission. 5 U.S.C. §551 (8), (9). An agency action that constitutes an order under APA is not a rule under the statute and, therefore, is not a rule under CRA. B–334309, Nov. 30, 2023 (citing B–334995, July 6, 2023; B–334400, Feb. 9, 2023; B–332233, Aug. 13, 2020 (rules and orders are ''mutually exclusive'')).

We explained that an adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved. B–334309, Nov. 30, 2023 (citing *United States v. Florida East Coast Railway Co*., 410 U.S. 224, 245–46 (1973); *Neustar, Inc. v. FCC*, 857 F.3d 886, 893 (D.C. Cir. 2017); *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)). In contrast, a rule is a broad application of general principles that is prospective in nature. B–334309, Nov. 30, 2023 (citing *Florida East Coast Railway Co*., 410 U.S. at 246; *Neustar*, 857 F.3d at 895; *Yesler Terrace Community Council*, 37 F.3d at 448).

We concluded that the Advanced Clean Car Program Waiver Notice met the APA definition of an order because the notice determined that California was not preempted from enforcing its Advanced Clean Car Program and therefore made a ''final disposition'' granting California a ''form of permission'' as described in the APA definition. B–334309, Nov. 30, 2023 (citing 5 U.S.C. §551 (6), (8), (9)). We noted that the notice was particular to California's Advanced Clean Car Program, involved consideration of particular facts, as opposed to general policy, and had immediate effect on California. *Id*.

We also concluded that even if the Advanced Clean Car Program Waiver Notice met the APA definition of a rule, it would still not be subject to CRA because of CRA's exclusion of rules of particular applicability. B–334309, Nov. 30, 2023. A rule of particular applicability is addressed to an identified entity and also addresses actions that entity may or may not take, taking into account facts and circumstances specific to that entity. B–334309, Nov. 30, 2023 (citing B–334995, July 6, 2023). We noted that the notice concerned a specific entity—California—and addressed a statutory waiver specific to California's Advanced Clean Car Program; therefore, the notice would be a rule of particular applicability. B–334309, Nov. 30, 2023.

EPA's Recently Submitted Notices of Decision

(1) Applicability of GAO's 2023 Decision

The analysis and conclusion in B–334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices of decision at issue here. For example, all three notices of decision involve waivers granted to California under the same authority and process (42 U.S.C. §7543(b)) at issue in the Advanced Clean Car Program Waiver Notice. In each case, California requested preemption waivers from EPA with respect to specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the waivers, determined to grant the requested waivers. *See* Advanced Clean Trucks Waiver Notice, 88 Fed. Reg. at 20688?90; Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 643–45; Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43.

The Low $NO_X$ Waiver Notice also involves an authorization under a separate authority (42 U.S.C. §7543(e)(2)(A)). As described above, the nature of the determination and process used is very similar to section 7543(b), and our analysis and conclusions in B–334309 would apply to this portion of the notice as well. *See* Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 644–45 (describing the relevant procedures and grouping the corresponding findings in sections 7543(b)(2) and 7543(e)(2)(A) together in summarizing the decision). Specifically, California requested EPA's authorization to adopt and enforce specific California regulations, and EPA, after holding a public hearing, receiving comments, and considering information presented by California and opponents of the authorization, determined to grant the requested authorization. *See* Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 643–45.

