# EXHIBIT D



# Congressional Record

**PROCEEDINGS AND DEBATES OF THE *119th* CONGRESS, FIRST SESSION**

*United States of America*

*Vol. 171*         WASHINGTON, THURSDAY, MAY 22, 2025         *No. 87*

# *Senate*

The Senate met at 10 a.m. and was called to order by the Honorable MARKWAYNE MULLIN, a Senator from the State of Oklahoma.

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Almighty God, source of enabling strength, sustain our Senators not only in the great moments but also in the repetitive and common tasks of life. Establish their work, strengthening them to honor You by serving others.

Lord, make them agents of healing and hope as they help people live blessed by greater justice and peace. Empower them to daily develop greater respect and submission to Your commands. Fill them with Your lifegiving spirit so that they will strive to permit justice to roll down like waters and righteousness like a mighty stream.

We pray in Your mighty Name. Amen.

### PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. GRASSLEY).

The assistant bill clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, May 22, 2025.*

*To the Senate:*

Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable MARKWAYNE MULLIN, a Senator from the State of Oklahoma, to perform the duties of the Chair.

CHUCK GRASSLEY,
*President pro tempore.*

Mr. MULLIN thereupon assumed the Chair as Acting President pro tempore.

### RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

### CAPITAL JEWISH MUSEUM SHOOTING

Mr. THUNE. Mr. President, before I begin, I need to mention the shooting that occurred last night outside an event at the Capital Jewish Museum in Washington, DC, held by the American Jewish Committee. From everything we know so far, it is appallingly clear that event attendees were deliberately targeted. And two young Embassy employees—tragically, two employees on the verge of getting engaged and starting a life together—were murdered in the attack.

I am grateful that the suspect is already in custody and for the help the Capitol Police provided in responding to the attack, and I know that he will be swiftly prosecuted to the fullest extent of the law. But I suspect that is little comfort right now to the many whose sense of safety has been shattered and who are worried that they will be targeted simply because they are Jewish or Israeli.

My prayers today are with the families of the deceased, with event attendees, with the employees of the Israeli Embassy, and with all the members of the Jewish community suffering in the wake of this attack. And to the Israeli and Jewish communities here in Washington, DC, know that we stand with you.

### UKRAINE

Mr. THUNE. Mr. President, one other topic I want to mention before I get to the main subject today is the war in Ukraine.

For the last 4 months, President Trump has gone to extraordinary lengths to bring an end to the bloodshed in Ukraine, and we here in the Senate commend him for those efforts.

Now the ball is in Putin's court. It is time for him to come to the table in good faith and make a serious proposal for an immediate cease-fire that can lead to a just and lasting peace in Ukraine. I hope he realizes it is time to do so. If not, the Senate stands ready to act. Thanks to the dogged work of Senator GRAHAM, we have bipartisan legislation, cosponsored by 80 of my colleagues, to impose additional economic sanctions and tariffs on Russia. If Russia is not willing to engage in serious diplomacy, the Senate will work with the Trump administration to consider additional sanctions to force Putin to start negotiating.

### MEMORIAL DAY

Mr. THUNE. Mr. President, this month, I have had the privilege of welcoming two groups of South Dakota veterans to Washington during Honor Flight visits. I went simply to say hello and to thank these men and women for their service to our country. This is something I have done for many years, and it is always an occasion that inspires me and makes me grateful to be an American and an heir to what they fought for.

After one of these groups of veterans returned home to South Dakota, KELOLAND News reported on their

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

visit, and a quote from one Vietnam veteran in that story struck me. He said:

I'm no hero. The heroes are the ones that didn't get to come back and have families, didn't get to become grandparents. They're the heroes.

Mr. President, this is a common sentiment among veterans. I know my dad, a World War II veteran, never talked much about himself; it was always about the men he served with, especially those who didn't come back. But no matter how many times I hear this, it always stops me in my tracks because it reminds me that we ask those who serve our country to be willing to sacrifice everything—their entire future and all that it could hold. And many, many Americans have given their lives to defend our security, liberty, and peace.

This Monday, on Memorial Day, we honor the men and women who sacrificed everything in service to our country. We remember their heroism and courage, and we take inspiration from their commitment to the ideals upon which our country is founded.

This year marks 80 years since the end of World War II. Millions of Americans served in the military during the war, and more than 400,000 Americans died. Among these were about 1,700 South Dakotans, men like CPT Arlo Olson of Toronto, SD, who was awarded the Congressional Medal of Honor for his bravery in advancing through Italy and who was killed there in 1943. He was 25 years old. Lieutenant Earl Ferguson, from Philip, who died when his B–24 bomber was shot down while targeting an oilfield in Romania. He was 26. And Private Glenn Dow, from Sioux Falls, who was killed on Omaha Beach on D-Day. Private Dow was 19.

These men gave their entire lives to defend our freedom and secure peace for us. They entrusted to us the future they would not see themselves, and they call on us to defend the peace they won.

In one of his Memorial Day proclamations, President Reagan wrote:

The defense of peace, like the defense of liberty, requires more than lip service. It requires vigilance, military strength, and the willingness to take risks and make sacrifices.

He continued:

The surest guarantor of both peace and liberty is our unflinching resolve to defend that which has been purchased for us by our fallen heroes.

On Memorial Day, we remember that our freedom has come at a cost, and we recognize that it is on us to live up to the ideals for which generations of Americans have been willing to give their lives.

These are American heroes, and we are a grateful nation.

I yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

## RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Democratic leader is recognized.

## CAPITAL JEWISH MUSEUM SHOOTING

Mr. SCHUMER. Mr. President, last night, just a few blocks from here, at the Capital Jewish Museum, a scourge of anti-Semitism reared its ugly head yet again in America. The sickening, cold-blooded murder of two Jewish staffers of the Israeli Embassy seems to be another horrific incident of anti-Semitism, which we all know is much too rampant in our society.

Yaron Lischinsky, Sarah Milgrim—may their memories be a blessing.

Such a blatant and targeted act of anti-Semitism, right here in the Nation's Capital, should outrage everybody—a beautiful young couple about to be married just starting their lives, gunned down seemingly because they were Jewish.

Let this be a call to all of us: We must never allow the malicious poison of anti-Semitism to fester and flourish. While we still must learn more about this tragic incident, we do know that when anti-Semitism is rife in the air, all kinds of individuals cling to it and, sometimes, unfortunately, act on it.

This morning, I am praying for those who were killed in this senseless act of violence, all those affected, and their families.

## BUDGET RECONCILIATION

Mr. SCHUMER. Mr. President, now, on reconciliation, a few hours ago, while most Americans were fast asleep, House Republicans rammed through their so-called Big Beautiful Bill through the House of Representatives, in the dead of night, in the hopes that nobody would notice.

House Republicans took a bill that was already rotten to the core and made it even worse to appease the most radical factions of their party. It will bring deeper, harder, and even faster pain to the American people.

It seems the hard right over there wanted even quicker pain. It is truly jarring to watch House Republicans cheer and pat each other on the back while bond markets spiral and working families are left to worry about how they will make ends meet.

So this morning, let's take a look at a few ways this bill has gotten even worse as it has reached final passage. We will surely learn more in the coming days, but let me share a few changes Republicans made that Americans deserve to hear.

First, this bill was already the largest cut in Medicaid in American history, but now these cuts have been rushed forward and will happen as soon as next year. Moving up the timeline now means that hospitals, particularly rural hospitals, have even less time to prepare and increases the chance that they will close and that hundreds in each county will lose their jobs.

Up to 14 million Americans are in danger of losing their health insurance. This bill will shut down rural hospitals, community health centers, urgent care clinics, and more. But while hospital beds are closing, Republicans are prioritizing a repeal on tanning bed taxes.

And, of course, at the last minute, the anti-choice radicals snuck in a new provision, penalizing enrollees in private plans on ACA exchanges covering reproductive care. Defunding Planned Parenthood wasn't enough. The radicals got their pitchforks and added a provision to effectively ban every insurance premium on every ACA exchange for covering abortion.

This is catastrophic and even increases the anti-choice provisions in the bill by a dramatic amount. It will mean that nearly one in seven Americans who has been insured through ACA since 2014 will be subject to this change.

And while our communities get sicker, our kids get hungry. Republicans weren't satisfied with simply making 4 million kids go hungry. They decided they needed to move up the timeline. Cuts to SNAP will take effect as soon as next year. That makes it even harder for food pantries to adapt—more chaos, more hunger, and more closures among our food pantries and kitchens that serve the hungry.

Widespread hunger is now on the fast track. Republicans seem to be saying that the average person who needs food gets only $5 a day. A dozen eggs cost more than $5 a day.

That is the price Republicans accept so they can cut taxes on the wealthy.

Republicans are stealing from hungry kids, stealing from low-income families to give trillions in tax giveaways to the wealthy.

This is not beautiful. It is ugly. It is revolting.

As the bill proceeds, perhaps the most dramatic change that occurred overnight is the surrender of America's clean energy future to China. Republicans are condemning Americans to higher energy costs and killing hundreds of thousands—even millions—of good-paying jobs.

Last night, the Republicans did something else too. They added a clean job kill switch. At the very last minute, Republicans added a provision that says any project that doesn't break ground within 60 days of this passage will lose the entire tax credit.

That is getting rid of the tax credit. No project can start in 60 days. That is

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 4 of 51

not how it works. They know that. They know that the clean energy tax credits are popular. They know that the clean energy tax credits will reduce costs for American families.

So instead of saying, "Kill it outright," they say, "You must start within 60 days." That is saying, "Kill it outright." Everyone knows that, and I saw that some of the hard-right people from the oil patch States were gloating—gloating—that clean energy is gone. It is one of the most devastating things added at the last minute in this bill, snuck in, in the dark of night.

We in the Senate—and I hope our Republican colleagues will join us in this—are going to fight this every step of the way. Much of the clean energy industry will be dead. As I said, hundreds of thousands, if not millions, of jobs will be lost, and China, 10 years from now, will be dictating what happens in our energy markets to our children.

To make matters even worse, of course, the bill also raises taxes on some projects that are underway. Donald Trump says he wants America to dominate energy, and then he does this—taxing energy projects, raising costs for families?

Nope. Donald Trump, what you are doing is absolutely stupid and counterproductive. You don't even know what you are doing. You just think: Oh, clean energy, let's just get rid of it. We will rely on oil, gas, and coal.

Well, there ain't enough oil, gas, and coal to fuel the world, and it is more expensive to do it, Donald Trump. What the heck are you doing?

This is an American energy kill switch. Solar jobs will vanish. Wind jobs will vanish. Manufacturing jobs will go to China, just the opposite of what the President says he wants. And people's electric bills will go up.

So America, when your electric bill starts going up, talk to Donald Trump, talk to the Republicans in the House, and please talk to the Republicans in the Senate and tell them not to move forward on this folly.

Republicans call their bill a tax break, but, in reality, it is a tax hike and a job killer, except for China, where it is a job creator. China wins; America loses.

In the coming days, Americans will take a look at the Republicans' Big Beautiful Bill and discover it gets uglier and uglier the closer they look.

The bill, hopefully, has a doomed future in the Senate. Senate Democrats will let hell freeze over and fight this in every way that we can.

Donald Trump told House Republicans that voting no on his bill will be the ultimate betrayal, but the real betrayal this morning was the Republicans voting yes—the betrayal of the American people—because there is nothing beautiful about the biggest cuts to Medicaid in American history, nothing beautiful about cutting SNAP benefits so children go hungry and can't learn or have productive lives,

nothing beautiful about cutting SNAP benefits by over $200 billion.

Senate Democrats will oppose this morally bankrupt bill with every fiber in our being—every fiber.

## TRIBUTE TO RUTH CARNEGIE

Mr. SCHUMER. Mr. President, now, on a more happy note, when Ruth Carnegie took a job with the Senate Doorkeepers 5 years ago, she quickly impressed everyone with her calm, competence, and her ability to handle chaos, which, of course, made perfect sense. She had spent the previous 3 years working for me.

Next week, after 3 years in "Schumerland," 12 years in the Senate, and 22 years on Capitol Hill, Ruth will move on to her next chapter. Now, it might surprise you that someone whose dream is to race down the autobahn found a home here in the Senate, an institution not known for its pace.

But, in truth, Ruth was built for both. When things moved fast, Ruth could keep up. When things slowed her down, Ruth could be steady. She is soft-spoken yet strong. She has a combination of humility, wisdom, and strength.

One of the things I admire most about Ruth is that she always lifts up everyone around her, being a mentor to many people who have and will go on to do great things.

Ruth, thank you, thank you, thank you. You have left an indelible mark on the Senate, and you have earned a very happy retirement.

I yield the floor.

## CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

## LEGISLATIVE SESSION

## PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; ADVANCED CLEAN CARS II; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume H.J. Res. 88, which the clerk will report.

The senior assistant legislative clerk read as follows:

A joint resolution (H.J. Res. 88) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision".

The ACTING PRESIDENT pro tempore. Under the previous order, the clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to a third reading and was read the third time.

### VOTE ON H.J. RES. 88

The ACTING PRESIDENT pro tempore. The joint resolution having been read a third time, the question is, Shall the joint resolution pass?

Mr. CRAPO. Mr. President, I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from North Carolina (Mr. BUDD), and the Senator from North Carolina (Mr. TILLIS).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) and the Senator from Oregon (Mr. MERKLEY) are necessarily absent.

The result was announced—yeas 51, nays 44, as follows:

[Rollcall Vote No. 277 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Slotkin |
| Curtis | Marshall | Sullivan |
| Daines | McConnell | Thune |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—44

| | | |
|---|---|---|
| Alsobrooks | Hickenlooper | Rosen |
| Baldwin | Hirono | Sanders |
| Bennet | Kaine | Schatz |
| Blumenthal | Kelly | Schiff |
| Blunt Rochester | Kim | Schumer |
| Booker | King | Shaheen |
| Cantwell | Klobuchar | Smith |
| Coons | Luján | Van Hollen |
| Cortez Masto | Markey | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |

NOT VOTING—5

| | | |
|---|---|---|
| Blackburn | Heinrich | Tillis |
| Budd | Merkley | |

The joint resolution (H.J. Res. 88) was passed.

The PRESIDING OFFICER (Mr. SHEEHY). The motion to reconsider is considered made and laid upon the table.

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 5 of 51

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; HEAVY-DUTY VEHICLE AND ENGINE EMISSION WARRANTY AND MAINTENANCE PROVISIONS; ADVANCED CLEAN TRUCKS; ZERO EMISSION AIRPORT SHUTTLE; ZERO-EMISSION POWER TRAIN CERTIFICATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"—Motion to Proceed

The PRESIDING OFFICER. The majority leader.

Mr. THUNE. Mr. President, I understand the Senate received H.J. Res. 87 from the House.

The PRESIDING OFFICER. The Senator is correct.

Mr. THUNE. I move to proceed to H.J. Res. 87.

The PRESIDING OFFICER. The clerk will report the motion.

The assistant bill clerk read as follows:

Motion to proceed to H.J. Res. 87, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision".

VOTE ON MOTION

Mr. THUNE. I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 278 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Curtis | Justice |
| Barrasso | Daines | Kennedy |
| Boozman | Ernst | Lankford |
| Britt | Fischer | Lee |
| Capito | Graham | Lummis |
| Cassidy | Grassley | Marshall |
| Collins | Hagerty | McConnell |
| Cornyn | Hawley | McCormick |
| Cotton | Hoeven | Moody |
| Cramer | Husted | Moran |
| Crapo | Hyde-Smith | Moreno |
| Cruz | Johnson | Mullin |
| Murkowski | Schmitt | Thune |
| Paul | Scott (FL) | Tillis |
| Ricketts | Scott (SC) | Tuberville |
| Risch | Sheehy | Wicker |
| Rounds | Sullivan | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was agreed to.

---

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE POLLUTION CONTROL STANDARDS; HEAVY-DUTY VEHICLE AND ENGINE EMISSION WARRANTY AND MAINTENANCE PROVISIONS; ADVANCED CLEAN TRUCKS; ZERO EMISSION AIRPORT SHUTTLE; ZERO-EMISSION POWER TRAIN CERTIFICATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

The legislative clerk read as follows:

A joint resolution (H.J. Res. 87) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision".

The PRESIDING OFFICER. Under the provisions of 5 U.S.C. 802, there will now be 10 hours of debate equally divided.

The Senator from Nebraska.

H.J. RES. 87

Mrs. FISCHER. Mr. President, today, the U.S. Senate will vote on my resolution to overturn the EPA's waiver for California's Advanced Clean Trucks.

First of all, I would like to thank my friend and colleague Chairman CAPITO for her strong leadership and work on this very important issue. This heavy-handed regulation imposes unrealistic emissions requirements for heavy-duty trucks and heavy-duty diesel engines. This government mandate handed down to vehicle manufacturers demands that they sell zero-emission trucks at an increased rate from 2024 to 2035. We aren't under any illusions as to what this means. We know that the goal is to effectively end the sale of internal combustion engines.

Now, I am not here today to disparage electric vehicles, and I am certainly not here to discourage the manufacturing and the purchasing of EVs either. What I am concerned about is the Federal Government dictating which cars and which trucks are acceptable and which are not. If Americans want to drive an electric or a hybrid car, that is fine. However, the government—the government—should not pick winners and losers in the vehicle marketplace. I believe in the power of America's free markets, and I believe we should allow the markets to determine the viability of clean trucks.

Here is the truth: This California waiver and subsequent regulation is simply not based in reality, and it will have real-world consequences on us. By requiring truckers to meet California's standards, even while working outside of the State, operator costs increase, fleet upgrades would be impacted, and interstate commerce would be disrupted. And American consumers would bear the brunt of increased costs. Hard-working families are already dealing with the high cost of everyday goods and services, and they cannot afford this regulation.

Let me be clear. This action is necessary to stop one State from dictating emission policies for the entire country. Prior to this waiver being granted, California's own Air Resources Board readily admitted this action would extend beyond its own State borders, and several States have already followed suit.

I would also like to address the eligibility of Congress disapproving rules. A few weeks ago, I questioned the Government Accountability Office Comptroller during an Appropriations subcommittee hearing. The Comptroller explicitly stated that GAO's role is just an advisory one and that it is up to us—it is up to Congress—to determine what constitutes a rule. Again, let me be clear. We are reclaiming our congressional authority under the Congressional Review Act.

I will be proud for this body to vote on and pass my resolution, which is a commonsense step to keep government overreach at bay, protect consumers, and support America's free markets. With the passage of the House version of this resolution and with the passage of the Senate's version today, it will head to the President's desk to be signed into law.

I yield the floor.

The PRESIDING OFFICER. The Senator from Wyoming.

CAPITAL JEWISH MUSEUM SHOOTING

Ms. LUMMIS. Mr. President, before I talk about digital assets, I want to take a moment to remember Sarah Lynn Milgrim and Yaron Lischinsky, who were tragically, senselessly murdered last night at the Capital Jewish Museum.

May their memory be a blessing for their families, their friends, their community, and their faith.

Let me be very clear. Anti-Semitism and this kind of hate-fueled violence have no place in our country, no place in the world.

I encourage you all to join me in keeping these families in your prayers in the coming weeks. I am proud to stand in support of Israel during this time.

GENIUS ACT

Mr. President, now I will switch to the GENIUS Act.

The GENIUS Act is a watershed moment in how we approach digital finance while also preserving the institutions that have served our Nation for decades.

Digital assets are the future, and it is our responsibility to ensure the United States continues to lead the way. The uncomfortable reality is that our payment system is outdated. Many of our financial rails date back to the 1970s and 1980s, before the internet transformed how we live and work.

When a small business owner in Cheyenne uses a traditional payment system to send a payment to a supplier overseas, they face delays up to 10 days and 2 to 5 percent transaction fees. This isn't just inconvenient; it is a competitive disadvantage to American businesses.

But digital assets change all that. Stablecoins can complete these same transactions in seconds, at a fraction of the cost, 365 days out of the year. The GENIUS Act not only revolutionizes the way we do business but preserves critical financial institutions, and they need this opportunity.

For more than 150 years, our country has maintained both State-chartered and national banks. There are about 5,000 banks; 4,000 of them are chartered at the State level and only 1,000 at the Federal level. This system has been the engine for American economic growth, providing businesses of all sizes with diverse financial services tailored to local needs.

In Wyoming, we have seen firsthand how State-chartered banks serve the specific needs of ranchers, energy producers, and Main Street that might otherwise have been overlooked by larger institutions. We have also seen how the dual banking system permits States, as laboratories of democracy, to thoughtfully integrate new products and services into our banking system.

Wyoming and other States were the first to provide legal clarity for digital assets and show, in great detail, how they can thoughtfully be integrated into our payments and contracts. The GENIUS Act thoughtfully preserves the dual banking system by creating clear pathways for stablecoin issuance under both State and Federal oversight. The legislation also protects and builds upon Wyoming's regulatory framework for digital assets that both protects consumers and promotes responsible innovation.

This legislation, the GENIUS Act, is thoughtful, and it is a balanced approach America needs to maintain and grow our influence in financial advancement, and history will remember how we capitalize on or squander this moment.

American leadership in digital finance is a privilege. Let's ensure it stays in America and not Europe, not Singapore, not China. Let's lead in this innovation, this technology, this advantage to individuals and small communities. We need American values and American leadership to ensure prosperity in the next generation.

Let's get the GENIUS Act passed and secure America's financial future.

I yield the floor.

The PRESIDING OFFICER (Mr. HAGERTY). The Senator from Utah.

UNANIMOUS CONSENT REQUESTS

Mr. LEE. Mr. President, last year this body, the United States Senate, passed 41 bills from the Energy and Natural Resources Committee. And 25 of those bills have been reintroduced. They all have bipartisan support. They all have been vetted in committee. They all are ready to move.

Today, I am asking that we pass four of them at the same time as a modest step forward for the kind of open, Member-driven process for which the Senate was built and has long existed.

The first, from Senator KING of Maine, would expand access to the Katahdin Woods and Waters National Monument—something that passed this body unanimously last year.

The second, from Senator CORNYN of Texas, would adjust the boundaries of Big Bend National Park—again, a commonsense proposal with bipartisan support.

The third, from Senator GILLIBRAND of New York, would establish a national historic park at Fort Ontario—the site of the only Holocaust refugee shelter in American history.

And fourth, from Senator LANKFORD of Oklahoma, would designate the Historic Greenwood District, also known as Black Wall Street, as a national monument.

The Greenwood District in Tulsa was once a thriving community of Black-owned businesses, professionals, and families until the Tulsa Race Massacre of 1921 tragically burned it to the ground.

Hundreds were killed, and thousands were left homeless. Designating this site as a national monument is long overdue. And this month, May 31—in fact, just a few days from now—marks the anniversary of that tragic, tragic massacre.

With that, Mr. President, I ask unanimous consent that the Committee on Natural Resources be discharged and the Senate proceed to the immediate consideration of the following bills en bloc: S. 282, the Katahdin Woods and Waters National Monument access from Senator KING; S. 1051, the Historic Greenwood District—Black Wall Street—National Monument from Sen-

ator LANKFORD; S. 432, Fort Ontario Holocaust Refugee Shelter National Historic Park Establishment Act from Senator GILLIBRAND; and S. 1112, the Big Bend National Park Boundary Adjustment Act from Senator CORNYN; further, that the bills be considered read a third time and passed and that the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there an objection?

The Senator from Oregon.

Mr. WYDEN. Mr. President, reserving the right to object.

I would say to my colleague, I very much wish that I was not in this position. This morning, I was—like Chairman LEE, I was chairman of the committee, and I know this is a challenging process to put these measures together.

Chairman LEE and I have worked very closely for years on these issues and a host of others, and I look forward to having plenty of opportunities in the future to continue our good work.

So the reason I am here is I requested that two additional, strongly bipartisan measures that already cleared the Chamber last Congress and had no objections be individually included in the request.

One of those bills was S. 356, the Secure Rural Schools Reauthorization Act of 2025, that for years I have championed with my friend and colleague from Idaho Senator CRAPO.

Across the West, this legislation has had bipartisan support because it would reauthorize a crucial lifeline—particularly for schools and law enforcement and roads throughout the West.

I was in Grant County recently, a small community in eastern Oregon, and they are basically hanging by a thread if they don't get the Secure Rural Schools money restored. That is why I am here on the floor today.

I am clear that I want us to work together and to get this done as expeditiously as possible. I am committed, as I have been over the years, working with Chairman LEE to advance these bipartisan proposals swiftly.

I deeply regret being out here and having to express my concerns today and to object, and I just hope we can be back on this floor very, very quickly to pass this good package of bills and make sure the Secure Rural Schools legislation is included.

Therefore, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Utah.

Mr. LEE. Mr. President, I appreciate the kind words from my friend and colleague the distinguished Senator from Oregon.

I know my time is short, but I need to respond to a couple of points. First, the bills to which my Democratic colleagues are referring have been cleared. They have been cleared through what is known as our hotline, cleared for passage on the Republican side—not one objection from one Republican.

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 7 of 51

It is the Democrats that are holding it up here. We are not the ones.

Secondly, I want to make very clear: This is a very unfortunate occurrence in the Senate. It is a bad habit that we have gotten into, and it is a habit that we must break.

The habit involves raising an objection. One of the things you did not hear from my friend and colleague from Oregon is a single objection, not on the merits, not on any legitimate procedural ground to any of the bills that I just mentioned—not a single one. No, these bills are drawing an objection today, not allowed to pass the Senate today—even though they passed in the past unanimously, and they don't have any substantive objection.

They are objecting to these not because they are unpopular but because they are popular. When they are popular, when the need for them is due and undisputed, when there is no legitimate argument against them, when the House delegation, the local population, the Senate delegation is all supportive of them, they use them and take them as hostages.

And they use them so that the way these things can happen is they will cuddle together a whole bunch of bills, and these bills all accomplish similar things. They have a lot of commonalities. They do similar things. They enjoy similar amounts of support. They have passed in the past. The local communities overwhelmingly support them. It makes sense to offer these up together. We opt to do them individually as often as we can.

But what they want to do is what has been done in the past, is you cuddle together a whole bunch of bills—sometimes a dozen or more, maybe dozens of them—and then time the introduction of that package to a moment just before a major holiday or long-scheduled recess, they bring them forward, and they say: Take them or leave them.

You must take all of them or have none of them. And what that does to public land States like mine, where 67 percent of the land is owned by the U.S. Government or beholden to everything, is it puts us in an impossible decision.

Usually, these deals are put together by two or three people in secret, and they bring it forward at the last possible minute when there is no time for debate, no time for amendments, no time to say, OK, this one doesn't belong, the others are fine.

Take it or leave it. It is extortion. We have got to end that process. There is not one legitimate reason why we shouldn't pass any one of these four bills. Let's get it done today. I find it tragic that this drew an objection.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Just to briefly respond because we are hearing about hostages and extortion and all this kind of thing. I just want my colleague to know because he and I have worked together for years and years and we have

never had a difference of opinion that was based on somebody trying to take hostages and these kinds of things.

This is about something that is really, in my communities, a question of whether they are going to make it in terms of keeping the schools open. There are no objections to what Senator CRAPO and I have been doing here.

Let me repeat that: No objections.

And throughout the West and in the Federal Government, like in my colleague's State, the Federal Government owns much of our land. People are waiting to see if we will work together and fix this.

I want to tell my colleague, I am happy to join him in 20 minutes if we have worked this out, and we will be done, and if my colleague says we will go home and say we got something else done that was constructive.

So I want to renew my point: This is not about politics. It is bipartisan. There are no objections. I stand willing, with my staff, to join the LEE staff right now. We can work together over the next few minutes. We have a unanimous consent request, and we are done.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. LEE. Mr. President, I have got colleagues ready to speak, and I just need 10 seconds here.

I respect and appreciate my friend and colleague from Oregon. It is not to him, personally, about taking bills hostage. But this is a process that has happened in the past over and over and over again. This is how it is playing out.

As to these bills, I reiterate there is not one Republican Senator objecting to them. Bring them forward. Let's pass them now. If there are problems, I don't know what they are, why they would arise. They are on the Democrat side, not ours.

But that is not our problem. It shouldn't be an impediment for Senator CORNYN's bill or Senator LANKFORD's bill or Senator GILLIBRAND's bill or Senator KING's bill that the Democrats can't get their act together, that, for some reason, they are not willing to support that legislation. This is unfortunate. We have got to fix it.

The PRESIDING OFFICER. The Senator from Texas.

Mr. CORNYN. Mr. President, I want to start by thanking my friend from Utah Senator LEE, the chairman of the committee of jurisdiction for hosting this unanimous consent request today to highlight the importance of many pieces of legislation but including the Big Bend National Park Boundary Adjustment Act.

It is no secret that Texas is home to a lot of wide-open spaces, beautiful terrain, and vibrant wildlife. And Big Bend is a national treasure.

This legislation expands and preserves the park's heritage, natural resources, and jaw-dropping scenery while safeguarding private property

rights. It authorizes the National Park Service to acquire approximately 6,100 additional acres adjacent to Terlingua Creek along the western boundary of the park.

And it clarifies that the Park Service may only acquire land through donation or exchange, not through eminent domain.

I am disappointed that our colleagues across the aisle have objected to this. This legislation is critical to Texans and all Americans being able to enjoy our big, beautiful national parks, including Big Bend.

And I thank my colleague from Utah for making the unanimous consent request, but I am disappointed that even on something as much as a no-brainer as something like this, our Democratic colleagues can't resist making partisan objections.

The PRESIDING OFFICER. The Senator from Oklahoma.

CAPITAL JEWISH MUSEUM SHOOTING

Mr. LANKFORD. Mr. President, I want to make a comment on the lands bill, my frustration of where things have gone today on things.

I do want to just pause for a moment and recognize that two staff members of the Israeli Embassy were murdered last night here in Washington, DC, simply because they were Jewish.

The murderer literally hovered outside of the Jewish museum here in Washington, DC, waiting for someone to walk out to murder—just a random person, apparently just to be able to kill a Jew. And then later screamed at the front door "Free Palestine."

This is anti-Semitism at its worst, and I want my Jewish friends to be able to know we are praying for you; we are speaking out on your behalf today; and we have not forgotten. And this kind of hatred and anti-Semitism cannot continue in America.

HISTORIC GREENWOOD DISTRICT–BLACK WALL STREET NATIONAL MONUMENT ESTABLISHMENT ACT

Mr. President, today, I am also disappointed. There is a bill that is a very simple bill that literally every single Republican has released and said: We want to be able to move this.

This is recognition of a national monument for the Historic Greenwood District in North Tulsa. In 1921, on May 31, overnight to June 1, there was the worst race massacre in American history. It is a stain on our American history, but it is also a moment to be able to look back to and learn from.

Over 100 years ago, this race massacre, when it occurred, was pushed under the rug and was told for generations to forget about it. We are pulling that thread and saying: There is some benefit to not losing track of that moment.

This particular bill is a designation as a national monument for that Historic Greenwood District. Now, it is written very carefully and in very close cooperation to make sure there is no eminent domain for the Federal Government; there is no Federal takeover;

private property rights are all protected. But it puts a recognition in this area that it is a Federal designation, just a recognition, no property is taken over, but to say: We as a nation remember.

It is important to the people of North Tulsa because the families and communities and the businesses in North Tulsa are literally turning tragedy into triumph. They are looking back on that time and saying that is what happened on that day, but don't look at just that day, look at who we are; look at who we have been; look at who we are now and where we are going.

This is an important piece that literally every single Republican cleared. No struggle with this bill at all. And then my Democrat colleagues came today, of all weeks and this day, to be able to say they were going to block it.

So my challenge is to my Democratic colleagues, I don't know what the fight and struggle is on this, and I don't know why this is difficult to be able to do. We should all have agreement on this. So whatever struggle is happening among their conference, I would encourage them to be able to work it out so we can pass this because in the past, in this body, this has been a unanimous issue. This should not be controversial to say: We, as a nation, recognize what happened on that day, and we honor the people of North Tulsa for what they are working to still create there in the Greenwood District.

So my encouragement is, let's work out our differences today on this. Let's get this passed and get this done.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

Mr. LANKFORD. Mr. President, I know of no further debate on the pending item.

The PRESIDING OFFICER. Is there further debate?

Hearing none, the clerk will read the title of the joint resolution for the third time.

The joint resolution was ordered to a third reading and was read the third time.

VOTE ON H.J. RES. 87

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Mr. SCHUMER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN) and the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from Maryland (Ms.

ALSOBROOKS) and the Senator from New Mexico (Mr. HEINRICH) are necessarily absent.

The result was announced—yeas 51, nays 45, as follows:

[Rollcall Vote No. 279 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—45

| | | |
|---|---|---|
| Baldwin | Hirono | Rosen |
| Bennet | Kaine | Sanders |
| Blumenthal | Kelly | Schatz |
| Blunt Rochester | Kim | Schiff |
| Booker | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Coons | Luján | Slotkin |
| Cortez Masto | Markey | Smith |
| Duckworth | Merkley | Van Hollen |
| Durbin | Murphy | Warner |
| Fetterman | Murray | Warnock |
| Gallego | Ossoff | Warren |
| Gillibrand | Padilla | Welch |
| Hassan | Peters | Whitehouse |
| Hickenlooper | Reed | Wyden |

NOT VOTING—4

| | | |
|---|---|---|
| Alsobrooks | Budd | |
| Blackburn | Heinrich | |

The joint resolution (H.J. Res. 87) was passed.

The PRESIDING OFFICER. Under the previous order, the motion to reconsider is considered made and laid upon the table.

━━━━━━━━━━━━━

PROVIDING CONGRESSIONAL DISAPPROVAL OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW NO$_X$ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION''—Motion to Proceed

The PRESIDING OFFICER. The Senator from Utah.

Mr. CURTIS. I understand the Senate received H.J. Res. 89 from the House.

The PRESIDING OFFICER. The Senator is correct.

Mr. CURTIS. I move to proceed to H.J. Res. 89.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

Motion to proceed to H.J. Res. 89, a joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine and Nonroad Engine Pollution Control

Standards; The 'Omnibus' Low NO$_X$ Regulation; Waiver of Preemption; Notice of Decision''.

VOTE ON MOTION

Mr. CURTIS. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from North Carolina (Mr. BUDD).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 51, nays 46, as follows:

[Rollcall Vote No. 280 Leg.]

YEAS—51

| | | |
|---|---|---|
| Banks | Grassley | Moreno |
| Barrasso | Hagerty | Mullin |
| Boozman | Hawley | Murkowski |
| Britt | Hoeven | Paul |
| Capito | Husted | Ricketts |
| Cassidy | Hyde-Smith | Risch |
| Collins | Johnson | Rounds |
| Cornyn | Justice | Schmitt |
| Cotton | Kennedy | Scott (FL) |
| Cramer | Lankford | Scott (SC) |
| Crapo | Lee | Sheehy |
| Cruz | Lummis | Sullivan |
| Curtis | Marshall | Thune |
| Daines | McConnell | Tillis |
| Ernst | McCormick | Tuberville |
| Fischer | Moody | Wicker |
| Graham | Moran | Young |

NAYS—46

| | | |
|---|---|---|
| Alsobrooks | Hirono | Sanders |
| Baldwin | Kaine | Schatz |
| Bennet | Kelly | Schiff |
| Blumenthal | Kim | Schumer |
| Blunt Rochester | King | Shaheen |
| Booker | Klobuchar | Slotkin |
| Cantwell | Luján | Smith |
| Coons | Markey | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Fetterman | Ossoff | Welch |
| Gallego | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |
| Hickenlooper | Rosen | |

NOT VOTING—3

| | | |
|---|---|---|
| Blackburn | Budd | Heinrich |

The motion was agreed to.

━━━━━━━━━━━━━

PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW NO$_X$ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION''

The PRESIDING OFFICER. The clerk will report the joint resolution by title.

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 9 of 51

*May 22, 2025*

The assistant bill clerk read as follows:

A joint resolution (H.J. Res. 89) providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low NO$_X$ Regulation; Waiver of Preemption; Notice of Decision".

The PRESIDING OFFICER. The Senator from California.

CALIFORNIA CLEAN AIR ACT AUTHORITIES

Mr. PADILLA. Mr. President, I know we are working our way through a series of votes. Many people are at lunch or wrapping up lunch. We have a little bit of business still ahead of us, but I want to take a minute just to remind this body what has transpired here over the last 24 hours: evidence again, actions again adjourn that Donald Trump and Republicans in Congress are stopping at nothing to attack California for the audacity of working to protect the health of Californians and for having the audacity to lead the clean energy economy.

But as I have said repeatedly over the last couple of days, it is not just what Donald Trump's EPA and Senate Republicans are doing that is problematic; it is how they made this possible—by fundamentally changing how the Senate operates through rules changes last night.

Now, it was not a magic trick. Before dinner yesterday, these bills to gut California's Clean Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes to move forward, open to full debate and amendments, but somehow, after dinnertime yesterday, once Senate Republicans were done with overruling the Parliamentarian, these bills were now not subject to the filibuster.

For the record and for the public's recognition, this is the first time in Senate history that the majority has used a nuclear option to take joint resolutions that were subject to the filibuster one minute and eliminate the filibuster for them the next. You may hear them try to deny it, but it is all on the record.

So let me recap. The Senate Parliamentarian, through the Chair, confirmed that all points of order are waived during a Congressional Review Act resolution. That is in the law. But the majority voted to ignore that provision of the law and raise one anyway.

Then the Senate Parliamentarian, through the Chair, confirmed that these resolutions do not qualify—repeat, do not qualify—for expedited consideration, but the majority voted to override the Parliamentarian and plow ahead anyway.

But no one should be fooled. What happened on the floor, as witnessed by the public, was nothing short of a power play that fundamentally changed how the Senate works.

Why? What was the driving impetus here? Was it President Trump? Is it the fossil fuel industry and what they want? Or did you happen to just think changing these rules and the way the Senate operates was simply a good idea? I would love to hear you make that case. But I know that one of the results of last night's actions and today's votes is that Californians will be forced to breathe dirtier air than they should have to.

California is being targeted for its leadership—it is that blatant; it is that obvious—because, yes, for over half a century, we have been the innovators and trailblazers in the fight against pollution.

A little bit of a history refresher here. Back in 1966, California established the first tailpipe emission standard for passenger vehicles in the Nation, responding to California's unique air quality needs with policy based on science and data. A year later, California established the California Air Resources Board to more comprehensively address the severe air pollution and its consequences.

Then, some of you may remember a catastrophic oilspill off the coast of Santa Barbara. Californians rose up and demanded stronger environmental protections, and this became the birth of the modern-day environmental movement and eventually the first Earth Day in 1970, which has grown in its recognition and celebration.

That same year, Congress passed the Clean Air Act on an overwhelming bipartisan basis. That original Clean Air Act authorized the waiver provision that allows California to set our own separate and more ambitious vehicle emissions standards.

Fast-forward to the year 2006, when California passed the Global Warming Solutions Act, stating the bold goal of reducing emissions to 1990 levels by the year 2020. It was the first in the world set of goals to establish both the regulatory and market programs to achieve real-world reductions in the greenhouse gas emissions that were causing climate change.

I remember it vividly because that same year, I ran for State senate because I wanted to be part of crafting policies to actually achieve those goals and implementing those policies and programs. I went on to serve for 6 years as chair of the California State Senate Committee on Energy, Utilities and Communications.

Since then, California has continued to lead the Nation with increasingly ambitious goals for cutting emissions.

It is a remarkable history when you stop and think about it and especially when you recognize that it hasn't just been Democrats that have been driving this.

As President, former California Senator Richard Nixon signed into law landmark legislation, including the National Environmental Policy Act, the Clean Air Act of 1970, the Endangered Species Act, and the creation of the EPA.

Yes, folks watching at home, Republicans did that.

As Governor, Ronald Reagan established the California Air Resources Board, committing California to a comprehensive, statewide approach to aggressively address air pollution in California.

A Republican did that.

It was Republican Governor Pete Wilson who established the California EPA.

A Republican did that.

It was Republican Governor Arnold Schwarzenegger who signed the 2006 Global Warming Solutions Act into law.

A Republican did that.

As a result of bipartisan efforts, in 2025, California achieved a diverse portfolio of clean energy resources—think not just conceptual but actually operational solar energy, wind energy, geothermal energy—all while fostering the fourth largest economy in the world. And we have a plan to decarbonize nearly every sector of our economy, from transportation to electricity, to manufacturing, to agriculture, construction, and buildings.

It is that long-term vision that has diversified our energy sources so that after seasons of extreme weather, we can still take advantage—more importantly, take advantage—of hydropower opportunity after rainstorms or reap the benefits of expanded wind and solar energy because we have grown our battery storage, technology, performance, and capabilities and capacity.

Now, here is where the rubber meets the road, colleagues. Most of you were not here last night in the wee hours of the morning when I explained that California, at the State and local level, has already done almost all they can to push the most ambitious regulatory agenda in the country to reduce emissions. They have done what they can from what is within their jurisdiction. We are investing in R&D into cleaner locomotives. We are investing in port electrification. We are making breakthroughs in hydrogen marine technologies like the first hydrogen fuel cell ferry in the United States.

But despite all this progress, despite all this innovation, despite all this investment, we are still shy in too many regions of attaining Federal clean air standards. Why? That is a logical question. If California is doing so much, why?

Well, California has done everything it can, but the Federal Government has not. We need the Federal Government to do its part.

Unless or until we have a Federal Government that says we need more ambitious goals and standards for the Nation, then California needs and deserves the ability to lead for itself, to protect Californians. That is why these waivers have been so important, because absent the Federal Government doing its part—and I am not holding my breath for the next 3½ years waiting for the Trump EPA to do so—California needs the Federal waivers to get the job done.

But I know that even after all this progress, the detractors will fall back on the same tired playbook of excuses. We know that the big oil industry sees California's clean cars and clean truck sales as existential threats. California has made tremendous advancements not just in technology but in markets, but that is why the fossil fuel industry has launched an all-out assault on California's rules.

I will give you just one example. If you happened to be reading the Wall Street Journal this past January, you might have picked up the paper to find an op-ed with the headline ''Biden's EPA Tries to Put One Over With EV Mandate.'' That kind of sounds a little ominous, but if you read who the authors were—the authors went on to complain about how slow and laborious the process is for the EPA to revoke a California waiver administratively. They literally tripped themselves up searching for every possible way to weaponize the Congressional Review Act to take down California's waivers.

Now, who were those authors? The authors were partners at the law firm of Boyden Gray, who represent oil and gas clients and who were in court actively trying to repeal California's waivers. So it makes a whole lot of sense when you realize that they wanted to publish this op-ed by January 8, just 12 days before January 20, when Donald Trump was sworn into his second term.

It is certainly no surprise that a month later, the EPA attempted to submit waivers as rules for congressional review, claiming that the Biden EPA had withheld them. Now, that is a little rich, to accuse the Biden administration of withholding EPA waivers when the first Trump administration did the exact same thing, and so did every other EPA before it, both Republican and Democratic, in its entire 50-plus-year history of the California waiver provision.

In fact, when Donald Trump's EPA did what the Boyden Gray lawyers told them to—submitting these waivers as rules to Congress—they actually still included language admitting that these were waivers and not rules. And when they were called on it, when it was pointed out, they had to go through the motions, do backups, and resubmit the waivers to Congress—ridiculous, blatant.

Now, regardless of how ludicrous this effort has been, we continue to hear all kinds of misinformation from detractors about why California's ambitious goals just won't work. I have a series of them, but I will just focus on the main talking point that I have heard from my Republican colleagues and from industry: that California is somehow coercing other States into adopting California's standards; or to let California do this is the equivalent of setting a national standard; or that these emissions standards become de facto national ones.

That is ridiculous. We have made it clear: Let California take care of California.

If California had the power, the authority to set those national standards, trust me, we would be doing this and a lot more. But we don't.

But I think the good work that California has done that has benefitted Californians—both our health and our economy, along with our environment—has inspired more than a dozen other States to follow California's lead voluntarily. Nobody is forcing other States—blue States or red States—to follow California's lead, but these other States see the benefits of what California is doing, and they choose to do so to protect their residents and to protect their environment.

Lastly, let me just conclude by stating something that has conveniently been stifled in this whole debate—limited debate—and conversation. So who benefits from all of this? It is not unleashing job creation and innovation in States—the other 49 States—but California. It is holding our Nation back in terms of improving air quality and our transition to a clean energy economy.

The winner here is actually China because, like it or not, the clean energy boom globally is happening. We have a big say in who leads it and who benefits from it.

Is it the United States? Not by the leadership and the policies I have seen of this administration in the near future. It can be California, but it seems like you are more interested in taking our tools away. And so now we risk China jumping ahead, both economically and technologically, in this space.

So I will remind you, folks, despite—not despite but because of California's leaning in on addressing the emissions, pollution, and climate challenges, California has become the fourth largest economy in the world.

We have proven that is what is good for clean air and is good for business and the economy. And that is something that you all ought to replicate and scale up, not fear and stifle. We have to be able to do both—protect our planet, strengthen our economy.

California has shown us the way. We can have reliable cars. Our kids can breathe clean air. We can invest in our economy and in our future.

California has been proud to fill the role of national leader in this space. We will continue to try to do anything and everything we can to do so, both for our interests and for the Nation's, but what has happened in the last 24 hours makes the job that much harder.

I yield the floor.

The PRESIDING OFFICER (Ms. LUMMIS). The Senator from California.

Mr. SCHIFF. Madam President, Members, welcome to the roaring twenties, not the ones you may have read about in F. SCOTT FITZGERALD novels, not the ones with jazz and liberation and industrial boom. I mean these roaring twenties—the ones where instead of flappers, you get fossil fuel and dirty air; where instead of innovation, you get obstruction, tariffs, isolationism, blinding nostalgia for a world that no longer exists. Instead of leaders who want to tackle the climate crisis head-on, you get votes to tear down the tools that we need to fight it.

The reason I stand here today and was here last night until 1:30, 2 in the morning is that Senate Republicans have pushed through resolutions to revoke California's authority to set its own vehicle emissions standards, to set its own rules about what kind of air we breathe in California.

This is an authority that my State has had by statute for more than 50 years. We have had the right to deal with our unique problems of congestion, our topography, our smog. We have had the right to demand of ourselves cleaner air, for ourselves and for our children.

That is under attack right now, and not just California's ability to set its own standards to protect its people, but because other States have also followed California's lead. This will affect the quality of air all around the country.

And that is the gravamen of the problem for my colleagues in the GOP. And that is that it is not just California. It is the fact that so many other States have followed our lead. So many other States have decided they would rather have fewer cancers than more cars with combustion engines.

That was their choice. That was their right. They weren't coerced into joining California. They made the decision about what was best for their constituents, and it is not for us in this body to arrogate to ourselves, to decide we know better for Californians or we know better for people in other States than what their own leaders have decided about the quality of their air.

This is a direct attack not only on my State but on our ability to innovate, to lead, and, indeed, to breathe clean air. This is bad policy—clearly, certainly yes—but it is also a dangerous abuse of the process in this House that will lead to other harmful consequences.

To get this done, to repeal California's statutory waiver to set its own air pollution rules, Republican leadership has decided to blow a procedural hole in the filibuster. And let's call it what it is: This is a dangerous new kind of nuclear option that dispenses with the filibuster. But they would have us believe: only here, only when it is necessary to cater to the oil industry. It is the oil exception to the filibuster rule.

Now, the nuclear option has been used over nominees in the past. And there has been debate about doing away with the filibuster entirely. But, today, what we are talking about is only carving out the oil industry from the filibuster—so not carving out protection for voting rights; not carving out protection for reproductive freedom; not carving out fundamental rights for the American people, for which there would be a strong case to

have a carve-out from the filibuster. But no, today, we are talking about an oil-industry-only carve-out. And they are using it to overturn some of the most successful clean air policies in American history.

Since the 1960s, California has had the obligation and the ability and the authority to lead, and they have used it. We have used it to reduce pollution, to increase fuel efficiency, and to drive innovation across the country. And much of the country has California to thank for the development of electric vehicles, for the improvement in fuel efficiency standards, because as we have led, others have followed and industry has adapted.

Despite the naysayers and those always saying it is too hard, it can't be done, America got cleaner cars thanks to California, and consumers got more choices thanks to California. Now, some in this Chamber want to go back in time, not because the policy failed but because it succeeded.

Imagine if, just after Henry Ford unveiled the Model T, Congress passed a resolution demanding we double down on bigger, stronger horses, because that is what this is—a deliberate attempt to deny the future because it threatens the status of Big Oil.

The President says that he is for energy independence. That is their mantra: Make America energy independent. But that is not what they are doing. They are killing clean energy all over the country.

You know what just came out of the House in the dead of night, last night, in their reconciliation bill—their "Big Ugly Bill?" A provision to essentially kill every clean energy project in the country that is not almost all finished. If it isn't going to be operational in a very short period of time, they want to pull the plug.

Now, why would they do that? Why would they do that when, in fact, most of those projects are in red States, not blue ones, not States like California but States like Indiana and Kentucky.

Why would they do that? Because the obligation here is not to their State or constituency. The obligation here is to the oil industry. They would sacrifice the jobs and the clean energy industry all over the country. To their own constituents, they would put those people out of work. And why? Because of fealty to the oil industry.

This is not about energy independence. It is about oil dependence.

Today, we are in a full transition to a clean transportation future—or we could be—and Senate Republicans are trying to bring back the smog. They are trying to make America smoggy again.

We are seeing the climate crisis, and they are trying to cut the brake lines on progress. We are literally standing at the gates of the future—a future that we will lead or China will lead, a renewable energy future—and some would rather turn it all around and ride off in a horse and buggy, because

that is what this vote means. That is what these votes mean—not just being stuck in a past technology beholden to an old way of doing things, but also stuck in a dirtier and more toxic world.

Millions will be stuck breathing in hazardous emissions unnecessarily.

What is the pay-for here? What is the pay-for for this gift to the oil industry? Cancer—cancer is the pay-for. We will pay for this repeal of clean air rules with cancer—maybe your cancer, maybe your father's cancer, maybe your sister's cancer, maybe your child's cancer.

That will be the pay-for because this is about power, and it is about profit, and it is about punishing States that dare to lead. It is about undermining the Senate's own rules to score a short-term win that will do long-term damage but will placate the oil industry, because once you start twisting the CRA into a weapon to attack anything you don't like—rules, waivers, facts—you don't just hurt California; you hurt the country, because don't think for a second it ends here.

If this gambit works, it will not be the last time this tactic is used. Today, we blow a hole in the filibuster for the oil industry. Tomorrow, we blow another hole in the filibuster for what other polluting industry? Or, more broadly, should we expect this majority to use it to strip away protections for workers or privacy rights or reproductive freedom?

This is the real fight here, not just over emissions or waivers or vehicles, but whether we are a nation led by and empowered to shape the future or held hostage by the past.

The roaring twenties were a time of reckless optimism. The stock markets soared, inequality deepened, and political leaders told Americans not to worry, everything was under control—until it wasn't, because the same decade that gave us jazz and swing also gave us the Smoot-Hawley Tariff Act, a disastrous attempt to protect American industry by walling off our economy to the rest of the world.

It sparked global retaliation. It strangled trade. It helped turn a market crash into a full-blown depression.

What are we seeing now? New tariffs, retaliation threats, political attacks on States that lead, and now an attempt to tear down environmental progress and green innovation just as the global economy is demanding more of it—much more of it.

The roaring twenties gave us invention, yes, but also an illusion, a false belief that we could grow forever without rules and without consequences.

We are in danger of making the same mistake again. We should be building the EV infrastructure for the future, not dismantling climate progress. We should be investing in clean energy, not clinging to combustion engines. We should be protecting the rules of this Chamber, not torching them when they become inconvenient to the oil industry.

The gutting of these norms doesn't end in prosperity; the sacrifice of clean air doesn't end in making us healthy again. It ends in cancer; it ends in an enfeebled economy; it ends in a country going backward and shrinking in on itself. It ends in crisis. Let's not go there.

I yield the floor.

The PRESIDING OFFICER. The Senator from Florida.

RECOGNIZING THE SIGNIFICANCE OF JEWISH AMERICAN HERITAGE MONTH AND CALLING ON ELECTED OFFICIALS AND CIVIL SOCIETY LEADERS TO COUNTER ANTISEMITISM

Mr. SCOTT of Florida. Madam President, I stand today to condemn the anti-Semitic and hate-fueled murders of Yaron Lischinsky and Sarah Milgrim that occurred last night at the hands of a Hamas sympathizer. This was a sickening, violent, and anti-Semitic attack in our Nation's Capital.

These two young professionals were targeted and murdered because they represented Israel and the Jewish people, with their murderer chanting "Free Palestine" after killing them in cold blood.

These were innocents, out for a night together at the Capital Jewish Museum here in DC, just like members of our own staff do each and every week. This anti-Semitism and hate for Israel and the Jewish people is disgusting, unacceptable, and must be condemned on every level. It is despicable, and it is dangerous.

We have seen a rise in anti-Semitism and anti-Israel hate since the October 7, 2023 attacks. We have seen Hamas sympathizers take over college campuses and instill fear in Jewish students. We have seen violent protests on our streets and now in our Nation's Capital. Jewish Americans are afraid to walk outside or live their daily lives. For nearly 600 days now, Israel has defended itself against Iran-backed Hamas terrorists who want to destroy Israel and destroy the Jewish people.

These terrorists murder babies and women in cold blood, take and murder innocent people, and brag about their acts with no remorse. They took innocent people, including Americans, hostage and tortured them. They still hold the bodies of American hostages to deprive their families of closure.

Israel is the United States' greatest democratic ally in the Middle East. We cannot abandon our ally. Thankfully, we have a President who is an ally of Israel and who is working to fight anti-Semitism in the United States.

President Trump is pushing back on colleges and universities that allow hateful anti-Semitic actions on campus that threaten the safety of Jewish students. He has appointed the most pro-Israel Cabinet ever assembled. And he is committed to defending Israel, combating terrorism, and protecting Jewish Americans.

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 12 of 51

Today, I rise to condemn last night's heinous and anti-Semitic attack on these innocent people. I condemn this hateful rhetoric against Israel and against the Jewish people who deserve the right to live freely and without fear in the United States and around the world.

The United States must always stand with Israel and the Jewish people, and today we join together to remember the innocent lives taken in an act of hate and pay tribute to their lives and the contributions of the Jewish people to our Nation.

Madam President, the fight against anti-Semitism is a bipartisan one. I am grateful for my colleague Jackie Rosen for working with me to draft a resolution that draws attention to anti-Semitism in America and declaring May, Jewish American Heritage Month.

I yield to my colleague from Nevada Senator ROSEN.

The PRESIDING OFFICER. The Senator from Nevada.

Ms. ROSEN. Madam President, I want to begin by thanking my colleague from Florida for his bipartisanship and his partnership, including to pass this bipartisan resolution to recognize Jewish American Heritage Month by unanimous consent.

I also want to take a moment to speak about the horrific murders that took place last night. Like so many other Jews in America and around the world, I woke up this morning heartbroken by the news of yet another unspeakable act of anti-Semitic violence that occurred late last night, this time—this time—in our Nation's Capital, less than 1 mile from where I am standing this very moment. This shooting occurred outside of the Capital Jewish Museum, where the American Jewish Committee was holding a large event. And the shooter went there specifically to target and kill Jews and people whom he perceived to be Jewish.

This is anti-Semitism—plain and simple. There is no justification in the world for carrying out or condoning this violent and vile hate crime. It is pure anti-Semitic violence.

My heart is shattered for the two Israeli Embassy workers who were killed, Yaron and Sarah—taken from us far, far too soon. Both were committed to public service, social action, peace, the betterment of the world. They were a young couple in love.

I have read reports that Yaron was planning to propose to Sarah next week in Israel.

They were cruelly taken from us far too soon at the beginning of their lives. May their memory be a blessing, and may their killer be brought to swift justice.

It is a tragedy that these innocent lives were cut short by hate, and it continues to be a tragedy that these incidents continue to occur in the United States and all over the world.

Over the last few years alone, we have seen anti-Semitic hate and extremist violence. It has done nothing but increase across this country. All over America, Jewish people, we have been threatened, beaten, verbally accosted. We have been killed just because of our faith, just because of whom they are—because of whom we are.

We have seen horrendous anti-Semitic incidents and attacks on Jewish communities, at schools and on college campuses, and Jewish-owned places of business, and on synagogues and places of worship.

And incidents of anti-Semitism in the United States and globally have risen dramatically since Hamas's brutal terrorist attack on October 7. All of it—all of it—is wrong and has no place in our country, no place in our society, no place in the world.

Those who commit these egregious acts, they want to send a message. They want to terrorize Jews. They want to scare Jews. They want to intimidate us. And it is vital that we all stand up together and send a clear and forceful message, and the message is this: We will not be afraid.

We will not be afraid.

We cannot be silent. There is desperate need to confront dangerous and growing anti-Semitism in our country and around the world to show that bigoted efforts to intimidate us will not work. We cannot be afraid. We cannot be silent.

That is why I am here on the Senate floor today. By passing this resolution and recognizing Jewish American Heritage Month, we are not just celebrating the numerous accomplishments and contributions that Jews have made to our country, we are sending the message back, a message that Jewish people have a place in America; that this is our home as well; that our lives, that they have value and they have meaning, just like anyone else; and that our country stands with it.

So I thank my colleagues on both sides of the aisle for allowing this resolution to pass, and I want to thank Senator SCOTT of Florida for his partnership in the effort to counter anti-Semitism and hate everywhere.

So, Madam President, I ask unanimous consent that the Senate proceed to the consideration of S. Res. 246 submitted earlier today.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The legislative clerk read as follows:

A resolution (S. Res. 246) recognizing the significance of Jewish American Heritage Month and calling on elected officials and civil society leaders to counter anti-semitism.

There being no objection, the Senate proceeded to consider the resolution.

Ms. ROSEN. I ask unanimous consent that the resolution be agreed to, the preamble be agreed to, and that the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 246) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in today's RECORD under "Submitted Resolutions.")

Ms. ROSEN. Thank you, Madam President. Again, thank you to all my colleagues for passing this important resolution unanimously today.

━━━━━━━━

## PROVIDING CONGRESSIONAL DISAPPROVAL UNDER CHAPTER 8 OF TITLE 5, UNITED STATES CODE, OF THE RULE SUBMITTED BY THE ENVIRONMENTAL PROTECTION AGENCY RELATING TO "CALIFORNIA STATE MOTOR VEHICLE AND ENGINE AND NONROAD ENGINE POLLUTION CONTROL STANDARDS; THE 'OMNIBUS' LOW NOₓ REGULATION; WAIVER OF PREEMPTION; NOTICE OF DECISION"

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. WICKER. I know of no further business and suggest we proceed to the vote.

The PRESIDING OFFICER. Is there further debate on the joint resolution?

If not, the clerk will read the title for the third time.

The joint resolution was ordered to a third reading and was read the third time.

### VOTE ON H.J. RES. 89

The PRESIDING OFFICER. The joint resolution having been read the third time, the question is, Shall the joint resolution pass?

Ms. BALDWIN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. BARRASSO. The following Senators are necessarily absent: the Senator from Tennessee (Mrs. BLACKBURN), the Senator from Alabama (Mrs. BRITT), the Senator from North Carolina (Mr. BUDD), and the Senator from Kansas (Mr. MORAN).

Further, if present and voting: the Senator from North Carolina (Mr. BUDD) would have voted "yea."

Mr. DURBIN. I announce that the Senator from New Mexico (Mr. HEINRICH) is necessarily absent.

The result was announced—yeas 49, nays 46, as follows:

[Rollcall Vote No. 281 Leg.]

YEAS—49

| | | |
|---|---|---|
| Banks | Daines | Kennedy |
| Barrasso | Ernst | Lankford |
| Boozman | Fischer | Lee |
| Capito | Graham | Lummis |
| Cassidy | Grassley | Marshall |
| Collins | Hagerty | McConnell |
| Cornyn | Hawley | McCormick |
| Cotton | Hoeven | Moody |
| Cramer | Husted | Moreno |
| Crapo | Hyde-Smith | Mullin |
| Cruz | Johnson | Murkowski |
| Curtis | Justice | Paul |

Ricketts
Risch
Rounds
Schmitt
Scott (FL)

Scott (SC)
Sheehy
Sullivan
Thune
Tillis

Tuberville
Wicker
Young

### NAYS—46

Alsobrooks
Baldwin
Bennet
Blumenthal
Blunt Rochester
Booker
Cantwell
Coons
Cortez Masto
Duckworth
Durbin
Fetterman
Gallego
Gillibrand
Hassan
Hickenlooper

Hirono
Kaine
Kelly
Kim
King
Klobuchar
Lujan
Markey
Merkley
Murphy
Murray
Ossoff
Padilla
Peters
Reed
Rosen

Sanders
Schatz
Schiff
Schumer
Shaheen
Slotkin
Smith
Van Hollen
Warner
Warnock
Warren
Welch
Whitehouse
Wyden

### NOT VOTING—5

Blackburn
Britt

Budd
Heinrich

Moran

The joint resolution (H.J. Res. 89) was passed.

(Mr. HUSTED assumed the Chair.)

The PRESIDING OFFICER (Mr. MORENO). The majority leader.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 73.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Michael Duffey, of Virginia, to be Under Secretary of Defense for Acquisition and Sustainment.

#### CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

##### CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 73, Michael Duffey, of Virginia, to be Under Secretary of Defense for Acquisition and Sustainment.

John Thune, Pete Ricketts, John Barrasso, Tim Sheehy, Bernie Moreno, Steve Daines, Eric Schmitt, Roger Marshall, Tommy Tuberville, John Hoeven, Marsha Blackburn, Bill Cassidy, John R. Curtis, Jim Justice, Thom Tillis, Katie Boyd Britt, Markwayne Mullin.

### LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 103.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Allison Hooker, of Georgia, to be an Under Secretary of State (Political Affairs).

#### CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

##### CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 103, Allison Hooker, of Georgia, to be an Under Secretary of State (Political Affairs).

John Thune, Markwayne Mullin, John Barrasso, Katie Boyd Britt, Rick Scott of Florida, Jim Banks, Cindy Hyde-Smith, Mike Rounds, Joni Ernst, Pete Ricketts, John Boozman, David McCormick, Bernie Moreno, James E. Risch, Bill Cassidy, John R. Curtis, Kevin Cramer.

### LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 109.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Dale Marks, of Florida, to be an Assistant Secretary of Defense.

#### CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

##### CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 109, Dale Marks, of Florida, to be an Assistant Secretary of Defense.

John Thune, Markwayne Mullin, John Barrasso, Katie Boyd Britt, Jim Banks, Cindy Hyde-Smith, Mike Rounds, Joni Ernst, Pete Ricketts, John Boozman, David McCormick, Bernie Moreno, Rick Scott of Florida, James E. Risch, Bill Cassidy, John R. Curtis, Kevin Cramer.

### LEGISLATIVE SESSION

Mr. THUNE. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. THUNE. Mr. President, I move to proceed to executive session to consider Calendar No. 97.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Jared Isaacman, of Pennsylvania, to be Administrator of the National Aeronautics and Space Administration.

#### CLOTURE MOTION

Mr. THUNE. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

##### CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 97, Jared Isaacman, of Pennsylvania, to be Administrator of the National Aeronautics and Space Administration.

John Thune, Dan Sullivan, John Barrasso, Mike Rounds, Todd Young, Cynthia M. Lummis, Tom Cotton, James Lankford, Bernie Moreno, John R. Curtis, Ted Budd, Mike Crapo, Katie Boyd Britt, Jim Banks, Markwayne Mullin, Jon A. Husted, Steve Daines.

### LEGISLATIVE SESSION

### MORNING BUSINESS

Mr. THUNE. Mr. President, I ask unanimous consent that the Senate resume legislative session and be in a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

## TRIBUTE TO ORVILLE VON EHWEGEN

Mr. GRASSLEY. Mr. President, this month brims with milestones for students across America.

In Iowa, more than 34,000 students are among the class of 2025. I congratulate our graduates and encourage you to keep working hard. The sky is the limit. You get to define your future because you live in the land of the free.

That is because we have extraordinary patriots who have answered the call to serve and defend our cherished freedoms. One of these extraordinary patriots is a member of the class of 2025. His name is Orville Von Ehwegen.

Orville's journey to East Sac County High School's commencement ceremony this past weekend took an unusual detour and extended timeline. He missed out on the pomp and circumstance as a teenager because he answered history's call to serve. You see, Orville is 107 years old. He was born in 1917 and dropped out of school at age 14 to help on the family farm during the Great Depression.

Later, he enlisted in the U.S. Army and fought in the South Pacific during World War II. When he returned, he opened an appliance store and was a successful small business owner alongside his wife.

On Sunday, this remarkable World War II veteran received an honorary diploma from East Sac County High School, 93 years after his last day as a student. Orville's inspiring life story is an example of sacrifice and service, which his fellow graduates can emulate.

I congratulate Orville and thank you for your service. I would be honored to have you share your story as part of my annual Veterans History Project so that future generations don't take freedom and liberty for granted and understand what it takes to preserve them.

Orville's advice to the class of 2025 is a lesson for us all: Be kind and work hard.

## VOTE EXPLANATION

Mr. GALLEGO. Mr. President, on May 14, 2025, I was unfortunately unable to cast my vote on rollcall vote No. 256, the confirmation of Eric M. Ueland to be Deputy Director for Management at the Office of Management and Budget. If I had been present, I would have voted nay.

## TRIBUTE TO TINA CAPPETTA

Mr. VAN HOLLEN. Mr. President, I rise today to pay tribute to a tremendous public servant Tina Cappetta, superintendent of the Chesapeake and Ohio Canal National Historical Park. Ms. Cappetta has served our National Park Service for over 35 years. She has dedicated herself to preserving our Nation's natural beauty and history at parks around the country for generations of families to enjoy.

In 2020, Ms. Cappetta returned as superintendent of the Chesapeake and Ohio Canal National Historical Park, where she served earlier in her career as the chief of resources management. During her tenure as superintendent, she has overseen the celebration of the park's 50th anniversary, managed the relocation of the Park's headquarters to Williamsport, MD, and renewed the Great Falls Canal Boat Program. Her thoughtful stewardship of one of our Nation's most cherished historical and recreational resources has inspired scores of visitors from around the world.

Ms. Cappetta's work to preserve the C&O Canal's history and breathtaking scenery is truly remarkable. The park is home to the largest collection of 19th-century canal features and buildings and is one of the most biologically diverse natural areas in our national park system. It provides recreational and educational activities in rural and urban settings, spanning from Washington, DC, to Cumberland, MD. Ms. Cappetta's tireless commitment to the park has touched countless lives, from visitors experiencing the canal for the first time, to locals enjoying a weekend bike trip or walk on the towpath.

I commend Ms. Cappetta for her extraordinary devotion to our National Park Service here in Maryland and around the country. Her legacy is one of leadership and unwavering dedication to the preservation of one of our region's gems and one of our Nation's most historically significant landscapes. I ask my colleagues to join me in thanking her and wishing her a well-earned, enjoyable, and fulfilling retirement.

## ADDITIONAL STATEMENTS

## RECOGNIZING BENTONVILLE STUDENTS' STEM COMPETITION PERFORMANCE

● Mr. BOOZMAN. Mr. President, I rise today to recognize three exceptional students from Bentonville West High School: Ronak Pai, LalitAditya Kameshwaran, and Veera Sai Joshik Unnam for winning the Samsung Solve for Tomorrow national competition.

The students, identifying a lack of affordable, nonintensive oral cancer screenings across the Natural State, dedicated their time and efforts to crafting a solution. Inspired by the direct experiences of their close family, friends, and loved ones who struggled to receive oral health care in both Arkansas and around the world, the trio conducted research and met with local dentists, as well as health providers, computer scientists, and cancer experts in hopes of making a difference.

They quickly discovered that oral cancer is one of the deadliest forms of cancer, as it can be difficult to diagnose and treat. That led them to compile thousands of images of mouth cancers and subsequently train an artificial intelligence model to develop an application that can detect and classify stages of oral cancer.

In February, their Oral Care app secured a statewide win, delivering a $12,000 technology prize package that included new computers for their school community, as well as the opportunity to showcase their work and compete on the national stage.

Ronak, LalitAditya, and Veera presented Oral Care to a panel of judges in Washington, DC, in April and earned the Community Choice Award against nine other teams.

As national winners, the students secured another prize package of $100,000 for Bentonville West, including more technology and classroom resources.

I am proud to celebrate these three exceptional students whose efforts have benefited their communities and have the potential to better the lives of people around the world. It is exciting to see young Arkansans recognized on the national stage. Ronak, LalitAditya, and Veera have showed not only their unique entrepreneurial and technological skills but a desire to create a brighter, healthier future.●

## REMEMBERING OFFICER MICHAEL T. HORAN

● Mr. BUDD. Mr. President, I rise today to honor the life of Greensboro Police Officer Michael T. Horan.

Officer Horan served our Nation in uniform for 18 years as an Active Reservist in the U.S. Coast Guard and joined the Greensboro Police Department in 2017, where he served on the department's violent crime reduction team, crimes against persons unit, patrol districts two and four, special events team, and as a rapid deployment and active shooter instructor. Officer Horan was known by his colleagues for always being willing to mentor the younger officers in his department and, oftentimes, took the rookies under his wing.

For Officer Horan, the call of duty had no boundaries, and in 2019, he received a lifesaving award for rescuing a father and son from rip currents while on vacation with his family in Emerald Isle, NC.

On Monday morning, December 23, 2024—just 2 days before Christmas—the Greensboro Police Department received a report about a suspect with a handgun inside a grocery store on Lawndale Drive. Like he always did, Officer Horan responded to the call. When he arrived on the scene, he encountered the suspect who, without warning, pulled out his weapon and took Officer Horan's life in an instant.

This year, on January 9, members of Officer Horan's family, as well as many members of the public, gathered inside Greensboro's Westover Church to say their final goodbyes. The service concluded with a 21-gun salute to memorialize Officer Horan's last watch.

Michael was devoted to his family and his community. Throughout his career, he was always committed to public safety. He will forever be remembered as a leader who put his city's most vulnerable first, and may his commitment to selfless service be an example to us all.

Now, I ask that you join me in a moment of silence to honor the memory of Greensboro Police Officer Michael T. Horan.●

---

### REMEMBERING KAREN ALEXANDER

● Mr. BUDD. Mr. President, I rise today to memorialize a servant leader of the great State of North Carolina. Mayor Karen Alexander of Salisbury went to her heavenly home far too soon on Sunday, December 29, 2024, at the age of 73 years young. Her colleagues and I will remember her as a loving, caring, and kind leader, always putting the needs of her city and the people she served above herself. She lived her life by the teachings of the Apostle Paul to Timothy: "And a servant of the Lord must not quarrel but be gentle to all, able to teach, patient, in humility correcting those who are in opposition, if God perhaps will grant them repentance, so that they may know the truth," 2 Timothy 2:24–25.

As an architect by trade, she founded her firm in 1989, where she led numerous renovation and design projects across the city. She was first elected to the city council in 2013. Not long after, she began serving as the mayor of Salisbury from 2015 to 2017 and later returned to the office in 2019. And she served as the president and board member of the North Carolina League of Municipalities.

Her initiatives as mayor brought new life to Salisbury's historic downtown area, improved public safety, and made life better for the city's residents. Throughout her career in public service, she was known for building consensus with class and grace.

Her relationships with her colleagues are described as being genuinely invested in the success of others. Her loving family will remember her as nurturing and supportive. As her daughter-in-law, Christy Mason Almazan, shared, "Karen had a way of making you feel like the very center of her attention. Her love was immense, and her presence was radiant."

The motto for the State of North Carolina is "Esse Quam Videri," Latin for "to be rather than to seem." I believe that Mayor Karen Alexander of Salisbury truly lived up to that standard and set the bar even higher.

Now, I ask that you join me in a moment of silence to honor the memory of Mayor Karen Alexander, a great North Carolinian who dedicated her life to public service.●

---

### RECOGNIZING THE ROWAN COUNTY CHAMBER OF COMMERCE

● Mr. BUDD. Mr. President, on March 19, 1925, the Rowan County Chamber of Commerce held its first annual meeting. For 100 years, the chamber has played a vital role in the growth and development of Rowan County, serving over 800 members and representing 60,000 employees.

Rowan County has a strong history of entrepreneurship and innovation, serving as the birthplace of some of North Carolina's most iconic businesses. In 1917, during a nationwide sugar shortage, the popular cherry soda Cheerwine was first crafted here. By the 1920s, it has become a favorite soft drink across the region, cementing its place as a symbol of Southern culture for over a century now. Likewise, in 1957, a modest local grocery store called Food Town opened its doors in Rowan County. Just a few decades later, it rebranded as Food Lion, and now is a household name with over 1,100 stores across 10 States, serving millions of families across the Southeast.

Since its founding, the Rowan Chamber has been a driving force behind the county's economic growth and business success. As a hub for collaboration, the chamber brings together businesses and community leaders, harnessing their collective expertise to tackle local challenges and advance economic development throughout the region.

From the beginning, the Rowan Chamber has been at the forefront of prioritizing community development. In their first annual report, in 1925, the chamber celebrated its efforts that brought Catawba College to Salisbury, promoted a new creamery for farmers to produce dairy products, and advocated for better roads. In more recent accomplishments, the chamber has been at the forefront of business advocacy, workforce and leadership development, and funding for transportation and education. The Rowan Chamber has also successfully advocated for infrastructure projects that have led to increased economic development across the county. The Yadkin River Bridge Project, I–85 four-lane expansion, the Old Beatty Ford Road exit, the Rowan County Airport expansion, and the development of the Paul E. Fisher Gateway Building are just some of the accomplishments that have been made possible by the chamber's concentrated efforts.

As a small business owner, myself, and a member of the Senate Commerce and Small Business Committees, I appreciate the efforts of President Elaine Spalding, the board of directors, and everyone at the Rowan Chamber of Commerce for their work to support business leaders and keep North Carolina an attractive place to live and work.●

---

### RECOGNIZING AMAZING GLAZE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Amazing Glaze during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Amazing Glaze opened in 2017 when Dean and Katie Giesbrecht purchased Double Shot Donuts from Bob and Heather Ross. The Rosses initially aimed to start a local coffee shop featuring a small bakery with pastries and donuts. In hopes of replicating a family donut recipe, the Rosses underwent 2 weeks of trial and error to create the well-known potato donut, using mashed potatoes in the dough.

Since the owners of Double Shot never planned to run a donut shop, they approached Dean and Katie to see if they were interested in purchasing the business. Dean, who had always wanted to own a business, and his wife Katie jumped at the opportunity. Together, the Giesbrechts learned everything they could about making donuts and running the shop.

After renaming the company to Amazing Glaze, Dean and Katie continued to serve the beloved potato donuts—growing the treat's popularity to new heights. In just 2 years, Dean and Katie partnered with Idaho State University in Pocatello to open an Amazing Glaze kiosk in the Student Union Building on campus. The kiosk has been a great success, inspiring the couple to open a third Amazing Glaze location in Idaho Falls in 2024. The pair hopes to launch more locations and expand the business to the Treasure Valley in the years to come.

Congratulations to Dean and Katie Giesbrecht and all of the employees at Amazing Glaze for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

---

### RECOGNIZING BLUETICK COFFEE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage

Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Bluetick Coffee during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Bluetick Coffee started in 2021 after Julie Kinskie and her family moved to Idaho County. As a new member of the community and coffee lover, Julie decided to open a coffee stand to meet her neighbors and embrace her new home. What started as a small coffee stand has grown to four locations in Riggins, Grangeville, New Meadows, and Kamiah, with plans to open a fifth stand soon.

Community comes first at Bluetick Coffee. Everything is locally sourced—with homemade baked goods from her friend Denise Vandyk and beef sticks from a nearby farm Cross O Meats. Julie also offers discounts to support local law enforcement, first aid professionals, and teachers.

Congratulations to Julie and all of the employees at Bluetick Coffee for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING BOND & BEVEL

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Bond & Bevel during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Bond & Bevel was born in the garage of Heath and Krista Albers in March of 2020. Heath had been looking for a good quality leather bag for years but could never justify the expense. When the world shut down in 2020, he had the time to learn how to make the bag of his dreams. He bought a full-grain leather cowhide and leathercraft tools and got to work.

As Heath fell in love with crafting leather goods, word got out of his new endeavor. Friends began to send him orders for a variety of leather products, and soon, what started as a hobby became a business. Krista created a website and social media pages to support Heath's growing popularity and established an online store.

In 2022, the Albers opened Bond & Bevel's brick-and-mortar store in Caldwell. Since then, Bond & Bevel has quickly become an integral part of the community. Now serving craft coffee, the store is a popular spot for Bible studies, work meetings, and monthly worship nights with local churches.

Congratulations to the Albers and all of the employees at Bond & Bevel for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING CLOVERLEAF CREAMERY

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small business owners and establishments that make our State special. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Cloverleaf Creamery during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Founded by Bill and Donna Stoltzfus, Cloverleaf Creamery has served Idahoans high-quality grass-fed dairy products for 18 years. Born and raised on his family's dairy farm in Pennsylvania, Bill has a lifelong love of the dairy industry. When Bill and his wife Donna saw demand for local, grass-fed dairy products in Buhl, they purchased Smith's Dairy in 2007 with the intent to sell their products directly to the consumer. Both their son and son-in-law, who also share ownership of Cloverleaf Creamery, helped to grow the business and purchased a 160-acre farm to grow feed for the dairy cows. Eric Stoltzfus is the plant manager of the creamery, while son-in-law Eric Butterworth is the manager of the farming operation.

Growing up on the family farm, Bill developed strong beliefs in the importance of responsibility, hard work, and the humane treatment of animals. Today, Bill runs Cloverleaf with the same high-quality standards—small herd numbers, grazing cattle on grass as the primary feed source, and managing the farm with careful attention to detail and respect for the animals. This level of care has proven successful, as Cloverleaf is now a staple across the Magic Valley and the Gem State.

The creamery continues to grow, gaining attention from local companies that have started selling Cloverleaf products in their stores. Today, you can find Cloverleaf's ice cream, yogurt, and cream in Boise, Sun Valley, Twin Falls, and in Swensen's Market in Paul. In 2021, Bill's daughter and son-in-law Olivia and Eric Butterworth opened Cloverleaf Farm Market in Twin Falls. The market carries Cloverleaf products along with other items from small, local farms and businesses.

Congratulations to Bill and Donna Stoltzfus, Eric Stoltzfus, Olivia and Eric Butterworth, and all of the employees at Cloverleaf Creamery for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

RECOGNIZING HAWKTECH ARMS, INC.

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor HawkTech Arms during Support Local Gems as one of Idaho's Small Business of the Month for June 2025.

Founded in 1999 by Dan and Jami Hawkins, HawkTech Arms has become a mainstay for firearms enthusiasts and competitive shooters across the Pacific Northwest. What began as a way to generate hobby income to support a passion for shooting, HawkTech Arms has become an integral part of the firearms community in Idaho and beyond. With a special focus on encouraging the shooting sports community, HawkTech Arms sponsors local and regional matches in a variety of shooting disciplines. The business has also been recognized for its support of junior shooting programs designed to promote education and competitive shooting among youth.

As Idaho's leading suppressor dealer, HawkTech Arms is uniquely equipped to handle high-volume NFA sales and, as such, offers the largest selection for local shooters and collectors alike. HawkTech Arms is well known for providing top-quality products in the firearms industry, coupled with exceptional service to an ever-growing customer base. The business also holds a strong commitment to the military and law enforcement communities. Recognized as one of the highest volume law enforcement dealers in the Northwest region through GLOCK's

Blue Label Dealer Program, HawkTech Arms is dedicated to providing firearms and addressing the needs of first responders.

Finally, it is worth noting that the staff and owners of HawkTech Arms are active volunteers in the Treasure Valley community. Mr. Hawkins has served on the board of directors for a local shooting range for the better part of 20 years, and many employees have taken leadership roles in a variety of local initiatives.

Congratulations to the Hawkins family and all the employees at HawkTech Arms on their selection as the Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING REDMAN & COMPANY INSURANCE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Redman & Company Insurance during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Redman & Company Insurance was founded in 1992 by Eric and Sue Redman with the goal of providing the best possible care to the people of Rathdrum. In 2005, their son Jordan and his wife Amy joined the family business. After growing the Redman & Company Insurance for 20 years, Eric and Sue sold the agency to Jordan, Amy, and Josh and Nicole Tebbee.

The agency quickly became an industry and community leader, with Jordan serving as a board member for region I of the Independent Insurance Agents & Brokers of Idaho and earning the 2018 Young Agent of the Year Award. In 2019, Redman & Company split into two agencies, Redman's and Tebbee's; and Redman & Company Insurance moved to Coeur d'Alene.

Today, Redman & Company Insurance is deeply involved in the north Idaho community. From supporting various organizations, including Ronald McDonald House, Second Harvest, and Tunnel to Towers, to their partnership with the State of Idaho to provide time off for new foster parents, Redman & Company Insurance makes giving back to their community a top priority.

Congratulations to Jordan, Amy, and all of the employees at Redman & Company Insurance for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING THOR'S CHOCOLATE

● Mr. RISCH. Mr. President, Idaho small businesses are the backbone of our economy and our communities. These small businesses not only employ our friends and neighbors, but provide invaluable goods and services that showcase shared Idaho values. They are an intrinsic element of the Gem State and deserve to be celebrated.

I am proud to relaunch my successful statewide initiative Support Local Gems this year on June 6 to encourage Idahoans to support the small businesses that make our State thrive. As a member and former chairman of the Senate Committee on Small Business and Entrepreneurship, I am pleased to honor Thor's Chocolate during Support Local Gems as one of Idaho's Small Businesses of the Month for June 2025.

Thor's Chocolate opened its doors to the Idaho Falls community in 2023, but their story began well before then. Christian Becker, founder of Thor's Chocolate, was raised in Germany and surrounded by world-famous, rich, and flavorful chocolates. After moving to Idaho in 1992, Christian noticed the Gem State was missing the high-quality chocolate he grew up enjoying.

Christian had always dreamed of going into the chocolate business and crafting his own European-style chocolate in Idaho. In 2020, with support from his wife Brittney, Christian bought his first cocoa bean roaster and melanger and began making his dream a reality. Following years of testing and crafting, Christian created a chocolate that could rival the feasts of Valhalla.

In 2023, Christian and Brittney launched Thor's Chocolate in Idaho Falls. Their chocolate has quickly become a staple in the community. Not only does Thor's Chocolate provide residents with irresistible sweets, but they partner with local charities, like the People in Need Coalition, to give back to the eastern Idaho region.

Congratulations to Christian and Brittney Becker and all of the employees at Thor's Chocolate for being selected as an Idaho Small Business of the Month for June 2025. You are an outstanding example of what it means to be one of Idaho's Local Gems. You make our great State proud, and I look forward to your continued growth and success.●

### RECOGNIZING 300 YEARS OF THE REFORMED CHURCH IN THE UNITED STATES

● Mr. ROUNDS. Mr. President, on June 12, 2025, we recognize the celebration of the tricentennial anniversary of the Reformed Church in the United States, RCUS, at the Mount Rushmore National Memorial in South Dakota.

The mission of the German Reformed Church in America, now known as the Reformed Church in the United States, officially began in the United States in 1725 when Rev. John Phillip Boehm formally organized a dozen congregations in Pennsylvania.

Throughout its history, the Reformed Church in the United States has had countless courageous members stand up for the American values of life and liberty. German Reformed immigrant John Peter Zenger was responsible for the first ruling of an American jury against a royal governor. Captain Peter Humrickhouse of the Church's Germantown congregation crossed the Delaware with General George Washington and was selected by General Washington to deliver a wagon train of powder to Yorktown. Baron von Steuben served in the Continental Army and trained troops at Valley Forge. Multiple German Reformed pastors volunteered as chaplains in the Continental Army.

As a testament to the Reformed Church's service to the United States of America, upon his inauguration as President, General George Washington published a letter to the pastors and elders of the German Reformed Church in America commending their loyalty to the cause of liberty.

It is fitting that the Reformed Church in the United States celebrate its tricentennial anniversary at the Mount Rushmore National Memorial, among the great faces of our Presidents, as a testament to the role RCUS played in preserving our Nation's legacy and ideals. It is nonetheless appropriate that the celebration be held in South Dakota, as the State did significant work in advancing the Reformed Church in the United States through the Eureka Classis.

Three hundred years after its founding, the Reformed Church in the United States shares the gospel of Jesus Christ and ministers to people both at home in the United States and across the world.

The tricentennial anniversary of the Reformed Church in the United States is an incredible time to commemorate the invaluable ways the church has shaped the intellectual and spiritual life of American communities.●

### MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Mr. Hanley, one of the secretaries.

### EXECUTIVE MESSAGES REFERRED

As in executive session the PRESIDING OFFICER laid before the Senate messages from the President of the United States submitting sundry nominations which were referred to the appropriate committees.

(The messages received today are printed at the end of the Senate proceedings.)

## MESSAGE FROM THE HOUSE

At 12:49 p.m., a message from the House of Representatives, delivered by Mrs. Alli, one of its reading clerks, announced that the House has passed the following joint resolution, without amendment:

S.J. Res. 31. Joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "Review of Final Rule Reclassification of Major Sources as Area Sources Under Section 112 of the Clean Air Act".

The message also announced that the House has passed the following bills, in which it requests the concurrence of the Senate:

H.R. 1701. An act to require the Secretary of Defense and the Secretary of State to monitor efforts by the People's Republic of China to build or buy strategic foreign ports, and for other purposes.

H.R. 1969. An act to amend and reauthorize the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program of the Department of Veterans Affairs.

The message further announced that the House has agreed to the following resolution:

H. Res. 435. Resolution relative to the death of the Honorable Gerald E. Connolly, a Representative from the Commonwealth of Virginia.

The message also announced that pursuant to 20 U.S.C. 4412, and the order of the House of January 3, 2025, the Speaker appoints the following Members on the part of the House of Representatives to the Board of Trustees of the Institute of American Indian and Alaska Native Culture and Arts Development: Mr. Cole of Oklahoma and Ms. Leger Fernandez of New Mexico.

The message further announced that pursuant to 20 U.S.C. 4303, and the order of the House of January 3, 2025, the Speaker appoints the following Members on the part of the House of Representatives to the Board of Trustees of Gallaudet University: Mr. Owens of Utah and Ms. McCollum of Minnesota.

## MEASURES REFERRED

The following bills were read the first and the second times by unanimous consent, and referred as indicated:

H.R. 1701. An act to require the Secretary of Defense and the Secretary of State to monitor efforts by the People's Republic of China to build or buy strategic foreign ports, and for other purposes; to the Committee on Foreign Relations.

H.R. 1969. An act to amend and reauthorize the Staff Sergeant Parker Gordon Fox Suicide Prevention Grant Program of the Department of Veterans Affairs; to the Committee on Veterans' Affairs.

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of nominations were submitted:

By Mr. CASSIDY for the Committee on Health, Education, Labor, and Pensions.

*Kirsten Baesler, of North Dakota, to be Assistant Secretary for Elementary and Secondary Education, Department of Education.

*Nicholas Kent, of Virginia, to be Under Secretary of Education.

*Henry Mack III, of Florida, to be an Assistant Secretary of Labor.

*Kevin O'Farrell, of Florida, to be Assistant Secretary for Career, Technical, and Adult Education, Department of Education.

*Wayne Palmer, of Virginia, to be Assistant Secretary of Labor for Mine Safety and Health.

*Julie Hocker, of Virginia, to be an Assistant Secretary of Labor.

*Marco Rajkovich, Jr., of Virginia, to be a Member of the Federal Mine Safety and Health Review Commission for a term of six years expiring August 30, 2030.

By Mr. GRASSLEY for the Committee on the Judiciary.

Terrance Cole, of Virginia, to be Administrator of Drug Enforcement.

Gadyaces Serralta, of Florida, to be Director of the United States Marshals Service.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

(Nominations without an asterisk were reported with the recommendation that they be confirmed.)

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. BLUMENTHAL (for himself and Mr. TILLIS):

S. 1855. A bill to amend title XIX of the Social Security Act to establish State plan requirements for determining residency and coverage for military families, and for other purposes; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1856. A bill to amend the Internal Revenue Code of 1986 to exclude military bonuses from gross income; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1857. A bill to amend title 14, United States Code, to require the retention of certain enlisted members of the Coast Guard who have completed 18 or more, but less than 20, years of service, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. DAINES:

S. 1858. A bill to require that national cemeteries be open to visitors on legal public holidays; to the Committee on Veterans' Affairs.

By Mr. BLUMENTHAL:

S. 1859. A bill to amend title 10, United States Code, to make certain members of the Ready Reserve who served on active duty after September 11, 2001, eligible for early retirement; to the Committee on Armed Services.

By Mr. LEE (for himself and Mr. CURTIS):

S. 1860. A bill to direct the Secretary of Agriculture to convey to Brian Head Town,

Utah, certain National Forest System land; to the Committee on Energy and Natural Resources.

By Mr. BLUMENTHAL:

S. 1861. A bill to amend title 10, United States Code, to allow members of the Selected Reserve and National Guard holding employment within the Federal Government the choice between military and civilian healthcare plans, and for other puposes; to the Committee on Armed Services.

By Mr. BARRASSO (for himself and Mr. HEINRICH):

S. 1862. A bill to amend title XI of the Social Security Act to expand and clarify the exclusion for orphan drugs under the Drug Price Negotiation Program; to the Committee on Finance.

By Mr. BLUMENTHAL:

S. 1863. A bill to amend section 455(m) of the Higher Education Act of 1965 to modify the eligibility requirements of the public service loan forgiveness program for certain members of the Armed Forces, the National Guard, and the commissioned corps of the National Oceanic and Atmospheric Administration, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. SCOTT of Florida:

S. 1864. A bill to amend the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 to modify the provision relating to public reporting of Chinese military companies, and for other purposes; to the Committee on Armed Services.

By Mr. PAUL (for himself, Mr. RICKETTS, Mr. CRAMER, and Mr. BUDD):

S. 1865. A bill to amend the Internal Revenue Code of 1986 to repeal the excise tax on indoor tanning services; to the Committee on Finance.

By Ms. BALDWIN (for herself, Ms. COLLINS, Ms. CORTEZ MASTO, and Ms. KLOBUCHAR):

S. 1866. A bill to amend the Public Health Service Act to reauthorize and improve the National Breast and Cervical Cancer Early Detection Program for fiscal years 2026 through 2030, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. WHITEHOUSE (for himself and Mr. GRAHAM):

S. 1867. A bill to provide for phase-out of de minimis treatment under the Tariff Act of 1930, and for other purposes; to the Committee on Finance.

By Mr. CRAMER (for himself and Mr. SHEEHY):

S. 1868. A bill to amend title 38, United States Code, to expand access by veterans to critical access hospitals and affiliated clinics under the Veterans Community Care Program, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. CRUZ:

S. 1869. A bill to require the Secretary of Defense to carry out an operational experimentation program to evaluate the military utility of optionally piloted vehicle rotary-wing aircraft, and for other purposes; to the Committee on Armed Services.

By Mr. SCHIFF (for himself and Mr. PADILLA):

S. 1870. A bill to adjust the boundary of the Santa Monica Mountains National Recreation Area to include the Rim of the Valley Corridor, and for other purposes; to the Committee on Energy and Natural Resources.

By Ms. CORTEZ MASTO (for herself and Mr. CASSIDY):

S. 1871. A bill to require the Secretary of Homeland Security to develop a plan to identify, integrate, and deploy new, innovative, disruptive, or other emerging or advanced

Case 4:25-cv-04966-HSG Document 1-4 Filed 06/12/25 Page 19 of 51

technologies that are safe and secure to enhance U.S. Customs and Border Protection's capabilities to meet its mission needs along international borders and at ports of entry; to the Committee on Homeland Security and Governmental Affairs.

By Ms. ERNST (for herself and Ms. BLUNT ROCHESTER):

S. 1872. A bill to direct the Secretary of Commerce to conduct a study on the feasibility of manufacturing in the United States products for critical infrastructure sectors, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. BOOKER (for himself, Mr. SCHUMER, Mr. SCHIFF, Mr. PADILLA, and Mr. WYDEN):

S. 1873. A bill to amend title 28, United States Code, to transfer the United States Marshals Service to the judicial branch, and for other purposes; to the Committee on the Judiciary.

By Mr. MERKLEY (for himself, Mrs. COLLINS, Ms. BALDWIN, Mrs. BLACKBURN, Mr. BLUMENTHAL, Mr. COONS, Mrs. GILLIBRAND, Mr. KELLY, Mr. SCHIFF, and Ms. MURKOWSKI):

S. 1874. A bill to amend the Public Health Service Act to reauthorize certain nursing workforce development programs, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. PETERS (for himself and Mr. LANKFORD):

S. 1875. A bill to establish an interagency committee to harmonize regulatory regimes in the United States relating to cybersecurity, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. TILLIS (for himself and Mr. BUDD):

S. 1876. A bill to authorize the Secretary of Agriculture to relocate a memorial honoring the 9 Air Force crew members who lost their lives in an airplane crash in the Cherokee and Nantahala National Forests during a training mission on August 31, 1982; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. TILLIS (for himself, Mr. HICKENLOOPER, Mrs. SHAHEEN, Mr. ROUNDS, Mr. PETERS, Mr. BUDD, and Mrs. BRITT):

S. 1877. A bill to direct the Securities and Exchange Commission to promulgate rules with respect to the electronic delivery of certain required disclosures, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mrs. FISCHER (for herself and Ms. SMITH):

S. 1878. A bill to establish an interactive online dashboard to improve public access to information about grant funding related to mental health and substance use disorder programs; to the Committee on Health, Education, Labor, and Pensions.

By Mr. OSSOFF (for himself, Mr. KELLY, Ms. BALDWIN, Ms. DUCKWORTH, Mr. SCHATZ, Mrs. SHAHEEN, Mr. WARNOCK, Mr. BENNET, and Mrs. GILLIBRAND):

S. 1879. A bill to amend chapter 131 of title 5, United States Code, to require Members of Congress and their spouses and dependent children to place certain assets into blind trusts, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Ms. SMITH (for herself, Mr. ROUNDS, Mr. BOOKER, Mr. DAINES, Mr. SHEEHY, Mr. HICKENLOOPER, Ms. KLOBUCHAR, Mrs. HYDE-SMITH, Mr. GALLEGO, Ms. LUMMIS, Ms. BLUNT ROCHESTER, and Mr. CRAPO):

S. 1880. A bill to amend the Community Development Banking and Financial Institutions Act of 1994 to reauthorize and improve the community development financial institutions bond guarantee program, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. MARKEY (for himself, Mr. SCHUMER, Mr. SANDERS, Mr. LUJÁN, Ms. WARREN, Mr. WYDEN, Mr. VAN HOLLEN, Mr. PADILLA, Mr. BLUMENTHAL, Ms. BALDWIN, and Mr. SCHIFF):

S. 1881. A bill to amend the Occupational Safety and Health Act of 1970 to expand coverage under such Act to public employees; to the Committee on Health, Education, Labor, and Pensions.

By Mrs. HYDE-SMITH (for herself, Mr. LANKFORD, Mr. GRASSLEY, and Mr. CORNYN):

S. 1882. A bill to expand and promote research and data collection on reproductive health conditions, to provide training opportunities for medical professionals to learn how to diagnose and treat reproductive health conditions, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. COONS (for himself and Mr. McCORMICK):

S. 1883. A bill to require the executive branch to develop a whole-of-government strategy to disrupt growing cooperation among the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, and the Democratic People's Republic of Korea, which are the foremost adversaries of the United States, and mitigate the risks posed to the United States; to the Committee on Foreign Relations.

By Mr. CORNYN (for himself, Mr. BLUMENTHAL, Mr. TILLIS, Mr. BOOKER, Mrs. BLACKBURN, Mr. FETTERMAN, Mr. SCHMITT, and Mrs. BRITT):

S. 1884. A bill to clarify the Holocaust Expropriated Art Recovery Act of 2016, to appropriately limit the application of defenses based on the passage of time and other non-merits defenses to claims under that Act; to the Committee on the Judiciary.

By Mrs. BRITT (for herself and Mr. FETTERMAN):

S. 1885. A bill to require the Federal Trade Commission, with the concurrence of the Secretary of Health and Human Services acting through the Surgeon General, to implement a mental health warning label on covered platforms, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. BANKS:

S. 1886. A bill to amend the Trade Act of 1974 to authorize the United States Trade Representative to impose remedial measures with respect to certain entities that evade or may attempt to evade duties imposed with respect to nonmarket economy countries, and for other purposes; to the Committee on Finance.

By Mr. WYDEN (for himself, Ms. CANTWELL, Mr. MERKLEY, Mr. BLUMENTHAL, Ms. BALDWIN, Mr. VAN HOLLEN, Mr. WELCH, Ms. WARREN, Mr. BOOKER, Mr. SCHATZ, Mr. BENNET, Mr. MARKEY, and Mr. WHITEHOUSE):

S. 1887. A bill to amend the Help America Vote Act of 2002 to allow all eligible voters to vote by mail in Federal elections, to amend the National Voter Registration Act of 1993 to streamline the procedures under which individuals may apply to register to vote in such elections through State motor vehicle authorities, to permit automatic voter registration through such authorities for eligible citizens of the United States who do not complete voter registration applications, and for other purposes; to the Committee on Rules and Administration.

By Mr. GRAHAM (for himself, Mr. COONS, and Mr. BOOZMAN):

S. 1888. A bill to establish the United States Foundation for International Food Security to leverage private sector investments in order to improve and scale economically viable agricultural production, build food systems to mitigate food shock, reduce malnutrition, and drive economic growth, and for other purposes; to the Committee on Foreign Relations.

By Mr. SCOTT of South Carolina (for himself, Ms. HASSAN, Mr. HAGERTY, Ms. ROSEN, and Mr. WHITEHOUSE):

S. 1889. A bill to repeal the sunset provision of the Iran Sanctions Act of 1996; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. CORNYN (for himself and Mr. WELCH):

S. 1890. A bill to establish a grant program for certain State and local forensic activities, and for other purposes; to the Committee on the Judiciary.

By Mr. COTTON:

S. 1891. A bill to amend the Internal Revenue Code of 1986 to establish the generic drugs and biosimilars production credit, and for other purposes; to the Committee on Finance.

By Ms. MURKOWSKI (for herself, Mr. DURBIN, Mr. TUBERVILLE, Mrs. MURRAY, Mr. MORAN, and Mrs. SHAHEEN):

S. 1892. A bill to clarify that amounts from declinations should be deposited in the Crime Victims Fund and to temporarily provide additional deposits into the Crime Victims Fund; to the Committee on the Judiciary.

By Mr. VAN HOLLEN (for himself and Ms. ALSOBROOKS):

S. 1893. A bill to award posthumously a Congressional Gold Medal to Henrietta Lacks, in recognition of her immortal cells which have made invaluable contributions to global health, scientific research, our quality of life, and patients' rights; to the Committee on Banking, Housing, and Urban Affairs.

By Ms. LUMMIS (for herself and Mr. CRAMER):

S. 1894. A bill to amend MAP–21 to modify provisions relating to a categorical exclusion for projects of limited Federal assistance, and for other purposes; to the Committee on Environment and Public Works.

By Mr. YOUNG (for himself, Mrs. SHAHEEN, and Mr. CRAMER):

S. 1895. A bill to establish the Mental Health Excellence in Schools Program to increase the recruitment and retention of school-based mental health service providers, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. CORNYN (for himself and Mr. COONS):

S. 1896. A bill to modify the provision of law on expedited review of export licenses for exports of advanced technologies to Australia, the United Kingdom, and Canada; to the Committee on Foreign Relations.

By Mrs. SHAHEEN (for herself and Mrs. BLACKBURN):

S. 1897. A bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to establish the Adverse Childhood Experiences Response Team grant program, and for other purposes; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself, Ms. CANTWELL, Mr. WICKER, and Ms. LUMMIS):

S. 1898. A bill to establish a demonstration program for the active remediation of orbital debris and to require the development of uniform orbital debris standard practices in order to support a safe and sustainable orbital environment, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. WARNER:

S. 1899. A bill to require Federal contractors to implement a vulnerability disclosure policy consistent with NIST guidelines, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. McCORMICK (for himself, Mr. ROSEN, Mr. SULLIVAN, and Ms. SLOTKIN):

S. 1900. A bill to require the Secretary of the Treasury to pursue more equitable treatment of Taiwan at the international financial institutions, and for other purposes; to the Committee on Foreign Relations.

By Mr. CRUZ (for himself, Mr. CORNYN, Mr. WICKER, and Mr. SCOTT of South Carolina):

S. 1901. A bill to address the effect of litigation on applications to export liquefied natural gas, and for other purposes; to the Committee on Environment and Public Works.

By Mr. RISCH (for himself and Mr. HICKENLOOPER):

S. 1902. A bill to require the Secretary of Energy to establish an energy threat analysis program, and for other purposes; to the Committee on Energy and Natural Resources.

By Mr. REED (for himself, Mr. HEINRICH, and Mr. MARKEY):

S. 1903. A bill to prohibit changes to Medicare and Medicaid in reconciliation; to the Committee on the Budget.

By Mr. REED:

S. 1904. A bill to amend the Animal Health Protection Act to require certain certifications from persons provided indemnification or compensation by the Secretary of Agriculture for poultry flocks affected by the highly pathogenic avian influenza, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. LUJÁN:

S. 1905. A bill to amend the Food and Nutrition Act of 2008 to increase the Federal cost share for supplemental nutrition assistance program administration to improve staffing and retention, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. MARSHALL (for himself, Ms. BALDWIN, Mr. MORAN, Mr. BENNET, Mr. GRASSLEY, Mr. KING, and Ms. KLOBUCHAR):

S. 1906. A bill to amend the Federal Food, Drug, and Cosmetic Act with respect to the regulation of zootechnical animal food substances; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. MARSHALL (for himself and Mr. PADILLA):

S. 1907. A bill to amend the Federal Insecticide, Fungicide, and Rodenticide Act to provide for a consistent definition for plant biostimulants; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. LANKFORD (for himself and Mr. KELLY):

S. 1908. A bill to require the Under Secretary of Defense for Intelligence and Security to complete a threat assessment regarding unmanned aircraft systems at or near international borders of the United States, and for other purposes; to the Committee on Armed Services.

By Mrs. SHAHEEN (for herself and Mr. WICKER):

S. 1909. A bill to encourage increased trade and investment between the United States and the countries in the Western Balkans, and for other purposes; to the Committee on Foreign Relations.

By Mr. BOOKER (for himself, Ms. HIRONO, Mr. PADILLA, Mr. MARKEY, Mr. MERKLEY, Mr. BLUMENTHAL, and Ms. WARREN):

S. 1910. A bill to provide for the overall health and well-being of young people, including the promotion and attainment of lifelong sexual health and healthy relationships, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. RICKETTS:

S. 1911. A bill to amend the Congressional Budget and Impoundment Control Act of 1974 to codify the Panel of Health Advisors within the Congressional Budget Office, and for other purposes; to the Committee on the Budget.

By Mr. DAINES (for himself, Ms. LUMMIS, and Mr. GRASSLEY):

S. 1912. A bill to amend title 38, United States Code, to expand access to the Veterans Community Care Program of the Department of Veterans Affairs to include certain veterans seeking mental health or substance-use services, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. MARKEY (for himself, Ms. WARREN, and Mr. SANDERS):

S. 1913. A bill to amend the Revised Statutes to remove the defense of qualified immunity in the case of any action under section 1979, and for other purposes; to the Committee on the Judiciary.

By Ms. WARREN (for herself, Mr. BLUMENTHAL, Ms. HIRONO, Mr. MARKEY, Mr. MERKLEY, and Mr. SANDERS):

S. 1914. A bill to require Federal law enforcement and prison officials to obtain or provide immediate medical attention to individuals in custody who display medical distress; to the Committee on the Judiciary .

By Ms. WARREN (for herself, Mr. MERKLEY, Ms. SMITH, Mr. PADILLA, Mr. SANDERS, Mr. SCHIFF, Mr. BLUMENTHAL, and Mr. WYDEN):

S. 1915. A bill to rescind each Medal of Honor awarded for acts at Wounded Knee Creek on December 29, 1890, and for other purposes; to the Committee on Armed Services.

By Mr. CORNYN (for himself, Ms. KLOBUCHAR, and Mr. GRASSLEY):

S. 1916. A bill to amend title 11, United States Code, to account for the protection of genetic information in bankruptcy; to the Committee on the Judiciary.

By Mr. HICKENLOOPER (for himself and Mr. MARSHALL):

S. 1917. A bill to amend the Small Business Investment Act of 1958 to exclude from the limit on leverage certain amounts invested in smaller enterprises located in rural or low-income areas and small businesses in critical technology areas, and for other purposes; to the Committee on Small Business and Entrepreneurship.

By Mr. BOOZMAN (for himself and Mr. LUJÁN):

S. 1918. A bill to amend the Internal Revenue Code of 1986 to allow a refundable tax credit against income tax for the purchase of qualified access technology for the blind; to the Committee on Finance.

By Mrs. HYDE-SMITH (for herself, Mrs. BRITT, Mr. MARSHALL, and Mr. BOOZMAN):

S. 1919. A bill to amend the Internal Revenue Code of 1986 to establish a domestic cotton consumption credit; to the Committee on Finance.

By Mr. TILLIS (for himself, Ms. HASSAN, Mr. SULLIVAN, and Ms. CORTEZ MASTO):

S. 1920. A bill to amend title XIX of the Social Security Act to develop national quality standards for continuous skilled nursing services provided through Medicaid, and for other purposes; to the Committee on Finance.

By Ms. BLUNT ROCHESTER (for herself and Mr. ROUNDS):

S. 1921. A bill to amend title 38, United States Code, to modify the administration of housing loans of the Department of Veterans Affairs to prevent or resolve default under such loans, and for other purposes; to the Committee on Veterans' Affairs.

SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Ms. ROSEN (for herself, Mr. SCOTT of Florida, Mr. WARNOCK, Mr. LANKFORD, Mr. HICKENLOOPER, Mr. RISCH, Mr. FETTERMAN, Mr. GRAHAM, Mrs. GILLIBRAND, Mr. PAUL, Ms. DUCKWORTH, Mr. CASSIDY, Mr. KAINE, Mr. CRAPO, Mr. WYDEN, Mr. CRAMER, Mr. SCHUMER, Mr. GRASSLEY, Mr. KELLY, Mr. MORENO, Ms. BALDWIN, Mrs. MOODY, Mrs. MURRAY, Mrs. CAPITO, Mr. HAGERTY, Mr. HAWLEY, Mrs. BRITT, and Mrs. SHAHEEN):

S. Res. 246. A resolution recognizing the significance of Jewish American Heritage Month and calling on elected officials and civil society leaders to counter antisemitism; considered and agreed to.

By Ms. HIRONO (for herself and Mr. BARRASSO):

S. Res. 247. A resolution designating May 2025 as "National Wildfire Preparedness Month"; to the Committee on the Judiciary.

By Mr. MERKLEY (for himself and Mr. BLUMENTHAL):

S. Res. 248. A resolution expressing the need for the Federal Government to establish a national biodiversity strategy for protecting biodiversity for current and future generations; to the Committee on Environment and Public Works.

By Mr. LUJÁN (for himself and Mr. DAINES):

S. Res. 249. A resolution expressing support for the designation of May 2025 as "Mental Health Awareness Month"; to the Committee on Health, Education, Labor, and Pensions.

By Mr. GRASSLEY (for himself, Mr. LUJÁN, Mr. RISCH, Mr. CRAPO, Ms. HASSAN, Mr. BARRASSO, Mr. WARNER, Mr. PADILLA, Mr. KAINE, Mr. CORNYN, Mrs. CAPITO, Mrs. HYDE-SMITH, Mr. MULLIN, Mr. HUSTED, Mrs. BRITT, Mr. WYDEN, Mr. YOUNG, and Ms. KLOBUCHAR):

S. Res. 250. A resolution recognizing National Foster Care Month as an opportunity to raise awareness about the challenges of children in the foster care system, and encouraging Congress to implement policies to improve the lives of children in the foster care system; considered and agreed to.

By Mr. HUSTED (for himself and Mr. FETTERMAN):

S. Res. 251. A resolution supporting the designation of May 4 through May 10, 2025, as "Children's Mental Health Awareness Week"; considered and agreed to.

By Mr. SCOTT of Florida (for himself, Mr. KELLY, Mr. JUSTICE, Mr. WARNOCK, Ms. WARREN, Mr. McCORMICK, Mrs. GILLIBRAND, Ms. COLLINS, Mr. TUBERVILLE, Mrs. MOODY, Mr. HUSTED, and Mr. KIM):

S. Res. 252. A resolution designating May 2025 as "Older Americans Month" ; considered and agreed to.

By Mr. SCHMITT (for himself, Mr. DURBIN, Ms. COLLINS, Mr. KAINE, Mr. LUJÁN, Mr. RISCH, Mr. PADILLA, Mr. RICKETTS, Mr. ROUNDS, Mr. SULLIVAN, Mr. WELCH, Ms. CORTEZ MASTO, Mr. HOEVEN, and Mr. PAUL):

S. Res. 253. A resolution congratulating His Holiness Pope Leo XIV on his election to the papacy; considered and agreed to.

By Mr. CASSIDY (for himself and Mr. WARNOCK):

S. Res. 254. A resolution designating June 12, 2025, as ''National Seersucker Day'', designating every Thursday after National Seersucker Day through the last Thursday in August 2025 as ''Seersucker Thursday'', and designating June 2025 as ''Seersucker Appreciation Month''; considered and agreed to.

By Mr. HAWLEY (for himself, Mr. SCHMITT, Mr. THUNE, Mr. SCHUMER, Ms. ALSOBROOKS, Ms. BALDWIN, Mr. BANKS, Mr. BARRASSO, Mr. BENNET, Mrs. BLACKBURN, Mr. BLUMENTHAL, Ms. BLUNT ROCHESTER, Mr. BOOKER, Mr. BOOZMAN, Mrs. BRITT, Mr. BUDD, Ms. CANTWELL, Mrs. CAPITO, Mr. CASSIDY, Ms. COLLINS, Mr. COONS, Mr. CORNYN, Ms. CORTEZ MASTO, Mr. COTTON, Mr. CRAMER, Mr. CRAPO, Mr. CRUZ, Mr. CURTIS, Mr. DAINES, Ms. DUCKWORTH, Mr. DURBIN, Ms. ERNST, Mr. FETTERMAN, Mrs. FISCHER, Mr. GALLEGO, Mrs. GILLIBRAND, Mr. GRAHAM, Mr. GRASSLEY, Mr. HAGERTY, Ms. HASSAN, Mr. HEINRICH, Mr. HICKENLOOPER, Ms. HIRONO, Mr. HOEVEN, Mr. HUSTED, Mrs. HYDE-SMITH, Mr. JOHNSON, Mr. JUSTICE, Mr. KAINE, Mr. KELLY, Mr. KENNEDY, Mr. KIM, Mr. KING, Ms. KLOBUCHAR, Mr. LANKFORD, Mr. LEE, Mr. LUJÁN, Ms. LUMMIS, Mr. MARKEY, Mr. MARSHALL, Mr. MCCONNELL, Mr. MCCORMICK, Mr. MERKLEY, Mrs. MOODY, Mr. MORAN, Mr. MORENO, Mr. MULLIN, Ms. MURKOWSKI, Mr. MURPHY, Mrs. MURRAY, Mr. OSSOFF, Mr. PADILLA, Mr. PAUL, Mr. PETERS, Mr. REED, Mr. RICKETTS, Mr. RISCH, Ms. ROSEN, Mr. ROUNDS, Mr. SANDERS, Mr. SCHATZ, Mr. SCHIFF, Mr. SCOTT of Florida, Mr. SCOTT of South Carolina, Mrs. SHAHEEN, Mr. SHEEHY, Ms. SLOTKIN, Ms. SMITH, Mr. SULLIVAN, Mr. TILLIS, Mr. TUBERVILLE, Mr. VAN HOLLEN, Mr. WARNER, Mr. WARNOCK, Ms. WARREN, Mr. WELCH, Mr. WHITEHOUSE, Mr. WICKER, Mr. WYDEN, and Mr. YOUNG):

S. Res. 255. A resolution honoring the life, achievements, and legacy of former United States Senator Christopher ''Kit'' Bond of Missouri; considered and agreed to.

By Mr. LUJÁN:

S. Res. 256. A resolution designating May 2025 as ''American Stroke Month''; to the Committee on the Judiciary.

By Mr. SCHIFF (for himself and Mr. DURBIN):

S. Res. 257. A resolution expressing the sense of the Senate concerning the arrest and continued detention of Ekrem Imamoglu and urging the Government of Turkiye to uphold democratic values; to the Committee on Foreign Relations.

## ADDITIONAL COSPONSORS

S. 199

At the request of Mr. CRAPO, the name of the Senator from Connecticut (Mr. BLUMENTHAL) was added as a cosponsor of S. 199, a bill to amend the Internal Revenue Code of 1986 to provide special rules for the taxation of certain residents of Taiwan with income from sources within the United States.

S. 201

At the request of Mr. KELLY, the name of the Senator from Virginia (Mr. WARNER) was added as a cosponsor of S. 201, a bill to provide for a study by the National Academies of Sciences, Engineering, and Medicine on the preva-

lence and mortality of cancer among individuals who served as active duty aircrew in the Armed Forces, and for other purposes.

S. 427

At the request of Mr. ROUNDS, the name of the Senator from Nebraska (Mr. RICKETTS) was added as a cosponsor of S. 427, a bill to require the Federal financial institutions regulatory agencies to take risk profiles and business models of institutions into account when taking regulatory actions, and for other purposes.

S. 554

At the request of Mr. SULLIVAN, the name of the Senator from New Jersey (Mr. BOOKER) was added as a cosponsor of S. 554, a bill to enhance bilateral defense cooperation between the United States and Israel, and for other purposes.

S. 557

At the request of Mr. KENNEDY, the name of the Senator from Idaho (Mr. CRAPO) was added as a cosponsor of S. 557, a bill to repeal the small business loan data collection requirements under the Equal Credit Opportunity Act.

S. 897

At the request of Mr. VAN HOLLEN, the name of the Senator from California (Mr. SCHIFF) was added as a cosponsor of S. 897, a bill to prohibit the sale and distribution of expanded polystyrene food service ware, expanded polystyrene loose fill, and expanded polystyrene coolers, and for other purposes.

S. 911

At the request of Mr. MCCONNELL, the name of the Senator from Nebraska (Mrs. FISCHER) was added as a cosponsor of S. 911, a bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to include certain retired law enforcement officers in the public safety officers' death benefits program.

S. 996

At the request of Mr. MULLIN, the name of the Senator from South Carolina (Mr. SCOTT) was added as a cosponsor of S. 996, a bill to amend the Clean Air Act to prevent the elimination of the sale of motor vehicles with internal combustion engines, and for other purposes.

S. 1144

At the request of Mr. THUNE, the name of the Senator from Minnesota (Ms. KLOBUCHAR) was added as a cosponsor of S. 1144, a bill to amend the Internal Revenue Code of 1986 to treat certain amounts paid for physical activity, fitness, and exercise as amounts paid for medical care.

S. 1241

At the request of Mr. GRAHAM, the name of the Senator from South Dakota (Mr. ROUNDS) was added as a cosponsor of S. 1241, a bill to impose sanctions and other measures with respect to the Russian Federation if the Government of the Russian Federation refuses to negotiate a peace agreement

with Ukraine, violates any such agreement, or initiates another military invasion of Ukraine, and for other purposes.

S. 1330

At the request of Mr. BLUMENTHAL, the names of the Senator from Arizona (Mr. KELLY) and the Senator from Delaware (Mr. COONS) were added as cosponsors of S. 1330, a bill to advance research to achieve medical breakthroughs in brain tumor treatment and improve awareness and adequacy of specialized cancer and brain tumor care.

S. 1515

At the request of Mr. YOUNG, the names of the Senator from Pennsylvania (Mr. MCCORMICK) and the Senator from Virginia (Mr. KAINE) were added as cosponsors of S. 1515, a bill to amend the Internal Revenue Code of 1986 to reform the low-income housing credit, and for other purposes.

S. 1593

At the request of Mr. MARKEY, the name of the Senator from Maryland (Mr. VAN HOLLEN) was added as a cosponsor of S. 1593, a bill to exempt small business concerns from duties imposed pursuant to the national emergency declared on April 2, 2025, by the President.

S. 1643

At the request of Ms. CORTEZ MASTO, the name of the Senator from Tennessee (Mrs. BLACKBURN) was added as a cosponsor of S. 1643, a bill to amend title XVIII of the Social Security Act to protect patient access to ground ambulance services under the Medicare program.

S. 1668

At the request of Mr. MERKLEY, the name of the Senator from Michigan (Mr. PETERS) was added as a cosponsor of S. 1668, a bill to amend chapter 131 of title 5, United States Code, to prohibit the President, Vice President, Members of Congress, and individuals appointed to Senate-confirmed positions from issuing, sponsoring, or endorsing certain financial instruments, and for other purposes.

S. 1741

At the request of Mr. SCHUMER, the names of the Senator from Maryland (Mr. VAN HOLLEN), the Senator from New Jersey (Mr. KIM) and the Senator from Connecticut (Mr. BLUMENTHAL) were added as cosponsors of S. 1741, a bill to ensure transparency with respect to the impact of certain tariffs on the prices of goods, and for other purposes.

S. 1744

At the request of Mr. RICKETTS, the name of the Senator from Colorado (Mr. BENNET) was added as a cosponsor of S. 1744, a bill to amend the Arms Export Control Act to include Taiwan among the list of recipient countries with respect to which shorter certification and reporting periods apply and to expedite licensing for allies transferring military equipment to Taiwan, and for other purposes.

S. 1751

At the request of Mr. CORNYN, the name of the Senator from Alabama (Mrs. BRITT) was added as a cosponsor of S. 1751, a bill to require the Secretary of Agriculture to establish a New World screwworm fly rearing facility, and for other purposes.

S. 1779

At the request of Ms. ERNST, the name of the Senator from Missouri (Mr. SCHMITT) was added as a cosponsor of S. 1779, a bill to amend the Clean Air Act to prohibit State standards relating to the control of emissions from existing locomotives and engines used in locomotives, and for other purposes.

S. 1810

At the request of Mr. CRUZ, the name of the Senator from Texas (Mr. CORNYN) was added as a cosponsor of S. 1810, a bill to amend the Internal Revenue Code of 1986 to allow a credit against tax for charitable donations to nonprofit organizations providing education scholarships to qualified elementary and secondary students.

S. 1821

At the request of Mr. TILLIS, the name of the Senator from Ohio (Mr. HUSTED) was added as a cosponsor of S. 1821, a bill to amend the Internal Revenue Code of 1986 to establish a tax on income from litigation which is received by third-party entities that provided financing for such litigation.

S. 1823

At the request of Mr. MULLIN, the name of the Senator from Texas (Mr. CORNYN) was added as a cosponsor of S. 1823, a bill to authorize livestock producers and their employees to take black vultures to prevent death, injury, or destruction to livestock, and for other purposes.

S. 1827

At the request of Mrs. MOODY, the names of the Senator from Utah (Mr. LEE) and the Senator from Missouri (Mr. HAWLEY) were added as cosponsors of S. 1827, a bill to authorize the expedited removal of aliens who are criminal gang members, members of foreign terrorist organizations, or have been convicted of certain specified crimes.

S. RES. 212

At the request of Mr. GRAHAM, the names of the Senator from Mississippi (Mrs. HYDE-SMITH) and the Senator from Arkansas (Mr. BOOZMAN) were added as cosponsors of S. Res. 212, a resolution affirming the acceptable outcome of any nuclear deal between the United States and the Islamic Republic of Iran, and for other purposes.

S. RES. 240

At the request of Ms. HIRONO, the name of the Senator from Oregon (Mr. MERKLEY) was added as a cosponsor of S. Res. 240, a resolution affirming that diversity, equity, inclusion, and accessibility are fundamental values of the United States and emphasizing the ongoing need to address discrimination and inequality in the workplace, pre-K through 12th grade and higher education systems, government programs, the military, and our society.

AMENDMENT NO. 2246

At the request of Mr. DURBIN, the names of the Senator from Hawaii (Ms. HIRONO) and the Senator from Rhode Island (Mr. WHITEHOUSE) were added as cosponsors of amendment No. 2246 intended to be proposed to S. 1582, a bill to provide for the regulation of payment stablecoins, and for other purposes.

---

STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. BARRASSO (for himself and Mr. HEINRICH):

S. 1862. A bill to amend title XI of the Social Security Act to expand and clarify the exclusion for orphan drugs under the Drug Price Negotiation Program; to the Committee on Finance.

Mr. BARRASSO. Mr. President, I ask unanimous consent that the text of the bill be printed in the RECORD.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 1862

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.

This Act may be cited as the ''Optimizing Research Progress Hope And New Cures Act'' or the ''ORPHAN Cures Act''.

SEC. 2. EXPANDING AND CLARIFYING THE EXCLUSION FOR ORPHAN DRUGS UNDER THE DRUG PRICE NEGOTIATION PROGRAM.

Section 1192(e) of the Social Security Act (42 U.S.C. 1320f–1(e)) is amended—

(1) in paragraph (1), by adding at the end the following new subparagraph:

''(C) TREATMENT OF FORMER ORPHAN DRUGS.—In calculating the amount of time that has elapsed with respect to the approval of a drug or licensure of a biological product under subparagraph (A)(ii) and subparagraph (B)(ii), respectively, the Secretary shall not take into account any period during which such drug or product was a drug described in paragraph (3)(A).''; and

(2) in paragraph (3)(A)—

(A) by striking ''only one rare disease or condition'' and inserting ''one or more rare diseases or conditions''; and

(B) by striking ''such disease or condition'' and inserting ''one or more rare diseases or conditions (as such term is defined in section 526(a)(2) of the Federal Food, Drug, and Cosmetic Act)''.

---

By Mr. REED (for himself, Mr. HEINRICH and Mr. MARKEY):

S. 1903. A bill to prohibit changes to Medicare and Medicaid in reconciliation; to the Committee on the Budget.

Mr. REED. Mr. President, critical programs for Americans from all walks of life are under threat right now: Medicare and Medicaid. The Trump administration and my colleagues on the other side of the aisle are working to pass partisan legislation that would make massive cuts to Medicaid. Indeed, the House of Representatives passed their bill last night, voting for the largest cut ever to healthcare for working-class Americans by a single vote. That is why I am introducing the Protect Medicare and Medicaid Act of 2025 with my colleagues Senators HEINRICH and MARKEY.

Under the budget reconciliation process, Republicans can ram through massive cuts to Medicaid or Medicare by a simple majority in the U.S. Senate. It shouldn't be possible to use this fast-track process to strip away the healthcare coverage of millions of Americans. Regrettably, that is what Donald Trump and congressional Republicans are doing.

Senators who served before me had the wisdom to say that this process is too partisan to touch a program like Social Security, which serves as a lifeline for retirees and has worked to reduce poverty among the elderly, and therefore exempted Social Security from the budget reconciliation process.

The bill I am introducing today is very simple. It would exempt Medicare and Medicaid from budget reconciliation, alongside Social Security. These programs are too important to fall victim to partisan attacks. Medicare and Medicaid combined provide health insurance to well over 100 million Americans, providing nursing home care to seniors and those with disabilities, health insurance for children and pregnant women, and countless others. Without these programs, millions of Americans would lose insurance, go bankrupt, or both. One party should not be able to unilaterally dismantle these programs. This bill would prevent that from happening. I hope my colleagues will join me in supporting this effort to protect the healthcare coverage of tens of millions of our fellow Americans.

---

By Mr. REED:

S. 1904. A bill to amend the Animal Health Protection Act to require certain certifications from persons provided indemnification or compensation by the Secretary of Agriculture for poultry flocks affected by the highly pathogenic avian influenza, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

Mr. REED. Mr. President, today I am introducing the Ending Taxpayer Support for Big Egg Producers Act. This legislation would help ensure that Federal funding intended to fight the avian flu outbreak is used responsibly to eradicate the disease and lower the cost of eggs, and does not go to large or highly profitable companies.

I have expressed concerns to both Democratic and Republican administrations that major egg producers may be taking advantage of the avian flu outbreak to engage in price gouging. The five largest U.S. egg producers control roughly half of the country's egg market, limiting choices for American consumers. I am glad that the Department of Justice has opened a probe into this potential anticompetitive behavior.

The fact is, egg prices remain high as companies continue to reel in profits.

One company, Cal-Maine Foods, recently announced in an SEC filing that it is spending up to $500 million to buy back shares for the benefit of the founder's family. Cal-Maine also recently reported quarterly profits of $509 million, more than three times what it made in the same period a year ago.

Despite its tremendous profits, last year Cal Maine received $44 million in USDA indemnity payments to compensate for bird deaths due to the avian flu outbreak. It should be uncontroversial that a company that has earmarked hundreds of millions of dollars of cash on-hand and expected earnings for stock buybacks also has the resources to bear losses and implement biosecurity measures without taxpayer assistance.

There are also some very large private companies that have benefited from government assistance under this program. While these companies do not have access to liquidity from the public markets, their size and national scale provide them with greater access to funding from banks and other lenders on terms that are more favorable than those available to smaller private companies that operate regionally or locally. Further, any company that is private-equity backed surely has similar access to funding through the sponsor of the investment fund that owns the company.

This legislation would ensure that taxpayer funds to support egg producers will be made available to publicly traded or private equity-backed companies only if they will not pay dividends or buy back stock. To receive taxpayer assistance, these companies also must certify that they cannot access alternative sources of financing. There are strong penalties, including criminal liability, for falsifying these certifications.

As egg prices remain high, and the Trump administration limits Federal resources at the Department of Agriculture, we must ensure that these limited resources are used effectively to combat the avian flu and help producers who need it most, rather than highly profitable companies.

I urge my colleagues to join me in supporting this commonsense legislation.

---

## SUBMITTED RESOLUTIONS

---

SENATE RESOLUTION 246—RECOGNIZING THE SIGNIFICANCE OF JEWISH AMERICAN HERITAGE MONTH AND CALLING ON ELECTED OFFICIALS AND CIVIL SOCIETY LEADERS TO COUNTER ANTISEMITISM

Ms. ROSEN (for herself, Mr. SCOTT of Florida, Mr. WARNOCK, Mr. LANKFORD, Mr. HICKENLOOPER, Mr. RISCH, Mr. FETTERMAN, Mr. GRAHAM, Mrs. GILLIBRAND, Mr. PAUL, Ms. DUCKWORTH, Mr. CASSIDY, Mr. KAINE, Mr. CRAPO, Mr. WYDEN, Mr. CRAMER, Mr. SCHUMER, Mr. GRASSLEY, Mr. KELLY, Mr. MORENO, Ms. BALDWIN, Mrs. MOODY, Mrs. MURRAY, Mrs. CAPITO, Mr. HAGERTY, Mr. HAWLEY, Mrs. BRITT, and Mrs. SHAHEEN) submitted the following resolution; which was considered and agreed to:

S. RES. 246

Whereas "Jewish American Heritage Month" has its origins in 1980, when Congress enacted the Joint Resolution entitled "Joint Resolution to authorize and request the President to issue a proclamation designating April 21 through April 28, 1980, as 'Jewish Heritage Week'", approved April 24, 1980 (Public Law 96–237; 94 Stat. 338);

Whereas, on April 24, 1980, President Jimmy Carter issued the proclamation for "Jewish Heritage Week", and in that proclamation, President Carter spoke about the bountiful contributions made by the Jewish people to the culture and history of the United States;

Whereas Congress has played a central role in recognizing "Jewish American Heritage Month" since the Senate and House of Representatives passed resolutions in 2005 and 2006, respectively, urging the President to proclaim the national observation of a month recognizing the Jewish-American community;

Whereas, since 2006, Presidents Bush, Obama, Trump, and Biden have all issued proclamations for "Jewish American Heritage Month", which celebrates Jewish Americans and encourages all people of the United States to learn more about Jewish heritage and the contributions of Jewish people throughout the history of the United States;

Whereas the people of the United States celebrate the rich history of Jewish people in the United States and the more than 350-year history of Jewish contributions to society in the American Colonies and United States;

Whereas the United States has long served as a haven for Jewish people escaping oppression in search of liberty, justice, and tolerance;

Whereas the Jewish-American community dates back to 1654, when a group of 23 Jewish people, fleeing persecution at the hands of the Portuguese Inquisition, fled Brazil and found refuge in what is now New York City;

Whereas Jewish Americans have established deep roots in communities across the United States and served their neighbors and the United States as loyal and patriotic citizens, always grateful for the safe harbor that the United States has provided for them;

Whereas the Jewish-American community has grown to over 6,000,000 people, representing approximately 2 percent of the population of the United States in 2024;

Whereas Jewish Americans have served in government and the military, won Nobel prizes, led universities and corporations, advanced medicine and philanthropy, created and performed in enduring works of performing and visual art, written great novels, become emblems of justice as members of the Supreme Court, and so much more;

Whereas, since Hamas' deadly attack on Israel on October 7, 2023, antisemitism in the United States has reached record highs with incidents targeting Jews and those who are perceived as Jewish;

Whereas, according to the American Jewish Committee, 77 percent of American Jews say they feel less safe as a Jewish person in the United States because of the October 7, 2023, Hamas terrorist attacks;

Whereas, according to the American Jewish Committee, almost 70 percent of Jewish adults report experiencing antisemitism online, including on social media;

Whereas, according to Hillel International, 83 percent of Jewish college students have experienced or witnessed some form of antisemitism since the October 7, 2023, Hamas terrorist attacks;

Whereas, in 2024, the Anti-Defamation League recorded 9,354 antisemitic incidents in the United States, which equals an average of 25 incidents per day and represents a 344 percent increase in antisemitic incidents over the previous 5 years and an increase of nearly 900 percent over the previous decade;

Whereas the Federal Bureau of Investigation has aggregated 2023 hate crime data showing the highest number of single-bias anti-Jewish hate crime incidents ever recorded;

Whereas one of the most effective ways to combat antisemitism and hate is through increasing education and awareness about the contributions Jewish Americans have made to the United States through the arts, entertainment, science and technology, the military, the government, business, culinary traditions, and other fields; and

Whereas, as the strength of a society can be measured by how that society protects its minority populations and celebrates their contributions, it is altogether fitting for the United States to once again mark the month of May as "Jewish American Heritage Month": Now, therefore, be it

Resolved, That the Senate—

(1) recognizes the significance of Jewish American Heritage Month as a time to celebrate the contributions of Jewish Americans to the society and culture of the United States;

(2) calls on elected officials, faith leaders, and civil society leaders to condemn and counter all acts of antisemitism;

(3) calls on elected officials and State and local leaders to educate the public on the contributions of the Jewish-American community and uplift Jewish stories and voices; and

(4) takes all possible steps to ensure the safety, security, and dignity of American Jews in all aspects of their lives, including at the workplace, college and university campuses, synagogues, and home.

---

SENATE RESOLUTION 247—DESIGNATING MAY 2025 AS "NATIONAL WILDFIRE PREPAREDNESS MONTH"

Ms. HIRONO (for herself and Mr. BARRASSO) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 247

Whereas wildfires across the contiguous United States, Alaska, Hawaii, and the United States territories have increased in scale, complexity, and severity, fire seasons have lengthened in many parts of the United States to encompass the entire year, and wildfire has become a threat in regions of the United States that have little or no history of wildfire;

Whereas, in the United States from 2015 to 2024, an average of 62,435 wildfires burned, consuming on average a total of 7,553,704 acres, which is 705,612 acres above the previous 10-year average;

Whereas, in the United States from January 1 to May 2, 2025, 22,759 wildfires burned 988,319 acres, which is above both the 10-year average occurrence of 15,639 wildfires and the average 10-year burned area of 951,468 acres;

Whereas, from May 2025 to August 2025, over 60 percent of States in the United States are predicted to be at risk for significant wildfire events, and over 50 percent of

States are expected to face above-normal risks for significant wildfire events;

Whereas nearly 85 percent of wildland fires in the United States are caused by humans;

Whereas Federal wildfire suppression efforts cost over $2,500,000,000 per year, and the total cost of wildfire damage across the United States is estimated to be tens to hundreds of billions of dollars per year;

Whereas significant investments in proactive planning, mitigation, and risk reduction are necessary for the United States to counteract increasingly severe wildfire risk, damage, and loss;

Whereas firefighters are on the front lines and are at an increased risk of developing cancer and respiratory diseases because they are exposed to smoke and hazardous chemicals in the line of duty;

Whereas the effects of long-term exposure to wildfire smoke will harm more people, as particulate pollution triggers asthma attacks, heart attacks, and strokes, and can kill;

Whereas preventative measures exist to help individuals and communities increase their fire resilience through—

(1) reducing the risk of home ignition by using fire-resistant construction materials and maintaining yard vegetation;

(2) community planning that reduces home wildfire exposure and increases access for firefighters;

(3) evacuation planning and assistance for people and their animals;

(4) vegetation and forest management; and

(5) limited use of combustibles during high heat or drier seasons, including fireworks, exhaust, and open flames; and

Whereas a nationally designated Wildfire Preparedness Month—

(1) increases awareness of the threat of wildfires and knowledge of lifesaving and fire mitigation practices; and

(2) promotes educational initiatives, encourages community programming, and increases overall knowledge and preparedness: Now, therefore, be it

*Resolved,* That the Senate—

(1) designates the month of May 2025 as "National Wildfire Preparedness Month";

(2) encourages increased awareness of, and preparedness for, the threat of wildfires and subsequent suppression efforts at the Federal, State, local, and Tribal levels of government, including Alaska Native and Native Hawaiian communities, and by nongovernmental organizations and communities; and

(3) supports resources and educational initiatives that communicate how communities at risk of exposure to wildfire hazards can take preventative measures, including, home hardening, land management practices that reduce or remove highly flammable grasses and shrubs, instituting or enhancing early warning systems, reducing unplanned human ignitions, reducing adverse health impacts from smoke and fire exposure, and safely and efficiently evacuating people and their animals.

───────────

SENATE RESOLUTION 248—EXPRESSING THE NEED FOR THE FEDERAL GOVERNMENT TO ESTABLISH A NATIONAL BIODIVERSITY STRATEGY FOR PROTECTING BIODIVERSITY FOR CURRENT AND FUTURE GENERATIONS

Mr. MERKLEY (for himself and Mr. BLUMENTHAL) submitted the following resolution; which was referred to the Committee on Environment and Public Works:

S. RES. 248

Whereas the planet is facing an unprecedented biodiversity crisis, largely driven by human activity;

Whereas recent scientific studies have confirmed that human-driven activities are significantly damaging the ecosystems of the planet by—

(1) altering 75 percent of the area of terrestrial environments and 66 percent of marine environments;

(2) directly exploiting wildlife and plant species;

(3) accelerating climate change, directly harming nature and exacerbating other threats;

(4) polluting air, land, and water; and

(5) introducing invasive species;

Whereas recent scientific studies have shown that human-driven threats have harmed biodiversity by—

(1) threatening approximately 1,000,000 species with imminent or near extinction, including—

(A) more than 40 percent of amphibians;

(B) 33 percent of corals, sharks, shark relatives, and marine mammals;

(C) more than 60 percent of cycads and more than 30 percent of conifer trees; and

(D) approximately 10 percent of the more than 5,000,000 insect species on the planet; and

(2) causing population sizes of wild species to decline by—

(A) an average of 68 percent for species of mammals, birds, fish, amphibians, and reptiles;

(B) approximately 3,000,000,000 birds in North America since 1970;

(C) approximately 50 percent for species of live corals; and

(D) an average of more than 20 percent overall;

Whereas human activity is accelerating the decline of important economic and cultural services, including—

(1) land productivity, with a reduction in the productivity of approximately ¼ of the land surface;

(2) land and freshwater resources, with more than ⅓ of the land surface and 75 percent of freshwater resources devoted to crop or livestock production;

(3) global crops with approximately $500,000,000,000 of global crops at risk due to pollinator loss;

(4) marine fisheries, with ⅓ of marine fisheries overfished, 60 percent fished at capacity, and only 7 percent fished below capacity; and

(5) environmental health, with 25 percent of greenhouse gas emissions caused by land clearing, crops, and fertilization;

Whereas the decline of biodiversity disproportionately impacts indigenous and other communities that rely on nature for essential services, including Native Americans and Alaska Natives, who offer unique perspectives and traditional ecological knowledge critical to preserving biodiversity;

Whereas the decline of biodiversity and ecosystem services observed worldwide is occurring in the United States;

Whereas the United States possesses an abundance and great diversity of species of fish, wildlife, and plants that are of significant value to the United States for intrinsic, aesthetic, ecological, educational, cultural, recreational, economic, and scientific reasons;

Whereas the decline of biodiversity presents a direct threat to the security, health, and well-being of the people of the United States by causing economic harm through the loss of valuable ecosystem services, including zoonotic disease buffering, pollination, water filtration, soil replenishment, the provision of game species, medicinal products, and recreational opportunities;

Whereas communities of color, low-income communities, Tribal communities, and other populations that have been systematically and deliberately targeted for environmentally degrading activities and excluded from conservation efforts face disproportionate impacts from biodiversity loss;

Whereas Federal agencies are tasked with protecting and conserving biodiversity in the United States and worldwide through a variety of legal and policy channels;

Whereas there is no coordinating policy to maximize the effectiveness of the conservation efforts of the Federal Government and collaboration by the Federal Government with States, local governments, Indian Tribes, private landowners, and other nongovernmental stakeholders;

Whereas the United States should play a leading role on the international stage in addressing the biodiversity crisis, yet the United States—

(1) is not a party to—

(A) the Convention on Biological Diversity, done at Rio de Janeiro June 5, 1992;

(B) the Convention on the Conservation of Migratory Species of Wild Animals (commonly known as "the Convention on Migratory Species"), done at Bonn November 6, 1979; or

(C) other relevant international agreements;

(2) does not issue a periodic national biodiversity outlook, contrary to most other countries; and

(3) does not have a national biodiversity strategy as part of the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services; and

Whereas scientific research highlights essential pathways forward, including—

(1) establishing the effective conservation, restoration, and durable protection of not less than 30 percent of an ecologically representative area of the lands, freshwater, and oceans in the United States and in the world by 2030 by working collaboratively with governments, land owners, fishers, indigenous peoples, communities, and others;

(2) restoring or rewilding species and degraded habitats, and ensuring integrity and connectivity of protected areas;

(3) retaining and protecting highly intact ecosystems;

(4) reducing pesticide use to levels not higher than necessary for ecologically sustainable and safe food production; and

(5) addressing the threats posed by invasive species: Now, therefore, be it

*Resolved,* That it is the sense of the Senate that—

(1) it is in the national interest for the Federal Government to establish a national biodiversity strategy—

(A) to ensure the conservation and restoration of the biodiversity of the United States;

(B) to secure and restore the ecosystem services provided by nature for current and future generations;

(C) to deliver on the United Nations Sustainable Development Goals;

(D) to set ambitious, yet necessary, goals for protecting biodiversity in the coming decades;

(E) to promote social equity and justice in the conservation of the biodiversity of the United States;

(F) to coordinate the actions of Federal agencies to advance the conservation of biodiversity;

(G) to promote collaboration among Federal, State, and Tribal governments, nongovernmental stakeholders, civil society, and international parties to advance conservation;

(H) to honor the Federal trust obligations to Indian Tribes and Native Americans; and

(I) to provide global leadership in addressing the biodiversity crisis; and

(2) the national biodiversity strategy described in paragraph (1) should include direction on—

(A) achieving the national goal of conserving not less than 30 percent of the land and waters of the United States to protect biodiversity and address climate change by 2030 (referred to in this resolution as "30x30"), supporting international efforts to achieve the same goal on a global scale, and setting other goals necessary to reduce the threats to biodiversity as indicated by the best available scientific information;

(B) taking action to protect threatened, endangered, and at-risk species from further imperilment or extinction;

(C) climate adaptation and mitigation strategies for biodiversity conservation, including—

(i) leading international agreements to combat climate change, including the decision of the 21st Conference of Parties of the United Nations Framework Convention on Climate Change adopted in Paris December 12, 2015 (commonly known as the "Paris Agreement");

(ii) establishing climate refugia and climate corridors for conservation of species affected by climate change; and

(iii) the rapid build-out of renewable energy;

(D) reviewing existing laws, plans, programs, and strategies that are relevant to addressing threats to biodiversity to assess how the laws, plans, programs, and strategies can contribute to the objectives of this resolution and, as necessary, recommending new laws, plans, programs, and strategies;

(E) ensuring integration of biodiversity protection across the activities of the Federal Government, including foreign policy and foreign assistance;

(F) advancing conservation in collaboration with State and Tribal governments and on private lands through incentives, funding, technical support, and partnerships;

(G) incorporating indigenous knowledge and practices to support conservation and biodiversity, safeguarding the rights and needs of indigenous peoples, and ensuring fulfillment of the Federal trust obligations that apply to government decisionmaking that impacts the interests of Native Americans;

(H) ensuring equitable access to nature, inclusive decisionmaking on biodiversity protection, and just allocations of resources to achieve the goals of this resolution, including with respect to systematically and deliberately targeted populations such as communities of color, low-income communities, and Native American communities;

(I) establishing regular monitoring and reporting on the status of biodiversity in the United States and globally, including a quadrennial assessment reported to Congress and the people of the United States;

(J) prioritizing programs to identify knowledge gaps and accelerate research and development of new conservation solutions across sectors;

(K) assessing and integrating the role of the United States in international biodiversity, ecosystem services, and nature conservation in—

(i) national security and foreign policy strategies, including in international development policies, planning and finance, diplomatic dialogues, and trade agreements; and

(ii) advancing global adoption of and progress toward 30x30; and

(L) funding existing conservation programs, developing new funding sources, and reducing subsidies that harm biodiversity in amounts commensurate with the scale of the harm to biodiversity.

---

SENATE RESOLUTION 249—EXPRESSING SUPPORT FOR THE DESIGNATION OF MAY 2025 AS "MENTAL HEALTH AWARENESS MONTH"

Mr. LUJÁN (for himself and Mr. DAINES) submitted the following resolution; which was referred to the Committee on Health, Education, Labor, and Pensions:

S. RES. 249

Whereas millions of people in the United States face mental health challenges and have unmet mental health needs;

Whereas, according to the Centers for Disease Control and Prevention, mental health disorders are chronic conditions, and, without proper diagnosis and treatment, children can face problems at home and in school, which can interfere with the future development of those children;

Whereas more resources should be dedicated in schools to the prevention, early detection, and treatment of mental health disorders in children;

Whereas childhood depression is more likely to persist into adulthood if it is left untreated;

Whereas it is important that the United States provides the necessary funding and resources to reach children and youth early on in life;

Whereas the COVID–19 pandemic accelerated the use of digital technologies, such as social media;

Whereas there has been a great concern about the impact of social media on the mental health of children and youth;

Whereas social media exposes children to bullying, depression, anxiety, and self-harm;

Whereas there is a strong need to further understand and deter any negative impact of social media on children and youth;

Whereas suicide is a significant public health issue that can have an enduring impact on individuals and their communities;

Whereas additional resources should be dedicated to the prevention of suicide in the United States;

Whereas veterans are more likely to experience mental health challenges than civilians;

Whereas it is important that the United States provides additional funding and resources to support veterans with mental health needs; and

Whereas it would be appropriate to observe May 2025 as "Mental Health Awareness Month": Now, therefore, be it

Resolved, That the Senate—

(1) supports the designation of May 2025 as "Mental Health Awareness Month" to remove the stigma associated with mental illness and place emphasis on scientific findings regarding mental health recovery;

(2) declares mental health a national priority;

(3) supports increasing access to mental health services;

(4) recognizes that mental well-being is equally as important as physical well-being for the citizens, communities, schools, businesses, and economy of the United States;

(5) applauds the coalescing of national, State, local, medical, and faith-based organizations in—

(A) working to promote public awareness of mental health; and

(B) providing critical information and support to individuals and families affected by mental illness; and

(6) encourages all individuals to draw on "Mental Health Awareness Month" as an opportunity to promote mental well-being and awareness, ensure access to appropriate coverage and services, and support overall quality of life for those living with mental illness.

---

SENATE RESOLUTION 250—RECOGNIZING NATIONAL FOSTER CARE MONTH AS AN OPPORTUNITY TO RAISE AWARENESS ABOUT THE CHALLENGES OF CHILDREN IN THE FOSTER CARE SYSTEM, AND ENCOURAGING CONGRESS TO IMPLEMENT POLICIES TO IMPROVE THE LIVES OF CHILDREN IN THE FOSTER CARE SYSTEM

Mr. GRASSLEY (for himself, Mr. LUJÁN, Mr. RISCH, Mr. CRAPO, Ms. HASSAN, Mr. BARRASSO, Mr. WARNER, Mr. PADILLA, Mr. KAINE, Mr. CORNYN, Mrs. CAPITO, Mrs. HYDE-SMITH, Mr. MULLIN, Mr. HUSTED, Mrs. BRITT, Mr. WYDEN, Mr. YOUNG, and Ms. KLOBUCHAR) submitted the following resolution; which was considered and agreed to:

S. RES. 250

Whereas National Foster Care Month was established more than 30 years ago—

(1) to bring foster care issues to the forefront;

(2) to highlight the importance of permanency for every child; and

(3) to recognize the essential role that foster parents, social workers, and advocates have in the lives of children in foster care throughout the United States;

Whereas all children deserve a safe, loving, and permanent home;

Whereas the primary goal of the foster care system is to ensure the safety and well-being of children while working to provide a safe, loving, and permanent home for each child;

Whereas there are approximately 368,530 children living in foster care in the United States;

Whereas there were approximately 186,602 youths that entered the foster care system in 2022 in the United States, while more than 108,877 youths were awaiting adoption at the end of 2022;

Whereas approximately 61,585 children entered foster care in 2022 due to parental drug abuse;

Whereas children of color are more likely to stay in the foster care system for longer periods of time and are less likely to be reunited with their biological families;

Whereas foster parents are the front-line caregivers for children who cannot safely remain with their biological parents, and foster parents provide physical care, emotional support, and education advocacy, and are the largest single source of families providing permanent homes for children leaving foster care to adoption;

Whereas children in foster care who are placed with relatives, compared to children placed with non-relatives—

(1) have more stability, including fewer changes in placements;

(2) have more positive perceptions of their placements;

(3) are more likely to be placed with their siblings; and

(4) demonstrate fewer behavioral problems;

Whereas some relative caregivers receive less financial assistance and support services than do foster caregivers;

Whereas an increased emphasis on prevention and reunification services is necessary

to reduce the number of children that enter or re-enter the foster care system;

Whereas approximately 18,538 youths aged out of foster care in 2022 without a legal permanent connection to an adult or family;

Whereas youth who age out of foster care lack the security or support of a biological or adoptive family and frequently struggle to secure affordable housing, obtain health insurance, pursue higher education, and acquire adequate employment;

Whereas foster care is intended to be a temporary placement, but children remain in the foster care system for an average of 22.6 months;

Whereas approximately one-third of children in foster care experience more than 2 placements while in care, which often leads to disruption of routines and the need to change schools and move away from siblings, extended families, and familiar surroundings;

Whereas youth in foster care are much more likely to face educational instability, with a study showing that 75 percent of foster youth experienced an unscheduled school change during a school year, compared to less than 40 percent of youth not in foster care;

Whereas children entering foster care often confront the widespread misperception that children in foster care are disruptive, unruly, and dangerous, even though placement in foster care is based on the actions of a parent or guardian, not the child;

Whereas 30 percent of children in foster care are taking not less than 1 anti-psychotic medication, and 34 percent of those children are not receiving adequate treatment planning or medication monitoring;

Whereas, due to heavy caseloads and limited resources, the average annual turnover rate is between 20 percent and 40 percent for child welfare workers;

Whereas States, localities, and communities should be encouraged to invest resources in preventative and reunification services and post-permanency programs to ensure that more children and older youth in foster care are provided with safe, loving, and permanent placements;

Whereas, in 2018, Congress passed the Family First Prevention Services Act (Public Law 115–123; 132 Stat. 232), which provided new investments in prevention and family reunification services to help more families stay together and ensure more children are in safe, loving, and permanent homes;

Whereas Federal legislation during the past 4 decades, including the Adoption Assistance and Child Welfare Act of 1980 (Public Law 96–272; 94 Stat. 500), the Adoption and Safe Families Act of 1997 (Public Law 105–89; 111 Stat. 2115), the Fostering Connections to Success and Increasing Adoptions Act of 2008 (Public Law 110–351; 122 Stat. 3949), the Child and Family Services Improvement and Innovation Act (Public Law 112–34; 125 Stat. 369), the Preventing Sex Trafficking and Strengthening Families Act (Public Law 113–183; 128 Stat. 1919), and the Supporting America's Children and Families Act (Public Law 118–258; 138 Stat. 2947) provided new investments and services to improve the outcomes of children in the foster care system;

Whereas May 2025 is an appropriate month to designate as "National Foster Care Month" to provide an opportunity to acknowledge the child welfare workforce, foster parents, the advocacy community, and mentors for their dedication, accomplishments, and the positive impact they have on the lives of children; and

Whereas much remains to be done to ensure that all children have a safe, loving, nurturing, and permanent family, regardless of age or special needs: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 2025 as "National Foster Care Month";

(2) recognizes National Foster Care Month as an opportunity to raise awareness about the challenges that children face in the foster care system;

(3) encourages Congress to implement policies to improve the lives of children in the foster care system;

(4) acknowledges the unique needs of children in the foster care system;

(5) recognizes foster youth throughout the United States for their ongoing tenacity, courage, and resilience while facing life challenges;

(6) acknowledges the exceptional alumni of the foster care system who serve as advocates and role models for youth who remain in care;

(7) honors the commitment and dedication of the individuals who work tirelessly to provide assistance and services to children in the foster care system;

(8) supports the designation of May 31, 2025, as "National Foster Parent Appreciation Day";

(9) recognizes National Foster Parent Appreciation Day as an opportunity to recognize the efforts of foster parents to provide safe and loving care for children in need and to raise awareness about the increasing need for foster parents to serve in their communities; and

(10) reaffirms the need to continue working to improve the outcomes of all children in the foster care system through initiatives designed to—

(A) support vulnerable families;

(B) prevent families from entering the foster care system and reunite families in cases where reunification is in the best interest of the child;

(C) promote adoption in cases where reunification is not in the best interests of the child;

(D) adequately serve those children brought into the foster care system; and

(E) facilitate the successful transition into adulthood for youth that "age out" of the foster care system.

―――――――

SENATE RESOLUTION 251—SUPPORTING THE DESIGNATION OF MAY 4 THROUGH MAY 10, 2025, AS "CHILDREN'S MENTAL HEALTH AWARENESS WEEK"

Mr. HUSTED (for himself and Mr. FETTERMAN) submitted the following resolution; which was considered and agreed to:

S. RES. 251

Whereas millions of youth in the United States struggle with mental health challenges, many of which suffer undiagnosed and untreated;

Whereas adults who struggle with mental health often show symptoms in their youth that go unaddressed and can continue later in life;

Whereas childhood and adolescence can be challenging times in life, leaving our youth especially vulnerable to anxiety, depression, bullying, and self-harm;

Whereas stigma surrounding mental health often prevents youth from seeking the help and support they need, which can exacerbate the effects of mental health conditions;

Whereas, according to the Centers for Disease Control and Prevention, mental health conditions are chronic conditions, and untreated mental health conditions can harm the development and well-being of children, impacting their academic, social, and home environments;

Whereas youth suicide continues to be a significant public health crisis, affecting families, individuals, and communities, and there is a need for extensive suicide awareness and prevention programs; and

Whereas May 4 through May 10, 2025, is an opportunity to strengthen public awareness of youth mental health conditions and advocate for meaningful action to improve mental health care for children in the United States: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the designation of May 4 through May 10, 2025, as "Children's Mental Health Awareness Week" to raise awareness of the mental health conditions facing our children and the importance of early detection, treatment, intervention, and prevention strategies;

(2) recognizes the relationship between children's mental health and plenty of outdoor recreation, a healthy diet, regular socialization with peers, and adequate sleep;

(3) urges youth mental health be categorized as a national priority and calls for the continued promotion of mental health in schools and communities;

(4) applauds the collaboration of local, State, and Federal organizations in promoting awareness of youth mental health and providing support for those in need;

(5) advocates for individuals, families, and communities to participate in activities during "Children's Mental Health Awareness Week" to promote mental health initiatives, reduce stigma, and facilitate access to essential services and resources; and

(6) reaffirms the importance of mental health as a necessary aspect of overall well-being and urges continued efforts to facilitate access to mental health care for the children of the United States.

―――――――

SENATE RESOLUTION 252—DESIGNATING MAY 2025 AS "OLDER AMERICANS MONTH"

Mr. SCOTT of Florida (for himself, Mr. KELLY, Mr. JUSTICE, Mr. WARNOCK, Ms. WARREN, Mr. McCORMICK, Mrs. GILLIBRAND, Ms. COLLINS, Mr. TUBERVILLE, Mrs. MOODY, Mr. HUSTED, and Mr. KIM) submitted the following resolution; which was considered and agreed to:

S. RES. 252

Whereas President John F. Kennedy first designated May as "Senior Citizens Month" in 1963;

Whereas, in 1963, only approximately 17,778,000 individuals living in the United States were 65 years of age or older, approximately ⅓ of those individuals lived in poverty, and few programs existed to meet the needs of older individuals in the United States;

Whereas, in 2023, there were more than 59,248,361 individuals who were 65 years of age or older living in the United States and those individuals accounted for 17.7 percent of the total population of the United States;

Whereas approximately 11,216 individuals in the United States turn 65 years of age each day;

Whereas, in 2023, more than 8,402,856 veterans of the Armed Forces were 65 years of age or older;

Whereas older individuals in the United States rely on Federal programs, such as programs under the Social Security Act (42 U.S.C. 301 et seq.), including the Medicare program under title XVIII of that Act (42 U.S.C. 1395 et seq.) and the Medicaid program under title XIX of that Act (42 U.S.C. 1396 et seq.), for financial security and high-quality affordable health care;

Whereas the Older Americans Act of 1965 (42 U.S.C. 3001 et seq.) provides—

(1) supportive services to help older individuals in the United States maintain maximum independence in the homes and communities of those individuals; and

(2) funding for programs that promote social connection and improve the health and well-being of older individuals, including nutrition services, transportation, and care management, which assist more than 10,000,000 older individuals in the United States each year;

Whereas, as local aging network leaders, Area Agencies on Aging are critical partners in the healthy aging continuum;

Whereas, in 2023, an estimated 6,774,000 individuals in the United States who were 65 years of age or older continued to work as full-time, year-round employees;

Whereas older individuals in the United States play an important role in society by continuing to contribute their experience, knowledge, wisdom, and accomplishments;

Whereas older individuals in the United States play vital roles in their communities and remain involved in volunteer work, the arts, cultural activities, and activities relating to mentorship and civic engagement;

Whereas more than 143,000 older individuals serve as AmeriCorps Seniors volunteers in the Foster Grandparent Program, Senior Companion Program, and the Retired and Senior Volunteer Program, helping communities by mentoring and tutoring children, providing independent living support and companionship to other older adults, addressing food insecurity, and more; and

Whereas a society that recognizes the success of older individuals and continues to enhance the access of older individuals to quality and affordable health care will—

(1) encourage the ongoing participation and heightened independence of older individuals; and

(2) ensure the continued safety and well-being of older individuals: Now, therefore, be it

Resolved, That the Senate—

(1) designates May 2025 as "Older Americans Month"; and

(2) encourages the people of the United States to provide opportunities for older individuals to continue to flourish by—

(A) emphasizing the importance and leadership of older individuals through public recognition of the ongoing achievements of older individuals;

(B) presenting opportunities for older individuals to share their wisdom, experience, and skills with younger generations; and

(C) recognizing older individuals as valuable assets in strengthening communities across the United States.

SENATE RESOLUTION 253—CONGRATULATING HIS HOLINESS POPE LEO XIV ON HIS ELECTION TO THE PAPACY

Mr. SCHMITT (for himself, Mr. DURBIN, Ms. COLLINS, Mr. KAINE, Mr. LUJÁN, Mr. RISCH, Mr. PADILLA, Mr. RICKETTS, Mr. ROUNDS, Mr. SULLIVAN, Mr. WELCH, Ms. CORTEZ MASTO, Mr. HOEVEN, and Mr. PAUL) submitted the following resolution; which was considered and agreed to:

S. RES. 253

Whereas the Senate recognizes the historic and spiritual significance of the election of His Holiness Pope Leo XIV as the Bishop of Rome and leader of the worldwide Catholic Church;

Whereas the Senate recognizes the historic and spiritual significance of the first Pope from the United States ever elected to the papacy;

Whereas the Pope serves as a global symbol of peace, compassion, humility, and the pursuit of justice; and

Whereas the election of the new Pope marks a moment of profound importance for over 1,000,000,000 Catholics worldwide, including millions in the United States, and for people of all faiths who are inspired by his message and ministry: Now, therefore, be it

Resolved, That the Senate—

(1) acknowledges the commitment of His Holiness Pope Leo XIV to promoting human dignity, defending the poor and marginalized, advancing interfaith dialogue, and fostering reconciliation and peace throughout the world;

(2) expresses the hope that the strong relationship between the United States and The Holy See will continue to deepen, reflecting shared values of human rights, religious freedom, and global cooperation;

(3) recognizes the significance of the Catholic Church in promoting justice, humanitarian assistance, and moral leadership in the world; and

(4) extends its best wishes for a successful and inspiring pontificate.

SENATE RESOLUTION 254—DESIGNATING JUNE 12, 2025, AS "NATIONAL SEERSUCKER DAY," DESIGNATING EVERY THURSDAY AFTER NATIONAL SEERSUCKER DAY THROUGH THE LAST THURSDAY IN AUGUST 2025 AS "SEERSUCKER THURSDAY," AND DESIGNATING JUNE 2025 AS "SEERSUCKER APPRECIATION MONTH"

Mr. CASSIDY (for himself and Mr. WARNOCK) submitted the following resolution; which was considered and agreed to:

S. RES. 254

Whereas seersucker was introduced to the United States in the South in the middle of the 19th century;

Whereas seersucker suits were popularized in the United States in the early 1900s by New Orleans businessman Joseph Haspel at his Broad Street facility in New Orleans, Louisiana;

Whereas, as a lightweight, hard-wearing fabric, seersucker is mostly worn and enjoyed by the people of the United States during hot summer months;

Whereas former Senator Trent Lott of Mississippi brought Seersucker Thursday to Congress in 1996, and after the day went unobserved in 2012 and 2013, then-Representative Bill Cassidy, with the help of the late Senator Dianne Feinstein, revived the tradition in 2014;

Whereas the Senate will remember the historic service of the late Senator Dianne Feinstein, who shall forever remain a part of this tradition, which Senator Raphael Warnock will continue in her stead;

Whereas the name "seersucker" originates from the Persian phrase "shir-o-shakar", meaning "milk and sugar", alluding to the alternating textures of the fabric;

Whereas the seersucker textile is made of cotton, linen, or silk (or combinations thereof), woven on a loom with threads at different tensions, creating alternating stripes of smooth and puckered textures that do not lay flat on one's skin, which is what makes the fabric so breathable;

Whereas cotton is an important crop that producers in the United States, including 3,500 family farms in Georgia, strive to cultivate in the highest quality; and

Whereas one of the alternating stripes in seersucker is frequently in a color, typically blue, but sometimes gray, green, tan, red, pink, or another color, which, in combination with the white stripes, creates the iconic pattern so well known today: Now, therefore, be it

Resolved, That the Senate—

(1) designates June 12, 2025, as "National Seersucker Day";

(2) designates every Thursday after National Seersucker Day through the last Thursday in August 2025 as "Seersucker Thursday";

(3) designates June 2025 as "Seersucker Appreciation Month";

(4) recognizes the contributions of the hard-working people of the United States through the wearing of seersucker, the unique warm weather clothing known as the working person's uniform;

(5) encourages Senators to support the objective of National Seersucker Day and Seersucker Thursday;

(6) encourages local governments in the United States to build partnerships with local organizations and other members of the clothing industries and enthusiasts to promote the wearing of seersucker; and

(7) invites the people of the United States to don their warm weather finest on National Seersucker Day and every Seersucker Thursday.

SENATE RESOLUTION 255—HONORING THE LIFE, ACHIEVEMENTS, AND LEGACY OF FORMER UNITED STATES SENATOR CHRISTOPHER "KIT" BOND OF MISSOURI

Mr. HAWLEY (for himself, Mr. SCHMITT, Mr. THUNE, Mr. SCHUMER, Ms. ALSOBROOKS, Ms. BALDWIN, Mr. BANKS, Mr. BARRASSO, Mr. BENNET, Mrs. BLACKBURN, Mr. BLUMENTHAL, Ms. BLUNT ROCHESTER, Mr. BOOKER, Mr. BOOZMAN, Mrs. BRITT, Mr. BUDD, Ms. CANTWELL, Mrs. CAPITO, Mr. CASSIDY, Ms. COLLINS, Mr. COONS, Mr. CORNYN, Ms. CORTEZ MASTO, Mr. COTTON, Mr. CRAMER, Mr. CRAPO, Mr. CRUZ, Mr. CURTIS, Mr. DAINES, Ms. DUCKWORTH, Mr. DURBIN, Ms. ERNST, Mr. FETTERMAN, Mrs. FISCHER, Mr. GALLEGO, Mrs. GILLIBRAND, Mr. GRAHAM, Mr. GRASSLEY, Mr. HAGERTY, Ms. HASSAN, Mr. HEINRICH, Mr. HICKENLOOPER, Ms. HIRONO, Mr. HOEVEN, Mr. HUSTED, Mrs. HYDE-SMITH, Mr. JOHNSON, Mr. JUSTICE, Mr. KAINE, Mr. KELLY, Mr. KENNEDY, Mr. KIM, Mr. KING, Ms. KLOBUCHAR, Mr. LANKFORD, Mr. LEE, Mr. LUJÁN, Ms. LUMMIS, Mr. MARKEY, Mr. MARSHALL, Mr. MCCONNELL, Mr. MCCORMICK, Mr. MERKLEY, Mrs. MOODY, Mr. MORAN, Mr. MORENO, Mr. MULLIN, Ms. MURKOWSKI, Mr. MURPHY, Mrs. MURRAY, Mr. OSSOFF, Mr. PADILLA, Mr. PAUL, Mr. PETERS, Mr. REED, Mr. RICKETTS, Mr. RISCH, Ms. ROSEN, Mr. ROUNDS, Mr. SANDERS, Mr. SCHATZ, Mr. SCHIFF, Mr. SCOTT of Florida, Mr. SCOTT of South Carolina, Mrs. SHAHEEN, Mr. SHEEHY, Ms. SLOTKIN, Ms. SMITH, Mr. SULLIVAN, Mr. TILLIS, Mr. TUBERVILLE, Mr. VAN HOLLEN, Mr. WARNER, Mr. WARNOCK, Ms. WARREN, Mr. WELCH, Mr. WHITEHOUSE, Mr. WICKER, Mr. WYDEN, and Mr. YOUNG) submitted the following resolution; which was considered and agreed to:

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 28 of 51

### S. RES. 255

Whereas Christopher Samuel "Kit" Bond, born to Arthur and Elizabeth Bond on March 6, 1939, in St. Louis, Missouri;

Whereas Kit Bond, a sixth-generation Missourian, grew up and lived in Mexico, Missouri, where he devoted his life to public service with integrity, energy, and an unshakable commitment to the people of Missouri and the United States;

Whereas Kit Bond served as Missouri's State Auditor from 1971 to 1973;

Whereas Kit Bond served as the 47th and 49th Governor of Missouri, serving from 1973 to 1977 and again from 1981 to 1985, during which time he was the youngest governor in the State's history when first elected;

Whereas Kit Bond served four terms in the United States Senate from 1987 to 2011, representing the people of Missouri with distinction, advancing conservative values, championing infrastructure, advocating for Missouri farmers, strengthening national defense, and working to secure America's leadership;

Whereas, during his time in the Senate, Kit Bond worked with Missouri developers to expand the availability of housing throughout the State and played a key role in growing the Parents as Teachers program statewide;

Whereas, during his time in the Senate, Kit Bond was a strong supporter of literacy programs and efforts to make high-quality care more accessible for women and children;

Whereas Kit Bond was a dedicated public servant for more than 40 years;

Whereas Kit Bond passed away on May 13, 2025, leaving behind a legacy of service, integrity, and love for Missouri and the Nation; and

Whereas Kit Bond is survived by his wife, Linda, his son, Sam, and two grandchildren: Now, therefore, be it

*Resolved,* That the Senate—

(1) has heard with profound sorrow and deep regret the announcement of the death of Christopher "Kit" Bond, former member of the Senate;

(2) directs the Secretary of the Senate to communicate this resolution to the House of Representatives and transmit an enrolled copy of this resolution to the family of Christopher "Kit" Bond; and

(3) stands adjourned, as a further mark of respect to the memory of the late Christopher "Kit" Bond, when the Senate adjourns today.

---

### SENATE RESOLUTION 256—DESIGNATING MAY 2025 AS "AMERICAN STROKE MONTH"

Mr. LUJÁN submitted the following resolution; which was referred to the Committee on the Judiciary:

#### S. RES. 256

Whereas quick identification and treatment for stroke results in a higher chance of survival and reduces recovery time for individuals experiencing a stroke;

Whereas treatment depends on the type of stroke someone is having, which must be diagnosed by a health care professional;

Whereas, when dealing with a time-sensitive medical emergency like a stroke, the right care, at the right time, at the right facility, is of the utmost importance;

Whereas a system of care allows for scientifically proven measures to be applied to every patient, every time;

Whereas, every 40 seconds, someone in the United States has a stroke;

Whereas stroke is a leading cause of serious long-term disability and the fifth-leading cause of death in the United States, causing more than 160,000 deaths each year;

Whereas nearly ½ of adults in the United States have high blood pressure, which is a leading cause and controllable risk factor for stroke;

Whereas the "F.A.S.T." warning signs and symptoms of stroke include face drooping, arm weakness, speech difficulty, and time to call 911;

Whereas, during American Stroke Month in May, and year-round, the "Together to End Stroke" initiative of the American Stroke Association strives to teach people everywhere that stroke is largely preventable, treatable, and beatable; and

Whereas more research and education is needed to help prevent and treat stroke: Now, therefore, be it

*Resolved,* That the Senate—

(1) designates May 2025 as "American Stroke Month";

(2) recognizes and reaffirms the commitment of the Federal Government and people of the United States to fighting stroke—

(A) by promoting awareness about the causes, risks, and prevention of stroke;

(B) by supporting research on stroke; and

(C) by improving access to affordable, quality care to reduce long-term disability and mortality;

(3) commends the efforts of States, territories, and possessions of the United States, localities, nonprofit organizations, businesses and other entities, and the people of the United States who support American Stroke Month; and

(4) encourages all individuals in the United States to familiarize themselves with the risk factors associated with stroke, recognize the warning signs and symptoms, and on first sign of a stroke, dial 911 immediately in order to begin to reduce the devastating effects of stroke on the population of the United States.

---

### SENATE RESOLUTION 257—EXPRESSING THE SENSE OF THE SENATE CONCERNING THE ARREST AND CONTINUED DETENTION OF EKREM İMAMOĞLU AND URGING THE GOVERNMENT OF TÜRKIYE TO UPHOLD DEMOCRATIC VALUES

Mr. SCHIFF (for himself and Mr. DURBIN) submitted the following resolution; which was referred to the Committee on Foreign Relations:

#### S. RES. 257

Whereas the Republic of Türkiye is a member of the North Atlantic Treaty Organization, an important ally of the United States, and, for many years, had been on a path to join the European Union, a process that involved important democratic and other reforms;

Whereas Ekrem İmamoğlu was elected as Mayor of Istanbul, Türkiye, in 2019, and was reelected in 2024;

Whereas Mr. İmamoğlu was widely seen as a likely opposition party candidate to compete in the 2028 Türkiye presidential election;

Whereas, on March 19, 2025, Turkish police detained Mr. İmamoğlu along with more than 100 other politicians, journalists, and businessmen;

Whereas, on March 23, 2025, Ekrem İmamoğlu was formally arrested and charged with corruption and terrorism charges, including establishing and managing a criminal organization, taking bribes, extortion, and aiding the Kurdistan Workers' Party (PKK), and was subsequently charged with threatening Istanbul Chief Prosecutor Akin Gürlek;

Whereas the Government of Türkiye has not provided any credible evidence to the public to support the charges against Mr. İmamoğlu;

Whereas widespread protests opposing the arrest and detention of Mr. İmamoğlu have erupted throughout Türkiye, constituting the largest anti-government protests in Türkiye since the Gezi Park protests in 2013;

Whereas numerous human rights and pro-democracy organizations and political figures in Türkiye have condemned the charges against Mr. İmamoğlu as baseless and politically motivated;

Whereas, on March 23, 2025, the Republican People's Party, the main opposition party in Türkiye, formally nominated Ekrem İmamoğlu as the party's candidate for president after receiving nearly 15,000,000 votes in the primary election;

Whereas, on April 11, 2025, Ekrem İmamoğlu appeared in court in Istanbul and denied all charges brought against him;

Whereas the Government of Türkiye, under the presidency of Recep Tayyip Erdoğan, has engaged in actions that undermine democracy and the rule of law, as evidenced in the Department of State's 2023 Country Reports on Human Rights Practices, which states the Government of Türkiye—

(1) "restricted equal competition and placed restrictions on the fundamental freedoms of peaceful assembly and expression"; and

(2) "restricted the activities of opposition political parties, leaders, and officials, including through police detention";

Whereas the leadership of the Government of Türkiye has been subject to numerous allegations of corruption since 2013;

Whereas May 19, 2025, marks 2 months since Ekrem İmamoğlu was arbitrarily detained in government custody;

Whereas on March 19, 2025, European Commission President Ursula von der Leyen called the arrest of Mayor İmamoğlu "deeply concerning'' and stated, "Türkiye must uphold the democratic values, especially the rights of elected officials";

Whereas on March 26, 2025, Elizabeth Throssell, a spokesperson for the United Nations Office of the High Commissioner on Human Rights, referencing the March 19, 2025 arrests of protesters by the Turkish police, that all those detained "for the legitimate exercise of their rights must be released immediately and unconditionally" and that those facing charges "should be treated with dignity" and "their rights to due process and a fair trial, including access to a lawyer of their own choice, must be fully ensured";

Whereas on April 9, 2025, the Parliamentary Assembly of the Council of Europe called on the Government of Türkiye "to release immediately Ekrem İmamoğlu"; and

Whereas on May 8, 2025, Turkish authorities blocked the social media account of Mayor İmamoğlu, preventing him from communicating with his supporters: Now, therefore, be it

*Resolved,* That the Senate—

(1) calls on President Erdoğan and law enforcement authorities in Türkiye to present any credible evidence against Ekrem İmamoğlu or immediately release him from detention;

(2) urges the Government of Türkiye to uphold democratic values, including free and fair elections; and

(3) urges the Secretary of State to issue forceful and timely statements and to engage diplomatically with the Government of Türkiye over anti-democratic behavior.

## AMENDMENTS SUBMITTED AND PROPOSED

SA 2266. Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table.

SA 2267. Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2268. Ms. SLOTKIN (for herself and Ms. LUMMIS) submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2269. Mr. CORNYN (for himself, Ms. CORTEZ MASTO, and Mr. SULLIVAN) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2270. Mr. MERKLEY (for himself, Mr. SCHUMER, Ms. WARREN, Mr. PETERS, Mr. REED, Mr. MURPHY, and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2271. Mr. MERKLEY (for himself and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2272. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2273. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2274. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2275. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2276. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

SA 2277. Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 2266.** Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ___. AUDIT REFORM AND TRANSPARENCY FOR THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.**

(a) IN GENERAL.—Notwithstanding section 714 of title 31, United States Code, or any other provision of law, the Comptroller General of the United States shall complete an audit of the Board of Governors of the Federal Reserve System and the Federal reserve banks under subsection (b) of that section not later than 12 months after the date of enactment of this Act.

(b) REPORT.—

(1) IN GENERAL.—Not later than 90 days after the date on which the audit required pursuant to subsection (a) is completed, the Comptroller General of the United States—

(A) shall submit to Congress a report on the audit; and

(B) shall make the report described in subparagraph (A) available to the Speaker of the House, the majority and minority leaders of the House of Representatives, the majority and minority leaders of the Senate, the Chair and Ranking Member of the committee and each subcommittee of jurisdiction in the House of Representatives and the Senate, and any other Member of Congress who requests the report.

(2) CONTENTS.—The report required under paragraph (1) shall include a detailed description of the findings and conclusion of the Comptroller General of the United States with respect to the audit that is the subject of the report, together with such recommendations for legislative or administrative action as the Comptroller General of the United States may determine to be appropriate.

(c) REPEAL OF CERTAIN LIMITATIONS.—Subsection (b) of section 714 of title 31, United States Code, is amended by striking the second sentence.

(d) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) IN GENERAL.—Section 714 of title 31, United States Code, is amended—

(A) in subsection (d)(3), by striking "or (f)" each place the term appears;

(B) in subsection (e), by striking "the third undesignated paragraph of section 13" and inserting "section 13(3)"; and

(C) by striking subsection (f).

(2) FEDERAL RESERVE ACT.—Subsection (s) (relating to "Federal Reserve Transparency and Release of Information") of section 11 of the Federal Reserve Act (12 U.S.C. 248) is amended—

(A) in paragraph (4)(A), by striking "has the same meaning as in section 714(f)(1)(A) of title 31, United States Code" and inserting "means a program or facility, including any special purpose vehicle or other entity established by or on behalf of the Board of Governors of the Federal Reserve System or a Federal reserve bank, authorized by the Board of Governors under section 13(3), that is not subject to audit under section 714(e) of title 31, United States Code";

(B) in paragraph (6), by striking "or in section 714(f)(3)(C) of title 31, United States Code, the information described in paragraph (1) and information concerning the transactions described in section 714(f) of such title," and inserting "the information described in paragraph (1)"; and

(C) in paragraph (7), by striking "and section 13(3)(C), section 714(f)(3)(C) of title 31, United States Code, and" and inserting ", section 13(3)(C), and".

**SA 2267.** Mr. PAUL submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 8, strike line 3 and all that follows through page 12, line 24, and insert the following:

(12) ELIGIBILITY.—Nothing in this Act shall

**SA 2268.** Ms. SLOTKIN (for herself and Ms. LUMMIS) submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

On page 98, between lines 16 and 17, insert the following:

(4) MITIGATION OF CERTAIN RISKS.—A State payment stablecoin regulator or appropriate Federal banking agency may, by rule or order, limit, condition, or prohibit the application of paragraph (2), in whole or in part, where necessary to mitigate systemic risk, protect depositors and consumers, address liquidity or operational risks, or preserve the safety and soundness of insured depository institutions. In prescribing any such rule or order, the regulators shall tailor requirements based on the nature of the custodial arrangement, the type and risk profile of the permitted payment stablecoin issuer, the size and complexity of the insured depository institution, and the scope of commingled activity.

**SA 2269.** Mr. CORNYN (for himself, Ms. CORTEZ MASTO, and Mr. SULLIVAN) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the end, add the following:

**TITLE II—FOREIGN INVESTMENT GUARDRAILS TO HELP THWART CHINA ACT OF 2025**

**SEC. 201. SHORT TITLE.**

This title may be cited as the "Foreign Investment Guardrails to Help Thwart China Act of 2025" or "FIGHT China Act of 2025".

**SEC. 202. SECRETARY DEFINED.**

Except as otherwise provided, in this title, the term "Secretary" means the Secretary of the Treasury.

**SEC. 203. SEVERABILITY.**

If any provision of this title, or the application thereof, is held invalid, the validity of the remainder of this title and the application of such provision to other persons and circumstances shall not be affected thereby.

**SEC. 204. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There is authorized to be appropriated $150,000,000 to the Department of the Treasury, out of which amounts may be transferred to the Department of Commerce to jointly conduct outreach to industry and persons affected by this title, for each of the first two fiscal years beginning on or after the date of the enactment of this Act, to carry out this title.

(b) HIRING AUTHORITY.—

(1) BY THE PRESIDENT.—The President may appoint, without regard to the provisions of sections 3309 through 3318 of title 5, United States Code, not more than 15 individuals directly to positions in the competitive service (as defined in section 2102 of that title) to carry out this title.

(2) BY AGENCIES.—The Secretary and the Secretary of Commerce may appoint, without regard to the provisions of sections 3309 through 3318 of title 5, United States Code, individuals directly to positions in the competitive service (as defined in section 2102 of that title) of the Department of the Treasury and the Department of Commerce, respectively, to carry out this title.

**SEC. 205. TERMINATION.**

This title shall cease to have any force or effect on the date on which the Secretary of Commerce revises section 791.4 of title 15, Code of Federal Regulations, to remove the People's Republic of China from the list of foreign adversaries contained in such section.

### Subtitle A—Imposition of Sanctions

**SEC. 211. IMPOSITION OF SANCTIONS.**

(a) IN GENERAL.—The President may impose the sanctions described in subsection (b) with respect to any foreign person determined by the Secretary, in consultation with the Secretary of State, to be a covered foreign person.

(b) SANCTIONS DESCRIBED.—The President may exercise all of the powers granted to the

President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of a foreign person that is determined to be a covered foreign person pursuant to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to any person who violates, attempts to violate, conspires to violate, or causes a violation of any prohibition of this section, or an order or regulation prescribed under this section, to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of such Act (50 U.S.C. 1705(a)).

(d) EXCEPTION FOR INTELLIGENCE AND LAW ENFORCEMENT ACTIVITIES.—Sanctions under this section shall not apply with respect to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(e) EXCEPTION FOR UNITED STATES GOVERNMENT ACTIVITIES.—Nothing in this section shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

(f) REPORT TO CONGRESS.—Not later than 365 days after the date of the enactment of this Act, and annually thereafter for 7 years, the Secretary shall submit to the appropriate congressional committees a report that—

(1) states whether each foreign person on the Non-SDN Chinese Military-Industrial Complex Companies List is a covered foreign person; and

(2) shall be submitted in unclassified form, but may include a classified annex.

(g) CONSIDERATION OF CERTAIN INFORMATION IN IMPOSING SANCTIONS.—In determining whether a foreign person is a covered foreign person, the President—

(1) may consider credible information obtained by other countries, nongovernmental organizations, or the appropriate congressional committees that relates to the foreign person; and

(2) may consider any other information that the Secretary deems relevant.

(h) ADMINISTRATIVE PROVISIONS.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this section.

(i) DELEGATION.—The President shall delegate the authorities granted by this section to the Secretary.

**SEC. 212. DEFINITIONS.**

In this title:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Financial Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Banking, Housing, and Urban Affairs and the Committee on Foreign Relations of the Senate.

(2) COUNTRY OF CONCERN.—The term "country of concern"—

(A) means the People's Republic of China; and

(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

(3) COVERED FOREIGN PERSON.—The term "covered foreign person" means a foreign person—

(A)(i) that is incorporated in, has a principal place of business in, or is organized under the laws of a country of concern;

(ii) the equity securities of which are primarily traded in the ordinary course of business on one or more exchanges in a country of concern;

(iii) that is a member of the Central Committee of the Chinese Communist Party;

(iv) that is the state or the government of a country of concern, as well as any political subdivision, agency, or instrumentality thereof;

(v) that is subject to the direction or control of any entity described in clause (i), (ii), (iii), or (iv); or

(vi) that is owned in the aggregate, directly or indirectly, 50 percent or more by an entity or a group of entities described in clause (i), (ii), (iii), or (iv); and

(B) that knowingly engaged in significant operations in the defense and related materiel sector or the surveillance technology sector of the economy of a country of concern.

(4) FOREIGN PERSON.—The term "foreign person" means a person, country, state, or government (and any political subdivision, agency, or instrumentality thereof) that is not a United States person.

(5) NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.—The term "Non-SDN Chinese Military-Industrial Complex Companies List" means the list maintained by the Office of Foreign Assets Control of the Department of the Treasury under Executive Order 13959, as amended by Executive Order 14032 (50 U.S.C. 1701 note; relating to addressing the threat from securities investments that finance certain companies of the People's Republic of China), or any successor order.

(6) UNITED STATES PERSON.—The term "United States person" means—

(A) any United States citizen or an alien lawfully admitted for permanent residence to the United States;

(B) an entity organized under the laws of the United States or of any jurisdiction within the United States (including any foreign branch of such an entity); or

(C) any person in the United States.

**Subtitle B—Prohibition and Notification on Investments Relating to Covered National Security Transactions**

**SEC. 221. PROHIBITION AND NOTIFICATION ON INVESTMENTS RELATING TO COVERED NATIONAL SECURITY TRANSACTIONS.**

The Defense Production Act of 1950 (50 U.S.C. 4501 et seq.) is amended by adding at the end the following:

**"TITLE VIII—PROHIBITION AND NOTIFICATION ON INVESTMENTS RELATING TO COVERED NATIONAL SECURITY TRANSACTIONS**

**"SEC. 801. PROHIBITION ON INVESTMENTS.**

"(a) IN GENERAL.—The Secretary may prohibit, in accordance with regulations issued under subsection (e), a United States person from knowingly engaging in a covered national security transaction in a prohibited technology.

"(b) EVASION.—Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in subsection (a) is prohibited.

"(c) WAIVER.—Subject to subsection (d), the Secretary is authorized to exempt from the prohibition set forth in subsection (a) any activity determined by the President, in consultation with the Secretary, the Sec-

retary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, to be in the national interest of the United States.

"(d) CONGRESSIONAL NOTIFICATION.—The Secretary shall—

"(1) notify the appropriate congressional committees not later than 5 business days after issuing a waiver under subsection (c); and

"(2) include in such notification an identification of the national interest justifying the use of the waiver.

"(e) REGULATIONS.—

"(1) IN GENERAL.—The Secretary, in consultation with the Secretary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, may issue regulations to carry out this section in accordance with subchapter II of chapter 5 and chapter 7 of title 5, United States Code (commonly known as 'Administrative Procedure Act').

"(2) NON-BINDING FEEDBACK.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall include a process under which a person can request non-binding feedback on a confidential basis as to whether a transaction would constitute a covered national security transaction in a prohibited technology.

"(B) AUTHORITY TO LIMIT FRIVOLOUS FEEDBACK REQUESTS.—In establishing the process required by subparagraph (A), the Secretary may prescribe limitations on requests for feedback identified as frivolous for purposes of this subsection.

"(3) NOTICE AND OPPORTUNITY TO CURE.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall account for whether a United States person has self-identified a violation of the prohibition set forth in subsection (a) in determining the legal consequences of that violation.

"(B) SELF-DISCLOSURE LETTERS.—The regulations issued under paragraph (1) shall dictate the form and content of a letter of self-disclosure, which shall include relevant facts about the violation, why the United States person believes its activity to have violated the prohibition set forth in subsection (a), and a proposal for mitigation of the harm of such action.

"(4) PUBLIC NOTICE AND COMMENT.—The regulations issued under paragraph (1) shall be subject to public notice and comment.

"(5) LOW-BURDEN REGULATIONS.—In issuing regulations under paragraph (1), the Secretary shall balance the priority of protecting the national security interest of the United States while, to the extent practicable—

"(A) minimizing the cost and complexity of compliance for affected parties, including the duplication of reporting requirements under current regulations;

"(B) adopting the least burdensome alternative that achieves regulatory objectives; and

"(C) prioritizing transparency and stakeholder involvement in the process of issuing the rules.

"(6) PENALTIES.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall provide for the imposition of civil penalties described in subparagraph (B) for violations of the prohibition set forth in subsection (a).

"(B) PENALTIES DESCRIBED.—

"(i) UNLAWFUL ACTS.—It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, notification requirement, or prohibition issued under this section.

"(ii) CIVIL PENALTY.—The Secretary may impose a civil penalty on any person who commits an unlawful act described in clause

Case 4:25-cv-04966-HSG Document 1-4 Filed 06/12/25 Page 31 of 51

(i) in an amount not to exceed the greater of—

"(I) $250,000; or

"(II) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

"(iii) DIVESTMENT.—The Secretary may compel the divestment of a covered national security transaction in a prohibited technology determined to be in violation of this title.

"(iv) RELIEF.—The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this title.

"(7) BURDEN OF PROOF.—In accordance with section 556(d) of title 5, United States Code, in an enforcement action for a violation of the prohibition set forth in subsection (a), the burden of proof shall be upon the Secretary.

"SEC. 802. NOTIFICATION ON INVESTMENTS.

"(a) MANDATORY NOTIFICATION.—Not later than 450 days after the date of the enactment of this title, the Secretary shall issue regulations prescribed in accordance with subsection (b), to require a United States person that engages in a covered national security transaction in a prohibited technology (unless the Secretary has exercised the authority provided by section 801(a) to prohibit knowingly engaging in such covered national security transaction) or a notifiable technology to submit to the Secretary a written notification of the transaction not later than 30 days after the completion date of the transaction.

"(b) REGULATIONS.—

"(1) IN GENERAL.—Not later than 450 days after the date of the enactment of this title, the Secretary, in consultation with the Secretary of Commerce and, as appropriate, the heads of other relevant Federal departments and agencies, shall issue regulations to carry out this section in accordance with subchapter II of chapter 5 and chapter 7 of title 5, United States Code (commonly known as 'Administrative Procedure Act').

"(2) PUBLIC NOTICE AND COMMENT.—The regulations issued under paragraph (1) shall be subject to public notice and comment.

"(3) LOW-BURDEN REGULATIONS.—In issuing regulations under paragraph (1), the Secretary shall balance the priority of protecting the national security interest of the United States while, to the extent practicable—

"(A) minimizing the cost and complexity of compliance for affected parties, including the duplication of reporting requirements under current regulation;

"(B) adopting the least burdensome alternative that achieves regulatory objectives; and

"(C) prioritizing transparency and stakeholder involvement in the process of issuing the rules.

"(4) PENALTIES.—

"(A) IN GENERAL.—The regulations issued under paragraph (1) shall provide for the imposition of civil penalties described in subparagraph (B) for violations of the notification requirement set forth in subsection (a).

"(B) PENALTIES DESCRIBED.—

"(i) UNLAWFUL ACTS.—It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, notification requirement, or prohibition issued under this section.

"(ii) CIVIL PENALTY.—A civil penalty may be imposed on any person who commits an unlawful act described in clause (i) in an amount not to exceed the greater of—

"(I) $250,000; or

"(II) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

"(5) BURDEN OF PROOF.—In accordance with section 556(d) of title 5, United States Code, in an enforcement action for a violation of the prohibition set forth in subsection (a), the burden of proof shall be upon the Secretary.

"(6) COMPLETENESS OF NOTIFICATION.—

"(A) IN GENERAL.—The Secretary shall, upon receipt of a notification under subsection (a), and in consultation with the Secretary of Commerce, promptly inspect the notification for completeness.

"(B) INCOMPLETE NOTIFICATIONS.—If a notification submitted under subsection (a) is incomplete, the Secretary shall promptly inform the United States person that submits the notification that the notification is not complete and provide an explanation of relevant material respects in which the notification is not complete.

"(7) IDENTIFICATION OF NON-NOTIFIED ACTIVITY.—The Secretary, in coordination with the Secretary of Commerce, shall establish a process to identify covered national security transactions in a prohibited technology or a notifiable technology for which—

"(A) a notification is not submitted to the Secretary under subsection (a); and

"(B) information is reasonably available.

"(c) CONFIDENTIALITY OF INFORMATION.—

"(1) IN GENERAL.—Except as provided in paragraph (2), any information or documentary material filed with the Secretary pursuant to this section shall be exempt from disclosure under section 552(b)(3) of title 5, United States Code, and no such information or documentary material may be made public by any government agency or Member of Congress.

"(2) EXCEPTIONS.—The exemption from disclosure provided by paragraph (1) shall not prevent the disclosure of the following:

"(A) Information relevant to any administrative or judicial action or proceeding.

"(B) Information provided to Congress or any of the appropriate congressional committees.

"(C) Information important to the national security analysis or actions of the Secretary to any domestic governmental entity, or to any foreign governmental entity of an ally or partner of the United States, under the direction and authorization of the Secretary, only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

"(D) Information that the parties have consented to be disclosed to third parties.

"(E) Information where the disclosure of such information is determined by the Secretary to be in the national security interest.

"(d) INAPPLICABILITY.—If the Secretary prohibits a covered national security transaction in a prohibited technology under section 801, the requirements of this section shall not apply with respect to the covered national security transaction.

"SEC. 803. REPORT.

"(a) IN GENERAL.—Not later than one year after the date on which the regulations issued under section 801(e) take effect, and not less frequently than annually thereafter for 7 years, the Secretary, in consultation with the Secretary of Commerce, shall submit to the appropriate congressional committees a report that—

"(1) lists all enforcement actions taken subject to the regulations during the year preceding submission of the report, which includes, with respect to each such action, a description of—

"(I) $250,000; or

"(II) an amount that is twice the amount of the transaction that is the basis of the violation with respect to which the penalty is imposed.

"(5) BURDEN OF PROOF.—In accordance with section 556(d) of title 5, United States Code, in an enforcement action for a violation of the prohibition set forth in subsection (a), the burden of proof shall be upon the Secretary.

"(6) COMPLETENESS OF NOTIFICATION.—

"(A) IN GENERAL.—The Secretary shall, upon receipt of a notification under subsection (a), and in consultation with the Secretary of Commerce, promptly inspect the notification for completeness.

"(B) INCOMPLETE NOTIFICATIONS.—If a notification submitted under subsection (a) is incomplete, the Secretary shall promptly inform the United States person that submits the notification that the notification is not complete and provide an explanation of relevant material respects in which the notification is not complete.

"(7) IDENTIFICATION OF NON-NOTIFIED ACTIVITY.—The Secretary, in coordination with the Secretary of Commerce, shall establish a process to identify covered national security transactions in a prohibited technology or a notifiable technology for which—

"(A) the prohibited technology or notifiable technology;

"(B) the covered national security transaction; and

"(C) the covered foreign person;

"(2) provides an assessment of whether Congress should amend the definition of the term 'prohibited technology' by—

"(A) identifying additional technologies, not currently listed as a prohibited technology, that the Secretary, in consultation with the Secretary of Commerce and, as applicable, the Secretary of Defense, the Secretary of State, the Secretary of Energy, the Director of National Intelligence, and the heads of any other relevant Federal agencies, determines may pose an acute threat to the national security of the United States if developed or acquired by a country of concern;

"(B) explaining why each technology identified in subparagraph (A) may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

"(C) recommending the repeal of technologies from the category of prohibited technology to the extent that the technologies no longer pose an acute threat to the national security of the United States if developed or acquired by a country of concern;

"(3) lists all notifications submitted under section 802 during the year preceding submission of the report and includes, with respect to each such notification—

"(A) basic information on each party to the covered national security transaction with respect to which the notification was submitted; and

"(B) the nature of the covered national security transaction that was the subject to the notification, including the elements of the covered national security transaction that necessitated a notification;

"(4) includes a summary of those notifications, disaggregated by prohibited technology, notifiable technology, by covered national security transaction, and by country of concern;

"(5) provides additional context and information regarding trends in the prohibited technology, notifiable technology, the types of covered national security transaction, and the countries involved in those notifications; and

"(6) assesses the overall impact of those notifications, including recommendations for—

"(A) expanding existing Federal programs to support the production or supply of prohibited technologies or notifiable technologies in the United States, including the potential of existing authorities to address any related national security concerns;

"(B) investments needed to enhance prohibited technologies or notifiable technologies and reduce dependence on countries of concern regarding those technologies; and

"(C) the continuation, expansion, or modification of the implementation and administration of this title, including recommendations with respect to whether the definition of the term 'country of concern' under section 807(2) should be amended to add or remove countries.

"(b) CONSIDERATION OF CERTAIN INFORMATION.—In preparing the report pursuant to subsection (a), the Secretary—

"(1) shall consider information provided jointly by the chairperson and ranking member of any of the appropriate congressional committees;

"(2) may consider credible information obtained by other countries and nongovernmental organizations that monitor the military, surveillance, intelligence, or technology capabilities of a country of concern; and

Case 4:25-cv-04966-HSG   Document 1-4   Filed 06/12/25   Page 32 of 51

"(3) may consider any other information that the Secretary deems relevant.

"(c) FORM OF REPORT.—Each report required by this section shall be submitted in unclassified form, but may include a classified annex.

"(d) TESTIMONY REQUIRED.—Not later than one year after the date of the enactment of this title, and annually thereafter for five years, the Secretary and the Secretary of Commerce shall each provide to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives testimony with respect to the national security threats relating to investments by United States persons in countries of concern and broader international capital flows.

"(e) REQUESTS BY APPROPRIATE CONGRESSIONAL COMMITTEES.—

"(1) IN GENERAL.—After receiving a request that meets the requirements of paragraph (2) with respect to whether a technology should be included in the amendments as described in subsection (a)(2), the Secretary shall, in preparing the report pursuant to subsection (a)—

"(A) determine if that technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

"(B) include in the report pursuant to subsection (a) an explanation with respect to that determination that includes—

"(i) a statement of whether or not the technology, as determined by the Secretary, may pose an acute threat to the national security of the United States if developed or acquired by a country of concern; and

"(ii) if the Secretary determines that—

"(I) the technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern, an explanation for such determination and a recommendation whether that technology should be named a prohibited technology or a notifiable technology; and

"(II) the technology would not pose an acute threat to the national security of the United States if developed or acquired by a country of concern, an explanation for such determination.

"(2) REQUIREMENTS.—A request under paragraph (1) with respect to whether a technology may pose an acute threat to the national security of the United States if developed or acquired by a country of concern shall be submitted to the Secretary in writing jointly by the chairperson and ranking member of one or more of the appropriate congressional committees.

**"SEC. 804. MULTILATERAL ENGAGEMENT AND COORDINATION.**

"(a) AUTHORITIES.—The Secretary, in coordination with the Secretary of State, the Secretary of Commerce, and the heads of other relevant Federal agencies, should—

"(1) conduct bilateral and multilateral engagement with the governments of countries that are allies and partners of the United States to promote and increase coordination of protocols and procedures to facilitate the effective implementation of and appropriate compliance with the prohibitions pursuant to this title;

"(2) upon adoption of protocols and procedures described in paragraph (1), work with those governments to establish mechanisms for sharing information, including trends, with respect to such activities; and

"(3) work with and encourage the governments of countries that are allies and partners of the United States to develop similar mechanisms of their own, for the exclusive purpose of preventing the development or acquisition of prohibited technologies by a country of concern.

"(b) STRATEGY FOR MULTILATERAL ENGAGEMENT AND COORDINATION.—Not later than 180 days after the date of the enactment of this title, the Secretary, in consultation with the Secretary of State, the Secretary of Commerce, and the heads of other relevant Federal agencies, should—

"(1) develop a strategy to work with the governments of countries that are allies and partners of the United States to develop mechanisms that are comparable to the prohibitions pursuant to this title, for the exclusive purpose of preventing the development and acquisition of prohibited technologies by a country of concern; and

"(2) assess opportunities to provide technical assistance to those countries with respect to the development of those mechanisms.

"(c) REPORT.—Not later than one year after the date of the enactment of this title, and annually thereafter for four years, the Secretary shall submit to the appropriate congressional committees a report that includes—

"(1) a discussion of any strategy developed pursuant to subsection (b)(1), including key tools and objectives for the development of comparable mechanisms by the governments of allies and partners of the United States;

"(2) a list of partner and allied countries to target for cooperation in developing their own prohibitions;

"(3) the status of the strategy's implementation and outcomes; and

"(4) a description of impediments to the establishment of comparable mechanisms by governments of allies and partners of the United States.

"(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term 'appropriate congressional committees' means—

"(1) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

"(2) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives.

**"SEC. 805. PUBLIC DATABASE OF COVERED FOREIGN PERSONS.**

"(a) IN GENERAL.—The Secretary, in consultation with the Secretary of Commerce, may establish a publicly accessible, non-exhaustive database that identifies covered foreign persons in a prohibited technology pursuant to this title.

"(b) CONFIDENTIALITY OF EVIDENCE.—The Secretary shall establish a mechanism for the public, including Congress, stakeholders, investors, and nongovernmental organizations, to submit evidence on a confidential basis regarding whether a foreign person is a covered foreign person in a prohibited technology and should be included in the database described in subsection (a), if any.

"(c) EXEMPTION FROM DISCLOSURE.—

"(1) IN GENERAL.—Except as provided in paragraph (2), any information or documentary material filed with the Secretary pursuant to this section shall be exempt from disclosure under section 552(b)(3) of title 5, United States Code, and no such information or documentary material may be made public (other than the identity of a covered foreign person in accordance with subsection (b)).

"(2) EXCEPTIONS.—Paragraph (1) shall not prohibit the disclosure of the following:

"(A) Information relevant to any administrative or judicial action or proceeding.

"(B) Information to Congress or any duly authorized committee or subcommittee of Congress.

"(C) Information important to the national security analysis or actions of the Secretary to any domestic governmental entity, or to any foreign governmental entity of a United States ally or partner, under the exclusive direction and authorization of the Secretary, only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

"(D) Information that the parties have consented to be disclosed to third parties.

"(d) RULE OF CONSTRUCTION.—The database described in subsection (a), if any, shall not be considered to be an exhaustive or comprehensive list of covered foreign persons for the purposes of this title.

**"SEC. 806. RULE OF CONSTRUCTION.**

"Nothing in this title may be construed to negate the authority of the President under any authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, or any other authority of the President or the Congress under the Constitution of the United States.

**"SEC. 807. DEFINITIONS.**

"In this title:

"(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—Except as provided by section 804(d), the term 'appropriate congressional committees' means—

"(A) the Committee on Financial Services, the Committee on Foreign Affairs, the Committee on Energy and Commerce, and the Committee on Appropriations of the House of Representatives; and

"(B) the Committee on Banking, Housing, and Urban Affairs and the Committee on Appropriations of the Senate.

"(2) COUNTRY OF CONCERN.—The term 'country of concern'—

"(A) means the People's Republic of China; and

"(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

"(3) COVERED FOREIGN PERSON.—Subject to regulations prescribed in accordance with this title, the term 'covered foreign person' means a foreign person that—

"(A) is incorporated in, has a principal place of business in, or is organized under the laws of a country of concern;

"(B) is a member of the Central Committee of the Chinese Communist Party;

"(C) is subject to the direction or control of a country of concern, an entity described in subparagraph (A) or (B), or the state or the government of a country of concern (including any political subdivision, agency, or instrumentality thereof); or

"(D) is owned in the aggregate, directly or indirectly, 50 percent or more by a country of concern, an entity described in subparagraph (A) or (B), or the state or the government of a country of concern (including any political subdivision, agency, or instrumentality thereof).

"(4) COVERED NATIONAL SECURITY TRANSACTION.—

"(A) IN GENERAL.—Subject to such regulations as may be issued in accordance with this title, the term 'covered national security transaction' means any activity engaged in by a United States person that involves—

"(i) the acquisition of an equity interest or contingent equity interest in a covered foreign person;

"(ii) the provision of a loan or similar debt financing arrangement to a covered foreign person, where such debt financing—

"(I) is convertible to an equity interest; or

"(II) affords or will afford the United States person the right to make management decisions with respect to or on behalf of a covered foreign person or the right to appoint members of the board of directors (or equivalent) of the covered foreign person;

"(iii) the entrance by such United States person into a joint venture with a covered foreign person;

"(iv) the conversion of a contingent equity interest (or interest equivalent to a contingent equity interest) or conversion of debt to an equity interest in a covered foreign person;

"(v) the acquisition, leasing, or other development of operations, land, property, or other assets in a country of concern that will result in, or that the United States person intends to result in—

"(I) the establishment of a covered foreign person; or

"(II) the engagement of a person of a country of concern in a prohibited technology where it was not previously engaged in such prohibited technology;

"(vi) knowingly directing transactions by foreign persons that the United States person has knowledge at the time of the transaction would constitute an activity described in clause (i), (ii), (iii), (iv), or (v), if engaged in by a United States person; or

"(vii) the acquisition of a limited partner or equivalent interest in a venture capital fund, private equity fund, fund of funds, or other pooled investment fund that the United States person has knowledge at the time of the acquisition, intends to engage in an activity described in clause (i), (ii), (iii), (iv), (v), or (vi).

"(B) EXCEPTIONS.—Subject to notice and comment regulations prescribed in consultation with Congress and in accordance with this title, the term 'covered national security transaction' does not include—

"(i) any transaction the value of which the Secretary determines is de minimis;

"(ii) any category of transactions that the Secretary determines is in the national interest of the United States;

"(iii) an investment—

"(I) in a security (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a))) that is traded on an exchange or the over-the-counter market in any jurisdiction;

"(II) in a security issued by an investment company (as defined in section 3 of the Investment Company Act of 1940 (15 U.S.C. 80a–3)) that is registered with the Securities and Exchange Commission;

"(III) made as a limited partner or equivalent in a venture capital fund, private equity fund, fund of funds, or other pooled investment fund (other than as described in subclause (II)) where—

"(aa) the limited partner or equivalent's committed capital is not more than $2,000,000, aggregated across any investment and co-investment vehicles of the fund; or

"(bb) the limited partner or equivalent has secured a binding contractual assurance that its capital in the fund will not be used to engage in a transaction that would be a covered national security transaction if engaged in by a United States person; or

"(IV) in a derivative of a security described under subclause (I), (II), or (III);

"(iv) any ancillary transaction undertaken by a financial institution (as defined in section 5312 of title 31, United States Code);

"(v) the acquisition by a United States person of the equity or other interest owned or held by a covered foreign person in an entity or assets located outside of a country of concern in which the United States person is acquiring the totality of the interest in the entity held by the covered foreign person;

"(vi) an intracompany transfer of funds, as defined in regulations prescribed in accordance with this title, from a United States parent company to a subsidiary located in a country of concern or a transaction that, but for this clause, would be a covered national security transaction between a United States person and its controlled foreign person that supports operations that are not covered national security transactions or

that maintains covered national security transactions that the controlled foreign person was engaged in prior to January 2, 2025;

"(vii) a transaction secondary to a covered national security transaction, including—

"(I) contractual arrangements or the procurement of material inputs for any covered national security transaction (such as raw materials);

"(II) bank lending;

"(III) the processing, clearing, or sending of payments by a bank;

"(IV) underwriting services;

"(V) debt rating services;

"(VI) prime brokerage;

"(VII) global custody;

"(VIII) equity research or analysis; or

"(IX) other similar services;

"(viii) any ordinary or administrative business transaction as may be defined in such regulations; or

"(ix) any transaction completed before the date of the enactment of this title.

"(C) ANCILLARY TRANSACTION DEFINED.—In this paragraph, the term 'ancillary transaction' means—

"(i) the processing, settling, clearing, or sending of payments and cash transactions;

"(ii) underwriting services;

"(iii) credit rating services; and

"(iv) other services ordinarily incident to and part of the provision of financial services, such as opening deposit accounts, direct custody services, foreign exchange services, remittances services, and safe deposit services.

"(5) FOREIGN PERSON.—The term 'foreign person' means a person that is not a United States person.

"(6) NOTIFIABLE TRANSACTION.—

"(A) IN GENERAL.—The term 'notifiable technology' means a technology with respect to which a covered foreign person—

"(i) designs any advanced integrated circuit that is not covered under paragraph (8)(A)(iii);

"(ii) fabricates any integrated circuit that is not covered under paragraph (8)(A)(iv);

"(iii) packages any integrated circuit that is not covered under paragraph (8)(A)(v); or

"(iv) develops any artificial intelligence system that is not covered under clause (vii), (viii), (ix), or (xvi) of paragraph (8)(A), and that is—

"(I) designed to be used for—

"(aa) any military end use (such as for weapons targeting, target identification, combat simulation, military vehicle or weapons control, military decision-making, weapons design (including chemical, biological, radiological, or nuclear weapons), or combat system logistics and maintenance); or

"(bb) any government intelligence or mass-surveillance end use (such as through incorporation of features such as mining text, audio, or video, image recognition, location tracking, or surreptitious listening devices);

"(II) intended by the covered foreign person or joint venture to be used for—

"(aa) cybersecurity applications;

"(bb) digital forensics tools;

"(cc) penetration testing tools; or

"(dd) control of robotic systems; or

"(III) trained using a quantity of computing power greater than $10^{23}$ computational operations (such as integer or floating-point operations).

"(B) UPDATES.—The Secretary, in consultation with Congress, may prescribe regulations in accordance with this title to refine the technical parameters of technologies described in subparagraph (A) as reasonably needed for national security purposes or to add or remove categories to or from the list in subparagraph (A).

"(7) PARTY.—The term 'party', with respect to a covered national security transaction, has the meaning given that term in regulations prescribed in accordance with this title.

"(8) PROHIBITED TECHNOLOGY.—

"(A) IN GENERAL.—The term 'prohibited technology' means a technology with respect to which a covered foreign person—

"(i) develops or produces any design automation software for the design of integrated circuits or advanced packaging;

"(ii) develops or produces any—

"(I) electronic design automation software for the design of integrated circuits or advanced packaging;

"(II) front-end semiconductor fabrication equipment designed for the volume fabrication of integrated circuits, including equipment used in the production stages from a blank wafer or substrate to a completed wafer or substrate; or

"(III) equipment for performing volume advanced packaging;

"(iii) designs any integrated circuit designs that meet or exceed the specifications set in Export Control Classification Number (ECCN) 3A090 in Supplement No. 1 to the Export Administration Regulations, or integrated circuits designed for operation at or below 4.5 Kelvin;

"(iv) fabricates integrated circuits that are—

"(I) logic integrated circuits using a nonplanar transistor architecture or with a technology node of 16/14 nanometers or less, including fully depleted silicon-on-insulator (FDSOI) integrated circuits;

"(II) NOT–AND (NAND) memory integrated circuits with 128 layers or more;

"(III) dynamic random-access memory (DRAM) integrated circuits using a technology node of 18 nanometer half-pitch or less;

"(IV) integrated circuits manufactured from a gallium-based compound semiconductor;

"(V) integrated circuits using graphene transistors or carbon nanotubes; or

"(VI) integrated circuits designed for operation at or below 4.5 Kelvin;

"(v) packages any integrated circuit using advanced packaging techniques;

"(vi) develops, designs, or produces any commodity, material, software, or technology designed exclusively for use in or with extreme ultraviolet lithography fabrication equipment;

"(vii) develops, designs, or produces any artificial intelligence models trained with at least $10^{25}$ floating point operations;

"(viii) develops, designs, or produces any artificial intelligence models that rely upon or utilize advanced integrated circuits that meet or exceed the specifications set in Export Control Classification Number (ECCN) 3A090 in Supplement No. 1 to the Export Administration Regulations;

"(ix) develops, designs, or produces any artificial intelligence models designed for use by the Government of the People's Republic of China, its special administrative regions, or its agencies and instrumentalities;

"(x) develops a quantum computer or produces any critical components required to produce a quantum computer such as a dilution refrigerator or two-stage pulse tube cryocooler;

"(xi) develops or produces any quantum sensing platform designed for, or which the relevant covered foreign person intends to be used for, any military, government intelligence, or mass-surveillance end use;

"(xii) develops or produces quantum networks or quantum communication systems designed for or intended to be used for—

"(I) networking to scale up the capabilities of quantum computers, such as for the purposes of breaking or compromising encryption;

"(II) secure communications, such as quantum key distribution; or

"(III) any other application that has any military, government intelligence, or mass-surveillance end use;

"(xiii) develops, designs, or produces materials, components, avionics, flight control, propulsion, Global Positioning System (GPS), data relay, and target detection systems for use in hypersonic systems or capable of sustainable operations above 1,000 degrees Celsius;

"(xiv) develops, installs, sells, or produces any supercomputer enabled by advanced integrated circuits that can provide theoretical compute capacity of 100 or more double-precision (64-bit) petaflops or 200 or more single-precision (32-bit) petaflops of processing power within a 41,600 cubic foot or smaller envelope;

"(xv) develops, designs, or produces any other technologies in the advanced semiconductors and microelectronics sector, the artificial intelligence sector, the high-performance computing and supercomputing sector, the hypersonic missiles sector, or the quantum information science and technology sector that are—

"(I) defense articles or defense services included on the United States Munitions List set forth in the International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations;

"(II) specially designed and prepared nuclear equipment, parts or components, materials, software, or technologies covered by part 810 of title 10, Code of Federal Regulations (relating to assistance to foreign atomic energy activities);

"(III) nuclear facilities, equipment, or materials covered by part 110 of title 10, Code of Federal Regulations (relating to export and import of nuclear equipment and material); or

"(IV) emerging or foundational technologies controlled pursuant to section 1758 of the Export Control Reform Act of 2018 (50 U.S.C. 4817); or

"(xvi) develops any artificial intelligence system that is designed to be exclusively used for, or which the relevant covered foreign person intends to be used for, any—

"(I) military end use (such as for weapons targeting, target identification, combat simulation, military vehicle or weapon control, military decision-making, weapons design (including chemical, biological, radiological, or nuclear weapons), or combat system logistics and maintenance); or

"(II) government intelligence or mass-surveillance end (such as through incorporation of features such as mining text, audio, or video, image recognition, location tracking, or surreptitious listening devices).

"(B) UPDATES.—The Secretary, in consultation with Congress, may prescribe regulations in accordance with this title to make updates to the technical parameters of technologies described in subparagraph (A) as reasonably needed for national security purposes.

"(9) SECRETARY.—Except as otherwise provided, the term 'Secretary' means the Secretary of the Treasury.

"(10) UNITED STATES PERSON.—The term 'United States person' means—

"(A) any United States citizen or an alien lawfully admitted for permanent residence to the United States;

"(B) an entity organized under the laws of the United States or of any jurisdiction within the United States (including any foreign branch of such an entity); or

"(C) any person in the United States.".

## Subtitle C—Securities and Related Matters

### SEC. 231. REQUIREMENTS RELATING TO THE NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.

(a) REPORT.—

(1) IN GENERAL.—Not later than 365 days after the date of the enactment of this Act, and biennially thereafter for 6 years, the Secretary shall submit to the appropriate congressional committees a report that states whether any of the following foreign persons qualifies for inclusion on the Non-SDN Chinese Military-Industrial Complex Companies List:

(A) Any PRC person listed on the Military End-User List (Supplement No. 7 to part 744 of the Export Administration Regulations).

(B) Any PRC person listed pursuant to section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (10 U.S.C. 113 note).

(C) Any PRC person listed on the Department of Commerce's Entity List (Supplement No. 4 to part 744 of the Export Administration Regulations).

(2) PROCESS REQUIRED.—To prepare the reports under paragraph (1), the President shall establish a process under which the Federal agencies responsible for administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1) shall share with each other all relevant information that led to the identification of the entities described in such lists.

(3) RISK-BASED PRIORITIZATION FRAMEWORK.—In making the initial determinations under paragraph (1), the Secretary may establish a risk-based prioritization framework factoring in prioritization of entity review submitted to the Secretary by the Federal agencies administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1).

(4) ANNUAL REPORTS TO THE APPROPRIATE CONGRESSIONAL COMMITTEES.—The report under paragraph (1) may summarize findings concerning entities previously reviewed pursuant to this section and do not necessitate additional review by the Secretary.

(5) MATTERS TO BE INCLUDED.—The Secretary shall include in the report required by paragraph (1) an overview of the criteria required for listing on Non-SDN Chinese Military-Industrial Complex Companies List. The heads of the Federal agencies administering the lists described in subparagraphs (A), (B), and (C) of paragraph (1) shall provide an overview of the criteria for entity identification or listing on each respective list.

(b) REQUIREMENT FOR DIVESTMENT.—

(1) IN GENERAL.—The President shall promulgate rules that prohibit a United States person from knowingly holding securities of entities on the Non-SDN Chinese Military-Industrial Complex Companies List, after the date that is 365 days after the date of the enactment of this Act.

(2) AUTHORIZATION.—The prohibitions on investment imposed under paragraph (1) shall not apply to a transaction in a security that is entered into on or before the date that is 365 days after the date of the enactment of this Act by a United States person, if such transaction is entered into solely to divest of the security.

(c) WAIVER.—

(1) IN GENERAL.—The President may establish a process under which the requirements of subsection (b) shall not apply if the President determines to do so is necessary to protect the national security or foreign policy objectives of the United States.

(2) CASE-BY-CASE REQUIREMENT.—Determinations under paragraph (1) shall be issued on a case-by-case basis for each entity on the Non-SDN Chinese Military-Industrial Complex Companies List.

(3) NOTICE AND BRIEFING.—The President shall notify the appropriate congressional committees in writing in advance of issuing a determination under paragraph (1) and shall provide a substantive briefing on the determination to the appropriate congressional committees within 30 days of issuing a determination.

(d) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Financial Services and the Committee on Foreign Affairs of the House of Representatives; and

(B) the Committee on Banking, Housing, and Urban Affairs of the Senate.

(2) COUNTRY OF CONCERN.—The term "country of concern"—

(A) means the People's Republic of China; and

(B) includes the Hong Kong Special Administrative Region and the Macau Special Administrative Region.

(3) NON-SDN CHINESE MILITARY-INDUSTRIAL COMPLEX COMPANIES LIST.—The term "Non-SDN Chinese Military-Industrial Complex Companies List" means the list maintained by the Office of Foreign Assets Control of the Department of the Treasury under Executive Order 13959, as amended by Executive Order 14032 (50 U.S.C. 1701 note; relating to addressing the threat from securities investments that finance certain companies of the People's Republic of China), and any successor order.

(4) PRC PERSON.—The term "PRC person" means a foreign person that—

(A) is incorporated in a principal place of business in, or is organized under the laws of, a country of concern;

(B) is a member of the Central Committee of the Chinese Communist Party;

(C) is the state or the government of a country of concern, as well as any political subdivision, agency, or instrumentality thereof; or

(D) is owned in the aggregate, directly or indirectly, 50 percent or more by an entity or a group of entities described in subparagraph (A), (B), or (C).

SA 2270. Mr. MERKLEY (for himself, Mr. SCHUMER, Ms. WARREN, Mr. PETERS, Mr. REED, Mr. MURPHY, and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(i) and insert the following:

(i) RULES OF CONSTRUCTION.—Nothing in this Act shall be construed as expanding the authority of the Board with respect to the services the Board can make directly available to the public.

(j) PREVENTING PAYMENT STABLECOIN CORRUPTION.—

(1) DEFINITIONS.—In this subsection—

(A) the term "covered individual" means—

(i) the President;

(ii) the Vice President;

(iii) a Member of Congress;

(iv) an individual appointed to a Senate-confirmed position; or

(v) a special Government employee (as defined in section 202 of title 18, United States Code) associated with the Executive Office of the President;

(B) the term "directly" means by virtue of the ownership or beneficial interest of a covered individual, or the spouse or child of a covered individual, in a payment stablecoin issuer;

(C) the term ''indirectly'' means by virtue of the financial interest of a covered individual, or the spouse or child of a covered individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the covered individual, or the spouse or child of a covered individual, has an ownership or beneficial interest;

(D) the term ''Member of Congress'' has the meaning given that term in section 13101 of title 5, United States Code; and

(E) the term ''promote'' includes the use of the name and likeness of a covered individual in any marketing materials, including in the title of the payment stablecoin.

(2) PROHIBITION.—It shall be unlawful for any covered individual, or any spouse or child of any covered individual, to directly or indirectly own, control, promote in exchange for anything of value, or affiliate with any payment stablecoin issuer or any entity that provides custodial or safekeeping services for payment stablecoins.

(3) TRANSITION.—Any individual in violation of paragraph (2) on the date of enactment of this Act shall, not later than 90 days after the date of enactment of this Act, come into compliance with the prohibition under that paragraph.

(4) ENFORCEMENT.—

(A) IN GENERAL.—Beginning on the date that is 90 days after the date of enactment of this Act, a violation of paragraph (2) shall be punishable by not more than 5 years in prison and fines of not more than 3 times the monetary value of any earnings related to the violation.

(B) NOT AN OFFICIAL ACT.—A violation of paragraph (2) shall not be deemed an official act if committed by any covered individual who is in office at the time of the violation.

(C) STATUTE OF LIMITATIONS.—No person shall be prosecuted, tried, or punished for any offense under this subsection unless the indictment for such offense is found, or the information for such offense is instituted, not later than 15 years after the date on which the offense was committed.

(k) FINANCIAL DISCLOSURE REPORTS.—Section 13104(b) of title 5, United States Code, is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting after paragraph (1) the following:

''(2) DISCLOSURE RELATING TO PAYMENT STABLECOIN INVOLVEMENT.—

''(A) DEFINITIONS.—In this paragraph:

''(i) DIRECTLY.—The term 'directly' means by virtue of the ownership or beneficial interest of a reporting individual, or the spouse or child of a reporting individual, in a payment stablecoin issuer.

''(ii) INDIRECTLY.—The term 'indirectly' means by virtue of the financial interest of a reporting individual, or the spouse or child of a reporting individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the reporting individual, or the spouse or child of a reporting individual, has an ownership or beneficial interest.

''(iii) PAYMENT STABLECOIN.—The term 'payment stablecoin' has the meaning given the term in section 2 of the GENIUS Act.

''(iv) PROMOTE.—The term 'promote' includes the use of the name and likeness of a reporting individual in any marketing materials, including in the title of the payment stablecoin.

''(B) REQUIREMENT.—Each report filed pursuant to subsections (b) and (c) of section 13103 shall include a statement of whether the reporting individual, or the spouse or child of the reporting individual, as of the filing date, directly or indirectly owns, controls, promotes in exchange for anything of value, or affiliates with any covered cryptocurrency issuer or any entity that provides custodial or safekeeping services for covered cryptocurrencies.''.

SA 2271. Mr. MERKLEY (for himself and Mr. BENNET) submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

Strike section 4(i) and insert the following:

(i) RULES OF CONSTRUCTION.—Nothing in this Act shall be construed as expanding the authority of the Board with respect to the services the Board can make directly available to the public.

(j) PREVENTING CRYPTOCURRENCY CORRUPTION.—

(1) DEFINITIONS.—In this subsection—

(A) the term ''covered cryptocurrency'' means any cryptocurrency, meme coin, token, non-fungible token, payment stablecoin, or other digital asset that is sold for remuneration;

(B) the term ''covered individual'' means—

(i) the President;

(ii) the Vice President;

(iii) a Member of Congress;

(iv) an individual appointed to a Senate-confirmed position; or

(v) a special Government employee (as defined in section 202 of title 18, United States Code) associated with the Executive Office of the President;

(C) the term ''directly'' means by virtue of the ownership or beneficial interest of a covered individual, or the spouse or child of a covered individual, in an issuer of a covered cryptocurrency;

(D) the term ''indirectly'' means by virtue of the financial interest of a covered individual, or the spouse or child of a covered individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the covered individual, or the spouse or child of a covered individual, has an ownership or beneficial interest;

(E) the term ''Member of Congress'' has the meaning given that term in section 13101 of title 5, United States Code; and

(F) the term ''promote'' includes the use of the name and likeness of a covered individual in any marketing materials, including in the title of the covered cryptocurrency.

(2) PROHIBITION.—It shall be unlawful for any covered individual, or any spouse or child of any covered individual, to directly or indirectly own, control, promote in exchange for anything of value, or affiliate with any issuer of a covered cryptocurrency or any entity that provides custodial or safekeeping services for covered cryptocurrencies.

(3) TRANSITION.—Any individual in violation of paragraph (2) on the date of enactment of this Act shall, not later than 90 days after the date of enactment of this Act, come into compliance with the prohibition under that paragraph.

(4) ENFORCEMENT.—

(A) IN GENERAL.—Beginning on the date that is 90 days after the date of enactment of this Act, a violation of paragraph (2) shall be punishable by not more than 5 years in prison and fines of not more than 3 times the monetary value of any earnings related to the violation.

(B) NOT AN OFFICIAL ACT.—A violation of paragraph (2) shall not be deemed an official act if committed by any covered individual who is in office at the time of the violation.

(C) STATUTE OF LIMITATIONS.—No person shall be prosecuted, tried, or punished for any offense under this subsection unless the indictment for such offense is found, or the information for such offense is instituted, not later than 15 years after the date on which the offense was committed.

(k) FINANCIAL DISCLOSURE REPORTS.—Section 13104(b) of title 5, United States Code, is amended—

(1) by redesignating paragraph (2) as paragraph (3); and

(2) by inserting after paragraph (1) the following:

''(2) DISCLOSURE RELATING TO COVERED CRYPTOCURRENCY INVOLVEMENT.—

''(A) DEFINITIONS.—In this paragraph:

''(i) COVERED CRYPTOCURRENCY.—The term 'covered cryptocurrency' means any cryptocurrency, meme coin, token, non-fungible token, payment stablecoin, or other digital asset that is sold for remuneration.

''(ii) DIRECTLY.—The term 'directly' means by virtue of the ownership or beneficial interest of a reporting individual, or the spouse or child of a reporting individual, in a covered cryptocurrency issuer.

''(iii) INDIRECTLY.—The term 'indirectly' means by virtue of the financial interest of a reporting individual, or the spouse or child of a reporting individual, in a business entity, partnership interest, company, investment fund, trust, or other third party in which the reporting individual, or the spouse or child of a reporting individual, has an ownership or beneficial interest.

''(iv) PAYMENT STABLECOIN.—The term 'payment stablecoin' has the meaning given the term in section 2 of the GENIUS Act.

''(v) PROMOTE.—The term 'promote' includes the use of the name and likeness of a reporting individual in any marketing materials, including in the title of the covered cryptocurrency.

''(B) REQUIREMENT.—Each report filed pursuant to subsections (b) and (c) of section 13103 shall include a statement of whether the reporting individual, or the spouse or child of the reporting individual, as of the filing date, directly or indirectly owns, controls, promotes in exchange for anything of value, or affiliates with any covered cryptocurrency issuer or any entity that provides custodial or safekeeping services for covered cryptocurrencies.''.

SA 2272. Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

SEC. ___. PROHIBITIONS ON THE ISSUE OF CENTRAL BANK DIGITAL CURRENCY.

(a) PROHIBITION ON FEDERAL RESERVE BANKS RELATING TO CERTAIN PRODUCTS OR SERVICES FOR INDIVIDUALS AND PROHIBITION ON DIRECTLY ISSUING A CENTRAL BANK DIGITAL CURRENCY.—Section 16 of the Federal Reserve Act (12 U.S.C. 411 et seq.) is amended by adding at the end the following:

''A Federal reserve bank may not—

''(1) offer products or services directly to an individual;

''(2) maintain an account on behalf of an individual; or

''(3) issue a central bank digital currency, as defined in section 10(11)(D), or any digital asset that is substantially similar under any other name or label.''.

(b) PROHIBITION ON FEDERAL RESERVE BANKS INDIRECTLY ISSUING A CENTRAL BANK DIGITAL CURRENCY.—Section 16 of the Federal Reserve Act (12 U.S.C. 411 et seq.), as amended by section 2, is further amended by adding at the end the following:

''A Federal reserve bank may not offer a central bank digital currency, as defined in

section 10(11)(D), or any digital asset that is substantially similar under any other name or label, indirectly to an individual through a financial institution or other intermediary.''.

''(c) PROHIBITION WITH RESPECT TO CENTRAL BANK DIGITAL CURRENCY.—Section 10 of the Federal Reserve Act (12 U.S.C. 241 et seq.) is amended by inserting before paragraph (12) the following:

''(11) PROHIBITION WITH RESPECT TO CENTRAL BANK DIGITAL CURRENCY.—

''(A) IN GENERAL.—The Board of Governors of the Federal Reserve System may not test, study, develop, create, or implement a central bank digital currency, or any digital asset that is substantially similar under any other name or label.

''(B) MONETARY POLICY.—The Board of Governors of the Federal Reserve System and the Federal Open Market Committee may not use a central bank digital currency to implement monetary policy, or any digital asset that is substantially similar under any other name or label.

''(C) EXCEPTION.—Subparagraph (A) and the eighteenth and nineteenth undesignated paragraphs of section 16 may not be construed to prohibit any dollar-denominated currency that is open, permissionless, and private, and fully preserves the privacy protections of United States coins and physical currency.

''(D) CENTRAL BANK DIGITAL CURRENCY DEFINED.—In this paragraph, the term 'central bank digital currency' means a form of digital money or monetary value that is—

''(i) denominated in the national unit of account;

''(ii) a direct liability of the Federal Reserve System; and

''(iii) widely available to the general public.''.

(d) SENSE OF CONGRESS.—It is the sense of Congress that the Board of Governors of the Federal Reserve does not have the authority to issue a central bank digital currency, or any digital asset that is substantially similar under any other name or label, and will not have such authority unless Congress grants such authority pursuant to section 8 of article I of the Constitution of the United States.

_____

**SA 2273.** Mr. CRUZ submitted an amendment intended to be proposed by him to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. ____. PROHIBITION ON RESTRICTING TRANSACTIONS USING SELF-CUSTODIAL SOFTWARE INTERFACES.**

(a) DEFINITION.—In this section, the term ''covered official'' means—

(1) an appropriate Federal banking agency;

(2) the Board;

(3) the Comptroller;

(4) the Corporation; or

(5) a primary Federal payment stablecoin regulator.

(b) PROHIBITION.—No covered official may prohibit, restrict, or otherwise impair the ability of a person to conduct a transaction that—

(1) is for that person's own and otherwise lawful purposes; and

(2) uses self-custodial software interfaces.

_____

**SA 2274.** Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes;

which was ordered to lie on the table; as follows:

At the end of section 3(c)(2), add the following:

''(C) LIMITATIONS.—With respect to a limited safe harbor provided under this paragraph—

''(i) the safe harbor shall expire not later than 180 days after the date on which the Secretary of the Treasury provides the safe harbor; and

''(ii) after the expiration of the safe harbor under clause (i), the Secretary of the Treasury may not renew, extend, or re-provide the safe harbor.

_____

**SA 2275.** Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 3(b)(2), strike ''digital asset service provider'' and insert ''person''.

_____

**SA 2276.** Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 18(c)(2), strike subparagraph (B) and insert the following:

(B) be subject to the jurisdiction of the United States with respect to the enforcement of this Act and any other applicable laws of the United States relating to anti-money laundering, countering the financing of terrorism, economic sanctions, financial fraud, and related financial crimes, including laws administered by the Department of the Treasury, the Office of Foreign Assets Control, the Financial Crimes Enforcement Network, and the Department of Justice.

_____

**SA 2277.** Ms. BLUNT ROCHESTER submitted an amendment intended to be proposed by her to the bill S. 1582, to provide for the regulation of payment stablecoins, and for other purposes; which was ordered to lie on the table; as follows:

In section 3(f), insert ''or (b)'' after ''subsection (a)'' each place it appears.

_____

## AUTHORITY FOR COMMITTEES TO MEET

Mr. LANKFORD. Mr. President, I have three requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to Rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

The Committee on Banking, Housing, and Urban Affairs is authorized to meet during the session of the Senate on Thursday, May 22, 2025, at 10 a.m., to conduct a hearing.

COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

The Committee on Health, Education, Labor, and Pensions is author-

ized to meet during the session of the Senate on Thursday, May 22, 2025, at 11:45 a.m., to consider nominations.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Thursday, May 22, 2025, at 10:15 a.m., to conduct an executive business meeting.

The PRESIDING OFFICER. The Senator from Rhode Island.

_____

## CONGRESSIONAL REVIEW ACT

Mr. WHITEHOUSE. Mr. President, the series of votes that we have concluded in the last 24 hours, with the last vote that just concluded, brings to its completion a sad and a sordid moment in the history of the Senate. I want to just wrap up to leave a record of what took place.

Before we got into this parliamentary rigmarole, there were two things that were pretty clear: one, a Congressional Review Act, a statute in American law, that allows Congress to override a very narrow set of Executive actions for a very narrow time period. The narrow set of Executive actions is EPA rulemakings. And the timeframe is set by the Congressional Review Act, but it is, at most, months. That is the law, or was the law until our procedural shenanigans intervened, and it had been the law for quite a long time. The Congressional Review Act goes back 30 years. So there was a long, long, long tradition of obeying this law.

It is not hard to figure out what a rule is because rulemakings have a very distinct procedural set of steps that they go through, and the Congressional Review Act was carefully crafted to deal just with those rules, including a provision that if the executive branch tried to hide a rule by not submitting it, that our Government Accountability Office was authorized to blow a whistle and say: No, that is actually a rule, in which case, it would have to come over here for a review under the Congressional Review Act.

So the question of what a rule was has long been considered during the course of the Congressional Review Act and over those 30 years, and it has always, always, always been a rule.

Before the Congressional Review Act came along—in fact, 20 years earlier—the Clean Air Act was passed by Congress. The Clean Air Act was a healthy respect for federalism and the role of sovereign States, and the role of California—what is now the fourth biggest economy on the planet—allowed California a waiver in order to be able to make its own clean air auto emissions rules.

So beginning with the passage of the Clean Air Act, California took advantage of this, and these waivers were filed with the EPA and processed by the EPA. Sometimes, they created the waiver. Sometimes, they amended a waiver. Sometimes, they renewed a waiver. Sometimes, they modified a waiver.

The first action was taken on July 11, 1968, by the EPA—so 50-plus years ago. The most recent one, until our current procedural rigmarole, was December 17, 2024—a week before Christmas, last year. Between July 11 of 1968 and December 17 of 2024, California's clean air standard was reviewed under this waiver process 131 times—131 times—and every single time, it was determined to be a waiver and not a rule. It was never—across that half century-plus—ever treated as a rule. It clearly was a waiver. It is described as a waiver in the statute. That is actually the law.

So that is where we stood: California had a legal right to run its own clean air program for 50 years, EPA was obliged to treat it as a waiver, and the Congressional Review Act did not apply because the Congressional Review Act only applied to rules, and this was not one.

The problem was that the fossil fuel industry, more or less, runs this place right now, and it wants to sell more gasoline. So California's Clean Air rules to make cars either be more efficient and get more miles per gallon or become hybrid and be able to run back and forth between gas and electric or be fully electric interfered with the impulse of Big Oil to sell more gasoline and, of course, do more pollution.

What was Big Oil to do in that circumstance? Well, there were a couple of things that they could have done. They could have, for instance, negotiated with California. Indeed, they could have asked the President to negotiate with California and, perhaps, with States like Rhode Island that joined the California Clean Air standard so we would be in the room and have more voices heard too. There could have been a robust, healthy, political, and democratic negotiation. But, no, Big Oil chose not to do that because it knew it had a fast lane through this body.

They had another alternative, which is to amend the Clean Air Act or the Congressional Review Act to solve this problem. You could amend the Clean Air Act to call the waiver a rule or make it proceed by rule, or you could amend the Congressional Review Act so that it wasn't limited to rules anymore but a waiver could fit in. You could do either one of those things by what my Republican colleagues usually like to cheer about, which is regular order—the regular order of the Senate, the regular order of Congress.

Of course, the problem for Big Oil in that was that they would have to get the law passed in the House, and they would have to get the law passed in the Senate. And in the Senate, that was subjected to having to negotiate with the Democrats in order to get past cloture and get 60 votes and then get the bill signed by the President. That is the proper way to proceed when you want to amend a law. But Big Oil didn't care to do that because it knew it had a fast lane through this body.

The third way they could have done this, which was actually commenced in the first Trump administration, was to have the EPA undertake an administrative review of the three key predicates that have to be checked off in order to grant the waiver to California and proceed under ordinary administrative Agency process; indeed, one that had already been commenced in the previous administration. They could easily have done that. But, of course, whatever Big Oil convinced Big Oil's representatives at EPA—LEE ZELDIN—to do would have then had to survive scrutiny in court because you can't do administrative procedures in this country if there is no rational basis for the decision at the end of the day. You can't do administrative decisions in this country if they are—to use the magic words of administrative law—"arbitrary and capricious." So they chose not to follow the administrative process either because they knew they had a fast lane through this body.

Unfortunately, the fast lane that Big Oil knew it had through this body ran right over the Parliamentarian because the Parliamentarian is obliged to police what is appropriate under the Congressional Review Act. She is our referee here over whether we are doing things legally and by the rules or not. And she determined—which, in my view, was an extremely easy determination based on 131 to 0 in previous waivers, never in 30 years under the Congressional Review Act something that wasn't a rule and the statutory waiver for 50 years for California in the Clean Air Act—hard to do much of a stronger case than that. So we got a decision, a proper decision, from the Parliamentarian saying, no, the special expedited procedures of the Congressional Review Act don't work in the Senate because it would be illegal because this is not a rule; this is a waiver. And it, obviously, was not a rule. It, obviously, was a waiver. So she wasn't wrong.

But the Parliamentarian is vulnerable to the political power of this body. This body can overrule the Parliamentarian. The majority can do it with a simple 51 votes.

Imagine a football game in which one team has more players than the other. One team commits a foul. The ref blows a whistle on the foul that the majority team committed, and the majority team gets—by vote—to overrule the referee.

That is a crummy way to go about doing business in an orderly, deliberative body like the U.S. Senate, and that is why it happens so rarely. Overruling the Parliamentarian on a matter is considered going nuclear—going nuclear—and this is the first time in the history of the Senate in which the majority has gone nuclear, overruling the Parliamentarian on a matter affecting legislation—both the Congressional Review Act and the Clean Air Act.

So the complex procedural rigmarole you saw last night and today was all designed to do a parliamentary end run around the Parliamentarian, overruling the determination that this was not a rule, changing the Congressional Review Act and the Clean Air Act, but without the proper procedures under the Constitution that we are obliged to follow when we are passing or amending laws.

There is a particular other problem here, which is that if they had gone the negotiation route with California, all of us who like clean air and want strong vehicle emissions regulations would have had a voice. Something would have had to have been agreed to. There would have had to have been some compromise. But Big Oil didn't want that because they knew what they had here in the Senate: a fast lane to whatever they want, whenever they wanted.

They could have gone through the court process, but the court process is bounded by laws, by fair procedures, by the opportunity for affected parties to be heard, and by the standards of having a rational basis and not being arbitrary and capricious. In this forum, the majority can have no rational basis and be 100 percent arbitrary and capricious and ram its view through. So the court thing wasn't quite as appealing because what has happened here would, by any standard, have had no rational basis and been arbitrary and capricious.

They could have gone the legislative route and passed the bill properly—amended the bill properly and used the constitutional procedures—but again, we would have had a voice in that.

So this ram job was the solution. Rolling over and overriding the Parliamentarian was the method, and serving the fossil fuel interests behind the Republican Party was the goal. But the outcome is going to be bad outside the Chamber, and it is going to be bad inside the Chamber. Outside the Chamber, the bad outcome is going to be a lot dirtier air; a far worse competitive position for our auto industry against China, which is already running ahead of us in the future technology of electric vehicles; and worse health outcomes, particularly in busy areas where there is lots of traffic—not to mention having the majority of the country's economy overruled by a minority of the country's economy, where the majority of the country's economy chose cleaner air.

So those are all the bad things that happened outside this body, and, as Senator SCHIFF said earlier, that will be measured in things like cancer diagnoses. This gets personal pretty quickly when it is clean air and health matters.

Inside the body, we have just opened an entirely new avenue for mischief. It could be mischief by any 30 of us. Frankly, it could be mischief by a minority of the majority who want to drive something through that most of the majority don't want. They can do it now using the Congressional Review

Act, which requires 30 signatures to get in. You can go back to any Executive action taken since the passage of the Congressional Review Act, and you can drop that into the Federal Register and submit it here and say it is a rule. Even if you are lying, even if it is not a rule, we have just opened the gate so that every Executive action ever taken can now be considered a rule, whether it is or not, for purposes of the Congressional Review Act. And a powerful special interest that controls a powerful party can ram whatever it wants through this body without constitutional procedure, without judicial safeguards, and without compromise.

So they broke wide open the window of what can be brought through the Congressional Review Act in time. It used to be just a matter of usually just a couple of months—depends on the change in elections—60 days or thereabouts. Now, 30 years of stuff is available to be dropped into the hopper in this process and shoved through this body.

The other is that it is not rules anymore; it is anything. So we have gone from a very narrow, carefully guardrailed provision to provide a short-term opportunity for Congress to overrule an offending regulation immediately after that regulation is passed to a wide-open sewer for political influence and interference into any Executive decision ever rendered that can be pulled out of the past, dropped into the Federal Register, submitted over here under the pretense that it was a rule, and with 30 votes and a majority behind it, off you go to the races.

So this is a bad, bad day for the Senate. It signals a willingness of this majority, after so much talk about defending the filibuster—oh, defending the filibuster. When we were in the majority, you never heard them stop talking about how important the filibuster was, but now that they are in the majority, it is only a little over 100 days—and this started some time ago. They immediately started the plot to bring this chore for the fossil fuel funders through the Senate floor and break the filibuster in order to accomplish their goal.

So give me a break.

I yield the floor. I see my friend Senator CASSIDY from Louisiana waiting to speak.

The PRESIDING OFFICER. The Senator from Louisiana.

RISK RATING 2.0

Mr. CASSIDY. Mr. President, I know you have a family legacy in Florida. You will appreciate that along the gulf coast and certainly in Louisiana, people in Louisiana are preparing for hurricanes.

I just had a meeting with the Calcasieu Parish Police Jury, and they sent me some photos of some Lake Charles homes. I am saying this in the context of a discussion about flood insurance and what has happened that just seems irrational.

To reduce their risk of flooding and therefore their monthly flood insurance premiums, people have paid to elevate their homes. It makes sense. If you get floodwaters, it works. And it costs anywhere from $25,000 to $40,000. If your foundation needs repair, there is another $25,000 on top of that. If you have to fully replace your foundation, that can be another $100,000. But if it lowers your flood insurance premiums, it can be a worthwhile investment. You lift your homes, and you may not flood.

Here is this home, a similar home. You can see, whereas the neighbors are flooding in this one, an elevation like this prevents a flood, in this picture. That home is not flooding. Their insurance premium should go down.

But after spending tens of thousands of dollars to mitigate one's risk of flooding, they are still seeing high insurance premiums. They are getting the worst of both worlds. They had to pay to elevate their home, successfully preventing flooding; despite that, they are having to pay much higher insurance premiums.

Let's put up the chart of prices. Two properties. This is before they elevated their home, after they elevated their home. At first, it worked. They go from $12,000 a year to $758, from $4,500 to $751. This is an investment which would lower the cost of flood insurance, saving the National Flood Insurance Program money; therefore, it is worthwhile to raise your home.

Now, however, under a new system called Risk Rating 2.0, it doesn't matter. Here, they pay tens of thousands of dollars to elevate their home, and under this new system, their premium is back up to $9,800 or to $7,300—in this case, higher than it was before they elevated their home. The percentage increase is about 1,200 percent. The percentage increase here is almost 900 percent. It does not make sense.

By the way, why would you pay to elevate your home if you get the double whammy of paying to elevate and then your premiums, in some cases, are higher than when they started?

These are just two examples of people who did everything right, did what they were supposed to—they are not going to flood—and yet, after Risk Rating 2.0, this is what happened. I don't know if people still say "ripped off," but they feel ripped off. They feel as if they did what was right and they have been punished and penalized because the premiums almost or in some cases more than doubled relative to what happens.

Now, these are nice homes, but they are not castles. These are middle-income families. The neighbor is driving a pickup truck. It looks a little bit—the Presiding Officer is a car dealer. That doesn't look like it is a 2025. It is a good truck. It is a good family. These are not wealthy families. They are good, middle-income families, spending tens of thousands of dollars to elevate their home, and yet, still, their premium continues to rise.

So with Risk Rating 2.0 driving up costs for lower and middle-income families, about a fifth of those enrolled in the National Flood Insurance Program will be forced to drop their coverage over the next 10 years, OK? You raise premiums, and you raise them to a degree that 20 percent of the people—typically the lowest risk—drop their coverage. Then the Flood Insurance Program has to spread its risk over a smaller base, which means it elevates the premiums even more, and so those who need it least are the next 20 percent to drop off. This initiates what is called an actuarial death spiral.

Risk Rating 2.0 is like termites eating away at the foundation of a house, and if we do nothing, the home is going to collapse.

I introduced legislation in February to give low- and middle-income households enrolled in the National Flood Insurance Program a 33-percent reduction in their premium in the form of a refundable tax credit that would go straight to their premium payment at the time it is due.

Hurricane season won't wait on those who need flood insurance. Americans in my State and across the country need relief now. If we really want to put Americans first, we can start by making the National Flood Insurance Program affordable now and keeping it affordable 10 to 15 years from now. It is a pocketbook issue, but when you flood, like folks in Louisiana and other States have, it becomes a personal issue.

Since the start of 2025, at least 21 Americans across 8 States have died as a result of flooding and storms hitting their communities. Millions have been left without power or evacuated from their homes. And when you hear "flood insurance"—hey, I don't live in a coastal State. I don't live in Florida or Louisiana. Why does it bother me? My home will not get destroyed.

I wish that were true. This isn't a one-State problem; it is a one-nation problem. All 50 States have National Flood Insurance Program policyholders. The darker the color, the more likely the flooding. Missouri is in a dark color. New York State—minimal coastline—is in a dark color. Pennsylvania is in a dark color.

This is called river ring flooding, where you have a river and it comes down like this, and people building in the valley get flooded because the river overflows its banks, and it fills up that V-shaped valley. So that is why you would see flooding.

And so that is why you see flooding here in the darker—not as dark, but still dark.

You have the Dakotas also having problems with flooding. So it is a 50-State problem. And in these States, there are many who don't have flood insurance, and the time will come when they wish that they did.

The National Flood Insurance Program can provide certainty for individuals and for their families. Maybe you

won't see flooding as extreme as losing a home. I sure hope you don't. But I am not just talking about the worst case scenario.

Let's imagine going back to this picture. The family didn't get their home completely flooded. The family got 4 inches of water in their living room. Their carpets are destroyed. If their floor is anything but concrete, it is destroyed. If you have furniture in there that is cloth, it is destroyed. If you get mold, then you are going to have to rip out the sheetrock and replace wherever you had sheetrock. Two to 3 inches destroys the carpet. In fact, the most expensive 3 inches in a flood are the first 3 inches. And that is what makes flooding so difficult for a middle-income family to recover from.

And for many, the National Flood Insurance Program is the only option they have. Now, by the way, the program designed to help them is failing them, and when millions of Americans are being impacted, Washington should act.

Let me be clear: the National Flood Insurance Program is a Federal program, meaning that Congress and the President can change and improve it. We just need to have the will.

So I urge my colleagues to join me in working with the Trump administration to end Risk Rating 2.0.

In 2019, my office worked with the Trump administration to successfully delay Risk Rating 2.0 because of the lack of transparency as to how FEMA was calculating the rates. President Trump understood then and understands now that Americans are tired of being ripped off.

When rivers swell, when coastlines have rising water, Americans should not have to fear the cost of rebuilding without affordable insurance. So let's make the National Flood Insurance Program affordable, accountable, and sustainable.

Severe weather is relentless. We must be too.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Ms. BLUNT ROCHESTER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Delaware.

## MEDICAID

Ms. BLUNT ROCHESTER. Mr. President, according to Secretary Kennedy, the Trump administration is committed to building the most compassionate Department of Health and Human Services in the history of the United States.

So I went to the dictionary and looked up the term "compassionate." It means: "a sympathetic consciousness of others' distress, together with a desire to alleviate it."

Yet the proposed Republican budget would make historic billion-dollar cuts to the programs real Americans rely on. Instead of alleviating distress, this "Big Bad Bill" would actually exacerbate it.

And late, late last night, House Republicans added even more distress to their Medicaid cuts, changes that would cut care and prevent access to care for millions of Americans; changes that would cut funding that ensures safe, healthy births for newborns; changes that will endanger our parents and grandparents who live in nursing homes.

So I rise today and seek true compassion from my colleagues and ask in the words of the famous song: "Where is the love?"

I rise today because I have been getting call after call, email after email, meeting with person after person, all worried sick about cuts to Medicaid. And I want to share some of their stories today. I want my colleagues to hear their names and understand the trade-offs they are making to support tax cuts for the wealthy, while failing to shrink the national debt.

Again, I am going to say that again: while failing to shrink the national debt.

Here are their stories.

Emmanual lives in Sussex County. When I met with him recently, he told me that if we pull the thread of Medicaid, his whole life would unravel. Emmanual calls himself a CP warrior, and he doesn't let cerebral palsy or his wheelchair stop him.

For Emmanual, Medicaid is more than prescriptions and doctors' appointments. It is about freedom and independence. Participating in Medicaid allowed him to get and keep a job. Access to Medicaid is how he went from being homeless to being employed, housed, and financially secure. It is what enables his wife to be his primary caretaker, while also allowing them to live together as husband and wife.

He struggles to plan for his future and that of his family because his life depends on decisions that we make here in this body.

Joy. Joy lives in Wilmington with her 34-year-old son, who she says is severely autistic. He received amazing services from the Delaware Autism Program when he was in school and now attends their day program at Point of Hope. And you guessed it; Point of Hope is funded through Medicaid.

Joy is literally terrified of what could happen if these cuts close that program. She doesn't know where her son will end up if they lose the support that Medicaid provides and she can no longer take care of him.

And Nancy. Nancy lives in Dover with her 19-year-old son Christopher, who was born prematurely. Christopher coded in the NICU and suffered a brain injury. As a result, he is on a Medicaid waiver since he was 8 months old.

For the last 19 years, Nancy has advocated for her family, as well as countless Delawareans. She built her life around caring for Christopher in their home versus an expensive long-term care facility.

Medicaid covers the medical equipment Nancy rents to keep Christopher alive. Medicaid covers the skilled medical professionals that help Nancy care for her son and give her respite. Nancy told me that Christopher's life depends on this budget.

In her words, this debate about funding cuts feels like the rug is being pulled from under her.

Emmanual, Joy, Nancy, and Christopher—these are just a few of the stories that I have been told since our Republican colleagues started their crusade against care. These are real people with real needs that Medicaid fills—real people whom we shine the light on and not ignore.

And I want my colleagues to hear their names. I want them to remember the names of the people in their own States who are imploring us to stand up and protect their access to care: the Emmanuals, the Joys, Nancys, the Christophers.

So whether you are a person of faith or just somebody who cares about your neighbor, now is the time to move from the Golden Rule of treating others as you would like to be treated to the "Platinum Rule"—to treat others the way they want to be treated, with real compassion, and to start with protecting Medicaid.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

## CONGRESSIONAL REVIEW ACT

Mr. MERKLEY. Mr. President, colleagues, using the Congressional Review Act to overturn waivers puts polluters in charge of government policy.

In 1970, Congress passed the Clean Air Act. The law explicitly states that individual States like California can enact stricter emission standards to protect the environment if they receive from the Environmental Protection Agency a waiver. And States like Oregon can adopt those standards if they so choose.

Since then, California has applied for, well, about 100 waivers. They have made vehicle emissions 99 percent cleaner than they were in 1970.

I remember going down to Southern California in the early eighties and seeing how incredibly polluted the air was near L.A., and I thought, How can anyone live here?

It hurt your eyes; it hurt your lungs. People don't have that impression today, despite the amount of vehicle miles going way up, because of the incredible efforts California made to clean up their air from auto emissions.

You know, in the last 50 years, California has never had a waiver revoked. That tells me they put together very competent proposals and that the Nation supported their effort to clean up their air.

But something different is happening right now. Senate Republicans are using the Congressional Review Act in ways that Congress never intended. Of course, the Congressional Review Act says if a rule is implemented and you are within 60 legislative days, it can be brought to the floor and it can be overturned by the House and the Senate and that if it is vetoed, well, then the House and Senate can overturn the veto, if they have enough votes—but all about rules; no mention of waivers.

Both the Government Accountability Office and the Senate Parliamentarian said the Congressional Review Act cannot be used to overturn waivers because, quite simply, they are not rules.

You know, here is the thing, words have meanings, and you can only trust the law if those words are honored. And to magically say a waiver is a rule is a real travesty of lawmaking, but that is where we are at now.

So what is this really all about—this Republican decision to invent new meanings to existing words when every bit of common sense and every bit of legal knowledge knows that that is a lie. Why did my colleagues engage in this massive deception? It is an end-run around the policymaking process.

They could have easily said: We want to expand the Congressional Review Act to cover waivers. And then you simply craft a bill. Republicans being in charge of the Senate and the House, they bring it to the floor; we debate it; it either passes or it doesn't pass.

It has the advantage of going through committee and being considered and having people weigh in on whether it is a good idea or not. But to simply reinvent and pretend, if you will, that the color black is the color white or an orange is an apple—because everyone understands a waiver is not a rule.

So it is unfortunate that the colleagues in charge of the legislative process have so corrupted it yesterday and today, not even trying to actually enact the law to accomplish what they want but instead saying: Let's use an expedited process that doesn't go through committee, where there is very limited debate, where there are no amendments allowed, in order to do a favor for a powerful special interest.

What does that tell us about government in the United States? My colleagues are choosing to be the agents for the powerful by inventing new meanings to words that don't exist, meanings that are not supported by the Parliamentarian; they are not supported by the Government Accountability Office, GAO, because they are so dedicated to pulling the strings of government on behalf of the fossil fuel industry. That is corruption plain and simple, on full display before the American public. That is what has happened.

Think about what this means for the future of this Nation. You can't count on a waiver staying in place so how do you make decisions based on getting that waiver?

Well, you get a license from the government. But the license, maybe that looks a lot like a rule. It is an act of government. It is a decision. How is that different from a waiver? You can't count on that license not being taken away by this body.

What about a grant? A grant is a government decision. Kind of like a waiver, except it has money coming in. So now a grant can be brought here to the floor and wiped out.

What about a permit? A permit is very close to being a waiver, saying: Hey, you can undertake this process. We are giving you permission. Well, that is what a waiver does. It says: Yes, you can undertake that process.

So now no one has a foundation for pursuing projects because they know that if the majority wants to play favors for a powerful special interest, they can wipe you out with no foundation of law.

That is what happened here, and that is a travesty. It is a travesty that none of my colleagues, I would hope—if they reflected on it outside the pressure of having their arms twisted—would engage in.

And I know they would be highly critical if the parties were reversed.

In addition, once that waiver is struck down, it is suggested under the rules of the CRA that a similar waiver might not be able to be granted in the future.

So now you have two laws in conflict with each other. One law says you can grant the waiver, and the other law says if something was struck down through the CRA, nothing similar can be done.

How are we to resolve this? My colleagues have no answer. They have taken us down a path where words have no meaning and where sheer power by one of the richest enterprises in America—the fossil fuel industry—is all that matters. They are the puppet masters of my Republican colleagues. They have pulled the strings, and now we are in deep trouble to have an honest foundation for legislative action.

This one waiver was something that the fossil fuel industry really hated because when cars became more efficient, they used less oil, and therefore the oil companies made less money. When these waivers were enacted, people were incentivized to buy cars that didn't even burn gasoline, and the oil companies were like: Oh, my goodness, we are not going to make as much money. Help us. Help us, dear Republicans. Help us out here. Invent something. Change the meaning of some words. Find some way to go past the normal legislative process to somehow deliver what we want.

And my colleagues obliged.

The damage is done. It is going to be extremely difficult to fix it. It has eviscerated half a century of California's clean air protections.

It was the wrong thing to do to blow up the good work of a State seeking to solve its air pollution problem. It was

absolutely the wrong thing to do to blow up the integrity of this body by deciding that a waiver is a rule and undermining the ability of any group to act with confidence based on decisions made by the Government of the United States because whether you have a waiver or you have a permit or you have a license, now you don't know whether some powerful interest is going to have this body rip it away from you.

Let's work together to reestablish integrity in this Chamber, integrity in our legislative process that was so badly damaged yesterday and last night.

The PRESIDING OFFICER (Mr. HUSTED). The Senator from Oklahoma.

---

## HISTORIC GREENWOOD DISTRICT–BLACK WALL STREET NATIONAL MONUMENT ESTABLISHMENT ACT

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Committee on Energy and Natural Resources be discharged from further consideration of S. 1051 and the Senate proceed to its immediate consideration.

The PRESIDING OFFICER. The clerk will report the bill by title.

The assistant bill clerk read as follows:

A bill (S. 1051) to establish the Historic Greenwood District–Black Wall Street National Monument in the State of Oklahoma, and for other purposes.

There being no objection, the committee was discharged, and the Senate proceeded to consider the bill, which had been reported by the Committee on Energy and Natural Resources.

Mr. LANKFORD. I ask unanimous consent that the bill be considered read a third time and passed and the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill (S. 1051) was ordered to be engrossed for a third reading, was read the third time, and passed as follows:

S. 1051

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

SECTION 1. SHORT TITLE.

This Act may be cited as the "Historic Greenwood District—Black Wall Street National Monument Establishment Act".

SEC. 2. DEFINITIONS.

In this Act:

(1) COMMISSION.—The term "Commission" means the Historic Greenwood District—Black Wall Street National Monument Advisory Commission established by section 5(a).

(2) MAP.—The term "Map" means the map entitled "Greenwood Historic District—Black Wall Street National Monument, Proposed Boundary", numbered 196/188,275, and dated August 2024.

(3) NATIONAL MONUMENT.—The term "National Monument" means the Historic Greenwood District—Black Wall Street National Monument established by section 3(a).

(4) SECRETARY.—The term "Secretary" means the Secretary of the Interior.

Case 4:25-cv-04966-HSG　　Document 1-4　　Filed 06/12/25　　Page 41 of 51

## SEC. 3. ESTABLISHMENT OF HISTORIC GREENWOOD DISTRICT—BLACK WALL STREET NATIONAL MONUMENT.

(a) ESTABLISHMENT.—

(1) IN GENERAL.—Subject to paragraph (2), there is established the Historic Greenwood District—Black Wall Street National Monument in the State of Oklahoma as a unit of the National Park System to preserve, protect, and interpret for the benefit of present and future generations resources associated with the Historic Greenwood District, Black Wall Street, and the Tulsa Race Massacre of 1921 and the role of each in the history of the State of Oklahoma and the United States.

(2) CONDITIONS OF ESTABLISHMENT.—

(A) DETERMINATION BY THE SECRETARY.—The National Monument shall be established on the date the Secretary determines that a sufficient quantity of land or interests in land has been acquired to constitute a manageable park unit.

(B) NOTICE.—Not later than 30 days after the date on which the Secretary makes a determination under subparagraph (A), the Secretary shall publish in the Federal Register notice of the establishment of the National Monument.

(b) BOUNDARY.—The boundary of the National Monument shall be as generally depicted on the Map.

(c) MAP.—The Map shall be on file and available for public inspection in the appropriate offices of the National Park Service.

(d) ACQUISITION AUTHORITY.—The Secretary may acquire any land or interest in land located within the boundary of the National Monument by—

(1) donation;

(2) purchase from a willing seller with donated or appropriated funds; or

(3) exchange.

(e) AGREEMENTS.—

(1) IN GENERAL.—The Secretary may enter into cooperative agreements, as appropriate, with public or private entities to provide and facilitate, within or outside the boundary of the National Monument, interpretive and educational services, administrative support, and technical assistance relating to the National Monument.

(2) MARKING AND INTERPRETATION OF SIGNIFICANT HISTORIC OR CULTURAL RESOURCES.—The Secretary may enter into agreements to mark or interpret significant historic or cultural resources or locations on land within the boundary of the National Monument.

(f) PRIVATE PROPERTY.—Nothing in this Act affects the rights of an owner of private property within or adjacent to the National Monument.

## SEC. 4. ADMINISTRATION.

(a) ADMINISTRATION BY SECRETARY.—The Secretary shall administer the National Monument in accordance with—

(1) this Act; and

(2) the laws generally applicable to units of the National Park System.

(b) MANAGEMENT PLAN.—

(1) IN GENERAL.—Not later than 3 years after the date on which funds are first made available to carry out this Act, the Secretary shall prepare a management plan for the National Monument in accordance with section 100502 of title 54, United States Code.

(2) CONSULTATION.—The Secretary shall consult with the Commission on the preparation of the management plan under paragraph (1).

## SEC. 5. ESTABLISHMENT OF HISTORIC GREENWOOD DISTRICT—BLACK WALL STREET NATIONAL MONUMENT ADVISORY COMMISSION.

(a) ESTABLISHMENT.—There is established an advisory commission, to be known as the "Historic Greenwood District—Black Wall Street National Monument Advisory Commission".

(b) DUTY.—The Commission shall advise the Secretary on matters relating to the development and management of the National Monument, including the construction of visitor service facilities and infrastructure.

(c) MEMBERSHIP.—

(1) COMPOSITION.—The Commission shall be composed of 11 members, to be appointed by the Secretary, of whom—

(A) 7 members shall be descendants of individuals who lived or worked in the Greenwood District of Tulsa in 1921, to be appointed after consideration of recommendations from interested organizations or individuals;

(B) 3 members shall have experience in the field of historic preservation or the purposes for which the National Monument was established; and

(C) 1 member shall be appointed after consideration of recommendations submitted by the Mayor of Tulsa.

(2) TERMS.—A member of the Commission shall be appointed for a term of 5 years.

(3) VACANCIES.—Any vacancy on the Commission shall be filled in the same manner in which the original appointment was made.

(4) SUCCESSORS.—Notwithstanding the expiration of a 5-year term of a member of the Commission, a member of the Commission may continue to serve on the Commission until the date on which—

(A) the member is reappointed by the Secretary; or

(B) a successor is appointed by the Secretary.

(d) CHAIR; BYLAWS.—The Commission shall—

(1) have a Chair, who shall be elected by the members of the Commission; and

(2) adopt such bylaws as the Commission considers necessary to carry out the functions of the Commission under this Act.

(e) MEETINGS.—The Commission shall meet at the call of—

(1) the Chair; or

(2) a majority of the members of the Commission.

(f) QUORUM.—A majority of the members of the Commission shall constitute a quorum.

(g) COMPENSATION.—

(1) IN GENERAL.—Members of the Commission shall serve without compensation.

(2) TRAVEL EXPENSES.—Members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for an employee of an agency under subchapter I of chapter 57 of title 5, United States Code, while away from the home or regular place of business of the member in the performance of the duties of the Commission.

(h) FACA NONAPPLICABILITY.—Section 1013(b) of title 5, United States Code, shall not apply to the Commission.

(i) TERMINATION.—The Commission shall terminate 10 years after the date on which the National Monument is established.

## NATIONWIDE INJUNCTIONS

Mr. LANKFORD. Mr. President, I rise today to talk about two separate issues that seem to be confusing in our current climate at this point.

The first of those is something called nationwide injunctions. Now, for folks that don't track this issue of nationwide injunctions, they have no idea what this means. I would tell you it is a fairly recent thing.

We have three branches of government. Any civics student in middle school knows that. We have the legislative branch, we have the executive branch, and we have the judicial branch. All three have unique roles. The legislative branch that we are in right now—we write the law. The executive branch executes the law. The judicial branch interprets the law.

Now, we know there is a difference between the House and the Senate. The Senate has a responsibility, and the House has a responsibility, and they are different, but they are both in the legislative branch.

The judicial branch also has different pieces as well, just like the legislative branch. There is the Supreme Court. We know that. It is right across the street. There are nine Justices that sit there, and they are the final decision makers on what the law says. But there are also daughter courts. There are circuit courts below the Supreme Court, and below the Supreme Court, there are district courts. District courts are scattered all over the country, and those individual, small district courts that are scattered all around the country—those individual courts make a decision on the person that is in front of them.

Now, again, this is fairly simple civics. When you have a Federal case in front of you, you go to the district court, and you file, and you get time in front of a judge. It may take time to be able to get there, but they make a decision on what is in front of them. That is what district courts do. They don't make decisions on something that is in a different State. The fine judges that are in Oklahoma make decisions about the case that is in front of them in Oklahoma. They don't decide a case in Indiana because they are not in Indiana and it is not a case filed in front of them; it is only the case filed in front of them in Oklahoma.

Now, if there is a dispute about that, it can be appealed, and it goes up to a circuit court, and it takes in a region. If there is a dispute even there, they take it on to the Supreme Court.

It is pretty simple—until the last several decades. You see, prior to 1960, there was no such thing as a nationwide injunction. No one even considered that. But we started seeing this beginning point where a district judge in a court in a single State would hear a case and say: This is so big, I am not going to let this go to the circuit court or to the Supreme Court. In my lower—in fact, lowest—court in the Federal structure, I am going to decide for the entire country, not just the person in front of me.

There were just a few that happened at that time, and the Supreme Court kind of looked away because they seemed like big cases. But then it started to rise.

During the George W. Bush administration, there were six nationwide injunctions that were done in these local district courts. Under President Obama, there were 12 nationwide injunctions that were issued. Then under President Trump, the first term, there were 64 nationwide injunctions.

Case 4:25-cv-04966-HSG    Document 1-4    Filed 06/12/25    Page 42 of 51

More and more individual district courts decided: I have an opinion, and I am not going to decide about the case in front of me; I am going to decide about the entire country.

Under President Biden, there were 14 nationwide injunctions that happened. In fact, President Biden's Solicitor General—the one who actually argues to the Supreme Court—warned that nationwide injunctions halt legal government actions and policies.

See, this is not a Republican-Democrat thing; this is a constitutional thing. This is the U.S. Constitutional structure to say: What is the role of lower courts? What is the role of a circuit court? What is the role of the Supreme Court?

We as people in our Nation honor the constitutional construct. For me, it is exceptionally important that the courts are blind to these issues and that they take action on the case in front of them and not a case that is not in front of them.

Senator GRASSLEY has introduced a bill to rein in the use of nationwide injunctions. His legislation is called the Judicial Relief Clarification Act. It makes it very simple. It is an important piece of legislation to decide how we are going to handle cases like this. It is very simple: Courts decide the cases in front of them. That had been the practice up until the early 1960s. We need to get it to be back to that practice again.

It is not a Republican issue and not a Democrat issue. It is a constitutional issue.

Nationwide injunctions are a backdoor way for judges to actually write legislation and to bring the decision of the executive branch to a halt.

The executive branch does have checks and balances, as does the legislative branch, as does the judicial branch. Those checks and balances are clear. If the executive branch does something inconsistent with the Constitution, it goes to our Federal courts and quickly works its way up through the district court, circuit court, to the Supreme Court. The Supreme Court is the one who checks the executive branch, not each district court around the country. It is the Supreme Court. We need to be able get back to that process in the days ahead. That needs to be done.

So I am looking forward to seeing Senator GRASSLEY's legislation actually move.

---

CONGRESSIONAL REVIEW ACT

Mr. LANKFORD. Mr. President, a second issue. This body for the last week has had a conversation about CRAs, and most Americans would just flip the dial and go "I don't even know what that is."

Well, a Congressional Review Act is a CRA. It has actually only existed in the last several decades as Congress found a reason to do oversight of the executive branch, especially when the

executive branch writes what is called a midnight regulation. Now, that doesn't mean they wrote it at midnight; that means they wrote it and put it in place at the very end of a Presidency.

A Congressional Review Act says that if there is a piece of regulation that is put in place, a rule that is done by an Agency and it is put in place—especially when there is a change in Congress and the White House—that the next Congress and the next White House can look at it and say: Yeah, that is out of bounds. That is too big. That needs to be stopped.

It was actually first used under President Bill Clinton. He put in what is called an ergonomics rule that literally changed the rules for every keyboard on every desk in America that would be produced. It was a giant rule they did at the very end. The next Congress came in and said: That would cost hundreds of millions of dollars. By the way, why should we in the Federal Government care what everyone's desk is like? Let people choose on that.

That simple statement, that simple first time that it was actually used, started a process now of saying: If an administration at the last minute puts in a rule that Congress then comes in and says "You overreached your bounds," we can check it.

Now, how do you determine whether it is a rule or not? What is a rule? What is not a rule? Because a lot of times, Agencies put out guidance or they put out orders. They put out all kinds of things. The Congressional Review Act is very specific. It says that you can only take action on this when it is actually a rule.

Well, there are two different ways that is determined, actually. One is, how much is it going to cost the entire economy? If it is over $100 million that it is going to cost the economy, it is a rule. It is going to have a massive effect across the entire economy.

The second way is pretty straightforward. The Government Accountability Office—you will hear it often referred to as GAO—in 2018, they came out and wrote their legal decision and said: It can even be a big thing that costs $100 million across the government. I am going to quote GAO in this, in their decision that the CRA—the Congressional Review Act—gives Agencies the primary responsibility for determining which Agency actions meet the CRA's definition of "rule." In other words, Agencies get the first option to say: Is this a rule or is this not a rule? If an Agency says it is a rule, it is a rule. That is what GAO said.

They came back a couple years later and rewrote an updated document. GAO came out again and said in their legal opinion: When an Agency submits a document to our office—that is, GAO—under the CRA, we consider that to be the Agency's determination that the document is a rule under the Congressional Review Act.

Now, again, everyone is glazing over on this because it just seems like

legalese. Why are we even talking about this? Well, because it has been in the news this week because something unique happened.

In 2022, the State of California put in a request to the Biden administration and said: We want to do a rule that is different in our State for electric vehicles than the rest of the country.

Now, you may say: Well, they can't do that.

Well, actually, interestingly enough, California can. California is the only State in America—because they had environmental rules even before the Clean Air Act was done. So California got a waiver, basically, to say: If your rules are at least as strong as the Clean Air Act, you can have your own rules, but you have to ask permission.

So that is part of law that was originally written on the Clean Air Act.

So California approached the Biden administration in 2022 and said: We would like to have an even stronger rule on emissions and on vehicles. We want to have a rule that says that by 2026, 35 percent of all vehicles have to be zero emission—that is, electric vehicles—by 2026.

Now, they asked for this in 2022. So they said: Within 4 years, we want 35 percent of all the vehicles sold in California to be zero emission, and by 2035, we want 100 percent of all vehicles to be electric vehicles, to be zero-emission vehicles.

Now, they asked for that in 2022, as I mentioned before. The Biden administration took a look at it, and in 2023, the Biden administration sat down with the GAO, the Government Accountability Office, and they started working on the text for this. The specific question was: How can we make sure that this is not a rule; that this is an order? And for months, they worked to be able to shape the language to be able to make sure it was an order, not a rule. And then the Biden administration sat on it and did nothing with it. In the meantime, 11 other States said: If California does that for electric vehicles, we are going to do that as well.

Here is the other thing about the law I didn't mention. The way the Clean Air Act gave permission to California to be able to do their own rules, the Clean Air Act is also written to say: If other States want to adopt the California rule because it is at least as strong as the national, other States could do it. So in the next few months, from 2022 and 2023, 11 other States adopt this rule. Suddenly, this is not a single-State issue; this is a national issue. In fact, it would now affect 40 percent of all the vehicles sold in America. This just shifted. This is not about one State anymore. This is almost half the vehicles sold in America now are going to have a new set of rules.

The Biden administration sat on that request. They didn't move on it. They have gotten their opinion worked out with GAO in 2023, but they didn't move on it, quite frankly, because the American people hate mandates. We don't

Case 4:25-cv-04966-HSG   Document 1-4   Filed 06/12/25   Page 43 of 51

like them at all. We like choice. We like to make our own decisions. I would dare say, everybody in this room uses a different kind of ink pen because we all like our choices and options. We drive different cars. We wear different colors of ties and different shoes because we like our options.

The Biden administration knew most American people would hate this rule because it suddenly created a nationwide mandate for what kind of car you could buy, and it had to be electric. So they sat on it.

After the election was over, in late December of 2024 and into January of 2025, the Biden administration dropped their order and gave California permission now to be able to do zero-emission vehicles by 2026. Next year, 35 percent of vehicles that have to be sold across 12 different States were going to have to be zero emissions, which would dramatically change car sales in America.

They did it after the election. That is the very definition of a midnight regulation. That is the very definition of a rule. It meets both criteria. It is well over $100 million of impact onto our Nation, and it affects multiple States.

So when the Trump administration came into office, the Environmental Protection Agency immediately reupped this, and they laid it down and said: That is definitely a rule. That is a rule. The Agency declared it. Now, it definitely has both definitions: The Agency declared it is a rule, and it is over $100 million of impact.

But then a letter went to GAO. Remember I said in 2023, they had worked with the Biden administration? Someone in this body wrote a letter to GAO and said: That thing you worked out with the Biden administration, do you still have that in the file? And GAO sent a letter back and said: We declared this, in 2023, just an order because it only affected one State, just California.

Here is the problem. GAO, as I mentioned in the beginning, in their very own legal opinion, said: If an Agency says it is a rule, it is a rule. And GAO doesn't even get involved. Literally, GAO broke its own legal opinion to now declare it is an order.

Why would they do that? Well, they would do that to prevent this Congress from speaking to that rule. It would no longer be under the Congressional Review Act.

I told you this was technical. But this was a fascinating little plot that went from 2022 all the way to the present to try to figure out how to get an electric vehicle mandate in America without ever having a vote in Congress. It was slick. It was well-shaped—except it was dependent on one thing: GAO breaking its own legal opinion.

I happened to call the leadership of GAO just last week and said: As far as you know, has GAO ever—ever—declared something not a rule when the Agency said it was a rule? And after a moment of silence, he responded: As far as I know, GAO has always deferred to the Agencies, until now.

They literally broke their own policy. They literally violated their own legal counsel. So now, we are in a quandary. GAO has broken their own legal counsel. We have an issue that will have well over $100 million of effect onto the country. It is now a near nationwide mandate on electric vehicle sales across the country without ever having a vote in Congress.

And our Democratic colleague says you can't change it because we worked a way to be able to fix it so you couldn't. That is not true. This body worked extensively with the Parliamentarian's office. This body worked extensively across the aisle to be able to have conversation, talking with members of the Democratic caucus to say: Do you really want to have, in your State, a mandate sitting there?

We don't.

Not only that, what will this do to our economy across the country? This was not about challenging the essence of the Senate; this was not about breaking the filibuster rule; this was not about going nuclear. This is about confronting an entity that broke its own rules intentionally to prevent this body from acting. This was a decision made to say: Get an Agency to impose on America a mandate that Congress never spoke to—never.

Where does Congress get to speak to this?

I would say to you as a Member of the U.S. Senate, the U.S. Congress is the lawmaking body for the country. The U.S. Constitution begins with "All legislative power shall reside in a Congress," not an Agency that wants to have electric vehicle mandates for every American. That is not how it works.

So we worked to make sure that we were clarifying one simple thing—in the Congressional Review Act, in this time as it has been every time it has been done and for every time in the future, this one simple question: When an Agency says it is a rule, is it a rule? It has been every other time until this time.

We clarified that one question. It didn't change the dates of the Congressional Review Act. It didn't change the process. It answered one question that, apparently, was in dispute that was never in dispute before but now appeared to be in dispute: When an Agency says it is a rule, is it a rule?

And we clarified what it has always been. The answer is, yes, it is a rule. And then we acted on that.

This body said, no, we will not have a nationwide mandate for electric vehicles across the country.

By the way, I don't have any opposition to electric vehicles. If somebody wants to buy an electric vehicle, they should be able to buy them. I think a lot of them look like great vehicles. Buy if you choose to.

But we are Americans. This body should not mandate that everyone has to be able to buy one. This body should make the path that if people choose to buy one, they can. That is setting the rules of the road saying: Here is the definition of a safe vehicle. Pick any one of those safe vehicles you want to be able to have.

We just set the rules of the road and then get out of the way and let people decide which vehicle they want to drive on that road. That is what has happened this week.

I understand there has been a lot of bluster and trying to redefine what actually occurred. But what has occurred this week is choice for the American people and clarification of what has always been: When an Agency says it is a rule, it is a rule—just like it was last year, just like it is now, just like it will be next year.

It is technical but important because the American people want to follow the U.S. Constitution and know that all legislative powers resides with this body, not in some other building somewhere down the street.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oklahoma.

## HISTORIC GREENWOOD DISTRICT—BLACK WALL STREET NATIONAL MONUMENT ESTABLISHMENT ACT

Mr. LANKFORD. Mr. President, I wanted to thank the Presiding Officer and several folks because we passed by unanimous consent today a national monuments piece for the Greenwood District in Oklahoma.

On May 31 of 1921, the largest race massacre in American history occurred in my great State of Oklahoma. It was in North Tulsa. That community was burned to the ground and destroyed in a race massacre. It is a scar on our Nation's history and on my State's history, but it is an area that we remember for a reason because we know how far we have come.

The community in North Tulsa and Greenwood—they are turning tragedy into triumph. They are starting new businesses. It is a beautiful area, and it continues to be able to grow and advance, but it still bears the scars of over 100 years ago of the incredible fire and massacre that happened there.

What we did today with unanimous consent didn't change the property rights of any person in Tulsa or in Oklahoma. It didn't add eminent domain. It didn't change codes. It didn't give the Federal Government control of any square inch of my great State. It just gave a designation—a monument designation—to that area. It is very similar to some other places in that it is just a designation so that we will always remember as a nation that something significant happened here.

And it is not just about what happened on that day, May 31, into June 1 of 1921. It is what it was like before, when it was Black Wall Street, a thriving community. It was like what it was like afterward, when people stayed and rebuilt a community. It is like what it

is now. It is people with great pride who continue to be able to thrive in that community and still call it Black Wall Street based on the entrepreneurship that is there.

So I appreciate my colleagues who have been involved in this—Chairman MIKE LEE and Ranking Member MARTIN HEINRICH—for their leadership in allowing this to be able to move today, and to ANGUS KING and CORY BOOKER, who has been my partner in this now for years, to be able to move this particular designation.

I just want to tell the Presiding Officer that I appreciate all of the work of this body in what has actually occurred here and for allowing this to move, because it may not be significant to a lot of people in the country, but it is to us in Oklahoma; it is to the good folks in Greenwood. And it is not a bad thing for us to remember, during this time period, how far we have come and the work that is still yet to come.

## APPOINTMENTS

The PRESIDING OFFICER. The Chair, on behalf of the President of the Senate, pursuant to Public Law 106–286, appoints the following Members to serve on the Congressional-Executive Commission on the People's Republic of China: the Honorable JEFF MERKLEY of Oregon, the Honorable TAMMY DUCKWORTH of Illinois, the Honorable ANDY KIM of New Jersey, the Honorable LISA BLUNT ROCHESTER of Delaware.

The Chair announces, on behalf of the Majority Leader, pursuant to Public Law 70–770, the appointment of the following individual to the Migratory Bird Conservation Commission: the Honorable JOHN BOOZMAN of Arkansas.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate proceed to executive session to consider the following nominations en bloc: all nominations on the Secretary's desk in the Air Force, Army, Coast Guard, Marine Corps, Navy, and Space Force, with the exception of PN89, Matthew Ryan, of the Army; that the nominations be confirmed en bloc; that the motions to reconsider be considered made and laid upon the table with no intervening action or debate; that no further motions be in order to any of the nominations; that the President be immediately notified of the Senate's action; and that the Senate then resume legislative session.

The PRESIDING OFFICER. Without objection, it is so ordered.

The nominations considered and confirmed are as follows:

NOMINATIONS PLACED ON THE SECRETARY'S DESK

AIR FORCE

PN116 AIR FORCE nominations (133) beginning JOSEPH L. ABRAMS, and ending JOSEPH M. YABES, JR., which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN117 AIR FORCE nominations (23) beginning MARGARET E. ABBOTT, and ending RACHAEL L. VOIGT, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN132-1 AIR FORCE nominations (209) beginning AMARA B. ADAMS, and ending ROBERT D. YOUNG, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

ARMY

PN121 ARMY nominations (3) beginning MATTHEW D. BRANDT, and ending DEJENE G. KASSAYE, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN122 ARMY nomination of Missy L. McNeill, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN134 ARMY nominations (932) beginning DOMANIQUE M. ABNER, and ending 00003259357, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN135 ARMY nominations (425) beginning EDWIN A. ABRAZADO, and ending 0003102153, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN136 ARMY nominations (466) beginning JESSICA S. ABBOTT, and ending 0003390902, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

PN137 ARMY nominations (29) beginning ROSS O. ANDERSON, and ending 0002422513, which nominations were received by the Senate and appeared in the Congressional Record of April 29, 2025.

COAST GUARD

*PN127-1 COAST GUARD nominations (262) beginning JOSHUA S. ALLEMAN, and ending MATTHEW G. ZAVALIJ, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

*PN128 COAST GUARD nominations (2) beginning JASON B. VEARA, and ending TARA E. LARKIN, which nominations were received by the Senate and appeared in the Congressional Record of April 28, 2025.

MARINE CORPS

PN50 MARINE CORPS nominations (2) beginning NATHAN C. HESS, and ending CHRISTOPHER S. LAMBERT, which nominations were received by the Senate and appeared in the Congressional Record of March 14, 2025.

PN151 MARINE CORPS nomination of Edward R. Rogers, II, which was received by the Senate and appeared in the Congressional Record of May 12, 2025.

NAVY

PN123 NAVY nomination of Wendell C. Eldridge, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN124 NAVY nomination of Eric M. Beall, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN125 NAVY nomination of Alexandra K. Holland, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

PN152 NAVY nominations (4) beginning ISABEL M. BERNAL, and ending JOHN J. W. YUN, which nominations were received by the Senate and appeared in the Congressional Record of May 12, 2025.

SPACE FORCE

PN126 SPACE FORCE nomination of Zachary R. Eagle, which was received by the Senate and appeared in the Congressional Record of April 28, 2025.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will resume legislative session.

## JOINT REFERRAL

Mr. LANKFORD. Mr. President, I ask unanimous consent that, as if in executive session, the nomination of Jeremiah Workman, of Ohio, to be Assistant Secretary of Labor for Veterans' Employment and Training, received in the Senate on May 6, 2025, be jointly referred to the Committee on Health, Education, Labor, and Pensions and the Committee on Veterans' Affairs.

The PRESIDING OFFICER. Without objection, it is so ordered.

## RESOLUTIONS SUBMITTED TODAY

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate now proceed to the en bloc consideration of the following resolutions, which are at the desk: S. Res. 250, S. Res. 251, S. Res. 252, S. Res. 253, and S. Res. 254.

There being no objection, the Senate proceeded to consider the resolutions en bloc.

Mr. LANKFORD. I ask unanimous consent that the resolutions be agreed to, the preambles agreed to, and the motions to reconsider be considered made and laid upon the table, all en bloc.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolutions were agreed to.

The preambles were agreed to.

(The resolutions, with their preambles, are printed in today's RECORD under "Submitted Resolutions.")

## HONORING THE LIFE, ACHIEVEMENTS, AND LEGACY OF FORMER UNITED STATES SENATOR CHRISTOPHER "KIT" BOND OF MISSOURI

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Senate proceed to the consideration of S. Res. 255, which is at the desk.

The PRESIDING OFFICER. The clerk will report the resolution.

The assistant bill clerk read as follows:

A resolution (S. Res. 255) honoring the life, achievements, and legacy of former United States Senator Christopher "Kit" Bond of Missouri.

There being no objection, the Senate proceeded to consider the resolution.

Mr. LANKFORD. I ask unanimous consent that the resolution be agreed to, that the preamble be agreed to, and that the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 255) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in today's RECORD under ''Submitted Resolutions.'')

---

## RECOGNIZING THE SIGNIFICANCE OF ASIAN AMERICAN, NATIVE HAWAIIAN, AND PACIFIC ISLANDER HERITAGE MONTH AS AN IMPORTANT TIME TO CELEBRATE THE SIGNIFICANT CONTRIBUTIONS OF ASIAN AMERICANS, NATIVE HAWAIIANS, AND PACIFIC ISLANDERS TO THE HISTORY OF THE UNITED STATES

Mr. LANKFORD. Mr. President, I ask unanimous consent that the Committee on the Judiciary be discharged from further consideration and the Senate now proceed to S. Res. 214.

The PRESIDING OFFICER. The clerk will report the resolution.

The assistant bill clerk read as follows:

A resolution (S. Res. 214) recognizing the significance of Asian American, Native Hawaiian, and Pacific Islander Heritage Month as an important time to celebrate the significant contributions of Asian Americans, Native Hawaiians, and Pacific Islanders to the history of the United States.

There being no objection, the committee was discharged, and the Senate proceeded to consider the resolution.

Mr. LANKFORD. I ask unanimous consent that the resolution be agreed to, that the preamble be agreed to, and the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The resolution (S. Res. 214) was agreed to.

The preamble was agreed to.

(The resolution, with its preamble, is printed in the RECORD of May 8,2025, under ''Submitted Resolutions.'')

---

## ORDERS FOR FRIDAY, MAY 23, 2025, THROUGH MONDAY, JUNE 2, 2025

Mr. LANKFORD. Mr. President, I ask unanimous consent that when the Senate completes its business today, it adjourn to then convene for pro forma sessions only, with no business being conducted, on the following dates and times: Friday, May 23 at 10 a.m.; Tuesday, May 27 at 1:15 p.m.; Friday, May 30 at 7 a.m.; further, that when the Senate adjourns on Friday, May 30, it stand adjourned until 3 p.m. on Monday, June 2; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and that the Senate be in a period of morning business with Senators permitted to speak therein for up to 10 minutes each; finally, notwithstanding rule XXII, the cloture motions filed on May 22 ripen at 5:30 p.m.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## ADJOURNMENT UNTIL MAY 23, 2025, AT 10 A.M.

Mr. LANKFORD. Mr. President, if there is no further business to come before the Senate, I ask that it stand adjourned under the provisions of S. Res. 255.

There being no objection, under the previous order and pursuant to S. Res. 255, as a further mark of respect for the late Christopher ''Kit'' Bond, the former Senator from the State of Missouri, the Senate, at 4:42 p.m., adjourned until Friday, May 23, 2025, at 10 a.m.

---

## NOMINATIONS

Executive nominations received by the Senate:

IN THE AIR FORCE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

JEFFREY A. SMITH

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

JOSHUA S. STINSON

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

CYRUS A. PERRY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

BENJAMIN R. WASHBURN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

RAYMOND E. KERR

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

MATTHEW T. OLSON

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

*To be colonel*

LEMUEL J. RIOS

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

*To be colonel*

JESSE C. ALLEN
BRYAN R. AMARA
WILLIAM S. ANDERSON II
ERIC D. ARCARA
CHRISTINA M. BALOCKI
BRANDON P. BAUGHMAN
ERIKA A. BOENISCH
MICHEAL E. BOLES
BRETT D. BOLLINGER
JOSEPH L. BOUSQUET
DOUGLAS C. BOWERS
CHRISTOPHER M. BOYD
AARON T. BOYER
JAISON T. BROWN
JERAMY S. BROWNING
ROBERT P. BUZZELL
MATTHEW V. CAIN
RAOUL P. CALIMLIM
JOHN L. CHAPMAN
CODY W. CLARK
JEFFREY M. CRETZ
CHRISTOPHER M. DANIELS
JORDAN A. DARNAUER
JEREMY D. DEROXAS
RICHARD D. DIXON
JEREMY R. DOOREN
THOMAS R. DORSETT
DENNIS M. DUKE
JENNIFER R. DURBIN
MATTHEW M. ERPENBACH
TOBBY R. EVANS
KENNETH F. FECHTER
SCOTT A. FEDAK
KELLY A. FORREST
DANIEL E. FROST
JAMES T. GARVEY
JAMISON M. GILKERSON
WILLIAM M. GOURLAY
MICHAEL S. GRAHAM
JAMES J. GROSS
BRIAN R. HANRAHAN
ANNE K. HANSEN
KENNETH S. HARTMAN
JEANIE L. HELMS
PETER L. HICKMAN II
ERIE L. HOWG
RUSSELL A. ISEMINGER
BRIAN A. J. JACKSON
SHAHZAD K. JAIROMI
ELZADIA P. KAINA
JAMES A. KEPKA
JEREMY K. KEPTER
CRAIG KINKADE
JASON D. KOLACIA
KEVIN A. KRAUSS
JUSTIN C. KROWICKI
GARY A. LEADSTROM
RACHEL L. LEIMBACH
JESSICA A. LEWIS
MARGIE J. LIPPERT
JOHN W. LOVE
AMBER L. MACRAE
NATHAN D. MASUNAGA
CHRISTOPHER J. MAYOR
KENNETH J. MCCORMICK
ANTHONY C. MEYERS
JOHN A. MIMS
STEVEN MONTALVO
TONJA M. MOON
ANTHONY R. MORFITT
JOHN W. MOYER
JOHN P. MURTHA
RICHARD A. NEELY
LEE R. NIETZEL
TIMOTHY J. NOVAK
MICHAEL F. ODONNELL
JON PERLSTEIN
SEAN S. PETERSON
JESSICA D. PISANO
ANDREW D. POWELL
MICHAEL K. PUGH
LEE G. RINELLA
RONA P. RITCHIE
ANTONIO D. RODRIGUEZ
BRANDON A. ROTH
RYAN W. SATTERTHWAITE
DOMINICK A. SICILIANO
BRENDAN N. SIMISON
PATRICK E. SLAVIN
SCOTT A. SMIT
ELIM H. SNIADY
CHRISTOPHER S. SOLBERG
RANDY ST JEAN
SHANA M. STROH
JOHN D. THOMPSON
ROBERT P. TONEY
PATRICK A. TRITZ
DIEGO M. URIBE
JAMES A. VENDETTI
JOSEPH R. WINTER
JOSEPH P. WITT
BRIDGET S. ZORN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

CLAYTON J. AUNE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

GARRETT M. WELLS

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

BRANDON G. WAGONER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be major*

GARRETT C. GUTHRIE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

VANESSA J. MOFFETT

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

RAMON MORADO

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES AIR FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

JOHN H. DIAZ

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

BRENNAN P. MCDONALD

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE AIR FORCE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

TYLER B. SMITH

IN THE ARMY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT AS A PERMANENT PROFESSOR AT THE UNITED STATES MILITARY ACADEMY IN THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTIONS 7433(B) AND 7436(A):

*To be colonel*

MARGARET A. NOWICKI

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES ARMY UNDER TITLE 10, U.S.C., SECTION 624:

*To be colonel*

ARTHUR G. BRONG

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES ARMY DENTAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624 AND 7064:

*To be lieutenant colonel*

SPENCER R. ATKINSON
BRITTANY E. BARTENSTEIN
ANGELICA BEDOYA ASTRAUSKAS
GARY M. BLYLEVEN
JESSICA L. BONDYCAREY
RAQUEL C. BRENTSON
REBECCA H. BRINDA
KAISHA T. CALVIN
YUSHENG CHEN
DEBRA L. CHURCH
NICOLE A. COLLINS
FRANK A. DELATOUR
JOSHUA D. GONZALEZ
JOHN C. HASTINGS
ANDREW C. JENZER
JOSHUA D. JONES
ANDREW J. KLISH
NATHAN E. KOSIBA
KIRSTIN M. LOW
JEFFREY M. MARRS
TAE Y. MOON
JENNY J. OH
NATHAN S. PERSELL
NICHOLAS G. RUANA
JAE W. SHIN
MARTIN J. SMALLIDGE
THOMAS M. WELNAK
ANNA YOO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES ARMY MEDICAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624 AND 7064:

*To be lieutenant colonel*

JOSEPH R. ADAMS
BRETT S. AMBROSON
MARC K. AMING
ROBERT J. ATCHISON
DRISCOLL H. AUGUSTINE
EVAN M. BAINES
LORAINE BARAKI
MORGAN R. BARRON
JULIE A. BAUNCHALK
CHRISTOPHER M. BELYEA
SARA E. BIBBENS
MATTHEW R. BLATTNER
KATHERINE A. BOHRINGER
KATHLEEN M. BOYER
JOSEPH D. BOZZAY
TOMMY A. BROWN II
WESLEY L. BRUNDRIDGE
RICHARD M. BUCK
ROBERT T. BUCKLEY
ANTHONY T. CANCIO
MIGUEL J. CANO
WILLIAM R. CARLTON, JR.
HANNAH C. CHEN
SIEN CHEN
JIN H. CHO
JAMES P. CHOHONIS
KELLY E. CHOHONIS
EDWIN Y. CHOI
ZACHARIAH Q. CLARK
BENJAMIN A. COOK
CHRISTOPHER J. CORKINS
BRIAN M. CORLISS
AMANDA C. COUSINS
CHRISTOPHER J. CRELLIN
HOLLY B. CRELLIN
MICHAEL J. DERICKSON
ALEXANDER A. DEW
LAITH R. DINKHA
KATELYN A. DOLEZAL
MERCEDES Y. DRISCOLL
CHRISTOPHER R. DUNBAR
MICHAEL J. ELSENBECK, JR.
DIMAS C. ESPINOLA
THORAN G. FARNSWORTH
SEAN E. FINDLAY
RAYMOND D. FISHER

CHRISTOPHER T. FLINTON
SHELLEY A. FLORES
NATHAN A. FRANKLIN
MEAGAN R. FREEMAN
SAMUEL V. GALIMA
TIMOTHY R. GALL
PHILIP H. GOERING
CHRISTOPHER M. GRACE
ANDREW E. GRAFF
JAMES I. GRAGG
MATTHEW D. GRANT
CARY T. GRAYSON III
PATRICK D. GRIMM
ALLY HA
ALAN J. HANS
MATHEW D. HARRELL
BRANDON F. HARRIS
DANIEL M. HEILMANN
GREGORY T. HORN
DAVID R. HOUHANI
ALEXANDER P. HOUSER
ANDREW J. HOWARD
WILLIAM T. JAEGLE
ASHLEY R. JONES
ZACHARY C. JUNGA
BRYAN J. KANTNER
AMIR KARIMIAN
THOMAS M. KELLEY
JOSEPH A. KELLY
ELAINE S. KEUNG
ALYSON M. KIL
KARL J. KMIECIK
ADAM W. KOWALSKI
JOHN P. KUCKELMAN
SABRINA E. KUNCIW
ALEXANDER E. LANIGAN
BRIAN H. LEE
MITCHELL A. LEGG
ROBERT D. LEIMBACH
JIE S. LEVEN
CORY G. MADIGAN
MEGAN B. MAHOWALD
JEREMY J. MANDIA
JOSEPH A. MANSFIELD
ANDY J. MARTINEZMORALES
CHINYERE A. MBAGWU
JOHN F. MCCAULEY IV
EDWARD R. MCCLELLAN
ISAAC E. MCCOOL
STERLING S. MCKISSACK
CLAY M. MERRITT
RAYMOND M. MEYER
CHRISTOPHER F. MIDDLEMAN
CHARLES A. MILLER
SUMIT MITTAL
JUSTIN G. MYGATT
MATTHEW A. NESTANDER
AMANDA P. NOPAKUN
ROBERT D. NORMAN
DREW W. NUTE
JOSHUA J. OLIVER
SARAH M. ORDWAY
JACOB R. PALUBICKI
EDWARD J. PARK
ELIZABETH M. PERKINS
CYNTHIA PHILIP
CODY J. PHILLIPS
ELYSE F. PIERRE
ALFRED J. PISANO
CHANDRA PUNCH
LAUREN K. RECKLEY
CREVAN O. REID
DUSTIN R. ROBERIE
CAROLYN A. ROBINSON
MARINA J. RODRIGUEZ
TYLER S. ROGERS
DANIEL J. ROUBIK
TIMOTHY G. RUSSELL
STEPHEN J. SAVIOLI
JOHN P. SCHACHT
WILLIAM C. SCHRAFFENBURG
ANN SCHILLING
JOHN Q. SCHISLER
TONI M. SCHISLER
STEPHANIE J. SEXTON
ANGELA K. SHADDEAU
ROWAN R. SHELDON
JAMES M. SILCOX
SARAH M. SMILOW
CAITLIN S. STEELE
FEHLIN STONE
JUSTINE K. STREMICK
JONATHAN I. STUART
PETER P. STUDEBAKER
NICHOLAS M. STUDER
AZFAR S. SYED
PAUL A. TATE
DERRICK J. THIEL
MATTHEW W. THOMPSON
TEODORA J. THOMPSON
DEWEY J. THOMS
RICHARD J. UPTON
PATRICK F. WALKER
MERRITT E. WARE
STEVEN L. WARNER
SHARON M. WEEKSGROH
JENNIFER M. WELLINGTON
TARA E. WHITE
SEAN L. WILKES
PAUL R. WISTERMAYER
CLAIRE P. WITMER
YUSHUANG XIE
YUCHING YEH
STEPHEN M. YOUNG
LIANG ZHOU

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES ARMY

DENTAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624 AND 7064:

*To be colonel*

MICHAEL M. ARMSTRONG
ANDREW M. BAKER
CHRISTOPHER K. CHANG
DAVID A. DANTES
YONG S. KIM
KWAME O. KWATENG
KHAI Q. LE
DONG S. LEE
JUSTIN P. LEWIS
SERGIO MUNOZ
DEMARCIO L. REED
RUSSELL K. SEARLE
ERIC J. SETTER
MARY S. STUART
SHANI O. THOMPSON BURKES
NAM T. VO
DOUGLAS N. WATERMAN
GARRETT G. WOOD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES ARMY MEDICAL CORPS UNDER TITLE 10, U.S.C., SECTIONS 624 AND 7064:

*To be colonel*

JASON B. ALISANGCO
DAVID M. ANDERSON
KELLY G. ANDERSON
MICHAEL D. APRIL
PETER S. ARMANAS
DARRELL F. BARKER
KELLY E. BEEKEN
ADRIANE E. BELL
MARK A. BLACK
JOEL R. BROCKMEYER
KRISTEN P. BUNCH
KRISTINA G. BURGERS
JASON M. CAGE
BARRETT H. CAMPBELL
MARIDELLE M. CHARIT
GRIGORY CHARNY
BRIAN M. COHEE
SUSAN M. COLLA
JAMES A. COX
RAJESH K. DANIELS
CASEY A. DANIELSEN
MIA D. DEBARROS
ERIK A. DEDEKAM
KATHERINE L. DENGLER
GRANT H. EVANS
BRANDON I. GARDNER
RONALD P. GOODLETT
LOUIS K. HAASE
SONYA H. HEIDT
AICHA M. HULL
KEITH L. JACKSON
DANIEL G. KANG
DAVID KASSOP
MONIKA A. KRZYZEK
CHRISTIAN A. LABRA
JAMES C. LEAGUE-PASCUAL
JOSEPH S. LEE
MYEO A. LU
JASON A. MACDONNELL
MATTHEW E. MILLER
MICHAEL D. NICKERSON
MELODY R. NOLAN
ARTHUR C. OKWESILI
RYAN T. OLESZEWSKI
MICHAEL I. ORESTES
NICHOLAS M. ORR
PATRICK D. OWSIAK
JEANNE C. PATZKOWSKI
MICHAEL S. PATZKOWSKI
ERIKA PETRIK
JILLIAN F. PHELPS
BRUCE D. PIER
JUSTIN D. PILGRIM
JASON S. RADOWSKY
JULIE A. RIZZO
ERIK Q. ROEDEL
LUIS O. ROHENA
REBECCA M. SEIFRIED
JERRY P. SEILER
OMAR SHAMI
WILLIAM J. SHERMAN
EMILY H. SHIN
TERRY SHIN
EMILY A. SIMMONS
TYSON J. SJULIN
RACHEL M. SULLIVAN
JONATHAN P. SWISHER
EVAN T. TRIVETTE
ROBERT J. WALTER
MATTHEW A. WESTHOFF
AARON B. WICKLEY
ALICIA M. WILLIAMS
SHAPRINA R. WILLIAMS
AHMAD H. YASSIN
CHONG K. YI
0002861750
0002875100

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE RESERVE OF THE ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

KYLE L. AKERS
JOHN B. ALLEN III
LUIS M. ALVAREZ
ROSS D. AMICO
JON M. ANDERSON

DAVID C. ANDREWS
ASHKAN ANGHA
KENNETH V. ANTHONY
CHRISTOPHER S. APPLEGATE
JEFFREY W. ARLEQUE
STEPHEN C. ARNETT
ADAM R. ASHWORTH
SAMUEL W. BAKER
SETH A. BARUN
JAMES W. BASS
JOSHUA F. BEHSUDI
ROBERT R. BELL II
MICHAEL J. BENDICH III
RAYMOND A. BENISEK II
BRANDON J. BENNETT
MATTHEW T. BESMER
JAMES A. BLOCKER
ROBERT L. BOHL
CHRISTOPHER B. BOWERS
BRAD D. BRADFORD
DANIEL M. BRADY
MATTHEW D. BRADY
MARCO D. BRETTMANN
PERVIS L. BROWN
DARIN G. BUSSABARGER
JUSTIN L. BUTCHER
NICHOLAS I. CALENICOFF
TRISHA A. CAMPELL
JARID A. CATRENICH
JASON L. CELLETTI
STEPHEN O. CHAN
DAVID S. CHANG
HARRY P. CHANG
DANIEL M. CHICOLA
DANIEL L. CHISM
THOMAS R. CLARK
ANITA Y. CLEVELAND
ORLANDO A. COBOS
BENJAMIN C. COOK
SHANON W. COTTA
JESUS J. CRUZ
JAMES R. DAVIS
JOSEPH M. DAVISON
TIMOTHY D. DEAN
MONICA M. DELACRUZ
JACK H. DENTON
TREVOR A. DEVALL
JASON D. DIAZ
NATHANIEL E. DIBLING
NATHAN D. DICKS
BRIAN D. DIMOND
JUSTIN C. DOUGLAS
JAMES N. DOWNEY
BRIAN T. DUDLEY
BRIAN A. DUKES
TERRY D. DURHAM
THOMAS L. EDWARDS
JAMES J. ELLIOTT
JASON R. EVANS
JOSHUA T. EVILSIZOR
COLIN F. FALKENSTEIN
DANIEL L. FALL
ROBERT N. FELICIO
JOHN D. FIEREK
DAMIEN K. FISHER
MICHAEL J. FORD
LEN A. FORTENBERRY
SARAH R. FRATER
MAX W. FURMAN, JR.
CLAUDIO GARCIA-CASTRO
DAVID J. GARNER
TODD N. GEORGE
RICHUARD C. GHINELLI
ALLEN E. GLEATON, JR.
CURTIS A. GOLLER III
MARK D. GOODWIN
JENNIFER M. GREEN
AARON L. GRIMM
PETER O. GUSTAFSON
JAYSON R. HACKETT
KYLE J. HALSETH
CHRISTOPHER D. HANNA
DEREK W. HART
EARNEST G. HEARN
JONATHAN P. HEARN
PATRICK D. HEFFERNAN
DANIEL S. HENDERSHOT
JASON P. HENDERSON
EVAN D. HESSEL
ALLAN T. HETTEEN
JAMES P. HICKS II
JOHN M. HOBOT
JAMES R. HOLDEN
JASON D. HOLMES
ERIC M. HOLTZAPPLE
JOHN T. HUBBARD
JUSTIN H. HUNTER
BRIAN G. IAROSSI
SAFIYA L. INGRAM
MARLIN J. JENKINS
PHILIP K. JERGENSON
DAVID L. JOHANSSON
BRADY B. JOHNSON
MARK D. JUNTUNEN
CHRISTOPHER L. JURNEY
LAURA L. KEENAN
CHRISTOPHER P. KEENE
MARK H. KELLIHER
MATHEW D. KILGORE
CHIN U. KIM
JAMES P. KING
NATHANIEL S. KING
JASON M. KLEINSCHMIT
JUSTIN K. KRAMER
MARK I. LAMPTON
DAVID M. LAUGHLIN
AARON P. LEFTON

RYAN A. LEONARD
CAMALA A. LEPAK
ALAN W. LESTER
JASON B. LEWIS
AARON D. LOCKHART
BARBARA J. LOWE
FLORANTE P. MANALOTO
THOMAS W. MANERA, JR.
JEFFREY M. MANN
JACKIE M. MANTON
JOSEPH D. MARTINKIS
PETER J. MCCANN
TREVIS A. MCCULLOUGH
ROBERT L. MCELHANEY
ARTHUR L. MCLAURIN, JR.
JESSICA J. MCPHERSON
THOMAS S. MEARES
JOSEPH P. MENDEL
RENE A. MENDOZA
MATTHEW D. MERCADO
JERAMY A. MILES
DANIEL W. MILLER, JR.
TODD R. MILLER
MICHAEL L. MINARD
NATHAN J. MOORE
CLIFF A. MORALES
DANIEL J. MORRISON
CHARLTON J. MOSLEY
DANIEL M. MURPHY
SETH D. NELSON
PETER J. NEWMAN
THOMAS R. NYFAVER
KYLE W. OBRECHT
DEMETRIUS D. PARROTT
ALICIA M. PARTIN
KENNETH D. PAUL
BRUCE J. PAULEY
LELAND G. PEARSON
IAN H. PIENIK
BRANDON T. PITCHER
ERNEST F. POLK III
BENJAMIN W. POSIL
CHARLES B. PRIEST
FRANK G. QUERNS III
ERIC L. QUINN
BRYAN P. REED
ROBERT W. REED
RODNEY C. RHODES
NOLAN O. RINEHART
JEFFREY T. RITTER
BRADLEY E. ROACH
SAMUEL J. ROBERTS
EDWIN M. RODRIGUEZ
MARCOS R. ROGERS
ZACHARY R. ROLF
JOSHUA M. ROMANO
KEVIN A. ROMINE
RICHARD P. ROWLAND
ROBERT C. SANDS
MICHAEL B. SHARP
ISAAC S. SHIELDS
STEFAN A. SHIRLEY
VINCENT SIRACUSA, JR.
GREGORY W. SMITH
JAMES W. SMITH
JEREMY K. SMITH
BRETT G. SNYDER
JEROMY B. SPELLINGS
GABRIEL D. SPICER
DONALD F. STADOLNIK, JR.
HARRY A. STAFFORD IV
GEORGE J. STALEY
BEVAN C. STANSBURY
SAMUEL B. STRAIN III
RALPH W. SULLENBERGER, JR.
GRANT T. SWINGER
PATRICK J. SZVETITZ
JEREMIAH J. SZYNSKIE
CHRISTINA L. TAYLOR
CHAD E. THOMSON
JASON L. THOMSON
LUCAS K. THORNE
DAVID A. THORNELOE
ADAM J. TIFFEN
CHADD M. TILLMAN
ERIC J. TOLSKA
BENJAMIN T. TOOLEY
OSCAR TORRES
JOSHUA A. URBAN
MARK A. VANVELDHUIZEN
DUC M. VO
LEW R. WEBER
JONATHAN R. WILKES
CHRISTOPHER D. WINNEK
JESSE N. WRIGHT
MATTHEW S. YORK
ADAM H. YOUNG
BRIAN E. ZDUNOWSKI

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE RESERVE OF THE
ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

ANGELA J. ALLEN
ERIC M. ANDERSON
PAUL D. BARNETT
MATTHEW R. BERNOSKI
CHARLES R. BONNER II
JOSHUA C. BOONE
DAVID L. BREWER
WILLIAM S. BROWN
SONYA L. CARTER
KURT C. CHARTIER
ROBERT O. COOKE
STEPHEN N. COWNE, JR.
BRADLEY D. DENISAR

CHARLES J. DUFFEE
THOMAS C. DUNAWAY
SARAH E. FRATICELLI
JANE A. GUMATAOTAO
QIANA HARDER
DAVIS N. HO
JAMES A. HOLLEY, JR.
JEREMIAH C. HOOD
TAYLOR JONES
JASON R. KIM
MEESHACK R. LEE
CHRISTOPHER C. LEWIS
JOHN H. LI
BRIAN M. MANDOCK
CARMONA C. MARCH
CHRISTIAN MARTINEZ
AUDREY D. MATTHEWS
CHAD V. MAYNARD
BRIAN J. MORRIS
FREDERICK A. MOSS
BRONWYN B. ODHNER
DAVID W. POWELL
JOSE H. RIVERA
LACEY R. ROCHA
MATTHEW D. ROUSSEAU
CHARLES J. SCHECK
GREGORY L. SMITH
DUANE E. SYNOGROUND, JR.
CHRISTOPHER H. TISON
MATTHEW P. VERETT
TYLER J. WATERHOUSE
KARL S. WHATLEY
COREY F. WILLIE
MATTHEW W. YARBROUGH
SHUN Y. YU

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT
TO THE GRADE INDICATED IN THE RESERVE OF THE
ARMY UNDER TITLE 10, U.S.C., SECTION 12203:

*To be colonel*

CARLOS J. ACOSTA RIVERA
JOSHUA B. ADAMES
THOMAS L. ADAMS III
YOLANDA M. AHMAD
ALEXANDER R. ALABIAD
DANIEL R. ALBAUGH
SYED M. ALI
MONETTE D. AMAYA
PATRICK J. ANDERSON
STEPHEN M. ANEST
THOMAS S. BAILEY
BRETT L. BARTELL
KERRY D. BATES
ROBERT L. BEAT
PETER BERMUDEZ
LEE W. BERRY
JAMES M. BISHOP
ASHLEY L. BLESSUM
PHILIP J. BOLDT
LUCAS J. BREWER
DANTE O. BROWN
KRISTEN G. BROWN
STEPHANIE M. BUCK
JORDAN L. BURFIELD
ANTHONY P. CARRIERE
SCOTT M. CARRINGTON
DANIELLE I. CASEY
ELISABETH J. CASTILLO
HIRAM A. CENTENOJUSTINIANO
COLLEEN C. CHIANESE
KEITH J. CHRUSTOWSKI
JOSHUA R. CLARK
SHANE B. CLARKE
MARIA E. CLAUS
KEITH A. CLAUSON
MICHAEL J. COCHENOUR
BRANDON B. COLE
JON R. COPE
MICHAEL P. CRAM
JAMES A. CROWELL
BRAD M. DAVIES
CHAD A. DAVIS
RAYMOND N. DEVOE
MATTHEW R. DICK
HUNG M. DIEP
CHARLES F. DOTTER
WILLIAM S. DOUGLASS
LETICIA L. DREILING
KARA E. DUBINSKY
BARON J. DULANEY
SCOTT M. EBERLE
DAVID L. EVANS
TIMOTHY C. FARRAR
ERICH W. FEIGE
SARAH M. FERNANDEZ
BEATRIZ A. FLOREZ
BENJAMIN L. FLOSI
LOUIS FOUST III
JONATHAN L. FREEMAN
PATRICK D. FRESHWATER
SARAH C. GAGE
PAMELA N. GILBERT
TERRELL T. GIVENS
DANIEL A. GOMEZ
RICHARD J. GOMEZ
LEWIS J. GRAY
STEVEN J. GRIFFIN
ROBERT J. GUAGLIARDI
LUIS A. GURRI
SAMUEL T. GUY
MATTHEW T. HAGERMAN
MATTHEW J. HALKO
GEORGINA HAMMOND
PAUL S. HAN
ANTONIO J. HARDY
SARA M. HARE

JOSEPH N. HARRIS
NICOLE M. HATCH
KNUD A. HERMANSEN
DEMERE K. HESS
AARON L. HOFFMAN
ROBERT M. HOGUE, JR.
LAUREN D. HOLLEY
SUNG S. HONG
LANCE R. HUBLICK
BILLY J. HYATT
JENNY IGLESIAS
MATTHEW O. ISNER
THOMAS G. IVANCO
JOHN H. JACKSON
LISA A. JASTER
BENJAMIN M. JENSEN
JEREMY M. JOHNSON
JEFFREY M. JONES
JEFFREY S. JONES
MATTHEW F. JOYCE
NATALIE A. JUHLIN
JACOB R. KARN
KEVIN A. KAUFMAN
KHARA J. KEEGAN
CHEYENNE D. KIEL
ANDREW R. KIMES
JASON R. KROPTAVICH
PHILLIP LEAHY
CHRISTOPHER K. LEE
JASON E. LESSER
JOSHUA A. LEWIS
JEFFREY Z. LI
MICHAEL A. LIPSNER
LUKE A. LISELL
BRIAN E. LOVE
WILLIAM V. LOWRY
CHARLES V. LUCAS
KATE J. MACALLISTER
CHRISTOPHER E. MACKIN
RENE A. MAHOMED
STEPHANIE M. MANN
JEREMIAH P. MANNING
MICHAEL T. MARRA
NORMA L. MARTINEZ
THEODORE C. MATAXIS
WILLIE O. MCCALLISTER
CHARLES R. MCGRUE
THOMAS M. MCINNIS
RYAN L. MENDENHALL
DANIEL R. MENENDEZ
SHAWN M. MEREDITH
MICHAEL A. MICHELL
NOEL MILIAN
SAMUEL A. MILLER
ARMER MITCHELL III
JEREMY S. MITCHELL
DIANE N. MONCRIEF
NATHAN F. MOORE
JOHNNY T. MORSE
ROBERT A. MUSTAFA
MARK E. MYERS
CHRISTOPHER H. NEELEY
BRUCE A. NEIGHBOR
ADAM C. NICKELSON
PATTON C. NIX
MICHAEL E. NOCKUNAS
KRISTY L. NORQUIST
BILAL M. OMARJEE
DUSTAN G. OWENS
JENNIFER S. PAMPUCHBORDEN
EVELYN R. PARKS
DAVID B. PAROBY
DIANA J. PARZIK
JARED D. PATTON
DEVIN R. PENALUNA
WOODROW D. PENGELLY
VICTOR M. PEREZ
MARTIN C. PETERS
JEFFREY R. PETTY
WILLIE O. PORTER, JR.
IRA PRAY
ANDREW K. PREWITT
SHAWN W. PRINKEY
ADAM D. PROCTOR
JOSEPH A. PROCTOR
GEORGEO X. PULIKKATHARA
ROMEO X. PULIKKATHARA
CHRISTOPHER M. PULLIAM
ANDREW J. RADANO
DAVID M. RADERSTORF II
MICHAEL R. REDINGTON
DAVID A. RICHARDS
JOHN C. RICHIE
EDWARD J. RIFFLE
JASON S. RITTER
JOSE M. RIVERA
ANDREW M. ROMER
ADAM C. ROSENBAUM
ROY A. ROSS
JEREMI D. RUBY
CHRISTOPHER M. RUFF
SCOTT M. RYMAN
JAMES P. SAKAI
JESUS SALAZAR
MOLLY J. SCHAEFER
MICHAEL J. SCHILLING
MICHAEL N. SCOTT
NATHAN D. SCOTT
PAUL A. SEGRO
JAMES P. SERVI
CHRISTOPHER R. SILBAUGH
MATTHEW D. SILVERMAN
BLAZEJ SLEZAK
BRADLEY D. SMITH
PHILLIP J. SMITH
DAVID C. SOUTTER
JARED R. SPERLI

SAMANTHA W. STANFORD
CHRISTOPHER J. STEIGHNER
CHRIS M. STONE
KEVIN P. STURM
DAVID M. STYS
ADAM M. SYMANSKI
MATTHEW J. TAVARES
CHARLES A. TAYLOR
GARRETT S. THOMPSON
DARRELL R. TRAN
STEVEN H. TRAWEEK
JEFFREY P. TRINIDAD
DOMINIC S. TRIPPODO
JOANN M. TROWBRIDGE
CHRISTOPHER P. TUNG
MATTHEW L. VANDERZANDEN
WILFREDO VELEZRODRIGUEZ
SHANNON M. VIRGADAMO
LOAN L. VO
MICHELLE WALDEN
WESLEY P. WELDON
JOEL R. WELTER
DAVID M. WHITT
WILLIAM H. WIGHTMAN
SHANECA K. WILLIAMS
MATTHEW L. WOOD
JACANNA F. WYATT
ZACHARY ZMAYEFSKI
JAY A. ZWIRBLIS

IN THE NAVY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DAVID C. SANDOMIR

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ALLEN H. GRIMES

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JONATHAN D. PADGETT

THE FOLLOWING NAMED OFFICER FOR TEMPORARY APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 605:

*To be captain*

JONATHAN D. PADGETT

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

RICKY R. ROWE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

DANIEL P. BRADLEY
STEVEN L. CABALLERO
ROBERT E. DANIELSON
SETH DINOLA
ERIN L. ELLIOTT
PATRICK A. GRIFFIN
JARED E. HENDERSON
CHRISTOPHER B. HOGAN
JASON D. HOWELL
BOBBY H. HSU
ERNEST K. JESSOP
KEVIN M. KAHL
KRIS KIER
RICHARD C. LINNELL
FRANK F. MEENA
JAMES C. MUSE
CHAD S. RORSTROM
NICHOLAS W. RYAN
RICHARD W. SEALY
CHARLES E. SHAMONSKY
BENJAMIN Y. SIMON
NATHANIEL B. VANDEVENTER
CHAD J. VANKEULEN
KASIMIR M. WNUK

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT AS A SENIOR MILITARY ACQUISITION ADVISOR IN THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTION 1725(A).

*To be captain*

DANIEL P. MALATESTA

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

MARTHA C. ADAMS
TIMOTHY S. AJA
NATHAN D. ATKINSON
CHRISTOPHER T. BECK
ROBERT C. BLACKWOOD
DANIEL B. BOEUNG
ANDREW M. BROWN
ZACHARY D. BUTALA

JAMES R. CATHRO
JEFFREY K. CUMMINGS
TIMOTHY A. CUSHANICK
JAMES W. DUVALL
MATTHEW Y. EDWARDS
RUSS T. ELKIN
TYSON L. FIELDS
NATALIE R. FRANTZ
TODD J. FRUEHAUF
CAMERON L. FULRATH
SCOTT R. GOLICH
DAVID R. HAGLUND
JUSTIN M. HANE
RICHARD A. HARVEY
MICHAEL A. HEAPHY, JR.
JOSEPH A. HEYNE
ZACHARY R. HOLLCRAFT
ADAM K. HRUBY
STEVEN R. HYMAN
MASON A. JEFFERSON
SANDRA L. KIRKWOOD
JOSHUA J. LARSON
PETER A. LINSKY
DAVID A. LIVERMORE
DAVID W. LUNDY
BRENDAN L. MAGUIRE
WILLIAM G. MANGAN
KIMBERLY R. MARTINEZ
BRYAN R. MCCARTHY
MICHAEL D. MONTELLANO
DOUGLAS R. NELSON
MITCHELL A. NEWTON
DAVID W. OLDHAM
DAVID P. PASCOE
CHRISTINA L. PETERSON
ANDREW M. PETTIT
CHARLES F. PLUNGIS III
MATTHEW C. PRESTON
SEAN E. PURDY
PETER G. RATZ
EVAN D. REESE
BRIAN J. ROBINSON
MICHAEL A. ROGERS
CHRISTOPHER C. RONNANDER
NICHOLAS A. RUEDA
THOMAS SANECKI
MICHAEL J. SAUNDERS
JOHN R. SCOTT
PETER SCOTT
CHRISTOPHER B. SHETTER
SARAH E. L. SPARKS
SAMUEL M. SPLETZER
RYAN E. SROGI
ERIC D. STRIBLE
MARK A. SWARTZ
MICHAEL W. SWEENEY
CHRISTOPHER A. VICTOR
JOSEPH M. VOLANSKY, JR.
BENJAMIN M. WALBORN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JOHN K. HOPE III

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

MICHAEL W. COULTER
DAVID C. DANIEL
STUART M. GOLD
DANIEL R. GREEN
REO HATFIELD
JEFFREY R. KIRKPATRICK
DAVID KLETT
JONATHAN J. LYNN
RONALD J. MATTHEWS
SHANE J. MEISNER
ARTHUR G. MOSLEY
CORNELIUS C. MURRAY
MONTY A. VIKDAL

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ROBERT J. CHAVEZ
VALIS K. HOUSTON
DEAN T. MOON

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

DANIEL S. AVONDOGLIO
ROBERT F. MARNELL

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

SANTIAGO M. CARRIZOSA

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

ALLISON M. ASHEARRIOLA
BARTHOLOMEW W. CONNOLLY
PATRICK L. OBRIEN

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JOSEPH E. BENTON III
DANIEL P. BERGIN
STEPHEN L. CASAPULLA
WILLIAM P. DELAO
LEE C. DORTZBACH
JAMER R. DOUGHTY
WILLIAM J. FEASTER
JOHN J. FRENCH III
GUY E. HOWERTON III
MICHAEL J. MESSENGER
SCOTT W. PHILLIPS
RONALD C. RILEY
THOMAS M. RYAN
CHRISTOPHER R. SPRINGER
LUKE G. WISNIEWSKI

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

LEON W. MOORE
NATHAN C. POTTER
SEAN M. SPICER
TODD M. SPITLER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

CHRISTOPHER A. BAXTER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

CALVIN MARTIN
MIKO K. WADE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

BRIAN J. ABBOTT
ZACHARY A. KEENAN
ERIC P. NARDO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

WADE A. BERZETT
KEVIN W. COCHRAN
EMMANUEL C. SAYOC
DEREK A. SCHIERLMANN
WAYNE W. STEPHENS
REGIS C. WORLEY, JR.

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

SCOTT P. BENNIE
AMBER B. BRANDT
ANDREW M. MENOCAL
CHRISTOPHER M. SCHMID

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JESSE BANDLE
STEPHANIE M. BEDZIS
JONATHAN H. BERGER
CATHERINE M. BERJOHN
MATTHEW S. BIDLACK
RICHARD J. BOWER
ORLANDO G. CABRERA
ROBERT C. CALL
RACHEL E. CARTER
ANNA Y. CHOE
JAMES C. CLIFFORD
CANDIDA A. COORE
ADRIAN M. CUELLAR
BRIDGET K. CUNNINGHAM
MOHENISH K. DAUGHTRY
CHRISTOPHER M. DAVIS
DANIEL P. DECECCHIS
KATHLEEN M. DONAHUE
SEAN M. DRISCOLL
ELIZABETH A. DUBIL
JAMES I. DUPREE
STEPHANIE L. ELENBAUM
AIDITH FLORESCARRERA
DANIEL A. FOSTER
PHILIP A. GAUDREAU III
RYAN J. GNANDT
JAMES L. HEGARTY
CHRISTOPHER D. HELMAN
PATRICK M. HENDERSON
GEORGE A. JAKUBEK
REBECCA L. JOHNSON
LEVI K. KITCHEN
DAVID J. KLIMASKI
KARL A. KUERSTEINER
DANIELLE M. LAGOSKI
LAURA M. LAUER
JESSICA J. LEE

LOUIS R. LEWANDOWSKI
JONATHAN T. LIEBIG
BRYCE D. LOKEY
DEBRA M. LOWRY
MATTHEW L. LUTYNSKI
KATHARINE I. MANGAN
JANELLE M. MARRA
JOHN C. MATTINGLY
ANDREW J. MCDERMOTT
JONATHAN D. MCDIVITT
PETER Z. MCINTYRE
JOSELYN C. MERCADOABADIE
DANIELLE C. MONTEIL
JEFFREY L. MOORE, JR.
KENNETH E. NEEDHAM
NICHOLAS T. NELSON
TARA A. OCONNELL
JEREMY K. RAMSEY
RYAN D. RESTREPO
CRYSTAL A. RUSSELL
OMAR SAEED
ELLE M. SCHOLLNBERGER
VIKAS SRIHVASTAVA
RAJ C. SINGARAJU
CHRISTOPHER S. SMITH
DUSTIN K. SMITH
TRACIE C. SNIDER
NICHOLAS W. SWEET
SCOTT A. TRASK
ROBYN M. TREADWELL
OBINNA N. UGOCHUKWU
ROBERT B. WALTON
ALLISON B. WEISBROD
REBECCA R. WELCH
CHRISTOPHER R. WORLEY
KATHERINE A. WRENNMARESH
JAY A. YELON
COLIN R. YOUNG
JOSEPH E. ZEMAN, JR.
JAMES L. ZIMMERMAN

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

WILLIAM P. BOGGESS
ANGEL J. CALVO
AMANDA A. FIX
DANIEL J. FUHRMANN
THOMAS D. GRUBBS
NICHOLAS J. HAMLIN
DREW B. HAVARD
MARIA D. JULIAMONTANEZ
ALLEN D. RASMUSSEN
CLAYTON T. RAU
MICHAEL A. SMITH
ERIC D. VILLARREAL
RACHEL L. WERNER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES P. ADWELL
JOHNFRITZ E. ANTOINE
MATTHEW R. ENGLISH
ASHLEE C. ESPIRITU
JOSEPH M. FROMKNECHT
THERON HAMILTON
LINDA D. HAVENS
JASON M. JONES
SANDEEP KUMAR
KIMBERLY L. LITTEL
JESSE D. LOCKE
ANN M. MACDONALD
RUDY D. MEDINA
DARIO P. MORGAN
OLUSEGUN A. OLABODE
EUGENE D. OSBORN
MICHAEL D. OWEN
SETH A. REINI
NICHOLAS C. SCHAAL
JONATHAN G. SHEA
MARK P. SIMONS
JONE L. TILLMAN
JENNIFER C. WALLINGER
TIMOTHY T. WELSH

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DENIZ M. BAYKAN
JOHN R. GOODIN
JOSEPH T. GRIFFO
DAVID H. LEE
MARK A. LINDSEY
PETER R. OSTROM
JESSICA L. PYLE
KATHERINE E. SHOVLIN
GARRETT S. SNOW
ALLISON E. WARF
LENA E. WHITEHEAD
KATHERINE D. WORSTELL

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ERIC K. CONRAD
JULIO A. PETERSON
STEPHANIE A. RIVERA
COREY J. SYLVE
KATHERINE VESTER

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ANTHONY B. FRIES
MICHELLE V. HIGINGBOTHAM
DENNIS D. SMITH, JR.

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MICHAEL R. FASANO
JERIAHMI L. L. TINSLEY

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

EMILY J. BINGHAM
WILLIAM M. CORLEY
DANIELLE L. GARFIELD
RICHARD J. MORRISSEY
SARAH C. M. PETTIT
ALICIA M. SALERNO
NICOLE A. SERRANO
THOMAS H. WRIGHT

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JEREMIAH P. ANDERSON
JERMAINE A. BAILEY
JOHN R. CRUMPACKER
JASON W. DOWNS
RICHARD L. DULDULAO
WILLIAM A. GIBSON
RAYMOND J. KILWAY II
SUNNY G. LAU
NICHOLAS A. MANZINI
MICHAEL P. MCCORMICK
ADAM J. MILLS
THOMAS R. PILKERTON
MICHAEL A. SAMMATARO
JUSTIN K. STEPANCHICK
CHRISTOPHER A. TILLEY
GILBERTO P. VIERA III
JAMES W. WALDREP
JOHNATHAN C. WALKER
JEFFREY K. WHITE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

BRIEN J. CROTEAU
KATHLEEN B. GILES
ISAAC R. STUTTS
LI SUNG
BRENT F. WEST

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

IAN P. ADAMS
TRAVIS S. AMERINE
ROBERT W. ANDERSON IV
GIEORAG M. ANDREWS
KEVIN C. ANTONUCCI
AARON S. ARKY
KATHLEEN R. BALL
JOHN G. BARRY
CHAD D. BARTKUS
DAVID R. BEAM
CLAYTON C. BEAS
KEVIN A. BEATLEY
MATTHEW A. BECKER
JON A. BENDA
DANIEL J. BERRY
MASON W. BERRY
RICHARD BETANCOURT
JESSICA F. BETZ
TIMOTHY W. BIERBACH
ZACHARY A. BITTNER
CHRISTOPHER H. BLAND
PHILLIP E. BOICE
TODD C. BOWERS
MATTHEW D. BOYCE
DOUGLAS A. BRAYTON
WALTER R. BRINKLEY, JR.
MATTHEW P. BROUILLARD
AMANDA G. BROWNING
VALERIE K. BROZNAK
ADAM L. BRYAN
GRANT T. BRYAN
JOSEPH BUBULKA
GABRIEL D. BURGI
KYLE F. CALTON
RENE R. CANO, JR.
BENJAMIN R. CANTU
WILLIAM J. CARROLL
MATTHEW E. CHANG
NATHANIEL J. CHASE
MICHAEL R. CHESNUT
SCOTT F. CHIRGWIN
CLINTON J. CHRISTOFK
RONNIE P. CITUK
CHRISTOPHER W. CLEVENGER
JASON E. COATES
ADAM COHEN

Case 4:25-cv-04966-HSG     Document 1-4     Filed 06/12/25     Page 50 of 51

MATTHEW D. COLLINSWORTH
RANDY S. CONANT
JASON A. CONLEY
ERIN N. CONNOR
ANDREW S. COUNTISS
KELLY N. CRAFT
CALEB T. CRAMER
COLLIER C. CROUCH
ANDREW C. CROUSE
JEREMIAH M. DALEY
MATTHEW J. DATTOLI
CHRISTOPHER M. DESCOVICH
DUSTIN W. DETRICK
THOMAS E. DIGAN, JR.
EMIL D. DINNOCENZO
THOMAS T. DIXON
MATTHEW S. DOMINICK
JAMES J. DONCHEZ
SEAN R. DOUGHERTY
RYAN R. DOWNING
LUCAS R. EDWARDS
DONALD W. EMERSON
RONALD C. FAIRBANKS
BILLIE J. FARRELL
MICHAEL R. FELBER
RANDALL L. FIELDS, JR.
LEE R. FIKE
PETER C. FLYNN
MARSHALL H. FOARD
WARREN H. FOGLER
ALEXANDER J. FRANZ
MICHAEL L. FRISBY II
THOMAS D. FUTCH
BRYAN M. GALLANT
JEREMY D. GARCIA
ROWDY A. GARCIA
JASON M. GARFIELD
KENT A. GERICKE
JOHN M. GLEASON
DEREK M. GOEBEL
JOSHUA P. GOODIN
NICHOLAS M. GREEN
JUSTIN R. GROVER
GREGORY A. GRUBBS
ERIK H. GUSTAFSON
DOUGLASS G. HAGENBUCH
STEVEN A. HALLE
JOSEPH S. HAMILTON
BRANDON C. HARDIN
JUSTIN R. HARDY
KEVIN M. HARRINGTON
KARL HASSENFRATZ
CHRISTOPHER S. HATHAWAY
CONOR L. HEELY
KYLE R. HICKMAN
JAMES M. HIGGINS, JR.
JUSTIN J. HOFF
JASON E. HOLBROOK
JOHN E. HOLTHAUS
JAMES D. HOSTETLER
JOHN J. HOY
MICHAEL J. HUBER
ISAIABENETTE E. INFANTE
ROBERT B. INMAN
BRIAN M. IRISH
JAMES J. IRRGANG, JR.
MATTHEW J. IWANCZUK
ALLEN W. JACOB
CARL D. JAPPERT
BRETT J. JASIONOWSKI
KEITH A. JOHNSON
LAUREN M. JOHNSON
JOSEPH T. KARAFFA
ROBERT E. KELLER
LUKE E. KELVINGTON
JAMES H. KEPPER IV
SAMEER KHANNA
LEANDRA N. KISSINGER
REED A. KITCHEN
RYAN J. KLAMPER
ERIC J. KNEPPER
DUSTIN T. KRAEMER
DOMINIC J. KRAMER
ANDREW L. LAIDLER
KYLE P. LAMBERT
STEPHEN V. LAMOURE
ANDREW A. LAMSON
CLIFTON G. LENNON
RANDALL J. LESLIE
SCOTT D. LIPPINCOTT
YILEI LIU
CARNE M. LIVINGSTON
ALFRED W. LONG, JR.
ROBERT A. LOW
RALPH P. LUFKIN
KATIE J. LUNSER
KERRY M. MAJOR
LUDWIG MANN III
JORDAN A. MAYO
KEVIN K. MCCLELLAN
JOHN P. MCCRAY
KYLE S. MCVAY
WILLIAM T. MIANTE
ADAM S. MILLER
MICHAEL J. MILLER
SAMUEL C. MILLS
DAXTON H. MOORE
JAMES J. MOORE
MICHELLE D. MORGAN
BRIAN M. MOWEY
GWENDOLYN H. MURPHY
BRAD W. MUSKOPF
JUSTIN M. NEFF
JONATHAN P. NELSON
JUSTIN A. NIXON
DAVID R. OWENS
KENNETH C. PACKARD

GARRETT T. PANKOW
JOSHUA D. PERRY
CAROLYN K. PETERSON
RYAN D. PIERCE
NICHOLAS R. PINKSTON
ANDREW M. PITTMAN
ANTHONY M. PIUNNO III
JOSEPH F. PRESTON
JOHN E. PRITCHETT
NICHOLAS R. QUIHUIS
JEFFREY W. RANSOM
RICHARD S. RAY
JOSEPH F. REARDON
ETHAN A. REBER
JAMES M. REEVES
JUSTIN D. REEVES
JOIN L. REID
ERIK S. REYNOLDS
BRIAN M. RHOADES
MICHAEL P. RILEY
NICHOLAS A. ROA
TAD J. ROBBINS
JEFFREY R. ROBERTS, JR.
THOMAS M. ROBERTS
CHRISTOPHER W. ROSE
BRIAN A. ROSS
THADDEUS RUSINEK
SETH D. SAALFELD
BLADE A. SCHALLENBERGER
ZACHARY P. SCHERTZ
DAVID M. SCHERR
JOSEPH R. SCHIPPERT
JONATHAN P. SCOBO
VANCE D. SCOTT
ADAM A. SHAPIRO
MATTHEW S. SHAW
JOHNATHAN E. SHEATER
ANTONIA K. SHEY
NATHANIEL R. SHICK
MICHAEL J. SIEDSMA
RICHARD W. SKINNELL
RICHARD D. SLYE
JAMES L. SMITH
JOHANNESS SMITH
JUSTIN B. SMITH
JOSEPH P. SNELGROVE
PARINA SOMMHOT
DIRK C. SONNENBERG
JOSHUA C. STARR
JAMES A. STEELE
ADAM M. STEIN
STEVEN L. STEINMETZ
EMILY C. STELLPFLUG
WILLIAM C. STEWART
MARK P. STINES
JEFFREY C. STORER
NICHOLAS J. SYLVESTER
CHAD T. TELLA
DAVID R. TERRY
KRISTOFER A. TESTER
ANDREW M. THOM
JARED B. THOMAS
JOSHUA H. TILEY
NEIL J. TOOHEY, JR.
DALE R. TOURTELOTTE
TODD M. TRAGO
ARTURO TREJO
MICHAEL Q. TREMEL
BRIAN TRUONG
TERRY L. TURNER II
GREGORY M. VALDEZ
JAMIE E. VANDYKE
CHRISTOPHER W. VANLOENEN
JOSLYN M. VENEY
FRANK P. VERDUCCI III
DAVID J. VITOLLO
SHAWN M. VRABEL
CHAD C. WALKER
DESMOND K. WALKER
ADAM P. WALTERS
ROBERT W. WARD
GEORGE B. WATKINS
JAMES N. WATTS
SCOTT E. WELLES
ELIOT A. WESTON
VES W. WHITTEMORE
STEPHEN V. WILLIAMS
MATTHEW W. WOLF
DAVID J. WRINKLY
KARI E. YAKUBISIN
CRISTOBAL YERA
CHRISTOPHER P. YOST
TIMOTHY C. YUHAS
KENNETH W. ZILKA
GEORGE S. ZINTAK

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES G. ANGERMAN
JOHNATHAN J. AUGER
THOMAS J. DILL
EDWARD A. FOSSON
DENNIS LA
ROBERT W. LEFTWICH
MICHAEL J. MCMANUS
WILLIAM E. MOILES
RACHAEL M. MUSSER
ROBERT L. OLSON
STEVEN M. PARKS
FEDERICO PEREZROMERO
JEREMY R. POTTS
TYLER R. SCHARAR
RILEY W. SMITH
ROBERT M. SYRE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

AARON E. KLEINMAN
KYU C. LEE
PHILIP N. PARK
JEFFREY J. ROSS
DAVID S. SCHLEUSENER
STEVEN E. STOUGARD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

LAMONT A. BROWN
CHRISTOPHER S. BURT
CURTISS BUTLER
MICHAEL J. COLLINS
JOSEPH M. COZART
MATTHEW E. DUNCAN
ANDRE L. FIELDS
MELISSA S. FLYNN
MELISSA A. GONZALES
MARK A. GUNTER
ADAM L. HAMILTON
JOSHUA R. HARDING
MICHAEL C. HOCKETT, JR.
MICHAEL D. LABBE
RAYMOND J. LANCLOS III
QUENTIN E. LEASE
JAMES R. MARSH
SCOTT M. MCCARTHY
MATTHEW L. MILLER
ARTHUR C. NELSONWILLIAMS
JACOB M. PRENTISS
MATTHEW B. REED
JAN D. SCHOTMAN
FREDERICK M. STAINES
RYAN R. STICKEL
BRENT L. SUMMERS

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

COLLEEN L. ABUZEID
SHEILA I. ALMENDRASFLAHERTY
ERICA L. ARNOLD
MARTIN L. BOESE
GABRIELLE A. CRANE
RONALD G. DEWEES
LORELIE D. FLINN
SARAH E. GENTRY
ANGELA M. JORDAN
KATHERINE M. KIDDE
JACQUELINE LOPEZ
SCOTT M. MACDONALD
THOMAS O. MATELLA, JR.
REGINALD MIDDLEBROOKS
JEFFREY A. MILES
SUSAN L. MORGAN
RACHEL E. NEWNAM
PETER I. NYILAS
JESSICA M. ORZECHOWSKI
HARLEY R. RAGLE III
APRIL L. REAVES
GINA D. ROMANO
TERI R. RYALS
AMANDA E. SCHAFFELD
JULIE M. SCHAUB
BETTINA A. SOLWAZI
CATHERINE C. SOTERAS
HANNAH C. STARNES
SARAH J. T. TALLENT
AMY B. TOMAINO
TONY TORRES
CHRISTOPHER R. WEISS
ELIZABETH M. ZULOAGA

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE GRADE INDICATED IN THE NAVY RESERVE UNDER TITLE 10, U.S.C., SECTION 12203:

*To be captain*

JUSTIN J. DEGRADO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

NAIMI AMIRAL
RICHARD J. COILLOT
DUSTIN D. DINOLA
STEPHANIE C. LASTINGER
CHESTER LEE III
KIMBERLY T. MANUEL
DANIEL M. MARZLUFF
JONATHAN I. NORRIS
SAINATH P. PANJETI
DANIEL C. ROLNICK
TONJA W. ROSS
CHRISTOPHER L. WALLACE
MICHAEL A. WHITE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ARLO K. ABRAHAMSON
TIMOTHY A. HAWKINS
RICHLYN C. IVEY

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAMES C. BAILEY
CHARLES L. FISHER, JR.
GAVIN D. GUIDRY
DANIEL J. HUTTON
JAMES M. LANDRY
ALEJANDRO PALOMINO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

DANIEL J. BELLINGHAUSEN
BARRY F. CARMODY, JR.
AMY M. GABRIEL
TRAVIS J. HARTMAN
BRYANNA H. HERRING
DEVIN M. HOLMES
JACOB E. KING
MICHAEL C. MABREY
TRAVIS J. REAM
JAMIE H. ROGERS
RICHARD M. ULLOA
JASON C. VINING
JAMES F. WRIGHTSON, JR.
ERIC ZILBERMAN

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MICHAEL J. BONACORSA
LAJUANA BUHMANN
ANDREW C. DAVIS
DANIEL R. FLEMMING
WILLIAM B. FOX
WILLIAM L. GRENOBLE V
DANIEL A. HOLLENDONER
FRANK C. KOVACS
ANDREW T. MICHALOWICZ
CHRISTOPHER M. MICHALSKI
MATTHEW D. MYERS
AMANDA B. RICHARDS
JEFFREY M. ROARK
JUSTIN L. SCARBROUGH
JUSTIN M. SPRAGUE
KHALIA S. WARNERBUTLER
JACOB E. WILSON

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

CHRISTIAN G. ACORD
JOHN R. BELCHER
SEAN B. BROWN
JEFFREY T. COVINGTON
KEVIN D. CUMMINGS
JEREMY J. HULS
CAMERON J. MACKLEY
EHAB MAKHLOUF
CRAIG T. MCLEMORE
NICHOLAS A. MIDZAK
ROBERT R. PINCKNEY, JR.
CHRISTOPHER J. WASEK

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

AARON N. AARON
ANDREW R. BELDING
KENNETH W. BROOKS
JOSEPH E. CANTU, JR.
ELIAS J. GEORGE
COLLEEN P. HANDBURY
JOSEPH J. KRUPPA
MICHAEL N. PERKINS II

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

KRISTINE N. BENCH
DOMINIC F. DIMAGGIO
MARK A. HEBERT
JAMES A. SCIANNA
CHRISTOPHER K. TUGGLE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

KURT E. DAVIS
ERVIN L. HENLEY
JASON A. RINTO

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ANDREW J. ADAMS
PETER B. MANZOLI

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JAIME I. ROMAN

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

MATTHEW L. SEVIER

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

ASHLEY S. M. MCABEE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

JEREMY D. BARTOWITZ

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 624:

*To be captain*

BRENNA L. SCHNARS

THE FOLLOWING NAMED OFFICER FOR TEMPORARY APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES NAVY UNDER TITLE 10, U.S.C., SECTION 605:

*To be captain*

STEVEN A. HALLE

### IN THE SPACE FORCE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT TO THE GRADE INDICATED IN THE UNITED STATES SPACE FORCE UNDER TITLE 10, U.S.C., SECTION 624:

*To be lieutenant colonel*

KRISTEN M. BARRA

### IN THE COAST GUARD

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT IN THE UNITED STATES COAST GUARD TO THE GRADE INDICATED UNDER TITLE 14, U.S.C., SECTION 2130(A):

*To be captain*

JOHN C. ADAMS
JAMES E. FOTHERGILL
ALAN K. ROSENBERG
JUDSON B. WHEELER

## CONFIRMATIONS

Executive nominations confirmed by the Senate May 22, 2025:

### IN THE AIR FORCE

AIR FORCE NOMINATIONS BEGINNING WITH JOSEPH L. ABRAMS AND ENDING WITH JOSEPH M. YABES, JR., WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

AIR FORCE NOMINATIONS BEGINNING WITH MARGARET E. ABBOTT AND ENDING WITH RACHAEL L. VOIGT, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

AIR FORCE NOMINATIONS BEGINNING WITH AMARA B. ADAMS AND ENDING WITH ROBERT D. YOUNG, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

### IN THE ARMY

ARMY NOMINATIONS BEGINNING WITH MATTHEW D. BRANDT AND ENDING WITH DEJENE G. KASSAYE, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

ARMY NOMINATION OF MISSY L. MCNEILL, TO BE MAJOR.

ARMY NOMINATIONS BEGINNING WITH DOMANIQUE M. ABNER AND ENDING WITH 00003259357, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH EDWIN A. ABRAZADO AND ENDING WITH 0003102153, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH JESSICA S. ABBOTT AND ENDING WITH 0003399902, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

ARMY NOMINATIONS BEGINNING WITH ROSS O. ANDERSON AND ENDING WITH 0002422513, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 29, 2025.

### IN THE MARINE CORPS

MARINE CORPS NOMINATIONS BEGINNING WITH NATHAN C. HESS AND ENDING WITH CHRISTOPHER S. LAMBERT, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON MARCH 14, 2025.

MARINE CORPS NOMINATION OF EDWARD R. ROGERS II, TO BE LIEUTENANT COLONEL.

### IN THE NAVY

NAVY NOMINATION OF WENDELL C. ELDRIDGE, TO BE LIEUTENANT COMMANDER.

NAVY NOMINATION OF ERIC M. BEALL, TO BE COMMANDER.

NAVY NOMINATION OF ALEXANDRA K. HOLLAND, TO BE LIEUTENANT COMMANDER .

NAVY NOMINATIONS BEGINNING WITH ISABEL M. BERNAL AND ENDING WITH JOHN J. W. YUN, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON MAY 12, 2025.

### IN THE SPACE FORCE

SPACE FORCE NOMINATION OF ZACHARY R. EAGLE, TO BE LIEUTENANT COLONEL.

### IN THE COAST GUARD

COAST GUARD NOMINATIONS BEGINNING WITH JOSHUA S. ALLEMAN AND ENDING WITH MATTHEW G. ZAVALIJ, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.

COAST GUARD NOMINATIONS BEGINNING WITH JASON B. VEARA AND ENDING WITH TARA E. LARKIN, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 28, 2025.