Ex. I

Michael Buschbacher*
James R. Conde*
James R. Wedeking*
Laura B. Ruppalt*
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
*Pro hac vice applications forthcoming

Eric Grant (Bar No. 151064)
John B. Thomas (Bar No. 269538)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 447-4900
grant@hicks-thomas.com

Counsel for Proposed Intervenor-Defendants
(complete list on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, | No. 4:25-cv-04966-HSG |
| Plaintiffs, | **INTERVENOR-DEFENDANTS' MOTION TO DISMISS [Fed. R. Civ. P. 12(b)(1), (6)]** |
| v. | |
| UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, | |
| Defendants. | Date: _____ __, 2025<br>Time:      2:00 p.m.<br>Courtroom: 2, 4th Floor Oakland Courthouse<br>Judge: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

NOTICE OF MOTION ............................................................................................................... 1

MOTION TO DISMISS ............................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

STATEMENT OF ISSUES ........................................................................................................ 2

BACKGROUND ........................................................................................................................ 2

I.      The Clean Air Act Broadly Preempts State Regulation of Motor
        Vehicle Emissions .......................................................................................................... 2

II.     EPA Issues Waivers of Clean Air Act Preemption For Three
        California Programs ........................................................................................................ 3

III.    Congress Repeals the EPA Waivers of Clean Air Act Preemption ............................... 4

IV.     Procedural History ........................................................................................................ 10

ARGUMENT ........................................................................................................................... 10

I.      The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims ................................. 11

        A.      The Congressional Review Act Prohibits Judicial Review ................................ 11

        B.      Plaintiffs Lack Standing for their Statutory Claims ......................................... 12

        C.      This Court Lacks Jurisdiction Under the APA .................................................. 14

II.     This Court Lacks Jurisdiction Over Plaintiffs' Constitutional Claims ......................... 16

        A.      This Court May Not Review Challenges to House and Senate
                Procedures ......................................................................................................... 16

        B.      This Court May Not Review Plaintiffs' Claims Against the
                President ............................................................................................................. 18

III.    Plaintiffs Fail to State Constitutional Claims .............................................................. 19

        A.      Plaintiffs Fail to State an Article II Claim ....................................................... 19

        B.      Plaintiffs Fail to State a Separations-of-Powers Claim .................................... 21

        C.      Plaintiffs Fail to State Tenth Amendment or Federalism Claim ....................... 24

        D.      Plaintiffs Lack a Cause of Action for Their Constitutional Claims .................. 25

IV.     The Complaint Should Be Dismissed *With* Prejudice ............................................... 25

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................................ 25

*Baker v. Carr*,
  369 U.S. 186 (1962) ...................................................................................... 17, 18, 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................ 15

*California v. Texas*,
  593 U.S. 659 (2021) ................................................................................................ 14

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
  529 F. Supp. 2d 1151 (E.D. Cal. 2007) ................................................................. 21

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) ............................................................................... 10

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
  482 F.3d 1157 (9th Cir. 2007) ........................................................................... 16, 18

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) ................................................................................. 17

*County of San Diego v. Nielsen*,
  465 F. Supp. 3d 1073 (S.D. Cal. 2020) ................................................................. 15

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ...................................................... 2, 5, 11, 12, 17, 23, 24

*Dalton v. Specter*,
  511 U.S. 462 (1994) .......................................................................................... 15, 19

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d. 992 (9th Cir. 2010) ................................................................................. 8

*DeVillier v. Texas*,
  601 U.S. 285 (2024) ................................................................................................ 25

*Diamond Alt. Energy, LLC v. EPA*,
  145 S. Ct. 2121 (2025) ......................................................................................... 1, 5

*Dorsey v. United States*,
  567 U.S. 260 (2012) ................................................................................................ 25

*Foster v. USDA*,
  68 F.4th 372 (8th Cir. 2023) ................................................................................... 11

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) .................................................................................. 15, 25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) .......................................................................................... 18

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
  508 F. Supp. 2d 295 (D. Vt. 2007) .................................................................. 21

*Havasupai Tribe v. Provencio,*
  906 F.3d 1155 (9th Cir. 2018) ......................................................................... 14

*Idaho Watersheds Project v. Hahn,*
  307 F.3d 815 (9th Cir. 2002) ........................................................................... 15

*INS v. Chadha,*
  462 U.S. 919 (1983) ......................................................................................... 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
  478 U.S. 221 (1986) ......................................................................................... 17

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior,*
  971 F.3d 1222 (10th Cir. 2020) ....................................................................... 11

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ......................................................................................... 10

*Lee v. City of Los Angeles,*
  250 F.3d 668 (9th Cir. 2001) ........................................................................... 10

*Leite v. Crane Co.,*
  749 F.3d 1117 (9th Cir. 2014) ......................................................................... 10

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ......................................................................................... 14

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
  521 F.3d 1097 (9th Cir. 2008) ......................................................................... 10

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) ........................................................................................... 18

*Mistretta v. United States,*
  488 U.S. 361 (1989) ......................................................................................... 22

*Montanans for Multiple Use v. Barbouletos,*
  568 F.3d 225 (D.C. Cir. 2009) ......................................................................... 11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA,*
  627 F.2d 1095 (D.C. Cir. 1979) .......................................................................... 3

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ............................................................................... 10, 13, 14

*Newsom v. Trump*,
     2025 WL 1712930 (9th Cir. June 19, 2025) .......................................................... 16

*NRC v. Texas*,
     145 S. Ct. 1762 (2025) ........................................................................................ 16

*Patchak v. Zinke*,
     583 U.S. 244 (2018) ............................................................................................ 23

*Polich v. Burlington Northern, Inc.*,
     942 F.2d 1467 (9th Cir. 1991) ............................................................................ 25

*Robertson v. Seattle Audubon Soc'y*,
     503 U.S. 429 (1992) ............................................................................................ 23

*Smith v. Los Angeles Unified Sch. Dist.*,
     830 F.3d 843 (9th Cir. 2016) ................................................................................ 8

*Steel Co. v. Citizens for Better Env't*,
     523 U.S. 83 (1998) .............................................................................................. 14

*Trump v. CASA, Inc.*,
     2025 WL 1773631 (U.S. June 27, 2025) ............................................................ 18

*Trump v. United States*,
     603 U.S. 593 (2024) ............................................................................................ 19

*United States v. Ballin*,
     144 U.S. 1 (1892) .........................................................................14, 16, 17, 23

*United States v. Fla. E. Coast Ry. Co.*,
     410 U.S. 224 (1973) ............................................................................................ 12

*United States v. Texas*,
     599 U.S. 670 (2023) .................................................................................14, 18, 19

*Utah v. Strieff*,
     579 U.S. 232 (2016) ............................................................................................ 14

*Wash. All. of Tech. Workers v. United States*,
     892 F.3d 332 (D.C. Cir. 2018) ............................................................................ 11

*Yesler Terrace Cmty. Council v. Cisneros*,
     37 F.3d 442 (9th Cir. 1994) .........................................................................20, 21

**Constitution**

U.S. Const. art. I, § 1 ................................................................. 13

U.S. Const. art. I, § 5, cl. 2 .......................................................2, 17, 24

U.S. Const. art. I, § 7, cl. 2–3.................................................... 13, 19

U.S. Const. art. II, § 3 ............................................................... 18

**Statutes**

5 U.S.C. § 551(4) ........................................................................6

5 U.S.C. § 551(6) ........................................................................6

5 U.S.C. § 551(8) ........................................................................6

5 U.S.C. § 701(a)(1) .................................................................. 15

5 U.S.C. § 704 ........................................................................... 14

5 U.S.C. §§ 801–808 ...................................................................5

5 U.S.C. § 801 ........................................................................... 19

5 U.S.C. § 801(a)(1)(A) ........................................................... 6, 12

5 U.S.C. § 801(a)(1)(A)(ii) ........................................................ 12

5 U.S.C. § 801(a)(3)(B) ............................................................. 12

5 U.S.C. § 801(b) ........................................................................5

5 U.S.C. § 801(b)(1) .................................................................. 12

5 U.S.C. § 802 ........................................................................... 12

5 U.S.C. § 802(a) ........................................................................6

5 U.S.C. § 802(d) ........................................................................5

5 U.S.C. § 804(3) ................................................................6, 12, 19

5 U.S.C. § 805 ................................................................2, 11, 12, 23

42 U.S.C. § 7507 ...................................................................... 3, 21

42 U.S.C. § 7507(2)....................................................................20

42 U.S.C. § 7521(a) .................................................................. 3, 25

42 U.S.C. § 7521(a)(2) ............................................................ 20, 21

42 U.S.C. § 7543(a) ........................................................................... 3, 4, 13, 25

42 U.S.C. § 7543(b) ................................................................................... 3, 25

42 U.S.C. § 7543(b)(1)(C) ...................................................................... 20, 21

42 U.S.C. § 7543(b)(3) .................................................................................... 21

Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996) ............................ 5

Pub. L. No. 119-15, 139 Stat. 65 (2025) ......................................................... 8

Pub. L. No. 119-16, 139 Stat. 66 (2025) ......................................................... 8

Pub. L. No. 119-17, 139 Stat. 67 (2025) ......................................................... 8


**Congressional Sources**

170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) ............................................. 7

171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) .............................................. 7

171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) ............................................. 7

171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) ............................................ 7

171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) ........................................... 7

S. Doc. No. 118-6 (Sept. 26, 2023) ............................................................... 13

*Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3 .................................................... 8

*Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U ...................................................................... 8


