David L. Rosenthal (CA Bar #314344)
david@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Of Counsel*
Thomas R. McCarthy
tom@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Counsel for AMICI CURIAE*
THE TRUCK RENTING AND LEASING ASSOCIATION,
NATIONAL PROPANE GAS ASSOCIATION,
WESTERN PROPANE GAS ASSOCATION, AND
PROPANE GAS ASSOCIATION OF NEW ENGLAND

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>*Defendants*. | CASE NO. 4:25-cv-04966-HSG<br><br>**AMICI CURIAE BRIEF OF THE TRUCK RENTING AND LEASING ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, WESTERN PROPANE GAS ASSOCIATION, AND PROPANE GAS ASSOCIATION OF NEW ENGLAND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date: October 23, 2025<br>Time: 2:00 p.m.<br>Courtroom: 2, 4th Floor, Oakland Courthouse<br>Judge: Hon. Haywood S. Gilliam, Jr. |

**TABLE OF CONTENTS**

INTRODUCTION ..... 1
INTEREST OF AMICI ..... 1
ARGUMENT ..... 3
I. The EPA waivers are rules subject to the CRA, rather than orders. ..... 4
A. Congress alone provides the authoritative interpretation of the CRA. ..... 5
B. The EPA waivers have all the hallmarks of rules of general applicability subject to the CRA. ..... 8
II. The EPA waivers will have tremendous, harmful effects in the marketplace if Congress's decision is nullified by this action. ..... 12
CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Cases**

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) (Scalia, J., concurring) .......... 5

*Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914 (D.C. Cir. 2013) .......... 8

*Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d U51, 1174 (E.D. Cal. 2007) .......... 11

*Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019) .......... 3, 6

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007) .......... 11

*INS v. Chadha*, 462 U.S. 919 (1983) .......... 5

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) .......... 4

*Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017) .......... 8

*United States v. Florida E. Coast Ry.*, 410 U.S. 224 (1973) .......... 5

*United States v. Reece*, 956 F. Supp. 2d 736 (W.D. La. 2013) .......... 5

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994) .......... 8, 9, 11

**Constitution, Statutes, and Regulations**

5 U.S.C. §551 .......... 4, 5

5 U.S.C. §801 .......... 3, 4

5 U.S.C. §804 .......... 4

5 U.S.C. §805 .......... 5, 6

42 U.S.C. §7507 .......... 8, 10

42 U.S.C. §7521 .......... 8, 12

42 U.S.C. §7543 .......... 11

88 Fed. Reg. 20,688 (Apr. 6, 2023) .......... 9

90 Fed. Reg. 642 (Jan. 6, 2025) .......... 9

90 Fed. Reg. 643 (Jan. 6, 2025) .......... 9

U.S. Const. art. I, §7 ..... 5

**Other Authorities**

EC4787, 170 Cong. Rec. 89 (May 22, 2024) ..... 7

EC4991, 170 Cong. Rec. 96 (June. 5, 2024) ..... 7

EC5696, 170 Cong. Rec. 139 (Sept. 9, 2024) ..... 8

EC6087, 170 Cong. Rec. 166 (Nov. 12, 2024) ..... 7

*Electrification Impacts Study Part 1*, Cal. Pub. Utils. Comm'n (May 9, 2023), perma.cc/265G-K3D2 ..... 15

Letter from Richard Corey, Executive Director, CARB, to Liane Randolph, CARB Chair, and Board Members (Jan. 10, 2022), perma.cc/AG2Z-8L42 ..... 10

Letter from Russell Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General (June 18, 2025), perma.cc/JDA6-DY76 ..... 5, 6

Letter from Thomas Armstrong, General Counsel, Government Accountability Office, to the Hon. Orrin Hatch, Chairman, U.S. Senate Comm. on Finance (Nov. 30, 2018), perma.cc/J2WY-YPYT ..... 7

Valeria Brannon & Maeve Carey, Cong. Rsch. Serv., R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 9-12 (Oct. 22, 2024) ..... 5

