Rob Bonta
Attorney General of California
Myung J. Park
Supervising Deputy Attorney General
Cecilia D. Segal, State Bar No. 310935
Katherine Gaumond, State Bar No. 349453
Caitlan McLoon, State Bar No. 302798
Emmanuelle S. Soichet, State Bar No. 290754
M. Elaine Meckenstock, State Bar No. 268861
Deputy Attorney General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0299
  Fax:  (510) 622-2270
  E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | Case No. 4:25-cv-04966-HSG<br><br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case |

# INTRODUCTION

1.    When Congress directed the United States Environmental Protection Agency (EPA) to regulate harmful emissions from new motor vehicles, 42 U.S.C. § 7521(a), it also preempted States from setting such standards, *id.* § 7543(a).  But, recognizing that California had already developed deep expertise in vehicle emissions control and that the State suffers from severe air pollution challenges, Congress directed EPA to "waive" this preemption for California, unless record evidence supports one of three limited bases for declining to do so.  *Id.* § 7543(b)(1).

2.    Congress's choice to allow California "to continue and expand its pioneering efforts" (pursuant to preemption waivers granted by EPA) has meant that the State "act[s] as a kind of laboratory for innovation" for vehicular emission controls, thereby advancing a core value of federalism while encouraging technological innovation for the protection of public health and welfare.  *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979); *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 386-87 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

3.    This Clean Air Act waiver provision was enacted in 1967, and EPA has granted California more than seventy-five preemption waivers for updates to the State's new motor vehicle emissions control program.  As Congress intended, these waivers have allowed California to "improve on 'its already excellent program,'" to foster technological advancements, and to protect Californians from harmful pollution.  *See MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

4.    Relevant here, between April 2023 and January 2025, EPA granted California's requests for three Clean Air Act preemption waivers, authorizing enforcement of the State's latest additions to its regulatory program:  the Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx ("Omnibus") regulations.  *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).  Pursuant to Section 177 of the Clean

Air Act, 42 U.S.C. § 7507, other States—including Plaintiffs here—have adopted some or all of these California standards as their own.

5.    On May 22, 2025, the Senate joined the House in adopting three Resolutions, purporting to "disapprove[]" these waivers.  H.J. Res. 87, 88, 89 (119th Congress) ("Resolutions").  The President signed the Resolutions on June 12, 2025.  In so doing, the Federal Government "singled out" these waivers—and the underlying California regulations—for an unprecedented attack, *South Carolina v. Baker*, 485 U.S. 505, 513 (1988), purporting to employ a statute—the Congressional Review Act (CRA)—deemed inapplicable by every nonpartisan arbiter and expert who analyzed the question.  The Plaintiff States—California, Colorado, Delaware, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington—challenge these unlawful Resolutions, which purport to prevent these States from enforcing laws they have chosen to adopt within their jurisdictions.

6.    The CRA was enacted to facilitate congressional review of certain *federal agency rules*.  5 U.S.C. § 801(a)(1)(A); *id.* § 804(3) (defining "rule").  Where it applies, it creates a narrow exception to the filibuster that enables the Senate to adopt a resolution disapproving of a federal agency's rule with a simple majority vote.  *Id.* § 802(d)(1).  The CRA also limits Senate debate over a given resolution to a maximum of five hours per side.  *Id.* § 802(d)(2).  If a CRA resolution disapproving of a federal agency's rule is enacted, the targeted rule ceases to have legal effect.  *Id.* § 801(b)(1).  And "a new rule that is substantially the same … may not be issued," absent further, specific congressional authorization.  *Id.* § 801(b)(2).

7.    While all fifty States consented—through their Senators—to these expedited procedures for congressional disapproval of *federal rules*, no State consented to the CRA as a means for Congress to negate *state rules*.  Nor would any State have done so.  States do not so easily surrender "the dignity … of sovereignty" they retain in our system of government.  *Alden v. Maine*, 527 U.S. 706, 715 (1999).

8.    Cabining the CRA to *federal rules* is also consistent with the principle that the Federal Government does not "impose its will on the States … lightly"—*e.g.*, through a process

2

with severely constrained debate.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  To the contrary, the Framers intentionally designed the Federal Government to "partake sufficiently of the spirit [of the States]" such that it would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments."  *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 551 (1985) (quoting The Federalist No. 46, p. 332).

9.      By purporting to utilize the CRA's expedited procedures against preemption waivers to which the CRA does not apply, the Federal Government ran roughshod over federalism and separation of powers principles.  It did so despite EPA's decades-old, consistent position—reiterated in each of the three actions at issue—that preemption waiver decisions are not "rules" and, accordingly, "the Congressional Review Act … does not apply."  *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023).  The Federal Government also blithely disregarded the legal conclusions of every nonpartisan arbiter upon whom Congress otherwise relies for determining the CRA's applicability—all of whom concluded the CRA did not apply.

10.     In fact, neither a federal agency nor Congress has ever before purported to apply the CRA or similar extraordinary procedures to any context that resembles this one.

11.     The President, his EPA Administrator, and Congressional leadership took these unprecedented steps because they saw the CRA's inapplicable, expedited procedures as a quick and easy way to "take … down" California's regulations.  Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[1]  They appear to have agreed with the argument that such procedures should be used—despite the CRA's obvious inapplicability—because "[w]aivers take years to roll back through the administrative process" and "ordinary legislation … would have to overcome the 60-vote filibuster in the Senate."  Boyden Gray PLLC, *Buschbacher, Conde Discuss How to Overturn CA's EV Mandate in the Wall Street Journal* (Jan. 9, 2025).[2]

---

[1] Available at https://perma.cc/8GQV-LQEN, last visited May 15, 2025.
[2] Available at https://perma.cc/D59T-Q7JB, last visited May 17, 2025.

12.     With every step, the "workings of the National Government" failed to follow the law and likewise failed to honor the "special restraints on federal power over the States." *Garcia*, 469 U.S. at 552. The "extraordinary defects" in the "national political process" that produced these Resolutions render them unlawful and "invalid under the Tenth Amendment" and principles of structural federalism. *South Carolina*, 485 U.S. at 512. That Congress violated separation of powers principles along the way only underscores the unconstitutionality of the Resolutions.

13.     This Court should declare that the Resolutions are unconstitutional and have no effect on the status or enforceability of state emissions control programs. Alternatively, if the Court concludes the Resolutions are valid, it should declare they were not enacted under the CRA because these waivers are not "rules" under that statute. This Court should also declare that EPA's post-hoc purported reclassification and submission of these waivers as supposed "rules" subject to the CRA were unlawful actions and enjoin EPA from similarly targeting other preemption waivers.

## **PARTIES**

14.     Plaintiff State of California is a sovereign state in the United States of America. California is represented by and through Attorney General Rob Bonta, the chief law enforcement officer of California; Governor Gavin Newsom, the chief executive officer of the State; and the California Air Resources Board (CARB), the state agency that developed and promulgated the targeted state regulations, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See, e.g.*, Cal. Code Regs., tit. 13, §§ 1961.4, 1962.4; *id.* § 1963 et seq.; *id.* §§ 1956.8, 1961.2.

15.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action. Colorado has adopted the Advanced Clean Cars II (for model years 2027-2032), Advanced Clean Trucks, and Omnibus regulations. *See* 5 Colo. Code Regs. § 1001-24.

16. Plaintiff State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504. Delaware has adopted the Advanced Clean Cars II regulation. *See* 7 Del. Admin. C. § 1140.

17. Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts. The Commonwealth of Massachusetts has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* 310 C.M.R. §§ 7.40(1)(c) Tbls. 1 & 2, 7.40(1)(d)(3)-(5).

18. Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey. New Jersey has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* N.J.A.C. 7:27-29A.7; N.J.A.C. 7:27-31.4; N.J.A.C. 7:27-28A.11.

19. Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action. New Mexico has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* 20.2.91.102 (C) New Mexico Administrative Code.

20. Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York. New York has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations. *See* N.Y. Comp. Codes R. & Regs., tit. 6, Part 218 and Section 200.9.

21.    Plaintiff State of Oregon is a sovereign state of the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is Oregon's chief legal officer and is authorized to represent the State in this Court.  Oregon has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Or. Admin. R. 340-257-0020 to -0095; 340-257-0200 to -0230; 340-261-0010 to -0090.

22.    Plaintiff State of Rhode Island is a sovereign state in the United States of America.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.  Rhode Island has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* 250-RICR-120-05-37; 250-RICR-120-05-37.4(B)(1) Tbls. 1 & 2.

23.    Plaintiff State of Vermont is a sovereign state of the United States of America.  Vermont is represented by Attorney General Charity R. Clark, who is Vermont's chief legal officer and is authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159.  Vermont has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Vt. Code R. § 12.030-040.

24.    Plaintiff State of Washington is a sovereign state of the United States of America.  Washington is represented by Attorney General Nicholas W. Brown.  The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.  *See* Chapter 43.10 RCW.  Washington has adopted the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations.  *See* Wash. Admin. Code § 173-423-030.

25.    Defendant United States is the Federal Government of the United States of America.

26.    Defendant EPA is a federal agency.

27.    Defendant Lee Zeldin is the EPA Administrator.  He is sued in his official capacity.

28.    Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

6

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

29.    This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the Constitution or laws of the United States).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.

30.    5 U.S.C. § 805 does not strip this Court of its jurisdiction because (a) Plaintiffs challenge actions and/or determinations that fall outside the scope of that provision; (b) Plaintiffs raise constitutional issues to which that provision does not apply; and/or (c) it would be unconstitutional to apply that provision to Plaintiffs' claims.  Indeed, this case presents precisely the kinds of "questions of intricacy and nicety" about federalism that the courts alone can resolve. *New York v. United States*, 505 U.S. 144, 155 (1992) (quoting The Federalist No. 82, p. 491 (C. Rossiter ed. 1961)).

