# Ex. A

Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Counsel for Intervenor-Defendants*
(complete list on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **INTERVENOR-DEFENDANTS' MOTION TO DISMISS [Fed. R. Civ. P. 12(b)(1), (6)]** <br><br><br><br><br><br> Date: _____ \_\_, 2025 <br> Time: 2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

NOTICE OF MOTION ....................................................................................................... 1

MOTION TO DISMISS ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

STATEMENT OF ISSUES ................................................................................................. 2

BACKGROUND ................................................................................................................. 3

I.    The Clean Air Act Broadly Preempts State Regulation of Motor
      Vehicle Emissions ................................................................................................... 3

II.   EPA Issues Waivers of Clean Air Act Preemption For Three
      California Programs ................................................................................................. 3

III.  Congress Repeals EPA's Waivers of Clean Air Act Preemption ........................... 5

IV.   Procedural History ................................................................................................ 10

ARGUMENT ..................................................................................................................... 10

I.    The Congressional Review Act Prohibits Judicial Review .................................. 11

II.   This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims ......................... 13

      A.    Plaintiffs Lack Standing for their Statutory Claims ................................. 13

      B.    This Court Lacks Jurisdiction Under the APA ......................................... 15

III.  Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to
      Congressional Procedures ..................................................................................... 17

IV.   This Court Lacks Jurisdiction Under the Declaratory Judgment Act ................... 18

V.    Plaintiffs Fail to State a Constitutional Claim ..................................................... 19

      A.    Plaintiffs Fail to State a Separations-of-Powers Claim ........................... 19

      B.    Plaintiffs Fail to State a Tenth Amendment or Federalism Claim ........... 21

      C.    Plaintiffs Lack a Cause of Action for Their Constitutional Claims ......... 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015).................................................................................................25

*Baker v. Carr,*
  369 U.S. 186 (1962).................................................................................................18

*Bennett v. Spear,*
  520 U.S. 154 (1997).................................................................................................16

*California v. Texas,*
  593 U.S. 659 (2021).................................................................................................15

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene,*
  529 F. Supp. 2d 1151 (E.D. Cal. 2007) ................................................................. 24

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
  598 F.3d 1115 (9th Cir. 2010) ...............................................................................10

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,*
  482 F.3d 1157 (9th Cir. 2007).......................................................................... 17, 18

*Corrie v. Caterpillar, Inc.,*
  503 F.3d 974 (9th Cir. 2007) ..................................................................................18

*County of San Diego v. Nielsen,*
  465 F. Supp. 3d 1073 (S.D. Cal. 2020) ..................................................................16

*Ctr. for Biological Diversity v. Bernhardt,*
  946 F.3d 553 (9th Cir. 2019)..................................... 2, 5, 11, 12, 13, 18, 19, 20

*Dalton v. Specter,*
  511 U.S. 462 (1994).................................................................................................16

*Daniels-Hall v. Nat'l Educ. Ass'n,*
  629 F.3d 992 (9th Cir. 2010) .................................................................................. 8

*DeVillier v. Texas,*
  601 U.S. 285 (2024).................................................................................................25

*Diamond Alt. Energy, LLC v. EPA,*
  606 U.S. 100 (2025) ...................................................................................... 1, 6, 13

*Foster v. USDA,*
  68 F.4th 372 (8th Cir. 2023) ..................................................................................11

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992).................................................................................................16

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
   508 F. Supp. 2d 295 (D. Vt. 2007) ........................................................................ 24

*Havasupai Tribe v. Provencio,*
   906 F.3d 1155 (9th Cir. 2018) ........................................................................ 15

*Idaho Watersheds Project v. Hahn,*
   307 F.3d 815 (9th Cir. 2002) ........................................................................ 16

*INS v. Chadha,*
   462 U.S. 919 (1983) ........................................................................ 15

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
   478 U.S. 221 (1986) ........................................................................ 18

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior,*
   971 F.3d 1222 (10th Cir. 2020) ........................................................................ 11

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ........................................................................ 10

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) ........................................................................ 11

*Leite v. Crane Co.,*
   749 F.3d 1117 (9th Cir. 2014) ........................................................................ 11

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 14

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
   521 F.3d 1097 (9th Cir. 2008) ........................................................................ 11

*Mistretta v. United States,*
   488 U.S. 361 (1989) ........................................................................ 21

*Montanans for Multiple Use v. Barbouletos,*
   568 F.3d 225 (D.C. Cir. 2009) ........................................................................ 11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA,*
   627 F.2d 1095 (D.C. Cir. 1979) ........................................................................ 3

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ........................................................................ 10, 13, 14

*NRC v. Texas,*
   605 U.S. 665 (2025) ........................................................................ 17

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
   557 U.S. 193 (2009) ........................................................................ 22

*Polich v. Burlington Northern, Inc.,*
   942 F.2d 1467 (9th Cir. 1991) ........................................................................ 11

*Robertson v. Seattle Audubon Soc'y*,
    503 U.S. 429 (1992) .................................................................................................. 19

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    339 U.S. 667 (1950) .................................................................................................. 19

*Smith v. L.A. Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) ...................................................................................... 8

*South Carolina v. Baker*,
    485 U.S. 505 (1988) ............................................................................................21, 22

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1998) .................................................................................................... 15

*United States v. Ballin*,
    144 U.S. 1 (1892) ...............................................................................15, 17, 18, 20

*United States v. Fla. E. Coast Ry. Co.*,
    410 U.S. 224 (1973) .................................................................................................. 13

*United States v. Texas*,
    599 U.S. 670 (2023) .................................................................................................. 15

*Utah v. Strieff*,
    579 U.S. 232 (2016) .................................................................................................. 15

*Wash. All. of Tech. Workers v. United States*,
    892 F.3d 332 (D.C. Cir. 2018) .................................................................................. 11

*Webster v. Doe*,
    486 U.S. 592 (1988) .................................................................................................. 12

*Yesler Terrace Cmty. Council v. Cisneros*,
    37 F.3d 442 (9th Cir. 1994) ...............................................................................23, 24

**Constitution**

U.S. Const. art. I, § 1 .................................................................................................. 14

U.S. Const. art. I, § 5, cl. 2 ........................................................................... 2, 17, 25

U.S. Const. art. I, § 7, cl. 2–3 ................................................................................... 14

**Statutes**

5 U.S.C. § 551(4) ......................................................................................................... 6

5 U.S.C. § 551(6) ......................................................................................................... 6

5 U.S.C. § 551(8) ......................................................................................................... 6

5 U.S.C. § 701(a)(1) ................................................................................................16

5 U.S.C. § 704 ........................................................................................................15

5 U.S.C. §§ 801–808 ................................................................................................5

5 U.S.C. § 801 ........................................................................................................ 22

5 U.S.C. § 801(a)(1)(A) ......................................................................................6, 12

5 U.S.C. § 801(a)(1)(A)(ii) ....................................................................................12

5 U.S.C. § 801(a)(3)(B) ..........................................................................................12

5 U.S.C. § 801(b) ......................................................................................................5

5 U.S.C. § 801(b)(1) ................................................................................................12

5 U.S.C. § 802 ........................................................................................................12

5 U.S.C. § 802(a) ......................................................................................................6

5 U.S.C. § 802(d) ......................................................................................................6

5 U.S.C. § 804(3) ..............................................................................................6, 12

5 U.S.C. § 805 ..............................................................................................2, 11, 12

42 U.S.C. § 7507 ..............................................................................................3, 24

42 U.S.C. § 7507(2) ................................................................................................23

42 U.S.C. § 7521(a) ..................................................................................................3

42 U.S.C. § 7521(a)(2) ......................................................................................23, 24

42 U.S.C. § 7543(a) ..............................................................................................3, 4

42 U.S.C. § 7543(b) ..................................................................................................3

42 U.S.C. § 7543(b)(1)(C) ..................................................................................23, 24

42 U.S.C. § 7543(b)(3) ........................................................................................... 24

Pub. L. No. 104-121, 110 Stat. 847 (1996) ..............................................................5

Pub. L. No. 119-15, 139 Stat. 65 (2025) ..........................................................8, 12

Pub. L. No. 119-16, 139 Stat. 66 (2025) ..........................................................8, 12

Pub. L. No. 119-17, 139 Stat. 67 (2025) ..........................................................8, 12

## Congressional Sources

170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024)...........................................................................7, 23

171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) ...............................................................................7

171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) ..............................................................................7

171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) .............................................................................7

171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) ............................................................................7

*Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3 ......................................................................... 8

*Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U ........................................................................... 8


## Regulations

88 Fed. Reg. 20,688 (Apr. 6, 2023).............................................................................................. 4, 24

90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................................................................ 4

90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................................................................ 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(C) ...................................................................................... 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(D) ...................................................................................... 4

Cal. Code Regs. tit. 13, § 1962.4 ...................................................................................................... 3

Cal. Code Regs. tit. 13, § 1963.1 ...................................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.2 ...................................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.6(a) .................................................................................................. 4

Cal. Code Regs. tit. 13, § 2016 ......................................................................................................... 4


## Court Rules

Fed. R. Civ. P. 12(b)(1) .......................................................................................................... 1, 10, 11

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 1, 10, 11, 16, 19

Fed. R. Evid. 201(b)(2) ...................................................................................................................... 8

Fed. R. Evid. 902(1) .......................................................................................................................... 8

N.D. Cal. Civ. R. 7-2 ......................................................................................................................... 1

**Other Authorities**

Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014) ............................................................. 6

All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ............................................5

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8 ................................................................................ 4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN ..................................................... 4

CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08* (Aug. 25, 2025), https://perma.cc/ES5W-EK72 ................................................................13

GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* (May 29, 2014) ...........................................................................7, 20

GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38* (Nov. 30, 2018) ......................................7

GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121* (Oct. 31, 2023)..........................23

George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN ........................................................................14

Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C................................................................3

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW .......................................................5

Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* (updated Nov. 12, 2021) .....................................................................................7, 21

Richard H. Fallon, Jr. et al. *Hart & Wechsler's The Federal Courts and the Federal System* (7th ed. 2015).............................................................................19

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on _____ ___, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (4th Floor) of the above-named Court (Hon. Haywood S. Gilliam, Jr. presiding), located at 1301 Clay Street, Oakland, California 94612, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Intervenor-Defendants") will, and hereby do, move to dismiss Plaintiffs' amended complaint, ECF No. 157, in its entirety and with prejudice, as described below.

## MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Civil Local Rule 7-2, Intervenor-Defendants respectfully move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. This Motion is supported by the following Memorandum of Points and Authorities, the attached document that is properly the subject of judicial notice, and any argument that may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Congress passed a legislative repeal of waivers of Clean Air Act preemption issued by the Environmental Protection Agency ("EPA") for three California programs designed to ban or limit the sale of new internal-combustion vehicles. The President signed those repeals into law. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025). California and the ten other States that joined this amended complaint ("Plaintiffs") do not like this legislation. Having failed to persuade Congress, they ask this Court to repeal those laws by judicial decree.

To call this a reach is an understatement. Plaintiffs' amended complaint alleges a wide variety of legal theories, but at bottom Plaintiffs argue that this legislation is void because the Senate allowed the votes to proceed with the approval of a simple majority of Senators, rather than the three-

fifths that Senate filibuster rules sometimes require. But the filibuster is not part of the Constitu-tion, there is no private right to enforce it, and there is nothing more exclusively within the Legis-lative Branch's authority than "determin[ing] the Rules of its Proceedings." U.S. Const. art. 1, § 5, cl. 2. Allowing courts to second guess those determinations would make federal judges arbiters of those parliamentary procedures—a separation-of-powers nightmare. This is why the Congres-sional Review Act ("CRA")—the law that codifies the procedures Congress followed here—pro-vides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. As the Ninth Circuit has held, this forecloses judicial review of challenges like those Plaintiffs raise here. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560–64 (9th Cir. 2019). This Court also lacks jurisdiction over Plaintiffs' claims for multiple other reasons, including: Plaintiffs lack standing for their statutory claims, review is unavailable under the Administrative Procedure Act ("APA"), and this Court lacks authority to review challenges to congressional procedure. And, in any event, Plaintiffs' constitutional challenges fail to state a cognizable claim or cite a viable cause of action. This Court should dismiss.

## STATEMENT OF ISSUES

1.  Whether the Congressional Review Act bars judicial review of Plaintiffs' claims.

2.  Whether Plaintiffs lack standing for their statutory claims because their alleged injuries result from Acts of Congress, not from EPA's actions, and the requested relief would not redress their alleged injuries.

3.  Whether this Court lacks jurisdiction under the Administrative Procedure Act because the chal-lenged EPA actions are not "final agency action."

4.  Whether Plaintiffs' constitutional claims are a non-justiciable challenge to House and Senate procedures.

5.  Whether the Declaratory Judgment Act fails to provide an independent basis for jurisdiction.

6.  Whether Plaintiffs' constitutional claims fail to state a legally cognizable claim or invoke a rec-ognized cause of action.

///

///

**BACKGROUND**

## I.    The Clean Air Act Broadly Preempts State Regulation of Motor Vehicle Emissions

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions from the Nation's new motor vehicles. 42 U.S.C. § 7521(a). The Clean Air Act also broadly preempts state law regulating new motor vehicle emissions. Section 209(a) provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* § 7543(a). Preemption prevents "an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

The Clean Air Act allows one limited exception from federal preemption. Section 209(b) provides that EPA "shall … waive application of [preemption] to" California—and only California—if certain statutory criteria are met. 42 U.S.C. § 7543(b). Once California has a waiver, other states may follow. Under Section 177, "[n]otwithstanding" Section 209(a), other states "may adopt and enforce" emissions standards for new motor vehicles that are "identical to the California standards for which a waiver has been granted," provided that "California and such State adopt such standards at least two years before commencement of [the applicable] model year." *Id.* § 7507.

## II.    EPA Issues Waivers of Clean Air Act Preemption For Three California Programs

In 2020, in a misguided effort to address "the climate change crisis," California Governor Gavin Newsom announced a policy to ban new internal-combustion vehicles and replace them with "zero-emission" vehicles (i.e., battery-electric or fuel-cell-electric vehicles). *See* Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C. Over the next several years, California adopted several regulatory programs under this policy, three of which are relevant to this suit.

*First*, **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet; by model year 2035, all cars and light trucks sold must be electric. Up to 20% of the required electric sales may be plug-in hybrid electric vehicles. *See* Cal. Code Regs. tit. 13, § 1962.4.

*Second*, **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. *See id.* §§ 1963.1, 1963.2.[1]

*Third*, the **Omnibus Low NO$_x$ ("Omnibus") Program**, among other things, sets emissions standards for nitrogen oxides ("NO$_x$") for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to sell some electric vehicles and engines to comply. *See id.* § 1956.8(a)(2)(C), (D).[2]

As California recognized, these programs "relat[e] to the control of emissions from new motor vehicles" and are preempted by Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Therefore California requested waivers from EPA. The Biden EPA issued a waiver for ACT in April 2023, 88 Fed. Reg. 20,688 (Apr. 6, 2023),[3] and waivers for ACC II and the Omnibus Program in January 2025, just weeks before President Biden left office. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Eleven other states and the District of Columbia have adopted one or more of the programs under Section 177 of the Clean Air Act.[4]

---

[1] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion vehicles starting in model year 2036. Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and so it remains preempted by Section 209. 42 U.S.C. § 7543(a).

[2] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program are "intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

[3] The April 2023 waiver also waived preemption for three other California programs: the Zero-Emission Airport Shuttle, Zero-Emission Power Train Certification, and Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance programs. 88 Fed. Reg. at 20,688.

[4] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

### III.   Congress Repeals EPA's Waivers of Clean Air Act Preemption

Many members of Congress were dismayed by EPA's waivers, which greenlighted a ban on sales of new internal-combustion cars and light trucks in about 30% of the U.S. market by 2035,[5] recognizing that the ban could be catastrophic for the U.S. economy. Electric vehicles are far more expensive to manufacture (and so to purchase) than internal-combustion vehicles; their range is far shorter; and most of the country lacks sufficient infrastructure to charge them. Automakers warned that it would "take a miracle" for manufacturers to meet ACC II's car standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[6] California's truck regulations could be even more devastating. The limited range and payload of electric trucks would increase the cost of transporting everyday goods and raise prices, while the limited availability of compliant heavy-duty engine technology was already threatening supply disruptions.[7] Rather than await a recission by the Trump EPA, which would invariably be challenged in court and could be reversed by a future EPA, Congress opted for legislation to fully and finally settle the undeniable "major question" of whether EPA can mandate electrification and ban the internal combustion engine.

Specifically, Congress used the Congressional Review Act. Enacted in 1996, the CRA provides a set of expedited legislative procedures by which Congress may review, and ultimately disapprove, rules issued by federal agencies. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996), *codified at* 5 U.S.C. §§ 801–808. If Congress passes and the President signs a "joint resolution" of disapproval, then the rule "shall not take effect (or continue)," and the rule "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after the date of the joint resolution." 5 U.S.C. § 801(b). The joint resolution is federal law, enacted in accordance with the constitutional requirements of bicameralism and presentment. *Ctr. for Biological Diversity*, 946

---

[5] All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* 2 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

[6] *Id.* at 3, 8.

[7] *See* Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

F.3d at 562 & n.6 (citing U.S. Const. art. I, §§ 1, 7); *accord Diamond Alt. Energy*, 606 U.S. at 107 n.1. One feature of the CRA is that joint resolutions are put on a legislative fast track that is exempt from the Senate's ordinary filibuster rule and that limits the motions that Senators may raise. 5 U.S.C. § 802(d). Although Congress chose to codify an exception to the filibuster in the CRA, no law—let alone the Constitution—*compels* the Senate follow a filibuster rule for *any* legislation, whether or not the CRA applies. *See generally* Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014).

CRA procedures are typically triggered by an agency's transmission of a rule to Congress. The CRA requires federal agencies to "submit to each House of the Congress and to the Comptroller General" each rule it promulgates, along with a report that includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). Once the rule is received, Congress generally has 60 days to introduce a joint resolution. *Id.* § 802(a).

But federal agencies need not submit every agency action because not every agency action is a "rule." The CRA defines that term by reference to the Administrative Procedure Act, *id.* § 804(3), which, in turn, defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). A "rule" is distinguished from an "order," which the APA separately defines as the "final disposition … of an agency in a matter other than rule making but including licensing," *id.* § 551(6), where a "license" is defined as "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission," *id.* § 551(8). Finally, the CRA restricts its application to exclude "any rule of particular applicability"—like ratemaking proceedings—and rules related to internal agency organization or management. *Id.* § 804(3).

Sometimes, an agency fails to submit a rule to Congress. In those circumstances, Congress has established an informal, ad-hoc process by which any member of Congress may ask the Government Accountability Office ("GAO") for an opinion on whether the agency action is a "rule" under the CRA. If GAO concludes the action is a "rule," Congress has by parliamentary convention typically deferred to that determination and treated publication of GAO's opinion in the ///

*Congressional Record* as constructive submission that starts the CRA's 60-day clock.[8] GAO's informal role, however, is entirely by custom. The CRA gives GAO no authority to determine whether an agency action is a "rule," and GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to *Congress* to decide whether CRA would apply." GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (May 29, 2014) (emphasis added) ("GAO Letter B-325553").

