Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Counsel for American Free Enterprise*
*Chamber of Commerce et al.*
(additional counsel and parties on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **BRIEF OF AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, STATE CORN GROWERS ASSOCIATIONS, NATIONAL CORN GROWERS ASSOCIATION, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, AND NATIONAL ASSOCIATION OF CONVENIENCE STORES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Date:    February 19, 2026 <br> Time:    2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:  Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .................................................................................................................. 1

INTEREST OF AMICI ......................................................................................................... 1

BACKGROUND .................................................................................................................... 3

I.      The Clean Air Act Broadly Preempts State Regulation of Motor
        Vehicle Emissions ...................................................................................................... 3

II.     EPA Issues Waivers of Clean Air Act Preemption for Three California
        Programs .................................................................................................................... 3

III.    Congress Repeals EPA's Waivers of Clean Air Act Preemption ............................... 5

IV.     Procedural History ..................................................................................................... 10

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ........................................................................................................................ 10

I.      The Congressional Review Act Bars Judicial Review .............................................. 11

II.     This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims ............................. 14

        A.      Plaintiffs Lack Standing for their Statutory Claims ...................................... 14

        B.      This Court Lacks Jurisdiction Under the APA ............................................... 16

III.    Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to
        Congressional Procedures ........................................................................................ 17

IV.     This Court Lacks Jurisdiction Under the Declaratory Judgment Act ....................... 19

V.      Plaintiffs Fail to State a Constitutional Claim Because the Resolutions
        Were Lawfully Enacted and Constitutionally Valid .................................................. 20

        A.      Plaintiffs Fail to State a Separations-of-Powers Claim ................................. 20

        B.      Plaintiffs Fail to State a Tenth Amendment or Federalism Claim .................. 22

        C.      Plaintiffs Lack a Cause of Action for Their Constitutional Claims ............... 26

CONCLUSION ..................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .................................................................................................. 26

*Baker v. Carr,*
  369 U.S. 186 (1962) .................................................................................................. 19

*Bennett v. Spear,*
  520 U.S. 154 (1997) .............................................................................................. 16, 17

*California v. Texas,*
  593 U.S. 659 (2021) .................................................................................................. 16

*Ctr. for Biological Diversity v. Bernhardt,*
  946 F.3d 553 (9th Cir. 2019) .................................................. 1, 6, 11, 12, 13, 16, 18, 21

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
  598 F.3d 1115 (9th Cir. 2010) ................................................................................... 10

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .................................................................................................... 16

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States,*
  482 F.3d 1157 (9th Cir. 2007) .............................................................................. 18, 19

*Corrie v. Caterpillar, Inc.,*
  503 F.3d 974 (9th Cir. 2007) ..................................................................................... 19

*County of San Diego v. Nielsen,*
  465 F. Supp. 3d 1073 (S.D. Cal. 2020) ...................................................................... 16

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) .................................................................................................. 23

*Dalton v. Specter,*
  511 U.S. 462 (1994) .................................................................................................. 17

*Demore v. Kim,*
  538 U.S. 510 (2003) .................................................................................................. 13

*DeVillier v. Texas,*
  601 U.S. 285 (2024) .................................................................................................. 26

*Diamond Alt. Energy, LLC v. EPA,*
  606 U.S. 100 (2025) ........................................................................................... 1, 6, 13

*Foster v. USDA,*
  68 F.4th 372 (8th Cir. 2023) ...................................................................................... 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .................................................................................... 17, 26

*Havasupai Tribe v. Provencio,*
    906 F.3d 1155 (9th Cir. 2018) ............................................................................ 16

*Idaho Watersheds Project v. Hahn,*
    307 F.3d 815 (9th Cir. 2002) .............................................................................. 16

*INS v. Chadha,*
    462 U.S. 919 (1983) .................................................................................... 15, 20

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) ........................................................................................ 19

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior,*
    971 F.3d 1222 (10th Cir. 2020) ......................................................................... 11

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ........................................................................................ 10

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) .............................................................................. 10

*Leite v. Crane Co.,*
    749 F.3d 1117 (9th Cir. 2014) ............................................................................ 10

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................ 15

*Mendiondo v. Centinela Hosp. Med. Ctr.,*
    521 F.3d 1097 (9th Cir. 2008) ............................................................................ 10

*Mendoza-Linares v. Garland,*
    51 F.4th 1146 (9th Cir. 2022) ............................................................................ 12

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................................ 22

*Montanans for Multiple Use v. Barbouletos,*
    568 F.3d 225 (D.C. Cir. 2009) ............................................................................ 11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA,*
    627 F.2d 1095 (D.C. Cir. 1979) ............................................................................ 3

*Murthy v. Missouri,*
    603 U.S. 43 (2024) .................................................................................. 10, 14, 15

*NRC v. Texas,*
    605 U.S. 665 (2025) ........................................................................................ 17

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
    557 U.S. 193 (2009) ........................................................................................ 23

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ................................................................................ 16

*Patchak v. Zinke,*
    583 U.S. 244 (2018) ................................................................................ 20

*Polich v. Burlington N., Inc.,*
    942 F.2d 1467 (9th Cir. 1991) ................................................................ 10

*Robertson v. Seattle Audubon Soc'y,*
    503 U.S. 429 (1992) ................................................................................ 21

*Skelly Oil Co. v. Phillips Petroleum Co.,*
    339 U.S. 667 (1950) ................................................................................ 19

*Smith v. L.A. Unified Sch. Dist.,*
    830 F.3d 843 (9th Cir. 2016) .................................................................... 8

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ........................................................................ 22, 23

*United States v. Ballin,*
    144 U.S. 1 (1892) ....................................................... 15, 18, 19, 22

*United States v. Fla. E. Coast Ry. Co.,*
    410 U.S. 224 (1973) ................................................................................ 13

*United States v. Or. State Med. Sch.,*
    343 U.S. 326 (1952) ................................................................................ 16

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................ 16

*Utah v. Strieff,*
    579 U.S. 232 (2016) ................................................................................ 15

*Wash. All. of Tech. Workers v. United States,*
    892 F.3d 332 (D.C. Cir. 2018) ................................................................ 11

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................................ 12, 13

*Yesler Terrace Cmty. Council v. Cisneros,*
    37 F.3d 442 (9th Cir. 1994) .............................................................. 24, 25

**Constitution**

U.S. Const. art. I, § 1 ................................................................................ 14

U.S. Const. art. I, § 5, cl. 2 ................................................................. 18, 25

U.S. Const. art. I, § 7, cl. 2–3 ................................................................. 14

**Statutes**

5 U.S.C. § 551(4) ................................................................................................. 6

5 U.S.C. § 701(a)(1) ............................................................................................ 17

5 U.S.C. § 704 .................................................................................................... 16

5 U.S.C. §§ 801–808 .............................................................................................5

5 U.S.C. § 801 ....................................................................................................23

5 U.S.C. § 801(a)(1)(A) .................................................................................. 6, 11

5 U.S.C. § 801(a)(1)(A)(ii) ..................................................................................12

5 U.S.C. § 801(b) ................................................................................................. 6

5 U.S.C. § 801(b)(1) ........................................................................................... 11

5 U.S.C. § 802 .................................................................................................... 11

5 U.S.C. § 802(a) ................................................................................................. 6

5 U.S.C. § 802(d) ................................................................................................. 6

5 U.S.C. § 804(3) ........................................................................................... 6, 11

5 U.S.C. § 805 .............................................................................................1, 11, 12

5 U.S.C. § 806(a) ................................................................................................12

42 U.S.C. § 7507 ...............................................................................................3, 25

42 U.S.C. § 7507(2) ............................................................................................25

42 U.S.C. § 7521(a) ..............................................................................................3

42 U.S.C. § 7521(a)(2) ........................................................................................25

42 U.S.C. § 7543(a) ...........................................................................................3, 4

42 U.S.C. § 7543(b) ..........................................................................................3, 13

42 U.S.C. § 7543(b)(3) ........................................................................................25

Pub. L. No. 104-121, 110 Stat. 847 (1996) ..........................................................5

Pub. L. No. 119-15, 139 Stat. 65 (2025) .........................................................8, 12

Pub. L. No. 119-16, 139 Stat. 66 (2025) .........................................................8, 12

Pub. L. No. 119-17, 139 Stat. 67 (2025) .........................................................8, 12

## Congressional Sources

170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024)..........................................................7, 24

171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) ................................................................7

171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) ...............................................................7

171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) ..............................................................7

171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) .............................................................7

*Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3 ............................................................................. 8

*Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U ............................................................................... 8

## Regulations

88 Fed. Reg. 20,688 (Apr. 6, 2023)...............................................................................4, 25

90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................................................ 4

90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................................................5

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(C) ...................................................................... 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(D) ..................................................................... 4

Cal. Code Regs. tit. 13, § 1962.4 ...................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.1 ...................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.2 ...................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.6(a) ................................................................................. 4

Cal. Code Regs. tit. 13, § 2016 ......................................................................................... 4

## Court Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................................................10

Fed. R. Civ. P. 12(b)(6) ................................................................................... 10, 16, 20

## Other Authorities

Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014) ............................................................ 6

All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ....................................5

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8 ........................................................................................ 4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN ......................................................................5

CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08* (Aug. 25, 2025), https://perma.cc/ES5W-EK72 ...........................................................................13

GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* (May 29, 2014) .................................................................................................7, 22

GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38* (Nov. 30, 2018) .........................................................7

GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121* (Oct. 31, 2023)................................... 24

George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN ..........................................................................................................14

Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C.........................................................................................3

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW ....................................................................5

Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* (updated Nov. 12, 2021) ..................................................................................................................... 6, 22

Richard H. Fallon, Jr. et al. *Hart & Wechsler's The Federal Courts and the Federal System* (7th ed. 2015)......................................................................................................19

**INTRODUCTION**

As this Court recognizes, this case is about actions under the Congressional Review Act ("CRA"). *See* ECF No. 182 at 5. Those actions are Congress's passage of Resolutions of Disapproval ("Resolutions") under the CRA repealing waivers of Clean Air Act preemption issued by the Environmental Protection Agency ("EPA") for three California programs designed to ban or limit the sale of new internal-combustion engine vehicles. The President signed those Resolutions into law. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025). California and the ten other States that joined this amended complaint ("Plaintiffs"), unhappy with the Resolutions Congress enacted and unable to change them through the legislative process, now ask this Court to nullify them.

