Rob Bonta
Attorney General of California
Myung J. Park
Supervising Deputy Attorney General
Katherine Gaumond, State Bar No. 349453
Caitlan McLoon, State Bar No. 302798
Cecilia D. Segal, State Bar No. 310935
Emmanuelle S. Soichet, State Bar No. 290754
M. Elaine Meckenstock, State Bar No. 268861
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN**, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP**, in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:       February 19, 2026<br>Time:      2:00 PM<br>Courtroom:  2 (4th Floor)<br>Judge:      The Honorable Haywood S. Gilliam, Jr.<br>Trial Date:   Not Set<br>Action Filed: June 12, 2025 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 1

    A.    Congress Intentionally Preserved California's Vehicle Emission Control
        Program, While Ensuring Manufacturers Face Only Two Such Programs ........... 1

    B.    California Continues to Seek to Reduce Vehicular Emissions .............................. 2

    C.    The Congressional Review Act Provides Fast-Track Review of Generally
        Applicable Federal *Rules* ..................................................................................... 3

    D.    Clean Air Act Waivers Have Never Been "Rules" Subject to the CRA ................ 4

    E.    The Federal Government Mounts an Unprecedented Attack on California's
        Program .................................................................................................................. 4

    F.    Procedural History ................................................................................................ 6

ARGUMENT ............................................................................................................. 6

I.    Plaintiffs' Constitutional Claims (Counts III and IV) Are Justiciable and Well Pled ........ 6

    A.    The CRA Does Not Bar Judicial Review of These Claims ................................... 7

        1.    The CRA does not bar review of any constitutional claim ......................... 7

        2.    Plaintiffs' claims do not call for review of conduct "under" the
              CRA    .................................................................................................... 7

    B.    Plaintiffs' Constitutional Claims Do Not Raise Political Questions.................... 11

    C.    Plaintiffs Have Stated Separation of Powers Claims (Count III)........................ 12

        1.    The Resolutions are impermissible legislative adjudications. ................. 12

        2.    The Senate delegated its explicit constitutional power to the
              Executive ................................................................................................. 17

    D.    Plaintiffs Have Stated a Claim that the Resolutions Violate the Tenth
        Amendment and Structural Principles of Federalism (Count IV)........................ 21

II.    Plaintiffs' Non-Constitutional Claims (Counts I, II, and V) Are Likewise
    Justiciable and Well Pled ............................................................................................. 23

    A.    These Non-Constitutional Claims Are Not Barred by CRA Section 805 or
        the Political Questions Doctrine .......................................................................... 23

    B.    Section 307(d) of the CAA Does Not Preclude this Court's Jurisdiction
        over These Non-Constitutional Claims................................................................ 24

    C.    Plaintiffs Have Standing to Bring Their Non-Constitutional Claims .................. 24

    D.    Plaintiffs Have Stated Claims that EPA's Actions Violate the APA and Are
        Ultra Vires (Counts I and II) ............................................................................... 27

CONCLUSION ........................................................................................................ 30

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Bank Markazi v. Peterson*
  578 U.S. 212 (2016) ......................................................................................... 16, 17

5

6

*Bennett v. Spear*
  520 U.S. 154 (1997) ..................................................................................... 25, 28, 29

7

*Boumediene v. Bush*
  553 U.S. 723 (2008) ............................................................................................... 16

8

9

*Bowsher v. Merck & Co., Inc.*
  460 U.S. 824 (1983) ................................................................................................. 3

10

*Bowsher v. Synar*
  478 U.S. 714 (1986) ............................................................................................... 12

11

12

*Cal. Dump Truck Owners Ass'n v. Nichols*
  784 F.3d 500 (9th Cir. 2015) ................................................................................. 24

13

*Cal. Dump Truck Owners Ass'n v. Nichols*
  924 F. Supp. 2d 1126 (E.D. Cal. 2012) ................................................................ 24

14

15

*Cary v. Curtis*
  44 U.S. 236 (1845) ................................................................................................. 13

16

*Chadha v. INS*
  634 F.2d 408 (9th Cir. 1980) ........................................................................... 13, 20

17

18

*City of Arlington v. FCC*
  569 U.S. 290 (2013) ............................................................................................... 12

19

20

*City of Fremont v. FERC*
  336 F.3d 910 (9th Cir. 2003) ................................................................................. 29

21

22

*Clark v. Martinez*
  543 U.S. 371 (2005) ................................................................................................. 8

23

24

*Common Cause v. Biden*
  909 F. Supp. 2d 9 (D.D.C. 2012) .......................................................................... 12

25

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*
  482 F.3d 1157 (9th Cir. 2007) ......................................................................... 11, 24

26

27

*Cook Inlet Treaty Tribes v. Shalala*
  166 F.3d 986 (9th Cir. 1999) ................................................................................. 16

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Ctr. for Biological Diversity v. Bernhardt (CBD)*
    946 F.3d 553 (9th Cir. 2019)............................................................................ 7, 8, 16, 27

4

5

*Dalton v. Specter*
    511 U.S. 462 (1994) ........................................................................................................ 29

6

*DHS. v. Regents of the Univ. of California*
    591 U.S. 1 (2020) ............................................................................................................ 30

7

8

*Diamond Alternative Energy, LLC v. EPA*
    606 U.S. 100 (2025) .................................................................................................. 10, 25

9

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ........................................................................................................ 10

10

11

*Ellis v. Costco Wholesale Corp.*
    657 F.3d 970 (9th Cir. 2011) ......................................................................................... 25

12

13

*Engine Mfrs. Ass'n v. EPA*
    88 F.3d 1075 (D.C. Cir. 1996). ........................................................................................ 2

14

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ........................................................................................................ 30

15

16

*Fletcher v. Peck*
    10 U.S. 87 (1810) ............................................................................................................ 13

17

18

*Franklin v. Massachusetts*
    505 U.S. 788 (1992) ........................................................................................................ 28

19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
    561 U.S. 477 (2010) .................................................................................................... 6, 19

20

21

*Garcia v. San Antonio Metro. Transit Auth.*
    469 U.S. 528 (1985) .............................................................................................. 21, 22, 23

22

23

*Gill v. DOJ*
    913 F.3d 1179 (9th Cir. 2019).......................................................................................... 28

24

25

*Horne v. USDA*
    576 U.S. 350 (2015) ........................................................................................................ 17

26

*INS v. Chadha*
    462 U.S. 919 (1983) .................................................................................................. 14, 19

27

28

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Kansas Nat. Res. Coal. v. DOI*
  971 F.3d 1222 (10th Cir. 2020)...................................................................... 8

4

*King v. Burwell*
  576 U.S. 473............................................................................................... 18

5

6

*Loper Bright Enters. v. Raimondo*
  603 U.S. 369 (2024)..................................................................................... 9

7

*Metzenbaum v. FERC*
  675 F.2d 1282 (D.C. Cir. 1982) .................................................................. 11

8

9

*Michel v. Anderson*
  14 F.3d 623 (D.C. Cir. 1994) ....................................................................... 8

10

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
  627 F.2d 1095 (D.C. Cir. 1979) ............................................................... 2, 3

11

12

*Mount Graham Coalition v. Thomas*
  89 F.3d 554 (9th Cir. 1996)................................................................... 15, 17

13

14

*Mountain States Legal Found. v. Glickman*
  92 F.3d 1228 (D.C. Cir. 1996) ................................................................... 26

15

16

*Murphy v. NCAA*
  584 U.S. 453 (2018)................................................................................ 1, 22

17

18

*Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*)
  583 U.S. 109 (2018)................................................................................ 8, 9

19

*Nat'l Ass'n of Postal Supervisors v. USPS*
  26 F.4th 960 (D.C. Cir. 2022) .................................................................... 30

20

21

*Nat'l TPS Alliance v. Noem*
  150 F.4th 1000 (9th Cir. 2025)..................................................................... 9

22

23

*Nevada v. Skinner*
  884 F.2d 445 (9th Cir. 1989)....................................................................... 21

24

*Nevada v. Watkins*
  914 F.2d 1545 (9th Cir. 1990).......................................................... 21, 22, 23

25

26

*Newsom v. Trump*
  141 F.4th 1032 (9th Cir. 2025)...................................................... 11, 24, 30

27

28

iv

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Nixon v. United States*
    506 U.S. 224 (1993)................................................................................ 12

5

*NLRB v. Noel Canning*
    573 U.S. 513 (2014)........................................................................... 11, 19

6

7

*Novak v. United States*
    795 F.3d 1012 (9th Cir. 2015).............................................................. 25

8

*NRG Power Mktg., LLC v. FERC*
    862 F.3d 108 (D.C. Cir. 2017)............................................................. 15

9

10

*Ohio Telecom Ass'n v. FCC*
    150 F.4th 694 (6th Cir. 2025)................................................................. 8

11

12

*Pennsylvania v. Wheeling & Belmont Bridge Co.*
    59 U.S. 421 (1855)........................................................................... 14, 15

13

14

*Plaut v. Spendthrift Farm, Inc.*
    514 U.S. 211 (1995)......................................................................... 13, 17

15

*Powell v. McCormack*
    395 U.S. 486 (1969)......................................................................... 11, 27

16

17

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*
    128 F.4th 1089 (9th Cir. 2025).............................................................. 28

18

19

*Pub. Citizen v. U.S. DOJ*
    491 U.S. 440 (1989) .............................................................................. 19

20

*Robertson v. Seattle Audubon Soc'y*
    503 U.S. 429............................................................................................ 16

21

22

*Safer Chemicals, Healthy Fams. v. EPA*
    943 F.3d 397 (9th Cir. 2019)................................................................. 28

23

24

*San Luis & Delta-Mendota Water Auth. v. United States*
    672 F.3d 676 (9th Cir. 2012)...................................................... 25, 26, 27

25

*Sierra Club v. Trump*
    929 F.3d 670 (9th Cir. 2019)................................................................. 28

26

27

*Sierra Club v. Trump*
    963 F.3d 874 (9th Cir. 2020).................................................................. 7

28

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

4

*South Carolina v. Baker*
    485 U.S. 505 (1988) ........................................................................ 21, 22, 23

5

*Thomas v. Anchorage Equal Rts. Comm'n*
    220 F.3d 1134 (9th Cir. 2000) ....................................................................... 26

6

7

*U.S. Army Corps of Eng'rs v. Hawkes Co.*
    578 U.S. 590 (2016) ..................................................................................... 29

8

9

*United States v. Arthrex, Inc.*
    594 U.S. 1 (2021) ......................................................................................... 13

10

*United States v. Ballin*
    144 U.S. 1 (1892) ......................................................................................... 11

11

12

*United States v. Brown*
    381 U.S. 437 (1965) ..................................................................................... 13

13

14

*United States v. Carolene Prods. Co.*
    304 U.S. 144 (1938) ..................................................................................... 22

15

*United States v. Klein*
    80 U.S. 128 (1871) ................................................................................. 14, 15

16

17

*United States v. Munoz-Flores*
    495 U.S. 385 (1990) ..................................................................................... 19

18

19

*United States v. Sherwood*
    312 U.S. 584 (1941) ..................................................................................... 14

20

*WildEarth Guardians v. USDA*
    795 F.3d 1148 (9th Cir. 2015) ................................................................. 25, 26

21

22

*Yellin v. United States*
    374 U.S. 109 (1963) ..................................................................................... 11

23

*Yesler Terrace Community Council v. Cisneros*
    37 F.3d 442 (9th Cir. 1994) .................................................................... 10, 11

24

25

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 5 ............................................................................... 12, 18

