Matthew J. Craig (SBN 350030)
mcraig@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (929) 294-2542
Facsimile: (212) 564-0883

Martin Totaro*
mtotaro@heckerfink.com
HECKER FINK LLP
1050 K Street, NW
Washington, D.C. 20001
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Attorneys for Amicus Curiae*
*Zero Emission Transportation Association*

*Admitted pro hac vice*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency, DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> *Defendants*. | Case No.: 4:25-cv-04966-HSG <br><br> **BRIEF OF THE ZERO EMISSION TRANSPORTATION ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS** |

**TABLE OF CONTENTS**

IDENTITY AND INTEREST OF AMICUS CURIAE ....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT..........................................2

ARGUMENT ........................................................................................................4

    I.    This Court Has Jurisdiction To Decide State Plaintiffs' Challenge ......................4

    II.    Congress Violated Separation-of-Powers When It Reversed Already-Final |Executive Branch Adjudications..................................................................5

        A.    The Constitution Assigns Only "Legislative" Powers to Congress............6

        B.    The Purported Disapproval Resolutions Encroach on Executive Authority By Reversing Prior, Final Agency Waiver Determinations Under the Clean Air Act ...................................................................7

        C.    Defendants' Contrary Arguments Lack Merit ...........................................11

CONCLUSION ..................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*5 Acres, LLC v. Miami-Dade Cnty., Fla.*,
   338 F.3d 1288 (11th Cir. 2003) ...................................................... 9

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) .............................................. 3, 9, 12, 14, 15

*Bi-Metallic Investment Co. v. State Board of Equalization*,
   239 U.S. 441 (1915) ...................................................................... 8

*Bond v. United States*,
   564 U.S. 211 (2011) ...................................................................... 6

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ...................................................................... 7

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .......................................................................... 6

*Center for Biological Diversity*,
   946 F.3d 561 ................................................................................. 3

*Citizens for Const. Integrity v. United States*,
   57 F.4th 750 (10th Cir. 2023) .................................................. 4, 5

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ................................................................ 9, 15

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ...................................................................... 6

*Ctr. for Biological Diversity v. Bernhardt*,
   946 F.3d 553 (9th Cir. 2019) ....................................... 3, 4, 5, 11

*Dep't of Transp. v. Association of American Railroads*,
   575 U.S. 43 (2015) ........................................................................ 7

*Fletcher v. Peck*,
   10 U.S. 87 (1810) .......................................................................... 7

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .................................................................... 11

- ii -

*Freytag v. Commissioner*,
    501 U.S. 868 (1991).................................................................................... 9

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013)................................................................... 9

*INS v. Chadha*,
    462 U.S. 919 (1983)........................................................................... 10, 13

*Londoner v. Denver*,
    210 U.S. 373 (1908).................................................................................... 8

*Medellin v. Texas*,
    552 U.S. 491 (2008).................................................................................... 6

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991).................................................................................... 6

*Mistretta v. United States*,
    488 U.S. 361 (1989).................................................................................... 6

*Nixon v. United States*,
    418 U.S. 683 (1974).................................................................................. 13

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
    584 U.S. 325 (2018).................................................................................. 15

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995)........................................................................... 11, 12

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014)................................................................... 4

*Robertson v. Seattle Audubon Soc.*,
    503 U.S. 429 (1992).................................................................................. 14

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017)................................................................... 9

*Springer v. Gov't of the Philippine Islands*,
    277 U.S. 189 (1928).................................................................................... 6

*State of Pennsylvania v. Wheeling & Belmont Bridge Co.*,
    59 U.S. 421 (1855).................................................................................... 12

*United States v. Brown*,
381 U.S. 437 (1965)............................................................................... 9

*United States v. Fla. E. Coast Ry. Co.*,
410 U.S. 224 (1973).......................................................................... 8, 9

*Webster v. Doe*,
486 U.S. 592 (1988).......................................................................... 3, 4

*Yesler Terrace Cmty. Council v. Cisneros*,
37 F.3d 442 (9th Cir. 1994) ................................................................ 8

**STATUTES**

5 U.S.C. § 551(3) ............................................................................ 7, 12

5 U.S.C. § 551(4) ............................................................................ 7, 12

5 U.S.C. § 801(1) .................................................................................. 2

5 U.S.C. § 801(a)(1)(A) ....................................................................... 2

5 U.S.C. § 801(b)(2) ........................................................................... 13

5 U.S.C. § 805 ............................................................................. 3, 4, 5

42 U.S.C. § 7543 .......................................................................... 11, 12

42 U.S.C. § 7543(1) .............................................................................. 8

42 U.S.C. § 7543(1)(A)......................................................................... 8

42 U.S.C. § 7543(a) .............................................................................. 7

**REGULATIONS**

88 Fed. Reg. 20,688 (Apr. 6, 2023) ...................................................... 2

90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................... 2

90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................... 2

**OTHER AUTHORITIES**

Zara Abrams, *Study links adoption of electric vehicles with less air pollution and improved health*, Keck School of Medicine Press Release (Feb. 2, 2023) ......................................... 1

