1  ROBERT "PERL" PERLMUTTER(State Bar No. 183333)
   MATTHEW S. McKERLEY (State Bar No. 332160)
2  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
3  San Francisco, California 94102
   Telephone:   (415) 552-7272
4  Facsimile:   (415) 552-5816
   perlmutter@smwlaw.com
5  mmckerley@smwlaw.com

6  Attorneys for Amicus Curiae
   BAY AREA AIR QUALITY MANAGEMENT
7  DISTRICT

8               **UNITED STATES DISTRICT COURT**

9       **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

10

11 | STATE OF CALIFORNIA, STATE OF
   | COLORADO, STATE OF DELAWARE,
12 | COMMONWEALTH OF MASSACHUSETTS,
   | STATE OF NEW JERSEY, STATE OF NEW
13 | MEXICO, STATE OF NEW YORK, STATE OF
   | OREGON, STATE OF RHODE ISLAND, STATE
14 | OF VERMONT, and STATE OF WASHINGTON,

15                Plaintiffs,

16        v.

17 | UNITED STATES OF AMERICA, U.S.
   | ENVIRONMENTAL PROTECTION AGENCY,
18 | LEE ZELDIN, in his official capacity as
   | Administrator of the U.S. Environmental Protection
19 | Agency, and DONALD J. TRUMP, in his official
   | capacity as President of the United States,

20

21                Defendants.

Case No. 4:25-cv-04966-HSG

**BRIEF OF THE BAY AREA AIR QUALITY MANAGEMENT DISTRICT AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

Date:     February 19, 2026
Time:     2:00 p.m.
Crtrm.:   2, 4th Floor

The Hon. Haywood S. Gilliam, Jr.

Trial Date:        None set

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 7

BACKGROUND ................................................................................................................ 8

      A.    The Clean Air Act and California law establish a framework that requires federal, state, and local authorities to work together to control air pollution. ........................................................................................ 8

      B.    California continues to suffer from the worst air pollution in the country and relies on its authority to regulate mobile sources to attain federal and state air quality standards. ............................................... 11

ARGUMENT ...................................................................................................................... 13

      I.    The federal government's unlawful revocation of California's adjudicatory waivers will dramatically worsen public health outcomes. ................................... 14

      II.    Absent the mobile source regulations at issue, air districts will need to consider drastic measures to protect local residents and satisfy the Act's requirements, and doing so might not even be possible at all. .............................. 15

      III.    The federal government's rejection of California's waivers is unlawful. ............... 18

CONCLUSION ................................................................................................................... 21

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*California Dump Truck Owners Ass'n v. Nichols,*
   784 F.3d 500 (9th Cir. 2015) ................................................................. 10

*Comm. for a Better Arvin v. U.S. E.P.A.,*
   786 F.3d 1169 (9th Cir. 2015) ................................................................. 8

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ................................................................. 18

*Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.,*
   627 F.2d 1095 (D.C. Cir. 1979) ................................................... 7, 9, 10

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   584 U.S. 453 (2018) ................................................................. 19

*South Carolina v. Baker,*
   485 U.S. 505 (1988) ................................................... 8, 18, 19, 20

*United States v. Carolene Products Co.,*
   304 U.S. 144 (1938) ................................................................. 20

**Federal Statutes**

42 U.S.C. § 7407 ................................................................. 9, 10

42 U.S.C. § 7408 ................................................................. 9

42 U.S.C. § 7409 ................................................................. 9

42 U.S.C. § 7410 ................................................................. 10

42 U.S.C. § 7411 ................................................................. 10

42 U.S.C. § 7416 ................................................................. 10

42 U.S.C. § 7501 ................................................................. 10

42 U.S.C. § 7502 ................................................................. 10

42 U.S.C. § 7511a ................................................................. 16

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

42 U.S.C. § 7513 ........................................................................................................... 15

42 U.S.C. § 7543 ......................................................................................... 9, 10, 11, 19

Pub. L. No. 91-604, 84 Stat. 1676 (1970) ................................................................... 9

**Federal Regulations**

40 C.F.R. § 51.491 (2025) .......................................................................................... 10

**Federal Register**

87 Fed. Reg. 68,483 (Nov. 15, 2022) ......................................................................... 13

89 Fed. Reg. 16,202 (Mar. 6, 2024) ..................................................................... 12, 13

**California Statutes**

California Health & Safety Code
        § 39002.......................................................................................................... 11
        § 39500.......................................................................................................... 11
        § 39602.......................................................................................................... 11
        § 39606.......................................................................................................... 11
        § 40001.......................................................................................................... 11
        § 40914.......................................................................................................... 11
        § 41650.......................................................................................................... 11

1967 Cal. Stat., ch. 1545............................................................................................. 9

**California Regulations**

California Code of Regulations, Title 17
        § 70200.......................................................................................................... 11

**Other Authorities**

Bay Area Air Quality Mgmt. Dist., *Emissions Lookup Tool* (Jan. 31, 2024),
        https://www.baaqmd.gov/about-air-quality/emission-inventory/emissions-
        lookup-tool ........................................................................................... 14, 16

Bay Area Air Quality Mgmt. Dist., *History of the Air District*,
        https://www.baaqmd.gov/about-the-air-district/history-of-air-district ................... 9

