James P. Duffy (*pro hac vice pending*)
Peter Heisler (*pro hac vice pending*)
Daniel Alvarez *(pro hac vice pending)*
Center for Applied Environmental Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(802) 233-7967
jay.duffy@caelp.org

Theodore Lamm (Bar No. 319230)
Center for Law, Energy & the Environment
UC Berkeley School of Law
2680 Bancroft Way
Berkeley, CA 94720
(646) 823-4693
theodore.lamm@gmail.com

*Attorneys for Amici Curiae*
*Professors William Araiza, Nina Mendelson,*
*& Evan Zoldan.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants. | Case No. 4:25-cv-04966-HSG <br><br> **BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF STATES' OPPOSITION TO MOTION TO DISMISS** <br><br> Date:      February 19, 2026 <br> Time:      2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:   Hon. Haywood S. Gilliam, Jr. |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

INTEREST OF *AMICI CURIAE* ........................................................................................ 2

DISCUSSION ..................................................................................................................... 2

     I.     Congressional adjudication violates the separation of powers. ................................ 2

          a.     The Framers expressly condemned legislative adjudication and designed the Constitution to prevent it. ........................................................ 3

          b.     The Administrative Procedure Act reflects—and reinforces—the constitutional separation of lawmaking and adjudication. ........................... 5

          c.     Congress cannot direct the outcome of agency adjudications any more than it can decide court cases. ......................................................... 6

     II.     The California waiver is an adjudication—a license allowing California to implement its own air emissions standards. ............................................................ 9

          a.     The text of Section 209(b) shows Congress intended EPA's decisions under the provision to function as adjudications, not rulemakings. ........... 10

          b.     Legislative history and EPA practice confirm that EPA's role under Section 209(b) is adjudicatory. ...................................................... 11

          c.     Judicial decisions reinforce the conclusion that EPA's role under Section 209(b) is adjudicatory. ...................................................... 13

          d.     Section 177 does not transform EPA's Section 209(b) determinations into rulemakings. ...................................................................... 13

     III.     The Resolutions are impermissible legislative adjudication. ................................. 14

CONCLUSION ................................................................................................................. 16

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Abraham Lincoln Mem'l Hosp. v. Sebelius*,
    698 F.3d 536 (7th Cir. 2012) ..................................................................6

4

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016) ....................................................................7, 14

5

*Bi-Metallic Investment Co. v. State Board of Equalization*,
    239 U.S. 441 (1915) ..................................................................5

6

*Hayburn's Case*,
    2 U.S. 409 (1792) ....................................................................8, 9

7

*INS v. Chadha*,
    462 U.S. 919 (1983) ....................................................3, 4, 8, 9, 15, 16

8

*Johannessen v. United States*,
    225 U.S. 227 (1912) ..................................................................9

9

*Londoner v. Denver*,
    210 U.S. 373 (1908) ..................................................................5

10

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ..................................................................9

11

*Motor & Equip. Mfrs Ass'n v. EPA*,
    627 F.2d 1095 (D.C. Cir. 1979) ..................................................13

12

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
    142 F.3d 449 (D.C. Cir. 1998) ..............................................11, 13

13

*Ohio v. EPA*,
    603 U.S. 279 (2024) ..................................................................15

14

*Paramino Lumber Co. v. Marshall*,
    309 U.S. 370 (1940) ..................................................................9

15

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ..................................................................7

16

*Plaut v. Spendthrift Farm*,
    514 U.S. 211 (1995) ....................................................1, 3, 8, 9

17

*Robertson v. Seattle Audubon Society*,
    503 U.S. 429 (1992) ..................................................................7, 14

18

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ..................................................6

19

*Sebelius v. Cloer*,
    569 U.S. 369 (2013) ..................................................................11

20

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ..................................................9

21

22

23

24

25

26

27

28

ii

*United States v. Arthrex, Inc.*,
   594 U.S. 1 (2021) .................................................................................9

*United States v. Fla. E. Coast Ry.*,
   410 U.S. 224 (1973) ............................................................................6

*United States v. Klein*,
   80 U.S. 128 (1871) ..........................................................................1, 7

*Yesler Terrace Cmty. Council v. Cisneros*,
   37 F.3d 442 (9th Cir. 1994) ..............................................................6

**Statutes**

5 U.S.C. § 551(4) ...................................................................................5

5 U.S.C. § 551(6) ...................................................................................5

5 U.S.C. § 551(7) ...................................................................................5

42 U.S.C. §§ 6297(d)(1)(A)–(B) .........................................................10

42 U.S.C. § 7409 .................................................................................10

42 U.S.C. § 7507 .................................................................................13

42 U.S.C. § 7521 .................................................................................11

42 U.S.C. § 7521(a) .............................................................................10

42 U.S.C. § 7543(b)(1) ........................................................................10

**Legislative Materials**

113 Cong. Rec. 30941–42 (1967) ........................................................12

113 Cong. Rec. 30951–52 (1967) ........................................................12

113 Cong. Rec. 30955 (1967) ..............................................................12

113 Cong. Rec. 30976 (1967) ..............................................................12

113 Cong. Rec. 30989 (1967) ..............................................................12

H.R. Rep. No. 79-1980 (1946) ..............................................................6

H.R. Rep. No. 90-728 (1967) ..............................................................12

H.R. Rep. No. 95-294 (1977) ..............................................................12

Pub. L. Nos. 119-15, 119-16, 119-17 (2025) ......................................14

**Administrative and Executive Materials**

33 Fed. Reg. 10160 (July 16, 1968) .....................................................12

36 Fed. Reg. 17458 (Aug. 31, 1971) ....................................................12

74 Fed. Reg. 32744 (July 8, 2009) .......................................................12

78 Fed. Reg. 2112 (Jan. 9, 2013) .........................................................14

88 Fed. Reg. 20688 (Apr. 6, 2023) .......................................................13

**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act (1947)........................................5

William Blackstone, *Commentaries* ..........................................................................................3

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*,
    121 Yale L.J. 1672 (2012)................................................................................................4

Justin R. Long, *State Constitutional Prohibitions on Special Laws*,
    60 Clev. St. L. Rev. 719 (2012).......................................................................................4

Montesquieu, *The Spirit of the Laws*,
    bk. XI, ch. VI (O. Piest ed., T. Nugent transl. 1949)........................................................3

Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration After Arthrex*,
    75 Duke L.J. (forthcoming 2026) .....................................................................................9

*The Federalist No. 47* .........................................................................................................3, 16

*The Federalist No. 48* ..............................................................................................................8

*The Papers of James Madison* 265 (C. Hobson & R. Rutland eds. 1989) ...............................8

Evan C. Zoldan, *Reviving Legislative Generality*,
    98 Marq. L. Rev. 625 (2014)............................................................................................4

Evan C. Zoldan, *The* Klein *Rule of Decision Puzzle and the Self-Dealing Solution*,
    74 Wash. & Lee L. Rev. 2133, 2143 (2017) .................................................................8, 15

1

2

**INTRODUCTION**

Congress cannot adjudicate. That principle—embedded in the Constitution and repeatedly affirmed by the Supreme Court—resolves this case. The Environmental Protection Agency's (EPA) decision to grant a single entity—California—a waiver of preemption under Section 209(b) of the Clean Air Act is neither a rulemaking nor a broad policy judgment. It is a record-based adjudication affecting the ability of a single state to best protect its air quality. As required by the statute Congress enacted, EPA applies fixed, limited, statutory criteria to California's enacted standards and must grant the waiver unless opponents carry the burden of proving one of three narrow factual predicates for denial. Congress, EPA, and the courts have treated the waiver process consistent with these statutory requirements for five decades. EPA itself has repeatedly described the proceeding as "adjudicatory," limited in scope, and grounded in specific factual findings—not broad policymaking discretion.

Because the underlying EPA actions here are adjudications, Congress's attempt to overturn them through the Resolutions is also an act of adjudication—and is thus impermissible. Each resolution identifies an EPA waiver determination and declares it incorrect. The Resolutions do not alter federal emissions policy, amend statutory criteria, or create any new rule of general applicability. The Resolutions are quintessentially adjudicative because they decide whether existing federal law applies to an individual entity.

The Constitution's design does not authorize Congress to adjudicate and thereby displace the adjudicatory judgment of a coordinate branch of government. For centuries, Anglo-American law has recognized and enforced a strong divide between generally applicable legislation and discrete, case-specific judgments. The Supreme Court has reiterated that divide in cases ranging from *United States v. Klein*, 80 U.S. 128 (1871), to *Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995), over 100 years later. The Administrative Procedure Act (APA) reflects a similar structural separation by maintaining mutually exclusive categories of rulemaking and adjudication and by

insisting that individualized factual determinations occur through narrow processes focused on discrete issues.

The Resolutions impermissibly cross this centuries-old structural barrier. By re-adjudicating and reversing the outcomes of EPA's specific waiver adjudications without altering governing law, Congress has claimed a power that the Constitution withholds from it. To maintain the separation of powers, Congress must refrain from adjudicating discrete legal issues—whether by name, as here, or in substance. The Resolutions therefore exceed Congress's authority and must be declared invalid. Accordingly, the Court should deny Defendants' motion to dismiss.

## INTEREST OF *AMICI CURIAE*

Law Scholars *Amici Curiae* are law professors who teach and write in the fields of constitutional, administrative, and legislative law. *Amicus* William Araiza is the Vice Dean and Stanley A. August Professor of Law at Brooklyn Law School. *Amicus* Nina Mendelson is the Joseph L. Sax Collegiate Professor of Law at the University of Michigan. *Amicus* Evan Zoldan is the Associate Dean for Academic Affairs, John W. Stoepler Professor of Law and Values, and Director of the Legal Institute of the Great Lakes at the University of Toledo College of Law.

Law Scholars *Amici Curiae* have a strong interest in the sound development of constitutional law in the federal courts. They submit this brief because this case implicates fundamental separation of powers principles, specifically Congress's attempt to re-adjudicate and nullify the California waivers determinations at issue. As leading scholars of constitutional and administrative law, Law Scholars *Amici Curiae* are well-positioned to assist the Court in evaluating the parties' arguments concerning those principles.

## DISCUSSION

### I.     Congressional adjudication violates the separation of powers.

The Constitution does not authorize Congress to decide individual rights and obligations in contested proceedings, nor does it authorize Congress to reverse judicial or agency adjudications. Congress itself reinforced this principle in the APA, and the Supreme Court has repeatedly

recognized that congressional adjudication is constitutionally invalid. The net effect is that Congress cannot adjudicate.

###     a.    The Framers expressly condemned legislative adjudication and designed the Constitution to prevent it.

Legislative adjudication is incompatible with the separation of powers. The Constitution "sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983). The legislature's role is to make law—general, prospective rules governing the public at large—not to decide whether or how those rules apply to particular parties. This separation of powers is derived from pre-constitutional theory. Blackstone captured the distinction: a measure "concerning a particular person" rather than the public is "a sentence [rather] than a law," and therefore outside legislative power. 1 William Blackstone, *Commentaries* *44. And, Montesquieu warned, "[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control." Montesquieu, *The Spirit of the Laws*, bk. XI, ch. VI, p. 152 (O. Piest ed., T. Nugent transl. 1949).

The Framers' lived experience also supported a pronounced limit on legislative power. They had witnessed and fervently opposed British and colonial use of legislation to impose judgments on named individuals or disfavored groups, which led to "factional strife and partisan oppression." *Plaut*, 514 U.S. at 219. Living "among the ruins of a system of intermingled legislative and judicial powers," the Framers developed "a sharp necessity to separate the legislative from the judicial power," prompted by "the crescendo of legislative interference with private judgments of the courts." *Id.* at 219, 221. Indeed, James Madison emphasized that combining legislative and adjudicative functions "may justly be pronounced the very definition of tyranny." *The Federalist No. 47* (quoting Montesquieu). Founding-era legislative acts that singled out particular parties or disputes, rather than prescribing general rules, were regarded as so grossly contrary to fundamental principles of liberty that they were deemed "repugnant to the spirit of the

American republics." Evan C. Zoldan, *Reviving Legislative Generality*, 98 Marq. L. Rev. 625, 652 (2014) (quoting Gordon S. Wood, *The Creation of the American Republic, 1776–1787*, at 401 (1969)). Early state constitutions codified this principle, insisting that legislatures address the public and not individuals—reflecting the Founders' conviction that they were implementing "an inescapable principle of natural law." Justin R. Long, *State Constitutional Prohibitions on Special Laws*, 60 Clev. St. L. Rev. 719, 725 (2012).

The Framers' insistence on separating legislative and adjudicative power was also grounded in a core commitment to due process. From the beginning, due process functioned as a structural guarantee as much as an individual right: deprivations of life, liberty, or property required adjudication applying general law by institutions independent of the lawmaker. Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1681 (2012). Rooted in the Magna Carta, "due process of law" originated as a check on unilateral power and required judgment by an independent body applying settled law—an early expression to what became the modern separation of powers. *Id.* at 1682–83.

The Constitution thus reflects a categorical rejection of the notion that congressional measures could adjudicate cases without establishing a new legal rule and could impose consequences on identified parties. The Bill of Attainder, Ex Post Facto, and Titles of Nobility Clauses all embody the principle that legislatures must govern through general, prospective, impersonal laws—not measures that decide the rights of particular parties. Zoldan, *Reviving Legislative Generality*, *supra*, at 653–55 (explaining that these clauses prohibit legislative punishment, retroactive lawmaking, and the conferral of legal status on named individuals, reflecting a constitutional commitment to legislative generality and the separation of lawmaking from adjudication); *see also Chadha*, 462 U.S. at 962 (Powell, J., concurring in the judgment) ("Th[e Bill of Attainder] Clause, and the separation-of-powers doctrine generally, reflect the Framers' concern that trial by a legislature lacks the safeguards necessary to prevent the abuse of power.").

1

2

**b.    The Administrative Procedure Act reflects—and reinforces—the constitutional separation of lawmaking and adjudication.**

3    When Congress enacted the APA, it institutionalized the existing jurisprudential distinction

4  between lawmaking and adjudication. The Court's decisions in *Londoner v. Denver*, 210 U.S. 373

5  (1908), and *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915),

6  articulate the constitutional boundary between legislative and adjudicative actions and provide a

7  framework for assessing whether Congress here impermissibly engaged in adjudication. When

8  government action affects "a relatively small number of persons . . . upon individual grounds," it is

9  properly understood as adjudicative and therefore triggers the requirements of due process. *Bi-*

10  *Metallic*, 239 U.S. at 445–46. Conversely, actions that apply broadly to large classes of persons are

11  properly understood as legislative and do not require adjudicatory procedures or trigger due-

12  process concerns. *See id.* The APA's definitions of rulemaking and adjudication reflect—and help

13  operationalize—the aforementioned constitutional judgment that individualized determinations of

14  rights and obligations must proceed through adjudication, not legislation.

15    The APA further reflects constitutional separation-of-powers and due-process principles by

16  establishing different procedures for general, prospective rulemaking as opposed to case-specific,

17  primarily retrospective adjudications. To that end, Congress designed the Act to maintain mutually

18  exclusive categories of rulemaking and adjudication. A "rule" is a statement of general or

19  particular applicability with future effect, 5 U.S.C. § 551(4), while an "adjudication" results in an

20  "order," *id.* § 551(6)–(7), defined as final disposition "in a matter *other than rule making*." *Id.*

21  § 551(6) (emphasis added). The contemporaneous Attorney General's Manual confirmed that "the

22  entire Act is based upon a dichotomy between rule making and adjudication," again reflecting the

23  constitutional divide between forward-looking policy and determinations of "past and present

24  rights and liabilities." Attorney General's Manual on the Administrative Procedure Act at 14

25  (1947).

26    The APA's legislative history underscores separation-of-powers concerns animating this

27  structural divide. The House Report emphasized that the APA "carefully distinguishes between the

28

so-called legislative functions of administrative agencies (where they issue general regulations) and their judicial functions (in which they determine rights or liabilities in particular cases)." H.R. Rep. No. 79-1980, at 251 (1946). In the 80 years since enactment, Congress has left these distinctions in place.

Courts have accordingly drawn lines between rulemakings and adjudications for decades. The Supreme Court reaffirmed the "recognized distinction" between proceedings "designed to adjudicate disputed facts in particular cases" and proceedings that promulgate "policy-type rules or standards." *United States v. Fla. E. Coast Ry.*, 410 U.S. 224, 245–46 (1973) (holding that nationwide industry rules constituted a rulemaking, not an adjudication, and thus did not require trial-type procedures). The Ninth Circuit has likewise explained that adjudications "resolve disputes among specific individuals in specific cases," while rules apply prospectively to broad classes. *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448–49 (9th Cir. 1994) (determining that an agency's decision that Washington's court procedures could satisfy federal due-process requirements in *future* individualized decisions had no immediate legal effect and therefore was not an adjudication); *see also, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–33 (D.C. Cir. 2017) (concluding that agency action suspending import permits constituted a rulemaking where it applied to all potential importers and intended to only bind future permitting adjudications and enforcement actions, notwithstanding the agency's characterization of the action as an adjudication); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 558–59 (7th Cir. 2012) (finding that an agency's decision on a reimbursement dispute was an adjudication because it applied existing law to a particular party's circumstance, even though the decision had implications for other regulated entities).

### c.    Congress cannot direct the outcome of agency adjudications any more than it can decide court cases.

Congressional adjudication (or re-adjudication) would threaten to collapse the constitutionally mandated separation between legislative and adjudicatory functions and violate due-process guarantees. The Supreme Court's separation-of-powers cases therefore draw a firm

6

boundary between legislating generally and impermissibly deciding specific disputes. The Court has repeatedly reaffirmed this boundary even while upholding legislation that changed underlying law. In *Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992), and *Bank Markazi v. Peterson*, 578 U.S. 212 (2016), for example, the Court sustained legislation because Congress supplied new substantive legal standards for courts to apply going forward, thus leaving courts' adjudicatory functions intact. *Bank Markazi*, 578 U.S. at 215 (amending substantive law to make specific foreign sovereign assets available to satisfy terrorism judgments); *Robertson*, 503 U.S. at 438–39 (replacing governing environmental standards applicable to pending timber-harvest litigation). The Court's focus was not on whether the statute affects the outcome of particular cases not yet resolved (unsurprisingly, since garden-variety legislation necessarily impacts the outcome of not-yet resolved cases), but whether the statute *directs a result* in those cases under old law. *Bank Markazi*, 578 U.S. at 228. In other words, Congress cannot decree in a pending (or completed) judicial adjudication that "Smith wins." *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (plurality opinion) (citing the Court's consensus on this point in *Bank Markazi*, 578 U.S. at 225). Congress may therefore change the law, including in ways that affect pending or future disputes. What it may not do—either directly or indirectly—is decide how existing law applies to identified parties or prescribe the outcome of completed or pending adjudications.

The separation of powers reinforced by these precedents is no mere formalism; rather, it serves the interests of fairness and due process that have been the Court's touchstone in deciding such cases. *United States v. Klein*, 80 U.S. 128 (1871), is a leading example. There, the Court held that Congress could not deny the proceeds of property confiscated by the government from a citizen who had committed hostilities against the United States but who had received a pardon, as adjudicated by a lower court. *Id.* at 146. Regarding Congress's directive, the Court asked: "Can we [dismiss the claimant's case] without allowing one party to the controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it?" *Id.* In holding that Congress's action was unlawful, the Court answered these questions in the negative. *Id.* Scholars have

understood this case to mean that Congress cannot specify the outcome of judicial proceedings to its own advantage. *See* Evan C. Zoldan, *The* Klein *Rule of Decision Puzzle and the Self-Dealing Solution*, 74 Wash. & Lee L. Rev. 2133, 2143 (2017).

This constitutional boundary should apply equally to agency adjudications completed under statutory authority. The Executive Branch has, from the Founding, been empowered to determine legal rights and obligations by applying statutory criteria to specific parties based on an evidentiary record.[1] And the same concerns that animated safeguards against congressional coopting of the decisions of Article III courts apply to Article II agencies implementing statutes. *See The Federalist No. 48* (James Madison) (warning that legislative encroachment threatens both executive and judicial functions (cited in *Plaut*, 514 U.S. at 221)); *see also Chadha*, 462 U.S. at 961–62 (Powell, J., concurring in the judgment) (noting how "the Framers vested the executive, legislative, and judicial powers in separate branches" to "prevent the recurrence of [] abuses" caused by "the exercise of judicial power by the state legislatures" during the Confederation). As part of Executive Branch enforcement authority, agencies exercise a quasi-judicial role in adjudications, whereas the Supreme Court has long held that Congress has "no judicial power *of any kind*." *Plaut*, 514 U.S. at 226 (citing *Hayburn's Case*, 2 U.S. 409, 413 (1792) (opinion of Iredell, J., and Sitgreaves, D.J.)) (emphasis added).

*Hayburn's Case* is instructive. Well before the advent of modern administrative law, the Court called into question a scheme that required courts to decide individual pension claims subject to revision by the political branches, concluding that adjudication must be final and observing that Congress possesses no judicial power to control the outcomes of cases. *Hayburn's Case*, 2 U.S. 409 at 411–412 (opinion of Wilson & Blair, JJ., and Peters, D.J.); *id.* at 412–413 (opinion of Iredell, J., and Sitgreaves, D.J.). That structural bar cannot evaporate based merely on the institutional difference between a court and an agency, as the Court's holding reflects constitutional concerns regarding separation of powers, due process, and finality in resolving the

---

[1] Congress began authorizing agency adjudication in 1789. 12 *The Papers of James Madison* 265 (C. Hobson & R. Rutland eds. 1989).

rights of individual parties. *See, e.g.*, *id.* at 412–413 (opinion of Iredell, J., and Sitgreaves, D.J.). While it is "emphatically the province and duty of the [courts] to say what the law is," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)), executive-branch agencies unquestionably must apply law to facts in carrying out the law, *e.g.*, *Chadha*, 462 U.S. at 964 (Powell, J., concurring in the judgment), fulfilling a function similar to Article III adjudications. Legislative interference with either of the other branches' adjudications may raise "the very danger the Framers sought to avoid—the exercise of unchecked power." *Id*.[2] Therefore, Congress has no power to adjudicate or re-adjudicate a completed agency adjudication.[3]

## II. The California waiver is an adjudication—a license allowing California to implement its own air emissions standards.

Section 209(b)'s waiver process is not a rulemaking or broad policy-setting exercise; it is a paradigmatic adjudication. Congress designed the provision to require EPA to resolve a discrete,

_____

[2] The President's approval of congressional adjudication cannot cure this constitutional defect. To be sure, the President may oversee principal officers who render binding legal positions in agency adjudications. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021). But that authority does not permit the President to collaborate with Congress to alter the outcome of completed agency adjudications governed by fixed statutory criteria that already embody Congress's policy choices and were enacted through proper presentment to a prior President—such as Section 209's waiver process. Allowing such coordinated outcome control would undermine statutory finality, evade judicial review, and distort the political accountability that the separation of powers is designed to preserve. *See id.* at 17–18; *Chadha*, 462 U.S. at 966 (Powell, J., concurring in the judgment); *see also Sierra Club v. Costle*, 657 F.2d 298, 406–07 (D.C. Cir. 1981) (recognizing the need for transparency (*i.e.*, docketing) where the President influences adjudicatory proceedings to promote due process and political accountability); Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration After Arthrex*, 75 Duke L.J. (forthcoming 2026) (manuscript at 86–87).

[3] Nor does the narrow administrative-law case distinguished in *Plaut* alter that conclusion. 514 U.S. at 232 (citing *Paramino Lumber Co. v. Marshall*, 309 U.S. 370 (1940)). The Court in *Paramino Lumber* specifically observed that the congressional act at issue did not "set aside a judgment . . . or direct the entry of an award;" instead, it reopened worker's compensation proceedings to allow presentation of new evidence "to remedy mistakes in administration." 309 U.S. at 376 & n.5, 378; *cf. Johannessen v. United States*, 225 U.S. 227, 241–42 (1912) (cited in *Paramino Lumber*, 309 U.S. at 381 n.25) (permitting review of a court proceeding granting a certificate of citizenship based on false evidence). Here, Congress has not merely reopened EPA's waiver adjudications to allow for presentation of supplemental or corrective evidence to the agency; rather, it has decided the matters itself. Nothing in the Court's cases suggests that Congress may reverse such adjudications—rather than changing the governing law for the future—consistent with the separation of powers.

record-based legal issue—whether California has satisfied fixed statutory criteria—through individualized factual determinations, not through the promulgation of generally applicable rules. As shown below, (a) the text and structure of Section 209(b) compel this conclusion because they confine EPA to narrow, case-specific findings; (b) the legislative history and EPA's consistent administrative practice confirm that Congress intended EPA to play an adjudicatory role; (c) courts have repeatedly characterized waiver decisions as adjudications subject to limited evidentiary review under statutory standards; and (d) the existence of Clean Air Act Section 177 does not transform EPA's adjudicatory determination into a legislative rulemaking simply because other states may later choose to adopt California's standards.

> a.    **The text of Section 209(b) shows Congress intended EPA's decisions under the provision to function as adjudications, not rulemakings.**

The structure and text of Section 209(b) demonstrate that EPA's waiver decision is an adjudication requiring factual, record-based determinations under fixed statutory criteria. Section 209(b)(1) directs that "[t]he Administrator *shall* . . . waive application of this section . . . *if the State determines* that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards." 42 U.S.C. § 7543(b)(1) (emphasis added). EPA may deny a waiver only if it makes one of three narrow negative findings: (1) that California's protectiveness determination was arbitrary and capricious; (2) that California does not face "compelling and extraordinary conditions" necessitating its standards; or (3) that the standards are inconsistent with Section 202(a), which sets forth the factors governing federal standard-setting, including feasibility, safety, cost, and lead-time. *See id.* Each of these is a fact-bound, individualized determination—a hallmark of adjudication.

Had Congress intended a rulemaking, it would have used the language it employed elsewhere in the Clean Air Act: directing EPA to "promulgate," "prescribe," or "establish" *national* standards, accompanied by policy-oriented factors and procedures. *See, e.g.*, 42 U.S.C. §§ 7521(a), 7409. Congress also expressly required rulemaking elsewhere when authorizing waivers of preemption for other state programs. *See, e.g.*, 42 U.S.C. §§ 6297(d)(1)(A)–(B) (energy

efficiency waivers). Section 209(b) contains none of these indicia of rulemaking. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted).

The nature of the required findings reinforces that EPA is acting as an adjudicator. Determining whether California's protectiveness finding is "arbitrary and capricious" requires EPA to evaluate the State's technical analysis, modeling, and justification—parallel to judicial review under the APA. Assessing whether California faces "compelling and extraordinary conditions" requires localized factual evaluation of California's air quality, climate, and pollution conditions. And determining consistency with Section 202(a) requires technical analysis of feasibility, lead time, and test procedure compatibility. *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998) (explaining that, in the waiver context, courts and EPA have repeatedly interpreted consistency with Section 202(a), 42 U.S.C. § 7521, to require only technological feasibility, meaning "sufficient lead time to permit manufacturers to develop and apply the necessary technology," and ensuring California's test procedures do not "impose inconsistent certification requirements"). None involves EPA's policy preferences.

Critically, Congress itself limited EPA's role under Section 209(b) to deciding whether the standards that California finds necessary to protect human health and the environment may take effect without disrupting EPA's overall statutory charge. EPA does not design, implement, or enforce the standards. In essence, EPA merely lifts federal preemption if statutory criteria are met. Its determination is a yes-or-no adjudication, not a policy-setting exercise.

**b.    Legislative history and EPA practice confirm that EPA's role under Section 209(b) is adjudicatory.**

Legislative history confirms that Congress intended a narrow, adjudicatory role for EPA. When first considering whether the Clean Air Act would preempt state air pollution laws in 1967, Congress faced two competing visions. The Dingell Amendment would have placed the federal government in control of California's program, granting the Administrator broad discretion to

1   decide whether California had met its burden to demonstrate that its more stringent standards were

2   warranted by changing the operative verb controlling EPA's grant of a waiver from "shall" to

3   "may." *See* H.R. Rep. No. 90-728, at 69 (1967). The Dingell Amendment would have changed

4   EPA's adjudicatory role in the waiver process to that of a policymaker and California

5   representatives fiercely opposed this, warning that the Amendment would force California to

6   "come with hat in hand to Washington" to plead for permission. *See* 113 Cong. Rec. 30955 (1967)

7   (statement of Rep. Edward R. Roybal). They emphasized that California would be "at the mercy"

8   of a single federal official, 113 Cong. Rec. 30941–42 (1967) (statement of Rep. H. Allen Smith),

9   and that national industry groups could use delay tactics to impede California's more stringent

10  standards, 113 Cong. Rec. 30976 (1967) *(*statement of Rep. Charles H. Wilson). Representative

11  Chester E. Holifield noted that, under the Dingell structure, California would need to litigate under

12  the APA to vindicate its authority. *See* 113 Cong. Rec. 30951–52 (1967).

13      By contrast, the Murphy Amendment preserved California's primary regulatory role and

14  confined the federal government to a narrow adjudicatory check—precisely the structure Congress

15  adopted. The House overwhelmingly rejected the Dingell Amendment, replacing it with the

16  Senate's Murphy language. *See* 113 Cong. Rec. 30989 (1967).

17      Early federal practice confirmed the adjudicatory structure. The first waiver determination

18  in 1968 evaluated only whether California met statutory criteria based on the hearing record. *See*

19  33 Fed. Reg. 10160 (July 16, 1968). In 1971, EPA emphasized its limited role, shorn of any broad-

20  based authority to make the policy judgments characteristic of legislation: "The issue of whether a

21  proposed California requirement is . . . unwise . . . is not legally pertinent" because the statute

22  permits denial only upon specific findings. 36 Fed. Reg. 17458 (Aug. 31, 1971).

23      When Congress revisited the waiver provision in 1977, it did not alter EPA's Section

24  209(b)'s adjudicatory nature. Rather, Congress *strengthened* deference to California: reaffirming

25  EPA's "liberal construction" of the waiver and broadening California's authority. *See* H.R. Rep.

26  No. 95-294, at 23, 301 (1977). Congress knew how EPA was administering the statute—and

27  approved.

28

---

12

In the decades since, EPA has consistently interpreted its role as adjudicatory. *See, e.g.*, 88 Fed. Reg. 20688, 20692 (Apr. 6, 2023) (EPA may deny a waiver only upon specific factual findings based on the record; opponents of a waiver bear the burden to demonstrate that one of the criteria for denial has been met). EPA has granted more than fifty waivers and fully denied only one. *See* 74 Fed. Reg. 32744, 32745 (July 8, 2009). EPA's uniform, longstanding view is powerful evidence of Section 209(b)'s adjudicatory character.

**c.    Judicial decisions reinforce the conclusion that EPA's role under Section 209(b) is adjudicatory.**

Courts have consistently described Section 209(b) waiver proceedings as tightly bounded, record-based adjudications. In *Motor & Equip. Mfrs Ass'n v. EPA*, 627 F.2d 1095, 1115, 1119, 1122 (D.C. Cir. 1979), the D.C. Circuit held that Section 209(b) "operates in a narrowly circumscribed proceeding," that EPA's authority is "modest in scope . . . with no 'broad and impressive' authority to modify California regulations," and that EPA's task is to "consider" and "assess" "material evidence" under the statutory criteria. Two decades later, the D.C. Circuit reaffirmed this understanding in *Nichols*, emphasizing that Congress "chose to permit California to blaze its own trail with a minimum of federal oversight" and held that EPA may not consider factors beyond those Congress specified. 142 F.3d at 463, 467. This unbroken judicial line confirms that EPA acts as an adjudicator—not a policymaker—when granting or denying waiver requests.

**d.    Section 177 does not transform EPA's Section 209(b) determinations into rulemakings.**

Clean Air Act Section 177 does not transform EPA's Section 209(b) waiver determinations into rulemakings. Section 177 establishes a separate, downstream mechanism by which states may, if they independently choose, adopt California's emission standards *after* EPA has granted California a waiver. *See* 42 U.S.C. § 7507. That state-by-state adoption process occurs under each state's own authority, at a later point in time, and is neither considered nor controlled by EPA when it decides whether California has satisfied Section 209(b)'s statutory criteria. EPA's waiver

---

13

decision therefore concerns only a single, discrete question: whether California may implement its own standards free from federal preemption.

Arguments to the contrary are misplaced. *See* Defs.' Mot. to Dismiss at 24–25, Nov. 17, 2025, Dkt. No. 172 (claiming that because other provisions of the Clean Air Act allow other states to adopt California's regulations, the waivers affect a public policy issue of nationwide importance, and amount to more than a "particularized adjudication of rights"). Section 209(b) contains no reference to other states, and EPA has consistently rejected calls to consider the effects of potential Section 177 adoption when evaluating a waiver request. As EPA explained, "[i]t is not appropriate . . . to review California regulations . . . through the prism of adopted or potentially adopted regulations by section 177 states." 78 Fed. Reg. 2112, 2143 (Jan. 9, 2013).

The statutory history confirms the point. Section 177 was enacted a decade after Section 209(b). When Congress amended Section 209(b) in 1977, it did not incorporate any consideration of other states' potential adoption decisions. Instead, Congress strengthened deference to California. If Congress had intended the possibility of downstream-state adoption to alter the adjudicatory character of EPA's role under Section 209(b), it would have amended Section 209(b)'s text to require EPA to account for those later choices. It did not.

**III.    The Resolutions are impermissible legislative adjudication.**

The congressional Resolutions are a quintessential legislative adjudication. Unlike valid exercises of legislative power, they do not amend any part of the Clean Air Act or regulations promulgated under the Act, alter statutory criteria under Section 209, or establish new EPA rules of general applicability for future conduct. Nor do they alter governing law to be applied in pending or future cases. *See Bank Markazi*, 578 U.S. at 231–32 (upholding congressional change in the governing law for a category of cases); *Robertson*, 503 U.S. at 437 (upholding a statute that "replaced the legal standard"). Instead, the Resolutions overturn the results of EPA's factor-and-fact-specific agency determination regarding the right of a single State—California—to determine how to best protect its air quality. *See* Pub. L. Nos. 119-15, 119-16, 119-17 (2025). Congress simply disagreed with and impermissibly overturned EPA's result without altering governing law,

14

much less justifying the reversal. The Resolutions thus violate core separation-of-powers principles and must be invalidated. *Cf. Chadha*, 462 U.S. at 965–66 (Powell, J., concurring in the judgment).

If allowed to stand, the Resolutions will strip California of authority Congress specifically intended for the State to retain. Notably, Congress designed Section 209(b) to preserve California's leadership and autonomy in setting motor-vehicle emission standards. So, Congress's reversal here would constitute a seismic shift, illegally aggrandizing federal power at the expense of the State's traditional authority to regulate pollution to protect its residents. *Cf. Ohio v. EPA*, 603 U.S. 279, 291 (2024) (recognizing states' interest in regulating air pollution within their borders before the federal government steps in). *Klein* and its progeny foreclose a raw power grab of this sort, *i.e.*, changing the referee's call on the field to alter the score in the current Congress's favor, without actually going through the process of revising the rules that the players must follow. *Cf.* Zoldan, *The* Klein *Rule of Decision Puzzle and the Self-Dealing Solution*, at 2138.

That shift cannot be justified as mere alteration of a federal program. It contradicts the Clean Air Act's cooperative-federalism structure and Congress's long-standing recognition of California's unique role. Thus, a waiver of preemption of California's vehicle emissions standards stands far from a mere "act of grace" that the federal government hypothetically may, consistent with constitutional limits, revoke through a resolution overturning an adjudication. *Cf. id.* at 2213–14.

The federal government's assertion that Congress may interfere with agency adjudications where public rights are involved merely repackages its unsupportable position that the Resolutions somehow altered, as a matter of policy, the balance of authority between federal and state air pollution controls. *Contra* Defs.' Mot. to Dismiss at 22–23, Dkt. No. 172 (citing *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 431–32 (1856) (noting that Congress could revoke a public right of passage along a river even though the Court had previously enjoined construction of a bridge obstructing it)). That begs the question whether the Resolutions amounted to broader legislation and, moreover, is wrong: the Resolutions no more affected a public right than would,

say, congressional revocation of a permit issued to an individual to graze livestock on federal lands. Although touching on matters that affect the public, the plain reversal of a specific agency decision, without more, does not effect broader public policy.

Simply, the Resolutions violate core separation-of-powers principles. Congress directed EPA to adjudicate waiver applications under Section 209(b); EPA did so and issued final determinations; and Congress then reversed those completed adjudications. This is not a close case: Congress has left *nothing* for the executive agency to do to implement the statute following its unlawful resolutions. *See The Federalist No. 47* (James Madison) ("[Separation of powers] can amount to no more than this, that where the *whole* power of one department of the government is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted."). And where, as here, one branch "has impaired or sought to assume a power central to another branch, the Court has not hesitated to enforce" the separation of powers. *Chadha*, 462 U.S. at 962–63 (Powell, J., concurring in the judgment).

## <u>CONCLUSION</u>

For the reasons stated above and in Plaintiff States' Opposition, this Court should deny the motions to dismiss. This Court should further conclude that Congress's retroactive nullification of EPA's grant of California's Clean Air Act waiver under the guise of the Congressional Review Act was ultra vires and violated the Constitution's separation of powers. EPA's waiver determinations are adjudications—individualized, record-based applications of fixed statutory criteria to completed cases—and Congress may not decide or reopen such cases based on existing law. Because the Resolutions neither amend the Clean Air Act nor establish any new rule of general applicability, but instead purport to overturn specific, completed adjudications, they exceed Congress's constitutional authority and must be vacated.

Dated: January 16, 2026                    Respectfully submitted,


/s/James P. Duffy
James P. Duffy (*pro hac vice pending*)

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Peter Heisler (*pro hac vice pending*)
Daniel Alvarez *(pro hac vice pending*)
Center for Applied Environmental Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(802) 233-7967
jay.duffy@caelp.org

Theodore Lamm (Bar No. 319230)
Center for Law, Energy & the Environment
UC Berkeley School of Law
2680 Bancroft Way
Berkeley, CA 94720

*Attorneys for Amici Curiae Professors William Araiza,
Nina Mendelson & Evan Zoldan*

BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG