ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*
JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
jeffrey.hughes@usdoj.gov

*Attorneys for Defendants*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division
JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch
STEPHEN M. PEZZI (FL Bar #1041279)
*Senior Trial Counsel*
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

      Plaintiffs,

      v.

UNITED STATES OF AMERICA, et al.,

      Defendants.

Case No. 4:25-cv-04966-HSG

**REPLY IN SUPPORT OF UNITED STATES' MOTION TO DISMISS AMENDED COMPLAINT**

Date: Feb. 19, 2026
Time: 2:00 p.m. PST
Judge: Hon. Haywood S. Gilliam, Jr.

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................1

    I.     Congress expressly precluded judicial review in 5 U.S.C. § 805 .........................1

    II.    The Court lacks subject-matter jurisdiction over California's claims that
             challenge the application or interpretation of House or Senate rules ...................5

    III.   California lacks Article III standing for several claims and much of its relief........7

           A.    California's alleged injuries were neither caused by the EPA
                  nor redressable by an order vacating any action by EPA ...........................7

           B.    California lacks standing to challenge the possible future
                  applicability of the CRA's reenactment provision.......................................8

    IV.   California's statutory and ultra vires claims fail.....................................................9

           A.    The alleged "reclassification" of the waivers is not final
                  agency action ...............................................................................................9

           B.    To the extent this Court concludes that California has alleged a
                  final agency action, this Court still lacks jurisdiction...............................11

            C.    California fails to identify any statutory prohibition
                  forbidding "reclassification" of the waivers ..............................................12

    V.    California's constitutional claims fail...................................................................13

           A.    Precedent forecloses California's "legislative adjudication" theory .........13

           B.    The nondelegation challenge to the Senate's "second point
                  of order" fails .............................................................................................17

           C.    California's "political process" claim is a political
                  complaint, not a legal one. ........................................................................18

CONCLUSION.....................................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Ardestani v. INS*,
   502 U.S. 129 (1991)..................................................................................... 15

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016)....................................................................... 13, 14, 16

*Bennett v. Spear*,
   520 U.S. 154 (1997)..................................................................................... 10

*Bittner v. United States*,
   598 U.S. 85 (2023)......................................................................................... 4

*Cal. Dump Truck Owners Ass'n v. Nichols*,
   924 F. Supp. 2d 1126 (E.D. Cal. 2012) ...................................................... 11

*Cal. Dump Truck Owners Ass'n v. Nichols*,
   784 F.3d 500 (9th Cir. 2015)....................................................................... 12

*Chadha v. INS*,
   634 F.2d 408 (9th Cir. 1980)....................................................................... 15

*Chevron U.S.A. Inc. v. EPA*,
   No. 21-71132, 2023 WL 5665761 (9th Cir. Sep. 1, 2023) ......................... 11

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
   482 F.3d 1157 (9th Cir. 2007) .................................................................. 5, 6

*Cook Inlet Treaty Tribes v. Shalala*,
   166 F.3d 986 (9th Cir. 1999)....................................................................... 17

*Ctr. for Biological Diversity v. Bernhardt*,
   946 F.3d 553 (9th Cir. 2019) ....................................... 1, 2, 3, 4, 8, 9, 17, 18

*Dalton v. Specter*,
   511 U.S. 462 (1994)................................................................................. 4, 10

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025)....................................................................................... 5

*Dorsey v. United States*,
   567 U.S. 260 (2012)..................................................................................... 17

*Hodges v. Snyder*,
    261 U.S. 600 (1923)..................................................................................... 14

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*,
    408 F.3d 638 (9th Cir. 2005) ...................................................................... 10

*INS v. Chadha*,
    462 U.S. 919 (1983)............................................................................. 15, 16

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)....................................................................................... 7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................... 8

*Mount Graham Coal. v. Thomas*,
    89 F. 3d 554 (9th Cir. 1996) ..................................................................... 14

*Murthy v. Missouri*,
    603 U.S. 43 (2024)....................................................................................... 7

*Nat'l TPS All. v. Noem*,
    150 F.4th 1000 (9th Cir. 2025) ................................................................... 3

*Nat'l Ass'n of Postal Supervisors v. USPS*,
    26 F.4th 960 (D.C. Cir. 2022) ................................................................... 13

*Nevada v. Watkins*,
    914 F.2d 1545 (9th Cir. 1990) ................................................................... 19

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) ................................................................. 13

*Noem v. Nat'l TPS All.*,
    145 S. Ct. 2728 (2025)................................................................................. 3

*NRC v. Texas*,
    605 U.S. 665 (2025)............................................................................. 12, 13

*Paramino Lumber Co. v. Marshall*,
    309 U.S. 370 (1940)............................................................................. 14, 15

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
    59 U.S. 421 (1855)..................................................................................... 14

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995)............................................................................. 14, 16

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
   128 F.4th 1089 (9th Cir. 2025) ............................................................................. 10

*Pugin v. Garland*,
   599 U.S. 600 (2023) ............................................................................................. 2

*Recycle for Change v. City of Oakland*,
   856 F.3d 666 (9th Cir. 2017) ............................................................................... 11

*South Carolina v. Baker*,
   485 U.S. 505 (1988) ............................................................................................. 19

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ............................................................................................. 16

*U.S. Army Corps of Eng'rs v. Hawkes*,
   578 U.S. 590 (2016) ............................................................................................... 9

*United States v. Klein*,
   13 Wall. 128 (1872) ............................................................................................. 14

*Virginia v. United States*,
   74 F.3d 517 (4th Cir. 1996) ................................................................................. 12

*Yesler Terrace Cmty. Council v. Cisneros*,
   37 F.3d 442 (9th Cir. 1994) ............................................................................. 15-16

*Young v. Meta Platforms Inc.*,
   No. 24-cv-03583, 2025 WL 754064 (N.D. Cal. Mar. 10, 2025) ............................. 8

**Statutes**

5 U.S.C. § 558(c) .......................................................................................................... 11

5 U.S.C. § 706 ................................................................................................................ 8

5 U.S.C. § 801(a)(1)(A) ................................................................................................ 2

5 U.S.C. § 801(b)(2) .................................................................................................... 17

5 U.S.C. § 802(a) ........................................................................................................... 4

5 U.S.C. § 802(g) ........................................................................................................... 6

5 U.S.C. § 804(3) ........................................................................................................... 5

5 U.S.C. § 805 ..................................................................................................... 1, 2, 18

8 U.S.C. § 1254a ................................................................................................ 3

42 U.S.C. § 7543(b)(1)(B) ................................................................................ 8

42 U.S.C. § 7543(b)(1)(C) ................................................................................ 8

Pub. L. No. 90-148 § 208(a)-(b), 81 Stat. 485, 501 (1967) ...................... 18-19

**Legislative History**

171 Cong. Rec. S3017-S3093 (May 21, 2025) ................................................ 5

171 Cong. Rec. S3102-S3140 (May 22, 2025) ................................................ 5

H. J. Res. No. 88, 119th Cong., 1st Sess. (2025) ............................................ 5

**INTRODUCTION**

As every middle schooler learns, a bill becomes a law when it is passed by majority votes in both Houses of Congress and signed into law by the President of the United States. Article I, Section 7 of the Constitution requires nothing more and nothing less. And here, everyone agrees that Congress has constitutional authority to enact nationwide legislation about vehicle-emission standards. Everyone also agrees that that sort of legislation may—and often does—preempt contrary state laws under the Supremacy Clause. Ultimately, despite California's efforts to make a simple case complicated, that is all that happened here: Congress passed and the President signed three laws that altered the nationwide regulatory scheme for vehicle emissions.

Nevertheless, relying on sources as varied as EPA press releases and opinions of the Senate Parliamentarian that a majority of the Senate have rejected, California seeks to undo the consequences of three duly enacted federal laws. Worse, in doing so, California seeks to elevate its views of proper congressional procedure over that of Congress, ignores explicit jurisdiction-stripping provisions that the Ninth Circuit has straightforwardly enforced, and invents novel constitutional theories about how, somehow, *these* federal laws just don't count.

Whether for lack of subject-matter jurisdiction or for failure to state a claim, this suit should be dismissed in its entirety. If California wants to restore the prior regulatory regime that was in place before Congress acted to change the law, it is free to seek that result through its extensive representation in Congress, and through normal political channels. These policy questions should be resolved by legislation, not litigation.

**ARGUMENT**

**I.    Congress expressly precluded judicial review in 5 U.S.C. § 805.**

"No determination, finding, action, or omission under [the Congressional Review Act] shall be subject to judicial review." 5 U.S.C. § 805; *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553 (9th Cir. 2019). As explained in the United States' motion (at 6-11), that explicit statutory text is straightforwardly fatal to (at least) Plaintiffs' statutory and ultra vires claims.

**a.** Plaintiffs' (collectively, "California") primary response is that "none of their claims at all . . . asks this Court to" conduct judicial review of any "'determination, finding, action, or

omission *under*" the CRA. Opp. 7-8 (quoting 5 U.S.C. § 805) (emphasis added). Remarkably, they go so far as to assert that the CRA is "not implicated" by this case. *Id.* at 8. How so? On California's telling: (1) CRA procedures apply only to "a rule," 5 U.S.C. § 801(a)(1)(A), (2) EPA's waivers "are not rules," Opp. 8, and therefore (3) "none of the government conduct alleged in the complaint occurred 'under' the CRA," *id.* In other words, according to California, because the government violated the CRA, the CRA's preclusion provision does not apply.

That argument puts the cart before the horse and would effectively read 5 U.S.C. § 805 out of the U.S. Code. After all, *every* CRA plaintiff has some merits theory about how the CRA has been improperly invoked, or misinterpreted, or otherwise violated. The purpose of a jurisdiction-stripping provision is to prohibit judicial review of those very questions. California's argument is circular: it assumes the validity of its position on the merits as the basis for concluding that § 805 does not bar review of the merits. If the statute worked that way, all claims that a plaintiff asserts are meritorious would proceed—just as if the preclusion provision did not exist. This Court "should not lightly conclude that Congress enacted a self-defeating statute." *Pugin v. Garland*, 599 U.S. 600, 607 (2023). If California were correct, every case applying § 805 would have been analyzed very differently. Mot. 7-8 (citing cases).

**b.** This is not a question of first impression in the Ninth Circuit. The plaintiffs in *Bernhardt*, just like California here, claimed that the agency action at issue was "not eligible for disapproval" under the CRA because the agency failed to comply with certain statutory requirements of the CRA itself. 946 F.3d at 562-63; *see* Mot. 11. And those plaintiffs argued, just as California does here, that because the agency action at issue in that case was "not eligible for disapproval" under the CRA, "the Joint Resolution was not enacted 'under' the CRA" for purposes of § 805. *Id.* at 563. The Ninth Circuit explicitly rejected that argument, holding that enactment of a CRA resolution was "an action under the CRA" that was subject to the statute's jurisdiction-stripping provision. *Id.* at 564. Because it lacked jurisdiction, the Ninth Circuit thus never answered the question of whether (as those plaintiffs argued) the government violated the CRA in that case. This Court should reach the same result here, as the determination of whether EPA waivers are rules under the CRA is beyond the jurisdiction of this Court.

1    That is even more clear given the posture of this case: Congress itself conclusively

2    determined that these waivers were properly subject to CRA procedures by voting (repeatedly)

3    to use those procedures to disapprove the waivers. Mot. 5-6, 26. That procedural determination

4    is exclusively the prerogative of Congress.[1] *See infra* at 5-6.

5    California's only response to *Bernhardt* is to (correctly) concede that "Section 805 bars

6    'claims that [the government] violated the CRA's statutory requirements,'" but then to

7    (incorrectly) assert without explanation that "Plaintiffs press no such claim here." Opp. 7

8    (quoting *Bernhardt*, 946 F.3d at 564). Similarly, in a footnote, California tries to distinguish

9    *Bernhardt* on the theory that the plaintiffs there claimed "that a joint resolution was ineffectual

10   because it was not enacted in accordance with the statutory procedure in the CRA," and that,

11   "[b]y contrast, Plaintiffs here claim that the Resolutions are ineffectual because their substance

12   and the process used to pass them violated the Constitution." *Id.* at 7 n.6. But on its face, that

13   distinction only works for California's constitutional claims—and thus seems to reflect forfeiture

14   of all of California's statutory and ultra vires claims. In any event, whatever the explanation for

15   California's shifting descriptions of its claims, the Court's task is now easier. Because

16   California's only response to *Bernhardt*'s holding about the scope of § 805 is to point out that

17   this case also involves constitutional claims, the Court should hold that all of California's

18   statutory and ultra vires claims (Counts I, II, V, and VI) are precluded.[2]

19

20   _____

21   [1] That is why (at least in their motion to dismiss in this case) Defendants do not argue the merits of whether "waivers are, in fact, rules, and thus subject to the CRA," Opp. 9—not because Plaintiffs are right about the definition of a "rule" versus an "order," but because the question is plainly beyond the jurisdiction of this Court under binding precedent, and because Congress has already decided that CRA procedures *do* apply here.

24   [2] Plaintiffs also extract without context (at 9) three words from *National TPS Alliance v. Noem*, 150 F.4th 1000, 1016 (9th Cir. 2025), but nothing in that case is inconsistent with the United States's argument here. That opinion interpreted the text of a materially different preclusion provision. *See id.* at 1016 (quoting 8 U.S.C. § 1254a). And the Ninth Circuit already interpreted *this* statute, in *Bernhardt*. So *Bernhardt* applies, not *National TPS Alliance*—that is, even ignoring the fact that the Supreme Court granted the government's stay motion in *National TPS Alliance*, 145 S. Ct. 2728 (2025) (Mem.), disagreeing with the Ninth Circuit's rejection of the same relief.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 4:25-CV-04966

**c.** As for California's constitutional claims, for the most part, given Ninth Circuit precedent, the United States never even argued that those claims were covered by § 805. *See Bernhardt*, 946 F.3d at 561. So most of California's arguments on that point attack a straw man.

The only exception is with respect to California's claims that are (to borrow Plaintiffs' own telling turn of phrase) "statutory claim[s] masquerading as constitutional" claims. Opp. 7; *accord* Mot. 29. On that point, California never responds to the United States' primary authority: *Dalton v. Specter*, which holds that claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" at all. 511 U.S. 462, 472 (1994). Instead, California offers only the perplexing retort that it "allege[s] not that the CRA was violated, but that the CRA was inapplicable." Opp. 7. Respectfully, that is not a legal argument—it is a euphemism; California cannot disclaim its allegations of a statutory violation via wordplay about what it means to "exceed . . . statutory authority." *Dalton*, 511 U.S. at 473. Accordingly, the government's § 805 arguments apply not just (as California seems to concede) to its statutory and ultra vires claims, but also to any of its nominally constitutional claims that are premised on a statutory violation of the CRA. *See, e.g.*, FAC ¶¶ 163-65 (alleging that EPA violated the CRA and thus failed "to faithfully execute the Nation's laws"); *id.* ¶ 157 (asserting nondelegation claim premised on argument that a waiver is "*not* a rule as defined in the CRA").

**d.** In asserting that Congress did not enact the Resolutions "under" the CRA, California argues that the Court should ignore what it calls the "prefatory clauses" of the Joint Resolutions, which state explicitly that Congress was "'[p]roviding congressional disapproval under chapter 8 of title 5, [U.S.] Code,' 139 Stat. 65, 66, 67 (June 12, 2025)." Opp. 10 n.8. But "[a] preamble, purpose clause, or recital is a permissible indicator of meaning." *Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023). In any event, the "operative clauses" of the relevant statutes are equally fatal to California's interpretation, as they each use the exact language that is explicitly called for in the CRA itself, and thus lead to the legal consequences that the CRA provides. *Compare* 5 U.S.C. § 802(a) (specifying the exact language to use in a CRA resolution), *with* 139 Stat. 65, 66, 67 (June 12, 2025) (using that exact language). Further, California cannot seriously ask this Court to ignore the legislative history cited in its own complaint, in which Congress could not

1  have been clearer that it enacted the Resolutions under the CRA. FAC ¶¶ 105-12; *see* 171 Cong.

2  Rec. S3017-S3093 (May 21, 2025) (referring to the "Congressional Review Act" 79 times); 171

3  Cong. Rec. S3102-S3140 (May 22, 2025) (38 times).

4       In sum, the Supreme Court was correct when it said that, "[a]cting *under* the

5  Congressional Review Act, Congress recently passed and the President signed legislation to

6  block [this] set of California regulations." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 107

7  n.1 (2025) (citing H. J. Res. No. 88, 119th Cong., 1st Sess. (2025)) (emphasis added).

8  California's strained efforts to complicate this case cannot avoid the CRA's jurisdictional bar.

9  **II.    The Court lacks subject-matter jurisdiction over California's claims that challenge the application or interpretation of House or Senate rules.**

10

11       Even if Congress had not enacted an express preclusion provision, the United States also

12  explained why California's claims (including constitutional claims) are not justiciable, to the

13  extent they amount to challenges to rules of legislative procedure. This argument is simpler than

14  California would like it to be: the Ninth Circuit has squarely held that "the Constitution textually

15  commits the question of legislative procedural rules to Congress." *Consejo de Desarrollo*

16  *Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007). That holding

17  is fatal to most of California's claims, before even considering the merits.

18       **a.** As for the statutory and ultra vires claims, California barely engages on this point. *See*

19  Opp. 23-24. First, it asserts without explanation that this "doctrine is not even implicated by

20  these claims (which generally present justiciable questions of statutory construction)." Opp. 24.

21  As a threshold matter, that argument is irreconcilable with California's position about the

22  applicability of § 805, discussed above. California cannot maintain, on one hand, that the CRA

23  is "not implicated" at all, *id.* at 8, and then, on the other, that this case raises "questions of

24  statutory construction," Opp. 24, about the meaning of the CRA. In any event, California got it

25  right the second time: the merits of their statutory claims *do* present various "questions of

26  statutory construction" about the meaning of the CRA, and in particular the definition of a "rule"

27  in the CRA, 5 U.S.C. § 804(3). That is why all those claims are straightforwardly precluded by

28  § 805, *see supra* at 1-5. But that is still no help to California on the political-question doctrine—

1  because here, all those statutory-construction questions are also "questions of legislative

2  procedural rules." *Consejo*, 482 F.3d at 1172. Although that may be unusual, it is also

3  undeniable: when it comes to the CRA, it just happens that the relevant legislative procedures

4  appear in the U.S. Code. *See* 5 U.S.C. § 802(g) ("This section is enacted by Congress . . . as an

5  exercise of the rulemaking power of the Senate and House of Representatives.").

6      California's only other argument is that "these claims concern the Executive Branch's

7  conduct, not an 'asserted failure of Congress to comply with its own procedural rules.'" Opp. 24

8  (quoting *Consejo*, 482 F.3d at 1171). That argument is refuted by California's own filings, which

9  contain thousands of words—and attach hundreds of pages of transcripts from the Congressional

10  Record, *see* Exs. to FAC—about whether Congress has "compl[ied] with its own procedural

11  rules." Opp. 24 (quoting *Consejo*, 482 F.3d at 1171). For example, California continues to rely

12  on the views of the GAO and the Senate Parliamentarian, calling the latter "the nonpartisan

13  arbiter of Senate rules." *Id.* at 5; *see id.* at 9, 23. Setting aside that Congress is *intended* to be

14  political, *see* THE FEDERALIST NO. 22, at 152 (Alexander Hamilton) (Clinton Rossiter ed., 1961),

15  the views of the Senate Parliamentarian about "Senate rules" could only possibly be relevant

16  (even on California's theory of this case) to questions about whether Congress has "compl[ied]

17  with its own procedural rules." Opp. 24 (quoting *Consejo*, 482 F.3d at 1171).

18      **b.** As for California's constitutional claims, again, the United States does not assert that

19  all are subject to the political-question doctrine—only those that challenge the application or

20  interpretation of the CRA, or other House or Senate procedures. So, for example, if it really were

21  true that Congress was disempowered by the Tenth Amendment from setting nationwide auto-

22  emission standards, that claim would not be barred. But several of these constitutional claims do

23  little more than quibble over Senate procedure. *See, e.g.*, FAC ¶ 157 (Count III: "To pass the

24  Resolutions, the Senate adopted a procedural rule that applies CRA-like legislative procedures .

25  . . ."); *id.* ¶ 163-64 (Count IV: alleging that Congress used "extraordinary procedures" that did

26  not include "rigorous debate" or "state official testimony"). Those claims are straightforwardly

27  barred by the Ninth Circuit's application of the political-question doctrine to legislative

28  procedural rules. *See Consejo*, 482 F.3d at 1172.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 4:25-CV-04966

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III. California lacks Article III standing for several claims and much of its relief.

#### A. California's alleged injuries were neither caused by the EPA nor redressable by an order vacating any action by EPA.

Though California's "injuries from the Resolutions are undisputed," Opp. 25, those injuries do not create standing to challenge EPA's "reclassification" of waivers in press releases or its reports to Congress. *See, e.g.*, FAC ¶ 126 ("No explanation was provided in the press release in which Administrator Zeldin first referred to waiver decisions as 'rules.'"). After all, "standing is not dispensed in gross," and "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation modified). California fails to do so here.

First, California does not dispute that "the last action by the EPA that had any legal significance here was EPA's *grant* of the waivers Plaintiffs now seek to restore," nor that "Congress could have taken the exact same action with or without any action from EPA." Mot. 15. Instead, California argues only that the result of EPA's actions is "that Congress would more likely disapprove additional waivers." Opp. 25. But that speculative prediction about the possible future actions of a possible future Congress comes with no citation. California offers "'no more than conjecture' to assume that [they] will be subject to" future legislative actions "induced" by EPA press releases or non-binding reports. That sort of speculation cannot support standing. *Murthy*, 603 U.S. at 72 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

Second, California barely responds on redressability. It is thus now undisputed that relief against the challenged EPA actions "would not change the fact that majorities in both Houses of Congress enacted legislation, signed by the President, which nullifies EPA's waivers." Mot. 15. California concedes this critical point, acknowledging that the relief it seeks against EPA "would not necessarily 'undo' *these* Resolutions." Opp. 26. Put another way, California does not seek to invalidate the Resolutions through their claims against EPA—nor could they. But their claims against EPA would not redress their alleged injury from the Resolutions, which are now law.

What little California does say about redressability is beside the point. As California sees it, relief against EPA "would make it more difficult—if not impossible—for EPA to take similar

1  actions in the future." Opp. 25. That is incorrect: The maximum relief that California could be

2  entitled to here would be to "hold unlawful and set aside" the actions they have challenged. 5

3  U.S.C. § 706. California cites no authority suggesting that this Court could issue a prospective

4  injunction prohibiting EPA from sending hypothetical future reports to Congress. And any new

5  injury from "additional resolutions targeting other waivers" would be caused by those

6  "additional resolutions," not by any of the EPA actions challenged here. Opp. 26.

**B.   California lacks standing to challenge the possible future applicability of the CRA's reenactment provision.**

As for standing to challenge the applicability of the CRA's reenactment provision, California largely ignores Defendants' central argument: that the Ninth Circuit has already resolved this question. In short, California's "challenge to the Reenactment Provision is legally distinct" from its other challenges to "the Joint Resolution[s]," which means that California "must separately establish standing for its argument" relating to "the Reenactment Provision." *Bernhardt*, 946 F.3d at 560. California does not dispute that it never even "tried to do so," Mot. 16, which is fatal to this request for relief. After all, California bears the burden to show standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and the operative pleading "may not be amended by briefs in opposition to a motion to dismiss," *Young v. Meta Platforms Inc.*, No. 24-cv-03583, 2025 WL 754064, at *2 (N.D. Cal. Mar. 10, 2025) (Gilliam, J.).

Even if the Court were to consider California's belated argument, it is meritless. Attempting to get around *Bernhardt*, California argues only that "the CAA does not afford EPA discretion to shape its future waiver actions or to choose to take no future waiver action at all." Opp. 27. That is incorrect and irrelevant. It is incorrect because Section 209(b) calls for EPA to make discretionary determinations, *see, e.g.*, 42 U.S.C. § 7543(b)(1)(B) (barring a waiver if the EPA Administrator makes a discretionary determination about "compelling and extraordinary conditions"); *id.* § 7543(b)(1)(C) (cross-referencing, e.g., discretionary authorities in § 7521(a))—which is part of why California favored EPA's regulatory scheme during the Biden Administration, while opposing it now. And it is irrelevant because nothing in *Bernhardt* turns on the amount of discretion delegated to the agency. The key point is that California's theory of

1  "alleged injury" relating to the possible future significance of the CRA's reenactment provision

2  to some possible future EPA actions "rests on a speculative chain of future possibilities, which

3  do not satisfy the requirements of Article III." *Bernhardt*, 946 F.3d at 560.

4  **IV.    California's statutory and ultra vires claims fail.**

5       **A.    The alleged "reclassification" of the waivers is not final agency action.**

6       California primarily argues that EPA's "reclassification" of the waivers as rules in a press

7  release is final agency action. Opp. 28-29. But the "reclassification" had no cognizable legal

8  consequences for California or EPA or anyone else. For that reason, the challenged EPA actions

9  are not final agency actions and are unreviewable under the APA.

10      To start, any supposed "reclassification" did not affect the waivers. Rather, the waivers

11 were in effect until Congress passed and the President signed the Resolutions. California's own

12 conduct confirms as much: they did not file this suit until *after* Congress and the President acted.

13      Nor did EPA's actions impose legal consequences on Congress. EPA's opinion as to

14 whether a waiver is an "order" or a "rule" does not preclude Congress from passing a statute

15 unwinding that action, under the CRA or otherwise. *See* Mot. 13-14. And even if EPA had not

16 "reclassified" the waivers as rules, Congress could still have acted without a submission from

17 the agency—either by passing a law according to procedures it saw fit, or by rejecting EPA's

18 legal views and passing joint resolutions without a submission. *See id.*.

19      Congress's freedom to do as it pleased before or after EPA acted stands in sharp contrast

20 with agency actions deemed to be final. In *U.S. Army Corps of Engineers v. Hawkes*, certain

21 Clean Water Act determinations about particular pieces of property were held to be final agency

22 actions because they imposed legal consequences. 578 U.S. 590, 598-600 (2016). That was

23 because the Corps of Engineers and EPA agreed to be bound by the determination, and because

24 those determinations either provide or deny property owners a safe harbor from civil Clean Water

25 Act suits brought by the government. *See id*; *contra* Opp. 28-29. No such effects followed from

26 the disputed EPA actions here. And unlike the determinations in *Hawkes*, 578 U.S. at 598-99,

27 EPA's alleged "reclassification" did not limit or expand California's liability in any way. It did

28

not even bind EPA. Thus, California's attempt to shoehorn this case into the framework of *Hawkes* fails: EPA's actions neither created nor denied California a "safe harbor."

EPA's actions are thus even less consequential than those in *Dalton*, 511 U.S. at 470. *See* Mot. 18-19. There, the President could approve or disapprove the recommendations contained in the report only after receiving it. 511 U.S. at 465. But here, Congress not only could decline to pass the resolutions, but it could also have *always* disapproved the waivers without any EPA submission, using whatever procedures it saw fit. So EPA's changed legal views were not a "necessary triggering step" for passage of the resolutions. *See* CALSTART Amicus Br. 14-15.

EPA's action also did not impose legal obligations on the agency itself. Contrary to California's assertion, Opp 28, EPA did not bind itself through the alleged "reclassification." Instead, the submission to Congress—a discrete and ministerial response—lacked the kind of "appreciable *legal* consequence[]" that is the hallmark of final agency actions. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (emphasis added). In this circuit, courts analyzing finality look to, among other factors, "whether the action has a direct and immediate effect on the day-to-day operations" of the party or agency and "whether immediate compliance with the terms is expected." *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005). Here, EPA's press release did not have "a direct and immediate effect on the day-to-day operations" of plaintiffs or EPA, nor did it require any "compliance with [its] terms." *Id.* And the "obligation" claimed by California is the mere transmission of a "purely advisory" document that Congress is free to accept or reject or ignore. *See Bennett*, 520 U.S. at 178. This is a far cry from, for example, a concrete plan, committed to by the agency, to dispose of hazardous munitions waste by burning or detonating them over a period of years. *See Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1103, 1112-13 (9th Cir. 2025).[3]

---

[3] The United States' petition for writ of certiorari of this decision is pending. *Dep't of the Air Force v. Prutehi Guahan*, No. 25-579 (U.S. Nov. 17, 2025).

California's remaining arguments fare no better. One cites a statement in the United States' motion, rather than EPA's challenged action, asserting that "EPA intends its 'rule' relabeling to apply to future waivers." Opp. 29. But the United States' motion only recognized the logical impact of *Congress's* action under the CRA. Mot. 23. EPA has not made any "legally enforceable promise" as to what conclusion it will reach about any future waivers, and certainly not in its alleged "reclassification" of the waivers at issue here. *Chevron U.S.A. Inc. v. EPA*, No. 21-71132, 2023 WL 5665761, at *1 (9th Cir. Sep. 1, 2023).

California also asserts that it lost procedural rights that EPA would have afforded had EPA tried to revoke a license. Opp. 29 (citing 5 U.S.C. § 558(c)). But even if California would have been entitled to such rights if EPA considered the waivers "licenses," those alleged rights have no role in this case. EPA did not revoke the waivers, Congress did. So the precise rights California might have been afforded in some other hypothetical scenario are irrelevant.

Finally, California previously alleged that EPA's submission to Congress was a final agency action subject to review. FAC ¶ 123. Now, however, California has abandoned any such claim by not responding to the United States' arguments to dismiss that claim, except in a conclusory fashion in one footnote. *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) (argument raised only "in a terse one-sentence footnote" is forfeited). Nor does California explain how "effectuat[ing] the reclassification" qualifies as a legal consequence. Opp. 28 n.26. The cited paragraphs are similarly unilluminating; they simply challenge EPA's description of the waivers. *See id*. Like the alleged "reclassification," the submission of the waivers to Congress is not a final agency action.

## B.   To the extent this Court concludes that California has alleged a final agency action, this Court still lacks jurisdiction.

Even if the alleged "reclassification" of an EPA act is final agency action—and it is not—jurisdiction to challenge the action would lie in the Court of Appeals, not this Court. The judicial review provision of the Clean Air Act "broadly" covers suits that have the "practical effect" of upsetting EPA's final actions or that are "closely related to" such final actions. *Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1139 (E.D. Cal. 2012), *aff'd* 784 F.3d 500 (9th

1  Cir. 2015). California claims that the courts of appeals only have jurisdiction over a suit

2  challenging an action "closely related" to a Clean Air Act action when the requested relief would

3  effectively nullify the latter action. Opp. 24. Plaintiffs are wrong.

4      The Ninth Circuit's decision in *Nichols* shows why. There, the court held that 42 U.S.C.

5  § 7607(b) divested the district court of jurisdiction in that case because plaintiffs challenged

6  EPA's legal conclusion *pertaining* to the state plan. *See id.*; *see also id.* at 510 (citing *Virginia*

7  *v. United States*, 74 F.3d 517, 523 (4th Cir. 1996) ("[T]he district courts are without jurisdiction

8  over the legal issues *pertaining* to final [actions]—whether or not those issues arise from the

9  statutes that authorized the agency action in the first place.")) (citation modified).

10     Here, even accepting for the sake of argument California's theory that they challenge

11  EPA's legal views pertaining to the waivers (which are indisputably Clean Air Act actions), the

12  argument still fails. Indeed, according to California, EPA's legal categorization is so central to

13  the waivers that by changing its analysis, EPA has attempted to impermissibly alter the waivers

14  without following the proper process. *See* Opp. 30. It is true that *Nichols* also held the district

15  court lacked jurisdiction because plaintiffs' suit would nullify in part an action taken by EPA

16  under the Clean Air Act, *see* Opp. 24—in that case, a State Implementation Plan—but it did not

17  announce a rule restricting circuit court jurisdiction to similar facts. *See* 784 F.3d at 507. Rather,

18  the court *also* held that the district court lacked jurisdiction because plaintiffs challenged EPA's

19  legal interpretation pertaining to the Clean Air Act action. *See id.* Therefore, even on California's

20  own theory, EPA's alleged "reclassification" is closely related to the waivers, and if it were

21  subject to judicial review at all, any challenge would have to be brought in circuit court.

22     **C.    California fails to identify any statutory prohibition forbidding**
       **"reclassification" of the waivers.**
23

24     To state an ultra vires claim, a plaintiff must allege that an agency "has taken action

25  entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *NRC*

26  *v. Texas*, 605 U.S. 665, 681 (2025) (citation modified). But California does not specifically

27  identify any particular statutory prohibition that EPA allegedly transgressed. Instead, the

28

Opposition points to general doctrines derived from APA case law. *See* Opp. 30.[4] These are standard arguments that an agency exceeded its delegated powers and are identical to the arguments underlying California's APA claim. *Compare* Opp. 30 (outlining alleged ultra vires actions contrary to APA doctrines) *with* FAC ¶¶ 125-31 (outlining alleged APA violations). California has thus attempted to "dress up a typical statutory-authority argument as an ultra vires claim," a "fairly common maneuver" that is "in large part why those claims rarely succeed." *NRC*, 605 U.S. at 682. This Court should dismiss Plaintiffs' ultra vires claim.

## V.   California's constitutional claims fail.

### A.   Precedent forecloses California's "legislative adjudication" theory.

The Amended Complaint alleges that the Resolutions are unconstitutional because they "'create no new substantive law' but instead determine 'how preexisting law applies to particular circumstances.'" FAC ¶ 153 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212 225 n.17 (2016)). Apparently realizing that its *Bank Markazi* theory is a poor fit, California now concocts a new theory that is equally wrong. According to California, the Constitution "forbids legislation that merely nullifies an adjudicatory order" "performed by a different Branch." Opp. 12. Though unclear, the argument appears to start from the premise that Congress lacks power to nullify an Article III judgment, then argues there is no relevant "distinction" (Opp. 13) between Article III courts and administrative agencies, and then concludes that the rule for Article III courts should be imported to Executive "adjudications." Opp. 12-15. This theory fails at every level.

**1.** To begin, California skips over the starting premise. Nowhere in its affirmative argument does it try to show the Constitution categorically "forbids Congress from overturning

---

[4] Though California implies that it can rely on case law rather than statutory provisions to show that a specific prohibition in a statute has been violated, *see* Opp. 30 n.30, the cases they cite show otherwise. In *National Association of Postal Supervisors v. USPS*, which predates *NRC*, the D.C. Circuit relied on case law that held that alleged violations of specific provisions of the Postal Reorganization Act of 1970 are subject to ultra vires review. 26 F.4th 960, 970-71 (D.C. Cir. 2022). In *Newsom v. Trump*, the Ninth Circuit analyzed case law to determine the deference the court owed to the President's determination that a statutory precondition existed, not whether an agency action violated a specific statutory prohibition. 141 F.4th 1032, 1047 (9th Cir. 2025); *see also id.* at 1056 (granting the government's motion to stay TRO).

adjudications" of Article III courts. Opp. 12-14. And the Supreme Court and Ninth Circuit have repeatedly held differently: "a judgment declaring a public right may be annulled by subsequent legislation." *Hodges v. Snyder*, 261 U.S. 600, 604 (1923); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855); *Mount Graham Coal. v. Thomas*, 89 F. 3d 554, 557 (9th Cir. 1996) ("judgment enforcing a public right . . . may be annulled by subsequent legislation").[5] California tries to explain away *Wheeling Bridge* because the statute there was "prospective[]." Opp. 15. But this does not help them because here they are also challenging the Resolutions' prospective effect. *See* FAC at 44.

**2.** Regardless, this Court need not resolve *Wheeling*'s precise contours or even address Article III precedent about nullifying judgments because that precedent does not apply to administrative agencies within the Executive Branch. California cites no case extending any of its Article III precedent to agencies. Opp. 12-15. And the Supreme Court squarely held that Congress can nullify an administrative order by statute in *Paramino Lumber Co. v. Marshall*, 309 U.S. 370, 374, 375 n.3 (1940). There, the Court upheld retroactive legislation ordering the longshoreman Employees' Compensation Commission to reopen and "review" a "final award" of compensation that had determined "the liability of employer to employee." *Id.* After rejecting the employer's due process claim, the Court held: "Nor can we say this legislation is an excursion of the Congress into the judicial function." *Id.* at 381. It then expressly rejected the employers' cited cases because they "involve[d] statutes affecting judicial judgments rather than administrative orders and are therefore inapplicable." *Id.* at 381 n.25.

*Plaut* reaffirms this distinction. While it holds that Congress may not "command[] the federal courts to reopen final judgments," it distinguishes "decisions upholding legislation that altered rights fixed by the final judgments of non-Article III courts . . . or administrative agencies." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225, 232 (1995) (citing *Paramino*

---

[5] Contra California (Opp. 14), *Klein* is irrelevant to whether Congress may nullify a judgment involving public rights. *United States v. Klein*, 13 Wall. 128 (1872). As *Bank Markazi* explains, 578 U.S. at 227-29, *Klein* was based on the President's "pardon power," and it did not involve nullifying a judgment but instead "outcome-altering legislation in pending civil cases."

1    *Lumber*, 309 U.S. at 370). *Plaut* and *Paramino Lumber* are thus dispositive of this claim.

2    *Chadha* rejected a similar argument. In *Chadha*, the House of Representatives nullified

3    an immigration judge's order through a one-House resolution, which was unconstitutional

4    because it failed to comply with bicameralism or presentment. *INS v. Chadha*, 462 U.S. 919,

5    956-57 (1983). Justice Powell concurred, arguing that the resolution was also "clearly

6    adjudicatory" and therefore unconstitutional. *Id.* at 957 n.22. The Ninth Circuit had embraced

7    that same argument. *Chadha v. INS*, 634 F.2d 408, 431 (9th Cir. 1980) (Kennedy, J.) (one-House

8    veto would "override individual adjudications"); *see* Opp. 11-12. But the Court *rejected* it,

9    holding that the resolution was not "adjudicatory" and was instead "legislative in purpose and

10   effect." *Chadha*, 462 U.S. at 957 n.22; *id.* at 952 (discussing the "legislative character of the one-

11   House veto"). And that *Chadha*'s order was not subject to judicial review, while EPA's waivers

12   are (Opp. 13-14 & n.11), makes no conceivable difference to California's theory.

13   Under this precedent, California's argument that there is no relevant "distinction"

14   between administrative agencies and Article III courts fails. Opp. 13. Indeed, California

15   concedes that (unlike with Article III courts) Congress can constitutionally enact targeted statutes

16   directing agencies "to take specific actions as to specific individuals or property." Opp. 13-14;

17   Mot. 24. That concession is unsurprising: Congress has been enacting these private laws since

18   1789, when George Washington signed the first one into law. Ch. 26, 6 Stat. 1 (1789).

19   **3.** Even if Congress lacked power to "merely nullify" some category of administrative

20   adjudications—and the Supreme Court has repeatedly rejected that proposition—EPA's

21   preemption waivers are not adjudicatory orders for constitutional purposes, much less a type of

22   adjudicatory order that Congress could not nullify. California never even defines "adjudicatory

23   order" for constitutional purposes. Opp. 12. Instead, it simply refers to the APA's statutory

24   definition of "order." *Id.* California's theory thus seems to be that Congress may never

25   constitutionally invalidate any APA-defined agency order. That analysis is unsupportable.

26   Unlike Article III courts, administrative agencies undertake a vast array of agency

27   proceedings, from "formal adjudication[s]" to "adversary adjudication[s]," *Ardestani v. INS*, 502

28   U.S. 129, 133 (1991), to an endless variety of "informal adjudication[s]," *Yesler Terrace Cmty.*

1   *Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994), to both formal and informal rulemaking.

2   Along that spectrum, EPA's preemption waivers are not the sort of agency action that would

3   implicate any relevant constitutional concerns. The petitioner requesting a waiver is the State of

4   California, not an individual with due process rights. *South Carolina v. Katzenbach*, 383 U.S.

5   301, 323 (1966) (States lack due process rights). There was no trial-like adjudication, no

6   adversary proceeding, no "Smith v. Jones." *Bank Markazi*, 578 U.S. at 231. It is just California

7   and its vehicle-emissions regulations. And the waivers waive preemption so that California may

8   then regulate vehicle emissions; the waivers address no individual right or anything in the realm

9   of a damages claim. Thus, unlike the immigration order in *Chadha*, or the workers'

10  compensation claim in *Paramino Lumber*, there is no due process concern that Congress is

11  "unilaterally . . . impos[ing] a substantial deprivation on one person." *Chadha*, 462 U.S. at 962

12  (Powell, J., concurring); *accord Plaut*, 514 U.S. at 242 (Breyer, J., concurring); Profs' Amicus

13  Br. (Dkt. No. 200) at 4 (contending that due process is central to separation of powers).

14          Amici's concern (*id.* at 4) about tyrannical deprivations of individual rights is particularly

15  unfounded here because of the generalized policy issues at stake. When it enacted the

16  Resolutions, Congress debated and resolved the broad policy question of whether there should

17  be nationwide standards for regulating motor vehicle emissions. Mot. 24-25. That is precisely

18  the type of policy issue Congress can and should address through federal legislation.

19          California's argument also fails the test of common sense. California cannot plausibly

20  contend that Congress lacks power under the Commerce Clause and the Supremacy Clause to

21  preempt California's regulations, or that setting nationwide emissions policy is "illegally

22  aggrandizing federal power." Profs' Amicus Br. 15. And California does not dispute that

23  Congress could have, for example, enacted a statute saying that "California's regulations are

24  hereby preempted." *See* Opp. 16. Its only argument is that Congress used the wrong words. But

25  there is no relevant difference between saying "the preemption waivers are disapproved" and

26  "the regulations are preempted"—after all, Congress is not required "to use any 'magical

27  passwords'" in legislating. *Dorsey v. United States*, 567 U.S. 260, 274 (2012). Either way,

28  Congress was not adjudicating individual rights; it was legislating national environmental policy.

**4.** Finally, California's claim fails even under the "amend the law" test from *Bank Markazi*, which applies *only* to Article III courts and is the *strictest* test the Supreme Court has ever used in this context. Mot. 22-23. This test demands "a high degree of judicial tolerance for an act of Congress that is intended to affect litigation so long as it changes the underlying substantive law in any detectable way." *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 991 (9th Cir. 1999). And in *Bernhardt*, the Ninth Circuit held that a CRA resolution "amend[s] the substantive environmental law" "even though it d[oes] not state that it constitute[s] an amendment." 946 F.3d at 562. California suggests the Department of Interior's "*rule*" itself "had changed the law" in *Bernhardt*, Opp. 16, but agency rules do not and cannot amend statutes, and *Bernhardt* said (correctly) that the CRA resolution at issue in that case "constituted an amendment to the National Wildlife Refuge System Administration Act." 946 F.3d at 562. That resolves the question.

The most obvious way the Resolutions amend the law is through the CRA's reenactment provision, 5 U.S.C. § 801(b)(2), which now prohibits EPA from issuing any waiver that is "substantially the same" as those that Congress disapproved. In response, California makes up another rule, contending that "downstream legal consequences" of a statute do not count as amending the law. Opp. 17. Even if that were correct, the reenactment provision is not a downstream consequence of Congress's action; it is a central feature of what Congress was voting on when it chose to disapprove EPA's waivers under the CRA. In short, before Congress enacted these Resolutions, EPA was permitted, at least under some circumstances, to grant waivers that are substantially the same as these waivers. Now it cannot. That changed the law "in a[] detectable way." *Cook Inlet*, 166 F.3d at 991.

**B.    The nondelegation challenge to the Senate's "second point of order" fails.**

California next claims that the Senate "adopted a procedural rule" that unconstitutionally delegates to EPA the "sole authority" to decide whether its preemption waivers are rules for purposes of the Senate's procedures for debating legislation under the CRA. Opp. 17. This claim is nonjusticiable because it challenges Senate procedures for debating legislation. Mot. 11-14;

1   *supra* at 5-6. The claim is also barred by statute because it is premised on an assumption that

2   EPA incorrectly determined its preemption waivers are rules under the CRA, and "[n]o

3   determination . . . under [the CRA] shall be subject to judicial review." 5 U.S.C. § 805. The text

4   of Section 805 is express and unequivocal, and *Bernhardt* does not address or apply to a

5   constitutional claim (like this one) premised wholly on a statutory determination. 946 F.3d at

6   561. *See supra* at 4.

7            Regardless, California's defense of this claim on the merits is untenable. Rather than

8   quoting the "procedural rule" they supposedly challenge—which says nothing about delegating

9   any authority to EPA (Mot. 26)—Plaintiffs say the constitutional violation is supposedly

10  "apparent from remarks of Senator Capito" and another remark "the next day" from "Senator

11  Lankford." Opp. 18. But when confronted with floor statements by Majority Leader Thune and

12  others that directly contradict their argument about the procedural rule's meaning (Mot. 27 &

13  nn.5-6), California protests that "individual Senators' views . . . are irrelevant." Opp. 20.

14           California then fails to respond to the core point: that the Senate voted for itself that

15  EPA's waivers are subject to CRA procedures. California addresses only the "vote[] to adopt the

16  rule of legislative procedure" (Opp. 20), but the key votes were on the motions "to proceed with

17  debate using the CRA's fast-track procedures," and the "Senate voted to approve those motions,"

18  conclusively determining for itself that these waivers were subject to the CRA's legislative

19  procedures. Mot. 26. The Senate then reaffirmed that conclusion when it enacted the statutes.

20           Ultimately, California asks this Court to reimagine a Senate procedural rule based on two

21  ambiguous floor statements, ignore contradictory statements, ignore the full Senate's repeated

22  votes, and then hold three statutes unconstitutional because the Senate supposedly followed that

23  reimagined procedural rule to avoid a filibuster before enacting the statute through full

24  bicameralism and presentment to the President. Needless to say, the claim fails.

25           **C.    California's "political process" claim is a political complaint, not a legal one.**

26           California cannot complain that it has been singled out for disfavor. To the contrary, in

27  1967, Congress singled out California for *favored* treatment by preempting all state emission

28  standards except California's, if it obtains a waiver. Pub. L. No. 90-148 § 208(a)-(b), 81 Stat.

485, 501 (1967). In recent decades, California transformed what began as a local smog-protection program into a platform for addressing global climate change. In 2025, Congress and the President changed course. They repealed three preemption waivers for California's most recent regulations, putting California back in equal status with 49 other states, none of which has ever been allowed its own preemption waiver.

California and its co-plaintiff states participated in this political process at every step of the way, including by debating the legislation, sending legislators to Congress who voted in the House and the Senate, and sending electors to vote in the Presidential election. They simply lost. And "the tenth amendment does not protect a State from being outvoted in Congress." *Nevada v. Watkins*, 914 F.2d 1545, 1556 (9th Cir. 1990). California has "not even alleged" it was "deprived of any right to participate in the national political process or . . . singled out in a way that left [it] politically isolated and powerless." *South Carolina v. Baker*, 485 U.S. 505, 513 (1988). The notion that California, New York, Massachusetts, and eight other states together are politically powerless is self-refuting.

California complains that "two of the three branches of the Federal Government joined together" to pass statutes invalidating California's regulations (Opp. 21), but every statute is passed by Congress and signed by the President—joined together. California argues that it was deprived of the "right to participate" in EPA's "reclassification of adjudicatory orders into 'rules'" (Opp. 23), but the political process for the Executive Branch happens every four years during a Presidential election. Finally, California complains about "expedited . . . procedures" for debating legislation that "everyone . . . understood were inapplicable" (*id.* at 21), but there is no constitutional right to the filibuster, and Plaintiffs' own Senators voted repeatedly on the very question of whether the CRA's expedited procedures were applicable to these waivers. Mot. 26. Having lost the vote on this legislation, the "States must find their protection from congressional regulation through the national political process," not the courts. *Baker*, 485 U.S. at 512.

## CONCLUSION

For these reasons, the amended complaint should be dismissed in its entirety, either for lack of subject-matter jurisdiction or for failure to state a claim upon which relief can be granted.

Dated: February 2, 2026

Respectfully submitted,

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch

ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (FL Bar #1041279)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
stephen.pezzi@usdoj.gov
(202) 305-8576

JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
jeffrey.hughes@usdoj.gov

*Attorneys for Defendants*