Pages 1 - 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Judge

State of California, et al.,        )
                                    )
            Plaintiffs,             )
                                    )
v.                                  ) No.  4:25-cv-04966-HSG
                                    )
UNITED STATES OF AMERICA, et al.,   )
                                    )
            Defendants.             )
_____)

Oakland, California

Thursday, February 19, 2026

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiffs:

            Office of the Attorney General
            State of California
            1515 Clay Street, 20th Floor
            Oakland, CA 94612
        BY:  MARGARET E.  MECKENSTOCK, ATTORNEY AT LAW

            Office of The Attorney General
            455 Golden Gate Avenue, Suite 11000
            San Francisco, CA 94102
        BY:  CECILIA D.  SEGAL, ATTORNEY AT LAW

 (Appearances continued on following page.)

REPORTED BY:   April Wood Brott, CSR No. 13782
            Official United States Reporter

APPEARANCES (continued):

For Defendants:

                    DOJ-Enrd
                    950 Pennsylvania Avenue, NW
                    Washington, DC 20530
               BY:  ROBERT N. STANDER, ATTORNEY AT LAW
                    JOHN D. ADAMS, ATTORNEY AT LAW

Thursday - February 19, 2026                                    1:57 P.M.

**P R O C E E D I N G S**

---o0o---

THE COURTROOM DEPUTY:  All rise.  This court is now in session, the Honorable Haywood S. Gilliam presiding.  You may be seated.

Your Honor, we're calling cv-25-4966, State of California, et al. versus the United States of America, et al.

Please step forward and state your appearances for the record, please.

MS. MECKENSTOCK:  Deputy Attorney General Elaine Meckenstock for the plaintiff, State of California.

THE COURT:  Good afternoon.

MS. MECKENSTOCK:  Good afternoon.

MR. STANDER:  Deputy Assistant Attorney General Robert Stander, here for the United States.

THE COURT:  Good afternoon.

All right.  So we're here for a hearing on the defendants' motion to dismiss.  There's obviously a lot here.  Whoever's going to be arguing should just stay at the podium.  I think we'll be having a discussion, and I've got a number of questions I will be posing as we work through the argument. But here's how I'd like to organize things.

Come to the podium.  It's not a deposition.  It's an oral argument.

All right.  So really, I think the -- you know, broadly conceptualized, there are two buckets here.  There are the statutory and ultra vires claims, and then there are the constitutional claims.

And the government is recognizing, I think appropriately, that as to the constitutional claims, we don't get into the question of the jurisdiction-stripping provision, Section 805.  There's a separate analysis, and they've got arguments as to why the claims fail substantively, but they are not arguing that there's any jurisdictional bar, at least under the CRA, with respect to those claims.

So let's talk first about the statutory ultra vires claims.  And it seems to me that the plaintiffs have a significant challenge in the Bernhardt case in the circuit.  Not every circuit has a case like that, but this one does.

And it seems to me to have squarely addressed the questions that are presented here, at least with respect to the statutory claims.  And I think the ultra vires claims are fairly characterized as a variant of those, where the argument is "You didn't follow the statute," and obviously, that was based on the jurisdiction-stripping provision in Section 805.

And it seemed to me that the plaintiffs' response was largely "Well, we don't get there because they didn't follow the statute, and so the triggering conditions aren't met, and you, Your Honor, can find that."  But it seems to me that's

exactly what Bernhardt said I don't do.

I mean, there, the plaintiffs were saying that there's a statutory trigger that wasn't met -- the timing, that the report wasn't submitted on time, and the argument was therefore, because they didn't do that, we're not even under the CRA, and therefore, the jurisdiction-stripping bar doesn't apply.  And the Ninth Circuit just directly rejected that argument, so I am not sure, at least at this stage, what the basis would be for reaching a different conclusion.

Obviously, if it gets to the Ninth Circuit and it's taken en banc, then they could change that, but given the law as it applies and given the way that those claims are framed, why isn't the defendant right that at least the statutory claims and the claims that argue in essence that the defendants didn't follow the statute -- how, under Bernhardt, do you get around the jurisdictional bar?

**MS. MECKENSTOCK:**  Sure, Your Honor.

I will start with the premise that this court can resolve whether the jurisdiction-stripping provision applies, and I think that's clear from the Supreme Court's decision in National Association of Manufacturers, or NAM, as well as in the Ninth Circuit's decision in TPS Alliance.

**THE COURT:**  But there's a Ninth Circuit decision right on point that says the opposite with respect to this jurisdiction-stripping statute.  So I think you've really got

to really find a way around Bernhardt, and it can't be other cases.

**MS. MECKENSTOCK:**  Okay, Your Honor.

So I think, as you said, that the claim in that case was a timeliness issue, that the agency had missed the deadline to submit the report to Congress, and because these questions about whether a jurisdiction-stripping provision applies are questions about the scope of statutory authority, a missed deadline doesn't go to that question.

Agencies miss deadlines all the time, and that doesn't remove the statutory authority to act.  It doesn't change whether the statute authorizes the agency to take action A.  It just means the agency missed the deadline, and I don't think we should read CBD as deciding anything more than what was presented to it, which is whether an untimely submission takes everything that follows out from under the scope of the statute.

**THE COURT:**  Well, but it didn't limit itself, at least the analysis, to that premise.  It essentially said Plaintiffs are arguing that it's not eligible for review under the CRA, but the Court couldn't reach that question as a jurisdictional matter.

Why, analytically, does it matter whether it's ineligible arguably because it wasn't submitted at the right time in the statute as opposed to what you're saying, which is that it

doesn't apply because these aren't real rules?  I don't understand what the analytical difference really is.  I understand that the facts of every case are different, but analytically, I'm not sure I see why a different result would be possible here.

MS. MECKENSTOCK:  So Your Honor, I don't think that Bernhardt decided that it couldn't reach the question.  I think it rejected CBD's argument that the untimeliness took it out from under the CRA, but I don't think -- and I think it decided, in fact, that the actions at issue were under the CRA.  It concluded that it was still a submission under the CRA and that the resolutions were therefore under the CRA.

So it actually reached the jurisdiction-stripping provision.  It just decided that the timeliness of the submission was not a sufficient basis to take it outside the scope of the statute, and that's consistent with longstanding precedent, including *McIntosh v. U.S.,* 601 U.S. 330 at 339, which lays out a ton of cases in which courts have held that missing a deadline doesn't change the scope of authority.

And I think to read Bernhardt more broadly than that, Your Honor, would conflict with National Association of Manufacturers, which the Supreme Court decided the year before.  It would also conflict with, I think, what CBD says about the BIEL case, in which it talks about how courts approach these jurisdiction-stripping provisions and that these are questions

of the scope of authority under the statute, and again, missing a deadline doesn't change that.

And so I think all that CBD was doing was rejecting the argument that was made there to say that missing a deadline takes something out from under the statute. And the issue we're presenting is entirely different, which is the entire statute is premised on a federal agency promulgating a federal rule.

And that never happened here, and so there is no action, no finding, no determination that could ever have been made within the scope of authority provided by the CRA. And that's a very different thing than just to say that an agency missed a deadline.

**THE COURT:** The way that the Court in Bernhardt framed the question is that CBD, the plaintiff, "nevertheless argues that because the Refuges Rule was not eligible for disapproval in the new session of Congress, the joint resolution was not enacted under the CRA."

And so are you saying that you're saying something other than that the disapproval action here was not something that Congress was eligible to do?

**MS. MECKENSTOCK:** Well, we are arguing that it wasn't eligible to do, but as I said, the difference in the basis for that argument is entirely different, and then the paragraph preceding the one that Your Honor just read from is the one

where the Court lays out the argument CBD is making about ineligibility, which is only a timeliness argument.

And so CBD is just concluding that that form of, quote-unquote, "eligibility" doesn't take the action out from under the scope of the statute because, again, these are fundamentally questions about agency authority to act, not agency authority to act in a timely manner.

And you can see that, I think, further up in the opinion where the Court is talking about the BIEL case, where it is laying out how courts think about these jurisdiction-stripping provisions, and it talks about looking at the agency's authority, and that's what the BIEL court did.  And so CBD was relying on that line of cases, which is the same analysis that the Supreme Court undertook in NAM, which again, was decided just the year before.

So I think it would be quite strange for the Ninth Circuit decision to have basically veered away from the NAM case, which also involved a jurisdiction-stripping provision using the word "under."  And the Supreme Court there had no trouble reaching the question of which provisions the agency was acting under in order to decide whether district courts are stripped of their decision.

And the Ninth Circuit's decision can't conflict with that, and I don't think it should be read to do so.

THE COURT:  So how then are you saying something other

than the Ninth Circuit got it wrong and the Supreme Court got it wrong?

**MS. MECKENSTOCK:**  So I'm not saying the Ninth Circuit got it wrong, Your Honor.  I think that the Ninth Circuit got it right.  I think the question it decided was whether an untimely submission changes the scope of authority provided by the CRA, and I think the Ninth Circuit decided it didn't.  It rejected that argument very squarely.

But that's not the argument we're making here.  The argument we're making here is that the scope of authority under the CRA turns entirely on the presence of a rule.

**THE COURT:**  Although wouldn't that, as the defense argues, read out Section 805 all together?  If really a plaintiff could come in and say there's this foundational question that the Court has to resolve as to the meaning of the statute, Section 805 doesn't reach that, what's the limiting principle there?

**MS. MECKENSTOCK:**  I think the limiting principle is that all of the courts always have jurisdiction to decide their own jurisdiction, and that's what the Supreme Court did in NAM.  It's what the Ninth Circuit did in National TPS Alliance, and it's what I think that the Ninth Circuit was doing in Bernhardt.

So the Court has a threshold, and in National TPS Alliance, the Ninth Circuit called this a first order question.

So there's a first order question of whether the jurisdiction-stripping provision applies, and as we know from NAM, that turns on "Did the agency act under the particular provision covered by the jurisdiction-stripping provision?" And so that is a question that this court can answer without reading 805 out of the books.  It's the same question the Sixth Circuit answered in the Ohio Telecom case.

So we have all of these cases where the courts are looking to assess whether the jurisdiction-stripping provision applies, and that doesn't read that provision out of the U.S. code.  It simply applies the law, and in some cases, the jurisdiction-stripping provision will apply, as it did in Bernhardt, and in some cases it won't, as we contend it shouldn't here.

But that doesn't read it out of the code.  It just gives it the meaning it was intended to have.

**THE COURT:**  And in your view, why would it apply in Bernhardt but not here, based on the reasoning of Bernhardt?

**MS. MECKENSTOCK:**  So I think, again, Bernhardt was rejecting the very specific argument that was made there and that we shouldn't read it as doing more than that, and there is longstanding case law and also just basic understanding of the way administrative law works that when an agency misses a deadline, that doesn't affect its authority to act.

And if it did, then courts couldn't order agencies to --

you know, give agencies new deadlines to perform acts when they miss them.  Agencies miss deadlines all the time, but that doesn't change the nature of the authority to act.  In other words, the agencies had an obligation to submit the report.  And yes, it had an obligation to submit the report in a timely manner, but the failure to do that didn't change the obligation.

And so that's what we're saying, is there is no obligation if there is no rule.  So it's just fundamentally a different question.

THE COURT:  All right.  And so would you agree with me that Bernhardt didn't lay out any of that reasoning that you just talked about in the way that it framed the basis for the decision in the case?

MS. MECKENSTOCK:  I don't think it explicated the issue, Your Honor, but I don't think that's a reason to read it more broadly than deciding the question that was presented, which was only a timeliness question.  I also don't think that's a reason to read it as undermining the Supreme Court, and I think if it had done that, we would see a different result from the Ninth Circuit and the National TPS Alliance case, which came later.

So I agree.  I think what the Court was doing was deciding the question, and I think the Court thought it was obvious that timeliness doesn't change authority.  And so therefore, this

wasn't a good argument, and they rejected it on its face in very short order without a lot of reasoning. And I just don't think that we should extrapolate from that that the Court decided something bigger than the question that was actually just presented to it.

THE COURT: All right. Why don't I hear from the defense on this point, really the statutory claims?

MR. STANDER: Yes, Your Honor.

I think California is attempting to perform jurisdictional gymnastics to try to get around this thing. The jurisdiction-stripping provision doesn't talk about authority. It doesn't say there's no jurisdiction if the agency doesn't have authority. It says no determination, finding, action, or omission shall be subject to judicial review.

And what California is challenging is the EPA's determination that its waivers are rules under the Congressional Review Act. And that's a determination under the Congressional Review Act, and so the claims are barred, and it's that simple.

Their trying to distinguish Bernhardt doesn't make any sense, because what Bernhardt said, as you've indicated today, is -- you know, the argument there was the agency action was not eligible for disapproval, and it's the same argument that's being made here, that agency action is not eligible. So it's on all fours with Bernhardt. The text of the

jurisdiction-stripping provision is what's dispositive, and it doesn't say anything at all about whether the agency has or doesn't have authority.

If there are no other questions on that specific argument, I'd also just add that there's a second, at least one other fundamental jurisdictional problem here, and that's Article III standing for these nonconstitutional claims.  California's briefs make two -- they have two theories of standing.  Both of them are based on the risk of future injury.

The first one is what I would call the "Congress might pass a statute in the future" theory, and it goes like this: They say what they're challenging is EPA's determination that the three waivers at issue here are rules under the CRA, and they say that increases the risk that EPA might make a similar determination as to other waivers in the future and that the EPA  might send those waivers to Congress and that Congress might pass a statute, a joint resolution disapproving those other waivers and thereby preempting other California regulations.

That's their theory, and it's wildly speculative.  It's based on the unfettered choice of Congress, a third party not before the Court, and it's based on the ultimate speculation, that Congress might someday pass a statute.

Their only other theory is what I would call the "EPA might deny a different waiver" theory, and this involves a

challenge to the reenactment provision.  So when Congress enacted the joint resolutions here, it triggered the CRA's reenactment provision.  That provision prohibits EPA from issuing a rule that is substantially the same as the rule that was disapproved, so from issuing a waiver that was substantially the same as the waiver that was disapproved.

And California's theory is that someday they might promulgate new regulations, and they might send those new regulations to EPA, and EPA might deny a waiver for those regulations based on the reenactment provision.

That's similarly speculative.  It's based on "someday" regulations.  There's no allegation in the complaint that California is planning on enacting more regulations.  So it fails because it's speculative, but it also has a separate problem that's very important to understand, and that's that a plaintiff can't use an EPA claim or an ultra vires claim to invalidate a statute.

So a successful EPA claim challenges EPA agency action, and the remedy is to set aside agency action.  It's not to set aside a statute.  And so invalidating the reenactment provision is not a remedy that's available for these claims, and they understand this.

That's why they've conceded that they're not challenging the validity of the resolutions themselves with their EPA claim and their ultra vires claim.  They concede that at page 25 of

their brief and then again at page 29.  And so for the same reason they can't invalidate the resolutions with these claims, they can't invalidate the reenactment provision.

So with two jurisdictional defects, the jurisdiction-stripping position, which I think is dispositive and there's not a way around it, it's clear on the text that the Ninth Circuit already addressed it.  And then you have standing on top of that, and so I think these claims are barred.

THE COURT:  It's sort of an unusual statute in that is there any source of enforceability of the requirements in the statute other than Congress's own good will in doing that?

MR. STANDER:  Well, I think this is a statute that is uniquely -- uniquely pertains to Congress's internal legislative procedures.  This is not a statute that's giving authority to agencies to regulate anyone.  This is a statute that is -- it's for Congress to review legislation.  All that agencies do is send a report to Congress, and then Congress decides if it wants to review the legislation, if it wants to pass a statute.

So this is, you know, unlike other jurisdiction-stripping provision -- like, for example, the TPS case involving immigration law.  It's a different statutory framework.  There, the agency has authority to regulate people in the world to make decisions about immigration.  And there's a

jurisdiction-stripping provision, and it's been applied in other cases. But the context there is about agencies out in the world doing things.

Here, it's just Congress. The whole statute is just for Congress to review legislation to decide what it wants to do as a matter of legislative priority. So we're in a very different world, and it's perfectly reasonable for this to be a much more muscular jurisdiction-stripping provision.

**THE COURT:** But just going to the basics, the plaintiffs are right. In the normal course, if there's a statute, the Court is empowered to say, "Is the triggering condition met under the statute?" There's a term in the statute, and there's not just blind deference to the other branches. That's what the courts do.

Here, I understand your argument about the jurisdiction-stripping provision, and I understand your point about the nature of the statute, but fundamentally, it is a statute. It has requirements in it. I think in this case, without venturing beyond my skis to start, there's certainly some irregularity about it -- let's say that -- about the process. And again, that's not a judicial finding. This is a discussion.

And it seems to me that the government's position is that Congress can decide to follow those provisions or not, and there's no consequence if they decide not to. Is that it?

**MR. STANDER:** Well, Congress was clear in the statute that they've enacted this as an exercise of its rules. And so Congress makes its own rules for itself. It's constitutionally committed to the exclusive discretion of Congress to decide whether it's going to use expedited debate procedures.

And this -- at the end of the day, what we're talking about is whether Congress used expedited debate procedures, ten hours of debate, to pass a statute or whether it would adhere to the filibuster. We're talking about exception to the filibuster rule at the end of the day.

And so whether Congress adheres to the filibuster, whether the Senate adheres to the filibuster, or whether it uses the expedited debate procedures, yes, that is exclusively 100 percent up to Congress to decide and not up to courts to decide. And that's really what's at the end of the road here, is that.

**THE COURT:** All right. But I noticed in your motion, for example, at page 14, you said, "Congress could have passed laws disapproving of these waivers without any involvement from EPA or by explicitly disagreeing with EPA's interpretation of the CRA and passing joint resolutions without submissions from the EPA."

But obviously the statute itself talks about the submission of reports, and that's what triggers the action. So are you saying that Congress could simply do something

completely different than what's laid out in the text of the CRA, and there's -- the only check on that would be their own political process basically?

**MR. STANDER:** Well, yes, Your Honor. Congress can always pass a statute. So Congress can pass a statute today that said the exact same thing as these joint resolutions. Congress can always pass a statute saying, you know, "We hereby preempt this law," or "We hereby disapprove of this agency action," at any time, whether under the CRA, whether outside the CRA.

So they can always do that. So, you know, the notion there needs to be a check on Congress for the legislative procedures that it uses, I think that's not true, and I think there are examples -- sorry.

**THE COURT:** I was just going to say but if they are going to do it under the CRA, do they have to follow the requirements of the CRA, or can they do whatever they want?

**MR. STANDER:** Well, I think in the Section 802 itself, you know, the statute says, Congress said, this was enacted as an exercise of the rulemaking power of Congress, and it said, "We reserve the right to change these rules at any time." So just like Congress reserves the right to change rules, parliamentary rules of any stripe, it can do so here.

And so I guess another point is when it passes a statute, it always does it when it does it constitutionally, through

bicameralism and presentment.  So if you think Congress didn't follow the -- what the CRA lays out, right, and then they pass a statute through bicameralism and presentment, that itself trumps any sort of prior legislative, you know, procedures itself.

So it's self-defining, self-consistent.  When Congress uses bicameralism and presentment, it is itself a statute.  Congress can't violate a prior statute by enacting a statute.  You have to harmonize the two things together.  The way to read two statutes -- the Congressional Review Act and a joint resolution -- is did Congress pass both of them and harmonize them, rather than saying there's some kind of conflict that's problematic.

**THE COURT:**  All right.  So the answer is it truly is purely political?

**MR. STANDER:**  That is what the statute -- so yes, Your Honor, and that's what the statute says itself.  And that's why there's this jurisdiction-stripping provision, I'd submit as well.

**THE COURT:**  And if Congress were to decide to amend the CRA for example, would that have to be done through bicameralism and presentment?

**MR. STANDER:**  Yes.  If Congress wants to amend the CRA, then yes, that's a statute.  They would amend it through bicameralism and presentment.

**THE COURT:** All right. And I don't know if we're still even in the purely statutory world or not still, but I did notice the argument about the -- what the parties are referencing as the second point of order.

And setting aside the non-justiciability issues -- I understand those arguments -- but I am just curious, as a factual matter, what the government's position is as to what happens, because the second point of order, as it's quoted in the motion, says, "Joint resolutions that meet all requirements of Section 802 of the CRA or are disapproving of agency actions, which have been determined to be rules subject to the CRA by a legal decision from the GAO, are entitled to expedited procedures under the CRA."

Is that a modification of the CRA itself?

**MR. STANDER:** No. No. I don't read that as a modification of that. I read it as just a way for the Senate to determine whether any specific agency action qualifies for the procedures of the CRA. So the Senate -- so this goes back to our jurisdiction-stripping provision. There's a determination at the outset of whether some agency action fits inside or outside the CRA.

I mean, and this is the Senate saying, "All right. In the past, we sort of deferred to the GAO. Whatever the GAO says, that's good enough for us. We'll let it be our advisory body."

Then there was a dispute between the Senate and GAO, and

they have to decide, "How are we going to resolve this?  Who gets to decide?  Is it Congress?  Is it the votes of Congress, or is it GAO?"

And so what they said in that rule is, "Okay.  In order to determine, make this determination that something qualifies or not, we'll either do it ourselves, just read the words there.  It will either be something that, in fact, qualifies and says the procedural point of order or if GAO says it does."

And then after the Senate issued that point of order, adopted that point of order, the full Senate voted.  So before proceeding with debate, using the legislative procedures of the CRA, before doing that, the majority leader introduced a motion to proceed with debate as to each of the resolutions, as to each of the waivers, put it to the Senate.  The full Senate voted and voted to move forward.

So that's a vote of the Senate deciding -- making the determination, we'll say, that the waivers are properly subject to the CRA.  Here's what they said about it, and we quote this in our brief.  So this is Senator Capito.  She said, "The procedural issue before the Senate was simply whether the GAO staff should be able to block resolutions of disapproval against agency-submitted rules."

And then Senator Fischer said, "GAO's role is just an advisory role, and it is up to us, it is up to Congress, to determine what constitutes a rule.  We are reclaiming our

congressional authority under the Congressional Review Act," and that's at page 27 of our brief. And so I guess I'll just add one other. Senator Thune concluded that waivers, quote, "are clearly rules in substance given their nationwide impact and scope."

So that was what was going on there, is the Senate determining for itself what qualifies. And that's what that point of order is all about.

**THE COURT:** All right. I want to give you a chance to respond at least on the -- theoretically, we're still on the statutory piece of this, and then we'll move in a minute to the constitutional arguments.

**MS. MECKENSTOCK:** So do you want me to go back to the discussion about standing or 805?

**THE COURT:** If you have anything more on either of those statutory-focused points.

**MS. MECKENSTOCK:** Yeah, Your Honor.

I would just simply say that, you know, they're effectively saying that Congress passed a statute that says courts don't have the power to determine their own jurisdiction and that that's what 805 says, and I just don't think it does. Congress doesn't usually pass statutes that contradict background, well-established law. And I also don't think that we should read Bernhardt as doing that either.

On standing, for these statutory claims, the U.S. is

correct that we have two theories.  I think they're mischaracterizing both of them.

The first theory isn't that -- just that Congress will pass a statute, and even if that were the theory, it's not wildly speculative by any means.  Congress has only done this three times in the 60-plus years that EPA has been granting waivers, and the only three times it did so were when EPA reported to reclassify waivers and rules and sent them over to Congress.

So the idea that it's speculative that if EPA did that again, Congress would do the same thing, just doesn't fly.  And our allegations are more than adequate to satisfy the standing requirement.

And the citation that we had to -- there's a Ninth Circuit case involving employment discrimination where the Court looks to the history of the employer's discrimination and the possibility that it might happen again and grants that the plaintiff established standing, and we more than satisfy those requirements.  And that's *LS v. Costco*, cited in our brief.

And on our second theory, they have this argument that we can't proceed now to find out whether the reenactment provision applies, but I think the closely analogue injury here is a pre-enforcement injury.  So California is in the process of considering its next regulations.

And they say we don't allege that we'll do that, but in

paragraph 47 of our complaint, we make clear that we still have a very severe air pollution problem in California, and California has been regulating to reduce that problem for longer than the federal government has done, since the 1950s.

And so the idea that there won't be a situation where we promulgate another regulation and ask for another waiver is not credible. And in any event, we have plausibly alleged that we will and therefore that we'll be subject to the reenactment provision, and we have to know -- we are in the process of designing that regulation now. And just as in a pre-enforcement challenge, we need to know what law applies.

And so we are being injured by the fact that we -- that they're threatening to enforce that reenactment provision against a future waiver, as it injures our ability to promulgate the regulations we think are best suited for California.

Turning to the constitutional questions, Your Honor --

THE COURT: So with respect to those --

MS. MECKENSTOCK: Yes.

THE COURT: -- let me frame them, because I want to be sure I understand what the arguments are, and at least the way that -- well, as I understand it, there are essentially two variants of the separation of powers argument. One is that this is impermissible legislative adjudication, essentially.

The second separation of powers prong is that the

legislature improperly delegated authority to the executive, and the way that it's framed is essentially that by, in your argument, framing it such that the agency was in charge of the triggering condition for the CRA, that was impermissible.  So that's the separation of powers angle.

And then there is, you know, what I'm thinking of as the Tenth Amendment structural principles of federalism argument. Are those your two constitutional arguments?

**MS. MECKENSTOCK:**  Those are the two counts we have and three claims, I would say, yes.

**THE COURT:**  Okay.  All right.  So with respect to those three, the legislative adjudication argument is sort of an interesting one, and I delved into some cases from the 1800s and the early 1900s that the parties were citing.  I take it you don't dispute the defendants' position that the Supreme Court has never extended that principle beyond Article III courts to agencies?

**MS. MECKENSTOCK:**  I wouldn't dispute that point entirely, Your Honor, but I would make two points in response, one being that the Ninth Circuit did address that question squarely in their decision in Chadha, which then went up to the Supreme Court and was decided on other grounds.

The Ninth Circuit said summary reversal of the executive's decision by the legislature in a single case without an indication of a need to change the standards or general rules

to be applied detracts from the authority of the second branch and, to that extent, undermines its powers.

So I would say there was -- there is a Ninth Circuit decision that is supportive of our position here, and I would also say that there is a footnote in Chadha, and it's Footnote 8 in the Supreme Court's decision in Chadha, that also supports our position because there, the Court suggested that Congress could, quote, "presumably legislate about Mr. Chadha's immigration status," but could only do so presumably during the time allocated or allotted in Section 244(c)(2), which is the section that creates the period for congressional review of the AG's temporary suspension order.

So in other words, once the agency's action became final after the period in 244(c)(2), the Court's footnote is suggesting that Congress could not then legislate as to Mr. Chadha's immigration status, so --

THE COURT: Right, although it seemed to me that Footnote 22 was directly on point, and it seemed that Justice Powell effectively agreed with the Ninth Circuit, the holding that you referred to earlier, and the majority just disagreed. What do I make of Footnote 22?

MS. MECKENSTOCK: Yeah, Your Honor.

So I don't think that the Supreme Court disagreed with the Ninth Circuit. I think Justice Powell thought the AG's temporary suspension was a judicial action and that, therefore,

the legislature was intruding upon the judicial power.

And the majority in Chadha agreed that there was a judicial cast to the AG's temporary suspension but then went on to say that it didn't present a case or controversy and that, therefore, that was an imperfect analogy and the only way that it didn't present -- the reason it didn't present a case or controversy was that it wasn't final.

And so that's an enormous distinction between the agency action in Chadha, which was a temporary suspension of a removal order and that that would only become final if Congress failed to act within, I think, 18 months. And so we have there essentially a proposal for legislation, whereas here, we have a final agency adjudication.

And so I don't think that Footnote 22 really addresses the situation we have here because I think the Court was very focused on the lack of finality.

THE COURT: Well, the footnote says, "Justice Powell's statement that the one-house veto in this case is clearly adjudicatory simply is not supported by his accompanying assertion that the House has assumed a function ordinarily entrusted to the federal courts."

MS. MECKENSTOCK: Yes, and the reason that the Court concluded that the piece of -- the resolution in Chadha was legislative and not adjudicatory was in part because they considered the action from the AG to be a recommendation for

legislation, that Congress had preserved for itself the ability to make law and that that's what Congress was doing.

But here, we don't have any -- Congress has not made any law, and that is the distinction that runs through all of these cases from Klein to Robertson to Bank Markazi and then to mount Graham, Cook Inlet, Alliance For Wild Rockies.

In all of these cases, the fundamental question is did Congress make law?  Did it amend the underlying substantive federal law in any way, and if it did, then it acted within its sphere; and if it didn't, as it did not do here, then it acted outside of its sphere and interfered in another branch's activities.  And it doesn't matter which branch that is.

**THE COURT:**  Well, that's your position.  Maybe it will be adopted someday.  It hasn't been yet, right?  You're asking for, you know, a stretch in the law and one that you think is appropriate and warranted.  But as I read it, none of the cases that you're relying on extended that Article III principle to the actions of the executive, right?

**MS. MECKENSTOCK:**  I think that's right, Your Honor. And, again, I think you can have -- law arises, law is made when unprecedented circumstances arise, and none of us have identified another situation where Congress has done anything like this where it has literally just, quote, "disapproved of agency adjudications," and so the fact that we don't have any case directly on point just goes to the unprecedented nature of

the action here.

But I also think the important element of these cases is not about which power -- which other branch is being intruded upon but really whether Congress is appropriately staying in its lane. And that, again, doesn't matter whether the branch that is intruded upon is the judiciary or the executive. The question is still fundamentally that Congress's role is limited to making law.

And it's a big role. They get to do a lot. But it has limits, and that limit is that they have to stay in that lane, and I don't think that -- I think that's the principles, that those are the principles that run through those lines of cases, and they're directly applicable.

We also have cases like the City of Arlington and the Arthrex case where the Court has recognized that executive power includes both the power to make rules and the power to adjudicate. So we have Supreme Court precedent directly on the point that agencies do adjudicate, even in a constitutional sense.

And so I don't know that there's -- they haven't identified any constitutional principle or case law that says you can't extend this principle, this barrier to Congress going outside of its lane, outside of the Article III.

THE COURT: Probably fair, although the cases do talk a lot about the, for what I think of for lack of a better term

is the, essentially the sanctity of the Article III powers. For example, you can't undo a judgment that's been entered by a court.

MS. MECKENSTOCK:  Yes, Your Honor, but that comes up in a different context.  So I do want to be clear that there's a sort of separate but related line of cases here involving Wheeling Bridge and then also, I would say, Paramino Lumber and some of the other cases that they're relying on where the question isn't whether Congress amended the law, because in those cases -- and I would throw Plaut into this mix too -- it's very clear that Congress amended the law, and there isn't even a dispute about that.

And then there is a question about how far that Congress can intrude upon the other branches when it makes law, but that's a different question from whether Congress is making law at all.  And that's -- our claim is predicated on the line of cases involving that question.

And so those cases are not really about Article III. They're about Article I and whether Congress is exceeding its Article I powers.

THE COURT:  Okay.  Now, again, Bernhardt dealt with this question too and essentially found that the CRA disapproval resolutions there did amend the substantive law. And what's the distinction here?

MS. MECKENSTOCK:  Well, the distinction, Your Honor,

is that there was an undisputed rule that through the rule had changed the substantive federal law applicable in Alaska's wildlife refuges, and so that --

**THE COURT:**  But you'd agree -- and the defendants make this point, and it's not subject to dispute -- the agency can't change the statute, right?

**MS. MECKENSTOCK:**  That's true, but they did change -- but the agency can change the law that applies in the wildlife refuges, and they very clearly did, and that was never in dispute and couldn't have been disputed.

And so when Congress repealed, directed the agency to appeal that rule, it did the same.  It changed the law back. So Congress did effectuate a change in the law through that and often does through actual CRA resolutions, targeting actual rules, because the rule changes the law, and then the repeal of the rule changes it back.

**THE COURT:**  But then how does that not devolve into your underlying argument, which is these aren't real CRA actions?

**MS. MECKENSTOCK:**  Well, it's just -- so setting aside the question of the application of 805, there's still a question about whether this was an adjudication, whether that is in an EPA sense or a constitutional sense.  And if they are adjudications, and I think they very clearly are, then when Congress reversed it, it didn't change the law.

And I think we know that these are adjudications, Your Honor, both because the definitions in the EPA include a license in the definition of an adjudicatory order, and a license is defined as something that grants a statutory exemption, which is exactly what EPA does when it grants a waiver. It exempts the state of California from otherwise applicable statutory preemption.

So clearly, we meet the statutory definition. But I think if there was any question at all, the text of the waiver provision itself answers the question because it directs EPA to, quote, "waive application." That is an application of the law, not making law.

So before the waiver -- before we get the waiver, Section 209(a) applies, and California is preempted. When we get the waiver, Section 209(a) no longer applies, and we are no longer preempted. That's an application of Section 209(a), and that's exactly the same thing courts do when they adjudicate preemption cases. So there's nothing about that that makes law. And so when Congress reverses it, it is not making law either.

THE COURT: Is it your position that Congress, under no circumstances, could terminate your waivers once they were granted?

MS. MECKENSTOCK: I think here we have a question about means, Your Honor. So as we know from the *Horn v.*

*Department of Agriculture* case, the Constitution cares about means as much as ends.  We know that from Munoz-Flores as well.  And so I think it's a question of how.  We don't dispute that Congress has the power to preempt states from regulating motor vehicle emissions.

They did that in Section 209(a), and they established the waiver provision, and we don't dispute their authority to do that.  What we do dispute is the authority to disapprove and do no more of an agency adjudication.

**THE COURT:**  So in essence, would that make the CRA entirely unconstitutional in your view?

**MS. MECKENSTOCK:**  No, because when Congress disapproves of a rule, as it did in the Bernhardt case, it is changing the law.  It is making law.  It is saying these requirements that the Department of Interior promulgated for Alaska's wildlife refuges no longer apply.

That's changing the law that applies, and they're -- but they didn't do that here, Your Honor.  They simply disapproved of the agency's application of the law through an adjudication, and so Congress did not make law here.

And the U.S. wants to talk -- wants to rely on Section 801 of the reenactment provision, Section 801(b) of the Congressional Review Act, but A, they don't have a single case in any of this body of law that uses -- that relies on another statute to say, "Well, you know that Congress made law under

this statute because this other statute is now triggered."

They don't have a single case that says that, and it makes total sense why they don't because, as the Court said in Bank Markazi, Congress can't -- and *Smith v. Jones*, Congress can't say Smith wins.  And it doesn't change that as a constitutional matter that if Smith won he would get attorney fees under another statute.

So the follow-on effects that flow from an adjudication don't matter for purposes of whether Congress made law. Congress simply can't say in *Smith v. Jones*, "Smith wins, and it doesn't matter what other effects that determination might have."

**THE COURT:**  But what I'm trying to understand is that starts to sound like an argument that the waiver is some sort of vested benefit that is beyond congress's ability to take back.  Is that what you're saying?

**MS. MECKENSTOCK:**  No, Your Honor.  If Congress wants to change the substantive law -- so I think you can use, you know, Paramino Lumber, one of the cases that they raised for the first time in reply, that you could use that case and say it was about a workers' compensation award, and Congress passed a substantive statute that said, "Agency, you need to consider some new evidence about this person and their workers' compensation benefits, and you need to institute a new proceeding.

"We're not telling you how that proceeding should come out, but you need to consider new evidence, and here's a timeline, a new timeline for you to act under."

Those are all changes to the substantive law. Congress could do the same thing here. They could pass a statute that tells EPA, "We want you to open a new waiver proceeding and consider it, and here's some new criteria. We don't want you to grant California a waiver for this particular regulation. We don't think, you know, this type of regulation should apply or create some new criteria that would potentially bar the granting of the waiver."

But that's making substantive law. That's changing the waiver criteria. And they didn't do that here, Your Honor. The enacted text, which is everything following the resolving clause, simply says, "Congress disapproves of this action," and then it provides a Federal Register notice, which, by the way, expressly says, "This is not a rule."

So all they did was disapprove of an agency final adjudication. That's literally all the statute does, and we contend that that's not constitutional, and it doesn't matter that they could achieve it through another means. As I mentioned, in the *Horn v. Department of Agriculture* case, the Court said, "What you're doing to manage raisin production is a taking."

That doesn't mean you couldn't do it through a

constitutional means like just limiting how many raisins are produced, right? Congress has lots of means available to itself. It can't choose unconstitutional ones.

THE COURT: How would that principle that you just stated be consistent with Wheeling Bridge, for example, which didn't say, "Go back and redo it"? It said, "Here's the answer."

MS. MECKENSTOCK: Well, it didn't just say, "Here's the answer," Your Honor. It said, "This bridge is now a post road." In other words, "We as Congress have decided, in our authority to determine what are post roads, that we need this road for the delivery of the mail, and we need the bridge to be at the height it is currently at in order to be this post road."

That did affect the kind of follow-on consequences of the Court's previous nuisance determination, but it did not sit in judgment of that nuisance determination. It literally made substantive law changing the legal status of the bridge.

And so again, these cases turn on whether Congress is actually making law, and our point is that they didn't do that here. They could have, but they chose not to, and that choice is a constitutional problem.

THE COURT: All right. What about this point? I'll let you be heard on the -- really the legislative adjudication theory.

**MR. STANDER:** Thank you, Your Honor.

So California's theory that they've laid out in their brief is that Congress categorically lacks power to nullify an administrative order by statute. As I think this discussion illustrated, the state has no affirmative support for this argument. If you look at the paragraph at the bottom of page 12 of their brief -- it carries over to page 13 -- that's their affirmative argument, and they cite no case remotely holding that Congress lacks that power or suggesting that Congress lacks that power.

And then on the other side, we cite two Supreme Court cases that directly refute the argument. So that's Plaut vs. Spendthrift Farm and Paramino Lumber vs. Marshall. So in Paramino Lumber, the Supreme Court upheld a statute that retroactively ordered an administrative agency to reopen a final order that had awarded monetary compensation to an employee and had adjudicated liability, monetary liability between employer and employee.

And the Supreme Court rejected a due process argument, it rejected a legislative adjudication argument, and then it distinguished cases and statutes that apply to Article III judgments from cases and statutes that apply to administrative orders.

The Supreme Court then reaffirmed that in Plaut. Plaut, as you mentioned, held that Congress lacks power to order

Article III courts to reopen final judgments, and then Plaut distinguishes statutes that affect non-Article III courts or administrative orders.

And in that paragraph, it cites Paramino Lumber, and then it says nothing in our holding today calls these cases into question, so that principle has been -- we're past this. As a matter of Supreme Court black-letter law, it is squarely refuted. So this notion of we don't have any cases that say the opposite is -- it's just not true.

Now, I hear today that we've cited Paramino Lumber for the first time in our reply, and that's, you know, because the complaint -- this claim in the complaint takes up all of two paragraphs. They cite one case. It's Bank Markazi. And the first time they articulated this theory of nullification of administrative orders was in their opposition brief.

So they keep changing their theory. They thought Bank Markazi was a good idea. That, as we've heard today, does not apply to administrative agencies. It's solely applicable to Article III courts, just the same way the Court drew that distinction in Plaut.

All this discussion today about Bank Markazi and all these cases that say -- and Wheeling Bridge, the Court doesn't need to get into any of that. The only thing that the Court can resolve is on very simple grounds, and that's based on two cases: Paramino Lumber and Plaut. All the discussion about

Wheeling Bridge, about Bank Markazi, about the varieties of administrative action, is all interesting, and we've made arguments in our briefs about why we prevail even under those standards, but I think the Court can avoid all that in its opinion.

As far as Chadha, at every turn, every case that California says supports it, when you look, it actually cuts the other way.  And so they're left distinguishing all of their own cases.  So their best support is the concurrence in Chadha.  That concurrence, as we said in our brief -- it draws on the same theory that the Ninth Circuit's opinion did in Chadha.

The Supreme Court rejected it, so California's left trying to distinguish its own precedent.  The same thing with Bank Markazi.  So all of those cases come out the wrong way for California.  In those cases, the Court has applied an extremely deferential standard of review, and they all come out upholding the statute.

And the standard is -- just backing up and clarifying again, these cases don't apply to administrative order.  So we're in a world here where we're trying to map this on from Article III courts into administrative orders, and it just doesn't work.

But if we try to do it, the standard is extremely deferential, and the standard is if the statute amends the law in any detectable way.  That's from the Ninth Circuit.  So when

we look at these statutes here, the resolutions do amend the law in any detectable way because they amend the EPA's authority to issue waivers.

Before these resolutions, EPA had authority under the Clean Air Act to issue waivers for these regulations.  They no longer have that authority.  So that's a simple amendment in the authority to issue waivers, and that's the end of the matter.  It's a detectable change in the law.

So I guess finally, I would say that all of this -- it's sort of much ado about nothing.  It's a "magic words" argument.  California concedes that Congress can pass a statute that says the regulations are hereby preempted, period, and that would be constitutional.

But somehow, if it says the waivers are disapproved, the preemption waivers are disapproved, that's a supposed -- suddenly a constitutional, flagrant constitutional violation.  That just doesn't pass the sort of gut test, and it doesn't have any legal support, and it's directly contradicted by binding Supreme Court precedent.

**THE COURT:**  All right.  Last word on that argument?

**MS. MECKENSTOCK:**  From me?

**THE COURT:**  Yeah.

**MS. MECKENSTOCK:**  Thank you, Your Honor.

So as I said earlier, Paramino Lumber, Plaut, and Wheeling Bridge are in a separate line of cases where the Court is

addressing how -- when Congress amends a substantive law, how far can it go into Article III, and that is not the premise of our claim here.

And as I indicated earlier, our claim relies on the other cases where the question is did Congress make law?  Did it exercise the power it has?  And we don't think it did, and they don't really have a good argument as to how it did.

All I heard was we're making a "magic words" argument, when in fact, this question about whether the text enacted by Congress changes the substantive law, that is the question in all of these cases, including Bank Markazi, which we cited in our complaint.  And it's not a "magic words" argument; it's a separation of powers question.

And to say -- they say that EPA no longer has the authority to issue these waivers again, but that's grounded, again, in 801.  And they still don't have a case saying that what another statute says goes to whether Congress made law in this resolution.

THE COURT:  But I don't get it.  The resolution directly says -- well, so your point is what the resolution says is that they're nullified, basically?

MS. MECKENSTOCK:  Correct.

THE COURT:  But that then also triggers the reenactment clause, right?

MS. MECKENSTOCK:  Well, if it is a CRA resolution,

yes.  It is our position that it is not.  But regardless, for purposes of this claim, that's a follow-on effect from a different statute.  And again, just as the Supreme Court said, you know, Congress lacks the power to say Smith wins in *Smith v. Jones*.

And they've never suggested remotely that that changes, that Congress's power to say Smith wins is different just because Smith would get a benefit under another statute.  So it doesn't matter that there are follow-on effects under other statutes.

That doesn't change what Congress did with this one.  And the claim -- that's where the text does matter.  And they want to say that it doesn't, but it has mattered in all of these cases.  And we know, again, from the *Horn v. Department of Agriculture* case, that means do matter under the Constitution.  And the fact that Congress could have passed a different statute doesn't matter to the constitutionality of this one.

**THE COURT:**  But what are the cases that you affirmatively think are best for you, you know, essentially, when it came to the key premise?

You know, for example, in your opposition, you say Defendants claim that legislative adjudication is permissible so long as it intrudes upon the executive's work rather than the judiciary's, but neither the Constitution nor the case law can sustain such a distinction.  But then there's a Cf. cite to

Arthrex.

I mean, what do you think -- are your two best cases?

**MS. MECKENSTOCK:** So Your Honor, I think, frankly, it's the entire line of cases starting from Klein and going all the way through Bank Markazi and Robertson and the Ninth Circuit cases, because the fundamental question in these separation of powers cases is the same question before the Court now, which is did Congress make law? Because if it did, we don't have a claim.

But it didn't, and therefore, we do have a claim, because Congress did something else: It exercised the authority that doesn't belong to it, and it doesn't matter whether that authority belongs to the judiciary or the executive branch.

That's what all -- that's why all of these cases focus on this question, "Did Congress amend the law?" And they look to the text, the enacted text of the laws Congress passed in order to answer that question.

And if you look at the enacted text here, it says Congress disapproves of insert Federal Register notice that says it's an adjudication. That order shall have no -- it says that rule shall have no force or effect.

But the use of the word "rule" doesn't transform the underlying action. It can't as a constitutional matter. It also can't amend the definition of what a rule is under the CRA because it didn't purport to do that. It solely purported to

say this is nullified.

THE COURT:  All right.  And so you would agree, you have to agree that the Government is citing the test, right?  If I were to get to the point where I was even considering the sort of Article III authority and importing it into this context, it demands a high degree of judicial tolerance for an act of Congress that is intended to affect litigation so long as it changes the underlying substantive law in any detectable way.

And so I would -- to accept your argument, I would have to agree that the resolutions did not change the underlying substantive law in any detectable way?

MS. MECKENSTOCK:  I think that's right, Your Honor.  And again, I don't think it does.  And again, we're looking solely at the enacted text of the resolutions, which just disapproves of an adjudication.  It doesn't create new statutory criteria.

It doesn't have a notwithstanding clause like you see in a number of these cases that came out the other way where Congress said, "Notwithstanding the statute over here, we want you to do something else, because that's an obvious change in the substantive law."

We don't have anything like that here, nor do we have anything like in Paramino Lumber where, you know, my opposing counsel said that they directed the agency to reopen an earlier

case.  But that's not what happened.  They specifically wanted the compensation under the agency's original order to remain in place.  They asked the agency to open a new proceeding, right?

That's a change in substantive law.  It's a direction to the agency to do something, not to nullify the existing adjudicatory order.  So we're back to the fact that they don't have a case that supports their proposition.

And I would, again, ask the Court to look at Footnote 8 in Chadha, which I think entirely supports our position here, which is Congress thought there might even be constitutional problems -- I mean the Court thought there might be constitutional problems with Congress legislating about Mr. Chadha's adjudication, even while the agency action was nonfinal.

But they did say that Congress could presumably do so but only in that limited window before the action was final. There's nothing about that footnote or anything in the Chadha decision from the Supreme Court that suggests that they don't think that Congress needs to stay in its lane with respect to the executive branch and only has to stay in its lane with respect to the judiciary.

So again, those cases are fundamentally about Article I. And yes, they do talk about Article III and the intrusion into it, but they are fundamentally at bottom about whether Congress is staying in its Article I lane.

**THE COURT:** Okay. Second separation of powers angle is delegation of power to the executive, and I just want to be sure I understand what you're saying, because I think I understand the parties' positions on this one. I just will have to decide which I agree with.

But it sounds like you're saying the Senate felt like it couldn't take these actions itself, so it worked with the agency to package this as a rule and then entirely deferred to that in its exercise of its legislative work? I mean, is that the gist of the argument?

**MS. MECKENSTOCK:** So the gist of the argument, Your Honor, is that yes, the second point of order is a reflexive deference to the executive branch and puts the executive branch rather than the Senate in charge of when these expedited procedures apply.

And the -- my opposing counsel, I think, mischaracterizes what actually happened there with the second point of order, and I think the best place to look to know what it did is two places. One, when Senator Thune introduced the point of order, he said it was needed in order to determine, quote, "how to apply the rules when faced with a new situation."

And that new situation, he says, is we have actions that an agency says are a rule, and then we have GAO saying they're not, and what do we do in that situation? And what they did in that situation is defer entirely to the agency instead of GAO.

And they want to characterize this as some independent judgment by the Senate of what constitutes a rule.

Bit first of all, the Senate cannot change the definition of a rule through a point of order.  That's in the statute. It's not even in Section 802, which are the internal rules. It's in 804.

And one house can't change that, and they didn't purport to.  And in fact, they didn't want to make an independent determination that it was a rule.  And the reason we know that is that they -- the majority in the Senate did not want to directly overrule the Senate parliamentarian.  So the way that --

THE COURT:  So all of this though -- I mean, whether we think that the Senate's processes are good or bad or that they followed them exact, that's way beyond the competence of the Court, in my view.

So but let me ask this:  What is it that you think in the point of order reflects this deference, in the point of order itself?

MS. MECKENSTOCK:  It's the first part, Your Honor, where they sort of say joint resolutions that meet all the requirements of Section 802 of the CRA, which I think they mean -- which they seem to mean the agency has sent it over and said it meets all of the requirements of Section 802.

And we know that that's not an independent determination

by the Senate because if it had been, we would have seen an overruling of the parliamentarian.  And instead, we have Senator Capito saying the procedural action we have taken today is not about the filibuster and not about the parliamentarian.  Instead, the procedural issue before the Senate was simply whether the GAO staff should be able to block resolutions of disapproval against agency-submitted rules.

So this is the Senate saying, "What the agency says is a rule is a rule, and we're going to let the executive branch decide when these expedited procedures are triggered."

And Your Honor, I understand that it's unusual for a court to be presented with a question about internal Senate rules, but as you can tell from our brief, the Supreme Court recognized that there were constitutional limits enforceable by courts on those rules in *United States v. Ballin* in 1892, and it reiterated that quote in Noel Canning much more recently.

So I do think that there is a nonpolitical question here, and Munoz-Flores definitely underscores the point because that also involved the procedure by which a bill was passed, did it meet the origination clause or not.  And the Supreme Court held that that was not a political question.

So it is not true, Your Honor, that you are somehow constitutionally forbidden from examining the internal rules of how a bill becomes a law.

**THE COURT:**  How is that consistent with a case like

Consejo?

MS. MECKENSTOCK:  Well, Consejo involved a much narrower question in which -- about a specific issue where the Senate or the House -- I'm sorry that I can't remember which -- declined to follow its ordinary procedures.  And so here, we're not challenging a decision not to follow some other procedure.  We're challenging the procedure they actually followed, the actual process.

And that is what Ballin says is subject to constitutional limits, that the process by which the Senate and the house conduct its business is largely under their control but with the exception that there are constitutional constraints on it.

THE COURT:  Fair, but it comes back to -- it hinges on your claim that this was an unconstitutional delegation, right?  That's the claim, and I have to up or down that claim.  But that, it seems to me, is not really about -- well, I think that covers it.  That's the question.  I understand your delegation argument.

MS. MECKENSTOCK:  Well, I think at a minimum, Your Honor, we have at least stated a claim there in terms of the factual allegations we made about the Senate procedure.

THE COURT:  Well, and that's certainly one question I had.  Obviously, this was presented on a motion to dismiss, and so really I'm looking at the four corners of the complaint, and certainly as to this claim, at least, there seems to be a lot,

you know, that's being presented on both sides about what actually happened and what got presented.

And so I guess the question for the government is how is that susceptible to dismissal at this stage, given the inferences that I have to make?  I mean, you would have to -- I would have to take all reasonable inferences from what they've pled as true at this point and wouldn't go behind that in terms of looking at the Congressional Record, would I?

**MR. STANDER:**  Well, Your Honor, these are all pure questions of law.  We're talking about legislative history.  We're talking about legislative history.  It's -- the notion that there would be fact disputes about what a senator meant, it borders on the absurd.

**THE COURT:**  Well, just what I'm saying is what are you asking me to judicially notice that's outside the four corners of the complaint?

**MR. STANDER:**  There's the legislative history.  The proceedings on the Senate floor is the only thing -- and this is not us, I don't think, asking to judicially notice.  I think it's the plaintiffs' complaint.  They're all appended to the plaintiffs' complaint, and it's pure legislative history.

And I think, you know, taking a step back from this, this is far out of bounds as far as, you know, nonjusticiable political question.  I think what we're talking about here are procedures for debating legislation.  We're talking about an

exception to the filibuster, you know, adhering to the filibuster or expedited legislative procedures.

I think there's a square holding from the Ninth Circuit saying that the choice of procedures for debating legislation is a nonjusticiable political question. It's committed, textually committed to Congress in the rules clause of Article I, Section 5. It would grossly interfere with the exclusive prerogative of the legislative branch, and maybe above all, there is a real lack of a judicially manageable standard here.

So in a real non-delegation claim, what the Court, Supreme Court has adopted is the intelligible principle test. That's a notoriously hard test to apply, and it's also notoriously deferential to Congress. California doesn't seem to want to adopt -- to ask for that test.

They haven't articulated any test, any standard judicially manageable or otherwise, and it's sort of impossible to ascertain how much. What's the line for what Congress can do in relying on, you know, all of the outside sources, reports from agencies, the lobbyists.

You know, suppose Congress passed a rule that amended -- it was an exception to the filibuster, and it said, "Anytime the Secretary of State sends us a report that says emergency legislation is needed for an important issue of foreign policy, we will not adhere to the filibuster," right?

California's view is that's unconstitutional because it

delegates to the Secretary of State the sole authority to decide when the filibuster will apply. I don't know where the judicially manageable standard is in all of this, but it's a nonjusticiable political question.

On the merits, you know, the procedural rule, the second point of order, if we're going to get into that, I think as far as a motion to dismiss, I think we would read the words, the four corners of the rule. It doesn't say at all what California wants it to say. I think when asked, the response was, "Well, it seems to say," or, "I think it says they were going to defer to the agency.

That's not what the rule says. It's not what Congress did, and I think the only thing the Court needs to resolve this claim is the vote of the Senate. The full Senate voted for itself. You know, again, there were motions to proceed with debate using the Congressional Review Act that the Senate majority leader introduced to the full Senate before using these procedures on each of the resolutions as to each of the waivers, and said, "Shall we proceed with these debate -- with this?"

And the full Senate voted. So it's self-defining. When the Senate votes, it's not delegating to somebody else the power to take that vote.

**THE COURT:** All right. So on this point you were referencing a case that sounded like it was "Vallin." What is

the case you're --

**MS. MECKENSTOCK:** *United States v. Ballin*, B-A-L-L-I-N, Your Honor.

**THE COURT:** Ballin. All right.

**MS. MECKENSTOCK:** And then restating in the Noel Canning -- and that's the case in which the Supreme Court says now twice that there are these constitutional limits on specifically the internal rules of the two houses of Congress and makes clear that those are judicially enforceable and are not a political question.

**THE COURT:** Okay. I'll look at those cases and the others that were cited.

The last argument is the Tenth Amendment argument. I'll hear whatever argument you have briefly on that one.

**MS. MECKENSTOCK:** Sure, Your Honor.

I think I would like to start by just laying out what I think the elements of this claim are. And I think initially you need an action by the federal government -- here, the resolutions -- that invades the rights of states or the prerogatives of their governments.

And I'm pulling that from the quote in Garcia from Madison in the Federalist Papers where the Court is affirming that they agree that the framers designed the federal government to be disinclined to do those two things, to invade the rights of states or the prerogatives of their governments. So that's one

element.

And then the second element is that you need that action to have been taken by the federal government through an unprecedented or at least extraordinary political process, so not in the ordinary way one would expect to see type of legislative or action occur. And then those procedural anomalies cannot be explained away as inadvertence or anything other than an attack on a particular state or states.

And I'm pulling this from obviously the language in Baker that refers to an extraordinarily defective national political process. So we do need something extraordinary. And I think the word "defective" has to be given meaning through the lens of both an understanding of federalism as well as the references in Baker to the kinds of things that would satisfy this claim, and that would be singling out states and depriving them of political participation.

So there's a targeting aspect involved in this claim. And this -- our claim satisfies both of those elements, Your Honor. This is a situation in which everyone involved in both the executive and legislative branches of the federal government knew the CRA did not apply.

EPA -- that had been EPA's position for decades consistently, and then Congress knew because they asked GAO this question in 2022 and got an answer in 2023. And that's attached as Appendix A to our complaint. And you can tell from

page 1 of that exhibit that it was Senator Capito who asked GAO for that decision.

Congress relied on that decision.  No resolutions were introduced concerning that waiver.  And actually, in both the House and the Senate, members of Congress introduced bills to repeal the waiver.  And we allege all of this in the complaint on the grounds that waivers could not be subject to the CRA.

So we start this entire national political process with that understanding that both the executive branch and the legislative branch knew waivers were not rules and they weren't subject to the CRA.

And then we have --

THE COURT:  But the majority of both houses ultimately voted, including some members from your state.

MS. MECKENSTOCK:  Yes, Your Honor.

THE COURT:  And it was approved.

MS. MECKENSTOCK:  I mean, so their contention is that our claim is that we were outvoted, but, Your Honor, that's almost always going to be true in a Tenth Amendment case.

THE COURT:  I get it.  This is another place -- and again, maybe there's a place to pioneer a new claim because there are new facts that happen all the time.  But it sounds like this theory has never actually been applied to invalidate legislation, correct?

MS. MECKENSTOCK:  I think that's right, Your Honor,

but I don't think that's a problem for us, because if you look at *Murphy v. NCAA*, the Supreme Court recently recognized that it is unprecedented action by the federal government against states that gives rise to Tenth Amendment claims.  And so that's exactly what we have here.

They haven't said there's nothing unprecedented about what happened here, and we clearly have alleged this was unprecedented.  So it's not surprising that this would present a situation where there would be a cognizable claim as outlined in Baker and Garcia.

**THE COURT:**  All right.  And I can't remember which of the cases it was, but one of the cases seemed to call into question whether this is even a viable theory.  It didn't say it's not, for sure, but it expressed some uncertainty as to that.

**MS. MECKENSTOCK:**  I think that's right, Your Honor. But the Ninth Circuit's, you know, uncertainty from one Ninth Circuit panel in dicta doesn't change that the Supreme Court has recognized this claim and in fact, adjudicated it in Baker. So the Supreme Court announced it in Garcia, and then someone in South Carolina tried to bring a claim, and the Supreme Court didn't say this is a political question.  This isn't a real claim.

They said it's not enough to come in here and say that Congress was uninformed when it voted on this law that you

don't like.  But we're saying way more than that, Your Honor.
We've alleged an incredible number of extraordinary aspects and
defects to this national political process.

So we're not on all fours with any case where this claim
has been rejected, and I think we more than satisfy the
elements that one can extrapolate from Garcia and Baker itself.
And again, the fact that this is unprecedented is simply a
reflection of what the government did, not any reflection upon
anything we're doing.

And I guess I would say, you know, they have this point
that bicameralism and presentment somehow defeats all of this
because that's always true in Tenth Amendment cases where
states challenge laws.  And it doesn't defeat the claim, no
more than it defeated the claim in Munoz Flores, right?
Bicameralism and presentment is required, but it's not
sufficient constitutionally for a legislation to survive.

And it also doesn't matter, again, here that Congress
could have enacted a similar resolution or a similar statute in
another way.  Again, we come back to that the means matter, and
also, we come back to the fact that the Supreme Court itself
was focused on the national political process when it
articulated this claim in the first place.

So Your Honor, honestly, I don't know of a process that
begins with everybody knowing that the statute doesn't apply,
and then the first thing that happens that's part of the actual

process is EPA slaps a label on an already final action purporting to change the nature of that action.  That's clearly extraordinary.

I'm not aware of any agency ever doing anything remotely like that, and it's obviously defective because agencies can't change the nature of an action after they've finalized it. They can certainly open up a new proceeding, but they're not authorized by the EPA to change the nature after the fact. They can't even provide post hoc rationalizations for the action they took, much less change the nature of it.  So we start from that.  And that was the lynchpin of this entire scheme.

And to the extent that there's an issue about being deprived of participation, we had no opportunity to participate in that extremely crucial step in the process, because there was no process.  They literally just issued a press release announcing their change.

And then we go on to Congress going against --

THE COURT:  I --

MS. MECKENSTOCK:  -- its -- or sorry.

THE COURT:  I get your argument on this one.

MS. MECKENSTOCK:  Understood.

THE COURT:  I understand where you're coming from.  I understand why you're describing these things as unusual-looking, because they were.

Counsel?

**MR. STANDER:** If I could just add one point on that, and the Tenth Amendment political process claim is also a nonjusticiable political question in this case where what they're complaining about is -- it boils down to a complaint about the filibuster or not following the filibuster and the legislative procedures.

And I'll just add one case I would suggest reviewing on the political question doctrine, and that's *Common Cause vs. Biden*. Judge Sullivan's opinion in DDC on that where it was a challenge to the filibuster walks through that Ballin case and the different lines of cases and explains how to reconcile them. I think it's a very useful background.

**THE COURT:** All right. I did read it.

All right. And I -- just to come back to the point that I was making a minute ago, obviously this was presented as a motion to dismiss, and, you know, essentially the government is saying it's playing it straight under Rule 12(b)(6). Just the claim is subject to dismissal.

In the plaintiffs' view, is there -- is that right? Isn't it up or down at this point, or do you think that there's some application of the 12(b)(6) standard that would mean that some or all of the claims advance? At some level, I could see everybody just wanting to get to the Court of Appeals as fast as possible because that's where this is ultimately going to be

finalized, if not further than that.

But what are you saying are the -- you know, for understandable reasons, the opposition wasn't the opposition that I get sometimes, which is, "Look, it's well-pled, and, you know, the actual resolution of the factual disputes is for later."  It was basically, "The whole thing is joined now."

What do you think are the issues of fact that would preclude dismissal if I took all of the allegations as true, as I have to at this stage, and I incorporate by reference all the things you attached?  I mean, is this a case that should just be up or down in terms of the application of the law?  Are there factual issues as opposed to all legal issues?

**MS. MECKENSTOCK:**  I think there are some mixed questions of law and fact, Your Honor.  I think around the federalism claim, you know, he keeps saying that our case is entirely about the filibuster, and I don't think that that's consistent with the complaint.

So I think we have pled a number of defects in the national political process and that you have to credit those allegations beyond just whether or not we wanted the filibuster to apply.

And then I think on the procedural separation of powers, there is a dispute about what the point of order means that neither party is able to explain the text.  So they say it means one thing.  We say it means something else.  Neither of

those meanings is actually all that easy to extrapolate from the text of the point of order. And so I think there's a dispute there that I'm not sure that the briefs to date really address. And I think our complaint alleges a meaning for that action by the Senate and can be credited.

And so I think, again, basically this is a standard of have we plausibly stated a claim, and I think we have done so. Perhaps the legislative adjudication issue is a little bit more legal and less factual because the fundamental question there is whether Congress amended the statute. And I do think that is a legal question that is answered by the four corners of the resolutions, the enacted text in the resolution, not the prefatory clause.

On our statutory claims, Your Honor, there are disputes, I think, about the facts related to our standing and how, you know, how likely they are, and how many waivers are out there that they might do this again, and facts about California's ongoing rulemaking.

So I do think there are factual issues that go to our standing with respect to those statutory claims.

THE COURT: Although Bernhardt was at motion to dismiss stage and found no standing on a comparable claim.

MS. MECKENSTOCK: I don't think it was comparable, Your Honor, because there were no -- I mean, literally the opinion says there were no allegations about the likelihood

that interior would adopt a similar rule.  And here, we do allege that California -- I mean, California has gotten more than 50 waivers over the course of the last 60 years, and we are going to ask for more waivers.

So EPA doesn't have discretion to do nothing when we ask them to.  And so it's not the same situation where interior has full discretion whether it promulgates another rule or not.  It might do nothing, right, or it might take a very, very different action and promulgate a radically different rule because it had discretion.

Here, the waiver statute works where California requests the waiver, and then EPA says yes or no.  And California will request another waiver.  So we have alleged -- unlike in CBD, we have allegations that support that this will occur.

THE COURT:  All right.  I'll assess whether I agree with that.  But fair enough.  Okay.  I'm going to take the motion under submission and will aim to issue something as soon as I can.

And thank you for the argument.  It was helpful.

MS. MECKENSTOCK:  Thank you, Your Honor.

MR. STANDER:  Thank you, Your Honor.

THE COURT:  You're welcome.

(The proceedings concluded at 3:24 P.M.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Wednesday, March 18, 2026

_____

April Wood Brott, CSR No. 13782