# Exhibit A

**No.**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

STATE OF CALIFORNIA,

Petitioner,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, AND LEE ZELDIN, IN HIS
OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY

Respondents.

_____

**Protective Petition for Review**

_____

ROB BONTA
 *Attorney General of California*
ANNADEL A. ALMENDRAS
 *Senior Assistant Attorney General*
DEBORAH M. SMITH
 *Acting Senior Assistant Attorney General*
MYUNG J. PARK
DAVID ZAFT
 *Supervising Deputy Attorneys General*

NATALIE COLLINS
M. ELAINE MECKENSTOCK
KATHERINE GAUMOND
 *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-4439
Email: katherine.gaumond@doj.ca.gov
 *Attorneys for Petitioner State of California*

Pursuant to 42 U.S.C. § 7607(b)(1) (Clean Air Act § 307(b)(1)), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, the State of California hereby protectively petitions this Court for review of the final actions of Respondents United States Environmental Protection Agency (EPA) and Administrator Lee Zeldin, set forth in (1) the June 12, 2026, press release titled "EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress,"[1] and (2) EPA's June 2026 submissions to Congress,[2] copies of which are attached as Exhibits A-G.

This petition is protective. California has challenged these actions in the U.S. District Court for the District of Columbia, *California v. EPA*, No. 1:26-cv-02185-BAH (D.D.C. June 22, 2026) and maintains that court has jurisdiction. California files this protective petition in order to protect its right to judicial review in the event the district court is found to lack jurisdiction, and this Court is found to be the proper venue pursuant to 42 U.S.C. § 7607(b)(1). California is filing petitions in both this Court and the Court of Appeals for the Ninth Circuit, in case of a

---

[1] EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* (June 12, 2026), available at https://www.epa.gov/newsreleases/epa-fulfillsstatutory-obligation-transmitting-four-california-waiver-rules-congress, last visited August 6, 2026, attached as Exhibit A.

[2] *See* EC-3922, EC-3925, EC-3926, and EC-3927 (June 12, 2026); attached as Exhibits B-E. *See also* 172 Cong. Rec. H4122 (daily ed. June 18, 2026); 172 Cong. Rec. S2892-2893 (daily ed. June 17, 2026); attached as Exhibits F-G.

1

dispute regarding *which* court of appeals is the proper venue to review such actions

under 42 U.S.C. § 7607(b)(1), in the event jurisdiction is proper in a court of

appeals.

Dated:  August 11, 2026

Respectfully Submitted,

ROB BONTA
Attorney General of California
ANNADEL A. ALMENDRAS
 Senior Assistant Attorney General
DEBORAH M. SMITH
 Acting Senior Assistant Attorney
 General
MYUNG J. PARK
DAVID ZAFT
Supervising Deputy Attorneys General

*/s/ Katherine Gaumond*
KATHERINE GAUMOND
NATALIE COLLINS
M. ELAINE MECKENSTOCK
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-4439
Email: katherine.gaumond@doj.ca.gov

*Attorneys for Petitioner State of
California*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2026, the foregoing Petition

for Review and exhibits were served on Respondents by sending a copy via

certified mail, return receipt requested, to each of the following addresses:


  Administrator Lee M. Zeldin
  Office of the Administrator (1101A)
  United States Environmental Protection Agency
  1200 Pennsylvania Avenue, N.W.
  Washington, D.C. 20460

  Todd Blanche
  Attorney General of the United States
  United States Department of Justice
  950 Pennsylvania Avenue, N.W.
  Washington, D.C. 20530- 0001

  Correspondence Control Unit
  Office of General Counsel (2311)
  United States Environmental Protection Agency
  1200 Pennsylvania Avenue, N.W.
  Washington, D.C. 20460


Dated:  August 11, 2026


           */s/ Katherine Gaumond*
           KATHERINE GAUMOND

# Exhibit A



# EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress

June 12, 2026

**Contact Information**
EPA Press Office (press@epa.gov)

**WASHINGTON** – Today, in accordance with the Congressional Review Act (CRA), U.S. Environmental Protection Agency (EPA) transmitted four California waiver rules to Congress that have given the state the authority to enact its own emission standards for cars, trucks, lawn mowers, and other equipment used daily by Americans. EPA has determined that each of these waivers is a rule under the CRA, and because previous Administrations failed to transmit them to Congress, as mandated under the CRA, Congress has not been provided with its statutorily required opportunity to review these rules.

*"EPA is accountable to Congress, but most importantly we must be accountable to the American people,"* **said EPA Administrator Lee Zeldin**. *"It is important for EPA to fulfill our statutory obligation to submit these California waivers to Congress for their review pursuant to the law."*

EPA is committed to promoting consumer choice and ensuring affordable vehicles for all Americans, while following the best reading of the law. The four rules have prospective, national effects, giving California and the states that adopted the waivers under Clean Air Act section 177 the force of federal law, supplanting EPA authority.

| Rules Being Transmitted to Congress | Current National Implication of the Rules |
|---|---|
| Motor Vehicle Evaporative Emissions and Greenhouse Gas ("Advanced Clean Cars I" (ACC I)) | This rule allows California to impose vehicle emissions requirements stricter than federal standards. This has resulted in a push towards electric vehicles across the nation. |
| Reinstatement of ACC I | Following the Trump Administration revoking ACC I, the Biden EPA reinstated it, allowing California once again to impose costly vehicle emission requirements higher than federal standards. |
| Small Offroad Engine (SORE) Amendments | This rule imposes costly emission requirements for lawn and garden equipment and has resulted in the push towards electrification of these tools. SORE leaves small businesses, landscapers, and homeowners forced to use expensive and impractical electric tools. |
| Greenhouse Gas Emission Standards – 2009 and Subsequent Model Years | This rule allows California to enforce strict greenhouse gas standards. Automakers are forced to make a vehicle fit California's standards instead of the federal standards and consumers pay for this through higher vehicle costs. |

## Background

In early 2025, EPA transmitted <https://epa.gov/newsreleases/epa-hails-congressional-disapproval-biden-epas-california-ev-mandate-rule> to Congress three emission waivers granted to California by the Biden Administration. In June 2025, all three CRA resolutions

disapproving the vehicle emission waiver rules were signed

<https://epa.gov/newsreleases/epa-administrator-zeldin-celebrates-president-trump-officially-ending-

californias> into law by President Trump, repealing EV mandates and restoring consumer

choice.

Last updated on June 15, 2026

# Exhibit B



## OFFICE OF POLICY AND REGULATORY MANAGEMENT   EC03922

WASHINGTON, D.C. 20460

**June 12, 2026**

**TO:**     The Honorable Mike Johnson
Speaker of the House of Representatives
The Capitol, H-209
Washington, D.C. 20515

**FROM:**   U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW 1803A
Washington, DC 20460

Dear Speaker,

EPA is submitting the following final rules "to each House of the Congress and to the Comptroller General," for their review under 5 U.S.C. 801(a).

We have also enclosed the required report that incorporates a concise general statement relating to the document. The report also indicates EPA's compliance with relevant statutes and executive orders, as applicable.

If you have any questions regarding this submission, please feel free to contact me at 202-564-8497.

Sincerely yours,

Melissa Kramer
Acting Branch Chief
Regulatory Management Branch

Enclosures

OFFICIAL COMMUNICATION
Received On

JUN 16 2026

in the Office of the
President of the Senate

(Page 10 of Total)

**TITLE(S) OF DOCUMENTS:**

1. (8927-2) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles
2. (9325-01-OAR) - California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision
3. (9768-1) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years
4. (10890-02-OAR) - California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision

(Page 11 of Total)



**DOCUMENT FOR CONGRESSIONAL REVIEW UNDER THE SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT OF 1996**

**Date of Document:** June 12, 2026

1. **Name of Agency:** U.S. Environmental Protection Agency

2. **Office:** Office of Policy

3. **Action Title:** California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles

4. **Concise, General Statement of the Document:** In the rule

5. **Other Unique Identifier:** 8927-2

6. **This rule is a:** Final Rule

7. **Statutory Authorization:** Section 209(b) of the Clean Air Act

8. **Major Rule under CRA:** N/A

9. **Proposed Effective Date:** N/A

   **Compliant with 5 U.S.C. §801(a)(3)(A):** N/A

   A. **Cost/Benefit Analysis Prepared:** N/A

   B. **Certification under 5 U.S.C. §605(b):** N/A

      **Preparation of FRFA under 5 U.S.C. §604(a):** N/A

   C. **Written Statement under §202 of the Unfunded Mandates Reform Act:** N/A

   D. **Public Comments Solicited:** Yes; February 12, 2009.

   E. **Information Collection under the Paperwork Reduction Act:** No

   F. **Discussion of Executive Order 12866:** Yes

      **Discussion of Executive Order 13132:** No

      **Other Executive Order or Administrative Statute requirements:** No

10. **GAO Database Modernization Act of 2023:** N/A

**32744**    Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–8927–2]

### California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles

**SUMMARY:** The Environmental Protection Agency (EPA) is granting the California Air Resources Board's (CARB's) request for a waiver of Clean Air Act preemption to enforce its greenhouse gas emission standards for model year 2009 and later new motor vehicles. This decision is under section 209(b) of the Clean Air Act (the "Act"), as amended. This decision withdraws and replaces EPA's prior denial of the CARB's December 21, 2005 waiver request, which was published in the **Federal Register** on March 6, 2008.

**DATES:** Petitions for review must be filed by September 8, 2009.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2006–0173. All documents and public comments in the docket are listed on the *www.regulations.gov* Web site. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket in the EPA Headquarters Library, EPA West Building, Room 3334, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding holidays. The telephone number for the Reading Room is (202) 566–1744. The Air and Radiation Docket and Information Center's Web site is *http://www.epa.gov/oar/docket.html*. The electronic mail (e-mail) address for the Air and Radiation Docket is: *a-and-r-Docket@epa.gov*, the telephone number is (202) 566–1742 and the fax number is (202) 566–9744.

**FOR FURTHER INFORMATION CONTACT:** Specific questions may be addressed to David Dickinson, Office of Transportation and Air Quality, Compliance and Innovative Strategies Division (6405J–NLD), EPA, 1200 Pennsylvania Ave., NW., Washington, DC 20460, telephone: (202) 343–9256, e-mail: *Dickinson.David@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
II. Background
  A. California's Greenhouse Gas Program for New Motor Vehicles
  B. EPA's Consideration of CARB's Request
III. Analysis of Preemption Under Section 209(a) of the Clean Air Act
  A. Clean Air Act Preemption Provisions
  B. Deference to California
  C. Burden of Proof
IV. California's Protectiveness Determination
  A. What Are "Applicable Federal Standards"?
  1. Are "Applicable Federal Standards" Limited to Clean Air Act Emission Standards or Do They Include NHTSA's Fuel Economy Standards?
  2. If EPA Did Consider CAFE Standards as "Applicable Federal Standards," Are the CAFE Standards More Stringent Than California's Greenhouse Gas Emission Standards?
  B. How Does EPA Evaluate Impacts on Other States?
  C. Is California's Protectiveness Determination Arbitrary and Capricious?
  1. Based on EPA's Traditional Analysis, Is California's Protectiveness Determination Arbitrary and Capricious?
  2. Is California's Protectiveness Determination Arbitrary and Capricious Based on the Real-World In-Use Effects of California's Greenhouse Gas Standards?
  a. Fleet Turnover/Delayed Scrappage
  b. The "Rebound Effect"
  c. Upstream Emissions Impacts
  D. Section 209(b)(1)(A) Conclusion
V. Does California Need Its Standards To Meet Compelling and Extraordinary Conditions?
  A. Basis of March 6, 2008 Denial
  B. Should EPA Review This Criterion Based on the Need for California's Motor Vehicle Program or the Need for the GHG Standards?
  1. Comments Supporting a Review of the Entire Program
  2. Comments Supporting a Review of the GHG Standards Separately
  3. Decision
  C. Does California Need Its Motor Vehicle Program To Meet Compelling and Extraordinary Conditions?
  D. Does California Need Its Motor Vehicle GHG Standards To Meet Compelling and Extraordinary Conditions?
  1. Are California's GHG Standards Designed in Part To Address an Air Pollution Problem That is Local or Regional in Nature?
  2. Do the Impacts of Climate Change in California Support a Denial of the Waiver?
  a. What Test Applies Under This Alternative Approach?
  b. Would a Waiver Be Denied Under This Alternative Approach?
  3. Must California's GHG Standards Achieve a Demonstrated Reduction in GHG Atmospheric Concentrations or Impacts Under Section 209(b)(1)(B)?
  E. Section 209(b)(1)(B) Conclusion
VI. Are the California GHG Standards Consistent With Section 202(a) of the Clean Air Act?
  A. Historical Approach: The Standard of Review for Consistency With Section 202(a)
  B. CARB's Assessment of the State of Development of GHG Reduction Technology and Comments Supporting CARB's Assessment
  1. Development of GHG Reduction Technology
  2. Overview of Technologies and Their Projected Applications
  3. CARB's Update on Technological Development
  4. Manufacturers' Comments on the Technological Feasibility of the GHG Standards
  C. Technological Feasibility and the Cost of Compliance
  1. Historical Approach
  2. Technology Cost Information in This Proceeding
  3. Consistency of Certification Test Procedures
  4. Safety Implications of the CARB GHG Standards
  E. Conclusion on Technological Feasibility
  F. Other Issues Related to Consistency With Section 202(a)
  1. Impacts of EPA's March 6, 2008 Denial on Lead Time
  2. Endangerment of Public Health or Welfare
  a. Is it Appropriate To Review Endangerment of Public Health or Welfare Under the "Consistency With Section 202(a)" Criterion?
  b. Parties Opposing the Waiver Have Not Met Their Burden of Showing Lack of Endangerment to Public Health or Welfare
  G. Section 209(b)(1)(C) Conclusion
VII. Additional Issues Raised
  A. EPA's Administrative Process for Evaluating California's Waiver Request
  1. Public Comment Process
  2. EPA's Reconsideration Process
  3. Is a Waiver Required Before California or Section 177 States Adopt California's Motor Vehicle Emission Standards?
  B. Scope of EPA's Waiver Review
  1. Relevance of the Energy Policy and Conservation Act (EPCA) to the Waiver Decision
  2. Do California's GHG Emission Standards Create an Impermissible "Patchwork"?
  3. What Impact Does Granting California a Waiver for Its GHG Emission Standards Have on PSD Requirements for GHGs?
VIII. Decision

### I. Executive Summary

Today, I, as Administrator of the Environmental Protection Agency, am granting California's request for a waiver of Clean Air Act preemption for California's greenhouse gas emission standards for 2009 and later model years of new motor vehicles, adopted by the California Air Resources Board on September 24, 2004. This decision withdraws and replaces EPA's previous March 6, 2008 Denial of California's waiver request.

In the March 6, 2008 Denial, EPA determined that one of the three criteria for denial of a waiver had been met, namely, that California did not need its

State standards to meet compelling and extraordinary conditions. I have reconsidered that determination, which was based on an interpretation of section 209(b)(1) of the Clean Air Act that I now reject. Based on a review of the statutory language, legislative history, and the comments received, I am returning to EPA's traditional interpretation of this provision. Applying EPA's traditional interpretation I have determined that the waiver should not be denied under this criterion. Since the March 6, 2008 Denial did not evaluate or make any determinations concerning either of the other two waiver criteria, I have evaluated those criteria and determined that the waiver should not be denied under either of them. This includes careful consideration of all of the evidence presented concerning technological feasibility of the model year 2009 and later model year standards, considering lead time and the cost of implementation.

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and later modified in 1977. Congress established that there would be only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the Clean Air Act and California emission standards adopted under its state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures. This struck an important balance that protected manufacturers from multiple and different state emission standards, and preserved a pivotal role for California in the control of emissions from new motor vehicles. Congress recognized that California could serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards. Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver, and did this to ensure that California had broad discretion in selecting the means it determined best to protect the health and welfare of its citizens. Section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards. EPA may deny a waiver only if it makes at least one of three findings specified

under the Clean Air Act (including whether California's "protectiveness finding" noted above is arbitrary and capricious). Therefore, EPA's role upon receiving a request for waiver of preemption from California is to determine whether it is appropriate to make any of the three findings specified by the Clean Air Act and if the Agency cannot make at least one of the three findings then the waiver must be granted. The three waiver criteria are properly seen as criteria for a denial— EPA must grant the waiver unless at least one of three criteria for a denial is met. This is different from most waiver situations before the Agency, where EPA typically determines whether it is appropriate to make certain findings necessary for granting a waiver, and if the findings are not made then a waiver is denied. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain its own new motor vehicle emissions program.

The three criteria for denial of a waiver are: First, whether California's determination that its standards are, in the aggregate, at least as protective as applicable Federal standards is arbitrary and capricious (Section 209(b)(1)(A)); second, whether California has a need for such standards to meet compelling and extraordinary conditions (Section 209(b)(1)(B)); and third, whether California's standards are consistent with Section 202(a) of the Act (Section 209(b)(1)(C)). EPA has consistently interpreted the waiver provision as placing the burden on the opponents of a waiver to demonstrate that one of the criteria for a denial has been met. In this context, since 1970, EPA has recognized its limited discretion in reviewing California waiver requests. EPA has granted over 50 waivers of preemption and has only fully denied one waiver request, the decision under reconsideration here.

In this case, California first requested that EPA waive preemption for its new motor vehicle greenhouse gas emission standards on December 21, 2005. EPA did not begin its formal consideration of the waiver request until after the *Massachusetts* v. *EPA* decision in April 2007, in which the Supreme Court determined that greenhouse gases are air pollutants within that term's meaning in the Clean Air Act. On March 6, 2008, after an administrative process that included two public hearings and a written comment period, EPA published its final decision denying California's request. EPA's waiver denial was based on the second waiver criterion, with EPA determining that California did not

need its greenhouse gas standards to meet compelling and extraordinary conditions. EPA did not address the other two waiver criteria.

The reconsideration process started early this year. On January 21, 2009, California Governor Schwarzenegger sent a letter to President Obama, and the California Air Resources Board sent a letter to Administrator-designee Jackson, requesting the Agency reconsider the prior denial. After reviewing CARB's reconsideration request and the concerns raised by many different parties, EPA found that there were significant issues regarding the Agency's denial of the waiver. The denial was a substantial departure from EPA's longstanding interpretation of the Clean Air Act's waiver provision and EPA's history of granting waivers to California for its new motor vehicle emissions program. Many different parties, including California, states that have adopted or are interested in adopting California's standards, members of Congress, scientists, and other stakeholders, had expressed similar concerns about the denial of the waiver. Based on this, EPA believed there was merit to reconsidering its decision denying California's waiver request and on February 12, 2009, EPA published a **Federal Register** notice announcing its reconsideration of California's greenhouse gas waiver request. EPA held a public hearing on March 5, 2009, and received written comments through April 6, 2009.

EPA received substantial comment on each of the three waiver criteria. The entire administrative process in consideration of California's request provided the Agency with extensive legal argument and evidence, including oral testimony from three public hearings and nearly 500,000 written comments. This material has been substantive and invaluable in the Agency's review. EPA has received extensive comments from many states; federal, state and local officials; industry; environmental groups; scientists; and other stakeholders. The vast majority of comments EPA received were in support of the waiver.

After a thorough evaluation of the record, I am withdrawing EPA's March 6, 2008 Denial and have determined that the most appropriate action in response to California's greenhouse gas waiver request is to grant that request. I have determined that the waiver opponents have not met their burden of proof in order for me to deny the waiver under any of the three criteria in section 209(b)(1). The findings I have made concerning each of the criteria are summarized below.

**32746**      **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

Concerning the criterion with respect to the protectiveness of California's standards in the aggregate, I find that the opponents of the waiver have not met their burden to demonstrate that California's determination was arbitrary and capricious. This evaluation can properly by made in situations where EPA has not issued its own standards, and this finding is appropriate whether or not comparison is made to EPA's current emissions standards or the National Highway Transportation Safety Administration's (NHTSA's) fuel economy standards, and whether or not it includes an evaluation of the real-world in-use effect of California's greenhouse gas standards on its broader motor vehicle program.

With respect to the criterion concerning the need for California's state standards to meet compelling and extraordinary conditions, I have found that the March 6, 2008 Denial was based on an inappropriate interpretation of the waiver provision. The March 6, 2008 Denial determined that Congress intended to allow California to promulgate only those state standards that address pollution problems that are local or regional, and this provision was not intended to allow California to promulgate state standards designed to address global climate change problems. In the alternative, EPA found that the effects of climate change in California are not compelling and extraordinary compared to the effects in the rest of the country.

The text of section 209(b) and the legislative history, when viewed together, lead me to reject the interpretation adopted in the March 6, 2008 Denial, and to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems and protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others.

Under that interpretation, I cannot find that opponents of the waiver have demonstrated that California does not

need its state standards to meet compelling and extraordinary conditions. The opponents of the waiver have not adequately demonstrated that California no longer has a need for its motor vehicle emissions program. I have also determined that even under the interpretation announced in the March 6, 2008 Denial, opponents of the waiver have not demonstrated that California does not need its greenhouse gas emission standards to meet compelling and extraordinary conditions. In addition, I have interpreted the "compelling and extraordinary conditions" criterion to not properly include a consideration of whether the impacts from climate change are compelling and extraordinary in California. Nevertheless, I have evaluated the comments received and evidence in the record and have determined that the opponents of the waiver have not met their burden in demonstrating why evidence such as the impacts of climate change on existing ozone conditions in California along with the cumulative impacts identified by proponents of the waiver (e.g., impacts on snow melt and water resources and agricultural water supply, wildfires, coastal habitats, ecosystems, etc.) is not compelling and extraordinary.

Concerning the criterion with respect to consistency of the greenhouse gas emission standards with section 202(a), EPA has reviewed extensive comments and records received from California and from the regulated community concerning the kinds of technology needed to comply with California's standards, including costs and lead time, as well as evidence concerning the current compliance status of manufacturers. In light of the previous waiver denial, EPA specifically asked for comment on how lead time should be evaluated as part of the Agency's reconsideration. Based on all of that information, I cannot find that opponents of the waiver have demonstrated that the greenhouse gas emission standards are inconsistent with section 202(a). While I believe that a grant of the waiver for model year 2009 would not be a retroactive change in the law, to limit any potential concerns that have been raised by the manufacturers over their potential reliance upon EPA's previous waiver denial, my decision provides that CARB may not hold a manufacturer liable or responsible for any noncompliance civil penalty action caused by emission debits generated by a manufacturer for the 2009 model year.

EPA finds that those opposing the waiver request have not met the burden

of demonstrating that California's regulations do not satisfy the statutory criteria of section 209(b). For this reason, I am granting California's waiver request to enforce its greenhouse gas motor vehicle emission regulations.

## II. Background

### A. California's Greenhouse Gas Program for New Motor Vehicles

As further explained below, CARB has adopted amendments to title 13, California Code of Regulations (CCR), sections 1900 and 1961, and established standards to regulate greenhouse gas (GHG) emissions from new passenger cars, light-duty trucks and medium-duty vehicles in a new section 1961.1.

California's GHG standards are included as part of its second generation low-emission vehicle program known as LEV II. EPA previously issued a waiver for the LEV II program and also issued a waiver for CARB's zero-emission vehicle program (known as ZEV) through the 2011 model year (MY).[1] By Resolution 04–28, CARB approved the GHG standards for motor vehicles on September 24, 2004, and California's Office of Administrative Law approved the regulations on September 15, 2005.[2]

CARB's regulation covers large-volume motor vehicle manufacturers beginning in the 2009 model year, and intermediate and small manufacturers beginning in the 2016 model year and controls greenhouse gas emissions from two categories of new motor vehicles—passenger cars and the lightest trucks (PC and LDT1) and heavier light-duty trucks and medium-duty passenger vehicles (LDT2 and MDPV). The regulations add four new greenhouse gas air contaminants (carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and hydrofluorocarbons (HFCs)) to California's existing regulations for criteria and criteria-precursor pollutants and air toxic contaminants. There are separate fleet average emission standards for the two vehicle size categories and within each category the sales-weighted average of a manufacturer's vehicles is required to comply with the standard. The regulations establish a manufacturer declining fleet average emission standard for these gases (expressed as grams of carbon dioxide equivalent per mile ("gpm")), with separate standards for each of the two categories of passenger vehicles noted above. CARB places the declining standards into two phases: near-term standards phased in

---

[1] 68 FR 19811 (April 22, 2003) and 71 FR 78190 (December 26, 2006).

[2] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.2.

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 18 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 9 of 47

Federal Register/Vol. 74, No. 129/Wednesday, July 8, 2009/Notice    32747

from the 2009 through 2012 model years, and mid-term standards, phased in from the 2013 through 2016 model years. Manufacturers may receive credits for meeting the standards before model year 2009, for surpassing the standards in later model years, and for selling alternative fuel vehicles. These credits may be banked for later use, transferred between vehicle categories, or sold to another manufacturer. If a manufacturer fails to meet the standard in a particular model year, it will begin to accrue debits. At that point it will have five years to make up for the debits, either by generating credits, or by purchasing credits from another manufacturer.

## B. EPA's Consideration of CARB's Request

By letter dated December 21, 2005, CARB submitted a request ("Waiver Request") seeking a waiver of Section 209(a)'s prohibition for its motor vehicle GHG standards.[3] On February 21, 2007, EPA notified the Executive Officer of CARB that the timing of EPA's consideration of the GHG waiver request was related to the then-pending *Massachusetts* v. *EPA* case before the United States Supreme Court. EPA stated that the decision in that case could potentially be relevant to issues EPA might address in the context of the GHG waiver proceeding. The Supreme Court issued its *Massachusetts* v. *EPA* decision on April 2, 2007, finding that greenhouse gases are air pollutants under the Clean Air Act, and that EPA is required to decide the pending rulemaking petition under section 202(a) of the Act, based on the statutory criteria of whether, in the Administrator's judgment, emissions of greenhouse gases from new motor vehicles cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare.[4]

On April 30, 2007, a **Federal Register** notice was published announcing an opportunity for hearing and comment on CARB's request.[5] EPA subsequently held two public hearings on May 22, 2007, in Washington, DC, and on May 30, 2007, in Sacramento, CA. The written comment period closed on June 15, 2007. On several occasions, EPA received requests to extend or re-open

the comment period; however, the Agency did not extend the June 15, 2007 deadline. The Agency instead indicated that consistent with past waiver practice it would continue, as appropriate, to communicate with stakeholders and evaluate any comments submitted after the close of the comment period to the extent practicable. By letter dated December 19, 2007, EPA notified California Governor Schwarzenegger that EPA would be denying the waiver. On March 6, 2008, EPA published its decision denying California's waiver request (March 6, 2008 Denial).[6]

EPA's March 6, 2008 Denial was based on a finding that California did not need its GHG standards for new motor vehicles to meet compelling and extraordinary conditions. Because this finding was sufficient to deny California's waiver request, the Administrator found it unnecessary to determine whether the criteria for denial of a waiver under sections 209(b)(1)(A) and (C) had been met.

On January 21, 2009, CARB submitted a request for EPA to reconsider its March 6, 2008 Denial ("Reconsideration Request").[7] CARB's Reconsideration Request stated its belief that EPA has the inherent authority to reconsider its previous waiver denial and EPA should do so in order to restore the Agency's interpretations and applications of the Clean Air Act to continue California's longstanding leadership role in setting emission standards. Specifically, CARB noted several bases for the reconsideration centered on EPA's misinterpretation of the Clean Air Act to set new flawed tests and misapplication of facts to those tests.

President Obama issued a Presidential Memorandum to the Administrator of the Environmental Protection Agency on January 26, 2009, stating that "In order to ensure that the EPA carries out its responsibilities for improving air quality, you are hereby requested to assess whether the EPA's decision to deny a waiver based on California's application was appropriate in light of the Clean Air Act. I further request that, based on that assessment, the EPA initiate any appropriate action." [8]

Subsequently, EPA published a **Federal Register** notice on February 12, 2009, which responded to CARB's reconsideration request and announced that EPA would fully review and

reconsider its March 6, 2008 Denial.[9] The February 12, 2009 notice specifically sought comment on: any new or additional information regarding the three section 209(b) waiver criteria; whether EPA's interpretation and application of section 209(b)(1)(B) in the March 6, 2008 Denial was appropriate; and, the effect of the waiver denial on whether CARB's GHG standards are consistent with section 202(a), including lead time. After holding a public hearing on March 5, 2009, the written comment period closed on April 6, 2009.

## III. Analysis of Preemption Under Section 209(a) of the Clean Air Act

### A. Clean Air Act Preemption Provisions

Section 209(a) of the Act provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.[10]

Section 209(b)(1) of the Act requires the Administrator, after an opportunity for public hearing, to waive application of the prohibitions of section 209(a) for any State that has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor engines prior to March 30, 1966, if the State determines that its State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.[11] However, no such waiver shall be granted by the Administrator if she finds that: (A) The protectiveness determination of the State is arbitrary and capricious; (B) the State does not need such State standards to meet compelling and extraordinary conditions; or (C) such State standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. In previous waiver decisions, EPA has stated that Congress intended EPA's review of California's decision-making be narrow. This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

[3] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.

[4] *Massachusetts* v. *EPA*, 549 U.S. 497, 127 S. Ct. 1438 (2007). On April 24, 2009, EPA issued "Proposed Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act" at 74 FR 18885 (April 24, 2009).

[5] 72 FR 21260 (April 30, 2007).

[6] 73 FR 12156 (March 6, 2008). The State of California brought litigation against EPA in the United States Court of Appeals, DC Circuit. This litigation is held in abeyance pending further order of the court. (February 25, 2009).

[7] California Air Resources Board, EPA–HQ–OAR–2006–0173–7044.

[8] 74 FR 4905 (January 28, 2009).

[9] 74 FR 7040 (February 12, 2009).

[10] Clean Air Act section 209(a).

[11] California is the only State which meets section 209(b)(1)'s requirement for obtaining a waiver. *See* S. Rep. No. 90–403 at 632 (1967).

Case 4:25-cv-04966-HSG Document 247-1 Filed 08/12/26 Page 19 of 162
USCA Case #26-1218 Document #2187882 Filed: 08/11/2026 Page 10 of 47

**32748** **Federal Register**/Vol. 74, No. 129/Wednesday, July 8, 2009/Notice

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California.[12]

Thus, my consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions that I may consider under section 209(b).

### B. Deference to California

In previous waiver decisions, EPA has recognized that the intent of Congress in creating a limited review based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess the wisdom of state policy. This has led EPA to state:

It is worth noting * * * I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shaped of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[13]

EPA has stated that the text, structure, and history of the California waiver provision clearly indicate both a congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of public policy" to California's judgment.[14]

The House Committee Report explained as part of the 1977

amendments to the Clean Air Act, where Congress had the opportunity to restrict the waiver provision, it elected instead to explain California's flexibility to adopt a complete program of motor vehicle emission controls. The amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.[15]

### C. Burden of Proof

In *Motor and Equip. Mfrs Assoc.* v. *EPA*, 627 F.2d 1095 (DC Cir. 1979) (*MEMA I*), the U.S. Court of Appeals stated that the Administrator's role in a section 209 proceeding is to:

consider all evidence that passes the threshold test of materiality and * * * thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver.[16]

The court in *MEMA I* considered the standards of proof under section 209 for the two findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision."[17]

The court upheld the Administrator's position that, to deny a waiver, there must be 'clear and compelling evidence' to show that proposed procedures undermine the protectiveness of California's standards.[18] The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare.[19]

With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings, but found that the opponents of the waiver were unable to meet their burden of proof even if the

standard were a mere preponderance of the evidence. Although *MEMA I* did not explicitly consider the standards of proof under section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary' conditions and whether the standards are technologically feasible—Congress intended that the standards of EPA review of the State decision to be a narrow one."[20]

Finally, opponents of the waiver bear the burden of showing that the criteria for a denial of California's waiver request has been met. As found in *MEMA I*, this obligation rests firmly with opponents of the waiver in a section 209 proceeding, holding that: "[t]he language of the statute and it's legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied."[21]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver decision. As the court in *MEMA I* stated, "Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious.'"[22] Therefore, the Administrator's burden is to act "reasonably."[23]

EPA received comment suggesting that the burden of proof upon reconsideration of EPA's March 6, 2008 Denial should be reversed and placed on California.[24] It is not clear whether

---

[12] 36 FR 17458 (Aug. 31, 1971). Note that the more stringent standard expressed here, in 1971, was superseded by the 1977 amendments to section 209, which established that California must determine that its standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.

[13] 40 FR 23103–23104; *see also* LEV I Decision Document at 64.

[14] 40 FR 23104; 58 FR 4166.

[15] *MEMA I*, 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95 Cong., 1st Sess. 301–02 (1977).

[16] *MEMA I*, 627 F.2d at 1122.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *See, e.g.*, 40 FR 21102–103 (May 28, 1975).

[21] *MEMA I*, 627 F.2d at 1121.

[22] *Id.* at 1126.

[23] *Id.* at 1126.

[24] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994 at 6–7.

the commenter is also suggesting that the entire burden of proof now shifts to California in that "[s]uch an allocation of the burden of proof ensures that decisions in which EPA has invested time and resources are not lightly overturned, and that those decisions enjoy the finality to which they are entitled." Moreover, the commenter suggests that EPA carries a separate responsibility, in order to reverse its prior decision, to explain why its first decision on the waiver request is no longer the correct one. The commenter cites several cases for the proposition that "[A]n agency changing its course * * * is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance" and that an agency must offer sufficient explanation to ensure the court that it is not "repudiating precedent to conform with shifting political mood." [25]

EPA believes that, regardless of the previous waiver denial, once California makes its protectiveness determination the burden of proof falls on the opponents of the waiver. This burden is inherent in the statutory requirement that EPA grant the waiver unless it makes one of the specific negative findings in section 209(b)(1).[26] This is consistent with the legislative history, which indicates that Congress intended a narrow review by EPA and to preserve the broadest possible discretion for California.[27]

As EPA explained in the previous waiver denial, the Agency did not address the section 209(b)(1)(A) and (C) criteria in its decision; therefore EPA is not in a position of reversing any interpretations or evidentiary findings. As further discussed in section VI, although commenters argue various adverse effects of the prior waiver denial on lead time, the burden remains on the opponents of the waiver to demonstrate why California's GHG standards are not consistent with section 202(a). With regard to section 209(b)(1)(B) and EPA's prior waiver denial, EPA has provided a reasoned analysis and explanation for any reversal of positions taken in this new decision. In the context of this reasoned explanation, EPA believes it is only required to demonstrate that it is aware that it is changing positions and that there are good reasons for the change in position.[28] As discussed above, the

burden of proof under section 209(b)(1)(B) still falls on those who wish EPA to deny the waiver, based on the statutory structure of section 209(b)(1) and the legislative history. This requirement is not disturbed by EPA's initial denial.

## IV. California's Protectiveness Determination

Section 209(b)(1)(A) of the Act requires EPA to deny a waiver if the Administrator finds that California was arbitrary and capricious in its determination that its State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. EPA recognizes that the phrase "States standards" means the entire California new motor vehicle emissions program. Therefore, as explained below, when evaluating California's protectiveness determination, EPA compares the California-to-Federal standards. That comparison is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA have previously found were not arbitrary and capricious.[29]

Traditionally, EPA has evaluated the stringency of California's standards relative to comparable EPA emission standards.[30] That evaluation follows the instruction of section 209(b)(2), which states: "If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as

such Federal standards for purposes of [209(b)(1)]."

To review California's protectiveness determination in light of section 209(b)(2), EPA conducts its own analysis of the newly adopted California standards to comparable applicable Federal standards. Reviewing that comparison quantitatively answers whether the new standards are more or less protective than the Federal standards. That comparison of the newly adopted California standards to the comparable applicable Federal standards is conducted in light of prior waiver determinations. That is, the California-to-Federal analysis is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA has not found arbitrary and capricious.[31]

A finding that California's determination was arbitrary and capricious under section 209(b)(1)(A) must be based upon "'clear and compelling evidence' to show that proposed [standards] undermine the protectiveness of California's standards." [32] Even if EPA's own analysis of comparable protectiveness or that suggested by a commenter might diverge from California's protectiveness finding, that is not a sufficient basis on its own for EPA to make a section 209(b)(1)(A) finding that California's protectiveness finding is arbitrary and capricious.[33]

California made a protectiveness determination with regard to its greenhouse gas regulations in Resolution 04–28, adopted by the California Air Resources Board on September 23, 2004.[34] Included in that Resolution were several bases to support

---

[25] Id.

[26] MEMA I, 627 F.2d at 1121.

[27] MEMA I, 627 F.2d at 1110–11, citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977).

[28] Federal Communications Commission v. Fox Television Stations, Inc., 129 S.Ct. 1800, 1809 (2009).

[29] In situations where there are no Federal standards directly comparable to the specific California standards under review, the analysis then occurs against the backdrop of previous waivers which determined that the California program was at least as protective of the federal program ((LEV II + ZEV) + GHG). See 71 FR 78190 (December 28, 2006), Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006).

[30] 36 FR 17458 (Aug. 31, 1971). ("The law makes it clear that the waiver requests cannot be denied unless the specific finding designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California."). The "more stringent" standard expressed here in 1971 was superseded by the 1977 amendments to section 209, which established that California's standards must be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. The stringency standard remains, though, in section 209(b)(2).

[31] In situations where there are no Federal standards directly comparable to the specific California standards under review, the analysis then occurs against the backdrop of previous waivers which determined that the California program was at least as protective of the federal program ((LEV II + ZEV) + GHG). See 71 FR 78190 (December 28, 2006), Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006).

[32] MEMA I, 627 F.2d at 1122.

[33] "Once California has come forward with a finding that the procedures it seeks to adopt will not undermine the protectiveness of its standards, parties opposing the waiver request must show that this finding is unreasonable." MEMA I, 627 F.2d at 1124.

[34] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.107, "Resolution 04–28, State of California, Air Resources Board, September 23, 2004" ("BE IT FURTHER RESOLVED that the Board hereby determines that the regulations approved herein will not cause California motor vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards.").

California's protectiveness determination. Most generally, CARB made a broad finding that observed and projected changes in California's climate are likely to have a significant adverse impact on public health and welfare in California, and that California is attempting to address those impacts by regulating in a field for which there are no comparable federal regulations.[35] CARB also found that its greenhouse gas standards will increase the health and welfare benefits from its broader motor vehicle emissions program by directly reducing upstream emissions of criteria pollutants from decreased fuel consumption.[36] Beyond that analysis of the new regulations' impact on its broader program, CARB projected consumer response to the greenhouse gas regulations. With respect to consumer shifts due to a potential "scrappage effect" (the impact of increased vehicle price on fleet age) and "rebound effect" (the impact of lower operating costs on vehicle miles travelled), CARB found minor impacts— but net reductions—on criteria pollutant emissions.[37] Further, even assuming larger shifts in consumer demand attributable to the greenhouse gas emission standards, CARB found that the result remains a net reduction in both greenhouse gas emissions and criteria pollutant emissions.[38] That is,

CARB found that the addition of its greenhouse gas emission standards to its larger motor vehicle emissions program (LEV II), which generally aligns with the federal motor vehicle emissions program (Tier II), renders the whole program to be more protective of public health and welfare. CARB noted that EPA has already determined that California was not arbitrary and capricious in its determination that the pre-existing California standards for light-duty vehicles and trucks, known as LEV II, is at least as protective as comparable Federal standards, the Tier II standards.[39] Implicit in California's greenhouse gas protectiveness determination, then, is that the inclusion of greenhouse gas standards into California's existing motor vehicle emissions program will not cause California's program to be less protective than the federal program.

### A. What Are "Applicable Federal Standards"?

EPA has received comments suggesting that the section 209(b)(1)(A) comparison to "applicable Federal standards" should include corporate average fuel economy (CAFE) standards promulgated, or that in the future may be promulgated, by the National Highway Traffic Safety Administration under the Energy Policy and Conservation Act of 1975 (EPCA), as amended by the Energy Independence and Security Act of 2007 (EISA).[40] That suggestion departs from EPA's traditional analysis. EPA has always interpreted "applicable Federal standards" as limiting EPA's inquiry to motor vehicle emission standards established by EPA under the Clean Air Act. After a thorough examination of the text and legislative history of the section 209(b) waiver provision, EPA has

determined that it should continue to interpret "applicable Federal standards" to mean motor vehicle emission standards established by EPA under the Clean Air Act that apply to the same cars and the same air pollutants or group of air pollutants as considered in California's aggregate protectiveness finding. Additionally, EPA has determined that even if it were appropriate to take NHTSA's fuel economy standards into account as "applicable Federal standards," the waiver opponents have not met their burden of proof to demonstrate that California's protectiveness determination was arbitrary and capricious. No waiver opponent has demonstrated that existing or proposed fuel economy standards are more stringent or more protective of the public health and welfare than California's greenhouse gas emission standards.

1. Are "Applicable Federal Standards" Limited to Clean Air Act Emission Standards or Do They Include NHTSA's Fuel Economy Standards?

Section 209(b)(1)(A) requires EPA to evaluate whether California's determination regarding the comparative level of protectiveness of its standards of the public health and welfare was "arbitrary and capricious." California's standards act to improve air quality, and thus benefit the public health and welfare, by establishing limits for emissions of air pollutants from new motor vehicles and new motor vehicle engines. California is then required to compare these new motor vehicle standards in the aggregate to "applicable Federal standards" to determine the relative protectiveness of California's standards. Depending on whether the waiver is granted or denied, vehicle manufacturers will either have to meet California standards for those new vehicles subject to its standards and EPA standards for others, or EPA standards for all of the new vehicles.

The most straightforward reading of the comparison called for by the statute, between California and Federal standards, is an "apples to apples" comparison. California has standards that apply to new motor vehicles and the standards set limits for emissions of air pollutants. California would then compare its standards to the same kind of Federal standard—Federal standards that apply to the same new motor vehicles and also set limits for emissions of air pollutants. The term "applicable" has to refer to what the Federal standards apply to, and the most straightforward meaning is that they apply in the same way that the

[35] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.107 at 9 ("Over the last hundred years, average temperatures in California have increased 0.7% F, sea levels have risen by three to eight inches, and spring run-off has decreased 12 percent. These observed and future changes are likely to have significant adverse effects on California's water resources, many ecological systems, as well as on human health and the economy. The signs of a global warming trend continue to become more evident and much of the scientific debate is now focused on expected rates at which future changes will occur."); California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.107 at 13 ("There are no comparable federal regulations that specifically require the control of greenhouse gas emissions from motor vehicles.").

[36] "The establishment of greenhouse gas emission standards will result in a reduction in upstream emissions (emission due to the production and transportation of the fuel used by the vehicle) of greenhouse gas, criteria and toxic pollutants due to reduced fuel usage." EPA–HQ–OAR–2006–0173–0010.107 at 8.

[37] "Supplemental analysis of the potential response of consumers (consumer response) to the regulations was performed as part of the staff evaluation. The evaluation of consumer response indicates that the impact of vehicle price increases on fleet turnover (changes to the average age of the motor vehicle fleet) as well as the impacts of lower operating costs on vehicle miles traveled (rebound effect) by consumers have minor impacts (less than one percent of the passenger vehicle emissions inventory) on criteria pollutant emissions." EPA–HQ–OAR–2006–0173–0010.107 at 12.

[38] "Taking into account the penetration of 2009 and later vehicles meeting the new standard, the proposed regulation will reduce greenhouse gas emission by an estimated 87,700 CO₂-equivalent

tons per day statewide in 2020 and by 155,200 CO₂-equivalent tons per day in 2030. This translates into an 18 percent overall reduction in greenhouse gas emissions from the light duty fleet in 2020 and a 27 percent overall reduction in 2030; Taking into account the penetration of 2009 and later vehicles meeting the new standard, the proposed regulation will reduce upstream emissions of non-methane organic gases (NMOG) by 4.6 tons per day statewide in 2020 and 7.9 tons per day statewide in 2030, and will reduce upstream emissions of NOₓ by 1.4 tons per day statewide in 2020 and 2.3 tons per day statewide in 2030. The regulation will provide a criteria pollutant benefit even taking into account possible pollutant increases due to consumer response." EPA–HQ–OAR–2006–0173–0010.107 at 15.

[39] 68 FR 19811 (April 22, 2003), Decision Document for Waiver of Federal Preemption for Low Emission Vehicle Amendments (LEV II) (April 11, 2003).

[40] Association of International Automobile Manufacturers, Inc., EPA–HQ–OAR–2006–1073–9005 at 13–14; Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994 at 16–23.

California standards apply, by setting limits on emissions of air pollutants from specified new motor vehicles. "[A]pplicable Federal standards" would be standards that impose a requirement on new motor vehicles and that directly establishes limits on emissions of air pollutants, as do the California standards. The "applicable" Federal standards are those set by EPA that directly apply by regulation to the same vehicles and, like the California regulations, set limits for the same air pollutants.

This is a straightforward and logical approach that provides clear guidance for California on what standards to compare. It avoids an open-ended inquiry into what other potential Federal standards might regulate different vehicles or regulate different aspects of the vehicles than emissions, and instead focuses the comparison on a clearly-defined and identifiable set of Federal standards that are parallel to the California standards at issue.

This interpretation also ties the comparison to the only Federal standards that are affected by the results of the comparison. If the California comparison shows it is more protective and the waiver is granted, the California standards would apply to the vehicles under section 209(b) and compliance with the California's standards will be deemed to mean compliance with the EPA standards under section 209(b)(3). If the California comparison is arbitrary and capricious and a waiver is denied, then EPA's Federal emission standards apply to those vehicles and California's standards do not. The applicability of emission standards under section 209(b) that results from the waiver decision is parallel to and fully consistent with the comparison made between the California and applicable Federal standards.

EPA has always limited its interpretation of the section 209(b) waiver provision to the scope of section 209(a)'s preemption.[41] Section 209(a) creates the explicit preemption of state emission standards, and at the same time leaves EPA to set federal emission standards, under the authority of section 202(a). Within the context of section 209, and the preemption of 209(a), section 209(b)'s waiver provision allows California the ability to set its own emission standards. Notably, section 209(b) merely gives back to California

what was taken away by section 209(a)—the ability to adopt and enforce its own state emission standards. This interaction between sections 209(a) and 209(b) supports interpreting the "applicable Federal standards" mentioned in section 209(b)(1)(A) to mean the same types of emission standards as the emission standards that are actually set by California are preempted under section 209(a), and are the subject of a waiver request under section 209(b).

Additionally, EPA's construction of "applicable Federal standards" provides a single, consistent usage of that phrase in the context of the section 209(b) waiver provision. In section 209(b), the phrase "applicable Federal standards" appears three times. The first two instances appear in sections 209(b)(1) and 209(b)(2) and pertain to EPA's review of California's protectiveness determination and the relative stringency of California's standards, as has been discussed above. The third instance occurs in section 209(b)(3) and specifically contemplates treatment of waived California standards for the purpose of Clean Air Act compliance. Section 209(b)(3) states: "in the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards *for purposes of this title.*" (Emphasis added) The reference to Title II of the Clean Air Act in section 209(b)(3) is further reason to limit the construction of "applicable Federal standards" to comparable Clean Air Act emission standards in sections 209(b)(1) and 209(b)(2). All three occurrences of "applicable Federal standards" in section 209(b) are then given the same meaning, in a context where all three occurrences function interactively to allow California to enforce its own emission standards.

The textual structure and legislative history of the waiver provision also support EPA's interpretation of "applicable Federal standards." The structure of section 209(b) is notable in its focus on limiting the ability of EPA to deny a waiver and preserving "the broadest possible discretion" for California to construct its motor vehicle program as it deems appropriate to protect its public health and welfare.[42] Where, as in this case, California's emission standards are specified in terms of direct regulation of emissions from new motor vehicles, it is most

clearly reasonable for EPA to limit its review under this criterion to those federal standards that likewise set limits for the same air pollutant emissions from the same motor vehicles. This is consistent with Congress' intent to provide California the broadest discretion and avoids limiting California's authority and frustrating this congressional intent.[43] EPA, thus, has determined it is reasonable to interpret "applicable Federal standards" to mean those EPA standards under the Clean Air Act that apply in the same manner as the California emission standards, regulating emissions of air pollutants from new motor vehicles.[44] Under this approach, any EPA standard that, like California's standards, sets limits for motor vehicle emissions could be considered an "applicable Federal standard" for the purpose of California's protectiveness determination.[45]

Applying this interpretation, Federal fuel economy standards issued by NHTSA would not be considered "applicable Federal standards" for purposes of this waiver criterion. In contrast to standards set limits for emissions from new motor vehicles, corporate average fuel economy (CAFE) standards set limits on fuel efficiency, to reduce fuel consumption. In contrast to EPA's and California's emission standards, which typically establish grams per mile ("gpm") levels of acceptable pollutant emissions, CAFE standards establish "miles per gallon" ("mpg") levels of acceptable fuel efficiency. Standards that set limits for emission levels and standards that set limits for fuel efficiency apply different legal requirements. The two kinds of standards can overlap significantly, in that the technology used to increase fuel efficiency will also lead to reductions in emissions of one of the GHGs—$CO_2$—

---

[41] "The legislative history of section 209 supports the Administrator's interpretation that the waiver provision is coextensive with the preemption provision, thereby permitting the Administrator to consider waiving preemption of California's entire program of emissions control." *MEMA I,* 627 F.2d 1095, 1108.

[42] H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–302 (1977); *MEMA I,* 627 F. 2d at 1110–11.

[43] *See MEMA I,* 627 F. 2d at 1111.

[44] *Entergy Corp.* v. *Riverkeeper, Inc.,* 129 S.Ct. 1498 (2009) ("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts. *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 8430844 (1984).").

[45] In this waiver there are no EPA or other Federal standards that have been identified that explicitly and directly regulate emissions of GHGs from new motor vehicles. While emission standards promulgated by EPA have always been treated as applicable Federal standards because they explicitly regulate the same vehicles and air pollutants, there is the possibility that another Federal agency could have a standard that also directly and explicitly regulates emissions from some new motor vehicles. EPA is not aware of any such circumstances at this time, but reserves the right to consider in the future whether such a non-EPA Federal standard would be considered an "applicable Federal standards" for the purpose of a CAA waiver determination.

but they are not the same legal requirements and the regulations do not apply in the same manner.[46] Fuel economy standards do impact the levels of one GHG—$CO_2$—that is emitted from motor vehicles. But fuel economy standards do not set limits on emission levels of $CO_2$ or any other air pollutant, as do California's standards. Lacking that kind of regulation of emissions of an air pollutant, fuel economy standards are not "applicable Federal standards."

The difference between emission standards and fuel economy standards is highlighted by comparing the two sets of standards at issue here. California's greenhouse gas emission standards establish allowable grams per mile ("gpm") levels for greenhouse gas emissions, including tailpipe emissions of carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), and methane ($CH_4$) as well as emissions of $CO_2$ and hydrofluorocarbons (HFCs) related to operation of the air conditioning system. By regulating emissions of four different greenhouse gas pollutants, the standards do more than reduce tailpipe $CO_2$ emissions resulting from fuel combustion. They do not directly equate to miles per gallon fuel economy reductions. Fuel economy standards, on the other hand, directly control miles per gallon ("mpg") fuel economy levels. $CO_2$ reductions will occur, but they are an expected indirect effect of improved fuel economy standards because the same technology that improves fuel economy effectively reduces $CO_2$ emissions.

There is no doubt that a CAFE standard would clearly produce companion reductions in $CO_2$ as fuel economy improves, given the technology used to improve fuel economy. However, for the reasons described above EPA believes the better interpretation of section 209(b)(1)(A) is to look at whether the Federal standard is applicable to the same vehicles and air pollutants as the California standards, by considering whether they directly regulate the same vehicles and air pollutants. It is clear that a CAFE standard does not meet this test. While there is a large but non-identical overlap

in effect between a CAFE standard and a GHG emission standard with respect to emissions of $CO_2$, the CAFE standards do not set limits on emissions of $CO_2$ or any other GHG. There also remain important areas where there is no overlap at all with the California standards, including the regulation of greenhouse gas pollutants other than $CO_2$. Instead of making an exception to its interpretation of "applicable Federal standards" for NHTSA's CAFE fuel economy standards, EPA believes it is more appropriate to apply its traditional interpretation, for all of the reasons discussed above. Therefore, EPA has determined that NHTSA's CAFE standards are not "applicable Federal standards" for purposes of this waiver criterion.

2. If EPA Did Consider CAFE Standards as "Applicable Federal Standards," Are the CAFE Standards More Stringent Than California's Greenhouse Gas Emission Standards?

Even if EPA were to take fuel economy standards into consideration as "applicable Federal standards," opponents of the waiver have not met their burden of proof to demonstrate that California's protectiveness determination was arbitrary and capricious. No waiver opponent has demonstrated that existing CAFE standards are more stringent or more protective of the public health and welfare than California's greenhouse gas emission standards.

EPA has consistently stated in prior waiver determinations that California's protectiveness determination must consider the "applicable Federal standards" in existence at the time of EPA's waiver decision.[47] Standards in existence at the time of a waiver decision have only included finalized emission standards that EPA has promulgated through its rulemaking process and pursuant to its Clean Air Act authority.

Applying that approach here, if EPA were to take NHTSA's fuel economy standards into account when reviewing California's protectiveness determination, our inquiry would be limited to those final fuel economy standards that are currently in existence

at the time of the waiver decision. Although NHTSA is required by the EISA to promulgate more stringent fuel economy standards in the future, the only final fuel economy standard under EISA that is currently in existence is that for the 2011 model year.[48] Additionally, although EPA and the Department of Transportation (DOT) have issued a notice of intent to engage in a joint rulemaking, with NHTSA issuing fuel economy standards under the EISA for the 2012 through 2016 model years and EPA issuing greenhouse gas standards under the CAA for those same model years, those standards are neither proposed nor final at this time.[49] To consider CAFE standards that have been proposed or those standards that may be proposed would be speculative about what standards will be adopted, and EPA has consistently found it inappropriate to engage in that speculation with respect to either EPA's or California's future standards in prior waiver decisions.

Further, it is reasonable to limit our consideration of "applicable Federal standards" to those final standards that are in existence, in light of the range of options that remain for California and EPA after a decision on this waiver. If federal greenhouse gas standards are promulgated in the future, and if such standards bring this determination into question, then EPA can revisit this decision at that time. The legislative history of section 209(b) makes clear that Congress considered section 209(b) as including the authority for EPA to withdraw a waiver if circumstances occur in the future that would make this appropriate: "Implicit in this provision is the right of the [Administrator] to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver.[50] EPA need not decide now what action might be authorized or appropriate under section 209(b) if EPA adopts greenhouse gas emission standards in the future, as that is best decided when EPA takes such action. Additionally, the possibility that CARB may revise its standards is always present. Such a revision would be considered by EPA in a future waiver proceeding. EPA would then determine whether those changes are within-the-scope of its prior waiver or if a new, full waiver determination would need to be made, as would be required if California

[46] The Supreme Court acknowledged this "overlap" between fuel economy and emission standards in *Massachusetts* v. *EPA*, 127 S. Ct. at 1438. ("[T]hat DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's 'health' and 'welfare.' 42 U.S.C. 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. *See* Energy Policy and Conservation Act, section 2(5), 89 Stat. 874, 42 U.S.C. 6201(5). The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.")

[47] See *e.g.*, Authorization of California's Under 25 Horsepower Utility Lawn and Garden Equipment Engine Exhaust Emission Standards (ULGE) (July 5, 1995) at 18. ("CARB's protectiveness determination must be judged on the standards that are in existence at the time EPA makes it authorization determination. However, as CARB correctly states, until EPA's rules become final no changed circumstances exist that affect CARB's protectiveness determination, and that it would be premature to make a protectiveness comparison with non-finalized federal standards.")

[48] 74 FR 14196 (March 30, 2009).

[49] 74 FR 24007 (May 22, 2009).

[50] S. Rep. No. 403, 90th Cong. 1st Sess. (1967), at 33–34.

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice    **32753**

decided to increase the stringency of its greenhouse gas standards.

California's greenhouse gas emission standards begin with the 2009 model year and increase in stringency through the 2016 model year. For that same time period, fuel economy standards only exist for the 2009 through 2011 model years. An appropriate comparison between California's greenhouse gas standards and NHTSA's fuel economy standards, then, would compare California's standards for the 2009 and later model years to NHTSA's fuel economy standards for the 2009 through 2011 model years.

In his December 19, 2007 letter notifying California Governor Schwarzenegger that California's waiver request would be denied, former EPA Administrator Johnson stated that the EISA "establishes an aggressive standard of 35 miles per gallon for all 50 states, as opposed to the 33.8 miles per gallon in California and a patchwork of other states." California prepared and documented a technical evaluation comparing federal fuel economy standards to its own standards.[51] Accounting for the differences between the two sets of standards, CARB attempted an "apples to apples" comparison of the standards and made several assumptions to that end. For its own standards, CARB assumed its current greenhouse gas regulations—at issue here—were in effect for the 2009 through 2016 model years and that those standards increased in stringency for the 2016 through 2020 model years (its "Pavley 2" standards that are not at issue in this waiver proceeding). Because EISA does not set standards, but directs NHTSA to issue standards that increase fuel economy to a minimum of 35 miles per gallon by the 2020 model year, CARB projected that the new CAFE standards would proportionally increase by 3.44 percent each year after the 2011 model year. Also, because EISA allows a fuel economy credit up to 1.2 miles per gallon for use of flexible fuel vehicles (FFVs) that can operate on high-blend ethanol, such as E85, based on manufacturer statements that they would produce large numbers of FFVs, CARB assumed maximum use of that credit. CARB also took into account differences in fleet mix in California and the other 49 states. To compare this range of years of the California

greenhouse gas emission standards to the corresponding range of years of EISA fuel economy standards, CARB translated the miles per gallon standards from EISA into greenhouse gas emission rates. The rates of greenhouse gas emission reduction from each set of standards were then compared from 2009 through 2020.[52] CARB found that in California in 2016, its greenhouse gas emission standards would achieve 51.9 million metric tons of greenhouse gas emission reductions compared to 23.7 million metric tons from federal fuel economy standards. By 2020, CARB found 100.5 million metric tons of greenhouse gas emission reductions from its standards compared to 59.5 million metric tons of greenhouse gas emission reductions from the federal fuel economy standards.[53] Both sets of reductions follow a similar pattern because both sets of standards are relatively similar in stringency in the near-term (2009–2011), with California's standards ramping up in the mid-term (2012–2016), just as the proposed EISA standards begin to increase their stringency. While both sets of standards gain stringency in the long-term (2016 and beyond), California found that its standards are more stringent sooner and in the long-term and, furthermore, that its standards are more protective of its public health and welfare because they achieve greater greenhouse gas reductions.

EPA notes that this comparison requires speculation regarding what final CAFE standards will be promulgated by NHTSA for the 2012–2020 model years, and what final GHG standards may be promulgated by CARB for the 2017–2020 model years. If the comparison were truly between final, promulgated standards of California GHG-to-CAFE, it would compare California standards for the 2009 through 2016 model years to the lone NHTSA fuel economy standard for the

2011 model year, and the preexisting standards for the 2009–2010 model years. This highlights that the appropriate approach is to compare standards that are final as of the time of the waiver decision. However, California's approach indicates that its standards are more stringent than federal CAFE standards even if CAFE standards increased in the 2012 through 2016 model years. Therefore, this approach also would indicate that California's standards, reviewing only those standards that are final at this time, are more stringent in the aggregate.

No commenter has presented evidence that questions CARB's claim that its greenhouse gas emission standards are more stringent than EISA. Most commenters opposing the waiver do not focus on the comparative stringency of the two sets of standards, but instead focus on EISA's mandate for more stringent fuel economy standards as undermining the currency of California's protectiveness determination or California's "need" for its greenhouse gas emission standards. For example, AIAM has argued that the increased stringency of CAFE standards due to the EISA removes the basis for California's protectiveness determination.[54] Similarly, the Alliance argues that "CARB erred in a fundamental way when it chose to ignore the impact of the federal CAFE standards generally and EISA's passage in specific on California's outdated protectiveness determination."[55] These arguments assume that CAFE standards are "applicable Federal standards" and that non-final standards may be taken into consideration at the time of a waiver determination. As explained in detail above, those assumptions are not consistent with EPA's interpretation of the section 209(b)(1)(A) criterion. Notably though, neither argument presents a factually-based analysis of the stringency of California's greenhouse gas emission standards as compared to existing fuel economy standards that undermines California's protectiveness determination.[56] Such an

[51] California Air Resources Board, Comparison of Greenhouse Gas Reductions for the United States and Canada under U.S. CAFE Standards and California Air Resources Board Greenhouse Gas Regulations, February 25, 2008, available at http://www.arb.ca.gov/cc/ccms/reports/pavleycafe_reportfeb25_08.pdf.

[52] The 2009 through 2020 model year standards are not a straightforward comparison of California's greenhouse gas standards to EISA standards because the years do not align. The California greenhouse gas standards at issue, here, are for the 2009 and later model years, whereas EISA was enacted in 2007 and mandates standards to reach 35 miles per gallon by the 2020 mode year, but as of yet have only been promulgated for the 2011 model year. The 2009 and 2010 MY federal fuel economy standards were pre-EISA standards. Neither California nor NHTSA has yet promulgated standards for the 2017–2020 model years: California greenhouse gas standards for those years are currently proposed in California (as "Pavley 2" standards), as are all the EISA standards from the 2012 through 2015 model years.

[53] California Air Resources Board, Comparison of Greenhouse Gas Reductions for the United States and Canada under U.S. CAFE Standards and California Air Resources Board Greenhouse Gas Regulations, (February 25, 2008), at 13–14.

[54] Association of International Automobile Manufacturers, Inc., EPA–HQ–OAR–2006–0173–9005 at 13–14.

[55] Alliance of Automobile Manufacturers, EPA, HQ–OAR–2006–0173–8994 at 20.

[56] The Alliance's comments received April 6, 2009 state: "It should be noted that * * * it is also true that the fuel economy improvements required by the California GHG standards are more stringent, overall, for the industry than the CAFE standards in many jurisdictions in which the state GHG standards would apply compared to the CAFE standards. CARB does not disagree with this point. See CARB, Comparison of Greenhouse Gas Reductions for the United States and Canada Under U.S. CAFE Standards and California's Air Resources
Continued

**32754**   **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

analysis would be necessary for EPA to make a section 209(b)(1)(A) finding, if EPA were to depart from its traditional review of California's protectiveness determination and interpret "applicable Federal standards" to include NHTSA's fuel economy standards. As noted below, the Alliance points to an analysis of the relative stringency of the two sets of standards to find that: "the combined vehicle-fuel program created by the EISA would result in greater life-cycle GHG reductions than the state standards that are the subject of this proceeding by the end of the decade." That analysis, however, is flawed for the purpose of this waiver consideration because it speculates as to NHTSA standards that are not yet finalized, or even proposed. Additionally, it infers that California's standards are more protective until 2017.[57]

Based on the above, and recognizing that federal fuel economy standards are not "applicable Federal standards," EPA notes that even if the stringency of CAFE standards are considered in context of the section 209(b)(1)(A) waiver criterion, the opponents of the waiver have not presented sufficient evidence to show that California's protectiveness determination is arbitrary and capricious. No commenter has shown that California's determination was arbitrary and capricious in finding that NHTSA's fuel economy standards are not in the aggregate more protective of human health and welfare than California's greenhouse gas standards, whether one considers just the CARB and NHTSA standards that are currently finalized, or one considers possible future standards that either agency might adopt.

### B. How Does EPA Evaluate Impacts on Other States?

Several comments have suggested that EPA should consider the impacts of California's greenhouse gas standards on other states.[58] At present time, thirteen other states and the District of Columbia have already adopted California's greenhouse gas emission standards pursuant to section 177 of the Act.[59]

These comments raise two objections concerning other states adoption of California's greenhouse gas emission standards. First, these comments suggest that state-by-state compliance with each state's adopted set of California standards presents an unworkable compliance "patchwork" for automobile manufacturers.[60] Second, and related, the comments suggest that enforcement of California's greenhouse gas standards in other states will lead to "environmental disbenefits" in those states.[61] EPA takes no position on the merits of either argument because these arguments are outside the scope of our section 209(b)(1) waiver criteria. EPA's evaluation of California's waiver request is limited to the State of California.[62] To the extent that these comments raise issues regarding the environmental impacts of consumer shifts within California they are evaluated below.

### C. Is California's Protectiveness Determination Arbitrary and Capricious?

1. Based on EPA's Traditional Analysis, Is California's Protectiveness Determination Arbitrary and Capricious?

As described above, EPA's traditional analysis has been to evaluate California's protectiveness determination by comparing the new California standards to applicable EPA emission standards for the same pollutants.[63] In the context of greenhouse gas emissions this analysis is simple. EPA has already determined that California was not arbitrary and capricious in its determination that the

---

§ 26.11.34), Vermont (Vt Air Poll. Ctrl Regs., Subchapter XI, 5–1106(a)(5)), Maine (06 Code of Maine Rules § 127), Connecticut (Conn. Admin. Code § 22a–174–36b), Arizona (18 A.A.C. 2), New Jersey (NJ Admin. Code §§ 7:27–29.13), New Mexico (20 NM Admin. Code, Chapter 2, Part 88), Oregon (Or. Admin. Rules § 340–257), Pennsylvania (36 Pa.B. 7424), Rhode Island (RI Air Poll. Ctrl Reg. 37.2.3), Washington (Wash. Admin. Code § 173.423–090(2), and Washington, DC (DC Law 17–0151) have adopted California's greenhouse gas emission standards. *See also http:// www.pewclimate.org/what_s_being_done/in_the_states/vehicle_ghg_standard.cfm.* Four more states, including Florida, Colorado, Utah, and Montana are poised to adopt the standards.

[60] National Automobile Dealers Association, EPA–HQ–OAR–2006–0173–7176.1, EPA–HQ–OAR–2006–0173–8956.

[61] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994 at 22.

[62] These states and the District of Columbia have acted pursuant to section 177 of the Clean Air Act, which is not relevant to this proceeding, and that any issues commenters have regarding section 177 and state compliance with that statutory provision, is not appropriate for this proceeding. EPA notes that the language of section 209(b)(1) refers to the "State" in several instances but in no instance does it refer to "states" or other areas of the country.

[63] See CAA section 209(b)(2).

pre-existing California standards for light-duty vehicles and trucks, known as LEV II, is at least as protective as comparable Federal standards, known as the Tier II standards.[64] In the context of the ZEV proceeding, EPA conducted its traditional analysis to compare California's newly enacted ZEV standards to a similar lack of applicable Federal standards. At that time, California found, and EPA deemed reasonable, that the addition of the ZEV standards did not render California's LEV II program, for which a waiver had previously been granted, less protective than the Federal Tier II program. In addressing the Alliance's petition for reconsideration with respect to this issue, EPA stated that "the words 'standards' and 'in the aggregate' in section 209(b)(1)(A) * * *. at minimum, include all the standards relating to the control of emissions for a category of vehicles (*e.g.* passenger cars, etc.) subject to CARB regulation, particularly where the standards are designed to respond to the same type of pollution."[65]

California's greenhouse gas standards are also an addition to its existing LEV II program. Since the greenhouse gas standards add onto California standards that have already been determined to be as least as protective, and since there are no applicable federal greenhouse gas emission standards, the point of comparison, here, is between California's greenhouse gas standards and an absence of EPA greenhouse gas emission standards. Comparing an absence of EPA greenhouse gas emission standards to the enacted set of California greenhouse gas emission standards provides a clearly rational basis for California's determination that the California greenhouse gas emission program will be more protective of human health and welfare than non-existent applicable federal standards. California directly addressed this traditional analysis in its finding that "[t]here are no comparable federal regulations that specifically require the control of greenhouse gas emissions from motor vehicles."[66]

EPA received comments suggesting that this type of traditional comparison is inappropriate, even "impossible," in

---

Board Greenhouse Gas Regulations: An Enhanced Assessment, at 8 (February 25, 2008)." Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994 at 20, note 4.

[57] *Id.*

[58] Association of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–7176.11, p. 1–2, 24–25; National Automobile Dealers Association, EPA–HQ–OAR–2006–0173–7176.1, EPA–HQ–OAR–2006–0173–8956; NERA Economic Consulting and Sierra Research, EPA–HQ–OAR–2006–0173–9053.1.

[59] New York (6 NY Code, Rules & Regs., Part 218–8.3), Massachusetts (310 Code of Mass. Regs. 7.40(2)(a)(6)), Maryland (Code of Md. Regs.

---

[64] 71 FR 78190 (December 28, 2006) and Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006); 68 FR 19811 (April 22, 2003) and Decision Document for Waiver of Federal Preemption for Low Emission Vehicle Amendments (LEV II)(April 11, 2003).

[65] EPA's August 13, 2008 Response to Petition for Administrative Reconsideration of EPA's ZEV Waiver Decision (through the 2011 Model Year) published on December 28, 2006, at 3.

[66] Id. at 13.

Case 4:25-cv-04966-HSG Document 247-1 Filed 08/12/26 Page 26 of 162
USCA Case #26-1218 Document #2187882 Filed: 08/11/2026 Page 17 of 47

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice 32755

the absence of Federal greenhouse gas emission standards.[67] Such an argument is contrary to legislative intent and EPA's practice.[68] This is not the first time that California has enacted emission standards in the absence of Federal standards; in fact, California's pioneering role in setting mobile source emission standards is one reason the waiver provision exists.[69] Given that section 209(b)(1) is designed to allow California to have standards more stringent than Federal standards, it would make little sense to use this provision to prevent California from having such standards where the Federal government has not yet acted. Moreover, in prior decisions EPA has found that such protectiveness determinations by California in the absence of Federal standards were reasonable.[70] Indeed, California standards may be most clearly "at least as protective" when they are compared to the absence of Federal emission standards. This commenter further points to the "tremendous level of current federal activity" as the primary reason why "it is impossible for EPA to evaluate how the GHG Regulations will compare with federal regulation in this field." While EPA has announced its intention to propose greenhouse gas emission standards, EPA has consistently stated that CARB's protectiveness determination must consider the Federal standards in existence at the time of EPA's waiver decision.[71]

Furthermore, waiting for future federal regulation would be contrary to the purpose of the section 209(b) waiver provision—effectively stalling California's ability to enforce its own program. CARB's protectiveness determination was made on September 23, 2004, at which time there were no federal greenhouse gas standards. CARB's determination, then, correctly

compared its standards to the absence of federal emission standards. Since that time, there has been no relevant intervening "applicable Federal standard."[72] Although AIAM points to the *Massachusetts* v. *EPA* decision and Executive Order 13,432, neither of those documents, nor any subsequent actions by the Federal government,[73] constitute final EPA regulation of greenhouse gas emissions for new motor vehicles that could be used as a comparable standard in this waiver proceeding.[74] The current lack of federal greenhouse gas emission standards maintains the factual basis for CARB's September 23, 2004 protectiveness determination. As noted above, if and when greenhouse gas standards are promulgated by EPA in the future, and if such standards bring this determination into question, then EPA can revisit this waiver decision at that time. Accordingly, applying its traditional comparative analysis, opponents of the waiver have not shown flaw or lack of reason in California's protectiveness determination; and we cannot find that California's protectiveness determination is arbitrary and capricious.

2. Is California's Protectiveness Determination Arbitrary and Capricious Based on the Real-World In-Use Effects of California's Greenhouse Gas Standards?

EPA received comments suggesting the need for and appropriateness of applying an alternative interpretation of section 209(b)(1)(A), based on an inquiry into the in-use effect of inclusion of greenhouse gas standards upon the broader motor vehicle emissions program.[75] EPA does not take a position as to the validity of the suggestion that the type of numerical analysis discussed above is insufficient. Noting the legislative history and text of section 209(b)(2), EPA would need a concrete factual basis to examine the in-use effect of California's greenhouse gas standards on its broader LEV II program as compared to the Federal Tier II program. We need not take a position on

that matter because to the extent that the in-use effects of the greenhouse gas standards are considered, the waiver opponents do not meet their burden to show that CARB's analysis of the effects is unreasonable.

These comments suggest that consumer effects will cause California's broader LEV II motor vehicle emissions program to be less protective than the Federal Tier II emissions program.[76] In support of this analysis, the Alliance commissioned a study from Sierra Research, NERA Economic Consulting, and Air Improvement Resource, Inc. entitled "Effectiveness of the California Light Duty Vehicle Regulations as Compared to Federal Regulations," which was submitted to EPA on June 15, 2007 ("June 2007 AIR/NERA/Sierra Study").[77] CARB specifically responded to the June 2007 Study in comments it submitted to the docket on July 24, 2007 ("CARB's July Comments").[78] Next, the Alliance submitted a response to California's response prepared by NERA Economic Consulting and Sierra Research ("October 2007 NERA/Sierra Study").[79] Most recently, the Alliance submitted another study produced by NERA Economic Consulting and Sierra Research entitled "Impacts of the California Greenhouse Gas Emission Standards on Motor Vehicle Sales" ("April 2009 NERA/Sierra Study").[80] On this issue, the Alliance also refers to a study published by the Society of Automotive Engineers entitled "Evaluation of California Greenhouse Gas Standards and Federal Independence and Security Act—Part 2: $CO_2$ and GHG Impacts" ("SAE Study").[81] At the same time, Air Improvement Resource, Inc. has independently submitted comments which include its "Evaluation of California Greenhouse Gas Standards and Federal Energy Independence and Security Act" ("March 2009 AIR Study").[82]

The Alliance has raised this issue before, in its request for reconsideration of EPA's waiver for California's ZEV

---

[67] Alliance of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1455 at 3; Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1297 at 2, 5–7, 11–12; National Automobile Dealers Association, EPA–HQ–OAR–0173–1671 at 3.

[68] The waiver provision allows California to "act as a testing agent for various types of control and the country as a whole will be a beneficiary of this research" (113 Cong. Rec. 32478 [1967]); "act as a laboratory for innovation" (*MEMA I* at 1095). *See* Decision Document for Authorization of State Standards for Utility Lawn and Garden Equipment (ULGE) (July 5, 1995).

[69] California first began regulating motor vehicle emissions in 1957, nearly a decade before Congress enacted the Motor Vehicle Air Pollution Control Act of 1965, which enabled a federal program.

[70] See e.g., Authorization of California's Under 25 Horsepower Utility Lawn and Garden Equipment Engine Exhaust Emission Standards (ULGE) (July 5, 1995).

[71] *Id.* at 18.

[72] See section IV.A., regarding "applicable Federal standards."

[73] The Alliance similarly argues that EISA's mandate for reformed CAFE standards renders California's protectiveness determination "obsolete" or "stale." Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–8994 at 21.

[74] Likewise, EPA and DOT's "Notice of Upcoming Joint Rulemaking To Establish Vehicle GHG Emissions and CAFE Standards" does not include any final standards which EPA can take into account as an "applicable Federal standards." 74 FR 24007 (May 22, 2009).

[75] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1297 at 5–12, and EPA–HQ–OAR–2006–0173–8994 at 22.

[76] *Id.*

[77] Sierra Research, Inc., EPA–HQ–OAR–2006–0173–1447, 1447.1–.5.

[78] California Air Resources Board, EPA–HQ–OAR–2006–0173–3601.

[79] NERA Economic Consulting, Inc. and Sierra Research, EPA–HQ–OAR–2006–0173–3651.

[80] NERA Economic Consulting and Sierra Research, EPA–HQ–OAR–2006–0173–9053.

[81] Thomas L. Darlington and Dennis F. Kahlbaum, Evaluation of California Greenhouse Gas Standards and Federal Independence and Security Act—Part 2: $CO_2$ and GHG Impacts, SAE Paper No. 2008–01–1853 (2008), Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994 at 20, note 44.

[82] Air Improvement Resources, Inc., EPA–HQ–OAR–2006–0173–13662.

**32756**    Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

standards.[83] In that reconsideration, the Alliance referred to the same June 2007 AIR/NERA/Sierra Study, saying that the California program, as a whole, was not at least as protective of public health and welfare as comparable federal standards. EPA denied the Alliance's request, in particular because the June 2007 AIR/NERA/Sierra Study was produced under the assumption that California's ZEV standards would be in effect until at least 2020 and that California's greenhouse gas standards would also be in effect. As EPA had only granted the ZEV waiver through the 2011 model year and had not granted the greenhouse gas waiver, EPA found that the study was not based upon the proper assumptions for comparing California's standards to federal standards. EPA stated at that time: "[T]o the extent that the real-world emission effects of CARB's ZEV program (aggregated with its LEV II standards) are relevant, if at all, the Alliance fails to submit sufficiently focused information regarding these programs and their associated effect on emissions. Thus, no basis exists to reconsider EPA's December 2006 waiver decision based on the NERA/Sierra/Air report." [84]

In evaluating its greenhouse gas standards, California's protectiveness determination went beyond a simple numerical comparison of its greenhouse gas standards to non-existent federal greenhouse gas standards. Its protectiveness determination was also based upon its own analysis of the impact of its greenhouse gas standards on its larger program. California found that its new greenhouse gas standards would yield not only reductions in greenhouse gas emissions but also a net reduction in criteria pollutant emissions.[85] Therefore, to the extent this analysis is even relevant for an EPA waiver review opponents must present "clear and compelling" evidence challenging the reasonableness of this determination and California's analysis.

The June 2007 AIR/NERA/Sierra Study prepared for the Alliance presents a finding that its results "indicate that the California Program, in the aggregate, is less protective of public health than the Federal Program with respect to emissions of ozone precursors and several other criteria pollutants." The study undertook consumer choice modeling to evaluate the effect of the California greenhouse gas emission standards on the new motor vehicle fleet and vehicle miles travelled (VMT) and compare those effects with fleet and VMT conditions were the Federal Program in effect in California. Its results showed that compliance with the California greenhouse gas standards would raise the cost of new motor vehicles in California, which would then lead to higher new vehicle prices, decreased new vehicle sales, increased retention of used vehicles ("scrappage effect"), increased fuel economy which would lead to increased VMT ("rebound effect"), and, finally, increased emissions of ozone precursors and several other criteria air pollutants.

On July 24, 2007, CARB submitted a response to comments received by EPA which specifically addressed the June 2007 AIR/NERA/Sierra Study.[86] First, CARB insisted that such a study should have been presented for consideration during California's rulemaking process and not later during EPA's consideration of California's waiver request. Second, CARB substantively responded to the June 2007 AIR/NERA/Sierra Study and claimed that its protectiveness determination was proper. In sum, CARB objected that the June 2007 AIR/NERA/Sierra Study is inappropriate because it is not focused on the relative stringency of emission standards, but instead presents "a series of speculative events driven by disputed and unsupported compliance costs that would supposedly result—contrary to experience with previous reduction and automotive regulatory measures—in a substantial reduction in new motor vehicle sales (fleet turnover); and * * * Californians' theoretical desire to drive even more miles than already projected to reach increasingly distant destinations in the face of increasing traffic congestion (rebound effect)." [87] CARB further critiqued several points of AIR/NERA/Sierra's analysis, including what it viewed as "grossly overstated * * * highly speculative cost estimates," modeling errors, lack of methodological detail, and faulty assumptions. CARB asserted that its staff reviewed similar analyses and had provided its own analyses that are "more reasonable and historically reliable" and "lead to dramatically different outputs."

NERA/Sierra responded to that critique on October 29, 2007.[88] That document includes specific responses to criticisms raised by CARB and generally defends the integrity of its analyses. NERA/Sierra affirmed its conclusions that CARB's protectiveness determination is not fully supported because it understates or ignores costs, does not consider the combined effects of the ZEV mandate and GHG requirements, and does not assure compliance through technological implementation. As to the specific modeling issues raised by CARB, NERA/Sierra maintained the correctness of its modeling assumptions and estimations with regard to technology cost, fleet turnover, rebound effect, and pollutant emission effect.

NERA/Sierra also submitted an additional study on April 6, 2009, presenting many of the same methodological assertions noted above. Notably, though, this study is less methodologically clear: It does not quantify scrappage or its effects on emissions, assumes technology is applied only to meet federal CAFE

---

[83] Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006) and EPA's August 13, 2008 Response to Petition for Administrative Reconsideration of EPA's ZEV Waiver Decision (through the 2011 Model Year) published on December 28, 2006.

[84] EPA's August 13, 2008 Response to Petition for Administrative Reconsideration of EPA's ZEV Waiver Decision (through the 2011 Model Year) published on December 28, 2006, at 17–18. That denial further opined: "In light of the language of section 209(b)(1)(A) and associated legislative history, it may only be necessary to examine the applicable emission limits in determining California's ability to set more stringent standards and pursue pioneering efforts (which may or may not lead to higher costs and associated fleet turnover concerns) under section 209(b)(1)(A). Given the legislative history * * * . EPA would need a concrete basis to examine the "real world" or in-use effect of California's standards in comparison to applicable federal standards (in this case, a comparison of LEV II + ZEV versus Tier 2). To require CARB to justify its standards and policy goals within the context of the protectiveness criteria based on waiver opponents' complicated and controversial models that apply assumptions that are themselves controversial, and where there are no corresponding federal standards, raises questions about whether demanding this type of review conflicts with Congress' intent to allow California 'the broadest possible discretion' in fashioning its own motor vehicle program without EPA second-guessing California's policy choices." Id. at 12.

[85] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.107 at 15 ("Taking into account the penetration of 2009 and later vehicles meeting the new standard, the proposed regulation will reduce greenhouse gas emission by an estimated 87,700 $CO_2$-equivalent tons per day statewide in 2020 and by 155,200 $CO_2$-equivalent tons per day in 2030. This translates into an 18 percent overall reduction in greenhouse gas emissions from the light duty fleet in 2020 and a 27 percent overall reduction in 2030; Taking into account the penetration of 2009 and later vehicles meeting the new standard, the proposed regulation will reduce upstream emissions of non-methane organic gases (NMOG) by 4.6 tons per day statewide in 2020 and 7.9 tons per day statewide in 2030, and will reduce upstream emissions of $NO_X$ by 1.4 tons per day statewide in 2020 and 2.3 tons per day statewide in 2030. The regulation will provide a criteria pollutant benefit even taking into account possible pollutant increases due to consumer response.").

[86] California Air Resources Board, EPA–HQ–OAR–2006–0173–3601.

[87] California Air Resources Board, EPA–HQ–OAR–2006–0173–3601 at 8.

[88] NERA Economic Consulting, Inc. and Sierra Research, EPA–HQ–OAR–2006–0173–3651.

standards (and not beyond that level of stringency), and assumes that further compliance is achieved through fleet mix changes combined with restrictions on vehicle availability. It is not clear whether and how ZEV program requirements are included in this study. Most importantly, though, the April 2009 NERA/Sierra Study is outside the scope of this proceeding; it presents "the effects on motor vehicle sales of the California Standards, assuming that they are implemented in the 13 states that have adopted California's standards." [89] That is, the April 2009 NERA/Sierra Study seeks to present the effect of California's greenhouse gas standards on new motor vehicle sales in those 13 states. This is inappropriate because the waiver inquiry is limited to the State of California (as noted above) and, even if this study had been limited to California, it would still be inadequate because it does not connect its findings with regard to depressed vehicle sales to increased criteria pollutant emissions.

Air Improvement Resources, Inc. ("AIR"), who had originally participated in the June 2007 AIR/NERA/Sierra Study but submitted comment independently on April 6, 2009, evaluated California's greenhouse gas standards as compared to EISA "standards." As noted above, this evaluation is not relevant to EPA's section 209(b)(1)(A) inquiry because EISA "standards" are not "applicable Federal standards" for the purpose of our waiver inquiry. Nor have any fuel economy standards been promulgated beyond the 2011 model year. Those underlying inadequacies render this study unpersuasive, if not entirely irrelevant. However, it is interesting to note that the primary finding of this study is that "the California program has lower GHG emissions until about 2016–2018." [90] AIR also included as an attachment an SAE Paper evaluating impacts on new vehicle fuel economy from California's greenhouse gas standards and EISA "standards." The finding of this paper is that California's greenhouse gas standards will lead to higher fuel economy than EISA "standards" until the 2017 model year. [91] The findings of both reports are

based on inconsistent assumptions that California's greenhouse gas standards will not become more stringent after the 2016 model year, (because this waiver request ends with the 2016 model year standards) but the federal fuel economy standards will become more stringent even though there are not yet any federal fuel economy standards past the 2011 model year. As stated above, EPA is not including fuel economy standards in its consideration of "applicable Federal standards." But, even if EPA were to engage in that analysis, it can only consider standards in existence at the time of a waiver decision, as stated above. Since no federal fuel economy standards exist yet beyond the 2011 model year, EPA will not make predictions about later year fuel economy standards in order to take them into account here.

As discussed below, EPA has evaluated both sets of analyses (from CARB and NERA/Sierra) and makes note of the following with regard to (1) fleet turnover/delayed scrappage, (2) the rebound effect, and (3) upstream emissions impacts. [92]

a. Fleet Turnover/Delayed Scrappage

The Alliance argues that California's greenhouse gas standards will cause delayed fleet turnover and, thus, increase criteria air pollutant emissions. Delayed fleet turnover results when the prices of new vehicles increase, causing prices of existing vehicles to increase as well. A consumer's decision to scrap an existing vehicle depends upon the trade-off between the value of existing vehicle in its working condition and its scrappage value. Rising prices of existing vehicles lead some consumers to decide to delay scrapping their vehicles. An older vehicle stock on the road results in an increase in criteria air pollution.

In conducting its analysis on consumer behavior impacts in its June 2007 study, NERA/Sierra/AIR evaluated the combined impacts of the California greenhouse gas emission standards and the Zero Emission Vehicle ("ZEV") rules. It is difficult to discern the total

cost per vehicle over various model years of the greenhouse gas versus the ZEV portion of the rules and, therefore, determine how much of the consumer behavior impacts are appropriately attributable to the greenhouse gas standards. Thus, it is difficult to undertake a direct comparison of the NERA/Sierra/Air and CARB studies. According to NERA/Sierra/AIR, as a result of price increases associated with the greenhouse gas and ZEV rules in 2020, they project that new vehicle sales in California will fall by approximately 130,000 vehicles. In addition, the number of vehicles in the fleet prior to the effective date of the ZEV and GHG regulations (i.e., pre-2009 model year vehicles) is more than 250,000 greater in 2020 than would otherwise be the case under a federal program.

CARB, on the other hand, only looks at the economic impacts of the California greenhouse gas standards, independent of the ZEV requirements. Without the ZEV requirements, CARB estimates that California's greenhouse gas standards will result in an increase in new vehicle prices of approximately $1,000 per vehicle (i.e., $1,064 for passenger vehicles, small trucks and sport utility vehicles (SUVs) and $1,029 for certain medium-duty trucks/ SUVs). [93] Using a consumer choice model, CARBITS, CARB estimated new vehicle sales from California standards would increase in the near-term, resulting in accelerated fleet turnover, but see declines in fleet turnover in the longer-term, with a loss of vehicle sales of roughly 97,000 in 2020. By 2020, CARB estimates that lost vehicle sales would lead to delayed fleet turnover. The potential increase in ozone precursor emission in California in out years (i.e., 2020) from delayed fleet turnover is about 2.5 tons/day. CARB estimates that those "disbenefits" of fleet turnover delay are more than offset by faster turnover in the early years of the California standard and reductions in emissions associated with fuel production. The more recent April 2009 NERA/Sierra study projects the impacts of the California GHG standards on new motor vehicle sales in the thirteen states that have adopted the California standards. Since the study only examines the impacts on new vehicle sales, it does not provide estimates of ozone precursor impacts of California standards.

b. The "Rebound Effect"

The Alliance contends that criteria air pollutant emissions will increase due to

[89] NERA Economic Consulting and Sierra Research, EPA–HQ–OAR–2006–0173–9053 at E–1.

[90] Air Improvement Resources, Inc., EPA–HQ–OAR–2006–0173–13662 at 2. Yet this analysis presumes the promulgation of fuel economy standards that have not yet been promulgated and does not accordingly presume the promulgation of further greenhouse gas standards by California, despite the fact that the Pavley law in California makes such further standards a significant possibility.

[91] Air Improvement Resources, Inc., EPA–HQ–OAR–2006–0173–13662.

[92] EPA's role in reviewing California's waiver request is limited to finding whether opponents have shown that California's protectiveness determination is arbitrary and capricious. In making its protectiveness determination, CARB included these analyses and the studies noted above have included similar analyses based on diverging assumptions. EPA has evaluated these analyses to demonstrate that CARB's protectiveness determination was not arbitrary and capricious. This evaluation is separate and distinct from any analysis that EPA would conduct in promulgating its own regulation. Nothing in this evaluation should be construed as an endorsement of CARB's or any other analysis or any particular assumption they rely upon.

[93] California Air Resources Board, EPA–HQ–OAR–2006–0173.0010.116.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 29 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 20 of 47

**32758**   **Federal Register**/Vol. 74, No. 129/Wednesday, July 8, 2009/Notice

the so-called vehicle "rebound effect." The rebound effect for vehicle fuel economy is defined as the increase in vehicle travel resulting from a decrease in the fuel cost per vehicle miles as a consequence of an increase in fuel economy. It is projected that increasing fuel efficiency lowers the effective cost of driving to the consumer, which results in an increase in vehicle usage (holding all other factors constant). NERA developed their own econometric estimate of the California rebound effect—17%—based on California vehicle inspection data from 1983–2003. In addition, NERA re-estimated a CARB-sponsored study on the rebound effect by Small & Van Dender and NERA found the long-run rebound effect in California to be roughly 13%.

In contrast, CARB used two types of analysis to evaluate the impact of the proposed regulations on changes in vehicle miles traveled: Econometric work by Small and Van Dender and travel demand modeling (Southern California Association of Governor's (SCAG)). The study by Small & Van Dender allowed the rebound effect to vary based on changes in income and congestion. In addition, the Small & Van Dender study also analyzed the impact of higher vehicle costs on VMT. Based on the econometric modeling, projected California incomes and transportation conditions, Small and Van Dender estimated a dynamic rebound effect of approximately 3% for the State of California in 2020. A major difference between the NERA and Small and Van Dender study was the way nominal income was converted to real income. NERA tried to approximate state cost of living adjustments, but had to modify metropolitan cost of living adjustments; Small and Van Dender used the national consumer price index. Based on the difference in income calculation, NERA found that income was no longer statistically significant in explaining changes in the rebound effect. Therefore, they removed this term from their model. California also used the Southern California Association of Governor's (SCAG) travel demand model to project changes in demand travel based on declining vehicle operating costs in the context of the transportation system in the L.A. South Coast Air Basin. In contrast to the econometric study, the travel demand modeling takes into account the available transportation infrastructure. CARB examined the emission impacts of changes in both the amount and the speed of motor vehicle travel, relative to the cost of gasoline per mile traveled. Based on the vehicle classes affected by the proposed GHG regulation, the results from SCAG indicate an elasticity of VMT to fuel cost (*i.e.*, a rebound effect) of roughly 4 percent in 2020.

c. Upstream Emissions Impacts

California's greenhouse gas standards also will influence the amount of fuel going through the petroleum marketing and distribution infrastructure in California. This, in turn, will reduce the "upstream" criteria air pollutants from transportation, spills, and other events associated with the infrastructure. There were large differences between the CARB and NERA/Sierra estimates of upstream emissions. NERA, focusing on fuel delivery trucks and transit distances, characterized CARB's estimates as significantly flawed. However, both estimated upstream emission reductions of ROG and $NO_x$, with CARB estimating a 6 ton per day reduction and NERA estimating a 1.1–1.5 ton per day reduction. The table below presents the rivaling estimates presented by the CARB and NERA/Sierra analyses.

| | CARB | NERA |
|---|---|---|
| Fleet Turnover/Scrappage Effect. | Accelerated fleet turnover in near-term; smaller delayed fleet turnover in out years (*e.g.*, 2020). | Delayed fleet turnover in near term; larger delayed fleet turnover in out years (*e.g.*, 2020). |
| Rebound Effect .................... | 3% in 2020 ....................................................................... | 17% in 2003, 13% in 2007. |
| Upstream Emissions ............. | 6 tons/day reduction in ROG+NOx ................................. | 1.1–1.5 tons/day reduction in ROG+NOx. |

Additionally, as with our analysis of the AIR/NERA/Sierra analysis in the context of the ZEV waiver reconsideration, we note that the study included a presumption that the ZEV standards would be in effect until at least 2020, and that this assumption appears to have a significant effect on other assumptions in the analysis. However, EPA explicitly declined to approve its waiver for California's ZEV standards beyond the 2011 model year, based in part on concerns that echoed comments from the Alliance. This makes the AIR/NERA/Sierra analysis an insufficient analysis to base a denial of California's waiver request.

In evaluating the studies prepared by AIR/NERA/Sierra in light of California's protectiveness determination, EPA takes important note of CARB's response. As stated above, while CARB disagrees that these studies are properly before EPA in the waiver proceeding, it points out that even if it is proper for EPA to consider the AIR/NERA/Sierra studies, they do not provide a basis for finding that California's protectiveness determination was arbitrary and capricious. CARB maintains that the Alliance has made no attempt to show that CARB's analyses are irrational, which CARB states waiver opponents must make given the "arbitrary and capricious" standard.

EPA agrees that to make a section 209(b)(1)(A) finding, it is not enough for waiver opponents to provide competing analyses that they claim are based on a rational set of assumptions. Rather, they must show that California's analysis, or the assumptions California relied on to support its protectiveness determination were arbitrary and capricious. Competing analyses, each based on rational assumptions, are not sufficient to deny a waiver.[94]

As previously stated, EPA does not need to decide the validity of the suggestion that the traditional numerical analysis is insufficient and that EPA must also consider the in-use effects of the standards. Given the legislative history and text of section 209(b)(2), EPA would need a concrete factual basis to examine the in-use effect of California's greenhouse gas standards on its broader LEV II program as compared to the Federal Tier II program. We need not take a position on that matter because the waiver opponents do not meet their burden to show that CARB's analysis of the in-use effects is arbitrary and capricious.[95] Rather, they present

---

[94] EPA's August 13, 2008 Response to Petition for Administrative Reconsideration of EPA's ZEV Waiver Decision (through the 2011 Model Year) published on December 28, 2006, at 17, note 25.

[95] To the extent that an analysis of the in-use effects of California's greenhouse gas standards may be appropriate, then such analysis properly includes consideration of the upstream emission reduction impacts identified and linked to the standards. A holistic examination of the in-use effects of a regulation should naturally include those effects that have a plausible connection to the standards, including such consequences as indirect upstream emission reductions. The March 6, 2008 Denial stated that California may otherwise have independent authority to regulate stationary sources and therefore there was no basis to include emission reductions from such sources as part of a mobile source rulemaking. However, EPA believes that the issue under section 209(b)(1)(A) is whether

rivaling analyses—each making different assumptions so that the differences in findings can be reduced to differences in assumptions. EPA finds that the Alliance has not met its burden of proof that the greenhouse gas regulations undermine California's previous LEV II and ZEV protectiveness determinations or that California was arbitrary and capricious in its greenhouse gas protectiveness determination.

EPA, therefore, finds that opponents of the waiver have not presented clear and compelling evidence that CARB was arbitrary and capricious in finding that the real-world effect of its standards "in the aggregate" would not lead to greater emissions of pollutants than the federal program.

### D. Section 209(b)(1)(A) Conclusion

Based on the record before me, I cannot find that CARB was arbitrary and capricious in its finding that the California motor vehicle emission standards including the greenhouse gas standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.

### V. Does California Need Its Standards To Meet Compelling and Extraordinary Conditions?

Under section 209(b)(1)(B) of the Act, I cannot grant a waiver if I find that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has traditionally interpreted this provision as considering whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions. However in the March 6, 2008 Denial, EPA limited this interpretation to California's motor vehicle standards that are designed to address local or regional air pollution problems. EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects and that it was appropriate to address such standards separately from the remainder of the program. EPA then proceeded to find that California did not need such standards to meet compelling and extraordinary conditions. The

interpretation adopted in the March 6, 2008 Denial is now before me for reconsideration.

### A. Basis of March 6, 2008 Denial

In the March 6, 2008 Denial, EPA provided its reasoning for changing its long-standing interpretation of this provision, as it pertains to California standards designed to address global air pollution. EPA described its long-standing interpretation in some detail, stating that:

Under this approach EPA does not look at whether the specific standards at issue are needed to meet compelling and extraordinary conditions related to that air pollutant. For example, EPA reviewed this issue in detail with regard to particulate matter in a 1984 waiver decision.[96] In that waiver proceeding, California argued that EPA is restricted to considering whether California needs its own motor vehicle program to meet compelling and extraordinary conditions, and not whether any given standard is necessary to meet such conditions. Opponents of the waiver in that proceeding argued that EPA was to consider whether California needed these PM standards to meet compelling and extraordinary conditions related to PM air pollution.

The Administrator agreed with California that it was appropriate to look at the program as a whole in determining compliance with section 209(b)(1)(B). One justification of the Administrator was that many of the concerns with regard to having separate state standards were based on the manufacturers' worries about having to meet more than one motor vehicle program in the country, but that once a separate California program was permitted, it should not be a greater administrative hindrance to have to meet further standards in California. The Administrator also justified this decision by noting that the language of the statute referred to "such state standards," which referred back to the use of the same phrase in the criterion looking at the protectiveness of the standards in the aggregate. He also noted that the phrase referred to standards in the plural, not individual standards. He considered this interpretation to be consistent with the ability of California to have some standards that are less stringent than the federal standards, as long as, per section 209(b)(1)(A), in the aggregate its standards were at least as protective as the federal standards.

The Administrator further stated that in the legislative history of section 209, the phrase "compelling and extraordinary circumstances" refers to "certain general circumstances, unique to California, primarily responsible for causing its air pollution problem," like the numerous thermal inversions caused by its local geography and wind patterns. The Administrator also noted that Congress recognized "the presence and growth of California's vehicle population, whose emissions were thought to be responsible for

ninety percent of the air pollution in certain parts of California."[97] EPA reasoned that the term compelling and extraordinary conditions "do not refer to the levels of pollution directly." Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—"geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems."[98]

The Administrator summarized that under this interpretation the question to be addressed in the second criterion is whether these "fundamental conditions" (i.e. the geographical and climate conditions and large motor vehicle population) that cause air pollution continued to exist, not whether the air pollution levels for PM were compelling and extraordinary, or the extent to which these specific PM standards will address the PM air pollution problem.[99]

However in the March 6, 2008 Denial, EPA limited this interpretation to California's motor vehicle standards that are designed to address local or regional air pollution problems. EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects.[100]

With respect to a global air pollution problem like elevated concentrations of greenhouse gases, EPA's March 6, 2008 Denial found that the text of section 209(b)(1)(B) was ambiguous and does not limit EPA to this prior interpretation. In addition, EPA noted that the legislative history supported a decision to "examine the second criterion specifically in the context of global climate change." The legislative history:

[I]ndicates that Congress was moved to allow waivers of preemption for California motor vehicle standards based on the particular effects of local conditions in California on the air pollution problems in California. Congress discussed "the unique problems faced in California as a result of its climate and topography." H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). See also Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. See, e.g., Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. In particular, Congress focused on California's

---

the indirect reductions of ozone pollutants from stationary sources created by the greenhouse gas emission standards for motor vehicles, can reasonably be considered by California in its determination that its standards are as protective of public health and welfare as applicable federal standards. Given that the effects are reasonably related to the regulations, if it is appropriate to consider in-use effects then it was not arbitrary and capricious for California to include such effects in this analysis.

[96] 49 FR 18887 (May 3, 1984).

[97] Id. at 18890.

[98] 73 FR 12156, 12159–60 (March 6, 2008).

[99] 73 FR at 12159–60.

[100] EPA recently reaffirmed that the traditional interpretation still applied for motor vehicle standards designed to address air pollution problems that are local or regional in nature. 71 FR 78190, 78192 (December 28, 2008); see also 71 FR 78190 and Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle Standards, at 34.

**32760**   **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

smog problem, which is especially affected by local conditions and local pollution. See Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), id. at 30942. See also, *MEMA I*, 627 F. 2d 1095, 1109 (DC Cir., 1979) (noting the discussion of California's "peculiar local conditions" in the legislative history). Congress did not justify this provision based on pollution problems of a more national or global nature in justifying this provision.[101]

Relying on this, and without any further significant discussion of either congressional intent or how this new approach properly furthered the goals of section 209(b), EPA determined that it was appropriate to:

[R]eview California's GHG standards separately from the remainder of its motor vehicle emission control program for purposes of section 209(b)(1)(B). In this context it is appropriate to give meaning to this criterion by looking at whether the emissions from California motor vehicles, as well as the local climate and topography in California, are the fundamental causal factors for the air pollution problem—elevated concentrations of greenhouse gases—apart from the other parts of California's motor vehicle program, which are intended to remediate different air pollution concerns.

EPA then proceeded to apply this interpretation to the GHG standards at issue in this waiver proceeding, and found that California did not need the GHG standards under this interpretation. Having limited the meaning of this provision to situations where the air pollution problem was local or regional in nature, EPA found that California's greenhouse gas standards do not meet this criterion. EPA found that the elevated concentrations of greenhouse gases in California are similar to concentrations elsewhere in the world, and that local conditions in California such as the local topography and climate and the number of motor vehicles in California are not the determinant factors causing the elevated GHG concentrations found in California and elsewhere. Thus, the March 6, 2008 Denial found that California did not need its GHG standards to meet compelling and extraordinary conditions, and the waiver was denied.

EPA also considered an alternative interpretation, where EPA would consider "the effects in California of this global air pollution problem in California in comparison to the rest of the country, again addressing the GHG standards separately from the rest of California's motor vehicle program." Under this alternative interpretation, EPA considered whether the impacts of

global climate change in California were significant enough and different enough from the rest of the country such that California could be considered to need its greenhouse gas standards to meet compelling and extraordinary conditions. EPA determined that the waiver should be denied under this alternative interpretation as well.

### B. Should EPA Review This Criterion Based on the Need for California's Motor Vehicle Program or the Need for the GHG Standards?

The essential first question to resolve in addressing whether California needs "such State standards to meet compelling and extraordinary conditions" is whether it is appropriate for EPA to evaluate this criterion based on California's need for its motor vehicle program as a whole, or to evaluate only the particular standards being addressed in this waiver proceeding.

#### 1. Comments Supporting a Review of the Entire Program

In its initial waiver request, CARB restates its need for its own engine and vehicle programs to meet serious air pollution problems. It notes that the relevant inquiry is whether California needs its own emission control program as opposed to the need for any given standard as necessary to meet compelling and extraordinary conditions. CARB notes that in prior waivers the Administrator has determined that:

"[C]ompelling and extraordinary conditions" does not refer to levels of pollution directly, but primarily to the factors that tend to produce them: geographical and climatic conditions that, when combined with large numbers and high concentrations of automobiles create serious air pollution problems."

In its initial waiver request letter, CARB stated:

California, the South Coast and San Joaquin Air basins in particular, continues to experience some of the worst air quality in the nation. California's ongoing need for dramatic emission reductions generally and from passenger vehicles specifically is abundantly clear from its recent adoption of state implementation plans for the South Coast and other California air basins. The unique geographical and climatic conditions, and the tremendous growth in the vehicle population and use which moved Congress to authorize California to establish separate vehicle standards in 1967, still exist today.[102]

CARB notes that these conditions have not changed to warrant a change in confirmation by EPA and that the opponents of the waiver bear the burden

on showing why California no longer has a compelling need, informed by its own circumstances and benefits that would accrue to it and other states.

EPA also received comment that the *Massachusetts* v. *EPA* holding suggests that EPA should treat greenhouse gases just like all other air pollutants when evaluating a section 209(b) waiver request for greenhouse gases. These comments suggest that once the Supreme Court clarified that greenhouse gases are Clean Air Act air pollutants, there was no room left to distinguish greenhouse gases from other air pollutants when evaluating waiver requests under section 209(b). These comments suggest that EPA ought not to treat elevated concentrations of greenhouse gases as an air pollution problem different from California's traditional air pollution problems. Likewise, the comments suggest, greenhouse gas pollutants should be treated just like other air pollutants which give rise to the need for California's motor vehicle emission program, and, therefore, be subject to EPA's traditional section 209(b)(1)(B) analysis.

Several commenters suggest that review of California's need for its motor vehicle emissions program as a whole is not only appropriate but is mandated by the statute.

#### 2. Comments Supporting a Review of the GHG Standards Separately

Several commenters opposing the GHG waiver request have advocated that EPA should review California's GHG standards separately under the "compelling and extraordinary conditions" criterion. Essentially, this would require that EPA's determination be based on California's need for GHG standards in isolation of its need for its own motor vehicle emissions program.

These commenters state that the statute requires a linkage between the compelling and extraordinary conditions and the particular standards that California wishes to enforce, and that a set of standards that cannot be linked to the compelling and extraordinary conditions cannot be said to be needed to meet such conditions. The commenters note that the statute refers to "standards"—not to a "program"—and that such an approach would shield regulations that would not meet the criterion from any review simply by referring to other regulations that do meet the criterion. Moreover, they state that the need for such standards must be based on the particular characteristics (topography, photochemistry) that make California's conditions compelling and

---

[101] 73 FR at 12161.

[102] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 27.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 32 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 23 of 47

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

32761

extraordinary, whereas global climate change (and, thus, control of GHGs) is not related to such conditions.

Included among the comments suggesting that section 209(b) was intended to allow California to address local air pollution problems and not global environmental issues like climate change was an argument that the phrase "need for such State standards to meet compelling and extraordinary conditions" is unambiguous.[103] That lack of ambiguity, according to these comments, compels the conclusion that global warming is not the type of condition California was meant to address with its motor vehicle emissions program. These commenters further suggest that the intent of Congress was to allow California the ability to set its own standards to address the state's unique local air pollution problems and "scientific evidence confirms that California's temperature trends are neither unique nor particularly distinct from those of at least a dozen other States."

### 3. Decision

After reviewing the comments and the March 6, 2008 Denial, I believe the better approach is to review California's need for its new motor vehicle emissions program as a whole to meet compelling and extraordinary conditions, and not to apply this criterion to specific standards, or to limit it to standards designed to address only local or regional air pollution problems. The traditional approach to interpreting this provision is the best approach for considering a waiver for greenhouse standards, as well as a waiver for standards designed to address local or regional air pollution problems.[104] Therefore, I believe the interpretation that was applied in the

March 6, 2008 Denial should be rejected and no longer be followed.

This traditional interpretation is the most straightforward reading of the text and legislative history of section 209(b). Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are "in the aggregate, at least as protective of public health and welfare as applicable federal standards." This decision by Congress requires EPA to allow California to promulgate individual standards that, in and of themselves, might not be considered needed to meet compelling and extraordinary circumstances, but are part of California's overall approach to reducing vehicle emissions to address air pollution problems.

EPA is to determine whether California's determination is arbitrary and capricious under section 209(b)(1)(A), and is to determine whether California does not need "such State standards" to meet compelling and extraordinary conditions. The natural reading of these provisions leads EPA to consider the same group of standards that California considered in making its protectiveness determination. While the words "in the aggregate" are not specifically applicable to section 209(b)(1)(B), it does refer to the need for "such State standards," rather than "each State standard" or otherwise indicate a standard-by-standard analysis.

In addition, EPA's March 6, 2008 Denial determined that this provision was appropriately interpreted to consider California's standards as a group for standards designed to address local or regional air pollution problems, but should be interpreted in the opposite fashion for standards designed to address global air pollution problems. The text of the provision, however, draws no such distinction, and provides no indication other than Congress intended a single interpretation for this provision, not one that varied based on the kind of air pollution problem at issue.

The March 6, 2008 Denial considered the legislative history, and determined that Congress was motivated by concern over local conditions in California that lead to local or regional air pollution problems. From this, EPA determined that Congress intended to allow California to address these kinds of local or regional air pollution problems, but no others. In effect, EPA inferred from the discussion in the legislative history that Congress intended to limit California's authority in this way, and to prohibit a waiver for California

standards aimed at global air pollution problems.

This ignores the main thrust of the text and legislative history of section 209(b), and improperly reads too much into an absence of discussion of global air pollution problems in the legislative history. The structure of section 209, both as adopted in 1967 and as amended in 1977, is notable in its focus on limiting the ability of EPA to deny a waiver, and thereby preserves discretion for California to construct its motor vehicle program as it deems appropriate to protect the health and welfare of its citizens. The legislative history indicates Congress quite intentionally restricted and limited EPA's review of California's standards, and its express legislative intent was to "provide the broadest possible discretion [to California] in selecting the best means to protect the health of its citizens and the public welfare." [105] The DC Circuit recognized that "[t]he history of the congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program. In short, to act as a kind of laboratory for innovation. * * * For a court [to limit California's authority] despite the absence of such an indication would only frustrate the congressional intent." [106]

In this context, it is fully consistent with the expressed intention of Congress to interpret section 209(b)(1)(B) the same way both for standards designed to address local and regional air pollution problems, and standards designed to address global air pollution problems. Congress intended to provide California the broadest possible discretion to develop its motor vehicle emissions program. Neither the text nor the legislative history of section 209(b) indicates that Congress intended to limit this broad discretion to a certain kind of air pollution problem, or to take away all discretion with respect to global air pollution problems.[107] In

---

[103] This comment, suggesting that the "need for such State standards to meet compelling and extraordinary conditions," is made under Step 1 of the test established under *Chevron, USA., Inc.* v. *NRDC.*

[104] The traditional interpretation of section 209(b)(1)(B) is certainly not "unambiguous precluded" by the language of the statute. See *Entergy Corp.* v. *Riverkeeper, Inc.,* 129 S.Ct. 1498 (2009)("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts. *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–844 (1984).") ("It seems to us, therefore, that the phrase "best available," even with the added specification "for minimizing adverse environmental impact," does not unambiguously preclude cost-benefit analysis."). *Carrow* v. *Merit Systems Protection Board,* 564 F.3d 1359 (Fed. Cir. 2009) ("[W]e are obligated to give controlling effect to [agency's] interpretation if it is reasonable and is not contrary to the unambiguously expressed intent of Congress", citing *Entergy Corp.*).

[105] H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–302 (1977). See *MEMA,* 627 F. 2d at 1110–11.

[106] *MEMA,* 627 F. 2d at 1111.

[107] This broad interpretation of section 209(b) is similar to the broad reading the Court provided to section 302(g) of the Clean Air Act when it held that the term "air pollutant" included greenhouse gases, rejecting among other things the argument that Congress limited the term to apply only to certain kinds of air pollution. *Massachusetts* v. *EPA,* 549 U.S. 497, 532 footnote 26.

**32762**    **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

addition, applying the traditional interpretation to greenhouse gas standards does not change the basic nature of the compromise established by Congress—California could act as the laboratory for the nation with respect to motor vehicle emission control, and manufacturers would continue to face just two sets of emissions standards—California's and EPA's.

This interpretation is directly in line with the purpose of Congress, as compared to the interpretation adopted in the March 6, 2008 Denial. The 2008 interpretation relied on the discussion in the legislative history of local conditions in California leading to air pollution problems like ozone. While this was properly read to support the view that this provision should be interpreted to address California's need for a motor vehicle program as a whole, the March 6, 2008 Denial went further and inferred that by discussing such local conditions, Congress also intended to limit California's discretion to only these kinds of local or regional air pollution problems. The March 6, 2008 Denial pointed to no particular language in the legislative history or the text of section 209(b) indicating such, instead, congressional intent to limit California's discretion was inferred from the discussion of local conditions. However, basing a limitation on such an inference is not appropriate given the express indication that Congress intended to provide California the "broadest possible discretion" in selecting the best means to protect the health of its citizens and the public welfare.

The text of section 209(b) and the legislative history, when viewed as a whole, leads me to conclude that the interpretation adopted in the March 6, 2008 Denial should be rejected. The better way to interpret this provision is to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems that exist in California, whether or not those problems are local or regional in nature, and to protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not intend this

criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long-range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs. As discussed later, the effects of global concentrations of greenhouse gases can have an impact on local ozone levels. This context for air pollution problems supports the view that Congress did not draw such a line between the types of air pollution problems under this criterion, and that EPA should not implement this criterion in a narrow way restricting how California determines it should develop its motor vehicle program to protect the health and welfare of its citizens.[108]

This approach does not make section 209(b)(1)(B) a nullity, as some have suggested. EPA must still determine whether California does not need its motor vehicle program to meet the compelling and extraordinary conditions discussed in the legislative history. If that is the case, then a waiver would be denied on those grounds. As discussed below, that is not the case at this point, even though conditions in California may one day improve such that it no longer has the need for a separate motor vehicle program. The statute contemplates that such improvement is possible. In addition, the opponents of a waiver always have the ability to raise their legal, policy, and other concerns in the State administrative process, or through judicial review in State courts.

[108] *See Massachusetts* v. *EPA*, "While the Congresses that drafted section 202(a)(1) might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete. The broad language of section 202(a)(1) reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence. See *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth" (internal quotation marks omitted)). Because greenhouse gases fit well within the Clean Air Act's capacious definition of "air pollutant," we hold that EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." 549 U.S. 497 at 532.

Congress, however, provided EPA a much more limited role under section 209(b) in considering objections raised by opponents of a waiver.

For these reasons, I believe that the better approach for analyzing the need for "such State standards" to meet "compelling and extraordinary conditions" is to review California's need for its program, as a whole, for the class or category of vehicles being regulated, as opposed to its need for individual standards.

Having adopted this interpretation of section 209(b)(1)(B), I apply it below to determine whether EPA can find that California does not need its motor vehicle program to meet compelling and extraordinary conditions. Given the basis for EPA's March 6, 2008 Denial and the considerable debate regarding the permissible interpretations of this provision, EPA has also evaluated this criterion reviewing the greenhouse gas standards separately—using the two interpretations discussed in the March 6, 2008 Denial. In either case, EPA also cannot deny California's request for a waiver based on a finding that California does not need such standards to meet compelling and extraordinary circumstances.

*C. Does California Need Its Motor Vehicle Program To Meet Compelling and Extraordinary Conditions?*

As discussed above, the better interpretation of this criterion, adopted herein, is the traditional approach of evaluating California's need for a separate program to meet compelling and extraordinary conditions. Applying this approach, with due deference to California, I cannot deny the waiver.

CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. In its Waiver Request letter, CARB stated:

California—the South Coast and San Joaquin Air basins in particular—continues to experience some of the worst air quality in the nation. California's ongoing need for dramatic emission reductions generally and from passenger vehicles specifically is abundantly clear from its recent adoption of state implementation plans for the South Coast and other California air basins.[109] The unique geographical and climatic conditions, and the tremendous growth in the vehicle population and use which moved Congress to

[109] See *e.g.* Approval and Promulgation of State Implementation Plans; California—South Coast, 64 FR 1770, 1771 (January 12, 1999). See also 69 FR 23858, 23881–90 (April 30, 2004) (designating 15 areas in California as nonattainment for the federal 8-hour ozone national ambient air quality standard).

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

32763

authorize California to establish separate vehicle standards in 1967, still exist today.[110]

CARB notes in its July 14, 2007 comments that it testified at EPA's earlier hearings on this waiver request that "since nothing has changed in the few months since EPA last easily made this determination [regarding the need for the motor vehicle emission program] on December 28, 2006 (71 FR 78190), and since California still has the "geographical and climatic conditions that, when combined with the large numbers and high concentrations of automobiles, create serious pollution problems," (49 FR at 18890 (citing legislative history)), this is the end of a proper and legal EPA analysis of the extraordinary and compelling conditions waiver prong."[111]

EPA has not received any adverse comments suggesting that California no longer needs a separate motor vehicle emissions program to address the various conditions that lead to serious and unique air pollution problems in California.

Based on the record, I am unable to identify any change in circumstances or any evidence to suggest that the conditions that Congress identified as giving rise to serious air quality problems in California no longer exist. Therefore, using the traditional approach of reviewing the need for a separate California program to meet compelling and extraordinary conditions, I cannot deny the waiver based on this criterion.

### D. Does California Need Its Motor Vehicle GHG Standards To Meet Compelling and Extraordinary Conditions?

As discussed above, EPA has also evaluated this criterion under two alternative approaches, reviewing the greenhouse gas standards separately using the two interpretations discussed in the March 6, 2008 Denial. While recognizing that they are not the interpretations adopted here by EPA, this section discusses the Agency's consideration of these alternative interpretations.

#### 1. Are California's GHG Standards Designed in Part To Address an Air Pollution Problem That Is Local or Regional in Nature?

In the March 6, 2008 Denial, EPA interpreted this criterion as calling for a review of California's GHG standards separately from the remainder of its

motor vehicle emission control program. In that context, it was determined appropriate to look at whether the emissions from California motor vehicles, as well as the local climate and topography in California, are the fundamental causal factors for the air pollution problem of greenhouse gases. This interpretation limited the meaning of this provision to situations where the motor vehicle standards at issue were designed to address an air pollution problem that was local or regional in nature, such that the local conditions in California were the fundamental causes of the air pollution problem.

The March 6, 2008 Denial applied this interpretation by focusing on elevated concentrations of greenhouse gases as the air pollution—a global air pollution problem. The March 6, 2008 Denial rejected arguments that the GHG standards should also been seen as an ozone control strategy, on the grounds that even if elevated concentrations of greenhouse gases lead to climate changes that exacerbate ozone, the causes of elevated concentrations of greenhouse gases are not solely local to California but are global in nature.

This overly narrow view fails to consider that although the factors that cause ozone are primarily local in nature and that ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. Whether or not local conditions are the primary cause of elevated concentrations of greenhouse gases and climate change, California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems. Reducing ozone levels in California cities and agricultural areas is expected to become harder with advancing climate change. California and many other commenters note that "California's high ozone levels—clearly a condition Congress considered—will be exacerbated by higher temperatures from global warming."[112] California also notes that

there is general consensus that temperature increases from climate change will exacerbate the historic climate, topography, and population factors conducive to smog formation in California, which were the driving forces behind Congress' inclusion of the waiver provision in the Clean Air Act.[113] There is a logical link between the local air pollution problem of ozone and California's desire to reduce GHGs as one way to address the adverse impact that climate change may have on local ozone conditions.[114] Given the clear deference that Congress intended to provide California on the mechanisms it chooses to use to address its air pollution problems, it would be appropriate to consider its GHG standards as designed in part to help address a local air pollution problem, and, thus, a waiver should not be denied even under the narrow interpretation employed in the March 6, 2008 Denial.

#### 2. Do the Impacts of Climate Change in California Support a Denial of the Waiver?

As part of EPA's March 6, 2008 Denial, EPA also considered an alternative interpretation for this criterion, where EPA would consider "the effects in California of this global air pollution problem * * * in comparison to the rest of the country, again addressing the GHG standards separately from the rest of California's motor vehicle program." EPA considered evidence and arguments submitted by commenters concerning whether the impacts of global climate change in California were significant enough and different enough from the rest of the country such that California could be considered to need its greenhouse gas standards to meet compelling and extraordinary conditions.[115] EPA determined in the March 6, 2008 Denial that the waiver should be denied under this approach as well.

---

[110] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1, at 16.

[111] California Air Resources Board, EPA–HQ–OAR–2006–0173–1686 at 7.

[112] California submits evidence that at the national scale, using global to regional air quality models, various papers demonstrate that climate change alone can worsen summertime surface ozone pollution in polluted regions of the United States including one finding that "climate change alone will increase summertime ozone in polluted regions by 1–10 ppb over the coming decades, with the largest effects in urban areas and during pollution episodes" and therefore "climate change will partly offset the benefit of the emissions reductions." See Jacob and Winner (2009), EPA–HQ–OAR–2006–0173–9010.4. CARB also cites the 2007 Interim Report of the U.S. EPA Global Change Research Program Assessment of the Impacts of Global Change on Regional U.S. Air Quality, a draft EPA study which concludes that climate change may significantly increase ground-level ozone in

areas throughout the nation. See also EPA's final April 2009 "Assessment of the Impacts of Global Climate Change on Regional U.S. Air Quality: A Synthesis of Climate Change Impacts on Ground-Level Ozone" which states as one of its general findings: "[W]hile these modeling studies cannot tell us what the future will hold, they demonstrate the potential for global climate change to make U.S. air quality management more difficult, and therefore future air quality management decisions should begin to account for the impacts of climate change." EPA–HQ–OAR–2006–0173–9006 at 7–9.

[113] Id.

[114] California also submits evidence that its GHG emission regulations would result in a slight reduction of ozone precursors. EPA–HQ–OAR–2006–0173–9006 at 10.

[115] 73 FR 12156, 12164.

**32764**    **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

As discussed above, this is not the interpretation that EPA now adopts. However, even if EPA were to examine the impacts of climate change in California under this interpretation, based on a review of all the evidence in the record, I cannot deny the waiver.

#### a. What Test Applies Under This Alternative Approach?

In the March 6, 2008 Denial, EPA found that legislative intent called for particular circumstances in California that are "sufficiently different" from the nation as a whole that justify separate standards in California.

EPA received comment stating that there is no statutory foundation for a "sufficiently different" test. Commenters noted there is nothing in the term "compelling and extraordinary conditions" that requires a comparison to the rest of the country. Similarly, commenters point to EPA's 1984 PM waiver where EPA's Administrator found that "there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country for a waiver to be granted." EPA also received comment that it was not reasonable for EPA to conclude that California does not face global warming impacts, including water supply, agricultural production, and wildfire seasonal impacts that present compelling and extraordinary conditions, since other states will face similar impacts. Under this rationale, since states other than California are also experiencing serious global warming impacts, California could never receive a waiver to combat climate change. Commenters find flaw in this rationale: similar impacts in other states have never before prevented California from receiving a waiver. Even though many states are faced with non-attainment ozone areas and smog problems similar to California, California has never had a waiver denied based on a finding under section 209(b)(1)(B) that it did not need its standards to meet compelling and extraordinary conditions. As such, EPA also received comment suggesting that the impacts of climate change should be reviewed within the State of California to determine their severity, and that such impacts need not be compared to impacts experienced or projected to occur elsewhere in the country.

Several commenters maintain that although the impacts of climate change in California may be compelling, they are not extraordinary when compared to the rest of the nation.[116] These commenters point to the record and the many submissions from other states, which recount the variety of impacts and risks of climate change in their respective states and claim that California is no different than any other state.

EPA does not need to resolve this issue. As discussed below, EPA has evaluated the evidence submitted concerning the observed and projected impacts of global climate change in California and other states and determined that even under the alternative approach used in the March 6, 2008 Denial, EPA cannot deny a waiver.

#### b. Would a Waiver Be Denied Under This Alternative Approach?

Commenters supporting the waiver maintain that California has clearly demonstrated that the impacts in California of global warming are "compelling and extraordinary." Several commenters point to the impacts of global warming recited in EPA's March 6, 2008 initial denial as evidence that EPA committed an error in judgment by not finding that the extreme and various impacts of climate change in California are compelling and extraordinary in nature and that, further, California clearly satisfied the section 209(b)(1)(B) requirements.[117]

---

[116] Association of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–9005. This comment notes the finding in *Massachusetts v. EPA* that the impacts of global warming are "widely shared" among the states.

[117] EPA has not received any comment suggesting EPA's prior inventory of evidentiary information is incorrect as set forth in its discussion of the "Relationship of Impacts of Global Climate Change in California to the Rest of the Country" at 73 FR 12156, 12163–12168. In addition, several new studies have been submitted to EPA, including: a recent report from the Pacific Institute examining the impacts that sea level rise would have on population, infrastructure, and property in California (this report uses projections of medium to medium-high greenhouse gas emissions scenarios indicating a 1.4 meter rise in the seal level by 2100 with 480,000 people at risk and $100 million in property at risk from a 100 year flood event); California's Climate Action Team Reports that emphasizes many of the points made in California's waiver request including the air quality impacts ("Climate change could slow progress toward attainment of health-based air quality standards and increase pollution control costs by increasing the potential for high ozone and high particulate days." The report itself synthesizes 37 recent reports that address a wide body of information on the range and gravity of the risks that climate change poses to California's citizens, natural resources, and economy); and the Public Policy Institute of California assessment of climate change on public health in California and cites number impacts including "an increase in the frequency and severity of air pollution episodes" and "an increase in extreme heat events and associated increases in heat related morbidity and mortality." *See* Environmental Defense Fund, EPA–HQ–OAR–

Commenters supporting the waiver, including California, have submitted an extensive array of reports and data outlining the risks and impacts of climate change on California. EPA received comment restating EPA's own statements from its March 6, 2008 Denial, including the following:

California has the largest agricultural based economy (13% of the U.S. market value of agricultural products sold) which is heavily dependent on irrigation, has the nation's highest crop value and is the nation's leading dairy producer. There is improved information on how livestock productivity may be affected by thermal stress and through nutritional changes in forage caused by elevated $CO_2$ concentrations. In addition, wine is California's highest value agricultural product, and wine grapes are very sensitive to temperature changes. California has the largest state coast population, representing 25% of the U.S. oceanic coastal population. The conditions which create California's tropospheric ozone problems remain (*e.g.*, topography, regional meteorology, number of vehicles) and climate change is expected to exacerbate tropospheric ozone levels. California's water resources are already stressed due to demands from agricultural, industrial and municipal uses, and climate change is expected to introduce an additional stress to an already over-allocate system by increasing temperatures and by decreasing snowpack which is an important water source in spring and summer. California has the greatest variety of ecosystems in the U.S., and the second most threatened and endangered species (of plants and animals combined) and the most threatened and endangered animal species, representing about 21% of the U.S. total.

In addition, one commenter suggests that this summary of findings about California's special characteristics that differentiate the magnitude, intensity and range of impacts of climate change supports that assessment. Dr. Stephen Schneider of Stanford University stated that "not only are California's conditions 'unique and arguably more severe' (*e.g.* temperature impacts from global warming are more certain for states like California) but also that no other state faces the combination of ozone exacerbation, wildfire emission's contributions, water system and coast system impacts and other impacts faced by California."[118] Conversely, opponents of the waiver do not contest California's claims that the impacts of climate change in California and elsewhere are substantial.[119] Instead,

---

2006–0173–9025 at 15–18; *See also* California Air Resources Board, EPA–HQ–OAR–2006–0173–9006 at 7–16.

[118] Environmental Defense Fund, EPA–HQ–OAR–2006–0173–9025 at 11–12.

[119] The Association of International Automobile Manufacturers notes that although in the March 6, 2008 Denial, "EPA found that there is ample evidence that global warming is 'compelling' in the

opponents of the waiver claim that the impacts in California are not unique or extraordinary. EPA received comment suggesting that the impacts of climate change in California are not sufficiently different from the nation as a whole to warrant a waiver.[120] Commenters note that the "need" requirement in section 209(b)(1)(B) authorizes the creation of regulatory standards specific to California only in cases where it is necessary to meet conditions unique to California. Commenters claim that California cannot meet this standard with respect to a global problem that does not affect California in a unique way as compared to other states. The commenters claim the impacts to coastline, ozone levels, and other impacts are not unique to California as they affect many other states as well.[121]

EPA notes that under this alternative approach the opponents of the waiver continue to bear the burden of proof to demonstrate their claims. Commenters opposing the waiver primarily focus and argue on one issue: Whether the effects of climate change in California are sufficiently different from the nation as a whole. Opponents of the waiver identify singular or multiple impacts in some other states but they largely submit conclusions—not factual evidence—as to why such adverse impacts demonstrate that California is not sufficiently different. On the other hand, California has identified a wide variety of impacts and potential impacts within California, which include exacerbation of tropospheric ozone, heat waves, sea level rise and salt water intrusion, an intensification of wildfires, disruption of water resources by, among other things, decreased snowpack levels, harm to high value agricultural production, harm to livestock production, and additional stresses to sensitive and endangered species and ecosystems. Opponents have not demonstrated that any other state, group of states, or area within the United States would face a similar or wider-range of vulnerabilities and risks. In addition, California has submitted information that climate change can impact ozone levels in California due to temperature exacerbation effects. Although other areas of the country are also projected to experience increases in temperatures which may also exacerbate local ozone levels, opponents of the waiver have not demonstrated that California's ozone levels should not be considered compelling and extraordinary conditions.

Under this alternative interpretation, the burden of proof is on the opponents of the waiver to demonstrate that the impacts of global climate change in California are either not significant enough or are not different enough from the rest of the country to be considered compelling and extraordinary conditions. The opponents of the waiver have focused their argument on the latter part of this interpretation, whether the impacts in California are sufficiently different from the rest of the country. Limiting evaluation to this issue, California has presented evidence of a

wide variety of vulnerabilities, impacts and potential impacts within California, while the opponents have not demonstrated that any other state, group of states, or area within the United States would face a similar or wider-range of vulnerabilities and risks. Therefore, EPA believes that those opposing the waiver have not met their burden of proof to demonstrate that the conditions in California are not sufficiently different and that a waiver should be denied under this alternative approach.

It is important to note that nothing in this decision or this document should be construed as reflecting a judgment concerning the issues pending before EPA under section 202(a) of the Act—whether emissions of GHGs from new motor vehicles or engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. EPA recently proposed to make an affirmative finding under that statutory provision.[122] The issues involved in that proposal are separate and different from those involved in this decision on California's request for a waiver under section 209(b). Nothing in this decision should be construed as reflecting the Agency's judgment regarding any issue relevant to the determinations in the pending proposal under section 202(a). The statutory provisions and criteria are different, and the judgments called for under these provisions are very different in nature. For example, in evaluating the alternative section 209(b)(1)(B) interpretation, I am not evaluating how serious the impacts or potential impacts of global climate change are, either in California or the rest of the country, as the opponents of the waiver have not focused on that issue. My finding under this alternative interpretation is a narrow one, and is limited to finding that the opponents of the waiver have not met their burden of proof under this alternative interpretation of section 209(b) concerning how the impacts in California might differ from the rest of the country.

3. Must California's GHG Standards Achieve a Demonstrated Reduction in GHG Atmospheric Concentrations or Impacts Under Section 209(b)(1)(B)?

Regardless of whether EPA examines the need for California's motor vehicle emissions program or conversely the need just for the GHG emission standards, some commenters suggest

---

sense that it presents serious environmental issues, the agency correctly determined that it does not present an extraordinary condition in California." EPA–HQ–OAR–2006–0173–9005 at 9. EPA did receive comment from Air Improvement Resources (AIR) suggesting that it might be contesting whether positive feedback from $CO_2$ concentrations on temperature increases (as seen in the models and data submitted to EPA by proponents of the waiver) will be seen in certain geographic areas due to an increase in cloudiness. EPA–HQ–OAR–2006–0173–13662 at 5–6. However, in its same submission it also states that while it may be true that California's cities will be disproportionately affected by increased temperatures it is by no means clear that this will be true in the future. (See p. 7). As noted in the text, the burden of proof is on the opponents of the waiver to demonstrate that the effects of climate change are not compelling or serious. Such opponents have not clearly stated the basis for making such a determination nor countered the many studies and data submitted by California and other proponents of the waiver. For purposes of this waiver proceeding, EPA is not making its own judgment with regard to the issues under section 202(a).

[120] Association of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–9005 at 9, citing 73 FR 12168—"As the discussion above indicates, global climate change has affected, and is expected to affect, the nation, indeed the world, in ways very similar to the conditions noted in California * * * These identified impacts are found to affect other parts of the United States and therefore these effects are not sufficiently different compared to the nation as a whole. California's precipitation increases are not qualitatively different from changes in other areas. Rise in sea level in the coastal parts of the United States are projected to be severe, or more severe, particularly in consequences, in the Atlantic and Gulf Regions than in the Pacific regions, which includes California. Temperature increases have occurred in most parts of the United States, and while California's temperatures have increased by more than the national average, there are other places in the United States with higher or similar increases in temperature."

[121] Id. at 9–10. The Association of International Automobile Manufacturers notes that comments submitted from States supporting the waiver include statements such as "Connecticut faces loss of its shoreline and beaches, forest die offs, destruction of shell fisheries and marine resources, * * *" "Global warming is having a serious impact on New Jersey's public health and economy * * *" "Rhode Island * * * As the most densely populated State in the country, direct impacts due

to climate change, such as heat wave, increased fire frequency, increased storm intensity resulting in beach erosion, loss of property, and loss of life— pose great concerns for us," and other concerns expressed by states such as Pennsylvania, Maryland, and New Mexico. See also Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1297 at 14–17 and EPA–HQ–OAR–2006–0173–0421–12 at 61–70 and General Motors Corporation, EPA–HQ–OAR–2006–0173–1596 at 6–8.

[122] See EPA's "Proposed Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act" at 74 FR 18886 (April 29, 2009).

**32766** Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

that the GHG emission standards must be proven to have some mitigative effect in order for them to be needed. Some commenters suggest that to the extent that California's high ozone levels could be exacerbated by higher temperatures from global warming, there is no demonstration in the waiver record that implementation of the California GHG standards would have any perceptible impact on temperature trends in California. Opponents of the waiver have argued that California, therefore, cannot show that its GHG emission regulations will achieve a measurable and specific temperature reduction in California, and thereby mitigate the identified climate change impacts in California.[123] They maintain that California's GHG regulations will not be needed to meet a particular condition since there is no analysis suggesting that California's GHG standards will have any discernible impact on that condition or achieve any perceptible improvement in environmental conditions inside California. In terms of GHG concentrations in California's atmosphere, EPA received comment stating there is no offered proof that a reduction in GHG emissions from California vehicles would have any impact on GHG concentrations in California's atmosphere compared to the GHG concentration impacts already in the record.

In response, other commenters supporting the waiver assert that the efficacy of California's standards is not at issue in this proceeding. There is no requirement in section 209(b)(1)(B) that California prove a certain level of environmental benefit. They assert that is particularly true in this instance, where the actual and anticipated impacts of global warming are complex and historically unprecedented, and it is widely-recognized that a number of efforts by governments, private entities, and individuals globally will be required to mitigate climate change, as no single source of GHG emissions, whether from an entire state, sector of the nation's economy, or of individual countries, is completely dominant in terms of influencing atmospheric concentrations of GHGs. They claim that California need not show that the climate will in fact respond to its regulatory action; rather its obligation is to show a rational connection between the regulation it has promulgated and the problem it seeks to address.

As noted above, the Agency's inquiry under section 209(b)(1)(B) is whether California needs its own motor vehicle emission control program to meet compelling and extraordinary conditions. Under this criterion, EPA does not consider, for example, the extent to which specific PM standards will address the PM air pollution problem.[124] Under this approach, there is no need to delve into the extent to which the GHG standards at issue here would address climate change or ozone problems. That is an issue appropriately left to California's judgment.

Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference.[125] EPA's consistent view is that it should give deference to California's policy judgments, as it has in past waiver decisions, on California's choice of mechanism used to address air pollution problems. EPA does not second-guess the wisdom or efficacy of California's standards.[126] EPA has also considered this approach with respect to the specific GHG standards themselves, as well as California's motor vehicle emissions program.

After reviewing the arguments, I conclude that California has submitted evidence demonstrating not only the causal connection between higher temperatures from global warming and its general exacerbation of tropospheric ozone, but also the serious effects of that potential increase in ozone on the public health and welfare in California. EPA notes that several commenters have stated that while California's GHG regulations will provide only a small difference in temperatures and/or GHG concentrations, there clearly will be some reductions. These commenters note that given the numerous sources in California and around the world that contribute to GHG concentrations, no single regulation could on its own reduce GHG emissions to the levels necessary to reduce all concerns, but that every small reduction is helpful in reducing these concerns. As noted by the Supreme Court in *Massachusetts* v.

*EPA*, while it is true that regulating motor vehicle GHG emissions will not by itself reverse global warming, a reduction in domestic automobile emissions would slow the pace of global emissions increase no matter what happens with regard to other emissions.[127] Moreover, there is some evidence in the record that proffers a specific level of reduction in temperature resulting from California's regulations.[128] EPA believes that under this alternative approach, opponents have not met their burden of demonstrating that California's motor vehicle program, or its GHG standards, does not have a rational relationship to contributing to amelioration of the air pollution problems in California.

### E. Section 209(b)(1)(B) Conclusion

With respect to the need for California's state standards to meet compelling and extraordinary conditions, I have found that the March 6, 2008 Denial was based on a departure from the traditional interpretation of the waiver provision. An examination of the text of section 209(b) and the legislative history, when viewed together, lead to the conclusion that the best way to interpret this provision and the interpretation I adopt here, is to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. As such, if California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. The best interpretation of the text and legislative history of this provision is that Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others.

Under that interpretation, I cannot find that opponents of the waiver have demonstrated that California does not need its state standards to meet compelling and extraordinary conditions. The opponents of the waiver have not adequately demonstrated that

---

[123] However, the Alliance presented some evidence at the May 30, 2007 waiver hearing that some temperature reduction may be achieved, based on application of the Wigley equation. EPA–HQ–OAR–2006–0173–0421 at 71.

[124] 74 FR 12156, 12159–60 (March 6, 2008).

[125] *MEMA I* at 1110–11.

[126] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.

[127] *Massachusetts* v. *EPA*, 59 U.S. 497, 525–526 (2007).

[128] EPA also received comment during the second comment period indicating that a local decrease in GHGs can have a direct effect on reducing local ozone concentrations, as well as particulate matter concentrations, in California, before they mix with other greenhouse gases in the upper atmosphere. The comments that address Dr. Jacobson's testimony do not dispute these atmospheric reactions and the fact that they can increase local temperature which can increase ozone concentrations.

California no longer has a need for its motor vehicle emission program.

Separately, even applying the alternative interpretations set forth in the March 6, 2008 Denial, I cannot find that that the opponents of the waiver have demonstrated that California does not need its greenhouse gas emission standards to meet compelling and extraordinary conditions. Nor can I find that the opponents of the waiver have demonstrated that the impacts from climate change in California are not compelling and extraordinary.

Therefore, upon reconsideration of the March 6, 2008 Denial, I determine that I cannot deny the waiver request under section 209(b)(1)(B).

## VI. Are the California GHG Standards Consistent With Section 202(a) of the Clean Air Act?

EPA has reviewed the information submitted to the record of this proceeding to determine whether the parties opposing this waiver request have met their burden to demonstrate that the GHG standards are not consistent with section 202(a). In its submissions, CARB has submitted information and argument that these GHG standards do provide regulated manufacturers with sufficient lead-time for the near term standards regardless of how it is measured and regardless of the waiver denial. For the mid-term standards, CARB has stated that initially, manufacturers can achieve compliance with credits from the near-term production, and subsequently can achieve compliance with refinements to existing technology and advanced technology combinations. The industry opponents of the waiver have submitted information and argument that there is insufficient leadtime for the CARB near-term standards because the already short time-frame for technology development was made even shorter by EPA's waiver denial. For the mid-term standards, the industry stated that it is likely that most large-volume manufacturers will be able to comply with the CARB standards only by "mix-shifting" their products to offer for sale more higher mileage vehicles to ensure meeting the CARB fleet average. The industry also submitted information and argument that the GHG standards will result in unsafe vehicles because vehicles meeting the standards will be lighter and more hazardous to occupants in accidents, and will be driven more because of higher fuel efficiency, so more accidents will occur. The industry argued that these complying vehicles are technologically infeasible because of the safety concerns. EPA's analysis of the

consistency of the CARB standards with section 202(a) of the Act follows.

### A. Historical Approach: The Standard of Review for Consistency With Section 202(a)

Under section 209(b)(1)(C), EPA must deny California's waiver request if the Agency finds that California standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. The scope of EPA's review under this criterion is narrow. EPA has previously stated that the determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the Federal test procedure.[129] Previous waivers of federal preemption have stated that California's standards are not consistent with section 202(a) if there is inadequate lead time to permit the development of technology necessary to meet those requirements, giving appropriate consideration to the cost of compliance within that time.[130] California's accompanying enforcement procedures would be inconsistent with section 202(a) if the Federal and California test procedures conflict, i.e., if manufacturers would be unable to meet both the California and Federal test requirements with the same test vehicle.[131]

EPA does not believe that there is any reason to review these criteria any differently for EPA's evaluation of California's greenhouse gas waiver request. There is nothing inherently different about how GHG control technologies should be reviewed when making a determination about technological feasibility or consistency of test procedures.

In the GHG waiver proceeding, automobile industry opponents of the waiver have presented evidence for EPA's consideration which they believe will require EPA to make the finding of inconsistency with section 202(a), and therefore require EPA to deny this waiver. They believe this finding should be made on one or more grounds that there is inadequate lead time provided by the CARB standards. EPA's process

[129] MEMA I, 627 F.2d at 1126.

[130] See e.g., 38 FR 30136 (November 1, 1973) and 40 FR 30311 (July 18, 1975).

[131] To be consistent, the California certification test procedures need not be identical to the Federal test procedures. California procedures would be inconsistent, however, if manufacturers would be unable to meet both the state and Federal requirements with the same test vehicle in the course of the same test. See, e.g., 43 FR 32182, (July 25, 1978).

for evaluating lead time is discussed immediately below. The industry opponents also raise arguments based on the cost of compliance with the standards, and claims of possible significant vehicle safety problems caused, at least indirectly, by compliance with the GHG standards, which will be discussed in other parts of this section.

Regarding lead time, EPA historically has relied on two decisions from the U.S. Court of Appeals for the DC Circuit for guidance regarding the lead time requirements of section 202(a). Section 202(a) provides that an emission standard shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance. In Natural Resources Defense Council v. EPA ("NRDC"), 655 F.2d 318 (DC Cir. 1981), the court reviewed claims that EPA's particulate matter standards for diesel cars and light trucks were either too stringent or not stringent enough. In upholding the EPA standards, the court concluded:

Given this time frame [a 1980 decision on 1985 model year standards]; we feel that there is substantial room for deference to the EPA's expertise in projecting the likely course of development. The essential question in this case is the pace of that development, and absent a revolution in the study of industry, defense of such a projection can never possess the inescapable logic of a mathematical deduction. We think that the EPA will have demonstrated the reasonableness of its basis for projection if it answers any theoretical objections to the [projected control technology], identifies the major steps necessary in refinement of the technology, and offers plausible reasons for believing that each of those steps can be completed in the time available.[132]

Another key case addressing the lead time requirements of section 202(a) is International Harvester v. Ruckelshaus ("International Harvester"), 478 F 2.d 615 (DC Cir. 1979). In International Harvester, the court reviewed EPA's decision to deny applications by several automobile and truck manufacturers for a one-year suspension of the 1975 emission standards for light-duty vehicles. In the suspension proceeding, the manufacturers presented data which, on its face, showed little chance of compliance with the 1975 standards, but which, at the same time, contained many uncertainties and inconsistencies regarding test procedures and parameters. In a May 1972 decision, the Administrator applied an EPA

[132] Natural Resources Defense Council v. EPA, 655 F.2d 318, 331. (emphasis added)

methodology to the submitted data, and concluded that "compliance with the 1975 standards by application of present technology can probably be achieved," and so denied the suspension applications.[133] In reviewing the Administrator's decision, the court found that the applicants had the burden of coming forward with data showing that they could not comply with the standards, and if they did, then EPA had the burden of demonstrating that the methodology it used to predict compliance was sufficiently reliable to permit a finding of technological feasibility. In that case, EPA failed to meet this burden.

With respect to lead time, the court in *NRDC* pointed out that the court in *International Harvester* "probed deeply into the reliability of EPA's methodology" because of the relatively short amount of lead time involved (a May 1972 decision regarding 1975 model year vehicles, which could be produced starting in early 1974), and because "the hardship resulting if a suspension were mistakenly denied outweigh the risk of a suspension needlessly granted."[134] The *NRDC* court compared the suspension proceedings with the circumstances concerning the diesel standards before it: "The present case is quite different; 'the base hour' for commencement of production is relatively distant, and until that time the probable effect of a relaxation of the standard would be to mitigate the consequences of any strictness in the final rule, not to create new hardships."[135] The *NRDC* court further noted that *International Harvester* did not involve EPA's predictions of future technological advances, but an evaluation of presently available technology.

EPA also evaluates CARB's request in light of congressional intent regarding the waiver program generally. This is consistent with the motivation behind section 209(b) to foster California's role as a laboratory for motor vehicle emission control, in order "to continue the national benefits that might flow from allowing California to continue to act as a pioneer in this field."[136]

For these reasons, EPA believes that California must be given substantial deference when adopting motor vehicle

emission standards which may require new and/or improved technology to meet challenging levels of compliance. This deference was discussed in an early waiver decision when EPA approved the waiver request for California's 1977 model year standards:

Even on this issue of technological feasibility I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the Federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to 'catch up' to some degree with newly promulgated standards. Such an approach to automotive emission control might be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency, under the statutory scheme outlined above I believe I am required to give very substantial deference to California's judgment on that score." [137]

EPA has traditionally considered lead time as starting with the date that the rules are adopted and become effective under California state law—not from the subsequent date of a request for a waiver or the decision on a waiver.[138] This is consistent with the structure of section 209(b), where the waiver criteria are presumed to be met absent an affirmative finding that requires EPA to deny it, which gives EPA a limited scope of review and affords deference to California. At the time that California adopts its rules, manufacturers have clear knowledge and are fully on notice of California's requirements and the date when such requirements will be implemented. In this case, the CARB GHG regulations became final and effective in 2004. This was five years before the first phase of compliance (the 2009 model year) and eight years before compliance with the "mid-term" standards, which include the most stringent standards (model year 2016). Because of this large amount of lead time available to manufacturers under CARB's regulatory schedule, the approach described in *NRDC* is the most appropriate under the circumstances at issue here.

EPA notes, however, that manufacturers have disputed whether ample lead time exists. Because EPA initially denied this waiver request, manufacturers have asserted that the

lead time should have "tolled" at the time of the denial, since California could not implement and enforce standards which had not received a waiver. This tolling issue is discussed below in section VI.F.1. Additionally, if the tolling might be considered to cause a reduction in lead time for the CARB near-term standards, it could be argued that the *International Harvester* approach, involving circumstances where the lead time is short, should apply. CARB, while maintaining that the *NRDC* approach is the correct measurement here, commented that even if *International Harvester* was the correct guide, "we believe that a combination of manufacturers' statements and plans indicated that manufacturers are already in, or with minor changes can demonstrate compliance for the 2009 and 2010 model years." [139] Under *International Harvester,* the burden was on the industry to demonstrate that the evidence supported the grant of an extension, then, the burden shifted to EPA to demonstrate the reasonableness of its projection. As discussed below, the manufacturers have not met their burden to show that the California standards are not technologically feasible, considering the lead time provided and cost of compliance.

Under *NRDC,* when compliance with CARB standards is phased-in over a lengthy time period, the reasonableness of a projection of technological feasibility can be based on answering any theoretical objections to the projected control technology; identifying the major steps necessary in refinement of the technology; and offering plausible reasons for believing that each of those steps can be completed in the time available.[140] EPA's review of the evidence on the technological feasibility of GHG technologies follows.

*B. CARB's Assessment of the State of Development of GHG Reduction Technology and Comments Supporting CARB's Assessment*

1. Development of GHG Reduction Technology

Under the terms of Assembly Bill 1493, which is the legislation that directed CARB to establish greenhouse gas emission standards, the CARB staff was directed to set those standards in a manner that would "achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles." CARB has

---

[133] *International Harvester* v. *Ruckelshaus,* 478 F.2d 615, 626.

[134] *NRDC,* 655 F.2d 318, 330.

[135] Id. The "hardships" referred to are hardships that would be created for manufacturers able to comply with the more stringent standards being relaxed late in the process.

[136] 40 FR 23102, 23103 (waiver decision citing views of Congressman Moss and Senator Murphy) (May 28, 1975).

[137] *Id.* at 23103.

[138] *See e.g.,* 59 FR 40625 (September 22, 1994).

[139] California Air Resources Board, EPA–HQ–OAR–2006–0173–9006, at 23.

[140] *NRDC,* 655 F.2d 318, 331.

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 40 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 31 of 47

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice    32769

identified four basic areas of GHG reduction technology: (1) Engine, drivetrain and other vehicle modifications; (2) mobile air conditioning system modifications; (3) alternative fuel vehicles; and (4) exhaust catalyst improvements.

To accomplish the assessment mandated by AB 1493, CARB staff held several meetings and workshops in 2003 and 2004 on GHG vehicle technology. Those meetings brought together technology developers, researchers from the auto industry, vehicle component suppliers, academic participants, and vehicle simulation firms to discuss technologies and their potential to reduce climate change emissions from motor vehicles. CARB staff presented its preliminary findings in a draft technology and cost assessment and held a public workshop to receive comments in April 2004. Following that presentation, CARB issued a draft proposal on the methodology for developing the GHG standards and the preliminary standards themselves, in June 2004. A public workshop on this draft was held in July 2004. After considering all the comments from these sessions, CARB published its final staff proposal in the Staff Report: Initial Statement of Reasons (ISOR) in August 2004.[141]

The CARB vehicle technology results in the ISOR relied on an existing vehicle simulation study (discussed below), as well as other existing studies and research, rather than on any sort of primary development or engineering work. CARB staff acknowledged that "because powertrain changes will be the focus for obtaining the reductions sought in this (GHG) rulemaking rather than aftertreatment technologies, staff could not reasonably build prototypes and test them in our laboratory. * * * Because building and testing prototypes is so expensive, and time consuming, even major automobile manufacturers rely on vehicle simulation firms to predict the performance of new technology either individually or in combination, and to assess their performance and emissions."[142] CARB further commented that the advantage of systems modeling "is to allow a wide diversity of combinations of technologies to be modeled together and examine how they interact when simulating a vehicle operating on various driving cycles."[143]

The study forming the basis of the ISOR vehicle technology results was a comprehensive vehicle simulation modeling effort and a thorough cost analysis performed for the Northeast States Center for a Clean Air Future (NESCCAF), by the recognized expert companies AVL Powertrain Engineering, Martec, and Meszler Engineering Services.[144] CARB staff believed that "the NESCAAF study is the most advanced and accurate evaluation of vehicle technologies that reduce greenhouse gas emissions yet performed." [145] Besides the NESCAAF study on vehicle technologies, CARB monitored a separate analysis of the GHG benefits of alternative fuel technologies, including upstream benefits and the cost associated with alternative fuel technologies, from work performed by TIAX, LLC. Finally, for air conditioning research, CARB staff met with various groups (including EPA) to develop its approach for reducing the emissions of air conditioning refrigerant and excess $CO_2$ emissions from air conditioning use.

After the release of the Initial Staff Report, CARB received comments on its evaluation of technological steps that could be taken to meet its GHG standards from parties who supported the CARB study, and from various industry parties who disagreed with many of the CARB conclusions. As part of its standard-setting process, CARB staff considered the comments from all parties on both sides, and responded to industry concerns in its Final Statement of Reasons (FSOR), published in August 2005.[146] CARB concluded that it had identified the necessary technology in existence at that time that could enable vehicles to meet the GHG standards; or specifically identified the projected control technologies; answered the industry objections regarding the technology; and has explained its reasons for believing that each of the steps can be completed in the time available.

---

[144] NESCCAF undertook this study "to help define GHG—reducing motor vehicle technologies that are expected to be feasible, commercially available and cost effective in the 2009–2015 timeframe." It was "inspired by the California's legislature's passage of Assembly Bill 1493 * * *" and it related to the Northeast U.S. because "the results presented in this report have significant implications for states in the Northeast and elsewhere that share California's commitment to reducing transportation related GHG emissions as part of a broader effort to address the risks posed by global climate change." Reducing Greenhouse Gas Emissions from Light-Duty Motor Vehicles, NESCCAF, p 1–1, September 2004.

[145] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44 at 44.

[146] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.116.

## 2. Overview of Technologies and Their Projected Applications

The NESCAAF study identified technologies for reducing $CO_2$ emissions that were modeled both individually and in various technology combinations (or "packages"). Because there were a multitude of technologies available for the $CO_2$ reductions, CARB realized that there needed to be engineering guidelines for choosing combinations that would be economical to the consumer. The guidelines tried to avoid combining technologies that tend to address the same categories of losses or technologies that may not complement one another from a drivability standpoint. Participants in the NESCAAF study and CARB staff then assembled a wide variety of combined technologies to evaluate through simulation modeling in order to identify those which would provide the greatest $CO_2$ reductions. In an effort to cover the full spectrum of $CO_2$ reductions that could be accomplished, CARB staff divided the results into two categories: near-term phase-in and mid-term phase-in applications. These translate to the following model year ranges: Near-term (2009–2012) and mid-term to fully phased-in (2013–2016).[147]

In the Initial Staff Report, CARB staff summarized the state of near-term technology for meeting its proposed $CO_2$ standards:

The technologies explored (in the Initial Staff Report) are currently available on vehicles in various forms, or have been demonstrated by auto companies and/or vehicle suppliers in at least prototype form * * * There is near term, or off the shelf technology package in each of the vehicles classes evaluated (small and large car, minivan, small and large truck) that resulted in a reduction of $CO_2$ emissions of at least 15 to 20 percent from baseline values. In addition there is generally a near-term technology package in each of the vehicle classes that results in about a 25 percent $CO_2$ emission reduction." [148]

For engines, $CO_2$ is emitted with engine exhaust as a result of the combustion process. CARB projected that by 2009, reductions in engine $CO_2$ emissions would result from these primary technology drive-train changes which could be expected in all vehicle classes: Dual cam phasing, turbocharging with engine downsizing, automated manual transmissions, and

---

[141] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44.

[142] Id. at 43.

[143] Id. at 58.

[147] The NESCAAF study had a different schedule: Near-term technologies (2009–2012), mid-term (2013–2015) and long term (2015 and later). California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 27.

[148] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44 at iii.

**32770**  **Federal Register** / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

camless valve actuation.[149] CARB also described several other technology items that may not be present in most vehicles in the early years of the standards, but are expected to be used in later years as development continues. These include: Gasoline direct injection, engine friction reduction, aerodynamic drag and rolling resistance, more aggressive shift logic, and early torque converter lock-up. Finally, CARB staff identified two other technology choices that while offering real GHG reduction capability were not as cost effective as the other technologies, and, accordingly, were not projected to be applied in the near-term—these are hybridization and greater dieselization of the fleet.

For the later years of these standards, CARB stressed that its GHG regulations "rely less on traditional technology-forcing than repackaging a combination of off-the-shelf technologies to meet the adopted standards." [150] The NESCAAF Report included, for each of the five vehicle categories, a table showing several promising technology packages, for each of the three time frames (near-, mid-, and long-term), their resulting $CO_2$ reductions, and expected costs.[151] Additionally, for the long-term phase of the standards (2015–2016), CARB projects that there will be increased market penetration of hybrid-electric vehicles and advanced multi-mode diesel vehicles.[152] In its December 2005 request letter, CARB discussed how improvements will occur, as it expects "that a manufacturer would plan for a rollout of new technologies that would begin in 2009 and then build on the initial efforts with additional near and mid-term technologies that would be commensurate with previous investments." [153]

For air conditioning systems, GHG emissions are either direct or indirect. Direct emissions are the result of normal leakage of the air conditioning refrigerant from the system over time, as well as leakages that occur because of vehicle accidents, poorly performed maintenance, or improper refrigerant recovery prior to vehicle scrappage. Air conditioning refrigerants used in vehicles today are typically a hydro-fluorocarbon (HFC), which is a very strong GHG. Indirect emissions are the

additional $CO_2$ emissions from the engine which occur because of the added load on the engine from operation of the air conditioning system. CARB, using the modeling in the NESCAAF Report, projected that $CO_2$ equivalent reductions could result from these improvements in the air conditioning system: improved variable displacement compressor with revised controls, improved low-leak systems, and the use of an improved refrigerant.[154]

CARB notes that alternative fueled vehicles generally can help reduce GHG emissions by: (1) Direct reduction of GHG emissions because the alternative fuels will produce fewer GHG emissions, and (2) indirect reductions in GHG emissions because of the decreased upstream emissions. Upstream emissions are well-to-tank emissions, including the fuels' extraction, processing, distribution and marketing. The alternative fuels which result in GHG reductions are CNG, LPG, ethanol (including E85), electric, and hybrid-electric.

In its ISOR, CARB identified exhaust catalyst improvement as another technology area that could lead to GHG emission reductions, specifically the reduction of methane and nitrous oxide ($N_2O$). These gases are greenhouse gases just like $CO_2$, but their mass emissions from motor vehicles are very small compared to $CO_2$. CARB notes that "although it is conceivable that these methane and $N_2O$ emissions could be reduced by faster catalyst heating at vehicle start-up and enhanced catalysts systems with higher surface density or higher and/or revised catalyst loadings, staff is not aware of such efforts at this time (August 2004)." [155] There were no further submissions to the record by CARB or any other party on this particular technology area.

3. CARB's Updates on Technological Development

At the time of the first set of EPA hearings on the CARB waiver request, in April 2007, CARB presented additional information to bolster its assertions on technological feasibility to highlight developments in GHG technology since CARB originally submitted its request to EPA in 2005. CARB summarized the recent developments and additional examples of real-life implementation of the technologies identified in its waiver request. In its comments following the April 2007 hearings, and its July 2007

letter responding to post-hearing comments, CARB offered additional information to bolster their GHG technology projections. Generally, CARB pointed to numerous instances in which many of the near-term and mid-term technologies have been applied in vehicles which have been produced in the years since 2004 (when the CARB standards became final) right up to mid-2007. For example, attached to additional comment letters it submitted to EPA's Docket in June and July 2007, CARB discussed the increased use of the GHG technologies discussed in the ISOR and provided summaries of GHG technology used in 2007 and 2008 model year vehicles showing increased use of all the near-term and mid-term technologies.[156] CARB also offered numerous examples, contained in manufacturer news releases and advertisements, and trade press stories, illustrating real-life adoption of the GHG technologies in both domestic and foreign manufacturers' vehicles.[157]

At its March 5, 2009 hearing following EPA's decision to reconsider its previous denial, CARB presented additional new information highlighting developments in GHG technology since the last opportunity to submit public comment on this issue. In addition, some environmental groups submitted testimony and comments in support of the CARB finding of technological feasibility of the GHG standards. This next section will summarize the technological feasibility information submitted by CARB and other parties. CARB noted that the manufacturers were employing the individual GHG-reducing technologies as well as the packages of those technologies CARB had projected as viable compliance pathways as early as 2004. CARB also noted that in addition to phasing-in technologies, as CARB had originally predicted, manufacturers were using other technologies that CARB did not rely on originally—including increased hybrid sales, downsized turbocharged engines in light truck lines, a large influx of diesel vehicle sales, and improved air conditioning systems. In some cases, the resulting reductions produced as much as 10% of the GHG reductions needed for manufacturers' fleet averages to meet the CARB standards.

CARB also cited to recent EPA studies on technological feasibility and costs for

[149] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44 at 59–60.

[150] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 34.

[151] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 27 and 35, and OAR–2006–0173–0010.44 at 59.

[152] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 27.

[153] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 35–36.

[154] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44 at 69–73, and EPA–HQ–OAR–2006–0173–0004.1 at 22–23.

[155] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.44 at 78–79.

[156] California Air Resources Board, EPA–HQ–OAR–2006–0173–1686, Attachments 84 and 85.

[157] California Air Resources Board, EPA–HQ–OAR–2006–0173–1686, Attachments 86 through 93 and 103, 104, 114, and California Air Resources Board, EPA–HQ–OAR–2006–0173–3601, Attachments 173–177.

GHG reductions in motor vehicles, conducted by EPA in 2007. These EPA reports were discussed in EPA's Advanced Notice of Proposed Rulemaking on Regulating Greenhouse Gas Emissions Under the Clean Air Act published on July 30, 2008.[158] The findings in these studies were very consistent with the technological feasibility, cost and lead time estimates from the CARB ISOR in 2004.

Three EPA studies were referenced by CARB. First, CARB discussed the June 2008 document "Vehicle Technical Support Document: Evaluating Potential GHG Reduction Programs for Light-Duty Vehicles (Light-Duty Vehicle TSD)." [159] The Light-Duty Vehicle TSD represented EPA's assessment during 2007 of how a light-duty vehicle program for GHG emission reductions under the Clean Air Act might be designed and implemented, with two program options: either (1) a fixed percentage reduction (4%) in $CO_2$ emissions per model year from 2011 to 2018, or (2) an annual reduction in $CO_2$ emissions per model year from 2011 to 2018, based on a model developed by the Department of Transportation's Volpe Center, establishing $CO_2$ emission standards, at the point the model projects maximum net benefits for those model years.[160] The Light-Duty Vehicle TSD collected information from a wide range of sources, including a 2002 National Academy of Sciences report, the 2004 NESCAAF report (also used by CARB), current technical literature, and information from vehicle manufacturers and automotive suppliers. CARB noted that the emission reduction potentials and costs in the EPA study were similar to the reduction potentials and costs estimated by CARB in its ISOR. In discussing the Light-duty TSD in the ANPRM, EPA also acknowledged that, based on enhancements to the Volpe Model later in 2007, the earlier EPA analysis "tended to underestimate the benefits and/or overestimate the costs of light-duty vehicle $CO_2$ standards that could be established under the CAA." [161]

CARB also referenced the March 2008 "EPA Staff Technical Report: Cost and Effectiveness Estimates of Technologies Used to Reduce Light-duty Vehicle Carbon Dioxide Emissions." This report presented the EPA staff assessment of costs and effectiveness of over 40 $CO_2$ reduction technologies in the categories of engines, transmissions, hybrids, accessories and other technologies (e.g., aerodynamic improvements). EPA noted that the majority of the technologies investigated are in production and available on current vehicles, either in the U.S., Europe or Japan. As part of that report, EPA worked with an internationally recognized automotive technology firm to perform a detailed vehicle simulation modeling study of the GHG reduction effectiveness of a number of advanced automotive technologies. As noted by CARB, the EPA Report obtained technology package reductions and cost estimates very similar to those in the CARB ISOR.[162] As in the earlier Light-Duty TSD, EPA noted that the estimates in this report are conservative because they rely on data sources from one to six years old and declared that the "automotive industry is a technology-driven industry, and new technologies are developed and introduced quickly. A number of technologies which have only recently been introduced or will be within the next year are likely to see improvements in their effectiveness and cost reductions beyond what we estimate (in this report)." [163]

Finally, CARB referenced an EPA staff technical memorandum "Documentation of Updated Light-duty Vehicle GHG Scenarios," dated June 23, 2008.[164] This memorandum summarized the staff work to update the "4% per year" GHG reduction scenario that was first documented in the Light-duty Vehicle TSD, by addressing some of the deficiencies of the earlier study,[165] and was discussed in the ANPRM for GHG Standards. EPA once again noted that because the updated analysis did not address all the issues identified in the earlier TSD, it continued to believe that the results of this updated analysis are conservative,

tending to overestimate the costs and/or underestimate the benefits. In its most recent comment, CARB noted that the EPA lead time estimates in EPA's ANPRM cite implementation rates supportive of CARB's estimates for implementing vehicle GHG reducing technologies.[166]

CARB summarizes the reports from EPA, NESCAAF and others by declaring that "the technologies examined are well known and most are already being implemented on today's vehicles, while the others are simply advanced versions of conventional technologies that are already being demonstrated by vehicle manufacturers and component suppliers." [167] To bolster this statement, CARB submitted a list of Model Year 2009 vehicles which employ GHG reduction technologies, which shows a gradual phasing-in of these technologies across all manufacturers and all product lines. CARB also submitted a list showing 2009 Model Year vehicles that comply with the CARB GHG standards; the list shows significant numbers of 2009 passenger cars and light trucks meeting the 2012 and later standards, significantly ahead of the deadlines.

With respect to the overall technological feasibility of its GHG standards, CARB believes that it has reasonably projected technological feasibility, consistent with the approach employed in the *NRDC* decision, when manufacturers have several years of lead time before compliance. CARB notes that it "either has demonstrated that the necessary technologies presently exist to meet the established standards or we have specifically identified the projected control technologies, answered objections raised by industry regarding those technologies, and explained why we believe that each of the steps can be completed in the time available." [168]

In support of its conclusion, CARB submitted for the record three analyses showing that the manufacturers are employing the GHG technologies at least as fast as CARB predicted, and certainly in time for compliance with the early model years. First, CARB did an "industry-wide" projection using manufacturers' 2009 sales projections and worst case $CO_2$ values per single test vehicle, and used the 2009 projected sales as unchanged for 2010 and 2011 model years.[169] The results of this analysis show industry-wide GHG

[158] Advanced Notice of Proposed Rulemaking, Regulating Greenhouse Gas Emissions Under the Clean Air Act, 73 FR 44354 (July 30, 2008).

[159] California Air Resources Board, EPA-HQ-OAR-2006-0173-9019.5.

[160] This approach uses a computer model developed by the Department of Transportation Volpe Center called the "CAFE Effects and Compliance Model" ("Volpe Model").

[161] This EPA assessment of the Light-Duty Vehicle TSD was contained in the Advanced Notice of Proposed Rulemaking, Regulating Greenhouse Gas Emissions Under the Clean Air Act, 73 FR 44354, at 44444 (July 30, 2008).

[162] California Air Resources Board, EPA-HQ-OAR-2006-0173-9006, at 21.

[163] California Air Resources Board, EPA-HQ-OAR-2006-0173-9019.6. at 1.

[164] California Air Resources Board, EPA-HQ-OAR-2007-0173-9019.7.

[165] For example, this updated analysis included factors such as consideration of multi-year planning cycles available to manufacturers, consideration of $CO_2$ trading between car and truck fleets within the same manufacturer, and inclusion of plug-in hybrids as a viable technology beginning in 2012. Advanced Notice of Proposed Rulemaking, Regulating Greenhouse Gas Emissions Under the Clean Air Act, 73 FR 44354, at 44444 (July 30, 2008).

[166] California Air Resources Board, EPA-HQ-OAR-2006-0173-9006, at 21.

[167] Id.

[168] Id. at 23.

[169] California Air Resources Board, EPA-HQ-OAR-2006-0173-9019.12.

credits for 2009 and 2010 and a debit for 2011, but an overall credit for the three-year period. CARB noted that because this was done on a worst-case testing basis, it is likely that testing with additional vehicles in each test group would show even the debiting companies in compliance.[170]

Second, CARB looked at the compliance projection for the major domestic manufacturers (Ford, GM and Chrysler) for the 2009 and 2010 model years.[171] CARB used the actual 2009 model year registration data (from Polk) and, then, applied $CO_2$ emissions data by vehicle model obtained from EPA, selecting the highest $CO_2$ emissions data for those vehicle models with multiple engines. The results showed that for the 2009 model year, GM and Ford have ample compliance margins for both PC/LDT1 and LDT2/MDV, while Chrysler has a debit for its PC/LDT1 fleet, but a wide margin for its LDT2/MDV fleet. The overall net result is compliance for all three companies. For 2010, the three companies run debits for PC/LDT1 but have compliance margins for LDT2/MDV (a small margin for GM, and substantial margins for Ford and Chrysler). Again, based on the use of accumulated credits, these companies would comply with the model years analyzed.

Third, CARB focused on just GM for the 2009 model year, using a different technique than their study directly above.[172] CARB used certification data provided by GM, projected sales based on GM's latest manufacturer update to CARB, and $CO_2$ results provided by EPA. Then each GM certification test group was divided by GM into sales sub-groups, each having one or several vehicle models. For each sub-group, the $CO_2$ emissions of the highest emitting model were multiplied with the total number of vehicles in the subgroup to calculate the sub-group's GHG value. The GHG values from all sales subgroups in a test group were summed up to represent the sales group GHG value. For the 2009 model year, under this analysis, the GM PC/LDT1 fleet over-complies by 14 grams per mile and

the LDT2/MDV fleet over-complied by 27 grams per mile, generating substantial credits for 2010 and beyond.

Additional support for 2009–2011 compliance was provided by the Natural Resources Defense Council. At EPA's March 5, 2009 waiver hearing, NRDC presented testimony regarding the technological feasibility of the GHG standards for the early years of compliance. NRDC performed its analysis by using EPA fuel economy trends data for MY 2008, which predicted a national average fuel economy level without CAFE credits for flexible fuel vehicles. NRDC then converted the miles per gallon numbers to $CO_2$ grams per mile levels using the California sales mix and the GHG conversion established by CARB. The result is that industry accrues substantial amount of credits in 2009 and 2010, and then runs a small deficit in 2011 that can be easily made up using banked credits from the first two years.[173]

Beyond submitting results from its own recent analyses, CARB submitted a very recent (March 2009) study by Energy & Environmental Analysis (EEA) entitled "Automakers Ability to Comply with California GHG Standards Through 2012." [174] The EEA study notes that, if the California waiver is granted, manufacturers would be required to comply with standards for MY 2009 vehicles, which are already in production and being sold, and would have very little lead time to make changes for MY 2010 (which will start production in mid-calendar year 2009), and limited opportunity to make changes at this point for MY 2011 and 2012. EEA looked at the product plans for the "Big Six" manufacturers in the U.S. (GM, Ford, Chrysler, Toyota, Honda and Nissan) based on commercially available data, and from public information reported in the trade press, as well as the information submitted by the manufacturers to the Federal government in connection to the auto restructuring plans.[175] Generally, because of projected large sales of hybrids and to a lesser extent, sales of

diesel vehicles, EEA projected that Toyota and Honda will meet California GHG standards through 2012, and that Nissan may have a shortfall in LDV/LDT1 for 2012, but will easily comply with LDT2/MDV in 2012, and will be able to meet the 2012 standards by trading between categories and using banked credits from prior years.

For the domestic manufacturers, EEA noted concerns about compliance with the California GHG standards, in part because these companies have Federal CAFE values which are significantly below the three Japanese companies, meaning that it will be harder for them to reach the target. Nevertheless, the EEA report noted that the product plans of these companies show the following industry-wide technology improvements coming on line in the next 4 to 5 years:

—Luxury vehicles adopting GDI across most product lines;
—4 valve OHC/DOHC engines with VVT replacing the few remaining 2-valve OHC 4 and 6 cylinder engines;
—6-speed transmissions replacing 4 or 5 speed units in most mass market vehicles
—Electric power steering replacing hydraulic units in compact and mid size cars;
—Cylinder cut-out applications to V–8 and some V–6 units;
—Variable valve lift used more widely by Japanese manufacturers;
—Introduction of several new diesel models and hybrid models by all manufacturers;
—Introduction of new small "crossover" SUV and car models that are one size class below the existing smallest models offered by the domestic manufacturers to compete with the Toyota Scion XD and XB models and the Honda Fit model.

To perform the GHG estimate, the EEA study used the actual fuel economy data by vehicle model for MY 2009, and used the product-plan based technology forecasts to derive fuel economy by model for MY 2010 through 2012. For sales numbers, EEA used 2008 sales data and sales for the first two months of 2009 both nationally and for California as sales indicators for the near term (MY 2009 and 2010). For 2011 and 2012, EEA used the sales forecast it had developed in the 2008 DOE study, which was a 15 million annual sales level of light duty vehicles nationally. The power train mix numbers (engine/transmission combinations) for all years were the 2008 numbers because this was the latest data available from the CAFE data base.

Using this approach, EEA found that all three domestic manufacturers are in

---

[170] California Air Resources Board, EPA–HQ–OAR–2006–0173–9006 at 24.

[171] California Air Resources Board, EPA–HQ–OAR–2006–0173–9019.13. CARB limited this particular analysis to the domestic manufacturers because, in its assessment, "the international auto companies are better positioned to comply and will unquestionably meet early model year standards." As summarized in the first (industry-wide) CARB analysis, although at least one international manufacturer (BMW) projected a slight debit for 2009, all the manufacturers were projected for overall compliance for the period 2009–2011.

[172] California Air Resources Board, EPA–HQ–OAR–2006–0173–9019.14.

[173] Natural Resources Defense Council, EPA–HQ–OAR–2006–0173–7176.13, at 5–6. The NRDC testimony also noted that developments in the period between the first waiver hearing (May 2007) and the new hearing strengthen the California case that the GHG standards are cost-effective and technically feasible—namely, higher gas prices, the market shift to cleaner cars and the passage of new Federal fuel economy standards.

[174] California Air Resources Board, EPA–HQ–OAR–2006–0173–9019.15.

[175] EEA completed a detailed study of product plans for the Big Six manufacturers for the U.S. Department of Energy in late 2008, and they used that study as a baseline for this report on California GHG compliance.

compliance with current and expected CAFE through 2012, with Chrysler lagging somewhat behind Ford and GM. EEA then translated these forecasts to GHG forecasts for the California vehicle class definitions, assuming no A/C improvement credits or alternative fuel credits, and no trading of credits between manufacturers, and predicted as follows:

—All manufacturers will comply with GHG requirements for 2009;

—GM and Chrysler will comply with GHG regulation in 2010 while Ford is on the edge of compliance. Ford can likely comply by either using banked credits from 2009 or with small adjustments to the power train and sales mix sold in California if necessary;

—Chrysler and GM may be able to meet 2011 GHG standards using banked credits from 2009 and 2010 and credit trading between classes. All three manufacturers could require additional efforts such as air conditioner improvements to comply with 2011 GHG requirements.

—Compliance with 2012 GHG requirements will be a challenge and may require credit trading and banked past and future credits over and above credits from air conditioner improvements and introduction of alternative fuel vehicles.

—The results appear to be very realistic based on the auto-manufacturers public statements of future fuel economy.[176]

Regarding the long-term (MY 2012 and later) outlook, CARB compared the restructuring plans submitted by the automakers to the arguments manufacturers made in this proceeding, regarding later model year feasibility. CARB stated that "by 2015, even those manufacturers facing the most difficult challenge complying with California's standards have made statements that on their face show they plan to comply with the later model years standards, even before receiving additional credit for GHG reductions from air conditioning improvements and regardless of 2009 and 2010 credits carrying forward."[177] For example, CARB cited from the GM restructuring plan that the company stated that it will work to develop any changes needed to * * * meet such additional requirements as California's.[178] Further, at EPA's March 5, 2009 hearing, NRDC

pointed out that the plans of both GM and Ford show MY 2012 fuel economy levels for cars and light trucks fleet average that come very close to allowing the automakers to comply with the GHG standards with little or no additional effort.[179] Additionally, CARB noted that Chrysler stated that, should this GHG waiver be granted, the company would try its best to comply using available technology; however, as a last resort it might restrict sales of certain vehicle models in California and other states adopting the California standards, out of necessity.[180] Finally, regarding Ford, NRDC stated in its testimony that Ford plans to improve the average fuel economy by 26 percent by 2012 and by 36 percent by 2015.[181]

4. Manufacturers' Comments on the Technological Feasibility of the GHG Standards

Manufacturers raised arguments regarding the feasibility of the CARB GHG standards both in the underlying rulemaking in California, and in the EPA waiver proceeding. In the CARB rulemaking, the manufacturers generally criticized some aspects of the CARB modeling work that substantiated CARB's conclusions on technological feasibility. For example, a manufacturer argued that CARB overestimated the emission reductions from the powertrain changes in many of the technology packages used in the modeling studies, such as the NESCAAF study. Because the studies assumed changes in the use of advanced transmissions and engines in such a magnitude to be unrealistic for the U.S. fleet, the manufacturer stated that the changes would require retooling of all U.S. driveline plants, perhaps more than once.[182] Manufacturers also argued that the modeling of technology packages risked "double-counting" emission benefits produced by the individual technologies, thus producing an unrealistic estimate of emission reductions.[183] CARB responded to these comments by stating that manufacturers were already planning to incorporate

advanced transmissions and engine technologies in their vehicles, and that the gradual phase-in of the CARB standards allowed manufacturers to accomplish this during regular scheduled vehicle upgrades. CARB also noted that its modeling done by AVL specifically avoided double-counting (while some manufacturers' modeling did not).

Regarding the EPA waiver proceeding, while the manufacturers did take issue with some of the CARB modeling work during the CARB rulemaking, the manufacturers did not challenge CARB's general conclusions that the necessary technology presently exists to meet the near-term standards, that projected control technologies for future years have been identified, and that objections raised by industry have been answered. Rather, the industry offered an assessment that much of this technology is already at hand. At the first EPA hearing in March 2007, although no individual manufacturer presented testimony, the Alliance of Automobile Manufacturers discussed the progress of the industry in producing more fuel-efficient vehicles. The Alliance stated that "every model available today is equipped with some kind of fuel efficient technology, including direct fuel injection, variable valve timing, continuously variable transmissions, cylinder deactivations, and more."[184] These technologies in the 2007 and 2008 MY vehicles are among those that CARB projected as being in use for the near-term GHG standards (see above discussion on "Overview of Technologies and Their Projected Applications," section VI.B.2).

In comments sent to EPA after the March 2007 hearing, the industry commenters focused on whether there was adequate lead time to comply with the near-term standards, citing testimony from a CARB official (in the Vermont litigation) that some manufacturers may need up to six years to comply with the 2011 MY standards and up to 7 years to comply with the 2012 MY standards.[185] Also, the industry criticized CARB for not providing sufficient information on some technology issues for the EPA (or the public) to make an informed decision.[186] CARB responded to these

---

[176] California Air Resources Board, EPA–HQ–OAR–2006–0173–9019.15.

[177] California Air Resources Board, EPA–HQ–OAR–2006–0173–9006, at 27.

[178] California Air Resources Board, EPA–HQ–OAR–2006–0173–9021.1, at 21.

[179] Natural Resources Defense Council, EPA–HQ–OAR–2006–0173–7176.13, at 4.

[180] California Air Resources Board, EPA–HQ–OAR–2006–0173–9020.2, at U116, and California Air Resources Board, EPA–HQ–OAR–2006–0173–9020.3, at 118–120.

[181] Natural Resources Defense Council, EPA–HQ–OAR–2006–0173–7176.13, at 4, citing from Ford Motor Company Business Plan, Submitted to the House Financial Services Committee, December 2, 2008.

[182] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.116, Comment 154 (at 107) and Comments 158–159(–115).

[183] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.116, Comment 162 at 117.

[184] Testimony of Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–0422, at 98.

[185] Association of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1455.2 at 11–12. The litigation in Vermont is *Green Mountain Chrysler-Plymouth Dodge-Jeep* v. *Crombie*, 508 F. Supp, 295 (D. Vt.).

[186] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–1297.2 at 35–36.

**32774**   Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

points, stating that the CARB official also testified that most of the CARB-identified technologies are already developed and required only a few years of lead time for implementation. Additionally, based on lead time beginning at the time of the final adoption of the standards by CARB (August 2005), CARB notes that the 6 or 7 year lead time for the 2011 and 2012 model years respectively is reasonable.[187] CARB also provided, in its June 2007 and July 2007 comments, information from the Vermont litigation where various manufacturers testified that they would be able to meet the early years of the California GHG standards.[188] Concerning the list of technical issues on which the industry claimed CARB had not provided enough information to allow public comment, CARB stated that these issues were among many issues previously addressed fully both in submissions to the Docket (primarily the CARB Final Statement of Reasons) as well as in the Federal litigation.[189]

Manufacturers also presented information on technological feasibility at EPA's March 5, 2009 hearing and the subsequent comment period. At the EPA hearing, the Alliance continued to acknowledge technological advances in GHG control. The Alliance stated that "automakers have made major contributions into developing new fuel efficient technologies and the results are now coming to dealer showrooms. More than 50 technologies offered in vehicles today reduce emissions, increase mileage and allow vehicles to run on cleaner fuels." [190] Regarding technological feasibility for the early years (near-term), the industry trade groups generally argued that CARB relied on manufacturer credits for these years to provide a cushion for compliance in the later years, but that the several years of lead time required for mid-term compliance combined with uncertainty resulting from the EPA waiver denial makes even the near-term lead time inadequate.[191] CARB, in its

testimony and subsequent comments, presented its new analyses of compliance (for the industry in general, and for GM) that showed industry compliance is likely if not certain for the 2009 through 2011 model years (see discussion above at section VI.B.3.). Additionally, if any individual manufacturers incur a debit in any model year, the CARB regulations provide the manufacturer up to five model years afterwards to make up the debit to avoid any noncompliance penalty.

Regarding the mid-term (2012–2016) model years of the GHG standards, the industry commenters have argued that the only means by which most large-volume manufacturers will be able to meet the CARB standards is by "mix-shifting" their product lines to offer for sale more higher mileage vehicles to ensure meeting the CARB fleet average.[192] The Alliance stated that "it is simply too late for manufacturers to meet all the Pavley standards for future model years through the use of technologies, if for no other reason than because approximately 18 months of the product planning and development cycle was pretermitted while the waiver was denied (assuming for purposed of this analysis that a waiver would be granted in June 2009)." [193] As discussed earlier, CARB responded to these arguments by noting that in the restructuring plans recently submitted to the government, the manufacturers have made statements demonstrating they plan to comply with the later model years of the CARB standards, even before receiving additional credit for GHG reductions from air conditioning improvements and regardless of 2009 and 2010 credits carrying forward. Regarding the manufacturers' mix-shifting argument, EPA notes that under the narrow standard of review applied to California's technological feasibility determinations, consistency with section 202(a) does not mean that all manufacturers will be able to sell all vehicle models in California and that a reduced product offering in California resulting from California emission

standards is a policy decision left to the state.[194]

*C. Technological Feasibility and the Cost of Compliance*

1. Historical Approach

Congress has stated that the consistency requirement of section 202(a) relates to technological feasibility.[195] Section 202(a)(2) states, in part, that any regulation promulgated under its authority "shall take effect after such period as the Administrator finds necessary to permit the development and application of the relevant technology, considering the cost of compliance within that time." Section 202(a) thus requires the Administrator to first review whether adequate technology already exists, or if it does not, whether there is adequate time to develop and apply the technology before the standards go into effect.

In *MEMA I*, the court addressed the cost of compliance issue at some length in reviewing a waiver decision. According to the court:

Section 202's cost of compliance concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures. *See* S. Rep. No. 192, 89th Cong., 1st Sass. 5–8 (1965); H.R. Rep. No. 728 90th Cong., 1st Sass. 23 (1967), *reprinted in* U.S. Code Cong. & Admin. News 1967, p. 1938. It relates to the timing of a particular emission control regulation rather than to its social implications. Congress wanted to avoid undue economic disruption in the automotive manufacturing industry and also sought to avoid *doubling or tripling* the cost of motor vehicles to purchasers. It, therefore, requires that the emission control regulations be technologically feasible within economic parameters. Therein lies the intent of the cost of compliance requirement.[196]

Previous waiver decisions are fully consistent with *MEMA I*, which indicates that the cost of compliance must reach a very high level before the EPA can deny a waiver. Therefore, past decisions indicate that the costs must be excessive to find that California's standards are inconsistent with section 202(a).[197] It should be noted that, as with other issues related to the determination of consistency with

[187] California Air Resources Board, EPA–HQ–OAR–2006–0173–3601, at 26–27.

[188] CARB referenced the industry assessments of early model year compliance from the litigation in Vermont, *Green Mountain Chrysler-Plymouth Dodge-Jeep* v. *Crombie*, 508 F. Supp, 295 (D. Vt.), California Air Resources Board, EPA–HQ–OAR–2006–0173–1686 at 20–21, California Air Resources Board, EPA–HQ–OAR–2006–0173–3601, at 27–28.

[189] The list of issues and the CARB response are discussed in the CARB July 2007 letter. EPA–HQ–OAR–2006–0173–3601, at 26.

[190] Testimony of Association of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–7177, at 108.

[191] Association of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994.1, at 24–25; Association of International Automobile

Manufacturers, EPA–HQ–OAR–2006–0173–9005.2 at 4.

[192] Regarding mix-shifting, the National Automobile Dealers Association also commented that this would be costly to dealers who would lose business due to the "scrappage effect" (see above pp 46–49), being forced to accept smaller vehicles regardless of local consumer demand, rationing of larger vehicles, and out-of state dealers unencumbered by CARB's regulations. National Automobile Dealers Association, EPA–HQ–OAR–2006–0173–8956.1, at 8–9.

[193] Association of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994.1 at 26.

[194] 40 FR 23102, 23103 (May 28, 1975).

[195] H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 301 (1977).

[196] *MEMA I* at 1118 (emphasis added). *See also id.* at 1114 n. 40 ("[T]he 'cost of compliance' criterion relates to the timing of standards and procedures.").

[197] *See, e.g.,* 47 FR 7306, 7309 (Feb. 18, 1982), 43 FR 25735 (Jun. 14, 1978), and 46 FR 26371, 26373 (May 12, 1981).

section 202(a), the burden of proof regarding the cost issue falls upon the opponents of the grant of the waiver.

Consistent with *MEMA I*, the Agency has evaluated costs in the waiver context by looking at the actual cost of compliance in the time provided by the regulation, not the regulation's cost-effectiveness. Cost-effectiveness is a policy decision of California that is considered and made when California adopts the regulations, and EPA, historically, has deferred to these policy decisions. EPA has stated in this regard, "the law makes it clear that the waiver request cannot be denied unless the specific findings designated in the statute can be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209 * * *" [198] Thus, under the language of section 202(a)(2), EPA will look at the compliance costs for manufacturers in developing and applying the technology with the costs being broken down on a cost per vehicle or unit basis.

2. Technology Cost Information in This Proceeding

At the time of CARB's original waiver request, CARB presented the projected technology costs for the GHG vehicle standards based on cost estimates for necessary components provided by Martec, the company that did the modeling studies that produced the CARB technology assessment in its ISOR. The costs were calculated by applying a mark-up factor, determined by the Argonne National Laboratory, for the components needed for the vehicles. Additionally, CARB assumed an additional 30% discount for a limited number of components where unanticipated improvements in production processes or simplifications or consolidation in parts after additional further development would be likely.[199]

At that time, CARB stated that the average cost of control for near-term technology packages on PC/LDT1 category vehicles was estimated at $383 per vehicle, and for LDT2/MDV category vehicles was estimated at $327 per vehicle. Performing similar calculations for the mid-term technology packages, CARB put the estimates for PC/LDT1 at $1,115, and for LDT2/MDV at $1,341. CARB also presented information on the

estimates of costs for the "major 6" manufacturers cost of compliance over the term of these standards. These figures ranged from $0 (for the three Japanese companies and GM) for the 2009 MY (*i.e.*, the fleets of these companies would comply with the 2009 standards with no changes) to the highest costs in the 2016 MY, with a $1,288–$1,341 range for the domestic manufacturers and a $272–$298 range for the Japanese manufacturers.

During the CARB GHG rulemaking, the manufacturers commented that CARB underestimated costs of individual technologies because CARB did not use the manufacturers' costs to individually develop each of the technologies, and CARB used a mark-up factor for final technology cost that was too low. The Alliance commissioned a study by Air Improvement Resources, NERA Economic Consulting, and Sierra Research (the above noted "June 2007 AIR/NERA/Sierra Study") that found the average vehicle cost increase to be about $3000, several times larger that the CARB estimates. In response, CARB provided a detailed critique of why the cost conclusions in this study were not reasonable. CARB found faulty technical analysis and inflated component costs.[200] In the time period since the CARB request, CARB has updated its technology cost estimates with new real-life information to show that manufacturers are continuing to implement the GHG technology packages and combinations CARB had identified at the outset—at costs in line with CARB's projections.[201]

EPA also received comments from the National Auto Dealers Association (NADA) and the National Association of Minority Automobile Dealers (NAMAD) concerning the costs of the CARB standards to its constituents, above the costs that GHG technology adds to the vehicle price to buyers. NADA notes that because of "dire financial straits" in the auto industry due to the economic recession, dealers are experiencing financial difficulties from vastly reduced vehicle sales (among other problems). NADA believes that if this waiver is granted, and the various other states which have adopted the GHG standards begin their own programs, the result will be a "state-by-state

patchwork approach to fuel economy that would fill their lots with more unsold vehicles." [202] NAMAD believes that "dealer will lose sales if automakers have to ration delivery of large vehicles in CARB (Section 177) states to meet the fleet average, and * * * if dealers are forced to take delivery of more small cars that their customers don't want, dealers will be stuck paying the interest charges while these vehicles sit on their lots." [203] EPA notes the comments of NADA and NAMAD on this particular type of cost, but also notes that these comments are not relevant to the issue of whether the technology feasibility of the GHG standards are consistent with section 202(a). The comments regarding the "patchwork" of the GHG standards in other states are discussed below in section VII. B. 2.

3. Consistency of Certification Test Procedures

The enforcement procedures that accompany California's greenhouse gas standards would also be inconsistent with section 202(a) if the California test procedures impose testing requirements inconsistent with the Federal testing requirements. Such inconsistency means that manufacturers would be unable to meet both the California and the Federal test requirements with the same test vehicle.[204]

CARB stated in its December 2005 Waiver Request letter that there "are no Federal test procedures that measure GHG for climate change purposes, [so] there are no potential inconsistencies precluding a manufacturer from using the same test vehicle to meet both Federal and California requirements" and noted in its most recent (April 2009) comment letter that this was still true.[205]

EPA received no comments suggesting that CARB's GHG testing requirements pose a test procedure consistency problem with federal test procedures.

4. Safety Implications of the CARB GHG Standards

The industry raised a vehicle safety issue for consideration within the technological feasibility criterion. The industry has proffered the idea that the CARB GHG standards will result in the production of vehicles which will be unsafe for two reasons. First, they claim

---

[198] 36 FR 17158 (August 31, 1971). *See also* 40 FR 23102, 23104; 58 FR 4166 (January 7, 1993), LEV Waiver Decision Document at 20.

[199] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 40.

[200] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.116 at 141–155.

[201] California Air Resources Board, EPA–HQ–OAR–2006–0173–1686 at 19, and EPA–HQ–OAR–2006–0173–3601 at 28–29. CARB also notes that in the Green Mountain case, 508 F. Supp. 2d at 365–366, the Court found that the industry consultant's (T. Austin) baseline assumptions and resulting cost estimates—double that of defendants' expert—were unsupported by the evidence.

[202] National Automobile Dealers Association, EPA–HQ–OAR–2006–0173–8956.1 at 5–6.

[203] Testimony of National Association of Minority Automobile Dealers, EPA HQ–OAR–2006–0173–7177, at 126–127.

[204] *See, e.g.*, 43 FR 32182 (Jul. 25, 1978).

[205] California Air Resources Board, EPA–HQ–OAR–2006–0173–0004.1 at 42 and EPA–HQ–OAR–2006–0173–9006 at 29.

**32776** Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

that many GHG-compliant vehicles will achieve compliance because they will be downsized, and will be inherently less safe in collisions. Second, they claim that because GHG-compliant vehicles will also have higher fuel economy than today's fleet, owners will drive more, and that additional VMT means more accidents will occur. The industry asserts that because the GHG standards will cause these problems, the resulting vehicles are technologically infeasible because of the safety concerns.

EPA takes safety into account in evaluating technology, feasibility and lead time of California emission standards. For example, when CARB in 1994 requested authorization for its original set of emission standards for small spark-ignition engines used in utility, lawn and garden equipment, the industry trade association raised safety concerns in the EPA authorization proceeding. The industry argued that compliance with the CARB standards would require the use of catalyst technology in equipment, and that current catalysts produced high exhaust and surface temperatures, and could also possibly cause sparking and flaming, so these safety issues must be addressed before this technology could become feasible, and the authorization should be denied on that basis. EPA examined these safety issues within the traditional consistency with section 202(a) criterion, with the requisite deference given to CARB and the burden placed on those arguing that safety concerns should give cause for EPA to deny the authorization. CARB responded to the industry objections by offering a detailed review of steps necessary to refine small engine catalyst technology to meet the standards while reducing the high temperature risks, as well as identifying some current small engines that met the standards without using a catalyst. After reviewing all relevant information from CARB and other commenters on the safety issues (and other technological feasibility issues) the Administrator stated he was "unable to make the finding that the CARB Tier 2 standards are not technologically feasible within the available lead time." [206]

In the California GHG proceeding, CARB has responded to the industry safety arguments, both during the underlying California rulemaking and in comments submitted to EPA in this waiver proceeding. In summary, CARB

rejected the industry arguments in several ways. First, it pointed out that under the terms of AB 1493, CARB is precluded from requiring vehicle down-weighting as a means of achieving compliance. Second, CARB has laid out a broad pathway of potential technologies for achieving compliance for all vehicle types, none of which require any weight reduction of vehicles. Third, CARB notes that an industry study (Sierra 2004) shows that weight reduction is far from cost-effective and therefore becomes an unlikely compliance option. Fourth, CARB submitted reports from experts that tend to dispute any safety impacts from the GHG standards by demonstrating that any weight reduction that may be made to comply with the GHG standards need not adversely affect vehicle safety. Finally, the opponents VMT safety theory is entirely based on their flawed rebound and fleet turnover arguments (discussed above in section IV.C.2).

Regarding the safety issue, EPA notes that CARB has provided considerable evidence that its GHG standards can be met without any increase in concern regarding vehicle safety. Even accepting the industry arguments regarding the safety implications of downsizing—which are disputed by CARB, particularly for downsizing of larger vehicles—EPA cannot make the finding that the CARB standards are technologically infeasible because manufacturers may choose to use a method of compliance that is not as safe as the methods CARB has identified, particularly where there are many business reasons for manufacturers not to choose such a method. The burden, here, is on manufacturers to demonstrate that safety concerns with the technology available for compliance were unavoidable and substantial and that manufacturers would have no reasonable technological option available to them in the lead time provided for compliance. Based on the entire record, they have not made such a demonstration. Beyond this limited type of review under section 209(b), EPA's proper role is to leave for California the judgment of what greenhouse standards are appropriate in light of safety concerns raised by manufacturers.

With regard to the claim that increased VMT will increase the number of accidents, this argument is not relevant to the safety of the vehicle but to an outcome based on the possible actions or changes of driving patterns of people who own these vehicles. This argument does not go to the technological feasibility of the vehicle

itself. This is a public policy argument that is left for California's discretion but is not relevant to the narrow technological feasibility analysis authorized for EPA under section 209(b).

For these reasons, EPA finds that the industry opponents of this waiver request, with respect to the vehicle safety impact of the CARB GHG standards have not met their burden of proof for EPA to find that these standards are not consistent with section 202(a) of the Act.

*E. Conclusion on Technological Feasibility*

After its review of the information in this proceeding, EPA has determined that CARB has demonstrated a reasonable projection that compliance with its GHG standards is reasonable, based upon the current and future availability of the described technologies in the lead-time provided and considering the cost of compliance. The industry opponents have not met the burden of producing the evidence necessary for EPA to find that California's GHG standards are not consistent with section 202(a).

With regard to motor vehicles required to meet the near-term standards for the 2009 through 2011 model years, the CARB technical information presented in this record clearly indicates that these requirements are feasible. CARB has presented the case that the industry as a whole will be able to meet these standards for this period—for the 2009 and 2010 model years—with compliance with the standards including credit generation, and for the 2011 model year—with a carry-forward of credits earned in the 2009 and 2010 model years. Within the industry, several manufacturers are not expected to need credits to comply in the 2011 model year. Moreover, California has provided several technological avenues that are currently available for meeting the 2011 MY standards without the need for credits. Manufacturers have provided no evidence that these technologies cannot be applied to meet the 2009–2011 MY standards.

For the mid-term standards, 2012 MY and beyond, CARB again identified various and reasonable technological avenues that manufacturers could use to meet the mid-term standards. CARB initially presented that the continued use of technologies identified for the near-term along with more sophisticated technologies and the expected upswing in hybrid-electric and diesel vehicles would result in industry compliance for these years. In its June 2007 comments,

[206] Decision Document, Authorization of California's Under 25 Horsepower Utility Lawn and Garden Equipment Engine Exhaust Emission Standards (ULGE) (July 5, 1995), EPA Docket A–91–01 at 61–70.

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

32777

CARB noted that it expected manufacturers to use combinations of the initially introduced technologies to meet the mid-term standards and cited several examples of this already happening in several manufacturers' products. CARB also noted that in 2007, manufacturers were aggressively introducing new hybrid vehicles well ahead of the mid-term standards. For the longer term, as noted earlier, CARB states that "by 2015, even those manufacturers facing the most difficult challenge complying with California's standards have made statements that on their face show they plan to comply with the later model years of standards, even before receiving additional credit for GHG reductions from air conditioning improvements and regardless of 2009 and 2010 credits carrying forward." [207]

In its comment submitted after EPA's March 5, 2009 hearing, CARB summarized the industry discussion on technological feasibility as follows:

In our July 24, 2007 comments CARB stated "* * * not a single manufacturer from either the Alliance or AIAM has independently presented any substantive comment concerning the principal and proper focus of the (EPA) proceeding—the technological feasibility and lead time for those manufacturers to comply with the subject greenhouse gas standards." Document ID No. EPA–HQ–OAR–2006–0173.3601 at 26. That statement remains true today, and stands in stark contrast to the renewed demonstration CARB has made in this reconsideration proceeding. [208]

Regarding the lead time provided by California to meet the near-term and the mid-term and later standards, the commenters have not met their burden to show that the lead time is insufficient. California provided manufacturers 4–5 years before the near-term GHG standards would go into effect and 8–9 years before the later standards, giving substantial time for development of technologies to meet the standards. The industry commenters have not shown that this lead time was insufficient, both for the near-term GHG standards, that were based on technologies already known and developed, as well as for the mid-term GHG standards, where CARB provided a reasonable pathway to be followed—answering theoretical objections,

identifying major steps needed to refine technology, and offering plausible reasons for predicting successful technologies. [209]

Regarding the cost component of the technological feasibility test, EPA believes that the opponents of the waiver have not met the burden of proof to show that the GHG standards are not technologically feasible because of excessive cost. The industry cost study (from Sierra Research) from the CARB rulemaking found an average vehicle cost increase of about $3,000 to comply with the CARB standards, an increase which CARB rebutted in detail, and which was also found not credible by the district court in the Vermont litigation. Alternatively, even if the industry estimates were closer to the mark than the CARB estimates, CARB points out that Congress was concerned with standards causing a *doubling or tripling* of vehicle costs (MEMA 627 F.2d at 1118), not the cost increases that CARB has projected (ranging from under $100 for some manufacturers in near-term to a maximum of $1,100 to $1,350 for vehicles in the 2016 MY). [210]

Therefore, for the above reasons, I am unable to find that the CARB GHG motor vehicle emission standards are not technologically feasible within the available lead-time giving consideration to the cost of compliance.

### F. Other Issues Related to Consistency With Section 202(a)

#### 1. Impact of EPA's March 6, 2008 Denial on Lead Time

In EPA's February 12, 2009 **Federal Register** notice, EPA specifically sought comment on the effect of the March 6, 2008 Denial on whether CARB's GHG

standards are consistent with section 202(a), including lead time.

In comments submitted for this reconsideration, the industry commenters asserted that any lead time clock that may have been running should have stopped completely and immediately upon EPA's March 6, 2008 Denial. Both the Alliance of Automobile Manufacturers and the Association of International Automobile Manufacturers noted that even CARB officials testified that manufacturers should have started development of their 2010–2012 MY product lines at the time the final standards were finalized in the 2004–2005 time frame, and that there should be a presumption that the industry could and would stop ongoing development efforts when this waiver was denied. [211] In its comments, the Alliance noted that it should not be assumed that a "retroactive" waiver would impose no hardship because manufacturers are able to earn credits for sales for the 2009 and 2010 MYs in advance of any waiver grant. They claim that the regulated parties would have conducted their business differently if they knew in advance that these regulations would be enforced. [212]

On the other hand, CARB urges EPA to reject the argument that the March 6, 2008 Denial tolled the lead time countdown. CARB noted that it always maintained that it intended to enforce the GHG standards from their start point for the 2009 MY, discussed how it pursued promptly all available avenues to overturn the March 6, 2008 Denial, and noted that the denial was all but guaranteed to be revisited because its waiver request was supported by both candidates for President in 2008. Additionally, CARB argues that any period the March 6, 2008 Denial was in effect was not significant compared to the four to ten years of lead time available to the manufacturers, and that technological advancements continued to appear during the denial period.

The manufacturers argue that EPA's earlier denial was reasonably relied upon by manufacturers, that the denial tolled or suspended lead time and allowed them to stop working towards compliance, which affects the adequacy of the lead-time for California's standards. This amounts to an argument that they reasonably had the opportunity to stop work towards

---

[207] California Air Resources Board, EPA–HQ–OAR–2006–0173–9006 at 27.

[208] California Air Resources Board, EPA–HQ–OAR–2006–0173–9006 at 29. CARB also noted, that in the final efforts to persuade EPA to deny this waiver, waiver opponents cited policy arguments against the waiver, such as the preference for a uniform national standard to avoid a "patchwork" of state regulations, rather than any attack on the technological feasibility of the standards.

[209] Regarding lead time, some industry comments suggest that EPA should count lead time from the time the waiver is granted. EPA, however, believes that lead time should run from the time the rule is adopted by California. As EPA made clear in its waiver decision for California's standards regulating medium-duty motor vehicles (59 FR 48625 (Sept. 22, 1994), Decision Document at 39–41), lead time should generally be measured from the point at which California adopts its regulations. At that point, the regulations, and their obligations on regulated parties, are clear. EPA measures lead time for its regulations from the time of promulgation, which is analogous to California's adoption of its regulations. EPA review of CARB waiver requests causes no more uncertainty than judicial review of EPA regulations. In addition, California and regulated parties do not know when EPA will make a final decision on a request for waiver of preemption, so California would have little ability to evaluate lead time at the time it adopts its standards if lead time were based on a future action by another entity the timing of which is uncertain. In any case, the commenters have not shown that the amount of lead time provided from the date of the waiver is insufficient.

[210] California Air Resources Board, EPA–HQ–OAR–2006–0173–0010.14 at 80–83 and, EPA–HQ–OAR–2006–0173–0004.1 at 39–40.

[211] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994.2 at 27, and, Alliance of International Automobile Manufacturers, EPA–HQ–OAR–2006–0173–9005.2 at 16, Note 4.

[212] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173–8994.2 at 23–25, see also National Automobile Dealers Association, EPA–HQ–OAR–2006–0173–8956.1, at 10–12.

**32778** Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

compliance at that point if they chose. However it does not change the basic issue before EPA: whether the manufacturers, as opponents of the waiver, demonstrated that the standards are not consistent with section 202(a) because of inadequate lead time.

Based on a review of the entire record, and even assuming the reasonableness of the manufacturers' claim that they could have reasonably stopped work towards compliance upon the March 6, 2008 Denial, the industry commenters have not shown that the lead time provided under these circumstances was insufficient. This is particularly true regarding the near-term GHG standards, which were based on technologies already known and developed. But this is also true for the mid-term GHG standards, where CARB provided a reasonable pathway to be followed—answering theoretical objections, identifying major steps needed to refine technology, and offering plausible reasons for predicting successful technologies.[213] I believe that this is borne out by the evidence submitted to the record by CARB and the NRDC, which show industry-wide compliance with the near-term GHG standards and with future-term compliance attainable using technology developments as well as early credits. Manufacturers have not come forward with evidence to show that they cannot feasibly achieve the near-term or mid-term GHG standards, based on lead time. Although the industry trade association comments generally discussed manufacturers' reliance on the EPA waiver denial to suspend or stop planning for California compliance, no manufacturer came forward and asserted that it actually stopped planning. Whatever disruptions may or may not have occurred as a result of the denial, near-term standards have clearly been shown to be feasible and mid-term standards are clearly feasible given the lead time provided, even taking account of the denial.

Regarding implementation and enforcement by CARB for the 2009 MY, manufacturers claim that approving the waiver for that year would be a retroactive grant of a waiver and would be improper. However, approval of the waiver for the 2009 MY technically would not be a retroactive action. EPA would not be determining that past conduct was or was not lawful when it occurred in the past, or rewriting past legal obligations. The legal obligation at issue is still a future obligation—

compliance with the annual fleet-averaging requirements for the 2009 MY standards by the end of 2009, based on sales throughout the year. The fact that some conduct which occurred in 2009 prior to the grant of the waiver is relevant to determining compliance with the 2009 MY obligation, after the end of the model year, does not by itself make the obligation to comply with the 2009 MY standards a retroactive legal obligation. In any case, even if a waiver for the 2009 MY was considered to impose retroactive obligations, EPA has the authority in an adjudication to take such action under appropriate circumstances.[214]

Under these circumstances, all of the evidence presented to date indicates that manufacturers will be in compliance with the 2009 standards. EPA is granting the waiver for 2009 and later years. However, out of an abundance of caution, and since any delay in granting this waiver stems from EPA's prior March 2008 Denial, EPA is imposing one specific limitation designed to ensure that CARB not hold a manufacturer liable or responsible for any noncompliance civil penalty action that could be caused by emission debits generated by a manufacturer for the 2009 model year. For the 2009 model year, CARB can fully implement and enforce its regulations, including implementation of CARB's Executive Orders for 2009 model year families issued both before and after the date of today's waiver, as described below. While debits from model year 2009 may offset credits generated in later years, and reduce the amount of credits available to a manufacturer, any debits from model year 2009 may not be used as a basis for holding a manufacturer in noncompliance and no civil penalties may be assessed based on such debits. Other than that restriction, CARB may fully implement and enforce, and manufacturers may use the GHG standards program as promulgated, such that CARB may implement certification for MY 2009 motor vehicles, and may grant manufacturers credits that can be used for future obligations. This restriction on handling of any possible debits appropriately limits any potential

concern raised by manufacturers over their potential reliance upon EPA's previous waiver denial.

2. Endangerment of Public Health or Welfare

a. Is it Appropriate To Review Endangerment of Public Health or Welfare Under the "Consistency With Section 202(a)" Criterion?

EPA has traditionally stated that a state standard would be inconsistent with section 202(a) if there is inadequate lead time to permit the development of the necessary technology, given the cost of compliance within that time, or if the Federal and State test procedures impose inconsistent certification requirements.[215] The legislative history of this provision and judicial precedent indicate that technological feasibility in the lead time provided was intended to be the primary focus of this criterion.[216]

However, several industry commenters have suggested that in the context of this waiver, it is also appropriate for EPA to include endangerment to public health or welfare in its evaluation of consistency with section 202(a). They note the language in section 202(a)(1) of the Clean Air Act that requires the Administrator to promulgate standards "applicable to the emission of any air pollutant * * * which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."

While acknowledging the limits of EPA's traditional review under the "consistency with section 202(a)" criterion, they note that previous waivers have generally reviewed standards designed to reduce concentrations of air pollutants, like criteria air pollutants that EPA has listed under section 108 of the CAA, for which an endangerment finding required under section 202(a)(1) has already been made. Even standards regulating PM and formaldehyde, for which EPA has granted waivers, involved pollutants that had been identified by EPA, or by Congress in the Clean Air Act, as needing regulation. Thus, the question of endangerment was not in dispute in previous waivers. By contrast, EPA has not made any final decision regarding whether emissions of GHGs from new motor vehicles cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare (this two-part

---

[213] EPA notes here (again) that lead time begins when California promulgates its standards, not when the waiver is granted.

[214] *Securities and Exchange Commission* v. *Chenery Corp.*, 332 U.S. 194 at 203 ("That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.").

[215] 68 FR 19811, 12 (April 22, 2003).

[216] *MEMA III*, 142 F. 3d at 463; *Ford*, 606 F. 2d at 1296, n. 17, 1297; H.R.Rep. No. 728, 90th Cong, at 22–23.

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice　　　　32779

test is hereafter referred to as "endangerment"). This is a requirement for EPA to issue regulations under section 202(a).[217] Thus, the commenters state that there is an issue for review in this waiver under the consistency with section 202(a) criterion that was never relevant for EPA's review of previous waiver requests.

In contrast, CARB states that no new test of consistency with section 202(a) is warranted or permissible. CARB argues that precedent shows that nothing more than technological feasibility and test compatibility is required under section 209(b)(1)(C).

I find that in this instance, I do not need to resolve the issue of whether it is appropriate to address the issue of endangerment under the consistency with section 202(a) criterion of section 209(b). This is because in this instance, I find that even if the issue of endangerment is relevant to EPA's evaluation of consistency with section 202(a), those opposing the waiver have not met their burden of proving that California's regulations are inconsistent with section 202(a) based on that concern.

b. Parties Opposing the Waiver Have Not Met Their Burden of Showing Lack of Endangerment to Public Health or Welfare

As noted above, parties opposed to a waiver have the burden of proof to show that one of the findings under section 209(b)(1) should be made. To the extent that the two-part endangerment test is relevant to a determination of consistency with section 202(a), those opposing a waiver must affirmatively demonstrate that California's standards are inconsistent with this criterion. They have failed to do so in this instance.

Commenters who claim that EPA should deny the waiver generally base their claim on the fact that EPA has not yet determined whether greenhouse gas emissions from new motor vehicles cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, or promulgated greenhouse gas standards pursuant to section 202(a). They claim that unless and until EPA makes such a determination that authorizes

regulation under section 202(a), EPA cannot grant a waiver to California. They also state that the fact that the current California waiver request pertains to global climate change emissions, rather than to conventional pollutants, means that EPA should not give California's waiver request a presumption of consistency under Section 209(b)(1)(C).

In contrast, commenters supporting the waiver request contend that EPA's lack of a determination on endangerment and lack of GHG emission regulations is not relevant to EPA's consideration of the waiver request. CARB notes in its comments that EPA may not find inconsistency on the ground that EPA must first make its own endangerment finding on GHG emissions before granting California's waiver request. CARB suggests that *Massachusetts* v. *EPA*'s contemplation of coordinated activity at the federal level is entirely irrelevant to the waiver. CARB also provides significant discussion on this issue providing evidence that, according to CARB, shows that global climate change does endanger public health and welfare.

Manufacturer suggestions that EPA should deny California's request because it has not yet made a finding of endangerment mistake the burden of proof that opponents of a waiver are obliged to meet before EPA must deny a waiver. To deny a waiver based on section 209(b)(1)(C), EPA must find that California's standards "are not consistent with section 202(a)." It is not enough that EPA has not made a decision on the subject of whether GHG standards are authorized under section 202(a). To deny a waiver the Administrator must affirmatively find that the standards are inconsistent with section 202(a). The initial presumption of consistency is not dependent on the pollutants being regulated, as suggested by commenters—the presumption is provided for in the statute.[218] Regarding endangerment, therefore, I believe that, to the extent it is even an appropriate criterion under section 209(b)(1)(C), it would not be appropriate to deny a waiver request unless it is affirmatively demonstrated that the pollutants being regulated do not "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."

To the extent endangerment is relevant to whether California's standards are consistent with section 202(a), this criterion should be narrowly interpreted and should require more than the fact that EPA has not yet made a final decision concerning endangerment. Denial of a waiver based on this issue should require either a previous determination by EPA on the merits that the endangerment test has not been met, or a demonstration in this proceeding by the opponents of the waiver that EPA could not find that the endangerment test is met. Lack of a final decision by EPA on this would not be sufficient to deny the waiver. Those opposing the waiver cannot simply point to an open question regarding the issue at hand—on the contrary, they must come forward with evidence demonstrating that California's standards are not consistent with section 202(a).[219]

In order to regulate emissions of a particular pollutant under section 202(a), EPA must review several issues, including whether the emissions of the pollutant from motor vehicles cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare, and whether the standards are technologically feasible within the lead time provided. EPA has to make such determinations as part of lawfully adopting GHG standards under section 202(a). However, lack of either kind of action by EPA is not by itself evidence that GHG standards are in fact inconsistent with section 202(a). The fact that EPA has not yet made either determination, in the context of its own rulemaking, is by itself not a basis to deny a waiver.

Congress understood that California may act a "laboratory for innovation" in the regulation of motor vehicles, and intended section 209 to allow such innovation.[220] Yet the ability of California to encourage such innovation would be greatly compromised if EPA were to determine that California could take no action under section 209 unless EPA had already made all of the necessary determinations regarding the consistency of its own standards in the context of its own regulation under section 202(a).

In similar instances where EPA reviewed California standards and EPA had not promulgated similar standards, EPA has determined that the absence of EPA standards does not by itself preclude a waiver or prevent its ability to review California's standards under section 209. Any comparisons necessary

---

[217] On April 24, 2009, EPA published a notice proposing to find that elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated endanger the public health and welfare of current and future generations and also proposing to find that emissions of carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons from new motor vehicles and new motor vehicle engines are contributing to this air pollution under section 202(a) of the Clean Air Act. 74 FR 18885, 18886.

[218] See *MEMA I*, 627 F. 2d at 1121 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination to comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them.").

[219] See *MEMA I*, 627 F. 2d at 1126.
[220] *See MEMA I*, 627 F. 2d at 1111.

**32780** Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice

under section 209 would simply take account of the absence of EPA regulations, *i.e.*, the comparison would be California standards to the absence of EPA standards. For example, under the similar procedures of section 209(e), EPA, authorized California to enforce its standards on evaporative emissions for small nonroad engines despite the fact that EPA had not yet promulgated evaporative standards for such engines.[221] In any case, commenters' discussions of "comparisons to federal standards" in this context is more suited to review of section 209(b)(1)(A), which discusses comparisons between California and applicable federal standards. Section 209(b)(1)(C) concerns whether California standards are consistent with section 202(a). This criterion is not dependent on the existence of comparable federal standards.[222]

An additional reason for interpreting the waiver criterion this way, and not determining inconsistency with section 202(a) based on lack of an EPA final decision on an issue, is that EPA may always take action in the future that may impact the criteria for a waiver. For example, if in the future EPA promulgated standards that were more stringent than California's standards, this could implicate the "protectiveness" criterion of section 209(b)(1)(A). The possibility of such future events should not be used as a reason to deny a waiver now. Instead, the impact of a future EPA action

---

[221] 71 FR 75536 (December 15, 2006).

[222] Commenter Alliance appears to put much weight on the existence of section 202(b)(3). That subsection was added in 1977 to ensure that where EPA provides a waiver for vehicle standards, vehicles meeting California standards can still receive a Federal certificate and be sold in California and other states where California standards are applicable. This was needed as some of the California standards may not individually be as stringent as federal standards, given the "in the aggregate" protectiveness provision. See discussion in *Ford* v. *EPA*, 606 F.2d 1293 (DC Cir. 1979). Without this provision, where more stringent individual federal standards applied, vehicles complying only with California standards could not receive a federal certificate of conformity. The language therefore is designed to deal with situations where federal standards exist, and may be more stringent than California's. It was not intended to add or imply any new substantive requirements regarding the existence of federal standards. Similarly, Alliance's reference to use of the word "the" in section 202(b)(2) is directed towards the first criterion of section 209(b), not the third. In any case, the argument raised could at most mean that section 209(b)(2) is not applicable to this waiver request. California does not rely on section 209(b)(2) in its request. Also, as noted above, EPA has long held that the absence of comparable federal standards would not automatically result in a denial of a waiver request under the "in the aggregate" criterion because EPA believes the appropriate comparison is between the protectiveness of the California standards as compared to the absence of the federal standards.

should be considered if and when EPA takes action. Otherwise, the waiver could be denied now, even though in the future it could be determined that it should have been granted. This would tend to reverse the statutory presumption of the grant of waiver unless opponents demonstrate it should be denied for certain specific reasons. Instead, it would be denied because of some future possible action that may or may not occur, and may be delayed for an unspecified period of time. Basing a denial on the possibility of events that may happen in the future is not consistent with Congress' goal to preserve the broadest possible discretion to California. A more prudent approach is to take action based on the record at hand, with the possibility of reviewing such action in the future if facts change that merit such a review. As discussed above in section IV.C.1, EPA may withdraw a waiver in the future if circumstances make such action appropriate.

It is important to remember that the criterion being reviewed under section 209(b)(1)(C) is consistency with section 202(a) and not consistency with EPA standards. EPA has considerable deference within section 202(a) to promulgate the regulations it believes are most reasonable. The test for EPA under section 209(b)(1)(C) is not whether California standards are the same as the standards that EPA has promulgated or would promulgate under section 202(a), but whether the opponents of the waiver have met their burden to show, based on the record before the Agency, that the standards promulgated by California could not lawfully be promulgated in a manner consistent with section 202(a). As a prior Administrator has stated:

I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[223]

---

[223] 40 FR 23104.

In this case, opponents of the waiver have not met their burden of proving that EPA could not find that emissions of GHGs from new motor vehicles cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. To the contrary, while California and others have provided a great deal of evidence regarding the dangers posed by GHGs, opponents of the waiver have not provided significant evidence that emissions of GHGs from motor vehicles do not cause or contribute to air pollution that can reasonably be anticipated to endanger public health or welfare. The recent EPA proposal to find that elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger public health and welfare, and to find that emissions of carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons from new motor vehicles and new motor vehicle engines are contributing to this air pollution under section 202(a) of the Clean Air Act is further indication that opponents of the waiver did not meet their burden of proof on this issue.[224] Thus, I cannot find that those opposing the waiver have met their burden of proving that California's GHG standards are not consistent with section 202(a) for reasons of the endangerment test.[225]

### G. Section 209(b)(1)(C) Conclusion

Based on its review of the information in the docket of this proceeding, I have determined that the opponents have not met their burden to demonstrate that the CARB GHG standards are not consistent with section 202(a). Therefore, I am unable to find that the CARB motor vehicle GHG emission standards are not consistent with section 202(a) of the Act.

### VII. Additional Issues Raised

*A. EPA's Administrative Process for Evaluating California's Waiver Request*

1. Public Comment Process

Section 209(b)(1) states in part that "The Administrator shall, after notice and opportunity for public hearing, waive application of this section * * *" In response to this language, EPA has consistently announced in the **Federal Register** the opportunity for a public

---

[224] 74 FR 18885 (April 24, 2009).

[225] Some commenters have indicated that if EPA chooses not to deny the waiver based on lack of an endangerment finding, EPA should hold its decision in abeyance until it makes a finding. However, given the burden of proof on opponents of a waiver, and the lack of any significant evidence to the contrary in the record on this issue, I believe it is not appropriate to delay further a decision on this matter.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 52 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 43 of 47

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice   32781

hearing for any waiver request received from CARB. As a general matter EPA has also offered an opportunity for written comment which has opened on the date of the **Federal Register** notice and closed on a date after the public hearing. As part of EPA's public hearings, the presiding officer has consistently stated that the hearing was being conducted in accordance with section 209(b) of the Clean Air Act and that any interested parties have the opportunity to present both oral testimony and written comments.

EPA has received comment suggesting that EPA has failed to provide any systematic procedure for commenters opposing the waiver to rebut the comments of those commenters supporting the waiver. Because opponents bear the burden of proof, this commenter believes that EPA should not treat the waiver proceeding like an informal rulemaking but instead clearly announce what evidence is admissible and applicable burdens of proof and evidentiary procedures, such as order of proof and argument that parties must follow.[226]

EPA's waiver proceedings and actions under section 209(b)(1) are informal adjudications. In a waiver proceeding, EPA receives a request from one entity (CARB) that is presenting an existing regulation established as a matter of California law. The request is for a waiver of preemption for that party, so it may adopt and enforce the specific regulations. In deciding this request, EPA interprets and applies the three specific criteria established by the Act, and under this provision EPA is required to grant the waiver unless EPA makes one of the three specified findings. EPA applies the pre-existing law, section 209(b), to a specific request covering a specific regulation or regulations, and applies the three statutory criteria to the facts of the specific request. The decision to grant or deny a waiver changes the legal rights of the party before EPA, California. If EPA grants the waiver, then CARB may enforce its state regulations. In that case, the rights and obligations of other parties, for example, the manufacturers, are affected by the operation of the state regulation that is no longer preempted. In addition, under a separate statutory provision, other States may then adopt and enforce California's' standards, under their state law. While these subsequent impacts clearly affect the legal rights and obligations of various parties, the only legal rights and obligations directly determined by EPA

in the waiver proceeding are the rights of the State of California to adopt and enforce its state regulations. The other legal impacts flow from the operation of other laws, once the waiver is granted. Therefore EPA believes that its waiver proceedings and actions therein should be considered an informal adjudication rather than a rulemaking. EPA has been conducting its waiver proceedings in this manner for decades, and while Congress has amended provisions in section 209 on two separate occasions, Congress has not chosen to alter EPA's administrative requirements. Instead, Congress has expressed support for EPA's practice in applying and interpreting section 209(b).[227]

EPA disagrees with the suggestion that its waiver proceedings are governed by section 554 of the Administrative Procedure Act (APA) or any other provision of Title 5 of the United States Code, including sections 556, 557 and 558. Section 554 of the APA, regarding formal adjudications, only applies to adjudications required by statute to be determined on the record after an opportunity for an agency hearing. Section 209(b)(1) merely states that the Administrator shall provide notice and opportunity for a public hearing and does not include language stating that EPA's decision shall be on record after an opportunity for a hearing. Conversely, other provisions in the Clean Air Act, including section 205(c)(1) specifically state that EPA's actions shall be made on the record after opportunity for a hearing in accordance with sections 554 and 556 of title 5 of the United States Code. Section 205(c)(1) also requires the Administrator to issue reasonable rules for discovery and other procedures for hearings.

Any potential action on the waiver request is not subject to the requirements of APA section 558(c). Any potential action by EPA would not constitute granting a "license" to California. The fundamental purpose of section 209(b) is to waive application of the preemption set forth in section 209(a) of the Act, and is not a formal approval of the type contemplated in the APA. As noted previously, CARB must merely submit its regulations to EPA with a finding that its standards, in the aggregate, are as protective of public health and welfare as applicable federal

standards. Unlike a license or permit applicant, the burden of proof is on the opponents of the waiver and EPA must make an affirmative finding of one of the three waiver criteria in order to deny California's waiver request. On the face of the Act, what California receives from EPA is a waiver, not a license or permit.

Contrary to commenter's claim, APA section 558 does not require the "adversary process" described in sections 556 and 557 for this action. APA section 558 requires the agency to "complete proceedings required to be conducted in accordance with sections 556 and 557 of [the APA] *or* other proceedings required by law." 5 U.S.C. 558(c) (emphasis added). By complying with the procedural requirements of section 209(b) of the Act, EPA is complying with both the CAA and any relevant standards set in the APA.

Regardless, the approval provision in APA section 558 was not meant to establish additional procedural requirements beyond those required by law. Instead, the goal of the approval provision of the section is to ensure "that an agency shall hear and decide licensing proceedings as quickly as possible." Attorney General's Manual of the APA (1947), 89. *Horn Farms* is not applicable to this situation, as the dicta statement regarding APA section 558 applied only to section 558's provisions regarding revoking a previously granted license, which is not at issue here.

EPA believes that only those actions or sections of the Clean Air Act that specifically reference section 554 or otherwise state that EPA's decision must be determined on the record after an opportunity for a hearing are subject to the formal adjudication requirements of the Administrative Procedure Act. EPA nevertheless, as part of good administrative practice, provides every interested party the opportunity to present oral testimony and provide written comment based on a **Federal Register** notice that clearly sets out the criteria by which EPA will evaluate CARB's waiver requests. EPA believes all commenters, including opponents of the waiver, have had ample opportunity to comment and meet their applicable burdens of proof. Opponents of CARB's GHG regulations and of its waiver request have had ample opportunity to present their viewpoints during the course of CARB's rulemaking and EPA's waiver proceeding. First, as noted in the March 6, 2008 Denial, in response to several requests to extend the comment period during EPA's initial consideration of CARB's waiver request EPA indicated that consistent with past waiver practice, it would continue, as appropriate, to communicate with any

---

[226] Alliance of Automobile Manufacturers, EPA–HQ–OAR–2006–0173.8994 at C–2 through C–4.

[227] The Committee on Interstate and Foreign Commerce that drafted the amendments to section 209 in 1977 stated that the amendment was "intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." (H.R. Rep. No. 294 301–302 (1977)).

stakeholders in the waiver process after the comment period ended and that it would continue to evaluate any comments submitted after the close of the comment period to the extent practicable.[228] EPA did not receive any request to extend the written comment period during the reconsideration of CARB's request. Opponents have also had the opportunity to submit lengthy comments during two separate comment periods (one of which occurred well after CARB had submitted all of their initial comments) and to testify at three separate public hearings. The regulated industry has in its possession, along with CARB, the necessary information to adequately comment on whether the GHG emission standards are technologically feasible and also what CARB has said about the protectiveness of its standards from both CARB's rulemaking phase and from earlier comments. Opponents have the same access to the necessary information in order to formulate comments in regard to the second waiver criterion at section 209(b)(1)(B).

### 2. EPA's Reconsideration Process

Upon receiving CARB's January 21, 2009 request for reconsideration of the March 6, 2008 waiver Denial, EPA published a notice on February 12, 2008 notifying the public that EPA was reconsidering its March 6, 2008 Denial, and was providing an additional hearing and the opportunity to submit comment on all issues relevant to the waiver, including inviting comment on certain specific criteria and questions.

EPA received comment suggesting that the February 12, 2009 notice failed to inform the public of relevant issues and contained misleading statements and, therefore, the Agency must issue a new notice before proceeding with any reconsideration of the denial.[229] This commenter notes the EPA fails to discuss the legal standards EPA believes it must meet to justify reconsideration of a major policy action including the legal standards EPA believes governs how it is to reopen a previously decided matter. EPA believes this commenter fundamentally misunderstands the purpose of the February 12, 2009 notice. EPA's February 12, 2009 notice did not constitute a final decision to change the Agency's position with regard to California's greenhouse gas waiver request, and did not implicate any arguable requirement to supply a justification for changing previous interpretations of law or evidentiary

findings. The Agency set forth sufficient reason for initiating a reconsideration process, and is under no obligation to provide anything further in the Notice announcing the process. EPA clearly set forth the criteria and issues it would review in the notice for reconsideration, which covered all of the issues relevant under section 209(b). It was unnecessary to provide any further justification for its reconsideration beyond that which was supplied in the notice. Commenters have failed to disclose that any procedural error by EPA prejudiced them in any way, or that EPA's February 12, 2009 notice limited their ability to fully comment on any of the issues relevant to California's request for a waiver.

### 3. Is a Waiver Required Before California or Section 177 States Adopt California's Motor Vehicle Emission Standards?

Several commenters have suggested that section 209(a), which provides that no "political subdivision shall adopt or enforce any standard," should be read to mean that neither California nor any Section 177 state may "adopt" a motor vehicle emission emissions regulation before EPA grants a waiver. Since lead time is an issue under section 209(b)(1)(C), see section VI, EPA believes it appropriate to clarify this issue especially since EPA has previously stated that lead time runs from the date of adoption of the regulation. Similarly, because of the number of states that have already adopted CARB's GHG emission standards EPA believes it appropriate to clarify this issue for purposes of section 177 as well.

EPA believes that section 209(b) on its face provides the necessary clarification as to whether California should adopt its regulations before or after receiving a waiver from EPA. Section 209(b)(1) clearly envisions EPA commencing a waiver process after California has submitted standards that have been adopted. Section 209(b)(1) states in part "The Administrator shall, after notice and opportunity for public hearing waive application of this section to any State which *has adopted* standards * * *" (Emphasis added). It would be illogical, if not impossible, for EPA to analyze the criteria in section 209(b) if it does not have a final regulation upon which to do the analysis. It would not be appropriate for EPA to analyze non-final documents that may or may not become final and that may or may not be revised prior to becoming final. Similarly, the courts have long interpreted the Clean Air Act to authorize pre-waiver adoption of

California standards by an opt-in state.[230]

### B. Scope of EPA's Waiver Review

#### 1. Relevance of the Energy Policy and Conservation Act (EPCA) to the Waiver Decision

In EPA's initial **Federal Register** notice of California's request for a waiver, we requested comment on whether the Energy Policy and Conservation Act (EPCA) fuel economy provisions are relevant to EPA's consideration of the request and to California's authority to implement its vehicle GHG regulations.[231]

EPA received many comments regarding EPCA and its effect, or lack thereof, on this proceeding. Several commenters stated that the provisions of EPCA are not relevant to EPA's waiver determination. They note that the language of section 209(b) limits the authority of EPA to deny a waiver to three criteria and does not reference inconsistency with EPCA (or with any other statute, other than section 202(a) of the Clean Air Act) as a basis for denial. One commenter noted that EPCA was already in existence when Congress strengthened California's authority to adopt motor vehicle emission standards, and Congress indicated no intent to limit such authority based on EPCA. Some commenters noted the Supreme Court decision in *Massachusetts* v. *EPA,* which stated that EPCA does not license EPA to shirk its environmental responsibilities under the Clean Air Act.

Several commenters also provided arguments regarding their view that California's GHG standards were consistent with the provisions of EPCA.

Other commenters stated that California's standards violate EPCA. Several of these commenters noted that EPA and court precedent regarding section 209(b) indicate that EPA cannot rule on EPCA preemption under section 209(b). However, the commenters state that if EPA does consider EPCA-related issues in this waiver proceeding, it must rule that California's standards violate EPCA. One commenter states that recent court cases have created confusion regarding the scope and effect of EPA waivers. The commenters state that if EPA decides not to address the issue of EPCA preemption in this proceeding, it

---

[228] 73 FR 12156, 12157 (March 6, 2008).
[229] Utility Air Regulatory Group, EPA–HQ–OAR– 2006–0173–8690 at 2–5.

[230] *See Motor Vehicle Manufacturers Association* v. *New York Dept. of Environmental Conservation,* 17 F.3d 521, 533–34 (2d Cir. 1994)—"[T]he plain language of 177, coupled with common sense," leads to the conclusion that other states 'may adopt the [California] standards prior to the EPA's having granted a waiver, so long as [the state] makes no attempt to enforce the plan prior to the time when the waiver is actually granted."
[231] 72 FR 12261.

Federal Register / Vol. 74, No. 129 / Wednesday, July 8, 2009 / Notice   **32783**

needs to explicitly state that it is not addressing the issue of express preemption under EPCA or conflict with EPCA, and that those issues are best left to the courts.

As EPA has stated on numerous occasions, section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein, and EPA has refrained from denying California's requests for waivers based on any other criteria. As EPA noted in its initial decision denying California's waiver request, the decision was "based solely on the criteria in section 209(b) of the Clean Air Act and this decision does not attempt to interpret or apply EPCA or any other statutory provision." [232] Where the Court of Appeals for the District of Columbia Circuit has reviewed EPA decisions declining to deny waiver requests based on criteria not found in section 209(b), the court has upheld and agreed with EPA's determination.[233]

As many of the commenters note, evaluation of whether California's GHG standards are preempted, either explicitly or implicitly, under EPCA, is not among the criteria listed under section 209(b). EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria. In considering California's request for a waiver, I therefore have not considered whether California's standards are preempted under EPCA. As in the March 2008 decision, the decision on whether to grant the waiver is based solely on the criteria in section 209(b) of the Clean Air Act and this decision does not attempt to interpret or apply EPCA or any other statutory provision. EPA takes no position regarding whether or not California's GHG standards are preempted under EPCA.

2. Do California's GHG Emission Standards Create an Impermissible "Patchwork"?

Under section 177 of the Act, other states may adopt California new motor vehicle emission standards under certain conditions. In this waiver proceeding EPA received comment suggesting that sections 202(a), 209(a) and 177 of the Act establish a regulatory framework designed to foster a national marketplace for vehicles while recognizing California's ability to establish its own program which can be

adopted by other states. EPCA however, sets a single national fuel economy standard and is designed to prevent a fracturing of the marketplace into individual state programs. Commenters argue that manufacturers will have at least 15 different fleets they will have to balance for purposes of fuel economy and greenhouse gas emissions flowing from the fleet-average emission requirements of each state. Manufacturers also are concerned that there are significant differences between manufacturers' fleets in California and those in individual section 177 states creating unnecessary compliance burdens. The commenters suggest that the federal government should establish a single, national program for regulation of vehicle greenhouse gas standards and fuel economy.

EPA also received comment stating that to the extent the auto industry is arguing that a patchwork is created because of differences between fleet composition in different states, that argument lacks merit and is irrelevant to this waiver proceeding. Citing an EPA waiver decision from 1971, this commenter notes that claims such as the patchwork issue are not appropriate in a waiver proceeding since EPA's consideration of evidence submitted during a waiver proceeding is limited by its relevance to the three waiver criteria EPA must consider under section 209. This has led EPA to previously reject arguments that are not specified in the statute as grounds for denying a waiver.[234]

Similar to EPA's response to the EPCA claims noted above, EPA may only deny waiver requests based on the criteria in section 209(b). The actions of other states relating to the adoption of the California GHG emission standards is not a factor I may consider under section 209(b). The actions of such states are authorized under a separate section of the Act, section 177, and must conform to the requirements of that section, including identicality. Section 209(b) does not authorize me in reviewing a waiver request to consider the impact of actions or potential actions taken by other states under section 177 of the Act.[235] I therefore will not consider this claim in determining whether to grant California's waiver request.

It is important to note that on May 19, 2009, EPA and the Department of Transportation (DOT) issued a "Notice of Upcoming Joint Rulemaking to Establish Vehicle GHG Emissions and

CAFE Standards" announcing EPA and DOT's intent to work in coordination to propose standards for control of emissions of greenhouse gases and for fuel economy, respectively. If proposed and finalized, these standards would apply to passenger cars, light-duty trucks, and medium-duty passenger vehicles (light-duty vehicles) built in model years 2012 through 2016. EPA believes that if these standards are ultimately adopted, they would represent a harmonized and consistent national policy pursuant to the separate statutory frameworks under which EPA and DOT operate.

3. What Impact Does Granting California a Waiver for Its GHG Emission Standards Have on PSD Requirements for GHGs?

Several commenters suggest that there would be a major consequence if an EPA waiver were to trigger other requirements under the Act, including Prevention of Significant Deterioration (PSD) requirements, and should it grant the waiver, EPA should state clearly that the waiver does not render GHGs "subject to regulation" under the Act. EPA also received comment suggesting that the question of when and how GHGs should be addressed in the PSD program or otherwise regulated under the Act should instead be addressed in separate proceedings dedicated to evaluating the complicated issues and impacts associated with those issues. EPA agrees that these issues are not relevant to the waiver decision criteria, and are most appropriately addressed in a separate forum. EPA is not addressing these issues in today's decision.

VIII. Decision

After review of the information submitted by CARB and other parties to this Docket, I find that those opposing the waiver request have not met the burden of demonstrating that California's regulations do not satisfy any of the three statutory criteria of section 209(b). For this reason, I am granting California's waiver request to enforce its motor vehicle GHG emission regulations.

My decision will affect not only persons in California but also persons outside the State who would need to comply with California's GHG emission regulations. For this reason, I hereby determine and find that this is a final action of national applicability.

Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeals for the District of Columbia Circuit. Petitions for review must be filed by September 8, 2009.

---

[232] 74 FR at 12159.

[233] See Motor and Equipment Manufacturers Ass'n v. Nichols, 142 F.3d 449, 462–63, 466–67 (DC Cir. 1998), Motor and Equipment Manufacturers Ass'n v. EPA, 627 F.2d 1095, 1111, 1114–20 (DC Cir. 1979).

[234] 36 FR 17458 (August 31, 1971).

[235] 43 FR 1829, 1833 (January 12, 1978), LEV I waiver decision document at 185–186.

**32784**    **Federal Register**/Vol. 74, No. 129/Wednesday, July 8, 2009/Notice

Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3).

Dated: June 30, 2009.

**Lisa P. Jackson,**

*Administrator.*

[FR Doc. E9–15943 Filed 7–6–09; 8:45 am]

**BILLING CODE 6560–50–P**

# Exhibit C



## OFFICE OF POLICY AND REGULATORY MANAGEMENT    EC03925

WASHINGTON, D.C. 20460

**June 12, 2026**

**TO:**   The Honorable Mike Johnson
Speaker of the House of Representatives
The Capitol, H-209
Washington, D.C. 20515

**FROM:**   U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW 1803A
Washington, DC 20460

Dear Speaker,

EPA is submitting the following final rules "to each House of the Congress and to the Comptroller General," for their review under 5 U.S.C. 801(a).

We have also enclosed the required report that incorporates a concise general statement relating to the document. The report also indicates EPA's compliance with relevant statutes and executive orders, as applicable.

If you have any questions regarding this submission, please feel free to contact me at 202-564-8497.

Sincerely yours,

Melissa Kramer
Acting Branch Chief
Regulatory Management Branch

Enclosures



**TITLE(S) OF DOCUMENTS:**

1. (8927-2) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles
2. (9325-01-OAR) - California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision
3. (9768-1) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years
4. (10890-02-OAR) - California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision



**DOCUMENT FOR CONGRESSIONAL REVIEW UNDER THE SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT OF 1996**

**Date of Document**: June 12, 2026

1. **Name of Agency:** U.S. Environmental Protection Agency

2. **Office:** Office of Policy

3. **Action Title:** California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision

4. **Concise, General Statement of the Document:** In the rule

5. **Other Unique Identifier:** 9325-01-OAR

6. **This rule is a:** Final Rule

7. **Statutory Authorization**: Section 209(b) of the Clean Air Act

8. **Major Rule under CRA**: N/A

9. **Proposed Effective Date**: N/A

   **Compliant with 5 U.S.C. §801(a)(3)(A)**: N/A

   A. **Cost/Benefit Analysis Prepared**: N/A

   B. **Certification under 5 U.S.C. §605(b):** N/A

      **Preparation of FRFA under 5 U.S.C. §604(a):** N/A

   C. **Written Statement under §202 of the Unfunded Mandates Reform Act:** N/A

   D. **Public Comments Solicited:** N/A

   E. **Information Collection under the Paperwork Reduction Act:** No

   F. **Discussion of Executive Order 12866**: Yes

      **Discussion of Executive Order 13132:** No

      **Other Executive Order or Administrative Statute requirements:** No

10. **GAO Database Modernization Act of 2023:** N/A

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2021–0257; FRL–9325–01–OAR]

## California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency (EPA) has completed the reconsideration of its 2019 action withdrawing a 2013 Clean Air Act (CAA) waiver of preemption for California's greenhouse gas (GHG) emission standards and zero emission vehicle (ZEV) sale mandate, which are part of California's Advanced Clean Car (ACC) program. This decision rescinds EPA's 2019 waiver withdrawal, thus bringing back into force the 2013 ACC program waiver, including a waiver of preemption for California's ZEV sales mandate and GHG emissions standards. In addition, EPA is withdrawing the interpretive view of CAA section 177 included in its 2019 action, that States may not adopt California's GHG standards pursuant to section 177 even if EPA has granted California a waiver for such standards. Accordingly, other States may continue to adopt and enforce California's GHG standards under section 177 so long as they meet the requirements of that section.

**DATES:** Petitions for review must be filed by May 13, 2022.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2021–0257. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available electronically through www.regulations.gov. After opening the www.regulations.gov website, enter EPA–HQ–OAR–2021–0257 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. EPA's Office of Transportation and Air Quality (OTAQ) maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in this notice;

the page can be accessed at https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 343–9256. Email: Dickinson.David@epa.gov or Kayla Steinberg, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 564–7658. Email: Steinberg.Kayla@epa.gov.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver
  B. Prior Waivers for GHG Standards
  C. SAFE 1 Decision
  D. Petitions for Reconsideration
III. Principles Governing This Review
  A. Scope of Preemption and Waiver Criteria Under the Clean Air Act
  B. Deference to California
  C. Standard and Burden of Proof
IV. EPA did not Appropriately Exercise Its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1
  A. Comments Received
  **B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider**
  C. Conclusion
V. The SAFE 1 Interpretation of Section 209(b)(1)(B) was Inappropriate and, in any Event, California met Its Requirements
  A. Historical Practice
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate to Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)
    1. EPA is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation
    2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation
    a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits
    b. California Needs Its Standards To Address the Impacts of Climate Change in California
    3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development
  E. Conclusion
VI. EPA Inappropriately Considered Preemption Under the Energy and Policy Conservation Act (EPCA) in Its Waiver Decision
  A. Historical Practice and Legislative History
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: EPA is Rescinding its SAFE 1 Actions Related to Preemption Under EPCA
    1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1
    2. EPA Improperly Deviated From its Historical Practice of Limiting its Review to Section 209(b) Criteria
  E. Conclusion
VII. EPA Inappropriately set Forth an Interpretive View of Section 177 in SAFE 1
  A. SAFE 1 Interpretation
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: EPA Is Rescinding SAFE 1's Interpretive Views of Section 177
  E. Conclusion
VIII. Other Issues
  A. Equal Sovereignty
  B. CARB's Deemed-to-Comply Provision
IX. Decision
X. Statutory and Executive Order Reviews

## I. Executive Summary

CAA section 209(a) generally preempts states from adopting emission control standards for new motor vehicles. But Congress created an important exception from preemption. Under CAA section 209(b), the State of California [1] may seek a waiver of preemption, and EPA must grant it unless the Agency makes one of three statutory findings. California's waiver of preemption for its motor vehicle emissions standards allows other States to adopt and enforce identical standards pursuant to CAA section 177. Since the CAA was enacted, EPA has granted California dozens of waivers of preemption, permitting California to enforce its own motor vehicle emission standards.

Of particular relevance to this action, in 2013, EPA granted California's waiver request for the state's Advanced Clean Car (ACC) program (ACC program waiver).[2] California's ACC program includes both a Low Emission Vehicle (LEV) program, which regulates criteria pollutants and greenhouse gas (GHG) emissions, as well as a Zero Emission Vehicle (ZEV) sales mandate. These two requirements are designed to control smog- and soot-causing pollutants and GHG emissions in a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as

[1] The CAA section 209(b) waiver is limited "to any State which has adopted standards . . . for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966," and California is the only State that had standards in place before that date. "California" and "California Air Resources Board" (CARB) are used interchangeably in certain instances in this notice when referring to the waiver process under section 209(b).

[2] 78 FR 2111 (January 9, 2013).

limited requirements related to heavy-duty vehicles). Between 2013 and 2019, twelve other States adopted one or both of California's standards as their own. But in 2019, EPA partially withdrew this waiver as part of a final action entitled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program" (SAFE 1), marking the first time the agency withdrew a previously granted waiver.[3] In addition, in the context of SAFE 1, EPA provided an interpretive view of CAA section 177 asserting that other states were precluded from adopting California's GHG standards.

As Administrator of the Environmental Protection Agency (EPA), I am now rescinding EPA's 2019 actions in SAFE 1 that partially withdrew the ACC program waiver for California's ACC program. I am rescinding these actions because (1) EPA's reconsideration of the waiver under the particular facts and circumstances of this case was improper; (2) EPA's reconsideration was based on a flawed interpretation of CAA section 209(b); (3) even under that flawed interpretation, EPA misapplied the facts and inappropriately withdrew the waiver; (4) EPA erred in looking beyond the statutory factors in CAA 209(b) to action taken by another agency under another statute to justify withdrawing the waiver; (5) that agency has also since withdrawn the action EPA relied on in any event; and (6) EPA inappropriately provided an interpretive view of section 177.

As a result of this action, EPA's 2013 waiver for the ACC program, specifically the waiver for California's GHG emission standards and ZEV sales mandate requirements for model years (MYs) 2017 through 2025, comes back into force.[4] I am also rescinding the interpretive view set forth in SAFE 1 that States may not adopt California's GHG standards pursuant to CAA section 177 even if EPA has granted California a section 209 waiver for such standards. Accordingly, States may now adopt and enforce California's GHG standards so long as they meet the requirements of

Section 177, and EPA will evaluate any State's request to include those provisions in a SIP through a separate notice and comment process.

Section II of this action contains a detailed history of EPA's waiver adjudications leading up to this action. In summary, in 2012, CARB submitted the ACC waiver request to EPA, which included ample evidence of the criteria pollution benefits of the GHG standards and the ZEV sales mandate. As it had in all prior waiver decisions with two exceptions (including SAFE 1), in considering the request EPA relied on its "traditional" interpretation of section 209(b)(1)(B), which examines whether California needs a separate motor vehicle program as a whole—not specific standards—to address the state's compelling and extraordinary conditions. In 2013, EPA granted California's waiver request for its ACC program in full. In 2018, however, EPA proposed to withdraw portions of its waiver granted in 2013 based on a new interpretation of section 209(b)(1)(B) that looked at whether the specific standards (the GHG standards and ZEV sales mandate), as opposed to the program as a whole, continued to meet the second and third waiver prongs (found in sections 209(b)(1)(B) and (C)).[5] In addition, EPA proposed to look beyond the section 209(b) criteria to consider the promulgation of a NHTSA regulation and pronouncements in SAFE 1 that declared state GHG emission standards and ZEV sales mandates preempted under EPCA. In 2019, after granting CARB a waiver for its ACC program in 2013 and after 12 states had adopted all or part of the California standards under section 177, EPA withdrew portions of the waiver for CARB's GHG emission standards and ZEV sales mandates. In SAFE 1, EPA cited changed circumstances and was based on a new interpretation of the CAA and the agency's reliance on an action by NHTSA that has now been repealed.[6]

On January 20, 2021, President Biden issued Executive Order 13990, directing the Federal Agencies to "immediately review" SAFE 1 and to consider action "suspending, revising, or rescinding" that action by April 2021. On April 28, 2021, EPA announced its Notice of Reconsideration, including a public hearing and an opportunity for public comment.[7] The Agency stated its belief that there were significant issues regarding whether SAFE 1 was a valid and appropriate exercise of Agency authority, including the amount of time that had passed since EPA's ACC program waiver decision, the approach and legal interpretations used in SAFE 1, whether EPA took proper account of the environmental conditions (*e.g.*, local climate and topography, number of motor vehicles, and local and regional air quality) in California, and the environmental consequences from the waiver withdrawal in SAFE 1. Further, EPA stated it would be addressing issues raised in the related petitions for reconsideration of EPA's SAFE 1 action. In the meantime, having reconsidered its own action, and also in response to Executive Order 13990, NHTSA repealed its conclusion that state and local laws related to fuel economy standards, including GHG standards and ZEV sales mandates, were preempted under EPCA,[8] and EPA revised and made more stringent the Federal GHG emission standards for light-duty vehicles for 2023 and later model years, under section 202(a).[9]

Section III of this action outlines the principles that govern waiver reconsiderations. It sets forth the statutory background and context for the CAA preemption of new motor vehicle emission standards, the criteria for granting a waiver of preemption, and the ability of other States to adopt and enforce California's new motor vehicle emission standards where a waiver has been issued if certain CAA criteria are met. In brief, CAA section 209(a) generally preempts all States or political subdivisions from adopting and enforcing any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines. But section 209(b) contains an important exception that allows only

---

[3] 84 FR 51310 (September 27, 2019).

[4] In SAFE 1, EPA did not withdraw the entire 2013 waiver, but instead only withdrew the waiver as it related to California's GHG emission standards and the ZEV sales mandate. The waiver for the low-emission vehicle (LEV III) criteria pollutant standards in the ACC program remained in place. EPA's reconsideration of SAFE 1 and the impact on the ACC waiver therefore relates only to the GHG emission standards and the ZEV sales mandate, although "ACC program waiver" is used in this document. This action rescinds the waiver withdrawal in SAFE 1. In this decision, the Agency takes no position on any impacts this decision may have on state law matters regarding implementation.

[5] EPA's 2018 proposal was jointly issued with the National Highway Traffic Safety Administration (NHTSA). 83 FR 42986 (August 24, 2018) (the "SAFE proposal"). In addition to partially withdrawing the waiver, that proposal proposed to set less stringent greenhouse gas and CAFE standards for model years 2021–2026. NHTSA also proposed to make findings related to preemption under the Energy Policy and Conservation Act (EPCA) and its relationship to state and local GHG emission standards and ZEV sales mandates.

[6] 84 FR 51310. In SAFE 1, NHTSA also finalized its action related to preemption under EPCA. NHTSA's action included both regulatory text and well as pronouncements within the preamble of SAFE 1. In 2020, EPA finalized its amended and less stringent carbon dioxide standards for the 2021–2026 model years in an action titled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles

Rule for Model Years 2021–2026 Passenger Cars and Light Trucks" (SAFE 2). 85 FR 24174 (April 30, 2020).

[7] "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Public Hearing and Public Comment." 86 FR 22421 (April 28, 2021).

[8] 86 FR 74236 (December 29, 2021).

[9] 86 FR 74434 (December 30, 2021).

California to submit a request to waive preemption for its standards. Importantly, EPA must grant the waiver unless the Administrator makes at least one of three findings: (1) That California's determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards, is arbitrary and capricious (the "first waiver prong," under section 209(b)(1)(A)); (2) that California does not need such State standards to meet compelling and extraordinary conditions (the "second waiver prong," under section 209(b)(1)(B)); or (3) that California standards are not consistent with section 202(a), which contains EPA's authority to regulate motor vehicles (the "third waiver prong," under section 209(b)(1)(C)). In the 1977 amendments to the CAA, section 177 was added to allow other States that may be facing their own air quality concerns to adopt and enforce the California new motor vehicle emission standards for which California has been granted a waiver under section 209(b) if certain criteria are met.

Section III also provides more context to indicate that Congress intended that, when reviewing a request for a waiver, EPA treat with deference the policy judgments on which California's vehicle emission standards are based. It discusses the history of Congress allowing states to adopt more stringent standards. Ultimately, Congress built a structure in section 209(b) that grants California authority to address its air quality problems, and also acknowledges the needs of other states to address their air quality problems through section 177. Lastly, Section III describes the burden and standard of proof for waiver decisions.

Section IV of this action then discusses EPA's first basis for rescinding the SAFE 1 waiver withdrawal: That EPA did not appropriately exercise its limited authority to withdraw a waiver once granted. Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. In the context of reconsidering a waiver grant, that authority may only be exercised sparingly. EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. EPA notes further support for limiting its

exercise of reconsideration authority, relevant in the context of a waiver withdrawal, is evidenced by Congress's creation of a state and federal regulatory framework to drive motor vehicle emissions reduction and technology innovation that depends for its success on the stable market signal of the waiver grant—automobile manufacturers must be able to depend reliably on the continuing validity of the waiver grant in order to justify the necessary investments in cleaner vehicle technology. Accordingly, EPA now believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even then, as with other adjudicatory actions, when choosing to undertake such a reconsideration EPA believes it should exercise its limited authority within a reasonable timeframe and be mindful of reliance interests. EPA expects such occurrences will be rare. The Agency's waiver withdrawal in SAFE 1 was not an appropriate exercise of EPA's limited authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Accordingly, EPA is rescinding its 2019 withdrawal of its 2013 ACC program waiver.

Sections V and VI further explain why, even if SAFE 1 were an appropriate exercise of EPA's limited authority to reconsider its previously-granted waiver, the Agency would still now rescind its waiver withdrawal.

As discussed in Section V, the Agency's reinterpretation of the second waiver prong in SAFE 1 was flawed. While EPA has traditionally interpreted the second waiver prong, section 209(b)(1)(B), to require a waiver unless the Agency demonstrates that California does not need its own motor vehicle emissions program, to meet compelling and extraordinary conditions, the SAFE 1 waiver withdrawal decision was based on a statutory interpretation that calls for an examination of the need for the specific standard at issue. Section V

explains why EPA believes that its traditional interpretation is, at least, the better interpretation of the second waiver prong because it is most consistent with the statutory language and supported by the legislative history. Accordingly, we reaffirm the traditional interpretation—in which EPA reviews the need for California's motor vehicle program—in this action.

Additionally, Section V explains why even if the focus is on the specific standards, when looking at the record before it, EPA erred in SAFE 1 in concluding that California does not have a compelling need for the specific standards at issue—the GHG emission standards and ZEV sales mandate. In particular, in SAFE 1, the Agency failed to take proper account of the nature and magnitude of California's serious air quality problems, including the interrelationship between criteria and GHG pollution.[10] Section V further discusses EPA's improper substitution in SAFE 1 of its own policy preferences for California's, and discusses the importance of deferring to California's judgment on "ambiguous and controversial matters of public policy" that relate to the health and welfare of its citizens.[11] Based on a complete review of the record in this action, EPA now believes that, even under the SAFE 1 interpretation, California needs the ZEV sales mandate and GHG standards at issue to address compelling and extraordinary air quality conditions in the state. EPA's findings in SAFE 1, which were based on the Agency's inaccurate belief that these standards were either not intended to or did not result in criteria emission reductions to address California's National Ambient Air Quality Standard (NAAQS) obligations, are withdrawn.

Section VI discusses SAFE 1's other basis for withdrawing the ACC program waiver, EPCA. In SAFE 1, EPA reached beyond the waiver criteria in section 209(b)(1) and considered NHTSA's regulations in SAFE 1 that state or local regulation of carbon dioxide emission from new motor vehicles (including

---

[10] As explained herein, the requirements in the ACC program were designed to work together in terms of the technologies that would be used to both lower criteria emissions and GHG emissions. The standards, including the ZEV sales mandate and the GHG emission standards, were designed to address the short- and long-term air quality goals in California in terms of the criteria emission reductions (including upstream reductions) along with GHG emission reductions. The air quality issues and pollutants addressed in the ACC program are interconnected in terms of the impacts of climate change on such local air quality concerns such as ozone exacerbation and climate effects on wildfires that affect local air quality.

[11] 40 FR 23102, 23104 (May 28, 1975); 58 FR 4166 (January 13, 1993).

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 65 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 9 of 53

Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices **14335**

California's ZEV sales mandate and GHG standards) are related to fuel economy and as such are preempted under EPCA. NHTSA has since issued a final rule that repeals all regulatory text and additional pronouncements regarding preemption under EPCA set forth in SAFE 1.[12] This action by NHTSA effectively removes the underpinning and any possible reasoned basis for EPA's withdrawal decision based on preemption under EPCA in SAFE 1. Additionally, the Agency has historically refrained from consideration of factors beyond the scope of the waiver criteria in section 209(b)(1) and the 2013 ACC program waiver decision was undertaken consistent with this practice. EPA believes that the consideration of EPCA preemption in SAFE 1 led the Agency to improperly withdraw the ACC program waiver on this non-CAA basis. EPA's explanation that withdrawal on this basis was justified because SAFE 1 was a joint action, and its announcement that this would be a single occurrence, does not justify the ACC waiver withdrawal. Thus, EPA is rescinding the withdrawal of those aspects of the ACC program waiver that were based on NHTSA's actions in SAFE 1.

Section VII addresses SAFE 1's interpretive view of section 177 that States adopting California's new motor vehicle emission standards could not adopt California's GHG standards.[13] EPA believes it was both unnecessary and inappropriate in a waiver proceeding to provide an interpretive view of the authority of states to adopt California standards when section 177 does not assign EPA any approval role in states' adoption of the standards. Therefore, as more fully explained in Section VII, the Agency is rescinding the interpretive view on section 177 set out in SAFE 1. Section VIII discusses certain other considerations, including the equal sovereignty doctrine and California's deemed-to-comply provision, and concludes that they do not disturb EPA's decision to rescind the 2019 waiver withdrawal action.

Section IX contains the final decision to rescind the withdrawal of the 2013 ACC program waiver. In summary, I find that although EPA has inherent authority to reconsider its prior waiver decisions, that authority to reconsider is limited and may be exercised only when EPA has made a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated

when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Further, EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. Even where those conditions are met, I believe that any waiver withdrawal decision should consider other factors such as the length of time since the initial decision and California and others' reliance on the initial decision. Because there were no factual or clerical errors or such significantly changed factual circumstances or conditions necessary to trigger EPA's authority to reconsider its previously granted waiver during the SAFE 1 proceeding, I believe SAFE 1 was not an appropriate exercise of EPA's authority to reconsider. In addition, even if it were an appropriate exercise, EPA should not have departed from its traditional interpretation of the second waiver prong (section 209(b)(1)(B)), which is properly focused on California's need for a separate motor vehicle emission program—not specific standards—to meet compelling and extraordinary conditions. And even under EPA's SAFE 1 interpretation of the second waiver prong, a complete review of the factual record demonstrates that California does need the GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in the State. Therefore, EPA should not have withdrawn the ACC program waiver based upon the second waiver prong in SAFE 1 and recission of the withdrawal is warranted. Additionally, I find that EPA inappropriately relied on NHTSA's finding of preemption, now withdrawn, to support its waiver withdrawal, and rescind the waiver withdrawal on that basis as well. Finally, independently in this action, I am rescinding the interpretive views of section 177 that were set forth in SAFE 1, because it was inappropriate to include those views as part of this waiver proceeding.

For these reasons, I am rescinding EPA's part of SAFE 1 related to the CAA preemption of California's standards. This recission has the effect of bringing the ACC program waiver back into force.

## II. Background

This section provides background information needed to understand EPA's decision process in SAFE 1, and this decision. This context includes: A summary of California's ACC program including the record on the criteria pollutant benefits of its ZEV sales mandate and GHG emission standards; a review of the prior GHG emission standards waivers in order to explain

EPA's historical evaluation of the second waiver prong; an overview of the SAFE 1 decision; a review of the petitions for reconsideration filed subsequent to SAFE 1; and a description of the bases and scope of EPA's reconsideration of SAFE 1. EPA's sole purpose in soliciting public comment on its reconsideration was to determine whether SAFE 1 was a valid and appropriate exercise of the Agency's authority. In the Notice of Reconsideration, EPA therefore noted that reconsideration was limited to SAFE 1 and that the Agency was not reopening the ACC program waiver decision.

### A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver

On June 27, 2012, CARB notified EPA of its adoption of the ACC program regulatory package that contained amendments to its LEV III and ZEV sales mandate, and requested a waiver of preemption under section 209(b) to enforce regulations pertaining to this program.[14] The ACC program combined the control of smog- and soot-causing pollutants and GHG emissions into a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as limited requirements related to heavy-duty vehicles for certain model years).[15]

In its 2012 waiver request, CARB noted that the 2012 ZEV amendments would also result in additional criteria pollutant benefits in California in comparison to the earlier ZEV regulations and would likely provide benefits beyond those achieved by

---

[12] 86 FR 74236.
[13] 84 FR at 51310, 51350.

[14] 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 (2012 Waiver Request) at 1, 3–6. CARB's LEV III standards include both its criteria emission standards and its GHG emission standards. SAFE 1 did not address the LEV III criteria emission standards and as such the ACC program waiver remained in place. SAFE 1 did address CARB's GHG emission standards and ZEV sales mandate and this action addresses these two standards as well. As noted in CARB's 2012 Waiver Request, these three standards are interrelated and comprehensive in order to address the State's serious air quality problems including its criteria pollutants and climate change challenges.

[15] As noted in CARB's waiver request, "[a]t the December 2009 hearing, the Board adopted Resolution 09–66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the *focus of the ZEV regulation to both GHG and criteria pollutant emission reductions*, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly." 2012 Waiver Request at 2 (emphasis added). EPA stated in SAFE 1 that California's ZEV standard initially targeted only criteria pollutants. 84 FR at 51329. *See also* 78 FR at 2118.

Case 4:25-cv-04966-HSG  Document 247-1  Filed 08/12/26  Page 66 of 162
USCA Case #26-1218  Document #2187882  Filed: 08/11/2026  Page 10 of 53

**14336**  Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

complying with the LEV III criteria pollutant standard for conventional vehicles only. CARB attributed these benefits not to vehicle emissions reductions specifically, but to increased electricity and hydrogen use that would be more than offset by decreased gasoline production and refinery emissions.[16] CARB's waiver request attributed the criteria emissions benefits to its LEV III criteria pollutant fleet standard and did not include similar benefits from its ZEV sales mandate. According to the request, the fleet would become cleaner regardless of the ZEV sales mandate because the ZEV sales mandate is a way to comply with the LEV III standards and, regardless of the ZEV sales mandate, manufacturers might adjust their compliance response to the standard by making less polluting conventional vehicles. CARB further explained that because upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.[17]

On August 31, 2012, EPA issued a notice of opportunity for public hearing and written comment on CARB's request and solicited comment on all aspects of a full waiver analysis for such request under the criteria of section 209(b).[18] Commenters opposing the waiver asked EPA to deny the waiver under the second waiver prong, section 209(b)(1)(B), as it applied to the GHG provisions in the ACC Program, calling on EPA to adopt an alternative interpretation of that provision focusing on California's need for the specific standards. Following public notice and comment and based on its traditional interpretation of section 209(b), on January 9, 2013, EPA granted California's request for a waiver of preemption to enforce the ACC program regulations.[19] The traditional interpretation, which EPA stated is the better interpretation of section 209(b)(1)(B), calls for evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary

conditions.[20] As explained, EPA must grant a waiver to California unless the Administrator makes at least one of the three statutorily-prescribed findings in section 209(b)(1). Concluding that opponents of the waiver did not meet their burden of proof to demonstrate that California does not have such need, EPA found that it could not deny the waiver under the second waiver prong.[21]

Without adopting the alternative interpretation, EPA noted that, to the extent that it was appropriate to examine the need for CARB's specific GHG standards to meet compelling and extraordinary conditions, EPA had explained at length in its earlier 2009 GHG waiver decision that California does have compelling and extraordinary conditions directly related to regulation of GHGs. This conclusion was supported by additional evidence submitted by CARB in the ACC program waiver proceeding, including reports that demonstrate record-setting wildfires, deadly heat waves, destructive storm surges, and loss of winter snowpack. Many of these extreme weather events and other conditions have the potential to dramatically affect human health and well-being.[22] Similarly, to the extent

that it was appropriate to examine the need for CARB's ZEV sales mandate, EPA noted that the ZEV sales mandate in the ACC program enables California to meet both its air quality and climate goals into the future. EPA recognized that CARB's coordinated strategies reflected in the ACC program for addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[23] Therefore, EPA determined that, to the extent the second waiver prong should be interpreted to mean a need for the specific standards at issue, CARB's GHG emission standards and ZEV sales mandate satisfy such a finding.

In the context of assessing the need for the specific ZEV sales mandate in the ACC program waiver, EPA noted CARB's intent in the redesign of the ZEV regulation of addressing both criteria pollutants and GHG emissions, and CARB's demonstration of "the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet . . . the goals set forth by California's climate change requirements" and found that the ZEV standards would help California achieve those "long term emission benefits as well as . . . some [short-term] reduction in criteria pollutant emissions." [24]

### B. Prior Waivers for GHG Standards

For over fifty years, EPA has evaluated California's requests for waivers of preemption under section 209(b), primarily considering CARB's motor vehicle emission program for criteria pollutants.[25] More recently, the Agency has worked to determine how

---

[16] 2012 Waiver Request at 6.

[17] *Id.* at 15–16.

[18] 77 FR 53119 (August 31, 2012).

[19] Set forth in the ACC program waiver decision is a summary discussion of EPA's earlier decision to depart from its traditional interpretation of section 209(b)(1)(B) (the second waiver prong) in the 2008 waiver denial for CARB's initial GHG standards for certain earlier model years along with EPA's return to the traditional interpretation of the second prong in the waiver issued in 2009. 78 FR at 2125–31. These interpretations are discussed more fully in Section III.

[20] *Id.* at 2128 ("The better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.").

[21] Because EPA received comment on this issue during the ACC program waiver proceeding, as it pertained to both CARB's GHG emission standards and ZEV sales mandate, the Agency recounted the interpretive history associated with standards for both GHG emissions and criteria air pollutants to explain EPA's belief that section 209(b)(1)(B) should be interpreted the same way for all air pollutants. *Id.* at 2125–31 ("As discussed above, EPA believes that the better interpretation of the section 209(b)(1)(B) criterion is the traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions. Applying this approach with the reasoning noted above, with due deference to California, I cannot deny the waiver.").

[22] *Id.* at 2126–29. Within the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program.

[23] *Id.* at 2131 ("Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions. The ZEV standards are a reasonable pathway to reach the LEV III goals, in the context of California's longer-term goals.").

[24] *Id.* at 2130–31. *See also* 2012 Waiver Request at 15–16); CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 4 (submitted November 14, 2012).

[25] EPA notes that the 1990 amendments to the CAA added subsection (e) to section 209. Subsection (e) addresses the preemption of State or political subdivision regulation of emissions from nonroad engines or vehicles. Section 209(e)(2)(A) sets forth language similar to section 209(b) in terms of the criteria associated with EPA waiving preemption, in this instance for California nonroad vehicle and engine emission standards. Congress directed EPA to implement subsection (e). See 40 CFR part 1074. EPA review of CARB requests submitted under section 209(e)(2)(A)(ii) includes consideration of whether CARB needs its nonroad vehicle and engine program to meet compelling and extraordinary conditions. *See* 78 FR 58090 (September 20, 2013).

section 209(b)(1)(B) should be interpreted and applied to GHG standards, including consideration of the relationship of GHG standards to California's historical air quality problems, the public health impacts of GHG emissions on NAAQS pollutants, and the direct impacts of GHG emissions and climate change on California and its inhabitants. While the SAFE 1 withdrawal and revocation of the waiver for CARB's ACC program represents a singular snapshot of this task, it is important to examine EPA's long-standing and consistent waiver practice in general, including EPA's interpretations in prior waiver decisions pertaining to CARB's GHG emission standards, in order to determine whether EPA properly applied the waiver criterion in section 209(b)(1)(B) in SAFE 1.[26]

Historically, EPA has consistently interpreted and applied the second waiver prong by considering whether California needed a separate motor vehicle emission program as compared to the specific standards at issue to meet compelling and extraordinary conditions.[27] At the same time, in response to commenters that have argued that EPA is required to examine the specific standards at issue in the waiver request, EPA's practice has been to nevertheless review the specific standards to determine whether California needs those individual standards to meet compelling and extraordinary conditions.[28] This does not mean that EPA has adopted an "alternative approach" and required a demonstration for the need for specific standards; rather, this additional Agency review has been afforded to

address commenters' concerns and this secondary analysis has been done to support the Agency's primary assessment. For example, EPA granted an authorization for CARB's In-use Off-road Diesel Standards (Fleet Requirements) that included an analysis under both approaches.[29] The only two departures from this traditional approach occurred first in 2008 when EPA adopted an "alternative approach" to the second waiver prong and second in 2019 when EPA adopted the "SAFE 1 interpretation" of the second waiver criterion.

EPA's task of interpreting and applying section 209(b)(1)(B) to California's GHG standards and consideration of the State's historical air quality problems that now include the public health and welfare challenge of climate change began in 2005, with CARB's waiver request for 2009 and subsequent model years' GHG emission standards. On March 6, 2008, EPA denied the waiver request based on a new interpretive finding that section 209(b) was intended for California to enforce new motor vehicle emission standards that address local or regional air pollution problems, and an Agency belief that California could not demonstrate a "need" under section 209(b)(1)(B) for standards intended to address global climate change problems. EPA also employed this new alternative interpretation to state a belief that the effects of climate change in California are not compelling and extraordinary in comparison with the rest of the country. Therefore, in the 2008 waiver denial, EPA did not evaluate whether California had a need for its motor vehicle emission program to meet compelling and extraordinary conditions (the traditional interpretation) but rather focused on the specific GHG emission standard in isolation and not in conjunction with the other motor vehicle emission standards for criteria pollutants.

In 2009, EPA initiated a reconsideration of the 2008 waiver denial. The reconsideration resulted in granting CARB a waiver for its GHG emission standards commencing in the

2009 model year.[30] In granting the waiver, EPA rejected the Agency's alternative interpretation of the second waiver prong announced in the 2008 waiver denial. Instead, EPA returned to its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions because the Agency viewed it as the better interpretation of the second waiver prong. Under the traditional interpretation, EPA found that the opponents of the waiver had not met their burden of proof to demonstrate that California did not need its motor vehicle emission program to meet compelling and extraordinary conditions. In responding to comments on this issue, EPA also determined that, even if the alternative interpretation were to be applied, the opponents of the waiver had not demonstrated that California did not need its GHG emissions standards to meet compelling and extraordinary conditions.[31]

Since EPA's 2009 GHG waiver decision and before SAFE 1 the Agency applied the traditional interpretation of the second waiver prong in its GHG-related waiver proceedings, including the on-going review of California's GHG emission standards for vehicles. In the first instance, in 2009, CARB adopted amendments to its certification requirements that would accept demonstration to the Federal GHG standards as compliance with CARB's GHG program. This provision is known as a "deemed-to-comply" provision.[32] In 2011, EPA determined that this deemed-to-comply provision was within-the-scope of the waiver issued in July 2009, relying on the traditional interpretation of the second waiver prong.[33] As such, in the June 14, 2011

[26] EPA notes that, in the history of EPA waiver decisions, it has only denied a waiver once (in 2008) and withdrawn a waiver once (in 2019). Each instance was under this second waiver prong in section 209(b)(1)(B).

[27] 49 FR 18887, 18890 (May 3, 1984).

[28] For example, in EPA's 2009 GHG waiver that reconsidered the 2008 GHG waiver denial, the Agency noted that "Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference. EPA's consistent view is that it should give deference to California's policy judgments, as it has in past waiver decisions, on California's choice of mechanism used to address air pollution problems. EPA does not second-guess the wisdom or efficacy of California's standards. EPA has also considered this approach with respect to the specific GHG standards themselves, as well as California's motor vehicle emissions program." 74 FR at 32766 (citing to *Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1110–11 (D.C. Cir. 1979)).

[29] 78 FR 58090. The United States Court of Appeals for the Ninth Circuit reviewed EPA's grant of a waiver of preemption under the traditional approach, and because of comments seeking an alternative interpretation, an assessment of the need for the standards contained in California's request. *Dalton Trucking* v. *EPA*, No. 13–74019 (9th Cir. 2021) (finding that EPA was not arbitrary in granting the waiver of preemption under either approach). The court opinion noted that "[t]his disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3."

[30] 74 FR 32743, 32745 (July 8, 2009).

[31] 74 FR at 32759–67. For example, EPA noted that the analysis of the need for CARB's GHG standards in the 2008 waiver denial failed to consider that although the factors that cause ozone are primarily local in nature and that ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. EPA noted that California had made a case that its greenhouse gas standards are linked to amelioration of its smog problems. *See also* 76 FR 34693 (June 14, 2011).

[32] California Code of Regulations, Title 13 1961(a)(1)(B). Under this provision, automakers could comply with the California GHG standards for model years 2017–2025 by meeting Federal GHG standards for the same model years.

[33] 76 FR 34693. EPA's "within-the-scope" decisions are generally performed when CARB has amended its regulations that were previously waived by EPA under section 209(b)(1) and include an analysis of whether EPA's prior evaluation of the waiver criteria has been undermined by CARB's amendments. EPA received comment during the
Continued

**14338** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

within-the-scope decision EPA determined that CARB's 2009 amendments did not affect or undermine the Agency's prior determination made in the 2009 GHG waiver decision, including the technological feasibility findings in section 209(b)(1)(C).[34] EPA also acted on two requests for waivers of preemption for CARB's heavy-duty (HD) tractor-trailer GHG emission standards.[35] Once again, EPA relied upon its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions and found that no evidence had been submitted to demonstrate that California no longer needed its motor vehicle emission program to meet compelling and extraordinary conditions.[36] EPA's

---

[34] reconsideration of SAFE 1 that questioned whether CARB needed its GHG standards if it was otherwise accepting compliance with the Federal GHG standards. EPA addressed the issue in its final decision (76 FR at 34696–98) and continues to believe EPA's analysis applies. The existence of federal emission standards that CARB may choose to harmonize with or deem as compliance with its own State standards (or that CARB may choose to set more stringent standards) does not on its own render California's as not needed. CARB continues to administer an integrated and comprehensive motor vehicle emission program (including its ZEV sales mandate and GHG emission standards and other applicable emission standards for light-duty vehicles) and this program continues to evolve to address California's serious air quality issues. CARB's decision to select some federal emission standards as sufficient to comply with its own State emission standards does not negate the overall design and purpose of section 209 of the CAA. In the within-the-scope decision issued in 2011, EPA agreed with Global Automakers comment that the deemed-to-comply provision renders emission benefits equally protective as between California and Federal programs. *Id.* at 34696.

[34] *Id.* at 34696–97.

[35] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). In this waiver decision EPA responded to comments regarding whether CARB had quantified how the GHG regulations would contribute to attainment of ozone or particulate matter standards by noting that nothing in section 209(b)(1)(B) calls for California to quantify specifically how its regulations would affect attainment of the NAAQS in the State. Rather, EPA noted, the relevant question is whether California needs its own motor vehicle emission program and not whether there is a need for specific standards. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[36] Relatedly, California explained the need for these standards based on projected "reductions in NOₓ emissions of 3.1 tons per day in 2014 and one ton per day in 2020 due to the HD GHG Regulations. California state[d] that these emissions reductions will help California in its efforts to attain applicable air quality standards. California further projects that the HD GHG Regulations will reduce GHG emissions in California by approximately 0.7 million metric tons (MMT) of carbon dioxide equivalent emissions (CO₂e) by 2020." 79 FR at 46261. *See also* 81 FR at 95982.

second waiver for the HD GHG emission standards made a similar finding that California's compelling and extraordinary conditions continue to exist under the traditional approach for the interpretation of the second waiver criterion.[37]

### C. SAFE 1 Decision

In 2018, NHTSA issued a proposal for new Corporate Average Fuel Economy (CAFE) standards that must be achieved by each manufacturer for its car and light-duty truck fleet while EPA revisited its light-duty vehicle GHG emissions standards for certain model years in the SAFE Proposal.[38] EPA also proposed to withdraw the waiver for the ACC program GHG emission standards and ZEV sales mandate, referencing both sections 209(b)(1)(B) and (C). EPA posited that since the grant of the initial waiver a reassessment of California's need for its GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), was appropriate. EPA further posited that its own Federal GHG rulemaking in the SAFE proposal raised questions about the feasibility of CARB's standards under the third waiver prong, section 209(b)(1)(C).[39] In addition, EPA reasoned that the SAFE proposal presented a unique situation that required EPA to consider the implications of NHTSA's proposed conclusion that California's GHG emission standards and ZEV sales mandate were preempted by EPCA.[40]

---

[37] 81 FR at 95987. At the time of CARB's Board adoption of the HD Phase I GHG regulation, CARB determined in Resolution 13–50 that California continues to need its own motor vehicle program to meet serious ongoing air pollution problems. CARB asserted that "[t]he geographical and climatic conditions and the tremendous growth in vehicle population and use that moved Congress to authorize California to establish vehicle standards in 1967 still exist today. EPA has long confirmed CARB's judgment, on behalf of the State of California, on this matter." See EPA Air Docket at *regulations.gov* at EPA–HQ–OAR–2016–0179–0012. In enacting the California Global Warming Solutions Act of 2006, the Legislature found and declared that "Global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California. The potential adverse impacts of global warming include the exacerbation of air quality problems, a reduction in the quality and supply of water to the state from the Sierra snowpack, a rise in sea levels resulting in the displacement of thousands of coastal businesses and residences, damage to the marine ecosystems and the natural environment, and an increase in the incidences of infectious diseases, asthma, and other health-related problems."

[38] The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 FR at 42986.

[39] As explained below, EPA did not make a determination regarding section 209(b)(1)(C) in SAFE 1.

[40] "To the extent that NHTSA has determined that these standards are void *ab initio* because EPCA

EPA thus also posited that state standards preempted under EPCA cannot be afforded a valid section 209(b) waiver and then proposed that it would be necessary to withdraw the waiver separate and apart from section 209(b)(1)(B) and (C) if NHTSA finalized its interpretation regarding preemption under EPCA.

During the SAFE 1 proceeding, EPA received additional information demonstrating that the ZEV sales mandate plays a role in reducing criteria pollution, including CARB's comments that EPA's prior findings in the ACC program waiver were correct. As noted by a number of States and Cities, "[f]or example, CARB modeled the consequences of the actions proposed in SAFE, which included withdrawing California's waiver for its GHG and ZEV standards and freezing the federal GHG standards at MY 2020 levels. CARB concluded these actions, which would eliminate California's ZEV and GHG standards and leave in place only federal GHG standards at MY 2020 levels, would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day."[41] The SAFE 1 record also includes information that demonstrates that California is "one of the most climate challenged" regions of North America, and that it is home to some of the country's hottest and driest areas, which are particularly threatened by record-breaking heatwaves, sustained droughts, and wildfire, as a result of GHG emissions.[42] This record also includes information from the United States *Fourth National Climate Assessment* that documents the impact of climate change in exacerbating California's record-breaking fires seasons, multi-year drought, heat waves, and flood risk, and notes that California faces a particular threat from sea-level rise and ocean acidification and that the State has "the most valuable ocean-based economy in the country."[43] EPA

---

preempts standards that relate to fuel economy, that determination presents an independent basis for EPA to consider the validity of the initial grant of a waiver for these standards, separate and apart from EPA's analysis under the criteria that invalidate a waiver request." 84 FR at 51338.

[41] States and Cities in Support of EPA Reversing Its SAFE 1 Actions (States and Cities), Docket No. EPA–HQ–OAR–2021–0257–0132 at 10 (citing CARB, Docket No. NHTSA–2018–0067–11873 at 287–88, 290–91 (upstream emission impacts), 308).

[42] States and Cities at 43–47 (citing EPA–HQ–OAR–2018–0283–5481, EPA–HQ–OAR–2018–0283–5683, and EPA–HQ–OAR–2018–0283–5054).

[43] *Id.* at 45 (EPA–HQ–OAR–2018–0283–7447—U.S. Global Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, Chapter 25., 2018). (*E.g.,* "The California coast extends 3,400 miles (5,500 km), 8 with 200,000 people living 3 feet (0.9 m) or less above sea level.9 The seaports of Long

received information during the SAFE 1 public comment period regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission standards.[44]

On September 27, 2019, EPA and NHTSA published the final SAFE 1 action that promulgated preemption regulations which supported NHTSA's conclusion that EPCA preempted California's GHG standards and ZEV sales mandate. In the same action, EPA withdrew the waiver of preemption for California to enforce the ACC program GHG and ZEV sales mandate on two grounds.[45]

First, in SAFE 1 the Agency posited that standards preempted under EPCA could not be afforded a valid waiver of preemption under section 209(b). EPA explained that Agency pronouncements in the ACC program waiver decision on the historical practice of disregarding the preemptive effect of EPCA in the context of evaluating California's waiver applications were "inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)–(C)." [46] EPA further explained that those pronouncements were made in waiver

proceedings where the Agency was acting solely on its own in contrast to a joint action with NHTSA such as SAFE 1. Additionally, EPA expressed its intention not to consider factors other than statutory criteria set out in section 209(b)(1)(A)–(C) in future waiver proceedings, explaining that addressing the preemptive effect of EPCA and its implications for EPA's waiver for California's GHG standards and ZEV sales mandate was uniquely called for in SAFE 1 because EPA and NHTSA were coordinating regulatory actions in a single notice.[47]

Second, EPA withdrew the waiver for the GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), on two alternative grounds. Specifically, EPA determined first that California does not need the GHG standards "to meet compelling and extraordinary conditions," under section 209(b)(1)(B), and second, even if California does have compelling and extraordinary conditions in the context of global climate change, California does not "need" the specific GHG standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problems of the type associated with GHG emissions.[48] EPA also reasoned that because CARB had characterized the ZEV sales mandate as a compliance mechanism for GHG standards, both were "closely interrelated" given the overlapping compliance regimes for the ACC program, and as a result the ZEV sales mandate was inextricably interconnected with CARB's GHG standards.[49] In support of its overall determination that the ZEV sales mandate was not needed to meet compelling and extraordinary conditions, EPA relied on a single statement in the ACC program waiver support document where CARB did not attribute criteria emission reductions to the ZEV sales mandate, but rather noted its LEV III criteria pollutant fleet standard was responsible for those emission reductions.[50] Relying on this reasoning, EPA also withdrew the waiver for the ZEV sales mandate under the second waiver prong finding that California had no "need" for its own ZEV sales mandate.

In withdrawing the waiver, EPA relied on an alternative view of the scope of the Agency's analysis of California waiver requests and posited that reading "such State standards" as

requiring EPA to only and always consider California's entire motor vehicle program would limit the application of this waiver prong in a way that EPA did not believe Congress intended.[51] EPA further noted that the Supreme Court had found that CAA provisions may apply differently to GHGs than they do to traditional pollutants in *UARG* v. *EPA*, 134 S. Ct. 2427 (2014) (partially reversing the GHG "Tailoring" Rule on grounds that the CAA section 202(a) endangerment finding for GHG emissions from motor vehicles did not compel regulation of all sources of GHG emissions under the Prevention of Significant Deterioration and Title V permit programs). EPA then interpreted section 209(b)(1)(B) as requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare.[52] Interpreting section 209(b)(1)(C) to be limited to the specific standards under the waiver, EPA stated that "such State standards" in sections 209(b)(1)(B) and (C) should be read consistently with each other, which EPA asserted was a departure from the traditional approach where this phrase in section 209(b)(1)(B) is read as referring back to "in the aggregate" in section 209(b)(1).[53]

In the SAFE proposal, as an additional basis for the waiver withdrawal, EPA proposed to find that CARB's ZEV sales mandate and GHG

---

Beach and Oakland, several international airports, many homes, and high-value infrastructure lie along the coast. In addition, much of the Sacramento–San Joaquin River Delta is near sea level. California has the most valuable ocean-based economy in the country, employing over half a million people and generating $20 billion in wages and $42 billion in economic production in 2014.10 Coastal wetlands buffer against storms, protect water quality, provide habitat for plants and wildlife, and supply nutrients to fisheries. Sea level rise, storm surges, ocean warming, and ocean acidification are altering the coastal shoreline and ecosystems."

[44] During the current reconsideration proceeding, EPA received additional comment regarding the criteria pollution benefits of California's GHG and ZEV standards. The States and Cities at 10–11. Likewise, CARB notes this connection in comments on the SAFE proposal. Multi-State SAFE Comments, EPA–HQ–OAR–2018–0283–5481 at 24. The States and Cities provided supplemental information in response to the Notice of Reconsideration by submitting California's latest analyses of the criteria pollutant benefits of its GHG standards. For example, CARB estimated those benefits for calendar years by which the South Coast air basin must meet increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

[45] 84 FR at 51328–29. Parties subsequently brought litigation against EPA on its SAFE 1 decision. *See generally Union of Concerned Scientists, et al.* v. *NHTSA, et al.*, No. 19–1230 (D.C. Cir. filed Oct. 28, 2019) (on February 8, 2021, the D.C. Circuit granted the Agencies' motion to hold the case in abeyance in light of the reconsideration of the SAFE 1 action). EPA also received three petitions for reconsideration of this waiver withdrawal.

[46] 84 FR at 51338.

[47] *Id.*

[48] *Id.* at 51341–42.

[49] *Id.* at 51337.

[50] *Id.* at 51330.

[51] In other words, EPA asserted that once it determines that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver. EPA based its reading also on an assertion of ambiguity in the meaning of "such State standards" in section 209(b)(1)(B).

[52] *Id.* at 51339–40.

[53] *Id.* at 51344–45. EPA notes that this SAFE 1 position was taken despite the Agency previously stating in the ACC program waiver that "Similarly, although the Dealers might suggest that EPA only be obligated to determine whether each of CARB's ACC regulatory components, in isolation, is consistent with section 202(a) we believe the better approach is to determine the technological feasibility of each standard in the context of the entire regulatory program for the particular industry category. In this case, we believe CARB has in fact recognized the interrelated, integrated approach the industry must take in order to address the regulatory components of the ACC program. As noted above, the House Committee Report explained as part of the 1977 amendments to the Clean Air Act that California was to be afforded flexibility to adopt a complete program of motor vehicle emission controls (emphasis added). As such, EPA believes that Congress intended EPA to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.32 EPA believes this intent extends to CARB's flexibility in designing its motor vehicle emission program and evaluating the aggregate effect of regulations within the program." 78 FR at 2217.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 70 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 14 of 53

**14340** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

standards are not consistent with section 202(a) of the CAA under the third waiver prong, section 209(b)(1)(C).[54] However, in the final SAFE 1 action, EPA and NHTSA explained they were not finalizing the proposed assessment regarding the technological feasibility of the Federal GHG and CAFE standards for MY 2021 through 2025 in SAFE 1, and thus EPA did not finalize any determination with respect to section 209(b)(1)(C).[55]

In justifying the withdrawal action in SAFE 1, EPA opined that the text, structure, and context of section 209(b) supported EPA's authority to reconsider prior waiver grants. Specifically, EPA asserted that the Agency's authority to reconsider the grant of ACC program waiver was implicit in section 209(b) given that revocation of a waiver is implied in the authority to grant a waiver. The Agency noted that further support for the authority to reconsider could be found in a single sentence in the 1967 legislative history of provisions now codified in sections 209(a) and (b) and the judicial principle that agencies possess inherent authority to reconsider their decisions. According to the Senate report from the 1967 CAA amendments, the Administrator has "the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver." [56] EPA also noted that, subject to certain limitations, administrative agencies possess inherent authority to reconsider their decisions in response to changed circumstances: "It is well settled that EPA has inherent authority to reconsider, revise, or repeal past decisions to the extent permitted by law so long as the Agency provides a reasoned explanation." [57] This authority exists in part because EPA's interpretations of the statutes it administers "are not carved in stone." [58]

Finally, in SAFE 1, EPA provided an interpretive view of section 177 as not authorizing other states to adopt California's GHG standards for which EPA had granted a waiver of preemption under section 209(b). Although section 177 does not require states that adopt California's emission standards to

submit such regulations for EPA review and provides no statutory role for EPA in states' decision to adopt California's standards, EPA chose to nevertheless provide an interpretation that this provision is available only to states with approved nonattainment plans. EPA stated that nonattainment designations exist only as to criteria pollutants and GHGs are not criteria pollutants; therefore, states could not adopt GHG standards under section 177. Notably, California in previous waiver requests addressed the criteria pollutant benefits of GHG emissions reductions, specifically related to ground level ozone.

### D. Petitions for Reconsideration

After issuing SAFE 1, EPA received three petitions for reconsideration urging the Agency to reconsider the waiver withdrawal of the ACC program's GHG standards and ZEV sales mandate and to rescind part or all of the SAFE 1 action.[59] The first Petition for Clarification/Reconsideration was submitted by the State of California and a number of States and Cities on October 9, 2019 (California Petition for Clarification).[60] These Petitioners sought both clarification and reconsideration of the scope of SAFE 1. Citing somewhat contradictory statements in the action, they claimed that SAFE 1 created confusion regarding which model years of the ACC program were affected by the waiver withdrawal.[61] They based their request for reconsideration of the withdrawal on the grounds that the SAFE 1 action relied on analyses and justifications not presented at proposal and, thus, was beyond the scope of the proposal.

A second Petition for Reconsideration was submitted by several non-governmental organizations on

---

[59] The California Petition for Clarification only sought reconsideration of SAFE 1 to the extent it withdrew the ACC program waiver for model years outside those proposed. The other two petitions sought reconsideration of the full SAFE 1 action.

[60] EPA–OAR–2021–0257–0015.

[61] The California Petition for Clarification notes that, "[i]n the Final Actions, EPA makes statements that are creating confusion, and, indeed, appear contradictory, concerning the temporal scope of its action(s)—specifically, which model years are covered by the purported withdrawal of California's waiver for its GHG and ZEV standards. In some places, EPA's statements indicate that it has limited its action(s) to the model years for which it proposed to withdraw and for which it now claims to have authority to withdraw—namely model years 2021 through 2025. In other places, however, EPA's statements suggest action(s) with a broader scope—one that would include earlier model years." *Id.* at 2. In SAFE 1, EPA withdrew the waiver for California's GHG and ZEV standards for model years 2017–2025 on the basis of EPCA preemption and for model years 2021–2025 on the basis of the second waiver prong.

November 25, 2019 (NGOs' Petition).[62] These Petitioners claimed that EPA's reconsideration of the ACC program waiver was not a proper exercise of agency authority because the Agency failed to consider comments submitted after the formal comment period—which they charged as inadequate—and because the EPA's rationale was a pretextual cover for the Administration's political animosity towards California and the oil industry's influence. The late comments summarized in the Petition address SAFE 1's EPCA preemption and second waiver prong arguments. On EPCA preemption, the summarized comments asserted that EPCA does not preempt GHG standards because GHG emission standards are not the "functional equivalent" of fuel economy standards, as SAFE 1 claimed. On the second waiver prong, the summarized comments asserted both that GHG and ZEV standards do have criteria pollutant benefits, and that the threat of climate change is compelling and extraordinary and will have California-specific impacts. In addition to objections to SAFE 1's EPCA preemption and second waiver prong arguments, the summarized comments asserted that ZEV standards play a key role in SIPs, which were disrupted by SAFE 1. This disruption, Petitioners claimed, violated "conformity" rules prohibiting federal actions from undermining state's air quality plans.[63]

A third Petition for Reconsideration was submitted by several states and cities on November 26, 2019 (States and Cities' Petition).[64] These Petitioners sought reconsideration of the withdrawal on the grounds that EPA failed to provide an opportunity to comment on various rationales and determinations, in particular on its authority to revoke argument, flawed re-interpretation and application of the second waiver prong, its flawed new

---

[62] EPA–HQ–OAR–2021–0257–0014. This Petition was joined by The Center for Biological Diversity, Chesapeake Bay Foundation, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Sierra Club, and the Union of Concerned Scientists.

[63] These "late comments" can be found in the "Appendix of Exhibits" attached to the Petition for Reconsideration. These comments are considered part of EPA's record for purposes of the reconsideration of SAFE 1.

[64] See EPA–HQ–OAR–2021–0257–0029. This Petition was joined by the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, Michigan, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, San Francisco, and San Jose.

---

[54] 83 FR at 43240.

[55] 84 FR at 51350. EPA explained that it may make a determination in connection with a future final action with regard to Federal standards. EPA's subsequent regulation to issue Federal standards did not address this issue. 85 FR 24174.

[56] 84 FR at 51332 (citing S. Rep. No. 90–403, at 34 (1967)).

[57] *Id.* at 51333.

[58] *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 863 (1984).

rationale for considering factors outside section 209(b) (namely, EPCA preemption), and its determination that states cannot adopt California's GHG standards under section 177. For example, these Petitioners claimed they did not have an adequate opportunity to comment on EPA's use of equal sovereignty or the endangerment finding as rationales for its new "particularized nexus" interpretation of the second waiver prong. These Petitioners also claimed that EPA's statements concerning the burden of proof applicable to a waiver revocation were either unclear or inaccurate, particularly whether the Agency bears the burden of proof in withdrawing a previously granted waiver and, if not, how and why this burden of proof is different from the burden of proof for denying a waiver request.[65] Finally, these Petitioners asserted that the Agency failed to consider comments, submitted after the formal comment period, that challenged EPA's interpretation of the second waiver prong, including new evidence of California's need for its GHG emission standards and ZEV sales mandate, and alleged that EPA's rationale was pretextual and based on the Administration's political animosity towards California and on the oil industry's influence.

EPA notified the petitioners in the above-noted Petitions for Reconsideration that the Agency would be considering issues raised in their petitions as part of the proceeding to reconsider SAFE 1. This action addresses these petitions in the broader context of EPA's adjudicatory reconsideration of SAFE 1 commenced in response to a number of significant issues with SAFE 1.

## III. Principles Governing This Review

The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution."[66] In Title II, Congress authorized EPA to promulgate emission standards for mobile sources and generally preempted states from adopting their own standards.[67] At the same time, Congress

created an important exception for the State of California.

### A. Scope of Preemption and Waiver Criteria Under the Clean Air Act

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and subsequent amendments. In Title II of the CAA, Congress established only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the CAA and California emission standards adopted under its state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures in keeping with its prior experience regulating motor vehicles and its serious air quality problems. Accordingly, section 209(a) preempts states or political subdivisions from adopting or attempting to enforce any standard relating to the control of emissions from new motor vehicles.[68] Under the terms of section 209(b)(1), after notice and opportunity for public hearing, EPA must waive the application of section 209(a) to California unless the Administrator finds at least one of three criteria to deny a waiver in section 209(b)(1)(A)–(C) has been met.[69] EPA may thus deny a waiver only if it makes at least one of these three findings based on evidence in the record, including

---

[65] The applicable burden of proof for a waiver withdrawal is discussed in Section III of this decision.

[66] *General Motors Corp.* v. *United States*, 496 U.S. 530, 532 (1990).

[67] "The regulatory difference [between Titles I and II] is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Engine Mfrs. Ass'n* v. *EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congress also asserted federal control in this area to avoid "the specter of an anarchic patchwork of federal and state regulatory

programs" nationwide. *See Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA I*).

[68] 42 U.S.C. 7543(a)–(a) Prohibition No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

[69] 42 U.S.C. 7543(b)(1):

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

arguments that opponents of the waiver have provided. This framework struck an important balance that protected manufacturers from multiple and different state emission standards and preserved a pivotal role for California in the control of emissions from new motor vehicles. Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver and did this to ensure that California had broad discretion in selecting the means it determined best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to allow California to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[70] Accordingly, section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards.

EPA has consistently interpreted the waiver provision as placing the burden on the opponents of a waiver and EPA to demonstrate that one of the criteria for a denial has been met. In this context, since 1970, EPA has recognized its limited discretion in reviewing California waiver requests. For over fifty years, therefore, EPA's role upon receiving a request for waiver of preemption from California has been limited and remains only to determine whether it is appropriate to make any of the three findings specified by the CAA. If the Agency cannot make at least one of the three findings, then the waiver must be granted. The three waiver criteria are also properly seen as criteria for a denial. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain its own new motor vehicle emission program.

The 1970 CAA Amendments strengthened EPA's authority to regulate vehicular "emission[s] of any air pollutant," while reaffirming the corresponding breadth of California's entitlement to regulate those emissions (amending CAA section 202 and recodifying the waiver provision as section 209(b), respectively). Congress also established the NAAQS program,

---

[70] *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy); *MEMA I,* 627 F.2d 1095, 1111 (D.C. Cir. 1979).

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 72 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 16 of 53

**14342** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

under which EPA issues air quality criteria and sets standards for so-called "criteria" pollutants, and states with regions that have not "attained" those federal standards must submit SIPs indicating how they plan to attain the NAAQS (which is often a multi-year, comprehensive plan). With the CAA Amendments of 1977, Congress allowed California to consider the protectiveness of its standards "in the aggregate," rather than requiring that each standard proposed by the State be as or more stringent than its federal counterpart.[71] Congress also approved EPA's interpretation of the waiver provision as providing appropriate deference to California's policy goals and consistent with Congress's intent "to permit California to proceed with its own regulatory program" for new motor vehicle emissions.[72]

In previous waiver decisions, EPA has noted that the statute specifies particular and limited grounds for rejecting a waiver and has therefore limited its review to those grounds. EPA has also noted that the structure Congress established for reviewing California's decision-making is deliberately narrow, which further supports this approach. This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California. Thus, my consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions that I may consider under section 209(b).[73]

Given the text, legislative history, and judicial precedent, EPA has consistently interpreted section 209(b) as requiring it to grant a waiver unless opponents of a waiver can demonstrate that one of the criteria for a denial has been met.[74]

The 1977 CAA Amendments additionally demonstrated the significance of California's standards to the Nation as a whole with Congress' adoption of a new section 177. Section 177 permits other states addressing their own air pollution problems to adopt and enforce California new motor vehicle standards "for which a waiver has been granted if certain criteria are met."[75] Also known as the "opt-in" provision, section 177 of the Act, 42 U.S.C. 7507, provides:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Nothing in this section or in Subchapter II of this chapter shall be construed as authorizing any such State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different that a motor vehicle or engine certified in California under

California standards (a "third vehicle") or otherwise create such a "third vehicle."

Any state with qualifying SIP provisions may exercise this option and become a "Section 177 State," without first seeking the approval from EPA.[76] Thus, over time, Congress has recognized the important state role, for example, by making it easier (by allowing California to consider its standards "in the aggregate") and by expanding the opportunity (via section 177) for states to adopt standards different from EPA's standards.[77]

## B. Deference to California

EPA has consistently noted that the text, structure, and history of the California waiver provision clearly indicate both congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of public policy" to California's judgment. In waiver decisions, EPA has thus recognized that congressional intent in creating a limited review of California waiver requests based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess the wisdom of state policy. In an early waiver decision EPA highlighted this deference:

It is worth noting * * * I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission

---

[71] 42 U.S.C. 7543(b)(1).

[72] H.R. Rep. No. 95–294, at 301 (1977).

[73] 78 FR at 2115 (footnote omitted).

[74] *MEMA I*, 627 F.2d at 1120–21 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the

burden of proving otherwise is on whoever attacks them."); *Motor & Equip. Mfrs. Ass'n, Inc. v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998) (*MEMA II*) ("[S]ection 209(b) sets forth the only waiver standards with which California must comply. . . . If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application.").

[75] This provision was intended to continue the balance, carefully drawn in 1967, between states' need to meet increasingly stringent federal air pollution limits and the burden of compliance on auto-manufacturers. *See, e.g.,* H.R. Rep. No. 294, 95th Cong., 1st Sess. 309–10 (1977) ("[S]ection 221 of the bill broadens State authority, so that a State other than California . . . is authorized to adopt and enforce new motor vehicle emission standards which are identical to California's standards. Once again, however, strict limits are applied . . . . This new State authority should not place an undue burden on vehicle manufacturers . . . ."); *Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation*, 17 F.3d 521, 527 (2d Cir. 1994) ("Many states, including New York, are in danger of not meeting increasingly stringent federal air pollution limits . . . . It was in an effort to assist those states struggling to meet federal pollution standards that Congress, as noted earlier, directed in 1977 that other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards or to "piggyback" onto California's preemption exemption. This opt-in authority, set forth in § 177 of the Act, 42 U.S.C. 7507, is carefully circumscribed to avoid placing an undue burden on the automobile manufacturing industry.").

[76] In 1990 Congress amended the CAA by adding section 209(e) to section 209. Section 209(e) sets forth the terms of CAA preemption for nonroad engines and vehicles and the ability of States to adopt California emissions standards for such vehicles and engines if certain criteria are met. 42 U.S.C. 7543(e)(2)(B) ("Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines . . . if (i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards . . . ."). Courts have interpreted these amendments as reinforcing the important role Congress assigned to California. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1090 ("Given the indications before Congress that California's regulatory proposals for nonroad sources were ahead of the EPA's development of its own proposals and the Congressional history of permitting California to enjoy coordinated regulatory authority over mobile sources with the EPA, the decision to identify California as the lead state is comprehensible. California has served for almost 30 years as a 'laboratory' for motor vehicle regulation."); *MEMA I*, 627 F.2d 1095, 1110 (D.C. Cir. 1979) ("Its severe air pollution problems, diverse industrial and agricultural base, and variety of climatic and geographical conditions suit it well for a similar role with respect to nonroad sources.").

[77] 40 FR at 23104; *see also* LEV I waiver at 58 FR 4166, Decision Document at 64.

control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shape of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[78]

As noted above, Congress amended the CAA in 1977. Within these amendments, Congress had the opportunity to reexamine the waiver provision and elected to expand California's flexibility to adopt a complete program of motor vehicle emission controls. The House Committee Report explained that "[t]he amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[79]

SAFE 1 was a departure from congressional intent and EPA's typical practice of deference to California on matters of state public policy regarding how best to address its serious air quality problems. In SAFE 1, EPA adopted a new interpretation of section 209(b)(1)(B) more than five years after the initial grant of the ACC program waiver and applied it to CARB's GHG standards and ZEV sales mandate. Specifically, EPA premised its finding on a consideration of California's "need" for the specific standards, instead of the "need" for a separate motor vehicle emission program to meet compelling and extraordinary conditions, stating that "such State standards" in section 209(b)(1)(B) was ambiguous with respect to the scope of the Agency's analysis. EPA further determined that California did not need the ZEV sales mandate to meet compelling and extraordinary conditions by relying on a single statement in the ACC program waiver support document taken out of context, where it noted that the ZEV sales

mandate had no criteria emissions benefits in terms of vehicle emissions and its LEV III criteria pollutant fleet standard was responsible for those emission reductions. In response to the SAFE 1 proposal, California had provided further context and additional data on net upstream emissions benefits of the ZEV sales mandate, but EPA did not consider them in arriving at the findings and conclusions in SAFE 1. The final decision in SAFE 1 was not based on the third waiver prong.[80] EPA also explained in SAFE 1 that the task of interpreting section 209(b)(1)(B) required no deference to California.[81]

### C. Standard and Burden of Proof

In *Motor and Equipment Manufacturers' Association* v. *EPA*, 627 F.2d 1095 (D.C. Cir. 1979) (*MEMA I*), the U.S. Court of Appeals for the District of Columbia stated, with regard to the standard and burden of proof, that the Administrator's role in a section 209 proceeding is to "consider all evidence that passes the threshold test of materiality and . . . thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver."[82] The court in *MEMA I* considered the standards of proof under section 209 for the two findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with CAA section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision."[83] The court upheld the Administrator's position that to deny a waiver, there must be clear and compelling evidence to show that the proposed procedures undermine the protectiveness of California's standards. The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and

welfare.[84] With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence.

Although *MEMA I* did not explicitly consider the standards of proof under section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary conditions and whether the standards are technologically feasible—Congress intended that the standard of EPA review of the State decision to be a narrow one."[85] Although EPA evaluates whether there are compelling and extraordinary conditions in California, the Agency nevertheless accords deference to California on its choices for how best to address such conditions in light of the legislative history of section 209(b).

As noted earlier, the burden of proof in a waiver proceeding is on EPA and the opponents of the waiver. This is clear from the statutory language stating that EPA "shall . . . waive" preemption unless one of three statutory factors is met. This reading was upheld by the D.C. Circuit in *MEMA I*, which concluded that this obligation rests firmly with opponents of the waiver in a section 209 proceeding, holding that: "[t]he language of the statute and its legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at

---

[78] 40 FR at 23104.

[79] *MEMA I*, 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)). Congress amended section 209(b)(1)(A) regarding California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[80] 84 FR at 51322–33. EPA notes that when reviewing California's standards under the third waiver prong, the Agency may grant a waiver to California for standards that EPA may choose not to adopt at the federal level due to different considerations. *See* 78 FR at 2133.

[81] 84 FR at 51339–40.

[82] *MEMA I*, 627 F.2d at 1122.

[83] *Id.*

[84] *Id.*

[85] *See, e.g.,* 40 FR at 23102–03. *See also MEMA I*, 627 F.2d at 1109 ("Congress had an opportunity to restrict the waiver provision in making the 1977 amendments, and it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emissions control. Under the 1977 amendments, California need only determine that its standards will be 'in the aggregate, at least as protective of public health and welfare than applicable Federal standards,' rather than the "more stringent" standard contained in the 1967 Act.") (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977), U.S. Code Cong. & Admin. News 1977, p. 1380).

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 74 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 18 of 53

**14344** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied." [86]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver decision. As the court in *MEMA I* stated, "Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious.' " [87] Therefore, the Administrator's burden is to act "reasonably." [88]

In this instance, EPA has withdrawn a previously granted waiver and is now reconsidering whether that withdrawal was an appropriate exercise of authority, whether the reinterpretation of the second waiver prong was appropriate, and whether EPA's evaluation and findings of fact under the second waiver prong meet the applicable burden of proof in the context of deference to California's policy choices. EPA believes that the same burden that is applicable to those opposed to an initial waiver request from CARB (this applies to any party including the Administrator as explained in *MEMA I*) is also applicable to EPA's actions in SAFE 1 (*e.g.,* the burden of proof of whether California does not need its standards to meet compelling and extraordinary conditions rests on those opposing a waiver for California). [89]

---

[86] *MEMA I*, 627 F.2d at 1121.

[87] *Id.* at 1126.

[88] *Id.*

[89] In EPA's 2009 evaluation of the 2008 GHG waiver denial the Agency applied a similar test. *See* 74 FR at 32745 ("After a thorough evaluation of the record, I am withdrawing EPA's March 6, 2008 Denial and have determined that the most appropriate action in response to California's greenhouse gas waiver request is to grant that request. I have determined that the waiver opponents have not met their burden of proof in order for me to deny the waiver under any of the three criteria in section 209(b)(1)."). In the context of 2009 GHG waiver that reconsidered the Agency's 2008 GHG waiver denial, EPA determined it was appropriate to apply the same burden of proof during the reconsideration as would apply at the time of the initial waiver evaluation. EPA received comment suggesting that the entire burden of proof shifts to California in order for the prior 2008 denial to be reversed. EPA, in response, stated that ". . . regardless of the previous waiver denial, once California makes its protectiveness determination the burden of proof falls on the opponents of the waiver . . . . This is consistent with the legislative history, which indicates that Congress intended a narrow review by EPA and to preserve the broadest possible discretion for California." *Id.* at 32749. EPA acknowledges that in SAFE 1 the Agency not

## IV. EPA Did Not Appropriately Exercise Its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1

The first question this final action tackles is whether the agency properly exercised its reconsideration authority to withdraw its previously-granted waiver in SAFE 1. EPA concludes that it did not, and on that independent basis rescinds SAFE 1's waiver withdrawal.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. For several reasons, in the context of reconsidering a waiver grant, that authority may only be exercised sparingly. First, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). A contrary approach, which treats reconsiderations as more broadly appropriate, would undermine Congress' intent that California be able to exercise its policy judgments and develop motor vehicle controls programs to address California's air pollution problems, and make advances which could be built on by EPA or adopted by other states. Second, EPA believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even when EPA is acting within the appropriate bounds of its authority to reconsider, during that reconsideration EPA should exercise its limited

---

only adopted an interpretation of the second waiver prong which was similar to the previously rejected interpretation, but that in doing so also questioned its previous position that the burden of proof in evaluating the need for standards at issue resides with those that oppose the waiver, including EPA. *See* 84 FR at 51344 n.268. In this action, however, EPA now finds that the historical deference provided to California regarding its policy choices on how best to address its serious air quality conditions also requires that the burden of proof should reside in those seeking to demonstrate that standards are not needed under the second waiver prong regardless of whether the rationale is characterized as a new interpretation or not. The language of section 209(b)(1) requires California to make a protectiveness finding under the first waiver prong. Moreover, nothing in section 209(b) could be read as support for drawing a distinction between the burden of proof when the Agency considers an initial waiver request and one where the Agency reconsiders a waiver decision based on a new interpretation of the statutory criteria. That burden properly resides with opponents of the waiver.

authority within a reasonable timeframe and be mindful of reliance interests.

The Agency's reconsideration in SAFE 1 was not an appropriate exercise of authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that had changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete and inaccurate assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Moreover, in considering the passage of time between the initial waiver and the SAFE 1 action, and the development of reliance interests based on the waiver, EPA finds those factors do not support the reconsideration of the ACC program waiver that occurred in SAFE 1. Accordingly, as explained in detail below, EPA is rescinding SAFE 1's withdrawal of its 2013 ACC program waiver because it was an inappropriate exercise of reconsideration authority.

### A. Comments Received

EPA received several comments in the reconsideration proceeding on the Agency's authority to reconsider waivers. Comments on explicit authority focused on whether any language in section 209(b)(1), on its face, permits EPA to reconsider a previously granted waiver. Some of these commenters also distinguished between the denial of the 2008 waiver and the reconsideration and grant of the GHG waiver in 2009, and EPA's grant of the ACC program waiver in 2013 and the reconsideration and withdrawal of the ACC program waiver in 2019.

EPA received comments in support of and against the view that EPA has inherent authority to reconsider waivers. As support for EPA's implied authority to reconsider, one commenter cited relevant language from the Senate Committee Report from 1967 that stated, "implicit in [§ 209] is the right of [EPA] to withdraw the waiver [if] at any time after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of that waiver." [90] According to the commenter because "the waiver authorizes *future* regulation, which always remains open to change," EPA must have the authority to reconsider a

---

[90] Urban Air Initiative (Urban Air), Docket No. EPA–HQ–OAR–2021–0257–0223 at 22 (quoting S. Rep. 90–403, at 34 (1967)).

waiver. Otherwise, EPA would be unable to monitor CARB's continued compliance with the waiver conditions in light of updated information.[91] The same commenter also argued that an agency generally retains the authority to reconsider and correct any earlier decision unless Congress acts to displace the authority with a process to rectify the Agency's mistakes and that explicit statutory authority to withdraw a waiver is therefore not necessary, because "the power to reconsider is inherent in the power to decide."[92] The commenter claimed that, under *Chevron*, "[a]n agency has a 'continuing' statutory obligation to consider the 'wisdom of its policy.'"[93]

In contrast, several commenters maintained that section 209(b) strongly indicates that EPA's authority to withdraw a previously issued waiver is, at most, limited. Several commenters argued that, absent language in a statute, administrative agencies lack inherent authority to reconsider adjudicatory decisions.[94] These commenters noted that courts highly scrutinize administrative revocations and are "unwilling[] to wrest a standardless and open-ended revocation authority from a silent statute."[95] Instead, these commenters argued, EPA may act only with the authorities conferred upon it by Congress, and thus the Agency may only act if the CAA explicitly or

implicitly grants it power to do so.[96] According to these commenters, section 209(b) is silent on waiver withdrawal, its text indicates that EPA may only consider 209(b)'s three factors before either granting or denying a waiver, and its purpose and structure affords broad deference to California's standards. "Taken together, these factors indicate that EPA may not withdraw a previously-issued waiver based solely upon a reconsideration of its initial judgment."[97] Commenters suggested that Congress, by listing the three waiver criteria and directing that EPA evaluate such criteria prior to granting the waiver, only authorized EPA to perform the evaluation once and that it "cannot later second-guess the wisdom of legal and policy judgments made as part of that evaluation."[98] Similarly, commenters noted that section 209 does not textually "provide" EPA any authority nor specify any process by which EPA might revoke the rights given by an earlier-granted waiver.[99] In response to SAFE 1's claim of inherent

reconsideration authority and the other commenters' reliance on the relevant excerpt from the 1967 Senate Report, these commenters argued that this "single sentence . . . does not establish any withdrawal authority," either generally or for the SAFE 1 withdrawal specifically.[100] That statement, commenters argued, "predate[s] the creation of the NAAQS program and Congress's invitations to development of numerous state reliance interests."[101] Moreover, according to these commenters, the statement only discusses authority in the case that "California no longer complies with the conditions of the waiver," which commenters believe means California's "compliance with waiver conditions and, specifically, its cooperation with EPA concerning enforcement and certification procedures," not "redefined waiver criteria."[102]

In response to the argument made by EPA in SAFE 1 that, given the "considerable degree of future prediction" required by the third waiver prong, "where circumstances arise that suggest that such predictions may have been inaccurate, it necessarily follows that EPA has authority to revisit those predictions,"[103] some commenters claimed that California's standards do not become inconsistent with federal standards simply because they become more stringent than federal standards (in other words, a weakening of the federal standards does not necessarily create an inconsistency). The commenters noted also that EPA did not in fact revise its section 202(a) standards between issuing and withdrawing the waiver at issue, nor did EPA in fact make any final findings under the third waiver prong.[104]

Many commenters stated that in order to exercise any implied or inherent authority, an agency must provide a "detailed justification" when departing from a policy that has "engendered serious reliance interests" and should not "rest on mere 'policy changes'"

[91] *Id.* at 21 ("A determination that California's state standards are technologically feasible and appropriate requires complex technical projections at the frontiers of science, which must be continually updated 'if the actual future course of technology diverges from expectation.'" (quoting *NRDC Inc. v. EPA*, 655 F.2d 318, 329 (D.C. Cir. 1981))).

[92] Urban Air at 20 (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86, 93 (D.C. Cir. 2014)). This commenter also notes that, in EPA's 2009 action to reconsider its prior denial of a GHG waiver in 2008, CARB submitted a letter to EPA stating that "California believes EPA has inherent authority to reconsider the denial and should do so in order to restore the interpretations and applications of the Clean Air Act to continue California's longstanding leadership role in setting emission standards." *Id.*

[93] *Id.* at 21.

[94] Institute for Policy Integrity Amicus Brief at 4 ("Lacking textual support, EPA invokes so-called 'inherent authority'—'more accurate[ly] label[ed] . . . 'statutorily implicit' authority,' *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016)—to justify its action. 84 FR at 51,331. But this Court is 'unwilling[] to wrest a standardless and open-ended revocation authority from a silent statute,' *Am. Methyl*, 749 F.2d 826, 837 (D.C. Cir. 1984), and EPA fails to justify the implicit authority it claims."); Twelve Public Interest Organizations app 1 at 32 (citing *Am. Methyl* for "rejecting 'implied power' as 'contrary to the intention of Congress and the design of' the Act and quoting *HTH Corp.*'s statement that agencies, as creatures of statute, lack inherent authority); States and Cities at 16 (also citing *Am. Methyl*).

[95] Institute for Policy Integrity at 1 (citing *Am. Methyl*).

[96] States and Cities at 15 (citing *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016)); Twelve Public Interest Organizations, Docket No. EPA–HQ–OAR–2021–0257–0277 app. 1 at 28 ("The Clean Air Act preserves state authority to regulate emissions unless expressly 'provided' otherwise. 42 U.S.C. 7416. In statutes like this where preemption is the exception, only Congress's 'precise terms' can produce preemption. *CTS Corp. v. Waldburger*, 573 U.S. 1, 12–13 (2014)."); National Coalition for Advanced Transportation (NCAT), Docket No. EPA–HQ–OAR–2021–0257–0131 at 7–8 ; Institute for Policy Integrity at New York University School of Law (Institute for Policy Integrity), Docket No. EPA–HQ–OAR–2021–0257–0115 at 2, citing its Final Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Petitioners (Institute for Policy Integrity Amicus Brief) at 4, *Union of Concerned Scientists, et al. v. NHTSA, et al.*, No. 19–1230 (D.C. Cir. filed Oct. 28, 2019), reprinted in the Institute's comments on the 2021 Notice of Reconsideration.

[97] Institute for Policy Integrity at 2, citing its Amicus Brief at 6–11.

[98] *Id.* at 7. *See also* Twelve Public Interest Organizations app. 1 at 28–29 ("Section 209(b)(1)'s precise terms mandate that EPA "shall" grant California a waiver unless EPA finds one of the three specified bases for denial. This language charges EPA "with undertaking a single review in which [the Administrator] applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver." *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1302 (D.C. Cir. 1979). It evinces no intent to provide EPA with the different and greater authority to withdraw a previously granted waiver, thereby arresting the State's ongoing implementation of its own laws.")

[99] *See* South Coast Air Quality Management District (SCAQMD), Docket No. EPA–HQ–OAR–2021–0257–0228 at 3. This commenter argued that section 116 of the CAA (which explicitly references section 209) provides that there needs to be a textual basis for any exercise of authority to deny California the right (which it achieved via the 2013 waiver) to enforce its emission standards. Thus, the commenter continued, because there is no language in section 209 that gives any authority nor specifies any process for EPA to revoke the rights/waiver previously granted then EPA may not do so by the terms of section 116.

[100] States and Cities at 16. *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[101] States and Cities at 16; *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[102] Twelve Public Interest Organizations app. 1 at 34. *See also* States and Cities at 16 (arguing that, although EPA proposed to withdraw the waiver on multiple grounds, such as the third waiver prong, "EPA's final action was based entirely on its own changed policy positions, namely its interpretation of Section 209(b)(1) to create a categorical bar against state regulation of vehicular GHG emissions and its decision to rely on another agency's newly articulated views of a different statute [EPCA].").

[103] 84 FR at 51332.

[104] Institute for Policy Integrity at 2.

alone.[105] Thus, supporters and opponents of SAFE 1 also provided comments on whether, assuming EPA did have authority to reconsider the ACC program waiver—either because of language in the CAA or because of its inherent authority to reevaluate decisions because of changed conditions—it was appropriate to exercise that authority in SAFE 1. Some commenters summarized precedent as requiring that the Agency consider reliance interests that have attached to its original decision, that reversals of informal adjudications occur within a reasonable time after the original decision, and that the reversal is not for the sole purpose of applying some change in administrative policy.[106] Opponents and supporters of SAFE 1 did, however, disagree on the significance of each of these factors.[107]

Commenters who argued that reliance interests were relevant to EPA's authority to reconsider also offered evidence of reliance interests that had accrued over the five years the ACC program waiver had been in effect, with several commenters providing specific details regarding their reliance on the GHG and ZEV standards. As commenters noted, California's standards are incorporated into plans and regulations aimed at achieving state and federal air pollution goals. These plans can be complex and cannot "change on a dime." [108] According to one commenter "[w]ithout the full Waiver, past decision-making was blighted and planned-for reductions to meet Air District goals need to be reassessed. The emission reductions are

key to combatting climate change, curbing ozone formation, preventing additional wildlife impacts, and attaining California [air quality goals] and [NAAQS]." [109] Revoking a waiver and disrupting existing air quality plans, they argue, also has "far-reaching ripple effects" because "businesses operating in California base their own long-term plans on the State's policies" and, if California cannot reduce emissions from the automobile sector, it will have to "consider requiring further reductions from other sectors of the economy." [110] Additionally, they said that by the time of the SAFE proposal, twelve states had already adopted at least one or both of the California standards under section 177.[111] Several of these states submitted comments attesting to their need for these standards to achieve both greenhouse gas and criteria emission reductions.[112] Like the reliance interests of Californian air districts, several of these section 177

states and other opponents of SAFE 1 claim that "reliance interests in State Implementation Plans are particularly acute" because "they set expectations for extended periods of time and for many sectors of the economy, making it challenging (if not impossible) to change them quickly." [113] These commenters note that "planning failures can carry significant consequences, including the imposition of federal plans that limit local flexibility and control, as well as penalties such as loss of highway funds." [114] Some automakers and industry groups also discussed their reliance interests.[115] For example, the National Coalition for Advanced

[105] States and Cities at 21–22 (quoting *FCC* v. *Fox*, 556 U.S. 502, 515 (2009)).

[106] *Id.* at 17 (citing *Am. Methyl*, 749 F.2d at 835; *Chapman* v. *El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953); *DHS* v. *Regents of the Univ. of California*, 140 S. Ct. 1891, 1914 (2020); *United States* v. *Seatrain Lines Inc.*, 329 U.S. 424, 429 (1947)).

[107] Urban Air at 21 (arguing that agencies need only provide a "detailed justification" to overcome reliance interests); Competitive Enterprise Institute (CEI), Docket No. EPA–HQ–OAR–2021–0257–0398 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0140) at 9 ("As for reliance interests, all costly wasteful, or otherwise defective government programs create reliance interests. Usurpations of power do as well. If the creation of reliance interests is enough to legitimize bad or unlawful policies, anything goes."). *Compare to* States and Cities at 17–18 (citing their comments on SAFE 1 at 130–31 and citing *Ctr. for Sustainable Econ.* v. *Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015)) (describing reliance interests as "weighty," stating that "[t]he Clean Air Act and long-standing Executive branch policy both place substantial importance on States' interests in implementing the plans and laws they have determined best meet the needs of their States"—plans and laws such as SIPs, which can and do include California standards).

[108] Twelve Public Interest Organizations app. 1 at 29.

[109] Bay Area Air Quality Management District (BAAQMD), Docket No. EPA–HQ–OAR–2021–0257–0278 at 2.

[110] Twelve Public Interest Organizations app. 1 at 29.

[111] States and Cities at 17. With these state adoptions, auto-manufacturers would then need to meet program requirements in these states.

[112] *See, e.g.*, Delaware Department of Natural Resources and Environmental Control (Delaware), Docket No. EPA–HQ–OAR–2021–0257–0109 at 1 ("The GHG program allowed by the waiver is vitally important, as it enables long-term plans and yields critical emission reductions that will contribute significantly to Delaware's ability to attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) for criteria pollutants."); Connecticut Department of Transportation and Connecticut Department of Energy and Environmental Protection (Connecticut), Docket No. EPA–HQ–OAR–2021–0257–0104 at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Minnesota Pollution Control Agency and Minnesota Department of Transportation (Minnesota), Docket No. EPA–HQ–OAR–2021–0257–0113 at 2 ("The MPCA is in the process of adopting the LEV and ZEV standards in Minnesota as allowed under section 177 of the CAA. These rules are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants. . . ."); Maine Department of Environmental Protection (Maine), Docket No. EPA–HQ–OAR–2021–0257–0130 at 1, 3 ("While the LEV program was initially created to help attain and maintain the health-based [NAAQS] for criteria pollutants, the California GHG and ZEV standards will contribute significantly to states' abilities to meet their emission reduction goals. . . . [T]he transportation sector is the largest source of ozone forming pollution in Maine . . . and California's ability to set ZEV standards under the [CAA] is an essential tool for addressing both criteria pollutants and GHGs."); Virginia Department of Environmental Quality (Virginia), Docket No. EPA–HQ–OAR–2021–0257–0112 at 2 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements.")

[113] Twelve Public Interest Organizations app. 1 at 30; Delaware at 3 (explaining that, without the California standards, adopted into Delaware's SIP, the State will not be able to meet air quality goals). These reliance interests, one commenter argued, are another reason to doubt the implicit authority of EPA to reconsider an already granted waiver: "It would be quite surprising, then, for EPA to have implicit authority to upend this multi-actor, multi-step scheme by pulling the rug out from under it after the fact." States and Cities at 16 (citing *Am. Methyl*, 749 F.2d at 840).

[114] Twelve Public Interest Organizations app. 1 at 30–31 (citing 42 U.S.C. 7410(c)(1) (establishing triggers for imposition of federal plan), 7509 (outlining sanctions for state planning failures)).

[115] *See* Ford Motor Company (Ford), Docket No. EPA–HQ–OAR–2021–0257–0028 at 1 ("Ford supports EPA's rescission of its SAFE I action, which withdrew California's waiver for zero emission vehicle (ZEV) mandate and greenhouse gas (GHG) emission standards within California's Advanced Clean Car (ACC) program. Ford does not believe this previous action was appropriate. Ford firmly supports recognition of California's authority to implement ZEV and GHG standards in support of its air quality targets pursuant to its 2012 waiver application. We have relied on California's actions pursuant to the waiver and California's related pronouncements in negotiating and agreeing to the California Framework Agreement, and in the development of our own product and compliance plans. Ultimately, Ford considered EPA's and NHTSA's rationales and California's statements regarding SAFE I and took action in the best interests of the company and of the environment."). *See also* Tesla, Docket No. EPA–HQ–OAR–2021–0257–0136 at 4 ("Because of the sizeable investments required to develop alternative fuel and advanced technology vehicles, regulatory stability is vital for ensuring the level of manufacturer and investor confidence necessary to facilitate innovation.") and at n.5 (quoting comments from several automakers and auto industry groups about reliance interests on the waiver from the MTE). *See also* Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Should EPA reinstate California's waiver, we request it be reinstated as it was originally granted, including the "deemed-to-comply" provision that was so important in establishing One National Program (ONP) over a decade ago. . . . Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production. Some manufacturers may have already begun production of 2022 model year vehicles. As a result, a reinstatement of California's waiver by EPA should apply prospectively to model years 2023 and later.").

Transportation, an industry coalition group, stated "NCAT members have invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by California and the section 177 States' continued ability to drive technology innovation and emission reductions." [116] EPA also received comment from CARB, by and through the comments of the States and Cities, that provided data on manufacturer compliance.[117]

According to commenters, these reliance interests were compounded by the considerable passage of time between the granting of the ACC program waiver in 2013 and SAFE 1's withdrawal in 2019. Commenters also remarked that the more than five years that had passed was too long a delay and well beyond the "weeks, not years" sometimes referenced as guidance for reasonableness.[118] SAFE 1, they noted "comes years after the waiver was granted, years after multiple sovereign States adopted California's standards, and years into long-term plans States developed in reliance on anticipated emission reductions from those standards—including, but not limited to, multiple EPA approved State Implementation Plans." [119]

Other commenters argued that SAFE 1 did not upend reliance interests and was not untimely. They agreed with the SAFE 1 decision that the 2018 Mid-Term Evaluation (MTE), which was agreed to in 2013, prevented any reliance interests from accruing.[120] Although this MTE was for the federal GHG standards for MYs 2022–2025, not the California GHG standards approved under the ACC program waiver, these commenters argued that the two were linked through the "deemed to comply"

provision approved in the ACC program waiver, which allowed manufacturers to comply with the California standards by meeting the federal standards.[121] They also noted that California separately agreed to a 2016 mid-term evaluation of its own state standards for the same model years.[122] Therefore, they argued, because the initial grant of the waiver was contingent on two subsequent mid-term evaluations, no one could have reasonably believed the ACC program waiver was "set in stone." Additionally, at least one commenter argued that California and other states' purported reliance interests were further undermined because they "have known for years that NHTSA's longstanding position is that state carbon dioxide regulations and zero-emissions vehicle mandates are related to average fuel economy standards and therefore preempted by CAFE" and "could not have reasonably believed that EPA would continue to ignore NHTSA's view of the law in perpetuity.[123]

Some commenters also argued that even if reliance interests are relevant, automakers and industry groups have reliance interests of their own affected by CARB's 2018 deemed to comply amendments and the SAFE 1 action itself. One commenter wrote that "CARB tossed automakers' reliance interests out the window when it refused to be bound by the results of the EPA and NHTSA's Mid-Term Evaluation (MTE) . . . and refused to honor its 'deemed to comply' pledge to automakers unless they complied with the standards set by the EPA in 2012 and 2017." [124] Another commenter noted that "[w]hatever 'reliance interests' are disturbed when EPA reverses a waiver grant are no more real, and no more serious for the parties involved, than the reliance interests upended by reversal of a waiver denial." [125]

Some commenters also argued that SAFE 1 was timely, disputing opponents' claims that a "reasonable" amount of time is measured in "weeks, not years." Commenters noted that "courts have not reached consensus on the amount of time that is reasonable." [126] Moreover, one commenter argued that "timeliness depends on reliance interests" and, because those could not have accrued prior to the MTE, the time period at issue is only four months (between the conclusion of the MTE and the reconsideration of the ACC program waiver, starting in 2018).[127] This "short time," the commenter claimed, "lies in the acceptable range given the intervening events." [128] Another commenter argued that, if "time elapsed" is a factor to be considered in the appropriateness of an action, it cuts in favor of SAFE 1, as thirty years passed between EPCA's enactment in 1975 and California's first request for a "waiver implicitly authorizing the State to regulate fuel economy." [129] Even if the time period at issue was nearly six years between the grant of the ACC program and the final SAFE 1 action, that commenter wrote, such a length of time is not unreasonable, since "[i]f six years locks a policy in place and puts it beyond revision or repeal by the next administration, elections no longer matter." [130]

In addition to reliance interests and timeliness, some commenters claimed that EPA's authority to revoke, if it existed, requires the Agency to have a purpose other than "applying some . . . change in administrative policy." [131] SAFE 1, they argued, did not meet this requirement. Instead, in SAFE 1, EPA "chose to *sua sponte* reconsider its 2013 Waiver Grant for the sole purpose of applying new policy determinations," specifically "NHTSA's views of EPCA preemption" and "new interpretations

---

[116] NCAT at 13; Rivian as a member of NCAT (Rivian), Docket No. EPA–HQ–OAR–2021–0135.

[117] States and Cities at 55–57, including app. D and app. E.

[118] *Id.* at 17 (citing *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977)). Twelve Public Interest Organizations app. 1 at 73. In addition, this commenter notes that the time period for seeking judicial review of the ACC program waiver had run long ago and that no one had sought that review (citing *Am. Methyl Corp.*, 749 F.2d at 835); NCAT at 14–15.

[119] Twelve Public Interest Organizations app. 1 at 58.

[120] America Fuel & Petrochemical Manufacturers, EPA–HQ–OAR–2021–0257–0139 (AFPM) at 26 ("And no reliance interests derive from this decision because one could not reasonably expect that the standards approved in that waiver would remain untouched. As part of the 2013 waiver decision, EPA and CARB committed to a 2018 mid-term evaluation of the federal standards for MYs 2022–2025."); Urban Air at 22; NADA at 6 ("as discussed at length repeatedly in EPA's 2013 CAA preemption waiver rule, a coordinated mid-term evaluation (MTE) involving EPA and NHTSA's MY 2022–2025 rules was expected to be conducted.").

[121] AFPM at 26 ("Because California's deemed-to-comply provision linked those standards to compliance with its own state program, any change in federal standards from the mid-term review would have required an equal overhaul of California's emissions program for those future MYs."); Urban Air at 22–23 ("The 2018-re-evaluation is relevant because California's deemed-to-comply provision allowed a manufacturer to satisfy state GHG standards simply by complying with federal standards."); NADA at 6 ("[A]s noted above, CA's GHG mandates included both a "deem-to-comply" rule enabling vehicle manufacturers to meet those mandates by complying with applicable federal rules, and a commitment on the part of the state to conduct a mid-term evaluation of its own GHG standards.").

[122] AFPM at 26–27; Urban Air at 22; NADA at 6.

[123] Urban Air at 23.

[124] CEI at 9.

[125] AFPM at 27. *See also* Urban Air at 20–21 ("And under the presumption that 'an agency retains authority to reconsider and correct an earlier

decision,' the grant of a waiver is as liable to change as the denial of a waiver. No greater reliance interests attach to the grant of a waiver authorizing regulation than to the denial of a waiver preventing regulation, so reliance interests provide no support for California's ratchet argument.").

[126] Urban Air at 23–24.

[127] *Id.* at 24. Another commenter disagreed with this accounting of time, stating that "timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. *E.g.*, *Am. Methyl*, 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations app. 1 at 38.

[128] Urban Air at 23–24.

[129] CEI at 8 (calling "time elapsed" a "frivolous objection.").

[130] *Id.*

[131] States and Cities at 17 (quoting *Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953)).

Case 4:25-cv-04966-HSG  Document 247-1  Filed 08/12/26  Page 78 of 162
USCA Case #26-1218  Document #2187882  Filed: 08/11/2026  Page 22 of 53

**14348**  **Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

[of section 209(b)(1)(B)] that served only to categorically bar state standards that reduce vehicular GHG emissions." [132] Still, another commenter disagreed, arguing that EPA's reconsideration was an appropriate reevaluation of the legal interpretation and facts upon which the initial waiver determination was based because—"reconsideration determinations do not become 'policy' decisions simply because they address substantive errors." [133]

EPA also received comment on whether EPA's actions were inappropriate because the Agency failed to satisfy the "requirements of reasoned decision-making." Some commenters noted that EPA had taken the position in SAFE 1 that "reducing criteria pollution is of overriding importance" yet failed to "consider[] the criteria-pollution and SIP consequences of its Waiver Withdrawal and Section 177 Determination." [134] Similarly, EPA received comments claiming that the decision to apply a new approach to the ACC program waiver section 209(b)(1)(B) was both unnecessary and unjustified because, as EPA acknowledged in SAFE 1, the Agency has consistently posited that section 209(b)(1)(B) calls for determining whether the State needs its own regulatory program, separate from that of the federal government, not whether the State needs each specific standard or package of standards for which it seeks a waiver. [135] One of these commenters pointed out that EPA also acknowledged that the phrase "such State standards" could reasonably remain the program-level interpretation (EPA's traditional interpretation) yet the Agency chose to adopt a new interpretation and apply it to the more than five-year old ACC program waiver, impacting expectations and reliance interests.

The Agency also received comments on whether NHTSA's finding of preemption under EPCA in the joint action granted EPA authority to reconsider the ACC program waiver. Commenters argued that NHTSA is charged with interpreting and

implementing EPCA and that its finding "that Congress prohibited California's standards" in the same action cannot be ignored. [136] Still other commenters pointed to the language of section 209(b)(1) itself, where only three criteria are provided by which EPA can deny a waiver. As such, they argued, EPA cannot have broad, implicit authority to revoke a waiver on entirely different grounds than by which it may deny a waiver. [137] The commenters also argued that the joint context of the action did not grant the Agency special authority to reconsider, explaining that "[w]hat Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency." [138] Some commenters also pointedly noted that SAFE 1's distinction between single-agency and joint actions is arbitrary and capricious and therefore not a valid basis for reconsideration because EPA stated it "does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C)," [139] and because NHTSA and EPA now consider SAFE 1 as "two severable actions." [140]

## B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider

EPA finds it does have authority to reconsider waivers, although its reconsideration of previously-granted waivers is limited and circumscribed. In the context of adjudicatory decisions (as contrasted to rulemakings), administrative law principles and case law support limited reconsideration authority for waiver proceedings. For example, in *Ivy Sports Med., LLC* v. *Burwell*, 767 F.3d 81, 86, 93 (D.C. Cir. 2014), the D.C. Circuit noted that where a statute "does not contain an express provision granting [the agency] authority to reconsider," "administrative agencies are assumed to possess at least some inherent authority to revisit prior decisions, at least if done in a timely fashion," noting the baseline limitations of such inherent authority. And in *Chapman* v. *El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953), the D.C. Circuit made clear that once concluded, an adjudicatory decision

granting a right "may not be repudiated for the sole purpose of applying some quirk or change in administrative policy." [141] These precedents suggest that, while agencies do generally possess some inherent authority to reconsider previous adjudicatory decisions, that authority is limited in scope.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. The 1967 legislative history provides some indication of congressional intent to preserve some implied authority for EPA to reconsider previous waiver decisions, but also to place limitations on it. This legislative history explains: "[i]mplicit in this provision is the right of the [Administrator] to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver." [142] Thus, from the earliest days of the program it has been understood that any withdrawal of a waiver should be tied to the statutory criteria and California's compliance with them. This legislative history must be taken into account along with Congress's intent expressed in the 1977 legislative history, which, as discussed previously, sought to ensure deference to California and to strengthen that state's role in driving emissions-reducing technological innovation. Congress was also mindful to ensure the ability of other states to adopt California's standards. [143] Ultimately, EPA concludes it has authority to reconsider previously-granted waivers, but that this authority may only be exercised sparingly. As discussed below, there are several considerations that support narrow authority to reconsider waiver grants.

First and most important, EPA believes its inherent authority to reconsider a waiver decision is

[132] *Id.* at 8, 19 ("No statute compelled EPA to reconsider the 2013 waiver at all, let alone to apply new policies to that long-settled decision rather than to new waiver requests."); Twelve Public Interest Organizations app. 1 at 35 ("EPA relied exclusively on its purported discretion to reinterpret Section 209(b)(1)(B) of the Clean Air Act . . . and its purported discretion to consider factors not enumerated in Section 209(b)(1)."). *See also* SCAQMD at 3 ("Because the 2013 waiver decision was not pending judicial review in 2019 and was a long-closed matter, the EPA could not rightfully reopen its adjudication.").

[133] Urban Air at 24 (citing *Civil Aeronautics Bd.* v. *Delta Air Lines*, 367 US 316, 321 (1961)).

[134] States and Cities at 8–9, 12.

[135] *Id.* at 22.

[136] *See, e.g.*, CEI at 11.

[137] States and Cities at 16–17.

[138] *Id.* at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[139] Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. EPA–HQ–OAR–2021–0257–0126 at 3; Twelve Public Interest Organizations app. 1 64–65; States and Cities at 20.

[140] SCAQMD at 7 (citing 86 FR at 22439 n.40).

[141] *See also Am. Methyl*, 749 F.2d 826, 835 (D.C. Cir. 1984) ("We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal."); *Mazaleski* v. *Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.") (quoting *Gratehouse* v. *United States*, 512 F.2d 1104, 1109 (Ct. Cl. 1975)); *Albertson* v. *FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("in the absence of any specific limitation," reconsideration available "within the period for taking an appeal"). *See generally* Daniel Bress, Note, Administrative Reconsideration, 91 VA. L. REV. 1737 (2005).

[142] S. Rep. No. 90–403, at 34 (1967).

[143] *See supra* Section III.B.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 79 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 23 of 53

**Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices **14349**

constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). It would be inappropriate and inconsistent with congressional intent for EPA to reconsider and withdraw a waiver on a ground outside the limited scope of those which Congress specified for EPA to consider when reviewing a waiver in the first place.[144] In the few instances where the Agency reconsidered prior waiver decisions prior to SAFE 1, EPA focused its review on the section 209(b) statutory waiver criteria.[145]

A circumscribed approach to reconsideration of waivers is consistent with the deference to California's policy judgment that Congress built into the waiver process.[146] Congress explicitly required that EPA "shall" grant the waiver unless one of three limited criteria are met. The use of the word "shall" (versus "may") was heavily debated by the enacting Congress, with the successful proponents of "shall" explaining that such language would "guarantee" that California could regulate with the burden placed on EPA to demonstrate why California should not be allowed to go beyond federal limitations.[147] Congress's legislative enactments since its creation of the waiver program—including adding section 177 to allow other states to adopt California's standards in 1977 and section 209(e)(2)(A) to create parallel deference for nonroad engines and vehicles in 1990—reinforce the important role it envisioned for, and deference it afforded to, California.[148]

In SAFE 1, EPA argued instead that deference to California was not merited where the Agency was interpreting its "own statute."[149] But in Title II of the Clean Air Act, Congress envisioned two standards—California and Federal.[150]

Congress recognized California's early attempts to address motor vehicle emissions intended to address its extraordinary environmental conditions as well as being a laboratory for motor vehicle emissions control.[151] Congress called for EPA deference to California in implementing section 209(b) by not only limiting EPA review of California waiver requests to three specific criteria but also instructing that EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[152] Similarly, "[t]he Administrator, . . . is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State."[153] Additionally, the D.C. Circuit has explained that "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight" and "[t]he statute does not provide for any probing substantive review of the California standards by federal officials."[154] Further, "[t]here is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial."[155] Thus, early in the waiver program's history, EPA explained the deference that Congress intended for the Agency's review of waiver requests by noting that it would feel constrained to approve a California approach to a problem that the EPA Administrator might not feel able to adopt at the federal level as a regulator. EPA explained that the balancing of risks and costs against potential benefits from reduced emissions is a central policy decision for any regulatory agency and substantial deference should be provided to California's judgement on such matters.[156]

In addition, limiting reconsideration of waivers undergirds Congress' intent that California would be a laboratory for the country driving emissions-reducing

technological innovation when it created the program in the first place. As the D.C. Circuit explained in *MEMA I*: "The history of congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation."[157] Indeed, broad authority to reconsider waiver grants could undermine the very structure that Congress built in Title II. Specifically, while EPA does not consider section 177 when reviewing waiver requests under section 209, Congress built a structure wherein EPA must grant California a waiver under section 209 unless one of the three statutory criteria are met, and then other states may adopt California's standards under section 177 as part of their overall air quality programs. Limited inherent authority to reconsider previously-granted waivers as described in this action is important to the success of Congress's structure.

Finally, even the sentence in the legislative history that suggests EPA has inherent reconsideration authority in the first place, and which SAFE 1 relied on for its assertion of inherent reconsideration authority, lends weight to the view that this authority is limited. According to the Senate report from the 1967 CAA amendments, the Administrator has "the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver."[158] That specific circumstance—where California does not comply with the conditions of a waiver—should not be expanded to include a gaping hole for discretionary administrative policy changes.

Given all of the above considerations, several principles emerge. EPA's authority to reconsider a grant of a waiver, which is an adjudicatory action by the Administrator, is not open-ended. Any reconsideration is constrained to the criteria that Congress set out in section 209(b). Even within those statutory criteria, considering all of the factors that weigh in favor of a narrow interpretation of the Agency's authority and the importance of not disrupting Congress's scheme, EPA believes reconsideration is limited to situations where the Agency has made

---

[144] *See MEMA I*, 627 F.2d at 1115 (noting that section 209(b) creates "a narrowly circumscribed proceeding requiring no broad policy judgments").

[145] EPA initiated reconsideration of certain motorcycle standards, under the third waiver prong, section 209(b)(1)(C), in order to "vacate that portion of the waiver previously granted under section 209(b)." 47 FR 7306, 7309 (February 18, 1982). EPA affirmed the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations." *Id.* at 7310.

[146] *See MEMA I*, 627 F.2d at 1124–25 (describing Congress's intent to defer to California's judgments regarding its motor vehicle program).

[147] H.R. Rep. No 90–728 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

[148] 40 FR 23104; 58 FR 4166.

[149] 84 FR at 51344 n.268.

[150] Motor vehicles are "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n* v. *EPA*, 88 F.3d 1075, 1079–80,

1088 (D.C. Cir. 1996) ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards.").

[151] *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

[152] H.R. Rep. No. 95–294, at 301–02 (1977).

[153] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381).

[154] *Ford Motor Co.* v. *EPA*, 606 F.3d 1293, 1297, 1300 (D.C. Cir. 1979).

[155] *Id.* at 1302.

[156] 40 FR at 23104.

[157] *MEMA I*, 627 F.2d at 110–11.

[158] S. Rep. No. 90–403, at 34 (1967).

Case 4:25-cv-04966-HSG  Document 247-1  Filed 08/12/26  Page 80 of 162
USCA Case #26-1218  Document #2187882  Filed: 08/11/2026  Page 24 of 53

**14350** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt.

Even if the bases for EPA's reconsideration did satisfy one of the foregoing conditions such that reconsideration may be appropriate, during that reconsideration EPA believes it should consider the passage of time and reliance interests. In the context of CAA waiver grants in general, and the 2013 ACC program waiver grant in particular, California is relying on its standards to meet short- and long-term emission reduction goals.[159] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[160] Several of these states incorporated these adopted standards into their SIPs.[161] Several automakers and industry groups have also indicated reliance on these standards.[162]

Reconsideration thus must carefully consider the factors noted and should not be undertaken where immense degrees of uncertainty are introduced in settled expectations of California, other states, and regulated industry or to allow for the continual questioning of EPA's decisions, thus impairing needed finality. Such reconsideration could frustrate congressional intent in designing the waiver program and ultimately discourage reliance by the recipient of EPA's waiver decision (CARB), states that may have adopted CARB's regulations under the terms of section 177 (and are permitted to enforce the regulations once EPA grants

a waiver to California) as well as the regulated industry.

We now turn to whether the reconsideration in SAFE 1 was a proper exercise of EPA's inherent reconsideration authority. As an initial matter, SAFE 1 did not assert that any clerical or factual error or mistake was made in the 2013 ACC program waiver. Nor did SAFE 1 point to any evidence showing that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. For example, SAFE 1 did not assert that California was not complying with the terms of the waiver. Instead, SAFE 1's reconsideration was premised on retroactive application of discretionary policy changes. Therefore, EPA believes it did not appropriately exercise its inherent authority in SAFE 1 to reconsider the prior ACC program waiver. Upon reconsideration, and as further shown in Sections V and VI, EPA now believes that SAFE 1 amounted to an improper exercise of the Agency's limited inherent authority to reconsider.[163]

SAFE 1 gave two primary reasons for withdrawing the 2013 ACC program waiver. Neither was an appropriate basis for reconsideration. First, SAFE 1 premised the revocation on its interpretation of the second waiver prong, section 209(b)(1)(B), that called for the Agency's scrutiny of specific standards under the waiver rather than California's program as a whole. As explained in detail in Section V of this final action, that statutory interpretation is flawed, and EPA does not believe a new statutory interpretation should be

the basis of reconsidering the grant of a waiver.

SAFE 1 premised the withdrawal of the ACC program waiver under section 209(b)(1)(B) on the perceived lack of record support on the causal link between GHG emission standards and air quality conditions in California.[164] Yet, the underlying record from the ACC program waiver, and the record of SAFE 1, have shown that CARB's ZEV sales mandate and GHG emission standards are designed to address California's serious air quality problems, including both its NAAQS pollutants and a variety of climate impacts from GHG emissions. As discussed in greater detail in Section V, EPA has since at least 2009 recognized that greenhouse gas pollution exacerbates criteria pollution, and climate change impacts on California's air quality conditions (e.g., heat exacerbation of ozone).[165] The ACC program was especially designed to

---

[159] States and Cities at 17–18.

[160] Id. at 17.

[161] Id. at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[162] E.g., Ford at 1; Tesla at n.5, 4; Rivian (as a member of NCAT) at 13–14.

[163] EPA acknowledges that, in the SAFE 1 proceedings, it had noted that at the time of proposal that CARB had given notice that it was considering amending its "deemed to comply" provision and that by the time of SAFE 1, California had entered into agreements with several automobile manufacturers to accept less stringent standards than the California program or the Federal standards as promulgated in 2012. As noted in SAFE 1, EPA believed that neither of these matters were necessary for EPA's action in SAFE 1, but that they provided further support for the action. 84 FR at 51334 n.230. By this action, EPA finds that neither of these matters amounted to a change in circumstances or conditions associated with the three waiver criteria and EPA's evaluation of the criteria in the ACC program waiver. EPA did not predicate its ACC program waiver on CARB's deemed-to-comply provision or any changes to the deemed-to-comply provision. (EPA does not take a position as to whether that provision has changed in its purpose as a result of CARB's 2018 amendment). Further, to the extent CARB utilized a deemed-to-comply provision or uses non-regulatory mechanisms to achieve its air quality objectives, this had no bearing on EPA's assessment of whether CARB has a need for its standards under the second waiver prong at the time of SAFE 1 or now.

[164] "California's approach in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified NOₓ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment." 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[165] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). CARB projected, for example, "reductions in NOₓ emissions of 3.1 tons per day in 2014 and one ton per day in 2020" in California. Id. at 46261. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

CARB also noted the scientific findings since EPA's 2009 GHG waiver including the report titled "Our Changing Climate 2012 Vulnerability &Adaptation to the Increasing Risks from Climate Change in California." The summary report highlights new insights for the energy, water, agriculture, public health, coastal, transportation, and ecological resource sectors that are vital to California residents and businesses. The study also predicts that peak concentrations of dangerous airborne particles will increase in the San Joaquin Valley because of climate change on wind patterns. This study provides further evidence of what is known as the "climate penalty," where rising temperatures increase ground-level ozone and health-damaging particles, despite the reductions achieved by successful programs targeting smog-forming emissions from cars, trucks, and industrial sources. Id. at 8–9. See also "The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment" Chapter 3 Air Quality Impacts—Key Finding ("Climate change will make it harder for any given regulatory approach to reduce ground-level ozone pollution in the future as meteorological conditions become increasingly conducive to forming ozone over most of the United States. Unless offset by additional emissions reductions, these climate-driven increases in ozone will cause premature deaths, hospital visits, lost school days, and acute respiratory symptoms.") at https://health2016.globalchange.gov/air-quality-impacts; Chapter 13: Air Quality, Fourth National Climate Assessment at https://nca2018.globalchange.gov/chapter/13/.

address both criteria and GHG pollution, including the effects of GHG pollution on criteria pollution in California.[166] As also further discussed in Section V, in SAFE 1 the Agency dismissed the criteria pollutant benefits of California's ZEV sales mandate requirements based on a snippet from the 2012 waiver request, taken out of context.[167] This was also remarkable considering EPA's prior waivers for ZEV sales mandate requirements that demonstrated criteria pollutant emissions reduction benefits.[168] The record also includes information that demonstrates that a withdrawal of the waiver for the GHG emission standards and ZEV sales mandate (and leaving the Federal GHG standards at the 2020 levels as proposed in SAFE) would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day.[169] In sum, EPA opted to elide the available ample technical support from the ACC program waiver proceedings. EPA's factual predicates in SAFE 1—that there was no criteria pollutant benefit of the GHG standards and ZEV sales mandate—for reconsideration based on the second waiver prong were simply inaccurate and inappropriate. Reconsideration was thus improper on this basis because there were no factual errors in the ACC program waiver and EPA should not be exercising authority to reconsider prior valid waivers that present no factual errors based on different statutory interpretations.

Second, SAFE 1 premised its revocation on NHTSA's finding of preemption under EPCA. This, too, was an inappropriate ground for reconsideration. As earlier noted, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). Preemption under EPCA is not one of these criteria and was not considered in CARB's ACC program

waiver request or in EPA's granting of that waiver. In fact, in its waiver grant, the Agency expressly found that consideration of preemption under EPCA would be inappropriate and unnecessary. In SAFE 1, the Agency did not premise its consideration of preemption under EPCA on any of the three statutory criteria. Therefore, EPA believes that SAFE 1 was not a proper exercise of the authority to reconsider on this basis, and any subsequent action in SAFE 1 to withdraw the ACC program waiver was inappropriate.

Although SAFE 1 was an inappropriate exercise of inherent authority given that the Agency did not correct a factual error and there was no change in factual circumstances so significant that the propriety of the waiver would be called into doubt, it is nevertheless relevant to note that SAFE 1 did not give appropriate consideration to the passage of time and the reliance interests that had developed between the granting and the revocation of the ACC program waiver. Several automakers and industry groups have also indicated reliance on these standards, as previously discussed.[170] California and section 177 states were, by the time of the reconsideration, into the long-term plans they had developed relying on the ACC program waiver standards.[171] California and other states

[166] 2012 Waiver Request at 1, 9–11, 15–17 ("[A]s detailed below, the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the federal standards that exist."). 78 FR at 2122 ([T]he ACC program will result in reductions of both criteria pollutants and GHG emissions.").

[167] 84 FR at 51337 (quoting CARB's statement that "[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions."). As explained in more detail below, this statement merely reflected how CARB attributed pollution reductions between its different standards and compliance mandates, not the reality of how those standards and mandates actually drive pollution reductions.

[168] 58 FR 4156. 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[169] States and Cities at 10.

[170] E.g., Ford at 1; Tesla at n.5, 4; Rivian (as a member of NCAT) at 13–14. EPA notes that it received limited comment on whether reliance interests had formed since the issuance of SAFE 1 but nothing to demonstrate error in the findings regarding section 209(b)(1)(C) made within the ACC program waiver. See Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production."). Further, as discussed elsewhere, the short passage of time since the promulgation of SAFE 1 and ongoing litigation over that action has, as automakers have noted in that briefing, prevented automakers from relying on the waiver revocation. See also Twelve Public Interest Organizations at 11 (noting filings by automakers suggesting lack of reliance on the waiver withdrawal).

[171] E.g., States and Cities at 17 (the length between the waiver grant and reconsideration was too long "by any measure."); Twelve Public Interest Organizations at app. 36. EPA acknowledges the commenter who argued that "timeliness depends on reliance interests" and, because the standards were not final before the MTE, the time period at issue is the four months between the MTE and the SAFE 1 proposal. Urban Air at 24. EPA also received comment that disagreed with this accounting of time stating that timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. E.g., Am. Methyl, 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations app. 1 at 38. EPA believes it is not necessary to resolve the

rely on waivers that EPA has approved to meet short- and long-term emission reduction goals.[172] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[173] Several of these states incorporated these adopted standards into their SIPs.[174]

SAFE 1 barely mentioned these reliance interests, explaining only that the Agency "will consider whether and how to address SIP implications of this action, to the extent that they exist, in separate actions; EPA believes that it is not necessary to resolve those implications in the course of this action." [175] EPA now believes that,

permissible amount of time, or the existence or lack of a bright line, that may pass before reconsideration of its prior adjudication is no longer appropriate. However, EPA did not "condition" its ACC program waiver on any subsequent actions, including the MTE, which explicitly applied to the federal standards. See 78 FR at 2137. EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA. As for the inclusion of the deemed-to-comply provision in the California standards, California provided documentation demonstrating that the deemed-to-comply provision was reliant upon the federal standards having a certain level of stringency, a fact that EPA had recognized. See States and Cities at 18–19 n. 14, 57–60. EPA found that the California standards were feasible even without the deemed-to-comply provision, 78 FR at 2138, making it irrelevant to the waiver grant. California's own actions with respect to its standards, such as its independent review of the ACC program, cannot disturb California's or other state's reliance on the federal waiver.

[172] States and Cities at 17–18.

[173] Id. at 17.

[174] Id. at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[175] Id. at 51324 n.167.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 82 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 26 of 53

**14352**　**Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

when exercising its inherent authority to reconsider the 2013 waiver decision, it was inappropriate to ignore these possible reliance interests and to "resolve" any potential implications at a later time. In the SAFE 1 context, while it was not necessary to resolve the status of every SIP, it was inappropriate to not even consider the reliance interests raised by the adoption of California standards by section 177 states (including, but not limited to, their adoption into SIPs). EPA has consistently recognized the importance of long-term planning in the attainment and maintenance of NAAQS.[176] Given the long-term nature of these plans, it is "challenging (if not impossible) to change them quickly," and any changes in one part of a SIP can affect multiple sectors of the economy.[177]

As noted above, EPA also received other comments regarding reliance interests, including those noting that the midterm evaluation (MTE) was an indication that the technological feasibility of the GHG emission standards was not a settled matter and hence no certainty or reliance could accrue. EPA, however, did not "condition" its ACC program waiver on any subsequent actions, including the

---

[176] EPA is responsible for approving SIPs and SIP amendments, which span years. See, e.g., 82 FR 42233 (September 7, 2017) (approval of Maine's SIP revision including updates to be consistent with California's updated LEV program); 80 FR 13768 (March 17, 2015) (approval of Connecticut's SIP revision, including the adoption of elements of California's LEV program). For example, states with areas that achieve attainment for any air pollutant must submit for EPA approval a revised SIP that sets out the State's plan for maintaining attainment for at least ten years after the redesignation. At the end of that ten-year period, the State must submit another ten-year maintenance plan to EPA for approval. 42 U.S.C. 7505a.

[177] Twelve Public Interest Organizations app. 1 at 29, 30. Several states also commented, during this reconsideration, that they rely on the California GHG standards and ZEV sales mandate to reach their own state emission reduction goals. E.g., Connecticut at 2 ("Reducing GHG emissions from the transportation sector is required to achieve Connecticut's economy-wide targets of at least 45 percent below 2001 levels by 2030 and 80 percent below 2001 levels by 2050, as required by the 2008 Global Warming Solutions Act (GWSA) and the 2018 Act Concerning Climate Change Planning and Resiliency."); Minnesota at 2 ("[California's standards] are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants, especially in communities of color and lower-income communities, which are disproportionately impacted by vehicle pollution. The MPCA found that these rules are needed to address GHG emissions in our state and take steps towards achieving Minnesota's statutory Next Generation Energy Act GHG reduction goals. On May 7, 2021, an independent Administrative Law Judge affirmed the MPCA findings."); Maine at 1 n.3 ("Maine statute at 38 M.R.S 576–A establishes tiered GHG emission reduction requirements culminating in gross annual reductions of at least 80% from 1990 baseline levels.").

MTE.[178] EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA.

EPA's historic practice of properly affording broad discretion to California has meant that in almost fifty years of administering the California waiver program the Agency had never withdrawn any waiver prior to SAFE 1. And while SAFE 1 cited prior reconsideration actions as support for the Agency's authority to reconsider prior waiver decisions, as previously noted, EPA has historically limited reconsideration of prior waived standards to statutory criteria and most important, none of these prior reconsideration actions resulted in a revocation.[179] As further shown in Sections V and VI, SAFE 1 was the result of a "probing substantive review of the California standards," with the Agency substituting its own judgment for California's contrary to both congressional exhortation of deference to California and the Agency's review practice.

This present reconsideration is an appropriate exercise of the Agency's reconsideration authority. It is not at all clear that the reasons for limiting reconsideration of waiver grants apply to the same degree to reconsideration of waiver denials and withdrawals. However, EPA need not resolve the question in this action, because this action falls well within the bounds of even the limited authority this action concludes the Agency possesses for reconsideration of waiver grants. First, this action corrects factual errors made in the SAFE 1 waiver withdrawal. Specifically, even under SAFE 1's flawed interpretation of section 209(b)(1)(B), SAFE 1 ignored facts demonstrating that California does need the specific standards at issue to meet compelling and extraordinary

---

[178] See 78 FR at 2137.

[179] See, e.g., 43 FR at 7310 (affirming the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations.").

conditions. Second, in this reconsideration EPA properly constrains its analysis to whether SAFE 1 made one of the three statutory findings necessary to deny a waiver. Third, this reconsideration is timely with respect to the finalization of SAFE 1 and limited, if any, reliance interests have developed as a result of SAFE 1 (which has been subject to judicial review since its promulgation).

### C. Conclusion

In SAFE 1, EPA inappropriately exercised its limited inherent authority to reconsider the ACC program waiver for several reasons. EPA believes its exercise of reconsideration authority to reinterpret the language of section 209(b)(1)(B) was not taken to correct any factual or clerical error or based upon factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, as discussed in detail in Section V, it was based upon a flawed statutory interpretation and a misapplication of the facts under that interpretation. Likewise, EPA's decision to reconsider the ACC program waiver based on NHTSA's rulemaking within SAFE 1, which raised issues beyond the statutory waiver criteria, was inappropriate. For these reasons EPA now believes it is appropriate to rescind its actions within SAFE 1.

### V. The SAFE 1 Interpretation of Section 209(b)(1)(B) was Inappropriate and, in any Event, California met its Requirements

Even if SAFE 1's reconsideration of the 2013 program waiver grant was appropriate, EPA concludes for two independent reasons that its waiver withdrawal in SAFE 1 based upon its new statutory interpretation was flawed. First, EPA concludes that the SAFE 1 interpretation of the second waiver prong was not an appropriate reading of that second waiver prong, section 209(b)(1)(B). It bears noting that the traditional interpretation is, at least, the better interpretation. Informed by but separate from the factual analysis discussed next, the Agency finds that the new interpretation set out in SAFE 1 was inconsistent with congressional intent and contrary to the purpose of section 209(b). Under the traditional interpretation of the second waiver prong, California's need for its own motor vehicle program, including its GHG emission standards and ZEV sales mandate, to meet compelling and extraordinary conditions is clear and the

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 83 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 27 of 53

*Federal Register* / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices    **14353**

waiver should not have been withdrawn.

Second, even if the interpretation in SAFE 1 were appropriate, EPA concludes that SAFE 1 incorrectly found that California did not have a need for its specific standards. EPA has evaluated California's need for both requirements by applying both the traditional and the SAFE 1 interpretations of section 209(b)(1)(B). In doing so, EPA reviewed the record from the ACC program waiver proceedings, including CARB's ACC program waiver request and supporting documents, as well as the comments received as part of the SAFE 1 proceeding and the comments received under the present reconsideration of SAFE 1.[180] The record review focused on salient pronouncements and findings in the ACC program waiver decision, such as the relationship of both criteria and GHG pollutants and the impacts of climate change on California's serious air quality conditions. For example, the effects of climate change and the heat exacerbation of tropospheric ozone is well established. California's ACC program is established, in part, to address this. California's program, including its GHG emission standards, is also designed to address upstream criteria emission pollutants. The review did so primarily because SAFE 1 premised the withdrawal of the GHG standards at issue on the lack of a causal link between GHG standards and air quality conditions in California. The review included EPA's prior findings regarding heat exacerbation of ozone, a serious air quality issue recognized by EPA as presenting compelling and extraordinary conditions under the second waiver prong.

On completion of this review, EPA finds no basis for discounting the ample record support on California's need for both the GHG standards and the ZEV sales mandate to address compelling and extraordinary conditions in California when using both the traditional and SAFE 1 interpretation to the second waiver prong. Additionally, because of the way CARB's motor vehicle emission standards operate in tandem and are designed to reduce both criteria and GHG pollution and the ways in which GHG pollution exacerbates California's serious air quality problems, including the heat exacerbation of ozone, the Agency in SAFE 1 should not have evaluated California's specific "need" for GHG standards. In sum, in reconsidering SAFE 1, and after having now reviewed and evaluated the complete factual record, EPA reaffirms that California needs the GHG standards and ZEV sales mandate at issue to "meet compelling and extraordinary conditions."

*A. Historical Practice*

Under section 209(b)(1)(B), EPA shall not grant a waiver if California "does not need such State standards to meet compelling and extraordinary conditions." For nearly the entire history of the waiver program, EPA has read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate," in the root paragraph of section 209(b)(1), which calls for California to make a protectiveness finding for its standards. EPA has interpreted the phrase "in the aggregate" as referring to California's program as a whole, rather than each State standard, and as such not calling for the Agency's standard-by-standard analysis of California's waiver request.[181] EPA has thus reasoned that both statutory provisions must be read together so that the Agency reviews the same standards that California considers in making its protectiveness determination and to afford California discretion.[182] The D.C. Circuit has also stated that "[t]he expansive statutory language gives California (and in turn EPA) a good deal of flexibility in assessing California's regulatory needs. We therefore find no basis to disturb EPA's reasonable interpretation of the second criterion."[183]

In addressing the Agency's reading of section 209(b)(1)(B), for example, in the 1983 LEV waiver request EPA explained that:

This approach to the "need" criterion is also consistent with the fact that because California standards must be as protective as Federal standards in the aggregate, it is permissible for a particular California standard or standards to be less protective than the corresponding Federal standard. For example, for many years, California chose to allow a carbon monoxide standard for passenger cars that was less stringent than the corresponding Federal standard as a "trade-off" for California's stringent nitrogen oxide standard. Under a standard of review like that proposed by MVMA/AIAM, EPA could not approve a waiver request for only a less stringent California standard because such a standard, in isolation, necessarily could be found to be contributing to rather than helping, California's air pollution problems.[184]

In 1994, EPA again had cause to explain the Agency's reading of section 209(b)(1)(B) in the context of California's particulate matter standards waiver request:

[T]o find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could 'include some less stringent than the corresponding federal standards.' See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977). Congress could not have given this flexibility to California and simultaneously assigned to the state the

---

[180] EPA notes that it reviewed the factual record within the ACC program waiver proceeding and finds there was no factual error in its evaluation of whether CARB's standards satisfied the second waiver prong. EPA also notes, merely as confirming the finding it made at the time of the ACC program waiver but not for purposes of making a new factual finding from that made at the time of the ACC program waiver decision, that the record and information contained in the SAFE 1 proceeding as well as the record and information contained in the Agency's reconsideration of SAFE 1 (including late comments submitted during the SAFE 1 proceeding and, in some cases, resubmitted during the Agency's reconsideration of SAFE 1) at each point in time clearly demonstrates the need of California's standards (whether evaluated as a program or as specific standards) to meet compelling and extraordinary conditions within California.

[181] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[182] 74 FR at 32751 n. 44;.32761 n.104. EPA cited *Entergy Corp.* v. *Riverkeeper, Inc.*, 129 S. Ct. 1498 (2009) ("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts"), and *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844 (1984).) ("It seems to us, therefore, that the phrase "best available,"' even with the added specification "for minimizing adverse environmental impact,"' does not unambiguously preclude cost-benefit analysis."). *See also* 78 FR at 2126–2127 n. 78.

[183] *Am. Trucking Ass'n* v. *EPA*, 600 F.3d 624, 627 (D.C. Cir. 2010) (*ATA* v. *EPA*). *See also Dalton Trucking* v. *EPA*, No. 13–74019 (9th Cir. 2021) ("The EPA was not arbitrary and capricious in declining to find that 'California does not need such California standards to meet compelling and extraordinary conditions,' § 7543(e)(2)(A)(ii), under the alternative version of the needs test, which requires 'a review of whether the Fleet Requirements are per se needed to meet compelling and extraordinary conditions,' 78 FR at 58,103. The EPA considered 'the relevant factors,' *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co., Inc.*, 463 U.S. 29, 42–43 (1983), including statewide air quality, 78 FR 58,104, the state's compliance with federal National Ambient Air Quality standards for ozone and PM$_{2.5}$ on a statewide basis, *id.* at 58,103–04, the statewide public health benefits, *id.* at 58,104, and the utility of the Fleet Requirements in assisting California to meet its goals, *id.* at 58,110. Contrary to Dalton's argument, the EPA did not limit its review to two of California's fourteen air quality regions. The EPA examined the relevant data provided by CARB, and it articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.' *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43, 103 S.Ct. 2856 (cleaned up).").

[184] 58 FR 4166, LEV Waiver Decision Document at 50–51.

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 84 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 28 of 53

**14354** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard.[185]

Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for EPA review of California's whole program. With two noted exceptions described below, EPA has consistently interpreted this provision as requiring the Agency to consider whether California needs a separate motor vehicle emission program as compared to the specific standards in the waiver request at issue to meet compelling and extraordinary conditions.

Congress intended to allow California to address its extraordinary environmental conditions and foster its role as a laboratory for motor vehicle emissions control. The Agency's long-standing practice therefore has been to evaluate CARB's waiver requests with the broadest possible discretion to allow California to select the means it determines best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[186] EPA notes that "the statute does not provide for any probing substantive review of the California standards by federal officials." [187]

As a general matter, EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[188] As discussed in Section II, there have only been two exceptions to this practice: one in 2008 and one in 2019. In 2008, EPA for the first time analyzed California's waiver request under an alternative approach and denied CARB's waiver request. EPA concluded that section 209(b) was intended to allow California to promulgate state standards applicable to emissions from new motor vehicles to address air pollution problems that are local or regional, but that section 209(b)(1)(B) was not intended to allow California to promulgate state standards for emissions from new motor vehicles designed to address global climate change problems. Or, in the alternative,

EPA concluded that effects of climate change in California were not compelling and extraordinary compared to the effects in the rest of the country.[189] EPA rejected this view a little over a year later in 2009 by applying the traditional interpretation in granting California's waiver request for the same GHG standard, finding no support in the statute or congressional intent for the alternative application of the statute.[190]

In evaluating the ACC program waiver in 2013, EPA applied the traditional interpretation to the ACC program waiver request and found that the Agency could not deny the waiver request under the second waiver prong.[191] Further, without adopting the alternative interpretation that had been applied in the 2008 GHG waiver denial, EPA assessed California's need for the GHG standards at issue and found that the Agency could not deny the ACC program waiver request, even applying the alternative interpretation. EPA noted that to the extent that it was appropriate to examine the CARB's need for the GHG standards at issue to meet compelling and extraordinary conditions, the Agency had discussed at length in the 2009 GHG waiver decision that California has compelling and extraordinary conditions directly related to regulations of GHGs.[192] Similarly,

[189] 73 FR at 12160–64.

[190] 74 FR at 32744, 32746, 32763 ("The text of section 209(b) and the legislative history, when viewed together, lead me to reject the interpretation adopted in the March 6, 2008 Denial, and to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems and protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. EPA concluded that even under this alternative approach California GHG standards were intended at least in part to address a local or regional problem because of the 'logical link between the local air pollution problem of ozone and GHG.'").

[191] 78 FR at 2129 ("CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. As discussed above, the term compelling and extraordinary conditions 'does not refer to the levels of pollution directly.' Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. California still faces such conditions.").

[192] Id. at 2129–30.

EPA explained that to the extent it was appropriate to examine California's need for the ZEV sales mandate, these requirements would enable California to meet both air quality and climate goals into the future.[193] Additionally, EPA recognized CARB's coordinated strategies reflected in the technologies envisioned to meet the ACC program requirements and in turn addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[194]

[193] Id. at 2129 ("[A]s EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that "Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems." (footnotes omitted)).

[194] Id. at 2130–31 ("As CARB notes in its waiver request, the goal of the CARB Board in directing CARB staff to redesign the ZEV regulation was to focus primarily on zero emission drive—that is BEV, FCV, and PHEVs in order to move advanced, low GHG vehicles from demonstration phase to commercialization. CARB also analyzed pathways to meeting California's long term 2050 GHG reduction targets in the light-duty vehicle sector and determined that ZEVs would need to reach nearly 100 percent of new vehicle sales between 2040 and 2050. CARB also notes that the "critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements. . . . The Vision for Clean Air effort illustrates that in addition to the cleanup of passenger vehicles (at issue here) as soon as possible as required in the LEV III regulation, transition to zero- and near-zero emission technologies in all on- and off-road engine categories is necessary to achieve the coordinated goals. Therefore, EPA believes that CARB's 2018 and later MY ZEV standards represent a reasonable pathway to reach these longer term goals. Under EPA's traditional practice of affording CARB the broadest discretion possible, and deferring to CARB on its policy choices, we believe there is a rational connection between California ZEV standards and its attainment of long term air quality goals. Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve

[185] 49 FR at 18887, 18890.

[186] See, e.g., S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

[187] Ford Motor Co., v. EPA, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[188] 74 FR at 32763–65; 76 FR 34693; 79 FR 46256; 81 FR 95982.

The only other exception to the application of the traditional interpretation was in SAFE 1, when EPA again used a standard-specific level of review and focused on California's need for GHG standards at issue under the waiver. There, EPA posited that section 209(b)(1)(B) called for a "particularized nexus" for California's motor vehicle standards: "Congress enacted the waiver authority for California under section 209(b) against the backdrop of traditional, criteria pollutant environmental problems, under which all three links in this chain bear a particularized nexus to specific local California features: (1) Criteria pollutants are emitted from the tailpipes of the California motor vehicle fleet; (2) those emissions of criteria pollutants contribute to air pollution by concentrating locally in elevated ambient levels, which concentration, in turn; (3) results in health and welfare effects (*e.g.*, from ozone) that are extraordinarily aggravated in California as compared to other parts of the country, with this extraordinary situation being attributable to a confluence of California's peculiar characteristics, *e.g.*, population density, transportation patterns, wind and ocean currents, temperature inversions, and topography."[195] As support for the nexus test, EPA, for the first time in waiver decisions, relied on section 202(a) and its own terms of authority to inform interpretation of the second waiver prong.[196] In addition, EPA relied on legislative history to interpret "compelling and extraordinary" conditions as a reference to "peculiar local conditions" and "unique problems" in California.[197]

Accordingly, EPA reasoned that California must demonstrate "compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards."[198]

In SAFE 1, EPA then posited that the nexus test should be applied to California's GHG standards specifically, rather than California's program "as a whole" under the traditional "aggregate" approach, "to ensure that such standard is linked to local conditions that giv[e] rise to the air pollution problem, that the air pollution problem is serious and of a local nature, and that the State standards at issue will meaningfully redress that local problem."[199] As support for the GHG-specific scrutiny, EPA reasoned that "[t]he Supreme Court's opinion in *UARG* v. *EPA*, 134 S. Ct. 2427 (2014), instructs that Clean Air Act provisions cannot necessarily rationally be applied identically to GHG as they are to traditional pollutants."[200]

Applying the nexus test, EPA concluded that California did not need its GHG standards to meet "compelling and extraordinary conditions" because they were missing a particularized nexus to specific local features. EPA in the alternative posited that "even if California does have compelling and extraordinary conditions in the context of global climate change, California does not 'need' these standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problem of the sort associated with GHG emissions."[201] EPA also dismissed the 2009 GHG waiver conclusion on deleterious effects of GHG emissions on ozone (*e.g.*, how increases in ambient temperature are conducive to ground-level ozone formation), stating that such a relationship "does not satisfy this requirement for a particularized nexus, because to allow such attenuated effects to fill in the gaps would eliminate the function of requiring such a nexus in the first place."[202]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

In the Notice of Reconsideration of SAFE 1, EPA noted its interest in any new or additional information or comments regarding whether it

appropriately interpreted and applied section 209(b)(1)(B) in SAFE 1. The Agency noted that EPA's finding in SAFE 1, that such standards were only designed to address climate change and a global air pollution problem, led EPA to a new interpretation of section 209(b)(1)(B). EPA solicited views on whether it was permissible to construe section 209(b)(1)(B) as calling for a consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue as well as California's specific standards where GHG standards are at issue.

The Notice of Reconsideration also set forth that EPA's decision to withdraw the ACC program waiver as it relates to California's ZEV sales mandate was based on the same new interpretation and application of the second waiver prong and rested heavily on the conclusion that California only adopted the ZEV sales mandate requirement for purposes of achieving GHG emission reductions. EPA recognized that this conclusion in turn rested solely on a specific reading of a single sentence in CARB's ACC program waiver request.[203] EPA requested comment on these specific conclusions and readings as well as whether the withdrawal of the ACC program waiver, within the context of California's environmental conditions and as applied to the GHG standards and ZEV sales mandate requirement, was permissible and appropriate.

### C. Comments Received

EPA received multiple comments on its decision to evaluate California's need for its GHG standards separate from its need for a separate motor vehicle emission program as a whole. Some commenters agreed that EPA could evaluate waiver requests for the specific GHG standards under the waiver along the lines of the Agency's pronouncements in SAFE 1. Additionally, commenters pointed to the method of EPA's review in SAFE 1—evaluating the standards individually, as they are received, rather than in the aggregate—as evidence of the flaw in the traditional interpretation.[204] Some commenters also echoed SAFE 1's concern that "once EPA had determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the

---

such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions." (footnote omitted)).

[195] 84 FR at 51339.

[196] *Id.* at 51339–40.

[197] *Id.* at 51342 (quoting S. Rep. No. 403, 90th Cong. 1st Sess., at 32 (1967)) ("Congress discussed 'the unique problems faced in California as a result of its climate and topography.' H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). *See also* Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. *See, e.g.,* Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. As explained at proposal, Congress focus was on California's ozone problem, which is especially affected by local conditions and local pollution. *See* Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), *id.*, at 30942. *See also, MEMA I,* 627 F.2d 1095, 1109 (D.C. Cir. 1979) (noting the discussion of California's 'peculiar local conditions' in the legislative history). In sum and as explained at proposal, conditions that are similar on a global scale are not 'extraordinary,' especially where 'extraordinary' conditions are a predicate for a local deviation from national standards, under section 209(b). 83 FR 43247.").

[198] *Id.*

[199] *Id.* at 51345.

[200] *Id.* at 51340.

[201] *Id.* at 51349.

[202] *Id.*

[203] *Id.* at 51330 ("Regarding the ACC program ZEV mandate requirements, CARB's waiver request noted that there was no criteria emissions benefit in terms of vehicle (tank-to-wheel—TTW) emissions because its LEV III criteria pollutant fleet standard was responsible for those emission reductions.").

[204] CEI at 13–14.

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 86 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 30 of 53

**14356**    Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

discretion to determine that California did not need any subsequent standards."[205]

Under this analysis of the specific standards at issue under the waiver, these commenters continued, California could not demonstrate that its GHG and ZEV standards were, on their own, compelling and extraordinary. These commenters agreed with SAFE 1's "particularized nexus" interpretation of "compelling and extraordinary," arguing that the words required unique consequences in order to give adequate meaning to the words themselves and in order to overcome equal sovereignty implications.[206] Using this interpretation, these commenters concluded that, because "GHG concentrations are essentially uniform throughout the globe, and are not affected by California's topography and meteorology," and because the entire nation would be affected by climate change, neither the effects of the regulations on climate change, nor the impacts of climate change on California could be considered "compelling and extraordinary."[207] Some commenters also argued that these standards were unnecessary given California's "deemed to comply" provision, which would theoretically allow all automobile manufacturers to comply with California's standards by meeting the less stringent Federal GHG standards.[208]

In contrast, other commenters asked that EPA reverse its SAFE 1 section 209(b)(1)(B) determination by reverting to EPA's long-standing "program-level" approach to the "need" inquiry, where "EPA considers California's need for its own mobile-source-emissions program as a whole, not whether California needs a particular standard for which it has requested a waiver."[209] These

commenters noted the long tradition of interpreting California's need in the aggregate, an interpretation that SAFE 1 acknowledged was reasonable.[210] This interpretation, they argued, best aligned with the text, legislative history, and purpose of the waiver program.[211] For example, some commenters argued that, because feasibility was evaluated under an aggregate approach, it would be unreasonable for California's need for the program to be evaluated under a more restrictive approach.[212] These commenters also argued that Congress had expressed approval of this aggregate approach, citing legislative history from 1977 and 1990.[213] This approach, they continued, aligns with the Waiver Program's broad deference to California to create an entire regulatory program, which is comprised of regulations that interact with and affect each other.[214] One commenter also responded directly to the question EPA posed in its Notice of Reconsideration, whether it was "permissible for EPA to construe section 209(b)(1)(B) as calling for consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue and consideration of California's individual standards where GHG standards are at issue."[215] According to the commenter, "The Supreme Court has rejected this 'novel interpretive approach' of assigning different meanings to the same statutory text in the same provision, depending on the application, because it 'would render every statute a chameleon.'"[216]

These commenters also asked EPA to revert to the traditional interpretation of "compelling and extraordinary" instead of SAFE 1's "particularized nexus" formulation. Commenters noted the SAFE 1 requirement appears nowhere in the text of the statute.[217] Because of this absence, they continued, EPA's references to the legislative history from 1967 have no "tether" to the statutory text and cannot justify the nexus requirement.[218] Further, commenters argued that EPA's reliance on the equal sovereignty doctrine improperly informed how EPA should interpret the phrase "compelling and extraordinary conditions" in the second waiver prong, and therefore requiring such conditions to be sufficiently different or unique among states, was inappropriate.[219] Commenters argued that the equal sovereignty doctrine was inapplicable to the second waiver prong. They explained that the Supreme Court has only applied the "rarely invoked" doctrine of equal sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.'"[220] Congress's exercise of its Commerce Clause power in regulating air pollution from new motor vehicles, commenters continued, is not such an "intrusion." Moreover, they wrote, applying the equal sovereignty doctrine in this instance would actually "diminish most States' sovereignty" because it would "reduce the regulatory options available to California and to other [section 177] States." This diminished sovereignty, they argued, would not "enhance[e] the sovereignty of any State" or "alleviate" any unjustified burden because "Section 209(b)(1) imposes no such burden."[221]

---

[205] 84 FR at 51341. *See, e.g.,* NADA at 5; Urban Air at 25, 29–33; AFPM at 22–23.

[206] AFPM at 12; Urban Air at 4.

[207] CEI at 14–16 ("The resulting "global pool" of GHG emissions is not any more concentrated in California than anywhere else . . . [E]ven if one assumes "compelling and extraordinary conditions" can refer to climate change impacts, such as heat waves, drought, and coastal flooding, California's vulnerability is not "sufficiently different" from the rest of the nation to merit waiving federal preemption of state emission standards. Thus, California is not "extraordinary" in regard to either the "causes" of the "effects" of global climate change."); NADA at 5 ("while vehicle GHG emissions also were, by definition, local, their impact on serious local air quality concerns could not be shown."); AFPM at 11–14 ("Neither the causes nor effects of GHG emissions are compelling and extraordinary conditions, as they are global rather than local conditions, and California's GHG standards and ZEV mandate will not meaningfully address the causes or effects of these GHG emissions.").

[208] NADA at 4–5; Urban Air at 33.

[209] States and Cities at 22 n.16.

[210] Twelve Public Interest Organizations at 7 ("The Trump EPA in turn acknowledged that this longstanding interpretation of Section 209(b)(1)(B) was a reasonable one, 84 FR at 51,341 . . . .").

[211] States and Cities at 22 (citing 84 FR at 51341); Tesla at 11 ("The plural reference to 'such State standards' requires that the standards be considered in the aggregate as a group. This language stands in stark contrast to alternate phrasing that was available to Congress and that would have permitted a non-aggregate determination, such as: 'such State does not need a State standard to meet compelling and extraordinary conditions.' Indeed, alternative language referencing individual standards is present in subsection (b)(2), which references 'each State standard.'").

[212] States and Cities at 25–26; Twelve Public Interest Organizations at 8 ("An aggregate approach to the consistency inquiry also makes sense under Section 209(b)(1)(C) because technological feasibility is effectively evaluated on a program basis. The feasibility of a new standard cannot be evaluated on its own if there are interactions with pre-existing standards. Such interactions between standards are what prompted Congress to add the "in the aggregate" phrase to section 209 in the first place.").

[213] States and Cities at 26–27; Ozone Transport Commission (OTC), Docket No. EPA–HQ–OAR–2021–0257–0283 at 4.

[214] States and Cities at 27–28.

[215] 86 FR at 22429.

[216] States and Cities at 24 (quoting *Clark* v. *Martinez,* 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos,* 553 U.S. 507, 522 (2008); *U.S. Dep't of*

the Treasury v. *FLRA,* 739 F.3d 13, 21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply "for all types of air pollutants" but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And "only two sentences later," EPA acknowledged that its review under this second prong would change "depending upon which 'air quality concerns' were implicated." *Id.*

[217] States and Cities at 34 (noting the lack of the words "nexus," "particularized," "peculiar," and "local" anywhere in sections 209(b) or 202(a)(1)).

[218] *Id.* at 35.

[219] *Id.* at 41–43; Twelve Public Interest Organizations at 4–6.

[220] States and Cities at 42 (quoting *Shelby Cnty.* v. *Holder,* 570 U.S. 529, 535, 545 (2013)).

[221] *Id.* at 43; Twelve Public Interest Organizations at 5 ("Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs").

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 87 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 31 of 53

*Federal Register* / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

**14357**

Similarly, commenters rebutted SAFE 1's use of words like "peculiar" and "unique" to further define "compelling and extraordinary." These words, they noted, appear nowhere in the text of section 209(b)(1)(B) and do not align with the plain meaning of the word "extraordinary." [222] Further, they argued, this narrow interpretation "would render the waiver provision unworkable" as, "for any given air pollutant, it is possible to identify other areas of the country that suffer from a similar pollution problem." [223] In fact, they continued, this argument was rejected in the 1967 legislative history and in 1984, "when EPA thoroughly rebutted the assertion that California could not receive a waiver if individual pollutant levels were 'no worse than some other areas of the country.' " [224] Moreover, they argued, the existence of section 177 necessarily acknowledges that other states may have the same or similar air pollution problems as California.[225]

Other commenters argued that California needed GHG standards to address "compelling and extraordinary" conditions in California even under the SAFE 1 interpretation of the second waiver prong. These commenters argued that GHG and ZEV standards produce both GHG and criteria pollution benefits, pointing to language in the ACC program waiver that acknowledged these dual benefits and to subsequent SIP approvals that incorporated the California standards in order to achieve criteria emission reductions.[226] In

particular, commenters explained that the 2012 California waiver request established that the ZEV standard would reduce criteria pollution both "by reducing emissions associated with the production, transportation, and distribution of gasoline" and "by driving the commercialization of zero-emission-vehicle technologies necessary to reduce future emissions and achieve California's long-term air quality goals." [227] As for the GHG standards, commenters noted that, as acknowledged in the ACC program waiver, "global warming exacerbates criteria pollution and makes it harder to meet air pollution standards." [228] Thus, they argue, "EPA expressly and improperly limited its Determination to consideration of the 'application of section 209(b)(1)(B) to California's need *for a GHG climate program.*" [229] Given EPA's consistent acceptance that "California's criteria pollution 'conditions' are 'extraordinary and

compelling' and that the record demonstrates that California's GHG and ZEV standards reduce criteria emissions in California," EPA should "reverse its SAFE 1 section 209(b)(1)(B) determination and the waiver withdrawal that rested on it—regardless of whether EPA reverts to its traditional, program-level approach." [230]

Regardless of the emissions benefits of the standards, some commenters argued that California's plan to address both long-term and short-term climate and criteria pollutant reduction goals is entitled to deference. Thus, even if "the mandate truly added nothing to the emission benefits of California's standards for vehicular emissions of criteria and greenhouse gas pollutants," commenters claimed, "the mandate would simply constitute the State's choice of means for automakers to comply with its standards." [231] These commenters further argued that section 209(b)(1)(B) "does not authorize EPA to inquire into whether the means to comply with California emission standards, as opposed to the actual standards themselves, are needed to meet compelling and extraordinary conditions." [232] Commenters also claimed that EPA's argument, that California cannot need the GHG and ZEV standards because those standards alone would not "meaningfully address global air pollution problems" posed by climate change, "lacks merit" and "is illogical." [233] Such an approach, they

---

[222] States and Cities at 38–39 (explaining that the existence of those words in the legislative history "simply highlight that Congress did *not* codify [them] in Section 209(b)(1)(B)" and that plain meaning of "extraordinary" is "out of the ordinary"); Twelve Public Interest Organizations app. 1 at 49 ("Congress understood, even in 1967, that '[o]ther regions of the Nation may develop air pollution situations related to automobile emissions which will require standards different from those applicable nationally.' S. Rep. No. 90–403, at 33.").

[223] Tesla at 9.

[224] *Id.* (quoting 49 FR at 18887, 18891) (stating that EPA explained that "there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted.")).

[225] Twelve Public Interest Organizations app. 1 at 49; States and Cities at 38–39.

[226] States and Cities at 9–14, 30–31; Center for Biological Diversity, Docket No. EPA–HQ–OAR–2021–0257–0358 at 2 ("The Trump EPA improperly separated California's need for greenhouse gas regulations from its need for criteria pollutant standards. In reality, these two goals are tightly linked, and both are critical to the Clean Air Act's goals of safeguarding public health and welfare."); San Joaquin Valley Air Pollution Control District (SJVAPCD), Docket No. EPA–HQ–OAR–2021–0257–0105 at 3 ("The District's *2016 Plan for the 2009 9-Hour Ozone Standard* adopted June 16, 2016, and *2018 Plan for the 1997, 2006, and 2012 PM 2.5 Standards*, adopted November 15, 2018, both rely on emission reductions from California's Advanced

Clean Cars regulation and other mobile source measures to support the Valley's attainment of the federal health-based NAAQS."); NCAT at 11 ("In addition, California's ZEV standards are intended to and do achieve significant incremental reductions of NOx and other non-GHG emissions."); Tesla at 10–11 ("In comments submitted to the EPA in 2009 regarding a preemption waiver, [California] explained that it 'specifically designed its GHG standards for criteria pollutants.' It also emphasized that it has 'frequently referenced the science to support GHG standards as a necessary method for controlling ozone and particulate matter pollution' and has 'consistently recognized that the State's ability to reduce nonattainment days for ozone and wildfire-caused particulate matter depends on its ability to reduce GHG emissions. . . . EPA also has repeatedly expressed its own understanding that GHG standards should be viewed as a strategy to help control criteria pollutants to address National Ambient Air Quality Standards nonattainment.'"); Twelve Public Interest Organizations at 5 ("For example, atmospheric heating due to global warming can increase the production of ground-level ozone in California, which suffers from extraordinary amounts of locally reacting nitrogen oxides and volatile organic compounds.").

[227] Center for Biological Diversity at 2–3. In contrast, some commenters, echoing SAFE 1, argued that these upstream emission benefits should not be considered in determining the criteria pollutant benefits of these standards. CEI at 16 ("Although NHTSA and EPA are required to consider all relevant factors when determining CAFE and tailpipe CO2 standards, it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for mobile source programs. The Clean Air Act already provides the EPA with ample authorities to regulate stationary sources, including the NAAQS program, New Source Performance Standards program, Prevention of Significant Deterioration of Air Quality program, Acid Rain program, and Regional Haze program. If Congress wanted NHTSA's CAFE program and EPA's mobile source program to prioritize reductions of indirect stationary source emissions, it could easily have said so. The indirect effects on stationary source emissions are not even mentioned.").

[228] Center for Biological Diversity at 3.

[229] States and Cities at 28 (citing 84 FR at 51339 (emphasis added)) (limiting section 209(b)(1)(B) consideration to "the case of GHG emissions.").

[230] States and Cities at 29. The commenter notes that EPA never considered whether California needed those criteria emission reductions from its ZEV and GHG standards because it refused to consider those criteria reductions at all: "EPA attempted to justify disregarding record evidence and its own prior findings concerning the criteria emission benefits of these California standards by mischaracterizing CARB's 2012 waiver request. . . . But, having chosen to *sua sponte* reopen the question whether California continues to need standards it has been implementing for six years, . . . ., EPA could not limit its consideration to what the standards were intended to achieve when they were originally designed or presented. . . . . CARB (and others) asserted clearly in SAFE 1 comments that both the GHG and ZEV standards produce criteria pollution benefits upon which California and other States rely to improve air quality." *Id.* at 29–30.

[231] Twelve Public Interest Organizations at 9–10.

[232] *Id.* (citing *MEMA I*, 627 F.2d 1095, 1111–14 (D.C. Cir. 1979)).

[233] States and Cities at 40, 49–50; NCAT at 11 ("EPA's argument that California does not 'need' vehicle standards that reduce GHG emissions because such standards alone cannot meaningfully reduce the impacts of climate change in California lacks merit. 84 FR at 51,346–47. EPA's approach in SAFE 1 read requirements into the statute that Congress did not choose to impose: That a single standard be sufficient to resolve an environmental problem caused by multiple and diverse sources. Instead, need should be defined by reference to the underlying problem, and California's standards are

Continued

explained "amounts to a conclusion that California is forbidden from acting precisely because climate change is a global threat—when in fact the global aspect of this problem demonstrates the need for California to take action," a conclusion, they noted, that was rejected by the Supreme Court in *Massachusetts* v. *EPA*.[234] Even if there was some merit to the argument, one commenter argued, SAFE 1's assertion that the regulations "would have only a *de minimis* effect on climate change understates the impact that collective action by California and the Section 177 states can have on GHG emissions."[235] The commenter noted that "[w]ith a total population of over 140 million people, these 19 jurisdictions collectively account for more than 42 percent of the U.S. population . . . and more than 40 percent of the U.S. new car market."[236]

Finally, these commenters also argued that climate change and its impacts are, themselves, "extraordinary and compelling" conditions. They provided evidence of increased weather events, agricultural effects, and wildfires, amongst other impacts of climate change, which have already begun to severely affect California.[237]

---

one important element of the broader response."); Tesla at 8–9 (citing *Massachusetts* v. *EPA*, 549 U.S. 497, 525–26 (2007)) ("'Nor is it dispositive that developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century: A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.'").

[234] Tesla at 8–9 ("Indeed, the Supreme Court rejected this logic in *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), explaining: "Because of the enormity of the potential consequences associated with man-made climate change, the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant."); States and Cities at 41.

[235] NESCAUM at 7.

[236] *Id.*

[237] States and Cities at 43–48; Twelve Public Interest Organizations at 5; Center for Biological Diversity at 3; Tesla at 8–9. States and Cities at 43–48; Twelve Public Interest Organizations at 5–6; Center for Biological Diversity at 3 ("California *also* experiences uniquely dangerous effects from increases in greenhouse gases. For example, the California legislature has found that global warming will cause adverse health impacts from increased air pollution and a projected doubling of catastrophic wildfires. Many of the state's most extreme weather events have occurred in the last decade, including a severe drought from 2012–2016, an almost non-existent Sierra Nevada winter snowpack in 2014–2015, three of the five deadliest wildfires in state history, and back-to-back years of the warmest average temperatures on record. These ongoing disasters demonstrate California's status as 'one of the most 'climate-challenged' regions of North America.'").

*D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate To Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)*

In this action, EPA first finds that the Agency should not have reinterpreted section 209(b)(1)(B) in evaluating California's "need" for GHG standards and ZEV sales mandate requirements at issue. The analysis below walks through the statutory language and history associated with this provision. As part of this discussion, the relationship of this provision and California's authority and deference is highlighted. The two interpretations of the waiver prong are then reviewed, presenting the Agency's rationale for its findings of the inappropriate SAFE 1 interpretation and support for its conclusion about the better interpretation. Second, as shown below, the factual record before the Agency at the time of SAFE 1 supports the GHG standards and ZEV sales mandate requirements at issue under either the traditional or SAFE 1 interpretation of section 209(b)(1)(B).

1. EPA Is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation

Except for two short-lived exceptions in the context of the 2008 waiver denial and SAFE 1, EPA has consistently recognized that reading the "needs" test of the second waiver prong as calling for a standard-specific evaluation would be inconsistent with congressional intent given the text of section 209(b)(1) legislative history, as well as the way the different standards in the ACC program work together to reduce criteria and GHG pollution and spur innovation. As further explained below, all of these aspects lend support to the Agency practice of not subjecting California's waiver requests to review of the specific standards under the second waiver prong, and we agree that the traditional interpretation of section 209(b) is, at least, the better interpretation.

Under section 209(b)(1)(B), EPA must grant a waiver request unless the Agency finds that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has historically read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate" in section 209(b)(1), which addresses the protectiveness finding that California must make for its waiver requests. In addition, as EPA has explained in the past, reading the provision otherwise would conflict with Congress's 1977 amendment to the waiver provision to allow California's standards to be "at

least as protective" as the federal standards "in the aggregate." This amendment must mean that some of California's standards may be weaker than federal standards counterbalanced by others that are stronger. If, however, a waiver can only be granted if each standard on its own meets a compelling need, then California could never have a standard that is weaker than the federal standard, rendering Congress's 1977 amendment inoperative. Congress would not have created the option for California's individual standards to be at least as protective "in the aggregate" and then taken that option away in the second waiver prong's "compelling need" inquiry.

In addition, EPA has reasoned that giving effect to section 209(b)(1) means that both subparagraph (b)(1)(B) and paragraph (b)(1) must be read together such that the Agency reviews the same standards that California considers in making its protectiveness determination. "§ 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver of preemption if its standards 'in the aggregate' protected public health at least as well as federal standards."[238]

EPA has thus explained the reasoning for the reading of "such State standards" for instance, as follows:

[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ". . . does not need such state standards," which apparently refers back to the phrase "State standards . . . in the aggregate," as used in the first sentence of section 209(b)(1), rather than to the particular standard being considered. The use of the plural, *i.e.*, "standards," further confirms that Congress did not intend EPA to review the need for each individual standard in isolation.[239]

EPA has also explained that "to find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 made in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could include some less stringent than the corresponding federal standards."[240] This is in accord with *MEMA I*, where the D.C. Circuit explained that:

The intent of the 1977 amendment was to accommodate California's particular concern

---

[238] *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).

[239] 49 FR at 18890.

[240] *Id.* at 18890 n.24.

with oxides of nitrogen, which the State regards as a more serious threat to public health and welfare than carbon monoxide. California was eager to establish oxides of nitrogen standards considerably higher than applicable federal standards, but technological developments posed the possibility that emission control devices could not be constructed to meet both the high California oxides of nitrogen standard and the high federal carbon monoxide standard.[241]

EPA has further explained that the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[242] For instance, EPA has previously granted a waiver for what was then described as "harmless emissions constituents such as methane" while reminding objectors of "EPA's practice to leave the decisions on controversial matters of public policy, such as whether to regulate methane emissions, to California."[243] Similarly, in the 1984 p.m. standards waiver decision, EPA also discussed California's "need" for its own standards at length in response to comments that California must have worse air quality problems than the rest of the country to qualify for a waiver.[244] There, EPA explained that California need not "have a 'unique' particulate problem, *i.e.*, one that is demonstrably worse than in the rest of the country [because], there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted."[245] Indeed, the word "unique" is not contained in the statutory provision. EPA further explained that "even if it were true that California's total suspended particulate problem is, as certain manufacturers argue, no worse than some other areas of the country, this does not mean that diesel

particulates do not pose a special problem in California."[246]

As explained at length earlier, EPA believes Congress intended the Agency to grant substantial deference to California on its choice of standards that are appropriate to meet its needs. EPA has explained that "Congress has made it abundantly clear that the manufacturers would face a heavy burden in attempting to show 'compelling and extraordinary conditions' no longer exist: The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver."[247] Likewise, the House Committee Report explained for instance that "[t]he [1977] amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the *broadest possible discretion* in selecting the best means to protect the health of its citizens and the public welfare."[248] EPA's past practice prior to SAFE 1, except for one instance, was consistent with this deferential stance.

In enacting section 209(b)(1), Congress struck a deliberate balance first in 1967 when it acknowledged California's serious air quality problems as well as its role as a laboratory for emissions control technology for the country,[249] and again, in the 1977 Amendments that allowed for California to seek and obtain waivers for standards that are less stringent than the federal standards (by amending section

209(b)(1)(A)) and also added section 177 to acknowledge that states may have air quality problems similar to California's by allowing states, subject to certain conditions, to adopt California's new motor vehicle standards once waived by EPA.[250] These provisions struck a balance between having only one national standard and having 51 different state standards by settling on two standards—a federal one and a California one that other states may also adopt. Since 1967, in various amendments to section 209, Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for the review of the standards as a whole program. Likewise, Congress has also not placed any additional constraints on California's ability to obtain waivers beyond those now contained in section 209(b)(1). The Agency has thus viewed the text, legislative history, and structure of section 209(b)(1) as support for the program-level review of waiver requests as well for the conclusion that California's air quality need not be worse than the rest of the country for EPA to grant a waiver of preemption. In addition, to the extent that SAFE 1 was intended to preclude California's regulation of all greenhouse gases from light-duty vehicles, the SAFE 1 interpretation creates a structural conflict within the relevant CAA provisions and could also create an inability for California to address GHG emissions and its contribution to the serious air quality problems within the State. There is a fundamental relationship between sections 209(a) and 209(b). Section 209(a) preempts states from adopting or enforcing new motor vehicle emission standards, and section 209(b) calls for EPA to waive that preemption for California vehicular emission standards unless EPA finds that one or more of the waiver criteria set out therein are not met. Nothing on the face of the CAA or applicable legislative history indicates that the scope of section 209(b)—the pollutants for which California may obtain a waiver—is more limited than the scope of section 209(a).[251] The D.C. Circuit has

---

[241] *MEMA I*, 627 F.2d 1095, 1110 n.32 (D.C. Cir. 1979).

[242] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.'"); "[T]he 1977 amendments significantly altered the California waiver provision." *Ford Motor Co.*, 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[243] 43 FR at 25735.

[244] It bears note that these are the same kinds of comments that EPA received in the context of the ACC program waiver proceedings on California's need for GHG standards.

[245] 49 FR at 18891.

[246] *Id.*

[247] *Id.* at 18890 n.25 (citing H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 302 (1977)).

[248] *MEMA I*, 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)) (emphasis added). Congress amended section 209(b)(1)(A) so that California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[249] The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution." *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). Motor vehicles "must be either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs.*, 88 F.3d at 1079–80, 1088 ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards."). *See also MEMA II*, 142 F.3d at 463.

[250] "§ 177 . . . permitted other states to 'piggyback' onto California 's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.'" *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).

[251] EPA believes that, to the extent the SAFE 1 interpretation has the practical effect of defining or implementing the scope of section 209(b) differently depending on the pollutants involved, the interpretation is contrary to legislative intent and the Agency's historic practice given the criteria emission benefits of CARB's GHG emission

Continued

already held as much as to section 209(a): "whatever is preempted [by section 209(a)] is subject to waiver under subsection (b)." [252] As demonstrated by EPA's review of the record in this decision, California's GHG emission standards at issue meet the SAFE 1 interpretation of the second waiver prong. Nevertheless, to the extent that SAFE 1 was intended to preclude all California regulation of greenhouse gases, EPA believes it improper to exclude entirely a pollutant from a waiver under section 209(b) that is otherwise preempted by section 209(a).

In addition, Congress has cited California's GHG standards and ZEV sales mandate in subsequent legislation. Federal procurement regulations direct the EPA to issue guidance identifying the makes and models numbers of vehicles that are low GHG emitting vehicles.[253] In a clear reference to California's motor vehicle GHG standards, Congress has required EPA when identifying those vehicles to "take into account the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States." [254] And in its State Implementation Plan provision regarding fleet programs required for certain non-attainment areas relating to issuing credits for cleaner vehicles, Congress stated that the "standards established by the Administrator under this paragraph . . . shall conform as closely as possible to standards which are established for the State of California for ULEV and ZEV vehicles in the same class.[255] Congress would not likely have adopted California's standards into its own legislation if it believed those standards to be preempted.

EPA also disagrees with SAFE 1's related argument that the statutory criteria must be interpreted in the context of the constitutional doctrine of "equal sovereignty." As explained in detail in Section VIII, waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and the Agency should not consider constitutional issues in evaluating waiver requests.[256] The constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver

requests. However, because the Agency asserted in SAFE 1 that the equal sovereignty doctrine formed a gloss on its statutory interpretation of the three criteria, EPA addresses that argument here briefly. In short, in SAFE 1, EPA stated that because section 209(b)(1) provides "extraordinary treatment" to California, the second waiver prong should be interpreted to require a "state-specific" and "particularized" pollution problem.[257] But section 177's grant of authority to other states to adopt California's standards undermines the notion that the regulatory scheme treats California in an extraordinary manner. Indeed, if section 209(b) is interpreted to limit the types of air pollution that California may regulate, it would diminish the sovereignty of California and the states that adopt California's standards pursuant to section 177 without enhancing any other state's sovereignty. Nor does section 209(b) impose any burden on any state. For these reasons, EPA agrees with commenters who argued that the Supreme Court's decision in *Shelby County* is inapposite. In section 209(b), Congress did not authorize "federal intrusion into sensitive areas of state and local policymaking." [258] Rather, it underscored a foundational principle of federalism—allowing California to be a laboratory for innovation. Nor is section 209(b) an "extraordinary departure from the traditional course of relations between the States and the Federal Government." [259] To the contrary, it is just one of many laws Congress passes that treat States differently, and where, as discussed more fully below, Congress struck a reasonable balance between authorizing one standard and authorizing 51 standards in deciding to authorize two. SAFE 1's invocation of the rarely used equal sovereignty principle as an aid in interpreting the second waiver prong simply does not fit section 209.

SAFE 1 dismissed the Agency's traditional interpretation of the second waiver prong under which EPA reviews the same standards that California considers in making its protectiveness determination, asserting that the practical implications of reviewing standards in the "aggregate" compared to specific standards presented in a waiver request meant that the Agency would never have the discretion to determine that California did not need any subsequent standards. But nothing in section 209(b)(1)(B) can be read as

calling for scrutinizing the specific California standards under the waiver.[260] Under section 209(b)(1)(B), EPA is to grant a waiver unless California does not need "such State standards" (plural). EPA interprets section 209(b)(1)(B) to refer back to the phrase "in the aggregate" in section 209(b)(1), which was added in the 1977 CAA Amendments when Congress removed the stringency requirements for waiver of California standards allowing instead for standards that are not as stringent as comparable federal standards, so long as the standards were "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." EPA believes that referring back to section 209(b)(1) is appropriate given that it precedes the language prior to section 209(b)(1)(B) and is in accord with the deference Congress intended by the 1977 Amendments.[261] Conversely, EPA believes that under the SAFE 1 interpretation California would, of necessity, be required to make a protectiveness finding for each of the specific standards, and the Agency believes this would be an inappropriate outcome from SAFE 1. Under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards." [262] As previously explained, "Congress could not have given this flexibility to California and simultaneously assigned to the state the seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard." [263]

SAFE 1 further argued that its interpretation read the use of "such standards" consistently between the second and third waiver prongs,

---

standards and ZEV sales requirements as well as the impacts of climate change on California's local and regional air quality.

[252] *MEMA I*, 627 F.2d 1095, 1106–08 (D.C. Cir. 1979).

[253] 42 U.S.C. 13212(f)(3).

[254] *Id.*

[255] 42 U.S.C. 7586(f)(4).

[256] 78 FR at 2145.

[257] 84 FR 51340, 51347.

[258] *Shelby County* v. *Holder*, 570 U.S. 529, 535, 545 (2013).

[259] *Id.*

[260] In the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program, or a program designed for a particular type of air pollution problem, if the underlying specific air pollutant is no longer at issue.

[261] EPA had applied the traditional interpretation of the second waiver prong prior to the 1977 Amendments.

[262] *See* H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); "In further amendments to the Act in 1977, § 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver from preemption if its standards 'in the aggregate' protected public health at least as well as federal standards." *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation*, 17 F.3d at 525.

[263] 49 FR at 18890 n.24.

sections 209(b)(1)(B) and (C).[264] It is true that section 209(b)(1)(C) employs the same phrase "such State standards" as employed in section 209(b)(1)(B), and it similarly uses that phrase to refer to standards in the aggregate. Indeed, section 209(b)(1)(C) involves an analysis of feasibility that can take more than the feasibility and impacts of the new standards into account. The feasibility assessment conducted for a new waiver request focuses on the standards in that request but builds on the previous feasibility assessments made for the standards already in the program and assesses any new feasibility risks created by the interaction between the standards in the petition and the existing standards.[265]

In sum, EPA now views as inconsistent with congressional intent the SAFE 1 interpretation, which was a flawed interpretation and also a significant departure from the traditional interpretation under which the Agency reviews California's need for the same standards as those that the State determines are "in the aggregate" as protective of public health and welfare, under section 209(b)(1).[266] EPA

believes the traditional interpretation is, at least, the better reading of the statute.

As previously explained, in reviewing waiver requests EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[267] In SAFE 1, however, EPA reinterpreted section 209(b)(1)(B) and further set out a particularized nexus test and applied this test separately to GHG standards at issue. SAFE 1 then concluded that no nexus exists for GHG emissions in California.[268] SAFE 1 further posited that California must demonstrate "compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards."[269] This has resulted in potentially different practical results depending on whether GHG standards or criteria emission pollutants are at issue, a distinction neither found in nor supported by the text of section 209(b)(1)(B) and legislative history. Specifically, SAFE 1 would have the ACC program MYs 2017–2025 criteria pollutants standards subject to review under the traditional interpretation while GHG standards at issue would be subject to review under the SAFE 1 particularized nexus test or individualized scrutiny.[270] This uneven application is even more irreconcilable given that California's motor vehicle emission program includes two GHG standards for highway heavy-duty vehicles that EPA previously reviewed under the traditional approach.[271] EPA

acknowledges that ascribing different meanings to the same statutory text in the same provision here, depending on its application, "would render every statute a chameleon."[272] Nothing in either section 209 or the relevant legislative history can be read as calling for a distinction between criteria pollutants and GHG standards and thus, the individualized scrutiny under the SAFE 1 particularized nexus test.[273] Nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California "does not need *such State standards to meet compelling and extraordinary conditions.*"[274] This is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program is "necessary" to achieve the NAAQS.[275] Moreover, as previously noted, "[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ". . . does not need *such* state standards" (emphasis in original), which apparently refers back to the phrase "State standards . . . in the aggregate as used in the first sentence of section 209(b)(1), rather than the particular standard being considered."[276] EPA has also explained that an individualized review of standards would mean that Congress "g[ave] flexibility to California and simultaneously assigned to the state the seemingly impossible tasks of establishing that 'extraordinary and compelling conditions' exist for each less stringent standard."[277]

---

[264] Section 209(b)(1)(C) provides that no such waiver shall be granted if the Administrator finds that "such State standards and accompanying enforcement procedures are not consistent with section 7521(a) [202(a)] of this title."

[265] For example, in the 2013 ACC waiver that contains CARB's LEV III criteria pollutant standards and GHG emission standards, as well as the ZEV sales mandate, EPA assessed information submitted by CARB regarding the technological feasibility, lead time available to meet the requirements, and the cost of compliance and the technical and resource challenges manufacturers face in complying with the requirements to simultaneously reduce criteria and GHG emissions. 78 FR at 2131.

[266] 84 FR at 51345. EPA notes that in SAFE 1 the following rationale was used to interpret both 209(b)(1)(C) and then connect it with 209(b)(1)(B): "[B]ecause both sections 209(b)(1)(B) and (C) employ the term 'such state standards,' it is appropriate for EPA to read the term consistently between prongs (B) and (C). Under section 209(b)(1)(C), EPA conducts review of standards California has submitted to EPA for the grant of a waiver to determine if they are consistent with section 202(a). It follows then that EPA must read 'such state standards' in section 209(b)(1)(B) as a reference to the same standards in subsection (C)." Although the Agency has not pointed to 209(b)(1)(C) as a basis of statutory construction to support the traditional interpretation of 209(b)(1)(B), EPA nevertheless believes it is supportive. EPA notes that the term "such state standards" in 209(b)(1)(C) allows the Agency, in appropriate circumstances, to review the consistency of CARB's suite of standards, for a particular vehicle category, with section 202(a). For example, EPA evaluated all of the standards (LEV III criteria pollutant, ZEV sales mandate, and GHG standards) of the ACC program in recognition of the aggregate costs and lead time associated with CARB's standards as well as technologies that may be employed to meet more than one standard. 78 FR 2131–45. EPA's assessment under 209(b)(1)(C) is not in practice a standard-by-standard review. EPA believes it appropriate to read the entirety of 209 together, along with its purposes, in order to

properly interpret its components such as 209(b)(1)(B).

[267] 74 FR at 32763–65; 76 FR at 34693; 79 FR at 46256; 81 FR at 95982.

[268] SAFE 1 also relied on *UARG* v. *EPA*, 134 S. Ct. 2427 (2014), where the Supreme Court disagreed with the Agency's decision to regulate all sources of GHG under Titles I and V as the consequence of the Agency's section 202(a) endangerment finding for motor vehicle GHG emissions. In EPA's view upon reconsideration of SAFE 1, *UARG* is distinguishable because here the Agency is acting under a specific exemption to section 202(a) that allows for California to set its own standards for motor vehicle GHG emissions under California state law, and thus, regulate major sources of GHG emissions within the State. California's authority to promulgate standards is neither contingent nor dependent on the Agency's section 202(a) endangerment finding for GHG. See 74 FR at 32778–80; 79 FR at 46262. Moreover, as discussed above, EPA's waiver authority under section 209(b) is coextensive with preemption under section 209(a). See *MEMA I*, 627 F.2d at 1107. UARG is inapplicable to the scope of preemption under section 209(a).

[269] 84 FR at 51341.

[270] *Id.* at 51337.

[271] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014).

The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[272] See States and Cities at 24 (quoting *Clark* v. *Martinez*, 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos*, 553 U.S. 507, 522 (2008); *U.S. Dep't of the Treasury* v. *FLRA*, 739 F.3d 13, 21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply "for all types of air pollutants" but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And "only two sentences later," EPA acknowledged that its review under this second prong would change "depending upon which 'air quality concerns' were implicated." *Id.*

[273] H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); 49 FR at 18890 n.24.

[274] CAA section 209(b)(1)(B) (emphasis added).

[275] Section 211(c)(4)(C) allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS.

[276] 49 FR at 18890.

[277] *Id.* at 18890 n.24.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 92 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 36 of 53

**14362**  Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

Similarly, nothing in either section 209 or legislative history can be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[278] "There is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial."[279] And most certainly, nothing in either section 209 or the legislative history can be read as calling for EPA to draw a comparison between California's GHG pollution problem and the rest of the country (or world) when reviewing California's need for GHG standards. Instead, the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[280] Thus, "even if it were true that California's [GHG] problem is, . . . no worse than some other areas of the country, this does not mean that [GHG] do not pose a special problem in California."[281] Rather, "EPA's practice [is] to leave the decisions on controversial matters of public policy, such as whether to regulate [GHG] emissions, to California."[282]

In addition, in Title II, Congress established only two programs for control of emissions from new motor vehicles: EPA emission standards adopted under the Clean Air Act and California emission standards adopted under its state law. And states other than California may not "tak[e] any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called 'third vehicle.'"[283]

As previously explained, and noted in the Notice of Reconsideration, since the grant of the initial GHG waiver request in 2009, the Agency has applied the traditional interpretation in granting two additional waivers for CARB's Heavy-Duty Vehicle GHG emission standards and these GHG standards are now part of California's motor vehicle program, but EPA did not address these waivers in SAFE 1.[284] It also bears note that, given the limited analysis and application of the SAFE 1 interpretation of the second waiver prong, it is uncertain whether the traditional interpretation remains otherwise applicable to earlier model year GHG standards under prior waivers. Ambiguity also applies to SAFE 1's interpretation of this prong in respect to all criteria pollutant standards in the ACC program. While SAFE 1 stated it was only applicable to the GHG standards at issue, in at least one instance the Agency indicated that the SAFE 1 interpretation could also be applicable to future evaluation of waiver requests for criteria pollutant standards.[285] This uncertainty between these statements in SAFE 1 further highlights the inappropriateness of the new interpretation of the second prong.

In sum, for the reasons noted above, EPA is withdrawing the SAFE 1 interpretation and reinstating certain aspects of the ACC program waiver that were earlier granted under the traditional interpretation and approach. EPA concludes it erred by not properly evaluating the statutory interpretation of section 209, the associated legislative history including the policy deference that should be afforded to California to address its serious air quality problems and to serve as a laboratory for the country, and because the "need" for a motor vehicle emission program and related standards within the program are necessarily better viewed as a comprehensive and interrelated effort to address the range of air quality problems facing California.[286] At the same time, EPA notes that the traditional interpretation is reasonable and consistent with the text, structure and congressional intent and purpose of section 209(b) and EPA is thus confirming that the traditional interpretation of section 209(b)(1)(B) was appropriate and is, at least, the better interpretation.[287]

## 2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation

Even if the SAFE 1 interpretation of section 209(b)(1)(B) was appropriate, the record of both the ACC program waiver and SAFE 1 proceeding demonstrate that California has a need for the GHG standards and ZEV sales mandate at issue under the SAFE 1 interpretation as well. The opponents of the waiver (including EPA in SAFE 1) did not met their burden of proof to demonstrate that California does not need its GHG emission standards and ZEV sales mandate, whether individually or as part of California's motor vehicle emission program, to meet compelling and extraordinary conditions.[288]

[278] *Id.* at 18891.

[279] *Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[280] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.'"); "[T]he 1977 amendments significantly altered the California waiver provision." *Ford Motor Co.,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[281] 49 FR at 18891.

[282] 43 FR at 25735.

[283] *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation,* 17 F.3d 521, 526, 528 (2d Cir. 1994).

[284] 79 FR 46256 (August 7, 2014); 81 FR 95982 (December 29, 2016).

[285] 84 FR at 51341 n.263. "EPA determines in this document that GHG emissions, with regard to the lack of a nexus between their State-specific sources and their State specific impacts, and California's GHG standard program, are sufficiently distinct from criteria pollutants and traditional, criteria pollutant standards, that it is appropriate for EPA to consider whether California needs its own GHG vehicle emissions program. *EPA does not determine in this document and does not need to determine today how this determination may affect subsequent reviews of waiver applications with regard to criteria pollutant control programs.*" (Emphasis added). *See also id.* at 51344 n.268 ("EPA is adopting an interpretation of CAA section 209(b)(1)(B), specifically its provision that no waiver is appropriate if California does not need standards "to meet compelling and extraordinary conditions," similar to the interpretation that it adopted in the 2008 waiver denial but abandoned in the 2009 and 2013 waiver grants, and applying that interpretation to determine to withdraw the January 2013 waiver for California's GHG and ZEV program for model years 2021 through 2025"), and at 51346 ("EPA therefore views this interpretation and application of CAA section 209(b)(1)(B) set forth here as, at minimum, a reasonable one that gives appropriate meaning and effect to this provision.").

[286] As noted previously, in the context of evaluating the "need" for California's motor vehicle emission standards the Agency is informed by the legislative history from 1967 and 1977, whereby California is properly viewed as a laboratory for the country and that its policy decisions on how best to address its serious air quality issues, and that deference on the question of "need" is in order. Therefore, EPA believes it misapplied the concept of deference in the context of the second waiver prong application in SAFE 1. *See e.g.,* 84 FR at 51344 n.268. While EPA believes it appropriate to not defer when it is interpreting its own statute, the Agency nevertheless determines that California's policy choices in term of its "need" in how best to address compelling and extraordinary conditions in California requires deference by the Agency. This is consistent with EPA's longstanding waiver practice and its integration of the legislative history behind section 209. In any event, EPA would reach the same conclusions regarding the second waiver prong even if it did not defer to California regarding the nature of its air quality problems. 86 FR at 74489 ("The 2009 Endangerment Finding further explained that compared with a future without climate change, climate change is expected to increase tropospheric ozone pollution over broad areas of the U.S., including in the largest metropolitan areas with the worst tropospheric ozone problems, and thereby increase the risk of adverse effects on public health (74 FR 66525)."). *See also* 86 FR at 74492.

[287] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[288] EPA notes that by this action it is rescinding the interpretation of section 209(b)(1)(B) as set forth in SAFE 1. Nevertheless, EPA believes it appropriate to address comments received that suggest the SAFE 1 interpretation was not only

As previously explained, the 1977 CAA Amendments allow California to promulgate standards that might not be considered needed to meet compelling and extraordinary circumstances but would nevertheless be part of California's overall approach of reducing vehicle emissions to address air pollution in California.[289] Thus, CARB may now design motor vehicle emission standards, individually, that might sometimes not be as stringent as federal standards but collectively with other standards would be best suited for California air quality problems because under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards." [290] And EPA is "required to give very substantial deference to California's judgments on this score." [291]

Indeed, as EPA noted in the ACC program waiver, Congress intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems that exist in California, whether or not those problems are only local or regional in nature, and to protect the health and welfare of its citizens:

Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.[292]

In the context of implementing section 209(b)(1)(B) and assessing the "need" for California's standards even under the SAFE 1 interpretation, EPA sees no reason to distinguish between "local or regional" air pollutants versus other pollutants that may be more globally mixed. Rather, it is appropriate to acknowledge that all pollutants and their effects may play a role in creating air pollution problems in California and that EPA should provide deference to California in its comprehensive policy choices for addressing them. Again, even if a new interpretation of section 209(b)(1)(B) were appropriate in SAFE 1, and EPA believes it is not, it is important to note that historically, criteria pollutant reductions have been relevant to section 209(b)(1)(B). As previously noted, nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California "does not need *such State standards to meet compelling and extraordinary conditions.*" [293] As also previously noted this is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program will result in criteria pollutant reductions that will enable achievement of applicable NAAQS.

The first section below focuses on criteria pollution reduction, which has long been relevant to section 209(b)(1)(B). EPA has never put in doubt that California's serious criteria air pollution problems (such as NAAQS nonattainment and the factors that give rise to those conditions, including the geographic and climate conditions in the State, the number of motor vehicles in California, and local and regional air quality) are "compelling and extraordinary," or that California "needs" regulations that address such emissions in order to achieve every fraction of criteria pollutant emissions it can achieve.[294] The factual record before the Agency in 2013 and again in 2019 includes ample documentation of criteria emission reductions from California's GHG standards and ZEV

sales mandate.[295] Nothing in the record is sufficient to demonstrate that California does not need the ACC program (or the motor vehicle emission program) or, in the context of the SAFE 1 interpretation, the specific GHG emission standards and the ZEV sales mandate to meet compelling needs related to criteria pollution. These benefits have a clear connection to California's "need" for its specific GHG standards and ZEV sales mandate, at issue under the waiver. The second section below focuses on the GHG reduction benefits of California's GHG standards and ZEV sales mandate. EPA acknowledges that California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat, and that climate-change impacts in California are therefore "compelling and extraordinary conditions" for which California needs the GHG standards and ZEV sales mandate.

a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits

As shown below, criteria pollutant reductions are demonstrably connected to California's "need" for its GHG standards and ZEV sales mandate at issue under the waiver.[296] EPA first concluded that there is a "logical link between the local air pollution problem

---

correct, but that the factual record supported the SAFE 1 withdrawal of the ACC waiver based on this interpretation.

[289] *See Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1296–97 (D.C. Cir. 1979); See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977).

[290] 43 FR 25729, 25735 (June 14, 1978). See *Ford Motor Co.,* 606 F.2d at 1296–97.

[291] 40 FR at 23104. See also LEV I (58 FR 4166 (January 13, 1993)) Decision Document at 64.

[292] 78 FR at 2128–29. *See* "Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California." Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *https://uconr.edu/sites/jackson_Lab/files/155618.pdf* at 4 ("Higher temperatures also increase ground-level ozone levels. Furthermore, wildfires can increase particulate air pollution in the major air basins of California. Together, these consequences of climate change could offset air quality improvements that have successfully reduced dangerous ozone concentrations. Given this "climate penalty," as it

is commonly called, air quality improvement efforts in many of California's air basins will need to be strengthened as temperatures increase in order to reach existing air quality goals.").

[293] CAA section 209(b)(1)(B) (emphasis added).

[294] In SAFE 1, EPA found that California's criteria pollution conditions remain "compelling and extraordinary and that California needs standards to produce any and all reductions in criteria pollutant emissions." 84 FR at 51344, 51346.

[295] When California originally adopted a ZEV sales mandate into its regulations, a significant factor in support of its action was addressing criteria pollutant emissions. In SAFE 1 EPA acknowledged that California's ZEV mandate initially targeted only criteria pollution. 84 FR at 51329. EPA's 2013 waiver grant recognized that with California's ACC program California had shifted to relying on the ZEV requirements to reduce both criteria and GHG pollution. 78 FR at 2114.

[296] In response to comments arguing that upstream emission benefits should not be considered in determining the criteria pollutant benefits of CARB' standards or that it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for motor vehicle emission programs, EPA believes it appropriate to reiterate the air quality problems facing California, as evidenced by NAAQS attainment challenges. Waiver practice and applicable case law, as previously noted, afford California wide deference in its policy and regulatory approaches in addressing these challenges. Therefore, EPA believes that to the degree a nexus between CARB's standards and addressing its serious air quality problems is required, that it is reasonable to base the need on related criteria emission impacts. EPA notes that, in setting its federal light-duty vehicle GHG standards, it is afforded discretion under the CAA to consider upstream emission impacts and does include such consideration in its own rulemakings. 77 FR 62624, 62819 (October 15, 2012) (taking fuel related upstream GHG emissions into account in setting compliance values for vehicle GHG emissions standards).

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 94 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 38 of 53

**14364** Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

of ozone and GHGs" in the 2009 California GHG waiver by explaining, for instance, that "the impacts of global climate change can nevertheless exacerbate this local air pollution problem." [297] Moreover, as previously explained, in two additional GHG waiver requests and associated EPA waiver decisions since the 2009 GHG waiver, EPA acknowledged that CARB had demonstrated the need for GHG standards to address criteria pollutant concentrations in California. In the 2014 HD GHG waiver request, CARB projected, for example, "reductions in $NO_x$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020" in California. [298]

In SAFE 1, EPA distinguished prior GHG waivers from the ACC program GHG waiver solely on grounds of how CARB attributed the pollution benefits in its waiver request. EPA explained that CARB had linked those prior waived GHG standards to criteria pollutant benefits but had not done so in the ACC program waiver request: "California's *approach* in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_x$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment." [299] Moreover, how CARB attributes the pollution reductions for accounting purposes from its various standards does not reflect the reality of how the standards deliver

emissions reductions and should not drive whether or not a waiver can be withdrawn. EPA believes, based on its historical deference to CARB in waiver proceedings, that CARB is entitled to this discretion.

EPA also believes that prior waiver decisions indicate that the "approach" taken by California in its waiver requests needs to be carefully assessed and understood by the Agency before discounting the benefits of its mobile source emission standards. The characterization of CARB's "approach," as not calling out criteria emissions benefits (such as upstream criteria emission benefits) of GHG standards, was incorrect and should not have undermined EPA's findings and grant of the initial ACC program waiver request for the following reasons: (1) As previously noted, the ACC program standards are interrelated and all serve to reduce both criteria and GHG pollution; (2) CARB conducted a combined emissions analysis of the elements of the ACC program because the program was designed to work as an integrated whole; and (3) EPA has always considered California's standards as a whole or "in the aggregate" under the traditional interpretation of section 209(b)(1)(B). [300] EPA noted the associated criteria pollutant and GHG emissions benefits for the whole ACC program: "the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the pre-existing federal standards." [301] EPA also made the requisite finding that California's protectiveness finding for the ACC program was not arbitrary and capricious, under section 209(b)(1)(A), by explaining that "California's ZEV and GHG emission standards are an addition to its LEV program." [302]

In SAFE 1, EPA further asserted that "California's responses to the SAFE proposal do not rebut the Agency's views that the ZEV standards for MY 2021–2025 are inextricably interconnected with the design and purpose of California's overall GHG reduction strategy." [303] For the following reasons, however, EPA was also incorrect in the assessment of criteria emission benefits of CARB's ZEV sales mandate. EPA focused on only the following snippet from one salient paragraph in CARB's 2012

waiver request as support for the lack of criteria emissions benefits: "There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles." [304] But, as discussed above, that was merely an attribution of benefits and did not reflect the practical reality of how California's standards work. Moreover, the paragraph in its entirety goes on to explain that CARB's ZEV sales mandate would achieve criteria emission reductions: "However, since upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production." [305]

It bears note that this attribution of criteria pollutant reductions was similar to the one that CARB made almost a decade ago for the 2009 GHG waiver request. [306] For example, CARB provided "extensive evidence of its current and serious air quality problems and the increasingly stringent health-based air quality standards and federally required state planning efforts to meet those standards firmly." [307] The States and Cities also commented that "the attribution CARB made as part of its waiver request was never intended to, and did not, establish the absence of any

---

[297] 74 FR at 32763. According to California, "California's high ozone levels—clearly a condition Congress considered—will be exacerbated by higher temperatures from global warming . . . [T]here is general consensus that temperature increases from climate change will exacerbate the historic climate, topography, and population factors conducive to smog formation in California, which were the driving forces behind Congress's inclusion of the waiver provision in the Clean Air Act." *Id.* (quoting comments submitted by CARB during the 2009 reconsideration). CARB also explained that "the factors that cause ozone are primarily local in nature and [] ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. Whether or not local conditions are the primary cause of elevated concentrations of greenhouse gases and climate change, California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems . . . . There is a logical link between the local air pollution problem of ozone and California's desire to reduce GHGs as one way to address the adverse impact that climate change may have on local ozone conditions." *Id.*

[298] 79 FR at 46261. See *also* 81 FR at 95985–86 n.27 (referencing Resolution 13–50's statements supporting California's continued need for its own motor vehicle program in order to meet serious ongoing pollution problems).

[299] 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[300] ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 72; CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 3.

[301] 74 FR at 2122.

[302] *Id.* at 2125.

[303] 84 FR at 51337.

[304] *Id.* at 51337, 51330, 51337, 51353–54, 51356, 51358.

[305] 2012 Waiver Request at 15–16. CARB also noted that criteria and PM emission benefits will vary by region throughout the State depending on the location of emission sources. Refinery emission reductions will occur primarily in the east Bay Area and South Coast region where existing refinery facilities operate. As refinery operations reduce production and emissions, the input and output activities, such as truck and ship deliveries, will also decline. This includes crude oil imported through the Los Angeles and Oakland ports, as well as pipeline and local gasoline truck distribution statewide. EPA again notes that in its light-duty vehicle GHG rulemaking in 2012 it also noted the upstream emission impacts. 77 FR at 62819.

[306] "The establishment of greenhouse gas emission standards will result in a reduction in upstream emissions (emission due to the production and transportation of the fuel used by the vehicle) of greenhouse gas, criteria and toxic pollutants due to reduced fuel usage." EPA–HQ–OAR–2006–0173–0010.107 at 8.

[307] CARB, EPA–HQ–OAR–2012–0562–0371. CARB estimated benefits of the ZEV and GHG standards for calendar years by which the South Coast air basin must meeting increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

vehicular emission benefits from the ZEV standard." EPA believes that CARB's statement was merely a "simplification that distinguished the standards based on the *primary* objectives of the two, complementary standards." [308] EPA agrees that the record from 2013, and 2019, demonstrates that CARB's attribution of short-term emissions benefits did not undercut the long-term vehicular emission benefits of the ZEV standards. Thus, regardless of how the emissions reductions are attributed, the GHG standards and ZEV sales mandate drive reductions in criteria pollution.

EPA has also consistently explained that "consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions . . . consider[ed] under section 209(b)." [309] And so, as earlier noted, any reconsideration of a prior waiver decision must comport with criteria in section 209(b)(1) as well as have record support. Moreover, in prior waiver requests for ZEV sales mandate requirements, CARB has discussed criteria pollutant emissions reductions because of the mandate for sale of vehicles that have zero emissions. [310] CARB's 2012 waiver request also indicated the clear intent regarding the evolution of the ZEV program and California's decision to focus both on criteria pollutant and GHG reductions. [311] EPA's reading of and reliance on the snippet from CARB's waiver request describing the ZEV sales mandate requirements in the ACC program was both incorrect and improper, as well as contrary to congressional intent and EPA's historic practice of affording broad discretion to California in selecting the best means for addressing the health and welfare of its citizens.

b. California Needs Its Standards To Address the Impacts of Climate Change in California

Under section 209(b)(1)(B), EPA is to grant a waiver request unless California

does not need the standards at issue to address "compelling and extraordinary conditions." In applying the traditional approach, EPA has consistently reasoned that "compelling and extraordinary conditions" refers primarily to the factors that tend to produce higher levels of pollution in California—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. [312] These conditions continue to exist in California and CARB, since the initial 2009 GHG waiver, has consistently drawn attention to the existential crisis that California faces from climate change and maintained that air quality issues associated with GHG emissions have exacerbated this crisis and have yet to attenuate. [313]

EPA now recognizes that CARB, as part of its original waiver request and in comments in response to SAFE 1, submitted ample evidence of multiple ways California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat; in other words that GHG emissions contribute to local air pollution, and that climate-change impacts in California are "compelling and extraordinary conditions." For example, CARB noted that "[r]ecord-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack— California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the State so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems." [314]

Within the ACC waiver request, CARB provided a summary report on the third assessment from the California Climate Change Center (2012), which described dramatic sea level rises and increases in temperatures in California and associated impacts on local air quality and other conditions in California. [315]

To the extent that SAFE 1 relied on the premise that GHG emissions from motor vehicles located in California become globally-mixed as part of global climate change, and therefore do not pose a local air quality issue (placing aside the impacts of heat on ozone as

---

[308] States and Cities at 31 (original emphasis).

[309] 74 FR at 32748. *See also* 78 FR at 2115.

[310] 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[311] *See* 2012 Waiver Request at 2. At the December 2009 hearing, the Board adopted Resolution 09–86, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the focus of the ZEV regulation to both GHG and criteria pollutant emission reductions, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly.

[312] 49 FR at 18890 (citing legislative history).

[313] 2012 Waiver Request at 1.

[314] CARB supplemental comment at EPA–HQ–OAR–2012–0562–0371. CARB notes that EPA's reasoning that the "compelling and extraordinary conditions" criteria should be viewed as a "program as a whole" was upheld as "eminently reasonable" in *ATA* v. *EPA*, 600 F.3d 624, 627–29 (D.C. Cir. 2010), and that the ACC program appropriately integrates the passenger vehicle program to address multiple pollutant types, which also reflects the intent of Congress in 1977 to broaden California's discretion to adjust its program as needed (*Ford Motor Co.* v. *EPA*, 606 F.2d at

1294). This comment extensively lays out the compelling and extraordinary conditions associated with California's air quality challenges and the need to reduce criteria emissions and greenhouse gas emissions associated with CARB's ZEV sale mandate and GHG standards. *Id.* at 5 ("The critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements.").

[315] 78 FR at 2129 ("To the extent that it is appropriate to examine the need for CARB's GHG standards to meet compelling and extraordinary conditions, as EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that 'Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous— is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems.") ("Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California. Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *http:// www.climatechange.ca.gov/adaptation/third-assessment*"). EPA also noted that "the better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long-range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs." 78 FR at 2128.

well as air quality impacts from the dramatic increase in wildfires), EPA notes that in addition to the record from the ACC waiver proceeding noted above, the SAFE 1 record contains sufficient and unrefuted evidence that there can be locally elevated carbon dioxide concentrations resulting from nearby carbon dioxide emissions.[316] This can have local impacts on, for instance, the extent of ocean acidification.[317] Thus, like criteria pollution, emissions of GHGs can lead to locally elevated concentrations with local impacts, in addition to the longer-term global impacts resulting from global increases in GHG concentrations.

Finally, in demonstrating the need for GHG standards at issue, CARB attributed GHG emissions reductions to vehicles in California. For instance, "CARB project[ed] that the standards will reduce car $CO_2$ emissions by approximately 4.9%/year, reduce truck $CO_2$ emissions by approximately 4.1%/year (the truck $CO_2$ standard target curves move downward at

approximately 3.5%/year through the 2016–2021 period and about 5%/year from 2021–2025), and reduce combined light-duty $CO_2$ emissions by approximately 4.5%/year from 2016 through 2025."[318] CARB also projected that its GHG emissions standards for MYs 2017–2025 will reduce fleet average $CO_2$ levels by about 34 percent from MY 2016 levels of 251 g/mile down to about 166 g/mile, based on the projected mix of vehicles sold in California."[319] CARB further noted that there might be a GHG emission deficit if only the Federal GHG standards were implemented in California.[320] The GHG emissions from California cars, therefore, are particularly relevant to both California's air pollution problems and GHG standards at issue.

In SAFE 1, EPA dismissed California's "need" for the GHG standards at issue because their impact on GHG emissions would be too small to "meaningfully address global air pollution problems of the sort associated with GHG emissions": "[T]he most stringent regulatory alternative considered in the 2012 final rule and [Final Regulatory Impact Analysis] . . . , which would have required a seven percent average annual fleetwide increase in fuel economy for MYs 2017–2025 compared to MY 2016 standards, was forecast to decrease global temperatures by only 0.02 °C in 2100."[321] EPA also received similar comments in response to the Notice of Reconsideration. But since the inception of the waiver program, EPA has never applied a test to determine whether a California waiver request under 209(b)(1) would independently solve a pollution problem. EPA has never applied a *de minimis* exemption authority to California waiver request under section 209(b)(1).[322] EPA believes there is no basis for exercise of such a test under section 209(b), considering that CARB continues to maintain that emissions reductions in California are essential for meeting the NAAQS.[323] EPA has reiterated that "California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's

judgment, to great deference."[324] As the Supreme Court has recognized, "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed."[325] And so, in the ACC program waiver decision, EPA also explained that "[t]he issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209."[326]

Further, nothing in either section 209 or the legislative history could be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[327] CARB further demonstrated a "need" for its GHG standards by projecting GHG emissions reductions deficits from implementation of only the Federal GHG program in California. "[I]f a National Program standard was theoretically applied only to California new vehicle sales alone, it might create a GHG deficit of roughly two million tons compared to the California standards."[328]

### 3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development

Congress also envisioned that California's other role under section 209(b) would be an innovative laboratory for motor vehicle emission

---

[316] CARB comment at EPA–HQ–OAR–2018–0283–5054 at 305–06 (California's Fourth Climate Assessment; https://www.energy.ca.gov/sites/default/files/2019-12/Governance_External_Ekstrom_ada.pdf).

[317] See, for example, reports from California's Fourth Climate Change Assessment, "California Mussels as Bio-indicators of Ocean Acidification," available at https://www.energy.ca.gov/sites/default/files/2019-12/Oceans_CCCA4-CNRA-2018-003_ada.pdf ("Because of the coupling between natural (upwelling-driven) and anthropogenic (CO2 emission-driven) processes, California waters are already experiencing declines in pH that are not expected in other areas of the world's oceans for decades (Feely et al. 2008; Chan et al. 2017). These perturbations to seawater chemistry join others associated with changing seawater temperatures (García-Reyes and Largier 2010) and reductions in ocean oxygenation (Bograd et al. 2008; Chan et al. 2008). Therefore, marine communities along the coast of California are increasingly subjected to a suite of concurrent environmental stressors. Substantial impetus exists to understand, quantify, and project biological and ecological consequences of these stressors, which current work suggests may be pervasive and diverse (Kroeker et al. 2010, 2013; Gaylord et al. 2015)."). Further, evidence in the record from a 2019 study demonstrated that locally enhanced carbon dioxide concentrations above Monterey Bay, California, fluctuate by time of day likely because of the magnitude of nearby urban carbon dioxide pollution and the effects of topography on offshore winds, and that this fluctuation increases the expected rate of acidification of the Bay. See Northcott, et al., Impacts of urban carbon dioxide emissions on sea-air flux and ocean acidification in nearshore waters, PLoS ONE (2019). For decades, the monthly average carbon dioxide concentrations off California's coast have been consistently higher and more variable than those at Mauna Loa (which are commonly used as the global measurements). In fact, another more recent study shows that the waters of the California Current Ecosystem, off the coast of Southern California, have already acidified more than twice as much as the global average. E.g., Cal. Office of Environmental Health Hazard Assessment, Atmospheric Greenhouse Gas Concentrations (Feb. 11, 2019).

[318] 78 FR at 2139.

[319] Id. at 2135.

[320] Id. at 2122.

[321] 84 FR at 51349.

[322] See, e.g., 74 FR at 32766 ("As noted by the Supreme Court in Massachusetts v. EPA, while it is true that regulating motor vehicle GHG emissions will not by itself reverse global warming, a reduction in domestic automobile emissions would slow the pace of global emissions increase no matter what happens with regard to other emissions.").

[323] See Alabama Power Co. v. Costle, 636 F.2d 323, 360–66, n.89 (D.C. Cir. 1979).

[324] 74 FR at 32766 ("Under this approach, there is no need to delve into the extent to which the GHG standards at issue here would address climate change or ozone problems. That is an issue appropriately left to California's judgment. . . . Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference.").

[325] Massachusetts v. EPA, 549 U.S. 497, 524 (2007).

[326] 78 FR at 2134.

[327] 49 FR at 18891.

[328] 78 FR at 2122 (citing EPA–HQ–OAR–2012–0562–0374 at 3). CARB also noted that "to the extent a manufacturer chooses not to exercise their National Program compliance option in California this would actually provide additional GHG benefits in California, so compliance in California can never yield fewer cumulative greenhouse gas reductions from the industry wide fleet certified in California." Id. at 2122 n.61.

standards and control technology. California is to serve as "a kind of laboratory for innovation" [329] and to "blaze its own trail with a minimum of federal oversight.[330] California's "unique [air pollution] problems and [its] pioneering efforts justif[ied] a waiver of the preemption section." [331] Congress stressed that California should serve the Nation as a "testing area" for more protective standards." [332] In the 2009 GHG waiver, for example, EPA explained that "the basic nature of the compromise established by Congress [is that] California could act as the laboratory for the nation with respect to motor vehicle emission control, and manufacturers would continue to face just two sets of emissions standards— California's and EPA's." [333] California's ZEV sales mandates have so far supported development of technologies such as battery electric and fuel cell vehicles that embody the pioneering efforts Congress envisaged. EPA acknowledged this important role in the ACC program waiver by explaining that California needs the ZEV sales mandate requirement to ensure the development and commercialization of technology required for the future, deeper vehicular emission reductions California will have to attain to meet its NAAQS obligations as well as achieve other long-term emission goals of new vehicle sales between 2040 and 2050.[334] In SAFE 1, however, EPA did not consider this additional role carved out in section 209(b)(1) for California as a proven ground for motor vehicle control emissions technology.[335]

In sum, while nothing in section 209 or the legislative history limits EPA's waiver authority to standards that reduce criteria pollution,[336] analyses in this section again recognize the way the different requirements in the ACC program work together to reduce criteria

and GHG pollution and spur technological innovation. These analyses conclude that GHG pollution exacerbates tropospheric ozone pollution, worsening California's air quality problems, and the manner in which GHG and criteria pollutant standards work together to reduce both forms of pollution. Ample record support exists on California's need for both GHG standards and ZEV sales mandate at issue to address compelling and extraordinary conditions in California. As noted above, in SAFE 1 EPA, however, relied on an excerpt of the ACC program waiver record to determine the lack of criteria emission benefits of GHG emission standards and ZEV sales mandate at issue. In doing so, EPA did not evaluate the complete record from the ACC waiver proceeding and the nature of California's air quality problem, including the relationship of climate change to California's ability to achieve the ozone NAAQS in the assessment of California's need for these requirements.[337]

As noted above, in SAFE 1, EPA established a new test under section 209, requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare, a test that would exclude GHG pollution from the scope of the waiver.[338] But this test is found nowhere in the text of section 209— the statute does not contain this requirement, or even use these terms.

EPA's review of the complete record confirms the Agency's conclusions in the ACC program waiver that California needs the GHG standards at issue to meet a compelling and extraordinary conditions regardless of whether the Agency focuses on criteria or greenhouse gas pollution reduction.

This review also indicates that opponents of the waiver (including EPA in SAFE 1) did not meet the burden of proof necessary to demonstrate that California did not have a need for the GHG standards, including under the nexus test applied in SAFE 1. It also bears note that EPA's longstanding practice, based on the statutory text, legislative history, and precedent calls for deference to California in its approach to addressing the interconnected nature of air pollution within the state and is not limited to criteria pollutant problems. Critically, EPA is not to engage in "probing substantive review" of waiver requests,[339] but rather "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [340]

*E. Conclusion*

Considering the text, legislative history, and precedent that support the Agency's historical practice of interpreting section 209(b)(1)(B) as calling for a program-level evaluation of waiver requests, as well as the uncertainty in settled expectations created by the SAFE 1 interpretation, EPA rescinds its actions in SAFE 1 regarding both the interpretation of section 209(b)(1)(B) and the findings regarding California's need for the GHG standards and ZEV sales mandate. EPA believes that the burden of proof had not been met in SAFE 1, based on the complete factual record, to demonstrate that California did not have a need for the GHG standards and ZEV sales mandate under the SAFE 1 interpretation of the second waiver prong nor had the burden been met to support a finding that the ample evidence in the record at the time of the ACC waiver decision did not demonstrate that California had a need for its standards to meet compelling and extraordinary conditions. As noted above, the result of the recission of the SAFE 1 action is the reinstatement of the ACC program waiver. EPA confirms the traditional interpretation of section 209(b)(1)(B) was appropriate and continues to be, at least, a better interpretation regardless of the recission of the SAFE 1 interpretation of this criterion.[341]

[329] *MEMA I*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).
[330] *Ford Motor Co., v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).
[331] S. Rep. No. 90–403, at 33 (1967).
[332] *Id.*
[333] 74 FR at 32763.
[334] 78 FR at 2123, 2130–31.
[335] 84 FR at 51343 ("[I]n a statute designed to address public health and welfare, it certainly cannot mean standards that allow a state to be "a laboratory for innovation" in the abstract, without any connection to a need to address pollution problems.").
[336] The Agency again notes that, unlike provisions of the CAA such as section 211(c)(4)(C) which allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS, section 209(b) makes no mention of NAAQS pollutants or otherwise indicates that air pollutants should be treated differently.

[337] For example, CARB's ISOR for its ZEV standards identifies at Table 6.2 the well to wheel emission benefits of the ZEV program compared to the LEV III program. ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 78. *See also* 2012 Waiver Request at 16. CARB noted in its comments on the SAFE proposal that "Rising temperatures exacerbate California's ozone problem by increasing ground-level ozone concentrations." CARB, EPA–HQ–OAR–2018–0283–5054 at 371–72 (citing the 2012 Waiver Request). In addition, "Several studies indicate that a warming climate is expected to exacerbate surface ozone in California's two major air basins: South Coast Air Basin and San Joaquin Valley. *Id.* at 372 (citing Jacob & Winner). *Effect of Climate Change on Air Quality*, 43:1 ATMOS. ENVIRON. 51 (Jan. 2009); Wu, et al., *Effects of 2000–2050 Global Change on Ozone Air Quality in the United States*, 113, D06302, J. GEOPHYS. RES.-ATMOS. (Mar. 19, 2008), *available at https://doi.org/10.1029/2007JD008917*; Rasmussen, et al., *The Ozone-climate Penalty: Past, Present, and Future*, 47:24 ENVTL. SCI. & TECH. 14258 (Dec. 17, 2013), *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3990462/*).
[338] 84 FR at 51339–40.

[339] *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1300 (D.C. Cir. 1979).
[340] *MEMA II*, 142 F.3d 449, 453 (D.C. Cir. 1998).
[341] *See* 84 FR at 51344 n.269.

## VI. EPA Inappropriately Considered Preemption Under the Energy Policy and Conservation Act (EPCA) in Its Waiver Decision

SAFE 1's other justification for withdrawing the ACC program waiver was that California's GHG standards and ZEV sales mandate were preempted under EPCA. As explained in detail in Section IV, EPA believes this basis for reconsideration was outside the appropriate bounds of EPA's authority to reconsider previously granted waivers. In particular, if EPA could reconsider and withdraw a waiver based on a factor not contained in the specified criteria for denial in section 209(b)(1), EPA could circumvent the specified criteria for denial via reconsideration of previously granted waiver.

Even if it were appropriate for EPA to reconsider a previously granted waiver based on non-statutory factors, in this action, EPA concludes that it was inappropriate to rely on preemption under EPCA as a basis for withdrawing certain aspects of the ACC program waiver. In SAFE 1, a joint action between NHTSA and EPA, NHTSA concluded that state or local regulations of tailpipe carbon dioxide emissions are "related to fuel economy standards" and are therefore preempted under EPCA.[342] As a direct result of NHTSA's codified text and pronouncements on preemption set forth in SAFE 1, EPA withdrew the ACC program waiver for California's GHG standards and ZEV sales mandate on grounds that they were preempted under EPCA. In SAFE 1, EPA believed it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio,* and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis."[343] NHTSA has since issued a

new final rule that formally repeals the codified text and pronouncements regarding preemption under EPCA found in SAFE 1. Upon reconsideration, EPA now believes that, given NHTSA's repeal of its regulation and pronouncements in SAFE 1, preemption under EPCA cannot serve as a basis for the withdrawal of the ACC program waiver as it did in SAFE 1—if it could ever legitimately serve as such basis. EPA thus believes it is appropriate to rescind the portion of the waiver withdrawal that was based on preemption under EPCA.

In addition, given the unique consideration of preemption under EPCA in SAFE 1 and its effect on an otherwise validly issued waiver under the CAA, EPA believes it is helpful to provide additional information regarding the Agency's historical practice and views to demonstrate why consideration of preemption under EPCA was inappropriate. Consideration of preemption under EPCA is beyond the statutorily prescribed criteria for EPA in section 209(b)(1). Preemption under EPCA was not a factor that California addressed under the applicable waiver criteria in its initial request nor was it a factor that EPA considered in granting the ACC program waiver. Until SAFE 1, the Agency consistently refrained from reviewing waiver requests against factors beyond the statutorily listed criteria under section 209(b)(1). Thus, EPA also believes that in the reconsideration of a waiver where EPA had previously declined to consider preemption under EPCA, SAFE 1 was contrary to congressional intent and the Agency's historic practice of hewing to section 209(b)(1) statutory criteria in reviewing waiver requests. Given this backdrop, EPA believes that the joint rulemaking context of SAFE 1 was an improper basis to deviate from EPA's long held belief to not consider factors outside the scope of section 209(b)(1), especially given that the Agency indicated it would only be a singular occurrence. EPA continues to view the text and congressional intent of the statute, as well as subsequent case law, as best supporting a limited scope of review for waiver requests under section 209(b)(1)—irrespective of whether a waiver proceeding is undertaken either solely by EPA or in unison with another agency. Therefore, based on EPA's historical practice of not considering factors outside of the section 209(b)(1) criteria and because EPA believes the "joint-action" premise was improper, the Agency is rescinding its withdrawal

of the ACC program waiver based on preemption under EPCA.

### A. Historical Practice and Legislative History

Historically, in reviewing California's waiver requests, EPA has refrained from the consideration of factors beyond those criteria set out in section 209(b)(1).[344] EPA has generally explained that the text, structure, and purpose of the California waiver provision indicate congressional intent for EPA to provide significant deference to California's judgment, especially on "ambiguous and controversial matters of public policy."[345] In section 209(a), Congress generally preempted state standards relating to the control of emissions from new motor vehicles and engines, but, in section 209(b), Congress carved out an exception for California, directing EPA to grant California a waiver of section 209(a) unless the Agency can make a finding under section 209(b). Congress recognized that California's "compelling and extraordinary circumstances," and its historical practice of regulating in the area, were sufficient "to justify standards on automobile emissions which may, from time to time, need be more stringent than national standards."[346] In creating the waiver program, Congress intended not only for California to be able to meet its own emission reduction needs, but also for California to act as "a kind of laboratory for innovation" for motor vehicle standards and control technology."[347]

[342] 49 U.S.C. 32919(a) ("When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter."). NHTSA noted that a law or regulation having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919(a). 84 FR at 51317–18. NHTSA's rule was codified at 49 CFR 531.7 ("Preemption") and 533.7 ("Preemption"), as well as each Appendix B in 49 CFR part 531 ("APPENDIX B TO PART 531—PREEMPTION") and Part 533 ("APPENDIX B TO PART 533—PREEMPTION").

[343] 84 FR at 51338.

[344] *See, e.g.,* 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review); 74 FR at 32783 (rejecting comments asking for the consideration of EPCA because it is not one of the three statutorily prescribed criteria); 78 FR at 2145 (again rejecting comments asking for the consideration of EPCA because it is outside the statutory criteria); 79 FR at 46265 (rejecting the argument that the HD GHG Regulations "impermissibly regulate fuel economy" because, like the commerce clause and Federal Aviation Administration Authorization Act of 1994 (FAAAA) issues, this issue is "outside the proper scope of review since it is not among the criteria listed under section 209(b).").

[345] 78 FR at 2112, 2115; 40 FR at 23103–04; 58 FR 4166.

[346] H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967); S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("The waiver of preemption is for California's 'unique problems and pioneering efforts.' ").

[347] *MEMA I,* 627 F.2d 1095, 1111 (D.C. Cir. 1979); 113 Cong. Rec. 30950, 32478 (Statement of Sen. Murphy) ("The United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions. . . [The] State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.").

Thus "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight." [348]

Legislative history makes clear that the Administrator must "presume" that the California standards "satisfy the waiver requirements" and that the burden of proving otherwise rests on the Administrator or other parties favoring denial of the waiver. [349] Further, according to the House Committee Report for the 1977 amendments that strengthened California's waiver provisions, EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [350] According to the House Report, "The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver." [351] EPA's historic practice of considering only listed criteria is thus in keeping with the highly deferential review of waiver requests that Congress intended in carving out the exception from preemption of new motor vehicle and engine standards in section 209(a). [352]

Courts have generally agreed with the Agency's consideration of only listed CAA criteria in reviewing waiver requests, also pointing to the statute's lack of any indication of the ability to consider non-statutory criteria as well as the waiver program's significant deference to California. The D.C. Circuit has stated that, under the text of the present statute, the section 209(b) criteria are "the only waiver standards with which California must comply" and that, therefore, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application." [353] The D.C. Circuit has repeatedly described EPA's waiver approval role as "limited" and "narrow." In MEMA I, for example, the court explained that "the Administrator has consistently held since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations." [354] The court further noted that "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider." [355] Similarly, the court has stated that "[t]he statute does not provide for any probing substantive review of the California standards by federal officials" and that "EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria." [356] Thus, the court has consistently rejected arguments requiring EPA to consider factors outside of the statutory criteria. In MEMA I, the court rejected a constitutional objection to a waiver, explaining that, because "the Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters," "[n]othing in section 209 requires him to consider the constitutional ramifications of the regulations for which California requests a waiver . . . although nothing in section 209 categorically forbids" it. [357] In the same case, the court also rejected an antitrust objection as outside the scope of the Administrator's review. [358] The court again upheld EPA's decision to not consider constitutional objections in American Trucking Association (ATA) v. EPA, stating, "We agree with EPA that ATA is seeking 'improperly to engraft a type of constitutional Commerce Clause analysis onto EPA's [s]ection 7543(e) waiver decisions that is neither present in nor authorized by the statute." [359]

It is against this backdrop that EPA has reviewed waiver requests by evaluating them solely under the criteria of section 209(b). For instance, prior to SAFE 1, EPA had solicited comment, in the context of the 2008 and 2009 GHG notices for comment on CARB's first waiver request for GHG emission standards, as to whether the EPCA fuel economy preemption provisions were relevant to EPA's consideration of CARB's authority to implement its motor vehicle GHG regulations. [360] In both instances, EPA declined to consider preemption under EPCA. [361] In the 2009 waiver, EPA explained that "section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein." [362] EPA further pointed to its historic practice of "refrain[ing] from denying California's requests for waivers based on any other criteria," which had been reviewed and upheld by the Court of Appeals for the District of Columbia Circuit. [363] In the 2013 review of the ACC program waiver request, the Agency again declined to consider factors outside the statutory criteria, explaining that "EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria." [364] A year later, EPA yet again declined to consider constitutionality claims, preemption under EPCA, and the implications of the Federal Aviation Administration Authorization Act of 1994 (FAAAA). [365] EPA explained that section 209(b) limits the Agency's authority to deny California's requests for waivers to the three criteria therein and that the Agency has consistently refrained from denying California's requests for waivers based on any other criteria. [366]

In SAFE 1, EPA changed course, reasoning instead that the Agency pronouncement in the ACC program waiver decision on factors EPA could consider in denying a waiver request "was inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)—

[348] Ford Motor Co. v. EPA, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[349] MEMA I, 627 F.2d at 1121–22 (citing, for example, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

[350] MEMA II, 142 F.3d 449, 453 (D.C. Cir. 1998) (quoting H.R. Rep. No. 95–294, at 301–02 (1977)).

[351] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381.

[352] See, e.g., 74 FR at 32783; 78 FR at 2145.

[353] MEMA II, 142 F.3d at 463.

[354] MEMA I, 627 F.2d at 1119 (internal citations omitted).

[355] Id. at 1116–17.

[356] Ford Motor Co. v. EPA, 606 F.2d 1293, 1300 (D.C. Cir. 1979), and ATA v. EPA, 600 F.3d 624, 628 (2010), respectively.

[357] MEMA I, 627 F.2d at 1115 (declining to consider whether California standards are constitutional).

[358] Id. at 1117 ("[N]othing in section 209 or elsewhere in the Clean Air Act can fairly be read to imply a duty on the Administrator to deny a waiver on the basis of the antitrust implications of California regulations.").

[359] ATA v. EPA, 600 F.3d at 628.

[360] 73 FR at 12159.

[361] Id.; 74 FR at 32783.

[362] 74 FR at 32783.

[363] Id. (citing MEMA I, 627 F.2d at 1111, 1114–20, and MEMA II, 142 F.3d 449, 466–67 (D.C. Cir. 1998)).

[364] 78 FR at 2145.

[365] HD GHG Regulations for certain model year sleeper-cab tractors and dry-van and refrigerated-van trailers. 79 FR at 46256, 46264.

[366] Id. In rejecting the commerce clause objection, the decision cited MEMA I's statement that "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims." Id. (citing MEMA I, 627 F.2d at 1114–20). Thus, the decision concluded, "Constitutional challenges to the HD GHG Regulations [were] more appropriately addressed by a legal challenge directly against the state." Id.

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 100 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 44 of 53

**14370**   Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

(C)." [367] EPA explained that this statement and EPA's historical practice of not considering preemption under EPCA "were made in the context of EPA acting on its own to administer section 209(b) in considering such applications." [368] Further, EPA distinguished these previous single-agency actions from its SAFE 1 joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, "would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio*." [369] At the same time, EPA expressed intentions not to consider factors outside the statutory criteria in future waiver proceedings.[370] EPA then concluded that NHTSA's determination of preemption in the same action "renders EPA's prior grant of a waiver for those aspects of California's regulations that EPCA preempts invalid, null, and void" because "California cannot enforce standards that are void *ab initio*." [371]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

In its April 28, 2021, Notice of Reconsideration, EPA acknowledged that SAFE 1's consideration of NHTSA's finding of preemption under EPCA deviated from its historic practice of "declin[ing] to look beyond the waiver criteria in section 209(b) when deciding the merits of a waiver request from CARB." [372] EPA sought comment on whether "EPA properly considered and withdrew portions of the ACC program waiver pertaining to GHG standards and the ZEV sales mandate based on NHTSA's EPCA preemption action, including whether EPA had the authority to withdraw an existing waiver based on a new action beyond the scope of section 209." [373] Given EPA's reliance on NHTSA's preemption findings as a basis of waiver withdrawal in SAFE 1, EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would

affect its own reconsideration of SAFE 1.

### C. Comments Received

EPA received comments in support of and against the consideration of preemption under EPCA in reviewing requests for waivers by California. Multiple comments related to the Agency's use of the joint action with NHTSA as a justification for deviating from the Agency's practice of reviewing waiver requests under the specific statutory criteria. Some commenters agreed that the context of a joint action necessitated consideration of preemption under EPCA because NHTSA was the agency charged with interpreting and implementing EPCA and so EPA must consider its findings in the same action.[374] One commenter also argued that the joint rulemaking of SAFE 1 would be consistent with pronouncements in *Massachusetts* v. *EPA* (2007) on the agencies' respective statutory obligations and the need to avoid inconsistency and so, "[o]nce NHTSA proposed to finalize a determination that EPCA preempts California's GHG motor vehicle standards, it would be unreasonable for the EPA to refuse to take NHTSA's action into account." [375]

Other commenters argued that the context of the rulemaking, whether joint or not, was irrelevant. One commenter stated emphatically that "what Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency." [376] Some commenters also argued that the context of the rulemaking was a particularly insufficient justification for revoking the waiver given language in SAFE 1 that allowed for inconsistent consideration of EPCA preemption. Several commenters noted that EPA constrained the future applicability of SAFE 1 by explaining that the Agency would not consider factors outside statutory criteria in future waiver reviews in other subject areas.[377] Another commenter also noted that "the action purported to be 'joint,' and yet as now acknowledged, SAFE Part 1 'is properly considered as two severable actions, a rulemaking by NHTSA and a final informal adjudication by EPA.' " [378] These inconsistencies, they argued, made SAFE 1's distinction between single-

agency and joint actions arbitrary and capricious.

Commenters also argued for and against consideration of factors outside the statutory criteria—including, but not limited to, preemption under EPCA—regardless of the kind of agency action, although EPA did not make this argument in SAFE 1. Commenters argued that EPA's authority to look outside the statutory criteria at EPCA was at least permissive, if not mandatory. According to one commenter, "EPA exaggerates the Court's position" in *MEMA I* in its Reconsideration notice: "[T]he court did not say that the EPA is *forbidden* to take constitutional ramifications into consideration, only that it is *not required* to do so." [379] Another commenter agreed that *MEMA I* and *MEMA II* "do not preclude EPA from considering" preemption under EPCA but then went further, saying that "EPA is *required* to consider EPCA preemption." [380] The commenter argued that *MEMA I* rejected petitioners' constitutional objections to a waiver under an institutional competence line of reasoning, concluding that "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims." [381] In contrast, they continued, the waiver proceeding is an appropriate forum for determining whether emission standards "relate to" fuel economy because this issue is "within the agency's competence, as this relationship is mathematical and based in science rather than understandings of Constitutional law and precedent." [382] However, the other commenter, who agreed that EPA is not "forbidden" from considering preemption under EPCA, also noted that EPA "has no special competence to interpret EPCA." [383]

Several commenters also argued that EPA could not reinstate the waiver because NHTSA concluded that EPCA preempts the standards, such standards were void *ab initio,* and therefore "the state mandates referenced in CA's petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption." [384] To ignore

---

[367] A complete discussion of preemption under EPCA in SAFE 1 can be found at 84 FR at 51337–38.

[368] *Id.*

[369] *Id.* Citing *Massachusetts* v. *EPA,* the Agency also asserted that the consideration of EPCA was supported by the Supreme Court's holding because it ensured consistency between NHTSA and EPA's programs. *Id.*

[370] 84 FR at 51338.

[371] *Id.*

[372] 86 FR at 22429.

[373] *Id.*

[374] *See, e.g.,* CEI at 11–12; AFPM at 2, 6.

[375] CEI at 11.

[376] States and Cities at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[377] NESCAUM at 3; Twelve Public Interest Organizations at app. 1 64–65; States and Cities at 20.

[378] SCAQMD at 7 (quoting 86 FR at 22439, n.40).

[379] CEI at 10 (original emphasis).

[380] AFPM at 5–6.

[381] *Id.* at 6 (quoting *MEMA I,* 627 F.2d 1095, 1114–15 (DC Cir. 1979)).

[382] *Id.*

[383] CEI at 11.

[384] NADA at 3–4; *See also* AFPM at 3 ("Since California's GHG tailpipe standards and ZEV mandate are related to fuel economy, they are not lawfully adopted and void *ab initio*—and there is nothing for EPA to reinstate."); Urban Air at 47–48; CEI at 2 ("But EPCA preemption is the proverbial elephant in the room. If SAFE 1's EPCA preemption argument is correct, the EPA could not grant a valid CAA preemption waiver for California's tailpipe

this, they claimed, would violate the Supremacy Clause of the Constitution. EPA, therefore, must look outside the statutory criteria to consider preemption under EPCA because it cannot "reasonably claim that the lawfulness and constitutionality of state actions over which it has supervision are issues outside the scope of its responsibility[.]" [385]

In contrast, other commenters pointed to EPA's historical practice of evaluating waiver requests under the section 209 statutory criteria, the text of the statute, and the policy implications of looking outside the statutory criteria, to support a return to EPA's traditional narrow approach. Most commenters argued that EPA's traditional interpretation was consistent with the text of section 209(b), which has no reference to preemption under EPCA or any other factors outside the three statutory criteria. [386] Not only does EPA have "no grounds to read EPCA preemption considerations into the statute," [387] these commenters argued, but to consider non-statutory criteria would actually be "arbitrary and capricious" [388] and contrary to "precedent respecting separation of powers and federalism principles." [389] Yet another commenter stated that the narrow interpretation "provides a safeguard from the capricious injection of outside-the-scope argumentation" because "[w]hen the adjudication is permitted to stray from the statutory criteria, prospects for a fair hearing can be derailed, and the EPA Administrator may be more prone to overstep and

exert policy preferences that are impermissible." [390]

Additionally, in their petitions for reconsideration of SAFE 1, several states and cities asserted that EPA unlawfully changed course in SAFE 1 by considering (and relying on) the purported preemptive effect of EPCA, which is outside the confines of section 209(b) and argued that this rationale for withdrawing the waiver was flawed. [391]

### D. Analysis: EPA Is Rescinding Its SAFE 1 Actions Related to Preemption Under EPCA

Since SAFE 1, NHTSA has formally withdrawn its conclusions (and associated regulatory text) that state or local regulations of tailpipe carbon dioxide emissions are related to fuel economy standards and therefore preempted under EPCA. [392] Thus the predicate for EPA's decision to withdraw the ACC waiver on that basis no longer exists. Furthermore, given the context of EPA's reconsideration of the ACC program waiver at the time of SAFE 1, the Agency believes it was inappropriate to reconsider the validity of the waiver against criteria such as preemption under EPCA. In this action, based on the two independent grounds noted above, the Agency is rescinding the portion of SAFE 1 that withdrew the ACC program waiver based on preemption under EPCA.

#### 1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1

In the Notice of Reconsideration, EPA sought comment on the Agency's reliance on NHTSA's preemption findings as a basis for its withdrawal of the ACC program waiver in SAFE 1. EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would affect its own reconsideration of SAFE 1. [393] NHTSA has since withdrawn its findings of preemption and the preemption basis of withdrawal is no longer applicable. Specifically, NHTSA has issued a new final rule that formally repeals the codified text and additional pronouncements regarding preemption under EPCA found in SAFE 1. [394] In

SAFE 1, EPA stated that it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio* and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis." [395] Since this condition no longer exists, EPA believes it is appropriate to rescind the waiver withdrawal that was based on preemption under EPCA. EPA believes that, to the extent it was ever appropriate for the Agency to base its action on NHTSA's finding of preemption under EPCA in SAFE 1, the repeal of the preemption rule makes it likewise appropriate to rescind the Agency's action in SAFE 1. This would also act to minimize regulatory uncertainty as to do otherwise would create further confusion that resulted from the joint action in SAFE 1 and would not appropriately reflect the current state of affairs under the circumstances of a unique federal regulation that had otherwise motivated EPA's actions in SAFE 1. NHTSA's recent action also supports EPA's belief that its practice of limiting its review of section 209(b) criteria, as explained below, remains appropriate in the context of preemption under EPCA.

#### 2. EPA Improperly Deviated From Its Historical Practice of Limiting Its Review to Section 209(b) Criteria

Section 209(b)(1) of the Act limits the Agency's authority to deny California's requests for waivers to the three criteria contained therein and the Agency has consistently refrained from reviewing California's requests for waivers based on any other criteria. EPA acknowledges that California adopts its standards as a matter of law under its state police powers, that the Agency's task in reviewing waiver requests is limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal district court, for the resolution of any constitutionality claims and assertions of inconsistency with other statutes.

---

CO₂ standards and ZEV mandates, because EPCA had already turned those policies into legal phantoms—mere proposals without legal force or effect.").

[385] CEI at 11.

[386] *See, e.g.,* States and Cities at 20 ("EPA's traditional understanding of its limited role is entirely consistent with the text of Section 209(b)(1) and precedent interpreting it."); NCAT at 12 ("As EPA has stated in several prior waiver decisions, there is no reference in Section 209(b) to EPCA preemption nor anything that could be construed to address this issue. Section 209(b) is unambiguous in this regard, and EPA has no grounds to read EPCA preemption considerations into the statute.").

[387] NCAT at 12.

[388] NESCAUM at 7 ("As the D.C. Circuit has explained in the context of Section 209(b), 'there is no such thing as a general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider.' It is a basic principle of administrative law that an agency action is 'arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.' ").

[389] States and Cities at 20 ("It is likewise entirely consistent with precedent respecting separation of powers and federalism principles and holding that 'a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority.' *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986).").

[390] SCAQMD at 7.

[391] 86 FR at 22428.

[392] 86 FR 74236.

[393] 86 FR at 22429.

[394] 86 FR 74236. NHTSA notes in this rulemaking that "the Agency is repealing all regulatory text and appendices promulgated in the SAFE I Rule. In doing so, the Agency underscores that any positions announced in preambulatory statements of prior NHTSA rulemakings, including in the SAFE I Rule, which purported to define the scope of preemption under the Energy Policy and Conservation Act (EPCA), do not reflect the Agency's reconsidered

understanding of its proper role in matters of EPCA preemption."

[395] EPA distinguished these previous single-agency actions from its joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, "would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio.*" 84 FR at 51338.

Considering the lack of statutory and precedential support as shown below, even if EPA were to have discretion to consider criteria outside section 209(b), EPA now views the joint-action context of SAFE 1 as an insufficient justification for deviating from its statutory authority and the Agency's historical practice and therefore the Agency rescinds its actions regarding preemption under EPCA in SAFE 1.

Withdrawal of the waiver was premised on NHTSA's preemption regulations in what EPA explained was a joint rulemaking action. But nothing in section 209(b) can be read as calling for consideration of preemption under EPCA in evaluating waiver requests regardless of whether EPA engaged in joint rulemaking with another agency or acted alone. Specifically, under section 209(b), EPA must grant California a waiver of the preemption contained in section 209(a) unless the Administrator makes a finding under any one of the listed criteria: "The Administrator shall . . . waive application of the preemption in section 209(a) if the Administrator finds any of the following: '(A) [California's] determination [that its standards in the aggregate will be at least as protective] is arbitrary and capricious, (B) [California] does not need such State standards to meet compelling and extraordinary conditions, or (C) such State standards and accompanying enforcement procedures are not consistent with section [202(a)].'"[396] Evaluation of preemption under EPCA is not a listed criterion.

Nor did SAFE 1 premise preemption under EPCA on any of the three statutory criteria. In the ACC program waiver request, CARB made a protectiveness finding that, as a quantitative matter, its standards, in the aggregate, were as protective as the Federal standards and did not address preemption under EPCA.[397] In fact, while California might opt to respond to comments on preemption under EPCA, California would not be expected to take it into account in any protectiveness finding made for a waiver request. It bears note that California's practice is not unusual because there are other factors and provisions of the CAA that California does not account for in making its protectiveness finding under section 209(b)(1).[398] In granting the ACC program waiver request, EPA found that California's protectiveness finding was

neither arbitrary nor capricious.[399] EPA also responded to comments on the consideration of preemption under EPCA in granting the waiver but dismissed such objections as outside the scope of its review.[400] Historically, EPA draws a comparison between the numerical stringency of California and federal standards in making the requisite finding as to whether California's protectiveness determination is arbitrary and capricious.[401] Thus, neither California's initial request, nor EPA's waiver grant, considered preemption under EPCA and as previously explained in the ACC program waiver, EPA declined to consider preemption under EPCA viewing it as outside the scope of Agency review.

SAFE 1 made clear that consideration of and reliance on preemption under EPCA was the consequence of regulations promulgated by NHTSA. As SAFE 1 also acknowledged, however, EPA does not "administer" EPCA; that task falls to NHTSA.[402] Instead, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application."[403] EPA therefore disagrees with the comment that *Massachusetts* provides the Agency special duty to consider preemption under EPCA in a joint rulemaking action in reviewing waiver requests. In *Massachusetts*, the Supreme Court recognized the potential overlap between NHTSA's and EPA's statutory obligations and concluded that "there is no reason to think the two agencies cannot both administer their obligations yet avoid inconsistency."[404] As one commenter noted, EPA and NHTSA have previously engaged in joint actions that addressed fuel economy and GHG emissions. In those actions, NHTSA's role has been to set national fuel economy standards and EPA's role has been to set national GHG

standards.[405] These roles are complementary, but distinct. The Court acknowledged the independence of these roles in *Massachusetts*: "EPA has been charged with protecting the public's 'health' and 'welfare,' 42 U.S.C. 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. See Energy Policy and Conservation Act, § 2(5), 89 Stat. 874, 42 U.S.C. 6201(5)."[406]

Regarding the Agency's simultaneous pronouncement that reliance on preemption under EPCA would be a singular exercise that would not be repeated, statutory support or past precedent for this singular consideration was also lacking.[407] In fact, this singular exercise would allow for EPA to evaluate the same waiver request differently and depending on EPA's own choice—the choice to act with another agency or not—rather than on the merits of the waiver request itself within specified criteria in section 209(b). Again, the result of this unique application of EPA's authority is unsupported under section 209(b)(1).

As previously noted, EPCA is generally administered by NHTSA and consideration of preemption under EPCA in reviewing waiver requests would for instance call for EPA to resolve the much debated and differing views as to what is a "law or regulation related to fuel economy," as contemplated by 39 U.S.C. 32919(a).[408] Relevant judicial precedent would also appear to call into question whether California's GHG standards and ZEV sales mandates are indeed preempted under EPCA.[409] But as previously explained, EPA does not implement EPCA, and the Agency's review of waiver requests is highly deferential.

EPA also disagrees with comments that the Agency must generally consider factors outside the criteria listed in section 209(b), including preemption under EPCA, regardless of the joint- or single-agency nature of the action. EPA

---

[396] CAA section 209(b)(1)(A)–(C).

[397] 2012 Waiver Request at 15–17.

[398] For example, "California is not required to comply with section 207 to get a waiver." *MEMA II*, 142 F.3d 449, 467 (D.C. Cir. 1989).

[399] 78 FR at 2125.

[400] *Id.* at 2145.

[401] Section 209(b)(2) provides that if each State [California] standard is at least as stringent as comparable applicable Federal standards then such standard shall be deemed to be as protective of public health and welfare as such federal standards for purposes of section 209(b)(1)(A). EPA acknowledges that in 1977 Congress amended the waiver provision to allow for California to address its unique combination of air quality problems and that California only be required to demonstrate stringency in the aggregate and that therefore some pollutant standards may not be as stringent.

[402] 84 FR at 51338 ("EPA agrees with commenters that EPA is not the agency that Congress has tasked with administering and interpreting EPCA. This is especially so because '[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims.' *MEMA I*, 627 F.2d at 1115.").

[403] *MEMA II*, 142 F.3d at 463.

[404] *Massachusetts* v. *EPA*, 549 U.S. 497, 532 (2007).

[405] In its most recent rulemaking addressing GHG emissions from light-duty vehicles, EPA extensively coordinated with NHTSA on details of the program but did not conduct it as a joint rulemaking. *See* 86 FR 74434, 74436 (December 30, 2021).

[406] *Massachusetts*, 549 U.S. at 497, 532.

[407] "EPA does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C)." 84 FR at 51338.

[408] EPA takes no position on any role NHTSA might play under 42 U.S.C. 32919(a) and acknowledges that NHTSA discusses this in its recent final rulemaking. *See generally* 86 FR 74236.

[409] *See, e.g., Cent. Valley Chrysler-Jeep, Inc.* v. *Goldstene*, 529 F. Supp. 2d 1151, 1153–54 (E.D. Cal. 2007), *as corrected* Mar. 26, 2008; *Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie*, 508 F. Supp. 2d 295, 300–01 (D. Vt. 2007).

has never claimed that it has such broad authority to consider factors outside section 209(b) and the decades of waiver practice, as well as judicial precedent, are indicative of the Agency's narrow scope of review for California waiver requests: "[T]he Administrator has consistently held since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations." [410] Instead, EPA has consistently declined to consider factors outside the three statutory criteria listed in section 209(b). [411] This limited scope of review has been repeatedly upheld by the courts. For example, in *MEMA I*, the D.C. Circuit stated that "there is no such thing as a "general duty" on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider." [412] In *MEMA II*, the D.C. Circuit again rejected consideration of a factor outside the 209(b) statutory criteria because doing so would restrict California's ability to "exercise broad discretion." [413]

Commenters also claim that ignoring NHTSA's finding of preemption would violate the Supremacy Clause of the Constitution because the necessary consequence of NHTSA's conclusion in SAFE 1 is that certain standards were void *ab initio* as preempted under EPCA and as such that "the state mandates referenced in [California's] petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption." [414] EPA disagrees. As the D.C. Circuit has held, "[t]hat [the Administrator] like every other administrative officer owes allegiance to the Constitution does not mean that he is required to issue rulings of constitutional dimension." [415] Thus, "[n]othing in section 209 requires [the Administrator] to consider the constitutional ramifications of the

regulations for which California requests a waiver." [416]

Moreover, consideration of factors beyond those set out in section 209(b)(1) would subject California and vehicle and engine manufacturers to changes in regulatory schemes by other federal agencies not acting under the authority of the CAA. [417] SAFE 1 and subsequent events perfectly encapsulate this problem. For instance, NHTSA has since finalized the repeal of the regulatory provisions and pronouncements it made in SAFE 1 that were the underpinnings for EPA withdrawing certain aspects of the ACC program waiver and with that action the Agency's basis for revocation of the waiver under EPCA has now evanesced. [418] Additionally, this is affirmation of EPA's long held view that waiver proceedings are not the appropriate venue for resolving these issues, and the joint-rulemaking context is not and should never have been justification for deviating from statutory authority and the Agency's historical practice.

It also bears note that consideration of factors beyond the criteria contained in section 209(b) would not be limited to preemption under EPCA. Commenters suggested, for instance, that EPA would not be able to "ignore the First Amendment," in the hypothetical situation where California impos[ed] standards on some manufacturers in retaliation for their voiced opposition to California's authority as well as criminality such as "bribery and extortion had been instrumental in assembling the legislative majorities." [419] In short, under the commenter's view, factors for consideration in waiver proceedings would be innumerable. And yet these factors bear little or no relation to specific criteria in section 209(b) that would otherwise warrant the denial of a waiver request. The D.C. Circuit has already, several times, held that EPA is not required to consider factors outside of and unconnected to these statutory criteria, especially constitutional objections. In fact, regarding the commenter's example, the court has already specifically rejected consideration of the First Amendment

in waiver evaluations. In *MEMA I*, the court considered and upheld EPA's decision declining to consider a First Amendment objection to a waiver as beyond the scope of agency review. [420] Courts have also rejected objections based on the applicability of CAA section 207 to California waiver requests [421] and the Commerce Clause. [422] EPA is therefore not persuaded by these arguments. Additionally, courts have long held that administrative proceedings for California waiver requests are ill-suited for consideration of constitutional issues. Nothing precludes commenters from challenging California's standards themselves—whether under EPCA, another statute, or the Constitution—in other, better-suited fora. According to the D.C. Circuit, for instance, [w]hile nothing in section 209 categorically forbids the Administrator from listening to constitutionality-based challenges, petitioners are assured through a petition of review . . . that their contentions will get a hearing." [423] The D.C. Circuit has also repeatedly stated that challenges which go to the legality of California's standards themselves, are better addressed directly by either courts or Congress. [424] Challenges based on preemption under EPCA similarly go to the legality of California's standards themselves and are thus more appropriate in court or addressed to Congress.

*E. Conclusion*

Because the landscape of federal law has changed since SAFE 1 due to NHTSA's repeal of its regulatory text, appendix, and pronouncements regarding EPCA preemption in SAFE 1, EPA believes that it is appropriate to rescind its waiver withdrawal actions in SAFE 1 that were predicated on the federal law context created by NHTSA's SAFE 1 action. On separate grounds, EPA also believes that, based on the foregoing, EPA should not have deviated from its practice of limiting its waiver review to the criteria in section

---

[410] *MEMA I*, 627 F.2d 1095, 1119 (D.C. Cir. 1979).

[411] *See, e.g.,* 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review); 74 FR at 32783 (declining to consider EPCA preemption, stating that "section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein."); 79 FR at 46264 (reiterating that EPA can only deny a waiver request based on the 209(b) statutory criteria, dismissing comments on preemption under EPCA, as well as the Constitution and the implications of the FAAAA).

[412] 627 F.2d at 1116.

[413] 142 F.3d at 464.

[414] NADA at 3.

[415] *MEMA I*, 627 F.2d at 1114–15.

[416] *Id*. at 1115.

[417] "The manufacture of automobiles is a complex matter, requiring decisions to be made far in advance of their actual execution. The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production." S. Rep. No. 403, 90th Cong., at 730 1st Sess. (1967).

[418] *See* 86 FR 74236.

[419] CEI at 11.

[420] *MEMA I*, 627 F.2d 1095, 1115 (D.C. Cir. 1979).

[421] *MEMA II*, 142 F.3d 449, 467 (D.C. Cir. 1998).

[422] *ATA* v. *EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) ("EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria."); *OOIDA* v. *EPA*, 622 Fed. Appx. 4, 5 (D.C. Cir. 2015) (rejecting a challenge for lack of jurisdiction because challengers objected to California's regulations themselves, not EPA's approval of them in a waiver under 209(b)).

[423] *MEMA I*, 627 F.2d at 1115.

[424] *Id*.at 1105. In *ATA* v. *EPA*,the D.C. Circuit rejected a constitutional challenge to a California waiver, concluding that Congress made the decision to give California "the primary role in regulating certain mobile pollution sources" so the challenger's argument was best directed to Congress. 600 F.3d 624, 628 (D.C. Cir. 2010).

209(b)(1). Thus, for the reasons stated above, EPA is rescinding those portions of SAFE 1 that withdrew the waiver of the ACC program on the basis of preemption under EPCA.

## VII. EPA Inappropriately Set Forth an Interpretive View of Section 177 in SAFE 1

In SAFE 1, EPA provided an interpretive view of section 177 of the CAA, stating that states adopting California's new motor vehicle emission standards (section 177 states) could not adopt California's GHG standards.[425] In this action, EPA determines that it was both inappropriate and unnecessary within a waiver proceeding to provide an interpretive view of the authority of section 177 states to adopt California standards, as EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which a waiver has been granted to California.[426] Rather, if a state chooses to submit such standards for inclusion in an SIP, EPA's role with regard to approval of these standards is to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission. Therefore, the Agency is rescinding the interpretive views on section 177 set out in SAFE 1.

### A. SAFE 1 Interpretation

In the SAFE proposal, EPA proposed to conclude that "States may not adopt California's GHG standards pursuant to section 177 because the text, context, and purpose of section 177 support the conclusion that this provision is limited to providing States the ability, under certain circumstances and with certain conditions, to adopt and enforce standards designed to control criteria pollutants to address NAAQS nonattainment."[427] Additionally, the proposal noted the title of section 177 ("New motor vehicle emission standards in nonattainment areas") indicates a limited scope of application.[428] The proposal also suggested that, because "[a]reas are only designated nonattainment with respect to criteria pollutants," it would be

"illogical" if states could use their 177 authority "to adopt California standards that addressed environmental problems other than nonattainment of criteria pollutant standards."[429]

In the SAFE 1 decision, EPA finalized its proposed interpretive view, reiterating that "the text (including both the title and main text), structural location, and purpose of the provision confirm that it does not apply to GHG standards."[430] Because section 177's title references nonattainment areas, and because nonattainment designations only exist for criteria pollutants, EPA claimed, states could not adopt standards for purposes of GHG control under section 177.[431]

As evidence for this interpretive view, EPA again pointed to the text and location of the section, which had been the basis for the Agency's interpretation in the SAFE proposal. EPA acknowledged commenters who argued that "CAA section 177 does not contain any text that could be read as limiting its applicability to certain pollutants only" and that EPA had "inappropriately relied on the heading for CAA section 177 to construe a statutory provision as well as arrogated authority to implement an otherwise self-implementing provision," but disagreed with these commenters.[432] In addition to the evidence relied on in the proposal, EPA provided examples of legislative history from the 1977 amendments to support its interpretive view.[433]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

Acknowledging that "section 177 does not require States that adopt California emission standards to submit such regulations for EPA review" and that "California in previous waiver requests has addressed the benefits of GHG emissions reductions as it relates to ozone," EPA sought comment in the 2021 Notice of Reconsideration on whether EPA had the authority in the

---

[429] Id.

[430] 84 FR at 51350.

[431] Id.

[432] Id.

[433] In particular, EPA cited legislative history on section 172(b), which set forth the "requisite provisions" for state plans for nonattainment areas. Id. at 51350 n.286. According to the legislative history, one of the many factors that must be considered by a state plan is "actual emissions of such pollutant resulting from in-use motor vehicles." Id. (quoting H.R. Rep. No. 294, 95th Cong., 1st Sess. 212 (1977), 1977 U.S.C.C.A.N. 1077, 1291, 1997 WL 16034). Therefore, EPA claimed, this legislative history "identifies section 177 as a means of addressing the NAAQS attainment planning requirements of CAA section 172, including the specific SIP content and approvals criteria for EPA." Id. at 51351.

SAFE 1 context to interpret section 177 of the CAA and whether the interpretive view was appropriate.[434] Specifically, EPA sought comment on whether it was appropriate for EPA to provide an interpretive view of section 177 within the SAFE 1 proceeding.[435] To the extent it was appropriate to provide an interpretation, EPA sought comment on whether section 177 was properly interpreted and whether California's motor vehicle emission standards adopted by states pursuant to section 177 may have both criteria emission and GHG emission benefits and purposes.[436]

### C. Comments Received

In response to SAFE 1, EPA received multiple petitions for reconsideration. One petition submitted by several states and cities asserted that, in adopting its interpretation of section 177, EPA "relie[d] on information and reasoning not presented in the SAFE Proposal," particularly the "superseded version of Section 172 . . . and legislative history for that outdated provision."[437] The petition noted that the use of this information and reasoning was used in the SAFE 1 to conclude that "section 177 is in fact intended for NAAQS attainment planning and not to address global air pollution."[438] Petitioners argued that because this information and reasoning was not presented in the proposal, "EPA should withdraw and reconsider its finalization of the Section 177 interpretation and allow for full and fair public comment before proceeding further."[439]

EPA also received many comments in response to the Notice of Reconsideration of SAFE 1, both supporting and opposing EPA's statements regarding section 177 in SAFE 1. Supporters of SAFE 1 reiterated the reasoning from the proposal and final action.[440] For example, one commenter wrote, "In short, 'the text, context, and purpose of Section 177 suggest' that the provision is limited to motor vehicle standards 'designed to control criteria pollutants to address NAAQS nonattainment.'"[441] Like the SAFE proposal and final action, the commenter stated that in addition to the text and context of the section, there is "substantial legislative history showing that Congress's purpose in creating the Section 177 program was to address

---

[434] 86 FR at 22429.

[435] Id.

[436] Id.

[437] See States and Cities' Petition at 27.

[438] Id. (quoting 84 FR at 51351).

[439] Id.

[440] CEI at 17–18; NADA at 6; AFPM at 12–13.

[441] CEI at 18 (quoting heavily from the SAFE proposal and SAFE final action).

---

[425] 84 FR at 51310, 51350.

[426] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

[427] 83 FR at 43240.

[428] Id.

non-attainment with NAAQS for criteria pollutants, not to address any global atmospheric phenomenon." [442]

Opponents of SAFE 1 argued both that EPA had no authority to issue its 177 statement and that the merits of EPA's argument were wrong. On the issue of authority, opponents of SAFE 1 claimed that SAFE 1 failed to consider the reliance interests of the stakeholders, particularly section 177 states. [443] SAFE 1, they argued, upset this reliance and created uncertainty. [444] A substantial number of commentors also argued that EPA had no authority to make its statements on section 177 because "Congress gave EPA no role in implementing Section 177 and no authority to constrain States' decisions regarding adoption of California emissions standards." [445]

On the merits of EPA's SAFE 1 argument, opponents of the action commented that EPA misinterpreted section 177 and that, even if EPA's interpretive view were correct, EPA misapplied it. Multiple commenters wrote that the text of section 177 does not limit the types of pollutants for which motor vehicle emission standards can be authorized. [446] Commenters also noted that the title of section 177 refers to geographic *areas,* not pollutants, and argued that the restriction was therefore on which states could adopt California standards (states with plan provisions approved under Part D) not on the pollutants for which those states could adopt standards. [447] A few commenters also argued that EPA's section 177 interpretive view would create a "third vehicle" scenario, in contradiction of section 177's identicality requirement. [448] Even if EPA's interpretation were correct, opponents continued, California's standards have both criteria emission and GHG emission benefits and purposes. [449] Commenters cited the factual record as well as EPA's own past findings as evidence of the connection between GHG standards and NAAQS attainment.

*D. Analysis: EPA Is Rescinding SAFE 1's Interpretive Views of Section 177*

EPA is withdrawing its non-regulatory and non-binding interpretation of section 177 set forth in SAFE 1. EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which the Agency has granted a waiver to California. [450] Rather, if a state chooses to submit such standards for inclusion in a SIP, EPA's role with regard to approval of these standards is

to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission. [451]

In reconsidering SAFE 1, EPA now believes that it was inappropriate to offer an interpretive view of section 177 in the context of that action. EPA believes it acted inappropriately in providing an interpretive view in SAFE 1 and that such action was based on an inaccurate assessment of the factual record. EPA's interpretive view was not compelled by any petition, request, or legislative or judicial mandate and was otherwise not final agency action. [452] EPA is therefore rescinding the interpretive views contained in SAFE 1.

As commenters have noted, section 177 does not describe a direct approval role for EPA. Section 177 says that "any State which has plan provisions approved under this part may adopt and enforce" identical California standards and delineates three specific criteria for adoption. [453] Nothing in this language or in the text of the rest of the section requires or allows EPA to approve such adoption and enforcement or directs EPA to implement the section through regulation; EPA plays no statutory approval role in the adoption of California standards by other states other than action on a SIP revision, should those states include the standards in their plans. In fact, there are only three prerequisites to adoption and enforcement by a state: That the state has a federally approved SIP, that the standards are identical (thus the state standards must not create or have the effect of creating a "third vehicle") to California standards for which California has received a waiver, and that California and the state adopt the standards with at least two years lead time. [454] This limited role has been

[442] *Id.*

[443] States and Cities at 50–55; Institute for Policy Integrity Amicus Brief at 22–26 ("[T]he fact that California and many other states have detrimentally relied on this waiver to meet federal and state air-pollution mandates resolves any lingering doubt about the lawfulness of EPA's Action. . . . Revoking the preemption waiver . . . jeopardizes the state's ability to meet federal standards for other harmful air pollutants, since the standards covered by the waiver would have reduced—directly and indirectly—nitrogen-oxide, ozone, and particulate-matter pollution. *See* 78 FR 2122, 2129, and 2134."); Tesla at 11–13; National Association of Clean Air Agencies (NACAA), Docket No. EPA–HQ–OAR–2021–0257–0096 at 3. Many of the 177 states had also provided comments, during the SAFE 1 comment period, explaining that they have adopted the ACC program standards to meet their public health goals. *See, e.g.,* Maryland Department of the Environment, Docket No. EPA–HQ–OAR–2018–0283–5831 at 2–3; Delaware Department of Natural Resources and Environment Control, Docket No. EPA–HQ–OAR–2018–0283–5066 at 3–5; Massachusetts Department of Environmental Protection, Docket No. EPA–HQ–OAR–2018–0283–5476; State of California et al., Docket No. EPA–HQ–OAR–2018–0283–5481 at 130–31 (California was joined by the States of Connecticut, Delaware, Hawaii, Iowa, Illinois, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, Oakland, San Francisco, and San Jose).

[444] *See, e.g.,* States and Cities at 50–55; Tesla at 11–13.

[445] States and Cities at 51. *See also* Tesla at 11–13; Twelve Public Interest Organizations app. 1 at 2; NESCAUM at 8–9; Southern Environmental Law Center (SELC), Docket No. EPA–HQ–OAR–2021–0257–0125 at 2–3; NCAT at 12; Class of '85, Docket No. EPA–HQ–OAR–2021–0257–0454 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0388) at 5–6; Maine at 2; OTC at 2. Ironically, one supporter of SAFE 1, while arguing that EPA cannot consider GHG reductions from section 177 states in its second prong analysis, acknowledged EPA's lack of an oversight role under section 177: "EPA cannot consider GHG reductions, if any, attributable to 'opt-in' states under Section 177, as these are out of the scope of a waiver application. Indeed, EPA has no legal role in reviewing opt-in states, as the statute grants the agency no role in reviewing opt-in by other states." AFPM at 15.

[446] *See, e.g.,* States and Cities at 53; NESCAUM at 9; NCAT at 12.

[447] *See, e.g.,* States and Cities at 53 ("[T]he reference in the title to 'nonattainment areas' is not a limitation to 'nonattainment (*i.e.,* criteria) pollutants' or standards that target them" but rather a limitation on the states that can adopt California's standards); NESCAUM at 9; SELC at 2; NCAT at 12.

[448] Commenters feared that EPA's interpretation, which "prevents Section 177 States from adopting California's GHG standards, but not any other California standards," could require states to "extract just the GHG portion of the Advanced Clean Cars rules from their programs, thus potentially creating type of 'third vehicle' forbidden by Section 177 (*i.e.,* a vehicle subject to a hybrid combination of the other California standards and the (now weakened) federal GHG standards." States and Cities at 54. *See also* NESCAUM at 11–12; SELC at 5.

[449] States and Cities at 31–32, 50–55; NESCAUM at 12–13; SELC at 5; NCAT at 12; Class of '85 at 4–5.

[450] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

[451] EPA notes that although section 177 states that ". . . any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles . . ." the language in section 177 does not require a state to submit its adopted motor vehicle emissions standards for SIP approval.

[452] 84 FR at 51338 n.256 ("EPA acknowledges that its actions in this document may have implications for certain prior and potential future EPA reviews of and actions on state SIPs. . . . EPA will consider whether and how to address those implications, to the that they exist, is separate actions."). EPA action on a state plan (including application of Section 177) is subject to judicial review. 42 U.S.C. 7607(b)(1).

[453] 42 U.S.C. 7507.

[454] *Id.*

**14376** **Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

acknowledged by courts and EPA alike.[455] Thus, it is well established that states have broad discretion to adopt California standards without being subject to EPA's approval.[456]

States with approved SIPs that have adopted the waived California standard into state law may submit a SIP revision that includes that adopted standard. In that proceeding, EPA could determine whether the statutory criteria for adoption are met for purposes of approving a SIP revision. Indeed, in the litigation following SAFE 1, EPA acknowledged that its interpretive view of section 177 would have no actual effect until applied in a future SIP context.[457] SIPs are a crucial planning tool in helping states reach attainment for NAAQS and California's standards are key components of many of these SIPs.[458] In a SIP proceeding, these states

and other stakeholders are better able to provide specific and comprehensive comments about the intent and effect of adopting California standards.[459]

For these reasons, EPA believes that it was inappropriate to provide an interpretive view of section 177 in SAFE 1.[460] Therefore, EPA is withdrawing its SAFE 1 interpretive view of section 177.

### E. Conclusion

EPA determines that it was both inappropriate and unnecessary, within the SAFE 1 waiver proceeding, to provide an interpretive view of the authority of section 177 states to adopt California standards. Therefore, EPA withdraws its interpretive views that had been set forth in SAFE 1.

### VIII. Other Issues

#### A. Equal Sovereignty

As explained in Section VI, EPA must grant California's waiver request unless the Agency makes one of the specified findings in section 209(b)(1). In this instance, Congress has made multiple determinations through its adoption of section 209 and subsequent amendments, dating from 1967 through the 1990 CAA Amendments, regarding California's role and its relation to federal standard setting for mobile sources. EPA's longstanding waiver practice, consistent with case law, has been to refrain from considering factors beyond section 209(b)(1) criteria as well as constitutional claims in the review of California waiver requests.[461] EPA

acknowledges that California adopts its standards as a matter of law under its police powers,[462] that the Agency's task in reviewing waiver requests is properly limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal court, for the resolution of constitutionality claims and inconsistency, if any, with other statutes. As further explained this practice flows from the statute and legislative history, which reflect a broad policy deference that is afforded to California to address its serious air quality problems (which are on-going) as well as to drive emission control innovation. And so, EPA has historically declined to consider constitutional issues in evaluating and granting section 209 waivers. In *MEMA I*, the D.C. Circuit rejected a First Amendment challenge to a waiver as outside the scope of review.[463] In 2009, EPA approved a waiver (and authorization) under section 209(e), granting California authority to enforce its Airborne Toxic Control Measure, which established in-use emission performance standards for engines in transport refrigeration units (TRUs) and TRU generator sets.[464] Responding to comments that the waiver reached beyond California's borders in violation of the Dormant Commerce Clause, EPA stated that such considerations are not factors that EPA must consider under section 209(e) because "EPA's review of California's regulations is limited to the criteria that Congress directed EPA to review." [465] This interpretation was upheld by the D.C. Circuit Court of Appeals. The Court agreed with EPA that the commenters had sought to "improperly . . . engraft a type of constitutional Commerce Clause analysis onto EPA's Section 7543(e) waiver decisions that is neither present in nor authorized by the statute." [466]

---

[455] In 1979, for example, only two years after the adoption of section 177, the D.C. Circuit stated that the Act only requires the three listed prerequisites, "not . . . that the EPA administrator conduct a separate waiver proceeding for each state that chooses [to adopt California standards]." *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1298 (D.C. Cir. 1979). Similarly, in 1994, while enacting rules implementing section 209(e)(2)(B), the parallel provision for the nonroad vehicle section of the California Waiver program, EPA noted that section 177 states had not "ask[ed] for EPA authorization before they adopted the California standards, nor did EPA or the automobile industry suggest that they needed such authorization." 56 FR 36969, 36983 (1994). *See also* 77 FR 62637 n.54 ("States are not required to seek EPA approval under the terms of section 177.").

[456] EPA also notes that there are ample judicial avenues to directly challenge state adoption of California standards. For example, the First and Second Circuits have already addressed objections to the adoption of California standards under section 177. In both *Am. Auto. Mfrs. Ass'n v. Mass. DEP* and *Motor Vehicle Mfrs. Ass'n v. NYSDEC*, petitioners argued that the States' adoption of California's low emission vehicles standards without the associated clean fuels plan violated section 177. 31 F.3d 18 (1st Cir. 1994); 17 F.3d 521 (2d Cir. 1994).

[457] Several commenters on the Notice of Reconsideration argued that SAFE 1 violated conformity rules by interfering with already approved SIPs. However, as EPA explained in the litigation over SAFE 1, the action had no actual effect on "either existing approvals of state plans or the plans themselves for criteria pollutants." Final Brief for Respondents at 106, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (D.C. Cir. Oct. 27, 2020). *See also* 84 FR 51338, n.256.

[458] Wisconsin at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Delaware at 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain

and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[459] The Agency has considered whether there may be any reliance interests on EPA's previous interpretive view of section 177 described in the SAFE 1 action. EPA is unaware of any such interests, and none were raised in comments.

[460] To the extent that EPA's reasoning in its SAFE 1 section 177 determination lacked fair notice, as the States and Cities' Petition claimed, such a contention is rendered moot by this action.

[461] EPA has declined to consider constitutional challenges to California Waivers since at least 1976. 41 FR 44212 (Oct. 7, 1976) ("An additional argument against granting the waiver was raised by the Motorcycle Industry Council and Yamaha, who contended that the CARB had violated due process when adopting their standards, by not allowing the manufacturers a fair and full opportunity to present their views at a State hearing. If this argument has any validity, the EPA waiver hearing is not the proper forum in which to raise it. Section 209(b) does not require that EPA insist on any particular procedures at the State level. Furthermore, a complete opportunity was provided at the EPA waiver hearing for the presentation of views."). *See also, e.g.*, 43 FR at 32184 (July 25, 1978) (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review).

[462] *Central Valley Chrysler-Jeep, Inc.* v. *Goldstene*, 529 F.Supp.2d 1151, 1174 ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates both the Clean Air Act and EPCA.").

[463] *MEMA I*, 627 F.2d 1095, 1111, 1114–14 (D.C. Cir. 1979).

[464] 74 FR 3030 (January 16, 2009).

[465] Decision Document, EPA–HQ–OAR–2005–0123–0049 at 67.

[466] *ATA* v. *EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) (quoting the U.S. brief). In a footnote to this statement, the Court said ATA could attempt to bring a constitutional challenge directly (which would argue that the waiver unconstitutionally burdens interstate commerce) but "express[ed] no view on that possibility." *Id.* at n.1. *See also OOIDA* v. *EPA*, 622 Fed. Appx. 4, 5 (D.C. Cir. 2015)

Consistent with the Agency's long standing practice, the decision on whether to grant the ACC program waiver was based solely on criteria in section 209(b) and the Agency did not either interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision in that waiver decision.[467]

Although EPA specified issues that it was seeking comment on within the Notice of Reconsideration, commenters nevertheless argued that the Equal Sovereignty Doctrine, which was not one of the identified aspects in that notice, preempts reinstitution of the relevant aspects of the ACC program waiver. According to these commenters, "Section 209, by allowing California and only California to retain a portion of its sovereign authority that the Clean Air Act takes from other States, is unconstitutional and thus unenforceable."[468] Other commenters argued that the Equal Sovereignty doctrine does not apply to the California waiver program. One comment maintained that the holding in *Shelby County* v. *Holder* is distinguishable from the CAA.[469] California disagreed with

EPA's characterization of the relevance of the doctrine, commenting that the Supreme Court has only applied the "rarely invoked" doctrine of Equal Sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.' "[470]

As explained in the 2013 ACC program waiver decision, EPA continues to believe that waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and specifically, that the Agency should not consider constitutional issues in evaluating waiver requests.[471] As previously noted in Section VI, the constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver requests, and such objections are better directed to either the courts or Congress. As the D.C. Circuit reasoned in *MEMA I*, "it is generally considered that the constitutionality of Congressional enactments is beyond the jurisdiction of administrative agencies."[472] Although commenters here raise a new constitutional argument—that of Equal Sovereignty rather than the First Amendment or the Dormant Commerce Clause—EPA is no more well-suited to resolve this constitutional objection than it is to resolve previous constitutional objections.[473]

EPA notes that Congress struck a deliberate balance in 1967 when it acknowledged California's serious air quality problems as well as it being a laboratory for the country, and once again in 1977 when Congress continued to acknowledge California's air quality problems as well as problems in other states and decided that California's new motor vehicle standards, once waived by EPA and subject to certain conditions, would be optionally

available for all states under section 177 under specified criteria.[474] In striking a balance between one national standard and 51 different state standards, Congress chose to authorize two standards—the federal standard, and California's standards (which other states may adopt). EPA believes this balance reflected Congress's desire for California to serve as a laboratory of innovation and Congress's understanding of California's extraordinary pollution problems on the one hand, and its desire to ensure that automakers were not subject to too many different standards on the other.

In reconsidering the SAFE 1 action and the appropriateness of reinstating the 2013 ACC program waiver, EPA has not considered whether section 209(a) and section 209(b) are unconstitutional under the Equal Sovereignty Doctrine. As in the 2013 ACC program waiver, the decision on whether to grant the waiver and the consequence of a reinstated waiver is based solely on the criteria in section 209(b) and this decision does not attempt to interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision.

### B. CARB's Deemed-To-Comply Provision

EPA received comments arguing that California's 2018 clarification to its deemed-to-comply provision "changed important underlying requirements of the original 2012 waiver application" and "EPA cannot reinstate a Clean Air Act waiver for a program that no longer exists."[475] These commenters maintain that California has never sought a waiver for the 2018 amendments or a determination that the change is within the scope of the prior waiver. As such, commenters maintain that EPA lacks a necessary predicate to permit California's enforcement of its amended GHG standards.

Other commenters argued that the "deemed to comply" provision was always conditioned on the federal standards providing GHG reductions that were at least equal to or as protective as California's program and so the 2018 amendments did not substantively change the provision or affect any related reliance interests and instead were designed to clarify the

---

(rejecting a challenge for lack of jurisdiction because challengers objected to the state regulations themselves, not EPA's approval of them in a waiver under 209(b)) ("To the extent there is any tension in our case law surrounding whether we might decide a constitutional claim brought within a broader challenge to an EPA waiver decision, OOIDA does not present us with such a challenge, and we have no occasion to resolve that question here.").

[467] 78 FR at 2145.

[468] Ohio and 15 States, Docket No. EPA–HQ–OAR–2021–0257–0124 at 1. This commenter also stated that "The waiver at issue here, allowing only California to regulate carbon emissions, is not sufficiently related to the problem that Section 209(a) targets. Congress enacted that section to permit California to address *local* air pollution. But California seeks special treatment for its proposed greenhouse gas targets . . . designed to mitigate climate change—an inherently global interest." *Id.* at 8–9. EPA notes that this characterization of CARB's standards is addressed in Section V.

[469] Twelve Public Interest Organizations at 5 ("*Shelby County* does not govern here. *See* Amicus Br. of Prof. Leah Litman 12–17, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (July 6, 2020) (A–0384). First, Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs. Second, the foundation for reserving California's authority has not waned over time. California had in 1967, and continues to have, the Nation's absolute worst air quality. For example, the South Coast air basin, home to 17 million people, typically leads the Nation in ozone (smog) pollution. The American Lung Association's 2021 'State of the Air' report on national air pollution shows that seven of the ten worst areas for ozone pollution in the country are in California, as are six of the worst ten for small particulate matter. Am. Lung Ass'n, *Most Polluted Cities*, https://www.lung.org/research/sota/city-rankings/most-polluted-cities (last visited July 2, 2021) (A–0422).").

[470] States and Cities at 41–42.

[471] 78 FR at 2145.

[472] *MEMA I*, 627 F.2d 1095, 1114–15 (D.C. Cir. 1979) (holding that EPA did not need to consider whether California's standards "unconstitutionally burden[ed] [petitioners'] right to communicate with vehicle purchasers."). *See also* Twelve Public Interest Organizations at 7 ("As regulatory agencies are not free to declare an act of Congress unconstitutional,' *Springsteen-Abbott* v. *SEC*, 989 F.3d 4, 8 (D.C. Cir. 2021), EPA cannot determine whether a statute Congress directed it to implement contravenes the equal-sovereignty principle. Thus, EPA should proceed to rescind the Waiver Withdrawal and leave Ohio's argument for review by an appropriate court.").

[473] *See, e.g., Johnson* v. *Robison*, 415 U.S. 361, 368, (1974) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"); *Springsteen-Abbott*, 989 F.3d at 8; *Meredith Corp.* v. *FCC*, 809 F.2d 863, 872 (D.C. Cir. 1987).

[474] "§ 177 . . . permitted other states to 'piggyback' onto California 's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.' " *Motor Vehicle Mfrs. Ass'n* v. *New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).

[475] AFPM at 7; Urban Air at 2, 18–19; NADA at 6.

provision.[476] Commenters maintain that CARB adopted "non-substantive amendments for its LEV III regulations to further clarify that the deemed-to-comply provision would only apply if the federal GHG standards remained substantially as they were as of the date of the 2017 Final Determination." [477] According to these commenters, California adopted these amendments after EPA's withdrawal of its 2017 Final Determination that had determined that its Federal GHG standards for model years 2022–2025 remained appropriate and instead concluded that the federal standards for model years 2022–2025 may be too stringent and should be revised. EPA notes that after the January 2017 MTE CARB subsequently found that compliance with those federal standards would result in equivalent or greater GHG benefits than originally projected for California.[478] These commenters further maintain that the clarification of the deemed-to-comply provision is immaterial to the reversal of the waiver withdrawal in SAFE 1 because the SAFE 1 action was expressly based on EPA's decision to rely on NHTSA's preemption findings and section 209(b)(1)(B) determination, neither of which was based on CARB's 2018 clarification rulemaking. As such, the commenters maintain that the clarification of the deemed-to-comply provision has no bearing on and does not preclude EPA's SAFE 1 waiver withdrawal.[479]

As previously explained, under section 209(b)(1) EPA is to grant a waiver of preemption for California to enforce its own standards that would otherwise be preempted under section 209(a). This preemption does not extend to federal standards that are adopted under section 202(a). EPA explained this in responding to comments on the deemed-to-comply provision in the ACC program waiver decision. "[T]he waiver decision affects only California's emission standards, not the federal standards that exist regardless of EPA's decision." [480] This preemptive effect of section 209(a) does not change even when California chooses to allow for compliance with its standards through

federal standards as envisaged by the deemed-to-comply provision.

It also bears note that in SAFE 1, EPA made clear that the 2018 amendment was not a "necessary part of the basis for the waiver withdrawal and other actions that EPA finalizes in this [SAFE1] document.[481] In the Notice of Reconsideration, EPA neither reopened nor reconsidered elements of the 2013 waiver that were not part of EPA's findings in SAFE 1.[482] As noted in this decision, EPA has evaluated the factual and legal errors that occurred in SAFE 1. As part of this evaluation, EPA believes it has considered all appropriate and relevant information necessary to its review of issues associated with the second waiver prong or consideration of preemption under EPCA. The Agency also recognizes that it received comments from parties that raised non-germane issues to EPA's Notice of Reconsideration. EPA did not conduct an analysis of such comments in the context of reconsidering the specific actions taken in SAFE 1. EPA also makes clear that the result of rescinding its part of SAFE 1 is the automatic reinstatement of the waiver granted to California in 2013 for its ACC program. That is the result of the action taken herein.[463]

[481] EPA declined to "take any position at this point on what effect California's December 2018 amendment to its "deemed to comply' provision . . . [may] have on the continued validity of the January 2013 waiver." 84 FR at 51329, n.208, 51334, n.230. Although EPA claimed in SAFE 1 that the deemed to comply clarification confirmed and provided further support for the SAFE 1 action, EPA no longer makes this claim to the extent it is relevant in its reconsideration and rescission of SAFE 1. The consequence of this action is the reinstatement of the ACC program waiver issued in 2013 and does not extend to other regulatory developments in California or by EPA that occurred subsequent to that waiver decision.

[482] 86 FR at 22423. In addition to declining to take a position on the effect of California's 2018 amendments to its "deemed to comply" provision, SAFE 1 did not finalize the withdrawal of the waiver under the first or third waiver prongs. EPA also notes that it has previously responded twice to the comments suggesting that CARB's deemed-to-comply provision demonstrates that California does not have a need for its own standards. See 78 FR at 2124–25.

[483] EPA acknowledges that motor vehicle emission standards in California as well as federally are periodically clarified, amended, or revised. For example, after California issued its first deemed-to-comply regulation, EPA determined that the state's GHG standards were within the scope of the 2009 waiver. While EPA believes that Congress intended regulatory certainty to be attached to the Agency's waivers issued under section 209, EPA acknowledges that conditions may change over time so significantly that it could merit a review of California's motor vehicle emission program and applicable standards therein or that would prompt California to submit a related waiver request to EPA. As explained in this decision, the conditions associated with the analysis of the three waiver criteria performed in the ACC waiver decision did not change so as to merit the SAFE 1 action. EPA

## IX. Decision

After review of the information submitted by CARB and other public commenters, the SAFE 1 action, and the record pertaining to EPA's 2013 ACC program waiver, I find that EPA did not appropriately exercise its limited inherent authority to reconsider waiver grants in SAFE 1. SAFE 1 did not correct a clerical or factual error, nor did the factual circumstances and conditions related to the three statutory criteria change prior to SAFE 1, much less change so significantly as to cast the propriety of the waiver grant into doubt. On this basis, I am rescinding the SAFE 1 action.

Furthermore, after review of both the 2013 ACC program waiver record as well as the SAFE 1 record, to the extent that EPA did have authority to reconsider the ACC program waiver, I have determined that the asserted bases were in error and did not justify the waiver withdrawal. With respect to the Agency's first purported basis—its discretionary decision to undertake a reinterpretation of the second waiver prong—I find that the statutory interpretation adopted in SAFE 1 is a flawed reading of the statute, and I hereby return to the traditional interpretation of the second waiver prong, which is, at least, the better interpretation. Under the traditional interpretation, which looks at the program as a whole, California clearly had a compelling need for the ACC program. Even if SAFE 1's statutory reinterpretation, which focuses on California's compelling need for the specific standards, were an appropriate reading, EPA did not perform a reasonable, accurate, and complete review of the factual record in its findings regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission regulations. Upon review, I find that SAFE 1's predicate for concluding that California did not have a compelling need for these specific standards was not reasonable given the record at the time of the ACC program waiver and once again during the SAFE 1 proceeding. A reasonable, accurate, and complete review of the record supports the need for California's specific GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in California. This is true whether I look at how these standards reduce criteria pollution, GHG pollution, or both. In

recognizes that federal light-duty vehicle GHG emission standards have been modified twice since SAFE 1 was issued; the current standards do not change EPA's conclusion that SAFE 1 should be rescinded.

[476] States and Cities at 58–61. ("California always intended its standards would 'remain an important backstop in the event the national program is weakened or terminated.' 78 FR at 2,128.").

[477] Id. at 60. "Final Determination on the Appropriateness of the Model Year 2022–2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation" (2017 Final Determination) at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100QQ91.pdf.

[478] 82 FR 14671 (March 22, 2017) and 83 FR 16077 (April 13, 2018).

[479] States and Cities at 60–62.

[480] 78 FR at 2124.

sum, although I am not adopting the interpretation of the second waiver prong set forth in SAFE 1, I find that the burden of proof necessary to demonstrate that CARB's ZEV sales mandate and GHG emission standards are not needed to meet compelling and extraordinary conditions has not been met under either interpretation of the second waiver prong. Therefore, I rescind the Agency's part of the SAFE 1 action to the extent it relied upon the second waiver prong to withdraw the ACC program waiver.

With regard to the applicability of preemption under EPCA, I find that, to the extent EPA's authority to reconsider the ACC program waiver rested upon NHTSA's joint action at the time as well as the applicability of its EPCA interpretation to EPA's review, this statute falls clearly outside the confines of section 209(b) where EPA's authority to grant, deny, and reconsider waivers resides. In any event, the grounds for such action under SAFE 1 no longer exist given NHTSA's recent final action withdrawing its EPCA preemption rule in its entirety.

Each of the decisions and justifications contained in this final action is severable.

This decision rescinds EPA's SAFE 1 action and therefore, as a result, the waiver of preemption EPA granted to California for its ACC program ZEV sales mandates and GHG emission standards issued in 2013, including for the 2017 through 2025 model years, comes back into force.

*Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on

a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).

This final action is "nationally applicable" within the meaning of section 307(b)(1). In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of section 307(b)(1).[484] This action rescinds EPA's final action in SAFE 1, which withdrew a waiver for new motor vehicle greenhouse gas emission standards and ZEV sales mandate granted to California under section 209(b) of the CAA. In addition to California, sixteen other states and the District of Columbia have already adopted California's motor vehicle greenhouse gas standards. The other states are New York, Massachusetts, Vermont, Maine, Pennsylvania, Connecticut, Rhode Island, Washington, Oregon, Minnesota, New Jersey, Nevada, Maryland, Virginia, Colorado, and Delaware.[485] These jurisdictions represent a wide geographic area and fall within eight different judicial circuits.[486] In addition,

[484] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[485] The same states have adopted California's ZEV sales mandate regulation with the exception of Pennsylvania, Washington, and Delaware.

[486] In the report on the 1977 Amendments that revised CAA section 307(b)(1), Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a

this action will affect manufacturers nationwide who produce vehicles to meet the emissions standards of these states. For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of section 307(b)(1) and is hereby publishing that finding in the **Federal Register**.

Under CAA section 307(b)(1), petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit within 60 days from the date this final action is published in the **Federal Register**.

**X. Statutory and Executive Order Reviews**

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act, 5 U.S.C. 801, *et seq.*, does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3).

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2022–05227 Filed 3–11–22; 8:45 am]
**BILLING CODE 6560–50–P**

scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323–24, reprinted in 1977 U.S.C.C.A.N. 1402–03.

# Exhibit D



EC03926

# OFFICE OF POLICY AND REGULATORY MANAGEMENT

WASHINGTON, D.C. 20460

**June 12, 2026**

**TO:**  The Honorable Mike Johnson
Speaker of the House of Representatives
The Capitol, H-209
Washington, D.C. 20515

**FROM:**  U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW 1803A
Washington, DC 20460

Dear Speaker,

EPA is submitting the following final rules "to each House of the Congress and to the Comptroller General," for their review under 5 U.S.C. 801(a).

We have also enclosed the required report that incorporates a concise general statement relating to the document. The report also indicates EPA's compliance with relevant statutes and executive orders, as applicable.

If you have any questions regarding this submission, please feel free to contact me at 202-564-8497.

Sincerely yours,

Melissa Kramer
Acting Branch Chief
Regulatory Management Branch

Enclosures



**TITLE(S) OF DOCUMENTS:**

1. (8927-2) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles
2. (9325-01-OAR) - California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision
3. (9768-1) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years
4. (10890-02-OAR) - California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision



**DOCUMENT FOR CONGRESSIONAL REVIEW UNDER THE SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT OF 1996**

**Date of Document**: June 12, 2026

1. **Name of Agency:** U.S. Environmental Protection Agency

2. **Office:** Office of Policy

3. **Action Title:** California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years

4. **Concise, General Statement of the Document:** In the rule

5. **Other Unique Identifier:** 9768-1

6. **This rule is a:** Final Rule

7. **Statutory Authorization**: Section 209(b) of the Clean Air Act

8. **Major Rule under CRA:** N/A

9. **Proposed Effective Date**: N/A

   **Compliant with 5 U.S.C. §801(a)(3)(A)**: N/A

   A. **Cost/Benefit Analysis Prepared:** N/A

   B. **Certification under 5 U.S.C. §605(b):** N/A

      **Preparation of FRFA under 5 U.S.C. §604(a):** N/A

   C. **Written Statement under §202 of the Unfunded Mandates Reform Act:** N/A

   D. **Public Comments Solicited:** Yes

   E. **Information Collection under the Paperwork Reduction Act:** No

   F. **Discussion of Executive Order 12866:** Yes

      **Discussion of Executive Order 13132:** No

      **Other Executive Order or Administrative Statute requirements:** No

10. **GAO Database Modernization Act of 2023:** N/A

(Page 113 of Total)

# ENVIRONMENTAL PROTECTION AGENCY

[FRL–9768–1]

## California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years

**SUMMARY:** The Environmental Protection Agency (EPA) is granting the California Air Resources Board's (CARB's) request for a waiver of Clean Air Act preemption to enforce its Advanced Clean Car (ACC) regulations. The ACC combines the control of smog and soot causing pollutants and greenhouse gas (GHG) emissions into a single coordinated package of requirements for passenger cars, light-duty trucks and medium-duty passenger vehicles (and limited requirements related to heavy-duty vehicles). The ACC program includes revisions to California's Low Emission Vehicle (LEV) program as well as its Zero Emission Vehicle (ZEV) program. By today's decision, EPA has also determined that CARB's amendments to the ZEV program as they affect 2017 and prior model years (MYs) are within the scope of previous waivers of preemption granted to California for its ZEV regulations. In the alternative, EPA's waiver of preemption for CARB's ACC regulations includes a waiver of preemption for CARB's ZEV amendments as they affect all MYs, including 2017 and prior MYs. In addition, EPA is including CARB's recently adopted "deemed to comply" rule for GHG emissions in today's waiver decision. This decision is issued under section 209(b) of the Clean Air Act (the "Act"), as amended.

**DATES:** Petitions for review must be filed March 11, 2013.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2012–0562. All documents and public comments in the docket are listed on the *www.regulations.gov* Web site. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket in the EPA Headquarters Library, EPA West Building, Room 3334, 1301 Constitution Ave. NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding holidays. The telephone number for the Reading Room is (202)

566–1744. The Air and Radiation Docket and Information Center's Web site is *http://www.epa.gov/oar/docket.html.* The electronic mail (email) address for the Air and Radiation Docket is: *a-and-r-Docket@epa.gov,* the telephone number is (202) 566–1742 and the fax number is (202) 566–9744.

**FOR FURTHER INFORMATION CONTACT:** Specific questions may be addressed to David Dickinson, Office of Transportation and Air Quality, Compliance Division (6405J–NLD), EPA, 1200 Pennsylvania Ave. NW., Washington, DC 20460, telephone: (202) 343–9256, email: *Dickinson.David@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. California's Advanced Clean Cars Program for New Motor Vehicles
  B. EPA's Consideration of CARB's Request
III. Analysis of Preemption Under Section 209 of the Clean Air Act
  A. Clean Air Act Preemption Provisions
  B. Deference to California
  C. Burden of Proof
  D. Comments Received on EPA's Application of the Section 209(b) Criteria
IV. California's Within the Scope Request for Its Zero Emission Vehicle Amendments
  A. Chronology
  B. CARB's ZEV Amendments
  C. EPA's Determination Regarding the Appropriateness of CARB's Within the Scope Request for the 2012 ZEV Amendments
  D. Application of the Within the Scope Waiver Criteria to CARB's 2012 ZEV Amendments Regarding 2017 and Earlier MYs
  1. Public Health and Welfare
  2. Consistency With Section 202(a)
  3. New Issues
V. Consideration of the Advance Clean Car Regulations Under the Full Waiver Criteria
  A. California's Protectiveness Determination
  1. Comments on CARB's Protectiveness Determination
  2. Is California's protectiveness determination arbitrary and capricious?
  3. Section 209(b)(1)(A) Conclusion
  B. Does California need its standards to meet compelling and extraordinary conditions?
  1. EPA's March 6, 2008 GHG Waiver Denial
  2. EPA's July 9, 2009 GHG Waiver
  3. Response to Comments Received
  4. CARB's GHG Emission Standards
  5. CARB's ZEV Emission Standards
  6. CARB's PM Emission Standards
  7. Section 209(b)(1)(B) Conclusion
  C. Are the California ACC standards consistent with section 202(a) of the Clean Air Act?
  1. Historical Approach
  2. LEV III Criteria Pollutant Standards
  a. Particulate Matter Standards

  b. EPA's Response to Comments
  3. LEV III Greenhouse Gas Emission Standards
  a. Comments on CARB's 2017 Through 2025 GHG Emission Standards
  b. EPA's Response to Comments
  4. California's ZEV Amendments as They Affect 2018 Through 2025 Model Years
  a. Comments on CARB's ZEV Amendments
  b. EPA's Response to Comments
  c. Conclusion on Technological Feasibility
  5. Consistency of Certification Test Procedures
  6. Relevance of the Energy Policy and Conservation Act (EPCA) to the Waiver Decision
VI. Decision
VII. Statutory and Executive Order Reviews

### I. Executive Summary

Today, as Assistant Administrator of the EPA's Office of Air and Radiation, I am granting California's request for a waiver of Clean Air Act preemption for California's ACC that combines the control of smog and soot causing pollutants and GHG emissions into a single coordinated package of requirements for MY 2015 through 2025 passenger cars (PCs), light-duty trucks (LDTs), medium-duty passenger vehicles (MDPVs), and limited requirements related to heavy-duty vehicles (HDVs). The ACC program regulations include revisions to both California's LEV and ZEV programs. By letter dated June 27, 2012, CARB submitted a request (CARB waiver request) that EPA grant a waiver of preemption under section 209(b) of the Clean Air Act (CAA), 42 U.S.C. 7543(b) for the revisions to the LEV program (LEV III).[1] CARB also sought confirmation that the amendments to the ZEV program are within the scope of prior waiver decisions issued by EPA, or in the alternative requested a waiver for these revisions (the LEV III and ZEV amendments, together known as the ACC, are considered as CARB's waiver request). By letter dated December 7, 2012, CARB submitted additional information (CARB supplemental request) to EPA requesting that EPA consider as part of CARB's pending ACC waiver request the CARB's Executive Officer adopted "deemed to comply" regulation.[2] CARB's "deemed to comply" regulation, adopted by CARB's Board on November 15, 2012 and final action taken by CARB's Executive Officer on December 6, 2012, allows automobile manufacturers to demonstrate compliance with CARB's GHG standards by complying with

---

[1] CARB waiver request at EPA–HQ–OAR–2012–0562–0004. The cover letter to CARB's Waiver Request is at EPA–HQ–OAR–2012–0562–0004.

[2] CARB supplemental request at EPA–HQ–OAR–2012–0562–0374.

EPA's GHG standards which were published for those MYs.

By today's decision we are confirming that CARB's ZEV amendments, as they affect 2017 and prior MYs are within the scope of previous ZEV waivers. EPA also finds that the entire ACC program meets the criteria for a waiver of Clean Air Act preemption and thus we are granting a waiver for CARB's ACC program. Included in EPA's full waiver are CARB's "deemed to comply" regulations, and the ZEV regulations as they affect 2017 and prior MYs.

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and later modified in 1977. Congress established that there would be only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the Clean Air Act, and California emission standards adopted under state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures. Other states can only adopt standards that are identical to California's standards. This struck an important balance that protected manufacturers from multiple and different state emission standards, and preserved a pivotal role for California in the control of emissions from new motor vehicles. Congress recognized that California could serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards. Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver. The provision was designed to ensure California's broad discretion to determine the best means to protect the health and welfare of its citizens.

Section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable federal standards. EPA may deny a waiver only if it makes at least one of three findings specified under the Clean Air Act (including whether California's "protectiveness finding" noted above is arbitrary and capricious). Therefore, EPA's role upon receiving a request for waiver of preemption from California is to determine whether it is appropriate to make any of the three findings specified by the Clean Air Act and if the Agency cannot make at least one of the three findings then the waiver must be

granted. The three waiver criteria are properly seen as criteria for a denial—EPA must grant the waiver unless at least one of three criteria for a denial is met. This is different from most waiver situations before the Agency, where EPA typically determines whether it is appropriate to make certain findings necessary for granting a waiver, and if the findings are not made then a waiver is denied. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain its own new motor vehicle emissions program.

The three criteria for denial of a waiver are: first, whether California's determination that its standards are, in the aggregate, at least as protective as applicable federal standards is arbitrary and capricious (Section 209(b)(1)(A)); second, whether California has a need for such standards to meet compelling and extraordinary conditions (Section 209(b)(1)(B)); and third, whether California's standards are consistent with Section 202(a) of the Clean Air Act (Section 209(b)(1)(C)). EPA and the Court of Appeals for the District of Columbia Circuit have consistently interpreted section 209(b) as placing the burden on the opponents of a waiver to demonstrate that one of the criteria for a denial has been met.[3]

If California acts to amend a previously waived standard or accompanying enforcement procedure, the amendment may be considered within the scope of a previously granted waiver provided that it does not undermine California's determination that its standards in the aggregate are as protective of public health and welfare as applicable federal standards, does not affect its consistency with section 202(a) of the Clean Air Act, and raises no new issues affecting EPA's previous waiver decisions.[4]

In this case, California is combining three sets of motor vehicle emission standards into a single ACC waiver request. The standards are complimentary in the way they address interrelated ambient air quality needs and climate change. EPA has previously granted a series of waiver and within the scope decisions regarding CARB's LEV, ZEV and GHG emission programs.[5]

As part of EPA's public comment process for CARB's ACC waiver request, we have received comments from: several states and organizations representing states; health and environmental organizations; industry; and other stakeholders.[6] The vast majority of comments EPA received were in support of the waiver. EPA received opposition to certain elements of the waiver, including a joint comment submitted by the Association of Global Automakers and the Alliance of Automobile Manufacturers (Manufacturers or Manufacturers comment).[7] We also received opposition to the ACC waiver request from the National Automobile Dealers Association (NADA or Dealers, or NADA comment).[8]

After a thorough evaluation of the record, we have determined that the waiver opponents have not met their burden of proof in order for us to deny the CARB's waiver request under any of the three criteria in section 209(b)(1). EPA also confirms that CARB's ZEV amendments, as they affect the 2017 and earlier MYs are within the scope of previous waivers of preemption. In the alternative, EPA's waiver of preemption for CARB's ACC regulations includes a

---

[3] Motor and Equipment Manufacturers Ass'n v. EPA (MEMA I), 627 F.2d 1095, 1120–1121 (D.C. Cir. 1979).

[4] Decision Documents accompanying within the scope of waiver determinations in 66 FR 7751 (January 25, 2001) at p. 5 and 51 FR 12391 (April 10, 1986) at p. 2, see also, e.g., 46 FR 36742 (July 15, 1981).

[5] EPA's LEV waiver decisions are found at 58 FR 4166 (January 13, 1993); 64 FR 42689 (August 5,

1999); 68 FR 19811 (April 22, 2003); 70 FR 22034 (April 28, 2005); and 75 FR 44951 (July 30, 2010). EPA's GHG waiver decisions are found at 73 FR 12156 (March 6, 2008) (GHG waiver denial); 74 FR 32744 (July 8, 2009) (GHG waiver); and 76 FR 34693 (June 14, 2011) (This prior within the scope decision included CARB's prior "deemed to comply" regulation for the 2012–2016 MYs). EPA's most recent ZEV waiver decisions are found at 71 FR 78190 (December 28, 2006); and 76 FR 61095 (October 3, 2011).

[6] EPA received support for CARB's waiver request, in the form of oral testimony and/or written comment (all docket references are to EPA–HQ–OAR–2012–0562–XXXX, with the last four numbers associated with each comment) from: Environmental Defense Fund (EDF)—0025 and 0353, the National Association of Clean Air Agencies (NACAA)—0028, American Lung Association—0029, Advanced Engine Systems Institute—0030, Environment America—0031, Consumer Federation of America (CFA)—0032, Manufacturers of Emission Control (MECA)—0033, Natural Resources Defense Council (NRDC)—0347, South Coast Air Quality Management District (SCAQMD)—0346, Sierra Club—0348, Northeast States for Coordinated Air Uses Management (NESCAUM)—0350, New York State Department of Environmental Conservation—0351, Consumers Union—0354, and Union of Concerned Scientists—0355. EPA also received similar comment at the waiver public hearing, transcript found at EPA–HQ–OAR–2012–0562–0026.

[7] EPA–HQ–OAR–2012–0562–0349. EPA also received written comment from Toyota Motor North America (Toyota) at EPA–HQ–OAR–2012–0562–0372 which notes that "Toyota could be forced to employ a variety of costly marketing programs to ensure compliance if the market does not accept ZEV technology in the volumes anticipated by California." Toyota notes that its further concerns are expressed in detail in the Manufacturers comments.

[8] EPA–HQ–OAR–2012–0562–0352.

waiver of preemption for CARB's ZEV amendments as they affect all MYs, including 2017 and prior MYs.

## II. Background

### A. California's Advanced Clean Car Program for New Motor Vehicles

As further explained below, CARB has adopted amendments to title 13, California Code of Regulations (CCR), and has established a single coordinated package that includes amendments to three sets of regulations regulating emissions from new PCs, LDTs, MDPVs, and certain HDVs: [9] the LEV regulation which includes two components—standards relating to criteria pollutants and standards to regulate GHG emissions, and the ZEV program.

This single ACC program combines the control of smog-causing pollutants and GHG emissions into a coordinated package of amendments and requirements for MY 2015 through 2025 in order to address near and long term smog issues within California and identified GHG emission reduction goals. The program also includes amended ZEV regulations and a Clean Fuels Outlet regulation. These additional program elements are designed to address these goals as well.[10] The ACC program, together, provides the regulated manufacturers with the ability to plan and integrate their product designs in order to meet applicable CARB emission requirements.

In order to achieve further emission reductions from the light- and medium-duty fleet, CARB adopted several amendments that represent a strengthening of its ongoing LEV regulations, including: a reduction of fleet average emissions of new PCs, LDTs, and MDPVs to super ultra-low-emission vehicle (SULEV) levels by 2025; replacement of separate non-methane organic gas (NMOG) and oxides of nitrogen (NOx) standards with combined NMOG plus NOx standards, which provides automobile manufacturers with additional flexibility in meeting the new stringent standards; an increase of full useful life durability requirements from 120,000 miles to 150,000 miles, which guarantees vehicles sustain these extremely low emission levels longer; a backstop to assure continued production of super-ultra-low-emission

vehicles after partial-zero-emission vehicles (PZEVs) as a category are moved from the ZEV regulations to the LEV regulations in 2018; more stringent particulate matter (PM) standards for light- and medium-duty vehicles, which will reduce the health effects and premature deaths associated with these emissions; zero fuel evaporative emission standards for PCs and LDTs, and more stringent standards for medium- and heavy-duty vehicles (MDVs); and, more stringent supplemental federal test procedure (SFTP) standards for PC and LDTs, which reflect more aggressive real world driving and, for the first time, require MDVs to meet SFTP standards.

The second component of CARB's LEV III regulations includes amendments to its GHG emission standards. CARB's GHG standards for the 2017 through 2025 MYs are designed to respond to California's identified goals of reducing GHG emissions to 80 percent below 1990 levels by 2050 and in the near term to reduce GHG levels to 1990 levels by 2020. As such, CARB's GHG amendments: reduce new light-duty $CO_2$ emissions from new light-duty regulatory MY 2016 levels by approximately 34 percent by MY 2025, and from about 251 grams of $CO_2$ per mile to 166 grams, based on the projected mix of vehicles sold in California; set emission standards for $CO_2$, $CH_4$, and $N_2O$; establish footprint based $CO_2$ emission standards, as distinguished from the current California GHG requirement of a fleet average GHG standard (this will allow manufacturers' new vehicle fleet $CO_2$ emissions to fluctuate according to their car-truck composition and sales according to vehicle footprint and will align the requirement with current federal GHG requirements); provide credits toward the $CO_2$ standard if a manufacturer reduces refrigerant emissions from the vehicle's air conditioning system; provide credits toward the ZEV standards if a manufacturer over complies with the LEV III GHG fleet requirement; provide credits towards the $CO_2$ standards if a manufacturer produces full size pickups with high efficiency drive trains; provide credits for deployment of technologies that reduce off-cycle $CO_2$ emissions; and require upstream emissions from zero-emission vehicles to be counted towards a manufacturer's light-duty vehicle GHG emissions. CARB's GHG emission regulations also include an optional compliance path whereby manufacturers may demonstrate compliance with CARB's

GHG emission regulations by complying with applicable EPA GHG emission requirements.

Lastly, CARB's ACC regulations include amendments to its ZEV regulations that can be described within two timeframes: (1) MY 2012 through 2017; and (2) MY 2018 and beyond. CARB's stated goal for amendments to the current ZEV regulation through MY 2017 is to make corrections and clarifications to its regulations and to enable manufacturers to successfully meet the 2018 and later MY requirements. These amendments include: A provision of compliance flexibility whereby carry forward credit limitations for ZEVs were removed, allowing manufacturers to bank ZEV credits indefinitely for use in later years (the flexibility also included slightly reducing the 2015 through 2017 credit requirement for intermediate volume manufacturers (IVM, less than 60,000 vehicles produced each year), to allow them to better prepare for requirements in 2018, and included a provision that allows ZEVs placed in any state that has adopted the California ZEV regulation to count towards the ZEV requirement through 2017 (i.e. extending the "travel provision" for BEVs through 2017); an adjustment of credits and allowances; and an addition of a new vehicle category (collectively "BEVx" vehicles) as a compliance option for manufacturers to meet up to half of their minimum ZEV requirement.

CARB's stated goal for its amendments affecting 2018 and subsequent MYs is the commercialization of ZEVs and "transitional zero-emission vehicles (TZEV; commonly a plug-in hybrid electric vehicle—PHEV). California would achieve this objective by simplifying its regulation and pushing higher production volumes which in turn would achieve cost reductions. These amendments include: an increased ZEV requirement for 2018 and subsequent MYs that pushes ZEVs and TZEVs to more than 15 percent of new sales by 2025; the removal of PZEV (near-zero emitting conventional technologies) and advanced technology PZEV (AT PZEV, typically non-plug-in HEVs) credits as compliance options for manufacturers; an allowance for manufacturers to use banked PZEV and AT PZEV credits earned in 2017 and previous MYs, but discount the credits, and place a cap on usage in 2018 and subsequent MYs; amended manufacturer size definitions that bring all but the smallest manufacturers under the full ZEV requirements by MY 2018; *a modified credit system that bases* credits for ZEVs on range, with 50 mile

---

[9] Medium-duty vehicles (MDVs) are vehicles in California's regulations between 8,500 and 114,000 lbs GVWR that are also called Class 2b/Class 3 vehicles. These vehicles are generally termed Heavy-duty vehicles under EPA's regulations.

[10] CARB's Clean Fuel Outlet Regulation is not subject to preemption under section 209 of the Clean Air Act.

BEVs earning 1 credit each and 350 Mile FCVs earning 4 credits each (the range of credit reflects the utility of the vehicle (i.e. the zero emitting miles it may travel) and its expected timing for commercialization) along with a simplified and streamlined TZEV credits system; a modified "travel" provision that ends the travel provision for BEVs after MY 2017and extends the travel provision for FCVs; and provisions allowing manufacturers who systematically over comply with the LEV III GHG fleet standard to offset a portion of their ZEV requirement in 2018 through 2021 MYs only.

## B. EPA's Consideration of CARB's Request

By letter dated June 27, 2012, CARB submitted a request (CARB waiver request) seeking a waiver of Section 209(a)'s prohibition for its ACC standards.[11] On August 31, 2012, a **Federal Register** notice (FR Notice) was published announcing an opportunity for hearing and comment on CARB's request.[12] EPA held a public hearing in Washington, DC on September 19, 2012. The written comment period closed on October 19, 2012.

EPA's FR Notice on CARB's waiver request asked for comment on several matters. Since CARB had submitted a within the scope request for its ZEV amendments as they affect both the 2012–2017 MYs and 2018 and subsequent MYs, EPA invited comment on the following issues: first, should California's ZEV amendments, as they affect the 2012–2017 MYs and/or the 2018 and later MYs, be considered under the within the scope criteria or should they be considered under the full waiver criteria?; second, to the extent part or all of those ZEV amendments should be considered as a within the scope request, do such amendments meet the criteria for EPA to confirm that they are within the scope of prior waivers? EPA also solicited comment in the event that EPA cannot confirm that some or all of CARB's ZEV amendments are within the scope of previous waivers. We also requested comment on all aspects of the full waiver analysis with regard to the ACC program (the LEV III criteria pollutant and GHG regulations, and the ZEV amendments to the extent EPA does not consider them under the within the scope analysis noted above). Therefore, we asked commenters to consider the following three criteria: whether (a) California's determination that its motor vehicle emission standards are, in the

aggregate, at least as protective of public health and welfare as applicable Federal standards is arbitrary and capricious, (b) California needs such standards to meet compelling and extraordinary conditions, and (c) California's standards and accompanying enforcement procedures are consistent with section 202(a) of the Clean Air Act.

Because CARB noted (in its waiver request and in its incorporated Board Resolution 12–11) its commitment to propose a "deemed to comply" rule for its GHG standards shortly after EPA finalized its light-duty vehicle GHG emission standards, EPA specifically invited comment on CARB's waiver request in light of CARB's explicit plans concerning adoption of a "deemed to comply" provision into its LEV III GHG standards.

## III. Analysis of Preemption Under Section 209 of the Clean Air Act

### A. Clean Air Act Preemption Provisions

Section 209(a) of the Act provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.[13]

Section 209(b)(1) of the Clean Air Act requires the Administrator, after an opportunity for public hearing, to waive application of the prohibitions of section 209(a) for any State that has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor engines prior to March 30, 1966, if the State determines that its State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.[14] However, no such waiver shall be granted by the Administrator if she finds that: (A) The protectiveness determination of the State is arbitrary and capricious; (B) the State does not need such State standards to meet compelling and extraordinary conditions; or (C) such State standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. In previous waiver decisions, EPA has stated that

Congress intended EPA's review of California's decision-making be narrow. This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California.[15]

Thus, my consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions that I may consider under section 209(b).

### B. Deference to California

In previous waiver decisions, EPA has recognized that the intent of Congress in creating a limited review based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess state policy choices. This has led EPA to state:

It is worth noting * * * I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shaped of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[16]

EPA has stated that the text, structure, and history of the California waiver provision clearly indicate both a congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of

---

[11] EPA–HQ–OAR–2012–0562–0004.
[12] 77 FR 53199 (August 31, 2012).

[13] Clean Air Act (CAA) section 209(a), 42 U.S.C. § 7543(a).
[14] CAA section 209(b), 42 U.S.C. § 7543(b). California is the only State which meets section 209(b)(1)'s requirement for obtaining a waiver. See S. Rep. No. 90–403 at 632 (1967).

[15] 36 FR 17458 (Aug. 31, 1971). Note that the more stringent standard expressed here, in 1971, was superseded by the 1977 amendments to section 209, which established that California must determine that its standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.
[16] 40 FR 23103–23104; see also LEV I (58 FR 4166), January 13, 1993)Decision Document at 64.

public policy" to California's judgment.[17]

The House Committee Report explained as part of the 1977 amendments to the Clean Air Act, where Congress had the opportunity to restrict the waiver provision, it elected instead to explain California's flexibility to adopt a complete program of motor vehicle emission controls. The amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, i.e., to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.[18]

*C. Burden of Proof*

In *Motor and Equip. Mfrs Assoc. v. EPA*, 627 F.2d 1095 (D.C. Cir. 1979) (*MEMA I*), the U.S. Court of Appeals stated that the Administrator's role in a section 209 proceeding is to:

consider all evidence that passes the threshold test of materiality and * * * thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver.[19]

The court in *MEMA I* considered the standards of proof under section 209 for the two findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision."[20]

The court upheld the Administrator's position that, to deny a waiver, there must be 'clear and compelling evidence' to show that proposed procedures undermine the protectiveness of California's standards.[21] The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare.[22]

With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings, but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence. As we explained in the GHG waiver decision, although *MEMA I* did not explicitly consider the standards of proof under section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations.[23] EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary' conditions and whether the standards are technologically feasible—Congress intended that the standards of EPA review of the State decision to be a narrow one."[24]

Finally, opponents of the waiver bear the burden of showing that the criteria for a denial of California's waiver request has been met. As found in *MEMA I*, this obligation rests firmly with opponents of the waiver in a section 209 proceeding, holding that: "[t]he language of the statute and it's legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied."[25]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver decision. As the court in *MEMA I* stated, Ahere, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious."[26] Therefore, the Administrator's burden is to act "reasonably."[27]

*D. Comments Received on EPA's Application of the Section 209(b) Criteria*

The Dealers provided a series of suggestions on several threshold issues for how EPA should evaluate CARB's ACC waiver request. While the ACC regulatory components are interrelated, the Dealers state that EPA should evaluate them separately by applying each of the three waiver criteria under section 209(b).[28]

This commenter also suggests that it is CARB's burden to make a determination that its standards are at least as protective of the public health and welfare as any applicable federal standards, and to determine that the standards are technologically feasible.[29] This commenter also suggests that Congress allowed for a limited waiver only if California is able to show that its standards are necessary to address "the unique problems facing [the state] as a result of its climate and topography."[30]

In addition, the Dealers suggest that a decision to deny a CARB waiver request only need meet a "preponderance of the evidence" standard. This commenter maintains that such a standard would preserve the traditional presumption in favor of CARB's protectiveness determination while affording EPA or those opposed to the waiver the ability to uphold section 209's general preemption. The commenter suggests that EPA mischaracterizes the *MEMA* decision within its prior GHG waiver decision when EPA stated "there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations."[31] The commenter states that because the Court opined that the "preponderance of the evidence standard governs the inquiry into technological feasibility," and the Court determined that the appropriate standard of proof "must take into account the nature of risk of error involved in any given decision" it is therefore appropriate that EPA must use its discretion to determine the appropriate standard when evaluating a waiver request under each element of

---

[17] 40 FR 23104; 58 FR 4166.

[18] *MEMA I*, 627 F.2d at 1110 (citing H.R.Rep. No 294, 95 Cong., 1st Sess. 301–02 (1977).

[19] *MEMA I*, 627 F.2d at 1122.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] 74 FR 32748

[24] *See, e.g.,* 40 FR 21102–103 (May 28, 1975).

[25] *MEMA I*, 627 F.2d at 1121.

[26] *Id.* at 1126.

[27] *Id.*

[28] NADA does not address the application of the three waiver criteria to CARB's LEV III criteria pollutant regulations .

[29] NADA comment at 3.

[30] *Id.*

[31] 74 FR 32748. EPA notes that the language following this statement, in the same paragraph of the GHG waiver decision, states "EPA's past waiver decisions have consistently made clear that: "[E]ven in the two area concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary conditions and whether the standards are technologically feasible—Congress intended that the standards of EPA review of the State decision to be a narrow one.''

Section 209(b). To settle the question of the appropriate burden of proof the commenter cites *International Harvester v. Ruckelshaus* wherein the decision over burden of proof is informed by an analysis that balances the cost of a wrong decision on feasibility against the gains of a correct one: "These costs include the risk of grave maladjustments * * * and the impact on jobs and the economy from a decision which is only partially accurate * * * against the environmental savings."

With regard to the Dealers' first suggestion that EPA should separately apply the waiver criteria to each of the ACC regulatory components (*e.g.*, GHG emission standards and ZEV), EPA notes that each part of CARB's regulations are subject to EPA waiver review. As such, by today's decision we address any adverse comments in that regard. However (and as explained in further detail under EPA's analysis of each waiver criteria below), we believe the Dealers fundamentally misunderstand the specific language of the section 209(b), its congressional history, and EPA's past administrative waiver practice. For example, although EPA would typically examine whether CARB's regulation of each pollutant is as stringent as any applicable federal standard, we nevertheless recognize both the statutory language and legislative history that requires EPA to consider the protectiveness of a CARB standard "in the aggregate" of all emission standards covering that particular industry category (*e.g.*, light-duty vehicles, etc). Furthermore, under the second waiver criterion of section 209(b), EPA continues to evaluate whether those opposed to a waiver have demonstrated that CARB no longer experiences compelling and extraordinary conditions. As such, for any standard or set of standards presented to EPA for waiver consideration, EPA's evaluation continues to be whether CARB has a need for its motor vehicle emission program to address the underlying compelling and extraordinary conditions. This is further explained in our discussion of this waiver criterion. Similarly, although the Dealers might suggest that EPA only be obligated to determine whether each of CARB's ACC regulatory components, in isolation, is consistent with section 202(a) we believe the better approach is to determine the technological feasibility of each standard in the context of the entire regulatory program for the particular industry category. In this case, we believe CARB has in fact recognized the interrelated, integrated

approach the industry must take in order to address the regulatory components of the ACC program. As noted above, the House Committee Report explained as part of the 1977 amendments to the Clean Air Act that California was to be afforded flexibility to adopt a *complete* program of motor vehicle emission controls (emphasis added). As such, EPA believes that Congress intended EPA to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.[32] EPA believes this intent extends to CARB's flexibility in designing its motor vehicle emission program and evaluating the aggregate effect of regulations within the program.

With regard to CARB's initial burden in submitting a waiver request to EPA, we believe this commenter misreads both section 209(b) along with the case law and legislative history it cites. California is only required to make a protectiveness finding as a threshold matter before submitting its waiver request to EPA. Section 209(b) of the Clean Air Act plainly states that "The Administrator shall, * * *, waive application of this section* * *., if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that * * *." Nothing on the face of section 209(b) requires California to make affirmative findings or showings under section 209(b)(1)(B) or (C). The *MEMA I* decision cited to by the commenter does not support the suggestion that CARB must initially make an affirmative determination or showing beyond the protectiveness determination. Of course, whether or not CARB has such a burden, CARB has clearly provided in its initial waiver request considerable support for its view that its waiver request meets the requirements of section 209(b)(1)(B) and (C).[33]

EPA continues to believe that the burden of proof for each waiver criteria lies on the opposing party. As earlier explained, this is inherent in the statutory provision that requires EPA to grant a waiver unless it makes one of the specific negative findings listed in section 209(b)(1).

The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to

the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing, and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.[34]

Further, pertinent legislative history evinces Congressional intent to place the burden of proof on the party opposing a waiver. This appears most dramatically from the debates on the floor of the House over two alternative versions of the statutory language. One, sponsored by the relevant legislative committee, would have permitted the federal government, upon application showing by California, to set special California standards if certain conditions were met. The second, which was sponsored by the entire California delegation, see 113 Cong. Rec. H 14428 (Cong. Moss) (daily ed. Nov. 2, 1967), and eventually adopted on the floor, would have required the federal government to waive preemption of standards promulgated by California unless certain findings were made. Despite the understandable efforts of some sponsors of the committee language to portray the differences between the two versions as purely verbal the majority of the House clearly disagreed. 113 Cong. Rec. H 14404 (Cong. Herlong); H 14432 (Cong. Rogers) (daily ed. Nov. 2, 1967). Sponsors of the language eventually adopted (the language sponsored by the California delegation) referred repeatedly to their intent to make sure that no "Federal bureaucrat" would be able to tell the people of California what auto emission standards were good for them, as long as they were stricter than Federal standards. 113 Cong. Rec. H 14393 (Cong. Sess); H 14395 (Cong. Smith); H 14396 (Cong. Holffield); H 14399 (Cong. Hosmer); H 14408 (Cong. Roybal); H 14409 (Cong. Reinicke); H 14429 (Cong. Wlson) (daily ed. Nov. 2, 1967). Thus, at the close of the debate, the House rejected language that would have imposed the burden of proof on California and instead accepted language that which places the burden on those who allege, in effect, that EPA's GHG emission standards are adequate to California's needs. They also viewed the change as necessary to their intent to preserve the California state auto emission control program in its original form, see HR. Rep. No. 728, 90th Cong. 1st Se. 96–97 (1967) (separate views of Congressmen Moss and Van Deerlin), 113 Cong. Rec. H 14415 (daily ed. Nov. 2, 1967) (Cong.

---

[32] H.R. Rep No. 294, 95 Cong., 1st sess. 301–02 (1977).

[33] CARB waiver request and supporting attachments.

---

[34] *MEMA I*, 627 F.2d at 1121.

Van Deerlin) and to continuing the national benefits that might flow from allowing California to continue to act as a pioneer in this field. 113 Cong. Rec. H 14407 (Cong. Moss) (daily ed. Nov. 2, 1967); S 16395 (daily ed. Nov. 14, 1967) (Senator Murphy). These points had also previously been made by the Senate Public Works Committee in reporting out waiver language identical to that eventually adopted by the House. S. Rep. No. 403, 90th Cong. 1st Sess. 32–33 (1967).

As also explained in *MEMA I:*

Legislative history makes clear that the burden of proof lies with the parties favoring denial of the waiver. Petitioners lost the battle they now wage twelve years ago when Congress specifically declined to adopt a provision which would have imposed on California the burden to demonstrate that it met the waiver requirements. As noted, the Senate version of the Air Quality Act of 1967 contained the language which was ultimately adopted by Congress. It vested the power to make the protectiveness determination in California and sharply restricted the Secretary's role in a waiver proceeding. The Senate Report explained that under the proposal the "Secretary is required to waive application unless he finds" one of the factual circumstances set out in section 209(b)(1)(A)–(C). S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967).

Finally, with regard to the Dealers' arguments about the burden of proof, we believe it necessary to differentiate between two separate questions: 1) who has the burden of proof; and 2) what is the appropriate level of proof? A discussion of who holds the burden of proof is addressed above. Below is a discussion regarding the appropriate "level" of proof. EPA agrees with the Dealers that EPA has the discretion to determine the appropriate level of proof, and we are guided by the language of the statute, relevant case law, and our prior administrative practice.

With regard to the standard of proof applicable to CARB's protectiveness determination, EPA rejects any contention that the standard should be anything other than "clear and compelling evidence." The language of section 209(b)(1)(A) requires that the Administrator find that CARB's protectiveness determination is "arbitrary and capricious" suggesting that EPA or others that may oppose the waiver must demonstrate that CARB's factual findings lacked any acceptable reasoning. As noted above, the *MEMA I* court upheld the Administrator's position that, to deny a waiver, there must be 'clear and compelling evidence' to show that proposed procedures undermine the protectiveness of

California's standards.[35] The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare.[36] EPA believes there is no reason to jettison the precedent along with its past administrative waiver practice merely because CARB seeks a waiver for "standards" as opposed to "accompanying enforcement procedures."

With respect to the second and third waiver criteria of section 209(b); however, EPA is also guided by the principles of deference noted above and by case law, as explained below in EPA's examination of technological feasibility. As the commenter notes, in the GHG waiver EPA reasoned that *MEMA I's* holding on the applicable standard of proof should be extended to waiver of standards. EPA continues to believe that it is appropriate to impose a standard of preponderance of evidence on the proponent of denial of a waiver of standards, for the second and third waiver criteria. This standard would also be similar to the standard in civil matters. "This view of the standard of proof dictates the standard normally adopted in civil matters, a preponderance of the evidence."[37] EPA also believes that it should apply such a standard in a way that accords with congressional intent to provide California with the broadest possible discretion in setting regulations that it finds protective of the public health and welfare[38] while limiting EPA's review to a narrow role that provides substantial deference to the State.[39]

Further, EPA agrees with the commenter that in making its determination, EPA should be mindful of the risk of error involved.[40] But this does not change the burden of proof. "The Administrator is not entitled to ignore the evidence adduced at the hearing. He must consider all evidence that passes the threshold test of materiality and he must thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended denial of the waiver."[41]

In sum, based on the statutory structure of section 209(b)(1) and

legislative history, the burden of proof falls on those who wish EPA to deny the waiver.

### IV. California's Within the Scope Request for its Zero Emission Vehicle Amendments

CARB's waiver request sought confirmation from EPA that the ZEV amendments (2012 ZEV Amendments), as they relate to 2017 and prior MYs are within the scope of existing waivers. The ACC waiver request also sought confirmation that the 2012 ZEV amendments as they relate to 2018 and later MYs are within the scope of existing waivers, or, in the alternative, meets the criteria for a full waiver.

### A. Chronology

California's initial ZEV program was included as part of its first low-emission vehicle program known as LEV I. The ZEV component of this program had a ZEV sales requirement starting with the 1998 MY and phasing in to a 10 percent sales requirement by the 2003 MY. EPA issued a waiver of preemption for these regulations on January 13, 1993.[42] CARB subsequently amended the ZEV regulations in March, 1996, by eliminating the ZEV sales requirement for the 1998–2002 MYs and retaining the 10 percent sales requirement for the 2003 and later MYs. EPA issued a within the scope determination for these amendments on January 5, 2001.[43] CARB again amended the ZEV regulations in 1999, 2001, and 2003 and on December 21, 2006, EPA waived preemption for these amendments through the 2011 MY.[44] The 2006 EPA action included a within the scope decision for certain components of the regulations and a full waiver authorization for other components. Specifically, EPA determined that certain provisions of the 1999–2003 amendments to the ZEV regulations affecting 2006 and prior MYs were within the scope of previous waivers of preemption. EPA's 2006 decision concurrently granted California's request for a waiver of preemption to enforce certain provisions of the ZEV regulations as they affected 2007 through 2011 MY vehicles. EPA also stated that that although we believed it appropriate to grant a full waiver of preemption for the 2007 MY, we also believed it appropriate to consider the 2007 MY regulations (with one exception noted) as within the scope of previous waivers of preemption, as they applied to certain vehicles that were

---

[35] *Id.*

[36] *Id.*

[37] *International Harvester* v. *Ruckelshaus,* 478 F 2d 615, 643 (D.C. Cir.) (*International Harvester*).

[38] *MEMA I,* 627 F. 2d at 1122.

[39] 40 FR 23103–104.

[40] *MEMA I,* 627 F.2d at 1122.

[41] *Id.*

[42] 58 FR 4166 (January 13, 1993).

[43] 66 FR 7751 (January 25, 2001).

[44] 71 FR 78190 (December 28, 2006).

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 122 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 13 of 39

Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices    2119

already subject to the pre-existing ZEV regulations. The 2006 waiver decision did not make any findings or determinations with regard to CARB's ZEV regulations as they pertained to the 2012 and later MYs. On October 3, 2011, EPA determined that additional CARB amendments to the ZEV regulations, as they affected 2011 and prior MYs, were within the scope of previous waivers for the ZEV regulations (or in the alternative qualified for a new waiver). At that time EPA also granted a waiver allowing California to enforce the ZEV amendments as they affected 2012 and later MYs.[45]

## B. CARB's ZEV Amendments

CARB's stated goal for the 2012 ZEV amendments, as they affect the ZEV regulation through MY 2017, was to make minor corrections and clarifications and to enable manufacturers to successfully meet the 2018 and later MY ZEV requirements. As such, the 2012 ZEV amendments included compliance flexibility provisions, adjustment of credits and allowances, and the addition of a new vehicle category that can earn credits to help manufacturers satisfy their sales requirement.

The compliance flexibility provisions include several modifications to the ZEV program credit and travel provisions. The limitations on carry forward credits for ZEVs are removed, allowing for indefinite banking of ZEV credits. The travel provision for credits from ZEV sales in Section 177 states is extended through 2017. Travel provision credits limit the credits manufacturers need to generate to those necessary for California, no matter how many states adopt the ZEV program under Section 177. Vehicles sold in section 177 states generate credits for California and vice versa under the travel provisions. The travel provision amendments allow for the continued travel of ZEV credits through MY 2017. Carry forward credits for ZEVs were previously limited to two additional model years. This limitation is removed by the 2012 amendments, allowing manufacturers to bank credits for all future model years. This modification is a flexibility to enable automakers to comply with the 2018 and later provisions.

In addition, the 2012 ZEV amendments provide for an adjustment of credits and allowances to incentivize longer-term technology. For example, the credits for Type V ZEVs (fuel cell vehicles with range of 300 miles or greater) are increased. Finally, the 2012

ZEV amendments create the addition of a new vehicle category that includes two new near-ZEV vehicle types: Type I.5x and Type IIx. These vehicles are plug-in hybrid electric vehicles (PHEVs) with more capable electric drive systems, but smaller engines that are not expected to be used often and have diminished performance. These vehicles can be used to meet up to one half of a manufacturer's minimum ZEV credit requirement. These vehicles will be eligible for the same credits as current Type I.5 (2.5 credits) and Type II (3 credits) and will qualify for travel provision credits through 2017.

Separately, CARB's stated goal for its 2012 ZEV amendments, as they affect 2018 and later MYs, is to achieve the commercialization of ZEVs and near-ZEVs such as PHEVs (with sales of approximately 15 percent of the new car market in California by 2025) by simplifying the regulation and pushing technology to higher volume production in order to achieve cost reductions. The amendments cover six major areas: increased ZEV requirements phased-in through 2025; the removal of "commercialized" technology from the ZEV program; amended manufacturer size definitions, ownership requirements and transitions; a modified credit system, a modified travel provision; and a new opportunity for manufacturers to generate additional ZEV credits via over compliance with applicable GHG emission standards during this time period.

The increased ZEV credit requirements are equivalent to approximately 15 percent ZEV and near-ZEV sales by 2025. This sales level is deemed by CARB to be the threshold at which costs will decrease due to volume effects. The credit requirement is being ramped up from the current program's static level of 16 percent total, which includes PZEVs and AT PZEVs. The new requirement consists of a 2 percent minimum ZEV and 2.5 percent minimum TZEV (4.5 percent total) requirement, ramping up to 16 percent minimum ZEV and 6 percent minimum TZEV (22 percent total) requirement in 2025 and beyond. The 2012 ZEV amendment revisions to credit calculations for ZEVs and TZEVs result in a projected market share of 15.4 percent of new sales in 2025.

Under the previous ZEV mandate; credits were allowed for PZEV-certified vehicles and HEVs which are not plugged in. CARB is removing these vehicle types from the credit scheme in MY 2018 and later. Remaining credits that are banked can continue to be used, but with discounts and caps applied.

Manufacturer size definitions have been amended to apply full ZEV mandate to all but the smallest manufacturers. Manufacturer sales volumes will be combined if joint ownership exceeds 33.4 percent and the transition period for manufacturers changing size categories has been modified. Under this system, 97 percent of the light-duty market will be covered by the ZEV mandate.

Currently, manufacturers with sales volumes exceeding 60,000 units in California are classified as large volume manufacturers (LVM). This modification reduces the threshold to 20,000 units, which will bring most manufacturers under the full ZEV mandate. This modification is being made because many of these current intermediate vehicle manufactures (IVMs) have a large market presence outside California. Remaining IVMs will be allowed to comply with the ZEV mandate with no restrictions on ZEV technology type, meaning an IVM can fully comply with TZEVs, but not PZEVs or AT PZEVs.

Additionally, ownership thresholds for treatment of automakers as one entity are being modified to more closely align them with GHG fleet regulations and changes are being made to the lead time provisions as manufacturers move between size classes.

CARB also modified its credit system. ZEV credits are based on range and technology reflecting utility of the vehicle and expected timing for commercialization. BEVs with a 50-mile range earn one credit and FCVs with 350 miles of range earn four credits each. Up to half a manufacturer's credit requirement may be met with more capable PHEVs which are meant to operate mainly as EVs, but are equipped with a small range-extending engine.

TZEVs, which are essentially PHEVs of the type available today such as the Chevrolet Volt have simplified credits based on electric range and a minimum requirement of 10 miles all-electric on the US06 test cycle. The TZEV credit ranges from a minimum of 0.2 to a maximum of 1.3 with a greater than 80 mile range.

Excess credits earned and banked from PZEVs and AT PZEVs will be discounted in 2018 and later years. Their use will then be limited to 25 percent of a manufacturer's TZEV requirement. No portion of the ZEV requirement may be met with banked credits. Smaller manufacturers (IVMs) will not have their credits capped for 2018 or 2019. In 2020 and later, the IVM cap will be 25 percent, but applied to their combined ZEV/TZEV requirement.

---

[45] 76 FR 61095 (October 3, 2011).

CARB has also modified the credit levels for various ZEV types. The current tiered CARB system, which encouraged manufacturers to design vehicles to meet a given range threshold is replaced with an equation that calculates credits based on the UDDS electric driving range.

In addition, CARB has modified its "travel provisions." The travel provision, which allows for the sale of a qualifying vehicle in a Section 177 state to count towards a manufacturer's credit requirement in California, ends for BEVs after 2017. Since FCVs are far behind BEVs in development and market penetration, travel credits are extended for FCVs. California intends to extend travel credits until sufficient refueling infrastructure exists to support FCVs in the market.

Lastly, the 2012 ZEV amendments provide that automakers who over comply with the LEVIII GHG standard may use the extra GHG reductions to offset a portion of their ZEV requirement in MYs 2018 through 2021. Manufacturers may offset 50 percent of their ZEV mandate in 2018, ramping down to 30 percent in 2021, subject to certain requirements.

### C. EPA's Determination Regarding the Appropriateness of CARB's Within the Scope Request for the 2012 ZEV Amendments

CARB primarily relies upon EPA's prior waiver and within the scope findings to demonstrate the appropriateness of applying the within the scope criteria to its 2012 ZEV amendments. In EPA's 2006 waiver determination, EPA stated that it will conduct a two-part inquiry when considering whether CARB amendments to a previously waived regulation fall within the scope of the previously granted waiver or whether the amendments require a new waiver:

EPA believes it is important to distinguish between the threshold issue of whether CARB's amendments should be subjected to either the within-the-scope criteria or the full waiver, and separately determining whether the same amendments actually meet the applicable criteria for actually confirming the within-the-scope request or granting a full waiver of federal preemption.

In determining the threshold question, EPA will consider whether the amendments make minor technical revisions or provide compliance flexibility on the one hand or whether the amendments add new or more stringent pollutant standards or new motor vehicle categories on the other.[46]

With regard to the 2017 and earlier MYs, following the precedent noted

above, CARB maintains that the 2012 ZEV amendments create no new issues affecting the previous waiver determinations concerning the ZEV program and that the 2012 ZEV amendments do not undermine CARB's original protectiveness determination and the ZEV regulations remain consistent with section 202(a). With regard to the 2018 and later MYs, CARB maintains that the within the scope criteria are appropriate since the overall ZEV credit requirement for MYs 2018 through 2022 is less burdensome than the currently waived program.

EPA received comment from the Manufacturers stating agreement that the amendments to the MYs 2009 through 2017 ZEV regulations qualify for a within the scope determination since the amendments increase the flexibility available to manufacturers to comply with those standards and otherwise lessen the burdens placed on manufacturers. However, the Manufacturers did not agree that the amendments to the ZEV regulation for 2018 and later MYs properly fall under the within the scope review. The commenter notes that in addition to the increase in the minimum ZEV credit requirements in 2018 MY and beyond, the CARB amendments also eliminate certain vehicle types (e.g., PZEVs and AT PZEVs) that were previously accepted towards compliance with the ZEV requirements during this time period. In addition, the Manufacturer notes that the changes to CARB's travel provisions are significant and raise serious compliance concerns.

The Dealers commented generally that the ZEV waiver should be denied, but raised no specific concerns about a within-the-scope determination for MYs 2012–2017.

Therefore, EPA has received no explicit comment suggesting that EPA reject CARB's request for confirmation that EPA evaluate the 2012 ZEV amendments as they affect the 2017 MY and earlier. EPA believes that it is appropriate to evaluate such amendments (which provide compliance flexibilities) under the within the scope criteria and applies such criteria below. However, with respect to the 2018 and later MYs, EPA agrees with the commenters that CARB's 2012 ZEV amendments have, in total, added to the level of stringency and compliance obligations. Therefore, EPA does not believe it is appropriate to apply within the scope analysis to the ZEV amendments as they apply in the 2018 and later MYs. As explained below, because EPA is applying the full waiver criteria for the 2012 ZEV amendments as they pertain to the 2018

and later MYS, EPA will in the alternative also examine the revisions for the 2017 and earlier MYs using the full waiver criteria.

### D. Application of the Within the Scope Waiver Criteria to CARB's 2012 ZEV Amendments Regarding 2017 and Earlier MYs

#### 1. Public Health and Welfare

Under section 209(b)(1)(A) of the Act, EPA cannot grant a waiver if the Agency finds that CARB was arbitrary and capricious in its determination that its State standards are, in the aggregate, at least as protective of public health and welfare as applicable federal standards. Similarly, under the criteria for a within the scope determination, the CARB amendments to an existing program may be considered within-the-scope of a previously granted waiver provided that the amendments do not undermine California's determination that its standards in the aggregate are as protective of public health and welfare as applicable Federal standards. Thus, in the within the scope context CARB may rely on the "protectiveness determination" that the Board made at the time of the initial regulations (the regulations which subsequently received a waiver of federal preemption from EPA) and then CARB must only demonstrate why the protectiveness determination has not been undermined by CARB's amendments or any other intervening events such as the adoption of EPA regulations since the initial waiver of federal preemption.

CARB asserts that its 2012 ZEV amendments as applied to MYs 2009 to 2017 are a critical component of the ACC package that will result in fleet standards that are at least as protective as would exist under federal standards. The Board resolved "that the Board hereby determines that the proposed regulations approved for adoption herein will not cause the California motor vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards." [47]

EPA received no comments suggesting that CARB's request should be denied on the basis of CARB failing to meet its burden associated with the protectiveness findings under section 209(b)(1)(A) of the Clean Air Act.

Therefore, based on the record before us, we cannot find that CARB's 2012 ZEV amendments, as the affect 2017 and earlier MYs, would undermine CARB's prior protectiveness determinations nor would it cause the California motor

---

[46] Decision Document accompanying waiver determination in 71 FR 78190 (December 28, 2006).

[47] CARB Resolution 12–11 at EPA–HQ–OAR–2012–0562–0005.

vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards.

## 2. Consistency With Section 202(a)

Under section 209(b)(1)(C), EPA cannot grant California its waiver request if the Agency finds that California standards and accompanying enforcement procedures are not consistent with section 202(a) of the Clean Air Act. Previous waivers of federal preemption have stated that California's standards are not consistent with section 202(a) if there is inadequate lead time to permit the development of technology necessary to meet those requirements, given appropriate consideration to the cost of compliance within that time. California's accompanying enforcement procedures would also be inconsistent with section 202(a) if the federal and California test procedures were inconsistent.

The scope of EPA's review of whether California's action is consistent with section 202(a) is narrow. EPA has previously found that the determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the federal test procedure.[48]

As previously noted, CARB maintains that the 2012 ZEV amendments, as they pertain to the 2017 and previous MYs, provide manufacturers with additional flexibility without increasing on balance the overall stringency of the preexisting ZEV requirements. EPA has received no comments explicitly questioning the feasibility of the amendments as they apply to these MYs. In the discussion below, EPA addresses the limited comments regarding the technological feasibility concerns with regard to 2018 and later MYs and EPA provides further analysis of the general technological feasibility concerns in the full waiver discussion. With regard to whether test procedures are consistent, CARB notes that the federal Tier 2 regulations require manufacturers to measure emissions from ZEVs in accordance with the California test procedures.[49] In addition, EPA has not received comment suggesting the test procedures are inconsistent. Therefore, based on the record before us, we cannot deny CARB's within the scope request for

2017 and prior MYs based on an inconsistency with section 202(a).

## 3. New Issues

As noted above, included in the within the scope criteria, is a determination of whether the amendments raise new issues affecting the previous waiver decisions. As previously noted, EPA examines any new information when reviewing whether CARB's amendments affect the ZEV program's consistency with section 202(a). If the amendments had increased the stringency of the standards upon the manufacturers (for the specific model years being reviewed in the within the scope analysis), or if the amendments had regulated or subjected new types of vehicles to be included in the ZEV program (or in this instance regulated the same vehicle types but for model years not previously waived by EPA), or added additional pollutants to the program, then likely new issues would have been created. However, in this instance no party has presented evidence that new issues exist for MYs 2017 and earlier as a result of the 2012 ZEV amendments. Therefore, EPA cannot deny CARB's request for a within the scope determination for MYs 2017 and earlier based on this criterion.

Therefore, based on the record before us, we cannot deny CARB's request for confirmation that its 2012 ZEV amendments, as they affect the 2017 and earlier MYs, are within the scope of previous waiver determinations. As such, we confirm CARB's request regarding the 2012 ZEV amendments as they affect 2017 and earlier MYs.

## V. Consideration of Advanced Clean Car Regulations Under the Full Waiver Criteria

CARB's ACC program regulations include revisions to both California's LEV and ZEV programs. CARB's request seeks a waiver of preemption under section 209(b) of the Clean Air Act (CAA), 42 U.S.C. 7543(b) for the revisions to the LEV III program. CARB's request also seeks a waiver for the ZEV amendments included in the ACC program regulations. Subsequent to CARB's initial ACC waiver request, CARB's Executive Officer took action to formally adopt a "deemed to comply" regulation affecting the GHG component of the ACC package. CARB submitted this additional information to EPA and requested that EPA consider the "deemed to comply" regulation as part of CARB's pending ACC waiver request. EPA's application of the section 209(b) waiver request, including the "deemed to comply" regulation, is set forth below.

### A. California's Protectiveness Determination

Section 209(b)(1)(A) of the Clean Air Act requires EPA to deny a waiver if the Administrator finds that California was arbitrary and capricious in its determination that its State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. EPA recognizes that the phrase "States standards" means the entire California new motor vehicle emissions program. Therefore, as explained below, when evaluating California's protectiveness determination, EPA compares the California-to-Federal standards. That comparison is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA have previously found were not arbitrary and capricious.[50]

Traditionally, EPA has evaluated the stringency of California's standards relative to comparable EPA emission standards.[51] That evaluation follows the instruction of section 209(b)(2), which states: "If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of [209(b)(1)]."

To review California's protectiveness determination in light of section 209(b)(2), EPA conducts its own analysis of the newly adopted California standards to comparable applicable Federal standards. The comparison quantitatively answers whether the new

[48] See MEMA I, at 1126.
[49] CARB waiver request at 29, citing 40 CFR 86.1811–04(n).

[50] In situations where there are no Federal standards directly comparable to the specific California standards under review, the analysis then occurs against the backdrop of previous waivers which determined that the California program was at least as protective of the federal program ((LEV II + ZEV) + GHG). See 71 FR 78190 (December 28, 2006), Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006).

[51] 36 FR 17458 (Aug. 31, 1971). ("The law makes it clear that the waiver requests cannot be denied unless the specific finding designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California."). The "more stringent" standard expressed here in 1971 was superseded by the 1977 amendments to section 209, which established that California's standards must be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. The stringency standard remains, though, in section 209(b)(2).

Case 4:25-cv-04966-HSG   Document 247-1   Filed 08/12/26   Page 125 of 162
USCA Case #26-1218   Document #2187882   Filed: 08/11/2026   Page 16 of 39

**2122** Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices

standards are more or less protective than the Federal standards. That comparison of the newly adopted California standards to the applicable Federal standards is conducted in light of prior waiver determinations. That is, the California-to-Federal analysis is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA has not found arbitrary and capricious.[52]

A finding that California's determination was arbitrary and capricious under section 209(b)(1)(A) must be based upon "'clear and compelling evidence' to show that proposed [standards] undermine the protectiveness of California's standards."[53] Even if EPA's own analysis of comparable protectiveness or that suggested by a commenter might diverge from California's protectiveness finding, that is not a sufficient basis on its own for EPA to make a section 209(b)(1)(A) finding that California's protectiveness finding is arbitrary and capricious.[54]

CARB has made a series of protectiveness determinations with regard to its ACC program. California made a protectiveness determination with regard to the 2012 ZEV and LEV amendments in CARB's Resolution 12–11, finding that the amendments would not cause the California motor vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards.[55] CARB noted that this protectiveness determination is the logical extension of the comparable findings that were found to be sufficient in the analyses of California's previous protectiveness determinations for its ZEV, LEV, and GHG regulations.[56] As

explained in CARB's waiver request, the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the pre-existing federal standards. CARB's Resolution 12–11 also sets forth the Board finding that "It is appropriate to accept compliance with the 2017 through 2025 MY National Program as compliance with California's GHG emission standards up through the 2017 through 2025 MYs, once U.S. EPA issues their Final Rule on or after its current July 2012 planned release, provided that the GHG reductions set forth in U.S. EPA's December 1, 2011 Notice of Proposed Rulemaking for 2017 through 2025 model year passenger vehicles are maintained, except that California shall maintain its own reporting requirements." Further, CARB's Resolution 12–21 sets forth that the CARB staff "prepared three separate Regulatory Notices * * * for these amendments [LEV III/GHG and ZEV] and presented them to the Board with a single coordinated analysis of emissions, costs, and associated environmental impacts and benefits.[57] CARB's Resolution 12–21 also resolves that the "recitals and findings contained in Resolution 12–11, are incorporated by reference herein."[58]

In addition, at the time CARB adopted the "deemed to comply" regulation, the CARB Board found that such amendments do not undermine the Board's previous determination that the regulation's emission standards, other emission related requirements, and associated enforcement procedures are, in the aggregate, at least as protective of public health and welfare as applicable federal standards and are consistent with section 209 of the Clean Air Act.[59] Therefore, subsequent to the finalization of EPA's GHG regulation (August 31, 2012), and as part of the CARB Board's adoption of the "deemed to comply" rule on November 15, 2012, the Board resolved and determined "that the proposed regulations approved for adoption herein will not cause California motor vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards."[60]

With regard to criteria pollutants, CARB notes that the primary fleet average emission requirement, beginning in 2015, declines every year to a fleet average NMOG plus $NO_X$

emission standard of 0.030 g/mi in 2025. CARB notes that this is clearly more stringent than the current federal Tier 2 fleet average $NO_X$ emission requirement with its implied fleet average NMOG and plus $NO_X$ requirement. In addition, the LEV III PM standards 3 mg/mi and 1 mg/mi are also significantly more stringent than the federal Tier 2 p.m. standards. CARB also notes that while there is no criteria emissions benefit with its ZEV requirements in terms of vehicle (tank-to-wheel—TTW) emissions since the LEV III criteria pollutant fleet standard is responsible for the emission reductions, but CARB notes that in terms of upstream emission impacts (well-to-wheel—WTW) there are emission reductions achieved from the ZEV requirements. There are no comparable federal standards.

CARB also notes that with regard to GHG emissions, the ACC program as a whole would provide major reductions in GHG emissions (e.g., by 2025 $CO_2$ emissions would be reduced by almost 14 million metric tonnes (MMT) per year, which is 12 percent from baseline levels). CARB's ACC waiver request, notes that the federal GHG standards do not become more stringent in the 2017–2025 MYs, as CARB's do. However, CARB states that it understands more stringent standards will "soon be finalized."

At the time the Board adopted the "deemed to comply" amendments it had before it the "Staff Report: Initial Statement of Reasons demonstrating that if a National Program standard was theoretically applied only to California new vehicle sales alone, it might create a GHG deficit of roughly two million tons compared to the California standards.[61] CARB notes that there might be a GHG emission deficit if the National Program applied in California, and thus CARB's GHG emission standards are at least as stringent as the EPA GHG emission standards.

### 1. Comments on CARB's Protectiveness Determination

The Dealers commented on CARB's protectiveness determinations for both its GHG emission standards and its ZEV regulations. At the outset, NADA claims that EPA must conduct a separate preemption waiver evaluation for each set of standards in the ACC program

---

[52] In situations where there are no Federal standards directly comparable to the specific California standards under review, the analysis then occurs against the backdrop of previous waivers which determined that the California program was at least as protective of the federal program ((LEV II + ZEV) + GHG). See 71 FR 78190 (December 28, 2006), Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle (ZEV) Standards (December 21, 2006).

[53] MEMA I, 627 F.2d at 1122.

[54] "Once California has come forward with a finding that the procedures it seeks to adopt will not undermine the protectiveness of its standards, parties opposing the waiver request must show that this finding is unreasonable." MEMA I, 627 F.2d at 1124.

[55] See CARB's Resolution 12–11, EPA–HQ–OAR–2012–0562–0006 at 22. EPA notes that the CARB Board also resolved that it found that separate California standards and test procedures are necessary to meet compelling and extraordinary conditions. Id. at 23.

[56] CARBS's waiver request at 13, citing 76 FR 61095 (October 3, 2011), 68 FR 19811 (April 22, 2003), and 74 FR 32744 (July 8, 2009), respectively.

[57] CARB Resolution 12–21 at 7.

[58] Id. at 10.

[59] See CARB's Resolution 12–35; EPA–HQ–OAR–2012–0562–0374.

[60] Id. at p. 9.

[61] EPA–HQ–OAR–2012–0562–0374 at 3. CARB also notes that to the extent a manufacturer chooses not to exercise their National Program compliance option in California this would actually provide additional GHG benefits in California, so compliance in California can never yield fewer cumulative greenhouse gas reductions from the industry wide fleet certified in California.

(e.g., LEV III criteria pollutants, GHG, and ZEV). EPA notes that NADA did not address the preemption waiver request for the CARB LEV III standards.

In the context of considering the ACC standards individually, NADA states that EPA must reject CARB's GHG preemption waiver request because CARB's finding is premature. NADA maintains that CARB has not conducted the necessary investigation to support is protectiveness determination because EPA has now finalized its GHG emission standards. NADA claims that CARB's determination should measure the standards that exist at the time EPA makes its waiver decision. NADA contends that rather than allowing CARB to look at the program as a whole, CARB must be required to examine each standard before the Agency, including the GHG standards at issue. In the alternative, the commenter suggests that CARB's protectiveness determination is arbitrary and capricious since CARB itself cites the absence of the federal GHG standards as reason for its protectiveness determination. Finally, the commenter argues that CARB's conclusions are not backed by facts or analysis and contradict the actuality that emissions from other parts of the world and the United States affect global concentrations, and therefore concentrations in California. The Dealers state that it therefore follows that GHG concentrations in California will be reduced by a greater amount if reductions occur on a nationwide basis, rather than just statewide. Thus by definition, CARB standards for limiting GHG emissions from California cars are less protective than the applicable federal standards.

CARB's supplemental comments, in response to NADA's claims, note that California demonstrated that it was reasonable for the Board to determine that the California standards "as submitted" are, in the aggregate, as or more stringent than the applicable federal standards.[62] CARB suggests this was a relatively simple determination at the time of CARB's June 2012 waiver request because: (1) EPA's proposed 2017–2025 MY GHG standards were not finalized; (2) EPA had not proposed or finalized a 1 mg/mile PM standard and other criteria pollutant improvements for 2015 and later MYs; and (3) EPA has no ZEV program that may achieve an additional incremental wells-to-wheels criteria pollutant reduction. CARB states that this prior and timely Board determination remains sound despite

the now finalized EPA GHG standards because (2) and (3) remain true and because EPA GHG standards: (1) do not account for upstream GHG emissions as does California's GHG program; (2) include vehicle multipliers for natural gas vehicles, effectively diluting federal standards vis a vis California's; and (3) contains relaxed criteria for GHG credits for mild hybrid-electric vehicle trucks, which also dilutes the federal standard. CARB also notes that to the extent manufacturers choose the EPA GHG standard compliance path to demonstrate compliance with California standards that results in essentially equal reductions (as stringent) of GHG emissions in California. Separately, CARB states that NADA's attempt to exclude CARB's LEV III standards from the "in the aggregate" protectiveness determination cannot be countenanced since this would render the phrase "in the aggregate" superfluous.

In addition, within CARB's Resolution 12–35, adopted on November 15, 2012, CARB addresses two issues raised by NADA's comments to EPA. CARB's Resolution 12–35 notes the question of whether the CARB Board failed to make a finding that California's passenger vehicle program remains as protective as applicable federal standards given the proposed "deemed to comply" rule on September 14, 2012 and also notes the question whether California's program is no longer as protective given the 2017 through 2025 MY National Program. First, it states that it sufficiently addressed NADA's protectiveness issues in its November 14, 2012 supplemental submittal to EPA. Within this submission, CARB noted that it was reasonable for the Board to determine that the California standards *as submitted* are, in the aggregate, as or more stringent that the applicable federal standards. CARB maintains that at the time of its June 2012 waiver submittal its protectiveness determination was a fairly simple one since EPA's 2017–2025 GHG standards were not finalized, EPA had not proposed nor finalized a 1 mg/mile PM standard and other criteria pollutant improvements for 2015 and later MYs, and EPA has no ZEV program that may achieve an additional incremental wells-to-wheels criteria pollutant reduction. CARB notes that the Board's determination remains solid despite the now finalized National Program rule because EPA still has no LEV III criteria pollutant/PM equivalent requirements and because EPA's GHG standards do not account for upstream GHG emissions as do California's, and because the National Program includes

vehicle multipliers for natural gas vehicles and relax criteria for GHG credits for mild hybrid electric vehicle trucks.

EPA also received comment regarding CARB's protectiveness determination for its ZEV standards. The Dealers suggest that CARB failed to adequately provide a protectiveness determination, and such a determination is drawn into question given CARB's stated conclusions that there is no TTW emission benefits from ZEV and that the ZEV regulation does not provide any additional GHG emission reductions beyond the GHG standards. The Dealers claim that CARB's failure to make a protectiveness determination regarding its ZEV standard is inherently arbitrary and capricious.

CARB states that contrary to NADA's assertion that it must make an individual protectiveness determination regarding its ZEV amendments CARB believes that requiring California to show that each standard (including the ZEV standard) is at least as protective in the aggregate would in effect ignore the phrase "in the aggregate" in section 209(b). CARB states that is why it made one protectiveness determination. CARB notes that purpose of the ZEV regulation is to commercialize the technologies needed to meet long term goals even beyond the emission reductions anticipated by the LEV III program.[63]

2. Is California's protectiveness determination arbitrary and capricious?

As described above, EPA's traditional analysis has been to evaluate California's protectiveness determination by comparing the new California standards, or amendments, to applicable EPA emission standards for the same pollutants. EPA notes that the "more stringent" standard expressed in 1971 was superseded by the 1977 amendments to section 209, which established that California's standards must be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. As noted above, this was intended to afford California the broadest possible discretion in designing is motor vehicle emission program. The comparison is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA have previously found were not arbitrary and capricious.

---

[62] CARB submitted comment on November 14, 2012 (CARB supplemental comment). EPA–HQ–OAR–2012–0562–0373.

[63] CARB's supplemental comments at 3–4. CARB also references table 6.2 of its Initial Statement of Reasons (ISOR) that details the well to wheel emissions benefits of the ZEV program compared to the LEV III program. EPA–HQ–OAR–2012–0562–0008.

EPA believes that the Dealers misapply our prior statement, made in EPA's 2009 GHG waiver decision, that the most straightforward reading of the comparison called for by the statute, between California and Federal standards, is an "apples to apples" comparison.[64] The stated purpose of the "apples to apples" phrase was to determine what the "applicable" Federal standards are for purposes of evaluating a protectiveness determination, in response to comments that the federal CAFE standards adopted by NHTSA should be considered applicable federal standards for purposes of this wavier criterion. EPA explained in the GHG waiver decision that "The term 'applicable' has to refer to what Federal standards apply, and the most straightforward meaning is that they apply in the same way that the California standards apply, by setting limits on emissions of air pollutants." Therefore, given the uniqueness of a CARB waiver request that includes interrelated standards applicable to the same vehicle category EPA believes CARB's approach of making one protectiveness determination for its ACC program is a reasonable approach permitted under section 209(b).[65] Although section 209(b)(2) informs EPA of the conclusion it must draw if each standard is at least as stringent as the comparable federal standard, EPA notes the protectiveness determination that CARB presents in a waiver request typically includes an implicit or explicit in the aggregate protectiveness determination since CARB typically examines whether its new standards (plural) undermine previous protectiveness determinations, which EPA evaluated in prior waiver decisions. In this context, once CARB presents an in the aggregate protectiveness determination EPA believes it appropriate to initially evaluate such standards in a side-by-side comparison with applicable Federal standards and then determine whether such standards are, in the aggregate, as protective as applicable Federal standards.

In the context of CARB's ACC standards this side-by-side analysis is simple. EPA has already determined that California was not arbitrary and capricious in its determination that the pre-existing California standards for light-duty vehicles and trucks, known as LEV II, is at least as protective as

comparable federal standards, known as the Tier II standards.[66] In this instance, CARB has finalized new and more stringent criteria pollutant standards (LEV III) while the Tier II standards remain in place at the federal level. In the absence of newer EPA standards since the time of its prior waiver for CARB's LEV II standards there is a clear rational basis for CARB's determination that its standards will be at least as protective of human health and welfare as applicable federal standards.

The Dealer's comments assert that CARB's protectiveness determination was premature because that assessment occurred before EPA finalized its own GHG emission standards. However, EPA believes that CARB's initial protectiveness determination (submitted to EPA in CARB's June 2012 waiver request) was not premature and was appropriate given the EPA standards in effect at that time. At the time CARB submitted its waiver request, EPA's GHG emission standards for the 2017 through 2025 MYs were the same for those MYs as for MY 2016, while CARB's were becoming more and more stringent over that period; therefore, CARB's protectiveness finding was reasonable at that time.

Subsequent to EPA's promulgation of its final GHG standards, in the context of CARB's "deemed to comply" regulation, CARB has provided an updated protectiveness determination (see Resolution 12–35) regarding the California GHG emission standards, in terms of the underlying benefits of CARB's program. EPA finds California to be correct in its determination that the "deemed to comply" regulation does not undermine CARB's determination that its regulations are in the aggregate as protective as EPA's standards. CARB's regulation will achieve, in the aggregate, equal or even additional GHG emission reductions in California relative to federal GHG standards, even if manufacturers choose to comply with the California regulations by complying with EPA's GHG emission standards. As noted above, EPA's National Program standards do not account for upstream GHG emissions as do California's and EPA's GHG standards includes vehicle multipliers for natural gas vehicles and relax criteria for GHG credits for mild hybrid electric vehicle trucks. EPA also believes that CARB correctly notes that even with the "deemed to comply" amendments, one or more manufacturers could still choose to

continue demonstrating compliance in California under the existing California regulations. To the extent manufacturers choose EPA's GHG standards as the compliance path—in California—the California standard, by definition would yield at least, essentially equivalent GHG reductions, so California's standards cannot be less stringent.

The Dealers seem to suggest that with EPA's GHG standards there will be a greater reduction of GHG emissions compared to the California GHG emission standards. California's protectiveness determination applies only to the protectiveness of CARB's emission standards, in California, compared to applicable federal standards. EPA believes that the Dealers ignore the obvious, that all stakeholders, including California, recognize the need for reductions of GHG emissions, as well as emissions of other pollutants, on a national basis. The federal GHG emission standards, applied in 50 states, will generally result in more emission reductions than CARB standards applied solely in California. If California were required to achieve equal emission results (with reductions counted only in California) to a federal program this would render 209(b) unusable. The relevant comparison is between the emission reductions achieved in California under the California program versus the emission reductions in California under the comparable federal program. Emissions reductions in other states are not considered, which is appropriate because the waiver decision affects only California's emission standards, not the federal standards that exist regardless of EPA's decision. EPA believes, and the record contains no evidence otherwise, that the reductions due to CARB's GHG emission standards in California versus the reductions of the comparable federal GHG emission standards in California, demonstrates that CARB's GHG emission standards are at least as protective as applicable federal standards. EPA notes that NADA raised similar arguments in the context of EPA's within the scope waiver decision, issued on June 14, 2011, for CARB's GHG emission amendments that included a "deemed to comply" provision for GHG emission standards during the 2012 through 2016 MYs. EPA noted "Thus, at the very least, compliance with California's GHG standards under the revised regulations will result in the same, if not more, emission reductions than would occur in the absence of the California standards. NADA provides no evidence that CARB's standards are less protective than the applicable Federal

---

[64] See 74 FR at 32750.

[65] EPA also notes that CARB has provided complete information and determinations that even in the context of comparing individual standards their standards are as protective of public health and welfare as applicable Federal standards.

[66] 68 FR 19811 (April 22, 2003) and Decision Document for Waiver of Federal Preemption for Low Emission Vehicle Amendments (LEV II) (April 11, 2003).

standards. As such, NADA fails to present any evidence or make any showing that the amendments undermine California's previous determination that its standards, in the aggregate, are at least as protective of public health and welfare as applicable Federal standards.''[67]

With regard to CARB's ZEV amendments EPA believes that CARB has provided a reasoned basis for their determination that the ZEV regulations are as protective or public health and welfare as comparable federal requirements, which for ZEV are nonexistent. In EPA's 2006 ZEV waiver proceeding, EPA conducted its traditional analysis to compare California's newly enacted ZEV standards to a similar lack of applicable federal standards. At that time California found, and EPA deemed reasonable, that the addition of the ZEV standards did not render California's LEV II program, for which a waiver had previously been granted, less protective than the federal Tier II program. In addressing the Alliance of Automobile Manufacturers' petition for reconsideration with respect to this issue, EPA stated that ''the words 'standards' and 'in the aggregate' in section 209(b)(1)(A) * * *, at minimum, include all the standards relating to the control of emissions for a category of vehicles (e.g., passenger cars, etc.) subject to CARB regulation, particularly where the standards are designed to respond to the same type of pollution.''[68] California's ZEV and GHG emission standards are an addition to its LEV program. EPA has not received any comment to suggest that the existence of either of these additional regulatory components undermines the protectiveness of CARB's LEV III emission standards. Although the Dealers suggest that ''consumers facing a CARB-constrained mix at their local dealership may elect to buy a CARB-exempted brand, to purchase a late-model used vehicle, or defer vehicle purchases altogether,'' EPA believes that the Dealers have failed to present any legal argument as to why EPA should take this into consideration within the waiver criteria. We also find that the Dealers have failed to provide evidence, under any standard of proof, as to whether such outcomes would ultimately impair the protectiveness of

CARB's emission standards. EPA believes it is appropriate, and certainly reasonable, for CARB to evaluate its standards in the aggregate when the nature of its regulations are interrelated and the regulations are submitted to EPA as one ACC program. Although NADA suggests that CARB failed to make an individual protectiveness determination for its ZEV standards, EPA believes this is of no significance in light of the overall protectiveness of CARB's emission standards and the lack of an applicable federal ZEV program. The Dealers mere contentions, which CARB reasonably refutes in its supplement comments,[69] that there is no criteria emission benefit from the ZEV proposal in terms of TTW emissions, and that the ZEV regulation does not provide GHG emission reductions in addition to the LEV III GHG regulation, suggest no reason to find that CARB's ACC program is any less protective of public health and welfare because of the existence of such ZEV standards.

### 3. Section 209(b)(1)(A) Conclusion

Based on the record before EPA, we cannot find that CARB was arbitrary and capricious in its finding that the California ACC program standards, including the LEV III criteria pollutant and GHG emission standards along with its ZEV amendments are, in the aggregate, at least as protective of public health and welfare as applicable federal standards.

### B. Does California need its standards to meet compelling and extraordinary conditions?

Under section 209(b)(1)(B) of the Act, EPA cannot grant a waiver if EPA finds that California ''does not need such State standards to meet compelling and extraordinary conditions.'' EPA has traditionally interpreted this provision as requiring a consideration of whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions. However in EPA's March 6, 2008 denial of CARB's GHG waiver request (GHG waiver denial), EPA limited this interpretation to California's motor vehicle standards that are designed to address local or regional air pollution problems. EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects and that it was appropriate to address such standards separately from the remainder of the program. EPA then found that California did not need such standards

to meet compelling and extraordinary conditions. The interpretation adopted in the March 6, 2008 waiver denial was before EPA for reconsideration when CARB resubmitted its GHG waiver request and EPA announced a new opportunity for hearing and public comment on February 12, 2009.[70]

Set forth below is a summary of EPA's departure from the traditional interpretation of section 209(b)(1)(B) in the GHG waiver denial along with EPA's return to the traditional interpretation (confirmed today) in EPA's waiver of preemption of CARB's GHG standards on July 8, 2009 (GHG waiver).[71] Because EPA received comment suggesting that CARB's GHG and ZEV standards do not meet the requirements of section 209(b)(1)(B), EPA believes it useful to recount the interpretive history associated with both GHGs and traditional local and regional air pollutants to explain why EPA believes that section 209(b)(1)(B) should be applied in the same manner for all air pollutants.

As explained below, EPA finds that the opponent of the ACC waiver has not met its burden of demonstrating why CARB no longer has a need for its motor vehicle emissions program under EPA's interpretation of section 209(b)(1)(B). Although EPA is not adopting the Dealers suggested interpretation, EPA also finds that the opponent of the waiver has not met its burden of demonstrating that CARB does not have the need for either its GHG or ZEV standards.

### 1. EPA's March 6, 2008 GHG Waiver Denial

In the March 6, 2008 waiver denial, EPA provided its reasoning for changing its long-standing interpretation of this provision, as it pertains to California standards designed to address global air pollution. EPA described its longstanding interpretation in some detail, stating that:

Under this approach EPA does not look at whether the specific standards at issue are needed to meet compelling and extraordinary conditions related to that air pollutant. For example, EPA reviewed this issue in detail with regard to particulate matter in a 1984 waiver decision.[72] In that waiver proceeding, California argued that EPA is restricted to considering whether California needs its own motor vehicle program to meet compelling and extraordinary conditions, and not whether any given standard is necessary to meet such conditions. Opponents of the waiver in that proceeding argued that EPA was to consider whether California needed

---

[67] 76 FR 34693, 34696 (June 14, 2011).

[68] Decision Document for Waiver of Federal Preemption for California's Zero Emission Vehicle (ZEV) Standards (December 21, 2006) and EPA's August 13, 2008 Response to Petition for Administrative Reconsideration of EPA's ZEV Waiver Decision (through the 2011 Model Year) published on December 28, 2006.

[69] See CARB supplemental comments at 3–4.

[70] 74 FR 7040 (February 12, 2009).

[71] 74 FR 32744 (July 9, 2009).

[72] 49 FR 18887 (May 3, 1984).

these PM standards to meet compelling and extraordinary conditions related to PM air pollution.

The Administrator agreed with California that it was appropriate to look at the program as a whole in determining compliance with section 209(b)(1)(B). One justification of the Administrator was that many of the concerns with regard to having separate state standards were based on the manufacturers' worries about having to meet more than one motor vehicle program in the country, but that once a separate California program was permitted, it should not be a greater administrative hindrance to have to meet further standards in California. The Administrator also justified this decision by noting that the language of the statute referred to "such state standards," which referred back to the use of the same phrase in the criterion looking at the protectiveness of the standards in the aggregate. He also noted that the phrase referred to standards in the plural, not individual standards. He considered this interpretation to be consistent with the ability of California to have some standards that are less stringent than the federal standards, as long as, per section 209(b)(1)(A), in the aggregate its standards were at least as protective as the federal standards.

The Administrator further stated that in the legislative history of section 209, the phrase "compelling and extraordinary circumstances" refers to "certain general circumstances, unique to California, primarily responsible for causing its air pollution problem," like the numerous thermal inversions caused by its local geography and wind patterns. The Administrator also noted that Congress recognized "the presence and growth of California's vehicle population, whose emissions were thought to be responsible for ninety percent of the air pollution in certain parts of California." [73] EPA reasoned that the term compelling and extraordinary conditions "do not refer to the levels of pollution directly." Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—"geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems." [74]

The Administrator summarized that under this interpretation the question to be addressed in the second criterion is whether these "fundamental conditions" (i.e. the geographical and climate conditions and large motor vehicle population) that cause air pollution continued to exist, not whether the air pollution levels for PM were compelling and extraordinary, or the extent to which these specific PM standards will address the PM air pollution problem. [75]

However in the GHG waiver denial, EPA limited this interpretation to California's motor vehicle standards that are designed to address local or regional air pollution problems. EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects. [76]

With respect to a global air pollution problem like elevated concentrations of GHGs, EPA's GHG waiver denial found that the text of section 209(b)(1)(B) was ambiguous and did not limit EPA to this prior interpretation. In addition, EPA noted that the legislative history supported a decision to "examine the second criterion specifically in the context of global climate change." The legislative history:

[I]ndicates that Congress was moved to allow waivers of preemption for California motor vehicle standards based on the particular effects of local conditions in California on the air pollution problems in California. Congress discussed "the unique problems faced in California as a result of its climate and topography." H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). See also Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. See, e.g., Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. In particular, Congress focused on California's smog problem, which is especially affected by local conditions and local pollution. See Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), id. at 30942. See also, *MEMA I*, 627 F. 2d 1095, 1109 (DC Cir., 1979) (noting the discussion of California's "peculiar local conditions" in the legislative history). Congress did not justify this provision based on pollution problems of a more national or global nature in justifying this provision. [77]

Relying on this, and without any further significant discussion of either congressional intent or how this new approach properly furthered the goals of section 209(b), EPA determined that it was appropriate to:

[R]eview California's GHG standards separately from the remainder of its motor vehicle emission control program for purposes of section 209(b)(1)(B). In this context it is appropriate to give meaning to this criterion by looking at whether the emissions from California motor vehicles, as well as the local climate and topography in California, are the fundamental causal factors for the air pollution problem—elevated concentrations of greenhouse gases—apart from the other parts of California's motor

vehicle program, which are intended to remediate different air pollution concerns.

EPA then applied this interpretation to the GHG standards at issue in that waiver proceeding. Having limited the meaning of this provision to situations where the air pollution problem was local or regional in nature, EPA found that California's GHG standards do not meet this criterion. EPA also found that the elevated concentrations of GHGs in California are similar to concentrations elsewhere in the world, and that local conditions in California such as the local topography and climate and the number of motor vehicles in California are not the determinant factors causing the elevated GHG concentrations found in California and elsewhere. Thus, EPA found that California did not need its GHG standards to meet compelling and extraordinary conditions, and denied the GHG waiver.

EPA also considered an alternative interpretation, where EPA would consider "the effects in California of this global air pollution problem in California in comparison to the rest of the country, again addressing the GHG standards separately from the rest of California's motor vehicle program." Under this alternative interpretation, EPA considered whether the impacts of global climate change in California were significant enough and different enough from the rest of the country such that California could be considered to need its GHG standards to meet compelling and extraordinary conditions. EPA determined that the waiver should be denied under this alternative interpretation as well.

### 2. EPA's July 9, 2009 GHG Waiver

In EPA's July 9, 2009 GHG waiver, the Agency determined that the better approach was to review California's need for its new motor vehicle emissions program as a whole to meet compelling and extraordinary conditions, and not to apply this criterion to specific standards, or to limit it to standards designed to address only local or regional air pollution problems. EPA reasoned that the traditional approach to interpreting this provision was the best approach for considering a waiver directed to GHG emission standards, as well as a waiver for standards directed to address local or regional air pollution problems. [78]

---

[73] *Id.* at 18890.
[74] 73 FR 12156, 12159–60.
[75] 73 FR at 12159–60.

[76] EPA recently reaffirmed that the traditional interpretation still applied for motor vehicle standards designed to address air pollution problems that are local or regional in nature. 71 FR 78190, 78192 (December 28, 2008); *see also* 71 FR 78190 and Decision Document for Waiver of Federal Preemption for California Zero Emission Vehicle Standards, at 34.
[77] 73 FR at 12161.

[78] The traditional interpretation of section 209(b)(1)(B) is certainly not "unambiguous precluded" by the language of the statute. See *Entergy Corp. v. Riverkeeper, Inc.*, 129 S.Ct. 1498 (2009) ("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 130 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 21 of 39

**Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices** 2127

Therefore, EPA rejected the interpretation that was applied in the March 6, 2008 waiver denial and stated it should no longer be followed.

EPA reasoned that the traditional interpretation was the most straightforward reading of the text and legislative history of section 209(b). Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are "in the aggregate, at least as protective of public health and welfare as applicable federal standards." This decision by Congress requires EPA to allow California to promulgate individual standards that, in and of themselves, might not be considered needed to meet compelling and extraordinary circumstances, but are part of California's overall approach to reducing vehicle emissions to address air pollution problems.

Further, we noted that EPA is to determine whether California's protectiveness determination is arbitrary and capricious under section 209(b)(1)(A), and whether California does not need "such State standards" to meet compelling and extraordinary conditions under section 209(b)(1)(B). The natural reading of these provisions led EPA to consider the same group of standards that California considered in making its protectiveness determination. While the words "in the aggregate" are not specifically mentioned in section 209(b)(1)(B), EPA explained that it does refer to the need for "such State standards," rather than "each State standard" or otherwise indicate a standard-by-standard analysis.

We also noted that EPA's GHG waiver denial had determined that this provision was appropriately interpreted to consider California's standards as a group for standards designed to address local or regional air pollution problems, but should be interpreted in the opposite fashion for standards designed to address global air pollution problems. The text of the provision, however, draws no such distinction, and provides no indication other than Congress intended a single interpretation for this provision, not one that varied based on

the kind of air pollution problem at issue.

EPA also explained that the GHG waiver denial had considered the legislative history, and determined that Congress was motivated by concern over local conditions in California that led to local or regional air pollution problems, and from this EPA determined that Congress intended to allow California to address these kinds of local or regional air pollution problems, but no others. However, upon a reexamination of the legislative history EPA found that the determination noted above ignores the main thrust of the text and legislative history of section 209(b), and improperly reads too much into an absence of discussion of global air pollution problems in the legislative history. The structure of section 209, both as adopted in 1967 and as amended in 1977, is notable in its focus on limiting the ability of EPA to deny a waiver, and thereby preserves discretion for California to construct its motor vehicle program as it deems appropriate to protect the health and welfare of its citizens. The legislative history indicates Congress quite intentionally restricted and limited EPA's review of California's standards, and its express legislative intent was to "provide the broadest possible discretion [to California] in selecting the best means to protect the health of its citizens and the public welfare." [79] The DC Circuit recognized that "[t]he history of the congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program. In short, to act as a kind of laboratory for innovation. * * * For a court [to limit California's authority] despite the absence of such an indication would only frustrate the congressional intent." [80]

EPA also determined that it was fully consistent with the expressed intention of Congress to interpret section 209(b)(1)(B) the same way both for standards designed to address local and regional air pollution problems, and standards designed to address global air pollution problems. Congress intended to provide California the broadest possible discretion to develop its motor vehicle emissions program. Neither the

text nor the legislative history of section 209(b) indicates that Congress intended to limit this broad discretion to a certain kind of air pollution problem, or to take away all discretion with respect to global air pollution problems. [81] In addition, EPA reasoned that applying the traditional interpretation to GHG standards does not change the basic nature of the compromise established by Congress—California could act as the laboratory for the nation with respect to motor vehicle emission control, and manufacturers would continue to face just two sets of emissions standards—California's and EPA's.

EPA further explained that this interpretation was consistent with Congressional purpose, as compared to the interpretation adopted in the GHG waiver denial relied on the discussion in the legislative history of local conditions in California leading to air pollution problems like ozone. While this was properly read to support the view that section 209(b) should be interpreted to address California's need for a motor vehicle program as a whole, the GHG waiver denial went further and inferred that by discussing such local conditions, Congress also intended to limit California's discretion to only these kinds of local or regional air pollution problems. The GHG waiver denial pointed to no particular language in the legislative history or the text of section 209(b) indicating such, instead, congressional intent to limit California's discretion was inferred from the discussion of local conditions. However, basing a limitation on such an inference is not appropriate given the express indication that Congress intended to provide California the "broadest possible discretion" in selecting the best means to protect the health of its citizens and the public welfare.

Additionally, EPA explained that the text of section 209(b) and the legislative history, when viewed as a whole, led to the conclusion that the interpretation adopted in the GHG waiver denial should be rejected. The better way to interpret this provision is to apply the traditional interpretation to the evaluation of California's GHG standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional

---

courts. *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–844 (1984).") ("It seems to us, therefore, that the phrase "best available," even with the added specification "for minimizing adverse environmental impact," does not unambiguously preclude cost-benefit analysis."). *Carrow* v. *Merit Systems Protection Board,* 564 F.3d 1359 (Fed. Cir. 2009) ("[W]e are obligated to give controlling effect to [agency's] interpretation if it is reasonable and is not contrary to the unambiguously expressed intent of Congress", citing *Entergy Corp.*).

[79] H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–302 (1977). *See MEMA I,* 627 F. 2d at 1110–11.

[80] *MEMA I,* 627 F. 2d at 1111.

[81] This broad interpretation of section 209(b) is similar to the broad reading the Court provided to section 302(g) of the Clean Air Act when it held that the term "air pollutant" included greenhouse gases, rejecting among other things the argument that Congress limited the term to apply only to certain kinds of air pollution. *Massachusetts* v. *EPA,* 549 US 497, 532 (2007) (footnote 26).

interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems that exist in California, whether or not those problems are local or regional in nature, and to protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long-range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.

EPA further stated that this approach does not make section 209(b)(1)(B) a nullity, as some had suggested. EPA must still determine whether California does not need its motor vehicle program to meet the compelling and extraordinary conditions discussed in the legislative history. If that is the case, then a waiver would be denied on those grounds, but that was not the case at that point. EPA observed that conditions in California may one day improve such that it no longer had the need for a separate motor vehicle program and that the statute contemplates that such improvement is possible. In addition, we noted that the opponents of a waiver always have the ability to raise their legal, policy, and other concerns in the State administrative process, or through judicial review in State courts. We concluded, however, that Congress provided EPA a much more limited role under section 209(b) in considering objections raised by opponents of a waiver.

3. Response to Comments Received

CARB states in its Waiver Support Document that the relevant inquiry under section 209(b)(1)(B) is whether California needs it own motor vehicle pollution control program to meet compelling and extraordinary conditions and not whether any particular standard is needed to meet such conditions. CARB notes that EPA

has consistently determined that the phrase "compelling and extraordinary conditions" refers to:

* * * Certain general circumstances, unique to California, primarily responsible for causing its air pollution [including] * * * geographical and climate factors [as well as] * * * the presence and growth of California's vehicle population, whose emissions were thought to be responsible for ninety percent of the air pollution problem in certain parts of California.

CARB also submits that the 2012 ZEV and LEV amendments (the ACC program) meet the same compelling and extraordinary conditions justifying previous waivers (e.g., the South Coast and San Joaquin Air basins continue to experience some of the worst air quality in the nation and that California has an ongoing need for dramatic emission reductions generally and from passenger cars specifically). CARB also submits that as in 1967, EPA's previous waivers have noted that California continued to have geographic and climatic conditions that, when combined with the large numbers and high concentrations of automobiles, created a serious air pollution problem.

EPA received only one comment requesting a denial of the waiver for the GHG and ZEV standards based on the grounds of section 209(b)(1)(B)—that "such State does not need such State standards to met compelling and extraordinary conditions." This commenter raised specific objections to both the GHG and ZEV elements of CARB's ACC program but none of them addressed whether California's geographic, climactic and air quality conditions remain the same as they were under prior waiver determinations.[82]

4. CARB's GHG Emission Standards

With regard to CARB's GHG standards, the Dealers state there is no need and no discernible environmental benefit from such standards because of EPA's GHG regulations for motor vehicles that CARB has agreed to accept as compliance for its own program. According to the commenter, this amounts to a legal admission that CARB does not need its own GHG standards. In addition, because manufacturers are already under a legal obligation to comply with the NHTSA/EPA 2017–2025 GHG standards there is no environmental benefit associated with separate CARB GHG standards. This commenter cited 1967 legislative history as support that Congress decided that federal preemption of new vehicle emission standards would be available

for California but only where California promulgated standards necessary to address "the unique problems facing the state."[83] Had Congress intended to give California discretion to adopt whatever standards it liked, without any consideration as to whether these standard are 'needed,' Congress would have omitted Sec. 209(b)(1)(B) altogether." This commenter also suggests that the "alternative arguments" in the 2009 GHG waiver decision, wherein California's need for its GHG standards standing alone was evaluated, should also be applied here. As such, this commenter suggests that since CARB does not intend to rely on its own regulations to meet environmental goals there can be no "rational connection" between the CARB's regulation and the state's air quality issues. Finally, the commenter notes that CARB's statement that a waiver "will remain an important backstop in the event the national program is weakened or terminated" is an identified "political need" outside the scope of Section 209.

CARB, in response to NADA's comments referenced above, states that while there may not be binding precedent that requires EPA to treat California's program as a whole in reviewing the need for specific standards, it previously has demonstrated that EPA's longstanding administrative practice to review the need for separate standard standards in the context of the ongoing compelling and extraordinary conditions justifying California's motor vehicle program remains sound.

CARB also notes that its commitment to accept compliance with the federal GHG emission standards is no different from the numerous times that EPA has followed California's lead—blazing a new trail as a laboratory for innovation—by catching up to or harmonizing with California's standards. In addition, rather than viewing CARB's actions an impermissible political backstop, CARB maintains that its actions are simply furthering the Congressional design of Section 209(b): to ensure that California can protect public health and welfare by ensuring its ability to separately implement and enforce necessary emission reductions through its own regulatory mechanisms. Therefore CARB can continue to set standards that in the first instance are more stringent, then may become as stringent and subsequently—under the NADA hypothetical—become more stringent should EPA lessen the stringency of the

[82] NADA at 7–9, 12–14.    [83] H.R. Rep. No. 90–728 (1967), at 22.

(Page 130 of Total)

federal GHG emission standards. In addition, CARB points to NADA's concession by acknowledging that CARB's standards must be as or more stringent—i.e., as protective as—the federal standards.

As discussed above, EPA believes that the better interpretation of the section 209(b)(1)(B) criterion is the traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions. Applying this approach with the reasoning noted above, with due deference to California, I cannot deny the waiver.

CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. As discussed above, the term compelling and extraordinary conditions "does not refer to the levels of pollution directly." Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. California still faces such conditions. For example, as stated in CARB's waiver request and additional written comment, California and particularly the South Coast and San Joaquin Valley Air Basins continue to experience some of the worst air quality in the nation and continue to be in non-attainment with national ambient air quality standards (NAAQS) for $PM_{2.5}$ and ozone.[84] In its recent announcement of new $PM_{2.5}$ ambient air quality standards, EPA projected that only seven of approximately 3,000 counties in the country may require state or local action to reduce fine particle pollution in order to meet the new standards by 2020. All seven counties are in California.

Further, EPA has not received any adverse comments suggesting that California no longer needs a separate motor vehicle emissions program to address the various conditions that lead to serious and unique air pollution problems in California.

Based on the record, I am unable to identify any change in circumstances or any evidence to suggest that the conditions that Congress identified as giving rise to serious air quality problems in California no longer exist. Therefore, using the traditional approach of reviewing the need for a separate California program to meet compelling and extraordinary conditions, I cannot deny the ACC

waiver request (including the GHG and ZEV components, along with LEV III criteria pollutants) based on this criterion.

To the extent that it is appropriate to examine the need for CARB's GHG standards to meet compelling and extraordinary conditions, as EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California.[85] In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California.[86] CARB notes that "Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems."[87] CARB provides a summary report on the third assessment from the California Climate Change Center (2012)[88] which describes dramatic sea level rises and increases in temperatures. The Commenter does not take issue with that analysis, but instead relies on the existence of the federal GHG standards and the "deemed to comply" language to claim that there is no need for CARB's GHG standards. Separate from EPA's stated interpretation and determinations noted above, EPA believes that the commenter does not appropriately appreciate the role that Congress envisioned California to play as an innovative laboratory that may set standards that EPA may ultimately harmonize with or that California or EPA may otherwise accept compliance with the others emission program as

compliance with their own. EPA's longstanding interpretation of section 209(b)(1)(B) is that EPA does not look at whether the specific standards at issue are needed to meet compelling and extraordinary conditions related to that air pollutant. As explained above, EPA reviewed this issue in some detail in both EPA's 2008 GHG waiver denial and subsequent 2009 GHG waiver decision and EPA continues to believe that our traditional interpretation is appropriate. The structure of section 209, both as adopted in 1967 and as amended in 1977, is notable in its focus on limiting the ability of EPA to deny a waiver, and thereby preserves discretion for California to construct it motor vehicle program as it deems appropriate to protect the health and welfare of its citizens.[89] EPA has previously considered NADA's argument that CARB no longer has a need for its GHG emission standards once CARB adopts a "deemed to comply" provision. In EPA's within the scope decision in 2011, where EPA considered CARB's previous "deemed to comply" provision applicable to the 2012 through 2016 MYs, EPA stated:

NADA's comments do not indicate that, as a result of the amendments, California no longer needs a separate motor vehicle emissions program to address compelling and extraordinary conditions in California, or provide any indication that EPA's prior determination on this issue is undermined in any way. Therefore, its comments do not show that California's amendments raise any new issues relevant to EPA's initial waiver decision.

Moreover, although NADA's comments reference the words of the section 209(b)(1)(B), "need * * * to meet compelling and extraordinary circumstances" criterion, they do not appear to be directed towards the geographical or climatological conditions that are being referred to by the words "compelling and extraordinary circumstances." Instead, NADA's comments appear to be directed at the stringency of the greenhouse gas standards. The stringency of California's standards is at issue in section 209(b)(1)(A), where Congress addressed the comparison of California standards to federal standards, but it is not an issue under section 209(b)(1)(B). As noted in EPA's underlying waiver decision, section 209(b)(1)(A) calls for a review of California standards "in the aggregate," and EPA can only deny a waiver if it finds that California was arbitrary and capricious in its finding that "its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." EPA notes that the language of section 209(b)(1)(A) clearly indicates Congress's determination that EPA review the effect of stringency on the protectiveness of California's standards "in

---

[84] 76 FR 40652, 40654 (July 11, 2011).

[85] 74 FR 32744, 32764–7265.

[86] EPA–HQ–OAR–2012–0562–0371.

[87] Id.

[88] Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California. Publication # CEC–500–2012–007. Posted: July 31, 2012; available at http://www.climatechange.ca.gov/adaptation/third_assessment/.

[89] See H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–302 (1977).

the aggregate," and that EPA cannot deny a waiver on the grounds of protectiveness if California standards are at least equally protective as Federal standards. "Redundancy" is not the criterion; it is whether California's standards are, in the aggregate, at least as protective as applicable Federal standards. Furthermore, NADA does not address California's standards "in the aggregate" and, as noted above, does not provide any evidence to suggest, even with regard to California's greenhouse gas standards, that California was arbitrary and capricious in its finding that its standards are at least as protective as comparable federal standards. The stringency issue raised by NADA is not relevant under section 209(b)(1)(B), and it would be inconsistent with the intent of Congress to deny a waiver or a within-the-scope determination based on section 209(b)(1)(B) for reasons Congress clearly addressed and clearly determined should not be the basis for a denial under section 209(b)(1)(A). NADA's comments, therefore, do not raise any new issues regarding our preexisting waiver for California greenhouse gas emission standards.[90]

EPA believes this interpretation of section 209(b)(1)(B) continues to be appropriate and therefore finds that CARB's GHG emission standards cannot be denied a waiver based on NADA's argument that there is no need for such standards given the existence of EPA GHG emission standards.

5. CARB's ZEV Emission Standards

The Dealers also requested that EPA deny a waiver of CARB's ZEV standards for MY 2018 and beyond because they were not necessary to meet compelling and extraordinary circumstances, under the section 209(b)(1)(B) criterion.[91] According to the commenter, the "compelling and extraordinary conditions" in California today are nothing like they were when Congress first enacted section 209. In addition, the commenter notes that CARB claims no criteria emissions benefit from the ZEV standards in terms of vehicle TTW emissions and subsequently notes several problems with CARB's upstream WTW emissions analysis and projected benefits. For example, the commenter disputes CARB's assumptions that reductions of fuel production by refineries will result from reductions in fuel consumption by the vehicle fleet in California. According to the commenter, refineries in California could simply shift fuel production to address either off-shore or out-of-state needs. The commenter further states that CARB has not and cannot show that its ZEV standards will achieve any reductions in criteria pollutants. With respect to the

relationship between the GHG and ZEV programs, the commenter also states that the ZEV standards do not provide any additional GHG emission benefits beyond the underlying GHG standards and the ZEV standards are therefore not necessary to meet any potential compelling and extraordinary conditions associated with GHG emissions from new motor vehicles. In addition, the commenter suggests that because CARB is providing a variety of compliance flexibilities, including over compliance with GHG standards producing ZEV credits and other alternative compliance path options, confirms that the underlying ZEV mandates are not "necessary."

CARB notes in its written response that to the extent commenters question California's need for additional criteria pollutant reductions from its new motor vehicle fleet, there remains no question that such reductions are essential to meet federal health-based ambient air quality standards. CARB notes that California and particularly the South Coast and San Joaquin Valley Air Basins continue to experience some of the worst air quality in the nation and continue to be in non-attainment with national ambient air quality standards (NAAQS) for $PM_{2.5}$ and ozone.[92] California's unique geographical and climatic conditions, and the tremendous growth in its on- and off-road vehicle population, which moved Congress to authorize the state to establish separate on-road motor vehicle standards in 1967 and off-road engine standards in 1990, still exist today.[93] In addition, CARB provides extensive evidence of its current and serious air quality problems and the increasingly stringent health-based air quality standards and federally required state planning efforts to meet those standards firmly in order to establish the need for the additional emission reductions from its motor vehicle emissions program.[94]

As stated above, EPA believes that the better interpretation of the section 209(b)(1)(B) criterion is the traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions. The issue of whether any particular standard provides comparable emission reductions is not a relevant criterion under section 209(b)(1)(B). Applying this approach with the reasoning noted

above, with due deference to California, I cannot deny the waiver.

As discussed in their written comments, CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. As discussed above, the term compelling and extraordinary conditions "does not refer to the levels of pollution directly. Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. California still faces such conditions. For example, California and particularly the South Coast and San Joaquin Valley Air Basins continue to experience some of the worst air quality in the nation and continue to be in non-attainment with national ambient air quality standards (NAAQS) for $PM_{2.5}$ and ozone.[95] In addition, EPA believes, and the record does not otherwise indicate, the underlying geographical and climatic conditions continue to exist in California and continue to give rise to serious air quality problems.

EPA has not received any adverse comments suggesting that California no longer needs a separate motor vehicle emissions program to address the various conditions that lead to serious and unique air pollution problems in California.

Based on the record, I am unable to identify any change in circumstances or any evidence to suggest that the conditions that Congress identified as giving rise to serious air quality problems in California no longer exist. Therefore, using the traditional approach of reviewing the need for a separate California program to meet compelling and extraordinary conditions, I cannot deny the ACC waiver request (including the GHG and ZEV components, along with LEV III criteria pollutants) based on this criterion.

As CARB notes in its waiver request, the goal of the CARB Board in directing CARB staff to redesign the ZEV regulation was to focus primarily on zero emission drive—that is BEV, FCV, and PHEVs in order to move advanced, low GHG vehicles from demonstration phase to commercialization. CARB also analyzed pathways to meeting California's long term 2050 GHG reduction targets in the light-duty vehicle sector and determined that ZEVs would need to reach nearly 100 percent

[90] 76 FR 34693, 34697–34698 (June 14, 2011).
[91] NADA at 13.

[92] 76 FR 40652, 40654 (July 11, 2011). CARB waiver request at 17–18.
[93] 74 FR 32744, 32762 (July 8, 2009); 76 FR 77515, 77518 (December 13, 2011).
[94] EPA–HQ–OAR–2012–0562–0371.

[95] 76 FR 40652, 40654 (July 11, 2011).

of new vehicle sales between 2040 and 2050. CARB also notes that the "critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, *Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air)*[96] demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements. In addition to considering the level of change needed to implement the current SIP and reduce GHG emissions by 80 percent below 1990 levels by 2050, the 2032 attainment date for the 0.075 ppm standard set in 2008 was used as an interim target. Adopted or pending rules, such as the LEV III regulation, were considered essential as baseline reductions assumed for the future, yet California identified still more transformative changes to achieve the 2032 and 2050 targets. The *Vision for Clean Air* effort illustrates that in addition to the cleanup of passenger vehicles (at issue here) as soon as possible as required in the LEV III regulation, transition to zero- and near-zero emission technologies in all on- and off-road engine categories is necessary to achieve the coordinated goals.

Therefore, EPA believes that CARB's 2018 and later MY ZEV standards represent a reasonable pathway to reach these longer term goals. Under EPA's traditional practice of affording CARB the broadest discretion possible, and deferring to CARB on its policy choices, we believe there is a rational connection between California ZEV standards and its attainment of long term air quality goals. Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions. The ZEV standards are a reasonable pathway to reach the LEV III goals, in the context of California's longer term goals.

### 6. CARB's PM Standards

EPA received comments suggesting that the PM standards promulgated within California's LEV III regulation were infeasible. The Manufacturers in particular commented that the technological feasibility of the one milligram per mile PM standard, that commences its phase in starting with the 2025 MY, has not been demonstrated (this issue is discussed below in the Section VI). The Manufacturers appear to raise issue with whether additional PM emission reductions from light-duty vehicles are needed since they represent so small a fraction of the PM inventory in California. CARB's supplemental comments assert that "while PM emission from LDVs are not a major contributor to the inventory, they are a significant contributor to urban pollution and human exposure, particularly near heavily travelled roadways, many of which are located in major urban centers in areas classified as non-attainment for health based PM ambient air quality standards." CARB also notes that the exact amount of pollution reduced through any given emission standard and the cost-effectiveness of any particular California standards are not waiver criteria and therefore not relevant to EPA's determination.

EPA does not believe that it is necessarily the Manufacturers' contention that the PM standards are not needed to meet compelling and extraordinary conditions. Nevertheless, EPA believes it appropriate to note, once again, that the compelling and extraordinary conditions Congress identified as giving rise to serious air quality problems continue to give rise to the need for a separate California new motor vehicle emissions program. EPA believes this includes CARB's serious PM air quality problems. EPA agrees that the PM standards will result in reductions in PM emissions, however small. It is not appropriate for EPA to second-guess CARB's policy choices, including how best to address their air quality concerns.

### 7. Section 209(b)(1)(B) Conclusion

With respect to the need for California's state standards to meet compelling and extraordinary conditions, I continue to apply the traditional interpretation of the waiver provision. As stated in the GHG waiver decision,[97] the best way to interpret this provision is to determine whether

California continues to have compelling and extraordinary conditions giving rise to a need for its own new motor vehicle emission program. Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, nor does EPA believe this criterion limits California's discretion to adopt or retain emission standards that are similar to EPA's standards. In addition, it is inappropriate for EPA to second guess CARB's policy choices and objectives in adopting ZEV standards designed to achieve long term emission benefits as well as projected to reasonably achieve some reduction in criteria pollutant emissions.

Under this interpretation and application of this criterion, EPA cannot find that the opponents of the waiver have demonstrated that California does not need its state standards to meet compelling and extraordinary conditions. The opponents of the waiver have not adequately demonstrated that California no longer has a need for its motor vehicle emission program. Therefore, I determine that I cannot deny CARB's ACC waiver request under section 209(b)(1)(B).

### C. Are the California ACC standards consistent with Section 202(a) of the Clean Air Act?

EPA has reviewed the information submitted to the record of this proceeding to determine whether the parties opposing, or seeking a deferral of, this waiver request have met their burden to demonstrate that the ACC standards are not consistent with section 202(a). In its initial Waiver Request, CARB submitted information and argument that the ACC standards are consistent with section 202(a). CARB notes that in developing the LEV III requirements it considered several factors (e.g., technical feasibility, lead time available to meet the requirements, and the cost of compliance and the technical and resource challenges manufacturers face in complying with the requirement to simultaneously reduce criteria and GHG emissions). CARB notes that that criteria emissions elements of LEV III occur over an 11-year period (2015 through 2025) while the GHG emission element is implemented over a 9-year period from 2017 through 2025. CARB sets forth its belief that both the stringency and implementation schedules for its PM standards are technologically feasible within the available lead time. With regard to LEV III GHG regulations, CARB noted that California coordinated with the EPA and NHTSA on technical and economic areas, and CARB has

---

[96] EPA–HQ–OAR–2012–0562–0371 at 5–6, citing *Vision for Clean Air: A Framework for Air Quality and Climate Planning*, June 27, 2012.

[97] 74 FR 32766. EPA incorporates this prior GHG waiver decision, and associated reasoning and interpretations, into today's waiver decision.

**2132** Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices

moved in parallel with the federal rulemaking in terms of stringency of the standards and lead time for compliance. CARB maintains that the standards and lead time are technologically feasible "even before CARB proposes to amend its LEV III GHG regulations to allow National Program compliance to serve as compliance in California. It will be undeniably true should California adopt its "deemed to comply" rule as planned."[98] With regard to the ZEV amendments, CARB noted the lack of objections from the regulated parties during CARB's rulemaking and the regulated parties' announcements of their planned ability to comply.

The Manufacturers have submitted information and argument that their members see no way to measure and meet the 1 mg/mile PM standard beginning in 2025 (as part of the LEV III standards) and ask EPA to withhold issuing a waiver for this standard at this time. The Manufactures have commented that they do not oppose California's GHG emission standards for the 2017 through 2025 MYs but suggests that EPA should grant California's waiver request after CARB has finalized its regulatory amendments to allow for a national compliance option.[99] Finally, while the Manufacturers agree that CARB's ZEV amendments, as they affect 2017 and earlier MYs, are within the scope of existing waivers, they are opposed to granting the waiver for the ZEV program past the 2017 MY based on argument that those standards will not be feasible either in California or in the individual Section 177 States given the status of the infrastructure and the level of consumer demand for ZEVs.

EPA also received comment from the Dealers suggesting that EPA should not grant California a waiver for its GHG emission standards past MY 2021 since the technical capabilities after that time are uncertain. In addition, like the Manufacturers, NADA does not oppose CARB's ZEV amendments through the 2017 MY. However, NADA believes CARB's ZEV amendments, as they affect 2018 and later MYs, raise serious

technological feasibility concerns including their economic feasibility (including their marketability when compared to non-ZEV vehicles). EPA's analysis of the consistency of the CARB standards with section 202(a) of the Act follows.

### 1. Historical Approach

Under section 209(b)(1)(C), EPA must deny California's waiver request if the Agency finds that California standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. The scope of EPA's review under this criterion is narrow. EPA has previously stated that the determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the federal test procedure.[100] Previous waivers of federal preemption have stated that California's standards are not consistent with section 202(a) if there is inadequate lead time to permit the development of technology necessary to meet those requirements, giving appropriate consideration to the cost of compliance within that time.[101] California's accompanying enforcement procedures would be inconsistent with section 202(a) if the federal and California test procedures conflict, i.e., if manufacturers would be unable to meet both the California and federal test requirements with the same test vehicle.[102]

EPA does not believe that there is any reason to review these criteria any differently for EPA's evaluation of California's ACC program request. There is nothing inherently different about how ACC control technologies should be reviewed when making a determination about technological feasibility or consistency of test procedures.

In the ACC waiver proceeding, opponents of the waiver have presented evidence for EPA's consideration which they believe will require EPA to make the finding of inconsistency with section 202(a), and therefore require EPA to deny or defer granting all or parts of the waiver request (e.g., a

deferral on the 2025 and later MY phase-in of the 1 mg/mile PM standard of LEV III, a denial of the GHG emission standards for MY 2022 and later, and a denial of the 2018 through 2025 MY ZEV requirements or a deferral on the 2021 and later MYs). As noted above, the commenters believe this finding should be made on one or more grounds, including: there exists either a lack of information or certainty of technological solutions based on the remoteness in time from the implementation of the standards; that there are questions of economic feasibility and marketability, including consumer demand; that technological consistency must include consideration of feasibility in section 177 states; and, that either the cost effectiveness of certain standards is unreasonable or that the standards are not needed for air quality purposes. EPA's process for evaluating lead time is discussed immediately below and in subsequent parts of this section. The industry opponents also raise arguments based on the cost of compliance with the standards (including cost-effectiveness), which will be discussed below and in other parts of this section. To the extent the commenters raise questions about the need for CARB's PM standards and that it could be the basis for EPA's waiver consideration, we address such concerns in the discussion above concerning section 209(b)(1)(B). EPA has already addressed the Dealers suggestions that CARB's ZEV requirements are not needed within the same discussion.

Regarding lead time, EPA historically has relied on two decisions from the U.S. Court of Appeals for the D.C. Circuit for guidance regarding the lead time requirements of section 202(a). Section 202(a) provides that an emission standard shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance. In *Natural Resources Defense Council* v. *EPA (NRDC)*, 655 F.2d 318 (DC Cir. 1981), the court reviewed claims that EPA's PM standards for diesel cars and light trucks were either too stringent or not stringent enough. In upholding the EPA standards, the court concluded:

Given this time frame [a 1980 decision on 1985 model year standards]; we feel that there is *substantial room for deference* to the EPA's expertise in projecting the likely course of development. The essential question in this case is the pace of that development, and absent a revolution in the study of industry, defense of such a projection can never possess the inescapable

---

[98] At the time of CARB's waiver request EPA's GHG emission rule had not yet been finalized. Subsequent to EPA's final rule CARB has adopted the deemed to comply and has provided the regulation for EPA's consideration. *See also* CARB Resolution 12–11 at 20.

[99] The Manufacturers note that both the federal and the California GHG emission standards provide for a comprehensive mid-term evaluation of the MYs 2022–2025. Therefore, the Manufacturers clearly state that "Any amendments to California's GHG emission standards made as a result of the mid-term evaluation will require analysis to determine whether the amendments fall within the scope of this waiver, or, if not, whether they qualify for a separate waiver under Section 209(b) of the Clean Air Act.

[100] *MEMA I,* 627 F.2d at 1126.

[101] *See e.g.,* 38 FR 30136 (November 1, 1973) and 40 FR 30311 (July 18, 1975).

[102] To be consistent, the California certification test procedures need not be identical to the Federal test procedures. California procedures would be inconsistent, however, if manufacturers would be unable to meet both the state and Federal test requirements with the same test vehicle in the course of the same test. *See, e.g.,* 43 FR 32182, (July 25, 1978).

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 136 of 162
USCA Case #25-1318    Document #2187882    Filed: 08/11/2026    Page 27 of 39

Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices    **2133**

logic of a mathematical deduction. We think that the EPA will have demonstrated the reasonableness of its basis for projection if it answers any theoretical objections to the [projected control technology], identifies the major steps necessary in refinement of the technology, and offers plausible reasons for believing that each of those steps can be completed in the time available (emphasis added).[103]

Another key case addressing the lead time requirements of section 202(a) is *International Harvester* v. *Ruckelshaus* (*International Harvester*), 478 F.2d 615 (DC Cir. 1979). In *International Harvester*, the court reviewed EPA's decision to deny applications by several automobile and truck manufacturers for a one-year suspension of the 1975 emission standards for light-duty vehicles. In the suspension proceeding, the manufacturers presented data which, on its face, showed little chance of compliance with the 1975 standards, but which, at the same time, contained many uncertainties and inconsistencies regarding test procedures and parameters. In a May 1972 decision, the Administrator applied an EPA methodology to the submitted data, and concluded that "compliance with the 1975 standards by application of present technology can probably be achieved," and so denied the suspension applications.[104] In reviewing the Administrator's decision, the court found that the applicants had the burden of coming forward with data showing that they could not comply with the standards, and if they did, then EPA had the burden of demonstrating that the methodology it used to predict compliance was sufficiently reliable to permit a finding of technological feasibility. In that case, EPA failed to meet this burden.

With respect to lead time, the court in *NRDC* pointed out that the court in *International Harvester* "probed deeply into the reliability of EPA's methodology" because of the relatively short amount of lead time involved (a May 1972 decision regarding 1975 MY vehicles, which could be produced starting in early 1974), and because "the hardship resulting if a suspension were mistakenly denied outweigh the risk of a suspension needlessly granted."[105] The *NRDC* court compared the suspension proceedings with the circumstances concerning the diesel standards before it: "The present case is quite different; 'the base hour' for commencement of production is

relatively distant, and until that time the probable effect of a relaxation of the standard would be to mitigate the consequences of any strictness in the final rule, not to create new hardships."[106] The *NRDC* court further noted that *International Harvester* did not involve EPA's predictions of future technological advances, but an evaluation of presently available technology.

EPA also evaluates CARB's request in light of congressional intent regarding the waiver program generally. This is consistent with the motivation behind section 209(b) to foster California's role as a laboratory for motor vehicle emission control, in order "to continue the national benefits that might flow from allowing California to continue to act as a pioneer in this field."[107]

For these reasons, EPA believes that California must be given substantial deference when adopting motor vehicle emission standards which may require new and/or improved technology to meet challenging levels of compliance. This deference was discussed in an early waiver decision when EPA approved the waiver request for California's 1977 MY standards:

Even on this issue of technological feasibility I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the Federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to 'catch up' to some degree with newly promulgated standards. Such an approach to automotive emission control might be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency, under the statutory scheme outlined above I believe I am required to give very substantial deference to California's judgment on that score."[108]

CARB, while maintaining that the *NRDC* approach is the correct measurement here, commented that the technological sophistication of ZEVs currently being produced is anticipated to continue to advance, making commercial production and compliance of these vehicles by MY 2018 and later

more feasible. CARB also notes that the only relevance of costs in a section 209(b) waiver proceeding is in the context of technological feasibility. "Past waiver determinations have made clear that for the cost of compliance to be found excessive it would need to be "very high" such that the cost to customers who purchased a complying vehicle would be doubled or tripled.[109] Additionally, the relevance of the cost of compliance analysis is limited to the question of whether such costs will adversely affect the timing of an emission standard." [110]

Under *NRDC*, when compliance with CARB standards is phased-in over a lengthy time period, the reasonableness of a projection of technological feasibility can be based on answering any theoretical objections to the projected control technology; identifying the major steps necessary in refinement of the technology; and offering plausible reasons for believing that each of those steps can be completed in the time available.[111] EPA's review of the evidence on the technological feasibility of CARB's ACC standards, in particular the standards which EPA received comment, follows.

Congress has stated that the consistency requirement of section 202(a) relates to technological feasibility.[112] Section 202(a)(2) states, in part, that any regulation promulgated under its authority "shall take effect after such period as the Administrator finds necessary to permit the development and application of the relevant technology, considering the cost of compliance within that time." Section 202(a) thus requires the Administrator to first review whether adequate technology already exists, or if it does not, whether there is adequate time to develop and apply the technology before the standards go into effect.

In *MEMA I*, the court addressed the cost of compliance issue at some length in reviewing a waiver decision. According to the court:

Section 202's cost of compliance concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead

---

[103] *Natural Resources Defense Council* v. *EPA*, 655 F.2d 318, 331. (emphasis added)
[104] *International Harvester* v. *Ruckelshaus*, 478 F.2d. 615, 626.
[105] *NRDC*, 655 F.2d 318, 330.

[106] *Id*. The "hardships" referred to are hardships that would be created for manufacturers able to comply with the more stringent standards being relaxed late in the process.
[107] 40 FR 23102, 23103 (waiver decision citing views of Congressman Moss and Senator Murphy) (May 28, 1975).
[108] *Id*. at 23103.

[109] 74 FR 32744, 32774 (July 8, 2009).
[110] CARB's waiver request at 25–26. *MEMA I*, 627 F.2d at 1105, 1114 n. 40 ("[T]he 'cost of compliance' consideration relates to the timing of standards and procedures.") CARB notes that EPA has recognized that the only relevance of costs is their impact on timing, e.g. "Manufacturers do not contend that the cost of compliance will be significantly reduced by extending lead time beyond the minimal period required for compliance." (36 FR 17459 (August 31, 1971)).
[111] *NRDC*, 655 F.2d 318, 331.
[112] H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 301 (1977).

time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures. *See* S. Rep. No. 192, 89th Cong., 1st Sass. 5–8 (1965); H.R. Rep. No. 728 90th Cong., 1st Sass. 23 (1967), *reprinted in* U.S. Code Cong. & Admin. News 1967, p. 1938. It relates to the timing of a particular emission control regulation rather than to its social implications. Congress wanted to avoid undue economic disruption in the automotive manufacturing industry and also sought to avoid *doubling or tripling* the cost of motor vehicles to purchasers. It, therefore, requires that the emission control regulations be technologically feasible within economic parameters. Therein lies the intent of the cost of compliance requirement (emphasis added).[113]

Previous waiver decisions are fully consistent with *MEMA I,* which indicates that the cost of compliance must reach a very high level before the EPA can deny a waiver. Therefore, past decisions indicate that the costs must be excessive to find that California's standards are inconsistent with section 202(a).[114] It should be noted that, as with other issues related to the determination of consistency with section 202(a), the burden of proof regarding the cost issue falls upon the opponents of the grant of the waiver.

Consistent with *MEMA I,* the Agency has evaluated costs in the waiver context by looking at the actual cost of compliance in the time provided by the regulation, not the regulation's cost-effectiveness. The appropriate level of cost-effectiveness is a policy decision of California that is considered and made when California adopts the regulations, and EPA, historically, has deferred to these policy decisions. EPA has stated in this regard, "the law makes it clear that the waiver request cannot be denied unless the specific findings designated in the statute can be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209 * * *."[115] Thus, EPA will look at the compliance costs for manufacturers in developing and applying the technology and not at cost effectiveness when making a waiver decision.

## 2. LEV III Criteria Pollutant Standards

California has adopted new standards for exhaust emissions of non-methane organic gases (NMOG), $NO_X$, and PM, as well as evaporative emissions standards. These standards phase in beginning with MY 2015. The LEV III standards are similar, in many respects, in structure to those in the existing federal Tier 2 program. As with the Tier 2 program, the proposed standards would apply to all light-duty vehicles (LDVs, or passenger cars, light-duty trucks (LDT1s, LDT2s, LDT3s, and LDT4s)) below 8,500 pounds GVWR (Gross Vehicle Weight Rating), and Medium-Duty Passenger Vehicles, or MDPVs (8,500 to 10,000 lbs GVWR). Based on our review of the LEV III criteria pollutant standards, and because EPA did not receive any comments objecting to CARB's LEV III criteria pollutant standards, with the exception of the PM standard issue discussed below, we find it unnecessary to provide a full written review whether such standards are consistent with section 202(a), as those opposing the waiver have clearly not met their burden regarding the issue, and we otherwise cannot make a finding that such standards are inconsistent with section 202(a).

### a. Particulate Matter Standards

The Manufacturers generally note that testing for and complying with the revised particulate matter standards will present significant burdens on the industry. In short, the Manufacturers recommend that EPA withhold issuing a waiver for the MY 2025 PM standard. While noting that the phase in of the 3 mg/mile FTP PM standard beginning in MY 2017 will be very challenging, they nevertheless state that the Manufacturers are optimistic that vehicles will achieve this level with time. Recognizing that there are long lead time changes, the Manufacturers appear to be agreeing with CARB's planned phased-in approach starting in the 2017 MY. Also, the Manufacturers are not objecting to EPA issuing a waiver for the 3 mg/mile PM standards based on their stated testing concerns.

However, the Manufacturers believe the 1 mg/mile PM standard, which begins its phase-in starting in the 2025 MY, raises further feasibility issues. Based on their knowledge of PM measurement and vehicle PM control technology, the Manufacturers state that their members "see no way to both measure and meet this standard." The Manufacturers believe that setting a standard that is unachievable today is inappropriate, and they do not believe

EPA should issue a waiver for these standards at this time.

Finally, the Manufacturers note that there is ample time to revisit the waiver request without interfering with CARB's implementation of standards should they be deemed feasible (during CARB's planned review of the standard).

CARB's supplemental comments note that the LEV III PM standards are based on a particular concern for their impact on public health and safety. As noted in their LEV III Technical Support Document, CARB acknowledges that while PM emissions from LDVs are not a major contributor to the inventory, they are a significant contributor to urban pollution and human exposure. CARB also notes that the exact amount of pollution reduced and the cost-effectiveness of particular California standards is not relevant to EPA's waiver determination.

What is relevant, CARB maintains, is that thirteen years of lead time (from the date of its adopted regulations to the first model year of the phase-in standards in 2025) are provided to improve the test procedure and for industry to incorporate needed improvements to their engines and fuel systems. CARB maintains that it has consistently demonstrated PM measurement capability at 1 mg/mi using new test procedures under development by EPA under 40 CFR Part 1066.[116] CARB suggests that EPA apply the rationale of *NRDC* and find that CARB has identified barriers to implementation of needed technologies and a viable path to overcome these barriers. For example, CARB states test data that they have presented demonstrates PM levels from current port fuel injected (PFI) engines below 1 mg/mi and from late model gasoline direct injection engines (GDI) approaching 1 mg/mi. CARB expects further technical improvements over the extensive lead time provided.[117] CARB has also identified that some of the low carbon technologies with proven track records that are most likely to be used (to meet GHG emission requirements) are: Advanced port fuel injection engines, GDI engines, boosted and downsized engines, clean diesel engines, hybrid, and plug-in hybrid technology among others. CARB notes

---

[113] *MEMA I* at 1118 (emphasis added). *See also id.* at 1114 n. 40 (A[T]he 'cost of compliance' criterion relates to the timing of standards and procedures.).

[114] *See, e.g.,* 47 FR 7306, 7309 (Feb. 18, 1982), 43 FR 25735 (Jun. 14, 1978), and 46 FR 26371, 26373 (May 12, 1981).

[115] 36 FR 17158 (August 31, 1971). *See also* 40 FR 23102, 23104; 58 FR 4166 (January 7, 1993), LEV Waiver Decision Document at 20.

[116] CARB notes that EPA has identified areas of improvement to Part 1066 it intends to evaluate in cooperation with CARB and industry (see pp. 54–59 of CARB's Technical Support Document at: *http://www.arb.ca.gov/regact/2012/leviiighg2012/levappp.pdf).*

[117] *Id.* at P–8 through P–20. CARB's Board has provided direction to its staff (Resolution 12–11 at 21) to conduct a review of the 1 mg/mi PM standard in the 2015 timeframe and report back to the Board its results.

that each of these technologies will have a particular impact on PM emissions. CARB notes that many of these technologies may be able to currently meet 2025 MY PM standards and that further improvements are reasonable. For example: (1) CARB's Technical Support Document states "Some current, well-maintained PFI-equipped LDVs emit PM mass levels below 1 mg/mi. For example, published research reports PM emissions rates for both PFI ULEV and SULEV vehicles of approximately 0.7 mg/mi or much less over the Federal Test Procedure (FTP or FTP–75) cycle" and (2) "Car makers who choose to pursue gasoline-fueled, $CO_2$ friendlier GDI internal combustion engines for their future vehicles will have two principal technical solutions for further reduction of PM mass emissions. One solution can utilize next generation state-of-the-art engines (e.g., start-stop system where the ICE automatically shuts down and starts up at idle) with optimized fuel injection strategies (e.g., spray-guided central injector) at nearly no net cost increase. The second solution employs post-combustion control in the form of the gasoline particle filter (GPF) at an additional cost." [118]

### b. EPA's Response to Comments

As explained below, EPA believes CARB presents a proper view of how lead time should be evaluated, for purposes of waiver review by EPA, and that CARB has provided reasonable responses to any theoretical objections to the projected control technology; identified the major steps necessary in refinement of the technology; and offered plausible reasons for believing that each of those steps can be completed in the time available.

We also believe that CARB has properly set forth the role of EPA in reviewing California standards which require new and/or improved technology to meet challenging levels of compliance. EPA is not setting its own standards under section 202(a) of the Clean Air Act, rather EPA's role within its waiver review is more limited and takes place in the context of deference that Congress envisioned for California. This deference was discussed in an early waiver decision when EPA approved the waiver request for California's 1977 model year standards:

Even on this issue of technological feasibility I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the Federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to 'catch up' to some degree with newly promulgated standards. Such an approach to automotive emission control might be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency, under the statutory scheme outlined above I believe I am required to give very substantial deference to California's judgment on that score. [119]

Regarding the feasibility of the CARB 1 mg/mile PM standard that commences its phase-in starting with the 2025 MY, EPA believes that it is proper to review this through the *NRDC* prism. In other words, EPA believes it appropriate to provide substantial room for deference to CARB's projections. Although the Manufacturers have raised a variety of concerns they have not provided any data or other information to demonstrate why the pathways and steps identified by CARB are unreasonable. EPA believes having given appropriate deference that CARB has reasonably projected possible pathways to address the theoretical concerns with the 2025 phased-in PM standard, including concerns relating to testing capability. The Manufacturers have provided no data or other information to demonstrate why CARB's identified path of improvements in testing technology and procedures is not feasible in the lead time provided. Similarly, the Manufacturers have provided no data or other information to demonstrate why CARB's identified technology solutions and possible refinements are infeasible, especially given the amount of lead time provided. Given the amount of lead time provided by CARB and their identified paths for improvements, EPA believes the opponents to the waiver have not met their burden of proof in regards to the PM standards commencing in MY 2025.

Therefore, based on the record before us, EPA cannot find that the opponents of the PM standard in 2025 have met their requisite burden of proof to demonstrate that such standards are inconsistent with section 202(a). Thus EPA cannot deny CARB's ACC waiver request on this basis.

### 3. LEV III GHG Emission Standards

CARB has worked closely with EPA and NHTSA throughout the development of the MY 2017–2025 GHG emission standards and has moved in parallel with the agencies in setting standards that are essentially equivalent in terms of lead time and stringency. CARB projects that its GHG emissions standards for MYs 2017–2025 will reduce fleet average $CO_2$ levels by about 34 percent from MY 2016 levels of 251 g/mile down to about 166 g/mile, based on the projected mix of vehicles sold in California. The basic structure of the GHG standards is consistent with that of EPA's GHG standards. CARB uses two vehicle categories, passenger cars and light trucks. CARB projects that the standards will reduce car $CO_2$ emissions by approximately 4.9%/year, reduce truck $CO_2$ emissions by approximately 4.1%/year (the truck $CO_2$ standard target curves move downward at approximately 3.5%/year through the 2016–2021 period and about 5%/year from 2021–2025), and reduce combined light-duty $CO_2$ emissions by approximately 4.5%/year from 2016 through 2025.

CARB notes that the $CO_2$ emission reduction estimates are approximate because the required emission level to achieve compliance with the standards for each vehicle manufacturer depends on each manufacturer's ultimate sales mix of vehicles.[120] Within the two categories, the $CO_2$ standard targets for vehicle models sold by each automaker are indexed to the vehicles' footprint, which is calculated as each vehicle model's wheelbase times its average track width. As a result of this regulatory structure, the precise $CO_2$ emission rates that will result from the standards in each year from 2017 through 2025 will depend on the ultimate sales-weighted mix of vehicles (i.e., according to vehicle sales in each category and the footprint of the models) sold in each year.

CARB also adopted separate nitrous oxide ($N_2O$) and methane ($CH_4$) standards that are harmonized with the standards EPA first adopted in the MY 2012–2016 rulemaking. As with the EPA program, manufacturers may use $CO_2$ credits to meet the $N_2O$ and $CH_4$ standards on a $CO_2$-equivelent basis.

CARB includes most of the flexibilities established by EPA for MYs 2017–2025. CARB includes averaging, banking, and trading provisions which allow for 5-year credit carry-forward and 3-year credit carry-back and credit trading between manufacturers. Manufacturers may generate air conditioning system credits through system efficiency improvements, low refrigerant leakage designs, and use of low global warming potential

---

[118] *Id.*

[119] 40 FR 23102, 23103 (May 28, 1975).

[120] EPA–HQ–OAR–2012–0562–0011 at ES–6.

refrigerants. Manufacturers may generate up to 18.8 g/mile CO₂-equivalent credit for cars and 24.4 g/mile CO₂-equievlent credits for trucks from air conditioning system improvements. CARB also moved to harmonize air conditioning system test procedures with EPA, replacing the A/C idle test requirement with the AC17 test procedure.

In addition CARB adopted off-cycle credits provisions similar to those adopted by EPA, which provide credits to manufacturers based on real world improvements in CO₂ emissions not captured on the 2-cycle test procedure. CARB adopted a list of pre-approved credits that manufacturers may claim by using pre-approved technologies. As with the EPA program, off-cycle credits based on the pre-approved credits list is capped at 10 g/mile. CARB also provides full-size pickup truck technology credits of 10 or 20 g/mile per vehicle depending on the level of technology employed, similar to the EPA program. Manufacturers may generate technology incentive credits by using hybrid technologies or by meeting performance-based criteria over a specified minimum percentage of full size pickup truck production.

The EPA and CARB programs differ in their treatment of advanced technology vehicles, specifically plug-in hybrids, battery electric vehicles, and fuel cell vehicles. EPA's program encourages the production of these advanced technology vehicles in two ways; by providing incentive multipliers for these technologies and by not counting the upstream emissions associated with electric operation for the first several model years of the program.[121] CARB does not provide a multiplier incentive or allow for the use of a 0 g/mile compliance value. CARB explains that incentives are not needed for plug-in hybrids, battery electric vehicles, and fuel cell vehicles under their GHG program because the California ZEV program requires manufacturers to produce vehicles using these technologies.

In its Final Statement of Reasons, CARB reiterated its commitment, as directed by Board Resolution 12–11, to accept compliance with EPA's GHG emission standards for MY 2017–2025 as compliance with California's GHG standards if CARB determines that EPA's final rule preserves the GHG reduction benefits set forth in EPA's

proposed rule.[122] CARB also notes their plan to adopt a "deemed to comply" rule within their waiver request to EPA. EPA stated in the **Federal Register** notice announcing the opportunity for hearing and comment on CARB's June 27, 2012 ACC waiver request that "EPA invites comment on all aspects of CARB's waiver request, and specifically invites comment on CARB's waiver request in light of CARB's plans concerning adoption of a "deemed to comply" provision into its LEV III GHG standards. This will allow EPA to consider any "deemed to comply" provision and comments on it when taking action on CARB's request for a waiver." [123]

On September 14, 2012, CARB proposed amendments to their program to permit compliance based on compliance with EPA's GHG standards. In its discussion of the differences between the EPA and CARB programs with regard to the treatment of advanced technology vehicles, CARB notes that manufacturers will have the option to comply with the federal program and utilize the EPA accounting provisions for these vehicles.[124] On November 15, 2012, the Air Resources Board agreed to accept compliance with federal standards as equivalent to compliance with California's, approving the amendment for "deemed to comply." [125] On December 7, 2012, CARB submitted additional information to EPA noting that CARB had approved further amendments to the ACC program, including the "deemed to comply" regulation, and therefore California has met its commitment to the National Program. CARB requested that EPA consider and take action on these amendments concurrent with the request set forth in CARB's June 27, 2012 ACC waiver request.[126]

a. Comments on CARB's 2017 Through 2025 GHG Emission Standards

CARB's waiver request notes that in 2010, President Barack Obama directed EPA and NHTSA to work with California to develop GHG fleet standards for MY 2017 through 2025 light-duty vehicles. In response, the three agencies developed the Interim Joint Technical Assessment Report (TAR), released in September 2010. The TAR was major milestone in the technical work done collaboratively by EPA, NHTSA, and CARB. CARB held

four public technical workshops covering topics of efficiency, mass-reduction, and safety technology; collaborative technical contract work (e.g., with FEV, Ricardo, Lotus); and extensive meetings with a wide range of stakeholders to gather input. This collaboration ensured that the three agencies had a common set of technical information on which to inform their proposals, allowing the agencies to develop standards that are harmonized in terms of their stringency.

CARB further notes that the feasibility analysis underlying its standards is based on several existing and emerging technologies that increase engine and transmission efficiency, reduce vehicle energy loads, improve auxiliary and accessory efficiency, and that would increasingly electrify vehicle subsystems with hybrid and electric drivetrains. The technology assessment conducted by CARB for the MY 2017–2025 standards builds on the original technical basis established in the previous rulemakings for California's MY 2009–2016 and federal MY 2012–2016 standards. CARB notes that several individual technologies offer substantial CO₂ reduction potential and that many of the technologies have only seen limited deployment in new vehicle models.[127]

In its Initial Statement of Reasons staff report, CARB highlights several CO₂ reduction technologies that manufacturers can employ to meet the standards.[128] The list of technologies cited by CARB is very similar to the list of technologies considered by EPA and NHTSA in evaluating standards for MYs 2017–2025.[129] Vehicle road load and accessory energy loads can be improved, for example, through mass reduction, improved accessories, electric power steering, improved aerodynamics, and low rolling resistance tires. CARB notes several considerable opportunities for engine efficiency improvements. Engine efficiency technologies include turbo charging and downsizing, gasoline direct injection, continuously variable valve lift, cylinder deactivation, and diesel-fueled engines. CARB also describes transmission efficiency improvements important in allowing the operation of the engine in its lowest fuel consumption operating points more frequently. These include more gears

---

[121] EPA allows a 0 g/mile compliance value to be used for vehicles sold in MY2017–2021 and caps the cumulative number of vehicles that a manufacturer may use the 0 g/mile compliance value for in MYs 2022–2025.

[122] California Air Resources Board, EPA–HQ–OAR–2012–0562–0021, at 16.

[123] 77 FR 53199, 53200 (August 31, 2012).

[124] Air Resources Board, EPA–HQ–OAR–2012–0562–0011, at 135.

[125] CARB Resolution 12–35 (November 15, 2012).

[126] EPA–HQ–OAR–2012–0562–0374.

[127] California Air Resources Board, EPA–HQ–OAR–2012–0562–0011, at 102–103.

[128] California Air Resources Board, EPA–HQ–OAR–2012–0562–0011, at 103–108.

[129] Joint Technical Support Document: Final Rulemaking for 2017–2025 Light-duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, Chapter 3, EPA–420–R–12–901, August 2012.

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 140 of 162
USCA Case #26-1213    Document #2187882    Filed: 08/11/2026    Page 31 of 39

Federal Register / Vol. 78, No. 67 / Wednesday, January 9, 2013 / Notices    2137

(e.g., 8 speed transmissions), closer gear ratio spacing, optimized controls, and dual clutch transmissions that allow essentially the same efficiency as manual transmissions.

CARB's analysis also includes various hybrid systems that offer significant potential $CO_2$ reductions through the elimination of engine idling, reduction in fuel consumption during deceleration, reduction of acceleration power requirement through launch assist, and the recovery of vehicle energy losses through regenerative braking during deceleration. Finally, CARB also includes emerging electric drive technologies including plug-in hybrids, electric, and hydrogen fuel cell vehicles.

EPA received several comments on CARB's waiver request generally supporting the California GHG standards as feasible and consistent with CAA section 202(a). The Environmental Defense Fund (EDF) and the Natural Resources Defense Council (NRDC) commented that CARB coordinated with EPA and NHTSA in the development of the GHG standards and the California GHG standards are aligned with the federal GHG standards in terms of stringency and lead time. EDF further commented that EPA received letters from 13 automakers supporting the federal GHG standards, and based on this coordination and support EPA can only determine that the CARB GHG standards are feasible.[130]

EPA received comments from the Dealers that EPA should not provide a waiver to California for the MY 2022–2025 GHG standards because the standards for these years are not consistent with CAA section 202(a). The commenter states that by committing to a mid-term evaluation in its own GHG program, EPA has already determined that "technological capabilities after MY 2022 are too remote to be accurately predicted." The commenter argues that it is inappropriate for CARB to obtain a waiver for years where it cannot demonstrate technological feasibility regardless of the fact that California has agreed to participate in the mid-term review. The Dealers assert that by agreeing to participate in the mid-term evaluation, CARB "has admitted that the technological feasibility of its GHG standards for MYs 2022–2025 is not knowable at this time."

As part of the waiver decision process, CARB's supplemental comments provided a response to comments submitted by NADA, including a response to NADA's comments regarding the feasibility of the MY 2022–2025 standards.[131] CARB comments that NADA concerns are not supported by relevant case law and should be dismissed. CARB comments that NADA is disregarding decades of precedent that clearly sets out the appropriate "technological feasibility" analysis under section 202(a). Citing *Natural Resources Defense Council* v. *U.S. Environmental Protection Agency,* (1981) 655 F.2d 318, 331, CARB notes CAA section 202(a) has historically been interpreted to allow for projections of likely future technological development. Such projections do not need to "possess the inescapable logic of a mathematical deduction." Instead, such a projection is considered sufficient if it "answers any theoretical objections to the [projected technology], identifies the major steps necessary in refinement of the technology, and offers plausible reasons for believing that each of those steps can be completed in the time available." Moreover, where the requirements of a standard are phased in over a lengthy period of time it bears on the likelihood of a proper finding of technological feasibility. CARB notes that the great length of time provided—until after MY 2022—supports a finding of technological feasibility under *NRDC,* and would be in line with past EPA waiver decisions.

b. EPA Response to Comments

EPA disagrees with NADA's characterization of the mid-term review as it relates to the technological feasibility of the standards for MYs 2022–2025. As discussed in the final rule for the EPA's GHG emission standards, EPA has found that its standards are technologically feasible under CAA section 202(a), based on available information regarding technology and costs.[132] EPA could not have adopted the standards for MYs 2022–2025 if it did not find the standards to be consistent with CAA section 202(a) which requires EPA to consider issues of technological feasibility, cost, and available lead-time.[133] As EPA discusses in the final rule in response to comments, "EPA does not agree that the mid-term evaluation is legally required, or that the standards adopted today would be arbitrary and capricious or without substantial evidence to support them absent such a mid-term evaluation. The final rule and supporting information and analysis amply justify the reasonableness and appropriateness of the final GHG standards adopted by EPA, irrespective of the provisions for a mid-term evaluation."[134] EPA is committed to conducting a mid-term evaluation for MYs 2022–2025 in close coordination with NHTSA and CARB given the long time frame in implementing standards out to MY 2025 and given NHTSA's obligation to conduct a separate rulemaking in order to establish final standards for vehicles for those years.[135] With respect to the waiver, however, EPA believes that NADA's reference to the mid-term review does not demonstrate technological infeasibility (or any requisite level of uncertainty) or that the CARB standards are inconsistent with section 202(a), particularly given that the CARB standards are closely aligned to those adopted by EPA. In addition, compliance with EPA's GHG standards will be deemed to be compliance with CARB's GHG standards. EPA agrees with CARB's response to the NADA concerns and believes that a reasonable technology path forward has been projected in support of the MY 2022–2025 standards, which is further supported by the substantial amount of lead-time provided for these standards. EPA believes that the substantial amount of lead-time provided also accords with a finding of technological feasibility under *NRDC,* and would be in line with past EPA waiver decisions.

EPA did not receive any additional comments on the waiver decision regarding the technology assessment or cost analysis done by CARB in support of their GHG standards. CARB has adopted GHG standards that are closely aligned to those adopted by EPA for MYs 2017–2025. In EPA's final rule establishing the MY 2017–2025 standards, EPA concluded that the standards are feasible in the lead time provided and the costs are reasonable, as required under Section 202(a) of the CAA.[136] The technical basis for the standards was developed jointly by EPA, NHTSA, and CARB. The methodology and underlying data used by CARB to assess technologies and costs, as summarized above, are very similar and in many cases the same as those used by EPA to assess the standards.[137] The extended lead time

---

[130] EDF's comment at EPA–HQ–OAR–2012–0562–0025 and 0353; and NRDC's comment at EPA–HQ–OAR–2012–0562–0347.

[131] EPA–HQ–OAR–2012–0562–0373 at 8.

[132] 77 FR 62880–62882 and 62777.

[133] See 77 FR 62671–62673 for discussion on EPA statutory authority.

[134] 77 FR 62786.

[135] 77 FR 62784–62788.

[136] 77 FR 62624.

[137] See 77 FR 62702–62713 for a description of the EPA and NHTSA joint technology and cost assessment. More detail is provided in the joint Technical Support Document for the rule.

**2138**    **Federal Register** / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices

provides the necessary time for manufacturers to combine individual technologies, many of which are currently available, into optimized packages and apply them across their vehicle fleets.

It is also important to note that the EPA and CARB GHG programs are very similar in terms of the structure of the programs and flexibilities contained in the programs. The $CO_2$ standards are attribute-based fleet average standards, based on vehicle footprint curves that are identical. The programs include averaging, banking, and trading provisions. Both GHG programs offer credits for air conditioning system improvements, off-cycle $CO_2$ reductions, and full-size pickup truck technology incentives. Both GHG programs contain the same $N_2O$ and $CH_4$ standards and essentially the same provisions for small volume manufacturer and small businesses.

There are some aspects of the CARB program that differ from the EPA program but, as discussed below, EPA does not believe that these differences change the feasibility of the standards in any significant way. CARB has explained in detail how these standards can be met using technologies that are reasonably expected to be available in the regulatory timeframe. NADA does not substantially undermine this explanation.

CARB estimated an average per vehicle cost in MY 2025 of $1,340 without the new ZEV requirements and $1,840 with the new ZEV requirements. In its final rule, EPA estimated an average per vehicle cost of about $1,800 in MY 2025 for the EPA GHG standards. Both agencies conclude that these up-front per vehicle costs will be more than offset by consumer fuel savings over the life of the vehicles.

Perhaps the most significant differences between the CARB and EPA vehicle programs involve the new California ZEV requirements which mandate use of ZEV-type technologies for a portion of a manufacturer's fleet, and therefore may alter the technology pathways that manufacturers might otherwise choose to meet the GHG standards. EPA has reviewed the consistency of the ZEV requirements with section 202(a) separately below

The CARB and EPA programs also differ in the treatment of vehicles capable of electric operation. EPA provides an advanced technology incentive multiplier through MY 2021 to encourage the increased sales of plug-in hybrids (PHEVs), electric vehicles (BEVs), and fuel cell vehicles (FCVs). CARB does not provide advanced technology incentive credits for these

vehicles because these types of vehicles are required under the ZEV program and an incentive is not necessary. CARB also accounts for upstream emissions from electric operation starting in MY 2017 while EPA phases in upstream accounting for MY 2022–2025 vehicles after vehicle sales thresholds are exceeded. These differences mean that PHEVs, BEVs, and FCVs do not receive as much credit in the CARB program compared to the EPA program. However, these vehicles still offer significantly lower $CO_2$ levels in the CARB program compared to more conventional technologies, lowering a manufacturer's $CO_2$ fleet average.

There are other minor differences between the CARB and EPA programs but EPA does not believe the differences have a significant impact on feasibility. Many of the differences in the programs arise from changes EPA made to various provisions between the proposal and final rules in response to comments. CARB delineates these minor differences in the Initial Statement of Reasons for their proposal to accept compliance with EPA's GHG emission standards as compliance with California's GHG emission standards (aka "deemed to comply").[138] These include revisions to the off-cycle credits, air conditioning system credits, and full-size pick-up credits. While most of the changes made by EPA in its final rule directionally provide somewhat more flexibility to manufacturers, the changes do not ultimately change the level of credits potentially available. CARB concludes and EPA agrees that the programs remain sufficiently comparable.

Finally, as discussed below, most if not all manufacturers will very likely opt to comply with the California program by complying with the EPA GHG emission standards, as permitted by the "deemed to comply" regulation. Therefore, the small differences between the programs will not in such cases have any practical implications for manufacturers. As CARB notes in its waiver request, "Throughout the development of the LEV III GHG regulations, California coordinated with the EPA and NHTSA on technical and economic areas, and CARB has moved in parallel with the federal rulemaking in terms of stringency of the standards and lead time for compliance." Given this coordination, commenters have not shown that the LEV III GHG regulations are technologically infeasible or that the lead time provided is inadequate.

The Manufacturers note that they do not oppose California's request for a

Section 209(b) waiver for its GHG emission standards but state that it would not be appropriate for the waiver to be granted until after California has finalized its regulatory amendments to allow for a national compliance option.[139] "This national compliance option is integral to the commitment letters the industry and California signed in July 2011 and to the single national GHG/fuel economy program all stakeholders sought to achieve."

As noted above, CARB notified EPA by letter dated December 7, 2012 that CARB has approved further amendments to its ACC program, including the "deemed to comply" regulation.[140] Included in CARB's December 7, 2012 letter to EPA is CARB's "Final 'Clean' Version of California's 2017–2025 Advanced Clean CAR Program, including its Passenger Vehicle Greenhouse Gas Regulations and LEV/GHG Test Procedures, and its ZEV regulations and Test Procedures" all as amended December 6, 2012.[141]

EPA has not received any comment, based on its August 31, 2012 **Federal Register** Notice, that CARB's "deemed to comply" regulation raises any issues regarding technological feasibility. EPA did receive comment from the Manufacturers requesting that EPA not grant CARB a waiver for its GHG emission standards until after CARB has finalized their "deemed to comply" regulations. Today's waiver applies to CARB's final regulation as adopted on December 6, 2012.

After review of the information in this proceeding, EPA believes that those opposing the waiver have not met their burden of showing that compliance with California's GHG standards is infeasible, even without the deemed to comply provision, based upon the current and future availability of the described technologies in the lead-time provided and considering the cost of compliance. The CARB technical information presented in this record clearly indicates that these requirements are feasible. In addition, California's regulations include a "deemed to comply" provision which provides further strong support for this view. EPA therefore determines that those opposing the waiver have not met the

---

[139] The Manufacturers note that California does not believe that another waiver request is necessary once the amendments are finalized, further supporting its request to wait until after CARB finalizes its rule.

[140] *See* CARB's Resolution 12–35 (November 15, 2012) at EPA–HQ–OAR–2012–0562–0374 (attachment 64), Executive Order R–12–016 (December 6, 2012) at EPA–HQ–OAR–2012–0562–0374 (attachment 66).

[141] *See* EPA–HQ–OAR–2012–0562–0374 (attachment 65).

---

[138] EPA–HQ–OAR–2012–0562–0374 at 6–13.

burden of producing the evidence necessary for EPA to find that California's GHG standards, including the "deemed to comply" provision, are not consistent with Section 202(a).

### 4. California's ZEV Amendments as They Affect 2018 Through 2025 Model Years

As noted above, after a thorough review of CARB's ZEV amendments, we have determined that such amendments, as they affect 2017 and earlier MYs, are within the scope of previous waivers of preemption. However, EPA recognizes that such amendments add significant new requirements, as they affect 2018 and later MYs, and therefore such amendments are reviewed under the full waiver criteria.

### a. Comments on CARB's ZEV Amendments

CARB notes in its waiver request that to date, all vehicle manufacturers operating in California are in full compliance with the ZEV mandate. Nearly 5,600 ZEVs (BEVs and FCVs) are in operation statewide and 380,000 AT PZEVs are also in operation. Fuel cell vehicle and infrastructure is progressing with several automakers moving toward commercialization sometime after 2015. Cumulatively, automakers plan to have 50,000 FCVs operational in California by 2017, according to CARB.[142] CARB also notes that most manufacturers have near-term production plans to meet or over comply with the regulatory requirements through MY 2017. In addition, recently a number of manufacturers have announced aggressive production plans for PHEVs and BEVs for the next three MYs. CARB maintains that these announcements reflect technological advancement in lithium-ion battery technology and a general shift in customer demand and concern about environmental stewardship. CARB provides a table in its waiver request that summarizes manufacturers' current ZEV and TZEV program commitments, by technology category and as publicly stated.[143] CARB suggests that the table reveals that nearly every manufacturer will be introducing BEV and PHEV products within the next one to three years, and five manufacturers will commercially introduce FCVs by 2015. CARB states that the technological sophistication of ZEVs currently being produced is anticipated to advance, making commercial production and compliance of these vehicles by MY 2018 and later

more feasible. A new feature of the ZEV amendments is that manufacturers will be allowed to use a variety of battery and fuel cell vehicle technologies to comply with the ZEV requirement, making compliance still more feasible. Finally, CARB notes that during its rulemaking proceedings for the adopting of the 2012 ZEV amendments they did not receive any comments questioning the overall technological feasibility of the amended standards.

With regard to the manufacturer costs associated with the ZEV emission requirements CARB states that the "ZEV regulation must be considered in conjunction with the proposed LEV III amendments. Vehicles produced as a result of the ZEV regulation are part of a manufacturer's light-duty fleet and are therefore included when calculating fleet averages for compliance with the LEV III GHG amendments. Because the ZEVs have ultra-low GHG emission levels that are far lower than non-ZEV technology, they are a critical component of automakers' LEV III GHG standard compliance strategies. As such the ZEV program cost is considered as the difference in complying with the LEV III GHG fleet standard without the proposed amendments to the ZEV regulation versus with the proposed amendments to the ZEV regulation. Assuming that all of the associated direct manufacturing and ICMs are passed on to consumers, the average incremental price increase that results from the proposed LEV III GHG fleet standards and proposed ZEV regulation over the 2017 through 2025 timeframe will differ from the average increase resulting from compliance with only the LEV III GHG amendments. The average incremental vehicle price due to proposed LEV III GHG standards, but with no amendments to the current ZEV regulation, in 2025 is expected to be $1,340. The average incremental vehicle price considering the proposed LEV III GHG fleet standards and the proposed ZEV requirements in 2025 MY increases to $1,840, a $500 incremental increase. * * * In the broader context of the overall fleet, the ultra-low GHG ZEV technology is a major component of compliance with the LEV III GHG fleet standards for the overall light duty fleet. In that fleet context, the overall cost of the ZEV program is the difference in costs between the "GHG-plus-ZEV" and the "GHG only" scenarios."[144]

EPA has also received comment from several consumer and environmental groups that support CARB's ZEV amendments. The Consumer Federation of America (CFA) provided comment

that "California's ability to set these strong standards is vitally important to the advancement of the auto industry and for meeting consumer demand for cleaner and more efficient cares in states across the nation. Consumers understand the benefits and have consistently voiced support for California's leadership on clean car standards. In fact, CFA's latest poll on the subject found that "more than 70% of Americans support states being allowed to continue setting tailpipe emission standards that, as a result, increase fuel economy for motor vehicles." This commenter also provides the latest from a *Consumer Reports* poll on the subject, including "Seventy-five percent of California consumers think California should require automakers to build fleets that include increasing numbers of zero emission vehicles including electric and hydrogen fuel cell cars." [145] EPA received comment from Consumer Reports/Consumers Union (Consumer Reports) in support of CARB's ACC program and notes the survey above. In addition, Consumer Reports notes that vehicle manufacturers are already offering plug-in hybrids and BEVs, with new models appearing all the time. "Consumers, particularly in California, are very open to buying alt-fuel vehicles. Importantly, some of the cleanest vehicles or alt-fuel vehicles are also proving very satisfying to vehicle owners." [146] EPA also received oral testimony from Calvert Investments noting that CARB's ACC program will help drive innovation, investment, and job creation and thus they strongly support both the LEV III (including GHG standards) and ZEV requirements in the ACC program. "Customers want and in an increasing number of countries require cleaner cars and trucks, to go further on every gallon of gas, while cutting back on GHG emissions that contribute to climate change. Companies that fail to embrace relevant new technologies, from improving mileage for conventional internal combustion engines to developing hybrid, electric, and fuel cell vehicles, are putting themselves at risk." [147]

In addition, EPA received comment from NRDC that provided specific input on the criterion for consistency with CAA Section 202(a). NRDC states that the forecasted ZEV sales in California exceed ZEV requirements. In a report jointly published with NRDC, auto industry analysts Baum and Associates

---

[142] *See* CARB's Initial Statement of Reasons (ISOR), EPA–HQ–OAR–2012–0562–0008 at 11.

[143] CARB waiver request at 27–28.

[144] CARB's ISOR at pp. 62–63.

[145] EPA–HQ–OAR–2012–0562–0032.

[146] EPA–HQ–OAR–2012–0562–0354.

[147] EPA Hearing Transcript at 83. EPA–HQ–OAR–2012–0562–0026.

**2140**

projected potential ZEV sales from 2015 to 2020. The 2012 ZEV amendments expect ZEV sales of about 75,000 vehicles in MY 2018 and 130,000 vehicles in 2020. The Baum Associates assessment, conducted before the ZEV amendments were proposed, projected ZEV sales of as much as 160,000 in MY 2018 and 180,000 in MY 2020. Baum and Associates also forecasts on an ongoing basis for the introduction of new ZEV models into the marketplace in the next few years, demonstrating the technical feasibility of ZEV technologies today. The Baum and Associates forecasts are based on detailed information about supplier and OEM production plans. NRDC compared the Baum and Associates forecast for BEVs, PHEVs, and FCVs to the ZEV and TZEV production announcements included by CARB in their waiver request. NRDC found that there are even more models that will be introduced than identified by CARB.[148]

EPA received comment both from the Manufacturers and the Dealers stating their objections to CARB's ZEV amendments as they affect 2018 and later MYs. The Manufacturers provide essentially three arguments for their assertion that the ZEV regulations are infeasible, particularly when applied individually in section 177 States. (The Manufacturers state that the amendments before EPA require an increasing number of ZEVs in California and each of the section 177 States.)[149] The Manufacturers claim that: 1) the infrastructure for BEVs will not be sufficient by MY 2018 to support increased sales of BEVS and that CARB has not explained how it determined that the infrastructure and the level of consumer demand in the Section 177 States will be sufficient to justify the ending of the travel provisions for ZEVs after MY 2017; 2) the cost of the ZEV program far exceeds its environmental benefits, especially when compared to the LEV III and GHG programs in terms of cost per ton of $CO_2$ removed: and 3) the current data on consumer demand for ZEVs indicates that it will not be feasible to meet the sales requirements for 2018 MY and beyond. In conjunction with this third argument the Manufacturers contend that the market for these types of vehicles has not

developed as quickly as anticipated and therefore there is no basis to conclude that BEV sales will reach required levels by 2025. (The Manufacturers also state that it is "highly unlikely that the required infrastructure and level of consumer demand for ZEVs will be sufficient by MY 2018 in either California or in the individual Section 177 States to support the ZEV sales requirements mandated by CARB.) Because of these concerns the Manufacturers suggest that EPA deny the ZEV waiver for 2018 and later MYs, or at least defer the program for MY 2021 and later, until California, EPA, and the auto industry have conducted a mid-term review of ZEV similar to the GHG program.

As noted above, the Manufacturers provide EPA with current vehicle sales and registration data. These data include current sales figures for hybrids (approximately 3% of annual sales nationally and approximately 6.1% in California according to registration data). The Manufacturers note that registration of hybrids in section 177 states is far lower. The Manufacturers maintain that the low sales numbers are due substantially to the increased cost relative to traditional vehicles, and that the demand for BEVs in section 177 States is particularly "sluggish." However, the comments EPA received did not include forecasts, projections, data, or other evidence to support the Manufacturer's conclusions about future ZEV sales, or in particular, to demonstrate that the CARB ZEV requirements are infeasible.

The Dealers maintain that technological feasibility requires that not only certain technologies be possible, but they also be "economically achievable." [150] The Dealers maintain that in order for ZEV vehicles to be marketable they must: (1) Be at least as safe as comparable conventionally-fueled vehicles, (2) offer a range comparable to conventionally-fueled vehicles, (3) offer a refueling time comparable to conventionally-fueled vehicles, (4) offer similar performance and capacities, and (5) come to market at a cost comparable to conventionally-

fueled vehicles. The Dealers maintain that CARB's estimates that ZEVs and TZEVs that will cost approximately $10,000 more than comparable traditional vehicles, with at best no performance advantages, are by definition not feasible as they will be unable to compete in the marketplace.

CARB provides several responses to the comments submitted by the Manufacturers. In terms of the applicability of section 177 within EPA's section 209 waiver deliberations, and consideration of the technological feasibility of CARB's amendments adopted in such states, CARB notes that the proper scope of EPA's inquiry is limited by the express terms of section 209(b). This is well illustrated both in past waiver determinations and in case law.[151] While CARB discredits the view that EPA should consider the feasibility of ZEV in other states, it also notes that charging infrastructure in states other than California does not seem to be a concern as both Nissan and General Motors are currently marketing advanced technology vehicles nationally, and Ford will begin 50-state marketing in early 2013. EPA notes that although it is unclear whether the Manufacturers are contesting the current or future adequacy of infrastructure in California (other than a sentence that states it is "highly unlikely"), CARB nevertheless sets forth that there is much activity in the field of electric vehicle charging infrastructure, and that public charging programs are being funded by the California Energy Commission, U.S. DOE EV Everywhere program, the U.S. DOE EV Project, and other programs to address the needs of plug in vehicles. CARB also states that it appears that charging infrastructure is sufficient and efforts underway to address infrastructure needs (through the programs noted above and CARB's own ZEV Executive Order) are focused on highest priority charging locations, namely multi-family dwellings and workplace charging.

CARB also responds to concerns expressed about the feasibility of ZEV vehicles in terms of consumer demand. They note that current sales data for plug in vehicles show sales growing rapidly—faster than conventional hybrids grew when they were first launched. CARB states that these early sales data, aggressive programs for community readiness, public education, infrastructure development and

---

[148] EPA–HQ–OAR–2012–0562–0347. See Baum and Mui, "The Zero Emission Vehicle Program: An Analysis of Industry's Ability to Meet the Standards", May 2010. Available at http://docs.nrdc.org/energy/files/ene_10070701a.pdf.

[149] EPA believes the Manufacturers have mischaracterized the nature of CARB's waiver request. CARB has only submitted its own ACC regulations to EPA and it has not submitted, nor has any other State submitted, section 177 state regulations.

[150] NADA points to CARB's waiver request at 25 wherein CARB states "It is well established that EPA will find a regulation to be technically feasible if 'a reasonable basis [exists] that a new technology will be available and economically achievable." However, NADA fails to reference CARB's subsequent (and EPA believe the appropriate view of cost) statement on the same page: "The only relevance of costs in a Section 209(b) waiver proceeding is in the context of technological feasibility. Past waiver determinations have made clear that for the cost of compliance to be found excessive it would need to be 'very high' such that the cost to consumers when purchased a complying vehicle would be doubled or tripled."

[151] CARB's supplemental comments at 6. See 49 FR 18887, 18889 (May 3, 1984) and 58 FR 4166 (January 7, 1993). See also MEMA I 627 F.2d 1095, 1114–20 (Administrator properly declined to review potential anti-trust and constitutional implications of CARB regulations under 209(b)).

incentives are in place to support as much as possible consumer acceptance and adoption of ZEV technologies. CARB also notes that the Dealers comments in this regard can be addressed by examining relevant case law and EPA's past application of the law. CARB notes that the Dealers' statement that it is inappropriate for EPA to grant a waiver unless the Agency can "demonstrate technological feasibility for all the years in which those standards would be in effect" is disregarding decades of waiver precedent that clearly sets out the appropriate "technological feasibility" analysis under section 202(a)." Section 202(a) has historically been interpreted to allow for projections of likely future technological development. Such projections do not need to 'possess the inescapable logic of a mathematical deduction.' Instead, such a projection is considered sufficient if it "answers any theoretical objections to the [projected technology], identifies the major steps necessary in refinement of the technology, and offers plausible reasons for believing that each of those steps can be completed in the time available." [152]

CARB also addresses the Dealers' stated concerns about the marketability of ZEVs.[153] CARB notes that a more appropriate measure of ZEV market success and growth potential is to examine the recent years when ZEVs have actually been available to consumers. In the last two years, with the introduction of Nissan Leaf, Ford Focus EV, Honda Fit EV, Mitsubishi IMiEV, and others, BEV sales have grown 228 percent.[154] As discussed below, CARB also points to the Joint Technical Assessment Report (TAR), which was developed by EPA, NHTSA, and CARB, and released in September 2010.

CARB states that the Dealers disregard well established law and create their own definition of "technological feasibility" in suggesting that EPA consider in its assessment a comparison of ZEVs and conventional vehicles on cost, safety, and performance features such as range and refueling time. CARB relies upon cost (*MEMA I* at 1118),

performance (*International Harvester* at 641–647), and durability (*NRDC* at 333–335). CARB states:

The ZEVs produced for the regulation will meet the same safety requirements that conventionally fueled vehicles meet. They already achieve acceleration and power characteristics expected on traditional vehicles and have demonstrated adequate durability. Range and refueling times are characteristics not traditionally taken into consideration. The automakers are targeting range for battery electric vehicles that match up with the vast majority of daily driving needs or most consumers (typical trips and typical daily needs are under 30 miles). For fuel cell vehicles, automakers have demonstrated range capability equal to or greater than conventionally fueled vehicles. With regard to refueling time, BEV drivers look at refueling differently; 30 seconds a day at home to plug in (with charging occurring overnight or while at work) and have a full range daily instead of visiting a gasoline station weekly is characterized as much more convenient. Fuel cell vehicles refuel in about the same amount of time as a gasoline car. By all of these measures ZEVs are more than technologically feasible for commercialization, certainly so with the abundant nine to 12 years of lead time for the 2022–2025 model years that are the focus of the comments.[155]

CARB also relies upon the projections and explanations submitted with its initial waiver request and notes that the Dealers are taking issue with standards that do not come into effect until after a lengthy lead time. In addition to CARB's waiver request projections and explanations noted at the outset of this section CARB also provides an explanation of the Joint Technical Assessment Report (TAR), which was developed by EPA, NHTSA, and CARB, and released in September 2010. The report concluded "electric drive vehicles including hybrid(s) * * * battery electric vehicles * * * plug-in hybrid(s) * * * and hydrogen fuel cell vehicles * * * can dramatically reduce petroleum consumption and GHG emissions compared to conventional technologies * * *. The future rate of penetration of these technologies into the vehicle fleet is not only related to future GHG and corporate average fuel economy (CAFE) standards, but also to future reductions in HEV/PHEV/EV battery costs, [and] the overall performance and consumer demand for the advance technologies * * *." [156]

CARB notes that the TAR stated that "* * * [A] number of the firms suggested that in the 2020 timeframe their U.S. sales of HEVs, PHEVs, and EVs combined could be on the order of 15–20 percent of their production." [157]

Lastly, CARB addresses the Manufacturers' comments regarding the cost-effectiveness of CARB ZEV amendments, in terms of cost per ton of $CO_2$ removal, in a manner similar to its response to the section 177 arguments—that such comments are irrelevant to EPA's 209(b) waiver consideration. CARB notes EPA's 2009 GHG waiver decision wherein EPA described the appropriate cost of compliance analysis under section 202(a): "Consistent with *MEMA I*, the Agency has to evaluate costs in the waiver context by looking at the actual cost of compliance in the time provided by the regulation, not the regulation's cost effectiveness. Cost effectiveness is a policy decision of California that is considered and made when California adopts the regulations, and EPA, historically, has deferred to these policy decision * * *. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209." [158]

In addition to the above facts, we believe additional information can help inform our review of the required increases in the sale of PHEVs, BEVS, and FCVs in California during the 2018 through 2025 timeframe.

EPA reviewed two additional studies of the market potential of ZEVs from the Electric Power Research Institute (EPRI) and the U.S. Energy Information Administration's Annual Energy Outlook (AEO) that are relevant to CARB's ZEV mandate. EPRI, a leading electric utility research organization published a July 2011 technical report, Transportation Electrification, A Technology Overview,[159] which presents three market projection scenarios for EVs and PHEVs. The scenarios project a range of Low, Medium, and High sales volumes. The

---

[152] CARB supplemental comments at 8, citing *NRDC v EPA*, 655 F.2d 318, 331.

[153] CARB notes that it is important to recognize that the ZEV regulations do not place requirements on dealers to offer for sale or sell ZEVs; rather the requirement is on the automakers. Since the obligation to sell and place ZEVs in service falls to the automakers, it is the automakers' responsibility to make the subject cars marketable and sellable by the dealers.

[154] CARB supplemental comments at 11, citing Natural Resources Defense Council post (October 31, 2012) attached as item 52 to supplemental comments.

[155] CARB's supplemental comments at 12.

[156] EPA, 2010. United States Environmental Protection Agency, National Highway Safety and Traffic Administration and California Air Resources Board. September 2010. "Interim Joint Technical Assessment Report: Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2017–2025" (p. vii). *http://www.epa.gov/otaq/climate/regulations/ldv-ghg-tar.pdf.*

[157] *Id.* at 2–5.

[158] CARB's supplemental comments at 9, citing 74 FR 32744, 32775 (July 8, 2009). CARB provides additional information explaining how the ZEV program was considered in conjunction with the LEV program and that the ZEV regulation remains an important part of California's plans to reach attainment of health based air quality standards.

[159] EPRI, Transportation Electrification, A Technology Overview, 2011 Technical Report, EPRI 1021334, July 2011. *Http://www.epri.com/abstracts/pages/productabstract.aspx?ProductID=000000000001021334.*

EPRI projection for national EV and PHEV sales in 2018 ranges from a low of 500,000 vehicles to a high of 1,920,000 vehicles. In 2025, the EPRI projections range from a low of 1,144,000 to a high of 5,073,000 vehicles. The Low projection mimics the historical market penetration of HEVs from 2000 through 2008, applying their rate of sales growth to PHEVs and EVs. The Medium projection is based on a "ground up" analysis of sales projections derived from PHEV and EV product announcements and production estimates. These projections are extrapolated past 2015 based on the aforementioned product announcements and the past sales performance of HEVs. The High projection is based on the average of the top third (more optimistic) of publicly available sales projections from several sources. In each of EPRI's three cases, projected PHEV and EV national sales far exceed CARB's ZEV mandate. EPA acknowledges that the EPRI study did not specifically project California sales but we believe it reasonable to assume that the supply of and demand for such vehicles will be significantly greater in California (and to some extent in section 177 states with ZEV programs) than it will be in states without a ZEV mandate. The EPRI study indicates that it would take less than 25 percent of the total national sales of ZEV in the Low scenario in order to exceed the necessary ZEV sales percentages during the 2018 through 2025 timeframe in California.

The U.S. Energy Information Administration (AEO) also analyzed two scenarios of market penetration for PHEVs and EVs in their Annual Energy Outlook 2012 (AEO2012).[160] AEO's reference case indicates a national market potential of around 165,000 EVs and PHEVs in 2018 which is more than twice the CARB ZEV requirement. In 2025, the AEO reference case indicates a national market potential of 283,000 ZEVs, which still exceeds CARB's proposed ZEV requirement of nearly 271,000. AEO's reference case assumes EV technology cost, especially batteries, remains high through 2030. AEO's High Technology Battery case, assumes the Department of Energy's (DOE) battery cost goals are met in 2015. Generally, these battery costs are more comparable to battery costs used by CARB and EPA in the 2010 Joint Technical Assessment

Report (TAR)[161] than those used in the reference case. The AEO High Technology Battery case indicates a market potential of ZEVs in 2018 as 805,000 units, increasing to 1,394,000 in 2025. As with the EPRI study above, using the projections of the AEO High Technology Battery case, it would take less than 25 percent of the total national sales of ZEV to exceed the necessary ZEV sales percentages during the 2018 through 2025 timeframe in California.

While both the EPRI and AEO market projections are for national sales, EPA believes it is reasonable to assume that a significant percentage of these vehicles will be sold in California as has been the past practice with HEVs and EVs.

b. EPA's Response to Comments

After a review of the information in this proceeding, EPA has determined that the opponents of the ZEV standards have not demonstrated that the necessary increase in PHEV and ZEV sales necessary to meet the ZEV standards in the 2018 through 2025 MYs is infeasible. A review of the record, indicates that compliance with the ZEV standards, as they affect the 2018 through 2025 MYs, is feasible giving consideration to cost and lead time available. CARB has answered any theoretical objections to the projected technology, identified the major steps necessary in refinement of the technology, and offers plausible reasons for believing that each of those steps can be completed in the time available. This assessment is based upon the current technology available along with projected improvements in technology and expected cost reductions (in addition to continuing increases in consumer demand in response to preferences for advance technologies, fuel savings, available and improved infrastructure, incentives, regulatory mandates, etc) and given the significant lead time provided. As discussed in detail below, EPA cannot find that those opposing the waiver request have met their burden of showing that California's regulations are inconsistent with section 202(a). Therefore, we cannot deny the waiver on that ground.

Basic Feasibility of ZEV Technology

At the outset we note that manufacturers are meeting the ZEV requirements today. As CARB noted in its waiver request, most manufacturers have near-term production plans to

meet or over comply with regulatory requirements through 2017. More importantly, a number of manufacturers have clearly demonstrated the feasibility of ZEV technology with in-production or planned PHEV, BEV and FCV models within the next few years. Manufacturers are also afforded the flexibility to determine the appropriate mix between BEVs and FCVs. We note that no commenter suggested that the underlying technology is not available today nor is there any evidence in the record that contradicts CARB's assertions that improvements and technology path moving forward will continue in the ZEV area in regards to range and other capabilities. The objections raised by those opposing the waiver on this point have to do less with the basic feasibility of ZEVs than with their acceptability/marketability, supporting infrastructure, and cost.

Regarding the lead time provided by California to meet the ZEV phase-in requirements, the commenters have not met their burden to show that the lead time is insufficient. While the commenters noted general concerns about marketability, infrastructure and cost they made no claims that inadequate lead time exists or that CARB's requirements would be feasible if more lead time were provided.

Regarding the cost component of the technological feasibility test, EPA believes that the opponents of the waiver have not met their burden to show that the ZEV standards are not technologically feasible because of excessive cost. As noted above, EPA has traditionally examined whether the necessary technology exists today, and if not, what is the cost of developing and implementing such technology. To the extent it is appropriate for EPA to continue to examine the cost of implementing ZEV technology, CARB estimates that by 2025 the incremental cost of a ZEV or TZEV is expected to rapidly decline, yet remain approximately $10,000 (high end estimate) higher than a conventional vehicle.[162] The Manufacturers note that CARB's analysis provides an incremental cost of $12,900 in MY 2020.[163] Under EPA's traditional analysis of cost in the waiver context, because such cost does not represent a "doubling or tripling" of the vehicle cost, such cost is not excessive nor does it represent an infeasible standard.[164] Moreover, though EPA believes that it is not necessary or appropriate for EPA to evaluate how manufacturers choose to

[160] U.S. Energy Information Administration, Annual Energy Outlook 2012, Data Tables, Table 57 accessed 12/13/12 at http://www.eia.gov/oiaf/aeo/tablebrowser/#release=AEO2012&subject=0-AEO2012&table=48-AEO2012&region=1-0&cases=hp2012-d022112a.

[161] "Interim Joint Technical Assessment Report: Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2017–2025," September 2010.

[162] CARB waiver request at 6.
[163] Manufacturers' comments at 16.
[164] MEMA I at 1118.

Case 4:25-cv-04966-HSG     Document 247-1     Filed 08/12/26     Page 146 of 162
USCA Case #25-1318     Document #2187882     Filed: 08/11/2026     Page 37 of 39

Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices     **2143**

allocate the incremental costs of ZEVs over their respective California fleets. CARB has identified one methodology of speeding the cost over the entire fleet with a resulting incremental cost of approximately $500, which is well within acceptable cost levels. EPA notes that manufacturers and dealers have many possible strategies available to spread the cost of the ZEV requirement beyond ZEV purchasers, but that such strategies are within the market choices of the manufacturers and dealers. Although EPA received comment that a manufacturer may have to employ costly marketing strategies if consumers do not otherwise accept ZEV vehicles, we do not believe such statements evidence standards that are infeasible. EPA also notes the likely existence of additional incentive programs that will further enable the marketability of ZEV vehicles from a cost perspective.

Relevance of Section 177 States on Consistency Analysis

The opponents of CARB's ZEV amendments, as they affect 2018 and later MYs, rely upon the implications of the adoption of CARB's ZEV amendments in section 177 states and resulting feasibility concerns. EPA's longstanding interpretation of section 209(b) and its relationship with section 177, is that it is not appropriate under section 209(b)(1)(C) to review California regulations, submitted by CARB, through the prism of adopted or potentially adopted regulations by section 177 states. EPA believes the language of section 209(b) is intended to apply solely to whether California's regulations can be denied a waiver under the criteria of section 209(b). State regulations promulgated under section 177, which are promulgated by separate state agencies under their own authority, and which have not been submitted to EPA for waiver review, are not a proper focus of review for our determination regarding whether California's state regulations meet the requirements under section 209(b). Section 177, and the state statutes authorizing state action under section 177, is separate provisions with their own requirements, and those opposed to state regulations promulgated under section 177 would need to take action under those provisions in those states.

An issue that arose during EPA's consideration of California's waiver request for its 1990 LEV standards was whether EPA could consider in its waiver decision the impact and implications of other states adopting the California standards under section 177. EPA concluded that section 209(b) does not authorize the agency to consider the impacts of actions or potential actions taken by other states under section 177 in reviewing a waiver request by California for its state standards.[165] EPA also received comment, during a 1978 waiver review that EPA must consider each of the criteria of section 209(b) of the Act in light of the possibility that eligible States may impose the emission control requirements, for which a waiver has been granted, under section 177. A commenter further argued that EPA could not grant a waiver unless and until we could make an affirmative finding that the basic market demand could be satisfied in all States eligible to adopt and enforce the California standards under section 177. We did not agree with the commenters' interpretation of EPA's responsibilities under section 209(b). "That section authorizes me to deny California a waiver only if I have determined that California does not meet the given criteria; it does not require me in granting a waiver to consider the impacts of actions taken by other States under section 177* * *" EPA continued "The legislative history behind the Clean Air Act Amendments of 1977 [the amendments that added section 177] contains no statement to the contrary." [166] More significantly, the legislative history behind the amendments to section 209(b) specifically states that the intent of these amendments was * * * "to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, i.e. to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [167] EPA also determined that Congress already had balanced the burdens on manufacturers by selecting the language they did for section 177 and believed that such authority should not place an undue burden on the vehicle manufacturers. EPA is also guided by the District of Columbia Circuit's discussion of section 177 and section 209: "Rather than being faced with 51 different standards, as they had feared, or with only one as they had sought, manufacturers must cope with two regulatory standards under the legislative compromise embodied in section 209(a).[168]

EPA also believes it important to clarify that the record and the comments do not indicate that the CARB Board based its technological feasibility analysis, in order to determine the ability of manufacturers to meet CARB's standards within California, on the existence of any travel provisions or other regulatory provisions which may allow a manufacturer to take credit for certain ZEV sales outside of California.

Manufacturer Contentions Regarding Cost-Effectiveness

With regard to the Manufacturers' contention that CARB's ZEV regulation is not cost-effective in terms of the cost per ton of removing $CO_2$, EPA agrees with California's argument that case law clearly precludes EPA's consideration of this issue within the waiver context. Consistent with the court in *MEMA* I, the Agency has previously evaluated costs in the waiver context by looking at the actual cost of compliance in the lead time provided by the regulation, not the regulation's cost effectiveness.[169] As noted previously, EPA has clearly stated that "The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209 * * *." [170] EPA has consistently afforded deference to CARB's policy judgments and has recognized that "The structure and history of the California waiver provision clearly indicate both a Congressional intent and an EPA practice of leaving the decision on ambiguous and controversial matters of public policy to California's judgment." [171] To the extent the Manufacturers are raising general concerns regarding the cost associated with the ZEV technology and meeting applicable ZEV requirements, EPA has addressed this above.

[165] 58 FR 4166 (January 13, 1993), and LEV Decision Document at pp. 185–186. See "State and Federal Standards of Mobile Source Emissions: Published by the National Research Council, 2006 at 81, 83. "In contrast to section 209(b) in which Congress explicitly assigned EPA the role of approving waiver of federal preemption for California standards, in section 177, Congress did not assign EPA any role in approving adoption of California by other states. As EPA itself stated, 'language requiring that other States request and receive authorization from EPA is noticeable absent."

[166] See H.R. Rep. No. 95–294, 95th Cong. 1st Sess. 14, 23, 26, 207–217, 301–302, 209–311 (1977); H.R. Rep. No. 95–564, 95th Cong., 1st Sess. 156, 158, 170 (1977).

[167] 43 FR 1829 (January 12, 1978), citing H.R. Rep No. 95–294, 95th Cong., 1st Sess. 301–302 (1977).

[168] *Engine Manufacturers Association v EPA*, 88 F3d 1075, 1080 (DC Cir. 1996).

[169] 36 FR 17158 (August 31, 1971). See also 74 FR 3232744, 32775 (July 8, 2009).

[170] Id.

[171] 40 FR 23102, 23104 (May 18, 1975). See also Decision Document accompanying waiver determination in 58 FR 4166 (January 13, 1993).

**2144**   Federal Register / Vol. 78, No. 6 / Wednesday, January 9, 2013 / Notices

## Consumer Demand

With respect to the consumer demand issues raised, we note that the record, based on comment from the Manufacturers and the Dealers, is insufficient to meet the burden of proof to counter the current and projected consumer demand evidence supplied by CARB and the other commenters supporting the waiver. EPA did not receive any evidence or data from commenters to refute the projections made by CARB or other commenters. Although the Dealers maintain that CARB's point that BEV and even FCVs are being marketed today is not sufficient to demonstrate the demand for hundreds of thousands of ZEVs that will be required to be produced by 2025, the Dealers only turn to the history of the ZEV program. We believe such history is instructive. However, it does not meet the burden of proof required to demonstrate that the ZEV requirements are technologically infeasible looking forward, given the substantial amount of lead time before the standards take effect and the steps that manufacturers and dealers can take to facilitate compliance with these standards (e.g. rebates and other incentives). In addition, we note that PHEV and ZEV costs are projected to decrease as demand increases and regulatory floors are established. EPA believes CARB easily meets the historical test of whether their emission standards result in "doubling or tripling" of costs as applied in *MEMA I* noted above. EPA has heard directly from consumer groups that express confidence that demand for advance technology vehicles exists today and continues to grow. In addition to this evidence, EPA also believes that the analyses of future ZEV market potential, noted above, provide additional evidence that CARB's projections are supportable. Moreover, while marketability is an important issue for Manufacturers and Dealers, it is questionable how relevant it is to basic technological feasibility. As discussed above, there is no real question about the basic feasibility of this technology, and that the cost of each vehicle, if carried across a Manufacturer's entire sales line, is not as high as to implicate basic feasibility. That matter of how Manufacturers and Dealers choose to market these vehicles is one of market choice, as Manufacturers and Dealers attempt to maximize sales at the expense of other Manufacturers and Dealers. That the industry as a whole will experience increased costs, and that such increased costs will create marketability issues, is clear. But these are not so significant to implicate the technological feasibility of the vehicles for purposes of a waiver determination.

## Infrastructure

The Manufacturers' recommendation that EPA deny a waiver for the 2018 and later ZEV amendments is based largely on an argument surrounding lack of market demand (discussed above) and infrastructure in the section 177 states. The comments state, "* * * while California's infrastructure and consumer market may be developing to the point where at some time in the future the introduction of the number of ZEVs required under the California regulations may be feasible in that State, the same is not true of all the Section 177 States that have adopted ZEV." [172]

However, as explained above, EPA has determined in previous waiver actions that section 209(b) does not authorize the Agency to consider the impacts of actions or potential actions taken by other states under section 177 in reviewing a waiver request. CARB provided considerable evidence of state and federal efforts and programs underway to ensure that the infrastructure needed for the ZEV program in California is available. The Manufacturers and Dealers do not take issue specifically with CARB's assertions regarding the infrastructure that has been, and will be, put in place to meet these requirements in California. Therefore, based on the record before me those opposing the waiver on this basis have not met their burden of proof.

## Dealers' List of Feasibility Criteria

Lastly, EPA responds to the laundry list of requirements that the Dealers maintain is required in order for ZEVs to be marketable and thus for the ZEV regulations to be technologically feasible. The Dealers fail to provide any evidence to support their assertions nor do they refute the legal arguments and evidence otherwise in the record. For example, the Dealers fail to provide any evidence that ZEV vehicles are not as safe as the conventionally-fueled (conventional) vehicles of the same size. EPA agrees with CARB's statements that ZEV vehicles will meet the same safety requirements that conventional vehicles must meet. In any case, while EPA takes safety into consideration when examining the feasibility of emission standards, this basic feasibility does not require an examination of the relative safety of each vehicle.

With regard to performance—many ZEVs already achieve acceleration and power characteristics expected on conventional vehicles. In addition, the Dealers provide no evidence that ZEVs lack performance characteristics that are essential for basic feasibility of the vehicle. ZEVs on the market today span a wide range of performance capability. The Mitsubishi iMiEV is a small four seat electric city car.[173] Nissan's Leaf offers 5 seats and a size comparable to a Nissan Versa.[174] Tesla's Model S is a larger sedan with luxury and performance comparable to other luxury sedans. Tesla's Roadster is a high performance two-seater EV.[175] Finally, Toyota's RAV4 EV is an electric version of their popular RAV4 SUV.[176] All these vehicles are designed to compete favorably on a performance basis with conventional cars in the same class.

EPA has not historically taken into consideration the range and refueling times. Moreover, NADA does not present any evidence or data to suggest necessary ranges and refueling times deemed essential by consumers. Nor do the Dealers provide evidence that BEVs are not now, and cannot be in the lead time permitted, be manufactured in a manner to be above these necessary ranges and times. Evidence in the record suggests that many consumers average drive trips and refueling expectations are well within the capacity of current ZEV technology. EPRI analyzed a "National Household Travel Survey" that found: about 95% of daily driving is under 90 total miles; about 80% of daily driving is under 40 total miles; about 65% of daily driving is under 20 miles; and, there seems to be little variation in daily driving habits between many factors such as weekday/ weekend, seasons, rural/urban, income, etc.[177]

EPA also notes that additional lead time is abundant, from nine to twelve years for the 2022–2025 timeframe for further developments to technology that can reasonably be expected.

### c. Conclusion on Technological Feasibility

After its review of the information in this proceeding, EPA has determined that the industry opponents have not met the burden of producing the evidence necessary for EPA to find that California's LEV III/GHG standards and ZEV emission standards (as finalized on

---

[172] Manufacturers comment at 13.

[173] http://www.mitsubishicars.com/MMNA/jsp/imiev/12/trims.do.

[174] http://www.nissanusa.com/leaf-electric-car/key-features.

[175] http://www.teslamotors.com/goelectric#.

[176] http://www.toyota.com/rav4ev/specs.html.

[177] EPRI: Transportation Statistics Analysis for Electric Transportation, Technical Update EPRI #1021848, Dec 2011.

December 6, 2012) are not consistent with Section 202(a).

## 5. Consistency of Certification Test Procedures

CARB notes that the test procedures for certifying ZEVs, AT PZEVs, and PZEVs are contained in the ZEV and LEV Standards and Test Procedures incorporated by reference in section 1962.1(h) and 1962.2(h) and are largely un-amended by the 2012 ZEV rulemaking. The federal Tier 2 regulations require manufacturers to measure emissions from ZEVs in accordance with the California test procedures. Accordingly there are no inconsistencies between the federal and California test procedures that would preclude a manufacturer from conducting one set of tests to demonstrate compliance with federal and California certification requirements. EPA has received no adverse comment or evidence of test procedure inconsistency and therefore we cannot deny the waiver on this basis.

## 6. Relevance of the Energy Policy and Conservation Act (EPCA) to the Waiver Decision

EPA received comment from the Dealers that CARB's waiver request for its GHG emission standards should be denied because CARB's standards are in direct conflict with EPCA. The Dealers note "EPCA expressly preempts state GHG emission standards because such laws relate to fuel economy standards." [178]

As EPA has stated on numerous occasions, section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein, and EPA has refrained from denying California's requests for waivers based on any other criteria. Where the Court of Appeals for the District of Columbia Circuit has

[178] Dealers at 10.

reviewed EPA decisions declining to deny waiver requests based on criteria not found in section 209(b), the court has upheld and agreed with EPA's determination.[179]

Evaluation of whether California's GHG standards are preempted, either explicitly or implicitly, under EPCA, is not among the criteria listed under section 209(b). EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria. In considering California's request for a waiver, I therefore have not considered whether California's standards are preempted under EPCA. As in previous waiver decisions, the decision on whether to grant the waiver is based solely on the criteria in section 209(b) of the Clean Air Act and this decision does not attempt to interpret or apply EPCA or any other statutory provision.

## VI. Decision

The Administrator has delegated the authority to grant California section 209(b) waivers of preemption to the Assistant Administrator for Air and Radiation. After review of the information submitted by CARB and other parties to this Docket, I find that those opposing the waiver request have not met the burden of demonstrating that California's regulations do not satisfy one or more of the three statutory criteria of section 209(b). For this reason, I am granting California's waiver request to enforce its ACC emission regulations, including the "deemed to comply" rule for GHG emissions. EPA also determines that CARB's amendments to the ZEV program as they affect 2017 and prior MYs are within the scope of previous waivers of preemption granted to California for its ZEV regulations. In the alternative, EPA's waiver of preemption for CARB's ACC

[179] See Motor and Equipment Manufacturers Ass'n v. Nichols, 142 F.3d 449, 462–63, 466–67 (DC Cir. 1998), MEMA I at 1111, 1114–20.

regulations includes a waiver of preemption for CARB's ZEV amendments as they affect all MYs, including 2017 and prior MYs.

My decision will affect not only persons in California but also persons outside the State who would need to comply with California's GHG emission regulations. For this reason, I hereby determine and find that this is a final action of national applicability.

Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeals for the District of Columbia Circuit. Petitions for review must be filed by March 11, 2013. Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

## VII. Statutory and Executive Order Reviews

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, the Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3).

Dated: December 27, 2012.

**Gina McCarthy,**

*Assistant Administrator, Office of Air and Radiation.*

[FR Doc. 2013–00181 Filed 1–8–13; 8:45 am]
**BILLING CODE 6560–50–P**

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 149 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 1 of 9

# Exhibit E

(Page 148 of Total)



EC03927

# OFFICE OF POLICY AND REGULATORY MANAGEMENT

WASHINGTON, D.C. 20460

**June 12, 2026**

**TO:** The Honorable Mike Johnson
Speaker of the House of Representatives
The Capitol, H-209
Washington, D.C. 20515

**FROM:** U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW 1803A
Washington, DC 20460

Dear Speaker,

EPA is submitting the following final rules "to each House of the Congress and to the Comptroller General," for their review under 5 U.S.C. 801(a).

We have also enclosed the required report that incorporates a concise general statement relating to the document. The report also indicates EPA's compliance with relevant statutes and executive orders, as applicable.

If you have any questions regarding this submission, please feel free to contact me at 202-564-8497.

Sincerely yours,

Melissa Kramer
Acting Branch Chief
Regulatory Management Branch

Enclosures

OFFICIAL COMMUNICATION
Received On

JUN 16 2026

in the Office of the
President of the Senate

**TITLE(S) OF DOCUMENTS:**

1. (8927-2) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles
2. (9325-01-OAR) - California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision
3. (9768-1) - California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years
4. (10890-02-OAR) - California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision

(Page 150 of Total)



**DOCUMENT FOR CONGRESSIONAL REVIEW UNDER THE SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT OF 1996**

**Date of Document**: June 12, 2026

1. **Name of Agency:** U.S. Environmental Protection Agency

2. **Office:** Office of Policy

3. **Action Title:** California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision

4. **Concise, General Statement of the Document:** In the rule

5. **Other Unique Identifier:** 10890-02-OAR

6. **This rule is a:** Final Rule

7. **Statutory Authorization:** Section 209 of the Clean Air Act

8. **Major Rule under CRA:** N/A

9. **Proposed Effective Date**: N/A

   **Compliant with 5 U.S.C. §801(a)(3)(A)**: N/A

   A. **Cost/Benefit Analysis Prepared**: N/A

   B. **Certification under 5 U.S.C. §605(b):** N/A

      **Preparation of FRFA under 5 U.S.C. §604(a):** N/A

   C. **Written Statement under §202 of the Unfunded Mandates Reform Act:** N/A

   D. **Public Comments Solicited:** Yes; 88 FR 33143 (May 23, 2023).

   E. **Information Collection under the Paperwork Reduction Act:** No

   F. **Discussion of Executive Order 12866:** Yes

      **Discussion of Executive Order 13132:** No

      **Other Executive Order or Administrative Statute requirements:** No

10. **GAO Database Modernization Act of 2023:** N/A

under TSCA finalized in May 2024 (89 FR 37028; May 3, 2024).

Between release of the draft risk evaluation and finalization of the DIDP risk evaluation, EPA updated the risk determination to find that six COUs contribute to unreasonable risk of DIDP based on new information identified by EPA, information provided by public commenters, and recommendations of the SACC. These changes stem from consideration of 1) multiple factors impacting occupational exposure during spray application, 2) applicability of developmental effects to average adult workers, and 3) identification of DIDP-containing products that could be spray applied. The COUs that EPA identified as presenting unreasonable risk were for acute exposure scenarios in which unprotected female workers of reproductive age were to spray adhesives and sealants; paints and coatings; lacquers, stains, varnishes, and floor finishes; or penetrants and inspection fluids that contain DIDP, because doing so could create high concentrations of DIDP in mist that an unprotected worker could inhale. The human health hazard that EPA identified as having the strongest evidence to support this risk evaluation is developmental toxicity, which means that laboratory animals dosed with DIDP had litters where more rodent offspring died than was the case with the litters of rodents that were not dosed with DIDP. As the most sensitive health effects of concern relate to exposure of the developing fetus during gestation, the population to which this risk determination is most relevant is female workers of reproductive age.

Consistent with the statutory requirements of TSCA section 6(a), EPA will propose a risk management regulatory action to the extent necessary so that DIDP no longer presents an unreasonable risk. EPA expects to focus its risk management action on the conditions of use that significantly contribute to the unreasonable risk. However, it should be noted that, under TSCA section 6(a), EPA is not limited to regulating the specific activities found to drive unreasonable risk and may select from among a suite of risk management requirements in section 6(a) related to manufacture (including import), processing, distribution in commerce, commercial use, and disposal as part of its regulatory options to address the unreasonable risk. As a general example, EPA may regulate upstream activities (*e.g.*, processing, distribution in commerce) to address downstream activities (*e.g.*, industrial and commercial uses) driving unreasonable risk, even if the upstream

activities do not drive the unreasonable risk. Like the prioritization and risk evaluation processes, there is an opportunity for public comment on any proposed risk management actions.

For more information about the TSCA risk evaluation process for existing chemicals, go to *https://www.epa.gov/assessing-and-managing-chemicals-under-tsca*.

## IV. References

The following is a listing of the documents that are specifically referenced in this document. The docket includes these documents and other information considered by EPA, including documents that are referenced within the documents that are included in the docket, even if the referenced document is not physically located in the docket. For assistance in locating these other documents, please consult the person listed under **FOR FURTHER INFORMATION CONTACT**.

1. EPA. Di-isodecyl Phthalate (DIDP); Manufacturer Request for Risk Evaluation Under the Toxic Substances Control Act (TSCA); Notice of Availability and Request for Comments. **Federal Register**. 84 FR 42914, August 19, 2019 (FRL–9998–26).
2. EPA. Di-isodecyl Phthalate (DIDP); Draft Scope of the Risk Evaluation to be Conducted Under the Toxic Substances Control Act (TSCA); Notice of Availability and Request for Comments. **Federal Register**. 85 FR 76077, November 27, 2020 (FRL–10017–14).
3. EPA. Di-isodecyl Phthalate (DIDP); Final Scope of the Risk Evaluation To Be Conducted Under the Toxic Substances Control Act (TSCA); Notice of Availability. **Federal Register**. 86 FR 48695, August 31, 2021 (FRL–8807–01–OCSPP).
4. EPA. Di-isodecyl Phthalate (DIDP) and Di-isononyl Phthalate (DINP); Science Advisory Committee on Chemicals (SACC) Peer Review of Draft Documents; Notice of SACC Meeting; Availability; and Request for Comment. **Federal Register**. 89 FR 43847, May 20, 2024 (FRL–11760–02–OCSPP).
5. EPA. Nontechnical Summary of the TSCA Risk Evaluation for Diisodecyl Phthalate (DIDP). December 2024. (EPA Document ID No. EPA–740–S–24–008).
6. EPA. Comment Summary and Responses for Diisodecyl Phthalate (DIDP) and Diisononyl Phthalate (DINP). December 2024.

*Authority:* 15 U.S.C. 2601 *et seq.*

Dated: December 20, 2024.

**Michal Freedhoff,**

*Assistant Administrator, Office of Chemical Safety and Pollution Prevention.*

[FR Doc. 2024–31280 Filed 1–3–25; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2023–0151; FRL–10890–02–OAR]

## California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency ("EPA") is providing notice of its decision granting the California Air Resources Board's ("CARB's") request for an authorization of amendments to its small off-road engine ("SORE") regulations. CARB's amendments covered by this authorization include those adopted by CARB in 2016 and 2021. EPA's decision was issued under the authority of section 209 of the Clean Air Act ("CAA" or "Act").

**DATES:** Petitions for review must be filed by March 7, 2025.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2023–0151. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m. to 4:30 p.m.; generally, it is open Monday through Friday, except Federal holidays. The electronic mail (email) address for the EPA Docket is: *a-and-r-Docket@epa.gov*. An electronic version of the public docket is available through the Federal government's electronic public docket and comment system. You may access EPA dockets at *http://www.regulations.gov*. After opening the *www.regulations.gov* website, enter EPA–HQ–OAR–2023–0151 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information ("CBI") or other information whose disclosure is restricted by statute.

EPA's Office of Transportation and Air Quality ("OTAQ") maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are

cited in this notice; the page can be accessed at: *https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.*

**FOR FURTHER INFORMATION CONTACT:** Michael Olechiw, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, Michigan 48105. Telephone: 734–214–4297. Email: *California-Waivers-and-Authorizations@epa.gov.*

**SUPPLEMENTARY INFORMATION:** On May 23, 2023, EPA published a **Federal Register** notice announcing its receipt of CARB's authorization request. In that notice, EPA invited public comment on California's authorization request and an opportunity to present testimony at a public hearing.[1] EPA held a public hearing on June 27, 2023, and the written comment period closed on July 28, 2023.[2] EPA has considered all comments submitted to the public docket on this matter.

On December 19, 2024, I signed a Decision Document granting California an authorization pursuant to section 209(e)(2)(A) of the CAA, as amended, 42 U.S.C. 7543(e)(2)(A), for CARB's 2016 and 2021 amendments to CARB's SORE regulations (the "2016 SORE Amendments" and "2021 SORE Amendments" respectively).[3] The 2016 SORE Amendments incorporate improvements to evaporative emissions certification procedures, revise the compliance testing procedure, update the evaporative emissions certification test fuel to represent commercially available gasoline, and align aspects of the SORE requirements with the corresponding federal requirements, while retaining elements of the evaporative emission standards previously adopted by CARB. The 2021 SORE Amendments primarily establish exhaust and evaporative emission standards and associated test procedures for 2024 and subsequent model year engines and equipment. The

2021 SORE Amendments establish SORE emission standards in two phases. First, the exhaust emission standards for most 2024 and subsequent model year ("MY") SORE are zero (0.00 grams per kilowatt-hour) for hydrocarbons and oxides of nitrogen. The evaporative emission standards for most 2024 and subsequent MY SORE are zero (0.00 grams per test). The above-mentioned emission standards apply for all categories of SORE except pressure washer engines with displacements greater than or equal to 225 cubic centimeters (cc) and portable generator engines. The emission standards for these latter categories of engines are amended and start in MY 2024; they are not zero but are numerically lower (more stringent) than the pre-MY 2024 CARB emission standards. The second phase of the emissions standards will be implemented beginning in MY 2028, when the exhaust and evaporative emission standards for engines used in pressure washers with displacements greater than or equal to 225 cc and portable generators will be aligned with the zero emission standards for other categories of SORE. A comprehensive description of California's SORE amendments can be found in the Decision Document for this authorization and in materials submitted to the Docket by CARB.[4]

CAA section 209(e)(1) permanently preempts any state, or political subdivision thereof, from adopting or attempting to enforce any standard or other requirement relating to the control of emissions for certain new nonroad engines or vehicles.[5] For all other nonroad engines (including "non-new" engines), states generally are preempted from adopting and enforcing standards and other requirements relating to the control of emissions, except that CAA section 209(e)(2)(A) requires EPA, after notice and opportunity for public hearing, to authorize California to adopt and enforce such regulations unless EPA makes one of three enumerated findings. Specifically, EPA must deny the authorization if the Administrator finds that (1) California's protectiveness determination (*i.e.*, that California standards will be, in the aggregate, as protective of public health and welfare as applicable federal standards) is

arbitrary and capricious, (2) California does not need such standards to meet compelling and extraordinary conditions, or (3) the California standards and accompanying enforcement procedures are not consistent with section 209 of the Act.

On July 20, 1994, EPA promulgated a rule (the 1994 rule) interpreting the three criteria set forth in CAA section 209(e)(2)(A) that EPA must consider before granting any California authorization request for nonroad engine or vehicle emission standards.[6] EPA revised these regulations in 1997.[7] As stated in the preamble to the 1994 rule, EPA has interpreted the consistency inquiry under the third criterion, outlined above and set forth in section 209(e)(2)(A)(iii), to require, at minimum, that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) of the Act.[8] In order to be consistent with section 209(a), California's nonroad standards and enforcement procedures must not apply to new motor vehicles or new motor vehicle engines. To be consistent with section 209(e)(1), California's nonroad standards and enforcement procedures must not attempt to regulate engine categories that are permanently preempted from state regulation. To determine consistency with section 209(b)(1)(C), EPA typically reviews nonroad authorization requests under the same "consistency" criteria that are applied to motor vehicle waiver requests under CAA section 209(b)(1)(C). That section provides that the Administrator shall not grant California a motor vehicle waiver if the Administrator finds that California "standards and accompanying enforcement procedures are not consistent with section 202(a)" of the Act.

CARB determined that these standards and accompanying enforcement procedures do not cause California's standards, in the aggregate, to be less protective to public health and welfare than the applicable Federal standards. The administrative record, including information presented to me by parties opposing California's

[1] 88 FR 33143 (May 23, 2023).

[2] A transcript of the public hearing is located at EPA–HQ–OAR–2023–0151–0007 and all written comments are also located at *regulations.gov* at EPA–HQ–OAR–2023–0151.

[3] EPA's Decision Document can be found at EPA–HQ–OAR–2023–0151. EPA's authorization decision includes the entire 2016 amendment and 2021 amendment regulatory text that can be found in CARB's December 20, 2022, authorization request (the SORE Authorization Support Document) found at EPA–HQ–OAR–2023–0151–0003. (CARB's entire authorization submission to EPA is found at EPA–HQ–OAR–2023–0151). The specific regulatory provisions under EPA's authorization consideration and included in this decision can be found at footnotes 1 and 2 to the SORE Authorization Support Document.

[4] The Decision Document can be found at EPA–HQ–OAR–2023–0151.

[5] States are expressly preempted from adopting or attempting to enforce any standard or other requirement relating to the control of emissions from new nonroad engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower. Such express preemption under CAA section 209(e)(1) also applies to new locomotives or new engines used in locomotives.

[6] See "Air Pollution Control; Preemption of State Regulation for Nonroad Engine and Vehicle Standards," 59 FR 36969 (July 20, 1994).

[7] See "Control of Air Pollution: Emission Standards for New Nonroad Compression-Ignition Engines at or Above 37 Kilowatts; Preemption of State Regulation for Nonroad Engine and Vehicle Standards; Amendments to Rules," 62 FR 67733 (December 30, 1997). The applicable regulations are now found in 40 CFR part 1074, subpart B, Part 1074.

[8] EPA has interpreted section 209(b)(1)(C) in the context of section 209(b) motor vehicle waivers.

authorization request, did not demonstrate that California arbitrarily or capriciously reached this protectiveness determination. Therefore, based on the record, I cannot find California's determination to be arbitrary and capricious under section 209(e)(2)(A)(i).

CARB has demonstrated the existence of compelling and extraordinary conditions justifying the need for such State standards. The administrative record, including information presented to me by parties opposing California's authorization request, did not demonstrate that California does not need such State standards to meet compelling and extraordinary conditions. Thus, based on the record, I cannot deny the authorization based on section 209(e)(2)(A)(ii).

CARB has submitted information that its emission standards and test procedures are consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) of the Act. The administrative record, including information presented to me by parties opposing California's authorization request, did not satisfy the burden of persuading EPA that the standards are not consistent with section 209. Thus, based on the record, I cannot deny the authorization based on section 209(e)(2)(A)(iii).

Accordingly, I hereby granted the authorization requested by California.

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. Petitions for review must be filed by March 7, 2025.

As with past authorization decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3).

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2024–31123 Filed 1–3–25; 8:45 am]
**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2023–0292; FRL–11010–02–OAR]

### California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency ("EPA") is providing notice of its decision granting the California Air Resources Board's ("CARB's") request for a waiver of Clean Air Act preemption for its Advanced Clean Cars II ("ACC II") regulations. EPA's decision was issued under the authority of the Clean Air Act ("CAA" or "Act") section 209.

**DATES:** Petitions for review must be filed by March 7, 2025.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2023–0292. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m. to 4:30 p.m.; generally, it is open Monday through Friday, except Federal holidays. The electronic mail (email) address for the EPA Docket Center is: *a-and-r-Docket@epa.gov*. An electronic version of the public docket is available through the Federal government's electronic public docket and comment system. You may access EPA dockets at *http://www.regulations.gov*. After opening the *www.regulations.gov* website, enter EPA–HQ–OAR–2023–0292 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information ("CBI") or other information whose disclosure is restricted by statute.

EPA's Office of Transportation and Air Quality ("OTAQ") maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in this notice; the page can be accessed at: *https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.*

**FOR FURTHER INFORMATION CONTACT:**
Michael Olechiw, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 2000 Traverwood Drive, Ann Arbor, MI 48105. Telephone: 734–214–4297. Email: *California-Waivers-and-Authorizations@epa.gov.*

**SUPPLEMENTARY INFORMATION:** On December 26, 2023, EPA published a **Federal Register** notice announcing its receipt of CARB's waiver request. In that notice, EPA invited public comment on California's waiver request and an opportunity to present testimony at a public hearing.[1] EPA held a public hearing on January 10, 2024, and the written comment period closed on February 27, 2024.[2] EPA has considered all comments submitted to the public docket on this matter.

On December 17, 2024, I signed a Decision Document granting California a waiver of preemption pursuant to section 209(b) of the CAA, as amended, 42 U.S.C. 7543(b), for regulations applicable to new 2026 and subsequent model year (MY) California on-road light- and medium-duty vehicles, hereafter the Advanced Clean Cars II ("ACC II") regulations.[3] The ACC II program includes a series of requirements regarding California's low emission vehicle ("LEV") IV regulation and a series of requirements regarding its zero-emission vehicle ("ZEV") program.[4] The LEV IV requirements include, for example, applying exhaust and evaporative emission fleet-average standards solely to vehicles powered by internal combustion engines and excluding ZEVs from the fleet calculation. The LEV IV requirements reduce the maximum allowed exhaust and evaporative emission rates from

---

[1] 88 FR 88908 (December 26, 2023).

[2] A transcript of the public hearing is located at EPA–HQ–OAR–2023–0292–0056 and all written comments are also located at *regulations.gov* at EPA–HQ–OAR–2023–0292.

[3] EPA's Decision Document can be found at EPA–HQ–OAR–2023–0292. In addition to the Decision Document, EPA prepared a Supplemental Response to Comments document that is also part of the Administrator's waiver decision. The Supplemental Response to Comments document can also be found at EPA–HQ–OAR–2023–0292.

[4] EPA's waiver decision includes the entire ACC II regulatory text that can be found in Attachment 7 to CARB's May 22, 2023, ACC II waiver request (the ACC II Waiver Support Document) found at EPA–HQ–OAR–2023–0292–0034. (CARB's entire waiver submission to EPA is found at EPA–HQ–OAR–2023–0292). The specific regulatory provisions under EPA's waiver consideration can be found at footnote 36 to the ACC II Waiver Support Document.

# Exhibit F

(1) has heard with profound sorrow and deep regret the announcement of the death of Kyle Thomas Busch; and

(2) respectfully requests that the Secretary of the Senate communicate this resolution to the House of Representatives.

The message also announced that the Senate has agreed to without amendment a concurrent resolution of the House of the following title:

H. Con. Res. 109. Concurrent Resolution allowing Emancipation Hall to be used for a ceremony to dedicate the Semiquincentennial Congressional Time Capsule on Wednesday, June 24, 2026.

The message also announced that the Senate has passed a bill of the following title in which the concurrence of the House is requested:

S. 4822. An act to prohibit the National Science Foundation from using Federal funds to descope or decommission the Ocean Observatories Initiative instruments.

The message also announced that pursuant to Public Law 110–315, the Chair, on behalf of the President pro tempore, upon the recommendation of the Majority Leader, announces the appointment of the following individual to be a member of the National Advisory Committee on Institutional Quality and Integrity:

Jeffrey Scott Stroup of Oklahoma.

The message also announced that pursuant to 10 U.S.C. 9355(a), as amended by Public Law 118–159, the Chair, on behalf of the Majority Leader, appoints the following Senator to the Board of Visitors of the U.S. Air Force Academy:

The Senator from South Dakota (Mr. ROUNDS) (Appropriations).

————

## ADJOURNMENT

The SPEAKER pro tempore. Pursuant to clause 13 of rule I, the House stands adjourned until noon on Monday next.

Thereupon (at 10 o'clock and 2 minutes a.m.), under its previous order, the House adjourned until Monday, June 22, 2026, at noon.

————

## EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XIV, executive communications were taken from the Speaker's table and referred as follows:

EC–3816. A letter from the Administrator, Agricultural Marketing Service, Fair Trade Practices Program, Department of Agriculture, transmitting the Department's final rule — Poultry Grower Payment Systems and Capital Improvement Systems; Delay of Effective Date [Doc. No.: AMS-FTPP-22-0046] (RIN: 0581-AE54) received June 3, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Agriculture.

EC–3817. A letter from the Acting Branch Chief, Regulatory Management Branch, Environmental Protection Agency, transmitting the Agency's notice — California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles [FRL-8927-2] received June 11, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

EC–3818. A letter from the Acting Branch Chief, Regulatory Management Branch, Environmental Protection Agency, transmitting the Agency's notice of decision — California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption [EPA-HQ-OAR-2021-0257; FRL-9325-01-OAR] received June 11, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

EC–3819. A letter from the Acting Branch Chief, Regulatory Management Branch, Environmental Protection Agency, transmitting the Agency's notice — California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years [FRL-9768-1] received June 11, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

EC–3820. A letter from the Acting Branch Chief, Regulatory Management Branch, Environmental Protection Agency, transmitting the Agency's notice of decision — California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision [EPA-HQ-OAR-2023-0151; FRL-10890-02-OAR] received June 11, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

EC–3821. A letter from the Director, Office of Congressional Affairs, Office of the Chief Financial Officer, Nuclear Regulatory Commission, transmitting the Commission's Major final rule — Fee Schedules; Fee Recovery for Fiscal Year 2026 [NRC-2023-0212] (RIN: 3150-AL12) received June 11, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Energy and Commerce.

EC–3822. A letter from the Director, Office of Personnel Management, transmitting the Office's report titled, ''Physicians' Comparability Allowance Program'' for Fiscal Year 2025, pursuant to 5 U.S.C. 5948(j); Public Law 103-114, Sec. 2(a); (107 Stat. 1116); to the Committee on Oversight and Government Reform.

EC–3823. A letter from the Chairwoman, Board of Governors, United States Postal Service, transmitting the Board's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3824. A letter from the Secretary, Department of Agriculture, transmitting the Department's Semiannual Report to Congress, of the Office of Inspector General, covering the six-month period that ended on March 31, 2026; ; to the Committee on Oversight and Government Reform.

EC–3825. A letter from the Acting Secretary, Department of Labor, transmitting the Department's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3826. A letter from the Deputy Secretary, Department of War, transmitting the Department's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3827. A letter from the Deputy Assistant Secretary, Office of Legislative Affairs, Department of the Treasury, transmitting the Department's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3828. A letter from the Director, Congressional, Legislative and Intergovernmental Affairs, Federal Election Commission, transmitting the Commission's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3829. A letter from the Administrator, General Services Administration, transmitting the Administration's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3830. A letter from the Director, Office of Personnel Management, transmitting the Office's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026, pursuant to Section 5 of the Inspector General Act; to the Committee on Oversight and Government Reform.

EC–3831. A letter from the Acting Secretary of Labor and Chair of the Board, Pension Benefit Guaranty Corporation, transmitting the Semiannual Report to Congress by the Office of Inspector General of the Pension Benefit Guaranty Corporation, and the response by PBGC Management; to the Committee on Oversight and Government Reform.

EC–3832. A letter from the Chairman, Railroad Retirement Board, transmitting the Board's Semiannual Report to Congress, of the Office of Inspector General, covering the period from October 1, 2025, through March 31, 2026; to the Committee on Oversight and Government Reform.

EC–3833. A letter from the Division Chief, Office of Regulatory Affairs, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice, transmitting the Department's final rule — Implementing PATRIOT Act Improvements: Contraband Cigarettes and Smokeless Tobacco [ATF No.: 2006R-1F] (RIN: 1140-AA31) received June 3, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on the Judiciary.

EC–3834. A letter from the Manager, Legal Litigation and Support, AGC-010, FAA, Department of Transportation, transmitting the Department's final rule — Airworthiness Directives; Airbus Helicopters [Docket No. FAA-2026-2283; Project Identifier MCAI-2026-00077-R; Amendment 39-23362; AD 2026-11-01] (RIN: 2120-AA64) received June 8, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Transportation and Infrastructure.

EC–3835. A letter from the Manager, Legal Litigation and Support, AGC-010, FAA, Department of Transportation, transmitting the Department's final rule — Airworthiness Directives; Airbus Helicopters [Docket No.: FAA-2026-1337; Project Identifier MCAI-2025-01289-R; Amendment 39-23363; AD 2026-11-02] (RIN: 2120-AA64) received June 8, 2026, pursuant to 5 U.S.C. 801(a)(1)(A); Public Law 104-121, Sec. 251; (110 Stat. 868); to the Committee on Transportation and Infrastructure.

EC–3836. A letter from the Manager, Legal Litigation and Support, AGC-010, FAA, Department of Transportation, transmitting the Department's final rule — Airworthiness Directives; Airbus Helicopters Deutschland GmbH Helicopters [Docket No.: FAA-2025-

# Exhibit G

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 161 of 162

**S2892**    USCA Case #26-1218    CONGRESSIONAL RECORD — SENATE    Document #2187882    Filed: 08/11/2026    Page 2 of 3    *June 17, 2026*

connections across communities that will endure for generations.

My thoughts are with Jim's wife Marian, his family, friends, and all those mourning his loss. We honor Jim Shee's life of service and celebrate the lasting impact he had on Arizona and its people.●

## MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Mr. Hanley, one of his secretaries.

## EXECUTIVE MESSAGES REFERRED

In executive session the Presiding Officer laid before the Senate messages from the President of the United States submitting sundry nominations which were referred to the Committee on Armed Services.

(The messages received today are printed at the end of the Senate proceedings.)

## MEASURES PLACED ON THE CALENDAR

The following bill was read the first and second times by unanimous consent, and placed on the calendar:

H.R. 2481. An act to require online dating service providers to provide fraud ban notifications to online dating service members, and for other purposes.

## EXECUTIVE AND OTHER COMMUNICATIONS

The following communications were laid before the Senate, together with accompanying papers, reports, and documents, and were referred as indicated:

EC–3902. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled "Semiannual Jackson-Vanik Compliance Report for Certain Independent States" received in the Office of the President pro tempore; to the Committee on Foreign Relations.

EC–3903. A communication from the Regulations Coordinator, Food and Drug Administration, Department of Health and Human Services, transmitting, pursuant to law, the report of a rule entitled "Amendment and Revocation of Organizational Information Regulations" (RIN0910–AJ24) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Health, Education, Labor, and Pensions.

EC–3904. A communication from the Assistant Secretary for Legislation, Department of Health and Human Services, transmitting, pursuant to law, a report entitled "National Maternal Mental Health Hotline Fiscal Year 2025"; to the Committee on Health, Education, Labor, and Pensions.

EC–3905. A communication from the Assistant Secretary for Legislation, Department of Health and Human Services, transmitting, pursuant to law, a report entitled "Fiscal Year 2025 Annual Progress Report on the C.W. Bill Young Cell Transplantation Program and National Cord Blood Inventory Program"; to the Committee on Health, Education, Labor, and Pensions.

EC–3906. A communication from the Secretary of Energy, transmitting, proposed leg-islation to amend the Atomic Energy Defense Act to extend the authority to accept, retain, and use external and international contributions to the Department of Energy's National Nuclear Security Administration's Office of Counterterrorism and Counterproliferation; to the Committee on Armed Services.

EC–3907. A communication from the Secretary of Energy, transmitting, proposed legislation to amend the John S. McCain National Defense Authorization Act for Fiscal Year 2019 to facilitate the goal to eliminate all cesium-137-based blood irradiators in the United States by December 31, 2027; to the Committee on Armed Services.

EC–3908. A communication from the Secretary of Energy, transmitting, proposed legislation to amend the Atomic Energy Defense Act to increase the threshold for the Department of Energy's requirement to receive specific authorization for construction design funds to the congressional defense committees from $5 million to $10 million; to the Committee on Armed Services.

EC–3909. A communication from the Chief of Staff of the Peace Corps, transmitting, pursuant to law, the Office of Inspector General's Semiannual Report for the period of October 1, 2025 through March 31, 2026 received in the Office of the President pro tempore; to the Committee on Homeland Security and Governmental Affairs.

EC–3910. A communication from the Chair of the Equal Employment Opportunity Commission, transmitting, pursuant to law, the Commission's Semiannual Report of the Inspector General and the Semiannual Management Report for the period from October 1, 2025 through March 31, 2026; to the Committee on Homeland Security and Governmental Affairs.

EC–3911. A communication from the Chief of Staff of the Peace Corps, transmitting, pursuant to law, the Office of Inspector General's Semiannual Report for the period of October 1, 2025 through March 31, 2026; to the Committee on Homeland Security and Governmental Affairs.

EC–3912. A communication from the Acting Branch Chief of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Pydiflumetofen; Pesticide Tolerances" (FRL No. 13308–01–OCSPP) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Agriculture, Nutrition, and Forestry.

EC–3913. A communication from the Acting Branch Chief of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Sodium Nitrate in Pesticide Formulations; Exemption from the Requirement of a Tolerance" (FRL No. 13292–01–OCSPP) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Agriculture, Nutrition, and Forestry.

EC–3914. A communication from the Deputy Associate Director of Offshore Regulatory Programs, Bureau of Safety and Environmental Enforcement, Department of the Interior, transmitting, pursuant to law, the report of a rule entitled "Oil and Gas and Sulfur Operations in the Outer Continental Shelf-Documents Incorporated by Reference" (RIN1014–AA51) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Energy and Natural Resources.

EC–3915. A communication from the Secretary of Energy, transmitting, proposed legislation to amend the American Medical Isotopes Production Act of 2012 to eliminate requirements for annual public workshops and reviews of the Department of Energy's National Nuclear Security Administration's molybdenum-99 programs by the Nuclear Science Advisory Committee; to the Committee on Energy and Natural Resources.

EC–3916. A communication from the Chair, Medicaid and CHIP Payment and Access Commission, transmitting, pursuant to law, a report entitled "Report to Congress on Medicaid and CHIP; June 2026"; to the Committee on Finance.

EC–3917. A communication from the Regulations Coordinator, Centers for Medicare and Medicaid Services, Department of Health and Human Services, transmitting, pursuant to law, the report of a rule entitled "Medicaid Program; Strengthening Oversight of Accrediting Organizations (AOs) and Preventing AO Conflicts of Interest, and Related Provisions" (RIN0938–AU88) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Finance.

EC–3918. A communication from the Acting Branch Supervisor of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Finding of Failure to Attain the 2006 24-Hour PM2.5 Standards; California; San Joaquin Valley; Error Correction" (FRL No. 13247–02–R9) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3919. A communication from the Acting Branch Supervisor of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Air Plan Approval; Connecticut; Ozone Ambient Air Quality Standard and Adhesive and Sealants Regulation Revisions" (FRL No. 13029–02–R1) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3920. A communication from the Acting Branch Supervisor of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Air Plan Approval; New York; New York Metropolitan Area Second Ten-Year Limited Maintenance Plan for the 2006 24-Hour PM2.5 Standard" (FRL No. 12788–02–R2) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3921. A communication from the Acting Branch Supervisor of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "Partial Withdrawals of Findings of Failure to Submit State Implementation Plan (SIP) Revisions to Amend Provisions Applying to Excess Emissions During Periods of Startup, Shutdown, and Malfunction" (FRL No. 12161–04–OAR) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3922. A communication from the Acting Branch Supervisor of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled "California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles" (FRL–No. 8927–2) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3923. A communication from the Branch Manager, Branch of Delisting and Foreign Species, Fish and Wildlife Service, Department of the Interior, transmitting, pursuant to law, the report of a rule entitled "Endangered and Threatened Wildlife and Plants; Removal of Northeastern Bulrush

June 17, 2026    CONGRESSIONAL RECORD — SENATE    S2893

Case 4:25-cv-04966-HSG    Document 247-1    Filed 08/12/26    Page 162 of 162
USCA Case #26-1218    Document #2187882    Filed: 08/11/2026    Page 3 of 3

From the List of Endangered and Threatened Plants'' (RIN1018–BD66) received during adjournment of the Senate in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3924. A communication from the Chairman, Nuclear Regulatory Commission, transmitting, pursuant to law, a report entitled ''Abnormal Occurrences Fiscal Year 2025''; to the Committee on Environment and Public Works.

EC–3925. A communication from the Acting Branch Chief of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled ''California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision'' (FRL No. 9325–01–OAR) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3926. A communication from the Acting Branch Chief of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled ''California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years'' (FRL No. 9768–01) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3927. A communication from the Acting Branch Chief of the Regulatory Management Division, Environmental Protection Agency, transmitting, pursuant to law, the report of a rule entitled ''California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision'' (FRL No. 10890–02–OAR) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Environment and Public Works.

EC–3928. A communication from the Paralegal of the Office of Chief Counsel, Pipeline and Hazardous Materials Safety Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Pipeline Safety: Editorial Corrections to MAOP Reconfirmation Requirement'' (RIN2137–AE72) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Commerce, Science, and Transportation.

EC–3929. A communication from the Paralegal of the Office of Chief Counsel, Pipeline and Hazardous Materials Safety Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Hazardous Materials: Streamlining Requirements for the Approval of Certain Energetic Materials'' (RIN2137–AF50) received in the Office of the President of the Senate on June 16, 2026; to the Committee on Commerce, Science, and Transportation.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. LEE, from the Committee on Energy and Natural Resources, with an amendment in the nature of a substitute:

S. 1547. A bill to amend title 54, United States Code, to reauthorize the National Parks and Public Land Legacy Restoration Fund, and for other purposes.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Ms. CANTWELL (for herself, Mr. CRUZ, Ms. BLUNT ROCHESTER, Mr. WICKER, Mr. PADILLA, and Mr. BUDD):

S. 4802. A bill to provide for the acquisition by the National Oceanic and Atmospheric Administration of aircraft for air, atmosphere, and weather reconnaissance and research missions, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. MERKLEY:

S. 4803. A bill to amend the Truth in Lending Act to include a home equity investment loan in the definition of a residential mortgage loan for the purposes of that Act, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. MERKLEY (for himself, Mr. HICKENLOOPER, and Mr. WELCH):

S. 4804. A bill to require the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation to each establish a pilot program for personal property manufactured home loan purchases; to the Committee on Banking, Housing, and Urban Affairs.

By Mrs. HYDE-SMITH (for herself, Mrs. BRITT, and Mr. KENNEDY):

S. 4805. A bill to require the United States Executive Directors at the international financial institutions to oppose certain projects involving shrimp production; to the Committee on Foreign Relations.

By Ms. LUMMIS:

S. 4806. A bill to clarify that the interconnection of large load facilities directly to facilities used for the transmission of electric energy in interstate commerce is a matter within the jurisdiction of the Federal Energy Regulatory Commission; to the Committee on Energy and Natural Resources.

By Mr. SHEEHY:

S. 4807. A bill to amend title 10, United States Code, to increase, and provide a cost-of-living adjustment with respect to, the death gratuity for families of deceased members of the Armed Forces; to the Committee on Armed Services.

By Ms. CORTEZ MASTO (for herself and Mr. MORENO):

S. 4808. A bill to amend the Federal Credit Union Act with respect to conversion modernization for privately insured credit unions; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. KAINE:

S. 4809. A bill to require the Secretary of State to develop a strategy for supporting free and fair elections in Venezuela, to impose sanctions on individuals who are complicit in gross violations of internationally recognized human rights in Venezuela, and for other purposes; to the Committee on Foreign Relations.

By Mr. KELLY (for himself and Mr. BUDD):

S. 4810. A bill to establish a grant program for education related to semiconductor manufacturing and related industries; to the Committee on Commerce, Science, and Transportation.

By Mr. PETERS (for himself and Mrs. FISCHER):

S. 4811. A bill to amend the Food Security Act of 1985 to include Indian Tribes in certain provisions relating to priority resource concerns; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. PADILLA (for himself, Mr. CURTIS, Mr. BOOZMAN, Mr. CRAPO, Mr. KELLY, Mr. MERKLEY, Mr. SCHIFF, and Mr. SHEEHY):

S. 4812. A bill to require the Administrator of the Environmental Protection Agency to modify regulations with respect to drinking water State revolving funds, and for other purposes; to the Committee on Environment and Public Works.

By Mr. TILLIS:

S. 4813. A bill to authorize leases of up to 99 years for land held in trust for federally recognized Indian Tribes; to the Committee on Indian Affairs.

By Mr. MARKEY (for himself, Ms. BLUNT ROCHESTER, Mr. SCHUMER, Ms. WARREN, Mr. KIM, Mr. COONS, Mr. VAN HOLLEN, Mr. BOOKER, Ms. ALSOBROOKS, Mr. WARNOCK, Mr. WELCH, Mrs. MURRAY, Mr. KING, Ms. DUCKWORTH, Mrs. GILLIBRAND, Mr. REED, Mr. WHITEHOUSE, Ms. HIRONO, and Mr. BENNET):

S. 4814. A bill to require the Secretary of Homeland Security to designate Haiti for temporary protected status; to the Committee on the Judiciary.

By Mrs. FISCHER (for herself and Mr. RICKETTS):

S. 4815. A bill to permanently extend the pilot program of the Department of Veterans Affairs on acceptance by the Department of donated facilities and related improvements and to authorize acceptance of donations of construction services, minor construction or nonrecurring maintenance projects, and targeted contributions, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. MURPHY (for himself and Mrs. GILLIBRAND):

S. 4816. A bill to amend title XX of the Social Security Act to authorize grants and training to support area agencies on aging and other community-based organizations in addressing social isolation among older individuals and adults with disabilities; to the Committee on Finance.

By Mrs. MURRAY (for herself, Ms. DUCKWORTH, Mr. FETTERMAN, Mr. MARKEY, Mr. MURPHY, Mr. PADILLA, Mr. REED, Mr. SANDERS, Ms. SMITH, Ms. WARREN, and Mr. WYDEN):

S. 4817. A bill to strengthen protections against child labor violations, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. MURPHY:

S. 4818. A bill to establish the Office of Social Connection Policy, to establish a national strategy on social connection, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. WHITEHOUSE (for himself, Mr. HAWLEY, Ms. KLOBUCHAR, Mr. KING, Mr. SCHIFF, Mr. COONS, Mr. BLUMENTHAL, Mr. KELLY, Mr. BENNET, and Mrs. SHAHEEN):

S. 4819. A bill to amend title 23, United States Code, to establish an EMS and First Responder Wellness Grant Program, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Ms. ALSOBROOKS (for herself and Mr. MCCORMICK):

S. 4820. A bill to amend the Export-Import Bank Act of 1945 to codify and expand the Regional Export Promotion Program of the Export-Import Bank of the United States; to the Committee on Banking, Housing, and Urban Affairs.

By Mrs. MOODY:

S. 4821. A bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to authorize the use of funds under the Edward Byrne Memorial Justice Assistance Grant Program to establish elder justice task forces, and for other purposes; to the Committee on the Judiciary.

By Ms. MURKOWSKI (for herself, Mr. SULLIVAN, Ms. CANTWELL, Mr. WYDEN,