(2) Effect of Resolutions of Disapproval

If Congress were to treat the EPA Notices of Decisions as rules under CRA and subsequently enact resolutions of disapproval, there is a question as to the precise effect those resolutions would have. As described above, if a resolution of disapproval is enacted, then the rule has no force or effect. 5 U.S.C. §801(b)(1). However, two of the three Notices of Decision submitted by EPA to Congress, the Low $NO_X$ Waiver Notice and the Advanced Clean Cars II Waiver Notice, appear to merely notify the public of previously issued decision documents granting California the requested preemption waivers and, in the Low $NO_X$ Waiver Notice, the requested authorization for its regulations. See Low $NO_X$ Waiver Notice, 90 Fed. Reg. at 643–44 (stating that EPA ''is providing notice of its decision'' and referencing the Low $NO_X$ Waiver Decision); Advanced Clean Cars II Waiver Notice, 90 Fed. Reg. at 642–43 (stating that EPA ''is providing notice of its decision'' and referencing the Advanced Clean Cars II Waiver Decision). EPA did not include the underlying decision documents in its submission to Congress and GAO. In contrast, the Advanced Clean Trucks Waiver Notice, like the Advanced Clean Car Program Waiver Notice we examined in B–334309, appears to be the decision document. *See* 88 Fed. Reg. at 20688 (stating that EPA ''is granting . . . California['s] . . . requests for waivers''). Accordingly, if Congress were to enact resolutions disapproving the Low $NO_X$ Waiver Notice or the Advanced Clean Cars II Waiver Notice under CRA, it is unclear whether or how those resolutions would affect the underlying waivers and authorizations.

CONCLUSION

In these circumstances, our view is that our prior analysis and conclusion in B–334309 that the Advanced Clean Car Program Waiver Notice was not a rule for purposes of CRA because it was an order under APA would apply to the three notices at issue here. We provide this information to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures.

If you have any questions, please contact Shirley A. Jones, Managing Associate General Counsel, or Charlie McKiver, Assistant General Counsel for Appropriations Law.

Sincerely,

EDDA EMMANUELLI PEREZ,
*General Counsel*.

Congressional Requesters

HON. SHELDON WHITEHOUSE,
*Ranking Member, Committee on Environment and Public Works, U.S. Senate*

HON. ALEX PADILLA,
*U.S. Senate*

HON. ADAM B. SCHIFF,
*U.S. Senate*

Mr. PADILLA. I yield the floor.

The PRESIDING OFFICER. The Senator from California.

Mr. SCHIFF. Mr. President, my colleagues, it is getting very late. Indeed, most of our constituents are asleep. But across the U.S. Capitol tonight, the lights remain on.

Over in the House, they burn dimly on the House floor as Republicans try to jam through a ''big, ugly bill'' that would wreak havoc on our families, our communities, and our climate to pay for more tax cuts for wealthy people, that would cut Medicaid and block help for families that will go hungry so that billionaires like Elon Musk get another tax break they simply don't need.

But that is not what I am here to talk about this evening. I am here at this hour, or this morning, because right here, right now, in the dead of night, Republicans in the Senate are hard at work on another objective, an unprecedented and previously unimaginable effort to abandon their own standards, their own precedent, their previous very public statements, the very rules of this body, to make our air less clean.

To do so is complicated. It requires a lot of parliamentary maneuvers. Why?

Because to make the air dirtier requires 60 votes, and they don't have 60 votes, or it requires Republicans to break their word, to eliminate the filibuster so they can do the bidding of those who would pollute our air.

Now, I don't blame my Republican colleagues for wanting to shroud what they have set out to do tonight in secrecy. I don't blame them for trying to hide it. It was just a few short weeks ago the Republican leader assured this body that he would never do any such thing, but that was then.

But hide or not, the blame will lay squarely on my Republican colleagues for the impact of what is done here tonight because tonight is a turning point, a moment in which the majority gave up yet another guardrail, where they chose to go nuclear, to violate the filibuster, to overturn the Parliamentarian in order to gratify the wishes of Big Oil over the need of our constituents for cleaner air.

The GOP wasn't always this way. Republican administrations didn't always demonstrate such hostility to the environment. At a different moment in our history, there was a very different kind of Republican Party.

So I would like to begin tonight by reading verbatim a message from President Ronald Reagan. The date was July 14, 1984. The then-President turned on a microphone in a studio here in Washington and took to the Nation's airwaves to deliver an address. This is part of what Ronald Reagan said:

My fellow Americans:

I'd like to talk to you today about our environment. But as I mentioned earlier this week, in doing so, I might be letting you in on a little secret—as a matter of fact, one of the best-kept secrets in Washington.

More than 15 years ago, the State of California decided that we needed to take action to combat the smog that was choking the beautiful cities of my home State. Out of that concern was born the first serious program to require manufacturers to build cleaner cars and help control air pollution. The auto industry had to build two kinds of cars—one that would be for sale in the other 49 States and one that would meet the stiff antipollution standards required in California.

We had other concerns in California, such as protecting our magnificent and unique coastline. And we took the lead in that area as well. It took the rest of the Nation a few years to catch on, but in 1970 the Congress followed California's lead and enacted the Clean Air Act. Other laws to protect and clean up the Nation's lakes and rivers were passed, and America got on with the job of protecting the environment.

Part of the secret I mentioned is that I happened to have been Governor of California back when much of this was being done. Now, obviously, neither the problems in California nor those nationally have been solved, but I'm proud of having been one of the first to recognize that States and the Federal Government have a duty to protect our natural resources from the damaging effects of pollution that can accompany industrial development.

Now, if you are just tuning in, this is a speech from Ronald Reagan.

The other part of the well-kept secret—

The former President had to say—

has to do with the environmental record of our administration, which is one of achievement in parks, wilderness land, and wildlife refuges. According to studies by the Environmental Protection Agency, the quality of our air and water has continued to improve during our administration.

In many big cities, the number of days on which pollution alerts are declared has gone down. And if you live near a river, you may have noticed that the signs have been coming down that used to warn people not to fish or swim.

We came to Washington committed to respect the great bounty and beauty of God's creation. We believe very strongly—

Reagan said—

in the concept of stewardship, caring for the resources we have so they can be shared and used productively for generations to come. And we've put that philosophy to work, correcting deficiencies of past policies and advancing long-overdue initiatives.

Let me give you some facts that our critics never seem to remember. When we took office in 1980, we faced a dusty shelf of reports which pointed out our predecessors had been so busy spending money on new lands for parks that they seriously neglected basic upkeep of the magnificent parks we had. So, we temporarily put off acquiring new parkland and started a new billion-dollar, 5-year program to repair and modernize facilities at our national parks and wildlife refuges. If you've been to just about any national park lately, you've probably seen the results.

We've nearly finished repairing the damage from years of neglect, and I've asked the Congress for almost $160 million to resume buying lands to round out our national park and refuge systems. We also took the lead in developing a new approach to protecting some 700 miles of undeveloped coastal areas—the dunes, beaches, and barrier islands that are some of our most beautiful and productive natural resources.

Now—

Reagan said—

there are some who want you to believe that commitment to protecting the environment can be measured by comparing the budgets of EPA under the previous administration with those proposed and approved by the Congress under my administration. But they deliberately ignore that the major Federal environmental laws are designed to be carried out by the States in partnership with EPA.

By the time the clean air, clean water, and other big programs put in place in the early 1970's moved into their second decade, the States had largely taken over the job formerly performed by the Federal Government. With the successful delegation to the States, EPA, under the leadership of Bill Ruckelshaus, has been freed to move on to the challenges of the 1980's—such as cleaning up abandoned toxic waste dumps.

Under our administration, funding for the Superfund cleanup program will have increased from just over a hundred million dollars in 1981 to $620 million in 1985.

And by the way, under this ''big, ugly bill,'' the cuts to Superfund cleanup will be enormous. It will move the country exactly the opposite direction that Ronald Reagan moved the country back in 1981.

By the end of this year—

Reagan said—

EPA expects to have undertaken more than 400 emergency actions to remove and contain public health hazards. And because we recognize that we need to do more cleanup work than the current law provides, I'm committed to seeking an extension of the Superfund program.

As I said, our progress on protecting the environment is one of the best-kept secrets in Washington. But it's not, by far, the only secret. And I'll have more on that in the months ahead.

Until next week, thanks for listening, and God bless you.

That was Ronald Reagan. The Republican Party wasn't always like it is today. There was a time when the environment and clean water and clean air were a priority of this party.

Now, this isn't the first time I have noted on the Senate floor that Ronald Reagan must be spinning in his grave. It is certainly true of our treatment of Ukraine and our giving in to the Kremlin. But that President, who was looked to as a portrait of the American conservative movement, watching as the party of Lincoln and Teddy Roosevelt and Reagan completes its transformation into the party of Donald J. Trump, it probably doesn't recognize what it sees.

What happened to ''States' rights''? Because this attack on California's clean air policy is an attack on States' rights.

What happened to ''freedom to innovate''? This will stifle innovation.

What happened to ''family values''?

How is what we are doing here tonight in service of our kids and the air that they breathe?

Now, Ronald Reagan wasn't the only Republican President to believe in clean air and clean water. This is Richard Nixon giving an address January 22, 1970.

I now turn to a subject which, next to our desire for peace, may well become the major concern of the American people in the decade of the seventies.

In the next 10 years we shall increase our wealth by 50 percent. The profound question is: Does this mean we will be 50 percent richer in a real sense, 50 percent better off, 50 percent happier?

Or does it mean that in the year 1980 the President standing in this place will look back on a decade in which 70 percent of our people lived in metropolitan areas choked by traffic, suffocated by smog, poisoned by water, deafened by noise, and terrorized by crime?

These are not the great questions that concern world leaders at summit conferences. But people do not live at the summit. They live in the foothills of everyday experience, and it is time for all of us to concern ourselves with the way real people live in real life.

The great question of the seventies is, shall we surrender to our surroundings, or shall we make our peace with nature and begin to make reparations for the damage we have done to our air, to our land, and to our water?

If you are tuning in, these are the words of Richard Nixon.

Restoring nature to its natural State—

He said—

is a cause beyond party and beyond factions. It has become a common cause of all the people of this country. It is a cause of particular

concern to young Americans, because they more than we will reap the grim consequences of our failure to act on programs which are needed now if we are to prevent disaster later.

Clean air, clean water, open spaces—these should once again be the birthright of every American. If we act now—

Nixon said—

they can be.

We still think of air as free. But clean air is not free, and neither is clean water. The price tag on pollution control is high. Through our years of past carelessness we incurred a debt to nature, and now that debt is being called.

What more profound words for today than that?

Through our years of past carelessness we incurred a debt to nature, and now that debt is being called.

And that debt is called climate change. Those are my words, not Nixon's.

But Nixon went on to say:

The program I shall propose to Congress will be the most comprehensive and costly program in this field in America's history.

This was a Republican President.

It is not a program for just one year. A year's plan in this field is no plan at all. This is a time to look ahead not a year, but 5 years or 10 years—whatever time is required to do the job.

I shall propose to this Congress a $10 billion nationwide clean waters program to put modern municipal waste treatment plants in every place in America where they are needed to make our waters clean again, and do it now. We have the industrial capacity, if we begin now, to build them all within 5 years. This program will get them built within 5 years.

As our cities and suburbs relentlessly expand, those priceless open spaces needed for recreation areas accessible to their people are swallowed up—often forever. Unless we preserve these spaces while they are still available, we will have none to preserve. Therefore—

Nixon said—

I shall propose new financing methods for purchasing open space and parklands now, before they are lost to us.

The automobile—

Nixon said—

is our worst polluter of the air. Adequate control requires further advances in engine design and fuel composition.

Little could he have imagined the electric vehicles of today. But he said:

We shall intensify our research, set increasingly strict standards—

This is Richard Nixon—

and strengthen enforcement procedures—and we shall do it now.

We can no longer afford to consider air and water common property, free to be abused by anyone without regard to the consequences. Instead, we should begin now to treat them as scarce resources, which we are no more free to contaminate than we are free to throw garbage into our neighbor's yard.

This requires comprehensive new regulations. It also requires that, to the extent possible, the price of goods should be made to include the costs of producing and disposing of them without damage to the environment.

Isn't this incredible? Richard Nixon, in the 1970s, talking about requiring that the price of goods should include the cost of producing and disposing of them without damage to the environment.

He went on:

Now, I realize that the argument is often made that there is a fundamental contradiction between economic growth and the quality of life, so that to have one we must forsake the other.

The answer—

He said—

is not to abandon growth, but to redirect it. For example, we should turn toward ending congestion and eliminating smog with the same reservoir of inventive genius that created them in the first place.

Now, Richard Nixon—that was in January of 1970.

This was Richard Nixon in July of the same year, July of 1970, in a special message to the Congress:

To the Congress of the United States: As concern with the condition of our physical environment has intensified, it has become increasingly clear that we need to know more about the total environment—land, water and air. It also has become increasingly clear that only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself.

The Government's environmentally related activities have grown up piecemeal over the years. The time has come to organize them rationally and systematically. As a major step in this direction, I am transmitting today two reorganization plans: one to establish an Environmental Protection Agency, and one to establish, within the Department of Commerce, a National Oceanic and Atmospheric Administration.

This was the work of a Republican President: the EPA and NOAA. And look what is happening to it today.

The Administrator of the EPA Lee Zeldin testified before our committee today. He is calling to cut the EPA in half—cut it by more than half, actually: by 55 percent. This creation of the Nixon administration, he believes more than half of it is a waste. This Agency devoted to what Reagan talked about, what Nixon talked about, devoted to clean air and clean water, is just a waste.

This was the CEO of Ford just a year ago:

If we cannot make money on EVs, we have competitors who have the largest market in the world, who already dominate globally, already setting up their supply chain around the world. If we don't make profitable EVs in the next five years, what is the future? We will just shrink into North America.

What about our competitiveness? Are we walking away from that too? Every step this body takes this week to undermine the growth of what could be America's next great manufacturing powerhouse will be felt not just by the big three but in communities all across America.

A recent study from Princeton University found that if Congress takes action to target these emissions regulations, as they are doing, and the EV tax credits that we passed in the last administration—can you guess the place that will be the most impacted? It will be the same States that supported Donald Trump in the last election. That is because the EV component plants that are being built for this burgeoning sector are happening in Texas and in Tennessee and in Missouri and in South Carolina. The battery factories are being launched in Indiana, Alabama, Georgia, Ohio, and Michigan.

Every signal we send to American industry and to the world that we are throwing in the towel to Chinese EV manufacturers will resonate far longer than I think this Senate realizes this week, and it will hit American families in the exact place it will hurt the most. It will hit them in the wallet. Cutting tax credits, shuttering American electric car manufacturers—these will make the modern commute, the future of family vacation, all that, more expensive as we become all that more reliant on fossil fuels to go anywhere.

It will also hurt the future earnings of our apprentices, our tradespeople, our engineers by killing in the cradle a sector of the American economy to the tune of thousands of good-paying jobs.

That is not to mention, even more significantly, making Americans spend far more on healthcare as they face more sick days and worse health conditions from dirtier air.

Now, I want to talk about that for a moment because I know there are many who take for granted our air, just as we take for granted that the sun will rise or set. While air that we breathe may feel like a given, we cannot lose sight of the fact, for 135 million people—more than 4 in every 10 Americans—they live in a community impacted by unhealthy levels of air pollution; and 24 million Americans—or 1 in every 14 adults—are living with asthma. That rate is even higher in children, with about 1 in every 12 kids living with asthma.

Now, consider for a second that elevated air pollution has been found by the University of Washington, Columbia, and the University of Buffalo to be equivalent on your lungs like a pack of cigarettes.

Why is smog like a pack of cigarettes? Because it has the same effects exactly on our health. Here is what the EPA says on this topic:

[C]onstant exposure to elevated particle pollution will contribute to reduced respiratory function, even in apparently healthy people.

Here is another quote:

Respiratory effects related to active exposure to fine particles include . . . reduction in pulmonary function, increased airway inflammation . . . and can be serious enough to result in emergency department visits and hospital admissions.

That is heart trouble, that is lung trouble, health effects so devastating you could land in the hospital just from constant exposure to smog—smog—something we will see a lot more of once again by repealing these Clean Air Act standards that California has set.

Now, I heard one of my colleagues earlier today say that California was

imposing its standards on everybody else. Now, that is just not the case. For decades now, California has had a right to set its own air quality standards. That right was given by statute.

But other States have chosen to follow California's lead. They weren't required to. They weren't forced to. They chose to. They chose for their constituents to have air as clean as what California was striving to achieve.

And, yes, a lot of States adopted those standards, and some of the other States might not like it. Maybe they are just fine with having dirtier air, and that is their judgment.

But to tell California we can't set our own air standard, to tell California that because other States are following our example, we should lose the opportunity to decide how clean or how dirty we want our own air to be; is that a road we really want to go down?

Now, I know because I have been in the majority before, and when you are in the majority, you feel like you will never be in the minority, but the tables will turn. Do my colleagues want a situation where the Democratic majority can look at rules we don't like in red States and say with a simple vote—majority vote—we are going to get rid of them? we don't like your rule on mifepristone? we don't like your license for natural gas? we don't like something your State likes, and therefore we are going to legislate by CRA? Because that is what is going to happen. You can overturn the Parliamentarian here. We can overturn the Parliamentarian there. I just don't think that is a road we want to go down.

I grew up in California. I have lived there since I was 11 years old. I saw the smog days, and I knew the haze that had come to define our cities and skies for a generation dating back to the first automobile boom of the post-war era. I remember all the smog alerts, days you were warned not to go outside.

It is no surprise that that smog at the time became synonymous with California. Even today, we see some of the most densely populated and at-risk areas in the Nation for air pollution are still in California.

The Los Angeles County area, including the San Fernando and San Gabriel Valleys; the Central Valley, including Bakersfield and Fresno; San Diego County; San Francisco Bay Area—these are all areas that see dense populations facing increasing health risks from smog, which is why California took such a step 60 years ago to become the first State to tackle air pollution caused by automobiles head-on, to take drastic generational action to clean up our air.

But the steps that my colleagues in the Republican Party are taking tonight aren't going to make America healthy again. They are going to make America hazy again. If we go down this road, the future is clear even if our skies won't be.

Americans will pay for this nuclear option with more of their paychecks on hospital bills. They will pay for it with fewer jobs, less success in their communities, fewer years with their loved ones, more cancers, less time to enjoy the quality of life, and less quality of life.

That is not a future I want to see. I want to see a future envisioned, I think, as we heard by Democratic Presidents and Republicans Presidents alike, in which we invest in the technologies that can clean our air and clean our water, in which we get ahead of this tipping point on climate change, in which fire seasons go back to being a few months a year and not year-round, in which we are not constantly seeing our wildlife at risk, and in which we have to wonder what the future will look like for our kids and our grandkids.

It may seem like a small step tonight to get rid of the filibuster, to force California to abandon its standards for its own air, but this step down this road may be the first. It will not be the last. And I want better for my kids and grandkids, and I want better for everyone else's family as well.

I yield the floor.

---

## ADJOURNMENT UNTIL 10 A.M. TOMORROW

The PRESIDING OFFICER. Under the previous order, the Senate stands adjourned until 10 a.m., May 22, 2025.

Thereupon, the Senate, at 1:21 a.m., adjourned until Thursday, May 22, 2025, at 10 a.m.