**Regulations**

88 Fed. Reg. 20,688 (Apr. 6, 2023) ......................................................... 4, 21

90 Fed. Reg. 642 (Jan. 6, 2025) ..................................................................... 4

90 Fed. Reg. 643 (Jan. 6, 2025) ..................................................................... 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(C) .................................................... 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(D) .................................................... 4

Cal. Code Regs. tit. 13, § 1962.4 .................................................................... 3

Cal. Code Regs. tit. 13, § 1963.1 .................................................................... 4

Cal. Code Regs. tit. 13, § 1963.2 ........................................................................... 4

Cal. Code Regs. tit. 13, § 1963.6(a) ....................................................................... 4

Cal. Code Regs. tit. 13, § 2016 ............................................................................... 4

**Court Rules**

Fed. R. Civ. P. Rule 12(b)(1) ....................................................................... 1, 10, 11

Fed. R. Civ. P. Rule 12(b)(6) ..........................................................1, 10, 11, 15, 19

Fed. R. Evid. 201(b) ............................................................................................... 8

Fed. R. Evid. 902(1) ............................................................................................... 8

N. Dist. Cal. Civil Local R. 7-2 ............................................................................. 1

**Other Authorities**

Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014) ........................................6

All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ..........................5

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8 ..........................................................................4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN..................................................4

GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* (May 29, 2014) ...................................................................................... 7, 23

GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018) .....................................7

George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN ........................................................................ 13

Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C..........................................................................3

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW ..........................................................5

Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* (updated Nov. 12, 2021) ........................................................................................................6

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on _____ ___, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (4th Floor) of the above-named Court (Hon. Haywood S. Gilliam, Jr. presiding), located at 1301 Clay Street, Oakland, California 94612, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Intervenor-Defendants") will, and hereby do, move to dismiss Plaintiffs' complaint in its entirety and with prejudice, as described below.

## MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Civil Local Rule 7-2, Intervenor-Defendants respectfully move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. This Motion is supported by the following Memorandum of Points and Authorities, the attached document that is properly the subject of judicial notice, and any argument that may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Congress passed a legislative repeal of waivers of Clean Air Act preemption issued by the Environmental Protection Agency ("EPA") for three California programs designed to ban or limit the sale of new internal-combustion vehicles. The President signed those repeals into law. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2131 n.1 (2025). California and the ten states that joined this complaint ("Plaintiffs") do not like this legislation. Having failed to persuade Congress, they ask this Court to repeal those laws by judicial decree.

To call this a reach is an understatement. Plaintiffs' complaint alleges a wide variety of legal theories, but at bottom Plaintiffs appear to argue that this legislation is void because the Senate allowed the votes to proceed with the approval of a simple majority of Senators, rather than the

three-fifths that Senate filibuster rules sometimes require. But the filibuster is not part of the Constitution, there is no private right to enforce it, and there is nothing more exclusively within the Legislative Branch's authority than "determin[ing] the Rules of its Proceedings." U.S. Const. art. 1, § 5, cl. 2. Allowing courts to second guess those determinations would make federal judges arbiters of those parliamentary procedures—a separation-of-powers nightmare. This is why the Congressional Review Act ("CRA")—the law that codifies the procedures Congress followed here—provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. As the Ninth Circuit has held, this forecloses judicial review of statutory challenges like those Plaintiffs mount here. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560–64 (9th Cir. 2019). This Court also lacks jurisdiction over Plaintiffs' claims for multiple other reasons: Plaintiffs lack standing to challenge EPA's actions, review is unavailable under the APA, and this Court lacks authority to review the political questions raised by Plaintiffs' constitutional claims. And, in any event, Plaintiffs' constitutional challenges fail to state a cognizable claim or even a viable cause of action. This Court should dismiss.

## STATEMENT OF ISSUES

1. Whether the Congressional Review Act bars judicial review of Plaintiffs' claims.

2. Whether Plaintiffs lack standing for their statutory claims because their alleged injuries result from Acts of Congress, not from EPA's actions, and relief directed towards those actions would not repeal or otherwise render invalid the Acts of Congress at issue.

3. Whether this Court lacks jurisdiction under the APA because the challenged EPA actions are not "final agency action."

4. Whether Plaintiffs' challenges to congressional procedures raise a non-justiciable political question.

5. Whether Plaintiffs' claims against the President raise a non-justiciable political question.

6. Whether Plaintiffs' constitutional claims fail to state a legally cognizable claim.

## BACKGROUND

### I.    The Clean Air Act Broadly Preempts State Regulation of Motor Vehicle Emissions

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions

from the Nation's new motor vehicles. 42 U.S.C. § 7521(a). The Clean Air Act also broadly preempts state law regulating new motor vehicle emissions. Section 209(a) provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* § 7543(a). Preemption prevents "an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

The Clean Air Act allows for one limited exception from federal preemption. Section 209(b) provides that EPA "shall … waive application of [preemption] to" California—and only to California—if certain statutory criteria are met. 42 U.S.C. § 7543(b). Once California has a waiver, other states may follow. Under Section 177, "[n]otwithstanding" Section 209(a), other states "may adopt and enforce" emissions standards for new motor vehicles that are "identical to the California standards for which a waiver has been granted," provided that "California and such State adopt such standards at least two years before commencement of [the applicable] model year." *Id.* § 7507.

**II. EPA Issues Waivers of Clean Air Act Preemption For Three California Programs**

In 2020, in a misguided effort to address "the climate change crisis," California decided to ban new internal-combustion vehicles and to require "zero-emission" vehicles (i.e., battery-electric or fuel-cell-electric vehicles). *See* Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C. California adopted several regulatory programs under this policy, three of which are relevant to this suit.

*First,* **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet; by model year 2035, all cars and light trucks sold must be electric. Up to 20% of the required sales may be plug-in hybrid electric vehicles. *See* Cal. Code Regs. tit. 13, § 1962.4.

*Second*, **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2024. Sales of internal-

combustion vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. *See id.* §§ 1963.1, 1963.2.[1]

*Third*, the **Omnibus Low NO$_x$ ("Omnibus") Program**, among other things, sets emissions standards for nitrogen oxides ("NO$_x$") for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to sell some electric vehicles and engines to comply. *See id.* § 1956.8(a)(2)(C), (D).[2]

As California recognized, these programs "relat[e] to the control of emissions from new motor vehicles" and are preempted by Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Thus, California submitted waiver requests. The Biden EPA issued a waiver for ACT in April 2023, 88 Fed. Reg. 20,688 (Apr. 6, 2023),[3] and waivers for ACC II and the Omnibus Program in January 2025, just weeks before President Biden left office. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Eleven other states and the District of Columbia have adopted one or more of the programs.[4]

### III. Congress Repeals the EPA Waivers of Clean Air Act Preemption

Many members of Congress were dismayed by EPA's midnight waivers, which greenlighted a ban on sales of new internal-combustion engine cars and light trucks in about 30% of the U.S.

---

[1] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion vehicles starting in model year 2036. Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and so it remains preempted by Section 209 of the Clean Air Act, 42 U.S.C. § 7543(a).

[2] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program are "intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

[3] The April 2023 waiver also waived preemption for three other California programs: the Zero-Emission Airport Shuttle, Zero-Emission Power Train Certification, and Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance programs. 88 Fed. Reg. at 20,688.

[4] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

market by 2035.[5] That ban could be catastrophic for the U.S. economy. Electric vehicles are far more expensive to manufacture (and so to purchase) than internal-combustion vehicles; their range is far shorter; and most of the country lacks sufficient infrastructure to charge them. Automakers warned that it would "take a miracle" for manufacturers to meet ACC II's standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[6] California's truck regulations could be even more devastating. The limited range and payload of electric trucks would increase the cost of transporting everyday goods and raise prices, while the limited availability of compliant heavy-duty engine technology was already threatening supply disruptions.[7] Rather than await a recission by the Trump EPA, which would invariably be challenged in court and could be reversed by a future EPA, Congress opted for legislation to fully and finally settle the undeniable "major question" of whether EPA can mandate electrification.

Specifically, Congress used the Congressional Review Act. Enacted in 1996, the CRA provides a set of expedited legislative procedures by which Congress may review, and ultimately disapprove, rules issued by federal agencies. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996), *codified at* 5 U.S.C. §§ 801–808. If Congress passes, and the President signs, a "joint resolution" of disapproval, then the rule "shall not take effect (or continue)," and the rule "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after the date of the joint resolution." 5 U.S.C. § 801(b). The joint resolution is federal law, enacted in accordance with the constitutional requirements of bicameralism and presentment. *Ctr. for Biological Diversity*, 946 F.3d at 562 & n.6 (citing U.S. Const. art. I, §§ 1, 7 (bicameralism); *id.* art. I, § 7, cl. 2 (presentment)); *accord Diamond Alt. Energy*, 145 S. Ct. at 2131 n.1. One feature of the CRA is that joint resolutions are put on a legislative fast track that is exempt from the Senate's ordinary filibuster rule and that limits the motions that Senators may raise. 5 U.S.C. § 802(d). Although

---

[5]All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* 2 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

[6] *Id.* at 3, 8.

[7] *See* Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

Congress chose to codify an exception to the filibuster in the CRA, no law—let alone the Constitution—*compels* the Senate follow a filibuster rule for *any* legislation, whether or not the CRA applies. *See generally* Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014).

CRA procedures are typically triggered by an agency's transmission of a rule to Congress. The CRA requires federal agencies to "submit to each House of the Congress and to the Comptroller General" each rule it promulgates, along with a report that includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). Once the rule is received, Congress generally has 60 days to introduce a joint resolution. *Id.* § 802(a).

But federal agencies need not submit every agency action because not every agency action is a "rule." The CRA defines that term by reference to the Administrative Procedure Act ("APA"), *id.* § 804(3), which, in turn, defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). A "rule" is distinguished from an "order," which the APA separately defines as the "final disposition … of an agency in a matter other than rule making but including licensing," *id.* § 551(6), where a "license" is defined as "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission," *id.* § 551(8). Finally, the CRA restricts its application to exclude "any rule of particular applicability," like ratemaking proceedings, and rules related to internal agency organization or management. *Id.* § 804(3).

Sometimes, an agency fails to submit a rule to Congress. In those circumstances, Congress has established an informal, ad-hoc process by which any member of Congress may ask the Government Accountability Office ("GAO") for an opinion on whether the agency action is a "rule" under the CRA. If GAO concludes the action is a "rule," Congress has by parliamentary convention typically deferred to that determination and treated publication of GAO's opinion in the *Congressional Record* as constructive submission that starts the CRA's 60-day clock.[8] GAO's

---

[8] *See* Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 12–13 (updated Nov. 12, 2021).

informal role, however, is entirely by convention. The CRA gives GAO no authority to determine whether an agency action is a "rule," and GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to *Congress* to decide whether CRA would apply." GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (May 29, 2014) (emphasis added) ("GAO Letter B-32552").

Moreover, the ad-hoc practice of consulting GAO applies *only when an agency has not submitted a rule* to Congress. GAO has explained that when an agency submits a rule—even if the agency "believes [the action] is exempt from the CRA" and submits it merely "out of an abundance of caution"—GAO will "take no position on whether the [submitted action] is a rule" because "an opinion by GAO would not further the purposes of [the] CRA by protecting Congress's CRA review and oversight authorities." GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018). In GAO's words, an agency's submission "obviates the need for a GAO opinion." *Id.* Agencies under presidents of both parties, including President Biden, have thus submitted dozens of actions to Congress "out of an abundance of caution." *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696).

Initially, EPA did not submit the ACT, ACC II, and Omnibus Program waivers to Congress. Under President Trump, EPA reversed course and transmitted the waivers to Congress after EPA concluded that the waivers were rules subject to the CRA.[9]

Several Senators nonetheless sought an opinion from GAO on whether the submitted waivers were "rules" under the CRA. Complaint, Ex. B (ECF No. 1-2) at 1 n.2. Breaking with past practice, GAO provided a substantive response in just a few days. GAO acknowledged the circumstances were "not one in which [it] normally issue[s] a legal decision." *Id.* at 1. But GAO went on to offer "[o]bservations" "to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures." *Id.* at 1, 9. Invoking its prior analysis of a different EPA action

---

[9] *See* 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) (EC-439, EC-440, EC-441); 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) (EC-484, EC-485, EC-486); 171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) (EC-518, EC-519, EC-520); 171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) (EC-660, EC-661, EC-662).

(the withdrawal of a waiver rescission), GAO concluded that the waivers were "not … rule[s] for purposes of [the] CRA because [they are] order[s] under [the] APA." *Id.* at 9.

Congress considered these arguments and ultimately disagreed with GAO's analysis and rejected its unprecedented attempt to insert itself into the process. In early April 2025, resolutions of disapproval for all three waivers were introduced in the House (the "Resolutions"). By May 1, the House had passed all three Resolutions with bipartisan majorities, including 35 Democratic House members who voted to repeal ACC II, *Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3. Following CRA procedures, the Senate moved to consider the three Resolutions by majority—not supermajority—vote. On May 22, the Senate voted to adopt all three. The Senate's disapproval of the ACC II waiver was also bipartisan, with Democrat Senator Elissa Slotkin from Michigan voting with Senate Republicans. *Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U. On June 12, President Trump signed the Resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

Congress had good reason to agree with EPA's determination that the waivers are "rules" under the CRA, and to doubt GAO's "observations." Although not required to provide an explanation, the Executive Branch set forth its concerns with GAO's analysis in a June 18, 2025, letter from the Director of the Office of Management and Budget ("OMB") to GAO Comptroller General. *See* Ex. 1 (reproducing letter).[10] OMB is home to the Office of Information and Regulatory Affairs ("OIRA"), which is the "Executive Branch's central authority for reviewing federal

---

[10] The existence and contents of this letter are properly subject to judicial notice under Federal Rule of Evidence 201(b)(2) as facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The letter is an official government document publicly available through a government website. *See* https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf (last visited July 9, 2025). And the letter is self-authenticating under Rule 902(1), because it is on official OMB letterhead, bears OMB's seal, and contains OMB Director Russell Vought's signature. Courts "routinely take judicial notice of letters published by the government," like this one. *Smith v. Los Angeles Unified Sch. Dist.,* 830 F.3d 843, 851 n.10 (9th Cir. 2016); *see also Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of … information … made publicly available by government entities" where the authenticity of the information is not subject to reasonable dispute.).

regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a 'major rule' within the meaning of the [CRA]," which includes "pars[ing] whether an action is a 'rule' at all." *Id.* at 1–2.

OMB explained that GAO failed to consider relevant case law, including a decision from the Ninth Circuit holding that an analogous "sub-delegation of regulatory authority to a State … is characteristic of a 'rule,' not an 'order,'" *id.* at 4–5 (citing *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)), and two federal district court decisions that had examined the Clean Air Act's waiver provisions and whose logic confirmed "that California waiver decisions are better classed as rules rather than as orders," *id.* at 4 (citing *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007), and *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007)). GAO also "overlook[ed] the most significant part of the entire statutory scheme": Section 177 of the Clean Air Act, which "allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing" and which makes waivers "nationally applicable," not "particular to California." *Id.* at 5 (cleaned up).

OMB also criticized GAO for failing to consider that a waiver "directly governs the conduct of motor-vehicle manufacturers *nationwide*," because "certification and conformance to California's alternative standards … creates a unique alternative nationwide compliance pathway … that displaces EPA's otherwise applicable federal standards." *Id.* (citing 42 U.S.C. § 7543(b)(3)). Therefore, like a rule, a waiver "creat[es] a new interstate regulator that can replace federal standards … across numerous States." *Id.* at 5–6. OMB also found puzzling GAO's conclusion that the waiver has "'immediate effect,'" because the Clean Air Act requires that waived California standards "give motor vehicle manufacturers [years of] 'lead time'" and "at least 'two years' of lead time for other States adopting" California's standards. *Id.* at 6.

Finally, OMB disagreed with GAO's assertion that a waiver merely "involve[s] considerations 'of particular facts, as opposed to general policy.'" *Id*. OMB observed that in issuing a waiver, EPA "considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place," including whether California's

programs "give the industry sufficient lead time to transition to 100% electric vehicles," whether "the industry's compliance costs with that lead time [are] 'appropriate,'" and whether "the standards [are] 'technologically feasible.'" *Id.*

Although OMB agreed with EPA that the waivers are "rules" subject to the CRA, it recognized that the ultimate decision fell elsewhere: "Congress … is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes. … *That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic.*" *Id.* at 7.

**IV. Procedural History**

Within hours of the President's signing the Resolutions, Plaintiffs filed this suit. Complaint, ECF No. 1 (June 12, 2025). Plaintiffs allege statutory and constitutional violations by EPA and its Administrator, non-party Congress, and the President. Plaintiffs ask this Court, among other things, to vacate EPA's actions, invalidate the Resolutions, and reinstate the waivers. *Id.* at 39–40. Just over seven weeks later, Intervenor-Defendants moved to intervene.

**ARGUMENT**

A court must dismiss a claim under Rule 12(b)(1) when it lacks jurisdiction over the subject matter of a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts … possess only that power authorized by Constitution and statute."). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence," *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010), including standing, which "plaintiffs must demonstrate … for each claim that they press … and for each form of relief that they seek," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A court must dismiss a claim under Rule 12(b)(6) "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). At the motion-to-dismiss stage, "factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (cleaned up) (Rule 12(b)(6)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (Rule 12(b)(1) facial challenge). "Conclusory allegations of law," however, "are insufficient to defeat a motion to dismiss." *Lee*, 250 F.3d at 679. Plaintiffs' complaint should be dismissed under

Rules 12(b)(1) and 12(b)(6).

## I.    The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims

### A.    The Congressional Review Act Prohibits Judicial Review

Congress has expressly withheld subject matter jurisdiction over Plaintiffs' claims in this suit. Section 805 of the CRA is expansive: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. "On its face, this language bars judicial review of *all* challenges to actions under the CRA, including constitutional challenges." *Ctr. for Biological Diversity*, 946 F.3d at 561 (emphasis added). Plaintiffs' suit is no more—and no less— than a challenge to the political branches' use of the CRA to enact Resolutions repealing EPA's waivers. Indeed, the only remedy that will redress Plaintiffs' alleged injury is invalidation of those Resolutions. *See infra* Section I.B (pp. 12–14). Judicial review of the suit, in its entirety, is therefore barred by Section 805.

Despite the provision's clear text, the Ninth Circuit has held that courts may consider constitutional claims related to actions taken under the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 561. Even under that precedent, however, Plaintiffs' statutory claims (Counts I–III), which are based entirely on alleged determinations, actions, or omissions "under" the CRA, are beyond this Court's review. 5 U.S.C. § 805; *Ctr. for Biological Diversity*, 946 F.3d at 563–64.

"'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020). Section 805 does not distinguish among actors, and thus includes actions or omissions "by agencies, the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) (Section 805 bars review of agency action or omission), *vacated on other grounds*, 144 S. Ct 2707 (2024) (mem.); *Wash. All. of Tech. Workers v. United States*, 892 F.3d 332, 346 (D.C. Cir. 2018) (same); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (same).

All of the actions that Plaintiffs challenge were taken "under" the CRA and so fall squarely within Section 805's prohibition. The CRA requires federal agencies to "submit to each House of

the Congress and to the Comptroller General a report" for each "rule," which includes "a concise general statement relating to the rule."5 U.S.C. § 801(a)(1)(A). That submission necessarily requires agencies to determine what actions are "rules" under the CRA. *See id.* § 804(3). The CRA then provides procedures for consideration of joint resolutions disapproving of rules, *id.* § 802, which necessarily requires that Congress determine a resolution is eligible for those procedures. The CRA provides that a joint resolution adopted by Congress and signed by the President has the effect that the "rule shall not take effect (or continue)," *id.* § 801(b)(1), and it specifies when the rule takes effect if the President vetoes the resolution, *id.* § 801(a)(3)(B).

EPA's characterization of waivers as "rules"; EPA's submission of the waivers to Congress; EPA's alleged failure to explain its reasoning in the "concise general statement relating to the rule," *id.* § 801(a)(1)(A)(ii); Congress's decision to consider the Resolutions under the CRA's expedited procedures; Congress's adoption of the Resolutions; and the President's signing of the Resolutions are therefore actions "under" the CRA and excluded from judicial review. *Id.* § 805. Indeed, despite their attempt to make this case about *EPA's* actions, *see infra* Section I.B (pp. 12–14), Plaintiffs at bottom challenge "*Congress's* enactment of the Joint Resolution[s]," over which this court "lack[s] jurisdiction." *Ctr. for Biological Diversity*, 946 F.3d at 563 (emphasis added).

Congress withheld review of actions under the CRA for good reason. Allowing courts to second-guess Congress's determination of what qualifies as a "rule" or other aspects of the CRA process would enable the judicial branch to override Congress's establishment of its own procedures, raising serious separation-of-powers concerns. *See infra* Section III.A (pp. 19–21). It would also add significant uncertainty: "the line dividing" a rule from an order is "not always … a bright one." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Allowing judicial review would turn what is intended to be an expedited process for curtailing agency overreach into a protracted legal battle, leaving the status of a duly enacted law in limbo for months or years as litigation plays out. Congress not only acted well within its authority by withholding judicial review for suits like this one, *Ctr. for Biological Diversity*, 946 F.3d at 563, it also acted wisely.

### B.  Plaintiffs Lack Standing for their Statutory Claims

Plaintiffs also lack standing for their statutory claims. Essentially, those claims allege that

EPA's characterization of the waivers as "rules" and subsequent submission of the waivers to Congress was unlawful and thus somehow tainted the Resolutions passed by Congress and signed by the President. Complaint at 27–31, ¶¶ 116–120, 126–132, 139. Plaintiffs, however, lack standing to bring these claims because their alleged injury (i) is not traceable to EPA's actions and (ii) will not be redressed by a favorable ruling or relief directed to EPA's actions. To establish standing, Plaintiffs "must show that [they] ha[ve] suffered … [1] an injury that is … [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Murthy*, 603 U.S. at 57 (internal quotation marks omitted). Plaintiffs allege they are injured because they are "prevent[ed] … from enforcing laws they have chosen to adopt within their jurisdictions." Complaint at 2, ¶ 5.

That injury does not result from the challenged EPA actions, but rather from Congress, which is not a party to this case, exercising its Article I authority to enact legislation nullifying EPA's prior Clean Air Act waivers. *See* U.S. Const. art. I, § 1. The CRA Resolutions were "adopt[ed]" by Congress and "signed" by President. Complaint at 2, ¶ 5. These legislative acts, not any action by EPA, repealed the Clean Air Act waivers at issue and triggered the preemption provisions of Section 209(a) of the Clean Air Act. *See* 42 U.S.C. § 7543(a) ("No State … shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines….").

This "exercise [of] independent judgment" by Congress and the President severs any causal chain to EPA. *Murthy*, 603 U.S. at 60. Congress was not obligated to accept EPA's characterization of the waivers or to pass Resolutions of disapproval once the waivers were submitted. Most rules that agencies submit under the CRA never make it to the floor of either House.[11] And Congress has the prerogative to act under the CRA even when an agency doesn't submit an action. *See supra* Section III (pp. 4–10). Nor was the President required to sign the Resolutions into law; he exercised independent judgment in concluding the CRA was an appropriate means to repeal the waivers. *See* Ex. 1; *see also* S. Doc. No. 118-6 (Sept. 26, 2023) (President Biden's veto of S.J. Res. 9, which

---

[11] George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN.

1   disapproved a final rule listing the lesser prairie chicken under the Endangered Species Act
2   pursuant to the CRA). These "unfettered choices made by independent actors" extinguish any
3   link between the challenged EPA actions and Plaintiffs' alleged injury. *Lujan v. Defs. of Wildlife*,
4   504 U.S. 555, 562 (1992).

5       Plaintiffs' alleged injury also will not be redressed "by a favorable ruling" on EPA's actions,
6   *Murthy*, 603 U.S. at 57, because a declaration or order related to *EPA's actions* would not render
7   the *Resolutions* unenforceable. The Resolutions were enacted "in conformity with the express
8   procedures of the Constitution's prescription for legislative action: passage by a majority of both
9   Houses and presentment to the President," *INS v. Chadha*, 462 U.S. 919, 958 (1983); *see also* U.S.
10  Const. art. I, § 7, cls. 2–3; *United States v. Ballin*, 144 U.S. 1, 6 (1892) (under the "federal
11  constitution," "the act of a majority of the quorum is the act of the body"). Therefore, the
12  Resolutions are and will remain a legitimate exercise of the federal legislative power, regardless of
13  any alleged deficiency in EPA's non-binding characterization and submission. *See Chadha*, 462
14  U.S. at 951. Simply put: there is no "fruit of the poisonous tree" doctrine for legislation. *Cf. Utah
15  v. Strieff*, 579 U.S. 232, 237 (2016). Nor would the persuasive effect of the Court's opinion provide
16  redress: "Whatever a court may say in an opinion does no more to compel [Congress and the
17  President] to change how they exercise their [lawmaking power] than an order vacating" EPA's
18  actions. *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring in the judgment).
19  Nor may Plaintiffs seek "damages" or prospective relief against EPA to remedy an alleged past
20  violation; and Plaintiffs do not "claim that they might enjoin Congress." *California v. Texas*, 593
21  U.S. 659, 673 (2021); *see also Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 108–09 (1998)
22  (failure to submit mandatory reports in the past did not authorize a prospective injunction). A
23  decision of the court related to EPA's actions "would amount to 'an advisory opinion without the
24  possibility of any judicial relief.'" *California v. Texas*, 593 U.S. at 673. No action of this Court
25  regarding EPA's actions could remedy Plaintiffs' alleged injury.

26      **C.  This Court Lacks Jurisdiction Under the APA**

27      For similar reasons, the challenged EPA actions are not "final agency action," 5 U.S.C. § 704,
28  and so this Court lacks jurisdiction over Plaintiffs' APA claim. *Havasupai Tribe v. Provencio*, 906

1  F.3d 1155, 1161 (9th Cir. 2018) ("Final agency action is a jurisdictional requirement imposed by 5

2  U.S.C. § 704" (cleaned up)); *see also* Complaint at 28–30, ¶¶ 122–135 (Count II).[12]

3      An agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's

4  decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,'

5  or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

6  EPA's actions do not satisfy *Bennett*'s second criterion. EPA's characterization of the waivers as

7  "rules" and subsequent submission to Congress created no right, imposed no obligation, and had

8  no "direct consequences" for Plaintiffs. *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Even after

9  submission, the waivers remained effective unless and until Congress passed (and the President

10 signed) resolutions of disapproval. Like other agency actions the Supreme Court has held are not

11 final, EPA's characterization and submission of the waivers were, at most, "recommendations

12 [that] were in no way binding on the President [and Congress], who had absolute discretion to

13 accept or reject them." *Bennett*, 520 U.S. at 178; *see also Dalton*, 511 U.S. at 469 (Secretary of

14 Defense's base closure recommendations were not final because the "action that will directly

15 affect the military bases is taken by the President, when he submits his certification of approval to

16 Congress" (cleaned up)); *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (Secretary of

17 Commerce's report of census results was not final because it "serves more like a tentative

18 recommendation" to the President, who ultimately submits a count to Congress).[13]

19      Plaintiffs also cannot evade the APA jurisdictional bar by claiming that EPA's actions were

20 "ultra vires." Complaint at 27–28, ¶¶ 114–21 (Count I). As the Supreme Court recently made

21 clear, the ultra vires exception to the APA "is a narrow one": it "applies only when an agency has

22

---

23 [12] Elsewhere, the Ninth Circuit has opined that "the fact that an agency decision is not final under
24 the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d
   815, 830 (9th Cir. 2002). Under that approach, lack of finality is assessed under Rule 12(b)(6).
25 *County of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1086 (S.D. Cal. 2020). Either way, Plaintiffs'
   APA claim must be dismissed.

26 [13] Section 805's prohibition of judicial review, *see supra* Section I.A. (pp. 11–12), also makes APA
27 review unavailable. 5 U.S.C. § 701(a)(1) (APA review does not apply "to the extent that … [other]
   statutes preclude judicial review."); *see* Complaint at 29–30, ¶¶ 122–132 (challenging the same
28 actions barred from review by 5 U.S.C. § 805).

taken action entirely in excess of its delegated powers and contrary to a specific prohibition in statute," not merely when "an agency has arguably reached a conclusion which does not comport with the law." *NRC v. Texas*, 145 S. Ct. 1762, 1776 (2025) (cleaned up). Plaintiffs' ultra vires claim does not come close to passing that high bar, as it does nothing more than "dress up a typical statutory-authority argument as an ultra vires claim." *Id.*

## II.  This Court Lacks Jurisdiction Over Plaintiffs' Constitutional Claims

This Court also lacks authority to review Plaintiffs' constitutional claims because they raise non-justiciable political questions.[14]

### A.  This Court May Not Review Challenges to House and Senate Procedures

Plaintiffs allege various constitutional defects in Congress's enactment of the Resolutions. *See, e.g.*, Complaint at 34–35, 37–38,  ¶¶ 155–158, 161–163, 172–176 (Counts V and VI). These claims amount to a non-justiciable challenge to House and Senate procedures.

"The constitution empowers each house to determine its rules of proceedings." *Ballin*, 144 U.S. at 5. That power is "absolute and beyond the challenge of any other body or tribunal," subject only to very narrow limitations: Congress may not "by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the … rule and the result which is sought to be attained." *Id.* "Neither … the advantages or disadvantages, the wisdom or folly, of … a rule [of Congress] present any matters for judicial consideration." *Id.* "In short, the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th 2007).

Plaintiffs' claims asserting constitutional defects in the process of enacting the Resolutions are "question[s] of legislative procedural rules" that this Court lacks authority to review. *Id.* Plaintiffs allege that Congress improperly (i) ignored the non-binding advice of GAO and the Senate Parliamentarian, Complaint at 31, 37 ¶¶ 140,  172, 175; (ii) accepted EPA's characterization of the

---

[14] Although the "political question doctrine … has traditionally been limited to constitutional cases," *Newsom v. Trump*, 2025 WL 1712930, at *5 (9th Cir. June 19, 2025) (per curiam), it applies with equal force to Plaintiffs' statutory claims to the extent those claims challenge Congress's establishment and application of CRA procedures, which are decisions committed to each House of Congress by the Constitution. U.S. Const. art. I, § 5, cl. 2.

waivers, *id.* at 34–35, ¶¶ 158–163; (iii) raised Points of Orders in the Senate, *id.* at 24–25, ¶¶ 101–105; (v) applied the CRA's procedures to the Resolutions, *id.* at 31–32, 37–38, ¶¶ 141, 173, 175–176, and (iv) limited Plaintiffs' participation in Congress's lawmaking process, *id.* at 37–38, ¶¶ 173, 175. In essence, Plaintiffs complain that the Senate chose to adopt the Resolutions without applying filibuster rules or seeking Plaintiffs' advice. But selecting the procedural rules to apply to pending legislation is a matter squarely committed to each House's discretion by the Constitution. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings."). And so determining whether to apply the CRA's "accelerated procedure is 'an exercise of the rulemaking power of the Senate and House of Representatives, respectively.'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)). The Constitution provides no right to particular congressional procedures or participation, and allowing the Senate to vote on the Resolutions without a prior supermajority procedural vote or testimony from Plaintiffs violates no "constitutional restraints or … fundamental rights." *Ballin*, 144 U.S. at 5; *see also infra* Section III (pp. 19–25). Moreover, use of expedited procedures and limited debate is "reasonabl[y] relat[ed]" to Congress's desire to expeditiously address what it viewed as EPA's error in issuing the waivers. *Ballin*, 144 U.S. at 5.

In modern parlance, whether Congress may consider the Resolutions using CRA procedures and without consulting Plaintiffs is a "political question" that "revolve[s] around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962). The "presence of a political question deprives a court of subject matter jurisdiction." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

The role of establishing and applying procedural rules is "textually … commit[ted]" by the Constitution to each House of Congress. *Baker*, 369 U.S. at 217. A court cannot "independent[ly] resol[ve]" Plaintiffs' claims "without expressing lack of the respect due" Congress in executing its lawmaking function or "without an initial policy determination"—like whether Congress should credit GAO's non-binding observations over competing recommendations—"of a kind

clearly for nonjudicial discretion." *Id.* Nor does it matter if Congress departed from its previous practice in passing the Resolutions (although it did not). As the Ninth Circuit has recognized, "the asserted failure of Congress to comply with its own procedural rules" in adopting the Resolutions "is a non-justiciable political question beyond [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72.

### B. This Court May Not Review Plaintiffs' Claims Against the President

Likewise, this Court may not review Plaintiffs' claims against the President. Plaintiffs appear to challenge the President's agreement that EPA's waivers are "rules" and his decision to sign the Resolutions into law. Complaint at 28, 32–33, 37–38, ¶¶ 117, 146–149, 172–176. But challenges to these actions, taken in furtherance of the President's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, raise a non-justiciable political question.

"[T]he duty of the President in the exercise of the power to see that the laws are faithfully executed … is purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Under Article II, the President "possesses authority to decide" how that duty is best accomplished, including by deciding what Acts of Congress he chooses to sign into law. *United States v. Texas*, 599 U.S. at 678–79. Consistent with "general principles" of separation of powers, "judicial interference with th[at] exercise of Executive discretion" is "forbid[den]." *Johnson*, 71 U.S. at 499. Indeed, an "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized … as 'an absurd and excessive extravagance.'" *Id.* Simply stated: "federal courts do not exercise general oversight of the Executive Branch." *Trump v. CASA, Inc.*, 2025 WL 1773631, at *15 (U.S. June 27, 2025).

Plaintiffs' claim that the President "neither exercised care nor even attempted to faithfully execute the Nation's laws," Complaint at 33, ¶ 149, would require this Court to engage in the sort of "judicial interference" with the President's core authorities that separation-of-powers principles "forbid." *Johnson*, 71 U.S. at 499. Under the Constitution, "it is [the *President's*] responsibility to take care that the laws be faithfully executed" and to decide which bills to approve, not a *court's. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010). This Court

1  has no constitutional role in assessing whether the President sufficiently "exercised care" or

2  adequately "attempted to faithfully execute the Nation's laws" pursuant to his Article II authority.

3  *Cf. Trump v. United States*, 603 U.S. 593, 607 (2024) ("courts have no power to control the

4  President's discretion when he acts pursuant to the powers invested exclusively in him by the

5  Constitution" (cleaned up)). Indeed, a court could not undertake the inquiry "without expressing

6  lack of the respect due" the President in execution of his Article II authorities. *Baker*, 369 U.S. at

7  217. Nor could this Court feasibly resolve Plaintiffs' claims, as "courts generally lack meaningful

8  standards for assessing" the sufficiency of the President's efforts. *United States v. Texas*, 599 U.S.

9  at 679. This is especially true when, as here, a lawsuit challenges the President's decision to sign

10  proposed legislation—a unique power that the president holds under Article I, not Article II, of

11  the Constitution. *See* U.S. Const. art. I. § 7, cl. 2–3. A President's decision to sign legislation is as

12  unreviewable as a Congressman's decision to vote for it. Plaintiffs' claims against the President are

13  therefore beyond this court's authority to address.

14  **III. Plaintiffs Fail to State Constitutional Claims**

15      Plaintiffs' constitutional claims should also be dismissed because they are meritless and so fail

16  to state a cognizable claim. Fed. R. Civ. P. 12(b)(6).

17          **A. Plaintiffs Fail to State an Article II Claim**

18      Plaintiffs allege that the President, EPA Administrator, and EPA "neither exercised care nor

19  even attempted to faithfully execute the Nation's laws" by concluding that the waivers were "rules

20  of general applicability subject to the CRA." Complaint at 32–33, ¶¶ 146–149 (Count IV).

21      These allegations do not raise a constitutional issue. Rather, they raise a garden-variety

22  statutory claim: that the Executive Branch incorrectly interpreted the meaning of "rule" under the

23  CRA to encompass EPA's waivers and so exceeded its statutory authority. *See* 5 U.S.C. §§ 801,

24  804(3). But an alleged error in statutory interpretation does not constitute an Article II "take care"

25  violation. "The distinction between claims that an official exceeded his statutory authority, on the

26  one hand, and claims that he acted in violation of the Constitution, on the other, is too well

27  established to permit this sort of evisceration." *Dalton*, 511 U.S. at 474. Plaintiffs cannot slap a

28  constitutional label on statutory claims to evade the CRA's jurisdiction bar.

1    In any event, the Executive Branch did not err in its interpretation. As OMB explained, EPA,

2  its Administrator, and the President were correct to conclude that the waivers are "rules" of

3  "general applicability" for purposes of the CRA, despite GAO's contrary (and far less carefully

4  reasoned) conclusion. *See* Ex. 1 at 3–6. The Ninth Circuit has explained:

5        Two principal characteristics distinguish rulemaking from adjudication. First,

6        adjudications resolve disputes among specific individuals in specific cases, whereas

7        rulemaking affects the rights of broad classes of unspecified individuals. Second,

8        because adjudications involve concrete disputes, they have an immediate effect on

9        specific individuals[.]… Rulemaking, in contrast, is prospective, and has a definitive

10       effect on individuals only after the rule subsequently is applied.

11  *Yesler*, 37 F.3d at 448 (citations omitted). Applying this framework, the Ninth Circuit held that a

12  determination by the federal Department of Housing and Urban Development ("HUD") that the

13  state of Washington's Public Housing Authority could apply state (rather than federal) eviction

14  procedures in federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

15    Like HUD's determination allowing Washington to substitute state procedures for federal

16  ones, EPA's waivers allowing Plaintiffs to substitute state emissions standards for federal ones

17  have "all the hallmarks of a rule." *Id.* at 448. First, the waivers "had no immediate, concrete effect

18  on anyone, but merely permitted" California and other states to enforce state emissions standards

19  "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable to California standards through

20  § 7543(b)(1)(C), requiring California's standards to give manufacturers adequate lead time "to

21  permit the development and application of the requisite technology"); *id.* § 7507(2) (copycat states

22  must "adopt such standards at least two years before commencement of [the applicable] model

23  year"). EPA waivers therefore have "prospective," rather than "immediate," effect. *Yesler*, 37

24  F.3d at 448. Second, the waivers "affected the rights of a broad category of individuals not yet

25  identified": manufacturers who, in the future, may sell new motor vehicles in those states. *Id.*

26    It does not matter "that the manner in which [EPA] made its decision[s] [may] share[] certain

27  features with adjudications," namely, that EPA "compare[s] the [criteria] … set out in [statute]

28  with" California's standards. *Id.* at 449. "The form of the proceeding is not dispositive; what

counts is its effect." *Id.* And the effect of a waiver is that of a rule that implements "a unique alternative nationwide compliance pathway" governing conduct of manufacturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) (providing that "compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). Intervenor-Defendants are aware of no other "adjudication" that has such sweeping, prospective effect on such a broad range of individuals.

In any event, describing EPA's process for considering a waiver request as merely an "adjudication" is "incomplete." *Yesler*, 37 F.3d at 449. EPA's "decision plainly involved more than applying a rule of decision to particular facts," since EPA weighs policy-laden considerations, including the technological feasibility and cost appropriateness of the state standards. *Id.*; 42 U.S.C. § 7521(a)(2) (applicable to California standards through § 7543(b)(1)(C)).

The waivers also are "generally," not "particularly," applicable rules. Once EPA issues a waiver, *any* other state may adopt California's standards without any additional factual showing or hearing. *Id.* § 7507. A waiver therefore imposes obligations on manufacturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA regularly concluded that waivers are "nationally applicable" and of "nationwide scope [and] effect." 88 Fed. Reg. at 20,725 (ACT waiver). Two federal district courts have agreed, opining that EPA waivers give effect to standards that are equivalent to federal regulations. *Green Mountain Chrysler*, 508 F. Supp. 2d at 347 ("It seems beyond serious dispute therefore that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation."); *Cent. Valley Chrysler-Jeep*, 529 F. Supp. 2d at 1173 ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

Because the waivers are reasonably characterized as "rules" under the CRA, Plaintiffs' Article II claim is meritless and fails to state a cognizable claim.

### B. Plaintiffs Fail to State a Separations-of-Powers Claim

Plaintiffs also fail to state a claim that Congress has violated separation of powers principles, either by delegating legislative power to the executive branch, Complaint at 34–35, ¶¶ 157–162, or

by exercising judicial power, *id.* at 35–36, ¶¶ 163–66 (Count V).

*First*, Plaintiffs claim that Congress "improperly delegated its constitutional authority 'to determine the Rules of its Proceedings' to the Executive Branch." *Id.* at 34, ¶ 158 (cleaned up). But Plaintiffs' account explains that both Houses applied their own judgment and rules of procedure in considering the Resolutions under the CRA. Members of the House "introduced the Resolutions" about "a month" after GAO issued its analysis, well aware of the dispute over the waivers' characterization, *id.* at 20, 22, ¶¶ 85, 93, and "voted to adopt all three Resolutions" by majority vote, consistent with House rules, *id.* at 23, ¶ 95. Members of the Senate were also familiar with GAO's opinion, as well as with other views. *Id.* at 20–21, ¶¶ 86, 89–90. Faced with competing interpretations, a majority of the Senate agreed that rules submitted by executive branch agencies consistent with "Section 802 of the Congressional Review Act" should be eligible for consideration under the CRA's expedited procedures. *Id.* at 24–25, ¶ 103 (the "Point of Order"). The Senate then went on, by majority vote, to adopt the Resolutions. *Id.* at 27, ¶ 111. Throughout the legislative process, Congress—not the Executive Branch—determined how to apply each House's rules and procedures.

Congress's considered decision to credit EPA's characterization of the waivers is no more a "delegation" than a decision to abide by GAO's opinion would be. The Constitution does not forbid Congress from consulting the Executive Branch in determining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches.").

*Second*, Plaintiffs' claim that "Congress's decision to allow the Executive Branch to be the sole arbiter of what the definition of 'rule' means under the APA and CRA … unconstitutionally intruded on the judiciary's Article III power." Complaint at 35, ¶ 163. But Congress has *not* made the executive branch "the sole arbiter." Each House of Congress, itself, decided to consider the waivers "rules" under the CRA. *Id.* at 22–24, ¶¶ 93–100. Even the "Point of Order" that Plaintiffs assail does not indicate that the Senate will agree with the Executive Branch in all circumstances, since it does not bind Senators' votes and says nothing about what happens when a federal agency

does *not* submit an action to Congress. The Senate can, as it did here, decide for itself whether the CRA applies, and it may well agree with GAO. And in the future, the Senate can always change the Point of Order anyway. *Ballin*, 144 U.S. at 5 (each House has "a continuous power" to make its own rules); GAO Letter B-32552, *supra*, at 9 ("CRA's expedited procedure for congressional review of agency rules was enacted as an exercise of the authority of the Senate and House of Representatives to set their own rules, with full recognition of the right of either House to change the rules.").

Nor did Congress's procedures intrude on the judicial power, because courts *have no power* to determine whether an agency action is a rule under the CRA. 5 U.S.C. § 805. "Congress generally does not infringe the judicial power when it strips jurisdiction because, with limited exceptions, a congressional grant of jurisdiction is a *prerequisite* to the exercise of judicial power." *Patchak v. Zinke*, 583 U.S. 244, 254 (2018) (plurality opinion). Congress's actions in the context of the CRA also have no effect on courts' authority to determine whether agency actions are "rules" in suits brought under the APA in non-CRA contexts. *Contra* Complaint at 35, ¶ 163.

Third, Plaintiffs claim that the Resolutions, themselves, invade the judicial power because they "direct the court how pre-existing law applies to particular circumstances" yet "fail[] to supply any new legal standard." *Id.* at 35–36, ¶¶ 164, 166 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17, 231 (2016)). But that completely misunderstands the Resolutions, and the CRA, itself. The Resolutions do effectuate a new legal standard: namely, that the three waivers are now unlawful and that there can be no judicial review of that decision. "When Congress enacts legislation that directs an agency to issue a particular rule, 'Congress has amended the law.'" *Ctr. for Biological Diversity*, 946 F.3d at 562. The same is true when Congress overrides an agency rule with new legislation. The Resolutions "compelled changes in law, not findings or results under old law." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). The Resolutions are therefore "enforceable as a change to substantive law, even though [they] did not state that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 562. And "because the [Resolutions] changed the substantive law, [they do] 'not violate the constitutional separation of powers' even though [they may] … 'chang[e] the law

applicable'" to "'pending litigation.'" *Id.* (*quoting All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)).

### C.  Plaintiffs Fail to State Tenth Amendment or Federalism Claim

Finally, Plaintiffs also fail to state a claim under the Tenth Amendment or federalism principles. Complaint at 36–38, ¶¶ 171–176 (Count VI).

Plaintiffs appear to claim that by using expedited procedures to adopt Resolutions that had the effect of limiting Plaintiffs' enforcement of state emissions standards, Congress violated Plaintiffs' Tenth Amendment rights and structural principles of federalism. *Id.* at 37–38, ¶¶ 172–76. In essence, Plaintiffs claim a Tenth Amendment right to the Senate filibuster when it comes to any curtailment of California's special treatment under the Clean Air Act.

But there is no constitutional right to the filibuster under the Tenth Amendment or any other provision of the Constitution. The Constitution provides that "*Each House* may determine the Rules of its Proceedings," including if, when, and how to apply the filibuster. U.S. Const. art. I, § 5, cl. 2 (emphasis added); *see also supra* Section II.A (pp. 16–18). Nor do states have a constitutional right to dictate congressional procedures for legislation in which they have particular interest. There is no "federalism" exception to each House's authority to determine its internal rules that would allow Plaintiffs to demand "debate," "testimony" by state officials, or other preferred forms of "participat[ion]." *See* Complaint at 37, ¶¶ 173, 175.

Nor do the Resolutions, themselves, impermissibly tread on constitutionally protected state interests. The Resolutions do not "negate *state rules*" as such. *Contra id.* at 2, ¶ 7. They invalidate *federal agency actions*: EPA's waivers. Even so, if Congress may affirmatively carve out a special exception for federal Clean Air Act preemption for California, then it surely can put limits on that exception when it believes California has gone too far.

The Resolutions certainly do modify the waiver provision of the Clean Air Act, including by forbidding EPA from imposing substantially similar waivers in the future. *See Ctr. for Biological Diversity*, 946 F.3d at 562. But that poses no problem because Plaintiffs have no *constitutional right* to enforce their own motor vehicle emissions programs. (Nor do Plaintiffs appear to claim one, as they have not challenged Congress's authority to regulate motor vehicle emissions and preempt

state programs. 42 U.S.C. §§ 7521(a), 7543(a)). Nor does California have a right to the precise, limited exception to Clean Air Act preemption that an earlier Congress provided. *See id.* § 7543(b). "[S]tatutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified. And Congress remains free to express any such intention either expressly or by implication as it chooses." *Dorsey v. United States*, 567 U.S. 260, 274 (2012) (citation omitted).

### D. Plaintiffs Lack a Cause of Action for Their Constitutional Claims

Finally, Plaintiffs' constitutional claims fail for a more fundamental reason: they lack a cause of action. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, see, *e.g.*, 42 U.S.C. § 1983." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted). No constitutional provision, doctrine, or statute cited by Plaintiffs provides a right to sue to challenge the sufficiency of presidential action or the internal procedures of Congress. *See Franklin*, 505 U.S. at 796; *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015). Nor can Plaintiffs successfully invoke the "inherent equitable power" of federal courts. Complaint at 38, ¶ 180 (Count VII). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and the CRA's jurisdiction stripping provision announces Congress's "'intent to foreclose' [the] equitable relief" that Plaintiffs seek. *Armstrong*, 575 U.S. at 327–28; *see supra* Section I.A (pp. 11–12).

### IV. The Complaint Should Be Dismissed *With* Prejudice

Because Plaintiffs cannot cure the defects by amendment, the Complaint should be dismissed with prejudice. *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (dismissal with prejudice is appropriate where "the complaint could not be saved by any amendment").

### CONCLUSION

For the foregoing reasons, Plaintiffs' entire complaint should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state any cognizable claim.

Dated: _____ ___, 2025        Respectfully submitted,

_____

Michael Buschbacher
James R. Conde
James R. Wedeking
Laura B. Ruppalt
Boyden Gray PLLC

Eric Grant
John B. Thomas
Hicks Thomas LLP

Counsel for Intervenor-Defendants
American Free Enterprise Chamber of
Commerce, Illinois Corn Growers Association,
Indiana Corn Growers Association, Iowa Corn
Growers Association, Kansas Corn Growers
Association, Kentucky Corn Growers
Association, Michigan Corn Growers
Association, Missouri Corn Growers
Association, Nebraska Corn Growers
Association, Tennessee Corn Growers
Association, Texas Corn Producers, Wisconsin
Corn Growers Association, and National Corn
Growers Association

Ex. 1



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

June 18, 2025

Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

> **Re:** **Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act"**

Dear Mr. Comptroller General:

Late last month, the Senate voted in favor of three joint House resolutions (which by then had passed the House)[1] invalidating three waivers of preemption granted by EPA to California.[2] The analysis below buttresses Congress's legal conclusions ***both*** to substantively override those waivers ***and*** to deem the waivers to be rules subject to the Congressional Review Act ("CRA") in the first place.

More specifically, this letter provides the Office of Management and Budget's ("OMB's") response to a March 6, 2025 Government Accountability Office ("GAO") letter concerning application of the CRA to these three waivers. In preparing this letter, I have consulted with the Office of Information and Regulatory Affairs ("OIRA"), which has a statutorily assigned role in the CRA process and reports to me as part of OMB.

OMB strongly disagrees with GAO's analysis (styled as a set of "Observations") for numerous reasons falling into two basic categories—GAO's lack of authority in this area ***and*** GAO's flawed administrative law analysis of how to classify when an agency action is deemed a rule versus an adjudication. I turn first to the four reasons why GAO exceeded its authority:

---

[1] *See* H.J. Resolutions 87, 88, and 89, *available at* https://www.congress.gov/bill/119th-congress/house-joint-resolution/87; https://www.congress.gov/bill/119th-congress/house-joint-resolution/88; and https://www.congress.gov/bill/119th-congress/house-joint-resolution/89 (last visited June 17, 2025).
[2] *See* 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 642 (Jan. 6, 2025); 68 Fed. Reg. 20,688 (Apr. 6, 2023).

## I.   GAO'S LACK OF POWER IN THIS AREA

*First, GAO has no legal role whatsoever* in deciding whether an action the Executive Branch submits to Congress for consideration under the Congressional Review Act ("CRA") is a "rule" or an "adjudication." That role is assigned instead to the Administrator of OIRA (see below for additional details) and ultimately Congress.

*Second*, GAO also has *no expertise in this area*, whereas OIRA routinely reviews federal actions to determine their character, consistency with law, and whether they meet the basic tests of rationality, such as producing net benefits or net costs, and at what level. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). When performing zone-of-interests analysis, for instance, the Supreme Court considers agency expertise to be a relevant prudential factor.[3] Just so here. As a prudential matter, GAO's non-expert Observations were properly not be credited by Congress and should not be in the future because GAO lacks expertise in this area, being an agency with a different assigned role.

*Third*, GAO has reached the opposite conclusion in the past. Indeed, as Comptroller, you *conceded* both the lack of a GAO role here and that GAO's Observations took an unprecedented legal position when being questioned recently by Representatives Valadao (CA) and Moore (WV).[4]

*Fourth, and worst of all, GAO's "Observations" functionally attempt to interfere with the democratic process.* Members of Congress should decide for themselves whether to apply the CRA to a particular action of the Executive Branch, not GAO. If Congress had wanted GAO to have a gatekeeping role over application of the CRA, Congress would have said so in clear terms. The silence in the statute on this point is telling. And Congress's enactment of the joint resolutions of disapproval represents an express rejection of GAO's actions.

* * * * *

OIRA is the Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a "major rule" within the meaning of the Congressional Review Act ("CRA" or "the Act"). *See* 5 U.S.C. § 804(2). Part of that role is to parse whether an action is a "rule" at all. Given this statutory role and based as well on OIRA's experience, I explain in detail below OMB's affirmative determination that the waivers are "rules" subject to the CRA.

As GAO notes, in granting those waivers, the prior Administration summarily asserted that the actions at issue are not subject to the Act. But following the change in Administration, EPA's new Administrator reassessed the agency's evaluation and

---

[3] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226–27 (2012) (considering Department of Interior regulations when resolving a zone-of-interests dispute); *Federal Defenders of N.Y. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (same as to federal BOP regulations). Zone-of-interests analysis constitutes a prudential jurisdictional analysis. *See Bennett v. Spear*, 520 U.S. 154, 162 (1994). We argue by analogy here that GAO lacks the congressional equivalent of jurisdiction over the CRA question at issue.
[4] *See* Hearing Before the House Committee on Appropriations, Subcommittee on the Legislative Branch, 119th Congress (Apr. 7, 2025), *available at* http://appropriations.house.gov/schedule/hearings/budget-hearing-government-accountability-office-congressional-budget-office-and (last visited June 17, 2025).

concluded that the waivers are best characterized as rules of general applicability within the meaning of the Act.[5]

Like Congress, OMB agrees with EPA Administrator Zeldin that the waivers are rules of general applicability subject to the CRA. And regardless, even if the question were close (which it is not), it was prudent for the EPA Administrator to submit the waivers to Congress out of an abundance of caution and out of deference to Congress's role in our constitutional Republic. This common agency practice obviates any advisory role for GAO.[6] Indeed, EPA has previously sent a prior action revoking a Clean Air Act preemption provision to Congress and that action remains listed on GAO's own website as a "final rule."[7]

OMB therefore believes that no additional information was necessary for Congress to discharge its legislative role, or for GAO to discharge its *ad hoc* advisory role. As GAO through a prior general counsel once testified before the Senate, the Act does not give GAO power "to decide what a rule is."[8] As GAO further explained in its March 6, 2025 letter concerning these waivers, *see* B-337179, GAO does not even "normally issue a legal decision" when an agency submits an action for review. *Id.* at 1. Indeed, OMB is unaware of GAO ever doing so before now. *See also supra* n.4.

As GAO notes in its letter to congressional requesters, "GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under the CRA because that submission generally obviates the need for a GAO decision on the matter." *Id.* at 1 n.3.[9] Hence, that should have marked the conclusion of GAO's involvement.

In its March informal letter to congressional requesters, however, GAO nevertheless departed from its longstanding practice and opined (albeit informally) that the submitted waivers were not rules of general applicability, citing a prior GAO opinion about a different waiver and claiming that the same legal analysis would apply to these three submitted waivers. *See* B-337179 at 7. GAO also claims that EPA has not explained

---

[5]     "The Biden Administration failed to send rules on California's waivers to Congress, ***preventing Members of Congress from deciding on extremely consequential actions that have massive impacts and costs across the entire United States.*** The Trump EPA is transparently correcting this wrong and rightly following the rule of law," said Administrator Zeldin.

EPA, Press Release, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (Feb. 14, 2025), *available at* https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting (last visited June 17, 2025) (emphasis added). GAO's footnote 15 in its Observations simply reflects the prior Administration's attempt to sidestep CRA review of California waiver decisions, relying on Biden-era EPA *Federal Register* notice from 2023 and a so-called "midnight" rule issued on January 6, 2025—precisely the kind of rule that the CRA was especially designed to place under Congress's watchful eye.

The position we take here is also consistent with that of the Small Business Administration's Office of Advocacy. *See* Advocacy Submits Comments on EPA Waiver Request for California Locomotive Regulation (Apr. 23, 2024), *available at* https://advocacy.sba.gov/2024/04/23/advocacy-submits-comments-on-epa-waiver-request-for-california-locomotive-regulation/ (last visited June 17, 2025) ("The Clean Air Act allows other states to implement California's standards once they are finalized. Advocacy is concerned that the ability of other states to potentially implement the In-Use Locomotive Rule ***turns a state regulation into a de facto national regulation***. Advocacy is concerned that California's proposed rule will disproportionately harm small locomotives [and] small businesses nationwide who rely on the country's rail system.") (emphasis added).

[6] *See, e.g.,* EC-5696, 170 Cong. Rec. S5883 (Sept. 9, 2024) (EPA "does not believe that the enclosed actions is [*sic*] a 'rule' within the meaning of 5 U.S.C. 804(3). Nevertheless, out of an abundance of caution, EPA is voluntarily submitting the action 'to each House of the Congress and the Comptroller General,' for their review under 5 U.S.C. 801(a).").

[7] *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, FRL-10000-45,* https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a "final rule.").

[8] *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. and H. Comm. On Res.,* 105th Cong. 20 (1977).

[9] *See also Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38,* B-330376 (Nov. 30, 2018).

why it disagrees with GAO. This letter provides the Executive Branch's response to GAO.

## II. GAO'S FLAWED ADMINISTRATIVE LAW ANALYSIS

In OMB's view, GAO's opinion overlooks and misrepresents important aspects of how preemption waivers under the Clean Air Act work under Section 209(b) of that statute as a matter of administrative law.

GAO's foundational claim is that a waiver of preemption is an "order" (by which it appears to mean something like a "license" particular to California, though GAO does not actually reach that conclusion) and thus is not a "rule" of general applicability. In the alternative, GAO claims that, if the waiver is a rule, it is one of particular applicability. OMB disagrees with both of these claims for five reasons.

*First*, GAO's conclusion that the waivers are "orders" is inconsistent with judicial decisions interpreting the Administrative Procedure Act, which forms the basis for the CRA's definition of a "rule."[10] Courts have been clear that sub-delegation of regulatory authority to a State—like that accomplished through the waivers—is characteristic of a "rule," not an "order." The seminal case here is *Yesler Terrace Community Council v. Cisneros*, which involved HUD's determination that Washington State's public housing authority could substitute its own eviction procedures for federally required ones. 37 F.3d 442 (9th Cir. 1994). The Ninth Circuit rejected HUD's argument that this was an "order," concluding that HUD's action "has all the hallmarks of a rule. HUD's determination has no immediate, concrete effect on anyone, but merely permitted [the Washington Public Housing Authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

Moreover, two separate district courts were called on to carefully analyze the Clean Air Act mobile source program including its preemption provision. And the analysis of each parallel OMB's conclusion that California waiver decisions are better classed as rules rather than as orders. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("[O]nce EPA issues a waiver for a California emissions standard" it has "the same stature as a federal regulation."); *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

The *Yesler* analysis, as confirmed by the Clean Air Act-specific logic of the *Green Mountain* and *Central Valley* district courts, applies here. The waivers at issue have "no immediate, concrete effect on anyone, but merely permit[]" California (and other States) to enforce different standards "in the future." *Id.* The waivers similarly "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *Id.*

---

[10] *See* 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]" with certain exceptions).

*Yesler* also shows why it is irrelevant that EPA styled its waivers as "decision[s]" and initially summarily disclaimed application of the CRA. As the Ninth Circuit explained, "that the manner in which [an agency] made its decision shares certain features with adjudications" is not determinative. *Id.* at 449. "The form of the proceeding is not dispositive, what counts is its ***effect***." *Id.* (emphasis added). The waivers, like the HUD determination in *Yesler*, have "legal consequences for yet-to-be-identified individuals only prospectively," *i.e.*, "the effects of a rule, not of an adjudication." *Id.*

GAO curiously cites *Yesler* on page 7 of its analysis, yet seems oblivious to the fact that *Yesler*, as applied here, leads to the opposite outcome than the one which GAO advocates. GAO does not even say anything about why waivers are distinguishable from the delegation of eviction authority at issue in *Yesler*.

***Second***, unlike an ordinary license, a waiver of Section 209(a) Clean Air Act preemption does more than grant California alone an exemption from a prohibition under the Clean Air Act. Under Section 177 of the Clean Air Act, 42 U.S.C. § 7507, a waiver allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing. As EPA explained in the Advanced Clean Trucks waiver, "[t]his final action will not only affect manufacturers of new heavy-duty vehicles and engines sold in California, but also manufacturers that sell their new heavy-duty vehicles and engines in those states that have already adopted or may choose to adopt California's regulations"—consequently, "this final action is ***nationally applicable***."[11]

Currently, 18 States have adopted at least one of California's electric-vehicle standards under Section 177. GAO's claim that a waiver is "particular to California" thus overlooks the most significant part of the entire statutory scheme. GAO's analysis, however, does not address this provision in any form.

Nor did GAO address Section 177's prohibition on creating a "third vehicle" that could lawfully be sold in the United States. Of course, the point of the "third vehicle" prohibition confirms that there are two and only two nationally applicable automobile emissions regimes that can govern in the United States: (1) EPA's federal car standards, unmistakably issued exclusively in the form of regulations; and (2) California's standards, because those standards can "travel" under Section 177 to govern in non-California States without a separate waiver.[12] It makes no sense to imagine that federal-car States are governed via regulations but California-car States are governed by adjudication. And any such argument particularly withers once one realizes that what EPA grants preemption waivers of is California regulations, not California adjudications.

***Third***, a waiver of Section 209(a) Clean Air Act preemption does not simply govern the primary conduct of California and all other Section 177 States. Instead, such a waiver also directly governs the conduct of motor-vehicle manufacturers ***nationwide***. Under Section 209(b)(3) of the Clean Air Act, certification and conformance to California's alternative standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. § 7543(b)(3). Thus, a waiver creates a unique alternative nationwide compliance pathway for motor-vehicle manufacturers that displaces EPA's otherwise applicable federal standards. Again, OMB is not aware of any "adjudicatory order" creating a new interstate regulator that can replace federal standards and govern

---

[11] *See, e.g.*, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023) (emphasis added).
[12] As noted above, EPA does not conduct a separate adjudication applicable to Section 177 State borrowing decisions.

compliance for an entire manufacturing industry across numerous States. Yet GAO's analysis is also mum about this provision.

*Fourth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption are orders because they have "immediate effect" on California, not prospective effect. It is unclear what GAO means by "immediate effect," but Section 202(a) of the Clean Air Act, 42 U.S.C. § 7521(a), which applies to EPA directly and to waiver decisions as well through Section 209(b)(1)(C), 42 U.S.C. § 7543(b)(1)(C), requires that the waived California rules give motor vehicle manufacturers adequate "lead time," which is typically measured in years, not months. And Section 177(2) also requires at least "two years" of lead time for other States adopting these alternative standards. OMB is aware of no adjudicatory order that requires multiple years of lead time.

True adjudications are inherently retrospective in nature—that is, they describe and establish at that moment in time the law as it always has been, not the law as it is being established prospectively and only for the first time. *See, e.g., Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). By contrast, California emissions regulations apply only prospectively, and only after the lapse of the appropriate amount of lead time. Moreover, EPA waivers are inherently prospective. Otherwise, Section 177 States would have no stability—if they could adopt the California-car standards "immediately" after California promulgated the relevant regulations, then a denied EPA waiver would automatically upset the national market for new automobiles and engines.

As the D.C. Circuit has explained, moreover, even in the agency context specifically, forward-looking obligations are a characteristic of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club In'tl. v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) ("an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking. Again, however, GAO's analysis does not discuss the Clean Air Act's lead time provisions.

*Fifth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption involve considerations "of particular facts, as opposed to general policy." Not so. In granting waivers, EPA must address the consistency of the regulations with Section 202(a), EPA's primary regulatory authority for motor vehicles. *See* 42 U.S.C. § 7543(b)(1)(C). In so doing, EPA considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place. These questions require making predictive policy judgments, not addressing "particular facts." For example, do the California regulations give the industry sufficient lead time to transition to 100% electric vehicles? Are the industry's compliance costs with that lead time "appropriate"? Are the standards "technologically feasible"? 42 U.S.C. § 7521(a)(2). OMB is unaware of any adjudicatory order that requires addressing similarly forward-looking and policy-laden questions about any entire industry's ability to comply. As with the other points made above, however, GAO's analysis is completely silent on the lead-time and technological feasibility aspects of the statutory regime.

\* \* \* \* \*

Because GAO does not address any of these five points, and appears to misunderstand how these Clean Air Act waivers operate, OMB, as the Executive Branch's expert agency for regulatory matters generally, is unpersuaded by GAO's opinion and letter and instead believes that the waivers were and are best characterized as rules of general applicability. But regardless, even if a close call, the EPA Administrator's decision to submit the waivers to promote greater accountability to Congress was reasonable. That practice promotes the kind of agency accountability to Congress that the CRA—and GAO—was created to enhance, not diminish.

It is Congress that is optimally positioned to **decide for itself** when to put rules submitted to it to CRA votes, as it did in considering the three passed House Joint Resolutions 87 through 89. **That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic**. In enacting the resolutions of disapproval, Congress emphatically rejected GAO's inappropriate attempt to interfere with Congress's powers under the Constitution and CRA. EPA is thus now barred from issuing any waiver of preemption California seeks that is substantially similar to the three overridden waivers.[13]

Sincerely,

Russell T. Vought
Director

---

[13] *See* 5 U.S.C. 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.").