## TRUCK RENTING AND PROPANE ASSOCIATIONS' AMICI CURIAE BRIEF

## INTRODUCTION

Amici support the Congressional Review Act joint resolutions of disapproval that nullified three Environmental Protection Agency federal preemption waivers granted to California. California used the waivers to set unattainable standards and ban gasoline and diesel cars and trucks. California's actions would wreak havoc on the marketplace if the joint resolutions were nullified and California standards were permitted to go into effect. Amici agree with the federal Defendants that the CRA's prohibition on judicial review bars Plaintiffs' statutory and constitutional claims. MTD.8-13 (Doc. 118). Amici also agree that Plaintiffs' claims fail on the merits because the joint resolutions comply with the CRA's requirements. Amici write separately to address the legal effect of the EPA waivers as rules and highlight the practical effects of the underlying actions.

Due in part to the broad impact of these preemption waivers on consumers, the nationwide vehicle marketplace, and the nationwide propane industry, Congress has appropriately designated the waivers as rules subject to Congressional Review Act scrutiny. Disapproval of the rules is essential to ensuring a unified national marketplace that promotes continued progress on fuel economy while safeguarding economic growth and consumer interests. Through its members, the associations highlight the great harm to industry, consumers, and environmental goals if the joint resolutions are invalidated in litigation and California's unduly burdensome and unrealistic standards go back into place.

## INTEREST OF AMICI

The Truck Renting and Leasing Association is a voluntary non-profit trade association founded in 1978 to serve as the unified and focused voice for the truck renting and leasing industry. TRALA's mission is to foster a positive legal and regulatory climate within which companies engaged in leasing and renting vehicles and trailers, as well as related businesses, can compete without discrimination in the North American marketplace. TRALA's nearly 500 members engage primarily in commercial truck renting and leasing, vehicle finance leasing, and

consumer truck rental. In addition, its membership includes companies with motor carrier operations and more than one hundred supplier member companies that offer equipment, products, and services to TRALA renting and leasing company members. TRALA members purchase approximately 30% of all over-the-road Class 2-8 trucks and tractors in the United States annually, and today approximately one in every four trucks on the road, regardless of size, is a rented or leased vehicle. This litigation will impact TRALA's membership significantly due to the fact that truck travel is interstate in nature, and given that TRALA companies typically do not operate their own vehicles—their customers do—it is critical that one state is not allowed to supplant the federal government with respect to emissions policy.

The National Propane Gas Association is the national trade association representing the U.S. propane industry. Over 2,400 companies are currently members of NPGA, including 36 affiliated state and regional associations. NPGA's members are primarily retail marketers of propane gas who deliver the fuel to the end user, but other members of NPGA include propane producers, transporters, and wholesalers; manufacturers and distributors of associated equipment, containers, appliances, and trucks; fabricators of propane gas cylinders and tanks; and service providers of all types. NPGA's mission is to advance safety and to increase the use of propane through sound public policy. NPGA regularly participates in litigation as a party or amicus to advance its mission. This litigation will have a significant impact on the propane industry and directly affects NPGA members, consumers, and the whole nation.

The Western Propane Gas Association is the trade and membership service organization that represents propane industry throughout California. Founded in 1949, WPGA represents the single-largest market for propane consumption in the country and upholds its core principles of education and safety. WPGA's primary purpose is to maintain high standards of practice within the industry and, in so doing, protect the consumers and communities its members serve. To advance its mission, WPGA participates in litigation as a party or amicus, including challenges to California Air Resources Board regulations.

The Propane Gas Association of New England is a regional alternative energy trade association representing members of the propane industry in the six New England States. PGANE exists to serve the propane industry by promoting safety, education, and public awareness of the uses and environmental and health benefits of propane. Its core activities include educating, informing, lobbying, and influencing a variety of stakeholders about the benefits of propane, expanding propane markets and uses, promoting compliance with standards and good business practices among its member companies.

**ARGUMENT**

"[T]he Congressional Review Act (CRA) was designed to give Congress an expedited procedure to review and disapprove federal regulations." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019) (citing 5 U.S.C. §§801-08). To further that purpose, "[t]he CRA assists Congress in discharging its responsibilities for overseeing federal regulatory agencies." *Id.* In practice, the CRA dictates a federal agency will submit a report to Congress of a rule before it goes into effect. *See id.* (citing 5 U.S.C. §801(a)(1)(A)). That report gives Congress the opportunity "to enact a joint resolution that disapproves the regulation." *Id.* at 557 (citing 5 U.S.C. §802(a)). "If the House and Senate pass a joint resolution of disapproval, and the President signs it into law, the agency's rule 'shall not take effect.'" *Id.* (quoting 5 U.S.C. §801(b)(1)).

That's exactly what happened here. Earlier this year, Congress exercised its CRA oversight authority to disapprove of three EPA waivers that had exempted California from federal preemption under the Clean Air Act. MTD.7. These waivers had authorized California to set unattainable vehicle emissions standards and effectively ban internal-combustion engines in new vehicles through a series of rules—namely, the Advanced Clean Trucks, Advanced Clean Cars II, and "Omnibus" Low NOx rules. *Id.* at 6-7. California's rules enabled by the EPA waivers require automakers to sell an annually increasing percentage of electric cars and trucks—and so a decreasing percentage of internal-combustion vehicles—beginning in model years 2024 (for medium- and heavy-duty trucks) and 2026 (for cars and light trucks). *Id.* Under California's rules, all cars and light trucks, as well as most heavy-duty pickup truck, box trucks, and semis sold by

model year 2035 must be electric. *Id.* California would also set emissions standards for medium- and heavy-duty trucks so low that, in practice, they require manufactures to sell an increasing percentage of electric vehicles to comply with the standard. *Id.* The combined effect of California's rules will effectively regulate the internal-combustion engine out of existence in the production of new vehicles.

After Congress passed three joint resolutions of disapproval of California's EPA waivers under the CRA, the President signed each into law on June 12, 2025. *Id.* at 7. And for good reason, due to the unsettling effects of California's actions if permitted to go into place. *See infra* 12-15. Several States challenge the resolutions, alleging in part that the EPA waivers are not "rules" subject to the CRA, but are instead "adjudicatory orders" that escape congressional review. *E.g.*, Compl. (Doc. 1) ¶¶116-21, 126, 137-41, 165, 172. Along with the reasons the United States gives in its brief, MTD.8-25, the proper characterization of the EPA waivers as rules disposes of the States' claims based on an alleged CRA violation.

**I. The EPA waivers are rules subject to the CRA, rather than orders.**

The EPA actions approving Clean Air Act preemption waivers are "rules," rather than "adjudicatory orders." This matters because rules are subject to disapproval under the CRA, whereas orders are not. 5 U.S.C. §801.

The CRA expressly adopts the Administrative Procedure Act's definition of "rule" with limited exceptions that do not apply here. *See* 5 U.S.C. §804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]."). For the purpose of CRA review, then, the term "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future" of various standards. 5 U.S.C. §551(4). Importantly, the Supreme Court has observed that rule "is defined broadly." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (citing 5 U.S.C. §551(4)).

Courts also look to the APA definition of "order" to inform whether an action is better classified as an order under the CRA. *See, e.g.*, Valeria Brannon & Maeve Carey, Cong. Rsch. Serv., R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 9-12 (Oct. 22, 2024) (collecting authorities); *see also, e.g.*, *United States v. Reece*, 956 F. Supp. 2d 736, 745 (W.D. La. 2013) (examining the APA's definition of "order" to determine that, under the CRA, "rules and orders are two different things"). The APA (and thus the CRA) term "order" means "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. §551(6). An adjudicatory order is retrospective in nature and binds specific individuals in specific cases. *E.g.*, *United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245 (1973) (recognizing a "distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other"). The "central distinction" between rulemaking and adjudicatory orders is that only rules have legal consequences "for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216-17 (1988) (Scalia, J., concurring).

**A. Congress alone provides the authoritative interpretation of the CRA.**

As a threshold issue, the CRA gives Congress the authoritative power to consider agency actions submitted to it for review. 5 U.S.C. §805 ("No determination, finding, action, or omission under this chapter shall be subject to judicial review."); *see also* MTD.8-13.

The CRA makes clear that Congress must interpret the CRA for at least two reasons. *See* Letter from Russell Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General, Government Accountability Office, at 2 (June 18, 2025), perma.cc/JDA6-DY76. *First*, the CRA treats joint resolutions of disapproval similar to federal statutes by requiring that they satisfy bicameralism and presentment. U.S. Const. art. I, §7; *INS v. Chadha*, 462 U.S. 919, 951-59 (1983). Upon completing this process, a joint resolution of disapproval is binding on the agency, just as a statute binds agency authority. So, the EPA has no choice but to treat California's since-revoked waivers as invalid because Congress in fact invalidated them.

*Second*, the CRA strips courts of jurisdiction to review any congressional "determination, finding, action, or omission under" the CRA. 5 U.S.C. §805. Not only can agencies not second-guess Congress's CRA actions, but this jurisdiction-stripping statute prevents courts from second-guessing a joint resolution of disapproval as well. *See Ctr. for Biological Diversity*, 946 F.3d at 563 (recognizing Congress's central role in CRA actions because "federal courts do not have jurisdiction over statutory claims that arise under the CRA"). The CRA thus makes clear that Congress alone has the authority to invalidate any action submitted by an agency for review, and the exercise of that power is unreviewable.

This makes sense because Congress is best positioned to decide when to put rules submitted to it to a CRA vote. *See supra* Vought Letter, at 2; *see also Ctr. for Biological Diversity*, 946 F.3d at 563 (recognizing that Congress made its "intent to preclude judicial review … fairly discernible" (cleaned up)). Congress did so here by considering and then passing the three joint resolutions that invalidated California's EPA waivers. That path best affords Congress its constitutional role. By enacting the resolutions of disapproval, Congress determined the EPA waivers were in fact subject to the CRA, binding the EPA and resolving the question once and for all.

Rather than accept Congress's determination that the EPA waivers are in fact rules, Plaintiffs oppose, selectively relying on the Government Accountability Office's advisory opinion. *See* Compl. ¶¶61-62. This reliance is misplaced because whether GAO has said a waiver determination could be an adjudicatory order or rule is of no consequence. Indeed, Congress gave GAO no legal role in deciding whether an action that an executive agency submitted to Congress under the CRA is a "rule" or an "order." *See supra* Vought Letter, at 2-3. Had Congress wanted to give GAO a role in classifying actions as rules or orders, it could have done so. *See id.* at 2. But Congress did not give GAO this role, nor did it credit GAO's "Observations" regarding the EPA waivers at issue here because Congress disapproved of the waivers under the CRA process reserved for rules.

Moreover, GAO's recent labeling of the EPA waivers as orders is inconsistent with prior statements by GAO. In 2018, GAO confirmed its limited role by declining to address whether an IRS action submitted to Congress qualified for CRA review. Letter from Thomas Armstrong, General Counsel, Government Accountability Office, to the Hon. Orrin Hatch, Chairman, U.S. Senate Comm. on Finance (Nov. 30, 2018), perma.cc/J2WY-YPYT. At that time, GAO concluded that "because IRS submitted the revenue procedure as a rule, Congress is able to fully exercise its review and oversight authorities under CRA" and GAO "therefore, take[s] no position on whether the revenue procedure is a rule otherwise." *Id.* at 1. GAO has no role in "the protection of Congress's review and oversight authorities when an agency has submitted a rule to Congress pursuant to CRA." *Id.*

Even between GAO and executive agencies, the "CRA gives agencies the primary responsibility for determining which agency actions meet CRA's definition of a rule." *Id.* at 2. "The purpose that a GAO opinion might serve otherwise was superseded by [the agency's] submission of the [agency] procedure as a rule under CRA." *Id.* at 2-3. This was so even though the agency itself "believe[d]" its action was "exempt from the CRA" and only submitted it to Congress "out of an abundance of caution." *Id.* at 3. GAO went on to conclude that the agency's "submission of [the action] to Congress pursuant to CRA obviates the need for a GAO opinion." *Id.* This confirms that even if GAO or an executive agency previously stated that an action was an order rather than a rule, the agency's submission of the action to Congress "supersede[s]" both the agency's opinion and GAO's opinion. *See id.* Put simply, once an agency submits an action to Congress for CRA review, the determination of whether an action is a rule rests with Congress alone.

That is likely why the Biden Administration submitted several actions to Congress for dispositive CRA review even though the executive agency believed the actions were not "rules." *E.g.*, EC6087, 170 Cong. Rec. 166 (Nov. 12, 2024) (submitting a report of a Bureau of Consumer Financial Protection action); EC4991, 170 Cong. Rec. 96 (June. 5, 2024) (Department of Energy action); EC4787, 170 Cong. Rec. 89 (May 22, 2024) (Department of Commerce action). In one

instance, the EPA even stated that it "disagrees with GAO's broader reading of the Congressional Review Act and does not believe that the enclosed action[] is a 'rule' within the meaning of [the CRA]," but nevertheless submitted the action for CRA review "out of an abundance of caution." EC5696, 170 Cong. Rec. 139 (Sept. 9, 2024). Each submission placed the determination of whether the action was in fact a rule, and thus whether the CRA applied, into Congress's hands alone. The same exact event occurred here when the EPA submitted the waivers to Congress—it sent the determination of whether the waivers were rules to Congress, making Congress's determination binding and immune from judicial review.

**B. The EPA waivers have all the hallmarks of rules of general applicability subject to the CRA.**

Even if the Court decides to review Congress's CRA action here, the EPA waivers have all the key features of "rules" of general applicability with prospective effect. The Ninth Circuit has identified three "hallmarks of a rule": an agency determination that (1) "has no immediate, concrete effect on anyone," (2) permits a state to act a certain way "in the future," and (3) affects "the rights of a broad category of individuals not yet identified." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994).

*First*, the EPA waivers do not have an immediate effect but are prospective in nature. The Clean Air Act requires that California give automakers sufficient "lead time" to comply with any State-specific emissions standard. 42 U.S.C. §7521(a). The Act also requires that other States that adopt California's alternate standard provide "two years" of lead time before the regulation goes into effect. 42 U.S.C. §7507. Courts have agreed that forward-looking obligations are indicative of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) (explaining that "an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking.

On this score, the Ninth Circuit's reasoning in *Yesler* is instructive. There, the Ninth Circuit considered the government's determination that the State of Washington's public housing

authority could substitute its own eviction procedures for federally required ones. *Id.* That action was in fact a rule—not an order—because it "has no immediate, concrete effect on anyone, but merely permitted [a Washington agency] to evict tenants in the future without providing them with informal grievance hearings." *Id.* at 448. Just as in *Yesler*, the sub-delegation of regulatory authority from an agency to a state accomplished through the EPA waivers is indicative of a rule. To be sure, the EPA initially labeled the waivers as "decision[s]." *Id.* at 449. But how an agency labels an action is irrelevant. *Yesler* went even further to say whether "the manner in which [an agency] made its decision shares certain features with adjudications" is "not dispositive." *Id.* Instead, "what counts is its effect." *Id.* The EPA waivers lack the features of an order—and cannot be recharacterized by a mere label—because the waivers have "legal consequences for yet-to-be-identified individuals only prospectively." *Id.* These are "the effects of a rule, not of an adjudication." *Id.*

The logic of the Clean Air Act cases confirms that the *Yesler* analysis applies to this EPA waiver question. *See supra* 8. The EPA waivers in dispute have "no immediate, concrete effect on anyone, but merely permit[]" California and other Plaintiff-States to enforce California's standards "in the future." *Yesler*, 37 F.3d at 448. In other words, they have only a "prospective" effect with future applicability. *See id.* The EPA waivers here are prospective in nature because they greenlit California programs set to go into effect well after the State enacted them. For instance, California adopted the Advanced Clean Trucks program in March 2021 and received the EPA waiver from the Biden Administration in April 2023. 88 Fed. Reg. 20,688 (Apr. 6, 2023). But the standards Advanced Clean Trucks imposed were not set to take effect until 2024, ratcheting up through 2035. So, at the time the EPA issued the enabling waiver for Advanced Clean Trucks, the program had no immediate effects but instead imposed future production standards. *See supra* 3-4. The same is true for Advanced Clean Cars II—enacted in August 2022, approved for an EPA waiver in January 2025, with effects that were not set to begin until 2026 and ratcheting up through 2035. 90 Fed. Reg. 642 (Jan. 6, 2025). California's "Omnibus" Low NOx program also sets emissions standards into the future. 90 Fed. Reg. 643 (Jan. 6, 2025). The

future effects of rules that California enacted years before standards go into effect, if the EPA waivers were to stand, confirm the rules' future orientation.

*Second*, the waivers have nationwide consequence. In permitting California to receive a preemption waiver, the Clean Air Act also permits every other State to adopt California's emissions standards. *See* Compl. ¶4 (citing 42 U.S.C. §7507). This means that a waiver for California really grants a waiver to all 50 states to adopt California's emissions standards that are more stringent than federal standards. *See* 42 U.S.C. §7507. As Texas explained, the EPA waivers effectively "allow California—and California alone—to dictate motor vehicle emissions standards" nationwide. Doc. 86, at 14. In practice, the EPA waivers granted to California "effectively nationalize its emission standards" because automakers must hit California electric vehicle target in order to sell vehicles within the State under California's rules. *Id.* at 15. Sales benchmarks aside, automakers cannot practically produce two sets of vehicles for sale in the country that meet different emissions standards. *See id.* In essence, California's more stringent standards override federal standards and impose a new regime across the United States. And California makes clear that is its regulatory goal. The California Air Resource Board, responsible for implementing California's rules, boasts that its regulatory scheme not only "sends truck manufacturers a clear signal regarding the end of combustion truck sales in California," but also forces "manufacturers [to] respond creatively when regulators inside and outside of California send strong, unified, regulatory signals." Letter from Richard Corey, Executive Director, CARB, to Liane Randolph, CARB Chair, and Board Members, at 5-6 (Jan. 10, 2022), perma.cc/AG2Z-8L42; *see also* Press Release, *California and Major Automakers reach Groundbreaking Framework Agreement on Clean Emission Standards*, CARB (July 25, 2019) perma.cc/2PP8-63RJ (expressing the regulator's intent in promulgating emissions rules to promote "an alternative path forward for clean vehicle standards nationwide").

Indeed, the ten States who join California in this lawsuit, among others, "have adopted these California standards as their own." Compl. ¶4. Contrary to the States' claim then, the EPA's waiver decisions do not "concern a specific entity—California," but rather affect the whole

country. *See id.* ¶84. Waivers that permit emissions standards that differ from federal law to predominate in many states are not particular to any one party and again evidence the effect of a rule rather than an order. As in *Yesler*, the waivers "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *See* 37 F.3d at 448.

District courts have agreed that Clean Air Act waiver decisions implicating the Act's preemption provision are properly classified as rules. "[O]nce EPA issues a waiver for a California emissions standard," it has "the same stature as a federal regulation." *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007); *see also Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d U51, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation."). If an EPA waiver makes California's standards a generally applicable rule that applies with the force of federal law, then the waivers here are rules of general applicability too.

*Third*, an EPA waiver does not simply govern conduct in California and the other Plaintiff-States who've chosen to adopt California's standards. The effect is broader still because the waivers govern the conduct of automotive manufacturers and gas-related industries nationwide. The Clean Air Act dictates that compliance with California's differing standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. §7543(b)(3). An EPA waiver thus creates an alternative path to compliance with federal law for automotive manufacturers that ignores the EPA's otherwise governing federal standards. Again, the waivers affect a broad category of market participants far beyond any one state's borders.

But for the CRA joint resolution, then, the EPA waivers would set "general policy," rather than considerations "of particular facts" that would be indicative of an order. *See* Doc. 1-1, at 6. The Clean Air Act requires the EPA, in granting waivers, to address whether a California

regulation that provides the basis for a waiver is consistent with the EPA's primary authority to regulate motor vehicles. *See* 42 U.S.C. §7543(b)(l)(C). This assessment requires the EPA to consider the same policy questions raised by setting federal emissions standards and make policy judgments rather than address "particular facts." *See* 42 U.S.C. §7521. Because they set general policy—along with other, identified reasons—the EPA waivers are rules, not orders, subject to CRA review.

**II. The EPA waivers will have tremendous, harmful effects in the marketplace if Congress's decision is nullified by this action.**

The EPA waivers and underlying California regulations would impose massive, unwarranted costs on the marketplace. Amici and their members are particularly concerned with the problem of transporting hazardous materials, including propane gas, on an electric vehicle. But for the CRA joint resolutions, California's regulations would require just that, as they would effectively ban the internal-combustion engine for new vehicles. The burden that the fleet turnover would place on an industry fueled by internal-combustion engines poses grave concerns. So too does the lack of sufficient charging infrastructure for electric engines to support industrial vehicles.

To begin with, battery placement on the class of electric vehicles that could transport propane gas poses a significant safety hazard. In the current class, batteries are located between the frames of a truck behind the cab to the rear axle. This means that the battery sits below propane containers in transit, such that a battery fire could lead to container failure. And the requirement that industry be limited to electric vehicles for transport operations will only increase dangerous fires by placing a potential ignition point filled with propane gas directly above a battery. These battery fires pose significant complications to firefighting crews and communities alike. *See, e.g.*, Jonathan Lloyd, *'Unprecedented' Number of Lithium Ion Batteries Complicates LA Wildfires Cleanup*, NBC LA (Jan. 29, 2025), bit.ly/46aGfOz. California's regulations have no answer for industry's concern and instead put the public at risk.

Separately, forcing industry to switch its fleets to all-electric vehicles dramatically reduces range and strains charging infrastructure. But that is exactly what will happen if California's

regulations go into full effect and force automakers to curtail productions of internal-combustion engine vehicles. The sheer size of batteries for this class of vehicle allows for a range of less than 200 miles. The additional weight risks creating more frequent incidents of rollovers and fires. Even assuming smooth operation, each stop and common comforts for drivers, such as air conditioning, further reduce range. And charging times for electric vehicles far exceed existing fueling needs in both time and frequency. Frequent charging, in turn, creates more wear-and-tear on batteries and hinders productivity, assuming adequate charging stations are even available. But, of course, the charging infrastructure is nowhere near available. The cost to build and install charging stations to meet hazard location requirements is both cost-prohibitive and unfeasible with current energy demand. *See, e.g.*, Brad Plumer, *Electric Cars Are Coming, and Fast. Is the Nation's Grid Up to It?*, N.Y. Times (Aug. 3, 2021), bit.ly/46p2PSn (recognizing that increased electric vehicle charging "would put a major strain on the grid").

To further illuminate these concerns, take TRALA's membership. TRALA members include nearly 500 truck leasing and rental firms, employ about 60,000 people, and maintain over 33,000 locations across the United States. TRALA members utilize massive fleets, totaling around 900,000 light-, medium-, and heavy-duty trucks (ranging from Class 2 to Class 8). Americans rely on these trucks for everything from moving across town to hauling goods across the country. In fact, one in every four trucks on the road today is a rented or leased truck. TRALA members and the services they provide thus represent true mobility for the American public.

To serve the public, TRALA members rely overwhelmingly on internal-combustion engine vehicles. Fleet plans are years in the making and require meticulous consideration. A decision that allows California regulations to upend the marketplace will alter operations for need-based travel across the country and impose astronomical costs to replace hundreds of thousands of trucks as fleets age. When TRALA members would ordinarily update fleets over time and replace aging internal-combustion engine vehicles with new, more efficient vehicles of the same kind, California's rules that restrict (and eventually eliminate) the production of those vehicles

derail fleet plans. This will force TRALA members to run older, less efficient equipment for longer that is counterproductive for business and the environment alike.

To maintain their fleets, TRALA members purchase over 30% of all new over-the-road trucks each year. If California and others are permitted to enforce a standard more stringent than that set at the federal level, the automakers that produce those trucks will make fewer internal-combustion trucks for TRALA members and others to buy. Those fewer trucks available will command a higher price and harm members' ability to provide cost-conscious Americans with affordable mobility solutions.

Electric trucks don't meet the duty-cycle needs of TRALA members either. A typical truck for in-town service is rented multiple times a day, which requires quick turnaround times that cannot accommodate the extended recharging required by typical electric vehicles. The time that a vehicle is not productive increases the cost to the consumer. And the cost of installing electric charging facilities at truck rental locations is cost prohibitive. TRALA members have estimated that it would cost billions of dollars to add electric vehicle charging capabilities to their respective locations. The predictable result is a reduction in TRALA members' national footprint—which means customers will have to travel further to obtain the services they need, increasing moving times and costs—and increased prices. Prices to consumers only go up when accounting for the increased burden on maintenance and repair operations imposed by an aging or electric fleet.

The artificial decrease of available internal-combustion engine trucks is not only bad for business, but also bad for American consumers. If California's rules go into effect, American consumers will be left with the choice of renting internal-combustion engine trucks at artificially high rates or renting expensive electric trucks that are not up to the task of handling their hauling and moving needs. The limited range of electric trucks—often less than 200 miles—is further reduced under moving conditions (e.g., towing a vehicle or with weight for large loads). This limits the utility of electric trucks that cannot complete a typical one-way move trailering a car to the satisfaction of consumers, an everyday request from TRALA's consumer rental companies' customers. And that again assumes that adequate charging stations are available to power an

electric fleet. Very few routes are populated with enough suitably located chargers to support electric truck transit, while charging times slow movement across the country.

To that end, the national infrastructure to indulge California's standards does not exist and will not exist for decades, if ever. And even if the charging infrastructure were to exist, the strain that frequent charging places on energy demand is too great to bear. In particular, the country lacks sufficient high-voltage transmission lines to transport the requisite electricity to charging stations as more electric vehicles hit the streets. Katie Brigham, *Why the electric vehicle boom could put a major strain on the U.S. power grid*, NBC News (July 1, 2023). And grid upgrades do not come cheap. A California Public Utilities Commission study forecasted that California alone must spend $50 billion by 2035 in distribution grid upgrades to meet the electric vehicle targets set by the State's rules. *Electrification Impacts Study Part 1*, Cal. Pub. Utils. Comm'n (May 9, 2023), perma.cc/265G-K3D2.

Finally, NPGA, TRALA, WPGA, and PGANE members have long been proponents of environmentally sustainable practices. The propane industry, for instance, has promoted propane Autogas vehicles, a low-emission alternative to diesel, and renewable propane, whose carbon intensity score is a fraction of conventional fuels. As with the truck renting/leasing industry, the propane industry also frequently turns over vehicles to introduce higher efficiency, low-emission engines. Across industries, equipment sharing reduces greenhouse gas emissions and reduces the national inventory of total large capacity vehicles. California's regulations would stifle this progress and impose negative environmental effects.

Until electric vehicles can safely and cost-effectively meet the needs of consumers, industry cannot provide them. That day is not yet here. California's regulations hasten to bring about a world that does not yet exist. The resurrection of California's unrealistic standards that the CRA joint resolutions nullified would be bad for business, bad for consumers, and bad for the environment.

**CONCLUSION**

The truck renting/leasing and propane associations respectfully offer this analysis in support of Defendants' motion to dismiss Plaintiffs' complaint.

Dated: September 26, 2025

Respectfully submitted,

*/s/ David L. Rosenthal*

David L. Rosenthal (#314344)
david@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Of Counsel*
Thomas R. McCarthy
tom@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Counsel for Amici Curiae*
*The Truck Renting and Leasing Association,*
*National Propane Gas Association,*
*Western Propane Gas Association, &*
*Propane Gas Association of New England*