31.    Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial district in which the State of California resides for purposes of that provision.

32.    Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for assignment of this action to any particular location or division of this Court.

**FACTUAL BACKGROUND**

**I.    Congress Enacted the Clean Air Act Waiver Provision to Allow California's Regulatory Program to Continue with Minimal Federal Oversight**

33.    From the inception of efforts to limit vehicular air pollution, California led the way. The State's "interest in pollution control from motor vehicles dates to 1946," *MEMA I*, 627 F.2d at 1109 n.26, and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091.  By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

7

34.     When Congress took up the mantle of federal vehicle emission regulation, it recognized both California's extraordinary air pollution challenges and the value of state-level experimentation.  Congress therefore opted to allow the State to continue and "improve on 'its already excellent program.'"  *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).  Accordingly, while it preempted other States from regulating emissions from new motor vehicles, Congress required EPA to waive that preemption for California except in narrow circumstances.  Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967).[3]  Under this waiver provision, California promulgates its own standards through a state rulemaking proceeding, determines that its state program is at least as protective as EPA's, and requests a waiver of preemption from EPA.  42 U.S.C. § 7543(b)(1); *see also* 42 U.S.C. § 7543(b)(1)(A)-(C) (identifying exclusive findings that can support EPA's denial of California's request for waiver).

35.     Consistent with the principle that Congress does not "impose its will on the States … lightly," *Gregory*, 501 U.S. at 460, the questions about whether and how to preempt state regulation of new motor vehicle emissions were heavily debated.  The precise text of the waiver provision was the subject of particularly rigorous discussion, with competing versions offered by the House and Senate.  The Senate version provided that the waiver "shall" be granted (absent certain limited findings), while the House version made waivers discretionary through the use of the word "may."  *See* 113 Cong. Rec. 30,956-57 (1967); *see also id.* at 30,950, 30,952.

36.     The Senate's use of "shall" was described as a "guarantee[]" that California could regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not be allowed to [do so]," H.R. Rep. No. 90-728, at 96 (1967).  By contrast, the House's use of "may" was characterized as placing California "at the mercy of" the Federal government, forcing the State "to come with hat in hand to Washington."  113 Cong. Rec. at 30,941, 30,955; *see also* H.R.

---

[3] The 1967 Act gave this authority to the Secretary of Health, Education, and Welfare.  In 1970, Congress transferred this authority to the Administrator of the newly created EPA.  Pub. L. No. 91-604, § 15(c)(2), 84 Stat. 1676, 1713 (1970).

Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

37.    Congress opted for "shall," 42 U.S.C. § 7543(b)(1), "consciously choos[ing] to permit California to blaze its own trail with a minimum of federal oversight," *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).[4]

38.    The decision to allow California to continue and expand its state-level program reflected a careful congressional compromise, balancing the benefits—for the State and "the entire country"—of preserving "a kind of laboratory for innovation," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996), against automakers' fears of "having to meet fifty-one separate sets of emissions control requirements," *MEMA I*, 627 F.2d at 1109-10.  This compromise ensured that California's "government will represent and remain accountable to its own citizens," *Printz v. United States*, 521 U.S. 898, 920 (1997), while also ensuring manufacturers must meet no more than two different sets of emission standards—California's state standards and EPA's federal ones.  And, as intended, this compromise has allowed California to continue addressing the "harsh reality" of the State's pollution problems using its expertise in regulating vehicular emissions.  *See* H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967).

39.    As part of the 1977 Clean Air Act Amendments, Congress noted with approval that EPA had been readily granting waivers to California, consistent with Congress's intent.  H.R. Rep. No. 94-1175 at 247 (1976); *see also MEMA I*, 627 F.2d at 1110 n.32.  Congress nonetheless sought to "ratify and strengthen" the waiver provision in order "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."  H.R. Rep. No. 95-294, at 301-02 (1977).  Specifically, Congress amended the waiver provision's text, removing the original requirement that each California standard be more

---

[4] In the 1970 CAA amendments, the waiver provision (originally Section 208(b)) was recodified as Section 209(b), 42 U.S.C. § 7543(b).  Pub. L. No. 91-604, § 8(a), 84 Stat. at 1694.

stringent than its federal counterpart and allowing the protectiveness of the state's program to be measured by viewing all the "state standards, in the aggregate."  42 U.S.C. § 7543(b)(1).

40.    Congress also opted to permit other States to choose to adopt "standards … identical to the California standards for which a waiver has been granted" under certain conditions, 42 U.S.C. § 7507, thereby respecting state authority to protect residents and natural resources while maintaining the commitment that manufacturers would be subject to no more than two sets of standards.

41.    Thirteen years later, in 1990, Congress again amended Section 209 of the Clean Air Act.  It made no changes to the waiver provision concerning new motor vehicle emissions (Section 209(b)).  Rather, it replicated that provision in a new and nearly identical provision (Section 209(e)(2)(A)) concerning non-road vehicles and engines—i.e., mobile sources of pollution that do not operate on roads, such as bulldozers, ships, and lawnmowers.  42 U.S.C. § 7543(e)(2)(A).  As with Section 209(b), under this new provision, EPA must "authorize"—i.e., waive preemption for—California's regulation of emissions from these non-road sources, unless the record supports one of three limited findings that permit denial of California's request.  *Id.*

42.    EPA has granted California more than seventy-five Clean Air Act preemption waivers as the State has expanded and strengthened its requirements that manufacturers reduce emissions from the new motor vehicles they sell in the State.  *See* EPA, *Vehicle Emissions California Waivers and Authorizations*.[5]  EPA has likewise granted California numerous waivers for the State's increasingly rigorous regulation of non-road vehicles and engines.[6]  EPA has granted such waivers under Democratic and Republican Presidents alike.  *See id.*  And these waivers are subject to judicial review in the appropriate Court of Appeals.  42 U.S.C. § 7607(b)(1).

---

[5] Available at https://perma.cc/9F5K-QC79, last visited May 14, 2025.

[6] *Id.*  These preemption waivers for the regulation of non-road sources are sometimes referred to as "authorizations," *see* 42 U.S.C. § 7543(e)(2)(A), but both "waivers" under Section 209(b) and "authorizations" under Section 209(e)(2)(A) waive preemption.  For simplicity, Plaintiffs use the term "waivers" throughout.

43.    Among the previously granted waivers are those for California's zero-emission-vehicle (ZEV) requirements for passenger cars and light trucks.  58 Fed. Reg. 4166 (Jan. 13, 1993); 71 Fed. Reg. 78,190 (Dec. 28, 2006); 78 Fed. Reg. 2112 (Jan. 9, 2013).[7]  The State first adopted such requirements in 1990, Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991), and has made them increasingly more stringent over time.

44.    One of the three waivers targeted by the Resolutions authorized the Advanced Clean Cars II regulation, which extended and gradually strengthened California's ZEV requirements for passenger cars and light trucks such that, by model year 2035, at least 80% of such vehicles sold in California would be zero-emission, while the other 20% could be plug-in hybrids.  Cal. Code Regs., tit. 13, § 1962.4(c), (e)(1)(C).  That regulation also strengthened several emission standards for vehicles with internal combustion engines, requiring reduced emissions of fine particulate matter and smog-forming oxides of nitrogen.  *Id.* § 1961.4.

45.    Another of the targeted waivers authorized, *inter alia*, the Advanced Clean Trucks regulation—designed to build on the success of the California ZEV requirements described above (for passenger cars and light trucks) by requiring gradual increases in sales of medium- and heavy-duty ZEVs beginning with model year 2024.  Cal. Code Regs., tit. 13, § 1963.1(b).  This regulation was adopted in 2021, and manufacturers began earning early credits for ZEV sales that year.  CARB, *Advanced Clean Trucks Credits Summary as of March 31, 2022*.[8]  Indeed, manufacturers "generated enough credits to meet the estimated 2024 model year compliance obligations" before that model year even commenced.  CARB, *Advanced Clean Trucks Credit Summary through the 2023 Model Year* (May 22, 2024).[9]

46.    The third of the targeted waivers authorized California's "Omnibus" regulation, which requires manufacturers of heavy-duty (mostly diesel-fueled) trucks to reduce smog-

---

[7] A zero-emission vehicle is one that—like an electric or hydrogen vehicle—has zero tailpipe emissions of any pollutant.
[8] Available at https://perma.cc/2DHP-FUR9, last visited May 24, 2025.
[9] Available at https://perma.cc/7B5E-2RBG, last visited May 24, 2025.

11

forming emissions beginning with model year 2024 and then further reduce those emissions in model year 2027 and beyond.  Cal. Code Regs., tit. 13, § 1956.8.

47.    Despite decades of progress, tens of millions of Californians live, study, work, or play in regions that continue to experience some of the worst air quality in the Nation.  American Lung Association, *State of the Air 2025 Report* 15-16, 18-19.[10]  California faces particularly severe challenges to meet public health standards for ozone (or smog) and fine particulate matter.  *Id.* The regulations covered by the waivers at issue are crucial parts of comprehensive plans to meet those public health standards and improve the air Californians breathe.  California Air Resources Board, *2022 State Strategy for the State Implementation Plan* 55, 65 (Sept. 22, 2022).[11]

48.    All of these regulations apply only in California and other States that have chosen to adopt one or more of the regulations, pursuant to the option provided by Congress in the Clean Air Act.  *See* 42. U.S.C. §§ 7507, 7543(e)(2)(B).

**II.    Congress Enacted the Congressional Review Act to Enhance Its Oversight of Generally Applicable *Federal Rules***

49.    When Republicans took control of both chambers of Congress after the 1994 midterm elections, they credited their election victory to the "Contract with America," which contained a promise to push for federal regulatory reform, including shrinking the size of the federal government.  *See* S. Rep. 104-15, at 3 (Mar. 16, 1995) (describing 1994 elections as sending "a clear message to Washington that [Americans] want a smaller, more efficient, and more effective government").

50.    Once in office, the Republican majority in the House attempted to impose a moratorium on all new federal regulations "to ensure economy and efficiency of Federal Government Operations."  H.R. Rep. No. 104-39, at 1 (Feb. 16, 1995).  That effort failed.

51.    The push for federal regulatory reform then evolved into what became known as the Small Business Regulatory Enforcement Fairness Act and the CRA, both of which were

---

[10] Available at https://perma.cc/G2RK-V9BM, last visited May 24, 2025.
[11] Available at https://perma.cc/X2Y9-LQ4N, last visited May 24, 2025.

incorporated into a broader, bipartisan bill:  the Contract with America Advancement Act of 1996.  Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996).  That Act also contained an increase to the Nation's debt limit and an increase to the limit on income Social Security recipients may earn without losing benefits.  110 Stat. at 847, 875.  That broader bill passed the House by a bipartisan vote of 328 to 91.  The House bill then passed, without amendment, by unanimous consent in the Senate.  142 Cong. Rec. S3114 (Mar. 28, 1996).

52.    The CRA requires a "Federal agency" that has promulgated a "rule" to submit the rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[*b*]*efore* a rule can take effect."  5 U.S.C. § 801(a)(1)(A) (emphasis added).

53.    Underscoring that it applies only to federal rules, the CRA defines the federal agency actions to which it applies by way of the federal Administrative Procedure Act's (APA) definition of "rule."  5 U.S.C. § 804(3) (cross-referencing 5 U.S.C. § 551); *see also id.* § 551(1) (limiting the definition of "agency" to "authorit[ies] of the Government of the United States").  The CRA then narrows the APA definition by, among other things, excluding "any rule of particular applicability."  *Id.*

54.    Congress has 60 session days from the agency's submission of a qualifying report to adopt a resolution to disapprove a particular rule.  5 U.S.C. § 802(a).  The text of such resolutions is prescribed by the statute as follows:  "That Congress disapproves the rule submitted by the __ relating to __, and such rule shall have no force or effect."  *Id.*  The first blank is filled in with the agency's name and the second is typically filled in with the title of the Federal Register notice announcing the final rule.  *E.g.,* H.J. Res. 35 (approved Mar. 14, 2025).  After a CRA joint resolution of disapproval is enacted, "a new rule that is substantially the same … may not be issued, unless [it] is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule."  5 U.S.C. § 801(b)(2).

55.    If an agency fails to submit an action that one or more members of Congress believe is a "rule" subject to the CRA, those members may ask the GAO for a determination.

13

Congressional Research Service, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 23 (updated Oct. 22, 2024).[12]  In that case, if the GAO concludes the agency action is or is not subject to the CRA, Congress has treated that conclusion as dispositive.  *Id.*  ("Thus, the question of whether Congress may use the CRA's fast-track parliamentary disapproval mechanism generally hinges upon the determination reached in GAO's opinion in such cases.").

56.    In the Senate, the consideration of CRA resolutions is highly expedited.  The CRA creates an exception to the filibuster, so that resolutions of disapproval require only a simple majority to pass.  5 U.S.C. § 802(d)(1).  And motions, amendments, and even debate are all severely limited.  *Id.* §§ 802(d)(1), 802(d)(2).  Specifically, debate about the resolution and any "debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution."  *Id.* § 802(d)(2).  Although other motions are not "in order" and thus not permitted, "[a] motion further to limit debate"—to less than 10 hours—"is in order and not debatable."  *Id.*

57.    The CRA also provides that "no determination, finding, action, or omission under this chapter shall be subject to judicial review."  5 U.S.C. § 805.

58.    Nothing in the CRA—or the broader Contract with America Advancement Act of 1996—indicates Congress was contemplating the use of the CRA to negate *state rules* or to otherwise ease the path to greater federal limits on state authority.  To the contrary, the text of the CRA is exclusively concerned with federal rules promulgated by federal agencies.  *E.g.*, 5 U.S.C. § 801(a)(1)(B) (referring to "the Federal agency promulgating the rule").  So, too, were other parts of the broader bill that contained the CRA.  *E.g.*, Pub. L. 104-121, 110 Stat. at 857 ("fundamental changes … are needed in the regulatory and enforcement culture of Federal agencies").

---

[12] Available at The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress | Congress.gov | Library of Congress, last visited May 21, 2025.

59.    The absence of any mention of state rules or state authority is particularly telling because Congress does not lightly exercise its power to "impose its will on the States." *Gregory*, 501 U.S. at 460.  Many features of the CRA—including its constraints on debate and its barriers to judicial review—are entirely inconsistent with that principle.

60.    Moreover, the Framers intended "[t]he difficulty of legislating at the federal level … to preserve room for lawmaking by governments" like States, which are "more local and more accountable than a distant federal authority." *West Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring).  As the 1967 debate over the Clean Air Act's preemption and waiver provisions indicate, had Congress contemplated that the CRA could be used to hamstring state authority, that would have been the topic of fierce debate.

61.    Until these Resolutions, Congress abided by the scope of the CRA as negotiated in the bipartisan bill of which it was a part.  Congress had never purported to apply the CRA and its extraordinary and expedited procedures to an agency action that was not a "rule" as defined in the CRA.

62.    More specifically, no previous resolutions using the CRA's fill-in-the-blank language disapproved of a federal agency action that waived preemption or otherwise authorized States to proceed with their own regulatory programs.  Congress has never, for example, even considered using the CRA to disapprove EPA's actions to authorize States to implement permitting programs under the Clean Water Act—even when EPA has "rush[ed] to transfer this permitting authority to [a State] in the final days" of a presidential administration.  *See Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 11 (D.D.C.), *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024) (appeal pending).  Congress has likewise never even considered using the CRA to disapprove of waivers that allow individual States "to test new or existing ways to deliver and pay for health care services in Medicaid and the Children's Health Insurance Program (CHIP)."  *See* Centers for Medicare & Medicaid Services, State Waivers List.[13]

_____

[13] Available at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list, last visited May 8, 2025.

63.     Likewise, Congress has never considered using the CRA to disapprove federal agency orders that, like these preemption waivers, permit conduct that would otherwise be prohibited. For example, Congress has never considered using the CRA to disapprove of a radio spectrum license, mining permit, or oil lease.

**III.    For Half a Century, and Regardless of Which Party Occupied the White House, Clean Air Act Preemption Waivers Have Been Understood to Be Adjudicatory *Orders*, Not *Rules***

64.     The text of the Clean Air Act demonstrates that Congress has always understood the difference between federal vehicle emission standards (which are federal rules) and decisions to waive preemption for state vehicle emission standards (which are not).  Where Congress delegated rulemaking power over vehicle emissions to EPA, it directed the agency to "prescribe … standards," 42 U.S.C. § 7521(a)(1), consistent with the APA's definition of rules as agency actions that "prescribe law," 5 U.S.C. § 551(4).  By contrast, Congress "sharply restricted [EPA's] role in a waiver proceeding." *MEMA I*, 627 F.2d at 1121.  Far from delegating rulemaking authority to EPA, the waiver provision anticipates that *California* will prescribe "State standards" and determine whether its standards "will be, in the aggregate, at least as protective" as EPA's.  42 U.S.C. § 7543(b)(1).  Thus, the waiver provision only empowers EPA to "waive application" of the preemption provision to law California has adopted, not to prescribe California law or otherwise make rules.  *Id.*

65.     Congress confirmed as much when it omitted waiver decisions from the list of EPA Clean Air Act actions to which the Act's "[r]ulemaking" requirements apply.  42 U.S.C. § 7607(d)(1).

66.     Until its post-hoc actions challenged here, EPA had likewise consistently maintained that its waiver decisions are not rules and therefore are not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. § 601(2)), and the CRA.  This had been EPA's position through Administrations of both parties, regardless of whether EPA granted a waiver request or denied it.  Thus, EPA's waiver decisions have consistently specified "this action is not a rule."  75 Fed. Reg. 70,237, 70,241 (Nov. 17,

16

2010); *see also, e.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The CRA does not apply …
because this action is not a rule."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past
waiver decisions, this action is not a rule…."). EPA maintained this position when the first
Trump Administration purported to withdraw parts of a waiver EPA had granted six years earlier.
84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent
with its previous actions on waiver requests….").[14]

67.    The GAO—the entity on which Congress relies for CRA applicability
determinations—has agreed. When asked by members of Congress whether a 2022 waiver action
was a "rule" subject to the CRA, the GAO concluded that the action "meets the statutory
definition of an order," rather than a rule. GAO Decision B-334309, *Environmental Protection
Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act
Waiver of Preemption* 5 (Nov. 30, 2023) (Exh. A). Specifically, the GAO determined that a
waiver decision "mak[es] a 'final disposition' granting California a 'form of permission' which
meets the definition of order under APA." *Id.* (quoting 5 U.S.C. § 551(6), (8), (9)).

68.    Members of both the Senate and the House also indicated—as recently as last year—
that they understood that EPA's preemption waiver decisions are not rules. When he introduced a
bill to repeal the Clean Air Act's waiver provision, in September 2024, Senator Mike Lee
expressly acknowledged that Clean Air Act preemption waivers "cannot be reviewed under the
Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the
CRA." Mike Lee, *Stop CARB Act One Pager* (118th Congress) (emphasis omitted).[15] That
bill—S.5038, 118th Cong. (2024)—had five co-sponsors in the Senate.[16] Representative Troy
Nehls likewise acknowledged that "none of [California's waivers] are subject to congressional

---

[14] This Federal Register notice was submitted to the Office of Management and Budget
under Executive Order 12866, and to Congress and the GAO for CRA consideration, because it
contained a separate action by the National Highway Traffic Safety Administration that was a
"rule." 84 Fed. Reg. at 51,352, 51,353. For its part, however, EPA repeatedly reaffirmed its
position that the waiver portion of the notice was not a rule. *Id.* at 51,352, 51,353, 51,360.

[15] Available at https://perma.cc/LNG5-45AW, last visited May 4, 2025.

[16] *See* https://www.congress.gov/bill/118th-congress/senate-bill/5038/cosponsors.

review" when he introduced the companion bill in the House.  Rep. Troy Nehls Introduces the Stop CARB Act (Sept. 12, 2024).[17]  That bill—H.R. 9574, 118th Cong. (2024)—had nine co-sponsors in the House.[18]

69.    Consistent with those understandings (including its own longstanding view), EPA did not follow rulemaking procedures when considering these California waiver requests.  It did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment.  *Cf.* 5 U.S.C. § 553(b).  Instead, EPA followed its traditional practice, providing notice to the public that it had received a waiver request from California and would provide "opportunity for public hearing and comment" on the three, limited findings the waiver provision empowers EPA to make.  *E.g.*, 88 Fed. Reg. 88,908, 88,909 (Dec. 26, 2023).

70.    When it finalized the waiver decisions at issue here, EPA reiterated its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et seq., … does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3)."  *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023).

71.    EPA did not submit these waivers to Congress before they took effect or when they were published in the Federal Register (one in April 2023 and two in January 2025).  Any member of Congress could have asked the GAO to determine whether these unsubmitted actions were rules subject to the CRA, following the ordinary congressional procedure concerning unsubmitted agency actions.  No member of Congress did so.

### IV.    The Trump Administration Purports to Invoke the CRA, Without Providing Any Legal Rationale and Without Any Administrative Process

72.    President Trump took aim at parts of California's vehicle emission program, from the very beginning of his second term.  He signed a day-one Executive Order that declared "state emissions waivers that function to limit sales of gasoline-powered automobiles" should be "terminat[ed]."[19]

---

[17] Available at https://perma.cc/55TB-737M, last visited May 4, 2025.
[18] *See* https://www.congress.gov/bill/118th-congress/house-bill/9574/cosponsors.
[19] *Unleashing American Energy* Executive Order (Jan. 20, 2025), available at

(continued…)

73.     That Executive Order directed federal agencies (including EPA) to "identify …

agency actions … inconsistent with" the Order and to "develop and begin implementing action

plans to suspend, revise, or rescind all [such] agency actions."  *Id.*  Upon first blush, this

Executive Order appeared to direct EPA (and other agencies) to take *administrative* action.  Thus,

at the outset, it appeared that the second Trump Administration intended to follow the path of the

first Trump Administration by seeking to administratively rescind certain waivers (or parts

thereof).  *See* 84 Fed. Reg. 51,310 (Sept. 27, 2019) ("EPA announces its decision to withdraw the

waiver" for certain California emission standards).

74.     This new Administration, however, had a different "action plan"—to invoke the

(inapplicable) CRA.  This "plan[] to suspend, revise, or rescind" certain waivers, *see supra* n.19,

was revealed on February 14, 2025, when President Trump and EPA Administrator Zeldin

"announced in the Oval Office … that the EPA [would] transmit[] to Congress" the three waiver

decisions at issue, as though the decisions were "rules" subject to the CRA.[20]  The President and

EPA Administrator appeared to be following a plan first publicized a month earlier as to "how the

incoming Trump administration" could purportedly use the CRA to "stop" the State's efforts to

reduce vehicular pollution, without following "the administrative process" which could "take

years" and without employing "ordinary legislation [which] would have to overcome the 60-vote

filibuster in the Senate."  *See supra* n.2.

75.     The Administration's announcement provided no explanation for EPA's about-face

from its longstanding and consistent position that waiver decisions are not rules, much less rules

of general applicability subject to the CRA.  *See supra* n.19.  Indeed, the announcement did not

even acknowledge that EPA had always treated waiver decisions as adjudicatory orders, including

in the very actions at issue when they were finalized.  *See id.*  Nor did EPA provide any public

---

(…continued)
https://perma.cc/33NL-LQKE, last visited May 5, 2025.
[20] EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirement* (Feb. 14, 2025), available at https://perma.cc/GDF5-HVM2, last visited May 5, 2025.

process leading up to the announcement of the purported reclassification of these waivers from orders to rules.

76.    The Administration's announcement likewise did not explain how the submission of these waiver decisions could be consistent with the CRA, given that all of the waivers had already "take[n] effect" and one of the waivers had been published in the Federal Register almost two years earlier.  *See* 5 U.S.C. § 801(a)(1)(A).

77.    Nonetheless, some members of Congress indicated they, too, were prepared to implement the Administration's plan (again without establishing CRA applicability or explaining their change in position on that issue).  They responded to the Administration's announcement by crediting "the Trump EPA['s]" submission of these waivers for "giving Congress the opportunity to reject California's effort to impose its EV mandate on all Americans."[21]  They also asserted "Chairman Capito [of the Senate Environment and Public Works Committee] will work with her colleagues to use the Congressional Review Act process to protect consumers from these unrealistic requirements that were approved by the Biden administration."[22]  The only "rules" or "requirements" referenced were California's, not federal ones, and these statements failed to acknowledge that California's regulations only apply in California (and other States that so choose), much less to accurately describe California's regulations, including the many provisions that require reduced emissions from gasoline- or diesel-fueled vehicles.

78.    EPA then submitted the three waivers at issue to the GAO and Congress on February 19, 2025.  *See* GAO Letter B-337179, *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 1 & n.1 (March 6, 2025) (Exh. B).  Neither EPA nor the President made those submissions public, although Administrator Zeldin claimed EPA was taking these actions to "transparently correct[]" prior errors.  *See supra* n.19.

---

[21] @EPWGOP ("EPW Republicans"), X, https://perma.cc/5WMM-DQVJ (Feb. 14, 2025), last visited May 11, 2025.
[22] *Id.*

**V.     The GAO Determines (Again) that Waiver Decisions Are Not Subject to the CRA**

79.     Upon receipt of EPA's submissions, the GAO observed that the waiver "notices themselves stated that CRA did not apply" and that EPA had not explained "why the agency was submitting the notices under the CRA."  Exh. B at 2, 6.  In fact, EPA's February 19 submissions described the waiver decisions as "actions" and "Notice[s] of Decisions," rather than rules.  The GAO thus "reached out to EPA on February 20, 2025, for clarification."  *Id.* at 2.

80.     On February 21, 2025, three Senators—including both Senators from California—requested that the GAO provide its legal opinion about whether these three waivers were rules subject to the CRA.  *See id.* at 1.

81.     On February, 25, 2025, the GAO followed up on its initial outreach to EPA, sending "a formal letter … seeking factual information and the agency's legal views on this matter."  *Id.* at 2.

82.     Some members of Congress welcomed EPA's submissions but, like EPA, failed to articulate a legal basis for treating waiver decisions as rules.  Rather, they asserted that the agency's submission—by itself—could transform into *rules* these actions that had been considered and finalized by EPA as *orders*:  "Once they submitted it to us, it's a rule. … [And] we can take it down."  Times of San Diego, *Republicans in Congress Are Preparing to Break Decades of Precedent to Block Climate Policy* (Feb. 27, 2025) (quoting Senator Capito).[23]

83.     EPA later resubmitted the notices of decision to Congress and GAO, relabeling them as "rules."  But EPA "still did not address the statements in the notices regarding the inapplicability of the CRA" or otherwise explain its new labels.  Exh. B at 2.

84.     On March 6, 2025, the GAO issued its legal analysis, concluding (as before) that waiver actions are not subject to the CRA.  Exh. B at 9.  Again, the GAO concluded that these three waiver decisions meet "the APA definition of an order," not of a rule, because they make

---

[23] Available at https://perma.cc/9VHE-RTB4, last visited May 11, 2025.

preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order." *Id.* at 6 (quoting 5 U.S.C. § 551(6)).

85.    The GAO also reiterated its prior conclusion that, even if waiver decisions were rules, they would still not be subject to the CRA because they are not rules of general applicability. Instead, the GAO concluded, waiver decisions "concern[] a specific entity—California—and address[] a statutory waiver specific to California's [program]." *Id.*

**VI.    Some Members of Congress Prepare to Plow Ahead, Regardless of GAO's Reasoned Conclusions**

86.    About a month later, and despite the GAO's reaffirmation that the CRA does not apply to Clean Air Act preemption waivers, members of the House introduced the Resolutions— each targeting one of the three preemption waivers at issue.  H.J. Res. 87, 88, 89 (introduced April 2, 2025).

87.    Some Senate leaders also signaled an interest in disregarding the GAO's determination.  For example, Senator Capito—Chairman of the Senate Committee on Environment and Public Works—responded to the GAO's determination by stating "that these waivers are rules, and subject to a resolution of disapproval under the Congressional Review Act." Alex Nieves, *There's hope for the waivers still* (Mar. 20, 2025).[24]

88.    No legal justification for this position was provided, however.  No public statements identified any errors in the GAO's reasoning or otherwise articulated a legal rationale for concluding that these waivers fit the CRA's statutory definition of a rule.

89.    Meanwhile, industry advocates—including those who first publicized the CRA playbook—maintained that the GAO's determination and, indeed, the statutory definition of "rule," were all irrelevant.  Buschbacher & Conde, *Congress Has the Authority to Review EPA "Waivers" of Clean Air Act Preemption*, Yale J. Reg. (Mar. 5, 2025) (arguing "that the CRA's text … do[es] not bind").[25]  Under that view, the only thing that mattered was EPA's submission

---

[24] Available at https://www.politico.com/newsletters/california-climate/2025/03/20/theres-hope-for-the-waivers-still-00242123, last visited May 11, 2025.
[25] Available at https://perma.cc/C8V5-9KFY, last visited May 11, 2025.

1    of the waiver decisions to Congress because "the CRA gives Congress unchallengeable power to

2    invalidate any action that an agency submits for review."  *Id.*

3    **VII.  The Senate Parliamentarian Also Concludes that these Waiver Decisions Are**
4    **Not Properly Subject to the CRA**

5        90.    The question of the CRA's applicability was then presented to the Senate

6    Parliamentarian, "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that

7    chamber.  Congressional Research Service, *The Congressional Review Act (CRA):  Frequently*

8    *Asked Questions*, 18 (Updated Nov. 12, 2021);[26] *see also* Jonathan S. Gould, *Law Within*

9    *Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters

10   of the rules governing Congress.").

11       91.    After hearing arguments on both sides, the Senate Parliamentarian agreed with the

12   GAO that waiver decisions are not subject to the CRA.  Although her decision was not made

13   public, it was widely reported as occurring on April 4, 2025.  Lisa Friedman, *Republican Plan to*

14   *Kill California's E.V. Policies Hits Senate Snag* (April 4, 2025).[27]

15       92.    That should have been the end of the matter because "in the ordinary course of

16   business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—

17   are as good as binding."  *Law Within Congress* at 1958.  Senate Majority Leader John Thune had

18   agreed as recently as January 2025, responding to questions about possibly overriding the Senate

19   Parliamentarian with "[w]e can't go there."  Russell Payne, *The Senate parliamentarian could*

20   *block some of Trump's agenda — and be a scapegoat for Republicans* (January 9, 2025).[28]

21       93.    But some members of Congress remained intent on attempting to use the CRA to

22   invalidate these three waivers.  Indeed, some immediately started "weighing whether to defy the

23   parliamentarian [in order] to reject California's plans…."  Kelsey Brugger, *Senators weigh next*

24

25       [26] Available at https://www.congress.gov/crs-product/R43992, last visited May 21, 2025.
         [27] Available at https://www.nytimes.com/2025/04/04/climate/california-ev-waiver-
26   senate.html, last visited May 22, 2025; *see also* https://perma.cc/A47L-KQEJ, last visited May
     21, 2025.
27       [28] Available at https://perma.cc/B8K5-CLCZ, last visited May 10, 2025.

28
                                                  23

*moves on California clean car rules* (April 10, 2025).[29]  The attack continued to focus on the parts of California's program that allegedly "ban gas-powered cars and trucks," again failing to acknowledge that other parts of the state program were authorized by these waivers.  *See supra* n.26.

## VIII. Congress Adopts the Resolutions, Using Extraordinary Procedural Maneuvers

94.    Despite the GAO and Senate Parliamentarian determinations, House members proceeded to consider the Resolutions.  Kelsey Brugger, *House plows ahead with assault on California EPA waivers* (Apr. 4, 2025).[30]  The public statements around this action again failed to address the fact that state emission regulations only apply in States that have chosen to adopt them.  *Id.* ("The American people should choose what vehicle is right for them, not California bureaucrats.").  These statements likewise failed to reconcile claims about the impacts of these waivers with EPA's position—in the very reports it submitted to Congress—that these were not "major rules," meaning EPA did not expect these waiver decisions to cause "major increase[s] in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions" or "significant adverse effects on competition, employment, investment, productivity, [or] innovation."  *See* 5 U.S.C. § 804(2).

95.    The only explanation provided by House members for departing from the practice that "the GAO … has historically decided what can be considered a rule under the CRA" was the fact that EPA submitted the waivers to Congress.  *Id.* ("'By submitting the three California waivers to Congress, Administrator Zeldin is ensuring that Congress has oversight of these major rules that impact every American,' [Energy and Commerce Chair] Guthrie said."); *see also Chairman Guthrie, Vice Chairman Joyce, and Energy and Commerce Republicans Introduce Legislation to Stop California EV Mandates*.[31]

---

[29] Available at https://perma.cc/SX9T-AAQK, last visited May 11, 2025.
[30] Available at https://perma.cc/AD9Z-P7W7, last visited May 11, 2025.
[31] Available at https://perma.cc/3UAM-QWWL, last visited May 21, 2025.

24

96.    The House later voted to adopt all three Resolutions, targeting the Advanced Clean Trucks and Omnibus waivers on April 30, 2025, and the Advanced Clean Cars II waiver on May 1, 2025. Camila Domonoske, *The House Strikes a Blow Against California in the Fight over EVs* (May 1, 2025).[32]

97.    No member or committee of the House provided any legal rationale suggesting that waiver decisions are federal agency rules of general applicability that could be subject to the CRA. Nor did any members of the House who had previously expressed the opposite view explain their change of position. Instead, after the House votes, the sponsors of the Resolutions continued to attribute Congress's purported use of the CRA here solely to the actions of the Executive Branch. *E.g.*, Congressmen Brett Guthrie, John Joyce, John James, and Jay Obernolte, *How Congress Is Fighting Biden's Disastrous EV Mandate* (May 2, 2025).[33]

98.    At least one press outlet described the House's decision to "hold[] the votes anyway"—despite the GAO and Senate Parliamentarian determinations—as "demonstrating that they are willing to carry out their agenda regardless of whether the nonpartisan arbiter deems them legal." Rachel Frazin, *House votes to overturn California gas car ban — again defying internal watchdog.*[34]

99.    Leaders in the Senate also ultimately decided to proceed with votes on the Resolutions, disregarding GAO's legal conclusion and the Senate Parliamentarian's determination but without identifying any errors or other basis for disagreement. E&E News, *Senate GOP Plots Demise of California Clean Car Rules* (May 20, 2025).[35]

100.    Senate Majority Leader Thune asserted that "'widespread effects'" make preemption waivers rules, without reference to the definition of a rule, without acknowledging that any "widespread effects" result from choices by *state governments*, and without explaining how waiver decisions do anything other than dispose of a request from California. *Id.* Senate

---

[32] Available at https://perma.cc/63NY-2KR9, last visited May 21, 2025.
[33] Available at https://perma.cc/DUL5-3VQS, last visited May 21, 2025.
[34] Available at https://perma.cc/W7UY-CLGA, last visited May 11, 2025.
[35] Available at https://perma.cc/PKF2-4386, last visited May 22, 2025.

Majority Whip John Barrasso likewise disregarded the limited applicability of California's standards, alleged nationwide effects, and also ignored the conventional vehicle provisions of these state regulations, claiming California's laws would somehow "force-feed electric vehicles to every man and woman who drives in this country." *Id.*

101.   When Senate Majority Leader Thune announced that he would proceed with the Resolutions under extraordinary, expedited procedures, he did not explain the basis for doing so, underscoring the unprecedented nature of this step. *See id.* ("It's a little early to sketch and lay that out.  But we have a process.  We're moving forward.").

102.   The extraordinary process became clear two days later when—during debate on a totally different resolution concerning an unrelated Department of Transportation (DOT) safety rule—Senate Majority Leader Thune introduced a point of order for the Senate to determine "that points of order are in order under the Congressional Review Act given sections 802(d)(1), 802(d)(2), and 802(d)(4) are in conflict with one another."[36]  That point of order was agreed to by a narrow vote of 51 to 46.

103.   Notably, section 802(d)(1) provides that "all points of order against the joint resolution (and against consideration of the joint resolution) are waived," meaning no such points of order are permitted as to CRA resolutions.  5 U.S.C. § 802(d)(1).  This text seems quite clear, and the alleged textual "conflict" was never explained.  But the passage of Senator Thune's point of order purportedly made any point of order permissible as a matter of Senate procedure.

104.   That change was necessary only to allow Senate Majority Leader Thune to introduce a second point of order—one that would seemingly have been impermissible without approval of the first.  This second point of order sought to establish that "Joint Resolutions that meet all the

---

[36] *See* Recent Floor Activity, May 21, 2025, *available at* https://perma.cc/4RK3-L4ZU, last visited May 23, 2025.  "Points of order" are the mechanism by which "Senators may enforce the Senate's legislative rules and precedents."  Congressional Research Service, *Points of Order, Rulings, and Appeals in the Senate* 1 (updated Nov. 15, 2018), available at Points of Order, Rulings, and Appeals in the Senate | Congress.gov | Library of Congress, last visited June 8, 2025.  When a member "believe[s] that one of those rules or precedents is, or is about to be, violated," they introduce a point of order to obtain a decision whether or not the action of another member would violate or have violated the Senate's internal rules.  *Id.*

requirements of Section 802 of the Congressional Review Act or are disapproving of agency actions which have been determined to be rules subject to the Congressional Review Act by a legal decision from the Government Accountability Office [are] entitled to expedited procedures under the Congressional Review Act." *See supra* n.36 ("Recent Floor Activity"). Under this second point of order, the Senate could proceed to consider and vote on joint resolutions via CRA-like extraordinary procedures so long as a federal agency had submitted a report purporting to be a Section 801(a)(1)(A) report concerning a "rule," regardless of whether anyone identified any reason to doubt the contrary conclusions of the GAO and the Senate Parliamentarian. In other words, the purpose of Majority Leader Thune's second point of order was to change the trigger for the Senate's extraordinary procedures so that agency labeling and submission alone sufficed. Notably, neither of these two points of order was necessary for the proceeding into which they were introduced—i.e., the proceeding concerning the DOT CRA resolution. In fact, neither was relied upon to introduce or vote on *that* resolution.

105. The purpose of these points of order was, in fact, unrelated to the DOT CRA resolution. Indeed, their sole purpose and effect was to enable the Senate to later vote on the waiver Resolutions—using extraordinary, expedited procedures—without having to directly address the Parliamentarian's contrary determination. *E.g.,* 117 Cong. Rec. S3025 (May 21, 2025) (Exh. C).

106. The Presiding Officer—Senator Capito—confirmed the point when the Senate proceeded to consider the Resolutions concerning the preemption waivers. She explicitly stated that the Senate could only do so "[p]ursuant to the precedent just established by the Senate"—i.e., the second point of order which was only permitted because of the first point of order, both of which were introduced and voted on during proceedings concerning the unrelated DOT resolution. 117 Cong. Rec. S3052 (May 21, 2025) (Exh. C).

107. Those in favor of the Resolutions continued to mischaracterize California's regulations and the waivers that authorized their enforcement. For example, Senate Majority Whip Barrasso asserted that "the Biden administration gave California—the liberal State of

27

California—permission to export its far-left electric vehicle mandate to the entire country."  117 Cong. Rec. S3017 (May 21, 2025) (Exh. C); *see also, e.g.*, *id.* at S3086-87 (Senator Capito inaccurately describing Advanced Clean Cars II as an "EV mandate").  All of these statements made clear that the regulatory requirements disfavored by the speakers were those designed and promulgated *by California*.  No regulatory requirement or other rule designed or promulgated by any federal agency was ever mentioned.

108.   Those in favor of the Resolutions also made clear they were relying on the "submission by the Trump EPA" as the sole trigger for expedited and extraordinary procedures.  117 Cong. Rec. S3087 (May 21, 2025) (Exh. C) (Senator Capito describing agency submission as sufficient to "trigger[] my right as a Senator to introduce this resolution to block California's EV mandate"); *see also id.* at S3088 (repeatedly using the phrase "Agency-submitted rules" rather than "rules").  Indeed, Senate leadership exclusively credited "President Trump and EPA Administrator Lee Zeldin … submitting the approved California waiver[s]" for the opportunity to enact the Resolutions.  *Id.* at S3087; *see also* 171 Cong. Rec. S3140 (May 22, 2025) (Exh. D) (Senator Lankford) ("So we worked to make sure that we were clarifying one simple thing . . . this one simple question: When an Agency says it is a rule, is it a rule? . . . . The answer is, yes, it is a rule. And then we acted on that.").

109.   As noted, that was the sole purpose and effect of Senate Majority Leader Thune's second point of order:  to allow the Senate to proceed on the Resolutions simply because EPA submitted reports labeling the waiver decisions as "rules," without regard to contrary conclusions in the Federal Register notices of final agency action and from the GAO and Senate Parliamentarian.  171 Cong. Rec. S3047 (May 21, 2025) (Exh. C) (Senator Thune) (asserting agency actions "submitted to Congress[ as] rules" *are* in fact rules "eligible for consideration under the [CRA]"); *accord* 171 Cong. Rec. S3140 (May 22, 2025) (Exh. D) (Senator Lankford) (stating that this had always been the Senate's approach); *id.* at S3106 (Senator Whitehouse) ("Before dinner yesterday, these bills to gut California's Clean Air Act authority were recognized as regular bills, subject to the filibuster rule requiring 60 votes to move forward, open to full

debate and amendments, but somehow, after dinnertime yesterday, once Senate Republicans were done with overruling the Parliamentarian, these bills were now not subject to the filibuster.").

110.   Nonetheless, throughout the Senate proceedings, advocates for the Resolutions continued to acknowledge that, by its plain terms, the CRA "applies only to allow for disapproval of Federal Agency rules and only during a prescribed time defined by the statute."  117 Cong. Rec. S3088 (May 21, 2025) (Exh. C).  They also described the expedited Senate procedures as established "by law," *id.* at S3087, although they had purported to alter the trigger for those procedures by a mere point of order.

111.   The next day, May 22, 2025, the Senate voted on each of the Resolutions and passed all three with votes of 51-45 (H.J. Res. 87, Advanced Clean Trucks), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus).

112.   EPA "hail[ed]" the Resolutions with a press release indicating that President Trump would sign them and again mischaracterizing the California regulations as an "EV Mandate." EPA, *EPA Hails Congressional Disapproval of Biden EPA's California EV Mandate Rule* (May 22, 2025).[37]  EPA described the Resolutions as "maintaining a consistent national approach to vehicle standards"—an approach the Clean Air Act explicitly rejects—and as preventing a "single state" from imposing "its radical agenda."  *Id.*

113.   The President signed the Resolutions on June 12, 2025.

## IX.   THE ADMINISTRATION PLANS TO TARGET ADDITIONAL WAIVERS

114.   Unfortunately, these Resolutions likely do not mark the end of the Federal Government's unlawful targeting of California emission regulations and preemption waivers.

115.   EPA's unprecedented actions with respect to the three targeted waivers has laid the groundwork for EPA to relabel other waivers EPA previously issued as orders, claiming they are suddenly rules—without process or justification—and thereby subjecting them to extraordinary and expedited consideration for congressional disapproval.

[37] Available at https://perma.cc/WW4C-Z4P7, last visited May 23, 2025.

29

116.   This prospect is far from speculative.  A Presidential Executive Order directed EPA to develop and implement an "action plan[] to suspend, revise, or rescind" the "state emissions waivers" this Administration finds objectionable.  *Supra* n.19.  EPA's action plan has never been made public.  On information and belief, State Plaintiffs allege this action plan—and other EPA documents—indicate that EPA plans to target other Clean Air Act preemption waivers granted to California.

117.   In fact, in cases challenging previously issued preemption waivers, EPA has sought abeyances, representing that it "could take further action that may obviate the need for judicial resolution of some or all the disputed issues"—i.e., that EPA plans to invalidate the waiver at issue.  *E.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA* (9th Cir. Case No. 25-1615), Dkt. 15.1 at 3-4 (April 11, 2025).  EPA was even more definitive in one waiver challenge, asserting that it "has determined that the agency should reassess the basis for and soundness of" a waiver decision EPA made in 2022 (the reinstatement of parts of a 2013 waiver the first Trump Administration purported to withdraw in 2019).[38]  EPA has thus been clear that it intends to target at least some additional preemption waivers previously issued (or reinstated) to California.

118.   Moreover, at least one industry group has met with EPA to urge the agency to relabel an additional California preemption waiver in an effort to subject it to extraordinary disapproval procedures.  On information and belief, Plaintiffs allege that other industry groups have done the same and that EPA has not rejected such requests.

119.   The Federal Government has also (erroneously) asserted that EPA alone may regulate new motor vehicle emissions, indicating a desire to eliminate California's program entirely (not just to prevent enforcement of the specific California regulations underlying the targeted waivers).  On information and belief, Plaintiffs allege that eliminating California's new motor vehicle emission program is an objective of this Administration (including EPA and its Administrator).  That objective would require invalidation of prior, extant waivers that allow California (and other

---

[38] Motion of Fed. Respondents to Hold Briefing Schedule in Abeyance at 3 (January 24, 2025), *Diamond Alternative Energy, LLC v. EPA* (Supreme Court Case No. 24-7).

States) to enforce earlier-adopted state regulations.  EPA and its Administrator are thus likely—if not certain—to target additional preemption waivers.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violations of the Administrative Procedure Act
(Against the United States, EPA and Its Administrator)**

120.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

121.   Congress "enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (internal quotation marks and citation omitted).

122.   EPA is an "agency" as defined in 5 U.S.C. § 551(1).

123.   EPA's relabeling (or purported reclassification) of these preemption waivers from adjudicatory orders into "rules" and the agency's submission of those orders as "rules" to Congress are final agency actions.

124.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

125.   The actions of EPA and its Administrator ("EPA Defendants") here were transparently arbitrary and capricious.  5 U.S.C. § 706(2)(A).  An agency must always "offer[] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).  Moreover, the agency must "provide a more detailed justification … when, for example, its new

31

policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

126. Yet here, EPA Defendants offered no explanation at all for the change in position between finalization of the waiver decisions and EPA's purported reclassification, despite the substantial reliance interests that attach to those waiver decisions. No explanation was provided in the press release in which Administrator Zeldin first referred to waiver decisions as "rules"; nor was any explanation included in the (second) submissions to Congress where EPA relabeled the decisions as "rules"—despite an explicit request for such an explanation from GAO. "An agency may not … depart from a prior policy *sub silentio*," *Fox Television*, 556 U.S. at 515. Nor may an agency supplant earlier conclusions with "impermissible post hoc rationalization." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908 (2020) (internal quotation marks and citation omitted). Yet, that is exactly what EPA did.

127. The EPA Defendants also took these actions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Indeed, EPA and its Administrator observed no public process at all when they changed positions on the nature of already finalized actions.

128. EPA Defendants' actions were also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), because no statute authorizes these actions.

129. EPA and its Administrator are "creatures of statutes" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus v. Dep't of Labor, Occupational Safety & Health Admin.,* 595 U.S. 109, 117 (2022). No law authorizes EPA or its Administrator to declare by fiat—and without process or reasoning—that actions already finalized as "orders" through adjudicatory procedures are instead "rules" of general applicability subject to the CRA.

130. The waiver provision of the Clean Air Act—Section 209(b)—only empowers EPA to "waive application" of Section 209(a) preemption to California through review of a request from

that State.  42 U.S.C. § 7543(b)(1).  It provides no authority to declare post hoc changes in the

nature of the action, much less authority to slap a new and unexplained label on an already

finalized action as part of an effort to trigger a wholly separate statute.

131.  The APA likewise does not provide EPA with authority to relabel already finalized

agency actions, without any process or explanation.  Indeed, as noted above, such conduct

epitomizes violations of the APA's reasoned decision-making requirements.

132.  Nor does the CRA authorize EPA's actions here.  That statute establishes a definition

of "rule," borrowing from, and then narrowing, the APA's definition.  5 U.S.C. § 804(3).  The

CRA requires agencies to submit to Congress and the GAO a "report" for each "rule" the agency

promulgates "[b]efore [the] rule can take effect."  *Id.* § 801(a)(1)(A).  Nothing in this text

empowers EPA to slap a "rule" label on any action it wishes and purport to send a "report" to

Congress, despite GAO and EPA conclusions to the contrary and without any attempt to explain

how the action comports with the CRA's definition of a "rule."  Nor does the CRA empower EPA

to submit "report[s]" months—or, in the case of the Advanced Clean Trucks waiver, years— *after*

its actions have taken effect.  The EPA Defendants cannot claim to have acted "under" the CRA

here, as their actions are untethered from any text in that statute.

133.  EPA Defendants' actions were also "not in accordance with law," 5 U.S.C.

§ 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C),

because EPA's "rule" labels were transparently erroneous.  EPA's waiver decisions do not

"implement, interpret, or prescribe law or policy" as rules do.  5 U.S.C. § 551(4).  Rather, such

decisions "orders" because they constitute "a final disposition," *id.* § 551(6), of a request from

California that either grants or denies California "an agency permit, certificate, approval,

registration, charter, membership, statutory exemption or other form of permission" to engage in

a course of conduct (i.e., enforcement of its regulatory program), *id.* § 551(8) (defining "license").

*See also id.* § 551(6) (defining "order" to include "licensing").

134.  That is clear from the nature of waiver proceedings which, pursuant to the Clean Air

Act's text, do not begin with notices of proposed rulemaking.  Rather, by congressional design, a

waiver proceeding commences with a request from California that includes its finding that the State's new motor vehicle emission standards "will be, in the aggregate, at least as protective of public health and welfare" as EPA's federal standards.  42 U.S.C. § 7543(b)(1).  EPA then has no discretion.  It must grant California's waiver request, unless evidence supports one of three factual determinations that could support a denial.  *Id.* § 7543(b)(1)(A)-(C).

135.   In contrast with its power to "prescribe" federal vehicle emission standards under a separate provision of the Clean Air Act (42 U.S.C. § 7521(a)(1)), EPA's role "in a waiver proceeding" is thus "sharply restricted."  *MEMA I*, 627 F.2d at 1121.  EPA does not determine the pollutants to be regulated, the stringency of the standards, or the speed with which standards increase in stringency.  California makes all those choices in a state rulemaking proceeding, before it submits a waiver request to EPA.  For its part, EPA determines only whether any "parties favoring denial of the waiver" have met their evidentiary burden to obtain that result.  *Id.*

136.   Put another way, it is California's regulations (not any action by EPA) that are "designed to prescribe law"—namely, the emission standards and other requirements vehicle manufacturers must meet in the State.  5 U.S.C. § 551(4) (defining "rule").  An EPA waiver is a form of permission for California to enforce its laws—a statutory exemption from otherwise applicable preemption.  As such, an EPA waiver decision is an "order"—"a final disposition" of a request (here, from California), including a "licensing request[]," *id.* at 551(6), where "licensing," in turn, includes such actions as "permit[s]," "approval[s]," and *statutory exemption[s] or other form[s] of permission*," *id.* § 551(8) (emphasis added).

137.   EPA Defendants' relabeling is without merit and is entitled to no deference.  For one thing, EPA has no "special duty … to administer" the APA or CRA definitions of a "rule."  *Loper Bright*, 603 U.S. at 389 (internal quotation marks omitted).  For another, EPA's entirely unexplained departure from its decades-old and consistently held position that Clean Air Act preemption waivers are not rules lacks any of the "factors which [could] give it power to persuade."  *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1940)) (looking to

"the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements").

138.  The EPA Defendants' APA violations provided a pretextual basis for Congress to use CRA-like procedures to disapprove these waivers, and the Resolutions would not have been introduced, much less enacted, without that pretextual basis.

139.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the purported reclassification and submission actions are unlawful, that these three waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

140.  Pursuant to 5 U.S.C. § 706, Plaintiffs are entitled to vacatur of EPA Defendants' purported reclassification and submission actions.  Plaintiffs are also entitled to an injunction prohibiting EPA from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A).

141.  Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll v. Safford,* 44 U.S. (3 How.) 441, 463 (1845)).

**COUNT II**

*Ultra Vires* **– Conduct in Excess of Statutory Authority**
**(Against the United States, EPA and Its Administrator)**

142.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

143.  EPA Defendants acted in excess of the agency's delegated powers when they purported to reclassify these waiver decisions as "rules" after the actions had already been finalized and had gone into effect.  They likewise acted in excess of the agency's delegated powers when they submitted a document to Congress and the GAO labeling the waiver decisions "rules" and claiming the document was a "report" under 5 U.S.C. § 801(a)(1)(A).  No statute

empowers EPA Defendants to take those actions, much less to do so without any public process or explanation for their change in positions. Certainly, no statute empowers any EPA Defendant to invoke a statute that is inapplicable—as declared expressly in EPA's own actions—simply because that statute would provide a faster or easier, but unlawful, means to a desired end.

144. In fact, EPA Defendants are prohibited from promulgating rules without following statutory rulemaking procedures. *E.g.*, 5 U.S.C. § 553; 42 U.S.C. § 7607(d). EPA Defendants are also prohibited from promulgating generally applicable federal vehicle emission rules without meeting the relevant requirements of 42 U.S.C. § 7521. Those procedures were not followed, those requirements were not addressed, and EPA Defendants' purported reclassification and submission of these waivers as "rules" was ultra vires.

145. The EPA Defendants' ultra vires conduct provided a pretextual basis for Congress to use CRA-like procedures to disapprove these waivers, and the Resolutions would not have been introduced, much less enacted, without that pretextual basis.

146. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the purported reclassification and submission actions are ultra vires, that these three waivers are not "rules," and that EPA's submissions are not "report[s]" under 5 U.S.C. § 801(a)(1)(A).

147. Plaintiffs are also entitled to an injunction prohibiting EPA from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A).

148. Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, including relief designed "to prevent an injurious act by a public officer," *id.* (quoting *Carroll*, 44 U.S. at 463).

**COUNT III**
**Violation of Separation of Powers**
**(Against All Defendants)**

149.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

150.  "[T]he separation of powers is designed to preserve the liberty of all the people.  So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellin*, 594 U.S. 220, 245 (2021) (citations omitted).  The Resolutions, and the process Congress used to enact them, each violated the separation of powers.

151.  A waiver proceeding is an adjudication of whether, based on particular facts, a set of California laws is exempted from the preemptive effect of section 209 of the Clean Air Act.  The Clean Air Act leaves EPA no discretion but to grant every waiver to which a single named party (the State of California) is entitled by the statute's terms.

152.  In issuing a waiver, EPA exercises "the type of nonpolicymaking adjudicatory power[] typically exercised by a court in the agency-review context." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 154 (1991).  Indeed, Congress directed EPA to apply the "arbitrary and capricious" standard to California's determination "that [its] standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards," 42 U.S.C. § 7543(b)(1), (b)(1)(A)—the same legal standard Congress directed courts to apply to agency actions, 5 U.S.C. § 706(2)(A). And an EPA waiver of preemption operates much like a court judgment finding no preemption:  it allows for enforcement of the relevant state law.

153.  EPA waivers "create no new substantive law" but instead determine "how pre-existing law applies to particular circumstances." *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016).  The same is true of the Resolutions, which did no more or less than countermand three EPA waivers.

154.  Congress lacks constitutional power to declare, in the first instance or on review, the rights of an individual party under a preexisting federal statute. *See Fletcher v. Peck*, 10 U.S. 87,

37

136 (1810) ("[T]he legislature [is] to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.").

155.   The procedure that Congress used to pass the Resolutions violated the separation of powers in a second, independent respect.  Courts must strike down legislation that was enacted through procedures that "ignore[d] constitutional restraints." *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (cleaned up).  Under the guise of changing an internal procedural rule, the Senate twisted the reporting requirement in 5 U.S.C. § 801(a)(1)(A) into a vehicle for the Executive Branch to manipulate legislative procedure in a manner contrary to the separation of powers.

156.   The Constitution states that "[e]ach House [of Congress] may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.  The Executive Branch is not assigned a role in the proceedings of either House of Congress.  The power to determine internal procedural rules "only empowers Congress to bind itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983), but for that reason the power must remain "independent … of the President," *id.* at 955.  Because "the Constitution by explicit text commits the power at issue to the exclusive control of" each House, courts cannot "tolerate *any* intrusion by" the Executive Branch in this arena and must act "to prevent any other Branch from undertaking to alter" that textual commitment.  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 485, 487 (1989) (Kennedy, J., concurring in the judgment). Internal legislative procedures "shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other [Branches]."  *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933).

157.   To pass the Resolutions, the Senate adopted a procedural rule that applies CRA-like legislative procedures to a joint resolution introduced to disapprove of an action by an Executive Branch agency whenever the agency denominates the action as a "rule" in a submission labeled as a report under section 801(a)(1)(A) of the CRA.  That procedural rule gives the Executive Branch unbridled discretion to trigger extraordinary legislative procedures for the disapproval of a federal administrative action that is *not* a rule as defined in the CRA.  The Senate's procedural rule

38

1   allows for intrusion by, and coercive influence of, the Executive Branch on internal legislative

2   procedure.

3       158.   The Senate's procedure violated the separation of powers.  That violation was not

4   rendered harmless by the House's passage of, and the President's signature on, the Resolutions.

5   *Cf. United States v. Munoz-Flores*, 495 U.S. 385, 397 (1990) ("A law passed in violation of the

6   Origination Clause" is "no more immune from judicial scrutiny because it was passed by both

7   Houses and signed by the President than … a law passed in violation of the First Amendment.").

8   The Resolutions, as the fruit of an unconstitutional Senate process, are incurably unconstitutional.

9       159.   Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the

10  Resolutions are unlawful, void, and of no effect.

11      160.   Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief,

12  enjoining EPA and its Administrator from giving the Resolutions any legal effect.

13                               **COUNT IV**

14  **Violation of the Tenth Amendment and Structural Principles of Federalism**
**(Against All Defendants)**

15

16      161.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged

17  herein.

18      162.   A "fundamental limitation that the constitutional scheme imposes on the Commerce

19  Clause to protect the 'States as States' is one of process."  *Garcia*, 469 U.S. at 554.  Thus, courts

20  may—and indeed must—intervene "to compensate for possible failings in the national political

21  process" that infringe on the States as States.  *Id.*  And that is not the only "affirmative limit[] *the*

22  *constitutional structure* might impose on federal action affecting the States under the Commerce

23  Clause."  *South Carolina*, 485 U.S. at 528 (Scalia, J, concurring in part) (quoting *Garcia*, 469 U.S.

24  at 556).

25      163.   These Resolutions were enacted only because both the Executive and Legislative

26  Branches made unprecedented decisions to target specific California regulations through

27  extraordinary procedures, purporting to employ a statute that no one credibly contended was

28                                    39

applicable.  The Executive Branch began these unprecedented maneuvers when, without any process or explanation, it issued a blatantly unlawful post-hoc declaration that these three adjudicatory orders were suddenly rules and submitted a document claiming to report such "rules" to Congress and the GAO.  In so doing, the Executive Branch neither exercised care nor even attempted to faithfully execute the Nation's laws or the Constitution's structural limits on federal intrusion.  *See* U.S. Const. art. II, § 3.  Congress then carried out the rest of this extraordinarily defective national political process, disregarding the reasoned decisions of both the GAO and the Senate Parliamentarian and treating the Executive Branch's unexplained and unlawful "rule" relabeling as determinative of congressional procedure.

164.  The Federal Government thus blasted gaping holes in state regulatory programs without any of the procedural mechanisms—such as rigorous debate and state official testimony—that serve to inform members of Congress about the consequences of their actions.  In the push to end the alleged "electric vehicle fantasy," for example, state regulations that require crucial emission reductions from gasoline- and diesel-fueled vehicles got swept in too.  And all of this was done with no regard for Plaintiff States' needs to reduce air pollution to meet federal air quality standards and protect public health and welfare or for the fact that some of the affected state regulations had already been operating *for years* and others continued *decades-old* state programs.

165.  Plaintiff States had no opportunity to participate in the Executive Branch's relabeling of the waivers as "rules" and submission of a "report" to Congress and the GAO because the Executive Branch provided *no process at all* for those actions.  The House and Senate's decisions to rely entirely on the Executive Branch's unjustified position—despite contrary, reasoned conclusions from the nonpartisan entities upon which Congress ordinarily relies—compounded Plaintiff States' exclusion and isolation.  Moreover, Defendants also hoped their chosen action plan would deprive Plaintiff States of judicial review.

166.  All of the States consented to the use of the extraordinary disapproval procedures of the CRA for certain *federal rules* and on certain timelines.  No State has ever consented to the use

of those or similar procedures to upend their state laws, much less longstanding state programs on which they rely to protect their residents.  Nor has Congress ever used such extraordinary procedures to this effect prior to these Resolutions.

167.  The Framers designed a Federal Government that would "be disinclined to invade the rights of the individual States, or the prerogatives of their governments."  *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, at 332 (B. Wright ed. 1961)).  These Resolutions required an end-run around that design.  The numerous "extraordinary defects in the national political process" reflected in that end-run render the Resolutions "invalid under the Tenth Amendment" and the principles of federalism embedded in the Constitution's structure.  *South Carolina*, 485 U.S. at 512.

168.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

169.  Pursuant to 28 U.S.C. §§ 2201, 2202, Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect and from relabeling other Clean Air Act preemption waiver actions, taken under 42 U.S.C. § 7543(b)(1), (e)(2)(A), as "rule[s]" subject to the CRA and submitting documents claiming to be "report[s]" of those actions under 5 U.S.C. § 801(a)(1)(A).  *See also Armstrong*, 575 U.S. at 326–27.

## COUNT V

### Nonstatutory Review: Violations of Federal Law by Federal Officials
### (Against All Defendants)

170.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

171.  Federal courts possess inherent equitable power to grant injunctive and declaratory relief "with respect to violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326–27, among them violations that themselves contravene the structural principles of the Constitution, *see Free Enter. Fund*, 561 U.S. at 491–92 n.2, or actions premised on legislation that does.

41

172.  The President, EPA, and its Administrator have stated definitely that the state regulations underlying the waivers at issue here, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, became preempted and unenforceable upon enactment of the respective Resolutions and are now preempted and unenforceable.

173.  Each of the Resolutions is unlawful and unconstitutional.

174.  Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for California's addition of these state regulations, including the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations, to the State's regulatory program are valid and in effect.

175.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit the rejection of certifications of vehicle or engine manufacturer compliance with these state regulations—including the Advanced Clean Cars II, Advanced Clean Trucks, and/or Omnibus regulations—as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3).

176.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit their taking other actions to implement or give legal effect to the Resolutions.

177.  Because these preemption waivers are valid and in effect, Plaintiffs are entitled to an injunction against EPA and its Administrator to prohibit interference with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law.

178.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Resolutions are unlawful, void, and of no effect.

179.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that any action by Defendants premised on validity of the unconstitutional Resolutions is itself unlawful, void, and of no effect.

**COUNT VI**

**Declaratory Judgment**
**(Against All Defendants)**

180.  Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

181.  As discussed above, the waiver decisions targeted by the Resolutions are outside the scope of the CRA because these decisions are not "rules" as defined by the APA or CRA, much less "rules" of general applicability subject to the CRA.

182.  Defendants have nonetheless asserted that the Resolutions and 5 U.S.C. § 801 together operate to preempt or otherwise preclude certain activities Plaintiffs may undertake.  The United States has previously brought such challenges against state programs adopted to reduce air pollution.  *E.g., United States v. California*, 444 F. Supp. 3d 1181, 1183 (E.D. Cal. 2020).  And the current Administration has clearly stated an intent to pursue such challenges again.  *See Protecting American Energy from State Overreach* Executive Order (Apr. 8, 2025).[39]

183.  "A person may seek declaratory relief in federal court if the one against whom he brings his action could have asserted his own rights there."  *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997); *see also City of Reno v. Netflix, Inc.*, 52 F.4th 874, 879 (9th Cir. 2022) (recognizing "the well-established availability of the [Declaratory Judgment] Act for defensive use against anticipated claims").  Federal district courts have "original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress," 28 U.S.C. § 1345, against Plaintiffs.

184.  In the event the Resolutions remain in effect despite Plaintiffs' other claims, Plaintiffs are entitled, pursuant to 28 U.S.C. § 2201, to a declaration that the Resolutions were not enacted under the CRA and that no provision of that statute, including 5 U.S.C. § 801, is triggered or otherwise rendered applicable by the Resolutions.

---

[39] Available at https://perma.cc/SE5W-PG8Q, last visited October 9, 2025.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs State of California, et al. respectfully request that this Court

1.　　Declare the Resolutions unconstitutional, unlawful, void, and of no effect;

2.　　Declare that any action by Defendants premised on validity of the Resolutions is unlawful, void, and of no effect;

3.　　Enjoin EPA and its Administrator from taking any action to implement or give legal effect to the Resolutions, including rejecting certifications of vehicle or engine manufacturer compliance with the state regulations for which EPA waived Clean Air Act preemption in the decisions at issue (e.g., the Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus regulations), as compliant with federal Clean Air Act standards under 42 U.S.C. § 7543(b)(3);

4.　　Enjoin EPA and its Administrator from interfering with Plaintiffs' enforcement of any state law on the ground that one or more of the Resolutions resulted in preemption of that state law;

5.　　Declare the purported reclassification of the three preemption waiver decisions as federal agency "rules" and the submission of those waivers decisions in documents purporting to be "reports" under 5 U.S.C. § 801(a)(1)(A) unlawful;

6.　　Vacate EPA's purported reclassifications of these orders as rules;

7.　　Declare that the CRA does not apply to EPA waiver decisions under 42 U.S.C. § 7543(b)(1);

8.　　Enjoin EPA and its Administrator from purporting to reclassify these or other Clean Air Act waiver decisions under 42 U.S.C. § 7543(b)(1) or 42 U.S.C. § 7543(e)(2)(A) as "rules" and submitting them to Congress in documents claiming to be "reports" under 5 U.S.C. § 801(a)(1)(A);

9.　　In the event the Resolutions remain in effect despite Plaintiffs' other claims, declare that the Resolutions were not enacted under the CRA and that no provision of that statute, including 5 U.S.C. § 801, is triggered or otherwise rendered applicable by the Resolutions.

10.　　Grant such other relief as the Court deems just and proper.

44

Dated:  October 10, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Plaintiff State of California*


**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov


**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov


**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

45

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

 */s/ William Grantham*
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
 (505) 717-3520
wgrantham@nmdoj.gov


**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov


**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov


**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov


**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

46

1    Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

2    */s/ M. Elaine Meckenstock*
     M. Elaine Meckenstock
3    Counsel for Plaintiff State of California

47