Moreover, the ad-hoc practice of consulting GAO applies *only when an agency has not submitted a rule* to Congress. GAO has explained that when an agency submits a rule—even if the agency "believes [the action] is exempt from the CRA" and submits it merely "out of an abundance of caution"—GAO will "take no position on whether the [submitted action] is a rule" because "an opinion by GAO would not further the purposes of [the] CRA by protecting Congress's CRA review and oversight authorities." GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018). In GAO's words, an agency's submission "obviates the need for a GAO opinion." *Id.* Agencies under presidents of both parties have thus submitted actions to Congress "out of an abundance of caution" without prompting a GAO response. *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696).

Initially, EPA did not submit the ACT, ACC II, and Omnibus Program waivers to Congress. Under President Trump, EPA reversed course and transmitted the waivers to Congress after EPA determined that the waivers were rules subject to the CRA.[9]

Despite EPA's determination, several Senators sought an opinion from GAO on whether the submitted waivers were "rules" under the CRA. Am. Complaint, Ex. B at 1 n.2, ECF No. 157-2. Breaking with past practice, GAO provided a substantive response, and did so in just a few days. GAO acknowledged the circumstances were "not one in which [it] normally issue[s] a legal

---

[8] *See* Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 12–13 (updated Nov. 12, 2021).

[9] *See* 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) (EC-439, EC-440, EC-441); 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) (EC-484, EC-485, EC-486); 171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) (EC-518, EC-519, EC-520); 171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) (EC-660, EC-661, EC-662).

decision." *Id.* at 1. But GAO went on to offer "[o]bservations" "to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures." *Id.* at 1, 9. Invoking its prior analysis of a different EPA action (the withdrawal of a waiver rescission), GAO concluded that the waivers were "not … rule[s] for purposes of [the] CRA because [they are] order[s] under [the] APA." *Id.* at 9.

Congress considered these arguments and ultimately disagreed with GAO's analysis and rejected GAO's unprecedented attempt to insert itself into the process. In early April 2025, resolutions of disapproval for all three waivers were introduced in the House (the "Resolutions"). By May 1, the House had passed all three Resolutions with bipartisan majorities, including 35 Democratic House members who voted to repeal the ACC II waiver, *Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3. Following CRA procedures, the Senate moved to consider the three Resolutions by majority—not supermajority—vote. On May 22, the Senate voted to adopt all three, with bipartisan disapproval of the ACC II waiver. *Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U. On June 12, President Trump signed the Resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

Congress had good reason to agree with EPA's determination that the waivers are "rules" under the CRA, and to discredit GAO's "observations." Although not required to provide an explanation, the Executive Branch set forth its objections to GAO's analysis in a June 18, 2025 letter from the Director of the Office of Management and Budget ("OMB") to the GAO Comptroller General. *See* Ex. 1 (reproducing letter).[10] OMB is home to the Office of Information and Regulatory

---

[10] The existence and contents of this letter are properly subject to judicial notice under Federal Rule of Evidence 201(b)(2) as facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The letter is an official government document publicly available through a government website. *See* https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf (last visited Nov. 13, 2025). And the letter is self-authenticating under Rule 902(1), because it is on official OMB letterhead, bears OMB's seal, and contains OMB Director Russell Vought's signature. Courts "routinely take judicial notice of letters published by the government,"
(…continued)

Affairs ("OIRA"), which is the "Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a 'major rule' within the meaning of the [CRA]," which includes "pars[ing] whether an action is a 'rule' at all." *Id.* at 1–2.

OMB explained that GAO failed to consider relevant case law, including a decision from the Ninth Circuit holding that an analogous "sub-delegation of regulatory authority to a State … is characteristic of a 'rule,' not an 'order,'" *id.* at 4–5 (citing *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)), and two federal district court decisions whose reasoning confirmed "that California waiver decisions are better classed as rules rather than as orders," *id.* at 4 (citing *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007), and *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007)). GAO also "overlook[ed] the most significant part of the entire statutory scheme": Section 177 of the Clean Air Act, which "allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing" and which makes waivers "nationally applicable," not "particular to California." *Id.* at 5 (cleaned up).

OMB also criticized GAO for failing to consider that a waiver "directly governs the conduct of motor-vehicle manufacturers *nationwide*," because "certification and conformance to California's alternative standards … creates a unique alternative nationwide compliance pathway … that displaces EPA's otherwise applicable federal standards." *Id.* (citing 42 U.S.C. § 7543(b)(3)). Therefore, like a rule, a waiver "creat[es] a new interstate regulator that can replace federal standards … across numerous States." *Id.* at 5–6. OMB also found puzzling GAO's conclusion that the waiver has "'immediate effect,'" because the Clean Air Act requires that waived California standards "give motor vehicle manufacturers [years of] 'lead time'" and "at least 'two years' of lead time for other States adopting" California's standards. *Id.* at 6.

---

like this one. *Smith v. L.A. Unified Sch. Dist.,* 830 F.3d 843, 851 n.10 (9th Cir. 2016); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) ("[i]t is appropriate to take judicial notice of … information … made publicly available by government entities" where the authenticity of the information is not subject to reasonable dispute).

1   Finally, OMB disagreed with GAO's assertion that a waiver merely "involve[s] considerations

2   'of particular facts, as opposed to general policy.'" *Id.* OMB observed that in issuing a waiver, EPA

3   "considers the same policy-laden questions implicated in setting *by regulation* the prospective fed-

4   eral emission standards for motor vehicles in the first place," including whether California's pro-

5   grams "give the industry sufficient lead time to transition to 100% electric vehicles," whether "the

6   industry's compliance costs with that lead time [are] 'appropriate,'" and whether "the standards

7   [are] 'technologically feasible.'" *Id.*

8   Although OMB agreed with EPA that the waivers are "rules" subject to the CRA, it recognized

9   that the ultimate decision fell elsewhere: "Congress … is optimally positioned to *decide for itself*

10  when to put rules submitted to it to CRA votes…. *That is the path that best affords Congress its con-*

11  *stitutional role of ensuring representative democracy in our Republic.*" *Id.* at 7.

12  **IV.  Procedural History**

13  Within hours of the President's signing the Resolutions, Plaintiffs filed this suit. Complaint,

14  ECF No. 1. Weeks later, Intervenor-Defendants moved to intervene. ECF No. 49. After the

15  United States filed a motion to dismiss, ECF No. 118, Plaintiffs amended their complaint, Am.

16  Complaint, ECF No. 157. In their amended complaint, Plaintiffs allege statutory and constitutional

17  violations by EPA and its Administrator, non-party Congress, and the President. Plaintiffs ask this

18  Court, among other things, to declare that the CRA does not apply to the waivers, to vacate EPA's

19  "reclassification" of the waivers and enjoin EPA from "reclassify[ing]" other waivers, to "declare

20  that the Resolutions were not enacted under the CRA," to declare the Resolutions void, and to

21  enjoin EPA from enforcing the Resolutions. Am. Complaint at 44.

22                                      **ARGUMENT**

23  A court must dismiss a claim under Rule 12(b)(1) when it lacks jurisdiction over the subject

24  matter of a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "The

25  party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chan-*

26  *dler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). This includes standing,

27  which "plaintiffs must demonstrate … for each claim that they press … and for each form of relief

28  that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A court must dismiss a claim under

Rule 12(b)(6) "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). At the motion-to-dismiss stage, "factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (cleaned up) (Rule 12(b)(6)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (Rule 12(b)(1) facial challenge). "Conclusory allegations of law," however, "are insufficient to defeat a motion to dismiss." *Lee*, 250 F.3d at 679.

Plaintiffs' amended complaint should be dismissed with prejudice under Rules 12(b)(1) and 12(b)(6). *See Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (dismissal with prejudice is proper where "the complaint c[annot] be saved by any amendment").

## I.    The Congressional Review Act Prohibits Judicial Review

Congress has expressly withheld subject matter jurisdiction over Plaintiffs' claims in this suit. Section 805 of the CRA is unambiguous and expansive: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Although Plaintiffs amended their claims to avoid expressly invoking the CRA, their suit remains no more—and no less—than a challenge to the political branches' use of the CRA to enact Resolutions repealing EPA's waivers. As a result, judicial review of the suit in its entirety is barred by Section 805. *Ctr. for Biological Diversity*, 946 F.3d at 563.

"'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020). Section 805 does not distinguish among actors, and therefore includes actions or omissions "by agencies, the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) (Section 805 bars review of agency action or omission), *vacated on other grounds*, 144 S. Ct 2707 (2024) (mem.); *Wash. All. of Tech. Workers v. United States*, 892 F.3d 332, 346 (D.C. Cir. 2018) (same); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (same). The CRA requires, *inter alia*, that federal agencies "submit to each House of the Congress and to the Comptroller General a report" for each "rule," which includes "a concise general

statement relating to the rule."5 U.S.C. § 801(a)(1)(A). That submission necessarily requires agencies to determine what actions are "rules" under the CRA. *See id.* § 804(3). The CRA then provides procedures for consideration of joint resolutions disapproving of rules, *id.* § 802, which necessarily requires that Congress first determine a resolution is eligible for those procedures. The CRA provides that a joint resolution adopted by Congress and signed by the President has the effect that the "rule shall not take effect (or continue)," *id.* § 801(b)(1), and it specifies when the rule takes effect if the President vetoes the resolution, *id.* § 801(a)(3)(B).

*All* of the actions that Plaintiffs challenge were taken "under" the CRA and so fall squarely within Section 805's prohibition. This includes EPA's characterization of waivers as "rules"; EPA's submission of the waivers to Congress; EPA's alleged failure to explain its reasoning in the "concise general statement relating to the rule," *id.* § 801(a)(1)(A)(ii); Congress's decision to consider the Resolutions under the CRA's expedited procedures; Congress's adoption of the Resolutions; and the President's decision to sign those Resolutions. Section 805 also precludes this Court from "declar[ing] that the Resolutions were not enacted under the CRA," as Plaintiffs request. Am. Complaint at 44; *see also id.* at 43, ¶ 184 (Count VI). Congress expressly stated that each Resolution was adopted pursuant to the CRA. Pub. L. No. 119-15, 139 Stat. at 65 ("Providing congressional disapproval under chapter 8 of title 5, United States Code"); Pub. L. No. 119-16, 139 Stat. at 66 (same); Pub. L. No. 119-17, 139 Stat. at 67 (same). That, too, is a "determination" beyond this Court's review. 5 U.S.C. § 805.

Section 805's bar on review applies equally to Plaintiffs' statutory and "constitutional" claims. *Ctr. for Biological Diversity*, 946 F.3d at 561 ("On its face, this language bars judicial review of all challenges to actions under the CRA, including constitutional challenges."). Despite the provision's clear and unambiguous text, the Ninth Circuit has held that courts may nevertheless consider some constitutional claims related to the CRA. *Id.* Even if correct, that exception does not apply to Plaintiffs' claims, which do not challenge the constitutionality of the CRA itself, but invoke far-fetched theories to cloak ordinary statutory challenges in constitutional language. *See infra* Section V (pp. 19–25); *cf. Webster v. Doe*, 486 U.S. 592, 603 (1988) (exception to prohibition on judicial review applies to protect "colorable constitutional claims"). Plaintiffs cannot slap a

constitutional label on their claims to evade the CRA's jurisdiction bar.

Congress withheld review of actions under the CRA for good reason. CRA resolutions are "legislation." *Diamond Alt. Energy*, 606 U.S. 107 n.1. Allowing courts to second-guess Congress's determination of what qualifies as a "rule" or other aspects of the CRA process would enable the judicial branch to override Congress's establishment of its own lawmaking procedures, raising serious separation-of-powers concerns. *See infra* Section III (pp. 17–18). It would also add significant uncertainty: "the line dividing" a rule from an order is "not always … a bright one." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Allowing judicial second-guessing would turn what is intended to be an expedited process for curtailing agency overreach into a protracted legal battle, leaving the status of a duly enacted law in limbo for months or years as litigation plays out. That is precisely what has happened here—complete with California making repeated threats of retroactive enforcement. *See, e.g.*, CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08*, at 3 (Aug. 25, 2025), https://perma.cc/ES5W-EK72. Congress not only acted well within its authority by withholding judicial review for suits like this one, *Ctr. for Biological Diversity*, 946 F.3d at 563, it also acted wisely.

## II.    This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims

### A.  Plaintiffs Lack Standing for their Statutory Claims

Plaintiffs also lack standing for their statutory claims (Counts I, II, and VI). Counts I and II allege that EPA's characterization of the waivers as "rules" and subsequent submission of the waivers to Congress were unlawful under the APA or outside EPA's statutory authority, and so somehow tainted the Resolutions passed by Congress and signed by the President. Am. Complaint at 31–36, ¶¶ 123–138, 143–145. Count VI invokes the Declaratory Judgment Act to request, "[i]n the event the Resolutions remain in effect despite [their] other claims," a declaration that "the Resolutions were not enacted under the CRA." *Id.* at 43, ¶ 184. Plaintiffs, however, lack standing to bring these claims because their alleged injury (i) is not traceable to EPA's actions and (ii) will not be redressed by relief directed to EPA's actions or by the requested declaration.

To establish standing, Plaintiffs "must show that [they] ha[ve] suffered … [1] an injury that is … [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Murthy*,

603 U.S. at 57 (internal quotation marks omitted). Plaintiffs allege they are injured because they are "prevent[ed] … from enforcing laws they have chosen to adopt within their jurisdictions." Am. Complaint at 2, ¶ 5. That injury, however, does not result from the challenged EPA actions, but from Congress, which is not a party to this case, exercising its Article I authority to enact legislation nullifying EPA's prior Clean Air Act waivers, and from the President's signing of that legislation. *See* U.S. Const. art. I, §§ 1, 7 cl. 2–3. These legislative acts, not any action by EPA, repealed the Clean Air Act waivers at issue and triggered preemption under Section 209(a).

This "exercise [of] independent judgment" by Congress and the President severs any causal chain to EPA. *Murthy*, 603 U.S. at 60. Congress was not obligated to accept EPA's characterization of the waivers as rules or to pass Resolutions of disapproval once the waivers were submitted. Most rules that agencies submit under the CRA never make it to the floor of either House.[11] And Congress has the prerogative to act under the CRA even when an agency doesn't submit an action. *See supra* Section III (pp. 5–7). Nor was the President required to sign the Resolutions into law; he exercised independent judgment in doing so. These "unfettered choices made by independent actors" extinguish any link between the challenged EPA actions and Plaintiffs' alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Nor can Plaintiffs manufacture injury by speculating that EPA might, at some indeterminate time in the future, submit another unidentified waiver to Congress under the CRA. Am. Complaint at 29–31, ¶¶ 114–119. As explained, Plaintiffs aren't injured by EPA's submissions, so whether any new submission occurs is irrelevant. In any event, Plaintiffs do not plead any facts showing a new submission is likely. But even if they had, their theory of injury depends entirely on Congress passing new legislation and the President signing it. As recent events have demonstrated, few things are more speculative than a belief that Congress will pass new legislation.

Plaintiffs' alleged injury also will not be redressed "by a favorable ruling" on EPA's actions, *Murthy*, 603 U.S. at 57, because a declaration or order related to *EPA's actions* would not render

---

[11] *See* George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN.

1    the *Resolutions* unenforceable. The Resolutions were enacted "in conformity with the express pro-

2    cedures of the Constitution's prescription for legislative action: passage by a majority of both

3    Houses and presentment to the President." *INS v. Chadha*, 462 U.S. 919, 958 (1983); *see also*

4    *United States v. Ballin*, 144 U.S. 1, 6 (1892) (under the "federal constitution," "the act of a majority

5    of the quorum is the act of the body"). Therefore, the Resolutions are and will remain a legitimate

6    exercise of the federal legislative power, regardless of any alleged deficiency in EPA's non-binding

7    characterization and submission. *See Chadha*, 462 U.S. at 951. Simply put: there is no "fruit of the

8    poisonous tree" doctrine for legislation. *Cf. Utah v. Strieff*, 579 U.S. 232, 237 (2016). For similar

9    reasons, a declaration that the Resolutions were not "enacted under the CRA" would provide

10   Plaintiffs no relief. Am. Complaint at 43, ¶ 184. Setting aside that this Court has no power to make

11   that determination, *see supra* Section I (pp. 11–13), such a declaration wouldn't render the chal-

12   lenged or future Resolutions unenforceable, since a constitutionally enacted law remains valid re-

13   gardless of the "CRA" label, *see infra* Section III (pp. 17–18).

14       Nor would the persuasive effect of the Court's opinion provide redress: "Whatever a court

15   may say in an opinion does no more to compel [Congress and the President] to change how they

16   exercise their [lawmaking power] than an order vacating" EPA's actions or declaring the Court's

17   opinion on the applicability of the CRA. *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch,

18   J., concurring in the judgment). Nor may Plaintiffs seek "damages" or prospective relief against

19   EPA to remedy an alleged past violation; and Plaintiffs do not "claim that they might enjoin Con-

20   gress." *California v. Texas*, 593 U.S. 659, 673 (2021); *see also Steel Co. v. Citizens for Better Env't*,

21   523 U.S. 83, 108–09 (1998) (failure to submit mandatory reports in the past did not authorize a

22   prospective injunction). A decision of the court related to EPA's actions or Congress's use of the

23   CRA "would amount to 'an advisory opinion without the possibility of any judicial relief.'" *Cali-*

24   *fornia v. Texas*, 593 U.S. at 673.

25       **B. This Court Lacks Jurisdiction Under the APA**

26       For similar reasons, the challenged EPA actions are not "final agency action," 5 U.S.C. § 704,

27   and so this Court lacks jurisdiction over Plaintiffs' APA claim, Am. Complaint at 31–35, ¶¶ 120–

28   141 (Count I). *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018) ("Final agency

1  action is a jurisdictional requirement imposed by 5 U.S.C. § 704" (cleaned up)).[12]

2      An agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmak-

3  ing process" and (2) is "one by which 'rights or obligations have been determined,' or from which

4  'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). EPA's actions do

5  not satisfy *Bennett*'s second criterion. EPA's characterization of the waivers as "rules" and subse-

6  quent submission to Congress created no right, imposed no obligation, and had no "direct conse-

7  quences" for Plaintiffs. *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Even after submission, the

8  waivers remained effective unless and until Congress passed and the President signed resolutions

9  of disapproval. Like other agency actions the Supreme Court has held are not final, EPA's charac-

10  terization and submission of the waivers were, at most, "recommendations [that] were in no way

11  binding on the President [and Congress], who had absolute discretion to accept or reject them."

12  *Bennett*, 520 U.S. at 178; *see Dalton*, 511 U.S. at 469 (Secretary of Defense's base closure recom-

13  mendations were not final because the "action that will directly affect the military bases is taken

14  by the President, when he submits his certification of approval to Congress" (cleaned up)); *Frank-

15  lin v. Massachusetts*, 505 U.S. 788, 798 (1992) (Secretary of Commerce's report of census results

16  was not final because it "serves more like a tentative recommendation" to the President, who ul-

17  timately submits a count to Congress).[13]

18      Plaintiffs also cannot evade the APA jurisdictional bar by claiming that EPA's actions were

19  "ultra vires." Am. Complaint at 35–36, ¶¶ 142–148 (Count II). The Supreme Court recently made

20  clear that the ultra vires exception "is a narrow one": it "applies only when an agency has taken

21  action entirely in excess of its delegated powers and contrary to a specific prohibition in statute,"

22  not merely when "an agency has arguably reached a conclusion which does not comport with the

---

23

24  [12] Elsewhere, the Ninth Circuit has opined that "the fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d

25  815, 830 (9th Cir. 2002). Under that approach, lack of finality is assessed under Rule 12(b)(6). *County of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1086 (S.D. Cal. 2020). Either way, Plaintiffs'

26  APA claim does not challenge final agency action and so must be dismissed.

27  [13] Section 805's prohibition of judicial review also precludes APA review of EPA's actions here. 5 U.S.C. § 701(a)(1) (APA review does not apply "to the extent that … [other] statutes preclude

28  judicial review"); *see supra* Section I (pp. 11–13).

law." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). Plaintiffs' ultra vires claim identifies no specific statutory prohibition that EPA violated, but "dress[es] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. It is therefore not subject to ultra vires review.

### III. Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to Congressional Procedures

Plaintiffs also claim that Congress's enactment of the Resolutions violates separations of powers, the Tenth Amendment, and structural principles of federalism. *See, e.g.*, Am. Complaint at 37–41, ¶¶ 149–169 (Counts III and IV). No matter how framed, these claims amount to a non-justiciable challenge to House and Senate procedures.

"The constitution empowers each house to determine its rules of proceedings." *Ballin*, 144 U.S. at 5. That power is "absolute and beyond the challenge of any other body or tribunal," subject to very narrow limitations: Congress may not "by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the … rule and the result which is sought to be attained." *Id.* "Neither … the advantages or disadvantages, the wisdom or folly, of … a rule [of Congress] present any matters for judicial consideration." *Id.* "In short, the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007).

Plaintiffs' claims asserting constitutional defects in the process of enacting the Resolutions are "question[s] of legislative procedural rules" that this Court lacks authority to review. *Id.* Plaintiffs allege that Congress improperly (i) ignored the non-binding advice of GAO and the Senate Parliamentarian, Am. Complaint at 40, ¶ 163; (ii) "adopted a procedural rule" that permits Congress to apply expedited procedures to agency actions determined to be "rules" by the Executive Branch and submitted to Congress, *id.* at 38, ¶ 157; (iii) applied the CRA's procedures to the Resolutions, *id.* at 39–40, ¶ 163, and (iv) adopted the Resolutions without sufficient "debate" or "state official testimony," *id.* at 40, ¶¶ 164–165. In essence, Plaintiffs complain that the Senate chose to adopt the Resolutions without applying the filibuster and without seeking Plaintiffs' advice. But selecting the procedural rules to apply to pending legislation is a matter squarely committed to each Chamber's discretion by the Constitution. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the

1  Rules of its Proceedings[.]"). And so determining whether to apply the CRA's "accelerated pro-

2  cedure is 'an exercise of the rulemaking power of the Senate and House of Representatives, re-

3  spectively.'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)). The Consti-

4  tution provides no right to particular congressional procedures or participation. Allowing the Sen-

5  ate to vote on the Resolutions without a prior supermajority procedural vote or testimony from

6  Plaintiffs therefore violates no "constitutional restraints or … fundamental rights." *Ballin*, 144

7  U.S. at 5; *see also infra* Section V (pp. 19–25). Moreover, use of expedited procedures and limited

8  debate is "reasonabl[y] relat[ed]" to Congress's desire to expeditiously address what it viewed as

9  EPA's error in issuing the waivers. *Ballin*, 144 U.S. at 5.

10      In modern parlance, whether Congress may consider the Resolutions using CRA procedures is

11  a "political question" that "revolve[s] around policy choices and value determinations constitu-

12  tionally committed for resolution to the halls of Congress or the confines of the Executive Branch."

13  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369

14  U.S. 186, 217 (1962). The "presence of a political question deprives a court of subject matter juris-

15  diction." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

16      The political question doctrine applies with full force here. The role of establishing and apply-

17  ing procedural rules is "textually … commit[ted]" by the Constitution to each Chamber of Con-

18  gress. *Baker*, 369 U.S. at 217. A court cannot "independent[ly] resol[ve]" Plaintiffs' claims "with-

19  out expressing lack of the respect due" Congress in executing its lawmaking function or "without

20  an initial policy determination"—like whether Congress should credit GAO's non-binding (and

21  extra-statutory) observations over competing recommendations—"of a kind clearly for nonjudicial

22  discretion." *Id.* Nor would it matter if Congress had departed from its previous practice in passing

23  the Resolutions (although it did not), since "the asserted failure of Congress to comply with its

24  own procedural rules" in adopting the Resolutions "is a non-justiciable political question beyond

25  [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72.

26  **IV.   This Court Lacks Jurisdiction Under the Declaratory Judgment Act**

27      Finally, even if Plaintiffs' claim for a declaratory judgment did not fail on its own terms, *see*

28  *supra* Sections I–II.A (pp. 11–15), Plaintiffs cannot bootstrap jurisdiction by seeking declaratory

relief, *see* Am. Complaint at 43, ¶¶ 180–184 (Count VI). The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). The "existence of jurisdiction over a declaratory action" therefore "depends on the answer to a hypothetical question: … would there have been a nondeclaratory action (i) concerning the same issue, (ii) between the same parties, (iii) that itself would have been within the federal courts' subject-matter jurisdiction?" Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 841 (7th ed. 2015). Because there is no nondeclaratory action concerning the same issue over which this Court has jurisdiction, *see supra* Sections I–III (pp. 11–18), this Court lacks authority to consider Plaintiffs' claim for declaratory relief.

## V.    Plaintiffs Fail to State a Constitutional Claim

Plaintiffs' constitutional claims should also be dismissed because they fail to state a cognizable claim. Fed. R. Civ. P. 12(b)(6).

### A.    Plaintiffs Fail to State a Separations-of-Powers Claim

Plaintiffs allege that Congress violated separation of powers principles by exercising judicial power, Am. Complaint at 37–38, ¶¶ 151–154, and allowing the Executive Branch to "intru[de]" on "internal legislative procedure," *id.* at 38–39, ¶¶ 155–158 (Count III). Neither theory is plausible.

*First*, Plaintiffs claim that Congress exercised judicial power because the Resolutions "'create no new substantive law' but instead determine 'how pre-existing law applies to particular circumstances.'" *Id.* at 37, ¶ 153 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016)). But that misunderstands the Resolutions, and the CRA itself. The Resolutions *do* create new substantive law, and in so doing effectuate a new legal standard: namely, that the carveout from Clean Air Act preemption for state vehicle emissions regulations does not include ACC II, ACT, and the Omnibus Program, and substantially similar regulations. "When Congress enacts legislation that directs an agency to [rescind] a particular [action], 'Congress has amended the law.'" *Ctr. for Biological Diversity*, 946 F.3d at 562. The Resolutions thus "compelled changes in law, not findings or results under old law." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). The Resolutions are therefore "enforceable as a change to substantive law, even though [they] did not state

that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 562. And "because the [Resolutions] changed the substantive law, [they do] 'not violate the constitutional separation of powers' even though [they may] … 'chang[e] the law applicable'" to "'pending litigation.'" *Id.* (*quoting All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)).

*Second*, Plaintiffs claim that Congress improperly "allow[ed] for intrusion by, and coercive influence of, the Executive Branch on internal legislative procedure." Am. Complaint at 38–39, ¶ 157. But Plaintiffs' own account shows that both Chambers exercised their own independent judgment and applied their own rules of procedure in adopting the Resolutions under the CRA. Members of the House "introduced the Resolutions" about "a month" after GAO issued its analysis, well aware of the dispute over the waivers' characterization, *id.* at 22, 24, ¶¶ 86, 94, and "voted to adopt all three Resolutions" by majority vote, consistent with House rules, *id.* at 25, ¶ 96. Members of the Senate were also familiar with GAO's opinion, as well as with other views. *Id.* at 22–23, ¶¶ 87, 90–91. Faced with competing interpretations, a majority of the Senate agreed that rules submitted by Executive Branch agencies consistent with "Section 802 of the Congressional Review Act" should be eligible for consideration under the CRA's expedited procedures. *Id.* at 26–27, ¶ 104. The Senate then went on, by majority vote, to adopt the Resolutions. *Id.* at 29, ¶ 111. Throughout the legislative process, each Chamber of Congress—not the Executive Branch—determined how to apply its rules and procedures. Far from allowing "the Executive Branch to manipulate legislative procedure," *id.* at 38, ¶ 155, each Chamber exerted control over its own procedures to achieve the outcome it desired.

Nor does the Senate's considered decision to credit the Executive Branch's determination of which agency actions are rules give the Executive Branch "unbridled discretion to trigger" CRA procedures. *Id.* at 38, ¶ 157. The Senate remains in full control of its internal procedures and can, at any time, choose to change its procedures or disregard an Executive Branch determination under the CRA. *Ballin*, 144 U.S. at 5 (each Chamber has "a continuous power" to make its own rules); GAO Letter B-325553, *supra*, at 9 ("CRA's expedited procedure for congressional review of agency rules was enacted as an exercise of the authority of the Senate and House of Representatives

1  to set their own rules, with full recognition of the right of either House to change the rules."). In

2  any event, the Constitution does not forbid Congress from consulting the Executive Branch in de-

3  termining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he sep-

4  aration-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress

5  from obtaining the assistance of its coordinate Branches."). That is all that the Senate did here by

6  establishing a default practice that it will accept a determination by an Executive Branch agency

7  that a submitted action is a "rule" under the CRA. Individual lawmakers remain free to disagree

8  and to vote their disagreement. That is no more a violation of separation of powers than the Sen-

9  ate's long-standing practice of accepting a determination by GAO—an unelected body not men-

10  tioned in the Constitution—that an action that has not been submitted is a "rule," *see supra* Sec-

11  tion III (pp. 6–7), a practice that Plaintiffs not only do not challenge but endorse, even though it is

12  not contemplated by the CRA, *see, e.g.*, Am. Complaint at 40, ¶ 165.

13  **B. Plaintiffs Fail to State a Tenth Amendment or Federalism Claim**

14  Plaintiffs also fail to state a claim under the Tenth Amendment or federalism principles. Am.

15  Complaint at 39–41, ¶¶ 161–169 (Count IV). Plaintiffs claim that "numerous 'extraordinary de-

16  fects in the national political process'" that led to the Resolutions' enactment "render the Reso-

17  lutions 'invalid under the Tenth Amendment' and the principles of federalism embedded in the

18  Constitution's structure." *Id.* at 41, ¶ 167 (quoting *South Carolina v. Baker*, 485 U.S. 505, 512

19  (1988)). But Plaintiffs fail to identify any defects, much less "extraordinary" ones, "that might

20  lead to such invalidation." *South Carolina*, 485 U.S. at 512. "Where, as here, the national political

21  *process* did not operate in a defective manner, the Tenth Amendment is not implicated." *Id.* at 513.

22  Plaintiffs complain that Congress and the President targeted the waivers "through extraordi-

23  nary procedures." Am. Complaint at 39–40, ¶ 163. But using the CRA to invalidate an agency ac-

24  tion is hardly "extraordinary." It's been done over a dozen times since the CRA was enacted, with

25  CRA resolutions of disapproval signed by Presidents of both parties. *See* Carey & Davis, *supra*,

26  App. A (cataloging rules overturned under the CRA through Nov. 12, 2021).

27  Nor do Plaintiffs identify anything defective in the CRA's expedited procedures, themselves,

28  or in Congress's application of them here. States have no constitutional right to demand "rigorous

debate" or "state official testimony" that would "inform members of Congress about the conse-quences of their actions." Am. Complaint at 40, ¶ 164. The Supreme Court has already rejected another State's nearly identical argument that "the political process failed" where a law was "'imposed by the vote of an uninformed Congress relying upon incomplete information.'" *South Carolina*, 485 U.S. at 513. As the Court observed, nothing in "the Tenth Amendment authorizes courts to second-guess the substantive basis for congressional legislation." *Id.* That is especially so when, as here, Congress is merely curtailing its prior decision to treat one State as more equal than the others. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("federalism concerns" require that any "departure from the fundamental principle of equal sovereignty [among the states] requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets").

Plaintiffs also complain that they "had no opportunity to participate in the Executive Branch's relabeling of the waivers as 'rules' and submission of a 'report' to Congress." Am. Complaint at 40, ¶ 165. But States have no statutory role to play in an agency submission under the CRA, *see* 5 U.S.C. § 801, nor do they have any constitutional right to influence it. Plaintiffs also were not improperly "exclu[ded] and isolat[ed]" from Congress's decision to credit the Executive Branch's characterization of the waivers as rules. Am. Complaint at 40, ¶ 165. States themselves get no votes in either Chamber, of course, but the interests of their citizens were well represented. Together, citizens of the eleven Plaintiff States are represented by 22 Senators and 130 members of the House of Representatives, accounting for nearly a quarter of the Senate and about thirty percent of the House. These members of Congress participated fully in the legislative process that resulted in the enactment of the Resolutions, including in the debate leading up to the votes.[14] Plaintiff States, therefore, had all the participation they were due.

Nor is it "extraordinary," or even unusual, for an Executive Branch agency to disagree with

---

[14] *See, e.g.*, Am. Complaint, Ex. B at 1 n.2 (Rhode Island Senator Whitehouse, and California Senators Padilla and Schiff requested opinion from GAO); Am. Complaint, Ex. C at 10–16, ECF No. 157-3 (Senator Whitehouse speaking on the Senate Floor); *id.* at 17 (Senator Padilla speaking on the Senate Floor); *id.* at 18–19 (Senator Schiff speaking on the Senate Floor); *id.* at 23, 30–32 (Massachusetts Senator Markey speaking on the Senate Floor).

1  GAO about whether a particular agency action is a "rule" under the CRA. Am. Complaint at 39–
2  40, ¶ 163. Agencies often disagree with GAO's conclusions.[15] What Plaintiffs allege is a "defect"
3  is merely their disagreement with Congress's decision in this instance to side with the agency ra-
4  ther than with GAO.

5      But Congress isn't constitutionally required to defer to GAO, and Congress's decision to de-
6  part from GAO's conclusion here wasn't arbitrary. As OMB explained, there are strong reasons to
7  conclude that the waivers are "rules" of "general applicability" for purposes of the CRA. *See* Ex. 1
8  at 3–6. The Ninth Circuit has explained:

9          Two principal characteristics distinguish rulemaking from adjudication. First, ad-
10         judications resolve disputes among specific individuals in specific cases, whereas
11         rulemaking affects the rights of broad classes of unspecified individuals. Second,
12         because adjudications involve concrete disputes, they have an immediate effect on
13         specific individuals[.]… Rulemaking, in contrast, is prospective, and has a defini-
14         tive effect on individuals only after the rule subsequently is applied.

15  *Yesler*, 37 F.3d at 448 (citations omitted). The Ninth Circuit therefore held that a determination
16  by the federal Department of Housing and Urban Development ("HUD") that the state of Wash-
17  ington's Public Housing Authority could substitute state eviction procedures for federal ones in
18  federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

19     Like HUD's determination, EPA's waivers allowing Plaintiffs to substitute state emissions
20  standards for federal ones have "all the hallmarks of a rule." *Id.* at 448. The waivers "had no im-
21  mediate, concrete effect on anyone, but merely permitted" California and other states to enforce
22  state emissions standards "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable through
23  § 7543(b)(1)(C), requiring lead time for California standards); *id.* § 7507(2) (other states must
24  "adopt such standards at least two years before commencement of [the applicable] model year").

25

---

26  [15] *See, e.g.*, GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Re-
    view Act to Staff Accounting Bulletin No. 121*, at 1 (Oct. 31, 2023) (SEC staff bulletin is a rule subject
27  to the CRA, despite SEC's contrary conclusion); 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024)
    (EC-5696) (transmitting action to Congress even though "EPA disagrees with GAO[]" and "does
28  not believe that the … action[] is a 'rule'" under the CRA).

EPA waivers therefore have "prospective" rather than "immediate" effect. *Yesler*, 37 F.3d at 448. The waivers also "affected the rights of a broad category of individuals not yet identified": manufacturers who, in the future, may sell new motor vehicles in those states. *Id.*

As with HUD's determination, it doesn't matter "that the manner in which [EPA] made its decision[s] shares certain features with adjudications." *See id.* at 449. "The form of the proceeding is not dispositive; what counts is its effect." *Id.* And the effect of a waiver is that of a rule that implements "a unique alternative nationwide compliance pathway" governing conduct of manufacturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) ("compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). EPA's waiver decisions "plainly involved more than applying a rule of decision to particular facts," including weighing policy-laden considerations like the standards' technological feasibility and cost appropriateness. *Yesler*, 37 F.3d at 449; 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C)).

The waivers also are "generally," not "particularly," applicable. Once EPA issues a waiver, any other state may adopt California's standards without any additional factual showing or hearing. 42 U.S.C. § 7507. A waiver therefore imposes obligations on manufacturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA regularly concluded that waivers are "nationally applicable" or of "nationwide scope [and] effect." 88 Fed. Reg. at 20,725 (ACT waiver). Two federal district courts have agreed, opining that EPA waivers give effect to standards that are equivalent to federal regulations. *Green Mountain Chrysler*, 508 F. Supp. 2d at 347 (concluding it is "beyond serious dispute … that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation"); *Cent. Valley Chrysler-Jeep*, 529 F. Supp. 2d at 1173 (finding "no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation"). EPA and Congress were thus correct to treat the waivers as "rules" under the CRA, despite GAO's contrary conclusion.

At bottom, Plaintiffs disagree with the Senate's decision to curtail California's special treatment under the Clean Air Act without applying filibuster rules. Am. Complaint at 41, ¶ 167 (describing the Resolutions as an "end-run"). But Congress's ability to choose the procedures that it

applies to any particular legislation isn't a "defect" of the legislative process, but a feature of the constitutional design. The Senate isn't limited to using procedures to which "[a]ll of the States consented." *Contra* Am. Complaint at 40, ¶ 166. "Each House," alone, "determine[s] the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. That is all that the Senate did here when deciding to treat the waivers as "rules" under the CRA. Plaintiffs have no right to the filibuster under the Tenth Amendment or any other provision of the Constitution, even for legislation in which they have a particular interest.

Because Plaintiffs have not identified any defects in the legislative process leading to the Resolutions' enactment, much less "extraordinary" ones, Plaintiffs' Tenth Amendment claim fails.

### C.  Plaintiffs Lack a Cause of Action for Their Constitutional Claims

Finally, Plaintiffs' constitutional claims also fail because they lack a cause of action. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, *see, e.g.*, 42 U.S.C. § 1983." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted). No constitutional provision, doctrine, or statute cited by Plaintiffs provides a right to sue to challenge the internal procedures of Congress, as Plaintiffs' constitutional claims do. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015). Nor can Plaintiffs successfully invoke the "inherent equitable power" of federal courts. Am. Complaint at 41, ¶ 171 (Count V). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and the CRA's jurisdiction stripping provision announces Congress's "'intent to foreclose' [the] equitable relief" that Plaintiffs seek. *Armstrong*, 575 U.S. at 327–28; *see supra* Section I (pp. 11–13).

### CONCLUSION

For the foregoing reasons, Plaintiffs' entire amended complaint should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state any cognizable claim.

1    Dated: _____ ___, 2025          Respectfully submitted,

2                                            _____
                                             Michael Buschbacher (*pro hac vice*)
3                                            James R. Conde (*pro hac vice*)
                                             James R. Wedeking (*pro hac vice*)
4                                            Laura B. Ruppalt (*pro hac vice*)
                                             Boyden Gray PLLC
5                                            800 Connecticut Avenue NW, Suite 900
                                             Washington, D.C. 20006
6                                            (202) 955-0620
                                             mbuschbacher@boydengray.com
7
                                             John B. Thomas (Bar No. 269538)
8                                            Jessica Wahl (Bar No. 321887)
                                             Hicks Thomas LLP
9                                            701 University Avenue, Suite 106
                                             Sacramento, California 95825
10                                           (916) 241-8414
                                             jthomas@hicks-thomas.com
11

12                                           *Counsel for Intervenor-Defendants*
                                             *American Free Enterprise Chamber of Commerce,*
13                                           *Illinois Corn Growers Association, Indiana Corn*
                                             *Growers Association, Iowa Corn Growers Associa-*
14                                           *tion, Kansas Corn Growers Association, Kentucky*
                                             *Corn Growers Association, Michigan Corn Growers*
15                                           *Association, Missouri Corn Growers Association,*
                                             *Nebraska Corn Growers Association, Tennessee*
16                                           *Corn Growers Association, Texas Corn Producers,*
                                             *Wisconsin Corn Growers Association, and Na-*
17                                           *tional Corn Growers Association*

18

19

20

21

22

23

24

25

26

27

28

Ex. 1



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

June 18, 2025

Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

> Re:    **Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act"**

Dear Mr. Comptroller General:

Late last month, the Senate voted in favor of three joint House resolutions (which by then had passed the House)[1] invalidating three waivers of preemption granted by EPA to California.[2] The analysis below buttresses Congress's legal conclusions ***both*** to substantively override those waivers ***and*** to deem the waivers to be rules subject to the Congressional Review Act ("CRA") in the first place.

More specifically, this letter provides the Office of Management and Budget's ("OMB's") response to a March 6, 2025 Government Accountability Office ("GAO") letter concerning application of the CRA to these three waivers. In preparing this letter, I have consulted with the Office of Information and Regulatory Affairs ("OIRA"), which has a statutorily assigned role in the CRA process and reports to me as part of OMB.

OMB strongly disagrees with GAO's analysis (styled as a set of "Observations") for numerous reasons falling into two basic categories—GAO's lack of authority in this area ***and*** GAO's flawed administrative law analysis of how to classify when an agency action is deemed a rule versus an adjudication. I turn first to the four reasons why GAO exceeded its authority:

---

[1] *See* H.J. Resolutions 87, 88, and 89, *available at* https://www.congress.gov/bill/119th-congress/house-joint-resolution/87; https://www.congress.gov/bill/119th-congress/house-joint-resolution/88; and https://www.congress.gov/bill/119th-congress/house-joint-resolution/89 (last visited June 17, 2025).
[2] *See* 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 642 (Jan. 6, 2025); 68 Fed. Reg. 20,688 (Apr. 6, 2023).

## I.  GAO'S LACK OF POWER IN THIS AREA

*First, GAO has no legal role whatsoever* in deciding whether an action the Executive Branch submits to Congress for consideration under the Congressional Review Act ("CRA") is a "rule" or an "adjudication." That role is assigned instead to the Administrator of OIRA (see below for additional details) and ultimately Congress.

*Second, GAO also has no expertise in this area,* whereas OIRA routinely reviews federal actions to determine their character, consistency with law, and whether they meet the basic tests of rationality, such as producing net benefits or net costs, and at what level. *See Michigan v. EPA,* 576 U.S. 743, 750 (2015); *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). When performing zone-of-interests analysis, for instance, the Supreme Court considers agency expertise to be a relevant prudential factor.[3] Just so here. As a prudential matter, GAO's non-expert Observations were properly not be credited by Congress and should not be in the future because GAO lacks expertise in this area, being an agency with a different assigned role.

*Third,* GAO has reached the opposite conclusion in the past. Indeed, as Comptroller, you *conceded* both the lack of a GAO role here and that GAO's Observations took an unprecedented legal position when being questioned recently by Representatives Valadao (CA) and Moore (WV).[4]

*Fourth, and worst of all, GAO's "Observations" functionally attempt to interfere with the democratic process.* Members of Congress should decide for themselves whether to apply the CRA to a particular action of the Executive Branch, not GAO. If Congress had wanted GAO to have a gatekeeping role over application of the CRA, Congress would have said so in clear terms. The silence in the statute on this point is telling. And Congress's enactment of the joint resolutions of disapproval represents an express rejection of GAO's actions.

\* \* \* \* \*

OIRA is the Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a "major rule" within the meaning of the Congressional Review Act ("CRA" or "the Act"). *See* 5 U.S.C. § 804(2). Part of that role is to parse whether an action is a "rule" at all. Given this statutory role and based as well on OIRA's experience, I explain in detail below OMB's affirmative determination that the waivers are "rules" subject to the CRA.

As GAO notes, in granting those waivers, the prior Administration summarily asserted that the actions at issue are not subject to the Act. But following the change in Administration, EPA's new Administrator reassessed the agency's evaluation and

---

[3] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 226–27 (2012) (considering Department of Interior regulations when resolving a zone-of-interests dispute); *Federal Defenders of N.Y. v. Federal Bureau of Prisons,* 954 F.3d 118, 130 (2d Cir. 2020) (same as to federal BOP regulations). Zone-of-interests analysis constitutes a prudential jurisdictional analysis. *See Bennett v. Spear,* 520 U.S. 154, 162 (1994). We argue by analogy here that GAO lacks the congressional equivalent of jurisdiction over the CRA question at issue.
[4] *See* Hearing Before the House Committee on Appropriations, Subcommittee on the Legislative Branch, 119th Congress (Apr. 7, 2025), *available at* http://appropriations.house.gov/schedule/hearings/budget-hearing-government-accountability-office-congressional-budget-office-and (last visited June 17, 2025).

concluded that the waivers are best characterized as rules of general applicability within the meaning of the Act.[5]

Like Congress, OMB agrees with EPA Administrator Zeldin that the waivers are rules of general applicability subject to the CRA. And regardless, even if the question were close (which it is not), it was prudent for the EPA Administrator to submit the waivers to Congress out of an abundance of caution and out of deference to Congress's role in our constitutional Republic. This common agency practice obviates any advisory role for GAO.[6] Indeed, EPA has previously sent a prior action revoking a Clean Air Act preemption provision to Congress and that action remains listed on GAO's own website as a "final rule."[7]

OMB therefore believes that no additional information was necessary for Congress to discharge its legislative role, or for GAO to discharge its *ad hoc* advisory role. As GAO through a prior general counsel once testified before the Senate, the Act does not give GAO power "to decide what a rule is."[8] As GAO further explained in its March 6, 2025 letter concerning these waivers, *see* B-337179, GAO does not even "normally issue a legal decision" when an agency submits an action for review. *Id.* at 1. Indeed, OMB is unaware of GAO ever doing so before now. *See also supra* n.4.

As GAO notes in its letter to congressional requesters, "GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under the CRA because that submission generally obviates the need for a GAO decision on the matter." *Id.* at 1 n.3.[9] Hence, that should have marked the conclusion of GAO's involvement.

In its March informal letter to congressional requesters, however, GAO nevertheless departed from its longstanding practice and opined (albeit informally) that the submitted waivers were not rules of general applicability, citing a prior GAO opinion about a different waiver and claiming that the same legal analysis would apply to these three submitted waivers. *See* B-337179 at 7. GAO also claims that EPA has not explained

---

[5]    "The Biden Administration failed to send rules on California's waivers to Congress, ***preventing Members of Congress from deciding on extremely consequential actions that have massive impacts and costs across the entire United States.*** The Trump EPA is transparently correcting this wrong and rightly following the rule of law," said Administrator Zeldin.

EPA, Press Release, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (Feb. 14, 2025), *available at* https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting (last visited June 17, 2025) (emphasis added). GAO's footnote 15 in its Observations simply reflects the prior Administration's attempt to sidestep CRA review of California waiver decisions, relying on Biden-era EPA *Federal Register* notice from 2023 and a so-called "midnight" rule issued on January 6, 2025—precisely the kind of rule that the CRA was especially designed to place under Congress's watchful eye.

The position we take here is also consistent with that of the Small Business Administration's Office of Advocacy. *See* Advocacy Submits Comments on EPA Waiver Request for California Locomotive Regulation (Apr. 23, 2024), *available at* https://advocacy.sba.gov/2024/04/23/advocacy-submits-comments-on-epa-waiver-request-for-california-locomotive-regulation/ (last visited June 17, 2025) ("The Clean Air Act allows other states to implement California's standards once they are finalized. Advocacy is concerned that the ability of other states to potentially implement the In-Use Locomotive Rule ***turns a state regulation into a de facto national regulation***. Advocacy is concerned that California's proposed rule will disproportionately harm small locomotives [and] small businesses nationwide who rely on the country's rail system.") (emphasis added).

[6] *See, e.g.,* EC-5696, 170 Cong. Rec. S5883 (Sept. 9, 2024) (EPA "does not believe that the enclosed actions is [*sic*] a 'rule' within the meaning of 5 U.S.C. 804(3). Nevertheless, out of an abundance of caution, EPA is voluntarily submitting the action 'to each House of the Congress and the Comptroller General,' for their review under 5 U.S.C. 801(a).").

[7] *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, FRL-10000-45,* https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a "final rule.").

[8] *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. and H. Comm. On Res.,* 105th Cong. 20 (1977).

[9] *See also Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38,* B-330376 (Nov. 30, 2018).

why it disagrees with GAO. This letter provides the Executive Branch's response to GAO.

## II.  GAO'S FLAWED ADMINISTRATIVE LAW ANALYSIS

In OMB's view, GAO's opinion overlooks and misrepresents important aspects of how preemption waivers under the Clean Air Act work under Section 209(b) of that statute as a matter of administrative law.

GAO's foundational claim is that a waiver of preemption is an "order" (by which it appears to mean something like a "license" particular to California, though GAO does not actually reach that conclusion) and thus is not a "rule" of general applicability. In the alternative, GAO claims that, if the waiver is a rule, it is one of particular applicability. OMB disagrees with both of these claims for five reasons.

*First*, GAO's conclusion that the waivers are "orders" is inconsistent with judicial decisions interpreting the Administrative Procedure Act, which forms the basis for the CRA's definition of a "rule."[10] Courts have been clear that sub-delegation of regulatory authority to a State—like that accomplished through the waivers—is characteristic of a "rule," not an "order." The seminal case here is *Yesler Terrace Community Council v. Cisneros*, which involved HUD's determination that Washington State's public housing authority could substitute its own eviction procedures for federally required ones. 37 F.3d 442 (9th Cir. 1994). The Ninth Circuit rejected HUD's argument that this was an "order," concluding that HUD's action "has all the hallmarks of a rule. HUD's determination has no immediate, concrete effect on anyone, but merely permitted [the Washington Public Housing Authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

Moreover, two separate district courts were called on to carefully analyze the Clean Air Act mobile source program including its preemption provision. And the analysis of each parallel OMB's conclusion that California waiver decisions are better classed as rules rather than as orders. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("[O]nce EPA issues a waiver for a California emissions standard" it has "the same stature as a federal regulation."); *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

The *Yesler* analysis, as confirmed by the Clean Air Act-specific logic of the *Green Mountain* and *Central Valley* district courts, applies here. The waivers at issue have "no immediate, concrete effect on anyone, but merely permit[]" California (and other States) to enforce different standards "in the future." *Id.* The waivers similarly "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *Id.*

---

[10] *See* 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]" with certain exceptions).

*Yesler* also shows why it is irrelevant that EPA styled its waivers as "decision[s]" and initially summarily disclaimed application of the CRA. As the Ninth Circuit explained, "that the manner in which [an agency] made its decision shares certain features with adjudications" is not determinative. *Id.* at 449. "The form of the proceeding is not dispositive, what counts is its **effect**." *Id.* (emphasis added). The waivers, like the HUD determination in *Yesler*, have "legal consequences for yet-to-be-identified individuals only prospectively," *i.e.*, "the effects of a rule, not of an adjudication." *Id.*

GAO curiously cites *Yesler* on page 7 of its analysis, yet seems oblivious to the fact that *Yesler*, as applied here, leads to the opposite outcome than the one which GAO advocates. GAO does not even say anything about why waivers are distinguishable from the delegation of eviction authority at issue in *Yesler*.

**Second**, unlike an ordinary license, a waiver of Section 209(a) Clean Air Act preemption does more than grant California alone an exemption from a prohibition under the Clean Air Act. Under Section 177 of the Clean Air Act, 42 U.S.C. § 7507, a waiver allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing. As EPA explained in the Advanced Clean Trucks waiver, "[t]his final action will not only affect manufacturers of new heavy-duty vehicles and engines sold in California, but also manufacturers that sell their new heavy-duty vehicles and engines in those states that have already adopted or may choose to adopt California's regulations"—consequently, "this final action is **nationally applicable**."[11]

Currently, 18 States have adopted at least one of California's electric-vehicle standards under Section 177. GAO's claim that a waiver is "particular to California" thus overlooks the most significant part of the entire statutory scheme. GAO's analysis, however, does not address this provision in any form.

Nor did GAO address Section 177's prohibition on creating a "third vehicle" that could lawfully be sold in the United States. Of course, the point of the "third vehicle" prohibition confirms that there are two and only two nationally applicable automobile emissions regimes that can govern in the United States: (1) EPA's federal car standards, unmistakably issued exclusively in the form of regulations; and (2) California's standards, because those standards can "travel" under Section 177 to govern in non-California States without a separate waiver.[12] It makes no sense to imagine that federal-car States are governed via regulations but California-car States are governed by adjudication. And any such argument particularly withers once one realizes that what EPA grants preemption waivers of is California regulations, not California adjudications.

**Third**, a waiver of Section 209(a) Clean Air Act preemption does not simply govern the primary conduct of California and all other Section 177 States. Instead, such a waiver also directly governs the conduct of motor-vehicle manufacturers **nationwide**. Under Section 209(b)(3) of the Clean Air Act, certification and conformance to California's alternative standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. § 7543(b)(3). Thus, a waiver creates a unique alternative nationwide compliance pathway for motor-vehicle manufacturers that displaces EPA's otherwise applicable federal standards. Again, OMB is not aware of any "adjudicatory order" creating a new interstate regulator that can replace federal standards and govern

---

[11] *See, e.g.*, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023) (emphasis added).
[12] As noted above, EPA does not conduct a separate adjudication applicable to Section 177 State borrowing decisions.

compliance for an entire manufacturing industry across numerous States. Yet GAO's analysis is also mum about this provision.

*Fourth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption are orders because they have "immediate effect" on California, not prospective effect. It is unclear what GAO means by "immediate effect," but Section 202(a) of the Clean Air Act, 42 U.S.C. § 7521(a), which applies to EPA directly and to waiver decisions as well through Section 209(b)(1)(C), 42 U.S.C. § 7543(b)(1)(C), requires that the waived California rules give motor vehicle manufacturers adequate "lead time," which is typically measured in years, not months. And Section 177(2) also requires at least "two years" of lead time for other States adopting these alternative standards. OMB is aware of no adjudicatory order that requires multiple years of lead time.

True adjudications are inherently retrospective in nature—that is, they describe and establish at that moment in time the law as it always has been, not the law as it is being established prospectively and only for the first time. *See, e.g., Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). By contrast, California emissions regulations apply only prospectively, and only after the lapse of the appropriate amount of lead time. Moreover, EPA waivers are inherently prospective. Otherwise, Section 177 States would have no stability—if they could adopt the California-car standards "immediately" after California promulgated the relevant regulations, then a denied EPA waiver would automatically upset the national market for new automobiles and engines.

As the D.C. Circuit has explained, moreover, even in the agency context specifically, forward-looking obligations are a characteristic of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club In'tl. v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) ("an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking. Again, however, GAO's analysis does not discuss the Clean Air Act's lead time provisions.

*Fifth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption involve considerations "of particular facts, as opposed to general policy." Not so. In granting waivers, EPA must address the consistency of the regulations with Section 202(a), EPA's primary regulatory authority for motor vehicles. *See* 42 U.S.C. § 7543(b)(1)(C). In so doing, EPA considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place. These questions require making predictive policy judgments, not addressing "particular facts." For example, do the California regulations give the industry sufficient lead time to transition to 100% electric vehicles? Are the industry's compliance costs with that lead time "appropriate"? Are the standards "technologically feasible"? 42 U.S.C. § 7521(a)(2). OMB is unaware of any adjudicatory order that requires addressing similarly forward-looking and policy-laden questions about any entire industry's ability to comply. As with the other points made above, however, GAO's analysis is completely silent on the lead-time and technological feasibility aspects of the statutory regime.

\* \* \* \* \*

Because GAO does not address any of these five points, and appears to misunderstand how these Clean Air Act waivers operate, OMB, as the Executive Branch's expert agency for regulatory matters generally, is unpersuaded by GAO's opinion and letter and instead believes that the waivers were and are best characterized as rules of general applicability. But regardless, even if a close call, the EPA Administrator's decision to submit the waivers to promote greater accountability to Congress was reasonable. That practice promotes the kind of agency accountability to Congress that the CRA—and GAO—was created to enhance, not diminish.

It is Congress that is optimally positioned to ***decide for itself*** when to put rules submitted to it to CRA votes, as it did in considering the three passed House Joint Resolutions 87 through 89. ***That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic***. In enacting the resolutions of disapproval, Congress emphatically rejected GAO's inappropriate attempt to interfere with Congress's powers under the Constitution and CRA. EPA is thus now barred from issuing any waiver of preemption California seeks that is substantially similar to the three overridden waivers.[13]

Sincerely,

Russell T. Vought
Director

---

[13] *See* 5 U.S.C. 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.").