The CRA squarely bars judicial review of actions taken under it: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. And the Ninth Circuit has confirmed that this bar applies to challenges of the very kind Plaintiffs raise here. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560–64 (9th Cir. 2019). This Court also lacks jurisdiction over Plaintiffs' claims for multiple other reasons, including: Plaintiffs lack standing for their statutory claims, review is unavailable under the Administrative Procedure Act ("APA"), and this Court lacks authority to review challenges to congressional procedure. And, in any event, Plaintiffs' constitutional challenges fail to state a cognizable claim or cite a viable cause of action. This Court should dismiss.

**INTEREST OF AMICI**

Amici are associations whose members are harmed by the California programs and who have a substantial interest in ensuring that the federal laws that block enforcement of California's programs remain in effect.

Amicus American Free Enterprise Chamber of Commerce ("AmFree") represents entrepreneurs and businesses across all sectors and states. AmFree's members are vitally interested in maintaining free, fair, and open markets, and AmFree serves its members by fighting against burdensome regulations and special-interest policies that threaten these markets and, consequently,

threaten our nation's economic prosperity. AmFree's members include producers of ethanol—the second-largest component of automobile gasoline by volume—and businesses that operate, sell, or lease vehicles subject to California's programs. These members are harmed by the decreased demand for gasoline and increased transportation costs caused by electric-vehicle mandates.

Amici State Corn Growers Associations and National Corn Growers Association represent farmers throughout their states and the nation who grow and sell corn crops, including for ethanol production. Their members, too, are harmed by the reduced demand for automobile gasoline and ethanol caused by California's programs.

Amicus American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association representing nearly all U.S. refining and petrochemical manufacturing capacity. AFPM members support more than three million quality jobs, contribute to our economic and national security, and enable the production of thousands of vital products used by families and businesses throughout the United States. California's attempt to revive its electric-vehicle mandates harms AFPM's membership because, among other things, it threatens to reduce liquid fuel sales.

Amicus American Petroleum Institute ("API") is a national trade association representing all segments of America's oil and natural gas industry. API's nearly 600 members support more than 11.3 million jobs and produce, process, and distribute most of our nation's energy. API was formed in 1919 as a standards-setting organization. In its over 100 years, API has developed more than 800 standards to enhance operational and environmental safety, efficiency, and sustainability. API works to support a strong, viable American oil and natural gas industry and therefore has a keen interest in this litigation. California's attempt to revive its electric-vehicle mandates harms API membership because, among other things, it threatens to reduce liquid fuel sales.

Amicus National Association of Convenience Stores ("NACS") is an international trade association that represents both the convenience and fuel retailing industries with more than 1,300 retail and 1,600 supplier company members. The U.S. convenience industry has more than 152,000 stores across the country, employs 2.74 million people, and had more than $837.4 billion in sales in 2024 ($501.9 billion of which were fuel sales). Approximately 120,000 convenience stores sell motor fuels. California's attempt to revive its electric-vehicle mandates harms NACS's

membership because, among other things, it threatens to reduce sales and undermine settled business expectations.

Amici and their members have long and actively opposed California's programs, including through regulatory and political engagement and litigation. Through these and other efforts, Amici have substantial expertise in the Clean Air Act, the CRA, constitutional law, and administrative law. In this brief, Amici provide additional information about California's programs, EPA's waivers of preemption for those programs, and the CRA resolutions that led to those waivers' repeal. Amici also explain why this Court lacks jurisdiction over Plaintiffs' claims and why EPA and Congress properly considered the waivers "rules" subject to the CRA. Amici respectfully submit that this brief may aid the Court in resolving Defendants' motion to dismiss, ECF No. 172.

## BACKGROUND

### I.   The Clean Air Act Broadly Preempts State Regulation of Motor Vehicle Emissions

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions from the nation's new motor vehicles. 42 U.S.C. § 7521(a). The Clean Air Act also broadly preempts state laws regulating new motor vehicle emissions: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* § 7543(a). Preemption prevents "an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

The Clean Air Act allows one limited exception from federal preemption: EPA "shall … waive application of [preemption] to" California—and only California—if certain statutory criteria are met. 42 U.S.C. § 7543(b). Once California has a waiver, other states may follow. *See id.* § 7507.

### II.   EPA Issues Waivers of Clean Air Act Preemption for Three California Programs

In 2020, California Governor Gavin Newsom announced a policy to ban new internal-combustion engine vehicles and replace them with "zero-emission" vehicles (i.e., battery-electric or fuel-cell-electric vehicles) that have zero tailpipe emissions. *See* Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C. Over the next several years, California adopted several regulatory programs under this policy, three of which are relevant here.

*First*, **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion engine vehicles) starting in model year 2026. The required electric-vehicle sales start at 35% of the fleet; by model year 2035, 100% of all new cars and light trucks sold must be electric. Up to 20% of the required electric sales may be plug-in hybrid electric vehicles. *See* Cal. Code Regs. tit. 13, § 1962.4.

*Second*, **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion engine vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (box trucks to semis), and 40% of their Class 7-8 sales (day and sleeper cab semis) with sales of electric trucks. *See id.* §§ 1963.1, 1963.2.[1]

*Third*, the **Omnibus Low NO$_x$ ("Omnibus") Program**, among other things, sets emissions standards for nitrogen oxides ("NO$_x$") for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to manufacture electric vehicles. *See id.* § 1956.8(a)(2)(C), (D).[2]

As California recognized, these programs "relat[e] to the control of emissions from new motor vehicles" and are preempted by Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Therefore, California requested waivers from EPA. The Biden EPA issued a waiver for ACT in April 2023, 88 Fed. Reg. 20,688 (Apr. 6, 2023), and waivers for ACC II and the Omnibus Program in January 2025, just weeks before President Biden left office. 90 Fed. Reg. 642 (Jan. 6, 2025); 90

---

[1] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion engine vehicles starting in model year 2036. Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and so it remains preempted. 42 U.S.C. § 7543(a).

[2] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program are "intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

Fed. Reg. 643 (Jan. 6, 2025). Eleven other states and the District of Columbia have adopted one or more of ACC II, ACT, and the Omnibus Program under Section 177 of the Clean Air Act.[3]

### III. Congress Repeals EPA's Waivers of Clean Air Act Preemption

Many members of Congress were dismayed by EPA's waivers, which greenlighted a ban on sales of new internal-combustion engine cars and light trucks in about 30% of the U.S. market by 2035,[4] recognizing that they could be catastrophic for the U.S. economy. Electric vehicles are far more expensive than internal-combustion engine vehicles; their range is far shorter; and some areas of the country face challenges in obtaining the infrastructure and generation capacity to charge them. Automakers warned that it would "take a miracle" for manufacturers to meet ACC II's car standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[5] California's truck regulations could be even more devastating. The limited range and payload of electric trucks would increase the cost of transporting everyday goods and raise prices, while the limited availability of compliant heavy-duty engine technology was already threatening supply disruptions.[6] And heavy-duty truck charging infrastructure is far more limited and more challenging to build and power than that for light-duty vehicles. Rather than await a rescission by the Trump EPA, which would invariably be challenged in court and could be reversed by a future EPA, Congress opted for legislation to fully and finally eliminate these regulations.

Specifically, Congress used the CRA. Enacted in 1996, the CRA provides a set of expedited legislative procedures by which Congress may review, and ultimately disapprove, rules issued by federal agencies. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996), *codified at* 5 U.S.C. §§ 801–808. If Congress passes and the President signs a "joint resolution" of disapproval, then

---

[3] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

[4] All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* 2 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

[5] *Id.* at 3, 8.

[6] *See* Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

the rule "shall not take effect (or continue)," and the rule "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after the date of the joint resolution." 5 U.S.C. § 801(b). The joint resolution is federal law, enacted in accordance with the constitutional requirements of bicameralism and presentment. *Ctr. for Biological Diversity*, 946 F.3d at 562 & n.6 (citing U.S. Const. art. I, §§ 1, 7); *accord Diamond Alt. Energy*, 606 U.S. at 107 n.1. One feature of the CRA is that joint resolutions are put on a legislative fast track that is exempt from the Senate's ordinary filibuster rule and that limits the motions that Senators may raise. 5 U.S.C. § 802(d).[7]

CRA procedures are typically triggered by an agency's transmission of a rule to Congress. The CRA requires federal agencies to "submit to each House of the Congress and to the Comptroller General" each rule it promulgates, along with a report that includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). The CRA defines "rule" by reference to the Administrative Procedure Act, *id.* § 804(3), which, in turn, defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). Once the rule is received, Congress generally has 60 days to introduce a joint resolution. *Id.* § 802(a).

Sometimes, an agency fails to submit a rule to Congress. In those circumstances, Congress has established an informal, ad-hoc process by which any member of Congress may ask the Government Accountability Office ("GAO") for an opinion on whether the agency action is a "rule" under the CRA. If GAO concludes the action is a "rule," Congress has by parliamentary convention typically deferred to that determination and treated publication of GAO's opinion in the *Congressional Record* as constructive submission that starts the CRA's 60-day clock.[8] GAO's informal role, however, is entirely by custom. The CRA gives GAO no authority to determine whether an

---

[7] Although Congress chose to codify an exception to the filibuster in the CRA, no law—let alone the Constitution—*compels* the Senate to follow a filibuster rule for *any* legislation, whether or not the CRA applies. *See generally* Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014).

[8] *See* Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 12–13 (updated Nov. 12, 2021).

agency action is a "rule," and GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to *Congress* to decide whether CRA would apply." GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (May 29, 2014) (emphasis added) ("GAO Letter B-325553").

Moreover, the ad-hoc practice of consulting GAO applies *only when an agency has not submitted a rule* to Congress. GAO has explained that when an agency submits a rule—even if the agency "believes [the action] is exempt from the CRA" and submits it merely "out of an abundance of caution"—GAO will "take no position on whether the [submitted action] is a rule" because "an opinion by GAO would not further the purposes of [the] CRA by protecting Congress's CRA review and oversight authorities." GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018). In GAO's words, an agency's submission "obviates the need for a GAO opinion." *Id.* Agencies under presidents of both parties have thus submitted actions to Congress "out of an abundance of caution" without prompting a GAO response. *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696).

Initially, EPA did not submit the ACC II, ACT, and Omnibus Program waivers to Congress. Under President Trump, EPA reversed course and transmitted the waivers to Congress after EPA determined that the waivers were rules subject to the CRA.[9]

Despite EPA's determination, several Senators sought an opinion from GAO on whether the submitted waivers were "rules" under the CRA. Am. Compl., Ex. B at 1 n.2, ECF No. 157-2. Breaking with past practice, GAO provided a substantive response and did so in just a few days. GAO acknowledged the circumstances were "not one in which [it] normally issue[s] a legal decision." *Id.* at 1. Although not a "legal opinion" of any kind, GAO went on to offer "[o]bservations" "to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures." *Id.* at 1, 9. Invoking its prior analysis of a different EPA action (the withdrawal

---

[9] *See* 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) (EC-439, EC-440, EC-441); 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) (EC-484, EC-485, EC-486); 171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) (EC-518, EC-519, EC-520); 171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) (EC-660, EC-661, EC-662).

1   of a waiver rescission), GAO concluded that the waivers were "not … rule[s] for purposes of [the]

2   CRA because [they are] order[s] under [the] APA." *Id.* at 9.

3       Congress considered these arguments and ultimately disagreed with GAO's analysis and re-

4   jected GAO's unprecedented attempt to insert itself into the process. In early April 2025, resolu-

5   tions of disapproval for all three waivers were introduced in the House. By May 1, the House had

6   passed all three Resolutions with bipartisan majorities, including 35 Democratic House members

7   who voted to repeal the ACC II waiver. *Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of

8   Representatives (May 1, 2025), https://perma.cc/46A6-JNK3. Following CRA procedures, the

9   Senate moved to consider the three Resolutions by majority—not supermajority—vote. On May

10  22, the Senate voted to adopt all three, with bipartisan disapproval of the ACC II waiver. *Roll Call*

11  *Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U. On

12  June 12, President Trump signed the Resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025);

13  Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

14      Congress had good reason to agree with EPA's determination that the waivers are "rules"

15  under the CRA, and to discredit GAO's "observations." Although not required to provide an ex-

16  planation, the Executive Branch set forth its objections to GAO's analysis in a June 18, 2025 letter

17  from the Director of the Office of Management and Budget ("OMB") to the GAO Comptroller

18  General. *See* Ex. 1 (reproducing letter).[10] OMB is home to the Office of Information and Regulatory

19  Affairs ("OIRA"), which is the "Executive Branch's central authority for reviewing federal regu-

20  lations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory

21  responsibility for determining whether an agency action is a 'major rule' within the meaning of the

22  [CRA]," which includes "pars[ing] whether an action is a 'rule' at all." *Id.* at 1–2.

23      OMB explained that GAO failed to consider relevant case law, including a decision from the

24  Ninth Circuit holding that an analogous "sub-delegation of regulatory authority to a State … is

---

[10] Courts "routinely take judicial notice of letters published by the government," like this one. *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016); https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf (last visited Nov. 13, 2025).

characteristic of a 'rule,' not an 'order,'" *id.* at 4–5 (citing *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)), and two federal district court decisions confirming "that California waiver decisions are better classed as rules rather than as orders," *id.* at 4 (citing *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007), and *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007)). GAO also "over-look[ed] the most significant part of the entire statutory scheme": Section 177 of the Clean Air Act, which "allows every other State in the country to adopt an identical rule without any addi-tional factual showing or contested hearing" and which makes waivers "nationally applicable," not "particular to California." *Id.* at 5 (cleaned up).

OMB also criticized GAO for failing to consider that a waiver "directly governs the conduct of motor-vehicle manufacturers *nationwide*," because "certification and conformance to California's alternative standards … creates a unique alternative nationwide compliance pathway … that dis-places EPA's otherwise applicable federal standards." *Id.* (citing 42 U.S.C. § 7543(b)(3)). There-fore, like a rule, a waiver "creat[es] a new interstate regulator that can replace federal standards … across numerous States." *Id.* at 5–6. OMB also found puzzling GAO's conclusion that the waiver has "'immediate effect,'" because the Clean Air Act requires that waived California standards "give motor vehicle manufacturers [years of] 'lead time'" and "at least 'two years' of lead time for other States adopting" California's standards. *Id.* at 6.

Finally, OMB disagreed with GAO's assertion that a waiver merely "involve[s] considerations 'of particular facts, as opposed to general policy.'" *Id.* OMB observed that in issuing a waiver, EPA "considers the same policy-laden questions implicated in setting *by regulation* the prospective fed-eral emission standards for motor vehicles in the first place," including whether California's pro-grams "give the industry sufficient lead time to transition to 100% electric vehicles," whether "the industry's compliance costs with that lead time [are] 'appropriate,'" and whether "the standards [are] 'technologically feasible.'" *Id.*

Although OMB agreed with EPA that the waivers are "rules" subject to the CRA, it recognized that the ultimate decision fell elsewhere: "Congress … is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes…. *That is the path that best affords Congress its*

1  *constitutional role of ensuring representative democracy in our Republic.*" *Id.* at 7.

2  **IV.  Procedural History**

3  Within hours of the President signing the Resolutions, Plaintiffs filed this suit. Compl., ECF

4  No. 1. After the United States moved to dismiss, ECF No. 118, Plaintiffs amended their complaint,

5  Am. Compl., ECF No. 157. In their amended complaint, Plaintiffs allege statutory and constitu-

6  tional violations by EPA and its Administrator, non-party Congress, and the President. Plaintiffs

7  ask this Court, among other things, to declare that the CRA does not apply to the waivers, to vacate

8  EPA's "reclassification" of the waivers and enjoin EPA from "reclassify[ing]" other waivers, to

9  "declare that the Resolutions were not enacted under the CRA," to declare the Resolutions void,

10 and to enjoin EPA from enforcing the Resolutions. *Id.* at 44.

11 <center>**LEGAL STANDARD**</center>

12 A court must dismiss a claim under Rule 12(b)(1) when it lacks jurisdiction over the subject

13 matter of a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "The

14 party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chan-*

15 *dler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). This includes standing,

16 which "plaintiffs must demonstrate … for each claim that they press … and for each form of relief

17 that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

18 A court must dismiss a claim under Rule 12(b)(6) "where the complaint lacks a cognizable legal

19 theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med.*

20 *Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). At the motion-to-dismiss stage, "factual allegations set

21 forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee*

22 *v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (cleaned up) (Rule 12(b)(6)); *Leite v. Crane*

23 *Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (Rule 12(b)(1) facial challenge). "Conclusory allegations

24 of law," however, "are insufficient to defeat a motion to dismiss." *Lee*, 250 F.3d at 679.

25 Dismissal with prejudice is proper where "the complaint c[annot] be saved by any amend-

26 ment." *See Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

27 <center>**ARGUMENT**</center>

28 Plaintiffs' amended complaint must be dismissed with prejudice. The CRA provides

expedited procedures for Congress to review and disapprove of agency rules, and expressly prohibits judicial review of *any* "determination, finding, action, or omission" made by Congress under the statute. 5 U.S.C. §§ 802, 805. This Court simply cannot adjudicate the acts under the CRA, which form the basis of the amended complaint. The amended complaint suffers from numerous other jurisdictional defects, and Plaintiffs fail to state a constitutional claim.

## I.    The Congressional Review Act Bars Judicial Review

Congress has expressly withheld subject matter jurisdiction over Plaintiffs' claims in this suit. Section 805 of the CRA is unambiguous and expansive: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." *Id.* § 805. Although Plaintiffs amended their claims to avoid expressly invoking the CRA, their suit remains a challenge to the political branches' use of the CRA to enact Resolutions repealing EPA's waivers. As a result, judicial review of the suit in its entirety is barred. *Ctr. for Biological Diversity*, 946 F.3d at 563.

"'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020). Section 805 does not distinguish among actors, and therefore includes actions or omissions "by agencies, the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) (Section 805 bars review of agency action or omission), *vacated on other grounds*, 144 S. Ct 2707 (2024) (mem.); *Wash. All. of Tech. Workers v. United States*, 892 F.3d 332, 346 (D.C. Cir. 2018) (same); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (same). The CRA requires, *inter alia*, that federal agencies "submit to each House of the Congress and to the Comptroller General a report" for each "rule," which includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). That submission necessarily requires agencies to determine what actions are "rules" under the CRA. *See id.* § 804(3). The CRA then provides procedures for consideration of joint resolutions disapproving of rules, *id.* § 802, which necessarily requires that Congress first determine a resolution is eligible for those procedures. And the CRA provides that a joint resolution adopted by Congress and signed by the President has the effect that the "rule shall not take effect (or continue)." *Id.* § 801(b)(1).

*All* of the actions that Plaintiffs challenge were taken "under" the CRA and so fall squarely within Section 805's prohibition. This includes EPA's characterization of waivers as "rules"; EPA's submission of the waivers to Congress; EPA's alleged failure to explain its reasoning in the "concise general statement relating to the rule," *id.* § 801(a)(1)(A)(ii); Congress's decision to consider the Resolutions under the CRA's expedited procedures; Congress's adoption of the Resolutions; and the President's decision to sign those Resolutions. Section 805 also precludes this Court from "declar[ing] that the Resolutions were not enacted under the CRA," as Plaintiffs request. Am. Compl. at 44; *see also id.* at 43, ¶ 184 (Count VI). Congress expressly stated that each Resolution was adopted pursuant to the CRA. Pub. L. No. 119-15, 139 Stat. at 65 ("Providing congressional disapproval under chapter 8 of title 5, United States Code"); Pub. L. No. 119-16, 139 Stat. at 66 (same); Pub. L. No. 119-17, 139 Stat. at 67 (same). That, too, is a "determination" beyond this Court's review. 5 U.S.C. § 805.

Although the Ninth Circuit has glanced at a narrow exception to Section 805's broad jurisdictional bar for constitutional claims, it did not engage with the CRA's text or its legislative history and instead merely invoked the general canon from *Webster v. Doe*, 486 U.S. 592, 603 (1988), that a "'clear'" statement from Congress is needed to foreclose judicial review of constitutional claims. *Ctr. for Biological Diversity*, 946 F.3d at 561.

That principle is inapplicable here. Section 805 clearly states, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review," 5 U.S.C. § 805, and Section 806(a) underscores the breadth of that command by applying the bar "notwithstanding any other provision of law," *id.* § 806(a). Congress drew no distinction between statutory and constitutional claims, and if it intended an exception, it would have said so. The Ninth Circuit has found similarly broad language sufficient to bar constitutional claims in other contexts. *See Mendoza-Linares v. Garland*, 51 F.4th 1146, 1148–49, 1161 (9th Cir. 2022).

Furthermore, *Webster* and its progeny's principle that courts should presume constitutional claims remain reviewable absent a clear statement to the contrary arose in cases involving

///

///

individual rights, such as liberty, due process, and access to habeas relief.[11] The concern animating those decisions was that Congress cannot, consistent with separation of powers, deny all judicial review when a citizen-claimant asserts a fundamental personal right. That concern does not apply here. This case does not involve liberty or individual rights. It involves institutional power. Plaintiffs ask this Court to prioritize California's policy preferences over the prerogatives of Congress, which legislates for the entire nation. But Plaintiffs are only permitted to implement California's desired regulatory regime under a narrow exception to federal preemption and only if EPA concludes that certain statutory conditions are met. 42 U.S.C. § 7543(b). California has no independent constitutional right to its preferred alternative to federal standards.

Congress withheld review of actions under the CRA for good reason. CRA resolutions are "legislation." *Diamond Alt. Energy*, 606 U.S. 107 n.1. Allowing courts to second-guess Congress's determination of what qualifies as a "rule" or other aspects of the CRA process would enable the judicial branch to override Congress's establishment of its own lawmaking procedures, raising serious separation-of-powers concerns. *See infra* Section III (pp. 17–19). It would also add significant uncertainty: "[T]he line dividing" a rule from an order is "not always … a bright one." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Allowing judicial second-guessing would turn what is intended to be an expedited process for curtailing agency overreach into a protracted legal battle, leaving the status of a duly enacted law in limbo for months or years as litigation plays out. That is precisely what has happened here—complete with California making repeated threats of retroactive enforcement. *See, e.g.*, CARB, *Manufacturers Advisory Correspondence (MAC) ECCD-2025-08*, at 3 (Aug. 25, 2025), https://perma.cc/ES5W-EK72. Congress not only acted well within its authority by withholding judicial review for suits like this one, *Ctr. for Biological Diversity*, 946 F.3d at 563, it also acted wisely.

///

---

[11] *See Webster*, 486 U.S. at 596, 603 (individual raising, among others, due process and equal protection claims) (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (individuals raising equal protection and due process claims)); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003) (noting that a "particularly clear statement" is needed to bar review of habeas claims).

1    **II.    This Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims**

2        **A.  Plaintiffs Lack Standing for their Statutory Claims**

3        Even if the CRA did not bar Plaintiffs' challenge, Plaintiffs lack standing for their statutory

4    claims (Counts I, II, and VI). Counts I and II allege that EPA's characterization of the waivers as

5    "rules" and subsequent submission of the waivers to Congress were unlawful under the APA or

6    outside EPA's statutory authority, and so somehow tainted the Resolutions passed by Congress

7    and signed by the President. Am. Compl. at 31–36, ¶¶ 123–138, 143–145. Count VI invokes the

8    Declaratory Judgment Act to request, "[i]n the event the Resolutions remain in effect despite

9    [their] other claims," a declaration that "the Resolutions were not enacted under the CRA." *Id.*

10   at 43, ¶ 184. Plaintiffs, however, lack standing to bring these claims because their alleged injury

11   (i) is not traceable to EPA's actions and (ii) will not be redressed by relief directed to EPA's actions

12   or by the requested declaration.

13       To establish standing, Plaintiffs "must show that [they] ha[ve] suffered … [1] an injury that

14   is … [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Murthy*,

15   603 U.S. at 57 (internal quotation marks omitted). Plaintiffs allege they are injured because they

16   are "prevent[ed] … from enforcing laws they have chosen to adopt within their jurisdictions."

17   Am. Compl. at 2, ¶ 5.

18       Plaintiffs asserted injury stems not from any EPA action but from Congress, which is not a

19   party to this case, exercising its Article I authority to enact legislation nullifying EPA's prior Clean

20   Air Act waivers, and from the President's signing of that legislation. *See* U.S. Const. art. I, §§ 1, 7

21   cl. 2–3. That is what nullified the prior Clean Air Act waivers, thereby triggering preemption under

22   Section 209(a). The "exercise [of] independent judgment" by Congress and the President severs

23   any causal chain to EPA. *Murthy*, 603 U.S. at 60. Congress was not obligated to accept EPA's

24   characterization of the waivers or to pass Resolutions of disapproval. Most rules submitted under

25   the CRA never make it to the floor of either House.[12] And Congress can act under the CRA even

26

27   ───────────────

28   [12] *See* George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN.

1    when an agency doesn't submit an action. *See supra* Section III (pp. 5–7). Nor was the President

2    required to sign the Resolutions into law; he exercised independent judgment in doing so. These

3    "unfettered choices made by independent actors" extinguish any link between the challenged EPA

4    actions and Plaintiffs' alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

5        Nor can Plaintiffs manufacture injury by speculating that EPA might, at some indeterminate

6    time in the future, submit another unidentified waiver to Congress under the CRA. Am. Compl. at

7    29–31, ¶¶ 114–119. As explained, Plaintiffs aren't injured by EPA's submissions, so whether any

8    new submission occurs is irrelevant. In any event, Plaintiffs do not plead any facts showing a new

9    submission is likely. Even if they had, their theory of injury depends entirely on Congress passing

10   new legislation and the President signing it.

11       Plaintiffs' alleged injury also will not be redressed "by a favorable ruling" on EPA's actions,

12   *Murthy*, 603 U.S. at 57, because a declaration or order related to *EPA's actions* would not render

13   the *Resolutions* unenforceable. The Resolutions were enacted "in conformity with the express pro-

14   cedures of the Constitution's prescription for legislative action: passage by a majority of both

15   Houses and presentment to the President." *INS v. Chadha*, 462 U.S. 919, 958 (1983); *see also*

16   *United States v. Ballin*, 144 U.S. 1, 6 (1892) (under the "federal constitution," "the act of a majority

17   of the quorum is the act of the body"). Therefore, the Resolutions are and will remain a legitimate

18   exercise of the federal legislative power, regardless of any alleged deficiency in EPA's non-binding

19   characterization and submission. *See Chadha*, 462 U.S. at 951. Simply put: there is no "fruit of the

20   poisonous tree" doctrine for legislation. *Cf. Utah v. Strieff*, 579 U.S. 232, 237 (2016). For similar

21   reasons, a declaration that the Resolutions were not "enacted under the CRA" would provide

22   Plaintiffs no relief. Am. Compl. at 43, ¶ 184. Setting aside that this Court has no power to make

23   that determination, *see supra* Section I (pp. 11–13), such a declaration wouldn't render the chal-

24   lenged or future Resolutions unenforceable, since a constitutionally enacted law remains valid re-

25   gardless of the "CRA" label, *see infra* Section III (pp. 17–19).

26       Nor would the persuasive effect of the Court's opinion provide redress: "Whatever a court

27   may say in an opinion does no more to compel [Congress and the President] to change how they

28   exercise their [lawmaking power] than an order vacating" EPA's actions or declaring the Court's

1    opinion on the applicability of the CRA. *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch,

2    J., concurring in the judgment).

3    　　Even more, Plaintiffs seek (among other remedies) prospective relief against EPA for past vio-

4    lations. But equitable relief may not be used to undo past completed acts. Injunctions prevent fu-

5    ture harm, not past conduct. *See United States v. Or. State Med. Sch.*, 343 U.S. 326, 333 (1952); *City*

6    *of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96

7    (1974). Here, EPA has completed the submission of the waiver decisions, and Congress has com-

8    pleted the legislative process. Plaintiffs do not credibly allege any imminent agency action or future

9    resolution under the CRA that presents a real and immediate threat of harm to them. The possi-

10   bility that similar waivers might be submitted to, or disapproved by, Congress in the future is spec-

11   ulative and too contingent to support equitable relief. *See Ctr. for Biological Diversity*, 946 F.3d at

12   560. The lack of concrete, ongoing harm forecloses any viable remedy. Likely recognizing this,

13   Plaintiffs do not "claim that they might enjoin Congress." *California v. Texas*, 593 U.S. 659, 673

14   (2021). So a decision of the court related to EPA's actions or Congress's use of the CRA "would

15   amount to 'an advisory opinion without the possibility of any judicial relief.'" *Id.*

16   　　**B.  This Court Lacks Jurisdiction Under the APA**

17   　　For similar reasons, the challenged EPA actions are not "final agency action," 5 U.S.C. § 704,

18   and so this Court lacks jurisdiction over Plaintiffs' APA claim, Am. Compl. at 31–35, ¶¶ 120–141

19   (Count I). *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018) ("Final agency action

20   is a jurisdictional requirement imposed by 5 U.S.C. § 704" (cleaned up)).[13]

21   　　An agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmak-

22   ing process" and (2) is "one by which 'rights or obligations have been determined,' or from which

23   'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). EPA's actions do

24   not satisfy *Bennett*'s second criterion. EPA's characterization of the waivers as "rules" and

25

───────────────────

26   [13] Elsewhere, the Ninth Circuit has opined that "the fact that an agency decision is not final under
     the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d

27   815, 830 (9th Cir. 2002). Under that approach, lack of finality is assessed under Rule 12(b)(6).
     *County of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1086 (S.D. Cal. 2020). Either way, Plaintiffs'

28   APA claim does not challenge final agency action and so must be dismissed.

subsequent submission to Congress created no right, imposed no obligation, and had no "direct consequences" for Plaintiffs. *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Even after submission, the waivers remained effective unless and until Congress passed and the President signed resolutions of disapproval. Like other agency actions the Supreme Court has held are not final, EPA's characterization and submission of the waivers were, at most, "recommendations [that] were in no way binding on the President [and Congress], who had absolute discretion to accept or reject them." *Bennett*, 520 U.S. at 178; *see Dalton*, 511 U.S. at 469 (Secretary of Defense's base closure recommendations were not final because the "action that will directly affect the military bases is taken by the President, when he submits his certification of approval to Congress" (cleaned up)); *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (Secretary of Commerce's report of census results was not final because it "serves more like a tentative recommendation" to the President, who ultimately submits a count to Congress).[14]

Plaintiffs also cannot evade the statutory jurisdictional bar by claiming that EPA's actions were "ultra vires." Am. Compl. at 35–36, ¶¶ 142–148 (Count II). The Supreme Court recently made clear that the ultra vires exception "is a narrow one": it "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in statute," not merely when "an agency has arguably reached a conclusion which does not comport with the law." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). Plaintiffs' ultra vires claim identifies no specific statutory prohibition that EPA violated, but "dress[es] up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. It is therefore not subject to ultra vires review.

### III.   Plaintiffs' Constitutional Claims Are Non-Justiciable Objections to Congressional Procedures

Plaintiffs also claim that Congress's enactment of the Resolutions violates separations of powers, the Tenth Amendment, and structural principles of federalism. *See, e.g.*, Am. Compl. at 37–41, ¶¶ 149–169 (Counts III and IV). No matter how framed, these claims amount to a non-

---

[14] Section 805's prohibition of judicial review also precludes APA review of EPA's actions here. 5 U.S.C. § 701(a)(1) (APA review does not apply "to the extent that … [other] statutes preclude judicial review"); *see supra* Section I (pp. 11–13).

1   justiciable challenge to House and Senate procedures.

2   "The constitution empowers each house to determine its rules of proceedings." *Ballin*, 144

3   U.S. at 5. That power is "absolute and beyond the challenge of any other body or tribunal," subject

4   to very narrow limitations: Congress may not "by its rules ignore constitutional restraints or violate

5   fundamental rights, and there should be a reasonable relation between the … rule and the result

6   which is sought to be attained." *Id.* "Neither … the advantages or disadvantages, the wisdom or

7   folly, of … a rule [of Congress] present any matters for judicial consideration." *Id.* "In short, the

8   Constitution textually commits the question of legislative procedural rules to Congress." *Consejo*

9   *de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007).

10  Plaintiffs' claims asserting constitutional defects in the process of enacting the Resolutions are

11  "question[s] of legislative procedural rules" that this Court lacks authority to review. *Id.* Plaintiffs

12  allege that Congress improperly (i) ignored the non-binding advice of GAO and the Senate Parlia-

13  mentarian, Am. Compl. at 40, ¶ 163; (ii) "adopted a procedural rule" that permits Congress to

14  apply expedited procedures to agency actions determined to be "rules" by the Executive Branch

15  and submitted to Congress, *id.* at 38, ¶ 157; (iii) applied the CRA's procedures to the Resolutions,

16  *id.* at 39–40, ¶ 163, and (iv) adopted the Resolutions without sufficient "debate" or "state official

17  testimony," *id.* at 40, ¶¶ 164–165. In essence, Plaintiffs complain that the Senate chose to adopt

18  the Resolutions without applying the filibuster or seeking Plaintiffs' advice. But selecting the pro-

19  cedural rules to apply to pending legislation is a matter squarely committed to each Chamber's

20  discretion by the Constitution. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules

21  of its Proceedings[.]"). And so determining whether to apply the CRA's "accelerated procedure

22  is 'an exercise of the rulemaking power of the Senate and House of Representatives, respec-

23  tively.'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)). The Constitution

24  provides no right to particular congressional procedures or participation. Allowing the Senate to

25  vote on the Resolutions without a prior supermajority procedural vote or testimony from Plaintiffs

26  therefore violates no "constitutional restraints or … fundamental rights." *Ballin*, 144 U.S. at 5; *see*

27  *also infra* Section V (pp. 20–26). Moreover, use of expedited procedures and limited debate is

28  "reasonabl[y] relat[ed]" to Congress's desire to expeditiously address what it viewed as EPA's

1    error in issuing the waivers. *Ballin*, 144 U.S. at 5.

2        In modern parlance, whether Congress may consider the Resolutions using CRA procedures is

3    a "political question" that "revolve[s] around policy choices and value determinations constitu-

4    tionally committed for resolution to the halls of Congress or the confines of the Executive Branch."

5    *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369

6    U.S. 186, 217 (1962). The "presence of a political question deprives a court of subject matter juris-

7    diction." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

8        The political question doctrine applies with full force here. The role of establishing and apply-

9    ing procedural rules is "textually … commit[ted]" by the Constitution to each Chamber of Con-

10   gress. *Baker*, 369 U.S. at 217. A court cannot "independent[ly] resol[ve]" Plaintiffs' claims "with-

11   out expressing lack of the respect due" Congress in executing its lawmaking function or "without

12   an initial policy determination"—like whether Congress should credit GAO's non-binding (and

13   extra-statutory) observations over competing recommendations—"of a kind clearly for nonjudicial

14   discretion." *Id.* Nor would it matter if Congress had departed from its previous practice in passing

15   the Resolutions (although it did not), since "the asserted failure of Congress to comply with its

16   own procedural rules" in adopting the Resolutions "is a non-justiciable political question beyond

17   [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72.

18   **IV.    This Court Lacks Jurisdiction Under the Declaratory Judgment Act**

19       Finally, even if Plaintiffs' claim for a declaratory judgment did not fail on its own terms, *see*

20   *supra* Sections I–II.A (pp. 11–16), Plaintiffs cannot bootstrap jurisdiction by seeking declaratory re-

21   lief, *see* Am. Compl. at 43, ¶¶ 180–184 (Count VI). The Declaratory Judgment Act "enlarged the

22   range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil*

23   *Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). The "existence of jurisdiction over a declar-

24   atory action" therefore "depends on the answer to a hypothetical question: … would there have

25   been a nondeclaratory action (i) concerning the same issue, (ii) between the same parties, (iii) that

26   itself would have been within the federal courts' subject-matter jurisdiction?" Richard H. Fallon,

27   Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 841 (7th ed. 2015). Because

28   there is no nondeclaratory action concerning the same issue over which this Court has jurisdiction,

*see supra* Sections I–III (pp. 11–19), this Court lacks authority to consider Plaintiffs' claim for declaratory relief.

## V. Plaintiffs Fail to State a Constitutional Claim Because the Resolutions Were Lawfully Enacted and Constitutionally Valid

Plaintiffs' constitutional claims should also be dismissed because they fail to state a cognizable claim. Fed. R. Civ. P. 12(b)(6).

### A. Plaintiffs Fail to State a Separations-of-Powers Claim

Plaintiffs argue that the CRA resolutions violate foundational separation-of-powers principles. *See* Am. Compl. at 37–39, ¶¶ 151–158. They advance two theories: that Congress violated separation-of-powers principles by exercising judicial power, *id.* at 37–38, ¶¶ 151–154; and that the Executive Branch "intru[ded]" on "internal legislative procedure," *id.* at 38–39, ¶¶ 155–158 (Count III). These theories are wrong.

*First*, Congress did not usurp the adjudicatory function of either the Executive or Judicial Branch. When Congress legislates through the full bicameralism-and-presentment process, it acts squarely within its constitutional role. *See Chadha*, 462 U.S. at 954–55. That is what happened here: Congress enacted laws under Article I, and the President signed them. Nothing in the Constitution forbids Congress from legislating in response to agency action or from considering agency submissions. Nor did Congress intrude on Article III. Limiting judicial review in this context is not a constitutional flaw; Article III does not guarantee judicial review of every congressional action. *See Patchak v. Zinke*, 583 U.S. 244, 254 (2018) (observing that Congress's authority to restrict courts' jurisdiction is an essential component of separation of powers). And the CRA leaves untouched the courts' authority to interpret the APA in cases that do not implicate determinations, acts, or omissions under the CRA.

Plaintiffs nonetheless contend that Congress exercised judicial power because the Resolutions "'create no new substantive law' but instead determine 'how pre-existing law applies to particular circumstances.'" *Id.* at 37, ¶ 153 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016)). But that misunderstands the Resolutions, and the CRA itself. The Resolutions *do* create new substantive law, and in so doing effectuate a new legal standard: namely, that the carveout from Clean

1    Air Act preemption for state vehicle emissions regulations does not include ACC II, ACT, and the

2    Omnibus Program, and substantially similar regulations. "When Congress enacts legislation that

3    directs an agency to [rescind] a particular [action], 'Congress has amended the law.'" *Ctr. for Bi-*

4    *ological Diversity*, 946 F.3d at 562. The Resolutions thus "compelled changes in law, not findings

5    or results under old law." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). The Reso-

6    lutions are therefore "enforceable as a change to substantive law, even though [they] did not state

7    that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for*

8    *Biological Diversity*, 946 F.3d at 562. And "because the [Resolutions] changed the substantive law,

9    [they do] 'not violate the constitutional separation of powers' even though [they may] … 'chang[e]

10   the law applicable'" to "'pending litigation.'" *Id.* (*quoting All. for the Wild Rockies v. Salazar*, 672

11   F.3d 1170, 1174 (9th Cir. 2012)).

12       *Second*, Plaintiffs claim that Congress improperly "allow[ed] for intrusion by, and coercive in-

13   fluence of, the Executive Branch on internal legislative procedure." Am. Compl. at 38–39, ¶ 157.

14   But Plaintiffs' own allegations show the opposite: Both Chambers exercised their own independent

15   judgment and applied their own rules of procedure in adopting the Resolutions under the CRA.

16   Members of the House "introduced the Resolutions" about "a month" after GAO issued its anal-

17   ysis, well aware of the dispute over the waivers' characterization, *id.* at 22, 24, ¶¶ 86, 94, and

18   "voted to adopt all three Resolutions" by majority vote, consistent with House rules, *id.* at 25,

19   ¶ 96. Members of the Senate likewise were familiar with GAO's opinion, as well as with other

20   views. *Id.* at 22–23, ¶¶ 87, 90–91. Faced with competing interpretations, a majority of the Senate

21   agreed that rules submitted by Executive Branch agencies consistent with "Section 802 of the

22   Congressional Review Act" should be eligible for consideration under the CRA's expedited pro-

23   cedures. *Id.* at 26–27, ¶ 104. The Senate then went on, by majority vote, to adopt the Resolutions.

24   *Id.* at 29, ¶ 111. At every step, each Chamber—not the Executive Branch—determined how to ap-

25   ply its rules and procedures. Far from allowing "the Executive Branch to manipulate legislative

26   procedure," *id.* at 38, ¶ 155, each Chamber exerted control over its own procedures to achieve the

27   outcome it desired.

28       It does not matter that the Senate sometimes credits the Executive Branch's determination

that an agency action is a rule. That does not give the Executive Branch "unbridled discretion to trigger" CRA procedures. *Id.* at 38, ¶ 157. The Senate remains in full control of its internal procedures and can, at any time, choose to change its procedures or disregard an Executive Branch determination under the CRA. *Ballin*, 144 U.S. at 5 (each Chamber has "a continuous power" to make its own rules); GAO Letter B-325553, *supra*, at 9 ("CRA's expedited procedure for congressional review of agency rules was enacted as an exercise of the authority of the Senate and House of Representatives to set their own rules, with full recognition of the right of either House to change the rules."). In any event, the Constitution does not forbid Congress from consulting the Executive Branch in determining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches."). That is all that the Senate did here by establishing a default practice that it will accept a determination by an Executive Branch agency that a submitted action is a "rule" under the CRA. Individual lawmakers remain free to disagree and to vote their disagreement.

### B. Plaintiffs Fail to State a Tenth Amendment or Federalism Claim

Plaintiffs also fail to state a claim under the Tenth Amendment or federalism principles. Am. Compl. at 39–41, ¶¶ 161–169 (Count IV). Plaintiffs claim that "numerous 'extraordinary defects in the national political process'" that led to the Resolutions' enactment "render the Resolutions 'invalid under the Tenth Amendment' and the principles of federalism embedded in the Constitution's structure." *Id.* at 41, ¶ 167 (quoting *South Carolina v. Baker*, 485 U.S. 505, 512 (1988)). But Plaintiffs fail to identify any defects, much less "extraordinary" ones, "that might lead to such invalidation." *South Carolina*, 485 U.S. at 512. "Where, as here, the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated." *Id.* at 513.

Using the CRA to invalidate an agency action is hardly "extraordinary." It's been done over a dozen times since the CRA was enacted, with CRA resolutions of disapproval signed by Presidents of both parties. *See* Carey & Davis, *supra*, App. A (cataloging rules overturned under the CRA through Nov. 12, 2021).

Nor are the CRA's expedited procedures or Congress's application of them here

"defect[ive]." States have no constitutional right to demand "rigorous debate" or "state official testimony" that would "inform members of Congress about the consequences of their actions." Am. Compl. at 40, ¶ 164. The Supreme Court has already rejected another State's nearly identical argument that "the political process failed" where a law was "'imposed by the vote of an unin-formed Congress relying upon incomplete information.'" *South Carolina*, 485 U.S. at 513. As the Court observed, nothing in "the Tenth Amendment authorizes courts to second-guess the sub-stantive basis for congressional legislation." *Id.* That is especially so when, as here, Congress is merely curtailing its prior decision to treat one State as more equal than the others. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("federalism concerns" require that any "departure from the fundamental principle of equal sovereignty [among the states] requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets").

Plaintiffs further complain that they "had no opportunity to participate in the Executive Branch's relabeling of the waivers as 'rules' and submission of a 'report' to Congress." Am. Compl. at 40, ¶ 165. But States have no statutory role to play in an agency submission under the CRA. *See* 5 U.S.C. § 801; *cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law."). Nor do they have any constitutional right to influence it. And Plaintiffs were not improperly "ex-clu[ded] and isolat[ed]" from Congress's decision to credit the Executive Branch's characteriza-tion of the waivers as rules. Am. Compl. at 40, ¶ 165. States themselves get no votes in either Chamber, of course, but the interests of their citizens were well represented. Together, citizens of the eleven Plaintiff States are represented by 22 Senators and 130 members of the House of Rep-resentatives, accounting for nearly a quarter of the Senate and about thirty percent of the House. These members of Congress participated fully in the legislative process that resulted in the enact-ment of the Resolutions, including in the debate leading up to the votes.[15] Plaintiff States, therefore,

---

[15] *See, e.g.*, Am. Compl., Ex. B at 1 n.2 (Rhode Island Senator Whitehouse, and California Senators Padilla and Schiff requested opinion from GAO); Am. Compl., Ex. C at 10–16, ECF No. 157-3

(…continued)

had all the participation they were due.

Moreover, it is not "extraordinary," or even unusual, for an Executive Branch agency to disagree with GAO about whether a particular agency action is a "rule" under the CRA. Am. Compl. at 39–40, ¶ 163. Agencies often disagree with GAO's conclusions.[16] What Plaintiffs allege is a "defect" is merely their disagreement with Congress's decision in this instance to side with the agency, which has a statutory role in the process, rather than with GAO, which does not.

But Congress isn't constitutionally required to defer to GAO, and Congress's decision to depart from GAO's conclusion here wasn't arbitrary. As OMB explained, there are strong reasons to conclude that the waivers are "rules" of "general applicability" for purposes of the CRA. *See* Ex. 1 at 3–6. The Ninth Circuit has described the relevant distinction between rules and adjudications:

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals[.]… Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler*, 37 F.3d at 448 (citations omitted). The Ninth Circuit therefore held that a determination by the federal Department of Housing and Urban Development ("HUD") that the state of Washington's Public Housing Authority could substitute state eviction procedures for federal ones in federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

Like HUD's determination, EPA's waivers allowing Plaintiffs to substitute state emissions standards for federal ones have "all the hallmarks of a rule." *Id.* at 448. The waivers "had no immediate, concrete effect on anyone, but merely permitted" California and other states to enforce

---

(Senator Whitehouse speaking on the Senate Floor); *id.* at 17 (Senator Padilla speaking on the Senate Floor); *id.* at 18–19 (Senator Schiff speaking on the Senate Floor); *id.* at 23, 30–32 (Massachusetts Senator Markey speaking on the Senate Floor).

[16] *See, e.g.*, GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121*, at 1 (Oct. 31, 2023) (SEC staff bulletin is a rule subject to the CRA, despite SEC's contrary conclusion); 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696) (transmitting action to Congress even though "EPA disagrees with GAO[]" and "does not believe that the … action[] is a 'rule'" under the CRA).

1   state emissions standards "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable through

2   § 7543(b)(1)(C), requiring lead time for California standards); *id.* § 7507(2) (other states must

3   "adopt such standards at least two years before commencement of [the applicable] model year").

4   EPA waivers therefore have "prospective" rather than "immediate" effect. *Yesler*, 37 F.3d at 448.

5   The waivers also "affected the rights of a broad category of individuals not yet identified": manu-

6   facturers who, in the future, may sell new motor vehicles in those states. *Id.*

7       As with HUD's determination, it doesn't matter "that the manner in which [EPA] made its

8   decision[s] shares certain features with adjudications." *See id.* at 449. "The form of the proceeding

9   is not dispositive; what counts is its effect." *Id.* And the effect of a waiver is that of a rule that

10  implements "a unique alternative nationwide compliance pathway" governing conduct of manu-

11  facturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) ("compliance with [California's] standards

12  shall be treated as compliance with applicable Federal standards"). EPA's waiver decisions

13  "plainly involved more than applying a rule of decision to particular facts," including weighing

14  policy-laden considerations like the standards' technological feasibility and cost appropriateness.

15  *Yesler*, 37 F.3d at 449; 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C)). The waivers

16  also are "generally," not "particularly," applicable. Once EPA issues a waiver, other states may

17  adopt California's standards. 42 U.S.C. § 7507. A waiver therefore imposes obligations on manu-

18  facturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA

19  regularly concluded that waivers are "nationally applicable" or of "nationwide scope [and] ef-

20  fect." 88 Fed. Reg. at 20,725 (ACT waiver). EPA and Congress were thus correct to treat the

21  waivers as "rules" under the CRA, despite GAO's contrary conclusion.

22      At bottom, Plaintiffs disagree with the Senate's decision to curtail California's special treat-

23  ment under the Clean Air Act without applying filibuster rules. Am. Compl. at 41, ¶ 167 (describing

24  the Resolutions as an "end-run"). But Congress's ability to choose the procedures that it applies

25  to any particular legislation isn't a "defect" of the legislative process, but a feature of the consti-

26  tutional design. The Senate isn't limited to using procedures to which "[a]ll of the States con-

27  sented." *Contra id.* at 40, ¶ 166. "Each House," alone, "determine[s] the Rules of its Proceed-

28  ings." U.S. Const. art. I, § 5, cl. 2. That is all that the Senate did here when deciding to treat the

waivers as "rules" under the CRA. Plaintiffs have no right to the filibuster under the Tenth Amendment or any other provision of the Constitution, even for legislation in which they have a particular interest.

Because Plaintiffs have not identified any defects in the legislative process leading to the Resolutions' enactment, much less "extraordinary" ones, Plaintiffs' Tenth Amendment claim fails.

**C. Plaintiffs Lack a Cause of Action for Their Constitutional Claims**

Finally, Plaintiffs' constitutional claims also fail because they lack a cause of action. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law or asserted offensively pursuant to an independent cause of action designed for that purpose, *see, e.g.*, 42 U.S.C. § 1983." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted). No constitutional provision, doctrine, or statute cited by Plaintiffs provides a right to sue to challenge the internal procedures of Congress, as Plaintiffs' constitutional claims do. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015). Nor can Plaintiffs successfully invoke the "inherent equitable power" of federal courts. Am. Compl. at 41, ¶ 171 (Count V). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and the CRA's jurisdiction stripping provision announces Congress's "'intent to foreclose' [the] equitable relief" that Plaintiffs seek. *Armstrong*, 575 U.S. at 327–28; *see supra* Section I (pp. 11–13). Moreover, to the extent Count V, Am. Compl. ¶¶ 170–179, alleges violations by the President, it is beyond this Court's review. *See Franklin*, 505 U.S. at 800–01 (courts lack authority to enjoin the President in the performance of discretionary duties).

## CONCLUSION

For the foregoing reasons, Plaintiffs' entire amended complaint should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state any cognizable claim.

Dated: December 12, 2025

Respectfully submitted,

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
Lehotsky Keller Cohn LLP
200 Massachusetts Ave., NW
Suite 700
Washington, DC 20001
Email: steve@lkcfirm.com
Email: mike@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

*/s/ Michael Buschbacher*
Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

*/s/ Katherine C. Yarger*
Katherine C. Yarger* (CO 40387)
Lehotsky Keller Cohn LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Attorneys for American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores*

*Counsel for Intervenor-Defendants American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association*

* Admitted pro hac vice.

Ex. 1



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

June 18, 2025

Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

> Re: **Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act"**

Dear Mr. Comptroller General:

Late last month, the Senate voted in favor of three joint House resolutions (which by then had passed the House)[1] invalidating three waivers of preemption granted by EPA to California.[2] The analysis below buttresses Congress's legal conclusions ***both*** to substantively override those waivers ***and*** to deem the waivers to be rules subject to the Congressional Review Act ("CRA") in the first place.

More specifically, this letter provides the Office of Management and Budget's ("OMB's") response to a March 6, 2025 Government Accountability Office ("GAO") letter concerning application of the CRA to these three waivers. In preparing this letter, I have consulted with the Office of Information and Regulatory Affairs ("OIRA"), which has a statutorily assigned role in the CRA process and reports to me as part of OMB.

OMB strongly disagrees with GAO's analysis (styled as a set of "Observations") for numerous reasons falling into two basic categories—GAO's lack of authority in this area ***and*** GAO's flawed administrative law analysis of how to classify when an agency action is deemed a rule versus an adjudication. I turn first to the four reasons why GAO exceeded its authority:

---

[1] *See* H.J. Resolutions 87, 88, and 89, *available at* https://www.congress.gov/bill/119th-congress/house-joint-resolution/87; https://www.congress.gov/bill/119th-congress/house-joint-resolution/88; and https://www.congress.gov/bill/119th-congress/house-joint-resolution/89 (last visited June 17, 2025).
[2] *See* 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 642 (Jan. 6, 2025); 68 Fed. Reg. 20,688 (Apr. 6, 2023).

## I.  GAO'S LACK OF POWER IN THIS AREA

*First, GAO has no legal role whatsoever* in deciding whether an action the Executive Branch submits to Congress for consideration under the Congressional Review Act ("CRA") is a "rule" or an "adjudication." That role is assigned instead to the Administrator of OIRA (see below for additional details) and ultimately Congress.

*Second*, GAO *also has no expertise in this area*, whereas OIRA routinely reviews federal actions to determine their character, consistency with law, and whether they meet the basic tests of rationality, such as producing net benefits or net costs, and at what level. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). When performing zone-of-interests analysis, for instance, the Supreme Court considers agency expertise to be a relevant prudential factor.[3] Just so here. As a prudential matter, GAO's non-expert Observations were properly not be credited by Congress and should not be in the future because GAO lacks expertise in this area, being an agency with a different assigned role.

*Third*, GAO has reached the opposite conclusion in the past. Indeed, as Comptroller, you *conceded* both the lack of a GAO role here and that GAO's Observations took an unprecedented legal position when being questioned recently by Representatives Valadao (CA) and Moore (WV).[4]

*Fourth, and worst of all, GAO's "Observations" functionally attempt to interfere with the democratic process.* Members of Congress should decide for themselves whether to apply the CRA to a particular action of the Executive Branch, not GAO. If Congress had wanted GAO to have a gatekeeping role over application of the CRA, Congress would have said so in clear terms. The silence in the statute on this point is telling. And Congress's enactment of the joint resolutions of disapproval represents an express rejection of GAO's actions.

* * * * *

OIRA is the Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a "major rule" within the meaning of the Congressional Review Act ("CRA" or "the Act"). *See* 5 U.S.C. § 804(2). Part of that role is to parse whether an action is a "rule" at all. Given this statutory role and based as well on OIRA's experience, I explain in detail below OMB's affirmative determination that the waivers are "rules" subject to the CRA.

As GAO notes, in granting those waivers, the prior Administration summarily asserted that the actions at issue are not subject to the Act. But following the change in Administration, EPA's new Administrator reassessed the agency's evaluation and

---

[3] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226–27 (2012) (considering Department of Interior regulations when resolving a zone-of-interests dispute); *Federal Defenders of N.Y. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (same as to federal BOP regulations). Zone-of-interests analysis constitutes a prudential jurisdictional analysis. *See Bennett v. Spear*, 520 U.S. 154, 162 (1994). We argue by analogy here that GAO lacks the congressional equivalent of jurisdiction over the CRA question at issue.
[4] *See* Hearing Before the House Committee on Appropriations, Subcommittee on the Legislative Branch, 119th Congress (Apr. 7, 2025), *available at* http://appropriations.house.gov/schedule/hearings/budget-hearing-government-accountability-office-congressional-budget-office-and (last visited June 17, 2025).

concluded that the waivers are best characterized as rules of general applicability within the meaning of the Act.[5]

Like Congress, OMB agrees with EPA Administrator Zeldin that the waivers are rules of general applicability subject to the CRA. And regardless, even if the question were close (which it is not), it was prudent for the EPA Administrator to submit the waivers to Congress out of an abundance of caution and out of deference to Congress's role in our constitutional Republic. This common agency practice obviates any advisory role for GAO.[6] Indeed, EPA has previously sent a prior action revoking a Clean Air Act preemption provision to Congress and that action remains listed on GAO's own website as a "final rule."[7]

OMB therefore believes that no additional information was necessary for Congress to discharge its legislative role, or for GAO to discharge its *ad hoc* advisory role. As GAO through a prior general counsel once testified before the Senate, the Act does not give GAO power "to decide what a rule is."[8] As GAO further explained in its March 6, 2025 letter concerning these waivers, *see* B-337179, GAO does not even "normally issue a legal decision" when an agency submits an action for review. *Id.* at 1. Indeed, OMB is unaware of GAO ever doing so before now. *See also supra* n.4.

As GAO notes in its letter to congressional requesters, "GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under the CRA because that submission generally obviates the need for a GAO decision on the matter." *Id.* at 1 n.3.[9] Hence, that should have marked the conclusion of GAO's involvement.

In its March informal letter to congressional requesters, however, GAO nevertheless departed from its longstanding practice and opined (albeit informally) that the submitted waivers were not rules of general applicability, citing a prior GAO opinion about a different waiver and claiming that the same legal analysis would apply to these three submitted waivers. *See* B-337179 at 7. GAO also claims that EPA has not explained

---

[5]     "The Biden Administration failed to send rules on California's waivers to Congress, *preventing Members of Congress from deciding on extremely consequential actions that have massive impacts and costs across the entire United States.* The Trump EPA is transparently correcting this wrong and rightly following the rule of law," said Administrator Zeldin.

EPA, Press Release, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (Feb. 14, 2025), *available at* https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting (last visited June 17, 2025) (emphasis added). GAO's footnote 15 in its Observations simply reflects the prior Administration's attempt to sidestep CRA review of California waiver decisions, relying on Biden-era EPA *Federal Register* notice from 2023 and a so-called "midnight" rule issued on January 6, 2025—precisely the kind of rule that the CRA was especially designed to place under Congress's watchful eye.

The position we take here is also consistent with that of the Small Business Administration's Office of Advocacy. *See* Advocacy Submits Comments on EPA Waiver Request for California Locomotive Regulation (Apr. 23, 2024), *available at* https://advocacy.sba.gov/2024/04/23/advocacy-submits-comments-on-epa-waiver-request-for-california-locomotive-regulation/ (last visited June 17, 2025) ("The Clean Air Act allows other states to implement California's standards once they are finalized. Advocacy is concerned that the ability of other states to potentially implement the In-Use Locomotive Rule *turns a state regulation into a de facto national regulation.* Advocacy is concerned that California's proposed rule will disproportionately harm small locomotives [and] small businesses nationwide who rely on the country's rail system.") (emphasis added).

[6] *See, e.g.*, EC-5696, 170 Cong. Rec. S5883 (Sept. 9, 2024) (EPA "does not believe that the enclosed actions is [*sic*] a 'rule' within the meaning of 5 U.S.C. 804(3). Nevertheless, out of an abundance of caution, EPA is voluntarily submitting the action 'to each House of the Congress and the Comptroller General,' for their review under 5 U.S.C. 801(a).").

[7] *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, FRL-10000-45,* https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a "final rule.").

[8] *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. and H. Comm. On Res.*, 105th Cong. 20 (1977).

[9] *See also Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38,* B-330376 (Nov. 30, 2018).

why it disagrees with GAO. This letter provides the Executive Branch's response to GAO.

## II.  GAO'S FLAWED ADMINISTRATIVE LAW ANALYSIS

In OMB's view, GAO's opinion overlooks and misrepresents important aspects of how preemption waivers under the Clean Air Act work under Section 209(b) of that statute as a matter of administrative law.

GAO's foundational claim is that a waiver of preemption is an "order" (by which it appears to mean something like a "license" particular to California, though GAO does not actually reach that conclusion) and thus is not a "rule" of general applicability. In the alternative, GAO claims that, if the waiver is a rule, it is one of particular applicability. OMB disagrees with both of these claims for five reasons.

*First*, GAO's conclusion that the waivers are "orders" is inconsistent with judicial decisions interpreting the Administrative Procedure Act, which forms the basis for the CRA's definition of a "rule."[10] Courts have been clear that sub-delegation of regulatory authority to a State—like that accomplished through the waivers—is characteristic of a "rule," not an "order." The seminal case here is *Yesler Terrace Community Council v. Cisneros*, which involved HUD's determination that Washington State's public housing authority could substitute its own eviction procedures for federally required ones. 37 F.3d 442 (9th Cir. 1994). The Ninth Circuit rejected HUD's argument that this was an "order," concluding that HUD's action "has all the hallmarks of a rule. HUD's determination has no immediate, concrete effect on anyone, but merely permitted [the Washington Public Housing Authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

Moreover, two separate district courts were called on to carefully analyze the Clean Air Act mobile source program including its preemption provision. And the analysis of each parallel OMB's conclusion that California waiver decisions are better classed as rules rather than as orders. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("[O]nce EPA issues a waiver for a California emissions standard" it has "the same stature as a federal regulation."); *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

The *Yesler* analysis, as confirmed by the Clean Air Act-specific logic of the *Green Mountain* and *Central Valley* district courts, applies here. The waivers at issue have "no immediate, concrete effect on anyone, but merely permit[]" California (and other States) to enforce different standards "in the future." *Id.* The waivers similarly "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *Id.*

---

[10] *See* 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]" with certain exceptions).

*Yesler* also shows why it is irrelevant that EPA styled its waivers as "decision[s]" and initially summarily disclaimed application of the CRA. As the Ninth Circuit explained, "that the manner in which [an agency] made its decision shares certain features with adjudications" is not determinative. *Id.* at 449. "The form of the proceeding is not dispositive, what counts is its *effect*." *Id.* (emphasis added). The waivers, like the HUD determination in *Yesler*, have "legal consequences for yet-to-be-identified individuals only prospectively," *i.e.*, "the effects of a rule, not of an adjudication." *Id.*

GAO curiously cites *Yesler* on page 7 of its analysis, yet seems oblivious to the fact that *Yesler*, as applied here, leads to the opposite outcome than the one which GAO advocates. GAO does not even say anything about why waivers are distinguishable from the delegation of eviction authority at issue in *Yesler*.

**Second**, unlike an ordinary license, a waiver of Section 209(a) Clean Air Act preemption does more than grant California alone an exemption from a prohibition under the Clean Air Act. Under Section 177 of the Clean Air Act, 42 U.S.C. § 7507, a waiver allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing. As EPA explained in the Advanced Clean Trucks waiver, "[t]his final action will not only affect manufacturers of new heavy-duty vehicles and engines sold in California, but also manufacturers that sell their new heavy-duty vehicles and engines in those states that have already adopted or may choose to adopt California's regulations"—consequently, "this final action is ***nationally applicable***."[11]

Currently, 18 States have adopted at least one of California's electric-vehicle standards under Section 177. GAO's claim that a waiver is "particular to California" thus overlooks the most significant part of the entire statutory scheme. GAO's analysis, however, does not address this provision in any form.

Nor did GAO address Section 177's prohibition on creating a "third vehicle" that could lawfully be sold in the United States. Of course, the point of the "third vehicle" prohibition confirms that there are two and only two nationally applicable automobile emissions regimes that can govern in the United States: (1) EPA's federal car standards, unmistakably issued exclusively in the form of regulations; and (2) California's standards, because those standards can "travel" under Section 177 to govern in non-California States without a separate waiver.[12] It makes no sense to imagine that federal-car States are governed via regulations but California-car States are governed by adjudication. And any such argument particularly withers once one realizes that what EPA grants preemption waivers of is California regulations, not California adjudications.

**Third**, a waiver of Section 209(a) Clean Air Act preemption does not simply govern the primary conduct of California and all other Section 177 States. Instead, such a waiver also directly governs the conduct of motor-vehicle manufacturers ***nationwide***. Under Section 209(b)(3) of the Clean Air Act, certification and conformance to California's alternative standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. § 7543(b)(3). Thus, a waiver creates a unique alternative nationwide compliance pathway for motor-vehicle manufacturers that displaces EPA's otherwise applicable federal standards. Again, OMB is not aware of any "adjudicatory order" creating a new interstate regulator that can replace federal standards and govern

---

[11] *See, e.g.*, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023) (emphasis added).
[12] As noted above, EPA does not conduct a separate adjudication applicable to Section 177 State borrowing decisions.

compliance for an entire manufacturing industry across numerous States. Yet GAO's analysis is also mum about this provision.

*Fourth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption are orders because they have "immediate effect" on California, not prospective effect. It is unclear what GAO means by "immediate effect," but Section 202(a) of the Clean Air Act, 42 U.S.C. § 7521(a), which applies to EPA directly and to waiver decisions as well through Section 209(b)(1)(C), 42 U.S.C. § 7543(b)(1)(C), requires that the waived California rules give motor vehicle manufacturers adequate "lead time," which is typically measured in years, not months. And Section 177(2) also requires at least "two years" of lead time for other States adopting these alternative standards. OMB is aware of no adjudicatory order that requires multiple years of lead time.

True adjudications are inherently retrospective in nature—that is, they describe and establish at that moment in time the law as it always has been, not the law as it is being established prospectively and only for the first time. *See, e.g., Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). By contrast, California emissions regulations apply only prospectively, and only after the lapse of the appropriate amount of lead time. Moreover, EPA waivers are inherently prospective. Otherwise, Section 177 States would have no stability—if they could adopt the California-car standards "immediately" after California promulgated the relevant regulations, then a denied EPA waiver would automatically upset the national market for new automobiles and engines.

As the D.C. Circuit has explained, moreover, even in the agency context specifically, forward-looking obligations are a characteristic of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club In'tl. v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) ("an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking. Again, however, GAO's analysis does not discuss the Clean Air Act's lead time provisions.

*Fifth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption involve considerations "of particular facts, as opposed to general policy." Not so. In granting waivers, EPA must address the consistency of the regulations with Section 202(a), EPA's primary regulatory authority for motor vehicles. *See* 42 U.S.C. § 7543(b)(1)(C). In so doing, EPA considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place. These questions require making predictive policy judgments, not addressing "particular facts." For example, do the California regulations give the industry sufficient lead time to transition to 100% electric vehicles? Are the industry's compliance costs with that lead time "appropriate"? Are the standards "technologically feasible"? 42 U.S.C. § 7521(a)(2). OMB is unaware of any adjudicatory order that requires addressing similarly forward-looking and policy-laden questions about any entire industry's ability to comply. As with the other points made above, however, GAO's analysis is completely silent on the lead-time and technological feasibility aspects of the statutory regime.

\* \* \* \* \*

Because GAO does not address any of these five points, and appears to misunderstand how these Clean Air Act waivers operate, OMB, as the Executive Branch's expert agency for regulatory matters generally, is unpersuaded by GAO's opinion and letter and instead believes that the waivers were and are best characterized as rules of general applicability. But regardless, even if a close call, the EPA Administrator's decision to submit the waivers to promote greater accountability to Congress was reasonable. That practice promotes the kind of agency accountability to Congress that the CRA—and GAO—was created to enhance, not diminish.

It is Congress that is optimally positioned to ***decide for itself*** when to put rules submitted to it to CRA votes, as it did in considering the three passed House Joint Resolutions 87 through 89. ***That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic***. In enacting the resolutions of disapproval, Congress emphatically rejected GAO's inappropriate attempt to interfere with Congress's powers under the Constitution and CRA. EPA is thus now barred from issuing any waiver of preemption California seeks that is substantially similar to the three overridden waivers.[13]

Sincerely,

Russell T. Vought
Director

---

[13] *See* 5 U.S.C. 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.").