26

U.S. Const. art. III, § 1 .................................................................................. 13

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

1 U.S.C. § 102 ................................................................................................................ 10

1 U.S.C. § 103 ................................................................................................................ 10

5 U.S.C. § 551(1) ........................................................................................................... 10

5 U.S.C. § 551(4) ............................................................................................................. 9

5 U.S.C. § 551(5) ............................................................................................................. 9

5 U.S.C. § 551(6) ............................................................................................................. 9

5 U.S.C. § 551(7) ............................................................................................................. 9

5 U.S.C. § 551(8) ............................................................................................................. 9

5 U.S.C. § 551(9) ............................................................................................................. 9

5 U.S.C. § 553(b) ........................................................................................................... 30

5 U.S.C. § 553(c) ........................................................................................................... 30

5 U.S.C. § 558(c) ........................................................................................................... 29

5 U.S.C. § 801(a)(1)(A) ........................................................................................... *passim*

5 U.S.C. § 801(a)(2)(A) ................................................................................................... 8

5 U.S.C. § 801(a)(5) ........................................................................................................ 8

5 U.S.C. § 801(b)(2) ..................................................................................... 17, 26, 27, 29

5 U.S.C. § 801(c)(2) ........................................................................................................ 8

5 U.S.C. § 802 ............................................................................................................... 18

5 U.S.C. § 802(a) ............................................................................................................ 8

5 U.S.C. § 802(d)(1) ........................................................................................................ 4

5 U.S.C. § 802(d)(2) ........................................................................................................ 4

5 U.S.C. § 802(g)(2) .................................................................................................. 8, 18

5 U.S.C. § 804(2) ............................................................................................................ 8

1

2

### TABLE OF AUTHORITIES
(continued)

**Page**

3      5 U.S.C. § 804(3) ............................................................................................................ 3, 9

4      5 U.S.C. § 805 ............................................................................................................... *passim*

5      5 U.S.C. § 806(a) ................................................................................................................... 9

6      5 U.S.C. § 808 ....................................................................................................................... 8

7      42 U.S.C. § 7507 ............................................................................................................. 2, 15

8      42 U.S.C. § 7543(a) ............................................................................................................. 11

9      42 U.S.C. § 7543(b)(1)................................................................................................. *passim*

10     42 U.S.C. § 7543(e)(2)(A) ..................................................................................................... 2

11     42 U.S.C. § 7607(b)(1)......................................................................................................... 24

12     42 U.S.C. § 7607(d) ............................................................................................................. 30

13     44 U.S.C. § 903 ................................................................................................................... 20

14     Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965)................................................................... 2

15     Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967)................................................ 2

16     Pub. L. No. 104-121, 110 Stat. 847 (1996) .......................................................................... 3

17     Priv. L. No. 97-27, Stat. 96 (1982) ..................................................................................... 14

18     Priv. L. No. 97-55, Stat. 96 (1983) ..................................................................................... 14

19     Priv. L. No. 98-46, Stat. 98 (1984) ..................................................................................... 14

20     Cal. Health & Safety Code § 43000(a) ................................................................................. 2

**OTHER AUTHORITIES**

142 Cong. Rec. S3114 (Mar. 28, 1996) ................................................................................ 3

171 Cong. Rec. S3018 (May 21, 2025)........................................................................ 5, 6, 18, 20

171 Cong. Reg. S3140 (May 22, 2025) ......................................................................... 6, 18, 20

69 Fed. Reg. 59,920 (Oct. 6, 2004)........................................................................................ 4

88 Fed. Reg. 20,688 (Apr. 6, 2023) ................................................................................... 3, 4

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2
<u>Page</u>

3    90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................................... 3, 4

4    90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................................... 4, 11

5    Cal. Code of Reg., tit. 13, § 1963(c) ........................................................................... 3

6    B. Garner, *Garner's Dictionary of Legal Usage* 620 (3d ed. 2011) ........................... 13

7
8    *Regulatory Reform Act: Hearings on H.R. 2327 Before the Subcomm. on Admin.*
       *Law and Govt'l Relations of the H. Comm. on the Judiciary*, 98th Cong., 312
9       (1983) ........................................................................................................... 19

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

With EPA approval, California and other States have been regulating emissions from the new motor vehicles sold in their States for more than fifty years. Last year, the Executive and Legislative Branches of the Federal Government mounted a coordinated and unprecedented attack on the most recent amendments to these state regulatory programs. The result was three congressional Resolutions, each targeting a waiver of Clean Air Act (CAA) preemption permitting enforcement of certain amendments. Plaintiff States contend the Resolutions violate separation-of-powers and federalism principles and, separately, that the Executive Branch's efforts to pave the way for the Resolutions were ultra vires or otherwise contrary to law.

Defendants move to dismiss, invoking a jurisdiction-stripping provision in the Congressional Review Act (CRA)—a statute that allows expedited congressional disapproval of certain federal agency rules. That provision does not bar constitutional claims and is not even triggered here because *none* of Plaintiffs' claims fits within its scope. Nor do any of Defendants' other jurisdictional attacks hold water. Far from presenting standardless political questions, Plaintiffs' claims turn on justiciable questions of constitutional or statutory text and structure. Plaintiffs' statutory claims do not trigger direct appellate review, and Plaintiffs have standing to bring those claims in order to reduce or eliminate real threats from Defendants.

On the merits, Defendants' own conduct establishes their actions had consequences and are thus final. Plaintiffs' ultra vires claim is grounded in well-established prohibitions against post-hoc and unexplained alterations to agency actions. And although Defendants attempt to cast doubt on Plaintiffs' constitutional claims by asserting they are novel, precedent supports those claims. Regardless, when (as here) the Federal Government "extend[s] its authority in unprecedented ways," new claims may naturally "emerge." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018).

**BACKGROUND**

**A.   Congress Intentionally Preserved California's Vehicle Emission Control Program, While Ensuring Manufacturers Face Only Two Such Programs**

California has long faced severe air quality challenges, including ozone (or smog) pollution, which increases incidences of respiratory ailments, and particulate matter pollution, which can

1

1  lead to heart attacks and premature deaths. ECF 157 (FAC) ¶¶ 38, 47. Motor vehicles are

2  substantial sources of this pollution. Cal. Health & Saf. Code § 43000(a). Accordingly, California

3  has been setting emission standards for new motor vehicles since the 1950s. FAC ¶ 33.

4      When Congress entered the field in 1965, it did not initially preempt the States. Pub. L. No.

5  89-272, § 202, 79 Stat. 992 (1965). Two years later, however, manufacturers "raised the spectre

6  of an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n,*

7  *Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979). Congress responded by generally

8  preempting States. But, noting "the benefits for the Nation" and "the people of California,"

9  *MEMA I*, 627 F.2d at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)), Congress also required

10  EPA to waive preemption for California, upon request, absent limited conditions, Pub. L. No. 90-

11  148, § 208(a), (b), 81 Stat. 485, 501 (1967). Congress later expanded the "discretion" it had

12  afforded California, *MEMA I*, 627 F.2d at 1110 (cleaned up), and also provided other States the

13  option to adopt California's standards as their own, subject to certain conditions, 42 U.S.C.

14  § 7507; *see also* FAC ¶¶ 39-40. Accordingly, manufacturers must meet two, but only two, sets of

15  emission standards; and new motor vehicles produced since 1967 have been "either 'federal cars'

16  designed to meet the EPA's standards or 'California cars' designed to meet California's

17  standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).[1]

18      Before requesting a waiver, California must determine that its standards "will be, in the

19  aggregate, at least as protective" as EPA's. 42 U.S.C. § 7543(b)(1). EPA must then waive

20  preemption unless the record supports one of three limited findings. *Id.* As "Congress intended,"

21  this has allowed "the State to continue and expand its pioneering efforts" regarding motor vehicle

22  emissions—"in short, to act as a kind of laboratory for innovation." *MEMA I*, 627 F.2d at 1111.

23      **B.    California Continues to Seek to Reduce Vehicular Emissions**

24      Despite substantial progress, tens of millions of Californians live, study, work, or play in

25  areas that still experience some of the worst air quality in the Nation. FAC ¶ 47. To reduce these

26  threats and meet state and federal air pollution standards, the California Air Resources Board

27  _____

28      [1] In 1990, Congress duplicated this waiver provision in a new one concerning non-road vehicles/engines (e.g., tractors, bulldozers, lawnmowers). 42 U.S.C. § 7543(e)(2)(A); FAC ¶ 41.

2

1  (CARB) regularly amends its regulatory program. *See id.* ¶¶ 42-47. For example, in 1990, CARB

2  adopted standards requiring gradually increasing sales of zero-emission passenger cars and light

3  trucks in California. *Id.* ¶ 43.[2] CARB has since amended that aspect of its program multiple

4  times, as technologies have matured. *Id.* The most recent amendments—Advanced Clean Cars

5  II—also tightened emission levels for vehicles with internal combustion engines. *Id.* ¶ 44. EPA

6  waived preemption for all of these amendments. *Id.*; 90 Fed. Reg. 642 (Jan. 6, 2025).

7      Building on the success of its initial zero-emission-vehicle requirements, CARB adopted

8  the Advanced Clean Trucks (ACT) regulation in 2021, requiring increasing California sales of

9  zero-emission medium- and heavy-duty vehicles, beginning with model year 2024. FAC ¶ 45.

10  EPA waived preemption in 2023. *Id.*; 88 Fed. Reg. 20,688 (Apr. 6, 2023). In its "Omnibus"

11  regulation, CARB also tightened its standards for emissions of oxides of nitrogen (NOx), a smog

12  precursor, from heavy-duty diesel-powered engines beginning with model year 2024. FAC ¶ 46.

13  EPA again waived preemption. *Id.*; 90 Fed. Reg. 643 (Jan. 6, 2025).

14
15  **C.    The Congressional Review Act Provides Fast-Track Review of Generally Applicable Federal *Rules***

16      The CRA was one part of a broader bill—the Contract with America Advancement Act of

17  1996—that also increased the Nation's debt limit and made changes to Social Security. Pub. L.

18  104-121, 110 Stat. 847 (Mar. 29, 1996); FAC ¶ 51. The bill passed the House by a bipartisan vote

19  and the Senate by unanimous consent. 142 Cong. Rec. S3114 (Mar. 28, 1996); FAC ¶ 51.

20      The CRA establishes a fast-track procedure for congressional review of certain federal

21  agency "rule[s]," as defined. 5 U.S.C. § 804(3). Before such a rule takes effect, the promulgating

22  agency must submit a report to Congress and the Government Accountability Office (GAO). *Id.* §

23  801(a)(1)(A).[3] If an agency does not do so, any member of Congress may ask the GAO to opine

24  on whether the action is a "rule" subject to the CRA. FAC ¶ 55. Congress treats those opinions as

25  dispositive of the CRA's applicability. *Id.* Congress can disapprove of rules subject to the CRA

26

27      [2] A zero-emission vehicle is one that produces zero exhaust emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1963(c).

28      [3] "The GAO is an independent agency within the legislative branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

3

1    through resolutions adopted using expedited procedures. Motions, amendments, and debate are

2    severely limited. 5 U.S.C. § 802(d)(1), (d)(2). And the Senate's 60-vote cloture rule, commonly

3    known as the filibuster, does not apply. *See id.*; FAC ¶ 56.

4          The CRA operated as designed—and as the Senate that passed it had unanimously

5    consented to—from 1996 until last year. It was never used to target *state* regulations or federal

6    *orders*—only *federal rules* submitted by agencies or declared to be rules by the GAO. FAC

7    ¶¶ 61-63. Indeed, until these Resolutions, Congress had never purported to use the CRA's

8    extraordinary procedures to disapprove of agency action in the face of a dispute over whether the

9    action was a "rule," unless the GAO independently concluded it was. *Id.* ¶¶ 55, 61.

10          **D.    Clean Air Act Waivers Have Never Been "Rules" Subject to the CRA**

11          Through Administrations of both parties, EPA has consistently maintained that its CAA

12    preemption waivers are orders, rather than rules. Waivers have thus not been subject to a host of

13    requirements that apply only to rules (e.g., the CRA). FAC ¶¶ 66, 70; *e.g.*, 69 Fed. Reg. 59,920,

14    59,922 (Oct. 6, 2004) ("The CRA does not apply because this action is not a rule."). When asked

15    for its opinion in 2023, the GAO agreed, concluding that a waiver is an "order," rather than a

16    "rule," as those terms are defined, because a waiver is "a 'final disposition' granting California a

17    'form of permission.'" FAC ¶ 67; FAC Exh. A at 1, 5-6. Members of Congress accepted this

18    GAO conclusion. *See id.* ¶¶ 66-67. In fact, they introduced bills—which never got out of

19    committee—to repeal the waiver provision, explaining the bills were necessary because a waiver

20    is *not* a "rule as that term is defined in the CRA." *Id.* ¶ 68.

21          EPA reiterated its longstanding position that preemption waivers are not rules in each of the

22    three waivers later targeted by a Resolution. FAC ¶ 70; 88 Fed. Reg. 20,688, 20,725 (Apr. 6,

23    2023); 90 Fed. Reg. 642, 643 (Jan. 6, 2025); 90 Fed. Reg. 643, 645 (Jan. 6, 2025). EPA thus did

24    not submit these waivers to Congress when the waivers were granted. FAC ¶ 71. No member of

25    Congress sought a GAO determination that these waivers were "rules" subject to the CRA. *Id.*

26          **E.    The Federal Government Mounts an Unprecedented Attack on
                  California's Program**

27          Instead, after the change in Administrations, President Trump and EPA Administrator

28

4

Zeldin declared, without process or explanation, that these three waivers were actually rules subject to the CRA. FAC ¶ 74. EPA later submitted notices of these waiver decisions to Congress and the GAO. *Id.* ¶¶ 78, 83. EPA did not acknowledge, much less explain, its change in position; nor did it provide any opportunity for public comment. *Id.* ¶¶ 75, 79, 83.

Waiver opponents advocated for the CRA because "the administrative process" could "take years … and ordinary legislation … would have to overcome the 60-vote filibuster in the Senate." FAC ¶ 74. The Administration appeared to agree, despite the CRA's widely recognized inapplicability. *Id.* ¶ 73. The Administration and waiver opponents have also contended that the CRA would insulate attacks on the waivers from judicial review. *Id.* ¶ 89; Req. for Jud. Not. (RJN) ¶ 1 (President asserting States "can't take us to court").

Waiver opponents in Congress cheered EPA's actions, announcing "[Zeldin] submitted it to us [so] we can take it down." FAC ¶ 82. But the GAO once again concluded that the CRA is inapplicable to preemption waivers because they are not "rules" as the CRA defines that term. *Id.* ¶¶ 84-85; Exh. B at 6-7, 9. The Senate Parliamentarian—the nonpartisan arbiter of Senate rules— agreed. *Id.* ¶¶ 90-91. That left waiver opponents in Congress in a bind because they had hoped to override the waivers without abandoning their facial support for the filibuster or their traditional adherence to the Senate Parliamentarian's rulings on procedural issues. *See* 171 Cong. Rec. S3047-48 (May 21, 2025) (Sen. Thune); *id.* at S3087-88 (Sen. Capito). So Majority Leader Thune teed up a "vote[] on what qualifies for [a] fast-track procedure," *id.* at S3048, and the Senate sustained a point of order that:

> joint resolutions that meet all the requirements of section 802 of the [CRA] or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures under the [Act].

*Id.* at S3051 (Sen. Thune). The Senate then fast-tracked the three Resolutions "[p]ursuant to the precedent just established" in the point of order. *Id.* at S3052 (Sen. Capito as presiding officer).

At first blush, this course of proceedings is puzzling. The first half of the point of order— that fast-track procedures are used for joint resolutions "that meet all the requirements of section 802 of the [CRA]," *id.* at S3051—seemed to merely recite the status quo. As did the second

1   half—that fast-track procedures are used for joint resolutions "disapproving of Agency actions

2   which have been determined to be rules subject to the CRA by a legal decision from GAO," *id.*;

3   FAC ¶ 55. Moreover, that second half would not apply to these Resolutions because GAO had

4   determined these waivers were *not* subject to the CRA.

5       The Resolutions' proponents "clarif[ied]" what they meant by the first half of the point of

6   order, 171 Cong. Rec. S3140 (May 22, 2025) (Sen. Lankford): an Executive Branch

7   denomination as a "rule" in a submission to Congress would now suffice, whether or not the

8   action *was* a rule. Put another way, the Senate modified its internal procedural rules to substitute

9   the term "Agency-submitted rule," 171 Cong. Rec. S3018 (May 21, 2025) (Sen. Barrasso);

10  *accord id.* at S3088 (Sen. Capito), in place of "rule" as defined (still) in the CRA.

11      Relying on this new "Agency-submitted" trigger, on May 22, 2025, the Senate passed the

12  Resolutions (which had previously passed the House)—with votes of 51-45 (H.J. Res. 87, ACT),

13  51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus). FAC ¶¶ 101-

14  111. Administrator Zeldin hailed the Resolutions as preventing a "single state" from imposing its

15  "radical agenda." FAC ¶ 112. On June 12, 2025, the President signed the Resolutions. FAC ¶ 113.

16      **F.      Procedural History**

17      Plaintiffs filed this suit on June 12, 2025. ECF 1. After Defendants moved to dismiss, ECF

18  118, Plaintiffs amended their complaint, ECF 157. This Court approved stipulated briefing

19  schedules for this motion, ECF 162, ECF 184, and authorized opening and opposition briefs up to

20  30 pages, ECF 168. On December 2, 2025, this Court denied all motions to intervene. ECF 182.[4]

21

22                                  **ARGUMENT**

23  **I.    PLAINTIFFS' CONSTITUTIONAL CLAIMS (COUNTS III AND IV) ARE JUSTICIABLE
        AND WELL PLED**

24      Plaintiffs' separation of powers and federalism claims are justiciable. These constitutional

25  claims are not barred by Section 805 of the CRA or the political questions doctrine. They also

26  survive Defendants' Rule 12(b)(6) attack.[5]

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [4] Two sets of intervenors have appealed this denial. ECF 189, 192.
28      [5] Any argument that Plaintiffs lack a cause of action is foreclosed by *Free Enter. Fund v.
    Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); FAC ¶ 171.

6

1

### A.    The CRA Does Not Bar Judicial Review of These Claims

2

Section 805 of the CRA bars judicial review of any "determination, finding, action, or

3

omission under this chapter." 5 U.S.C. § 805. This bar does not extend to any constitutional

4

claim. Plaintiffs do not plead "faux constitutional claims," MTD 29:5-6, only the genuine article.

5

In any event, *none* of Plaintiffs' claims here (constitutional or otherwise) seek review of conduct

6

"under" the CRA.

7

#### 1.    The CRA does not bar review of any constitutional claim

8

A "serious constitutional question … would arise if" Section 805 "den[ied] a judicial forum

9

for constitutional claims." *Ctr. for Biological Diversity v. Bernhardt* (*CBD*), 946 F.3d 553, 561

10

(9th Cir. 2019). For that reason, and because Section 805 lacks "explicit language barring …

11

review of constitutional claims," the Ninth Circuit has held it does not cover those claims. *Id.*

12

Defendants suggest, and one of their *amici* contends, that Count IV—alleging violations of

13

the Tenth Amendment and principles of structural federalism—is a statutory claim masquerading

14

as constitutional because, they argue, it is contingent on a CRA "violat[ion]." MTD 28:27-28; *see*

15

ECF 178-1 at 6-9. That misapprehends Count IV. There, and elsewhere, Plaintiffs allege not that

16

the CRA was violated, but that the CRA was inapplicable; and that, in their misplaced efforts to

17

invoke it, Defendants violated the Constitution. *E.g.*, FAC ¶ 163. This is plainly a constitutional

18

claim, not a statutory one. *See Sierra Club v. Trump*, 963 F.3d 874, 894 (9th Cir. 2020) (statute's

19

"relevan[ce] does not transform … constitutional claim into a statutory one"), *vacated sub nom.*

20

*Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (directing remand due to changed circumstances).

21

Section 805 bars "claims that [the government] violated the CRA's statutory requirements," *CBD*,

22

946 F.3d at 564, but Plaintiffs press no such claim here.[6]

23

#### 2.    Plaintiffs' claims do not call for review of conduct "under" the CRA

24

Section 805 does not bar Plaintiffs' claims for the independent reason that none of their

25

constitutional claims—indeed, none of their claims at all—asks this Court to "subject to judicial

26

---

27

[6] The *CBD* plaintiffs claimed (incorrectly) that a joint resolution was ineffectual because it was not enacted in accordance with the statutory procedure in the CRA. 946 F.3d at 562-63. By contrast, Plaintiffs here claim that the Resolutions are ineffectual because their substance and the process used to pass them violated the Constitution.

28

7

1   review" a "determination, finding, action, or omission *under* this chapter [i.e., the CRA]." 5

2   U.S.C. § 805 (emphasis added). All actions under the CRA pertain to "rule[s]," as the statute

3   defines that term. Waivers are not "rules," so none of the government conduct alleged in the

4   complaint occurred "under" the CRA.

5          The phrase *under a statute* "is most naturally read to mean … 'pursuant to' or 'by reason of

6   the authority of'" that statute. *Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 124

7   (2018). In Section 805, "'[u]nder this chapter' refers to duties the CRA imposes on various

8   actors." *Kansas Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1235 (10th Cir. 2020). For example, the

9   President or an agency may "determine[]" that a rule will take effect sooner than otherwise

10  allowed, 5 U.S.C. §§ 801(c)(2), 808; the Office of Management and Budget "find[s]" that a rule is

11  "major," *id.* § 804(2); or the Comptroller General "report[s] each major rule" to Congress, *id.*

12  § 801(a)(2)(A). Section 805 forbids judicial review of these activities (or a failure to perform

13  them) because each activity is "taken as part of the … legal obligations and requirements" the

14  CRA imposes regarding rules. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 722 (6th Cir. 2025).

15         Critically, *every* obligation and activity under the CRA is conditioned on the presence of a

16  "rule," and thus the CRA (and Section 805) are not implicated where (as here) there is no rule.

17  Only a rule can trigger the promulgating agency's duty to send a report to Congress, 5 U.S.C.

18  § 801(a)(1)(A), and the report must include "a copy of the rule[,] a concise general statement

19  relating to the rule," and "the proposed effective date of the rule," *id*. And it is Congress's receipt

20  of that report that opens the window to enact a "joint resolution" as the CRA defines the term. *Id.*

21  § 802(a).[7] Thus, absent a bona fide "rule," the CRA does not impose a duty, or contemplate a

22  "determination, finding, action, or omission" of the sort that could be subject to Section 805's bar.

23  *Id.* § 805.

24  _____

          [7] The definition of "joint resolution" is not a procedural rule affected by "the constitutional
25  right of either House to change [such] rules … at any time." 5 U.S.C. § 802(g)(2). The term "joint
    resolution" is not confined to Section 802; it repeats throughout the CRA—including in provisions
26  with no bearing on congressional rules—and it bears the same meaning each time. *E.g.*, *id.* §
    801(a)(5) (concerning effective dates of rules). "A statute ... cannot be amended by one chamber
27  unilaterally." *Michel v. Anderson*, 14 F.3d 623, 628 (D.C. Cir. 1994). Indeed, the CRA would be
    incoherent if either chamber could unilaterally redefine "joint resolution," as that would leave it
28  with indeterminate meaning—or worse, meaning two things at once. *See Clark v. Martinez*, 543
    U.S. 371, 383, 386 (2005) ("same statutory text" cannot "bear[] two different meanings").

1    A waiver granted under CAA Section 209(b)(1), 42 U.S.C. § 7543(b)(1), is not a "rule" as

2    the CRA defines the term. 5 U.S.C. § 804(3); FAC ¶¶ 64-71. The CRA draws from the

3    Administrative Procedure Act ("APA"), which divides administrative proceedings into rules

4    promulgated through rulemakings and orders issued through adjudications. *E.g.*, 5 U.S.C

5    § 551(4), (5), (6), (7). All *licensing* yields adjudicatory orders, not rules. *See id.* § 551(6). And a

6    license includes "the *grant*," *id.* § 551(9) (emphasis added), of a "statutory exemption or other

7    form of permission," *id.* § 551(8). In a waiver, EPA *grants* the individual requesting party (i.e.,

8    the State) a *statutory exemption* from "application of" Section 209 of the CAA. 42 U.S.C. §

9    7543(b)(1). A waiver is a "form of permission" for California to enforce its covered laws—i.e., a

10   form of license. 5 U.S.C. § 551(8). That is why EPA held an unbroken view, for decades, that

11   waiver grants are not "rules" subject to the CRA. FAC ¶¶ 66, 69-70. And that is why Congress's

12   own nonpartisan arbiters, the GAO and Senate Parliamentarian, concluded that a waiver "meets

13   the statutory definition of an order [and] reflects the hallmarks of an order that courts identified."

14   FAC, Exh. A at 5; *id.* ¶¶ 67, 84-85, 91. A waiver is an adjudicatory order, not a rule.

15   Tellingly, Defendants nowhere take the position that the waivers are, in fact, rules, and thus

16   subject to the CRA. Instead, they argue that the classification of agency actions as "rules" under

17   the CRA belongs to Congress and is insulated from judicial review. MTD 1:27-2:3. But the CRA

18   defines the term "rule" in statutory text. And that definition in no way turns on whether EPA or

19   Congress "*invoked*" the terms "rule" or "joint resolution," or the CRA itself, in connection with a

20   given agency action. MTD 1:9 (emphasis added). *This Court*, not the political branches, must

21   resolve whether waivers are rules, to answer the "first order question," *Nat'l TPS Alliance v.*

22   *Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025), whether Section 805 divests the Court of jurisdiction

23   over any of Plaintiffs' claims. And it must answer that question "applying [its] own legal

24   judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 n.4 (2024). Defendants' "mere

25   designation" of waivers as rules, and mere designation of their conduct as occurring *under the*

26   *CRA*, "does not control [the] interpretive inquiry." *NAM*, 583 U.S. at 125 n.8.[8]

27   _____

28   [8] The CRA definitions of "rule" and "joint resolution" control "notwithstanding any other provision of law," 5 U.S.C. § 806(a), so they "absolutely, positively prevail" over all but the most
(continued...)

9

Some of Defendants' *amici* try to argue that waivers are rules. Echoing a post hoc analysis from Russell Vought, Director of the White House Office of Management and Budget (which Defendants do not even mention), those *amici* collapse the distinction between EPA's waivers and California's regulations. ECF 177-1 at 9-13, 179-1 at 8-12, 185-1 at 7-10. California's regulations are not *federal* rules; they fail the definition of a CRA rule because the State is not "the Government of the United States." 5 U.S.C. § 551(1). The federal character of EPA's adjudication cannot be stapled onto *California's* rulemaking to produce a "federal rule."[9]

*Amici* otherwise rely on *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994), which categorized as a rule a discretionary determination by the Secretary of Housing and Urban Development (HUD) that the State of Washington's eviction procedures satisfied the elements of due process, as set forth in HUD regulations. In rejecting the United States' argument that HUD's determination was an adjudication, the court emphasized that "[n]othing in the statute requires HUD to make a due process determination in the first place." *Id.* at 449. As HUD did not have "to take any action at all," its decision to act was discretionary and could not be classified as mere adjudication. *Id.* HUD's action also "had no effect on the State"; the determination's "sole effect … was to deprive" public-housing tenants of their federal "right to an informal grievance hearing prior to eviction." *Id.* Additionally, that deprivation operated "only prospectively," and the affected tenants comprised a "broad category of individuals not yet identified." *Id.* at 448-49.

Waivers lack the features that rendered HUD's determination a rule in *Yesler Terrace*. EPA *must* act upon each waiver request. 42 U.S.C. § 7543(b)(1). EPA's action has direct effects on state laws; and downstream effects on a narrow, identifiable class of automakers that become

_____

crystalline statements in other legislation, A. Scalia & B. Garner, Reading Law 127 (2012). The CRA definitions thus prevail over the prefatory clauses of the Resolutions, which purport to be "[p]roviding congressional disapproval under chapter 8 of title 5, [U.S.] Code." 139 Stat. 65, 66, 67 (June 12, 2025). Prefatory clauses lack legal effect, 1 U.S.C. §§ 102-103, and cannot "expand the scope of the operative clause[s]," *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008). Nothing in the Resolutions' *operative* clauses broadens the CRA's definition of a "rule" (to cover waivers) or its definition of a "joint resolution" (to cover resolutions that disapprove non-rules).

[9] The Supreme Court's descriptive reference to the Resolutions in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025), does not establish otherwise. That case— briefed and argued before these Resolutions were enacted—involved a different waiver action (and no resolution). The issues raised here were thus "not at issue" there. *Id.* at 107. Whether the Resolutions are "action[s] under" the CRA, 5 U.S.C. § 805, is a question of first impression here.

10

1   subject to state standards. Plus, waiver grants do not announce a rule that is "subsequently

2   applied" to California (or anyone else), *Yesler Terrace*, 37 F.3d at 448; rather, they have

3   immediate retrospective (as well as prospective) effect: they waive preemption for actions

4   California has already taken to adopt its standards, *see id.* § 7543(a), (b)(1), as well as for covered

5   standards applicable to vehicles sold before EPA acted, *e.g.*, 90 Fed. Reg. 643, 644 (Jan. 6, 2025)

6   (standards applicable in model years 2024 and later).

7       Waivers are not rules, no conduct occurred under the CRA, and Section 805 is inapplicable.

8   **B.    Plaintiffs' Constitutional Claims Do Not Raise Political Questions**

9       Plaintiffs' constitutional claims also do not implicate the political questions doctrine—"a

10  narrow exception to" the Judiciary's "responsibility to decide cases properly before it." *Newsom*

11  *v. Trump*, 141 F.4th 1032, 1045 (9th Cir. 2025) (cleaned up). These claims "require[] an

12  interpretation of the Constitution—a determination for which clearly there are judicially

13  manageable standards." *Powell v. McCormack*, 395 U.S. 486, 549 (1969) (cleaned up).

14      Moreover, Plaintiffs' first separation-of-powers claim has nothing to do with legislative

15  procedure. *Infra* Sec I.C.1. And Plaintiffs' second separation-of-powers and federalism claims do

16  not depend on Congress's decision not to follow certain rules—e.g., the decision not "to hold a

17  hearing on legislation applicable to the general public." *Consejo de Desarrollo Economico de*

18  *Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007). Rather, to the extent

19  congressional procedure is implicated, Plaintiffs allege constitutional defects in the procedures

20  Congress actually used. Such claims are justiciable because they ask whether "there is 'a

21  reasonable relation between the mode or method of proceeding … and the result which is sought

22  to be attained'" and whether the procedures "'ignore[d] constitutional restraints or violate[d]

23  fundamental rights.'" *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (quoting *United States v.*

24  *Ballin,* 144 U.S. 1, 5 (1892)); *see also Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has

25  been long settled, of course, that rules of Congress and its committees are judicially

26  cognizable."). Defendants' cases are in accord. *Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C.

27  Cir. 1982) ("[J]udicial intervention may be appropriate where rights of persons other than

28  members of Congress are jeopardized by Congressional failure to follow its own procedures.");

1    *Common Cause v. Biden*, 909 F. Supp. 2d 9, 29-30 (D.D.C. 2012) (finding political question

2    "precisely" because "Plaintiffs identify *no* explicit constitutional restraints upon [the challenged

3    Senate rule]") (emphasis added), *aff'd on other grounds,* 748 F.3d 1280 (D.C. Cir. 2014).[10] This

4    Court can adjudicate whether Congress ignored two constitutional restraints: the Tenth

5    Amendment and separation of powers.

6         **C.    Plaintiffs Have Stated Separation of Powers Claims (Count III)**

7         Plaintiffs plausibly allege the Resolutions violated the separation of powers in two respects:

8    (1) they are substantively invalid because the Framers prohibited legislative adjudication; and

9    (2) they are procedurally invalid because the process the Senate used to pass them is incompatible

10   with the Rules Clause, U.S. Const. art. I, § 5, cl. 2. FAC ¶¶ 149-160.

11        **1.    The Resolutions are impermissible legislative adjudications**

12        Plaintiffs' substantive separation-of-powers claim rests on three propositions: (1) the

13   Constitution forbids legislation that merely nullifies an adjudicatory order; (2) each Resolution

14   merely nullified EPA's grant of a waiver to California; and (3) EPA's grant of a waiver to

15   California is an adjudicatory order. FAC ¶¶ 151-154. Defendants unavailingly contest the first

16   and second propositions, MTD 21:19-25:14, and their *amici*'s attacks on the third proposition fail

17   for reasons explained in Section I.A.2, *supra*.

18        1. The Constitution forbids Congress from overturning adjudications performed by a

19   different Branch. The Vesting Clauses divide powers among the three Branches and "do[] not

20   permit Congress to execute laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). "[S]ince the

21   beginning of the Republic," the Executive has, in appropriate cases, executed laws by

22   determining individual parties' legal rights in adjudications. *City of Arlington v. FCC*, 569 U.S.

23   290, 304 n.4 (2013). Where Article III permits, the Judiciary—whose province is "to say what the

24   law is," *id.* at 316 (cleaned up)—may review adjudications performed by the Executive and

25

26        [10] Defendants' reliance on *Nixon v. United States*, 506 U.S. 224 (1993) is misplaced. MTD
     12:24. This case does not require interpretation of a constitutional term (like "try") that "lacks
27   sufficient precision to afford any judicially manageable standard of review." *Id.* at 230; *see also
     id.* at 239. Nor is this a context (like impeachment) where the Framers might have anticipated
28   separate congressional and judicial proceedings concerning the same conduct or intended the
     legislature to check the judiciary. *Id.* at 234-35.

overturn any unlawful ones. But whether in the first instance or on review, *Congress* exceeds its power when it declares the rights of individual parties under its own laws. "Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals." *United States v. Brown*, 381 U.S. 437, 461 (1965); *accord Fletcher v. Peck*, 10 U.S. 87, 136 (1810). *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225 (1995) ("[R]evers[ing] a determination once made, in a particular case…. exceeds the powers of Congress."). The Resolutions, in Defendants' words, "nullif[y] EPA's waivers." MTD 15:9. But the Constitution does not empower Congress "to reduce" a sister Branch's adjudicatory work "to nothingness and deprive it of all efficacy or value." *Nullify*, B. Garner, *Garner's Dictionary of Legal Usage* 620 (3d ed. 2011).

Defendants claim that legislative adjudication is permissible so long as it intrudes upon the Executive's work (rather than the Judiciary's), MTD 24:6-15, but neither the Constitution nor the caselaw can sustain such a distinction. *Cf. United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (observing that agencies' adjudicatory duties "partake of a Judicial quality as well as Executive" (quotation omitted)). For agencies and (inferior) courts alike, "Congress may from time to time ordain and establish" bodies in a different Branch, U.S. Const. art. III, § 1, and may assign those bodies a power that Congress itself can never wield: the power to adjudicate rights of individual parties based on substantive laws and procedural rules that Congress has prescribed. Congress may revoke or reshuffle the assignment of adjudicatory power, or it may sway the outcomes of pending and future adjudications by changing the laws that govern the conduct of the parties or the adjudicator. *See, e.g.*, *Cary v. Curtis*, 44 U.S. 236 (1845) ("[T]he judicial power of the United States, although it has its origin in the Constitution, is (except in enumerated instances, applicable exclusively to [the Supreme Court]) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress."). But Congress may not nullify a past adjudication, irrespective of which of the other two Branches performed it.

Defendants stress that Congress has an extra power over agencies that it lacks over courts: It can force agencies "to take specific actions as to specific individuals or property." MTD 24:17. The power to mandate a new agency action, however, does not entail the power to disappear an old one. *See Chadha v. INS*, 634 F.2d 408, 434 (9th Cir. 1980) (Kennedy, J.) ("Plenary power for

13

1    making laws does not import authority to revise particular administrative dispositions. This is a

2    case in which the greater power definitely does not include the lesser."), *aff'd on other grounds*,

3    462 U.S. 919 (1983).[11] None of the private laws recited by Defendants, MTD 24 n.4, nullified an

4    agency's adjudication; each amended the substantive laws governing conduct of specific parties

5    and told agencies not to *adjudicate* those parties' rights but to simply grant them *relief*.[12]

6          Defendants also argue Congress can nullify adjudications of "public rights," but there is

7    likewise no support for a distinction here between private and public rights. Indeed, the canonical

8    case invoking the constitutional prohibition on legislative adjudication involved a public right: In

9    *United States v. Klein*, the Supreme Court held unconstitutional, and declined to apply, a statute

10   that directed the outcome of a case in the Court of Claims where the plaintiff sought monetary

11   compensation from the government. 80 U.S. 128, 136 (1871). Money claims against the Treasury

12   are quintessential public rights justiciable by "judicial as well as non-judicial agencies" like the

13   then-Court of Claims, a "legislative … court." *United States v. Sherwood*, 312 U.S. 584, 587

14   (1941). If the Framers denied Congress a power to nullify public-rights adjudications done by an

15   "Article I court," it is implausible that they extended a nullification power to such adjudications

16   by another Branch (the Executive), subject to review by yet another (the Judiciary).

17         Defendants misread the decision in *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59

18   U.S. 421 (1855), to "hold[] that Congress can nullify a specific final judgment by statute in cases

19   involving public rights." MTD 22:27. The Supreme Court there said the opposite: it "is certainly

20

21         [11] In *INS v. Chadha*, the Supreme Court held that a one-House resolution disapproving of
     the Attorney General's suspensions of six deportation proceedings was sufficiently "legislative in
22   purpose and effect" to need bicameralism and presentment. 462 U.S. at 957 n.22 (cited at MTD
     24:19-20). The Resolutions undisputedly had to (and did) undergo those procedures, too. But the
     Supreme Court did not answer the question here: whether a bicameral resolution signed by the
23   President violated the separation of powers by nullifying a final adjudication of the Executive.
           Justice Powell, like the Ninth Circuit, found the one-House veto impermissibly exercised
24   judicial power. *Id.* at 964–67 (Powell, J., concurring in the judgment); *Chadha*, 634 F.2d at 429-
     35. The majority recognized the veto's "judicial cast." 462 U.S. at 957 n.22. But it deemed Justice
25   Powell's analogy to judicial review "less than perfect" because the Attorney General's suspension
     actions were (unlike EPA waivers) unreviewable by courts. *Id.* Moreover, those suspensions were
26   (again, unlike EPA waivers) discretionary, and expressly contingent on congressional review. *Id.*
     at 925. The analogy between the Resolutions and judicial review of waivers *is* perfect, and fatal.
27         [12] Two of the private laws used "notwithstanding" clauses to supersede preexisting,
     contrary law, Priv. L. No. 97-55, 96 Stat. 2636 (1983); Priv. L. No. 97-27, 96 Stat. 2623 (1982),
28   and the third prescribed relief to be granted in the future, Priv. L. No. 98-46, 98 Stat. 3434 (1984).

14

1    not to be denied, especially"—not *solely*—"as it respects adjudication upon the private rights of

2    parties," "that the act of congress cannot have the effect and operation to annul the judgment of

3    the court already rendered, or the rights determined thereby in favor of the plaintiff." 59 U.S. at

4    431. The *Wheeling Bridge* statute was constitutional because, rather than nullify the judgment that

5    had declared the bridge a nuisance, Congress prospectively "'modified' the status of the bridge

6    'in the contemplation of the law,'" MTD 23:4-6 (quoting 59 U.S. at 430), such that it "ceased to

7    be"—not *never was*—"a nuisance," *Klein*, 80 U.S. at 146. Likewise, in *Mount Graham Coalition*

8    *v. Thomas*, the Ninth Circuit invoked the doctrine of constitutional avoidance to find a statute

9    "reasonably susceptible to [a] prospective interpretation" under which Congress changed the law

10   without "undoing past judgments" of the court respecting an agency's adjudicatory order. 89 F.3d

11   554, 557 (9th Cir. 1996). The Resolutions are not reasonably susceptible to such an interpretation

12   because through them Congress unsettled final, past adjudications of California's waiver requests.

13       Defendants suggest that an EPA waiver should be legislatively nullifiable due to its

14   importance and downstream effects on millions of people. MTD 24:22-25:14. But plenty of

15   adjudications share those features: there is nothing unique about agencies adjudicating the rights

16   of States, or of parties that will use those rights to enforce their own standards against a

17   significant industry. *See, e.g.*, *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 111-15 (D.C. Cir.

18   2017) (discussing agency's adjudication whether an operator of a power transmission system may

19   enforce a given tariff against utilities, generators, and others that collectively serve millions of

20   people). In any case, the Resolutions' constitutionality turns on the particularized *character* of

21   EPA's adjudicatory orders rather than the magnitude of their *effects*.[13] Had Congress wanted to

22   retain a power to nullify EPA's past actions on "a public policy issue" of this magnitude, MTD

23   25:4, it should have given the agency rulemaking, not adjudicatory, authority.

24       2. Each Resolution is an adjudicatory action that did no more than nullify an EPA waiver:

25       *Resolved by the Senate and House of Representatives of the United States*
        *of America in Congress assembled*, That Congress disapproves the rule submitted

26

27   _____
     [13] Defendants invoke Section 177 of the CAA, 42 U.S.C. § 7507, to suggest that waiver
     adjudications are not particularized to California. MTD 24-25. But that provision, enacted ten
     years after Section 209(b), did not change the waiver process—which begins with a request from
28   *California*—or the criteria for a waiver—all of which refer to California. 42 U.S.C. § 7543(b)(1).

by the Environmental Protection Agency relating to [the Federal Register notice of a waiver], and such rule shall have no force or effect.

H.J. Res. 87, 88, 89 (119th Cong.). There is not a "reasonable construction" of this text that could rescue any Resolution from unconstitutionality by broadening its effects beyond a bare "repeal of an EPA preemption waiver." MTD 24:4, 24:22-23; *see Boumediene v. Bush*, 553 U.S. 723, 787 (2008) ("We cannot ignore the text and purpose of a statute in order to save it."). If Congress had enacted substantive legislation to override EPA's waivers by amending the CAA to preempt California's regulations, that legislation would have looked like prior congressional attempts to do just that. *See* FAC ¶ 68. But the Resolutions Congress actually adopted do not even purport to do anything more than undo a specific agency adjudicatory action.

The Ninth Circuit did not "squarely h[o]ld" in *CBD* that any statute with the cookie-cutter language in Section 802(a) of the CRA effects "'a change to substantive law.'" MTD 23:19-22. In that case, there was no dispute that the agency action targeted by a congressional resolution was a rule subject to the CRA. *See CBD*, 946 F.3d at 558. Because the object of the legislation was a discretionary *rule* by which an agency had changed the law, *id.*, Congress's disapproval of that rule changed the law back. *CBD* is silent about whether legislation purporting to nullify an agency's adjudicatory *order* changes the law. Understandably so—before 2025, neither of the political branches had ever invoked the CRA in relation to an agency adjudication. FAC ¶¶ 62-63.

Defendants note that "[b]efore the Resolutions, California's regulations were not preempted because California had obtained a waiver," whereas "[a]fter the Resolutions, the regulations are preempted as a matter of law, *regardless* of whether California satisfies the criteria under § 209(b) [of the CAA]." MTD 23:23-26. But that highlights the difficulty: Congress did not "alter[] the legal standards governing" EPA's adjudications; it just "direct[ed] the result[s]" of three that had already concluded. *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016). All the CAA's (unamended) criteria call for EPA "findings of fact or applications of law … to fact." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992); *see* 42 U.S.C. § 7543(b)(1)(A)-(C). The Resolutions merely nullified EPA's fact-bound waivers, without "chang[ing] the underlying substantive law in any detectable way," *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d

16

1    986, 991 (9th Cir. 1999), as Congress had done in all the cases on which Defendants rely. The

2    problem with the Resolutions is not that Congress "used the wrong words," but that it "could not

3    constitutionally accomplish the result" of bare nullification. *Mount Graham Coal.*, 89 F.3d at 557.

4         Defendants contend the Resolutions change substantive law because they allegedly have the

5    collateral effect of preventing EPA "from issuing a waiver that is 'substantially the same' as

6    [those] Congress repealed." MTD 23:26-28.[14] Plaintiffs have explained why the Resolutions are

7    not "CRA resolutions" to which those collateral effects attach. *Supra* Sec I.A.2. Regardless, such

8    an effect could not constitutionalize a legislative adjudication. Congress could not, for example,

9    "enact a statute directing that, in '*Smith v. Jones*,' 'Smith wins,'" *Bank Markazi*, 578 U.S. at 225

10   n.17, just because the judgment had downstream legal consequences for Smith or Jones.

11        Last, Defendants protest that invalidating these Resolutions "would [not] make sense," as

12   legislators (in Defendants' telling) carefully considered the merits of preempting these California

13   laws. MTD 24:22-25:14. The record belies that telling (FAC ¶¶ 77, 93, 94, 100), but more

14   importantly, Congress still violates the Constitution "when an individual final [adjudication] is

15   legislatively rescinded for even the *very best* of reasons, such as the legislature's genuine

16   conviction … that [it] was wrong." *Plaut*, 514 U.S. at 228. "[T]he means" that Congress "use[d]

17   to achieve its ends" here were not consistent "with the letter and spirit of the constitution." *Horne*

18   *v. USDA*, 576 U.S. 350, 362 (2015) (quoting *McCulloch v. Maryland,* 17 U.S. 316, 421 (1819)).

19        **2.    The Senate delegated its explicit constitutional power to the**
            **Executive**
20

21        Plaintiffs have also stated a second, independent violation of the separation of powers. The

22   Senate, in passing the Resolutions, adopted a procedural rule that vests the Executive Branch with

23   sole authority to decide whether legislation introduced to disapprove agency action that does not

24   meet the CRA definition of "rule" nonetheless comes in for extraordinary Senate procedures

25   paralleling those set out in Section 802 of the CRA. *See supra* 5:15-6:13 (Background Sec. E). In

26   this way, the Senate transformed an innocuous reporting requirement into a vehicle for the

─────────────────────────────────────────

27        [14] In pressing Section 801(b)(2) as a defense to this claim whose justiciability they do not
     deny, Defendants wreck their own argument, MTD 15, that Section 801(b)(2)'s *applicability* to
28   the Resolutions is not properly before the Court in this case. (Plaintiffs do agree with Defendants,
     MTD 15 n.2, that the interpretation of Section 801(b)(2) for future actions is not presented here.)

1    Executive to direct legislative process. The Constitution forbids any amount of Executive Branch

2    direction in this setting. *See* U.S. Const. art. I, § 5, cl. 2 (Rulemaking Clause) ("Each House may

3    determine the Rules of its Proceedings ...."). Because the Senate passed the Resolutions only by

4    unconstitutionally abdicating its rule-setting power to the Executive, the Resolutions are

5    unconstitutional.

6        a. Section 801(a)(1)(A) of the CRA directs Executive Branch agencies to report each rule to

7    Congress. 5 U.S.C. § 801(a)(1)(A). Receipt of a section 801(a)(1)(A) report triggers extraordinary

8    procedures for a "joint resolution" introduced by a member of Congress to disapprove the rule.

9    These extraordinary procedures include prioritized consideration, no opportunity for amendment,

10   limited debate, and bypass of the Senate filibuster. *Id.* § 802. Individually and collectively, these

11   procedures smooth the path for bills responding to federal agency rules, whereas legislation

12   responsive to the array of *other* Executive action still receives "the type of care and deliberation

13   that one might expect." *King v. Burwell*, 576 U.S. 473, 492 (2015). The CRA leaves each House

14   free to vary its own procedures, *see* 5 U.S.C. § 802(g)(2), subject to constitutional restraints.

15       b. The Senate's abdication of its procedural power to the Executive Branch is apparent from

16   remarks of Senator Capito, who "r[o]se in support of [her] resolution" to disapprove one of

17   EPA's waivers. 171 Cong. Rec. S3086 (May 21, 2025). It was "[f]ortunate[]," she noted, that

18   "President Trump and EPA Administrator Lee Zeldin decided to give the American people a say

19   by submitting the approved California waiver to Congress as a rule." *Id.* at S3087. In other words,

20   absent EPA's after-the-fact reclassification in a report to Congress, the Senate would not have

21   considered, much less fast-tracked, her Resolution. The next day, in the debate over the

22   disapproval of another EPA waiver, Senator Lankford left no doubt as to what had transpired:

23           So we worked to make sure that we were clarifying one simple thing . . . this one
             simple question: When an Agency says it is a rule, is it a rule? . . . The answer is, yes,
24           it is a rule. And then we acted on that.

25   171 Cong. Rec. S3140 (May 22, 2025). In "acting on that" *Executive Branch* determination, the

26   Senate acted unconstitutionally.

27       c. The Senate's *when you say so* regime invites the Executive to manipulate the procedure

28   to serve Executive purposes. The President may, in his sole discretion, direct an agency head to

18

1    slap the new (and errant) label "rule" on any action by a prior Administration—even from

2    decades ago—that the President disfavors and report it to Congress, upon which the Senate duly

3    fast-tracks a resolution introduced to disapprove that action. The Senate's *when you say so*

4    approach is especially pernicious because it encourages the President to treat the CRA reporting

5    requirement still on the books as a farce.

6          Since "the Constitution by explicit text commits the power at issue to the exclusive control

7    of" each House of Congress, courts cannot "tolerate *any* intrusion by" the Executive and must act

8    "to prevent any other Branch from undertaking to alter" that textual commitment. *Pub. Citizen v.*

9    *U.S. DOJ*, 491 U.S. 440, 485, 487 (1989) (Kennedy, J., concurring in the judgment). It is of no

10   moment that the Branch with the power ceded it willingly, or even that it came up with the idea.

11   *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). Indeed, the

12   Senate's "enthusiasm for" this novel arrangement "sharpen[s] rather than blunt[s]" the need for

13   judicial scrutiny. *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in the judgment).

14         It is not enough that the Senate stayed *more* in control of its procedures than the Executive

15   because the Senate retained the power to amend those procedures again at any time until it passed

16   the legislation. The Senate had a passenger-side brake, but it still let the President drive. And the

17   Constitution demands that the Senate stay in absolute, not relative, control of its own procedure.

18         The Senate's maneuver is no less troubling because it concerns "procedure." Process often

19   determines substance. *See Regulatory Reform Act: Hearings on H.R. 2327 Before the Subcomm.*

20   *on Admin. Law and Govt'l Relations of the H. Comm. on the Judiciary*, 98th Cong., 312 (1983)

21   (statement of Rep. John Dingell) ("I'll let you write the substance on a statute and you let me

22   write the procedure, and I'll screw you every time."). The power to determine internal rules of

23   procedure "only empowers Congress to bind itself," *Chadha*, 462 U.S. at 955 n.21, but that is

24   precisely why the power must be "independent … of the President," *id.* at 955. The flaw in the

25   Senate's process was not made harmless by the House's passage of, and the President's signature

26   on, the Resolutions. *Cf. United States v. Munoz-Flores*, 495 U.S. 385, 397 (1990) ("A law passed

27   in violation of the Origination Clause" is "no more immune from judicial scrutiny because it was

28

1    passed by both Houses and signed by the President than … a law passed in violation of the First

2    Amendment."). The process by which the Resolutions became law is incurably unconstitutional.

3         d. Defendants submit there was no problem because the Senate, not the Executive Branch,

4    voted to adopt the rule of legislative procedure. MTD 26:4-14. That theory cannot be right since,

5    among other things, it would eviscerate the nondelegation doctrine. The issue in nondelegation

6    cases is not whether Congress *ratified* the delegation (it did, by definition), but whether the

7    delegation unconstitutionally ceded power to the Executive.

8         Defendants attempt to rebut Plaintiffs' recitation of Senate proceedings. MTD 26:15-28:1.

9    But there is no better evidence of which procedures Congress used to pass legislation than "[t]he

10    public proceedings of each House of Congress as reported by the Official Reporters" and then

11    "printed in the Congressional Record." 44 U.S.C. § 903. Defendants belittle that record as

12    "legislative history," MTD 26:21-26, 27:2-8, which might persuade if the issue here were one of

13    statutory construction. No statute, however, can shed light on what happened on the Senate floor.

14         Quoting a floor speech by Senate Majority Leader Thune, Defendants assert that he reached

15    "his own independent conclusion" that EPA waivers qualify as CRA "rules." MTD 27:19-20. But

16    individual Senators' views on that legal issue are irrelevant to Plaintiffs' claim. All that matters is

17    which *procedure* Senators intended to enshrine. And, in the same speech, Senator Thune made his

18    view on that point plain—that agency actions "submitted to Congress[ as] rules" *are* in fact rules

19    "eligible for consideration under the [CRA]," regardless of whether they meet the statutory

20    definition. 171 Cong. Rec. S3047 (daily ed. May 21, 2025); *accord* 171 Cong. Rec. S3140 (daily

21    ed. May 22, 2025) (Sen. Lankford). The Senate enshrined reflexive deference to the Executive on

22    this matter of Senate procedure, just as Senator Thune and his like-voting colleagues intended.

23         Defendants characterize the Senate debate as "not about whether the Senate would defer to

24    EPA …, but about whether it would defer to GAO or instead decide for itself" whether to fast-

25    track resolutions disapproving EPA waivers. MTD 27:11-13. In fact, it was about both. The

26    Senate decided for itself to defer to the Executive Branch agency rather than GAO. And the

27    Senate did not just "*consider* EPA's submissions when deciding on procedures for debating

28    legislation," MTD 28:3–4 (emphasis added); it reflexively deferred to the submissions.

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.    Plaintiffs Have Stated a Claim that the Resolutions Violate the Tenth Amendment and Structural Principles of Federalism (Count IV)**

Plaintiffs' federalism claim also easily survives Defendants' motion. Here, Plaintiffs seek to redress "failings in the national political process" that infringe on the "special and specific position [States occupy] in our constitutional system." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554, 556 (1985). And the Complaint alleges such failings in spades. Specifically, Plaintiffs allege that two of the three branches of the Federal Government joined together in an unprecedented effort to invoke expedited congressional procedures that everyone— including EPA and Congress—understood were inapplicable, with the express aims of invalidating particular States' laws *and* of depriving those States of any opportunity to defend against this attack (including in court). FAC ¶¶ 89, 161-167; RJN ¶ 1. These unprecedented and calculated maneuvers constitute "extraordinary defects in the national political process" and render the Resolutions "invalid under the Tenth Amendment" and structural federalism. *South Carolina v. Baker*, 485 U.S. 505, 512 (1988).

This claim is judicially reviewable. *Contra* MTD 13:11-12, 28:25-26, 29:10. The Supreme Court has adjudicated just such a claim, concluding the national political process *in that case* had "not operate[d] in a defective manner." *Baker*, 485 U.S. at 513; *see also Garcia*, 469 U.S. at 556 ("*In the factual setting of these cases* the internal safeguards of the political process have performed as intended.") (emphasis added). The Ninth Circuit has twice done the same, as Defendants acknowledge. MTD 29:18-21; *Nevada v. Skinner*, 884 F.2d 445, 452 (9th Cir. 1989) (recognizing "claim of infringed sovereignty" would lie with judiciary where "extraordinary defect[s]" infected "the national political process"); *Nevada v. Watkins*, 914 F.2d 1545, 1556 (9th Cir. 1990).[15] Even by Defendants' own telling, the political question doctrine does not bar this (or any) federalism claim that asserts "Congress failed to comply with" the Tenth Amendment, MTD 12:13-14, 13:3-4, which provides a justiciable standard. *See supra* Sec. I.B. Courts may provide relief "to compensate for possible failings in the national political process," *Garcia*, 469 U.S. at

---

[15] Defendants misleadingly quote *Watkins*, implying that the entire claim, rather than the singular contention about committee representation, was non-justiciable. MTD 12:28-13:2. The Court adjudicated the merits of the political-process claim. *Watkins*, 914 F.2d at 1557. Committee representation is not at issue here, and the text Defendants quote is inapposite.

1    554, and must be able to review that process in order to do so. The legal basis for Plaintiffs'

2    federalism claim is not "dictum," MTD 29:17, and this claim is reviewable as the constitutional

3    claim that it is, *contra id.* at 28:25-29:7.[16]

4        Defendants also attempt to undermine this claim by noting that no State has previously

5    succeeded in bringing a political-process federalism claim. MTD 29:17-18. But when the Federal

6    Government "attempt[s] to … extend its authority in unprecedented ways" against States, that

7    naturally gives rise to new or different federalism claims. *Murphy*, 584 U.S. at 471 (recounting

8    "relatively recent[]" emergence of anti-commandeering principle). Indeed, the potential for the

9    Federal Government to behave in unprecedented ways is precisely why "*Garcia* left open the

10   possibility" of an *extraordinary* defects claim. *Baker*, 485 U.S. at 512. Certainly, the Court hoped

11   that "the solicitude" for States built into the national political process would carry the day in

12   most, if not all, circumstances. *Garcia*, 469 U.S. at 557. But the Court also recognized that those

13   protections might fail. *Baker*, 485 U.S. at 512. The fact that two branches of the Federal

14   Government have never previously ganged up on specific States and their chosen laws like this,

15   FAC ¶¶ 61, 62, does not somehow make the Government's actions constitutional.

16       Nor can Defendants defeat this claim with a tally of who voted which way or who was able

17   to make a statement on the floor of the House or Senate. *Contra* MTD 30:1-17. As in *Garcia* and

18   *Baker*, when States bring Tenth Amendment claims, they regularly challenge legislation passed

19   by majorities in Congress and signed by Presidents. The fact that certain States were "outvoted"

20   and bills became laws may not be sufficient, by itself, for a political-process claim, *Watkins*, 914

21   F.2d at 1556-57, but being outvoted cannot be a *barrier* to a federalism claim, or such claims

22   could rarely, if ever, be brought. And if there were any doubt that this political-process claim is

23   intended to protect States in the minority (who, by definition, will often be outvoted), the Court

24   resolved it, *Baker*, 485 U.S. at 513, by citing to a footnote in *United States v. Carolene Products

25   Company*, 304 U.S. 144, 153 n.4 (1938) that anticipated potential failures in "political processes

26   ordinarily to be relied upon to protect minorities."

---

27   [16] Defendants cannot transform this recognized Tenth Amendment and structural
28   federalism claim into a statutory CRA claim with mere say-so. MTD 28:26-29:7. Plaintiffs do not
     allege violation of the CRA, but violation of the Constitution.

22

Regardless, Plaintiffs allege far more than that they were outvoted or unrepresented on a congressional committee whose members were selected in the ordinary way, *Watkins*, 914 F.2d at 1556-57; and far more than that Congress was "uninformed" and relied "upon incomplete information," *Baker*, 485 U.S. at 513 (cleaned up). Rather, Plaintiffs allege a concerted attack ""singl[ing] out" specific, disfavored state laws, *Baker*, 485 U.S. at 513; *see* FAC ¶ 112, by the two political branches of the Federal Government—carried out by purportedly invoking procedures the participants knew did not apply and to which States unanimously consented (through the Senate) only for *other* kinds of agency actions. FAC ¶ 166. The Executive Branch set the wheels in motion with its purported reclassification of adjudicatory orders into "rules," months (or years) after finalization and while judicial review was pending—providing no process, explanation, or justification for the change, FAC ¶¶ 9-11, 51, 58-63, 66-71, 77, 163, and thereby depriving Plaintiffs "of any right to participate in" that crucial step, *Baker*, 485 U.S. at 513; *see also* FAC ¶ 165. Then, the House and Senate likewise disregarded their prior understandings of the CRA's inapplicability and their usual adherence to nonpartisan arbiters (the GAO and Parliamentarian) on that specific question. Indeed, the Senate had to adopt its own extraordinary rule changes specifically to end-run (covertly) around the conclusions of those usual arbiters—as evinced by the fact that the Senate's new "points of order" were entirely irrelevant to the debate into which they were introduced. Indeed, those points of order were necessary *solely* to defer entirely to the Executive Branch's extraordinary and defective reclassification of these particular waivers. FAC ¶¶ 67-68, 71, 84-111, 165.

The Federal Government was designed to "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, p. 332). That design failed—extraordinarily—here.

## II. PLAINTIFFS' NON-CONSTITUTIONAL CLAIMS (COUNTS I, II, AND V) ARE LIKEWISE JUSTICIABLE AND WELL PLED

### A. These Non-Constitutional Claims Are Not Barred by CRA Section 805 or the Political Questions Doctrine

Plaintiffs' non-constitutional claims do not require review of any "determination, finding, action, or omission under" the CRA, 5 U.S.C. § 805, because none of Defendants' actions

23

involved a rule, *supra* Sec. I.A.2. Thus, none of these (or any other) claims is barred by Section 805. Nor do Plaintiffs' non-constitutional claims raise political questions. *Contra* MTD 13:11-14. That doctrine is not even implicated by these claims (which generally present justiciable questions of statutory construction). *Newsom*, 141 F.4th at 1045-46. Moreover, these claims concern the *Executive Branch's* conduct, not an "asserted failure of Congress to comply with its own procedural rules." *Consejo*, 482 F.3d at 1171. *See* MTD 12-13.

### B.    Section 307(d) of the CAA Does Not Preclude this Court's Jurisdiction over These Non-Constitutional Claims

Plaintiffs' non-constitutional claims are also not subject to direct appellate review pursuant to CAA Section 307(b)(1), 42 U.S.C. § 7607(b)(1)). Defendants concede the challenged EPA actions were not taken "under" the CAA, *id.*, but argue that these actions are "closely related" to CAA final actions (i.e., the waiver grants), MTD 20:13-16. As Defendants' own cases reveal, however, the "closely related" test is triggered—and a district court deprived of jurisdiction— only when the requested relief "would effectively nullify" a CAA action through a collateral attack. *Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 507 (9th Cir. 2015).[17] Defendants do not credibly disagree. MTD 20:20-25 (quoting *Sierra Club v. Wheeler*, 2018 WL 6182748, at *4 (N.D. Cal. Nov. 27, 2018) (Gilliam, J.)). Far from seeking to *nullify* or *collaterally attack* CAA waivers, Plaintiffs seek—through their constitutional claims (which no one asserts belong in a court of appeals)—to have the disapproving Resolutions invalidated. And the relief Plaintiffs seek through their non-constitutional claims, *infra* Sec. II.C, would not nullify the waivers either. This Court has jurisdiction.[18]

### C.    Plaintiffs Have Standing to Bring Their Non-Constitutional Claims

Defendants' standing attack (MTD 14:20-15:12) also fails. Plaintiffs have sufficiently alleged all three standing elements for their non-constitutional claims: (1) an "injury in fact" (2)

---

[17] The lower court decision in this case (MTD 20:4, 20:15) does not establish a different test, and the claims here are "completely separate," *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1139 (E.D. Cal. 2012) (cleaned up), from challenges to the waivers.

[18] Plaintiffs filed protective petitions for review in both the Ninth and D.C. Circuits to protect their rights in the (unlikely) event a Court of Appeal is found to have original jurisdiction. *See* MTD 6 n.3. EPA moved to dismiss in the Ninth Circuit (on the same standing and finality grounds as here) but did not ask that Court to determine it has CAA jurisdiction.

24

1  "fairly traceable to the challenged conduct" and (3) "likely to be redressed by a favorable court

2  decision." *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1154 (9th Cir. 2015) (cleaned up).

3       1. Plaintiffs' injuries from the Resolutions are undisputed. MTD 14:21-23. Plaintiffs would

4  just as indisputably be injured by future resolutions disapproving of other waivers. *See* FAC ¶¶

5  114-119. "[A]ctual injury and the threat of future injury" satisfies the first element. *San Luis &*

6  *Delta-Mendota Water Auth. v. United States* (*San Luis*), 672 F.3d 676, 701-02 (9th Cir. 2012);

7  *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) (injury "coupled with

8  a sufficient likelihood that [plaintiffs] will be wronged in a similar way" suffices) (cleaned up).

9       Defendants dispute traceability because, they contend, Congress's actions were (and would

10  be) "independent" of the Executive actions challenged in these claims. MTD 15:1-5. But the

11  challenged actions need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520

12  U.S. 154, 168–69 (1997) (cleaned up). And the allegations in the Complaint—which must be

13  credited on this motion—more than suffice to establish that EPA's "unlawful conduct [was] at

14  least a substantial factor motivating" Congress's actions. *Novak v. United States*, 795 F.3d 1012,

15  1019 (9th Cir. 2015) (cleaned up); FAC ¶ 77 (quoting members of Congress thanking EPA for the

16  "opportunity" to act); *id.* at ¶ 82 (same); *id.* at ¶ 95 (same); *see also id.* ¶¶ 89, 104, 108-109.

17  Notably, EPA itself asserted that, prior to its challenged actions, Congress was "*prevent[ed] ...*

18  *from*" reviewing these waivers, RJN Exh. 1 at 1 (emphasis added); and, in fact, Congress had

19  never enacted such resolutions before, despite almost 60 years of waivers, FAC ¶¶ 42-43, 61-62.

20  The "predictable" effect, *Diamond Alternative Energy*, 606 U.S. at 112, of further reclassification

21  and reporting of waivers would be that Congress would more likely disapprove additional

22  waivers. Indeed, that was the whole reason for EPA's actions.

23       The threat of future Resolutions can be redressed here. *Contra* MTD 15:6-12. Specifically,

24  vacatur of EPA's actions, a declaration that they were unlawful, or an injunction prohibiting EPA

25  from repeating its actions would make it more difficult—if not impossible—for EPA to take

26  similar actions in the future.[19] While that would not necessarily "undo" *these* Resolutions, it

27

28       [19] Relief even as to *some* of EPA's actions (e.g., reclassification) would provide redress
because of the causal link between submission and the purported reclassification.

1    would prevent Plaintiffs from "sustain[ing] a new injury" from additional resolutions targeting

2    other waivers. *San Luis*, 672 F.3d at 703-704 (finding redressability where relief would prevent

3    future, but not past, injury). The fact that Congress *could* independently enact similar resolutions

4    without any action by EPA (MTD 15:4-5) does not undermine Plaintiffs' standing. *WildEarth*

5    *Guardians*, 795 F.3d at 1157 (finding redressability although another actor might "pick up where

6    the" defendant agency "left off").[20] Indeed, these independent resolutions are purely

7    "hypothetical," *id.* at 1158—given that Congress credited EPA for enabling these Resolutions and

8    that Congress has never taken any such independent action. It is not, however, at all hypothetical

9    that further reclassifications and submissions by EPA would injure Plaintiffs.

10        2. Plaintiffs also face (and are already experiencing) injuries from the threat that EPA will

11    decline to grant future waivers based on the CRA's "Reenactment Provision," which states that "a

12    new rule that is substantially the same" as one disapproved by CRA resolution "may not be

13    issued." 5 U.S.C. § 801(b)(2); *see* FAC ¶ 182. California intends to seek waivers for future

14    amendments to its vehicle emissions program, as it has successfully done more than 75 times. *See*

15    FAC ¶¶ 42-43; RJN Exh. 2 (announcing workshop regarding CARB's next amendments). But

16    Defendants have taken the position that the Reenactment Provision prohibits EPA "from issuing a

17    waiver that is 'substantially the same' as the waivers Congress repealed—regardless of whether

18    California's request satisfies the criteria under CAA § 209(b)." MTD 23:26-28. Any such denial

19    would prevent California, and any Plaintiff States that choose to adopt California's next

20    regulations as their own, from enforcing their laws. This threat constitutes injury in fact. *San Luis*,

21    672 F.3d at 701. Indeed, California is injured *now* by the uncertainty this threat introduces (for the

22    first time) into the design of the State's next vehicle emission regulations. *See* FAC ¶ 47; RJN

23    Exh. 2.[21]

24

25    ───────────────

      [20] Given the "drastic injury" to Plaintiff States from rendering their health and welfare
26    laws unenforceable, they need only satisfy a "lesser … increment in probability … to establish
      standing." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996).
27    [21] This extant injury more than overcomes Defendants' conclusory reference to ripeness.
      MTD 15:11. Regardless, this is one of the "many cases" where "ripeness coincides squarely with
      standing's injury in fact prong," *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138
28    (9th Cir. 2000), so these claims are ripe for the same reasons Plaintiffs have standing.

1    This is more than a "plausible inference" of a threat, *CBD*, 946 F.3d at 560; the threat has

2   already been made. Defendants nonetheless assert these injuries are speculative because, the

3   theory goes, EPA might deny future waivers even absent the Reenactment Provision. MTD 16:6-

4   11. But, unlike the statute in *CBD* (on which Defendants exclusively rely, MTD 16:1-11), the

5   CAA does not afford EPA discretion to shape its future waiver actions or to choose to take no

6   future waiver action at all. *See id.* To the contrary, when California requests a waiver (and it will),

7   EPA will have no discretion: it "shall" grant or deny that request, 42 U.S.C. § 7543(b)(1), and

8   may only deny if it makes specific factual findings, *id.* § 7543(b)(1)(A)-(C). Given that EPA has

9   granted more than seventy-five waivers over the last half-century (FAC ¶¶ 42-43), it is hardly

10  speculative that EPA would, in the future, be likewise unable to make the findings necessary to

11  deny a waiver on CAA grounds or that any denial would therefore invoke the Reenactment

12  Provision.[22]

13    Defendants do not dispute that this injury is traceable to EPA; nor could they do so, since

14  EPA itself is the one threatening to deny future waiver requests. And redressability is also

15  satisfied because a declaration that the Reenactment Provision, and other parts of 5 U.S.C. § 801,

16  are not applicable—or an injunction preventing EPA from denying waivers based on the

17  (inapplicable) Reenactment Provision—would remove the threat.[23] Vacatur of EPA's actions or a

18  declaration that waivers are not "rules" would reduce the risk (and thus the injury) as the

19  Reenactment Provision only applies to future "rule[s]." *See* 5 U.S.C. § 801(b)(2).

20    **D.    Plaintiffs Have Stated Claims that EPA's Actions Violate the APA and Are
         Ultra Vires (Counts I and II)**

21
         Plaintiffs have also adequately alleged APA and ultra vires claims against EPA's purported

22  reclassification and submission actions.[24] *Contra* MTD 18:6-19:22, 21:1-17.

23

24  _____

         [22] Plaintiffs agree with Defendants that the meaning of "substantially the same" is not
25  before this Court in this case. MTD 15:27-28.
         [23] Neither remedy would "blue pencil three duly enacted federal statutes." MTD 16:1-2.
26  None of the Resolutions says anything at all about their effects on *future* waivers. *See* MTD 6:5-9
    (quoting text of one Resolution).
27       [24] Defendants do not contend that Plaintiffs fail to state a claim in Count VI, *see* MTD
    16:2, which pleads an independent ground for declaratory relief, *see Powell v. McCormack*, 395
28  U.S. at 518 ("[A] request for declaratory relief may be considered independently of whether other
    forms of relief are appropriate.").

27

1        1. Beginning with the APA, Defendants do not dispute that EPA's actions were "'in excess

2  of statutory jurisdiction, authority, or limitations, or short of statutory right.'" FAC ¶ 128 (quoting

3  5 U.S.C. § 706(2)(C)). Instead, they argue the Complaint fails to satisfy the second prong of the

4  test for final agency action, MTD 18:14-15—that "the action must be one by which rights or

5  obligations have been determined, or from which legal consequences will flow," *Prutehi*

6  *Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025)

7  (cleaned up). But EPA's challenged actions had sufficient "practical and legal effects" to be final,

8  *Gill v. DOJ*, 913 F.3d 1179, 1184 (9th Cir. 2019), especially as finality "must be interpreted in a

9  pragmatic and flexible manner," *Prutehi*, 128 F.4th at 1108 (cleaned up).

10        Whether EPA's actions had "independent legal effect ... is a function of the agency's

11  intention to bind either itself or regulated parties." *Safer Chemicals, Healthy Fams. v. EPA*, 943

12  F.3d 397, 417 (9th Cir. 2019). EPA intended to bind itself here.[25] The agency itself asserts that

13  the relabeling of these waiver orders as "rules" "impose[d] a legal obligation upon the agency,"

14  *Prutehi*, 128 F.4th at 1111—namely the obligation to submit to Congress. Administrator Zeldin

15  asserted that the submission was "following the rule of law," RJN Exh. 1 at 1, and was required

16  "in order to comply with the agency's duties under the CRA," RJN Exh. 3 at 2.[26] There is no such

17  duty except as to "rules," 5 U.S.C. § 801(a)(1)(A), so EPA can only point to its own relabeling as

18  the trigger, FAC ¶¶ 74-78, 83, 126. EPA thus intended to "alter the legal regime to which the

19  action agency [was] subject." *Bennett*, 520 U.S. at 178.[27] Moreover, EPA also intended to affect

20  Plaintiff States' rights as well—specifically, to deny these particular waivers (and thus Plaintiff

---

22        [25] Defendants misleadingly quote *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992), implying agency actions can only be final if they impose "'direct consequences' *for Plaintiffs*." MTD 19:5-6 (emphasis added). But the Court was discussing "direct consequences *for the reapportionment*" of representatives in the House—the effect of the action at issue. *Franklin*, 505 U.S. at 798 (emphasis added). That language does not describe, much less limit, the parties upon whom such consequences must fall. As the cases cited herein make clear, consequences *for the agency* are sufficient. *See also Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019). In any event, EPA's actions did have direct consequences for Plaintiffs, as described.
        [26] The submissions to Congress are likewise final actions because, at a minimum, they purported to effectuate the reclassification. FAC ¶¶ 79, 83.
        [27] Plaintiffs allege that EPA's relabeling could not implicate the CRA, but that allegation does not undercut finality. The lawfulness of an agency's action and its implementation is a distinct question from whether the agency treated the action as consequential for itself or others.

28

1  States) "safe harbor" from the "potential" use of the CRA. *U.S. Army Corps of Eng'rs v. Hawkes*

2  *Co.*, 578 U.S. 590, 599 (2016); FAC ¶¶ 70-71, 74.

3       If given legal effect, EPA's purported "rule" reclassification has other consequences as

4  well. For one thing, EPA is claiming it cannot issue future waivers that are "substantially the

5  same" as the targeted ones. MTD 23:26-28. Thus, EPA intends its "rule" relabeling to apply to

6  *future* waivers, 5 U.S.C. § 801(b)(2) (applicable only to "new rule[s]"), thereby changing "the

7  terms on which [California's waiver] applications will be considered," *City of Fremont v. FERC*,

8  336 F.3d 910, 914 (9th Cir. 2003). For another, if these waivers were changed from licensing

9  orders (*supra* 9:5-10) into "rules," the license holder (California) would have lost—at a

10  minimum—its right to advance notice and an opportunity to course correct before EPA could

11  attempt a "withdrawal" of that license, 5 U.S.C. § 558(c), as the agency (unlawfully) undertook

12  once before, FAC ¶ 73. And that legal consequence would have been effective from the moment

13  of reclassification, regardless of whether the waivers were later disapproved by Congress.

14       Defendants' heavy reliance on *Dalton v. Specter*, 511 U.S. 462 (1994) (MTD 18:20-19:14)

15  is misplaced because the agency actions in that case bear no resemblance to these. Specifically,

16  the recommendations for military-base closures in *Dalton* "were in no way binding," and the lack

17  of finality flowed from that fact. *Bennett*, 520 U.S. at 178 (describing *Dalton*). Here, as explained,

18  EPA itself claimed its relabeling bound it to submit these waivers to Congress; and, if credited,

19  that action purported to alter the rights of others. Moreover, *Dalton* involved a military-base

20  closure statute but did not involve a recommendation to close a non-military facility (e.g., a post-

21  office) based on relabeling it as a military base. Thus, the *Dalton* Court was not presented with,

22  and did not decide, the finality of such reclassifications. Lastly, Defendants argue that someone

23  other than the agency took "the final action of enacting the Resolutions," attempting an analogy

24  to the President's base-closure decisions in *Dalton*. MTD 19:2-4. But, in their APA claim,

25  Plaintiffs do not challenge the Resolutions or seek to invalidate them; they challenge EPA's pre-

26  Resolution actions and seek relief as to EPA's conduct, *supra* Sec. I.C. *Contra Dalton*, 511 U.S.

27  at 464 (Respondents sought to prevent base closure).

28

1      2. Defendants' effort to dismiss Plaintiffs' ultra vires claim likewise fails. Defendants

2  notably do not dispute the first ultra vires element—that EPA's actions were "entirely in excess of

3  its delegated powers." MTD 21:5 (quoting *NRC v. Texas*, 605 U.S. 665, 681 (2025)). Instead,

4  Defendants argue "Plaintiffs fail to identify any 'specific prohibition'" against these actions. *Id.*

5  21:11-12 (quoting *NRC*, 605 U.S. at 681). Defendants are wrong. The APA prohibits agencies

6  from creating "a moving target" by attempting to alter their actions after they are final.[28] *DHS v.*

7  *Regents of the Univ. of California*, 591 U.S. 1, 23 (2020). Even more specifically, the APA

8  prohibits agencies from claiming a finalized "order" is *suddenly* a "rule" because that

9  classification determination controls which procedures the agency must follow and therefore

10  cannot be made after the fact. For example, to promulgate a *rule*, the agency must provide notice

11  of the proposed rule that satisfies 5 U.S.C. § 553(b) and a final rule that satisfies 5 U.S.C.

12  § 553(c).[29] And, separately, the APA prohibits an agency from "depart[ing] from a prior policy

13  *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).[30]

14      EPA ran afoul of all of these prohibitions, when it purported to change these adjudicatory

15  orders into rules long after the actions were finalized without opening a new proceeding

16  (assuming that would have been authorized) and without acknowledging, much less explaining,

17  the departure from its longstanding prior position (reiterated in these final actions). FAC ¶¶ 66,

18  70, 74-75, 79, 83. Plaintiffs have stated an ultra vires claim.

19                         **CONCLUSION**

20      Defendants' motion to dismiss Plaintiffs' complaint should be denied.

21

22

23

---

24      [28] While Defendants assert EPA's actions were "under" the CRA such that Section 805 applies, MTD 8:27-9:4, they nowhere argue that the CRA empowers agencies to relabel or

25  reclassify actions finalized as orders into rules. Nor could it, as the statute contains no such language. Regardless, the CRA does not purport to modify the specific prohibitions in the APA.

26      [29] Other statutes can supplant these requirements. *E.g.*, 42 U.S.C. § 7607(d).
    [30] Cases interpreting the APA's requirements are relevant to the "specific prohibition"

27  inquiry. *E.g.*, *Newsom*, 141 F.4th at 1047 (relying on precedent interpreting "Congress's statutory delegations"); *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022)

28  (similarly relying on precedent as controlling).

Dated:  January 9, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


/s/ M. Elaine Meckenstock
M. ELAINE MECKENSTOCK
Deputy Attorney General
Attorneys for State of California


**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

/s/ Carrie Noteboom
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov


**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

/s/ Seth Schofield
SETH SCHOFIELD*
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov


**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

/s/ Lisa J. Morelli
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 900-0782
Lisa.Morelli@law.njoag.gov

31

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

 */s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
 (505) 717-3520
wgrantham@nmdoj.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

*Admitted pro hac vice*

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

*/s/ M. Elaine Meckenstock*
M. Elaine Meckenstock
Counsel for Plaintiff State of California

32