BlueGreen Alliance Foundation, *EV Jobs Hub*, https://evjobs.bgafoundation.org/ ...................... 1

Emily S. Bremer, *Reckoning with Adjudication's Exceptionalism Norm*, 69 Duke L.J. 1749 (2020) ...................................................................................................................................... 10

*The Federalist No. 81* (Alexander Hamilton) (J. Cooke ed. 1961) ............................................... 12

GAO, *B-334309: EPA—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* (Nov. 30, 2023) .................................................... 7

GAO, *B-337179: Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* (Mar. 6, 2025) .......................................................... 7

International Energy Agency, *Global EV Outlook 2025* (May 2025) ........................................... 1

International Energy Agency, *World Energy Investment 2024* (June 2024) ................................. 1

U.S. Dep't of Interior, *About the Departmental Cases Hearings Division* https://www.doi.gov/oha/organization/dchd ........................................................................ 10

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The electric vehicle industry is a major driver of U.S. economic growth. *See* International Energy Agency, *Global EV Outlook 2025*, at 10 (May 2025) (noting that one in every ten cars sold in the United States is now electric), https://perma.cc/82K5-ZDYH. The industry is responsible for more than 200,000 electric vehicle-related jobs and almost $200 billion in investments in the U.S. economy. *See* BlueGreen Alliance Foundation, *EV Jobs Hub*, https://evjobs.bgafoundation.org/. These investments span across many sectors, including on-shore manufacturing and mining as well as the U.S. power grid. *Id.*; International Energy Agency, *World Energy Investment 2024*, at 78 (June 2024), https://perma.cc/49UX-PDBZ. Increased adoption of zero-emissions vehicles has also contributed to reductions in harmful air pollutants and improved public health outcomes, helping Americans live safer, longer, and healthier lives. *See* Zara Abrams, *Study links adoption of electric vehicles with less air pollution and improved health*, Keck School of Medicine Press Release (Feb. 2, 2023), https://perma.cc/CLQ2-RQFU.

The Zero Emission Transportation Association (ZETA) is a coalition promoting those critical interests. ZETA is composed of over three dozen companies committed to supporting electric vehicle adoption and maintaining U.S. electric vehicle manufacturing dominance in global markets. ZETA's members span the electric vehicle supply chain—including vehicle manufacturers, charging infrastructure manufacturers, network operators, battery manufacturers and recyclers, electricity providers, and critical minerals producers, among others. Together, these companies create hundreds of thousands of jobs, invest billions of dollars in on-shore industry and mineral production, and promote U.S. leadership in advanced clean technology. Several of ZETA's members are directly impacted by the California regulations that Congress has unlawfully disapproved. If allowed to stand, the purported disapproval resolutions will not only distort separation of powers. Congress's attempts to overturn an Executive Branch's already-final adjudications will also inflict significant harm on ZETA's members, the ability of the United States to maintain its dominance in the electrical vehicle industry, and the environment. A ruling by this Court that precludes Congress from exceeding its constitutional authority will prevent those harms and protect regulated entities' reliance interests in abiding by the agency's prior adjudications allowing California's regulations to take effect.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case involves an unprecedented attempt by Congress to overturn the results of already-final agency adjudications conducted pursuant to the requirements of the Clean Air Act. Congress's effort to reverse agency adjudications—rather than make new law to guide how future adjudications will be conducted—should be rejected as a violation of separation of powers.

In this case, California adopted three state regulations as part of its program to reduce emissions from motor vehicles: the Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx (Omnibus) regulations. Together, these rules gradually strengthen California's emission requirements for vehicles ranging from passenger cars to heavy-duty trucks. EPA granted California's requests to waive preemption for those amendments to California's regulatory program under the Clean Air Act. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (Advanced Clean Trucks); 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II); 90 Fed. Reg. 643 (Jan. 6, 2025) (Omnibus). After conducting an "adjudicatory review" that was "based on evidence in the record," 88 Fed. Reg. at 20,692, EPA granted the three waivers. In doing so, EPA made clear that, "[a]s with past waiver decisions," the determination to grant or not grant a waiver is an adjudication and "is not a rule." 90 Fed. Reg. at 643.

In February and March 2025, however, EPA submitted the three waivers to Congress for review under the Congressional Review Act. The Act creates expedited procedures for Congress to disapprove federal agency "rule[s]." 5 U.S.C. § 801(a)(1)(A); *see id.* § 802. The Act limits Senate debate, prohibits amendments and points of order, and creates an exception to the filibuster, allowing a bare majority of the Senate to adopt a resolution disapproving of a rule. *See id.* § 802(d). A "rule" disapproved by Congress "shall not take effect (or continue)." *Id.* § 801(b)(1). In May, Congress adopted three resolutions purporting to disapprove those waivers under the Act even though EPA had previously determined that the "Congressional Review Act . . . does not apply because" a decision to grant or deny a waiver "is not a rule." 90 Fed. Reg. at 643; *see* H.J. Res 87, 119th Cong., 139 Stat. 65 (2025) (Advanced Clean Trucks), H.J. Res. 88, 119th Cong., 139 Stat. 66 (2025) (Advanced Clean Cars II), H.J. Res. 89, 119th Cong., 139 Stat. 67 (2025) (Omnibus). The President signed the resolutions on June 12, 2025. *See id.*

Congress has never sought to use the Congressional Review Act to overturn an agency's already-final adjudicative order. State Plaintiffs' challenge to Congress's purported disapproval resolutions turns in large part on whether federal courts can address the validity of those resolutions and whether Congress violates separation-of-powers when it reverses final Executive Branch adjudications. This amicus brief addresses those two issues.

*First*, the Ninth Circuit has already concluded that the Congressional Review Act's jurisdiction-stripping provision, 5 U.S.C. § 805, does not bar judicial review of a constitutional challenge, including a challenge based on "separation-of-powers principles." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019). That holding is binding on this Court. It is also correct. "[W]here Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). A contrary rule would raise "the serious constitutional question that would arise if [this Court] construed a statute to deny a judicial forum for constitutional claims." *Center for Biological Diversity*, 946 F.3d at 561 (citation modified). The United States acknowledges—including in this case and others—that Section 805 does not bar constitutional claims like those brought by State Plaintiffs, and Defendants' amici err by arguing otherwise.

*Second*, State Plaintiffs' separation-of-powers challenge to Congress's encroachment on Executive Branch authority is correct on the merits. That challenge pointedly does not present a facial attack to the constitutionality of the Congressional Review Act. It does not call into question Congress's ordinary use of that statute to invalidate agency rules. It does not ask this Court to rule that all disapproval resolutions under the Act are unlawful. It does not require this Court to opine on the contours of Congress's exclusive constitutional authority to determine its own rules. *See* U.S. Const. art. I, § 5, cl. 2. And it does not require this Court to issue a decision that will have unintended consequences for Congress when Congress lawfully exercises its authority.

Rather, State Plaintiffs' separation-of-powers argument asks this Court for a narrow opinion holding that Congress violates separation of powers when it enacts legislation that overturns an already-final Executive Branch adjudication. Just as "a statute that directs, in 'Smith v. Jones,' 'Smith wins,'" exceeds the legislative power because it "compel[s] . . . findings or results under old law," *Bank Markazi*

*v. Peterson*, 578 U.S. 212, 231 (2016), Congress likewise has no authority to overrule the results of an adjudication already conducted by an Executive Branch agency. In both scenarios, Congress exceeds its authority when it ceases to engage in a legislative function and exercises the prerogatives—in this case, engaging in adjudications—assigned to a different branch of government. If anything, the separation-of-powers violation is even clearer here because Congress did not merely decide that Smith wins. It dictated that result while leaving nothing left to adjudicate even after the Executive Branch had already determined, based on the factual record, that Jones must prevail.

Defendants and their amici do not dispute that Congress cannot lawfully dictate the result in a particular adjudication under current law, but they err by asserting that the purported disapproval resolutions amended the Clean Air Act rather than compelled findings or results under that statute. Congress's effort to overturn three fact-based, already-final agency adjudications granting waivers plainly dictates a result reversing the Executive Branch's prior, record-based decisions.

## ARGUMENT

### I.     This Court Has Jurisdiction To Decide State Plaintiffs' Constitutional Challenge

"The Supreme Court has long held that a statutory bar to judicial review precludes review of constitutional claims only if there is 'clear and convincing' evidence that the Congress so intended." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 308 (D.C. Cir. 2014) (citations omitted); *accord Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear."). That bedrock principle "applies to both facial and as-applied constitutional claims." *Ralls Corp.*, 758 F.3d at 308.

Consistent with that jurisprudence, the Ninth Circuit has already recognized that the Congressional Review Act's jurisdiction-stripping provision, 5 U.S.C. § 805, "does not include any explicit language barring judicial review of constitutional claims," and held that "Congress did not intend to bar such review," *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019). It did not limit the scope of the holding to particular types of constitutional challenges. *Id.* (citation modified). Applying that holding, the Court concluded that it had jurisdiction to entertain a challenge based on "separation-of-powers principles." *Id.*; *see Citizens for Const. Integrity v. United States*, 57 F.4th 750, 758 (10th Cir.

2023) ("Section 805 does not meet this clear-statement requirement. It is not enough just to bar judicial review in general, as the Supreme Court has repeatedly ruled when holding that such a general bar does not preclude the courts from entertaining constitutional challenges.").

Several amici urge a contrary conclusion without much by way of reasoning. *See, e.g.*, Iowa Amicus Br. 7 ("This challenge raises separation of powers issues. And any challenges to that waiver run headlong into the Congressional Review Act's jurisdiction stripping. *See* 5 U.S.C. § 805."); AFECOC Amicus Br. 11-13. The United States does not. Faced with the Ninth Circuit's binding holding in *Center for Biological Diversity*, it does not contest this Court's jurisdiction over State Plaintiffs' separation-of-powers claims. *See* ECF 172, at 1 (MTD) (arguing that Section 805 "bars most of Plaintiffs' claims"); *id.* at 6 (arguing that "Congress expressly precluded judicial review over Plaintiffs' statutory and ultra vires claims (Counts I, II, V, and VI)," but omitting separation-of-powers claim (Count III)). And the United States did not invoke Section 805 in response to constitutional challenges in *Center for Biological Diversity* and *Citizens for Constitutional Integrity* either. *See* Br. for the United States, *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019); Br. for the United States, *Citizens for Const. Integrity v. United States*, 57 F.4th 750 (10th Cir. 2023). That sustained recognition of the availability of constitutional challenges—across multiple presidential administrations and by a branch that routinely presses robust interpretations of jurisdiction-stripping provisions—confirms that Section 805 does not bar judicial review of State Plaintiffs' separation-of-powers claims.

## II.    Congress Violated Separation-of-Powers When It Reversed Already-Final Executive Branch Adjudications

The Constitution assigns all legislative powers to Congress, leaving the authority to execute laws to the Executive Branch and the power to decide cases to the Judicial Branch. Through the purported disapproval resolutions, however, Congress sought to overturn already-final adjudications conducted by EPA. Those acts were not legislative and thus exceeded the grant of constitutional authority to Congress. Allowing the disapproval resolutions to stand would thwart the constitutional design and put all sorts of agency adjudications at risk of being overturned by Congress with none of the protections afforded to parties in an adjudication. Defendants resist that conclusion, but their arguments boil down to the claim

1    that, through the disapproval resolutions, Congress did not dictate the results of a specific matter. That is

2    precisely what Congress did. After EPA conducted adjudications and granted California its three

3    emissions waivers, California's regulations took effect. The purported disapproval resolutions claim to

4    nullify those waivers. It would be difficult to think of an example that more openly directs results

5    (definitively rescinding the waivers) under laws still on the books (the Clean Air Act's waiver provision).

6        **A.    The Constitution Assigns Only "Legislative" Powers to Congress**

7        "Time and again" the Supreme Court has "reaffirmed the importance in our constitutional scheme

8    of the separation of governmental powers into the three coordinate branches." *Metro. Wash. Airports Auth.*

9    *v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273 (1991). Under the Constitution, "[a]ll

10   legislative Powers herein granted shall be vested in a Congress of the United States," Art. I, §1; "[t]he

11   executive Power shall be vested in a President of the United States," Art. II, §1, cl. 1; and "[t]he judicial

12   Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the

13   Congress may from time to time ordain and establish," Art. III, §1. "[T]his separation and the consequent

14   exclusive character of the powers conferred upon each of the three departments is basic and vital." 

15   *Springer v. Gov't of the Philippine Islands*, 277 U.S. 189, 201 (1928).

16       When functioning properly, the "carefully crafted system of checked and balanced power within

17   each Branch" serves as the "greatest security against tyranny—the accumulation of excessive authority in

18   a single Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989); *see also Buckley v. Valeo*, 424

19   U.S. 1, 122 (1976) ("The Framers regarded the checks and balances that they had built into the tripartite

20   Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one

21   branch at the expense of the other."). And these "structural principles secured by the separation of powers"

22   protect not only the three branches of government, but "individual liberty" too. *Bond v. United States*, 564

23   U.S. 211, 222 (2011). "Liberty is always at stake when one or more of the branches seek to transgress the

24   separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

25       Under that framework, "[l]egislative power, as distinguished from executive power, is the

26   authority to make laws." *Springer*, 277 U.S. at 202; *see Medellin v. Texas*, 552 U.S. 491, 526 (2008)

27   (explaining that "the power to make the necessary laws is in Congress; the power to execute in the

28

President"); *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."). But "[t]he structure of the Constitution does not permit Congress to execute the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986); *see Dep't of Transp. v. Association of American Railroads*, 575 U.S. 43, 67-68 (2015) (Thomas, J., concurring) ("When the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, *only* the vested recipient of that power can perform it." (emphasis added)).

### B.   The Purported Disapproval Resolutions Encroach on Executive Authority By Reversing Prior, Final Agency Waiver Determinations Under the Clean Air Act

#### 1.   *Individual Waiver Decisions Are Adjudicative*

Waiver decisions under the Clean Air Act are adjudications. Waiver decisions do not prescribe a rule of general applicability with "future effect," as do agency rules. 5 U.S.C. § 551(4); *id.* § 804(3). As the Government Accountability Office has explained, "a Clean Air Act preemption waiver . . . [is] instead an adjudicatory order." GAO, *B-337179: Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 2 (Mar. 6, 2025), https://www.gao.gov/assets/880/875948.pdf; *see id.* at 7 ("[A]n adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved."). A waiver is "particular to California's [emissions standards], as opposed to a broad unspecified group"; EPA's "process involve[s] consideration of particular facts, as opposed to general policy"; and a waiver decision "has immediate effect in that California is not preempted from enforcing its [emissions standard]." GAO, *B-334309: EPA— Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* 5-6 (Nov. 30, 2023). Those are the hallmarks of an adjudication, not a rule.

That conclusion is compelled by the way in which the Clean Air Act operates. While generally preempting state regulation of emissions from new motor vehicles, 42 U.S.C. § 7543(a), Congress in the Clean Air Act required EPA to waive that preemption for California and allow California to promulgate its own state-law rules absent certain disqualifying conditions. The waiver provision mandates that EPA

"shall" waive federal preemption for California if the "State determines that the State standards will be, in the aggregate at least as protective of public health and welfare as applicable Federal standards." *Id.* § 7543(b)(1). Such a waiver must be granted unless EPA finds after a review of the facts one of three disqualifying conditions is met—that the State's determination on the protectiveness of the standards is arbitrary and capricious; that the State does not need standards "to meet compelling and extraordinary conditions"; or that the State's standards are technologically infeasible within the lead time provided or involve test procedures that are inconsistent with federal test procedures. *Id.* § 7543(b)(1)(A)-(C).

In contrast to a rulemaking, these provisions require EPA to conduct an adjudication that "resolve[s] disputes among specific individuals in specific cases"—whether a particular regulation by a specific party (California) satisfies the requirements for a waiver. *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). And EPA's decision here "ha[d] an immediate effect on specific individuals (those involved in the dispute)" by granting California permission to undertake a specific action (enforce particular motor-vehicle regulations). *Id.* As EPA previously explained while reiterating its position that waivers are adjudications rather than rules, those decisions are made pursuant to an "adjudicatory review" that is "based on evidence in the record" following a request by California to recognize the validity and enforceability of its already-adopted emissions regulations because California met the statutory standards for waiver. 88 Fed. Reg. at 20,692.

EPA's prior position is supported by a century of precedent. The distinction "between rulemaking and adjudication is illustrated by" the Supreme Court's "treatment of two related cases under the Due Process Clause of the Fourteenth Amendment." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244 (1973). In *Londoner v. Denver*, 210 U.S. 373 (1908), the Court held that the Denver city council acting as a tax board engaged in an adjudication when assessing a tax against a small group of landowners for the cost of paving a particular street. *Id.* at 386-88. But in *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915), the Court upheld a state agency's decision to increase the valuation of all taxable property in Denver without providing a hearing for those affected because that action was legislative, not adjudicative. "Central to the distinction was that the agency's action in *Bi-Metallic* was generally applicable to an open class of all Denver property owners while *Londoner* involved a

particularized order affecting particular owners in each case upon individual grounds." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (citation modified). As demonstrated by the contrasting results in *Londoner* and *Bi-Metallic*, an "adjudication" is not an exercise of legislative authority and results from fact-based determinations affecting "a small number of persons . . . in each case upon individual grounds." *Fla. E. Coast Ry.*, 410 U.S. at 244-45 (discussing *Londoner* and *Bi-Metallic*). A decision based on individual grounds to allow or not allow California to enforce its own emissions regulations after a review of the facts qualifies as an adjudication because it resolves an individual waiver application following review of the facts in the record.

### 2. *Upholding the Purported Disapproval Resolutions Would Distort Separation of Powers*

Because EPA's decisions are adjudicative, Congress has no authority to step in and reverse the agency's prior, fact-based, decision to grant California waivers. Since "the beginning of the Republic," agencies have "conduct[ed] adjudications," and "under our constitutional structure they *must be* exercises of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. Art. II, §1, cl. 1); *see Freytag v. Commissioner*, 501 U.S. 868, 909 (1991) (Scalia, J., concurring in part and concurring in the judgment) (agency adjudicators "exercise the executive power"). Even if Congress has authority to enact legislation "that govern[s] one or a very small number of specific subjects," *Bank Markazi*, 578 U.S. at 234, it cannot conduct or reverse individual adjudications. Just as "a statute that directs, in 'Smith v. Jones,' 'Smith wins,'" exceeds the legislative power because it "compel[s] . . . findings or results under old law," *Bank Markazi*, 578 U.S. at 231, so too does a statute erasing an already-final Executive Branch adjudication by infringing on the Executive Branch's core authority to execute the laws as to specific parties. "Congress possesses full legislative authority, but *the task of adjudication must be left to other tribunals*." *United States v. Brown*, 381 U.S. 437, 461 (1965) (emphasis added); *see 75 Acres, LLC v. Miami-Dade Cnty., Fla.*, 338 F.3d 1288, 1294 (11th Cir. 2003) (noting "the important distinction between legislative action and adjudicative action"); *cf. In re Aiken Cnty.*, 725 F.3d 255, 263 (D.C. Cir. 2013) (Congress can create new criminal offenses, but "Congress may not mandate that the President prosecute a certain kind of offense or offender").

The distinction between the power to make substantive law versus the power to overturn Executive Branch adjudications is no matter of mere form. Unlike administrative agencies subject to "established substantive rules" and "procedural safeguards" like the right to "a hearing before an impartial tribunal that are present when . . . an agency adjudicates individual rights," the "only effective constraint on Congress' power is political, but Congress is most accountable politically when it prescribes rules of general applicability." *INS v. Chadha*, 462 U.S. 919, 966 (1983) (Powell, J., concurring in the judgment) (arguing that the defect with the legislative veto in that case was that one House of Congress was exercising adjudicatory rather than legislative powers). The same constraints are absent when Congress in effect issues an adjudicative order. *See id.* at 964-65 (Powell, J., concurring in the judgment) ("The House did not enact a general rule; rather it made its own determination that six specific persons did not comply with certain statutory criteria. It thus undertook the type of decision that traditionally has been left to other branches.").

Permitting this unconstitutional, unprecedented action to stand would set a dangerous precedent. Every day, agencies issue numerous orders in adjudications, spanning requests for public benefits and permits to conducting enforcement actions against persons who have allegedly violated federal laws. *See, e.g.*, Emily S. Bremer, *Reckoning with Adjudication's Exceptionalism Norm*, 69 Duke L.J. 1749, 1763 (2020) (listing the top ten largest adjudication schemes by agency). For example, agencies adjudicate topics such as Social Security benefits, immigration, veterans' benefits, employment discrimination, the validity of patents and trademarks, union disputes, and securities fraud. *See id.* And agencies routinely conduct adjudications to grant or deny oil or gas leases. *See, e.g.*, U.S. Dep't of Interior, *About the Departmental Cases Hearings Division* ("Examples of case types referred for hearing include adjudications relating to oil and gas leases, rights-of-way, and alleged trespasses on federal land and resources."), https://www.doi.gov/oha/organization/dchd. These and other examples demonstrate that conducting adjudications is a core function of Executive Branch agencies. If Congress can unilaterally reverse any of the resulting agency orders, all the legal rights and obligations at issue in those adjudications—including due process rights that typically attach in adjudications—will be subject to "trial

by legislature" and "the tyranny of shifting majorities." *Chadha*, 462 U.S. at 961-62 (Powell, J., concurring in the judgment).

Never before has Congress used the Congressional Review Act to invalidate an EPA waiver decision—indeed, to invalidate *any* adjudicatory order by *any* agency. That is "[p]erhaps the most telling indication of the severe constitutional problem" with the resolutions at issue. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010). Congress's "prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). And it does not matter that the Executive Branch was complicit in this encroachment on its own power. The separation of powers does "not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" *Free Enterprise Fund*, 561 U.S. at 497. Separation-of-powers principles protect against hobbling future presidential administrations from encroachments prior administrations acquiesced to, for whatever reason. And the beneficiaries of "high walls and clear distinctions" between the co-equal branches serves States' rights and individual liberty too, not just the interests of the Executive Branch. *Plaut*, 514 U.S. at 239.

### C.    Defendants' Contrary Arguments Lack Merit

Defendants dispute that Congress exceeded its authority by purporting to overturn adjudications already conducted by the Executive Branch. But Defendants misdescribe what Congress has done and misread Supreme Court precedents. A fair reading of the facts and the law show that Congress violated separation of powers when it overturned EPA's already-final adjudications granting California waivers.

### 1.    *Congress Dictated the Results By Reversing Already-Final Adjudications*

Defendants err by claiming that, under the Ninth Circuit's opinion in *Center for Biological Diversity*, the purported disapproval resolutions substantively amended the Clean Air Act even though its preemption and waiver provisions, *see* 42 U.S.C. § 7543, have not changed in the United States Code. *See* MTD 21-23. *Center for Biological Diversity* explains how the Congressional Review Act is supposed to operate in practice. Ordinarily, when Congress enacts a joint resolution repealing a rule, that act operates "as a change to substantive law, even though it did not state that it constituted an amendment to" pre-existing law. 946 F.3d at 562. That makes sense when Congress repeals an agency rule under the

Congressional Review Act because a rule is a forward-looking provision prescribing legal requirements for regulated parties that have "future effect." 5 U.S.C. § 551(4); *id.* § 804(3). Overturning a rule alters forward-looking legal requirements for regulated parties and in that sense changes substantive law.

Here, in contrast, there has been no change of law. Congress could have changed the law as applied to California by, for example, amending the Clean Air Act to eliminate the ability of EPA to allow California to promulgate and enforce regulations governing motor vehicle emissions. Or Congress could have broadened the three conditions that permit EPA to deny a waiver request. Or Congress could have given EPA discretion to deny waivers by altering the Clean Air Act's requirement that EPA "shall" waive federal preemption for California when it meets the requirements for a waiver. 42 U.S.C. § 7543. But Congress did not do any of that. Instead, while Congress could have changed the law as applied to California, it simply disagreed with and sought to reverse EPA's exercise of adjudicatory authority under the Clean Air Act when EPA followed the statute and concluded that California was entitled to emissions waivers.

This distinction—between Congress changing the underlying law versus Congress dictating its application to specific facts—provides the separation-of-powers line between permissible and impermissible legislation. Congress has authority to change the underlying law but that authority does not extend to compelling findings or results under existing law. For example, Congress can pass laws that affect pending cases, but cannot "retroactively command[] the federal courts to reopen final judgments." *Plaut*, 514 U.S. at 219. Congress may even enact legislation that applies retroactively to pending cases, but "[o]f course" Congress cannot pass a law directing judgment for a particular party. *Bank Markazi*, 578 U.S. at 231. That limit does not depend on whether Congress is addressing a public or private right. *See* MTD 22-23 (citing *State of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855), while omitting the Supreme Court's statement that, "if the remedy in this case had been an action at law and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress," *id.* at 431); *The Federalist No. 81*, at 545 (Alexander Hamilton) (J. Cooke ed. 1961) ("A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases."). Further, although Congress can

1   change the law to wipe out a particular criminal prosecution by stripping courts of jurisdiction of that case,

2   it cannot disapprove of the Executive Branch's decision to bring the criminal prosecution and overturn

3   that decision because "the Executive Branch has exclusive authority and absolute discretion to decide

4   whether to prosecute a case." *Nixon v. United States*, 418 U.S. 683, 693 (1974). And Congress's intrusion

5   into adjudications encroaches on "the type of decision that traditionally has been left to other branches."

6   *Chadha*, 462 U.S. at 965 (Powell, J., concurring in the judgment).

7          As these examples show, Congress cannot exceed its authority to legislate by dictating the results

8   of already-completed proceedings assigned to another branch of government. But that is exactly what

9   Congress tried to do here. Congress targeted EPA's prior adjudications granting California the waivers it

10  was entitled to under the Clean Air Act. Congress did not amend that statute. Congress instead declared

11  that those adjudications have the opposite result. As Defendants acknowledge, "[b]efore the Resolutions,

12  California's regulations were not preempted because California had obtained a waiver under § 209(b) of

13  the Clean Air Act" while under the purported disapproval resolutions "the regulations are preempted as a

14  matter of law, regardless of whether California satisfies" the waiver criteria under the Clean Air Act. MTD

15  23. That decision exceeded Congress's legislative authority because it directed a specific result

16  overturning a prior waiver decision without altering the criteria for when California is entitled to a waiver.

17         To support their contrary view, Defendants argue that the purported disapproval resolutions did

18  change the underlying law because the Congressional Review Act prohibits an agency from reissuing a

19  rescinded rule "in substantially the same form" which, under Defendants' view, shows that Congress

20  amended substantive law by limiting what the agency can do in the future. *See* 5 U.S.C. § 801(b)(2); MTD

21  23. Although that separate consequence extends beyond Congress's decision to reverse individual,

22  already-final adjudications, it cannot cure Congress's overreach here. Congress violated separation of

23  powers when it unlawfully reversed agency adjudications. When Congress invalidates a rule, it has the

24  authority to establish limits on what types of rules agencies can promulgate in the future. When Congress

25  attempts to nullify or reverse an already-final Executive Branch adjudication, it does not. Any potential

26  separate, future consequences from a disapproval resolution cannot transform Congress's reversal of an

27

28

Executive Branch adjudication into a valid legislative act merely because Congress's action might also have some forward-looking effects.

## 2. *Robertson and Bank Markazi Support State Plaintiffs, Not Defendants*

Congress's decision to overturn an individual adjudication already made by an agency distinguishes this case from *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429 (1992), and *Bank Markazi*. *See* MTD 22-23. Unlike here, those cases involved Congress amending a law rather than leaving existing law intact. Both cases also show why Congress overstepped its constitutional authority here.

In *Robertson*, the Court addressed the validity of a statute that established a set of rules to govern timber harvesting within areas in Oregon and Washington that contained northern spotted owls. The Court upheld the statute at issue in that case, but it made clear that a statute is invalid if it "direct[s] any particular findings of fact or applications of law . . . to fact" or "direct[s] results under old law." 503 U.S. at 438, 439. Congress's action in that case did not direct results under the old law because it "did not instruct the courts" on how to decide whether a regulated entity's timber sales violated the new statute. *Id.* at 439. In other words, there was work left for other branches to do in assessing how the statute would apply to a particular set of facts. Here, by contrast, the disapproval resolutions reversed the agency's prior, individual adjudications under the Clean Air Act, which Congress did not amend. The purported disapproval resolutions left nothing for courts, agencies, or anyone else to decide because they directed a result—that California was not entitled to waivers. And, unlike here, the statute at issue in *Robertson* did not operate to overturn a specific, final adjudication. The Court instead upheld the statute at issue in large part because it referenced particular cases "only as a shorthand for describing certain environmental law requirements, not to limit the statute's effect to those cases alone." *Bank Markazi*, 578 U.S. at 248 (Roberts, C.J., dissenting) (describing *Robertson*).

*Bank Markazi* likewise confirms that Congress exceeded its constitutional authority by enacting the disapproval resolutions. As noted above, the Court explained that "a statute that directs, in 'Smith v. Jones,' 'Smith wins,'" exceeds the legislative power because it "compel[s] . . . findings or results under old law." 578 U.S. at 231. Defendants urge that "*Bank Markazi* is inapplicable" because the case "concerns judicial power, not executive power." MTD 24. That is clearly wrong because the Supreme Court used

the example to demonstrate the limits of *legislative* authority. Just as a statute that directs a court to declare one party the victor in a pending case would be an unconstitutional encroachment on judicial authority by Congress, a resolution that nullifies a particular order granting permission to an individual party to engage in a course of conduct under federal law is an unconstitutional encroachment on executive authority by Congress. In both instances, Congress transgresses its role assigned by the Constitution that limits its authority to legislative rather than adjudicative acts. And in contrast to the statute at issue in that case and the statute at issue in *Robertson*, the disapproval resolutions did not leave "plenty" of factual determinations "to adjudicate." *Bank Markazi*, 578 U.S. at 230 n.20. Congress instead performed the entire adjudications itself.

Defendants similarly err by urging that, because agencies may adjudicate only public rights, *Bank Markazi*'s hypothetical does not apply and Congress has authority to direct that Smith wins. MTD 24-25 (citing *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325 (2018)). *Oil States*'s discussion of private and public rights is irrelevant: irrespective of whether private or public rights are involved, Congress cannot constitutionally encroach on the authority of a coordinate branch.

The implications of Defendants' contrary view are startling. Under that view, Congress has authority to definitively overturn any adjudication any agency ever conducts even if the agency's decision is already final. That is not, and has never been, the law. Adjudications cannot be "exercises" of the legislative power. *City of Arlington*, 569 U.S. at 304 n.4. If anything, the encroachment here harms separation of powers more than the example in *Bank Markazi*, because Congress compelled findings and results under old law by declaring that Smith won even after the Executive Branch concluded after an adjudication that Jones had already prevailed. Congress left nothing for coordinate branches of government to decide by purporting to reverse the results of an already-final adjudication. The Constitution forbids that result.

## CONCLUSION

ZETA respectfully requests that this Court deny Defendants' motion to dismiss.

1

2

3

4        Dated: January 16, 2026

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

_____

Martin Totaro
*mtotaro@heckerfink.com*
HECKER FINK LLP
1050 K Street, NW
Washington, D.C. 20001
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

Matthew J. Craig (SBN 350030)
*mcraig@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (929) 294-2542
Facsimile: (212) 564-0883

*Attorneys for Amicus Curiae*
*Zero Emission Transportation Association*