Bay Area Air Quality Mgmt. Dist., *Illegal Federal Rejection of California Motor Vehicle Emissions Standards Hurts the Bay Area* (Jan. 14, 2026), https://www.baaqmd.gov/waiver ................................................................ 13, 14, 15, 16

CARB, 2022 State Strategy for the State Implementation Plan (Sept. 22, 2022), https://ww2.arb.ca.gov/sites/default/files/2022-08/2022_State_SIP_Strategy.pdf ................................................ 12, 13, 15, 16

CARB, *California Ambient Air Quality Standards*, https://ww2.arb.ca.gov/resources/california-ambient-air-quality-standards .......................... 11

CARB, *History*, https://ww2.arb.ca.gov/about/history ................................................. 9

CARB, Public Hearing to Consider the Proposed Advanced Clean Trucks Regulation, Staff Report: Initial Statement of Reasons (Oct. 22, 2019), https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2019/act2019/isor.pdf ..................... 12

CARB, Resolution 23-4 (Jan. 26, 2023), https://ww2.arb.ca.gov/sites/default/files/barcu/board/res/2023/res23-4.pdf ........................ 11

CARB, Staff Report: PM2.5 Area Designation Recommendations for the 2024 Annual PM2.5 National Ambient Air Quality Standard (Dec. 13, 2024), https://ww2.arb.ca.gov/sites/default/files/2024-12/Staff_Report_PM2.5_Area_Designation_Recommendations_2024_Annual_PM2.5_NAAQS.pdf ................................................................ 12, 15

EPA, *Required SIP Elements by Nonattainment Classification*, https://www.epa.gov/ground-level-ozone-pollution/required-sip-elements-nonattainment-classification ................................................................ 16

EPA, *Green Book: 8-Hour Ozone (2008) Nonattainment Areas*, https://www3.epa.gov/airquality/greenbook/hnc.html ................................................. 16

EPA, *Green Book: 8-Hour Ozone (2015) Nonattainment Areas*, https://www3.epa.gov/airquality/greenbook/jnc.html ................................................. 16

Mfrs. Emissions Control Tech., *Regulatory Background on the U.S. Mobile Source Emission Control Program: The California Air Resources Board*, https://www.meca.org/regulation/the-california-air-resources-board/ ................................... 9

San Joaquin Valley Air Pollution Control Dist., 2024 Plan for the 2012 Annual PM2.5 Standard (June 20, 2024), https://ww2.valleyair.org/media/gw5bacvj/2024-pm25-plan.pdf ........................................ 17

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

San Joaquin Valley Air Pollution Control Dist., 2022 Plan for the 2015 8-hour
    Ozone Standard (Dec. 15, 2022),
    https://ww2.valleyair.org/media/q55posm0/0000-2022-plan-for-the-2015-8-
    hour-ozone-standard.pdf ........................................................................ 12, 13, 17

S. Coast Air Quality Mgmt. Dist., 2022 Air Quality Management Plan (Dec. 2,
    2022), https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-
    management-plans/2022-air-quality-management-plan/final-2022-aqmp/final-
    2022-aqmp.pdf ........................................................................................ *passim*

S. Coast Air Quality Mgmt. Dist., *The Southland's War on Smog: Fifty Years of
    Progress Toward Clean Air (through May 1997)*,
    https://www.aqmd.gov/home/research/publications/50-years-of-progress ............................ 9

S. Coast Air Quality Mgmt. Dist., South Coast Air Basin Attainment Plan for the
    2012 Annual PM2.5 Standard (June 7, 2024),
    https://www.aqmd.gov/docs/default-source/clean-air-plans/pm2.5-plans/final-
    pm2.5-plan/2012-annual-pm2-5-plan.pdf ........................................................ 15, 17

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

# INTRODUCTION

For over 50 years, the Clean Air Act's ("Act") cooperative federalism framework has balanced federal standards with state innovation. The Act delegates to states primary responsibility for achieving National Ambient Air Quality Standards ("NAAQS") while recognizing California's authority—born of decades of pioneering work predating federal regulation—to serve as "a laboratory for innovation" in controlling mobile source emissions. *Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.* ("*MEMA I*"), 627 F.2d 1095, 1111 (D.C. Cir. 1979). The three-tiered system established under the Act and California law divides regulatory labor in California according to the nature of pollution sources. The United States Environmental Protection Agency ("EPA") sets national standards; the California Air Resources Board ("CARB") regulates mobile sources that cross jurisdictional boundaries within the state; and California's local and regional air pollution control and air quality management districts ("air districts") control stationary sources in fixed locations where the air districts can most efficiently monitor and regulate them.

EPA and Congress are now attempting to destroy that framework through procedural manipulation of the process established under the Congressional Review Act ("CRA") to review federal "rules." After EPA granted adjudicatory waivers for California's Advanced Clean Cars II, Advanced Clean Trucks, and Heavy-Duty Omnibus regulations under Clean Air Act section 209, Congress and EPA conspired to recharacterize these waivers as "rules" subject to CRA disapproval. This post-hoc relabeling manufactured authority that never existed and denied California meaningful political participation. If allowed to stand, Defendants' actions would hamstring the State's ability to reduce air pollution from mobile sources while maintaining federal mandates that require deep emissions reductions from those very sources. The result would put California's air districts in an almost impossible position: they will remain federally obligated to protect public health through standards they would have few—if any—practical means of achieving.

The numbers are unforgiving. Mobile sources account for approximately 80 percent of all nitrogen oxide ("NOx") emissions in California's major air basins. And NOx is a primary

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

1   contributor to the ground-level ozone and fine particulate matter pollution that poses grave

2   health risks to millions of Californians. Without the authority granted under the adjudicatory

3   waivers for California regulation of mobile sources, the State's air districts will face a series of

4   difficult choices. In the South Coast Air Basin, even reducing emissions from every stationary

5   source to zero would not achieve federal ozone standards because emissions from mobile

6   sources alone exceed the basin's carrying capacity. In the Bay Area, the Bay Area Air Quality

7   Management District ("Air District" or "Bay Area Air District") may be forced to implement

8   industry-crippling stationary source controls if Defendants' actions stand. The alternative is

9   structural non-compliance with federal law—not because compliance is unachievable, but

10  because Defendants have deliberately stripped away the primary regulatory tools capable of

11  producing the federally required emission reductions.

12      This case thus presents an unprecedented instance of "extraordinary defects" in the

13  national political process that justify judicial intervention under the Tenth Amendment. *South

14  Carolina v. Baker*, 485 U.S. 505, 512 (1988). The federal government manipulated procedures

15  to nullify state regulations and denied California participation through CRA processes that

16  everyone understood were legally inapplicable, making it exceedingly difficult, if not

17  impossible, for California's air districts to comply with federal law while threatening thousands

18  of premature deaths. The Constitution's federalism protections cannot tolerate that result. The

19  Air District respectfully urges the Court to deny the motion to dismiss.

**BACKGROUND**

**A.      The Clean Air Act and California law establish a framework that requires
          federal, state, and local authorities to work together to control air pollution.**

23      The Clean Air Act sets out a carefully crafted framework that requires the federal

24  government and states to work together to improve air quality throughout the country. *Comm.

25  for a Better Arvin v. U.S. E.P.A.*, 786 F.3d 1169, 1173 (9th Cir. 2015). This framework

26  expressly recognizes, and builds upon, decades of California air pollution control efforts that

27  began long before the federal government took any interest in air quality. In 1946, for instance,

28  the California Legislature enacted the state's first air pollution control law, which authorized

counties to establish local air pollution control districts.[1] Thirteen years later, recognizing that automobiles were a major cause of smog, California formed the Motor Vehicle Pollution Control Board to regulate tailpipe emissions.[2] By 1967, California had equipped over 1.5 million vehicles with pollution control technology, a year before federal emission controls were adopted nationally and three years before Congress created the EPA.[3]

In August 1967, Governor Ronald Reagan signed the Mulford-Carrell Act (1967 Cal. Stat., ch. 1545) into law. CARB, *History*, https://ww2.arb.ca.gov/about/history (last visited Jan. 6, 2026). This law merged the Bureau of Air Sanitation and the Motor Vehicle Pollution Control Board into the California Air Resources Board, creating an integrated agency with statewide authority. *Id.* The Mulford-Carrell Act represented the first state statute to comprehensively address air quality impacts statewide.

Three years later, Congress enacted the federal Clean Air Act. Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970). In doing so, Congress expressly affirmed California's unique contributions to controlling emissions and preserved California's authority to regulate motor vehicle emissions through the waiver provision at issue in this case. 42 U.S.C. § 7543(b)(1); *MEMA I*, 627 F.2d at 1109-11. The Act requires EPA to establish NAAQS for air pollutants that "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7408(a)(1)(A), 7409(a). It delegates to the states primary responsibility for achieving and maintaining the NAAQS. 42 U.S.C. § 7407(a).

---

[1] Bay Area Air Quality Mgmt. Dist., *History of the Air District*, https://www.baaqmd.gov/about-the-air-district/history-of-air-district (last updated Mar. 19, 2025).

[2] S. Coast Air Quality Mgmt. Dist., 2022 Air Quality Management Plan (Dec. 2, 2022) ("South Coast 2022 Ozone Plan") at 1-1–1-3, https://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2022-air-quality-management-plan/final-2022-aqmp/final-2022-aqmp.pdf; S. Coast Air Quality Mgmt. Dist., The Southland's War on Smog: Fifty Years of Progress Toward Clean Air (through May 1997), https://www.aqmd.gov/home/research/publications/50-years-of-progress (last visited Jan. 6, 2026).

[3] Mfrs. Emissions Control Tech., *Regulatory Background on the U.S. Mobile Source Emission Control Program: The California Air Resources Board*, https://www.meca.org/regulation/the-california-air-resources-board/ (last visited Jan. 6, 2026).

States fulfill that responsibility by preparing and submitting a State Implementation Plan ("SIP") to EPA for approval. *Id.* §§ 7407(a), 7410(a)(1). Among other requirements, SIPs must contain enforceable emission limitations or other control measures to meet the Act's requirements and provide assurances that the states have adequate personnel, funding, and legal authority to carry out the plan. *See id.* § 7410(a)(2). SIPs in "nonattainment" areas must also demonstrate attainment of the NAAQS, require reasonable further progress toward attainment, and include an accurate inventory of emissions from all sources.[4] *See id.* §§ 7502(c), 7501(1). Once approved, the SIP becomes federal law enforceable by the states, EPA, and private citizens. *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 503 (9th Cir. 2015).

The Act has long recognized two distinct sources of pollution: "stationary sources" and "mobile sources." "Stationary sources" consist of buildings and other fixed structures that emit air pollutants. *See* 42 U.S.C. § 7411(a)(3). "Mobile sources" consist of on-road vehicles, such as automobiles and trucks, and nonroad vehicles, such as trains, airplanes, and marine vessels. 40 C.F.R. § 51.491 (2025).

The Act also establishes separate schemes for regulating these two distinct sources of pollution. It requires EPA to set federal standards of performance for certain categories of stationary sources. *See* 42 U.S.C. § 7411(b). But it allows states to establish more stringent standards for those sources or set standards for stationary sources that are not subject to federal standards. *See id.* § 7416.

In contrast, the Act generally preempts states from establishing their own emissions standards for new motor vehicles. *Id.* § 7543(a). However, the Act contains a significant exception to this preemption that is central to this case. Specifically, in recognition of California's "pioneering efforts" regulating emissions from mobile sources, the Act allows California to request a waiver to set mobile source standards that are more stringent than federal standards. *MEMA I*, 627 F.2d at 1109-11; *see* 42 U.S.C. § 7543(b)(1). Upon request, EPA ***must***

---

[4] A "nonattainment" area is any area that does not meet the NAAQS for a criteria pollutant. 42 U.S.C. § 7407(d)(1)(A)(i).

1    grant the waiver if the California standards "will be, in the aggregate, at least as protective of

2    public health and welfare as applicable Federal standards," except in very limited circumstances

3    that are not present here. 42 U.S.C. §§ 7543(b)(1), (e)(2).

4            California implements its obligations under the Act by apportioning responsibilities

5    between CARB and California's local air districts. CARB is primarily responsible for

6    controlling air pollution from mobile sources, while California's air districts have primary

7    responsibility for regulating stationary sources of pollution. Cal. Health & Safety Code §§

8    39002, 39500. CARB also has primary responsibility for preparing and submitting California's

9    SIP to EPA for approval. *Id.* § 39602. And it coordinates the activities of the local air districts as

10   necessary to comply with the Act. *Id.*

11           Similar to the Act, California law mandates compliance with California's own Ambient

12   Air Quality Standards ("CAAQS"), which are often more stringent than the NAAQS and include

13   pollutants like hydrogen sulfide and sulfates not covered federally.[5] The air districts must

14   achieve and maintain both federal and state air quality standards within their respective

15   jurisdictions. *Id.* § 40001(a). Air districts located within a nonattainment area for the CAAQS or

16   the NAAQS must adopt attainment plans that show continuous progress towards attainment. *Id.*

17   § 40914. Air districts submit their attainment plans to CARB for approval, which CARB then

18   submits to EPA for inclusion in California's SIP.[6]

19           **B.      California continues to suffer from the worst air pollution in the country and
                       relies on its authority to regulate mobile sources to attain federal and state air
20                     quality standards.**

21           Despite great progress over the past 50 years, California continues to exceed several

22   NAAQS. For instance, atmospheric levels of ozone and fine particulate matter ("$PM_{2.5}$")

23

24   _____

25   [5] Cal Health & Safety Code § 39606(a)(2); *see* Cal. Code Regs. tit. 17, § 70200; CARB,
     *California Ambient Air Quality Standards*, https://ww2.arb.ca.gov/resources/california-ambient-
26   air-quality-standards (last visited Jan. 6, 2026).

27   [6] Cal Health & Safety Code § 41650; *see, e.g.*, CARB, Resolution 23-4 (Jan. 26, 2023),
     https://ww2.arb.ca.gov/sites/default/files/barcu/board/res/2023/res23-4.pdf (certifying the South
28   Coast Air Quality Management District's 2022 attainment plan for ozone and directing CARB's
     executive officer to submit the plan to EPA for inclusion in California's SIP).

pollution remain dangerously high in California. California residents living in the greater Los Angeles area suffer from the worst ozone pollution in the nation. South Coast 2022 Ozone Plan at ES-1. Similarly, in 2020 alone, the San Joaquin Valley recorded over 100 days where ozone levels exceeded federal standards.[7] In total, over 21 million Californians, more than half of the state's residents, continue to live in areas that exceed the federal standard for safe exposure to ozone.[8]

High levels of $PM_{2.5}$ pollution are also pervasive throughout the State. The San Joaquin Valley, for instance, has the highest $PM_{2.5}$ levels in the nation.[9] In 2024, EPA revised the NAAQS for annual $PM_{2.5}$ levels downward by 25%, from 12 to 9 micrograms per cubic meter ("µg/m³"), based on EPA's determination that the older standard did not "protect public health with an adequate margin of safety." *See* Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16,202, 16,273 (Mar. 6, 2024) ("2024 $PM_{2.5}$ Final Rule"). Residents in nine separate regions of California, including the Bay Area, currently experience $PM_{2.5}$ levels exceeding that standard.[10]

Exposure to these harmful pollutants poses grave health risks to Californians. Ozone can cause asthma attacks, aggravate chronic bronchitis and emphysema, and increase susceptibility to lung infection. South Coast 2022 Ozone Plan at ES-3. Long-term exposure to $PM_{2.5}$ can cause

---

[7] *See* San Joaquin Valley Air Pollution Control Dist., 2022 Plan for the 2015 8-hour Ozone Standard (Dec. 15, 2022) ("SJV 2022 Ozone Plan") at 2-16 (Figure 2-10), https://ww2.valleyair.org/media/q55posm0/0000-2022-plan-for-the-2015-8-hour-ozone-standard.pdf.

[8] CARB, 2022 State Strategy for the State Implementation Plan (Sept. 22, 2022) ("2022 SIP Strategy") at 1-2, https://ww2.arb.ca.gov/sites/default/files/2022-08/2022_State_SIP_Strategy.pdf.

[9] CARB, Public Hearing to Consider the Proposed Advanced Clean Trucks Regulation, Staff Report: Initial Statement of Reasons (Oct. 22, 2019) at II-4, https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2019/act2019/isor.pdf.

[10] *See* CARB, Staff Report: PM2.5 Area Designation Recommendations for the 2024 Annual PM2.5 National Ambient Air Quality Standard (Dec. 13, 2024) ("$PM_{2.5}$ Area Designation Recommendations") at 4, https://ww2.arb.ca.gov/sites/default/files/2024-12/Staff_Report_PM2.5_Area_Designation_Recommendations_2024_Annual_PM2.5_NAAQS.pdf.

1  cardiovascular impacts such as atherosclerosis, strokes, and heart attacks (myocardial infarction)

2  (2024 $PM_{2.5}$ Final Rule, 89 Fed. Reg. at 16,229); neurological impacts such as

3  neurodegeneration and reduced cognitive function (*id.* at 16,233-34); and increased risk of lung

4  cancer (*id.* at 16,232-33). Unhealthy concentrations of both pollutants have been linked to

5  premature deaths.[11]

6        CARB and the State's air districts have prepared a series of attainment plans, which are

7  part of California's SIP, that demonstrate how California will comply with the Act and reduce

8  ambient concentrations of these pollutants to levels that protect public health. These plans reveal

9  deep dependencies on the three California mobile source regulations Defendants manipulated

10  the CRA to purportedly revoke in this case.[12]

11        In sum, federal waiver cooperation is indispensable. Indeed, as detailed below, without

12  the ability to regulate mobile sources as authorized under the waivers, air districts throughout

13  California may be forced to take unprecedented actions to comply with the Act, assuming it is

14  even possible to do so at all.

15                          **ARGUMENT**

16        Defendants seek to place California and its local air districts in an impossible bind: meet

17  federal air quality standards, but do so without authority over the emissions sources that

18

19  ───────────────

   [11] 2022 State SIP Strategy at 15; Bay Area Air Quality Mgmt. Dist., *Illegal Federal Rejection of*
20  *California Motor Vehicle Emissions Standards Hurts the Bay Area* (Jan. 14, 2026) ("*Bay Area*
   *Mobile Source Impacts*"), https://www.baaqmd.gov/waiver.
21
   [12] The attainment demonstrations included in California's SIP rely on anticipated emissions
22  reductions from these state regulations in two main ways. First, they use emissions models that
   incorporate anticipated emissions reductions from the three regulations. *See, e.g.*, Official
23  Release of EMFAC2021 Motor Vehicle Emission Factor Model for Use in the State of
   California, 87 Fed. Reg. 68,483, 68,485 & n.8 (Nov. 15, 2022) (approving CARB's latest
24  emissions model, which incorporates the Advanced Clean Trucks and Heavy-Duty Omnibus
   regulations). Second, they rely on CARB measures and commitments to reduce mobile source
25  emissions contained in state-level planning documents. *See* 2022 SIP Strategy at 39-53 (showing
   dependency on CARB mobile source regulations to achieve attainment in seven nonattainment
26  areas in California); *see also, e.g.*, South Coast 2022 Ozone Plan at 4-3, 4-30–4-47 (relying on
   CARB mobile source commitments to demonstrate attainment of the NAAQS); SJV 2022
27  Ozone Plan at ES-4, 3-18–3-34 (same).

28                                    13

constitute most of the problem. This is not ordinary regulatory hardship. It is a failure of the political process itself. Defendants have deliberately and unlawfully sought to destroy the carefully crafted framework that made clean air achievable and leave local air districts responsible for outcomes they can no longer control. The stakes could not be higher. Californians will die as direct consequence of Defendants' actions. The Constitution forbids the federal government from infringing on the Plaintiff States' authority, and obligation, to protect public health in this way.

## I.  The federal government's unlawful revocation of California's adjudicatory waivers will dramatically worsen public health outcomes.

The Bay Area Air District estimates that by 2030, the three California regulations allowed by the waivers that Congress purported to revoke in this case (Advanced Clean Cars II, Advanced Clean Trucks, and Heavy-Duty Omnibus) will remove 7 tons of $PM_{2.5}$ and 500 tons of NOx from the Bay Area's air each year. *Bay Area Mobile Source Impacts*. By 2050, these numbers will increase to ***50 tons of $PM_{2.5}$ and 2,500 tons of NOx per year***.[13] *Id.* Across the entire state, the total emissions reductions from these three regulations would be substantially higher. To put those numbers into perspective, losing these regulations would be like adding 20,000 to 30,000 trucks—with the concomitant increase in daily air pollution—to the Bay Area's roads alone. *Id.*

Public health outcomes will significantly worsen as a result. Mobile sources account for the vast majority of NOx emissions in California.[14] And NOx emissions play a key role in

---

[13] The three regulations require clean vehicles to phase in over time. *Bay Area Mobile Source Impacts.* Since the requirements phase in, the pollution reductions and corresponding health benefits of keeping the regulations in place will increase over time. *Id.*

[14] *See, e.g.*, South Coast 2022 Ozone Plan at ES-4 (noting that mobile sources account for 80 percent of NOx emissions in the South Coast Air Basin); Bay Area Air Quality Mgmt. Dist., *Emissions Lookup Tool* (Jan. 31, 2024) ("*Bay Area Emissions Lookup Tool*"), https://www.baaqmd.gov/about-air-quality/emission-inventory/emissions-lookup-tool (showing that over 80 percent of NOx emissions in the Bay Area in 2025 also came from mobile sources).

forming ground-level ozone and $PM_{2.5}$.[15] High levels of $PM_{2.5}$ and ozone exposure can cause serious health impacts, including premature death. *See Bay Area Mobile Source Impacts*. The Bay Area Air District estimates that as many as ***400 Bay Area residents will die over the next 25 years*** if the federal government's purported revocation of California's waivers is allowed to stand. *Id.* Across California's multiple nonattainment areas—many with worse air quality than the Bay Area—thousands more lives are at stake. Indeed, every year, over 5,000 premature deaths in California are linked to $PM_{2.5}$ pollution, more than half of which is produced by mobile sources. 2022 State SIP Strategy at 15.

**II.    Absent the mobile source regulations at issue, air districts will need to consider drastic measures to protect local residents and satisfy the Act's requirements, and doing so might not even be possible at all.**

CARB has recommended classifying nine regions in California, including the Bay Area, as nonattainment areas for the 2024 Annual $PM_{2.5}$ NAAQS. *See* $PM_{2.5}$ Area Designation Recommendations at 4. If California is unable to regulate emissions pursuant to the three regulations at issue here, these regions will struggle to demonstrate attainment and, as a practical matter, may not be able to do so at all.

On-road vehicles produce approximately 20% of the Bay Area's NOx pollution. *Bay Area Mobile Source Impacts*. The Air District estimates that the three regulations at issue here will eliminate substantial amounts of NOx pollution in the Bay Area over the next two decades. *See id.* Consequently, the Air District anticipates that, absent these regulations, it will need to enforce significantly stricter standards on stationary sources, which are already highly regulated, to show the Bay Area will attain the NAAQS by 2032 and beyond.[16] *Id.* For instance, to make

---

[15] South Coast 2022 Ozone Plan at 2-22; S. Coast Air Quality Mgmt. Dist., South Coast Air Basin Attainment Plan for the 2012 Annual PM2.5 Standard (June 7, 2024) ("South Coast 2024 PM2.5 Plan") at 2-3, https://www.aqmd.gov/docs/default-source/clean-air-plans/pm2.5-plans/final-pm2.5-plan/2012-annual-pm2-5-plan.pdf.

[16] Assuming that EPA adopts final nonattainment determinations in 2026, these regions will need to submit attainment plans demonstrating how they will achieve attainment by 2032. *See* 42 U.S.C. §§ 7513(c) (requiring "moderate" nonattainment areas to achieve attainment "as expeditiously as practicable but no later than the end of the sixth calendar year after the area's designation as nonattainment").

15

up for the mobile source NOx emission reductions authorized under the waivers—and

purportedly revoked by Defendants' actions—the Air District might be forced to require

substantial reductions in NOx emissions from the Bay Area's remaining oil refineries, which

likely would have significant economic impacts.[17]

As challenging as the situation is for the Bay Area, the circumstances facing other

California air districts are even more dire. The Bay Area is classified as "marginal"

nonattainment for ozone, which exempts the Bay Area from having to submit an attainment

demonstration for that pollutant under the Act.[18] By contrast, the Los Angeles area, the

Coachella Valley, and the San Joaquin Valley are the only three air regions in the entire nation

classified as "extreme" nonattainment areas for ozone—the highest classification under the

Clean Air Act.[19] The South Coast Air Basin's ozone levels exceed the federal standard by more

than 60 percent; the San Joaquin Valley's ozone levels exceed the federal standard by more

than 30 percent. *See* 2022 State SIP Strategy at 21-22 (showing measured ozone levels or "design

values" in the South Coast Air Basin and San Joaquin Valley of 114 parts per billion ("ppb")

and 93 ppb respectively, compared to the federal standard of 70 ppb). These districts also face

serious nonattainment for federal PM$_{2.5}$ standards. Neither district could meet the December

2025 deadline for the ***2012 Annual PM$_{2.5}$ NAAQS*** of 12 µg/m³, which is less stringent than the

---

[17] *See Bay Area Mobile Source Impacts* (noting that oil refineries are "one of the most
significant stationary sources of NOx" in the Bay Area and that enforcing more stringent
pollution standards could cost the refining sector billions of dollars)*; Bay Area Emissions
Lookup Tool* (showing that Bay Area oil refineries will produce approximately 2,000 tons of
NOx per year in 2040—590 tons per year from petroleum refining and an additional 1,486 tons
per year from refinery external combustion—roughly equivalent to the NOx reductions that the
three regulations would achieve).

[18] *See* 42 U.S.C. § 7511a; EPA, *Required SIP Elements by Nonattainment Classification*,
https://www.epa.gov/ground-level-ozone-pollution/required-sip-elements-nonattainment-
classification (last updated Nov. 12, 2025) (showing that attainment demonstrations are required
for areas classified as "moderate" nonattainment and above for ozone).

[19] EPA, *Green Book: 8-Hour Ozone (2015) Nonattainment Areas*,
https://www3.epa.gov/airquality/greenbook/jnc.html (last updated Dec. 31, 2025); EPA, *Green
Book: 8-Hour Ozone (2008) Nonattainment Areas*,
https://www3.epa.gov/airquality/greenbook/hnc.html (last updated Dec. 31, 2025).

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG

EPA's latest 2024 Annual $PM_{2.5}$ standard. Instead, both air districts required EPA to grant five-year extensions to 2030—even with aggressive controls already in place.[20]

The math in these regions is unforgiving. In the South Coast Air Basin, achieving attainment requires reducing NOx emissions to approximately 60 tons per day by 2037—83% percent below current levels. South Coast 2022 Ozone Plan at ES-4, 1-24. Yet mobile sources will account for approximately 80 percent of regional NOx emissions in 2037. *Id.* at 4-7. The San Joaquin Valley faces a similar structural problem: mobile sources account for over 80 percent of remaining NOx emissions, and the district must achieve a 72 percent reduction in NOx by 2037. SJV 2024 $PM_{2.5}$ PLAN at ES-2; SJV 2022 Ozone Plan at ES-1. Put simply, the air districts must cut emissions by three-quarters. But if Defendants' actions stand, they will have authority to regulate only one-fifth of the pollution.

Local air districts have already exhausted most of their regulatory options. In the San Joaquin Valley, air pollution from stationary sources under the San Joaquin Valley Air District's jurisdiction has been reduced by more than 93 percent. SJV 2022 Ozone Plan at ES-2. The combined efforts of the San Joaquin Valley Air District and CARB "represent the nation's toughest air pollution emissions controls." SJV 2024 $PM_{2.5}$ Plan at ES-3. The South Coast Air District likewise operates "one of the most stringent stationary source control programs in the country," and has determined that additional stationary source emission reductions are practically non-existent. South Coast 2024 $PM_{2.5}$ Plan at 6-34. Indeed, the South Coast 2022 Ozone Plan expressly concluded "there is no viable pathway to achieve the needed reductions without widespread adoption of zero emissions (ZE) technologies across all mobile sectors." South Coast 2022 Ozone Plan at ES-5. Even if the South Coast Air District reduced emissions from every stationary source within its regulatory authority to zero, the region would still fail to meet the 2015 ozone standard because emissions from mobile sources alone—approximately

---

[20] San Joaquin Valley Air Pollution Control Dist., 2024 Plan for the 2012 Annual PM2.5 Standard (June 20, 2024) ("SJV 2024 $PM_{2.5}$ Plan") at ES-1, https://ww2.valleyair.org/media/gw5bacvj/2024-pm25-plan.pdf; South Coast 2024 $PM_{2.5}$ Plan at ES-1, 4-46.

143 tons per day in 2037—exceed the basin's 60 ton per day carrying capacity. *Id.* at 3-27, 4-6–4-7. Thus, attaining the NAAQS for ozone in the South Coast Basin will require the regulation of mobile sources authorized by the EPA adjudicatory waivers that Congress has now purported to rescind. *See id.* at 3-6 (showing reliance on the Advanced Clean Trucks and Heavy-Duty Omnibus regulations), 4-35–4-36 (showing reliance on the Advanced Clean Cars II regulation).

In short, if California loses its authority to regulate mobile sources pursuant to the three waivers, some regions of California will have few practical paths to clean air—not because regulators have failed to try, but because the law leaves them powerless to address the overwhelming majority of the pollution problem. In other regions such as the Bay Area, local air districts may have no option but to implement industry-crippling stationary source controls.

## III.    The federal government's rejection of California's waivers is unlawful.

Three features distinguish this case from ordinary federalism disputes and establish circumstances that warrant judicial intervention: (1) Defendants' deliberate procedural manipulation to deny California's political participation; (2) the ongoing Clean Air Act mandates Congress left in place that will be extraordinarily difficult, if not impossible, for some air districts to achieve; and (3) the thousands of preventable deaths that will occur as the direct consequence of Defendants' actions.

As the Plaintiff States establish in their opposition to the motion to dismiss, Defendants' actions invalidating California's mobile source regulations reflect "extraordinary defects in the national political process" sufficient to render them "invalid under the Tenth Amendment" and structural principles of federalism. *Baker*, 485 U.S. at 512; Doc. 194 at 31-33; *see also Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985) (discussing possibility that procedural defects could give rise to Tenth Amendment violations). The practical consequences of the political breakdown here are not abstract or speculative. They will result in premature deaths and force local air districts to consider draconian measures with potentially drastic consequences for California's economy. Ultimately, it may prove structurally impossible for some California air districts to meet their Clean Air Act obligations.

Although the Supreme Court has noted that generally "[s]tates must find their protection

18

from congressional regulation through the national political process," it has also explicitly recognized the possibility that "extraordinary defects" could render federal action invalid. *Baker*, 485 U.S. at 512. Defendants argue no court has ever found such defects sufficient. Doc. 172 at 38:17-18. But that reflects the rare—and indeed, unprecedented—nature of circumstances this extreme, not any constitutional barrier to judicial review. As Plaintiffs observe, when the federal government "attempt[s] to . . . extend its authority in unprecedented ways," it "naturally gives rise to new or different federalism claims." Doc. 194 at 32 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018)). The question here is not whether previous cases have succeeded, but whether the case at bar rises to the level the Supreme Court contemplated in *Garcia* and *Baker*.

This case rises to that level. Two branches of the federal government weaponized procedures designed to control ***federal*** regulations, using them instead to attempt to nullify ***state*** regulations that EPA was statutorily required to approve based on the straightforward and adjudicatory application of the Act's established (and still in effect) standards to the factual record before it. And these branches of the federal government did so based entirely on EPA's contrived relabeling of its adjudicatory waivers as "rules" after the fact to create the false appearance of CRA applicability. *See* Doc. 194 at 13-16, 28-30 (describing EPA's post-hoc relabeling and Congress's reflexive deference to executive branch submissions). This manipulation eliminated any meaningful opportunity for California to defend its regulations and interests through normal political channels. *Id.* at 31-33.

The Court in *Baker* emphasized that, based on the factual circumstances in that case, South Carolina was not "deprived of any right to participate in the national political process or . . . singled out in a way that left it politically isolated and powerless." 485 U.S. at 513. In stark contrast here, California was systematically denied such participation through procedures everyone involved understood were legally inapplicable. Doc. 157 ¶¶ 161-167. Moreover, California was singled out in a way that left it politically isolated. California alone has authority to request a preemption waiver under Section 209, which Defendants deliberately targeted. *See* 42 U.S.C. § 7543(b)(1); Doc. 157 ¶ 34; Doc. 172 at 13. And California needs that waiver

19

1   authority in a way no other state does. The State suffers from the worst ozone and PM$_{2.5}$

2   pollution in the nation. *Supra* Background, Section B. The manner and circumstances in which

3   California was singled out in this way are precisely the type of "extraordinary defects" that

4   *Baker* identified as distinguishing ordinary political losses from constitutional violations.

5          The magnitude of harm here distinguishes this case from any theoretical political process

6   failure. Without CARB's waiver-dependent regulations, air districts face an almost impossible

7   task: they must achieve federally-mandated air quality standards while losing access to the

8   mobile source emissions reductions that constitute the overwhelming majority of the solution.

9   The alternative—imposing stationary source controls severe enough to compensate for the loss

10  of mobile source reductions—could potentially lead businesses to shut down major portions of

11  California's economy. In some areas of California, even those extreme measures may not

12  suffice. Thousands of Californians will die prematurely as a consequence. *See supra*, Section I.

13         Defendants attempt to dismiss these concerns by tallying votes and noting California's

14  representatives participated in congressional proceedings. Doc. 172 at 39:1-17. But *Garcia* and

15  *Baker* do not require states to prove they were outvoted. Indeed, that would render such

16  federalism claims nearly impossible, as the Supreme Court has recognized. *Baker*, 485 U.S. at

17  512-13 (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 153 n.4 (1938), which

18  expressed concern for the subversion of "political processes ordinarily to be relied upon to

19  protect minorities"). The issue is not the vote count, but whether "extraordinary defects" in the

20  political process subverted state sovereignty. *Id.* at 512. The Plaintiff States cannot be faulted for

21  inadequate political participation when the federal government deliberately circumvented

22  normal procedures to prevent meaningful participation. *See* Doc. 194 at 32-33.

23         The system of cooperative federalism embodied in the Clean Air Act does not

24  contemplate—and the Constitution does not permit—the federal government using lawless

25  procedures to strip states of regulatory authority while simultaneously holding them responsible

26  for achieving standards that may be impossible to meet as a result of the challenged action.

27  While courts properly defer to the political process in most circumstances, this case presents the

28  "extraordinary defects" that justify judicial intervention. *Baker*, 485 U.S. at 512. The

1  combination of procedural manipulation, extreme difficulty in complying with the law, and life-

2  threatening consequences to California residents represents precisely the type of political

3  process failure the Supreme Court contemplated in *Garcia* and *Baker*. If this Court cannot

4  provide relief under those circumstances, the Tenth Amendment's protections of state

5  sovereignty become illusory.

6                                            **CONCLUSION**

7         Without California's Clean Air Act waivers, Californians will suffer grave harm, which

8  California's air districts will have few practical tools to prevent. California, the Bay Area Air

9  District, and its sister agencies remain federally obligated to achieve air quality standards while

10  being stripped of authority over the mobile source emissions that constitute the large majority of

11  California's pollution problem. For these reasons, the Air District respectfully urges this Court

12  to deny the Defendants' motion to dismiss.

13

14  DATED: January 16, 2026              SHUTE, MIHALY & WEINBERGER LLP

15

16

17                                   By:    _____/s/ *Robert "Perl" Perlmutter*_____
                                             ROBERT "PERL" PERLMUTTER
18                                           MATTHEW S. McKERLEY

19                                           Attorneys for Amicus Curiae
20                                           BAY AREA AIR QUALITY MANAGEMENT
                                             DISTRICT
21

22  2013147.7

23

24

25

26

27

28

BAAQMD AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG